**WEILAND GOLDEN GOODRICH LLP**
Jeffrey I. Golden, State Bar No. 133040
jgolden@wgllp.com
Faye Rasch, State Bar No. 253838
fayer@rasch.law
Ryan W. Beall, State Bar No. 313774
rbeall@wgllp.com
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Telephone      714-966-1000
Facsimile      714-966-1002

Attorneys for Chapter 7 Trustee
Thomas H. Casey

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SANTA ANA DIVISION

| | |
|---|---|
| In re | Case No. 8:16-bk-12589-SC |
| ANDREA STEINMANN DOWNS, | Chapter 7 |
| Debtor. | Adv. No. 8:18-ap-01168-SC |
| THOMAS H. CASEY, Chapter 7 Trustee for the bankruptcy estate of Andrea Steinmann Downs,<br><br>Plaintiff,<br><br>v.<br><br>LORA RAE STEINMANN, HEINZ H. STEINMANN, ERIC STEINMANN, MARY (SYPKENS) STEINMANN, JOHN STEINMANN, TESSIE (STAPLETON) STEINMANN, KATY (BELKNAP) STEINMANN, HEINZ STEINMANN, JEFF STEINMANN, TOM STEINMANN, AND SUSIE (WILSON) STEINMANN,<br><br>Defendants. | **CHAPTER 7 TRUSTEE'S OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS UNDER RULE 9011 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF THOMAS H. CASEY AND JEFFREY I. GOLDEN IN SUPPORT THEREOF**<br><br>**DATE:** September 2, 2021<br>**TIME:** 11:00 A.M.<br>**CTRM:** 5C (In Person)<br>411 West Fourth Street<br>Santa Ana, CA  92701 |

*Weiland Golden Goodrich LLP*
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1336845.1

OPPOSITION

1

**TABLE OF CONTENTS**

2

**Page**

3    I.    INTRODUCTION ................................................................................................. 2

4    II.    STATEMENT OF FACTS .................................................................................. 5

5        A.    Bankruptcy Case Background ................................................................ 6

6        B.    Adversary Proceeding Relevant Background ........................................ 6

7            1.    The Trustee's Diligence and Investigation into the Alleged
8                Causes of Action ........................................................................ 6

9            2.    The Steinmanns' Motions to Dismiss ......................................... 8

10           3.    Sanctions Levied Against Lora Steinmann ................................. 9

11           4.    The Creditors' Motion to Intervene in the Adversary
12               Proceeding ................................................................................. 10

13           5.    Service and Filing of 9011 Motion .......................................... 10

    III.    LEGAL ANALYSIS ........................................................................................ 11

14       A.    FRBP 9011 Standard ........................................................................... 11

15       B.    The Trustee Did Not Violate FRBP 9011(b)(1) or (b)(2) .................... 14

16           1.    The Complaint Was Not Filed for an "Improper Purpose" ....... 14

17           2.    The Claims Alleged in the Complaint Were Not Frivolous ...... 15

18               a.    The Trustee's Reasonable and Competent Inquiry ....... 15

19               b.    The Causes of Action Alleged in the Complaint Were
20                   Not Frivolous Arguments ............................................. 16

21                   (1)    Kosmala v. Cook (In re Cook) ........................... 19

22       C.    Monetary Sanctions Against a Represented Party Can Issue From a
             Finding of Frivolousness Only ............................................................ 19

23       D.    The Steinmanns are Estopped from Arguing the Causes of Action in
24           the Complaint are Frivolous ................................................................ 20

25       E.    The Stenimanns Are Not Entitled to Super Priority Administrative
             Claim .................................................................................................... 22

26       F.    There is Insufficient Evidence to Support the Motion ......................... 23

27    IV.    CONCLUSION ................................................................................................. 23

28

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

## Cases

4

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990).................................................................................... 14

5

*DeStefano v. Twentieth Century Fox Film Corp.*,
    111 F.3d 123 (2d Cir. 1997) ........................................................................ 16

6

*Holgate v. Baldwin*,
    425 F.3d 671 (9th Cir. 2005) .................................................................. 21, 22

7

8

*Hudson v. Moore Business Forms, Inc.*,
    836 F.2d 1156, (9th Cir. 1986) .................................................................... 13

9

*In re Brooks-Hamilton*,
    400 B.R. 238 (9th Cir. 2009) ....................................................................... 14

10

11

*In re Cook*,
    2008 Bankr. LEXIS 4728 (9th Cir. BAP 2008)............................................ 19

12

*In re Flashcom, Inc.*,
    503 B.R. 99 (C.D. Cal. 2013) ...................................................................... 14

13

14

*In re Grantham Bros.*,
    922 F.2d 1438 (9th Cir. 1991) .................................................................... 13

15

*In re Keegan Management Co., Securities Litigation*,
    78 F.3d 431 (9th Cir. 1996) ........................................................................ 12

16

17

*In re Lawrence*,
    494 B.R. 534 (Bankr. E.D. Cal. 2013)............................................... 14, 19, 20

18

*In re Quiones*,
    543 B.R. 638 (Bankr. N.D. Cal. 2015) ........................................................ 21

19

20

*In re Radakovich*,
    2014 WL 4676009 (9th Cir. BAP. 2014) ................................................ 15, 18

21

*In re Seunghwan Jeon*,
    2020 WL 3048195 (9th Cir. BAP 2020) ...................................................... 19

22

23

*In re Theokary*,
    2012 WL 3717967 (Bankr. E.D. Pa. 2012) ................................................. 16

24

*In re Villa Madrid*,
    110 B.R. 919 (9th Cir. BAP 1990) .............................................................. 13

25

26

*In re Vizconde*,
    715 Fed.Appx. 630 (9th Cir. 2017)............................................................. 12

27

28

*Kadjevich v. Kadjevich (In re Kadjevich)*,

## TABLE OF AUTHORITIES (cont.)

**Page(s)**

220 F.3d 1016 (9th Cir. 2000) ........................................................ 22

*Matter of Yagman,*
796 F.2d 1165 (9th Cir. 1986) ................................................. 17, 21

*Operating Eng'rs Pension Trust v. A-C Company,*
859 F.2d 1336 (9th Cir. 1988) ................................................. 12, 13

*Phillips v. Gilman (In re Gilman),*
836 Fed.Appx. 511 (9th Cir. 2020) ................................................ 21

*Ridder v. City of Springfield,*
109 F.3d 288 (6th Cir. 1997) ........................................................ 21

*Roth v. Green,*
466 F.3d 1179 (10th Cir. 2006) ..................................................... 21

*Strom v. United States,*
641 F.3d 1051 (9th Cir. 2011) ...................................................... 13

*Townsend v. Holman Consulting Corp.,*
914 F.2d 1136 (9th Cir. 1990) (reversed on other grounds) ........................ 13, 14

*Townsend v. Holman Consulting Corp.,*
929 F.2d 1358 (9th Cir. 1990) ................................................. 14, 15

*Zaldivar v. City of Los Angeles,*
780 F.2d 823 (9th Cir. 1986) ........................................................ 14

**Statutes**

11 U.S.C. § 364 ........................................................................ 22

11 U.S.C. § 503 ........................................................................ 23

11 U.S.C. § 503(b)(1)(A) ............................................................... 22

11 U.S.C. § 510 ........................................................................ 22

11 U.S.C. § 544 ........................................................................ 16

11 U.S.C. § 726 ........................................................................ 22

**Other Authorities**

Federal Rule of Bankruptcy Procedure 9011 .............................................. 12

**Rules**

Fed. R. Civ. P. 11 ........................................................ 12, 13, 16, 17, 21

1

## TABLE OF AUTHORITIES (cont.)

2

**Page(s)**

3

Fed. R. Bankr. P. 9011(c)(2)(A) .............................................................................. 14, 20

4

Fed. R. Bankr. P. 9011(c) ............................................................................................ 12

5

Fed. R. Bankr. P. 9011(b)(2) ................................................................. 13, 14, 19, 20

6

Fed. R. Bankr. P. 9011(b)(1) ....................................................................................... 14

7

Fed. R. Bankr. P. 9011(b) ........................................................................................... 12

8

Fed. R. Bank. P. 9011 ......................................................... 12, 13, 14, 15, 16, 18, 19, 23

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **TO THE HONORABLE SCOTT C. CLARKSON, MOVANTS AND THEIR ATTORNEYS,**

2  **AND ALL OTHER INTERESTED PARTIES:**

3       Thomas H. Casey, the duly appointed, qualified and acting Chapter 7 trustee ("Trustee")

4  for the bankruptcy estate ("Estate") of Andrea Steinmann Downs ("Debtor") hereby submits the

5  following *Opposition* ("Opposition") *to the Motion for Sanctions Under Rule 9011 of the Federal*

6  *Rules of Bankruptcy Procedure* ("9011 Motion") filed by Defendants Lora Rae Steinmann, Heinz

7  H. Steinmann, Eric Steinmann, Susanna Steinmann Wilson, Thomas Steinmann, John Steinmann,

8  Mary Steinmann Sypkens, Teresa Steinmann Stapleton, Kay Steinmann Belknap, Jeff Steinmann,

9  and Heinz J. Steinmann (collectively, the "Steinmanns") in connection with the above captioned

10 adversary proceeding ("Adversary Proceeding").  (Adv. Dkt. No. 316[1]).  In support of its

11 Opposition, the Trustee submits the following memorandum of points and authorities and the

12 declarations of Jeffrey I. Golden ("Golden Declaration") and Thomas H. Casey ("Casey

13 Declaration) and respectfully states as follows:

14 I.   **INTRODUCTION**

15      The 9011 Motion should be denied as meritless and untimely.  The 9011 Motion asserts that

16 sanctions should be awarded because the Complaint (defined herein) is frivolous and legally

17 unwarranted.  Given the Trustee counsel's good faith belief, based upon the investigation

18 conducted, the filing and pursuit Complaint cannot constitute a basis for an award of sanctions

19 pursuant to Federal Rule of Bankruptcy Procedure 9011 ("Rule 9011").  Accordingly, the Trustee

20 should not be sanctioned under Rule 9011.

21      Furthermore, the Steinmanns' 9011 Motion is extremely untimely.  The purpose of Rule

22 9011 is judicial economy; encouraging the voluntary dismissal of an arguably flawed complaint

23 promptly after the filing of the complaint, before the court and the parties invest significant

24 resources in the litigation.  In stark contrast, the Steinmanns' 9011 Motion was not even served

25 until very near the end of a two year long Adversary Proceeding, and not filed until months after

26

27 ─────────────────────

28      [1] "Adv. Dkt." refers to the docket of the above-captioned adversary proceeding and "Bk. Dkt." refers to the docket
of the above-captioned bankruptcy proceeding.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  the Adversary Proceeding was concluded; long after the Steinmanns failed to prevail on their

2  motions to dismiss, failed to prevail on their appeal to the Ninth Circuit Bankruptcy Appellate

3  Panel ("BAP") of the order denying their motions to dismiss, participated in multiple mediations,

4  and actively litigated the Adversary Proceeding for two years.  The Steinmanns did not bring the

5  9011 Motion early in the litigation, when Rule 9011's purpose could have been achieved, in light

6  of the predecessor Court's denial of their motions to dismiss and the perception that such a

7  sanctions motion would not be well received. Instead, they waited for years, until the case was

8  reassigned and the present Court signaled to the parties its views regarding the theories being

9  pursued by the Trustee through the Complaint, before seeking to use Rule 9011 as a punitive vessel

10  against the Trustee and the Creditors, rather than a deterrence.  The service of the 9011 Motion

11  years after the Complaint was filed, and then actually filing the 9011 Motion months after the

12  Complaint has already been dismissed cannot possibly serve the purpose of Rule 9011.

13      The history of the Adversary Proceeding makes clear that the Trustee did not violate Rule

14  9011(b)(1)[2] or (b)(2).  The Complaint survived multiple challenges before the predecessor Court

15  and the BAP, and the predecessor Court rejected this very same argument by the Steinmanns, that

16  the causes of action in the Complaint are objectively frivolous, thereby effectively barring any

17  award of Rule 9011 sanctions.

18      First, in January 2019, after extensive briefing and multiple hearings, the predecessor Court

19  denied the Steinmanns' Rule 12(b)(6) Motions to Dismiss the Adversary Complaint. The legal

20  effect of a denial of a motion to dismiss establishes both the cognizability and plausibility of the

21  claims alleged in the Complaint.

22      Second, in April 2019, the BAP denied the Steinmanns' requests for interlocutory review

23  and reversal of the Court's orders, refusing to hear the Steinmanns' appeal of the interlocutory

24  orders of the predecessor Court denying their Motions to Dismiss.  See Adv. Dkt. Nos. 117, 118.

25

26  _____

27  [2] Although the 9011 Motion concludes that the Trustee and Creditors have violated Rule 9011(b)(1) by filing the
Complaint for an improper purpose, the motion does not specifically allege any improper purpose beyond the causes of
action in the Complaint being frivolous.  The 9011 Motion also seeks sanctions against the Estate in the form of a super

28  priority administrative claim and the Creditors, while citing no basis or authority for such an extraordinary remedy.

1336845.1                                    3                                    OPPOSITION

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    Third, after the predecessor Court's orders denying the Steinmanns' Motions to Dismiss,

2    and the BAP's denial of the Steinmanns' appeal of the same orders, the Creditors sought in

3    December 2019 to intervene and join in the prosecution of the Complaint over the Steinmanns'

4    opposition. The Steinmanns' opposition to such intervention motion was predicated upon the

5    argument, once again, that the Complaint contained no causes of action upon which relief could be

6    granted. The predecessor Court entered an Order partially granting the Creditors' motion to

7    intervene, and held that the claims alleged in the Complaint "exist[ed] under some substantive

8    law."  See Adv. Dkt. No. 135; and Adv. Dkt. No. 145.

9    Fourth, in response to yet another attempted argument by the Steinmanns that the

10    Complaint was legally deficient and that relief could not be granted upon the causes of action

11    alleged in the Complaint, the predecessor Court (i) rejected the Steinmanns' efforts to avoid

12    discovery regarding whether assets of significant value (including assets held in the Revocable

13    Trust before the Debtor was purportedly disinherited by her parents) were being held, concealed

14    and used and applied for the intended benefit of the Debtor pursuant to an alleged undisclosed trust

15    arrangement among the Debtor and the Defendants, and whether any such assets constituted

16    bankruptcy estate property, (ii) compelled the Steinmanns to participate in discovery, and (iii)

17    sanctioned Lora Steinmann for her discovery abuses in previously failing to participate in the

18    discovery process in good faith. *See* Bk. Dkt. Nos. 632, 634, 711-712, 728.

19    Further, the 9011 Motion does not contain evidence or claims of bad faith by the Trustee to

20    show that the Complaint was filed for an improper purpose.  Rather, it merely asserts that the

21    Complaint was filed for an improper purpose because, once again, the Steinmanns argue that the

22    claims asserted in the Complaint are frivolous.  Indeed, the Steinmanns themselves acknowledged

23    that the Adversary Proceeding contained the "novel" issue of, *inter alia*, whether the FDCPA could

24    be utilized by a trustee to recover avoidable transfers.

25    Prior to the filing of the Complaint, the Trustee's counsel made reasonable and competent

26    inquiry into the facts and claims alleged in the Complaint and the relationship between the Debtor

27    and the Steinmanns.  The predecessor Court's recognition of the tenability of the claims asserted in

28    the Complaint is manifest from its multiple denials of the Steinmanns arguments to the contrary.

1  The present Court's dismissal of the Complaint following the predecessor Court's repeated rulings

2  denying dismissal of the Complaint does not render the Complaint frivolous, unwarranted, or in

3  bad faith.

4         Curiously, the 9011 Motion seeks sanctions in the unprecedented form of a "super-priority"

5  administrative claim against the Estate, while citing no legal authority or other basis for such an

6  extraordinary remedy.  The 9011 Motion provides no evidence or authority that sanctions pursuant

7  to the 9011 Motion should be allowed against the Estate as a "super-priority" administrative claim.

8         Generally, under Federal Rule of Civil Procedure 11, as found by many courts to be an

9  analogue to Rule 9011, monetary awards to proponents of Rule 9011 motions are strongly

10 disfavored on the ground that fee awards create an inappropriate financial incentive to file Rule

11 9011 motions.  (Advisory Notes to 1993 Amendment of Rule 11).  Regarding the amount of any

12 sanctions, "[a] sanction imposed for violation of this Rule **shall be limited to what is sufficient to**

13 **deter repetition of such conduct** or comparable conduct by others similarly situated". Fed. R.

14 Bankr. P. 9011(c)(2) (emphasis added).  The Trustee was acting in good faith with no malicious

15 intent in connection with the filing and pursuit of the Complaint and any allegedly improper

16 conduct by the Trustee was not: (i) part of a pattern of activity by the Trustee; (ii) intended to injure

17 or (iii) engaged in by the Trustee in other litigation; all factors to be considered when determining

18 whether to award monetary sanctions.  Here, there is no need to impose any monetary sanctions.

19        As a result, the Trustee requests the Court deny the 9011 Motion in its entirety.

20 **II.    STATEMENT OF FACTS**

21        **A.     Bankruptcy Case Background**

22        On June 19, 2016, the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy

23 Code (the "Bankruptcy Case").  (Bk. Dkt. No. 1).  On September 7, 2018, the Court converted the

24 Bankruptcy Case into a Chapter 7 proceeding due to the Debtor's obstructionism, resulting in the

25 appointment of Thomas H. Casey as Trustee.  (Bk. Dkt. Nos. 267, 292-293).

26        **B.     Adversary Proceeding Relevant Background**

27        On September 6, 2018, the Trustee initiated the Adversary Proceeding by filing a complaint

28 against the Debtor's parents revocable trust's ("Revocable Trust") trustees and beneficiaries (1) to

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1   avoid and recover fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A), 544(b) and 550; (2)

2   for imposition of a resulting trust; (3) for declaratory relief; (4) for preservation of the transfer for

3   the benefit of the estate; and (5) for attorneys' fees and costs in an effort to avoid, and recover for

4   the benefit of the Estate, the transfer of the Debtor's interest in the Revocable Trust ("Complaint").

5   (Adv. Dkt. No. 1).  At the deposition of Lora Steinmann, a settlor of the Revocable Trust, Lora

6   admitted that Debtor was strategically disinherited to prevent any trust funds falling into the hands

7   of Debtor's creditors. (Adv. Dkt. No. 1; Exhibit 1 at pp. 47:8-16; Exhibit 2 at pp. 71:8-10, 72:23-

8   25, 73:10-15; Exhibit 3 at pp. 67:16-68:5; *see* Golden Declaration).

9
10
         **1.     The Trustee's Diligence and Investigation into the Alleged Causes of
Action**

11         Prior to the filing of the Complaint and by way of example the Trustee's counsel conducted

12   significant due diligence with respect to the claims asserted in the Complaint. The Trustee's

13   counsel conducted extensive investigation and legal research regarding: (i) the Revocable Trust, the

14   elimination of the Debtor's interest in the Revocable Trust, and the apparent continued use of

15   family assets to support the Debtor's lifestyle, (ii) the nuances of, and interplay between, FDCPA

16   and bankruptcy law, (iii) resulting trusts, and (iv) analysis of a litigation in which members of the

17   Trustee's counsel's firm had previously litigated a resulting trust claim through trial. In addition,

18   the Trustee's counsel (i) interviewed Tim Downs regarding relevant facts and information on the

19   Debtor and her family, (ii) strategized with other counsel to further analyze the potential claims and

20   develop a strategy to effectively pursue his claims, (iii) reviewed the deposition testimony of

21   family members of the Debtor, the Debtor's petition, schedules, statements of financial affairs,

22   341(a) testimony and 2004 examinations, and (iv) conducted other investigation of people and

23   documents.  That investigation evidenced a reasonable likelihood that an agreement existed

24   between the Debtor and the Debtor's family to safeguard and retain assets for the benefit of the

25   Debtor to be provided to her at a later time.

26         The Debtor was neither forthcoming nor honest with the Trustee in her § 341 meeting of

27   creditors. For example, at the Debtor's July 29, 2016, § 341 meeting of creditors, the Debtor

28   specifically stated that she was not the beneficiary of any trusts.  Exhibit 4 pp. 65:4-6. *See* Golden

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

Declaration. Afterwards, the Trustee through counsel discovered that another trust existed in which the Debtor had an interest as a beneficiary. *See* Golden Declaration.  Furthermore, the Debtor did not disclose any interest in any trusts in her filed Schedules A/B or Statement of Financial Affairs. Exhibit 5, *see* Golden Declaration; Bk. Dkt. Nos. 43, 207.

Throughout the litigation, the Steinmanns took active and repeated actions to thwart the Trustee's access to relevant documents and deposition testimony.  For example, both the depositions of Lora Steinmann and Eric Steinmann required the intervention of the predecessor Court to combat the incessant obstruction by the Steinmanns. Indeed, the predecessor Court took the exceptional step of requiring Eric Steinmann to appear *in court, before the predecessor Court,* for his deposition.  At the hearing on the Motion for Entry of Order Compelling Testimony of Lora Steinmann, held on December 17, 2019, the Court expressed significant frustration at the delay regarding discovery:

THE COURT: "Well, I have a question. What's going on with Eric's exam? I mean, I know you want documents. I mean, I'm fed up, frankly. I want to order here, for the exam to take place here in this courtroom, and he is to bring documents. He seems to be the lynchpin here, and I'm tired of this game." Exhibit 6, pp. 13:2-7, *See* Golden Declaration.

THE COURT: "Well, what if I just say, he has to be here by a date certain, we're going to do it here in the courtroom, and he is to bring documents? I'm just, I want to short-circuit this." *Id*. pp. 13:15-18.

THE COURT: "This is just, it's such a game with them." *Id*. pp. 13:20-21.

THE COURT: "-- because I don't believe it will happen. And then they'll say, delay, delay." *Id*. pp. 14:10-11.

THE COURT: "I want there to be some teeth here. I was just -- I mean, Eric needs to come here. I'm just so tired of this. He's in the background actively doing things. He needs to be here." *Id*. pp. 15:10-13..

THE COURT: "And my -- I'm not holding my breath for him to give up any docs, really I'm not. All right. I'm open to suggestions. I'm going to let Mr. Hays – I'm just tried, Mr. Hays, of these people.  I'm really tired.  I understand they don't like being sued, but the Trustee has an obligation here, and we need answers to questions.  Is there a side deal here?

What – you know, she was cut out of the trust right before she filed bankruptcy, right after a major judgment.  Yeah, there seems to be some coordination if you just look at the surface.  But since we're getting no cooperation from them whatsoever--." *Id*. pp. 15:25-16:1.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    THE COURT: -- "you would think if there wasn't anything, we would be getting

2    cooperation.  *Id.* pp. 16:3-4.

3    The Court ultimately sanctioned Lora Steinmann for her discovery abuses, and rejected her

4    arguments that she need not cooperate with discovery since the Complaint did not state valid

5    claims for relief[3].

6    **2.    The Steinmanns' Motions to Dismiss**

7    On or about November 8 and November 9, 2018, the Steinmanns (divided into several

8    groupings) filed two motions to dismiss the Complaint ("Motions to Dismiss") (Adv. Dkt. Nos. 25,

9    27). The Motions to Dismiss argued that the Complaint had failed to state a valid claim for relief

10   under Federal Rule of Civil Procedure 12(b)(6) because (i) the Debtor lacked a legally cognizable

11   property interest in the Revocable Trust, and (ii) the Debtor's parents, settlors of the Revocable

12   Trust, were entitled to revoke the Debtor's beneficial interest, for any reason whatsoever, including

13   in strategic anticipation of the Debtor's bankruptcy filing.

14   On January 8, 2019, the predecessor Court heard the Motions to Dismiss and denied the

15   Motions to Dismiss. On January 15, 2019, the Court entered orders denying the Motions to Dismiss

16   (Adv. Dkt. Nos. 49, 50).

17   Thereafter, the Steinmanns sought leave from the BAP to appeal the interlocutory orders

18   denying their Motions to Dismiss (Adv. Dkt. Nos. 58, 60)[4]. The Steinmanns requested the Court

19   stay its Motion to Dismiss Orders pending the BAP's resolution of the requested appeal arguing

20   that the Motion to Dismiss Orders implicated "a brand new issue of law" in a "pretty unique case."

21   Exhibit 8, pp. 3:2-10, 42:12-14, *see* Golden Declaration. The BAP denied the Steinmanns' request

22   and dismissed the appeals (Adv Dkt. Nos. 117, 118).

23   **3.    Sanctions Levied Against Lora Steinmann**

24   On January 15, 2019, the Trustee filed Motions for Orders under Federal Rule of

25   Bankruptcy Procedure 2004 ("Rule 2004 Motions") seeking testimony and information from Eric

26

27   ───────────────

[3] The predecessor Court's discovery sanctions of Lora Steinmann are discussed below.

28   [4] *Lora Rae Steinmann, et al. v. Thomas H. Casey*, BAP Nos. CC-19-1020, CC-19-1021 (B.A.P. 9th Cir.).

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1   Steinmann (the Debtor's brother), Lora Steinmann (the Debtor's mother), and Heinz H. Steinmann

2   (the Debtor's father) ("2004 Defendants") (Bk. Dkt. Nos. 498, 502). In response to the Rule 2004

3   Motions, the 2004 Defendants sought protective orders to avoid having to provide the requested

4   information (Bk. Dkt. Nos. 545-546).

5        The predecessor Court granted the Rule 2004 Motions and denied the 2004 Defendants'

6   requests for protective orders, ordering Eric and Lora Steinmann to appear and produce documents

7   in accordance with the Rule 2004 Motions. (Bk. Dkt. Nos. 632, 634, 711-712, 728).

8        On September 3, 2019, Lora Steinmann appeared for the examination and deposition

9   pursuant to the Rule 2004 Motions. At the examination, Ms. Steinmann refused to answer any

10  questions or produce any documents. In response, the Trustee and Hausman Holdings, LLC and

11  David and Pamela Moellenhoff ("Creditors") jointly moved to compel the testimony of Lora

12  Steinmann and the production of documents. (Bk. Dkt. Nos. 736, 738).

13       In response to the motions to compel, Ms. Steinmann argued that she should not have to

14  provide information or testimony because the Adversary Proceeding lacked merit and should have

15  been dismissed (even though the predecessor Court had already ruled on the Motions to Dismiss

16  and the BAP dismissed the Steinmanns' appeal of the same). (Bk. Dkt. Nos. 737, 745). The

17  predecessor Court denied Lora Steinmann's arguments regarding the tenability of the causes of

18  action alleged in the Complaint, and ordered Lora and Eric Steinmann to participate in discovery.

19  (Bk. Dkt. Nos. 759, 816). Additionally, the predecessor Court issued an order sanctioning Lora

20  Steinmann for her misconduct at the FRBP 2004 examination in response to a motion brought by

21  the Creditors. (Bk. Dkt. No. 848).

22       **4.    The Creditors' Motion to Intervene in the Adversary Proceeding**

23       On September 17, 2019, the Creditors moved to intervene in the Adversary Proceeding on

24  the grounds that they "possesse[d] a significant and concreate interest in [its] outcome [  ] by virtue

25  of their (i) status as the Debtor's largest creditors; and the  (ii) significant value of the Debtor's

26  fraudulently transferred interest in the [Revocable] Trust"; as well as because (iii) "[i]f the Debtor

27  and Steinmanns prevail[ed] in the [] Adversary Action, the Debtor's interest in the [Revocable]

28  Trust [would] remain beyond the reach of the Trustee, and the Estate [would] correspondingly be

1   denied a potentially significant asset that [could] be used to satisfy the Debtor's creditors." (the

2   "Intervention Motion")  (Adv. Dkt. No. 122 at pp. 10:10-22, 11:3-8).

3       The Steinmanns filed a joint opposition to the Intervention Motion again arguing that the

4   Creditors lacked standing due to the alleged untenability of the claims asserted in the Adversary

5   Proceeding. (Adv. Dkt. No. 135). Once more, the predecessor Court rejected such argument and

6   granted the Intervention Motion as to the second and third causes of action in the Complaint and

7   explicitly found that the Creditors had carried "the[ir] burden of showing that [those] purported

8   claims exist[ed] under some substantive law." (Adv. Dkt. No. 145 at p. 4:6-5:20).

9           **5.     Service and Filing of 9011 Motion**

10      On July 31, 2020, the Bankruptcy Case and the Adversary Proceeding were reassigned to

11  the Honorable Scott C. Clarkson following the retirement of the Honorable Catherine Bauer.  (Bk.

12  Dkt. No. 931; Adv. Dkt. No. 178).

13      Throughout the Adversary Proceeding, and prior to the incursion of significant legal fees,

14  the Trustee sought to engage in mediation with the Steinmanns to settle the Adversary Proceeding

15  and to keep fees and costs limited.  Specifically, the Trustee and Steinmanns conducted more than

16  three mediations before the Honorable Mitchell Goldberg.  The disputes by and among the parties

17  to the mediation sought a global resolution of the major issues in this case.

18      On August 12, 2020, the Trustee and the Creditors jointly filed a Motion to Extend

19  Discovery Cut-off Date arguing that the discovery deadline should be continued due in part to the

20  Trustee's and the Creditor's efforts in discovery and the difficulty in obtaining documents from the

21  Steinmanns and the recent disclosure of a second trust in which the Debtor may have an interest.

22  (Adv. Dkt. No. 183). On September 15, 2020, this Court denied the motion to extend discovery

23  without a hearing.

24      Less than 10 days later, the Steinmanns, on September 24, 2020, served the Trustee and

25  Creditors with an un-filed version of the 9011 Motion. *See* Golden Declaration.

26      One week later, on October 2, 2020, the Court set a hearing and corresponding briefing

27  schedule, *sua sponte*, to determine whether judgment should be granted in favor of the Steinmanns

28  on the pleadings in the Adversary Proceeding.  (Adv. Dkt. No. 233).

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1    On October 15, 2020, the Trustee moved to voluntarily dismiss the Complaint's first, fourth

2    and fifth causes of action.  (Adv. Dkt. No. 268).

3    On November 17, 2020, the Court entered orders (i) granting the Steinmanns' judgment on

4    the pleadings and dismissing the Complaint; and (ii) denying the Trustee's motion for voluntary

5    dismissal as procedurally improper.  (Adv. Dkt. Nos. 300, 304).

6    The next day, on November 18, 2020, the Court entered judgment in favor of the

7    Steinmanns in the Adversary Proceeding.  (Adv. Dkt. No. 304).

8    Thereafter, on March 11, 2021, the Adversary Proceeding was closed. (Adv. Dkt. No. 315).

9    On July 8, 2021, the Steinmanns filed their Motion for Sanctions Under Rule 9011 of the

10   Federal Rules of Bankruptcy Procedure to (i) dismiss the Adversary Proceeding and (ii) impose

11   monetary sanctions against the Estate and Creditors to be satisfied in the form of super-priority

12   administrative claims against the Estate. (Adv. Dkt. No. 316).

13   **III.    LEGAL ANALYSIS**

14       **A.    FRBP 9011 Standard**

15   As a preliminary matter, Rule 9011 is treated similarly to Federal Rule of Civil Procedure

16   11 ("FRCP 11"). *In re Vizconde*, 715 Fed.Appx. 630, 632 (9th Cir. 2017).

17   Federal Rule of Bankruptcy Procedure 9011 provides that

> (b) [b]y presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, –

>> (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

>> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

> (c) . . . If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

…

> (2) … A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated. Subject to the limitations in subparagraphs (A) and (B), the sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.
>
> > (A) Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2).

Fed. R. Bankr. P. 9011(b),  (c).

FRCP 11 is designed to act as a deterrent to improper conduct by counsel and seeks to impose punishment upon such counsel to achieve this goal. However, "[r]ule 11 is an extreme remedy, one to be exercised with extreme caution." *In re Keegan Management Co., Securities Litigation*, 78 F.3d 431, 436 (9th Cir. 1996) (quoting *Operating Eng'rs Pension Trust v. A-C Company*, 859 F.2d 1336, 1345 (9th Cir. 1988)).  "The rule should not be applied so as to chill an attorney's enthusiasm in pursuing factual or legal theories." *In re Villa Madrid*, 110 B.R. 919, 922 (9th Cir. BAP 1990) (internal quotations omitted). The bar to avoid violating FRCP 11 is low.  A party need only show that it made a reasonable inquiry and that there is some "plausible basis for the theories alleged." *Strom v. United States*, 641 F.3d 1051, 1059 (9th Cir. 2011). The *Strom* Court explained as follows:

> So, for example, a suit raising a novel issue of law as to which there is no caselaw to the contrary would not be subject to Rule 11 sanctions, even if it was subject to dismissal on the pleadings for failure to state a claim for relief.

*Id.*

FRCP 11 frivolousness is a minimal standard. "Rule 11 sets a low bar: It deters 'baseless filings' by requiring a 'reasonable inquiry' that there is some plausible basis for the theories alleged." *Strom*, 641 F.3d at 1059. When there is a plausible basis, even a very weak one, supporting the litigant's position, imposition of Civil Rule 11 sanctions is inappropriate. *Id.* Rule 11 should be treated as an "extraordinary remedy" that is imposed with "extreme caution." In

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

*Operating Eng'rs Pension Trust v. A-C Co.,* 859 F.2d 1336, 1344-1345 (9th Cir. 1988), the Court explained,

> Rule 11 must not be construed so as to conflict with the primary duty of an attorney to represent his or her client zealously. Forceful representation often requires that an attorney attempt to read a case or an agreement in an innovative though sensible way. Our law is constantly evolving, and effective representation sometimes compels attorneys to take the lead in that evolution. Rule 11 must not be turned into a bar to legal progress. The simple fact that an attorney's legal theory failed to persuade the district court does not demonstrate that counsel lacked the requisite good faith in attempting to advance the law.

To establish that a claim is frivolous under Rule 9011(b)(2), a party must  show such claim is " baseless and made without a reasonable and competent inquiry.'" *In re Grantham Bros.*, 922 F.2d 1438, 1443 (9th Cir. 1991) (quoting *Townsend v. Holman Consulting Corp.,* 914 F.2d 1136, 1140 (9th Cir. 1990) (reversed on other grounds)).

Moreover, Rule 9011 cannot be used, with the benefit of hindsight, as a weapon to be wielded by a party after victory before the court on the relevant issues. *Hudson v. Moore Business Forms, Inc.*, 836 F.2d 1156, 1159 (9th Cir. 1986). Pursuant to the plain text of Rule 9011, monetary sanctions may only be awarded in the case of frivolous pleadings not when a pleading has been presented for an improper purpose. *See* Fed. R. Bankr. P. 9011(c)(2)(A).

**B.    The Trustee Did Not Violate FRBP 9011(b)(1) or (b)(2)**

**1.    The Complaint Was Not Filed for an "Improper Purpose"**

A pleading is filed for an "improper purpose" if it is filed "to harass or cause unnecessary delay or needless increase in the cost of litigation." *In re Flashcom, Inc.*, 503 B.R. 99, 132 (C.D. Cal. 2013) (quoting *In re Brooks-Hamilton*, 400 B.R. 238, 252 (9th Cir. 2009)).

The 9011 Motion provides absolutely no claim or evidence of bad faith or improper conduct. Instead, the 9011 Motion, relying upon *Townsend v. Holman Consulting Corp*., 914 F.2d 1136 (9th Cir. 1990) and *Zaldivar v. City of Los Angeles*, 780 F.2d 823 (9th Cir. 1986)[5], seems to

---

[5] *Townsend* was amended and superseded by *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358 (9th Cir. 1990) and *Zaldivar* was abrogated by *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384 (1990).

1  argue that if the claims made in the Complaint were frivolous, the Complaint must have been filed

2  for an improper purpose. The case law does not support such a reading of Rule 9011. The Trustee's

3  counsel made diligent inquiry into the bases of the Complaint and brought the Adversary

4  Proceeding with the sole purpose of fulfilling his duties as a Chapter 7 Trustee to recover assets of

5  the Estate for the benefit of creditors of the Estate. Even if this Court were to decide that the causes

6  of action pled by the Trustee were insufficient or wrong (or even rise to the level of frivolousness),

7  such a finding does not necessitate a finding that the Trustee brought the Adversary Proceeding for

8  an improper purpose. There is simply no evidence or authority to suggest that the Trustee be found

9  liable for monetary sanctions for the Complaint being filed for an improper purpose.

10  **2.    The Claims Alleged in the Complaint Were Not Frivolous**

11      The causes of action pled in the Complaint were not "frivolous" as to warrant Rule 9011

12  sanctions. The Trustee's counsel performed a reasonable and competent inquiry into the causes of

13  action alleged in the Complaint, the predecessor Court ruled on the question of the viability of the

14  Complaint, and the claims themselves were not determined to be "frivolous."

15  a.    The Trustee's Reasonable and Competent Inquiry

16      Prior to filing the Adversary Proceeding, the Trustee's counsel investigated the claims, the

17  Revocable Trust, and the divestment of the Debtor's interest in the same. Legal research was

18  conducted on both claims for relief of fraudulent transfer and reach back cases as well as the

19  interplay between the FDCPA and bankruptcy law. The Trustee's counsel conducted due diligence

20  regarding information on the Debtor. The Trustee's counsel also interviewed Tim Downs regarding

21  the Debtor and her family.

22      The Trustee's counsel made a reasonable inquiry into the facts and circumstances

23  surrounding the transfer of the Debtor's interest in the Revocable Trust, and other undisclosed

24  assets of the Debtor. Based upon such inquiry, the Trustee filed the Complaint with the an objective

25  and good faith belief that an interest of the Debtor was fraudulently transferred and that assets of

26  the Debtor and/or assets held in trust by the Debtor's family for the benefit of the Debtor, were

27  concealed. *Townsend*, 929 F.2d at 1364 ("Whether a pleading is sanctionable must be based on an

28  assessment of the knowledge that reasonably could have been acquired at the time the pleading was

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1   filed."); *see In re Radakovich*, 2014 WL 4676009 (9th Cir. BAP. 2014). As a result, the Trustee's

2   filing of the Complaint was not done for an improper purpose and was predicated upon the

3   Trustee's reasonable and competent inquiry into the causes of action alleged in the Complaint.

4             b.       The Causes of Action Alleged in the Complaint Were Not Frivolous

5                      Arguments

6             The Complaint alleged that for the purpose of thwarting the Debtor's creditors, the

7   Steinmanns extinguished the Debtor's interest in the Revocable Trust.  The Trustee's specific legal

8   theories were then expressly detailed in various pleadings including his oppositions to the Motions

9   to Dismiss (Adv. Dkt. No. 39), Exhibit 8, *see* Golden Declaration. Specifically, the Trustee alleged

10  that the transfer of the Debtor's interest in the Revocable Trust represented a fraudulent transfer

11  pursuant to § 544 because the transfer was completed with the intent to hinder, delay, and defraud

12  creditors and the Debtor had an interest in the Revocable Trust prior to the transfer as a result of the

13  definition of "property" as defined in the Federal Debt Collection Procedures Act ("FDCPA"). The

14  Trustee alleged that the FDCPA was the "applicable law" as contemplated in § 544. The Complaint

15  alleged that for the purpose of thwarting the Debtor's creditors, the Steinmanns extinguished the

16  Debtor's interest in the Revocable Trust.

17            In fact, no cases have been cited by the Steinmanns in which FRCP 11 or Rule 9011

18  sanctions were brought after a failed motion to dismiss. To the contrary, sanctions motions brought

19  in the wake of failed motions to dismiss necessarily fail, even where, as here, there has been a

20  change in the judge presiding over the case. *In re Theokary*, 2012 WL 3717967 (Bankr. E.D. Pa.

21  2012) ("Ordinarily, a party's continued prosecution of a claim after the court's denial of a motion

22  to dismiss will not give rise to a Rule 9011 violation. *See, e.g., DeStefano v. Twentieth Century Fox*

23  *Film Corp*., 111 F.3d 123, at *2 (2d Cir. 1997) (nonprecedential) ('counsels' reliance on a prior

24  order … denying summary judgment, despite the successor judge's statement as to her expectation

25  that she would overturn that ruling, was not so misguided as to warrant imposition of sanctions

26  under either Rule 11 or the court's inherent power')."). 

27            In the present case, it is clear that the 9011 Motion was brought only after a reassignment of

28  the Adversary Proceeding to the present Court. There is little doubt that if the Steinmanns brought

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  their 9011 Motion at the same time as their Motions to Dismiss, it would have been denied by the

2  predecessor Court.  Therefore, any granting of sanctions pursuant to the 9011 Motion would

3  necessarily be the product of hindsight or changed circumstances. Both are disqualifying for the

4  finding of frivolousness at the time of the filing of the Complaint.

5       The purpose of FRCP 11 sanctions "is to deter subsequent abuses." *Matter of Yagman*, 796

6  F.2d 1165, 1183 (9th Cir. 1986). In *Yagman*, the plaintiff appealed an award of sanctions against

7  him after trial. A successor court took over responsibility of the action one week before trial. The

8  plaintiff's complaint had survived several motions for summary judgment before the predecessor

9  court. The sanction levied by the successor court against the plaintiff, "was essentially an

10  accumulation of all perceived misconduct, from filing through trial, with a reevaluated

11  determination that it was far more serious than appeared at the time." *Id.* at 1183. While the

12  *Yagman* court does not place a restriction on determining sanctions at the end of a trial or action,

13  "in situations where a complaint or other paper is obviously and recognizably frivolous when filed,

14  or as circumstances lead the court to strongly suspect that a filed paper may not be well-grounded

15  in fact or law, the court should *at a minimum* provide notice to the certifying attorney that Rule 11

16  sanctions will be assessed at the end of trial if appropriate. This procedure administers the

17  paramount aim of deterrence and, simultaneously, eliminates the danger of an unsuspected punitive

18  award." *Id.* at 1183-84. There was never a suggestion from the Bankruptcy Court that the causes of

19  action asserted in the Complaint were not well-grounded in fact or law until more than two years

20  after the filing of the Complaint.  To the contrary, the Bankruptcy Court repeatedly found that

21  precisely the opposite was true in denying the Steinmanns' motions to dismiss, in compelling

22  discovery and sanctioning Lora Steinmann for violation of her discovery obligations, and in

23  granting Creditors' Motion to partially intervene in this case.

24       There is little doubt that the 9011 motion was served for punitive, not deterrent, reasons.

25  Clearly the Steinmanns perceived that the 9011 Motion would be better received now than earlier

26  in the Adversary Proceeding.  Prior to the present Court's involvement in the action, the

27  Steinmanns admitted that the issues in the Adversary Proceeding and alleged in the Trustee's

28  Complaint "present[ed] a question of first impression" on "whether the FDCPA can be utilized in a

16

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    bankruptcy case … to avoid the termination of a revocable beneficiary's former interest in a trust."

2    (BAP Dkt. No. 2 at p. 8:3-5). Additionally, the predecessor Court acknowledged that the Adversary

3    Proceeding implicated a "side deal" that was "coordinat[ed]" between the Debtor and family

4    members regarding the Debtor's interest in the Revocable Trust. Ex 6 at pp. 15:10-16:1, *See*

5    Golden Declaration.  The Trustee's counsel, having performed a diligent review of the facts and the

6    law, determined that the Complaint was appropriate and warranted in part due to the novel issue of

7    law regarding the Trustee's ability to utilize the FDCPA as well as factual issues regarding the

8    divestment of the Debtor's interest in the Revocable Trust.

9         The Steinmanns made the same arguments with respect to (i) their Motions to Dismiss the

10   Complaint, (ii) their responses to the predecessor Court's order to show cause regarding sanctions

11   against Lora Steinmann, and (iii) in relation to this 9011 Motion. These arguments were heard and

12   rejected by the predecessor Court multiple times. Even assuming that the predecessor Court was

13   incorrect, the Steinmanns are still required to prove that the Complaint is more than just "incorrect"

14   or fails to state a claim. Otherwise, Rule 9011 sanctions would be appropriate with respect to *every*

15   *single* successful motion to dismiss whereby a court finds that the causes of action alleged in a

16   complaint fail to state a claim.

17        The simple fact that the present Court has determined that the causes of action pled in the

18   Complaint are insufficient to warrant a judgment is not evidence of the frivolousness of such

19   arguments. The standard for a finding of frivolousness is "minimal." *In re Radakovich*, 2014 WL

20   4676009 *4-5 (9th Cir. BAP 2014) ("This minimalist approach to assessing frivolousness is no

21   accident. Rather, it is necessitated by the risk that losing argument easily can be conflated with

22   frivolous arguments."). To find that the Complaint is frivolous, in light of the orders from the

23   predecessor Court and the appellate courts regarding this specific contention made by the

24   Steinmanns for years, would have the exact chilling result that weighs against over-enforcing Rule

25   9011 sanctions. The Trustee made logical arguments regarding the ability of a chapter 7 trustee to

26   avoid a transfer of an interest of a debtor in a revocable trust. These arguments were not dismissed

27   out of hand by the predecessor Court and the Steinmanns themselves argued to the BAP that the

28   issues in the Complaint were novel. The Steinmanns knew that a Rule 9011 motion would have no

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1   chance of success for more than two years after the filing of the Complaint, and only filed the 9011

2   Motion when they believed it would be better received.  Punishing or recovering one's attorneys'

3   fees and costs from an opposing losing litigant is simply not the purpose of sanctions under Rule

4   9011. Upon the totality of the facts and circumstances, the causes of action in the Complaint were

5   not "frivolous" and therefore the Trustee has not violated Rule 9011 with respect to the filing of the

6   Complaint.

7                              (1)    Kosmala v. Cook (In re Cook)

8          The Steinmanns make much of the case titled *In re Cook*, 2008 Bankr. LEXIS 4728 (9th

9   Cir. BAP 2008) (no. CC-08-1091-HmoD) as proof that the Trustee knew that the causes of action

10  asserted in the Complaint were frivolous. In *Cook*, the debtor was a beneficiary under a revocable

11  trust, the settlors of the trust died within 180 days of the filling of the bankruptcy petition, and the

12  issue was whether a post-petition trust distribution to a debtor beneficiary qualifies for inclusion

13  in the bankruptcy estate. Ultimately, the court held that because the trust was an inter vivos trust,

14  rather than a testamentary trust, the trust distribution did not become included in the bankruptcy

15  estate. Here, the "novel" issue, as admitted by the Steinmanns, related to the ability of a chapter 7

16  trustee to utilize the FDCPA to avoid a transfer of the Debtor's interest in the Revocable Trust.

17  Furthermore, as the Court acknowledged, there was at the very least the apparent possibility of a

18  side arrangement regarding the Debtor's interest in the Revocable Trust. Although technically the

19  *Cook* case involved a revocable trust, its similarities stop there.  Furthermore, the 9011 Motion

20  seeks sanctions against the Trustee in the form of a super-priority administrative claim against the

21  Estate and the Creditors only, not from any of their respective counsel. *Cook* has no bearing on

22  whether the Trustee's causes of action in the Complaint are frivolous.

23          **C.    Monetary Sanctions Against a Represented Party Cannot Issue From a Finding**

24                  **of Frivolousness Only**

25          There is no question that a court can find that a complaint is frivolous without being filed

26  for an improper purpose.  A court need not infer improper purpose from the fact that it has found a

27  violation of FRBP 9011(b)(2). Rather, improper purpose generally refers to the harassment or

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1  causing of unnecessary delay or needless increase in cost of litigation. *In re Seunghwan Jeon*, 2020

2  WL 3048195 (9th Cir. BAP 2020).

3      "As with frivolous pleadings, whether a paper is filed for an improper purpose is tested by

4  objective standards[,]" and a court must ask whether the pleading is "harass[ing]," "cause[d]

5  unnecessary delay," or "needless[ly] increase[d] [] the cost of litigation." *G.C. & K.B. Invs., Inc. v.*

6  *Wilson*, 326 F.3d 1096, 1110 (9th Cir. 2003) (quotation marks omitted).  The Steinmanns do not

7  argue that the Trustee's filing of the Complaint was done with an improper purpose so as to engage

8  in abusive litigation for the purpose of harassment or delay.  At most, the 9011 Motion prays the

9  Court somehow infer an improper purpose from the alleged frivolousness of the Complaint,

10  contrary to the law and unsupported factually.

11      Even if the Court finds that the Complaint was frivolous, no monetary sanctions should

12  issue against any represented party pursuant to Rule 9011(c)(2)(A). The Rule 9011 Motion

13  specifically and exclusively requests sanctions against the Trustee through a super-priority

14  administrative claim against Estate, and the Creditors. Both of those entities are represented parties

15  who therefore are not subject to monetary sanctions under Rule 9011(c)(2)(A) for a violation of

16  Rule 9011(b)(2).

17  **D.**    **The Steinmanns are Estopped from Arguing the Causes of Action in the**

18      **Complaint are Frivolous**

19      The Steinmanns are estopped from now arguing the causes of action in the Complaint are

20  frivolous for at least two reasons: first, the predecessor Court ruled against the Steinmanns on their

21  Motions to Dismiss and the Steinmanns, in appealing the order, admitted to the BAP that the causes

22  of action alleged in the Complaint represented "novel" issues, and second, the timing of the filing

23  of the 9011 Motion is deficient.

24      As laid out in the previous sections, the predecessor Court ruled against the Steinmanns,

25  denying their Motions to Dismiss. Such a finding, as a matter of law, is a denial of the argument

26  that the causes of action alleged in the Complaint could not state a claim upon which relief could be

27  granted. In response to the orders denying their Motions to Dismiss, the Steinmanns attempted to

28  appeal the orders specifically admitting to the BAP that there were novel issues raised in the

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1   Complaint. To now, years later, argue that the Complaint was frivolous is clearly based upon the

2   Steinmanns' perception of the Court's view of the causes of action in the Complaint, and not upon

3   the history of the case or any actual frivolousness in the Complaint.

4        The timing of the 9011 Motion is not only fatally late, it is also quite telling. For more than

5   two years, the Steinmanns' arguments in the Adversary Proceeding fell upon deaf ears. After the

6   Complaint was filed, the Steinmanns unsuccessfully sought to dismiss the Complaint and

7   unsuccessfully sought to appeal the same. There is little mystery as to why the Steinmanns served

8   the 9011 Motion more than two years after the commencement of the Adversary Proceeding. This

9   Court signaled in its early rulings its views regarding the Adversary Proceeding and the Complaint,

10  and the Steinmanns, seizing an opportunity to strike back, served the 9011 Motion.  Now, more

11  than 7 months after serving the 9011 Motion, and only after the Adversary Proceeding was already

12  dismissed, did the Steinmanns finally file the 9011 Motion.

13        In order to achieve the goals of Rule 11 or 9011, courts "require that motions under Rule 11

14  be brought promptly after the identification of the allegedly wrongful conduct." *In re Quiones*, 543

15  B.R. 638, 648 (Bankr. N.D. Cal. 2015). Prompt action is necessary to achieve the primary purpose

16  of sanctions, which is to "deter subsequent abuses" and such purpose is not served by "tolerating

17  abuses during the course of an action and then punishing the offender after the trial is at an end."

18  *Matter of Yagman*, 796 F.2d at 1183 (citing with approval *Ridder v. City of Springfield*, 109 F.3d

19  288, 295 (6th Cir. 1997) ("By virtue of the fact that under the 1993 amendments, a Rule 11 motion

20  cannot be made unless there is some paper, claim, or contention that can be withdrawn… it follows

21  that a party cannot wait to seek sanctions until after the contention has been judicially opposed."

22  (internal citations omitted)). Courts routinely deny Rule 11 motions where, as here, a motion was

23  not filed until after the case was dismissed. *See Roth v. Green*, 466 F.3d 1179, 1193 (10th Cir.

24  2006). The 9011 Motion should be denied as having been filed after this Court ruled on the

25  Complaint. *Phillips v. Gilman (In re Gilman)*, 836 Fed.Appx. 511, 515 (9th Cir. 2020) ("Creditors

26  untimely filed their Rule 9011 Motion after the Bankruptcy Court had already ruled on 'the

27  underlying dispute[s] giving rise to' the Rule 9011 Motion.").  As a result, since the Court had

28

1336845.1

OPPOSITION

1  already dismissed of the causes of action in the Complaint and closed the Adversary Proceeding,

2  the filing of the 9011 Motion is untimely and violates the express purpose of the Rule.

3      Additionally, even if the Adversary Proceeding was still pending, the Steinmanns' long

4  delay in bringing the 9011 Motion is equally disqualifying. In *Holgate v. Baldwin*, 425 F.3d 671

5  (9th Cir. 2005), a movant seeking sanctions served a Rule 11 motion, but waited over ten months

6  before taking any action to seek sanctions. The court held that "ordinarily the motion should be

7  served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as

8  untimely… It is hard to view [movant's] service of its May 2003 motion as timely when the

9  underlying complaint was filed over a year earlier on February 7, 2002." *Id*. at 679.

10     The Steinmanns served the 9011 Motion on September 24, 2020, more than two years after

11 the commencement of the Adversary Proceeding but only ten days after this Court's order denying

12 the Motion to Extend Discovery Cut-off Date. Clearly the purpose of the 9011 Motion was not to

13 force a dismissal of the Adversary Proceeding. Indeed, the Adversary Proceeding was dismissed

14 after the Court's judgment in the action on November 17, 2020, and the Steinmanns waited another

15 seven months to file the instant 9011 Motion on July 8, 2021. The delay in service of the 9011

16 Motion until so long after the filing of the Complaint, combined with the clear purpose of the 9011

17 Motion, is disqualifying and should preclude the issuance of sanctions. Furthermore, the actual

18 filing of the 9011 Motion is tardy as there is no relief that can be granted with respect to the

19 offensive pleading which was filed more than three years ago.

20     **E.    The Steinmanns Are Not Entitled to Super Priority Administrative Claim**

21     The Steinmanns seek damages, in an unknown amount, to be allowed as an administrative

22 claim against the Estate entitled to super-priority status. The only authority cited by the Steinmanns

23 in support of such contention is *Kadjevich v. Kadjevich (In re Kadjevich)*, 220 F.3d 1016 (9th Cir.

24 2000) which held that "tort claims based on a trustee's post-petition negligence" are granted

25 "administrative-expense priority" pursuant to 11 U.S.C. § 503(b)(1)(A), which is to say the same

26 priority as other administrative expenses. Nothing in § 503(b)(1)(A) implies super-priority status.

27 Sections 364 and 726 of the Bankruptcy Code discuss potentially super-priority allowed claims,

28 yet nothing in the 9011 Motion implicates either section. Nothing in the 9011 Motion compels, or

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1   even suggests, that any sanctions levied against the Estate should be allowed as a super-priority

2   administrative claim except one sentence arguing that the Trustee and the Creditors' claims and

3   rights to payment should be subordinated by § 510. No analysis, authority, or argument is provided

4   to back up such contention. Super-priority administrative claims require a finding of administrative

5   priority under § 503.  However, a finding of administrative priority under § 503 does not compel a

6   finding of a super-priority administrative claim.  In fact, super-priority administrative claims are to

7   be paid ahead of § 503 administrative claims. The 9011 Motion does not assert any basis for the

8   granting of a super-priority administrative claim against the Estate for a violation of Rule 9011.

9            **F.       There is Insufficient Evidence to Support the Motion**

10           The 9011 Motion is noticeably devoid of any supporting evidence.  Rather, the only

11   evidence cited in the 9011 Motion are two declarations, one that attests to the Revocable Trust

12   having been amended to remove the Debtor as a named beneficiary, and one that attests to the 9011

13   Motion having been served, neither of which are denied.  Missing from the 9011 Motion is any

14   admissible evidence regarding frivolousness, improper purpose, or bad faith.[6]

15   **IV.     CONCLUSION**

16           For each of the foregoing reasons, the Trustee respectfully requests that the Court deny the

17   9011 Motion.

18

19   DATED:  August 5, 2021            WEILAND GOLDEN GOODRICH LLP

20
                                      By: _____
21                                        JEFFREY I. GOLDEN
                                          FAYE C. RASCH
22                                        Attorneys for Chapter 7 Trustee Thomas
                                          H. Casey
23

24

25

26

27   _____

28   [6] The 9011 Motion is devoid of admissible evidence and proper legal support, however the Trustee has not chosen to request sanctions based upon the 9011 Motion.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1

2

### DECLARATION OF THOMAS H. CASEY[7]

3        I, Thomas H. Casey, declare as follows:

4        1.        I am the Chapter 7 trustee for the bankruptcy estate of Andrea Steinmann Downs

5 ("Debtor").  Except as to statements based on information and belief, I know each of the following

6 facts to be true of my own personal knowledge, except as otherwise stated, and, if called as a

7 witness, I could and would competently testify with respect thereto.  I make this declaration in

8 support of the *Opposition* ("Opposition") *to the Motion for Sanctions Under Rule 9011 of the*

9 *Federal Rules of Bankruptcy Procedure* ("9011 Motion").  All capitalized terms have the same

10 meaning or definition as the capitalized terms in the Motion.

11        2.        On June 19, 2016, the Debtor filed a voluntary petition under Chapter 11 of the

12 Bankruptcy Code. On September 7, 2018, the Court converted the case to a Chapter 7 proceeding.

13 Thereafter I was appointed chapter 7 trustee of the Debtor's bankruptcy case.

14        3.        On September 6, 2018, I caused, based upon communications with counsel, to be

15 filed an adversary proceeding against the Revocable Trust's trustees and beneficiaries (1) to avoid

16 and recover fraudulent transfers pursuant to 11 U.S.C. §§ 548(a)(1)(A), 544(b) and 550; (2) for

17 imposition of a resulting trust; (3) for declaratory relief; (4) for preservation of the transfer for the

18 benefit of the estate; and (5) for attorneys' fees and costs in an effort to avoid, and recover for the

19 benefit of the Estate, the transfer of the Debtor's interest in the Revocable Trust.

20        4.        I later discovered through my counsel that the Debtor's parents had another trust, an

21 irrevocable trust, in which the Debtor has an interest.

22        5.        I had multiple conversations with counsel prior to the filing of the Complaint.

23        6.        I have never been the subject of a non-discovery sanction action as a trustee or an

24 attorney.

25

26

27

28

---

[7] All capitalized terms not defined herein shall have the meaning ascribed to them in the Opposition.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

1    7.    At all times, I was acting in my capacity as Trustee based upon the best interests of

2    the creditors and the estate.

3    8.    I believe that the litigation was not filed for any improper or a bad faith purpose and

4    in fact was filed in good faith.

5    I declare under penalty of perjury that the foregoing is true and correct.

6    Executed on this 5 day of August, 2021, at Rancho Santa Margarita, California.

8                                            THOMAS H. CASEY

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1336835.1                              24                                OPPOSITION

# DECLARATION OF JEFFREY I. GOLDEN[8]

I, Jeffrey I. Golden, declare as follows:

1.        I am an attorney at law duly licensed to practice before this Court.  I am a member of the law firm of Weiland Golden Goodrich LLP, counsel of record for Thomas H. Casey, Chapter 7 Trustee in this action.  Except as to statements based on information and belief, I know each of the following facts to be true of my own personal knowledge, except as otherwise stated, and, if called as a witness, I could and would competently testify with respect thereto.  I make this declaration in support of the *Opposition* ("Opposition") *to the Motion for Sanctions Under Rule 9011 of the Federal Rules of Bankruptcy Procedure* ("9011 Motion").  All capitalized terms have the same meaning or definition as the capitalized terms in the Motion.

2.        Prior to the filing of the Adversary Proceeding I investigated the claims and the Revocable Trust and the Debtor's interest in the same including, without limitation research regarding reach back cases as well as the interplay of the FDCPA and bankruptcy law. The investigation is summarized by way of example in the opposition attached hereto.

3.        Investigation was conducted and Tim Downs was interviewed regarding information on the Debtor and her family.

4.        The claims alleged in the Complaint were analyzed and there was investigation and research prior to filing the Complaint.

5.        The firm reviewed numerous pleadings, documents and transcripts prior to filing the Complaint.

6.        After stating that she was not a beneficiary to any trusts, I learned that the Debtor did have an interest in a previously undisclosed irrevocable trust.

7.        At all times, the firm and I believed that we were acting in good faith with respect to the causes of action alleged in the Complaint, and the filing and pursuit of the action was never

---

[8] All capitalized terms not defined herein shall have the meaning ascribed to them in the Opposition.

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    intended to be in bad faith or for an improper purpose.  In fact, it was believed that at all times the

2    Trustee and counsel were acting in the best interest of the creditors and the estate.

3         8.     The Trustee sought to settle the matter and the parties attended mediation on

4    multiple occasions.

5         9.     Neither the firm nor I have ever received a non-discovery sanction and in fact, have

6    been recognized for high standards of ethics and integrity.

7         10.     A 2004 examination of Lora Steinmann was held on July 10, 2017. Attached hereto

8    as Exhibit "1" is a true and correct copy of the transcript of the examination of Lora Steinmann

9    held on July 10, 2017.

10         11.     A 2004 examination of Lora Steinmann was held on September 3, 2019. Attached

11    hereto as Exhibit "2" is a true and correct copy of the transcript of the examination of Lora

12    Steinmann held on September 3, 2019.

13         12.     A 2004 examination of Eric Steinmann was held on January 29, 2020. Attached

14    hereto as Exhibit "3" is a true and correct copy of the transcript of the examination of Eric

15    Steinmann held on January 29, 2020.

16         13.     A § 341 meeting of creditors was held for the Debtor on July 29, 2016. Attached

17    hereto as Exhibit "4" is a true and correct copy of the transcript from the § 341 meeting of creditors

18    for the Debtor held on July 29, 2016.

19         14.     A true and correct copy of the Debtor's Statement of Financial Affairs and amended

20    Schedules A/B is attached hereto as Exhibit "5."

21         15.     A hearing was held on the Motion for Entry of Order Compelling Testimony of Lora

22    Steinmann was held on December 17, 2019. Attached hereto as Exhibit "6" is a true and correct

23    copy of the transcript of the hearing on the Motion for Entry of Order Compelling Testimony of

24    Lora Steinmann, held on December 17, 2019.

25         16.     On February 26, 2019, a hearing was held *inter alia* on the Steinmanns' request for

26    motion for stay pending appeal. Attached as Exhibit "7" is a true and correct copy of the February

27    26, 2019 hearing.

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    17.    On December 26, 2018, the Trustee filed opposition to the Steinmanns' Motions to

2  Dismiss. Adv. Dkt. No. 39. Attached as Exhibit "8" is a true and correct copy of the Trustee's

3  opposition to the Steinmanns' Motions to Dismiss.

4    I declare under penalty of perjury that the foregoing is true and correct.

5    Executed on this  5th day of August, 2021, at Costa Mesa, California.

6

7                                                    _____

8                                                    Jeffrey I. Golden

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

In re:                              )
                                    )
ANDREA S. DOWNS,                    ) CASE NO.
                                    ) 8:16-bk-12589-CB
_____)


DEPOSITION OF:   LORA STEINMANN

TAKEN ON:        July 10, 2017


37755            Amy L. Horn

                 CSR No. 7919

EXHIBIT 1  PAGE  28

1      DEPOSITION of LORA STEINMANN, was taken on behalf

2  of the Movants at 4 Park Plaza, Suite 1200, Irvine,

3  California, commencing on Monday, July 10, 2017, at the

4  hour of 10:04 a.m. before Amy L. Horn, CSR No. 7919,

5  Certified Shorthand Reporter for the State of California,

6  with principal office in the County of Los Angeles.

7

8  APPEARANCES OF COUNSEL:

9      FOR THE MOVANTS:

10       RAINES FELDMAN, LLP

          BY:  HAMID RAFATJOO, ESQ.

11       18401 Von Karman Avenue

          Suite 360

12       Irvine, California  92612

          (310)440-4100

13       hrafatjoo@rainesfeldman.com

14

      FOR THE DEBTOR:

15

       LAW OFFICES OF SHANNON GALLAGHER

16       BY:  SHANNON GALLAGHER, ESQ.

          507 East First Street

17       Suite E

          Tustin, California  92780

18       (949)955-2880

19

20      ALSO PRESENT:

21       MARY SYPKENS

       ANDREA DOWNS

22       JILL LINDSAY

23

24

25

2

1

2                              I N D E X

3   WITNESS                    EXAMINATION BY              PAGE

4   LORA STEINMANN

                               MR. RAFATJOO                04

5

6

7

8

9                          E X H I B I T S

10  A  -  Notice of Deposition                            05

11  B  -  Application for Approval of Employment of

              Bosley, Till, Neue & Talerico               12

12

    C  -  Application to Employ Brown Rudnick             16

13

    D  -  Declaration of Lora Steinmann                   18

14

15

16

17

18

19         QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

20                      PAGE     LINE

21                       50       11

                         51       09

22

23

24

25

                                                            3

EXHIBIT 1  PAGE  30

1          IRVINE, CALIFORNIA; MONDAY, JULY 10, 2017;

2                      10:04 A.M.

3                        -oOo-

4                   LORA STEINMANN,

5    having been first duly sworn, was examined and testified

6    further as follows:

7

8                      EXAMINATION

9    BY MR. RAFATJOO:

10        Q.    Thank you.  Ms. Steinmann, my name is

11   Hamid Rafatjoo, and I'm an attorney with Raines Feldman.

12   We're counsel for Hausman Holdings and David and Pamela

13   Moellenhoff in the bankruptcy case of Andrea Downs.

14             Would you please state your name for the

15   record?

16        A.    Lora Rae Steinmann.

17             MR. GALLAGHER:  Why don't you spell your

18   first name?

19             THE WITNESS:  L-o-r-a.  R-a-e.  Capital

20   S-t-e-i-n-m-a-n-n.

21   BY MR. RAFATJOO:

22        Q.    Have you had your deposition taken before?

23        A.    Yes.

24        Q.    So you know I'm going to ask you some

25   questions.  If you don't understand anything, please just

                                                         4

1  interrupt me and let me know.

2       A.    Okay.

3       Q.    Do not guess at any answers.  If you're not

4  sure, just say so.  Okay?  You do understand that you're

5  here under oath pursuant to subpoena; right?

6       A.    Yes.

7       Q.    You were supposed to produce some documents.

8  Have you seen the 2004 that was served on you?

9       A.    Yes.

10      Q.    Did you review that Exhibit A to it which

11 listed the documents you were supposed to produce?

12      A.    Yes.

13      Q.    Would you like to see it again?  We'll mark

14 this as Exhibit A.  If you go to page 9, please.

15      A.    All right.

16            (Exhibit A was marked for

17            identification.)

18            MR. GALLAGHER:  Just for the record, I didn't

19 compare them, but is Exhibit A attached to this document

20 Exhibit 1 identical to the Exhibit A that was attached to

21 the subpoena that was served on her?

22            MR. RAFATJOO:  Yes.

23            MR. GALLAGHER:  Okay.

24            THE WITNESS:  Yes, I saw these.

25            MS. DOWNS:  Did you say you're with a

5

EXHIBIT 1  PAGE  32

1  different law firm?

2          MR. RAFATJOO:  Yes, I switched firms.

3          MS. DOWNS:  I didn't realize that.  What was

4  the name of it again?

5          MR. RAFATJOO:  Raines Feldman.

6          MR. GALLAGHER:  Was it A?

7          THE COURT REPORTER:  A.

8  BY MR. RAFATJOO:

9     Q.   All right.  So let's go down that list, and

10  you can tell me what you are producing today.

11          The first document request relates to the

12  loan agreement between Andrea Downs and Mr. Steinmann,

13  and any other documents evidencing a $300,000 loan made

14  by Mr. Steinmann to the debtor.

15          Are you producing any documents relating to

16  those?

17     A.   Yes.  My attorney has all of these documents.

18     Q.   Okay.  Can I get those documents, please?

19          MR. GALLAGHER:  Well, do you want to talk

20  about the protective order and the stipulation?

21          MR. RAFATJOO:  The protective order applies

22  to the trust documents, not to these things.

23          MR. GALLAGHER:  Okay.

24          (Discussion held off the record.)

25          MR. GALLAGHER:  I'm going to hand you a

6

1   document that consists -- or a group of documents that

2   consist of one, two, three, four, five, six, seven, eight

3   pages, and these documents are responsive to both

4   categories 1 and 2 of Exhibit A.

5          MR. RAFATJOO:  We'll mark that -- we'll mark

6   these as Exhibit 1.

7          MR. GALLAGHER:  I'm fine with that.  I think

8   the first document you marked is Exhibit A, so --

9          MR. RAFATJOO:  What did I mark as Exhibit A?

10          MR. GALLAGHER:  The notice of motion that had

11   these list of documents.

12          MR. RAFATJOO:  I understand.  So category --

13   I'll just make that category 1 and 2 then responsive.

14          MR. GALLAGHER:  Whatever system you want.

15          MR. RAFATJOO:  Category 1 and 2.  So this is

16   responsive to 1 and 2, these eight pages?

17          MR. GALLAGHER:  Yes.

18          MR. RAFATJOO:  And there's no other documents

19   relating to any other loans?

20          THE WITNESS:  No.

21   BY MR. RAFATJOO:

22      Q.   We're going to skip over 3 and 4, because

23   those relate to the trust documents where we need to

24   discuss the protective order.

25          On Exhibit A, No. 5, we're asking for

7

1   documents evidencing any payments made by you or your

2   husband to the Brown Rudnick or Bosley, Till, Neue &

3   Talerico firm for legal services provided to

4   Andrea Downs.  What documents are you producing for

5   those?

6           MR. GALLAGHER:  All right.  I have another

7   set of documents.  Let me just see how many pages these

8   are.  These are 20 pages of documents that are responsive

9   to category No. 5.

10           MR. RAFATJOO:  We'll mark these 20 pages as

11   category 5.  I will note that you have stamped these

12   confidential, and we have not agreed to confidentiality

13   as to any of these documents.  We have not agreed as to

14   confidentiality to any documents relating to categories 1

15   and 2, either.  The only issue that remains is 3 and 4 as

16   to whether or not we're going to agree to a protective

17   order as to those documents; correct?

18           MR. GALLAGHER:  Well, it was my understanding

19   that we were producing documents that contained

20   confidential information of the deponent, and that you

21   agreed that you would keep that information confidential

22   and not use it for any purpose other than this

23   litigation.

24           MR. RAFATJOO:  That is an absolutely

25   incorrect statement.  We can talk about that when we get

8

EXHIBIT 1  PAGE 35

1    to categories 3 and 4.  Let's go down the list.

2    BY MR. RAFATJOO:

3        Q.    Exhibit A, No. 6.  Can you take a look at

4    that, please, Mrs. Steinmann?  Have you produced

5    documents in response to category item No. 6 on

6    Exhibit A?

7        A.    There are no documents.

8        Q.    There are no documents?

9        A.    Huh-uh.

10        Q.    Can you please look at item No. 7 on

11    Exhibit A and let me know if you're producing any

12    documents relating to those?

13        A.    There are no documents on No. 7.

14        Q.    Can you please take a look at No. 8 and let

15    me know if you're producing any documents relating to

16    No. 8?

17        A.    I think we have one.

18            MR. GALLAGHER:  We have two pages of

19    documents responsive to No. 8.

20            MR. RAFATJOO:  I will tab these category 8.

21    And I will again state that we have not agreed to

22    confidentiality as to these things, even though you have

23    stamped the bottom of the pages.

24            MR. GALLAGHER:  And for the record, I believe

25    that you have.

9

1   BY MR. RAFATJOO:

2       Q.    And can you look at No. 9 on Exhibit A?

3       A.    I have no documents on that.

4       Q.    You have no documents in response to No. 9?

5       A.    Huh-uh.

6           MR. RAFATJOO:  All right.  So let's talk

7   about categories 3 and 4 and the issues regarding the

8   protective order.

9           Before we get there, can you please identify

10  all the trust documents that are at issue here for the

11  record?

12          MR. GALLAGHER:  For categories 3 and 4,

13  there's a Declaration of Trust that consists of 11 pages.

14  An Assignment of Personal Property that consists of two

15  pages.  A First Amendment to the Steinmann Trust that

16  consists of three pages.  The will of Lora Steinmann that

17  consists of three pages, and the will of Heinz Steinmann

18  that consists of three pages.

19          MR. RAFATJOO:  Okay.  Let's discuss the

20  protective order.

21          MR. GALLAGHER:  Okay.

22          MR. RAFATJOO:  When you and I spoke initially

23  regarding the protective order, it was after the deadline

24  for filing a motion for protective order had passed.  You

25  asked me that with respect to the trust documents, to the

10

EXHIBIT 1  PAGE 37

1    extent that the names of children other than Andrea Downs

2    are in the trust, you would like to redact those names so

3    as to protect their interests.  You also requested that

4    we do not use these trust documents in the state court

5    action and they be limited to the bankruptcy court

6    action.

7         I told you that subject to reviewing the

8    stipulation and subject to the redaction of the names not

9    impacting the content of the documents, and also making

10   it clear that Andrea's children's names should remain in

11   the trust documents as well, that I would be fine with

12   reviewing a draft of the stipulation so that we could

13   move this process along, but that I would also request

14   that you would produce those documents before any

15   deposition.

16        Is that an accurate reflection of our

17   conversation?

18        MR. GALLAGHER:  No.

19        MR. RAFATJOO:  Okay.  What did you understand

20   our conversation to be?

21        MR. GALLAGHER:  Well, we'll take it up when

22   the time comes if there's an issue with it, but we're

23   here, we're producing documents on the understanding that

24   you're keeping it confidential.  So if you want to go

25   forward with it, we can go forward.

11

1          MR. RAFATJOO:  I'm not agreeing to any

2     confidentiality, because that was not part of the

3     agreement.

4          MR. GALLAGHER:  Okay.  Then I guess we can

5     take it up with the judge.

6          MR. RAFATJOO:  So you don't want this --

7     you're going to prevent her from testifying as to

8     anything?

9          MR. GALLAGHER:  No.  You can ask her whatever

10    questions you want.

11         MR. RAFATJOO:  Okay.  For the record, this

12    deposition is going to get continued given the position

13    taken regarding document production.

14         I'm going to hand you what we will mark as

15    Exhibit 2?

16         THE COURT REPORTER:  So the first one was A.

17         MR. RAFATJOO:  I'm going to stick with A and

18    B.  Sorry.

19              (Exhibit B was marked for

20              identification.)

21    BY MR. RAFATJOO:

22         Q.   I'm going to mark as Exhibit B, which is an

23    application to employ Bosley, Till, Neue & Talerico.  Can

24    you please take a look at that?

25         A.   You want me to read this whole thing?

                                                          12

1    Q.    Just, if you haven't seen it before, yes.

2    (Discussion between Ms. Downs & Counsel off the record.)

3              THE WITNESS:  Can I talk with you about this?

4              MR. GALLAGHER:  Well, you should respond to

5    the question.

6              MR. RAFATJOO:  I just want you to get to the

7    bottom of page 5.  Not the whole thing.

8              THE WITNESS:  Okay.

9              MS. DOWNS:  You can say that you want to go

10   off the record, Mom.

11              (Discussion held off the record.)

12   BY MR. RAFATJOO:

13   Q.    Have you read to the bottom of page 5?

14   A.    Yes, I have.

15   Q.    You saw that footnote 2 on page 5 makes

16   reference to a $25,000 payment that you made to the

17   Bosley, Till, Neue, Talerico Law Firm; is that correct?

18   A.    Yes, that's correct.

19   Q.    And you made that payment?

20   A.    Yes.

21   Q.    And they paid you back that money?

22   A.    Yes.

23   Q.    So that was a loan to Andrea?

24              MR. GALLAGHER:  Well, objection.  Calls for a

25   legal conclusion.

13

1    BY MR. RAFATJOO:

2         Q.    What was the reason for that payment?

3         A.    So she would be represented.

4         Q.    And when you made that payment, did you have

5    any request that you get repaid?

6         A.    No.  There was -- other arrangements were

7    made.

8              MR. GALLAGHER:  Listen to what the question

9    was.  Read back the question.

10                   (Record read.)

11             THE WITNESS:  No.

12   BY MR. RAFATJOO:

13        Q.    So you had written the $25,000 check without

14   any agreement that you would be repaid that money?

15        A.    No.  Yes.  Yes.  Yes.

16        Q.    So why did you get repaid that money?

17             MR. GALLAGHER:  If you can answer.

18             THE WITNESS:  Because another person in the

19   family helped her out and they -- and I was out of it.

20   BY MR. RAFATJOO:

21        Q.    Who was the other person in the family that

22   helped her out?

23        A.    My son, Eric.

24        Q.    What did he do?

25        A.    He paid -- he paid them.

                                                         14

1       Q.    He paid them the 25,000?

2       A.    He just -- he just paid me back and I was out

3  of that particular transaction.

4       Q.    Okay.  Earlier you made the statement --

5       A.    I'm not sure what happened.

6       Q.    You said that there were other arrangements

7  that were made with respect to this 25,000.

8       A.    The other arrangement was paying me back.

9  That's what I meant.

10      Q.    So even though earlier you said that you had

11 no agreements to get repaid, you said the other

12 arrangement was so that you would get repaid?

13      A.    I don't exactly know what you're asking.

14      Q.    I'm asking, you wrote a $25,000 check to this

15 law firm?

16      A.    Uh-huh.

17      Q.    And your testimony was that you had no

18 agreements that you would be repaid that money?

19      A.    Uh-huh.

20      Q.    That is what you have testified; correct?

21      A.    That's right.

22      Q.    Then you said there were other arrangements

23 that were made; correct?

24      A.    For her legal defense.  There were other

25 arrangements that were made that I'm not a party to, so I

                                                    15

1  was out of it then.

2        Q.    So when you got --

3        A.    So if you understand that.

4        Q.    So when you got your money back, the

5  $25,000 --

6        A.    I wasn't a party to this anymore.

7        Q.    Were you surprised that you got your $25,000

8  back?

9        A.    What do you mean by surprised?

10        Q.    You weren't expecting to get that money back,

11  correct, and then you got the money back?

12        A.    That is what happened.

13        Q.    Okay.  When you wrote the check to Bosley,

14  Till, Neue & Talerico --

15        A.    Uh-huh.

16        Q.    -- did you consider that a gift --

17        A.    Yes.

18        Q.    -- to Andrea.  You did?

19        A.    Yes.

20        Q.    I'm going to give you a document which we

21  will mark Exhibit C.  This is the application to employ

22  Brown Rudnick.

23        A.    I've read that.

24                  (Exhibit C was marked for

25                  identification.)

                                                    16

1          MR. GALLAGHER:  He didn't ask you if you've

2    read it.  He just said he's handing it to you.  This was

3    Exhibit B?

4          THE COURT REPORTER:  Yes.

5          THE WITNESS:  Who does this belong to?

6          MR. GALLAGHER:  The court reporter is going

7    to keep this.  And this is Exhibit C.

8          THE WITNESS:  Okay.

9    BY MR. RAFATJOO:

10        Q.    If you can flip to page --

11        A.    Maybe I haven't read it.  Okay.  What page?

12        Q.    Let's go to page 8.

13        A.    Okay.

14        Q.    Paragraph 10.  Can you please review that

15    paragraph?  Paragraph 10 on page 8 is part of the

16    declaration Andrea Downs filed in support of the

17    application to employ Brown Rudnick as her special

18    counsel to defend her in the state court action.

19            In that paragraph 10, she states that all

20    fees and costs incurred by her and at litigation will be

21    paid by you, and the payment of such funds to the firm

22    will not create an obligation for her to be repaid -- for

23    you to be repaid; is that accurate?

24        A.    That is accurate.

25        Q.    So you made a gift to your daughter for all

                                                              17

1    the fees relating to her defense by the Brown Rudnick

2    Law Firm?

3       A.    Yes.

4       Q.    I'm going to hand you what we will mark as

5    Exhibit D.   Can you please take a look at that

6    declaration?

7            (Exhibit D was marked for

8            identification.)

9         THE WITNESS:   Yes.

10   BY MR. RAFATJOO:

11      Q.    This is your declaration in support of the

12    application to employ Brown Rudnick.   And in this

13    declaration, you state that you are agreeing to pay all

14    of your daughter's fees with respect to her

15    representation by the Brown Rudnick firm, and that you

16    have no expectation of getting repaid; is that correct?

17      A.    That's correct.

18      Q.    Earlier you testified that you paid $25,000

19    to the Bosley firm, which you got repaid.   How much have

20    you paid to the Brown Rudnick Law Firm?

21      A.    $250,000.

22      Q.    Was that the amount of the retainer?

23      A.    That's correct.

24      Q.    How much more have you paid them after that?

25      A.    I have paid them nothing after that.

18

1    Q.    Do you owe them anything?

2    A.    No.

3    Q.    All you had to pay them was 250,000?

4    A.    Correct.

5         MR. GALLAGHER:  I don't know if you want my

6    interjections or not, but I think her statement about the

7    retainer was inaccurate, but that's evidenced by the

8    documents if you look at them.

9    BY MR. RAFATJOO:

10    Q.    Okay.  So how much was the retainer that you

11    paid them?

12    A.    $250,000.

13    Q.    Okay.  Other than the $250,000 that you have

14    paid them, have they sent you any bills?

15    A.    The bills are there.

16    Q.    You have produced all of the bills today?

17    A.    I have produced all of that.

18    Q.    Has there been any other arrangements made

19    regarding the payment of the Brown Rudnick Law Firm?

20    A.    No.

21    Q.    Your son, none of your children, none of your

22    entities have agreed to pay the Brown Rudnick Law Firm?

23    A.    Correct.

24    Q.    So it is your understanding that the

25    engagement of Brown Rudnick was based on a fixed fee?

19

1      A.      Correct.

2      Q.      You have produced documents which were just

3  produced this morning, we have not had a chance to review

4  them, so we are reserving our rights to ask additional

5  questions regarding any and all categories here.

6          With respect to the trust documents, given

7  your counsel's position, we're going to have to go to

8  court and get a determination as to how and when those

9  documents are going to be produced.

10         MR. GALLAGHER:  Well, and for the record,

11 we're willing to produce those documents with the

12 understanding that they will be kept confidential and not

13 used for any purpose other than this bankruptcy

14 proceeding, which is what you and I discussed.

15         MR. RAFATJOO:  I'm happy to not use them for

16 any purpose other than this bankruptcy proceeding, but

17 the confidentiality of it in terms of what is in this

18 stipulation is beyond the scope of what we had discussed.

19         MR. GALLAGHER:  Okay.

20         MR. RAFATJOO:  Because this stipulation goes

21 above and beyond what we had agreed to.  This stipulation

22 prevents the use of these documents, requires us to file

23 these things under seal.  To the extent the court doesn't

24 allow them to be filed under seal, it is going to become

25 our burden, and this is not our burden with respect to

                                                        20

EXHIBIT 1 PAGE 47

1    these documents.  That was not our agreement to take the

2    burden from you and shift it to the plaintiffs.

3             MR. GALLAGHER:  Well, where do you perceive

4    there's a burden being shifted to you?

5             MR. RAFATJOO:  In the stipulation there is an

6    absolute burden that is becoming ours in dealing with

7    these documents.

8             MR. GALLAGHER:  Can you identify that?

9             MR. RAFATJOO:  Let me find your stipulation.

10   This stipulation does not entitle them to file

11   confidential information under seal.  I don't know about

12   these local rule references.

13             There are numerous issues with respect to the

14   stipulation, the use.  The definition of the term "party"

15   and "non-party," who that encompasses.  References to any

16   party to this action or stipulation, that is beyond the

17   scope.

18             MR. GALLAGHER:  Well, I asked where there's

19   being some burden created upon plaintiffs.

20             MR. RAFATJOO:  Look at page 1, line 24.

21             MR. GALLAGHER:  Well, that doesn't created a

22   burden on you.  It just says for the fact --

23             MR. RAFATJOO:  We can't file it.

24             MR. GALLAGHER:  What's that?

25             MR. RAFATJOO:  We cannot file it under seal.

21

EXHIBIT 1  PAGE  48

1          MR. GALLAGHER:  No, you can.  It says if you

2     want -- if for some reason you think you need to use

3     those documents.  I mean, there's another procedure set

4     forth if you think that they're erroneously designated as

5     confidential, but assuming that they are confidential,

6     you're entitled to file them under seal.

7          MR. RAFATJOO:  But part of the discussion is

8     that none of these things are going to be tagged

9     confidential.  It's just redacting the names of the

10    siblings.  This goes above and beyond all of that.  When

11    you get to paragraph 7.2, you look at paragraph 8, you

12    look at paragraph 9.

13         MR. GALLAGHER:  Let me respond to your

14    comment, though.  If you agree that these are going to be

15    kept confidential and not used for any purpose other than

16    this proceeding --

17         MR. RAFATJOO:  They're not going to be used

18    for any purpose other than the bankruptcy proceeding.  I

19    didn't agree to the fact that I would keep it

20    confidential.  That means I can't use it in court, even

21    in the bankruptcy court.

22         MR. GALLAGHER:  It doesn't mean you can't use

23    it in court.  You're entitled to use it in court.  Just

24    file it under seal.

25         MR. RAFATJOO:  I'm not going to file it under

                                                          22

1   seal.  It's not my burden.

2           MR. GALLAGHER:  Well, there's a provision --

3   if you think it's not confidential, there's a provision

4   set forth in Section 6.

5           MR. RAFATJOO:  Okay.  I understand that, but

6   you're making it my burden.  It is not my burden.

7           MR. GALLAGHER:  No, not if you read

8   Section 6.

9           MR. RAFATJOO:  The designated party shall

10   file it.

11           MR. GALLAGHER:  Right.

12           MR. RAFATJOO:  That's me.  But the process is

13   going to be, the rest of it limits my rights.  7.2, 8, 9,

14   10, all of these things need to come out.  If you want to

15   take those provisions out, make it your burden, that's a

16   different story.

17           MR. GALLAGHER:  Well, how do we deal with

18   stopping you from using it in another proceeding, when 7

19   says that you're going to keep it confidential and use it

20   only in this litigation?

21           MR. RAFATJOO:  There's a difference between

22   using it in the state court action and keeping it

23   confidential, and that's where you're trying to shift the

24   burden, and I'm not willing to accept it.

25           MR. GALLAGHER:  I'm not trying to shift the

23

EXHIBIT 1  PAGE  50

1   burden.  The issue is it's not just the state court

2   action.  I don't know that I want their personal and

3   confidential estate planning documents part of a public

4   record, aside from whether you use it in the state court

5   action.  That's all I'm saying.  I mean --

6         MR. RAFATJOO:  I'm only going to use it in

7   the bankruptcy court action.  I don't have anywhere else

8   to use it.

9         MR. GALLAGHER:  Okay.  Well, with the

10   understanding that you're only going to use it in the

11   bankruptcy action and -- I mean, do you foresee any

12   possibility of needing to file their estate planning

13   documents in the bankruptcy court?

14         MR. RAFATJOO:  I haven't seen them.  I don't

15   know what they are.

16         MR. GALLAGHER:  Well, I think that if they

17   are filed there, they should be filed under seal.  I

18   mean, I'll stipulate if you want to file them in the

19   bankruptcy court action, you do it under seal.  That's

20   all I'm getting to.  I don't want their documents --

21         MR. RAFATJOO:  I am not filing a motion to

22   file documents under seal, because that is a burden.  And

23   in the bankruptcy court, there is a process associated

24   with that, which I'm sure there is in the state court, as

25   well.  If the court denies the motion to file under seal

24

EXHIBIT 1  PAGE  51

1   and says I don't think these should be filed under seal,

2   I don't want to be in a position where I now cannot use

3   these documents.  It is not my burden.

4        MR. GALLAGHER:  I'm willing to leave it to

5   the judge's discretion whether it should be filed under

6   seal or not.

7        MR. RAFATJOO:  You file a motion to that

8   extent.  I will give you notice and then you file the

9   motion if you want to designate it under seal.  I don't

10  care about that.

11       MR. GALLAGHER:  Okay.  That's fine.  I don't

12  have a problem with the burden.  I just don't want it to

13  be anything other than in this action and kept

14  confidential.

15       MR. RAFATJOO:  If you want to revise your

16  stipulation, you can.

17       MR. GALLAGHER:  I mean, it's on the record.

18  If that's our agreement, that's our agreement.

19       MR. RAFATJOO:  Okay.  So why don't you state

20  on the record what you believe the agreement is?

21       MR. GALLAGHER:  Okay.  That we will provide

22  you with the Steinmann's estate planning documents with

23  the understanding that they are privileged and

24  confidential and will not be used for any purpose other

25  than this bankruptcy proceeding.

25

EXHIBIT 1  PAGE  52

1          And in the event you desire to file them at

2    some point for some motion or other proceeding in the

3    bankruptcy action, you'll give me 21 days notice, during

4    which time I can go forward in the court and seek a

5    protective order so they are not disclosed or they are

6    filed under seal.  And further, that in accordance with

7    our prior agreement, that we will redact the names of

8    other individuals in the documents other than the

9    Steinmanns or Andrea Downs.

10          MR. RAFATJOO:  Or her children.

11          MR. GALLAGHER:  Or her children.

12          MR. RAFATJOO:  Other than the part where you

13    said that we would agree that the documents are

14    privileged and confidential, because I don't know what

15    the ripple effect of that is that you have in mind, the

16    rest of it sounds fine, subject to us taking a break and

17    me reviewing them.  Let's state it on the record here.

18          MR. GALLAGHER:  Okay.  So the gist of the

19    understanding, though, is that in the event you wanted to

20    use these for some purpose, that you'll give me adequate

21    notice to enable me to go into court and seek an order

22    from the court that they be filed under seal?

23          MR. RAFATJOO:  That's fine.

24          MR. GALLAGHER:  Okay.

25          MR. RAFATJOO:  So we're going to take a

26

1  break.

2                      (Recess taken.)

3              MR. RAFATJOO:  Can you please read the

4  stipulation that was stated on the record?

5                      (Record read.)

6              MR. RAFATJOO:  Following up on the

7  stipulation that was just read into the record, we agreed

8  that the terms "privileged" and "confidential" come out

9  of that.  The documents to which this stipulation applies

10 only relates to categories 3 and 4.  You have produced

11 other documents, and you may produce other documents as

12 you may discover them down the road that apply to other

13 categories, you have stamped those confidential.  Those

14 are not confidential documents; correct?

15             MR. GALLAGHER:  Can I see them again?  And

16 also, when you say take out the terms "privileged" and

17 "confidential," can we read it without those terms and

18 see what it says?

19                      (Record read.)

20             MR. GALLAGHER:  See, I think -- why are they

21 not privileged and confidential?  They're their personal

22 estate planning documents.

23             MR. RAFATJOO:  Because I don't know what your

24 intention is with categorizing them as privileged and

25 confidential and how you're planning on limiting the use

                                                         27

EXHIBIT 1  PAGE  54

1    of them.  We have agreed to limit the use of them to the

2    bankruptcy court, and that's -- and you get to file them

3    under seal if the court allows you to do so.

4                MR. GALLAGHER:  Okay.  Without conceding that

5    they're not privileged or confidential, I'm okay with

6    taking those terms out.  I believe they are privileged

7    and confidential.  But if the stipulation is that they're

8    not going to be used for any purposes other than the

9    bankruptcy proceeding, and that we can seek to have them

10    filed under seal if they ever become necessary, that's

11    fine.

12                MR. RAFATJOO:  Okay.

13                MR. GALLAGHER:  All right.  And on these

14    other documents, I'm fine without them being considered

15    confidential, except, you know, to the extent that this

16    first is a check that is written and has account

17    information on it which has been redacted, I believe

18    that's confidential and should remain confidential.

19                MR. RAFATJOO:  What should remain

20    confidential?

21                MR. GALLAGHER:  The account number.

22                MR. RAFATJOO:  That's fine.

23                MR. GALLAGHER:  And so on these statements of

24    accounts, that's another example of an account number

25    that's been redacted.  That's fine.  Yeah.  And I think

                                                                28

EXHIBIT 1  PAGE  55

1    there are just -- same thing here on the account numbers

2    and checks, there are account numbers.  We took those

3    out, as well.  So with that understanding, I think we're

4    fine.

5          MR. RAFATJOO:  Okay.  Can I get the documents

6    that you're producing in response to category 3 on

7    Exhibit A of the 2004?

8          MR. GALLAGHER:  Yeah.  What I'm handing you

9    will be a Declaration of Trust which consists of 11

10   pages, an Assignment of Personal Property which is two

11   pages.  Can I see the categories?  The will of

12   Lora Steinmann, which is three pages, and the will of

13   Heinz Steinmann, which is three pages.  Those are

14   documents responsive to category No. 3.

15         MR. RAFATJOO:  Okay.  What about documents

16   for category No. 4?

17         MR. GALLAGHER:  I'm going to have the First

18   Amendment to the Steinmann Trust, which is three pages.

19   I'm handing that to you.

20         MR. RAFATJOO:  Thank you.  We are going to go

21   off the record while we review these documents.  Thank

22   you.

23              (Recess taken.)

24   BY MR. RAFATJOO:

25      Q.   Mrs. Steinmann, thank you very much for

                                                        29

EXHIBIT 1  PAGE  56

1    producing the documents that you have produced.  I'm

2    going to ask you a few questions regarding them, and as

3    I've stated earlier, what we will do is that we're going

4    to suspend this deposition and reconvene at a later date

5    to be determined --

6                    MR. GALLAGHER:  We don't agree with that.

7                    THE WITNESS:  You've read it now.  I don't

8    want to have to come back again.

9                    MR. RAFATJOO:  You agreed to it beforehand.

10                   MR. GALLAGHER:  No, we didn't.

11                   MR. RAFATJOO:  So we are going to do that.

12                   MR. GALLAGHER:  I didn't agree to it

13   beforehand.

14                   MR. RAFATJOO:  That's what we said earlier

15   because you didn't produce the documents.

16                   MR. GALLAGHER:  No, that's not true.

17   BY MR. RAFATJOO:

18       Q.    Can you describe how you keep your records?

19       A.    Are you suspending this?

20                   MR. GALLAGHER:  Objection.  No, no.

21   Objection.  Vague and ambiguous.

22                   Just answer his questions if you understand

23   them.

24                   THE WITNESS:  Okay.

25

30

EXHIBIT 1  PAGE  57

1  BY MR. RAFATJOO:

2      Q.    In response to Exhibit A, we asked you for

3  some documents.  On the 2004, there are a list of

4  documents that you're supposed to produce, nine

5  categories of documents, and you have produced some

6  documents and you claim that you don't have other

7  documents.

8          My question to you is what kind of system do

9  you use personally to maintain your files?

10         MR. GALLAGHER:  Objection.  Vague and

11 ambiguous.

12 BY MR. RAFATJOO:

13     Q.    Do you have a filing system?

14         MR. GALLAGHER:  Objection.  Vague and

15 ambiguous.

16 BY MR. RAFATJOO:

17     Q.    How do you keep your records?

18         MR. GALLAGHER:  Objection.  Vague and

19 ambiguous.

20 BY MR. RAFATJOO:

21     Q.    If you get a billing statement from a utility

22 company, where do you keep it?

23         MR. GALLAGHER:  You can answer, if you know.

24         THE WITNESS:  In a file under the title of

25 that billing company.

31

1    BY MR. RAFATJOO:

2        Q.    If you write a check to someone, do you keep

3    a copy of it?

4        A.    Not always.

5        Q.    If someone sends you an invoice, do you keep

6    a copy of it?

7        A.    Yes.

8        Q.    Where do you keep that copy?

9        A.    In a file.

10        Q.    Where is the file located?

11        MR. GALLAGHER:    Objection.    How is this

12    relevant to this proceeding?

13        MR. RAFATJOO:    I'm trying to figure out what

14    kinds of records she maintains.

15        MR. GALLAGHER:    Well, you can ask her

16    questions about the records she maintains with respect to

17    the categories of documents that you've requested.

18        MR. RAFATJOO:    I'm trying to get there.    You

19    keep objecting as to vague and ambiguous.

20        MR. GALLAGHER:    Because your questions aren't

21    clear.    So if you have a question about the documents

22    you've requested, you can ask that.

23        MR. RAFATJOO:    I'm asking questions about the

24    documents I've requested.

25        MR. GALLAGHER:    So limited to the documents

32

1    that he's requested.  What's the question?

2    BY MR. RAFATJOO:

3         Q.    There are documents that we have requested

4    regarding loans made to your daughter.

5         A.    Uh-huh.

6         Q.    Do you keep records of those?

7         A.    Yes.

8         Q.    Where do you keep those records?

9         A.    In a file.

10         Q.    Where are those files?

11         A.    In my husband's office.

12         Q.    Which is located where?

13         A.    In my home.

14         Q.    Is there anyone else who maintains copies of

15    those?

16         A.    No.

17         Q.    Are those files for all of the loans that you

18    have made to your daughter, Andrea Downs?

19         A.    No.

20         Q.    What else is in those files?

21         A.    I have paid those legal fees and those are

22    not in a file.  You have them, though.  So those could be

23    considered --

24              MR. GALLAGHER:  Well --

25              THE WITNESS:  Well, that's a gift, though.

33

EXHIBIT 1  PAGE  60

1          MR. GALLAGHER:  Listen to his question and

2    respond to the question.

3          THE WITNESS:  Okay.

4    BY MR. RAFATJOO:

5     Q.    So the question is with respect to

6    Andrea Downs --

7     A.    Yeah.

8     Q.    -- do you maintain a file as to her in your

9    filing cabinet?

10     A.    Yes.

11     Q.    And what do you keep in that file?

12     A.    Loan agreements.

13     Q.    Have you produced all of those documents?

14     A.    Yes.

15     Q.    With respect to the items that we have

16    requested, I'm going to go down the list.  Category 1 is

17    the loan agreement between Andrea Downs and

18    Mr. Steinmann.  Can you please tell me what you did in

19    order to find responsive documents?

20     A.    I looked in the file.

21     Q.    Is that the only thing?

22     A.    Uh-huh.

23          MR. GALLAGHER:  You have to answer audibly.

24    Is that a "yes"?

25          THE WITNESS:  Oh, yes.

34

1    BY MR. RAFATJOO:

2        Q.    Would anybody else have had documents

3    responsive to category No. 1?

4        A.    No.

5        Q.    With respect to category No. 2, the second

6    request, which is documents evidencing other loans made

7    by you or your husband to the debtor, to Andrea, or any

8    of her businesses, what did you do to find responsive

9    documents?

10       A.    Looked in the file.

11       Q.    Did you do anything else?

12       A.    No.

13       Q.    Would anybody else have had copies of

14   documents that would have been responsive?

15       A.    No.

16            MR. GALLAGHER:  Can we get a copy of the list

17   while you're reading it so she has it in front of her?

18   Or maybe I have it.  It's one of the documents.

19            MR. RAFATJOO:  Yeah.  It's one of the things

20   that was produced.

21            THE WITNESS:  This is what we're talking

22   about.  Okay?

23            MR. GALLAGHER:  Yes.

24            THE WITNESS:  All right.  Thank you.

25

35

```
1   BY MR. RAFATJOO:

2        Q.    Now that you have the list in front of you,

3   would you like to change your answer --

4        A.    No.

5        Q.    -- to any of the previous questions?

6        A.    No.

7              MR. GALLAGHER:  Let him finish his question

8   and then respond.

9   BY MR. RAFATJOO:

10       Q.    Would you like to change your answer to any

11  of the prior questions that I asked?

12       A.    No.

13       Q.    With respect to category No. 3 listed on

14  Exhibit A --

15       A.    Uh-huh.

16       Q.    -- can you please tell me what you did to

17  find responsive documents?

18             MR. GALLAGHER:  Well, I'll object to the

19  extent that it invades the attorney-client privilege.

20  BY MR. RAFATJOO:

21       Q.    That's okay.  You can answer it as to the

22  fact that it does not.

23       A.    Well, I handed you a copy of it.  I don't

24  know what else you're asking me.  I don't understand your

25  question.
```

EXHIBIT 1  PAGE  63

1    Q.    My question is what did you do when you saw

2    this request for documents, what did you do to find

3    responsive documents?  I know you have handed me

4    documents.  I'm trying to see what steps you took to find

5    documents that were responsive to this question.

6         A.    Looked in the file where this was.

7         Q.    Would anybody else have documents that would

8    be responsive to this?

9         A.    No.

10            MR. GALLAGHER:  Other than her attorney?

11   BY MR. RAFATJOO:

12        Q.    Your attorneys would have documents?

13        A.    Yes.  My attorney has it, yes.

14        Q.    Did you contact your attorneys to send you

15   documents in response to this?

16            (Discussion held off the record.)

17            THE WITNESS:  I think I handed him the

18   document, because I had it in my files.  Originally he

19   had it, but then I had it, and I gave it back when you

20   asked for it.

21   BY MR. RAFATJOO:

22        Q.    Who was the attorney?

23        A.    Dan Holden is the attorney for the will.

24        Q.    Are there any other attorneys --

25        A.    No.

37

1        Q.    -- for the will.  And he's the one who

2    prepared these documents?

3        A.    Yes.

4        Q.    With respect to category No. 4, what did you

5    do to find responsive documents in response to category

6    No. 4?

7              MR. GALLAGHER:  Is that your phone?

8              THE WITNESS:  It is, but it's on silent so

9    I'm not going to answer it.

10             MR. GALLAGHER:  No.  I just wanted to make

11   sure it wasn't bothering you while you're trying to

12   answer the question.

13             THE WITNESS:  No, it wasn't bothering me.

14   What did I do -- rephrase the question, please.

15   BY MR. RAFATJOO:

16       Q.    Sure.  The category No. 4 asks for certain

17   documents.  When you got this list and you read category

18   No. 4, I would like to know what you did to find

19   responsive documents to that category No. 4.

20       A.    Found them in the file.

21       Q.    Would anybody else have documents that

22   relates to category No. 4?

23       A.    No.

24       Q.    With respect to category No. 5, what did you

25   do to find documents that would be responsive to that

                                                          38

1   request?

2        A.    I found them in the file.

3        Q.    Would anybody else have documents that would

4   be responsive to this?

5        A.    No.

6        Q.    Category No. 6, what did you do to find

7   responsive documents regarding this category?

8             MR. GALLAGHER:  There were no documents

9   produced.

10            THE WITNESS:  No documents.

11  BY MR. RAFATJOO:

12       Q.    Would anybody have documents that would be

13  responsive to this category?

14       A.    No.

15            MR. GALLAGHER:  Let him finish his question.

16            THE WITNESS:  Oh, I thought I did.  Sorry.

17  BY MR. RAFATJOO:

18       Q.    Category No. 7, what did you do to find

19  responsive documents with respect to this category?

20            MR. GALLAGHER:  There were no documents

21  produced in response to category No. 7.

22            THE WITNESS:  Yes.  There's no documents.

23  BY MR. RAFATJOO:

24       Q.    Would anyone have documents that would be

25  responsive to category No. 7?

39

1        A.    No.

2        Q.    Category No. 8, what did you do to find

3  documents that would be responsive to this request?

4              MR. GALLAGHER:  This is probably worthy of a

5  comment by me, because as you and I discussed, we

6  produced a list of gifts that had been made rather than

7  any underlying documents because they were in de minimis

8  amounts.

9  BY MR. RAFATJOO:

10       Q.    What did you do to find documents in response

11 to category No. 8?

12       A.    Look through my checkbooks.

13       Q.    Would anybody else have documents that would

14 be responsive to this?

15       A.    No.

16       Q.    Category No. 9, what did you do to find

17 documents that would be responsive to this category?

18       A.    I'm not aware of any documents.

19       Q.    Would anyone have documents that would be

20 responsive to this?

21       A.    Not that I know.

22             MR. RAFATJOO:  Going back to category No. 8,

23 this was documents evidencing any monetary or

24 non-monetary gifts exceeding 5,000.  So that was -- that

25 is above the de minimis amounts that we have discussed,

                                                        40

1   so we would need the documents that would be responsive

2   to that.

3           MR. GALLAGHER:  Which is above the 5,000?

4           MR. RAFATJOO:  All documents evidencing any

5   gifts exceeding 5,000.

6           MR. GALLAGHER:  I don't think there are any

7   gifts exceeding 5,000.

8           MR. RAFATJOO:  Okay.

9           MR. GALLAGHER:  I mean, other -- I mean, the

10  lists we gave you were all like $100 payments and things

11  like that.

12          MR. RAFATJOO:  Okay.

13          MR. GALLAGHER:  And I think any -- if there

14  was a gift beyond that, we've given whatever documents

15  there were.

16  BY MR. RAFATJOO:

17      Q.    Which attorney has -- other than Mr. Holden,

18  have any other attorneys prepared any wills or trusts for

19  you?

20      A.    Many, many years ago we had one when our

21  children were little.

22      Q.    Okay.

23      A.    Do we have evidence of that?

24          MR. GALLAGHER:  Listen to his question.

25          THE WITNESS:  Yes.

                                                        41

1  BY MR. RAFATJOO:

2       Q.    And what was the name of that attorney?

3       A.    Is that Bill Farrell?

4           MR. GALLAGHER:  This is you on your own.

5           THE WITNESS:  I don't know.  I don't know.

6  BY MR. RAFATJOO:

7       Q.    You don't remember the name of the attorney?

8       A.    I think I do, but I'm not sure.

9       Q.    What do you think the name of the attorney --

10      A.    I think it was Bill Farrell.

11      Q.    Bill Farrell.  And if you remember that name,

12 will you let us know?

13      A.    Yes.  He's passed on.

14      Q.    He's passed on.

15          MR. GALLAGHER:  Don't --

16          THE WITNESS:  Okay.  Sorry.

17 BY MR. RAFATJOO:

18      Q.    Prior to the documents that you have

19 produced, the trust and the statement of trust and the

20 will --

21      A.    Uh-huh.

22      Q.    -- were there any other wills or trusts that

23 you had that were in effect prior to the dates that you

24 established the trust that you handed me?

25      A.    Just one.  The one I just told you about.

42

1        Q.    And you have not produced a copy of that?

2              MR. GALLAGHER:  Well, first of all, just for

3     clarification, was it a trust or a will?

4              THE WITNESS:  It was a will, not a trust.

5              MR. RAFATJOO:  But you have not produced a

6     copy of that?

7              MR. GALLAGHER:  We have not produced a copy

8     of some antecedent will from some prior date, that I'm

9     aware of.

10             MR. RAFATJOO:  But the request went back five

11    years.

12             THE WITNESS:  This would be farther than

13    that.

14             MR. RAFATJOO:  But it was in existence five

15    years ago?  It may have been dated prior to that, but it

16    was in existence five years ago?

17             THE WITNESS:  What should I --

18             MR. GALLAGHER:  Well, I'm not sure I agree

19    with your characterization, but I'll agree that I did not

20    produce any will other than the ones that I gave you

21    today.

22             MR. RAFATJOO:  Are you going to produce it?

23             MR. GALLAGHER:  I don't know.  I'd have to

24    look at the request and see what she has and if it's

25    responsive to your request.

43

```
 1  BY MR. RAFATJOO:
 2       Q.    With respect to the Brown Rudnick firm or
 3  let's -- with respect to the Bosley, Till, Neue, Talerico
 4  firm, the one that represents your daughter in the
 5  bankruptcy case, other than the $25,000 payment, have you
 6  made any payments to that firm?
 7       A.    No.
 8       Q.    Have you caused anyone else to make payments
 9  to that firm?
10       A.    No.
11       Q.    Have any of your entities made any payments
12  to that firm?
13       A.    I don't know.
14       Q.    You don't know if any of the entities that
15  you have an interest in have made payments to them?
16       A.    No entities.  Nothing I have an interest in,
17  no.
18       Q.    With respect to the Brown Rudnick Law Firm,
19  other than the $250,000 payment, have you made any
20  payments to them?
21       A.    No.
22       Q.    With respect to the Brown Rudnick Law Firm,
23  have you caused anyone else -- requested anyone else to
24  make any payments to them?
25       A.    No.
```

44

1   Q. With respect to the Brown Rudnick Law Firm,

2 have any of your entities made any payments to them?

3   A. No.

4   Q. With respect to the Brown Rudnick Law Firm,

5 are you aware of any other payments other than the

6 $250,000 having been paid to them?

7   A. No, I'm not aware of any.

8   Q. This trust that you have provided, is this

9 the one and only trust that you have established?

10   A. Yes.

11   Q. For the entities that you have an interest

12 in, do your children have interests in those entities?

13   A. No.

14   MR. GALLAGHER:  Objection.  Vague and

15 ambiguous.

16 BY MR. RAFATJOO:

17   Q. Do you make any distributions, any payments

18 to your children?

19   MR. GALLAGHER:  Well, I'm going to object,

20 because this gets into her confidential information.  If

21 you have a question about Andrea Downs and the deponent,

22 she'll answer it.  But what she does with respect to her

23 entities and her other children and who may be involved

24 in them is not relevant to this proceeding.

25   MR. RAFATJOO:  Well, I disagree with that,

45

1    but we'll limit it for purposes of right now to

2    Andrea Downs.

3    BY MR. RAFATJOO:

4         Q.    Do you make any payments to Andrea Downs?

5         A.    No.

6         Q.    Does she have any kind of interest in any of

7    your entities?

8         A.    No.

9         Q.    Does she have any interest in any of your

10   husband's entities?

11        A.    No.

12        Q.    Does she receive any distributions or any

13   payments from any of you or your husband's entities?

14        A.    No.

15        Q.    Why was Andrea disowned?

16             MR. GALLAGHER:  Objection.  Vague and

17   ambiguous.

18             MR. RAFATJOO:  You have produced a trust

19   document that says Andrea was disowned.

20             MR. GALLAGHER:  Objection.  The document

21   speaks for itself as to what it provides in it.

22             MR. RAFATJOO:  But we're trying to understand

23   what her mindset is for disowning her daughter.

24             MR. GALLAGHER:  Well, objection.  That's not

25   what the document says, so you're misstating.

46

1          MR. RAFATJOO:  That's what the document says.

2   The document says she's disowned.  I'm asking why did you

3   amend your trust to disown Andrea?

4          MR. GALLAGHER:  Objection.  The document

5   speaks for itself.

6          MR. RAFATJOO:  It does not.

7   BY MR. RAFATJOO:

8       Q.    Why did you disown Andrea?

9          MR. GALLAGHER:  Same objection.

10  BY MR. RAFATJOO:

11      Q.    You can answer the question.

12         MR. GALLAGHER:  You can answer.

13         THE WITNESS:  In lieu of what was happening,

14  we didn't want any of our assets to be given to anyone

15  else, so we decided that we have a revocable trust, that

16  we would exclude Andrea from receiving any of our assets.

17  BY MR. RAFATJOO:

18      Q.    So if heaven forbid something should happen

19  to you now, what would happen to Andrea?

20      A.    She would receive nothing.

21      Q.    Was Andrea aware of that?

22      A.    Yes.

23      Q.    When did she become aware of that?

24         MR. GALLAGHER:  Well, objection.  Calls for

25  speculation as to what Andrea's knowledge is or was.

                                                          47

1   BY MR. RAFATJOO:

2        Q.    Did you have a conversation with Andrea about

3   disowning her?

4        A.    Yes.

5        Q.    When did you have that conversation?

6        A.    I'm not sure.

7        Q.    This document is dated May 2016.  The

8   document that you have produced which is called First

9   Amendment to the Steinmann Trust, it is in that document

10  that you disowned Andrea?

11       A.    Correct.

12       Q.    When did you have a conversation with Andrea

13  about disowning her?

14       A.    I don't -- I can't give you a date.  I don't

15  know.  Probably after that.

16       Q.    So you first disowned her --

17       A.    Yes.

18       Q.    -- and then you advised her of that?

19            MR. GALLAGHER:  Let him finish the question.

20            THE WITNESS:  Okay.

21  BY MR. RAFATJOO:

22       Q.    Have you contributed any other assets to the

23  trust?

24       A.    I don't understand your question.  What do

25  you want to ask?

                                                          48

1       Q.    In the Declaration of Trust that you have

2  produced, there's a list of assets that you've

3  contributed to the trust.

4       A.    Uh-huh.

5       Q.    One is real property commonly known as

6  5797 Cedar Street?

7       A.    Uh-huh.

8       Q.    Is that your home?

9       A.    That's our home.

10      Q.    The second one is Desmond Properties.  The

11  third one is all interest in checking, savings,

12  investment accounts.  No. 4 is all personal property.

13  And No. 5 is such other assets as trustors to be

14  specifically designated by separate documents.

15         Have you assigned any other assets to the

16  trust?

17         MR. GALLAGHER:  How is that relevant?  How

18  does what they've done with their personal estate plan

19  and their assets relate to the bankruptcy proceeding?

20         MR. RAFATJOO:  Because we're trying to

21  determine what's in the trust.

22  BY MR. RAFATJOO:

23      Q.    Have you assigned any --

24         MR. GALLAGHER:  But Andrea Downs is not a

25  beneficiary of the trust.

49

1          MR. RAFATJOO:  She's not right now.  She was

2     at the point in time when this trust was established.

3          MR. GALLAGHER:  But she's not now.

4          MR. RAFATJOO:  That was the question.

5          MR. GALLAGHER:  She's not now, so whatever

6     they've done with their assets is not relevant to this

7     proceeding and it's privileged information.

8          MR. RAFATJOO:  It's not privileged

9     information.

10    BY MR. RAFATJOO:

11         Q.    You can answer the question.  We would like

12    to know what other assets you've contributed to the

13    trust.

14         MR. GALLAGHER:  You don't have to answer

15    that.

16         THE WITNESS:  Okay.

17         MR. GALLAGHER:  If you want to ask something

18    that pertains to Andrea Downs, I don't have a problem

19    with it.

20         MR. RAFATJOO:  I'm asking questions that

21    apply to Andrea Downs.

22    BY MR. RAFATJOO:

23         Q.    You're not going to answer that question?

24         A.    No, not on the advice of my attorney.

25         Q.    Category No. 4 says all personal property

                                                        50

EXHIBIT 1  PAGE  77

1    owned by the trustors that is being assigned to the

2    trust.

3                Does that include all interests that you have

4    in your various entities, LLCs, corporations?

5                MR. GALLAGHER:  Objection.  Vague and

6    ambiguous.  The document speaks for itself.  Lack of

7    foundation.

8    BY MR. RAFATJOO:

9        Q.    Other than Desmond Properties, do you have

10   any other entities?

11               MR. GALLAGHER:  Objection.  And instruct the

12   witness not to answer on the basis of her constitutional

13   right of privacy.

14               MR. RAFATJOO:  She dos not have a

15   constitutional right of privacy as to these issues.

16               MR. GALLAGHER:  Sure, she does.

17               MR. RAFATJOO:  No, she does not.  We've

18   already dealt with this.

19               MR. GALLAGHER:  No, you haven't dealt with

20   it.

21               MR. RAFATJOO:  You objected in the bankruptcy

22   court, and I filed my paper on it, and the court issued a

23   response subpoena on it.

24               MR. GALLAGHER:  No.

25               MR. RAFATJOO:  Well, I'm going to file a

                                                          51

1   motion to compel then.

2          MR. GALLAGHER:  Okay.

3          MR. RAFATJOO:  All right.  This deposition is

4   suspended.  We're going to continue it.

5          MR. GALLAGHER:  Okay.  We're going -- we're

6   here if you have other questions.

7          MR. RAFATJOO:  I have a lot of other

8   questions based on these documents, but, you know, you've

9   just produced them and they trigger a lot of other

10  questions.  I had asked you before to produce these

11  documents earlier in consideration for the stipulation

12  that we entered into.

13         MR. GALLAGHER:  No.  You don't get to ask me

14  to give some benefit to you and then pose conditions on

15  me.

16         MR. RAFATJOO:  You're the one who blew the

17  deadline for filing a motion for protective order.

18         MR. GALLAGHER:  No, no, no.  As we discussed,

19  it wasn't a motion for a protective order.  It was a

20  motion to quash.

21         MR. RAFATJOO:  You didn't --

22         MR. GALLAGHER:  And you came to me and begged

23  for a continuance for the deposition, which I agreed to,

24  and then you tried to say I'm only going to agree to that

25  if you do this and that.  That was not part of the

                                                          52

1    agreement.

2             MR. RAFATJOO:  When you asked for the

3    stipulation for the protective order, I told you you

4    missed the deadline, I will only agree to it if you give

5    me the documents earlier.

6             MR. GALLAGHER:  Okay.

7             MR. RAFATJOO:  Okay.  Whatever revisionist

8    you want to do, that's up to you.

9             MR. GALLAGHER:  The record is clear, look at

10   the e-mails.  And the judge will see that.

11            MR. RAFATJOO:  The judge will see it.

12            MR. GALLAGHER:  Okay.  We're not coming back,

13   so if you have any other questions.

14            MR. RAFATJOO:  You're coming back, because

15   we're going to file a motion to compel production of

16   documents, we're going to require you to answer some of

17   these questions that you're not answering.  We have a

18   right to these questions.

19            MS. SYPKENS:  This is ridiculous.

20            MR. GALLAGHER:  It's okay.  You can take a

21   chance with the judge.  We produced the documents that

22   were responsive to your subpoena.

23            MR. RAFATJOO:  You haven't.  You have a trust

24   that you didn't produce.  You have a will that you didn't

25   produce.

53

1          MR. GALLAGHER:  No. 1, you misheard her

2    testimony again, and I don't know that the will she's

3    referring to is responsive to your request.  What you're

4    asking her about now is not a document production.

5    You're asking her about her asset transfers to her trust.

6    Okay?

7          MR. RAFATJOO:  I'm asking about that, yes,

8    because that's part of when you produce these things,

9    we're supposed to ask questions regarding them.  The 2004

10   says questions regarding the categories listed here.

11         MR. GALLAGHER:  I don't think that's what it

12   says.

13         MR. RAFATJOO:  That's what it says.  It's a

14   2004.

15         MR. GALLAGHER:  Well, okay.  Like I said, if

16   you want to ask questions, you can ask questions.

17   Otherwise --

18         MR. RAFATJOO:  You're telling her not to

19   answer the questions and you haven't produced all the

20   documents, so what do you want me to do?

21         MR. GALLAGHER:  I have produced all of the

22   documents as far as I know.

23         MS. SYPKENS:  About that --

24         MR. GALLAGHER:  No, no, no.

25         So it's your deposition, if you want to stop

                                                        54

1   it.

2           MR. RAFATJOO:  We're going to suspend it.

3   We're going to go to court and we're going to come back

4   here and answer some questions, because this is just not

5   how it's done.  This may be how you guys do it in state

6   court; this is not how we do it in bankruptcy court.  We

7   have a right to ask questions and get documents.

8           MR. GALLAGHER:  You don't have a right to ask

9   her questions about her personal financial affairs that

10  have nothing to do with the debtor.

11          MR. RAFATJOO:  We do when it has to do with

12  the debtor.  The testimony is --

13          MR. GALLAGHER:  How do you agree with me when

14  I say that it has nothing to do with the debtor?

15          MR. RAFATJOO:  I said we do as it has to do

16  with the debtor.

17          MR. GALLAGHER:  It doesn't have anything to

18  do with the debtor.

19          MR. RAFATJOO:  Sure, it does.

20          MR. GALLAGHER:  No, it doesn't.  Explain to

21  me how her personal financial affairs have anything to do

22  with the debtor.

23          MR. RAFATJOO:  Because it will eventually

24  inure to the debtor's benefit, and we have a right to

25  know.

                                                        55

1          MR. GALLAGHER:  No.  No.  Under the documents

2    that have been presented to you, nothing will inure to

3    the debtor.

4          MR. RAFATJOO:  The self-serving documents

5    that were amended right before trial?  That's a different

6    issue.

7          MR. GALLAGHER:  What do you mean

8    self-serving?  Someone's estate planning can't be

9    self-serving?  That's the whole purpose of it is to serve

10   the purpose of --

11         THE COURT REPORTER:  Wait.

12         MR. RAFATJOO:  We can disagree on it.  We're

13   going to go to bankruptcy court and then we're going to

14   deal with this.

15         MR. GALLAGHER:  Okay.

16         MR. RAFATJOO:  I'm going to order a

17   transcript and attach it to whatever we file with the

18   court.

19         (Discussion held off the record.)

20         MR. GALLAGHER:  I'm not sure what the

21   equivalent statutes are here under the Federal Rules of

22   Civil Procedure.  Why don't we stipulate that the court

23   reporter will be relieved of whatever duties she has

24   under the Federal Rules of Civil Procedure with respect

25   to the review and execution of the transcript.  And what

56

1   the reporter will do is send a copy of the transcript

2   once it's prepared to my office, and I will arrange to

3   have the deponent review the transcript and sign it under

4   penalty of perjury.  And I will let opposing counsel know

5   within two weeks of any changes, corrections or comments

6   that were made to the deposition transcript.

7             MR. RAFATJOO:  Okay.

8      (Whereupon, at 12:15 p.m., the deposition concluded.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                        57

1   STATE OF CALIFORNIA              )

                                    )

2   COUNTY OF LOS ANGELES           )

3

4          I am the witness in the foregoing deposition.  I

5   have read the foregoing deposition or have had read to me

6   the foregoing deposition, and having made such changes

7   and corrections as desired, I certify that the same is

8   true in my own knowledge.

9          I hereby declare under penalty of perjury under

10  the laws of the State of California that the foregoing is

11  true and correct.

12         This Declaration is executed this _____ day of

13  _____, 2017, at _____,

14  California.

15

16

17                         _____

                            LORA STEINMANN

18

19

20

21

22

23

24

25

                                                              58

```
 1              UNITED STATES BANKRUPTCY COURT
 2       CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION
 3
 4    _____
                                    )
 5    In re:                        ) No. 8:16-bk-12589-CB
                                    )
 6    ANDREA S. DOWNS               ) Chapter 7
                                    )
 7                    Debtor.       )
      _____)
 8    THOMAS H. CASEY, Chapter 7    )  Adversary No. 8:18-ap-
      Trustee,                      )  01167-CB
 9                                  )
              Plaintiff,            )
10                                  )
          vs.                       )
11                                  )
      LORA RAE STEINMANN, HEINZ H.  )
12    STEINMANN, ERIC STEINMANN,    )
      MARY (SYPKENS) STEINMANN,     )
13    JOHN STEINMANN, TESSIE        )
      (STAPLETON) STEINMANN, KATY   )
14    (BELKNAP) STEINMANN, HEINZ    )
      STEINMANN, JEFF STEINMANN,    )
15    TOM STEINMANN, SUSIE (WILSON))
      STEINMANN,                    )
16                                  )
              Defendant.            )
17    _____)
18           DEPOSITION OF LORA RAE STEINMANN
19                Wrightwood, California
20              Tuesday, September 3, 2019
21                     Volume I
22    Reported by:
      VALERIE D. GRANILLO
23    CSR No. 11469
      Job No. 3512642
24
25    PAGES 1 - 80

                                            Page 1
```

```
 1                 UNITED STATES BANKRUPTCY COURT
 2         CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION
 3
 4       _____
                                       )
 5       In re:                        ) No. 8:16-bk-12589-CB
                                       )
 6       ANDREA S. DOWNS               ) Chapter 7
                                       )
 7                    Debtor.          )
         _____)
 8       THOMAS H. CASEY, Chapter 7    )  Adversary No. 8:18-ap-
         Trustee,                      )  01167-CB
 9                                     )
                 Plaintiff,            )
10                                     )
             vs.                       )
11                                     )
         LORA RAE STEINMANN, HEINZ H.  )
12       STEINMANN, ERIC STEINMANN,    )
         MARY (SYPKENS) STEINMANN,     )
13       JOHN STEINMANN, TESSIE        )
         (STAPLETON) STEINMANN, KATY   )
14       (BELKNAP) STEINMANN, HEINZ    )
         STEINMANN, JEFF STEINMANN,    )
15       TOM STEINMANN, SUSIE (WILSON) )
         STEINMANN,                    )
16                                     )
                 Defendant.            )
17       _____)
18
19               Deposition of LORA RAE STEINMANN, Volume I,
20       taken on behalf of Petitioner, at 997 Rivera Drive,
21       Wrightwood, California, beginning at 12:00 p.m. and ending
22       at 1:35 p.m., on Tuesday, September 3, 2019, before
23       VALERIE D. GRANILLO, Certified Shorthand Reporter No.
24       11469.
25
```

Page 2

```
 1    APPEARANCES:

 2

 3   For Petitioner:

 4        WEILAND GOLDEN GOODRICH

 5        BY:  JEFFREY GOLDEN

 6        Attorney at Law

 7        650 Town Center Drive, Suite 600

 8        Costa Mesa, California 92626

 9        (714) 966-1000

10        jgolden@wgllp.com

11

12   For Respondent:

13        MARSHACK HAYS

14        BY:  D. EDWARD HAYS

15        Attorney at Law

16        870 Roosevelt Avenue

17        Irvine, California 92620

18        (949) 333-7777

19        ehays@marshackhays.com

20

21

22

23

24

25
```

Page 3

1  APPEARANCES (continued):

2

3  For Hausman Holdings, LLC and David and
   Pamela Moellenhoff:

4

        RAINES FELDMAN

5

        BY:  HAMID R. RAFATJOO

6

        1800 Avenue of the Stars, 12th Floor

7

        Los Angeles, California 90067

8

        (310) 440-4100

9

        hrafatjoo@raines.law.com

10

11 Also Present:

12      HEINZ J. STEINMANN

13

14

15

16

17

18

19

20

21

22

23

24

25

                                        Page 4

EXHIBIT 2  PAGE  89

1                            INDEX

2   WITNESS                                   EXAMINATION

3   LORA RAE STEINMANN

    Volume I

4

5

                        BY MR. GOLDEN                    5

6

7

8

9

10

11  NUMBER                 DESCRIPTION                  PAGE

12  Exhibit 1    Declaration of Trust                    35

13  Exhibit 2    First Amendment to the Steinmann

14               Trust                                   48

15

16

17

18

19

20

21

22

23

24

25

                                            Page 5

EXHIBIT 2  PAGE  90

```
 1          Wrightwood, California, Tuesday, September 3, 2019

 2                         12:00 p.m.

 3

 4                    LORA RAE STEINMANN,

 5    having been administered an oath, was examined and

 6    testified as follows:

 7

 8                       EXAMINATION

 9    BY MR. GOLDEN:

10        Q    Good morning.  Could you please state your full

11    name for the record.

12        A    Lora, and that's L-o-r-a, Rae, R-a-e, Steinman,

13    S-t-e-i-n-m-a-n-n.

14        Q    Thank you.  And have you ever had your deposition

15    taken before?

16        A    Yes.

17        Q    About how many times?

18        A    Twice.

19        Q    And have you ever had a bankruptcy rule 2004

20    examination?

21        A    I don't think so.

22             MR. HAYS:  You can answer if you know.  And if

23    you don't know, you don't know.

24             THE WITNESS:  Why?  Is this different or

25    something?
```

Page 6

EXHIBIT 2  PAGE 91

1    BY MR. GOLDEN:

2        Q    Well, if you -- as your lawyer says, you either

3    know or you don't know.

4        A    I don't know.  I don't know whether I have or

5    not.

6        Q    And you understand the rules in a deposition,

7    probably, then, but I'm going to go through them briefly

8    anyway.

9        A    Okay.

10       Q    Wait until I finish asking a question before you

11   answer it.  That way you can make sure that you understood

12   the question.  Fair enough?

13       A    Yeah.

14       Q    Speak audibly so the court reporter can hear you.

15       A    Okay.

16       Q    If you answer a question I've asked, I will

17   assume that you understood it based upon your answer.  So

18   if you don't understand something like a minute ago, ask

19   me to clarify it, and I'm happy to do so.  Do you

20   understand that?

21       A    Yes.

22       Q    Is there any reason you can't give your best

23   testimony today?  Because of medication or any other thing

24   that may be influencing your ability to do so?

25       A    No.

                                                  Page 7

EXHIBIT 2  PAGE  92

1     Q   Okay.  And you understand that you're testifying

2  under penalty of perjury, and that carries with it the

3  same obligation to tell the truth as if you were

4  testifying in a court of law?

5     A   Yes.

6     Q   And the two times you had your deposition taken

7  before, about how long ago were they?

8     A   I can't remember.

9     Q   More than ten years?

10    A   Oh, no.

11    Q   More than a year?

12    A   I think one of them was -- I would guess two

13  years ago, and one of them was maybe nine, ten months ago,

14  I would guess.

15    Q   Okay.  Do you know what they were in connection

16  with?

17    A   This matter.

18    Q   And what is "this matter"?

19    A   This matter of the bankruptcy court wanting to

20  get funds.

21    Q   Okay.  And both of them were in connection with

22  what you described as "this matter"?

23    A   Yes.

24    Q   Okay.  And was it more than one proceeding or was

25  it the same proceeding, as far as you know?

Page 8

1      A    I don't understand that question.

2      Q    Was it one court matter or was it more than one

3  court matter?

4      A    Well, we're talking about same thing here each

5  time.

6      Q    Okay.

7      A    So in fact, I don't know why this is happening a

8  third time, so.

9      Q    Okay.  Today, do you understand you are here for

10  a deposition in connection with what is called an

11  adversary action or a litigation that the bankruptcy

12  trustee has commenced?

13      A    Yes.

14      Q    Do you also understand that you are here today

15  for what's called a bankruptcy rule 2004 examination which

16  has been noticed by -- for examination by the parties here

17  as well?

18      A    Yes.

19      Q    And when I'm done asking questions, then he's

20  going to ask you some questions as well.

21          MR. HAYS:  Well, we don't think there will be any

22  questions asked by Mr. Rafatjoo today.  This is the

23  trustee's motion, and the trustee is the party in the

24  adversary proceed.  And while Mr. Rafatjoo says he wants

25  to intervene in that proceeding, he hasn't filed a motion

Page 9

EXHIBIT 2  PAGE  94

1  yet, and the court hasn't granted that yet.  So he can

2  observe, because he's here, but he's not going to ask any

3  questions.  If he does, we won't answer.

4       MR. GOLDEN:  Well, the 2004 was -- first of all,

5  the 2004, they joined in, and we've had conversations

6  about the fact that we were recording dates and times for

7  him to ask questions.  So it's a little, I think,

8  disconcerting to find out now that you're saying that you

9  won't allow him to ask questions.  The whole concept of

10  combining them was to avoid the need for multiple -- more

11  examinations.  And to raise this at the last second, I

12  think, is problematic, but I don't meant to interrupt you.

13       MR. HAYS:  You've said your peace.  But I told

14  you once or twice on the phone that Hamid was not his

15  client, was not a party to this proceeding.  And just

16  because they join in 2004 motion doesn't make them a party

17  for purpose of asking questions.  You and I had that

18  conversation, Jeff.

19       MR. GOLDEN:  Yeah.  I keep interrupting you.

20       MR. RAFATJOO:  Okay.  This is not the adversary

21  action.  This is the 2004 that we joined in.

22       MR. HAYS:  There's two things here today, as he

23  just said -- as counsel for the trustee just said.  This

24  is a combined examination of the 2004 and the deposition

25  in the adversary.

Page 10

EXHIBIT 2  PAGE 95

1        MR. RAFATJOO:  And you know very well that we

2   joined in the 2004.

3        MR. HAYS:  That doesn't make you --

4        MR. RAFATJOO:  And that we're allowed to ask

5   questions.  Now you're saying you don't want to allow me

6   to ask questions.  Or I can ask questions, but you're

7   going to instruct your client not to answer.  That's

8   perfectly fine, because we can raise it with the court.

9        MR. HAYS:  That is correct.

10        MR. RAFATJOO:  We will do that then.

11        MR. HAYS:  Understood.

12        MR. GOLDEN:  All right.  Just for the record -- I

13   won't keep talking, because that's never productive when

14   lawyers just go on and on at a deposition.  But I think

15   this approach is unproductive, contrary to what the

16   understanding of the parties were and is only going to

17   lead to more expense that I think is really unnecessary,

18        MR. HAYS:  Well, and you've said your peace, but

19   Mr. Rafatjoo has already conducted a rule 2004 examination

20   of my client and his --

21        MR. RAFATJOO:  Which was continued.

22        MR. HAYS:  -- and his client is not yet a party

23   to this proceeding.

24        MR. RAFATJOO:  The 2004 of your client was

25   continued, so we have a right to ask questions.  Now

Page 11

EXHIBIT 2  PAGE 96

 1  you're saying you don't want -- you're instructing your

 2  client to not to answer questions.

 3        MR. HAYS:  There won't be any questions today.

 4        MR. RAFATJOO:  No, I can ask questions here.  You

 5  are saying you will instruct your client not to answer.

 6        MR. HAYS:  Yes.  You're interrupting me, but that

 7  is what I was going to say.

 8        MR. GOLDEN:  And I'm sorry.  There's one more

 9  point I want to make, and you can have the last word if

10  you want or you can't.  So I'm not trying to do that, but

11  there is one important point.  For me, in my mind, the

12  reason we combined them was precisely for this reason.

13  Because otherwise, I would not have had necessarily a need

14  to do so.  It was because of the other party.

15        But in any event, I'll proceed unless somebody

16  wants to add anything.

17    Q    Okay.  All right.  So let me start this.  What

18  is -- how many children do you have?

19    A    I had 11 children.  One is deceased.

20    Q    Okay.  Sorry.  And so you have 10 children now?

21    A    Uh-huh.

22    Q    And how have you provided -- now, and your

23  husband is alive, correct?

24    A    Correct.

25    Q    And his name is?

                                                    Page 12

1      A    Heniz.  And it's Heinz H., not Heinz Z.

2      Q    Okay.  Thank you.  And he and you had -- at what

3  point did he and you start to plan for your distribution

4  of assets to your children?

5           MR. HAYS:  Objection; overbroad.  Pertains to

6  issues that are not relevant to the bankruptcy case in

7  terms of what the debtor has or doesn't have and instruct

8  the witness not to answer.  You can ask about what the

9  debtor has and doesn't have, but you can't ask about all

10  the other kids and all of her and her husband's assets.

11           (Instruction Not to Answer.)

12           MR. GOLDEN:  I don't think that's appropriate at

13  all.

14      Q    Are you refusing to answer based upon your

15  attorney's instructions?

16      A    I'm certainly going to follow his instructions.

17      Q    Is that a yes or a no?

18      A    Yes.

19      Q    Try to answer my questions directly.  Do you

20  understand?

21           MR. HAYS:  I think she did.

22           MR. GOLDEN:  She did the second time.  I just

23  want to make sure you understand.

24           MR. HAYS:  She has and she will.

25  BY MR. GOLDEN:

                                        Page 13

1        Q    Do you understand?

2        A    Yes.

3        Q    Thank you.  Did you review any pleadings in

4    connection with this matter?

5        A    I don't know.  No, not that I know of.

6             MR. HAYS:  Do you know what a pleading is?

7             THE WITNESS:  No.

8             MR. HAYS:  If you don't understand the question,

9    make sure you --

10            THE WITNESS:  I don't understand the question.

11   BY MR. GOLDEN:

12       Q    Did you review any court documents in connection

13   with this matter?

14       A    We did a trust.

15            MR. HAYS:  He said "court documents."

16            MR. GOLDEN:  Please don't interrupt her, though.

17            THE WITNESS:  I think that's a court document.

18            MR. HAYS:  You asked a question.

19            MR. GOLDEN:  Yeah, but you don't clarify in the

20   middle of an answer.  You know that's not appropriate.  I

21   don't care if you want to do it afterwards.

22       Q    Go on.

23       A    I thought that was a court document.  Otherwise,

24   I've done nothing, no, just the trust.  It is a legal

25   document done by a lawyer.

                                              Page 14

1      Q    So you've done a trust document.  How many trusts

2    have you done?

3      A    One.

4      Q    Before you did a trust, did you have a will?

5      A    There was one maybe 30 years ago when we went on

6    a trip.  I don't know where it is.  It just said who was

7    going to take care of who and that sort of thing.  We were

8    young then, and our children were young.

9      Q    Do you have a copy of that will?

10     A    Not anymore.

11     Q    You destroyed it?

12     A    I couldn't find it.

13     Q    Did you have a lawyer involved with it?

14     A    I think it was maybe Richard Anderson was our

15   lawyer at the time.

16     Q    Okay.  And where does Richard Anderson work?

17     A    Let me think.  Like Rancho area.  Rancho

18   Cucamonga area or something like that or Upland.

19     Q    And were all of your assets in the will at that

20   time?

21     A    Yeah.  We didn't have very much, but it was our

22   home and that sort of thing.

23     Q    Okay.  And years later, then, you formed a trust?

24     A    Yes.  And that supersedes anything that was done

25   prior to that.

                                              Page 15

EXHIBIT 2  PAGE  100

1    Q    And prior to that, what else was done other than

2    the will?

3    A    Nothing.

4    Q    And why did you do a trust?

5    A    Because it was -- it was prudent to do a trust.

6    We didn't want to have to go to probate when we die.  We

7    figured this was the right thing to do.

8    Q    Did someone advise you of that?

9         MR. HAYS:  Objection.  And let me caution you if

10   you had a conversation with an attorney, do not reveal the

11   communication between you and the attorney.

12        THE WITNESS:  I don't know.  I think we just

13   decided to do that, and I had an attorney do it for me.

14   BY MR. GOLDEN:

15   Q    Okay.  What attorney did you have do it for you?

16   A    Am I allowed to tell him that?

17        MR. HAYS:  You can give him the name.

18        THE WITNESS:  Dan Holden.

19   BY MR. GOLDEN:

20   Q    Could you spell that?

21   A    Dan Holden, H-o-l-d-e-n.

22   Q    And where does he work?

23   A    In San Bernardino.

24   Q    And when was the last time you've spoken with Dan

25   Holden?

Page 16

EXHIBIT 2  PAGE 101

1        A     I see him all the time.

2        Q     Okay.

3        A     They're friends of ours.  But he has a serious

4    problem with Alzheimer's right now, so he won't --

5    wouldn't be able to talk about this with you.  His firm

6    could.  I think they have.

7        Q     What's his firm's name?

8        A     I think it's Lemon and something, L-e-m-o-n.  I'm

9    not sure.

10       Q     And you met with him to set up the trust?

11       A     Correct.

12       Q     And you set up one trust?

13       A     Correct.

14       Q     Were there any amendments to the trust?

15       A     Yes.

16       Q     How many amendments?

17       A     One.

18       Q     And how long after the trust was set up was the

19   amendment done?

20       A     I think four months.

21       Q     And did he give you any advice -- you don't have

22   to tell me what the advice is, but did he give you any

23   advice as to why a trust should be set up?

24       A     No.

25       Q     Okay.  Did you explain to him how you wanted your

                                                    Page 17

EXHIBIT 2  PAGE  102

1    assets to be divided?

2        A    Yes.

3        Q    Did he have any input into that process?

4        A    No.

5        Q    And how did you want your assets to be divided?

6        A    We were -- at the time we set the trust up, the

7    asset were divided equally amongst our children.

8        Q    And what were the assets in the trust at the time

9    you set it up?

10        MR. HAYS:    Objection; instruct the witness not to

11    answer.  It's not relevant to this proceeding.

12        (Instruction Not to Answer.)

13    BY MR. GOLDEN:

14        Q    Do you -- are you refusing to answer based upon

15    your attorney's instruction?

16        A    Yes.

17        Q    Do you know what assets existed at the time you

18    set up the trust?

19        A    Yes.

20        Q    And I'm not asking you to say them based upon

21    your attorney's instruction, but you could specifically

22    recite them; is that correct?  Again, I'm not asking you

23    to do that, because your attorney instructed you not to.

24    But if he allowed you to, you could tell me what they are

25    specifically now; is that correct?

Page 18

1        A    Are you asking me what we own?  Is that what

2    you're asking?

3        Q    I'm asking whether you could tell me now what you

4    owned specifically at the time you set up the trust.

5              (Interruption in the Proceedings.)

6              THE WITNESS:  Yes.  Excuse me, this is my son

7    Heinz.  I think he wants to come down and give me moral

8    support here.

9              (Discussion off the Record.)

10   BY MR. GOLDEN:

11       Q    And how many different assets were there at the

12   time?

13             MR. HAYS:  Objection; irrelevant to this

14   proceeding.  Instruct the witness not to answer.

15             (Instruction Not to Answer.)

16   BY MR. GOLDEN:

17       Q    Are you refusing to answer based upon your

18   attorney's instructions?

19       A    Yes.

20             MR. GOLDEN:  Okay.  And just for the record, your

21   irrelevancy objections apply both to the adversary

22   proceeding and the 2004; is that correct?

23             MR. HAYS:  Correct.  It's a joint examination.

24             MR. GOLDEN:  Okay.

25             MR. HAYS:  But they have -- the deponent and her

                                                      Page 19

1   husband have a certain amount of financial privacy, and

2   their assets are their assets.  They are their business

3   and has nothing to do with the debtor, the bankruptcy

4   estate or this adversary proceeding.

5           MR. GOLDEN:  Okay.  I'm not aware of that as a

6   basis for objection, but we can let the bankruptcy court

7   make that determination.

8      Q    And were all of those assets that you just

9   referred to put into that trust?

10     A    Yes.

11          MR. HAYS:  Objection; instruct the witness not to

12  answer.

13          (Instruction Not to Answer.)

14          THE WITNESS:  Okay.  Sorry.

15  BY MR. GOLDEN:

16     Q    Okay.  Were any of those assets moved out of the

17  trust at any time?

18          MR. HAYS:  Objection.  Same objection.  Instruct

19  the witness not to answer.

20          (Instruction Not to Answer.)

21  BY MR. GOLDEN:

22     Q    Are you refusing to answer based upon your

23  attorney's instruction?

24     A    Yes.

25     Q    How were your assets divided among your children

                                                Page 20

1   in the trust?

2           THE WITNESS:  Can I answer that?

3           MR. HAYS:  The trust document speaks for itself,

4   but you can answer it.

5           MR. GOLDEN:  That's not a valid objection, but.

6           THE WITNESS:  We divided everything evenly.

7   BY MR. GOLDEN:

8       Q    You mean for among each child?

9       A    Well, we -- everything was going to be divided

10  equally with each child.

11      Q    So all -- a hundred percent of all of the assets

12  would be split equally among each of the children?

13      A    Uh-huh.

14      Q    Is that correct?

15      A    Right.

16      Q    And Andrea Downs was among them, correct?

17      A    Correct.

18      Q    And what was the value of each share at that

19  time?

20      A    I can't tell you that.

21          MR. HAYS:  Objection; instruct the witness not to

22  answer.  We're not going to get into what assets the

23  trustors own and what the value of those assets were.

24  It's irrelevant.

25          (Instruction Not to Answer.)

                                        Page 21

```
 1    BY MR. GOLDEN:

 2        Q    Can you tell me the value of Andrea Downs'

 3    interest in those assets at that time?

 4        A    No.

 5             MR. HAYS:  Instruct the witness not to answer.

 6             (Instruction Not to Answer.)

 7    BY MR. GOLDEN:

 8        Q    Are you refusing to answer based upon your

 9    attorney's instructions?

10        A    Yes.

11        Q    And you do understand that you can be sanctioned

12    in the event the court compels you to answer?

13             MR. HAYS:  Objection; argumentative.  You don't

14    need to answer that question.

15             (Instruction Not to Answer.)

16    BY MR. GOLDEN:

17        Q    Do you understand that?

18             MR. HAYS:  Instruct the witness not to answer

19    that question.  It's argumentative.

20             (Instruction Not to Answer.)

21    BY MR. GOLDEN:

22        Q    Are you -- I don't think it's argumentative at

23    all.  Are you refusing to answer based upon your

24    attorney's instructions?

25        A    Yes.
```

Page 22

1        Q    Okay.  Let me -- I'll give you the chance to

2    answer.  Just let me finish my question.

3             Did you -- well, actually, before I get there, do

4    you have a CPA or an accountant?

5             THE WITNESS:  Could I answer that?

6             MR. HAYS:  I think you can answer yes or no.

7             THE WITNESS:  Yes.

8    BY MR. GOLDEN:

9        Q    And who is that?

10            MR. HAYS:  And I think at that point there's no

11   relevancy to this proceeding, and I'm going to instruct

12   you not to answer.

13            (Instruction Not to Answer.)

14            THE WITNESS:  Okay.

15   BY MR. GOLDEN:

16       Q    Are you refusing to answer based upon your

17   attorney's instructions?

18       A    Yes.

19       Q    Does that accountant have any books and records

20   regarding -- financial records regarding the trust?

21            MR. HAYS:  Objection; irrelevant.  Same

22   objection.  Instruct the witness not to answer.

23            (Instruction Not to Answer.)

24   BY MR. GOLDEN:

25       Q    Are you refusing to answer based upon your

                                              Page  23

1  attorney's instructions?

2      A    Yes.

3      Q    When was the last time you spoke to your

4  accountant?

5      A    Two days ago.

6      Q    When was the last time you spoke to your

7  accountant about the trust?

8          MR. HAYS:  Objection; assumes facts not in

9  evidence.

10  BY MR. GOLDEN:

11     Q    You can answer.

12     A    What did you ask again?

13     Q    Sure.  When was the last time that you spoke with

14  your accountant regarding the trust?

15         THE WITNESS:  Can I answer that?

16         MR. HAYS:  You can answer, yes.

17         THE WITNESS:  Two days ago.

18  BY MR. GOLDEN:

19     Q    Okay.  And what did you talk about?

20         MR. HAYS:  Objection; irrelevant.  Instruct the

21  witness not to answer.

22         (Instruction Not to Answer.)

23         THE WITNESS:  I'm not going to answer.

24  BY MR. GOLDEN:

25     Q    Okay.  You're refusing to answer based upon your

                                              Page 24

EXHIBIT 2  PAGE  109

1    attorney's instructions?

2        A    Yes.

3        Q    When was the last time you spoke to the law firm

4    that -- well, let me back up.  Sorry.  You said that, if I

5    understood you before, the lawyer that set up the trust is

6    having some health issues.  And the law firm that he was

7    with is still handling the trust matter.  Did I understand

8    your testimony correctly before?

9            MR. HAYS:  I don't think you ever asked that

10   question.

11           THE WITNESS:  I don't think anybody's handling

12   anything.  It's just been -- the trust is done, and we

13   have it.

14   BY MR. GOLDEN:

15       Q    Does the law firm or that lawyer have any

16   documents or records concerning the trust?

17       A    They have the trust.

18           MR. HAYS:  Hold on.  Give me a chance to make my

19   objection first.

20           MR. GOLDEN:  And by the way, not to interrupt

21   you.  And also let me finish asking my question again too

22   as well.

23           MR. HAYS:  You're jumping the gun.  You're being

24   too helpful.

25           So have you finished your question?

                                              Page 25

EXHIBIT 2  PAGE  110

1          MR. GOLDEN:  Oh, yeah, I did.

2          MR. HAYS:  I just wanted to make sure.

3          MR. GOLDEN:  Yeah.

4          MR. HAYS:  Anything you've talked about with your

5    lawyers or not talked about with your lawyers are between

6    you, attorney-client privilege, and instruct you not to

7    answer.

8          THE WITNESS:  Okay, I won't answer that question.

9          MR. GOLDEN:  Okay.  Can you read back my last

10   question, please.

11         (Record Read.)

12         MR. GOLDEN:  So are you instructing -- you

13   just -- I thought your objection went to communications.

14         MR. HAYS:  She did say they have a copy of the

15   trust, and she did say that there wasn't anything else

16   that was done.  They did the trust, and there was nothing

17   else ongoing.  She did say that.  And anything beyond that

18   I've objected to and instructed her not to answer anything

19   else.

20         MR. GOLDEN:  Okay.  So and again, you can

21   instruct her.  I'm not going to obviously argue with you.

22   But each of the two points you made were not the question

23   that I asked.  And maybe just clarifying that you're

24   instructing her not to answer the question I asked, which

25   was simply whether or not they would have any other

                                        Page 26

1    documents other than the trust or not.

2         MR. HAYS:  Well, I don't know if they do or not.

3    I don't know if you know if they do or not.  But the

4    bottom line is I think you're starting to ask questions

5    pertaining to attorney-client communications.  She's told

6    you they have the trust.  She's told you they have the

7    amendment.  Anything beyond that, I think, is

8    attorney-client privilege.

9         MR. GOLDEN:  So you're instructing her not to

10   answer?

11        MR. HAYS:  Correct.

12        THE WITNESS:  Yes.

13   BY MR. GOLDEN:

14   Q    All right.  So you did you -- have you in the

15   last six months asked your accountant if they had any

16   copies of any documents related to the trust?

17        MR. HAYS:  Objection.  Same objection as before

18   instruct her not to answer.  What she talks about with her

19   accountants has no bearing on the debtor or this

20   proceeding.

21        (Instruction Not to Answer.)

22        THE WITNESS:  I am not going to answer that

23   question.

24   BY MR. GOLDEN:

25   Q    Okay.  And did you ask your lawyer or the law

Page 27

1  firm that he was at whether or not they had any documents

2  relating to the trust?

3         MR. HAYS:  Objection.  You've specifically asked

4  for an attorney-client communication.  Instruct her not to

5  answer.

6         (Instruction Not to Answer.)

7  BY MR. GOLDEN:

8     Q    And you're refusing to answer based upon your --

9     A    Yes.

10    Q    Please let me finish asking the question.  Will

11 you do so, please?

12    A    Uh-huh.

13    Q    And another thing, which will be really helpful,

14 instead of saying "uh-huh" or "mm-hmm," if you answer in

15 words so that the court reporter could write it down more

16 effectively.

17    A    All right.

18    Q    Thank you.  Are you refusing to answer based upon

19 your attorney's instructions?

20    A    Yes.

21    Q    Thank you.  Did you ask your accountant whether

22 or not -- and I'm sorry.  You don't have to give me his

23 name.  But can I ask if it's a male or a female?

24        MR. HAYS:  It's just irrelevant.

25        MR. GOLDEN:  I just want to use the correct

Page 28

EXHIBIT 2  PAGE 113

```
 1    pronoun.

 2              MR. HAYS:  You can just say "accountant."

 3              MR. GOLDEN:  Okay, fine.

 4         Q    Did you ask your accountant whether your

 5    accountant had any documents regarding Andrea Downs?

 6              MR. HAYS:  Objection.  Instruct her not to

 7    answer.  What she talks about with her accountants are her

 8    business.

 9              (Instruction Not to Answer.)

10    BY MR. GOLDEN:

11         Q    Are you refusing to answer based upon your

12    attorney's instructions?

13         A    Yes.

14         Q    Did you ask -- did you ever communicate with your

15    lawyer or the law firm that he was at about any documents

16    that they may have regarding Andrea Downs?

17              MR. HAYS:  Same objection.  What she talks about

18    with her attorneys is privileged communication.  Instruct

19    the witness not to answer.

20              (Instruction Not to Answer.)

21    BY MR. GOLDEN:

22         Q    When you formed the trust, were you of -- were

23    you mentally in good shape?

24              THE WITNESS:  Can I answer that?

25              MR. HAYS:  You can answer that.
```

Page 29

1              THE WITNESS:  Yes, I was.

2      BY MR. GOLDEN:

3          Q    And was your husband in -- was he of sound mental

4      faculty at that time?

5          A    Yes.

6          Q    And has that changed for either of you since

7      then?

8              MR. HAYS:  You can answer to the extent you know.

9              THE WITNESS:  I'm still of sound mind.  My

10     husband is too.  He has some memory problems, but he's of

11     sound mind.

12     BY MR. GOLDEN:

13         Q    Okay.  So your husband has some memory issues but

14     is -- but other than not remembering certain things is --

15     understands things and is capable of making decisions and

16     having conversations?

17         A    Yes.  He has advanced Parkinson's disease.

18             MR. GOLDEN:  Give me one minute, please.

19         Q    Do you -- you're aware that this examination in

20     connection with the adversary proceeding that I mentioned

21     and the 2004 examination were noticed so that -- for you

22     to be here at a certain time and place?

23         A    Yes.

24         Q    And you're aware that the court ordered that as

25     well?

                                                    Page 30

EXHIBIT 2  PAGE  115

1           MR. HAYS:  I think you're assuming facts not in

2      evidence.  There is no court order on the 2004, nor is

3      there one on a deposition in the lawsuit.

4      BY MR. GOLDEN:

5           Q    Were you aware of any court order?

6           A    I'm only aware of the paperwork that's sent to

7      me.

8           Q    What paperwork was sent to you?

9           A    Well, telling me what you're planning to do.

10          Q    Okay.  So you saw some paperwork telling you what

11     we're planning to do; is that right?

12          A    Right.  Right.

13          Q    Okay.  And that paperwork told you that there was

14     going to be a 2004 examination and a deposition at a

15     certain time and place.

16          A    Correct.

17          Q    And it also asked you to bring a certain amount

18     of documents as well, correct?

19          A    I read that, yes.

20          Q    What did you read?

21          A    That you asked for some documents, but I don't

22     know what you are asking for.

23          Q    Okay.  When you say -- so what is your

24     recollection of what was asked for?

25          A    It's my understanding that you have the trust and

                                                      Page 31

EXHIBIT 2  PAGE  116

1   the amendment.  That's all I have.  It's my understanding

2   you have that already.

3       Q    Did you ever get a list of documents that we were

4   requesting?

5       A    Yeah, I did see that.  And I don't know whether

6   we had anything besides the two things I told you.

7       Q    When you say you don't know whether you did or

8   not, what do you mean?

9       A    I was told that you received those two documents,

10  and that's all that we have to give you.

11      Q    Who told you that?

12      A    My son, Eric.

13      Q    Okay.  And but a minute ago you testified that

14  you don't know whether or not those were all the documents

15  you had.

16          MR. HAYS:  That misstates her testimony.

17          THE WITNESS:  I don't know of any other documents

18  that we would need to give you.

19  BY MR. GOLDEN:

20      Q    Do you have other documents?

21      A    No.

22      Q    Those are all the documents that you have?

23      A    That's all the documents I have pertaining to

24  this matter.

25      Q    And when I say that you have, they're all the

                                                Page 32

EXHIBIT 2  PAGE  117

1  documents that you have in your possession, custody or

2  control.  Is that correct?

3      A    Correct.

4      Q    So you would have no other documents in the hands

5  of anybody else like your lawyer or your accountant or any

6  third party.  Is that correct?

7           MR. HAYS:  Hold on.  You can -- we're now getting

8  into a question that would require her to answer a

9  question I've previously instructed her not to answer.  So

10  without talking about what documents your attorneys or

11  your accountants have, are there any other documents in

12  the world other than what you've produced?

13          THE WITNESS:  No.

14          MR. GOLDEN:  I don't understand his question, so

15  I'm just going to move on.  And I'll give you a chance to

16  ask questions at the end.

17          But his question was a little bit different than

18  my question.  And if you're instructing her not to answer,

19  that's fine.  I don't have a problem with that.

20          MR. HAYS:  You asked does anybody else have

21  documents.  That could include the attorney and the

22  accountant, which I've previously instructed her not to

23  answer.  So I carved out the attorney and the accountant

24  and did my best to rephrase the question, does anybody

25  else have documents, to which she said no.

                                              Page  33

EXHIBIT 2  PAGE  118

1   BY MR. GOLDEN:

2       Q    Okay.  So does your son, Eric, have any documents

3   relating to the trust?

4       A    He has the two documents that I already

5   mentioned.

6       Q    He doesn't have anything else?

7       A    No.

8       Q    He doesn't have any correspondence from a lawyer?

9       A    Well, all of these things are sent to the three

10  trustees.  That's my husband, my son and Eric.  So we have

11  all of these papers, if you're calling these documents.

12  These are just telling us what you're doing.

13      Q    And is the accountant -- the accountant is your

14  accountant, correct, and your husband's?

15      A    Yes.

16      Q    Is he Andrea's accountant?

17      A    No.

18      Q    Is he Eric's accountant?

19           THE WITNESS:  How do I answer that?

20           MR. HAYS:  If you know, you know.  If you don't,

21  you don't.

22           THE WITNESS:  Well, Eric is our accountant.

23  BY MR. GOLDEN:

24      Q    Is Eric the accountant you were making reference

25  to earlier?

                                              Page 34

EXHIBIT 2  PAGE  119

1      A     Yes.

2      Q     And -- okay.  So is Eric the accountant for the

3  other children?

4      A     No.  I think they have, in their own businesses,

5  their own accountants.

6      Q     And is he the accountant for the trust?

7      A     He's a trustee, so I don't know how to answer

8  that.  He's our accountant.  He is a CPA and a lawyer.

9      Q     But is he an accountant for the trust?

10         MR. HAYS:  If you don't know, you don't know.

11         THE WITNESS:  I don't know.

12         MR. GOLDEN:  Let me mark as Exhibit 1 this

13  document.  And for the record, I'll ask everyone to ignore

14  the top two lines single spaced on top of the document

15  which are documents relating to the document being filed

16  in the court.  I understand those are not part of the

17  actual document.  I'm not purporting to make them so.

18         (Exhibit 1 was marked for identification by

19         the court reporter and is attached hereto.)

20  BY MR. GOLDEN:

21      Q     So having said that, do you recognize this

22  document otherwise?

23      A     Yes.

24      Q     What is it?

25      A     It is our trust.

                                              Page 35

EXHIBIT 2  PAGE  120

1    Q    And who set the trust up?

2    A    Dan Holden.

3    Q    I'm sorry?

4    A    Dan Holden.

5    Q    And the trustees of the trust are?

6    A    Eric, myself and my husband.

7    Q    Okay.  From the beginning, correct?

8    A    Right.

9    Q    And will you turn to page 8.

10   A    I just have 24 to 30.

11   Q    I'm sorry.  Those page numbers should be ignored

12   as well on the bottom right-hand side.

13   A    So is it this?

14        MR. HAYS:  Yes.

15        THE WITNESS:  Okay.

16   BY MR. GOLDEN:

17   Q    And is that your signature?

18   A    It is.

19   Q    And who are the trustors of this document?

20   A    Eric, myself and my husband.

21   Q    Okay.  And so did the three of you set this trust

22   up initially?

23   A    Correct.

24   Q    And the assets of all three of you were put into

25   the trust?

Page 36

EXHIBIT 2  PAGE  121

```
 1              MR. HAYS:  Objection.  Instruct the witness not

 2   to answer.

 3              (Instruction Not to Answer.)

 4   BY MR. GOLDEN:

 5       Q    Are you refusing to answer based upon your

 6   attorney's instruction?

 7       A    Yes.

 8       Q    So who drafted this document?

 9       A    Dan Holden.

10       Q    Did Eric Steinmann also take a hand in drafting

11   this document?

12       A    No.

13       Q    Is he a beneficiary?

14       A    Yes.

15       Q    So he's a trustor, a trustee and a beneficiary,

16   correct?

17              MR. RAFATJOO:  He's not a trustor.

18              MR. HAYS:  The document speaks for itself.  He's

19   not a trustor.

20              MR. GOLDEN:  Well, she testified that he is, but.

21              MR. HAYS:  She didn't understand your question.

22              THE WITNESS:  I didn't answer.

23              MR. HAYS:  Not this time.  Not this time.

24   BY MR. GOLDEN:

25       Q    So now you're saying he's not a trustor; is that
```

Page 37

EXHIBIT 2  PAGE  122

1  right?

2      A    He's a trustee, and he's a beneficiary.

3      Q    But now you're saying he's not a trustor,

4  correct?

5      A    Yes.

6      Q    You did testify to that earlier, but I just want

7  to understand the actual facts.

8      A    Maybe I didn't understand the terms.  Sorry.

9      Q    That's okay.  I just want to get the actual

10  facts.

11      A    Okay.

12      Q    So only -- so was it only your assets and Heinz

13  Steinmann's assets were put in the trust or were there

14  other assets as well?

15          MR. HAYS:  Objection; instruct her not to answer.

16  It's irrelevant.

17          (Instruction Not to Answer.)

18  BY MR. GOLDEN:

19      Q    Do you refuse to answer based upon your

20  attorney's instructions?

21      A    Yes.

22      Q    What were the value of the assets that were put

23  in the trust at the time?

24          MR. HAYS:  Same objection.  Same instruction.

25  And you've already asked and answered.  Instruct the

                                             Page 38

1    witness not to answer.

2            (Instruction Not to Answer.)

3            MR. GOLDEN:  And asked and answered, I don't

4    think, is appropriate anyway.

5        Q    But are you refusing to answer based upon your

6    attorney's instruction?

7        A    Yes.

8        Q    And under this trust, was any money or income

9    ever paid to any of the beneficiaries?

10           MR. HAYS:  Objection; irrelevant.  Instruct the

11   witness not to answer.

12           (Instruction Not to Answer.)

13   BY MR. GOLDEN:

14       Q    Are you refusing to answer based upon your

15   attorney's instructions?

16       A    Correct.

17       Q    Was any income or assets ever paid to you during

18   the course of this trust?

19           MR. HAYS:  Same objection.  Same objection.

20           (Instruction Not to Answer.)

21   BY MR. GOLDEN:

22       Q    Are you refusing to answer based upon your

23   attorney's instruction?

24       A    Yes.

25       Q    Was Andrea Downs ever to receive any funds from

                                                Page 39

EXHIBIT 2  PAGE  124

1   this trust?

2           MR. HAYS:  You can answer.

3           THE WITNESS:  No.

4   BY MR. GOLDEN:

5       Q    Did she -- were there other children that got

6   paid instead of her during the course of this trust?

7           MR. HAYS:  Objection; instruct the witness not to

8   answer.  It's irrelevant to this proceeding what other

9   kids did or didn't get.

10          (Instruction Not to Answer.)

11  BY MR. GOLDEN:

12      Q    Are you refusing to answer based upon your

13  attorney's instructions?

14      A    Yes.

15      Q    And by the way, just to -- for the record, well,

16  let me just take the last question that your attorney just

17  instructed you not to answer.  I don't want you to answer

18  the question in violation of what your lawyer said.  But

19  sitting here now, you know the answer to that question,

20  but for your instruction by your lawyer.  Is that correct?

21          MR. HAYS:  Do you understand what he's saying?

22          THE WITNESS:  I don't understand what you're

23  saying.

24  BY MR. GOLDEN:

25      Q    I'm not saying it very clearly.  I'm saying --

                                              Page 40

EXHIBIT 2  PAGE  125

1   and again, I don't want you to answer the question,

2   because I want to respect what your lawyer just said.

3       A    Okay.

4       Q    But if your lawyer gave you permission to answer,

5   which he has not as of this point, if he did, would you

6   know the answer to the question of whether Andrea Downs

7   received less than the other children?  I'm not asking

8   whether she did or not at this point.  I'm only asking you

9   whether sitting here now you know that or not.

10          MR. HAYS:  That wasn't even your question.

11          THE WITNESS:  I was going to say that.  That

12   wasn't what you said.

13          MR. GOLDEN:  Okay.

14          MR. HAYS:  You asked if Andrea had gotten

15   anything.

16          THE WITNESS:  And I said no.

17          MR. HAYS:  And we allowed her to answer.  She

18   said no.  Then you said have any of the other kids gotten

19   anything, and we said it's irrelevant and instructed her

20   not to answer.

21          MR. GOLDEN:  Okay.

22          MR. HAYS:  But do you know the answer to that

23   question if I would tell you it's okay to answer it?

24          THE WITNESS:  Yes.

25          MR. HAYS:  Okay.

Page 41

EXHIBIT 2  PAGE  126

```
 1            MR. GOLDEN:  Can we have an understanding that

 2    the questions that you would instruct her not to answer,

 3    that she knows the answers to but he's not answering?

 4            MR. HAYS:  Well, some she may, and some she may

 5    not.  But I don't know every single question you're going

 6    to ask, and I can't recall every single question you have

 7    asked to know the answer to that question.

 8            MR. GOLDEN:  I appreciate that.  But I'd like her

 9    if -- to say if she doesn't know the answer to the

10    question, she doesn't know the answer to the question.

11    Otherwise, I'll go through each one and do it.

12            MR. HAYS:  Wait for his question.

13            MR. GOLDEN:  I'm not asking you a question yet.

14    I'm talking to your lawyer.

15            MR. HAYS:  Wait for his question.

16            MR. GOLDEN:  Do you want me to go through each

17    question?

18            MR. HAYS:  What's the question?

19            MR. GOLDEN:  The question is --

20            MR. HAYS:  Every single previous question?

21            MR. GOLDEN:  No, no.

22            MR. HAYS:  I'm asking.  I don't understand what

23    you're asking.

24            MR. GOLDEN:  If you instruct her not to answer,

25    if she doesn't know the answer to the question, I'd like
```

Page 42

```
 1   her to say, "I don't know the answer to the question."
 2              MR. HAYS:  I think you're going to have to cross
 3   that bridge on each question.
 4              MR. GOLDEN:  All right.  That's fine.
 5      Q    Do you know what the other children received
 6   under this trust?
 7      A    Yes.
 8      Q    Do you know what Andrea Downs has received under
 9   this trust?
10      A    Yes.
11      Q    Do you know what happened to the assets that were
12   placed into this trust?
13              THE WITNESS:  I don't know how to answer that.
14              MR. HAYS:  Then tell him.
15              THE WITNESS:  Okay.  I don't know how to answer
16   your question.
17   BY MR. GOLDEN:
18      Q    I think you've indicated earlier you know what
19   assets were put into this trust.  You were pretty clear
20   about that.
21      A    Yes.
22      Q    And you were unclear -- you wouldn't tell me
23   whether or not they were just your assets and your
24   husband's assets or whether other assets were included.
25   But you did tell me that you knew what assets were put
```

Page 43

 1    into the trust.

 2       A     Yes.

 3       Q     And now in 2019 or whatever year we're in,

 4    whatever month it is, are the same assets that you put

 5    into the trust in that trust now?

 6          MR. HAYS:  I think it's irrelevant to this

 7    proceeding.  There's just no connection with any of it.

 8    So I would instruct her not to answer.  Her assets are her

 9    business.

10          (Instruction Not to Answer.)

11          MR. GOLDEN:  Well, she answered the question that

12    she that she -- you've told her -- you've refused to let

13    her tell me what the assets are.  You've allowed her to

14    acknowledge that she knows what the assets were at the

15    time of the trust.  I'm not asking her yet what assets

16    exist as of today.  I'm asking her whether or not the

17    assets that existed at the time of the trust are the same

18    or different as of today.  Are you refusing to let her

19    answer that question?

20          MR. HAYS:  You can answer.

21          THE WITNESS:  Wouldn't that be asking us about

22    what our business and what we're doing?  Wouldn't it?

23          MR. HAYS:  I think it is.  But if you give me

24    five minutes to take a break and talk to her, I'll see if

25    we can maybe get you a little more detail of an answer.

                                              Page 44

```
 1              THE WITNESS:  Okay.

 2              MR. HAYS:  All right.  Take a five-minute break.

 3    It is 12:41.

 4              (Recess.)

 5              MR. HAYS:  So we took the break.  I spoke with my

 6    client.  And we're not going to answer the question about

 7    whether anything is different now about trust assets than

 8    it was upon formation, because the debtor has no interest

 9    in the trust.  So whatever happens to the trust and/or its

10    assets are irrelevant.

11    BY MR. GOLDEN:

12        Q    Okay.  But prior to the first amendment, did

13    Andrea downs have an interest in the trust?

14        A    Yes.

15        Q    Did Andrea get any funds or property from the

16    trust prior to that?

17        A    No.

18        Q    Did any of the other children get any funds or

19    property prior to that?

20        A    No.

21              MR. HAYS:  Objection; irrelevant.  Instruct the

22    witness not to answer.

23              (Instruction Not to Answer.)

24    BY MR. GOLDEN:

25        Q    I think you did answer.  But are you otherwise
```

Page 45

EXHIBIT 2  PAGE  130

1    refusing to answer based upon your attorney's instruction?

2        A    Yes.

3        Q    And after the amendment, did Andrea or the kids

4    get any funds or distributions from the trust?

5        A    I'm not going to answer.

6            MR. HAYS:  Hold on.  Let me make my objection

7    first.  You can answer vis-a-vis Andrea, but do not answer

8    the question vis-a-vis your other children in terms of

9    distribution.  So did Andrea get anything given to her as

10   a distribution from the trust after the amendment?

11           THE WITNESS:  What are you asking me?  Say it

12   again.

13   BY MR. GOLDEN:

14       Q    Well, you're refusing to answer that question

15   based upon your attorney's instructions, correct?

16       A    Yes.

17       Q    Has Andrea received any money from trust assets

18   at any time since the trust was formed?

19       A    Can I answer that?  No.

20       Q    Did Andrea receive any money from the trust as a

21   distribution from the trust since the trust was formed?

22       A    No.

23       Q    Did Andrea receive any gifts from the trust since

24   the trust was formed?

25       A    No.

Page 46

EXHIBIT 2  PAGE 131

1      Q      Did you and your husband receive money or assets

2    from the trust since the trust was formed?

3            MR. HAYS:  Objection; irrelevant to the debtor's

4    bankruptcy case and this action.  Instruct the witness not

5    to answer.

6            (Instruction Not to Answer.)

7    BY MR. GOLDEN:

8      Q      Are you refusing to answer based upon your

9    attorney's instructions?

10     A      Yes.

11     Q      When did your husband get Parkinson's?

12     A      Oh, he was diagnosed about eight years ago.

13     Q      So what year would that have been, roughly?

14     A      Well, that would be 2011, I guess.

15     Q      And can he give a deposition?

16     A      No.

17     Q      Because?  Why can't he?

18     A      He's not well.

19     Q      Is he mentally capable of answering questions?

20            MR. HAYS:  I mean, to the extent you know.  And I

21   think you've already answered a little bit in that regard,

22   but.

23            THE WITNESS:  I don't want to speak to that.  I'm

24   not answering that question.  I don't know how to answer

25   that question.

                                                   Page 47

EXHIBIT 2  PAGE  132

1        MR. HAYS:  She's already testified he has memory

2  problems.

3        MR. GOLDEN:  I understand.

4    Q    But is he capable of giving a deposition?

5    A    No, he is not.

6    Q    Okay.  Because of mental abilities; is that

7  correct?

8    A    Because of his physical abilities also.

9    Q    Okay.  But absent his physical abilities, could

10  he give a deposition given his mental abilities?

11   A    No.

12   Q    Okay.  And how long has his mental abilities been

13  impaired in that way?  Has that been during the eight

14  years, roughly?

15   A    More like two years.

16        MR. GOLDEN:  Okay.  Let me mark this as Exhibit

17  2.

18        (Exhibit 2 was marked for identification by

19        the court reporter and is attached hereto.)

20  BY MR. GOLDEN:

21   Q    Do you recognize this document?

22   A    Yes.

23   Q    Is that the amendment to the trust?

24   A    Correct.

25   Q    And actually, I know I just did that.  But go

                                          Page 48

1    back to Exhibit 1 for a second, and go to schedule A.

2         A    Is it an article or schedule?  What is it?  I've

3    got different -- no, I've got the -- what page do you

4    mean?

5              MR. HAYS:  Page 9 after the signatures.

6              THE WITNESS:  Oh, here.

7    BY MR. GOLDEN:

8         Q    Yeah.

9         A    Okay.

10        Q    So have you seen this schedule before?

11        A    Well, if it came with it, I did.  I don't

12   recognize it right now.

13        Q    Okay.  You don't know if you recall seeing this

14   or not?

15        A    I don't recall seeing this, not this page, no.

16        Q    And do you see where things are blacked out?

17        A    Yeah.

18        Q    Do you know who blacked them out?

19        A    I don't.

20        Q    Do you know if they were blacked out in the

21   original trust?

22        A    I haven't seen it so I don't know.

23             MR. HAYS:  We redacted them.

24             MR. GOLDEN:  Okay.

25        Q    And but you did see the original trust document

                                                    Page 49

EXHIBIT 2  PAGE  134

```
 1   at one point?

 2       A    Yes.

 3       Q    And did you see the schedule at one point?

 4       A    I probably didn't pay any attention that page.

 5       Q    Okay.  Did you read this trust?

 6       A    Yes.

 7       Q    Did you read it before you signed it?

 8       A    Yes.

 9       Q    Do you understand it?

10       A    Yes.

11       Q    Did someone explain it to you?

12       A    I can read.

13       Q    Did someone explain it to you?

14       A    No.

15       Q    Okay.  Did you -- when you did this trust, did

16   you inform the children of this trust?

17       A    Yes.

18       Q    Did they get a copy of the trust?

19       A    I don't know.

20       Q    Did you tell them what was in the trust?

21       A    No.

22       Q    When you say you don't know if they got a copy of

23   the trust, who would know that?

24       A    I don't know.  I really don't know.  I know I

25   have one.
```

Page 50

1      Q    Did you give them a copy?

2      A    And I'm a trustee, and the trustees have them.

3   But I don't know if all the kids have them.

4      Q    Did you send them a copy?

5      A    No, I did not.

6      Q    Do you know if your accountant sent them a copy?

7      A    I do not know that.

8      Q    And the first amendment, whose idea was the first

9   amendment?

10     A    Whose idea was it?

11     Q    Yes.

12     A    The trustees'.

13     Q    You're a trustee.

14     A    I don't understand.  Why are you asking that?

15     Q    Sorry.  Was it your idea?

16     A    Well, it was my idea also, yes.

17     Q    Also whose other idea was it?

18     A    I don't know.

19     Q    Okay.  Why was the amendment drafted?

20     A    Why was the amendment drafted?  As I said before,

21   and it was misquoted, in lieu of the present

22   circumstances, it seemed the prudent thing to do.

23     Q    Could you explain that, please?

24     A    My daughter was being taken to court in a

25   lawsuit.

Page 51

EXHIBIT 2  PAGE  136

1    Q    So this amendment does what?

2    A    Takes Andrea out of the trust as a beneficiary.

3    Q    And why did you do that?

4    A    I just explained that.

5    Q    Because of litigation?

6    A    That's what I said.

7    Q    Okay.  And why did the litigation cause you to

8  take her out of the trust?

9    A    I felt it was our -- my understanding was that

10 with a revokable trust, I can take anybody out at any

11 time.  So it was my understanding I don't have to answer

12 that question.  That's my privilege.  This is our -- this

13 is what we've earned.  We can do what we want with it.

14   Q    My question is why did you do it?

15   A    I answered that question.  I'm not going to

16 answer it any further.

17   Q    Did you take your kids out -- any of your other

18 children out?

19   A    No.

20        MR. HAYS:  Objection; instruct not to answer.

21        (Instruction Not to Answer.)

22        THE WITNESS:  Okay.

23        MR. HAYS:  It's irrelevant to the debtor.

24 BY MR. GOLDEN:

25   Q    And did you put -- do you have assets other than

Page 52

EXHIBIT 2  PAGE  137

1    the assets that are in this trust?

2            MR. HAYS:  Objection; instruct her not to answer.

3    It's irrelevant to this proceeding.

4            (Instruction Not to Answer.)

5            THE WITNESS:  I'm not going to answer.

6    BY MR. GOLDEN:

7        Q    You're refusing to answer based upon your

8    attorney's instructions?

9        A    Yes.

10       Q    Have you given Andrea Downs, you or your husband,

11   any funds or property since this trust was created?

12       A    No.

13       Q    You haven't given her any cash either, correct?

14       A    No.

15       Q    You haven't loaned her any money either, correct?

16       A    No.

17       Q    When was the last time you gave her anything?

18       A    I don't know.  Probably Christmas.  Maybe gave

19   her a Christmas gift.  But nothing, no.  We haven't given

20   her any funds.

21       Q    Before 2016?

22       A    Before 2016?

23       Q    I'm saying you haven't given her anything before

24   2016; is that right?

25       A    Oh, we gave loans to her.

                                              Page 53

1        Q      Before 2016?

2        A      Yes, several different times.  When she was in

3    business, she talked to my husband, and he helped her out.

4        Q      When was the last time you gave her a loan?

5        A      I never have.  I helped her with -- I helped her

6    with paying a lawyer for her for her court case.  That's

7    the money that I gave her.  We have separate accounts, my

8    husband and I.  He's done -- loaned her money before this

9    happened, as he has all our children, and they've paid him

10   back.

11       Q      So other than the loans, have you ever given

12   Andrea or your husband any money or property since 2016?

13           MR. HAYS:  You said Andrea or her husband or

14   Andrea or the deponent's husband?

15   BY MR. GOLDEN:

16       Q      Have you or your husband ever given Andrea any

17   money or property since January 1st, 2016?

18       A      No.

19       Q      Have you loaned any money to Andrea?

20       A      No.

21       Q      Have you loaned any money to Andrea since January

22   1st, 2016?

23       A      No.

24       Q      Have you loaned any money to Andrea in 2015?

25       A      I don't know.

                                          Page 54

EXHIBIT 2  PAGE  139

1      Q    Okay.  But at some point you loaned her some

2   money for a lawyer; is that correct?

3      A    I paid for her lawyer.

4      Q    You paid for it or you loaned her the money for

5   it?

6      A    I paid for her lawyer.

7      Q    Okay.  It wasn't a loan, then, correct?

8      A    It was a -- it was considered a loan.

9      Q    Oh, it was a loan.  Okay.  How much did you loan

10  her?

11     A    I don't want to tell you that.  That's -- I don't

12  think I have to tell him that.

13          MR. HAYS:  You can answer the question if you

14  recall.

15          THE WITNESS:  You probably know this.  You all

16  make way too much money.  $250,000 I had to pay for her

17  lawyer.

18  BY MR. GOLDEN:

19     Q    Were you paid back?

20     A    No.  She has nothing.

21     Q    What were the terms of repayment?

22     A    Well, had she been made whole, she probably would

23  have worked again and paid it back, but she can't.  She

24  has nothing now.  It's very sad.

25     Q    What lawyer did you loan her money for?

                                                  Page 55

EXHIBIT 2  PAGE  140

1        A      Ron Russ.

2        Q      And how was that number come up?  Was that a

3    $250,000 number?

4        A      That was an agreement that he had and I had at

5    the start of their legal proceedings.

6        Q      And what were the terms of that agreement?

7        A      Well, that I would pay him that amount.

8        Q      And was that a retainer?

9        A      I don't understand.  That's the amount I paid

10   him, the whole proceeding.

11       Q      Okay.  For the whole proceeding?

12       A      Yeah.

13       Q      It wasn't a retainer; it was a flat fee?

14       A      Yeah.

15       Q      And this first amendment, who drafted this?

16       A      Dan Holden.

17       Q      Have you sent a copy of this to your children?

18       A      No.

19       Q      Are your children aware of the first amendment?

20       A      Yes.

21       Q      How are they aware?

22       A      I don't know.  Just probably talked to them.

23       Q      You just said that you knew that they were aware.

24       A      I said I think they know.  I probably shouldn't

25   have answered that.

                                              Page 56

1       Q     That's not what you said.  But it sounds like

2    you're not sure.

3       A     I'm not sure.  Okay.

4       Q     Okay.

5       A     I mean, you've sent them all this stuff, too, you

6    know.  You've been after them, so they certainly know.

7       Q     Have there been any amendments to schedule A of

8    the trust agreement?

9       A     This looks like everything that we have.  It

10   looks like.  Isn't it?

11           MR. HAYS:  I don't know.

12           THE WITNESS:  I don't know either.

13           MR. HAYS:  And that's your business.  The

14   question was are you aware of any amendments to schedule

15   A.

16           THE WITNESS:  No amendments.  Nothing's changed.

17   This is what we have.

18   BY MR. GOLDEN:

19      Q     All right.  I am going to go through each of the

20   document requests that we asked you to produce and ask you

21   about each one of them.  Okay?

22      A     All right.

23      Q     The first were all documents evidencing any sort

24   of future, contingent or equitable interest held directly

25   or indirectly by the debtor in the Steinmann Family Trust,

Page 57

EXHIBIT 2  PAGE  142

1    including but not limited to, financial future equitable

2    or contingent interest for the period of June 19, 2012 to

3    the petition date.  Do you recall that?

4         A    Yes.  I read that.

5         Q    And you've produced all the documents that you

6    have?

7         A    I have produced the documents that I have.

8         Q    Which is just the trust and the amendment?

9         A    That's right.

10        Q    Okay.  Nothing else?

11        A    Nothing that I know of.

12        Q    You don't have any correspondence from anyone?

13   Letters?

14        A    Not that I know of.

15        Q    Did you look?

16        A    No.

17        Q    Okay.  Do you have any e-mails?

18        A    No.

19        Q    Did you look?

20        A    Well, I don't -- I didn't talk about any of these

21   things with her.

22        Q    Did you search your e-mails?

23        A    I don't -- no, I did not.

24        Q    So you could have had an e-mail regarding this?

25        A    What do you mean "regarding this"?  I don't

                                             Page 58

1    understand your question.

2        Q     The first question had to do with any interest

3    held by Andrea Downs in the trust, not necessarily

4    communications with Andrea.

5        A     Well, she knew that she was in the trust when we

6    made it.  That's it.  And she knew when we took her out.

7        Q     Did you have any communications with your lawyer

8    regarding Andrea Downs' interest in the trust at any time?

9             MR. HAYS:  Objection; instruct her not to answer

10   the content of attorney-client privilege communication.

11            (Instruction Not to Answer.)

12   BY MR. GOLDEN:

13       Q     You can answer the question.

14            MR. HAYS:  No.  Instruct her not to answer.

15            MR. GOLDEN:  Oh, okay.  You won't let her answer

16   whether or not there are any communications.

17            MR. HAYS:  Correct.

18   BY MR. GOLDEN:

19       Q     Are you refusing to answer based upon your

20   attorney's instructions?

21       A     Yes.

22            MR. GOLDEN:  Okay.  So I guess there wouldn't be

23   a privileged log.  I'm not trying to be difficult.  I

24   wasn't asking her -- just to be clear for the record.  And

25   I'm fine.  I'm not going to badger her or argue with you.

                                                Page 59

1   But to be clear for the record, I was not in any way,

2   shape or form asking her the content of any communications

3   but just whether or not there were any communications or

4   not.  And I'll move on, but I just want to make sure that

5   I wasn't miscommunicating.

6          MR. HAYS:  That's fine.  All right.

7   BY MR. GOLDEN:

8      Q    Secondly, any documents evidencing any future,

9   contingent or equitable interest held directly or

10  indirectly by Andrea Downs in any trust or will that you

11  may have settled or established for any or all of your

12  children before you settled the Steinmann Family Trust

13  including any future financial equitable or contingent

14  interest from June 19, 2012 to the petition date.  Do you

15  recall that?

16     A    That's a lot of words.  I'm not understanding

17  what you're saying.  You're asking whether I ever talked

18  to her about our assets between the '12 and '16?

19     Q    I'll summarize it.

20     A    Please.

21     Q    Yeah.  The second document requests were, was

22  there any documents at all concerning any will, trust or

23  will, for any or all of your children before the trust?

24     A    No.  I never talked about it until we decided to

25  do it.

                                              Page 60

EXHIBIT 2  PAGE  145

1     Q     Your will, any communications?

2     A     No.

3     Q     Any letters?

4     A     No.

5     Q     Any e-mails?

6     A     No.

7     Q     With anyone.  Not just with your children, with

8   anyone.  With your lawyer, with your accountant?

9     A     No.  We weren't thinking about that until we

10  decided to do the trust.

11    Q     But you had a will.

12    A     But that was like 30 years ago.  It didn't

13  pertain to this.

14    Q     But this question asks about a will or a trust.

15    A     Yeah.

16          MR. HAYS:  She's already answered earlier that

17  she doesn't have it, and she looked for it.  That was from

18  30 years ago.

19  BY MR. GOLDEN:

20    Q     Not just -- but not just a will, but any

21  documents relating to it.  So I understand you can't find

22  the will.  I get that.  But I mean any correspondence, any

23  communications, any notes.  You're saying you don't have

24  anything.  Is that right?

25    A     Not pertaining to a will, no.  I have no

Page 61

1    correspondence until this was done.

2       Q    Number 3 had to do with any documents held by

3    Andrea in the trust from June 19, 2012 to the petition

4    date.  Do you have any other documents relating to that?

5       A    Nothing pertaining to the trust, no.  No

6    documents.

7       Q    No communications with your accountant regarding

8    that or regarding Andrea?

9       A    What dates are you talking about?

10      Q    From June 19th, 2012 through the bankruptcy

11   petition.

12      A    Which is what date?

13      Q    Sometime in 2016.

14      A    Was it before or after we did this?  We had

15   discussion about this when we did it on January 8th,

16   but -- or not -- on January 8th, yes, but not before that.

17      Q    Okay.  Was there correspondence with your

18   accountant regarding that?

19      A    No.

20      Q    Were there e-mails?

21      A    No.  We just talked about doing this in my

22   kitchen.  We decided to do this.

23      Q    Okay.  No letters and no e-mails?

24      A    No.

25      Q    And no documents at all?

Page 62

EXHIBIT 2  PAGE  147

1      A    No, just the ones you have.

2      Q    Any documents relating to any transfers of any

3  interest held by you directly or indirectly that you may

4  have settled or established?  Did you transfer any assets?

5      A    No.

6      Q    Did you transfer any assets of Andrea?

7      A    I had nothing to do with any of Andrea's

8  business, nothing.

9      Q    Documents regarding the Steinmann Trust, are

10  these all the documents regarding the Steinmann Trust?

11      A    Yes.  We just went to a lawyer, and we did it.

12      Q    Do you have a list of assets written down

13  someplace?

14      A    I don't know.  I don't know.  I maybe know what

15  we have, but I don't know that we have it written down

16  somewhere.  We had to put them into the trust.  I think

17  he -- I can't answer that.  I don't know.

18      Q    But you are a trustee of the trust, correct?

19      A    Yeah.

20      Q    So you are responsible for knowing what happens

21  to the trust?

22      A    There's one bank account that we don't have.

23      Q    Okay.  Go ahead.  There's one bank account you

24  don't have?

25      A    In the trust, okay.

Page 63

```
 1              MR. HAYS:  Hold on a second.  We're not going to

 2     talk about what you own.  We're not going to talk about

 3     what the trust owns so try to keep that in mind.

 4              THE WITNESS:  Okay.

 5     BY MR. GOLDEN:

 6        Q    So your husband has a bank account, and you have

 7     a bank account, correct?

 8              MR. HAYS:  We're not going talk about what you

 9     own and what the trust owns.  Instruct her not to answer.

10              (Instruction Not to Answer.)

11     BY MR. GOLDEN:

12        Q    Are you refusing to answer based upon your

13     attorney's instructions?

14        A    Yes, yes.

15        Q    Have you ever paid Andrea any money out of your

16     husband's bank account or your bank account?

17        A    No.

18        Q    Do you have any documents regarding any interest

19     held by any of your children in the trust other than the

20     trust document?

21              MR. HAYS:  Do you understand?

22              THE WITNESS:  No, I don't understand.  You're

23     asking whether the children have any interest?

24     BY MR. GOLDEN:

25        Q    No.  Do you have any other documents regarding
```

Page 64

EXHIBIT 2  PAGE  149

1   the children's interest in the trust?

2       A    No, just the trust.

3       Q    And your accountant doesn't have any other

4   documents or your lawyer; is that correct?

5       A    No.

6       Q    All they have is the trust?

7       A    Well, it spells out, you know, that our assets

8   are in there, and we know what they are.

9       Q    But there were never any letters or e-mails at

10  any time, correct?

11      A    No.

12      Q    And did you ever direct any money to be paid to

13  Andrea Downs since 2016?

14      A    I have answered that over and over.  I have not

15  paid any money to Andy Downs since 2016.

16      Q    Has Eric Steinmann directed any money to be paid

17  to Andrea Downs?

18      A    You'd have to ask him.

19      Q    I'm asking you.

20      A    I don't know.

21      Q    Are you aware of any?

22      A    I'm not aware of any.

23      Q    Has your husband directed any transfers of any

24  assets --

25      A    I am not aware of them.

Page 65

1        Q      -- to her?

2               Has Andrea Downs, does she have any assets now?

3        A      Not that I'm aware of.

4        Q      Did she have any assets when she filed her

5    bankruptcy petition?

6        A      I think that was the purpose her filing

7    bankruptcy.  She was -- she had lost everything to legal

8    fees.

9        Q      Did she get married?

10       A      No.

11       Q      Do you know where she is now?

12       A      Yes, I know where she is.

13       Q      I said where she is?

14       A      I know where she is.

15       Q      Oh, where is she?

16       A      She lives in Balboa Peninsula.

17       Q      Is she in this country now?

18       A      Yes.

19       Q      Do you ever give her any gifts?

20              THE WITNESS:  What is it he's asking?  If I give

21   her a gift and buy her something I'm supposed to tell?

22   BY MR. GOLDEN:

23       Q      I'll ask this.  Did you ever give her any gifts

24   since 2015?  Have you given her any gifts?

25       A      Yes.

Page 66

EXHIBIT 2  PAGE  151

| | | |
|---|---|---|
| 1 | Q | Did you give her any gifts this year? |
| 2 | A | Yes. |
| 3 | Q | You give her any gifts in 2018? |
| 4 | A | Yes. |
| 5 | Q | Did you give her any gifts in 2017? |
| 6 | A | Yes, on her birthday and on Christmas. |
| 7 | Q | Okay.  And does your husband give her gifts? |
| 8 | A | No. |
| 9 | Q | Does Eric give her gifts? |
| 10 | A | No. |
| 11 | Q | You're sure of that? |
| 12 | A | Yeah. |
| 13 | Q | Okay. |
| 14 | A | I'm the gift giver. |
| 15 | Q | Do any of your other entities give her any gifts |
| 16 | | for money? |
| 17 | A | No. |
| 18 | Q | And what entities do you own? |
| 19 | | MR. HAYS:  Objection; instruct her not to answer. |
| 20 | | (Instruction Not to Answer.) |
| 21 | | BY MR. GOLDEN: |
| 22 | Q | Are you refusing to answer based upon your |
| 23 | | attorney's instructions? |
| 24 | A | Yes. |
| 25 | Q | What other entities does Andrea have an interest |

Page 67

EXHIBIT 2  PAGE  152

```
 1   in?

 2        A     I don't know.

 3        Q     Did she have an interest in entities in the past?

 4        A     Yes, I suppose.

 5        Q     What entities?

 6        A     I don't know.

 7        Q     Have you ever known her to have an interest in

 8   any entity?

 9        A     Yes.

10        Q     What entity?

11        A     Shorecliff Communications, that's her business.

12        Q     Anything else?

13        A     And then she was -- the problem that she got into

14   with this lawsuit was -- Happenstance, maybe, is the name

15   of the company.  I'm not sure.

16        Q     And any other companies or businesses she had an

17   interest in?

18        A     She had Coastal Communications.  I think she was

19   starting something up with that.  She was doing -- she was

20   working and starting things until --

21        Q     What was she doing at Coastal Communications?

22        A     I think it was something to do with crowd

23   funding.  She was putting up like seminars and getting

24   people together.  It was a business transaction.  I'm

25   certain you know all of that.
```

Page 68

EXHIBIT 2  PAGE  153

```
 1        Q    But she had an ownership interest in it?

 2        A    Yes.

 3             MR. GOLDEN:  I'd like to take a ten-minute break.

 4             (Recess.)

 5   BY MR. GOLDEN:

 6        Q    How much in gifts did you give her this year?

 7        A    How much gifts?

 8        Q    What gifts did you give her this year?

 9        A    I think I bought her some clothing on her

10   birthday in March.  That was probably all.

11        Q    Did you give her any cash this year?

12        A    No.

13        Q    Did you give her any cash last year?

14        A    No.

15        Q    Did you give her gifts last year?

16        A    Yes.  But I -- I usually give gifts to all of

17   them on their birthday and at Christmas.

18        Q    So what gifts did you give her last year on her

19   birthday?

20        A    Christmas we gave everybody a Swiss Army blanket

21   bag full of really good chocolates and Swiss things.  It

22   was a pretty nice gift.

23        Q    On her birthday what did you give?

24        A    I told you.  I think I bought her an outfit.

25        Q    No, last year.
```

Page 69

EXHIBIT 2  PAGE  154

1    A    I don't remember.

2    Q    Okay.  Did your husband give her any gifts?

3    A    I buy for like 70 people.  I can't remember

4    everything.

5    Q    I understand.  Did your husband give her any

6    gift?

7    A    No.  He doesn't ever do that.

8    Q    Okay.  And Andrea Downs, is she getting married?

9    A    Yes.

10    Q    When is she getting married?

11    A    In the middle of September.

12    Q    Where is she getting married?

13    A    In France.

14    Q    Are you going to the wedding?

15    A    No.

16    Q    And who's paying for the wedding?

17    A    Not me.

18    Q    Are you giving her a wedding gift?

19    A    I haven't thought about it yet.

20    Q    Okay.

21    A    It's kinda nosy.  These people are in their 50s

22    and 60.  I gave them weddings when they were young.

23    Q    You're aware that there was a judgment for fraud

24    against Andrea?

25    A    Yes.

EXHIBIT 2  PAGE 155

1    Q    Did that impact your feelings about her or your

2    decisions regarding what to do with her end of the trust?

3    A    Explain what you mean by "impact my feelings."

4    Q    You tell me.

5    A    I don't feel any differently about my daughter.

6    Q    Okay.  And if that judgment went away -- well,

7    let me take it back.

8         If that judgment never occurred, would Andrea

9    Downs still be one of the beneficiaries under the trust?

10   A    Yes.

11   Q    If that judgment went away, would you make her a

12   beneficiary of the trust again?

13        MR. HAYS:  Objection; calls for speculation.

14        THE WITNESS:  Yeah.  I won't answer.

15   BY MR. GOLDEN:

16   Q    You can answer the question.

17        MR. HAYS:  You can answer if you know, but it's

18   asking you to speculate a hypothetical.

19        THE WITNESS:  I don't know.  I don't know.

20   BY MR. GOLDEN:

21   Q    What?

22   A    I don't know what people do in the future, you

23   know.  I'm not going to answer that question.

24   Q    I'm asking about you, not other people.

25   A    I don't know what I would do in the future.

Page 71

EXHIBIT 2  PAGE  156

1      Q     What would you do today if that happened?

2      A     I would do nothing today.

3      Q     So if that judgment went away, you would not add

4   her in as a beneficiary?

5      A     Not today.

6      Q     Why?

7      A     I'm not going to answer that.

8      Q     Okay.  Just to be clear, you know what you would

9   do, but you're not going to answer that.  Is that correct?

10   That's all I'm asking?

11      A     You're supposing something.  I don't know.  I

12   don't know.  First of all, we both know that's not going

13   to happen, so this just seems silly.

14      Q     All I'm asking you is when you said I'm not going

15   to answer that, I'm not here to badger you.  I don't want

16   to badger you in any way.  You said, "I'm not going to

17   answer that."  I'm just clarifying that you're not

18   going -- you know what considerations there would be, and

19   you know what you might do.  But you don't want to answer

20   that; is that correct?

21      A     I have never thought of it, and I don't know.

22   And I answered you already.

23      Q     Okay.  Is there any reason other than the

24   existence of the judgment that you took Andrea out of the

25   trust?

Page 72

EXHIBIT 2  PAGE 157

```
 1        A     I think that's our business why we would do that.

 2   We are free to move -- do that, anything with any of our

 3   children if we want to in the way our trust is written.

 4              MR. GOLDEN:  Move to strike as nonresponsive.

 5        Q     Is there any other reason?

 6              You can repeat the last question, actually.

 7              (Record Read.)

 8              THE WITNESS:  No.

 9   BY MR. GOLDEN:

10        Q     And do you have -- do you intend one day to share

11   assets with Andrea?

12        A     No.

13        Q     Why?

14        A     Because this judgment is going to be going on

15   longer than I am.

16        Q     But -- understood.  Understood.

17        A     I think that's clear.

18        Q     Understood.  Understood.  Other than the

19   judgment, she would have some interest in those assets?

20        A     What are you getting at?

21        Q     Well, if the judgment wasn't there, she would

22   have been still there as a beneficiary.

23        A     Yes.  I already answered that.

24        Q     Right.  Yes, you did.  Yes, you did.  And as a

25   beneficiary, she would have an entitlement to assets
```

                                                        Page 73

EXHIBIT 2  PAGE  158

1    and/or income if the judgment wasn't there.

2        A    When I'm dead she would have that.

3        Q    Well, unless there was income paid beforehand.

4        A    There's no income paid.  Everything we kept in

5    our own hands.

6        Q    Why is there no income paid?

7        A    Income paid to who?

8        Q    To the beneficiaries.

9        A    We don't do that.

10       Q    But are the assets generating income in the

11   trust?

12            MR. HAYS:  Objection.  Don't answer the question.

13   Your assets are your assets.

14            (Instruction Not to Answer.)

15            THE WITNESS:  Yes.

16   BY MR. GOLDEN:

17       Q    Are you refusing to answer based upon your

18   attorney's instruction?

19       A    Yes.

20       Q    Do you understand that you have a duty to make

21   those assets income producing?

22            MR. HAYS:  I don't know if you even understand

23   the question.  But I would instruct you not to answer it,

24   because your assets are your assets and are irrelevant to

25   this proceeding.

                                              Page 74

EXHIBIT 2  PAGE  159

```
 1              (Instruction Not to Answer.)

 2    BY MR. GOLDEN:

 3        Q    Do you refuse to answer based upon your

 4    attorney's instructions?

 5        A    Yes.

 6              MR. GOLDEN:  All right.

 7              MR. RAFATJOO:  For the record, you're not

 8    allowing me to ask questions, or if I ask questions,

 9    you're instructing your client not to answer them.

10              MR. HAYS:  Correct.

11              MR. RAFATJOO:  Okay.  And this is the first time

12    you have disclosed that to me, correct?

13              MR. HAYS:  This is the first time you've

14    disclosed to me that you intended to come and ask any

15    questions, so how would it have come up?  I've had all of

16    my conversations with Mr. Golden, and I raised this issue

17    with him that I didn't think you had any right to ask any

18    questions.

19              MR. RAFATJOO:  But you never raised that with me,

20    correct?

21              MR. HAYS:  Nor did you raise with me that you

22    intended to come and ask questions.

23              MR. RAFATJOO:  You did see my joinder in the

24    2004, correct?

25              MR. HAYS:  You filed a joinder in the trustee's
```

Page 75

1   motion.  Doesn't make you a party with the ability to ask

2   questions.

3          MR. RAFATJOO:  Okay.  So by that point, you knew

4   our intent to come and ask questions.

5          MR. HAYS:  That's not true.  I didn't know what

6   your intent was.  I thought you were supporting the

7   trustee so the trustee could get an examination.

8          MR. RAFATJOO:  And Jeff never told you that I

9   would ask questions?

10         MR. HAYS:  That is correct.

11         MR. RAFATJOO:  Okay.  We'll deal with the judge

12  on that one.  Don't want to make a scene at the house.

13         MR. GOLDEN:  For the record, I did indicate that

14  he intended to ask questions.  And the three of us

15  actually had a conversation together about the scheduling

16  of the examination.  But again, we can deal with it that

17  way.  Although again, I would just implore you to let him

18  ask the questions so we don't have to create the time and

19  expense of coming again.  If you're going to instruct her

20  not to answer, it may be -- this is just -- I mean, it may

21  be super short anyway, but.

22         MR. RAFATJOO:  I'm not going to ask questions if

23  he's going to instruct her not to answer them.

24         MR. GOLDEN:  No, no, no.  I'm sorry.  I meant --

25  I wasn't clear.  If he's going to instruct her not to

                                                Page 76

EXHIBIT 2  PAGE 161

1    answer on grounds of relevancy or other issues other than

2    the fact that because you are asking those questions.  But

3    yes, I agree.  It would be futile for you to do it if

4    you're just going to instruct her not to answer because

5    his client's asking questions.  But to me, it's just

6    burdensome to come back a second time for that purpose.

7              MR. HAYS:  Well, then, I've said my peace on it,

8    so I don't need to repeat it.

9              MR. GOLDEN:  Okay.

10             MR. HAYS:  And things may change if his motion

11   for intervention is granted.  But that's just not the case

12   right now.

13             MR. GOLDEN:  Well, the 2004 is different than the

14   adversary.

15             MR. HAYS:  I understand.  But everything about

16   the trust is specific to the adversary.

17             MR. GOLDEN:  Well, all right.

18             THE WITNESS:  Can I ask a question?

19             MR. HAYS:  You and I can talk when we're done.

20             THE WITNESS:  Okay.

21   BY MR. GOLDEN:

22      Q    What assets do you and your husband own today?

23             MR. HAYS:  Objection.  Instruct the witness not

24   to answer.  It's probably the fourth or fifth time you've

25   asked that.  Instruct her not to answer.

                                              Page 77

EXHIBIT 2  PAGE  162

```
 1              (Instruction Not to Answer.)

 2              MR. GOLDEN:  Are you refusing to answer based

 3     upon your attorney's instructions?

 4              THE WITNESS:  Yes.

 5     BY MR. GOLDEN:

 6         Q    Do you know what assets Eric Steinmann owns?

 7         A    No.

 8              MR. HAYS:  Same objection.  Okay.  You don't

 9     know.

10              THE WITNESS:  I don't know.

11     BY MR. GOLDEN:

12         Q    Do you have any idea of any assets he owns at

13     all?

14         A    No.

15         Q    Okay.  Do you know who has been -- well, strike

16     that.

17              All right.  I am going to -- now we're going to

18     be filing a motion to compel based upon this examination.

19     I'm inclined to do a stipulation of sorts generally just

20     to sort of focus the issues for the judge.

21              MR. HAYS:  I think it's required by the local

22     rules.

23              MR. GOLDEN:  It is required.  I think the little

24     ambiguity about -- sorry, a little bit of ambiguity about

25     what kind of things fall within the prediscovery
```

Page 78

1    stipulation or not.  But I totally like the idea and

2    agree.  And maybe it's less ambiguous in this context if

3    I'm making it clean, and I'm totally fine with that for

4    this content.

5            And so for now, I'm just going to -- I'm not

6    concluding the examination.  But it will be adjourned to

7    some other date and time based upon, one, what we either

8    work out with the court rules with respect to the

9    questions you didn't answer; and two, I think, with

10   respect to their right to ask questions as well.

11           And am I missing anything?

12           MR. RAFATJOO:  That's it.

13           THE WITNESS:  I don't know who pays for you

14   people to come and do this.  But I absolutely don't agree

15   that this should happen after I've already had it done

16   twice -- three times now, and I'm not going to say

17   anything different.  So that's my rant.

18                   (TIME NOTED: 1:35 p.m.)

19

20

21

22

23

24

25

                                              Page 79

EXHIBIT 2  PAGE  164

1           I, the undersigned, a Certified Shorthand

2    Reporter of the State of California, do hereby

3    certify:

4           That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were administered an oath; that

8    a record of the proceedings was made by me using

9    machine shorthand which was thereafter transcribed

10   under my direction; that the foregoing transcript is

11   a true record of the testimony given.

12           Further, that if the foregoing pertains to

13   the original transcript of a deposition in a Federal

14   Case, before completion of the proceedings, review

15   of the transcript [ ] was [x] was not requested.

16           I further certify I am neither financially

17   interested in the action nor a relative or employee

18   of any attorney or any party to this action.

19           IN WITNESS WHEREOF, I have this date

20   subscribed my name.

21   Dated: September 14, 2019.

22

23

24   *Valerie D. Granillo*

25           VALERIE D. GRANILLO

         CSR No. 11469

                                             Page 80

EXHIBIT 2  PAGE  165

**[01167 - andrea]**

| 0 |
|---|
| **01167**  1:8 2:8 |

| 1 |
|---|

**1**  1:25 5:12 35:12
  35:18 49:1
**10**  12:20
**11**  12:19
**11469**  1:23 2:24
  80:25
**12**  60:18
**12589**  1:5 2:5
**12:00**  2:21 6:2
**12:41**  45:3
**12th**  4:6
**14**  80:21
**16**  60:18
**1800**  4:6
**19**  58:2 60:14 62:3
**19th**  62:10
**1:35**  2:22 79:18
**1st**  54:17,22

| 2 |
|---|

**2**  5:13 48:17,18
**2004**  6:19 9:15
  10:4,5,16,21,24
  11:2,19,24 19:22
  30:21 31:2,14
  75:24 77:13
**2011**  47:14
**2012**  58:2 60:14
  62:3,10
**2015**  54:24 66:24
**2016**  53:21,22,24
  54:1,12,17,22
  62:13 65:13,15
**2017**  67:5
**2018**  67:3
**2019**  1:20 2:22 6:1
  44:3 80:21

| 24  36:10 |
|---|
| **250,000**  55:16 56:3 |

| 3 |
|---|

**3**  1:20 2:22 6:1
  62:2
**30**  15:5 36:10
  61:12,18
**310**  4:8
**333-7777**  3:18
**35**  5:12
**3512642**  1:23

| 4 |
|---|

**440-4100**  4:8
**48**  5:14

| 5 |
|---|

**5**  5:5
**50s**  70:21

| 6 |
|---|

**60**  70:22
**600**  3:7
**650**  3:7

| 7 |
|---|

**7**  1:6,8 2:6,8
**70**  70:3
**714**  3:9
**7355**  80:24

| 8 |
|---|

**8**  36:9
**80**  1:25
**870**  3:16
**8:16**  1:5 2:5
**8:18**  1:8 2:8
**8th**  62:15,16

| 9 |
|---|

**9**  49:5
**90067**  4:7
**92620**  3:17

| 92626  3:8 |
|---|
| **949**  3:18 |
| **966-1000**  3:9 |
| **997**  2:20 |

| a |
|---|

**abilities**  48:6,8,9
  48:10,12
**ability**  7:24 76:1
**able**  17:5
**absent**  48:9
**absolutely**  79:14
**account**  63:22,23
  64:6,7,16,16
**accountant**  23:4
  23:19 24:4,7,14
  27:15 28:21 29:2
  29:4,5 33:5,22,23
  34:13,13,14,16,18
  34:22,24 35:2,6,8
  35:9 51:6 61:8
  62:7,18 65:3
**accountants**  27:19
  29:7 33:11 35:5
**accounts**  54:7
**acknowledge**
  44:14
**action**  9:11 10:21
  47:4 80:17,18
**actual**  35:17 38:7
  38:9
**add**  12:16 72:3
**adjourned**  79:6
**administered**  6:5
  80:7
**advanced**  30:17
**adversary**  1:8 2:8
  9:11,24 10:20,25
  19:21 20:4 30:20
  77:14,16
**advice**  17:21,22,23

**advise**  16:8
**ago**  7:18 8:7,13,13
  15:5 24:5,17
  32:13 47:12 61:12
  61:18
**agree**  77:3 79:2,14
**agreement**  56:4,6
  57:8
**ahead**  63:23
**alive**  12:23
**allow**  10:9 11:5
**allowed**  11:4
  16:16 18:24 41:17
  44:13
**allowing**  75:8
**alzheimer's**  17:4
**ambiguity**  78:24
  78:24
**ambiguous**  79:2
**amendment**  5:13
  17:19 27:7 32:1
  45:12 46:3,10
  48:23 51:8,9,19,20
  52:1 56:15,19
  58:8
**amendments**
  17:14,16 57:7,14
  57:16
**amount**  20:1
  31:17 56:7,9
**ana**  1:2 2:2
**anderson**  15:14,16
**andrea**  1:6 2:6
  21:16 22:2 29:5
  29:16 39:25 41:6
  41:14 43:8 45:13
  45:15 46:3,7,9,17
  46:20,23 52:2
  53:10 54:12,13,14
  54:16,19,21,24
  59:3,4,8 60:10

**[andrea - based]**

62:3,8 63:6 64:15
65:13,17 66:2
67:25 70:8,24
71:8 72:24 73:11
**andrea's** 34:16
63:7
**andy** 65:15
**angeles** 4:7
**answer** 6:22 7:11
7:16,17 10:3 11:7
12:2,5 13:8,11,14
13:19 14:20 18:11
18:12,14 19:14,15
19:17 20:12,13,19
20:20,22 21:2,4,22
21:25 22:5,6,8,12
22:14,15,18,20,23
23:2,5,6,12,13,16
23:22,23,25 24:11
24:15,16,21,22,23
24:25 26:7,8,18,24
27:10,18,21,22
28:5,6,8,14,18
29:7,9,11,19,20,24
29:25 30:8 33:8,9
33:18,23 34:19
35:7 37:2,3,5,22
38:15,17,19 39:1,2
39:5,11,12,14,20
39:22 40:2,8,10,12
40:17,17,19 41:1,4
41:6,17,20,22,23
42:2,7,9,10,24,25
43:1,13,15 44:8,10
44:19,20,25 45:6
45:22,23,25 46:1,5
46:7,7,14,19 47:5
47:6,8,24 52:11,16
52:20,21 53:2,4,5
53:7 55:13 59:9
59:11,13,14,15,19

63:17 64:9,10,12
67:19,20,22 71:14
71:16,17,23 72:7,9
72:15,17,19 74:12
74:14,17,23 75:1,3
75:9 76:20,23
77:1,4,24,25 78:1
78:2 79:9
**answered** 38:25
39:3 44:11 47:21
52:15 56:25 61:16
65:14 72:22 73:23
**answering** 42:3
47:19,24
**answers** 42:3
**anybody** 33:5,20
33:24 52:10
**anybody's** 25:11
**anymore** 15:10
**anyway** 7:8 39:4
76:21
**ap** 1:8 2:8
**appearances** 3:1
4:1
**apply** 19:21
**appreciate** 42:8
**approach** 11:15
**appropriate** 13:12
14:20 39:4
**area** 15:17,18
**argue** 26:21 59:25
**argumentative**
22:13,19,22
**army** 69:20
**article** 49:2
**asked** 7:16 9:22
14:18 25:9 26:23
26:24 27:15 28:3
31:17,21,24 33:20
38:25 39:3 41:14
42:7 57:20 77:25

**asking** 7:10 9:19
10:17 18:20,22
19:1,2,3 25:21
28:10 31:22 41:7
41:8 42:13,22,23
44:15,16,21 46:11
51:14 59:24 60:2
60:17 64:23 65:19
66:20 71:18,24
72:10,14 77:2,5
**asks** 61:14
**asset** 18:7
**assets** 13:4,10
15:19 18:1,5,8,17
19:11 20:2,2,8,16
20:25 21:11,22,23
22:3 36:24 38:12
38:13,14,22 39:17
43:11,19,23,24,24
43:25 44:4,8,13,14
44:15,17 45:7,10
46:17 47:1 52:25
53:1 60:18 63:4,6
63:12 65:7,24
66:2,4 73:11,19,25
74:10,13,13,21,24
74:24 77:22 78:6
78:12
**assume** 7:17
**assumes** 24:8
**assuming** 31:1
**attached** 35:19
48:19
**attention** 50:4
**attorney** 3:6,15
16:10,11,13,15
18:23 26:6 27:5,8
28:4 33:21,23
40:16 59:10 80:18
**attorney's** 13:15
18:15,21 19:18

20:23 22:9,24
23:17 24:1 25:1
28:19 29:12 37:6
38:20 39:6,15,23
40:13 46:1,15
47:9 53:8 59:20
64:13 67:23 74:18
75:4 78:3
**attorneys** 29:18
33:10
**audibly** 7:14
**avenue** 3:16 4:6
**avoid** 10:10
**aware** 20:5 30:19
30:24 31:5,6
56:19,21,23 57:14
65:21,22,25 66:3
70:23

**b**

**back** 25:4 26:9
49:1 54:10 55:19
55:23 71:7 77:6
**badger** 59:25
72:15,16
**bag** 69:21
**balboa** 66:16
**bank** 63:22,23
64:6,7,16,16
**bankruptcy** 1:1
2:1 6:19 8:19 9:11
9:15 13:6 20:3,6
47:4 62:10 66:5,7
**based** 7:17 13:14
18:14,20 19:17
20:22 22:8,23
23:16,25 24:25
28:8,18 29:11
37:5 38:19 39:5
39:14,22 40:12
46:1,15 47:8 53:7
59:19 64:12 67:22

Page 2

[based - correct]

74:17 75:3 78:2
78:18 79:7
**basis**  20:6
**bearing**  27:19
**beginning**  2:21
36:7
**behalf**  2:20
**belknap**  1:14 2:14
**beneficiaries**  39:9
71:9 74:8
**beneficiary**  37:13
37:15 38:2 52:2
71:12 72:4 73:22
73:25
**bernardino**  16:23
**best**  7:22 33:24
**beyond**  26:17 27:7
**birthday**  67:6
69:10,17,19,23
**bit**  33:17 47:21
78:24
**bk**  1:5 2:5
**blacked**  49:16,18
49:20
**blanket**  69:20
**books**  23:19
**bottom**  27:4 36:12
**bought**  69:9,24
**break**  44:24 45:2,5
69:3
**bridge**  43:3
**briefly**  7:7
**bring**  31:17
**burdensome**  77:6
**business**  20:2 29:8
44:9,22 54:3
57:13 63:8 68:11
68:24 73:1
**businesses**  35:4
68:16

**buy**  66:21 70:3

**c**

**california**  1:2,19
2:2,21 3:8,17 4:7
6:1 80:2
**called**  9:10,15
**calling**  34:11
**calls**  71:13
**capable**  30:15
47:19 48:4
**care**  14:21 15:7
**carries**  8:2
**carved**  33:23
**case**  13:6 47:4
54:6 77:11 80:14
**casey**  1:8 2:8
**cash**  53:13 69:11
69:13
**cause**  52:7
**caution**  16:9
**cb**  1:5,8 2:5,8
**center**  3:7
**central**  1:2 2:2
**certain**  20:1 30:14
30:22 31:15,17
68:25
**certainly**  13:16
57:6
**certified**  2:23 80:1
**certify**  80:3,16
**chance**  23:1 25:18
33:15
**change**  77:10
**changed**  30:6
57:16
**chapter**  1:6,8 2:6
2:8
**child**  21:8,10
**children**  12:18,19
12:20 13:4 15:8
18:7 20:25 21:12

35:3 40:5 41:7
43:5 45:18 46:8
50:16 52:18 54:9
56:17,19 60:12,23
61:7 64:19,23
73:3
**children's**  65:1
**chocolates**  69:21
**christmas**  53:18
53:19 67:6 69:17
69:20
**circumstances**
51:22
**clarify**  7:19 14:19
**clarifying**  26:23
72:17
**clean**  79:3
**clear**  43:19 59:24
60:1 72:8 73:17
76:25
**clearly**  40:25
**client**  10:15 11:7
11:20,22,24 12:2,5
26:6 27:5,8 28:4
45:6 59:10 75:9
**client's**  77:5
**clothing**  69:9
**coastal**  68:18,21
**combined**  10:24
12:12
**combining**  10:10
**come**  19:7 56:2
75:14,15,22 76:4
77:6 79:14
**coming**  76:19
**commenced**  9:12
**communicate**
29:14
**communication**
16:11 28:4 29:18
59:10

**communications**
26:13 27:5 59:4,7
59:16 60:2,3 61:1
61:23 62:7 68:11
68:18,21
**companies**  68:16
**company**  68:15
**compel**  78:18
**compels**  22:12
**completion**  80:14
**concept**  10:9
**concerning**  25:16
60:22
**concluding**  79:6
**conducted**  11:19
**connection**  8:15
8:21 9:10 14:4,12
30:20 44:7
**considerations**
72:18
**considered**  55:8
**content**  59:10 60:2
79:4
**context**  79:2
**contingent**  57:24
58:2 60:9,13
**continued**  4:1
11:21,25
**contrary**  11:15
**control**  33:2
**conversation**
10:18 16:10 76:15
**conversations**
10:5 30:16 75:16
**copies**  27:16
**copy**  15:9 26:14
50:18,22 51:1,4,6
56:17
**correct**  11:9 12:23
12:24 17:11,13
18:22,25 19:22,23

Veritext Legal Solutions
866 299-5127

EXHIBIT 2  PAGE  168

[correct - eric]

21:14,16,17 27:11
28:25 31:16,18
33:2,3,6 34:14
36:7,23 37:16
38:4 39:16 40:20
46:15 48:7,24
53:13,15 55:2,7
59:17 63:18 64:7
65:4,10 72:9,20
75:10,12,20,24
76:10
**correctly** 25:8
**correspondence**
34:8 58:12 61:22
62:1,17
**costa** 3:8
**counsel** 10:23
**country** 66:17
**course** 39:18 40:6
**court** 1:1 2:1 7:14
8:4,19 9:2,3 10:1
11:8 14:12,15,17
14:23 20:6 22:12
28:15 30:24 31:2
31:5 35:16,19
48:19 51:24 54:6
79:8
**cpa** 23:4 35:8
**create** 76:18
**created** 53:11
**cross** 43:2
**crowd** 68:22
**csr** 1:23 80:25
**cucamonga** 15:18
**custody** 33:1

**d**

**d** 1:22 2:23 3:14
16:21 80:25
**dan** 16:18,21,24
36:2,4 37:9 56:16

**date** 58:3 60:14
62:4,12 79:7
80:19
**dated** 80:21
**dates** 10:6 62:9
**daughter** 51:24
71:5
**david** 4:3
**day** 73:10
**days** 24:5,17
**dead** 74:2
**deal** 76:11,16
**debtor** 1:7 2:7
13:7,9 20:3 27:19
45:8 52:23 57:25
**debtor's** 47:3
**deceased** 12:19
**decided** 16:13
60:24 61:10 62:22
**decisions** 30:15
71:2
**declaration** 5:12
**defendant** 1:16
2:16
**deponent** 19:25
**deponent's** 54:14
**deposition** 1:18
2:19 6:14 7:6 8:6
9:10 10:24 11:14
31:3,14 47:15
48:4,10 80:13
**described** 8:22
**description** 5:11
**destroyed** 15:11
**detail** 44:25
**determination**
20:7
**diagnosed** 47:12
**die** 16:6
**different** 6:24
19:11 33:17 44:18

45:7 49:3 54:2
77:13 79:17
**differently** 71:5
**difficult** 59:23
**direct** 65:12
**directed** 65:16,23
**direction** 80:10
**directly** 13:19
57:24 60:9 63:3
**disclosed** 75:12,14
**disconcerting** 10:8
**discussion** 19:9
62:15
**disease** 30:17
**distribution** 13:3
46:9,10,21
**distributions** 46:4
**district** 1:2 2:2
**divided** 18:1,5,7
20:25 21:6,9
**division** 1:2 2:2
**document** 14:17
14:23,25 15:1
21:3 35:13,14,15
35:17,22 36:19
37:8,11,18 48:21
49:25 57:20 60:21
64:20
**documents** 14:12
14:15 25:16 27:1
27:16 28:1 29:5
29:15 31:18,21
32:3,9,14,17,20,22
32:23 33:1,4,10,11
33:21,25 34:2,4,11
35:15 57:23 58:5
58:7 60:8,22
61:21 62:2,4,6,25
63:2,9,10 64:18,25
65:4

**doing** 34:12 44:22
62:21 68:19,21
**downs** 1:6 2:6
21:16 22:2 29:5
29:16 39:25 41:6
43:8 45:13 53:10
59:3,8 60:10
65:13,15,17 66:2
70:8 71:9
**drafted** 37:8 51:19
51:20 56:15
**drafting** 37:10
**drive** 2:20 3:7
**duty** 74:20

**e**

**e** 6:12,13 16:21
17:8 58:17,22,24
61:5 62:20,23
65:9
**earlier** 34:25 38:6
43:18 61:16
**earned** 52:13
**edward** 3:14
**effectively** 28:16
**ehays** 3:19
**eight** 47:12 48:13
**either** 7:2 30:6
53:13,15 57:12
79:7
**employee** 80:17
**entities** 67:15,18
67:25 68:3,5
**entitlement** 73:25
**entity** 68:8,10
**equally** 18:7 21:10
21:12
**equitable** 57:24
58:1 60:9,13
**eric** 1:12 2:12
32:12 34:2,10,22
34:24 35:2 36:6

Page 4

[eric - golden]

36:20 37:10 65:16
67:9 78:6
**eric's**  34:18
**established**  60:11
63:4
**estate**  20:4
**evenly**  21:6
**event**  12:15 22:12
**everybody**  69:20
**evidence**  24:9 31:2
**evidencing**  57:23
60:8
**examination**  5:2
6:8,20 9:15,16
10:24 11:19 19:23
30:19,21 31:14
76:7,16 78:18
79:6
**examinations**
10:11
**examined**  6:5
**excuse**  19:6
**exhibit**  5:12,13
35:12,18 48:16,18
49:1
**exist**  44:16
**existed**  18:17
44:17
**existence**  72:24
**expense**  11:17
76:19
**explain**  17:25
50:11,13 51:23
71:3
**explained**  52:4
**extent**  30:8 47:20

**f**

**fact**  9:7 10:6 77:2
**facts**  24:8 31:1
38:7,10

**faculty**  30:4
**fair**  7:12
**fall**  78:25
**family**  57:25 60:12
**far**  8:25
**federal**  80:13
**fee**  56:13
**feel**  71:5
**feelings**  71:1,3
**fees**  66:8
**feldman**  4:4
**felt**  52:9
**female**  28:23
**fifth**  77:24
**figured**  16:7
**filed**  9:25 35:15
66:4 75:25
**filing**  66:6 78:18
**financial**  20:1
23:20 58:1 60:13
**financially**  80:16
**find**  10:8 15:12
61:21
**fine**  11:8 29:3
33:19 43:4 59:25
60:6 79:3
**finish**  7:10 23:2
25:21 28:10
**finished**  25:25
**firm**  17:5 25:3,6
25:15 28:1 29:15
**firm's**  17:7
**first**  5:13 10:4
25:19 45:12 46:7
51:8,8 56:15,19
57:23 59:2 72:12
75:11,13
**five**  44:24 45:2
**flat**  56:13
**floor**  4:6

**focus**  78:20
**follow**  13:16
**follows**  6:6
**foregoing**  80:4,6
80:10,12
**form**  60:2
**formation**  45:8
**formed**  15:23
29:22 46:18,21,24
47:2
**forth**  80:5
**four**  17:20
**fourth**  77:24
**france**  70:13
**fraud**  70:23
**free**  73:2
**friends**  17:3
**full**  6:10 69:21
**funding**  68:23
**funds**  8:20 39:25
45:15,18 46:4
53:11,20
**further**  52:16
80:12,16
**futile**  77:3
**future**  57:24 58:1
60:8,13 71:22,25

**g**

**generally**  78:19
**generating**  74:10
**getting**  33:7 68:23
70:8,10,12 73:20
**gift**  53:19 66:21
67:14 69:22 70:6
70:18
**gifts**  46:23 66:19
66:23,24 67:1,3,5
67:7,9,15 69:6,7,8
69:15,16,18 70:2
**give**  7:22 16:17
17:21,22 19:7

23:1 25:18 28:22
30:18 32:10,18
33:15 44:23 47:15
48:10 51:1 66:19
66:20,23 67:1,3,5
67:7,9,15 69:6,8
69:11,13,15,16,18
69:23 70:2,5
**given**  46:9 48:10
53:10,13,19,23
54:11,16 66:24
80:11
**giver**  67:14
**giving**  48:4 70:18
**go**  7:7 11:14 14:22
16:6 42:11,16
48:25 49:1 57:19
63:23
**going**  7:7 9:20
10:2 11:7,16 12:7
13:16 15:7 21:9
21:22 23:11 24:23
26:21 27:22 31:14
33:15 41:11 42:5
43:2 45:6 46:5
52:15 53:5 57:19
59:25 64:1,2,8
70:14 71:23 72:7
72:9,12,14,16,18
73:14,14 76:19,22
76:23,25 77:4
78:17,17 79:5,16
**golden**  3:4,5 5:5
6:9 7:1 10:4,19
11:12 12:8 13:12
13:22,25 14:11,16
14:19 16:14,19
18:13 19:10,16,20
19:24 20:5,15,21
21:5,7 22:1,7,16
22:21 23:8,15,24

Page 5

[golden - instruct]

24:10,18,24 25:14
25:20 26:1,3,9,12
26:20 27:9,13,24
28:7,25 29:3,10,21
30:2,12,18 31:4
32:19 33:14 34:1
34:23 35:12,20
36:16 37:4,20,24
38:18 39:3,13,21
40:4,11,24 41:13
41:21 42:1,8,13,16
42:19,21,24 43:4
43:17 44:11 45:11
45:24 46:13 47:7
48:3,16,20 49:7,24
52:14 53:6 54:15
55:18 57:18 59:12
59:15,18,22 60:7
61:19 64:5,11,24
66:22 67:21 69:3
69:5 71:15,20
73:4,9 74:16 75:2
75:6,16 76:13,24
77:9,13,17,21 78:2
78:5,11,23

**good**   6:10 29:23
69:21
**goodrich**   3:4
**gotten**   41:14,18
**granillo**   1:22 2:23
80:25
**granted**   10:1
77:11
**grounds**   77:1
**guess**   8:12,14
47:14 59:22
**gun**   25:23

**h**

**h**   1:8,11 2:8,11
13:1 16:21

**hamid**   4:5 10:14
**hand**   36:12 37:10
**handling**   25:7,11
**hands**   33:4 74:5
**happen**   72:13
79:15
**happened**   43:11
54:9 72:1
**happening**   9:7
**happens**   45:9
63:20
**happenstance**
68:14
**happy**   7:19
**hausman**   4:3
**hays**   3:13,14 6:22
9:21 10:13,22
11:3,9,11,18,22
12:3,6 13:5,21,24
14:6,8,15,18 16:9
16:17 18:10 19:13
19:23,25 20:11,18
21:3,21 22:5,13,18
23:6,10,21 24:8,16
24:20 25:9,18,23
26:2,4,14 27:2,11
27:17 28:3,24
29:2,6,17,25 30:8
31:1 32:16 33:7
33:20 34:20 35:10
36:14 37:1,18,21
37:23 38:15,24
39:10,19 40:2,7,21
41:10,14,17,22,25
42:4,12,15,18,20
42:22 43:2,14
44:6,20,23 45:2,5
45:21 46:6 47:3
47:20 48:1 49:5
49:23 52:20,23
53:2 54:13 55:13

57:11,13 59:9,14
59:17 60:6 61:16
64:1,8,21 67:19
71:13,17 74:12,22
75:10,13,21,25
76:5,10 77:7,10,15
77:19,23 78:8,21
**health**   25:6
**hear**   7:14
**heinz**   1:11,14 2:11
2:14 4:12 13:1,1
19:7 38:12
**held**   57:24 59:3
60:9 62:2 63:3
64:19
**helped**   54:3,5,5
**helpful**   25:24
28:13
**heniz**   13:1
**hereto**   35:19 48:19
**hmm**   28:14
**hold**   25:18 33:7
46:6 64:1
**holden**   16:18,21
16:25 36:2,4 37:9
56:16
**holdings**   4:3
**home**   15:22
**house**   76:12
**hrafatjoo**   4:9
**huh**   12:21 21:13
28:12,14
**hundred**   21:11
**husband**   12:23
20:1 30:3,10,13
34:10 36:6,20
47:1,11 53:10
54:3,8,12,13,14,16
64:6 65:23 67:7
70:2,5 77:22

**husband's**   13:10
34:14 43:24 64:16
**hypothetical**
71:18

**i**

**idea**   51:8,10,15,16
51:17 78:12 79:1
**identification**
35:18 48:18
**ignore**   35:13
**ignored**   36:11
**impact**   71:1,3
**impaired**   48:13
**implore**   76:17
**important**   12:11
**inclined**   78:19
**include**   33:21
**included**   43:24
**including**   58:1
60:13
**income**   39:8,17
74:1,3,4,6,7,10,21
**index**   5:1
**indicate**   76:13
**indicated**   43:18
**indirectly**   57:25
60:10 63:3
**influencing**   7:24
**inform**   50:16
**initially**   36:22
**input**   18:3
**instruct**   11:7 12:5
13:7 18:10 19:14
20:11,18 21:21
22:5,18 23:11,22
24:20 26:6,21
27:18 28:4 29:6
29:18 37:1 38:15
38:25 39:10 40:7
42:2,24 44:8
45:21 47:4 52:20

Veritext Legal Solutions
866 299-5127

EXHIBIT 2  PAGE  171

[instruct - loan]

53:2 59:9,14 64:9
67:19 74:23 76:19
76:23,25 77:4,23
77:25
**instructed** 18:23
26:18 33:9,22
40:17 41:19
**instructing** 12:1
26:12,24 27:9
33:18 75:9
**instruction** 13:11
18:12,15,21 19:15
20:13,20,23 21:25
22:6,15,20 23:13
23:23 24:22 27:21
28:6 29:9,20 37:3
37:6 38:17,24
39:2,6,12,20,23
40:10,20 44:10
45:23 46:1 47:6
52:21 53:4 59:11
64:10 67:20 74:14
74:18 75:1 78:1
**instructions** 13:15
13:16 19:18 22:9
22:24 23:17 24:1
25:1 28:19 29:12
38:20 39:15 40:13
46:15 47:9 53:8
59:20 64:13 67:23
75:4 78:3
**intend** 73:10
**intended** 75:14,22
76:14
**intent** 76:4,6
**interest** 22:3 45:8
45:13 57:24 58:2
59:2,8 60:9,14
63:3 64:18,23
65:1 67:25 68:3,7
68:17 69:1 73:19

**interested** 80:17
**interrupt** 10:12
14:16 25:20
**interrupting** 10:19
12:6
**interruption** 19:5
**intervene** 9:25
**intervention** 77:11
**involved** 15:13
**irrelevancy** 19:21
**irrelevant** 19:13
21:24 23:21 24:20
28:24 38:16 39:10
40:8 41:19 44:6
45:10,21 47:3
52:23 53:3 74:24
**irvine** 3:17
**issue** 75:16
**issues** 13:6 25:6
30:13 77:1 78:20

**j**

**j** 4:12
**january** 54:17,21
62:15,16
**jeff** 1:14 2:14
10:18 76:8
**jeffrey** 3:5
**jgolden** 3:10
**job** 1:23
**john** 1:13 2:13
**join** 10:16
**joinder** 75:23,25
**joined** 10:5,21
11:2
**joint** 19:23
**judge** 76:11 78:20
**judgment** 70:23
71:6,8,11 72:3,24
73:14,19,21 74:1
**jumping** 25:23

**june** 58:2 60:14
62:3,10

**k**

**katy** 1:13 2:13
**keep** 10:19 11:13
64:3
**kept** 74:4
**kids** 13:10 40:9
41:18 46:3 51:3
52:17
**kind** 78:25
**kinda** 70:21
**kitchen** 62:22
**knew** 43:25 56:23
59:5,6 76:3
**know** 6:22,23,23
7:3,3,4,4 8:15,25
9:7 11:1 14:5,5,6
14:20 15:6 16:12
18:17 27:2,3,3
30:8 31:22 32:5,7
32:14,17 34:20,20
35:7,10,10,11
40:19 41:6,9,22
42:5,7,9,10,25
43:1,5,8,11,13,15
43:18 47:20,24
48:25 49:13,18,20
49:22 50:19,22,23
50:24,24,24 51:3,6
51:7,18 53:18
54:25 55:15 56:22
56:24 57:6,6,11,12
58:11,14 63:14,14
63:14,15,17 65:7,8
65:20 66:11,12,14
68:2,6,25 71:17,19
71:19,22,23,25
72:8,11,12,12,18
72:19,21 74:22
76:5 78:6,9,10,15

79:13
**knowing** 63:20
**known** 68:7
**knows** 42:3 44:14

**l**

**l** 6:12 16:21 17:8
**law** 3:6,15 8:4
25:3,6,15 27:25
29:15
**lawsuit** 31:3 51:25
68:14
**lawyer** 7:2 14:25
15:13,15 25:5,15
27:25 29:15 33:5
34:8 35:8 40:18
40:20 41:2,4
42:14 54:6 55:2,3
55:6,17,25 59:7
61:8 63:11 65:4
**lawyers** 11:14
26:5,5
**lead** 11:17
**legal** 14:24 56:5
66:7
**lemon** 17:8
**letters** 58:13 61:3
62:23 65:9
**lieu** 51:21
**limited** 58:1
**line** 27:4
**lines** 35:14
**list** 32:3 63:12
**litigation** 9:11
52:5,7
**little** 10:7 33:17
44:25 47:21 78:23
78:24
**lives** 66:16
**llc** 4:3
**loan** 54:4 55:7,8,9
55:9,25

[loaned - okay]

**loaned** 53:15 54:8
  54:19,21,24 55:1,4
**loans** 53:25 54:11
**local** 78:21
**log** 59:23
**long** 8:7 17:18
  48:12
**longer** 73:15
**look** 58:15,19
**looked** 61:17
**looks** 57:9,10
**lora** 1:11,18 2:11
  2:19 5:3 6:4,12
**los** 4:7
**lost** 66:7
**lot** 60:16

**m**

**m** 6:13 17:8
**machine** 80:9
**mail** 58:24
**mails** 58:17,22
  61:5 62:20,23
  65:9
**making** 30:15
  34:24 79:3
**male** 28:23
**march** 69:10
**mark** 35:12 48:16
**marked** 35:18
  48:18
**married** 66:9 70:8
  70:10,12
**marshack** 3:13
**marshackhays.c...**
  3:19
**mary** 1:12 2:12
**matter** 8:17,18,19
  8:22 9:2,3 14:4,13
  25:7 32:24
**mean** 21:8 32:8
  47:20 49:4 57:5

**mm** 28:14
**moellenhoff** 4:3
**money** 39:8 46:17
  46:20 47:1 53:15
  54:7,8,12,17,19,21
  54:24 55:2,4,16,25
  64:15 65:12,15,16
  67:16
**month** 44:4
**months** 8:13 17:20
  27:15
**moral** 19:7
**morning** 6:10
**motion** 9:23,25
  10:16 76:1 77:10
58:25 61:22 71:3
  76:20
**meant** 10:12 76:24
**medication** 7:23
**memory** 30:10,13
  48:1
**mental** 30:3 48:6
  48:10,12
**mentally** 29:23
  47:19
**mentioned** 30:20
  34:5
**mesa** 3:8
**met** 17:10
**middle** 14:20
  70:11
**mind** 12:11 30:9
  30:11 64:3
**minute** 7:18 30:18
  32:13 45:2 69:3
**minutes** 44:24
**miscommunicati...**
  60:5
**misquoted** 51:21
**missing** 79:11
**misstates** 32:16

78:18
**move** 33:15 60:4
  73:2,4
**moved** 20:16
**multiple** 10:10

**n**

**n** 6:13,13,13 16:21
  17:8
**name** 6:11 12:25
  16:17 17:7 28:23
  68:14 80:20
**necessarily** 12:13
  59:3
**need** 10:10 12:13
  22:14 32:18 77:8
**neither** 80:16
**never** 11:13 54:5
  60:24 65:9 71:8
  72:21 75:19 76:8
**nice** 69:22
**nine** 8:13
**nonresponsive**
  73:4
**nosy** 70:21
**noted** 79:18
**notes** 61:23
**nothing's** 57:16
**noticed** 9:16 30:21
**number** 5:11 56:2
  56:3 62:2
**numbers** 36:11

**o**

**o** 6:12 16:21 17:8
**oath** 6:5 80:7
**objected** 26:18
**objection** 13:5
  16:9 18:10 19:13
  20:6,11,18,18 21:5
  21:21 22:13 23:21
  23:22 24:8,20

25:19 26:13 27:17
  27:17 28:3 29:6
  29:17 37:1 38:15
  38:24 39:10,19,19
  40:7 45:21 46:6
  47:3 52:20 53:2
  59:9 67:19 71:13
  74:12 77:23 78:8
**objections** 19:21
**obligation** 8:3
**observe** 10:2
**obviously** 26:21
**occurred** 71:8
**oh** 8:10 26:1 47:12
  49:6 53:25 55:9
  59:15 66:15
**okay** 7:9,15 8:1,15
  8:21,24 9:6,9
  10:20 12:17,20
  13:2 15:16,23
  16:15 17:2,25
  19:20,24 20:5,14
  20:16 23:1,14
  24:19,25 26:8,9,20
  27:25 29:3 30:13
  31:10,13,23 32:13
  34:2 35:2 36:7,15
  36:21 38:9,11
  41:3,13,21,23,25
  43:15 45:1,12
  48:6,9,12,16 49:9
  49:13,24 50:5,15
  51:19 52:7,22
  55:1,7,9 56:11
  57:3,4,21 58:10,17
  59:15,22 62:17,23
  63:23,25 64:4
  67:7,13 70:2,8,20
  71:6 72:8,23
  75:11 76:3,11
  77:9,20 78:8,15

Veritext Legal Solutions
866 299-5127

EXHIBIT 2  PAGE  173

[once - questions]

**once** 10:14
**ones** 63:1
**ongoing** 26:17
**order** 31:2,5
**ordered** 30:24
**original** 49:21,25
  80:13
**outfit** 69:24
**overbroad** 13:5
**owned** 19:4
**ownership** 69:1
**owns** 64:3,9 78:6
  78:12

**p**

**p.m.** 2:21,22 6:2
  79:18
**page** 5:11 36:9,11
  49:3,5,15 50:4
**pages** 1:25
**paid** 39:9,17 40:6
  54:9 55:3,4,6,19
  55:23 56:9 64:15
  65:12,15,16 74:3,4
  74:6,7
**pamela** 4:3
**papers** 34:11
**paperwork** 31:6,8
  31:10,13
**parkinson's** 30:17
  47:11
**part** 35:16
**parties** 9:16 11:16
**party** 9:23 10:15
  10:16 11:22 12:14
  33:6 76:1 80:18
**pay** 50:4 55:16
  56:7
**paying** 54:6 70:16
**pays** 79:13
**peace** 10:13 11:18
  77:7

**penalty** 8:2
**peninsula** 66:16
**people** 68:24 70:3
  70:21 71:22,24
  79:14
**percent** 21:11
**perfectly** 11:8
**period** 58:2
**perjury** 8:2
**permission** 41:4
**pertain** 61:13
**pertaining** 27:5
  32:23 61:25 62:5
**pertains** 13:5
  80:12
**petition** 58:3
  60:14 62:3,11
  66:5
**petitioner** 2:20 3:3
**phone** 10:14
**physical** 48:8,9
**place** 30:22 31:15
  80:5
**placed** 43:12
**plaintiff** 1:9 2:9
**plan** 13:3
**planning** 31:9,11
**pleading** 14:6
**pleadings** 14:3
**please** 6:10 14:16
  26:10 28:10,11
  30:18 51:23 60:20
**point** 12:9,11 13:3
  23:10 41:5,8 50:1
  50:3 55:1 76:3
**points** 26:22
**possession** 33:1
**precisely** 12:12
**prediscovery**
  78:25

**present** 4:11 51:21
**pretty** 43:19 69:22
**previous** 42:20
**previously** 33:9,22
**prior** 15:25 16:1
  45:12,16,19 80:7
**privacy** 20:1
**privilege** 26:6 27:8
  52:12 59:10
**privileged** 29:18
  59:23
**probably** 7:7 50:4
  53:18 55:15,22
  56:22,24 69:10
  77:24
**probate** 16:6
**problem** 17:4
  33:19 68:13
**problematic** 10:12
**problems** 30:10
  48:2
**proceed** 9:24
  12:15
**proceeding** 8:24
  8:25 9:25 10:15
  11:23 18:11 19:14
  19:22 20:4 23:11
  27:20 30:20 40:8
  44:7 53:3 56:10
  56:11 74:25
**proceedings** 19:5
  56:5 80:4,6,8,14
**process** 18:3
**produce** 57:20
**produced** 33:12
  58:5,7
**producing** 74:21
**productive** 11:13
**pronoun** 29:1
**property** 45:15,19
  53:11 54:12,17

**provided** 12:22
**prudent** 16:5
  51:22
**purporting** 35:17
**purpose** 10:17
  66:6 77:6
**put** 20:9 36:24
  38:13,22 43:19,25
  44:4 52:25 63:16
**putting** 68:23

**q**

**question** 7:10,12
  7:16 9:1 14:8,10
  14:18 22:14,19
  23:2 25:10,21,25
  26:8,10,22,24
  27:23 28:10 33:8
  33:9,14,17,18,24
  37:21 40:16,18,19
  41:1,6,10,23 42:5
  42:6,7,10,10,12,13
  42:15,17,18,19,20
  42:25 43:1,3,16
  44:11,19 45:6
  46:8,14 47:24,25
  52:12,14,15 55:13
  57:14 59:1,2,13
  61:14 71:16,23
  73:6 74:12,23
  77:18
**questions** 9:19,20
  9:22 10:3,7,9,17
  11:5,6,6,25 12:2,3
  12:4 13:19 27:4
  33:16 42:2 47:19
  75:8,8,15,18,22
  76:2,4,9,14,18,22
  77:2,5 79:9,10

Veritext Legal Solutions
866 299-5127

EXHIBIT 2  PAGE  174

**[r - set]**

| r |
|---|
| **r** 4:5 6:12,12 |
| **rae** 1:11,18 2:11 2:19 5:3 6:4,12 |
| **rafatjoo** 4:5 9:22 9:24 10:20 11:1,4 11:10,19,21,24 12:4 37:17 75:7 75:11,19,23 76:3,8 76:11,22 79:12 |
| **raines** 4:4 |
| **raines.law.com** 4:9 |
| **raise** 10:11 11:8 75:21 |
| **raised** 75:16,19 |
| **rancho** 15:17,17 |
| **rant** 79:17 |
| **read** 26:9,11 31:19 31:20 50:5,7,12 58:4 73:7 |
| **really** 11:17 28:13 50:24 69:21 |
| **reason** 7:22 12:12 12:12 72:23 73:5 |
| **recall** 42:6 49:13 49:15 55:14 58:3 60:15 |
| **receive** 39:25 46:20,23 47:1 |
| **received** 32:9 41:7 43:5,8 46:17 |
| **recess** 45:4 69:4 |
| **recite** 18:22 |
| **recognize** 35:21 48:21 49:12 |
| **recollection** 31:24 |
| **record** 6:11 11:12 19:9,20 26:11 35:13 40:15 59:24 60:1 73:7 75:7 |

| |
|---|
| 76:13 80:8,11 |
| **recording** 10:6 |
| **records** 23:19,20 25:16 |
| **redacted** 49:23 |
| **reference** 34:24 |
| **referred** 20:9 |
| **refuse** 38:19 75:3 |
| **refused** 44:12 |
| **refusing** 13:14 18:14 19:17 20:22 22:8,23 23:16,25 24:25 28:8,18 29:11 37:5 39:5 39:14,22 40:12 44:18 46:1,14 47:8 53:7 59:19 64:12 67:22 74:17 78:2 |
| **regard** 47:21 |
| **regarding** 23:20 23:20 24:14 29:5 29:16 58:24,25 59:8 62:7,8,18 63:9,10 64:18,25 71:2 |
| **related** 27:16 |
| **relating** 28:2 34:3 35:15 61:21 62:4 63:2 |
| **relative** 80:17 |
| **relevancy** 23:11 77:1 |
| **relevant** 13:6 18:11 |
| **remember** 8:8 70:1,3 |
| **remembering** 30:14 |
| **repayment** 55:21 |

| |
|---|
| **repeat** 73:6 77:8 |
| **rephrase** 33:24 |
| **reported** 1:22 |
| **reporter** 2:23 7:14 28:15 35:19 48:19 80:2 |
| **requested** 80:15 |
| **requesting** 32:4 |
| **requests** 57:20 60:21 |
| **require** 33:8 |
| **required** 78:21,23 |
| **respect** 41:2 79:8 79:10 |
| **respondent** 3:12 |
| **responsible** 63:20 |
| **retainer** 56:8,13 |
| **reveal** 16:10 |
| **review** 14:3,12 80:14 |
| **revokable** 52:10 |
| **richard** 15:14,16 |
| **right** 11:12,25 12:17 16:7 17:4 21:15 27:14 28:17 31:11,12,12 36:8 36:12 38:1 43:4 45:2 49:12 53:24 57:19,22 58:9 60:6 61:24 73:24 75:6,17 77:12,17 78:17 79:10 |
| **rivera** 2:20 |
| **ron** 56:1 |
| **roosevelt** 3:16 |
| **roughly** 47:13 48:14 |
| **rule** 6:19 9:15 11:19 |
| **rules** 7:6 78:22 79:8 |

| russ 56:1 |
|---|

| s |
|---|
| **s** 1:6 2:6 6:13 |
| **sad** 55:24 |
| **san** 16:23 |
| **sanctioned** 22:11 |
| **santa** 1:2 2:2 |
| **saw** 31:10 |
| **saying** 10:8 11:5 12:1,5 28:14 37:25 38:3 40:21 40:23,25,25 53:23 60:17 61:23 |
| **says** 7:2 9:24 |
| **scene** 76:12 |
| **schedule** 49:1,2,10 50:3 57:7,14 |
| **scheduling** 76:15 |
| **search** 58:22 |
| **second** 10:11 13:22 49:1 60:21 64:1 77:6 |
| **secondly** 60:8 |
| **see** 17:1 32:5 44:24 49:16,25 50:3 75:23 |
| **seeing** 49:13,15 |
| **seen** 49:10,22 |
| **seminars** 68:23 |
| **send** 51:4 |
| **sent** 31:6,8 34:9 51:6 56:17 57:5 |
| **separate** 54:7 |
| **september** 1:20 2:22 6:1 70:11 80:21 |
| **serious** 17:3 |
| **set** 17:10,12,18,23 18:6,9,18 19:4 25:5 36:1,21 80:5 |

Veritext Legal Solutions
866 299-5127

EXHIBIT 2  PAGE  175

[settled - time]

**settled** 60:11,12
  63:4
**shape** 29:23 60:2
**share** 21:18 73:10
**shorecliff** 68:11
**short** 76:21
**shorthand** 2:23
  80:1,9
**side** 36:12
**signature** 36:17
  80:24
**signatures** 49:5
**signed** 50:7
**silly** 72:13
**simply** 26:25
**single** 35:14 42:5,6
  42:20
**sitting** 40:19 41:9
**six** 27:15
**somebody** 12:15
**someplace** 63:13
**son** 19:6 32:12
  34:2,10
**sorry** 12:8,20
  20:14 25:4 28:22
  36:3,11 38:8
  51:15 76:24 78:24
**sort** 15:7,22 57:23
  78:20
**sorts** 78:19
**sound** 30:3,9,11
**sounds** 57:1
**spaced** 35:14
**speak** 7:14 47:23
**speaks** 21:3 37:18
**specific** 77:16
**specifically** 18:21
  18:25 19:4 28:3
**speculate** 71:18
**speculation** 71:13

**spell** 16:20
**spells** 65:7
**split** 21:12
**spoke** 24:3,6,13
  25:3 45:5
**spoken** 16:24
**stapleton** 1:13
  2:13
**stars** 4:6
**start** 12:17 13:3
  56:5
**starting** 27:4
  68:19,20
**state** 6:10 80:2
**states** 1:1 2:1
**steinman** 6:12
**steinmann** 1:11,12
  1:12,12,13,13,14
  1:14,14,15,15,18
  2:11,12,12,12,13
  2:13,14,14,14,15
  2:15,19 4:12 5:3
  5:13 6:4 37:10
  57:25 60:12 63:9
  63:10 65:16 78:6
**steinmann's** 38:13
**stipulation** 78:19
  79:1
**strike** 73:4 78:15
**stuff** 57:5
**subscribed** 80:20
**suite** 3:7
**summarize** 60:19
**super** 76:21
**supersedes** 15:24
**support** 19:8
**supporting** 76:6
**suppose** 68:4
**supposed** 66:21
**supposing** 72:11

**sure** 7:11 13:23
  14:9 17:9 24:13
  26:2 57:2,3 60:4
  67:11 68:15
**susie** 1:15 2:15
**swiss** 69:20,21
**sypkens** 1:12 2:12

**t**

**t** 6:13
**take** 15:7 37:10
  40:16 44:24 45:2
  52:8,10,17 69:3
  71:7
**taken** 2:20 6:15
  8:6 51:24 80:4
**takes** 52:2
**talk** 17:5 24:19
  44:24 58:20 64:2
  64:2,8 77:19
**talked** 26:4,5 54:3
  56:22 60:17,24
  62:21
**talking** 9:4 11:13
  33:10 42:14 62:9
**talks** 27:18 29:7
  29:17
**tell** 8:3 16:16
  17:22 18:24 19:3
  21:20 22:2 41:23
  43:14,22,25 44:13
  50:20 55:11,12
  66:21 71:4
**telling** 31:9,10
  34:12
**ten** 8:9,13 69:3
**terms** 13:7 38:8
  46:8 55:21 56:6
**tessie** 1:13 2:13
**testified** 6:6 32:13
  37:20 48:1

**testify** 38:6
**testifying** 8:1,4
  80:7
**testimony** 7:23
  25:8 32:16 80:11
**thank** 6:14 13:2
  14:3 28:18,21
**thing** 7:23 9:4 15:7
  15:22 16:7 28:13
  51:22
**things** 10:22 30:14
  30:15 32:6 34:9
  49:16 58:21 68:20
  69:21 77:10 78:25
**think** 6:21 8:12
  9:21 10:7,12
  11:14,17 13:12,21
  14:17 15:14,17
  16:12 17:6,8,20
  19:7 22:22 23:6
  23:10 25:9,11
  27:4,7 31:1 35:4
  39:4 43:2,18 44:6
  44:23 45:25 47:21
  55:12 56:24 63:16
  66:6 68:18,22
  69:9,24 73:1,17
  75:17 78:21,23
  79:9
**thinking** 61:9
**third** 9:8 33:6
**thomas** 1:8 2:8
**thought** 14:23
  26:13 70:19 72:21
  76:6
**three** 34:9 36:21
  36:24 76:14 79:16
**time** 9:5,8 13:22
  15:15,20 16:24
  17:1 18:6,8,17
  19:4,12 20:17

Veritext Legal Solutions
866 299-5127

EXHIBIT 2  PAGE  176

[time - witness]

21:19 22:3 24:3,6
24:13 25:3 30:4
30:22 31:15 37:23
37:23 38:23 44:15
44:17 46:18 52:11
53:17 54:4 59:8
65:10 75:11,13
76:18 77:6,24
79:7,18 80:5
**times**  6:17 8:6
10:6 54:2 79:16
**today**  7:23 9:9,14
9:22 10:22 12:3
44:16,18 72:1,2,5
77:22
**told**  10:13 27:5,6
31:13 32:6,9,11
44:12 69:24 76:8
**tom**  1:15 2:15
**top**  35:14,14
**totally**  79:1,3
**town**  3:7
**transaction**  68:24
**transcribed**  80:9
**transcript**  80:10
80:13,15
**transfer**  63:4,6
**transfers**  63:2
65:23
**trip**  15:6
**true**  76:5 80:11
**trust**  5:12,14
14:14,24 15:1,4,23
16:4,5 17:10,12,14
17:18,23 18:6,8,18
19:4 20:9,17 21:1
21:3 23:20 24:7
24:14 25:5,7,12,16
25:17 26:15,16
27:1,6,16 28:2
29:22 31:25 34:3

35:6,9,25 36:1,5
36:21,25 38:13,23
39:8,18 40:1,6
43:6,9,12,19 44:1
44:5,5,15,17 45:7
45:9,9,13,16 46:4
46:10,17,18,20,21
46:21,23,24 47:2,2
48:23 49:21,25
50:5,15,16,18,20
50:23 52:2,8,10
53:1,11 57:8,25
58:8 59:3,5,8
60:10,12,22,23
61:10,14 62:3,5
63:9,10,16,18,21
63:25 64:3,9,19,20
65:1,2,6 71:2,9,12
72:25 73:3 74:11
77:16
**trustee**  1:8 2:8
9:12,23 10:23
35:7 37:15 38:2
51:2,13 63:18
76:7,7
**trustee's**  9:23
75:25
**trustees**  34:10
36:5 51:2,12
**trustor**  37:15,17
37:19,25 38:3
**trustors**  21:23
36:19
**trusts**  15:1
**truth**  8:3
**try**  13:19 64:3
**trying**  12:10 59:23
**tuesday**  1:20 2:22
6:1
**turn**  36:9

**twice**  6:18 10:14
79:16
**two**  8:6,12 10:22
24:5,17 26:22
32:6,9 34:4 35:14
48:15 79:9

**u**

**uh**  12:21 21:13
28:12,14
**unclear**  43:22
**undersigned**  80:1
**understand**  7:6,18
7:20 8:1 9:1,9,14
13:20,23 14:1,8,10
22:11,17 25:7
33:14 35:16 37:21
38:7,8 40:21,22
42:22 48:3 50:9
51:14 56:9 59:1
61:21 64:21,22
70:5 74:20,22
77:15
**understanding**
11:16 31:25 32:1
42:1 52:9,11
60:16
**understands**  30:15
**understood**  7:11
7:17 11:11 25:5
73:16,16,18,18
**united**  1:1 2:1
**unnecessary**  11:17
**unproductive**
11:15
**upland**  15:18
**use**  28:25
**usually**  69:16

**v**

**valerie**  1:22 2:23
80:25

**valid**  21:5
**value**  21:18,23
22:2 38:22
**violation**  40:18
**vis**  46:7,7,8,8
**volume**  1:21 2:19
5:3
**vs**  1:10 2:10

**w**

**wait**  7:10 42:12,15
**want**  11:5 12:1,9
12:10 13:23 14:21
16:6 18:5 28:25
38:6,9 40:17 41:1
41:2 42:16 47:23
52:13 55:11 60:4
72:15,19 73:3
76:12
**wanted**  17:25 26:2
**wanting**  8:19
**wants**  9:24 12:16
19:7
**way**  7:11 25:20
40:15 48:13 55:16
60:1 72:16 73:3
76:17
**we've**  10:5 52:13
**wedding**  70:14,16
70:18
**weddings**  70:22
**weiland**  3:4
**went**  15:5 26:13
63:11 71:6,11
72:3
**wgllp.com**  3:10
**whereof**  80:19
**wilson**  1:15 2:15
**witness**  5:2 6:24
13:8 14:7,10,17
16:12,18 18:10
19:6,14 20:11,14

Page 12

EXHIBIT 2  PAGE  177

[witness - z]

20:19 21:2,6,21
22:5,18 23:5,7,14
23:22 24:15,17,21
24:23 25:11 26:8
27:12,22 29:19,24
30:1,9 32:17
33:13 34:19,22
35:11 36:15 37:1
37:22 39:1,11
40:3,7,22 41:11,16
41:24 43:13,15
44:21 45:1,22
46:11 47:4,23
49:6 52:22 53:5
55:15 57:12,16
64:4,22 66:20
71:14,19 73:8
74:15 77:18,20,23
78:4,10 79:13
80:19
**witnesses**  80:6
**word**  12:9
**words**  28:15 60:16
**work**  15:16 16:22
79:8
**worked**  55:23
**working**  68:20
**world**  33:12
**wrightwood**  1:19
2:21 6:1
**write**  28:15
**written**  63:12,15
73:3

| x |
| --- |

**x**  80:15

| y |
| --- |

**yeah**  7:13 10:19
14:19 15:21 26:1
26:3 32:5 49:8,17
56:12,14 60:21

61:15 63:19 67:12
71:14
**year**  8:11 44:3
47:13 67:1 69:6,8
69:11,13,15,18,25
**years**  8:9,13 15:5
15:23 47:12 48:14
48:15 61:12,18
**young**  15:8,8
70:22

| z |
| --- |

**z**  13:1

Page 13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

EXHIBIT 2  PAGE  179

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.

EXHIBIT 2  PAGE  180

1            UNITED STATES BANKRUPTCY COURT

2            CENTRAL DISTRICT OF CALIFORNIA

3                    --oOo--

4   In Re:                    )   Case No. 8:16-bk-12589-CB
                              )
5   ANDREA STEINMANN DOWNS,   )   Chapter 7
                              )
6           Debtor.           )   Santa Ana, California
    _____)   Wednesday, January 29, 2020
7                             )   1:00 p.m.
                              )
8   CASEY,                    )   Adv. No. 8:18-ap-01168-CB
                              )
9           Plaintiff,        )
                              )
10      vs.                   )
                              )
11  STEINMANN, et al.,        )
                              )
12          Defendants.       )
    _____)

13

14                          CONT STATUS CONFERENCE RE:
                            COMPLAINT: (1) TO AVOID AND
15                          RECOVER FRAUDULENT TRANSFERS
                            PURSUANT TO 11 U.S.C. SECTIONS
16                          548(A)(1)(A), 544(B) AND 550;
                            (2) FOR IMPOSITION OF A
17                          RESULTING TRUST; (3) FOR
                            DECLARATORY RELIEF; (4) FOR
18                          PRESERVATION OF THE TRANSFER
                            FOR THE BENEFIT OF THE ESTATE;
19                          (5) FOR ATTORNEYS' FEES AND
                            COSTS

20

21              TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE CATHERINE BAUER
22              UNITED STATES BANKRUPTCY JUDGE

23

24
    Proceedings produced by electronic sound recording;
25  transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  181

ii

```
 1  APPEARANCES:

 2  For the Trustee:              JEFFREY I. GOLDEN, ESQ.
                                  Weiland, Golden & Goodrich
 3                                650 Town Center Drive
                                  Suite 600
 4                                Costa Mesa, California 92626
                                  (714) 966-1000
 5

 6  For the Hausman and          HAMID R. RAFATJOO, ESQ.
      Moellenhoff Creditors:     Raines Feldman, LLP
 7                                1800 Avenue of the Stars
                                  Twelfth Floor
 8                                Los Angeles, California 90067
                                  (310) 440-4100
 9
                                  ALAN J. KESSEL, ESQ.
10                                TAMBRY L. BRADFORD, ESQ.
                                  Pepper Hamilton, LLP
11                                Four Park Plaza
                                  Suite 1200
12                                Irvine, California 92614
                                  (949) 567-3500
13

14  For the Defendants:          D. EDWARD HAYS, ESQ.
                                  Marshack Hays, LLP
15                                870 Roosevelt
                                  Irvine, California 92620
16                                (949) 333-7777

17  For Eric Steinmann:          STEPHEN LARSON, ESQ.

18  For Teresa Steinmann         E. SCOTT PALMER, ESQ.
      Stapleton, Katy            Palmer Hunter
19    Steinmann Belknap,         One Wilshire Building
      Jeffrey D. Steinmann,      624 South Grand Avenue
20    and Heinz J. Steinmann:    Suite 2200
                                  Los Angeles, California 90017
21                                (213) 629-8704

22  For Susanna Steinmann,       GERALD P. KENNEDY, ESQ.
      Thomas Steinmann,          525 B Street
23    John Steinmann, and        Suite 2200
      Mary Sypkens Steinmann:    San Diego, California 92101
24                                (619) 238-1900

25
```

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  182

iii

1 | Court Recorder:                    Audrey McCall
                                       United States Bankruptcy Court
2 |                                    411 West Fourth Street
                                       Suite 2030
3 |                                    Santa Ana, California 92701

4 | Transcriber:                       Briggs Reporting Company, Inc.
                                       2160 Fletcher Parkway
5 |                                    Suite 209
                                       El Cajon, California 92020
6 |                                    (310) 410-4151

7 |

8 |

9 |

10 |

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  183

iv

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| Eric Steinmann | 18 | -- | -- | -- |

| EXHIBITS | | IDENTIFIED | RECEIVED |
|----------|--|------------|----------|

Plaintiff's:

(None.)

Defendant's:

(None.)

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  184

1

<u>SANTA ANA, CALIFORNIA  WEDNESDAY, JANUARY 29, 2020  1:00 PM</u>

2                   --oOo--

3       (Call to order of the Court.)

4            THE COURT:  Good afternoon.

5            ALL:  Good afternoon, your Honor.

6            THE COURT:  Good afternoon, Audrey.

7            All right.  It's 1:00 o'clock.  We're on the Downs

8 matter, Casey versus Steinmann, the status conference.

9 Thank you all for being here, appreciate it.

10           So I'll take appearances, whoever wants to start.

11           MR. GOLDEN:  I'll start, your Honor.

12           THE COURT:  Thank you.

13           MR. GOLDEN:  Good afternoon, your Honor.  Jeffrey

14 Golden of Weiland Golden Goodrich on behalf of the Trustee.

15           THE COURT:  Great.  Thank you.

16           MR. RAFATJOO:  Good afternoon, your Honor.  Hamid

17 Rafatjoo of Raines Feldman, LLP, for the Hausman and

18 Moellenhoff creditors.

19           THE COURT:  Thank you.

20           MR. KESSEL:  Good afternoon, your Honor.  Alan

21 Kessel and Tambry Bradford of Pepper Hamilton on behalf of

22 the Hausman and Moellenhoff creditors as well.

23           THE COURT:  Thank you.

24           MR. HAYS:  And good afternoon, your Honor.  For

25 the defendants, Heinz, Lora, and Eric Steinmann -- and Eric

2

1  Steinmann is also present -- Ed Hays of Marshack Hays.

2           THE COURT:  Thank you very much.

3           MR. LARSON:  Good afternoon, your Honor.  Stephen

4  Larson newly appearing as co-counsel for Eric Steinmann.

5           THE COURT:  Thank you very much.

6           MR. PALMER:  Good afternoon, your Honor.  Scott

7  Palmer appearing for four of the sibling defendants, Theresa

8  Steinmann Stapleton, Katy Steinmann Belknap, Jeffrey D.

9  Steinmann, and Heinz J. Steinmann.

10          THE COURT:  All right.  Thank you.

11          MR. GOLDEN:  Your Honor, if I may, there were two

12  procedural issues I wanted to raise at the beginning.

13          THE COURT:  Okay.

14          MR. GOLDEN:  First is a scheduling issue, in part,

15  for today.  Mr. Rafatjoo and I have an emergency hearing in

16  front of Judge Wallace at 2:00 o'clock --

17          THE COURT:  My goodness.

18          MR. GOLDEN:  -- but other counsel present today

19  will be able to keep this hearing moving during that time

20  period, your Honor.  But, with the Court's permission, we

21  would like to just be excused briefly.

22          THE COURT:  Of course.

23          MR. GOLDEN:  It should not be a long hearing, and

24  it involves, interestingly, another case where my firm

25  represents Mr. Casey, but, again, I don't mean to be

3

1  disruptive in any way.

2          THE COURT:  I appreciate you telling me.

3          MR. GOLDEN:  Secondly, well, I didn't know how the

4  Court wanted to proceed initially, but I was going to get

5  into talking about the examination and the documents that

6  were produced, and I first wanted to make sure that the

7  Court had a copy of -- I presume the Court does -- of the

8  documents and the privilege log and the like that were

9  submitted by the Steinmann parties about a week ago.

10          THE COURT:  I have what was submitted under seal.

11          MR. GOLDEN:  Yes, yes.

12          THE COURT:  Yes.

13          MR. GOLDEN:  And the Court also has the redaction

14  log?

15          THE COURT:  Uh-huh.

16          MR. GOLDEN:  I apologize.  That was presented to

17  the Court as well, correct?

18          MR. KESSEL:  I don't know for sure, your Honor.

19  I'd have to check.

20          THE COURT:  I don't know that I have the

21  redaction.

22          MR. HAYS:  I have a copy of it, your Honor.

23          THE COURT:  Okay.  That would be great.

24          MR. GOLDEN:  If Mr. Hays has no objection, may we

25  approach and present the Court with a copy of that?

4

1        MR. HAYS:  Yes.

2        THE COURT:  Yes, please.

3        MR. GOLDEN:  Okay.

4        THE COURT:  Great.  Thank you very much.

5        Do we have a telephonic on this?

6        MR. GOLDEN:  I'm sorry.

7        THE COURT:  I don't know.  I don't have --

8        MR. KENNEDY:  Yes, your Honor.  Thank you.

9        THE COURT:  Yes.  Go ahead.  Who do we have?

10       MR. KENNEDY:  Yes.  Gerald Kennedy on behalf of

11  the sibling defendants, the other four sibling defendants,

12  Susanna Steinmann, Thomas Steinmann, John Steinmann, and

13  Mary Sypkens Steinmann.  Thank you.

14       THE COURT:  Great.  Thank you.

15       I don't have a list.  Is there somebody else?

16       THE CLERK:  (Indiscernible.)

17       THE COURT:  That's it?  Okay.  Great.  Thanks,

18  Audrey.  Okay.  Got it.

19       MR. GOLDEN:  So today is -- in addition to the

20  status conference, is the examination of Mr. Steinmann, and

21  my preliminary sort of procedural comment, your Honor, is,

22  although we are prepared to proceed, we are concerned, and I

23  just wanted to talk for a minute, if I may, your Honor,

24  about the document production, because our hope was that

25  documents would be produced responsive at the level that

5

1  we expected.

2          We were disappointed because, if you look at the

3  redaction log, your Honor -- and it does refer to the

4  document ID numbers in the far left-hand corner, which makes

5  it really easy if, at any point, the Court ever wants to

6  refer to the documents that were submitted under seal to see

7  what pages they refer to.  There were various items that

8  were blocked off for either attorney-client privilege, or it

9  says, "Redacted as nonresponsive information," or "Redacted

10 as nonresponsive information outside of temporal scope."

11         As I understood the Court's order today -- and

12 this is the Court's order regarding some of the discovery

13 issues -- Mr. Steinmann would be testifying, among other

14 things, regarding assets of the trust at various points in

15 time, which is why documents were submitted under seal, for

16 example, and on the attorney-client privilege redactions,

17 there was no indication as far as why these documents would

18 be redacted.  They're charts.  It's not correspondence, your

19 Honor, and there's no indication of who the lawyer was or

20 what the parties were, so there's no way to understand that.

21         With respect to the other items, you know, my

22 understanding is, you know, we were allowed to ask questions

23 about the assets of the trusts, and there were document

24 requests, in addition to that, that went to all documents

25 that related to the assets of the trust, and, you know, so

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  189

6

1  it's not a temporal scope, but certainly there were -- you

2  know, all documents that would be relevant to any of those

3  assets at any time would obviously be relevant as part of

4  the scope of that as well, and today we have the ability to

5  ask questions about that.

6          So we'll go forward with the examination.  I don't

7  know if anybody else wants to add anything, including Mr.

8  Hays or any of the other counsel on this side, either, but I

9  just wanted the Court to be aware of that.  I'm glad that

10 you have the redaction log now, and, obviously, I don't know

11 what's redacted, so I don't know how material or nonmaterial

12 it is, because it's just completely blacked out.

13         MR. KESSEL:  And, your Honor, if I may supplement

14 what Mr. Golden said, because I (indiscernible).  Do you

15 have their production in front of you?  If you don't, I have

16 a copy.

17         THE COURT:  I do.

18         MR. KESSEL:  Okay.  Your order on January 8th

19 could hardly have been more clear.  You found, and I quote,

20 that:

21             "The requested information in dispute in

22             issues numbers two, four, five, and six

23             of the joint stipulation are 'essential

24             to prosecute the adversary proceeding

25             and the administration of the Debtor's

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  190

7

1      bankruptcy estate.'"

2      Consistent with that, you ordered the production

3  of all documents that are called for with respect to those

4  issues, and the answering of all questions and testimony

5  with respect to those issues, and those issues, among other

6  things, two, four, five, and six, require:

7           "The identification of the assets in and

8           all interests held by the Steinmann

9           Family Trust, including and (sic) their

10          value, the identification of the assets

11          in and interest held by any trust

12          established for any and all or all of

13          the Steinmann children, and their value,

14          respective value, and the payments or

15          transfers made to or for the benefit of

16          the Debtor."

17     Despite that fact, your Honor, if you go through

18  some of these documents -- and these are simply

19  representative examples, but we are going to explore them in

20  greater detail in the examination, what we can get through

21  with it.  If you look at the documents that were produced

22  under seal, at page seven -- it's five zeroes and a seven,

23  which is the first page of the trust.  Okay.

24     You'll see in the first paragraph that Heinz and

25  Lora Steinmann are identified as the Trustors, as well as

8

the Trustees, in the next paragraph, the first recital, that

they desire to establish a trust to initially fund with

assets set forth on Schedule A, and thereafter intend to

transfer the trust's additional assets, all of which would

go in, and then the last paragraph of that page, that there

were assets that were separately controlled by Mr.

Steinmann, Heinz Steinmann, and assets that were separately

controlled by Lora Steinmann.

        With respect to those assets that were controlled

by Heinz Steinmann, in that same paragraph, Eric Steinmann,

who is also one of the Trustees, was to assist with the

management of those assets for and with Mr. Heinz Steinmann,

and Mary Sypkens was supposed to do the same with respect to

Lora Steinmann, and despite the fact that a few documents

have been produced -- and I'll show you exactly what they

are.  They begin on page 43 and continue to 49 of the

document production.

        For Lora Steinmann, not a single document has been

produced as to Mr. Heinz Steinmann's controlled assets that

were also part of this trust, and we know that Heinz

Steinmann not only has separately controlled assets, because

it's specifically referenced in the trust, but also replete

in this document production at various points, and I have

them, and can list them for the Court, but, as

representative examples, on page 128, 130, 131, 134, and

9

1 135, Mr. Heinz Steinmann makes separate loans to the Debtor

2 in varying amounts, ranging from $420,000 to 250,000,

3 200,000, and $100,000, respectively.

4         So there's a big omission of these documents that

5 were supposed to be produced, and obviously are critical,

6 and that's the whole reason why we went through the motion,

7 and the Court's order was as clear as it was.

8         Mr. Golden started going through some of the

9 redactions, and I want to go through those because I think

10 it shows that the order has also not been complied with in

11 those regards, and further shows, unfortunately, that the

12 issues that brought us to have to file the motion are

13 continuing to this date.

14         If you look at pages 38 to 42, what you see is a

15 statement of financial condition where it's handwritten in,

16 "December 31, 2008."  Every one of those pages, with one

17 exception that I'm going to get to, is redacted in its

18 entirety, and these are the Steinmann Family Trust statement

19 of financial conditions, and the one entry that is not

20 redacted appears on page 39, under paragraph four, and it

21 says, "Expenses and amounts advanced for family members and

22 friends, Annie Downs, $970,000."

23         We don't have a single document that identifies

24 the composition of that 970.  We know it's on the December

25 2018 financial statement, but there's no other documents, no

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  193

10

1  other reference, nothing, with respect to, obviously, that

2  critical issue, which, among other things, was specifically

3  called for by document request number nine, I believe it

4  was, and I think it was the ninth issue in the motion to

5  compel that your Honor granted.

6        Now, I suspect that defendants are going to claim,

7  well, that "We can redact the entirety of this financial

8  statement, with the exception of giving you, in effect, that

9  tease with respect to Ms. Downs, because we're going to say,

10  'Well, hey.  You know, the document productions went from

11  July of 2012 to the petition date in June 19th of 2016,'"

12  but this trust was created in January of '16, and if those

13  assets were in that trust at that time, and are still in

14  there, unless there's been transfers, in which case they'd

15  be part of the other documents, they're clearly responsive,

16  particularly where there's absolutely no temporal limitation

17  whatsoever, document requests or otherwise, with respect to

18  the testimony.

19        The whole point of that exercise that we went

20  through, with all the motions, was so that we could get the

21  identity of all of the assets and all of the interests held

22  in both the Steinmann Family Trust and in any other trust

23  created for the benefit of any or all of the children, and

24  the value, and we don't have any of that, and pages 38

25  through -- what did I say it was, 42? -- is a good example

11

1 of it.

2       Then you also have -- and I think it's equally

3 egregious -- if you go to page 53 -- and, again, there's a

4 representative example, and this appears on pages 53, 54,

5 62, 74, 80, 83, 95, and 103 to 104 -- selective redactions

6 of consolidated 2016 statements, where they're picking and

7 choosing what assets, none of which have any value

8 whatsoever identified, even in the entire document, that

9 they'd like to disclose and those that they don't.  That's

10 obviously also in direct violation of the Court's order.

11       Then, as another example, if you look at page

12 46 -- and this is one of the things that Mr. Golden was

13 alluding to as a representative example -- there's on the

14 top box a redaction, and if you look at the redaction log,

15 it's because of attorney-client privilege, which gives us no

16 basis to identify that, but, obviously, the basis is suspect

17 because, if you look at that box on the preceding page, it

18 talks about:

19           "If he does not want" -- talking about

20           Jeff, one of the Steinmanns -- "does not

21           want to purchase the 50-percent share,

22           then the entire property will be sold

23           outright within two years.  Fifty

24           percent of the sale proceeds will go

25           to the trust estate, and 50 percent

12

1         to Jeff."

2         Then, "Redacted," but in just the next box -- skip

3 down one, two boxes -- you have the same language, and it

4 says, "Fifty percent will go to the trust's estate, and 25

5 percent to Mary, and 25 percent to Katy."  How could the

6 first box be somehow privileged, and the recipients of the

7 box, you know, two boxes down not be?  And, again, that's

8 just a representative example.

9         If you go to pages 108 to 113, again, this goes to

10 the transfers, you know, to and for the benefit of the

11 Debtor, and if you recall last time we were here, we were

12 talking about Brown Rudnick.  I tried that case.  We were in

13 court for nine months, all in, and you see that there are

14 various payments here.

15         Now, remember, on page 108, allegedly, you know,

16 there was a $250,000 flat fee.  Well, by December of 2016,

17 Brown Rudnick had already gone through that $250,000

18 retainer and flat fee, alleged flat fee.  We hadn't even

19 started trial yet.  First day we started was January 11th of

20 2017.  It continued through September 28th of 2017.

21         Then, if you go to page 110, obviously, these go

22 directly to payments made by or on behalf of the Debtor.

23 There's $100,000 which is referenced on page 108.  You see

24 "Retainer," but it's all blacked out.  We don't have the

25 account information, and here this account is from the

13

1 Steinmann Trust, and the statement is August 30th to

2 September 28th of '16, which is, you know, more than three

3 months after Andrea, the Debtor, was allegedly disinherited

4 from the same trust, if you believe the defendant's

5 position.

6          So here you have the trust paying her expenses,

7 and it continues on the next page, 111.  There's a check on

8 10/21 for 39,804.41.  Again, all of the underlying

9 identifying information is redacted.  The same thing happens

10 on page 112.  Here's another payment, December 27th of 2016,

11 for $110,195, six months after Andrea is -- or seven months

12 after she's allegedly been disinherited by the trust, and

13 all the information is redacted.  Clearly, that's in

14 violation of the court order.

15          The privacy concerns, as expressly stated in your

16 order, were addressed by having these documents filed under

17 seal, and having this become nonpublic testimony.  It wasn't

18 to give them carte blanche to continue to hide documents,

19 but just do so a little less overtly than they did before,

20 and, again, you know, the $970,000 advances that I

21 referenced in that 2018 statement kind of crystalizes that

22 point.

23          What's going on here, and again going back to that

24 dart-board analogy we talked about last time, that's the

25 game we're playing.  It's like whack-a-mole.  You know, we

14

1 keep coming in, we keep getting court orders, and we never

2 get everything that the Court orders us to get.

3          So the point is, we don't believe they complied

4 with the court order.  We're going to have to redress that,

5 and while we can start Mr. Steinmann's deposition today, we

6 clearly don't have the documents to be able to complete it,

7 to the extent that this Court was going to sit here for 10

8 or more hours, regardless, but that is something that I

9 wanted to make the Court aware of before we proceed.

10          THE COURT:  Thank you.

11          MR. GOLDEN:  I'm prepared to proceed, but I didn't

12 know if Mr. Hays wanted to respond.

13          THE COURT:  Mr. Hays probably has something.

14          MR. HAYS:  Very briefly, your Honor.  The document

15 production requests, with the exception of the requests

16 dealing with expenses or monies transferred to or for the

17 benefit of the Debtor, were all through a very specific time

18 period.  It was June of 2012 through the petition date in

19 June of 2016.  All responsive documents covering that time

20 period were produced.

21          The things that were redacted regarding, you know,

22 basically, financial privacy, asset-type issues, were all

23 things that were outside of the scope of that request.  The

24 court order was clear, to produce the documents that were

25 called for.  Those documents have all been produced.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  198

15

1          The court order was also clear that if they want

2   to ask questions dealing with other time periods or assets,

3   they're free to ask those questions.  Mr. Eric Steinmann is

4   here to answer questions to the best of his ability.  If

5   they want to serve additional document production requests

6   covering a post-petition time period for assets of the

7   trust, they're free to do so, but we produced everything

8   that was within the possession, custody, or control of our

9   clients that were responsive to the document production

10  request at issue.

11          No one is hiding the ball, and a lot of what was

12  said, if not all of what was aid, is speculation of counsel

13  was to what was going on, with them making inappropriate

14  assumptions that have no factual foundation or basis.  For

15  example, the specific redaction of attorney-client was

16  "Handwritten note between client and counsel" that followed

17  that line.  There wasn't a handwritten note on the box two

18  boxes below.

19          So all of this is legitimate.  It was carefully

20  gone through, and they're free to ask whatever questions

21  they want to ask of the witness, who is here and present to

22  testify.

23          THE COURT:  Thank you.

24          MR. KESSEL:  Your Honor, if may just briefly

25  respond?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  199

16

1          THE COURT:  Mr. Kessel, yes.

2          MR. KESSEL:  That's right, we are -- and I agree

3  with Mr. Hays on this -- we are able to ask Mr. Steinmann

4  the questions, but we need the documents to be able to do

5  so.  What I said -- and that's why I walked the Court

6  through it -- was based upon and established by their very

7  own documents.

8          According to Mr. Hays, if you put monies into this

9  trust or assets into this trust when it's created, on

10 January 6th, I believe it was, or January 8th of 2016, then

11 whatever happened to those assets thereafter is irrelevant,

12 according to him -- you saw the wholesale redactions -- even

13 though, if they had been transferred out of the trust, they

14 would be called for by that other document request.

15         So to say that there's a temporal limitation that

16 justifies their wholesale redaction and withholding of

17 documents can't bear credulity, because whatever happened to

18 those assets that were in that trust, subsequent

19 disposition, or if they're still there, obviously, the

20 documents pertaining to those assets and those interests are

21 still relevant and are clearly still responsive, and I think

22 it's manifest in the $970,000 that was advanced to Andrea

23 outside of the temporal period that Mr. Hays is talking

24 about from that very same trust.

25         THE COURT:  All right.  Thank you.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  200

17

1        MR. GOLDEN:  Your Honor, unless the Court has any

2  questions about the document issue at this point, I don't

3  want to be redundant of the arguments that were made.  I'm

4  prepared to, you know, proceed with the examination, if the

5  Court is so inclined.

6        THE COURT:  All right.  Sounds good to me.

7        Mr. Steinmann.

8        MR. GOLDEN:  Calling Mr. Steinmann.

9        THE COURT:  Just so you know, sometimes that thing

10 shakes, because it's handicapped accessible.  We're probably

11 not having an earthquake, but it freaks people out

12 sometimes.  Go ahead and be seated.  Would you please raise

13 your right hand and be sworn.

14              ERIC STEINMANN - WITNESS - SWORN

15        THE COURT:  Thank you very much.  If you would

16 please state your full name, spell your last name, and give

17 us your current address.

18        THE WITNESS:  My name is Eric Steinmann.  The last

19 name is spelled S-T-E-I-N-M-A-N-N, and my current address is

20 10108 Leisure Lane, L-E-I-S-U-R-E, Lane, Jacksonville,

21 Florida, 32256.

22        THE COURT:  I'm sorry.  What was the name of the

23 city?

24        THE WITNESS:  Jacksonville.

25        THE COURT:  Jacksonville.  Okay.  Thank you.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  201

18

1   Thank you very much.  Thank you for being here.

2           Mr. Golden.

3           MR. GOLDEN:  Your Honor, unless there's an

4   objection by Mr. Hays, just to make it easier during the

5   examination, I was going to hand him a copy of the documents

6   and pleading filed under seal by them last week.

7           MR. HAYS:  No objection to that, your Honor, but I

8   don't know -- do you have a copy?

9           MR. GOLDEN:  Or anybody else like --

10          UNIDENTIFIED SPEAKER:  I have it.

11                        DIRECT EXAMINATION

12  BY MR. GOLDEN:

13  Q    Okay.  Good afternoon, Mr. Steinmann.

14  A    Good afternoon.

15  Q    Mr. Steinmann, your parents were Lora Steinmann and

16  Heinz Steinmann, correct?

17  A    Correct.

18  Q    And you have nine siblings.  Is that right?

19  A    I had 10 siblings at one time.  I have nine siblings

20  now.

21  Q    Understood.  And the surviving siblings are Andrea

22  Downs, Mary -- is it Sypkens? -- John Steinmann, Teresa

23  Stapleton, Kathryn Belknap, Heinz Steinmann, Susanna Wilson,

24  Jeffrey Steinmann, and Thomas Steinmann?

25  A    Correct.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  202

19

1  Q    Yes.  And you're a lawyer?

2  A    I'm inactive, and I never really practiced as a lawyer,

3  so you have to define that better to have me give you a good

4  answer, I think.

5  Q    You became a member of the Bar in 1982.  Is that right?

6  A    I believe that's the case, yes.

7  Q    Did you ever practice law at any point?

8  A    I practiced law from the standpoint that my clients as

9  a CPA would have leases, and I would work on leases for

10 them, that type of stuff, which is within the definition of

11 "practicing law," but I didn't practice law -- hold myself

12 out to be an attorney separate from being a CPA.

13 Q    And I have that you're a member of the California Bar

14 since June 10th, 1982, License Number 102907.  Does that

15 sound correct?

16 A    That sounds correct.

17 Q    Have you been a member of any other bars?

18 A    I was a member of the Colorado Bar, I think, maybe for

19 a half a year initially or something.  I took the -- I think

20 I took the Bar -- no.  I'm sorry.  I'm getting confused.  I

21 took the CPA exam in Colorado.

22 Q    So are you a member of any other Bars?

23 A    No, no.

24 Q    And I know you just kind of explained, but I just want

25 to make sure I understand.  Is your California Bar license

20

1 active or inactive right now?

2 A     The California Bar license is inactive, and has been

3 for quite some time.

4 Q     Since 2005?

5 A     At least that long, I would say, yes.

6 Q     Do you know since when?

7 A     I don't know.

8 Q     And other than what you testified to a few minutes ago

9 regarding the leases, have you provided any legal advice to

10 any individual or entity other than that since you obtained

11 your license?

12 A     I imagine I have.

13 Q     Okay.  What kind of legal matters would that be?

14 A     I believe I've been asked questions by friends and

15 family, and I would have given them my best advice.  So, if

16 that's legal advice for pay, separately designated as that,

17 I would say no.

18 Q     Do you know what areas of the law you gave legal advice

19 in?

20 A     Certainly tax matters, and probably not much other than

21 that, contracts, leases, that type of thing.

22 Q     Anything else?

23 A     Not that I can recall.

24 Q     And do you hold any other professional licenses or

25 certifications?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  204

21

1   A    I do.

2   Q    And what are those?

3   A    I'm inactive as a CPA.  So I don't know if that

4   constitutes holding that or not.  I have an EDL as a

5   commercial truck driver.  That's about it, that I can

6   recall.  I am certified for work at heights, which would be

7   considered a professional designation, I believe.

8   Q    What's your current employment?

9   A    I'm an executive for a company called Allied Finance.

10  Q    Do you have any other employment or occupation right

11  now?

12  A    Occupation would be, I work for the company I've been

13  involved with for the last 25 years, but I don't take a

14  check.  But my occupation is the development manager for

15  that company, and I'm working quite often doing that.

16  Q    For Allied?

17  A    No.  It's for a group of companies that, you know,

18  formerly operated under the brand Clear Talk Wireless.

19  Q    Separate from Allied?

20  A    Allied finances one of the shareholders in the parent

21  company of that group.

22  Q    And how many companies are in that group?

23  A    I don't know.

24  Q    How long have you been involved with that group and

25  Allied?

22

1  A    Since at least 1999.

2  Q    Have any of the other family members been involved in

3  that group at all?

4  A    Yes.  As investors, yes.

5  Q    In any other capacity?

6  A    My brother, Heinz, was for some time a manager of one

7  of the areas for that group, and he has also, and still on

8  occasion, does some construction for us.

9  Q    Have all of your siblings been investors?

10 A    No.

11 Q    Which ones have been investors?

12 A    John Steinmann, maybe Rob and Tess Stapleton.  I don't

13 remember for sure.  Annie and Tim Downs were for a period,

14 and my dad -- I'm sorry.  You said siblings.  Of siblings,

15 that's all I can remember.  I think that's it.

16 Q    And how much did Andrea Downs invest?

17 A    I don't recall, but I think a very small amount, under

18 $10,000.

19 Q    And do you know what happened to that investment?

20 A    Yes.  It was repurchased in -- we offered to buy back

21 everyone's investment in, I believe, about 2008, and I think

22 Andrea's investment was repurchased for about 154,000 at

23 that time.

24 Q    And did you coordinate all of the investments for the

25 family?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  206

23

1  A     And please explain "coordination."

2  Q     Did the investments go through you?

3  A     Not necessarily, no.

4  Q     Other than what you testified to, do you have any other

5  occupations or employment at this time?

6  A     Can you define "occupations"?  I have no other

7  employment, but could you define "occupations"?

8  Q     Any role where you're representing an individual or

9  entity in a professional capacity, or receiving any money?

10  A     I'm on the condo association in Jacksonville.  I don't

11  know if that qualifies, but I don't receive any money for

12  it.  I'm on a charitable board, and I don't receive any

13  money for that.

14  Q     But even apart from receiving money, are you doing any

15  work for any entity or individual, apart from what you've

16  testified to?

17  A     Well, I'm working on a charitable organization I'm

18  involved with on a regular basis.

19  Q     Right.  Other than what you already testified to?

20  A     I'm trying to think.  I don't think so, no.

21  Q     You're familiar with the trust for your --

22  A     Excuse me.  There's a political action committee that I

23  also have a role.  I think I might be an officer of it.

24  Q     You're familiar with the trust of your parents,

25  correct, that relates to this litigation?

24

1  A     I believe it's the revocable trust.

2  Q     Yes, the trust of Lora Steinmann and Heinz Steinmann.

3  A     The revocable trust that was started in about January

4  8th or 26th of 1996 -- or 2016?

5  Q     Yes.  So you're familiar with that trust?

6  A     I'm familiar with that trust to some degree, yes.

7  Q     Were you involved in the formation of the trust?

8  A     In what regard do you mean "involved"?

9  Q     Did you give advice concerning the trust?

10  A     No.

11  Q     No legal advice?

12  A     Regarding the formation of that trust?  No.

13  Q     Did you give legal advice regarding that trust at any

14  time?

15  A     Legal advice, as opposed to just -- I don't think so,

16  no, but I was at some point notified I was a trustee, and at

17  the time and since then, I've tried to give my best advice

18  on anything that came up.

19  Q     But you've never been a lawyer for the trust.  Is that

20  your testimony?

21  A     No, I've never been a lawyer for the trust.

22  Q     Have you been an accountant for the trust?

23  A     The trust is a revocable trust, so the things that

24  happen within the trust get reported on my parents' return

25  personally, and I still do or am involved in doing their

25

1  returns for them, as I have been for four years.

2  Q    Have you given legal advice to your parents?

3        MR. LARSON:  I'll object as vague, your Honor,

4  periods of time.

5        THE COURT:  Do you want to clarify it?

6  BY MR. GOLDEN:

7  Q    Have you given legal advice to your parents regarding

8  the trust?

9  A    I'm trying to think.  If tax direction is legal advice,

10  I imagine I've given them some advice related to that.

11  Q    Okay.  Were you involved in the collection of the

12  documents for production today?

13  A    Yes.

14  Q    What was the extent of your involvement?

15  A    It was explained to me what was required, and they

16  asked me to see if I could help my mom gather this stuff up

17  to provide it.

18  Q    And what did you do in that regard?

19  A    I wrote a list down of -- went through the things.  I

20  wrote a list down, and went over and asked her for a number

21  of items.  I gave her -- the next day, I came back.  She had

22  a stack of stuff pulled out of files, and I took that stuff

23  and pretty much sent it over, and went through it with an

24  individual from Stephen Larson's office.

25  Q    Do you know if she searched her e-mails?  Did she

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  209

26

1  search her e-mails for documents?

2  A    My mom?

3  Q    Yes.

4  A    I don't know if she did search her e-mails.  I don't

5  know that there is anything that was requested that would be

6  likely to be found in an e-mail.

7  Q    Do you and your parents communicate via e-mail?

8  A    Not regularly, no.

9  Q    But periodically?

10 A    I can't think of the last time, to be honest with you.

11 Q    Okay.  Did you help to determine what documents were

12 responsive to the request?

13 A    No.  I think I helped determine what the pool of

14 documents was, and to the extent that I picked them up and

15 transmitted them, scanned them, had somebody in my office

16 scan them, but I didn't determine which ones were being

17 provided or not.

18 Q    And did you or your parents go to any third parties for

19 documents?

20 A    I don't know if she requested a statement from a

21 brokerage firm or something in doing that.  So I couldn't

22 answer that.  I don't know.

23 Q    Were you involved in the redaction of the documents?

24 A    No.

25 Q    Did you see the documents before they were redacted?

27

1  A    Yes.

2  Q    So do you know what information is redacted in the

3  documents?

4  A    I would say yes.

5  Q    Or at least you have a general sense of it?

6  A    Yes.

7  Q    Could you turn to page 38?  Do you see that document

8  called the "Steinmann Trust Statement of Financial

9  Condition," and below it's written in handwriting "December

10 31st, 2018"?

11 A    Correct.

12 Q    Can you tell me what was redacted here, please?

13 A    If that's the first page, I believe that would be

14 assets of the trust that were listed out there in a

15 financial statement format.

16 Q    Okay.  Do you remember what they are?

17 A    What those assets are?

18 Q    Yes.  Can you please tell me?

19 A    Yes.  There would be a bank account, I believe.  To the

20 extent that I can remember, there would be a bank account, a

21 brokerage statement account, perhaps, on this page or the

22 next page, some real estate holdings, and then there would

23 be some unlisted securities and loans.

24 Q    Anything else that you can remember?

25 A    (No response.)

28

1  Q    I know it's hard, because the entire two pages are

2  completely blacked out.

3  A    No, those -- maybe some small amount relative -- small

4  amount of jewelry, personal holdings.  Maybe that's listed

5  on there.

6  Q    Do you know what the total was?

7  A    Total for --

8  Q    The total dollar amount of the assets were at that

9  time?

10  A    I don't.

11  Q    Was it over a million?

12  A    I believe it would be over a million.

13  Q    Over 10,000,000?

14  A    I'm not certain.

15  Q    Do you think maybe between one and 10,000,000?

16  A    Maybe.

17  Q    Okay.  When was the last time you looked at that

18  document, if you remember?

19  A    When was this provided?

20  Q    Last week.

21  A    Maybe two days or so before it was provided.  I think

22  they were talking about this had to be provided in a couple

23  days.

24  Q    Thank you.  On the next page, on number 39, there was a

25  reference earlier, right?  It says, "Annie Downs, $970,000."

29

1 Do you know what that was about?

2 A    That was the amount shown as a loaned amount lent to

3 Annie Downs.

4 Q    So did she get like a lump-sum check for $970,000 in

5 2018, December?

6 A    No, she didn't.  This was all for periods prior, and I

7 think it's the summation of what was spoken about earlier.

8 Q    But prior in December -- prior in 2018, correct?

9 A    Prior to 2016.

10 Q    Prior to 2016?

11 A    Correct.

12 Q    Okay.  So when she get --

13 A    But, to be clear, there was a separate statement asking

14 for any assets lent to, I believe, Annie Downs at any time,

15 irrespective of this period that was in the other questions,

16 and that's why that was left unredacted, and that's why this

17 whole thing was provided to you in this format.

18 Q    But you don't -- do you know what period of time she

19 was given the $970,000?

20 A    I do.

21 Q    What was that?

22 A    There was originally a $420,000 loan I think I've

23 spoken about, in 1998.  There was then maybe a 200, and 250,

24 and another 250 or another $100,000 loan.  I think I heard

25 it earlier today, and the summation of those, I believe,

30

1  would be the 970,000.  The 970,000, by the way, is

2  incorrect, because she actually paid back the 420,000 from

3  1998, in about 1999.

4  Q    The next three pages are completely redacted.  Do you

5  have any idea what the next three pages say?

6  A    The assets would be listed, and then there would -- the

7  next three -- the next pages, I believe, the first one would

8  show the liability for taxes and whatnot, and come to a

9  total, and then, after that, I think there would be some

10 explanation of the individual assets listed previously, in

11 the form of notes to the financial statements.

12 Q    They would basically show what the assets and

13 liabilities were during that time period?

14 A    It would show detail making up the summary listings

15 earlier.

16         MR. GOLDEN:  Your Honor, if I may excuse myself,

17 briefly?

18         THE COURT:  Of course.

19         MR. GOLDEN:  But I think counsel will continue on,

20 so that --

21         MS. BRADFORD:  Your Honor, I have a lot of

22 documents that I'm working from.  Do you mind if I stay

23 seated?

24         THE COURT:  Not a problem.  Of course.

25         MS. BRADFORD:  Thank you.

31

1          MR. GOLDEN:  I'll be right back, your Honor.

2          MS. BRADFORD:  Okay.

3          THE COURT:  All right.

4   BY MS. BRADFORD:

5   Q    Good afternoon, Mr. Steinmann.

6   A    Good afternoon.

7   Q    Why don't we just pick back up with the document that

8   we were just talking about.  When Mr. Golden was questioning

9   you, you mentioned several assets that would have been

10  reflected on this document.  One of them was a bank account.

11  What kind of bank account is that?

12  A    A checking account, I believe.

13  Q    Is that a single checking account?

14  A    I don't know if there's one or more.  There could be

15  more than checking, and I know there's probably at least one

16  checking account.

17  Q    And do you know what bank that checking account is at?

18  A    I don't know, but -- I don't know.

19  Q    Other than a checking account or perhaps multiple

20  checking accounts, any other bank accounts?

21  A    Not that -- I don't know.

22  Q    Okay.  You also mentioned a brokerage statement

23  account.  Is that a single account?

24  A    I believe that's a single account.

25  Q    And where is that account held?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  215

32

1  A     They change their name quite often, but I believe it's

2  currently called Morgan Stanley Smith Barney, something or

3  another.

4  Q     And it's your testimony that there's only one Morgan

5  Stanley account?

6  A     I believe that to be the case.

7  Q     All right.  You also mentioned real estate holdings.

8  What would those be, that you can recall?

9  A     They have a home.  They have an apartment building,

10  small apartment building.  My mom is a contractor, is still

11  actively developing properties, and I believe has one or --

12  has at least two properties that are in the course of

13  construction, one a private residence she's building as a

14  spec home, and the other a fourplex, if I recall correctly,

15  and there may be some land, some lots that she holds as

16  well.  I don't know that for certain, but I believe that

17  would be the other thing that I can remember.

18  Q     And so the value of all of these items that we have

19  just discussed would be reflected on the statement of

20  financial condition.  Is that correct?

21  A     Yes.

22  Q     Who prepared this document?

23  A     Joseph Sofio.

24  Q     And who is Joseph Sofio.

25  A     He's my godson.  He does work for me, and he has an

33

1 accounting background as well.  He's also the son of Mary

2 Sypkens.

3 Q    And where does he live?

4 A    Phoenix, Arizona.

5 Q    Do you know his address offhand?

6 A    I don't.

7 Q    And so Joseph assists you in your duties as serving as

8 your parents' accountant?

9 A    Yes.  It's certainly not solely what he does, but he

10 does do that.

11 Q    What else does he do for you?

12 A    He helps me with my own investments, and he helps me

13 prepare the tax returns for some of the entities that I'm

14 involved with.

15 Q    What entities would those be?

16 A    There's an entity that owns a cattle ranch and a hay

17 operation in Texas called Craver Ranch LLC.  There's an

18 investment in a shipyard in Alaska.  It's called Jag Alaska.

19 There's an investment organization centered in Georgia

20 called Jerrick (phonetic) Holdings, and what else?  He helps

21 with the tax returns for, I believe, the charitable

22 organization, OneTownAtATime.org.  That's what comes to

23 mind.

24 Q    Does Joseph have his own company, his own business?

25 A    He does.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  217

34

1  Q     What's the name of the company?

2  A     Well, I think he just calls it by his own name.  He was

3  a CPA, I believe.

4  Q     As far as the work that you do for your parents as an

5  accountant, are you paid for that at all?

6  A     No.

7  Q     Is Joseph paid for his assistance?

8  A     Well, I pay him.

9  Q     You pay him directly?

10  A     Yes.

11  Q     Okay.

12  A     But they don't pay him.

13  Q     Now, if you look at the statement, there's writing

14  underneath the title that says, "December 31st, 2018,"

15  looking at page 38.  Do you know whose handwriting that is?

16  A     That's Joseph's.

17  Q     Were similar statements prepared on a yearly basis for

18  the trust?

19  A     I think the -- "were"?  I would say no.

20  Q     Have there been any other statements for any other year

21  prepared for the trust, other than December 31st, 2018?

22  A     There might be a December 31st, 2019, I believe.

23  Q     But you don't believe there was anything prepared prior

24  to December 31st, 2018?

25  A     I don't believe so, no.  I think I saw two financial

EXHIBIT 3  PAGE  218

1 statements, but the information related to Annie was the

2 same on both of them.

3 Q    Do you know whether these statements were distributed

4 to any of the beneficiaries, or who got copies of these

5 statements?  Let me just ask you that.

6 A    I got a copy of them, and I don't know if I shared it

7 with my parents or not, but, if I shared it with anyone, it

8 would only be my parents.  It was for the purpose of being

9 able to talk to them about the trust.

10 Q    Now, at the time that the trust was created, in January

11 of 2016, was there any type of document put together that

12 reflected the assets of the trust and the value of those

13 assets?

14 A    Not that I'm aware of.

15 Q    How did you identify what assets were going into the

16 trust?

17 A    I didn't.

18 Q    You are a Trustee of the trust, correct?

19 A    Correct.

20 Q    And so, as a Trustee, is it your responsibility to know

21 what assets are in the trust at all times?

22 A    I don't know that that's true, but I wasn't even, I

23 believe, told I was a Trustee until possibly after that

24 date.

25 Q    So when do you recall first learning about the trust?

36

1 A    It was before the amendment was made, but I believe it

2 was after -- the trust was in place when I first learned

3 about it.

4 Q    And so you didn't find out that you were a Trustee

5 until after the trust was already in place.  Is that your

6 testimony?

7 A    I believe that's the -- I believe that is correct.

8 Q    Was there any point in time where you actually sat down

9 to figure out what assets were in the trust, once you

10 learned that you were a Trustee?

11 A    Certainly, in preparation of this financial statement,

12 I did so, and sat down to find out.  I didn't make an issue

13 to try and find out, no.

14 Q    So it's your testimony that you had no idea what assets

15 were in the trust from the time it was created until you

16 were preparing this financial statement in December of 2018?

17 A    I don't think that's correctly stated, no.

18 Q    Okay.  What about it was incorrect?  What did you know

19 as far as the assets that were in the trust prior to the --

20 A    You have two questions before me right now, so which

21 one did you want me to answer?

22 Q    I'd like an answer to both, but let's start with, what

23 did you know about what assets were in the trust prior to

24 creating this financial statement in December of 2018?

25 A    Prior to creating this statement in 2018, I think I

37

1 knew pretty much all the assets that were in the trust.

2 Q    Okay.  And when did you first gain that knowledge?

3 A    Probably somewhere in 2017, I would imagine, before I

4 would know the assets that were in the trust, but I think I

5 knew probably about 2017.

6 Q    And so what occurred in 2017 that then caused you to

7 know what the assets were in the trust?

8 A    Well, I believe, by then, probably the assets that were

9 to be transferred into the trust were, for the most part,

10 transferred into the trust.

11 Q    So is it your testimony that there were no assets

12 transferred into the trust prior to 2017?

13 A    No.

14 Q    Can you make a distinction as to what was transferred

15 when the trust was first created and then what was

16 transferred afterwards?

17 A    No.  I don't know that there was anything transferred

18 when the trust was first created.

19 Q    And what do you base that --

20 A    What?

21 Q    What do you base that testimony on?

22 A    Well, in responding to this document request, we did

23 send, I think, documents from the transfers to the trust

24 through Smith Barney, and those occurred, if I remember,

25 largely between March, May, June, that type of time frame,

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  221

38

you know, so that those assets were being transferred in

there, and those were some of the easier assets to transfer

in.  I think the other --

Q    What year are you talking about, just so we're clear,

when you say --

A    2016.

Q    Okay.

A    And --

Q    And you said you provided documents reflecting those

transfers to your attorney?

A    I did.  I saw those documents, and I'd be surprised if

they're not produced.

Q    They're not.  I can tell you that.  But I just want to

make sure that you actually turned them over.

A    I believe --

        MR. HAYS:  Your Honor, if I may, it's Bates stamp

page 53.

        THE COURT:  Fifty-three.

        MS. BRADFORD:  Okay.  One second.

        THE COURT:  Thank you.

BY MS. BRADFORD:

Q    So do you have page 53 in front of you?

A    Yes.

Q    What is this document?

A    This is a document that would have came (sic) in

39

probably January 2017, showing the results of everything

that went in in that account for the tax year 2016 or

calendar year 2016.

Q    And where on here does it reflect a transfer of a

particular asset into the trust?

A    You can see the -- you know, the ABHI (phonetic) income

fund started producing, and they paid, I think, monthly.  It

starts paying from March, April, and May of 2016.

Similarly, the American High Income Fund (phonetic), March,

April, May of 2016, and so on.

Q    So is it your testimony that this account was first

created in March of 2016, and not what reflects the

transfer?

A    It could have been that the payment was March, but the

transfer would have happened during the month of March.

Otherwise, you would have had, likely, a February entry.

Q    Okay.  And when you say "transfer," where was the

transcript from?  Was it an account belonging to your father

or your mother, or someone else?

A    I don't know.  They both -- it could have been either,

but, more than likely, my dad.

Q    Okay.  We actually have a number of documents from

Morgan Stanley, so why don't we shift to those.  We start on

page 51, and so this appears to be a statement issued on

February 6, 2017, account number ending in 0032.  It states

40

1 the account owners as your father, your mother, and yourself

2 as Trustees of the trust.  Is that how the account is held?

3 A    Yes.

4 Q    Are you a signatory on this account?

5 A    I don't believe I'm the sole signatory, but I believe

6 I'm one of the signatories on it.

7 Q    And if you flip through just the first statement that

8 we have, you'll notice that we're missing several pages.  So

9 we're missing pages two, four, six, and eight.  When you

10 provided these documents to your attorney, were they

11 complete statements or were they missing pages?

12 A    I don't know.

13 Q    You don't know?

14 A    I don't know.

15 Q    Now, this is a consolidated tax statement for 2016.  Do

16 you know whether there were monthly statements issued for

17 this account?

18 A    I believe there would be, but I don't know.

19 Q    Did you make any effort to locate monthly statements

20 for this account?

21 A    Yes.

22 Q    Did you find any?

23 A    No.

24 Q    And what did you do to look for monthly statements?

25 A    Asked my mom.

41

1  Q     Asked your mom.  Did you contact Morgan Stanley?

2  A     I didn't personally, no.

3  Q     Did she?

4  A     I've already said I didn't know.

5  Q     Okay.  Now, looking at this statement, I'm assuming

6  that you're more familiar with this than I am.  Is there

7  anywhere on the statement where we can actually see what the

8  value of this account is as of this time period?

9  A     I don't see that, no.

10  Q     Do you think it would be on the missing pages?

11  A     No, I don't think so.  This is just the statement for

12  tax reporting, and would show the items that have to be

13  reported on the tax return.

14  Q     So would you have ever received a statement from Morgan

15  Stanley that would have reflected the value of the account

16  at any point in time?

17  A     I would not.

18  Q     You would not.  So nobody would ever know what the

19  value of this account is at any point in time?  Morgan

20  Stanley just doesn't issue those types of statements?

21  A     No.  Your question was, would I have received it?  No.

22  Q     Okay.  Would anyone have received it?

23  A     I would expect that somebody would receive that, yes.

24  Q     And who do you expect that would be?

25  A     My folks, at Box 327, may have received it at the time,

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  225

42

1  yes.

2  Q    Okay.  And your mother did not have any of those

3  statements.  Is that your testimony?

4  A    I asked her for them, and I didn't get them.

5  Q    Okay.  So, just to clarify, given the fact that your

6  name is on this account and you are a signatory to it,

7  theoretically, you could have contacted Morgan Stanley to

8  request those statements, correct?

9  A    I believe that's correct.

10 Q    So let's turn to page 103.  This is a portion of what

11 looks like another statement.  This one has a different

12 account number -- no.  I'm sorry.  I take that back.  This

13 looks like it might be some of the missing pages -- no.

14 This was later in the production, some of the missing pages.

15 So we have pages eight and six.  Okay.  So let's take a look

16 at page 56.

17 A    Page 56?

18 Q    Uh-huh.  And so this is another Morgan Stanley

19 consolidated tax statement, this one for account number

20 ending in 9032, the account owners being Heinz H. Steinmann

21 and Lora R. Steinmann as joint tenants.  Is that how this

22 account is currently held as well?

23 A    I don't know that this account exists currently.

24 Q    What do you think may have happened to this account?

25 A    I think that it might have got transferred into the

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  226

43

1 trust, eventually, and that this is a reporting statement

2 for the activity before it got transferred.

3 Q    Okay.  And so that would be -- when you say "the

4 trust," are you referring to the account that we just looked

5 at prior?

6 A    Correct.

7 Q    Okay.  And you testified earlier that there's only one

8 Morgan Stanley account, to your knowledge?

9 A    To my knowledge, there's only one Morgan Stanley

10 account at this time, or at the time of the financial

11 statement that you were asking about.

12 Q    Okay.  So let's take a look at page 60.  This is

13 another Morgan Stanley consolidated tax statement, tax year

14 2016, for account number ending in 8032.  It lists on here

15 account owners as your father, your mother, and yourself as

16 Trustees of the Steinmann Trust Number Two.  Is this a

17 second account?

18 A    I don't see the number on this one.  Zero, zero

19 (indiscernible).  It could be a separate account, or it

20 could be a subaccount.

21 Q    It could be a subaccount?

22 A    Yes.

23 Q    How does a subaccount work?

24 A    It has the same last three digits.  So I would -- yes.

25 Q    Okay.

44

1  A    I don't know.  The answer to your question is I don't

2  know.

3  Q    All right.  But, again, there was never any request to

4  Morgan Stanley made to get statements for this account,

5  showing the value for this particular account, correct?

6  A    I don't know.

7  Q    You didn't make a request?

8  A    I didn't make a request.

9  Q    You did or you didn't?

10 A    I did not.

11 Q    Okay.  All right.  Let's look at page 63.  Okay.  So

12 this is another consolidated tax statement, tax for 2016,

13 account number ending in 1032.  The name on this account is

14 your father, your mother, and yourself as Trustees of the

15 Steinmann Trust Number Three.  So my question is, is this

16 yet another Morgan Stanley account for the trust, a third

17 account?

18 A    I don't know.

19 Q    As Trustee of the trust, do you in any way keep track

20 of the bank accounts belonging to the trust?

21 A    No, I don't.  "Keep track"?  Could you define "keep

22 track"?

23 Q    Make yourself generally knowledgeable about what bank

24 accounts are held by the trust.

25 A    Yes, I do.

45

1  Q    Okay.  And, generally speaking, are you aware of

2  multiple Morgan Stanley accounts held by the trust?

3  A    If I can recall how I've seen these statements, they

4  come in a single package.  So I don't know if that is listed

5  as multiple accounts or what, but I believe it all comes in

6  the mail as one package, and where I've seen that package is

7  gathering it up for either the year-end tax return or to

8  make one of these financial statements.

9  Q    Okay.  And what do you do with those packets?  Do you

10 save them?

11 A    I probably return them to my parents, or I give them to

12 Joe Sofio to do the financial statement, and he returns

13 them, I believe, or I don't know what he would do with them,

14 and I'm not sure I always gather them, but I think I have

15 gathered them at times, and I remember it's a one-package

16 mailing.

17 Q    As you sit here today, do you have a general idea of

18 the value of any of the three accounts belonging to the

19 trust that we've just looked at here?

20 A    Yes, I have a general idea.

21 Q    What's that?

22 A    Of any of the three accounts?

23 Q    Any of the three.

24 A    Maybe $9,000,000, something like that.

25 Q    For a single one?

46

1  A    Maybe the largest one would be that, if they're

2  different accounts.  I don't know that they're different

3  accounts.

4  Q    Well, they're different account numbers.

5  A    There's different account numbers there.

6  Q    Right.

7  A    I agree with you, but I don't know how that's spread,

8  or why, to be honest as I sit here.  I thought it was all

9  one account --

10 Q    Okay.  So, as you sit --

11 A    -- and it may be all one account, with different

12 subaccounts for different type of investment or something,

13 but I don't know.  They have one -- far as I know, they've

14 got this Morgan Stanley thing.

15 Q    Okay.  And so what's your general understanding of the

16 value of the entire Morgan Stanley thing?

17 A    I don't know, exactly.

18 Q    Why don't you give me an estimate.

19 A    Probably that range, 9,000,000, 10,000,000, something

20 like that.

21 Q    What is your estimate based off of?  Have you seen

22 documents recently, and that's where you're coming up with

23 that number, or what is the basis?

24 A    I saw the financial statement that you spoke about last

25 week.

47

1  Q     And was that the number on the financial statement for

2  Morgan Stanley?

3  A     That's just what I seem to recall.  I wasn't focused on

4  it.

5  Q     Okay.  So let's take a look at page 81.  So this is

6  another consolidated tax statement, tax year 2016, this one

7  for Morgan Stanley account number ending in 5032.  This

8  title is a little different.  It's your father, your mother,

9  and yourself as co-Trustees of the Steinmann Trust Number

10 Four.  To your knowledge, is this yet another account held

11 by the trust with Morgan Stanley?

12 A     You're just pointing this out to me today.  You know, I

13 didn't pay any attention to this before.  I think it's all

14 one account, but it may be different accounts for some

15 reason, and if it is, I don't know why.

16 Q     Okay.  And I haven't been pointing it out throughout

17 all of these statements, but, you know, here again we're

18 missing pages.  You can see we're missing pages two and four

19 and six and eight.  When you provided these documents to

20 your attorney, was there a complete statement here, or did

21 you only provide certain pages?

22 A     I don't know.

23 Q     And I presume, when you provided the documents to your

24 attorneys, they did not include any redactions.  Is that

25 right?  These black boxes weren't there?

48

1  A    No.

2  Q    Did you review this production before it was filed with

3  the Court?

4  A    No.

5  Q    Okay.  So you simply provided the documents.  After

6  that, you didn't see anything else.  Is that your testimony?

7  A    I had a discussion, but I don't believe I saw the

8  documents.  But maybe they were put back in front of me

9  while we discussed or something, but I don't recall that.

10 Q    When you say you had a discussion, was that in

11 preparation for your examination today?

12 A    No.  I remember there was a discussion on that

13 financial statement that showed the $970,000 for Annie.  I

14 mean, we provided the financial statement, and then it was

15 pointed out that that was outside of the document requests,

16 but then there was a separate request for anything that went

17 to Annie.  So they said, "Well, look.  We've got to provide

18 this information on Annie, and black out the rest of it."

19 Q    Okay.  Let me ask you this.  Did you ever see a copy of

20 the actual document requests that were served on your mother

21 that these documents are responsive to?

22 A    Yes, yes.

23 Q    And so you yourself reviewed those requests.  Is that

24 right?

25 A    Well, I got a copy, and then, when we talked about it,

49

1 it was in the context of the document requests, so "Here's

2 what you've got to get," and, you know, "Here's why we're

3 providing this," and it all seemed to make sense to me.

4 Q    And so you said that you then had a conversation with

5 your mother about what documents she needed to gather.  Is

6 that right?

7 A    Yes.

8 Q    And what did you tell her as far as documents she

9 needed to look for?

10 A    I believe I asked her for any statements that she had

11 on Morgan Stanley account (sic) for the trust, and any files

12 she had on that, and I asked her for any files or

13 information she had on any amounts that were given to Annie,

14 including this Hausman agreement, which was for 250,000,

15 fixed, and all those amounts you said were after the trust

16 date going to that.  There is no other 250,000 and those.

17 That was it.  And then I asked -- and then, also, any loans

18 that were made for Annie.

19 Q    And those were the only documents that you told your

20 mother to look for?

21 A    No, there was some other stuff that I asked for.  I

22 can't remember the whole list, but I had some notes written

23 down, and I went over and asked her for them, left her with

24 the notes, I think.

25 Q    Okay.  So you didn't tell your mother that she needed

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  233

50

1  to look for any bank account statements, only the Morgan

2  Stanley one?

3  A    Yes.  There was in the past -- my mom had a number of

4  bank accounts, but I believe those have all been put in now

5  to the Morgan Stanley account, I believe, but, if there is

6  some other bank accounts for my mom out there, they don't, I

7  believe, have a sizeable amount of money involved in them,

8  and at the time I asked her for the documents, I think I

9  assumed it was for any periods.

10     So I think, if I had known that this had a cutoff in

11  2016, June or something, that I might have asked her the

12  question a little different, because I know that the assets

13  are still being transferred at that time, but it still

14  wouldn't change the fact that, you know, if it's

15  transferred, it's going to be in the Morgan Stanley account,

16  as far as I know.

17  Q    Right, but we don't have anything showing any of the

18  assets in the Morgan Stanley accounts after June 2016.  So

19  do you think all of those bank accounts were transferred

20  prior to that?

21  A    No, no.  I don't think that -- I think they probably

22  started with the easiest things to transfer, which would be,

23  you've got another account for Morgan Stanley.  You call

24  Morgan Stanley and say, "Transfer this account over to that

25  account," and then went on to the harder things, which were,

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  234

51

1  you know, the real estate or some of her individual accounts

2  or something like that.  Probably -- and this is just pure

3  speculation -- probably that happened after that June 2016

4  date.

5  Q    Can you take a look at page 43?  Do you recognize this

6  document?

7  A    I recognize this.

8  Q    What is this?

9  A    This appears to be something my mom gave me when -- it

10 was in one of the files she gave me showing -- I think this

11 is a discussion of what they were going to put into the

12 trust, and I think it deals with her real estate, largely.

13 Q    Do you know when your -- or do you know who created

14 this document?

15 A    No.

16 Q    Do you know when it was created?

17 A    No, but I -- no, I don't.

18 Q    Now, this document is entitled "Lora Steinmann's

19 Properties."  Did you ask your mother for any sort of

20 documentation related to her husband's property, your

21 father?

22 A    No.

23 Q    And so you do know whether or not such documents exist?

24 A    Documents related to my dad's property?

25 Q    Yes.

52

1  A     What time frame are we talking about?

2  Q     Any time frame.

3  A     Yes.  My dad's property was horses.  I think there's a

4  list, or I think a list was provided, and there's his

5  account, which got transferred into the trust account.

6  Q     You believe that your dad's -- there was a list of

7  horses provided?  Is that what you said?

8  A     I think so.

9  Q     So you recall seeing a list?

10 A     Yes.

11 Q     Can you just take a quick look through that production

12 and tell me if you see that list?

13 A     You want me to look through the whole production?

14 Q     It's not that many pages.

15 A     I don't see it.  Well, is it before page 43 up here?  I

16 don't see a list of horses.

17 Q     Other than horses, does your dad have any other -- I

18 guess this would be considered separate property?

19 A     Just, the loans that were made to individuals were

20 largely done by my dad, but it would be their joint

21 property, and none of it is separate property.  I think it's

22 all held jointly.  My mom does her thing and my dad does

23 his, you know, so they keep some separate accounts.

24 Q     So your testimony is that loans made to individuals

25 were made out of your father's bank account.  Is that what

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  236

53

1  you're saying?

2  A    As far as I know.

3  Q    And when you say "individuals," who are you referring

4  to?

5  A    A number of my brothers and sisters he's made loans to.

6  He's made loans to some of the doctors that practice with my

7  brother.  He's made loans to my brother for some of the

8  medical buildings.  He's made loans to some of the people in

9  the family for building houses, that type of thing.

10 Q    And so would those loans be reflected on that statement

11 of financial condition that we were looking at earlier?

12 A    Yes.

13 Q    What was the purpose of putting those loans in the

14 statement of financial condition for the trust?

15 A    The statement of financial condition is to record the

16 assets and liabilities to the trust.  The loans would be an

17 asset of the trust.

18 Q    How so?

19 A    You know, they were amounts that were owed to him, and

20 then they got transferred into the revocable trust, and at

21 that point, it became owed to the revocable trust and were

22 an asset of the revocable trust.

23 Q    Was there a provision in the trust that provided, once

24 there was going to be a disposition of the trust assets,

25 then any amounts that had been advanced to the beneficiaries

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  237

54

1 would be taken out of their portion?

2 A     I don't know.

3 Q     Does your father have any real property, similar to

4 your mother?

5 A     To my knowledge, he has nothing other than the house

6 that they live in.

7 Q     And other than the horses and the bank accounts,

8 anything else?

9 A     The horses, the bank accounts, the loans.  That's all

10 I'm aware of it.

11 Q     Do you know where his --

12 A     Some private unlisted stock.  He still has some stock

13 in our company, I believe.  It would be considered his side

14 of the ledger.

15 Q     When you say "our company," what company are you

16 referring to?

17 A     NTCH, Inc., is the holding company for a group of

18 companies.

19 Q     Do any of your other family members continue to hold

20 stock in NTCH, Inc.?

21 A     My brother Heinz and my brother John do, I believe.

22 Q     No one else?

23 A     Not to my knowledge.

24 Q     Ally Finance Corp. continues to be a shareholder in

25 NTCH, Inc., correct?

55

1  A    Yes.  Let me correct that.  I believe my brothers, my

2  dad own stock in Ally Finance.  Ally Finance owns stock in

3  NTCH.

4  Q    At one point in time, did Ms. Downs own stock in Ally

5  Finance, Andrea Downs?

6  A    I believe that's correct.

7  Q    When was that?

8  A    I believe she acquired it in about 2000 or thereabouts,

9  and her and her husband had their stock redeemed in about

10 2008.

11 Q    Had their stock redeemed in Ally Finance?

12 A    They might have owned stock directly in NTCH.

13 Q    Right.  What about their ownership interests in Ally

14 Finance?

15 A    I don't believe they have an ownership or had an

16 ownership interest in Ally Finance.  They would have had

17 maybe that in one or the other.

18         MS. BRADFORD:  I was looking for a document

19 (indiscernible).  Mr. Golden did indicate that he would like

20 to pick back up.

21         THE COURT:  All right.  So go back to Mr. Golden's

22 questions.  Does anybody need a break at this point?

23         MR. GOLDEN:  I could do a break now or a break in

24 10 minutes, whatever the Court prefers.

25         THE COURT:  I didn't know if you wanted to catch

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  239

56

1 up on what happened while you were out --

2          MR. GOLDEN:  Yes, that might be -- yes, we

3 could do -- we could, yes.

4          THE COURT:  -- so we don't go over the same thing

5 again.

6          MR. GOLDEN:  Yes, yes, yes.  Great idea.

7          THE COURT:  Okay.  All right.  Why don't we pick

8 back up at 3:00, and take a break.

9          You're still under oath, but you can get off the

10 stand if you would like.

11          MR. GOLDEN:  Thank you, your Honor.

12          THE COURT:  So we'll take a break until 3:00

13 o'clock.  We're off the record.

14      (Proceedings recessed briefly.)

15          THE COURT:  All right.  So now we'll go back on

16 the Downs matter.

17          Mr. Golden.

18          MR. GOLDEN:  Yes, your Honor.  Thank you, your

19 Honor.  And, by the way, your Honor, if I may, what is the

20 time frame the Court is contemplating right now, if that's

21 the appropriate question to ask?

22          THE COURT:  Well, we kind of close things down at

23 5:00.  Like, the air gets turned off and stuff like that.

24 So, I mean, I'll sit here forever, but it's not fair to

25 people.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  240

57

1          MR. GOLDEN:  Right.  No air is never a good thing.

2          THE COURT:  Yes.  No, and it gets really hot in

3  here.

4          MR. GOLDEN:  I understand.

5          THE COURT:  If we need to continue this, I'm happy

6  to continue it to a date that's good for everybody.

7          MR. GOLDEN:  Okay.  I understand.  Thank you, your

8  Honor.

9  BY MR. GOLDEN:

10 Q   Mr. Steinmann, are there documents that will show us

11 what assets were put into the trust and what happened to

12 those assets?

13 A   There are.

14 Q   Do we have those documents here in the document

15 production?

16 A   No.  There are some documents that I thought would be

17 here that aren't in here.  That may be because they're not

18 responsive, but there is some that show what went into the

19 trust, I believe.

20 Q   And what happened to the assets instead?

21 A   What happened to the assets after they were in the

22 trust?

23 Q   Yes.

24 A   Yes.  I mean, that would be -- I don't know that I have

25 details on that, but, you know, there's a point-in-time

58

1 snapshot that has been largely redacted, and there's

2 probably another one subsequent to that.

3 Q    What documents would you look at to get that

4 information?

5 A    There were some documents on transferring assets into

6 the trust.  So that would be the first part of your

7 question.  The second part of your question would be to just

8 see what's in there, and then look at it at a point in time

9 afterwards and compare what's going on.

10 Q    But what documents would those be, is what I meant to

11 ask.

12 A    I believe the financial statement at a point later in

13 time, compared to what went into it originally.

14 Q    Okay.  And your mother has copies of those financial

15 statements, right?

16 A    We provided one that's largely redacted here, and I

17 think there may be one subsequent to that, but it pretty

18 much has the same information.

19 Q    And you have possession of those financial statements,

20 that information, as well yourself, correct?

21 A    The recent financial statements?  I do.

22 Q    Well, you're a Trustee of the trust, right?

23 A    Yes.

24 Q    And how long have you been a Trustee of the trust?

25 A    I guess from its inception.

59

1  Q    But you indicated you were not aware of that initially?

2  A    I indicated the trust was set up before I made aware I

3  was a Trustee.  That's correct.

4  Q    So when do you think you were made aware that you were

5  a trustee?

6  A    I think that I was made aware after the trust was set

7  up, but prior to when the trust was amended.

8  Q    But you did -- but let me turn you to page --

9  A    If I signed on the original trust thing, then I must

10  have been made aware of that original trust thing or

11  something.

12  Q    Well, you signed the original trust document, right?

13  A    That must be when I was made aware.

14  Q    So you were made aware at the time you signed it?

15  A    Probably.

16  Q    Okay.  I'm not trying to put words in your mouth.  I

17  thought you said it was after.

18  A    I thought it was, but then I see what you're saying,

19  that I probably signed the document, so maybe I was made

20  aware of that.  I just don't recall it.

21  Q    And what are your responsibilities and duties as

22  trustee of the trust?

23  A    To show up here in court and testify, I guess.

24  Q    But did you have any other responsibilities over the

25  years you were trustee of the trust?

60

1  A    I really have not -- occasionally, my mom will sell a

2  piece of property, and then I have to run around and do a

3  notarized signature, get that notarized and something like

4  that, and I think I can recall that happening about twice,

5  and anything else, you know, if there were some checks,

6  maybe I have to sign on a check, maybe I don't.  I can't

7  really recall.

8  Q    But you knew what the assets of the trust (sic) and

9  what happened to the assets of the trust while the time

10 (sic) you were a trustee, right?

11 A    In general.

12 Q    Would anything ever happen to an asset -- would an

13 asset of the trust ever be transferred or disposed without

14 you knowing about it?

15 A    The way the trust is set up, it just requires two

16 people out of the three to transfer an asset, and I don't

17 know that -- and, look.  I might be wrong on that, but

18 that's far as I know.  Things that could happen that I

19 didn't know about (indiscernible).  My mom made a deal with

20 somebody regarding a house, to give them a discount to do

21 this or something like that.  Sure.

22     There could be things like that, but I think, on the

23 big things, if she's selling a house, then I have to sign

24 off on it.  So, in general, there's not a lot going on in

25 there, and I know most of what's going on, I imagine, but

61

1  there could be stuff that I don't.

2  Q    How many trust amendments were there?

3  A    One, one that I'm aware of.

4  Q    Okay.  But you never heard of any more?

5  A    I never heard of any more.

6  Q    And the one you're aware of, is that the one where

7  Andrea Downs was disinherited?

8  A    Define "disinherited," please.

9  Q    Okay.  What happened in the amendment to the trust?

10  A    I think there was one amendment to the revocable trust,

11  where it was revoked for Annie, and she was taken out as a

12  beneficiary at that time so that, if my folks passed away at

13  that time, she would not be a beneficiary.

14  Q    Now, prior to that time, she had received a lot of

15  support from everyone, right?

16  A    Define "a lot," and define "everyone," please.

17  Q    For a decade, didn't she receive over seven figures, a

18  million dollars, in payments to her for her benefit part of

19  that time?

20  A    I would say the answer to that is no.

21  Q    Okay.  Did she receive any funds in the five or 10

22  years prior to that, monies paid to her for the benefit of

23  her?

24  A    Yes, she did.

25  Q    About how much?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  245

62

1  A    Well, now, wait a second.  For the benefit of her from

2  whose standpoint, her standpoint or from the standpoint of

3  the people that were providing the money?

4  Q    For her benefit or to her.

5  A    Or to her?  Yes, she did receive funds in the probably

6  five- or six-year period before, and I'm assuming you're

7  saying before this bankruptcy action was filed in 2016, or

8  before when?

9  Q    Before the amendment.

10  A    Before the amendment to the trust, yes.

11  Q    So, in the 10 years before, she didn't receive over a

12  million dollars that was paid to her for her benefit?

13  A    No, not to my knowledge she didn't.

14  Q    About how much did she get?

15  A    In that period, maybe $550,000.

16  Q    Paid to her?

17  A    Paid to her, and that is the gross amount, and she paid

18  some amount back.  So I think it's a net amount less than

19  that.

20  Q    But were there also other payments made for her

21  benefit, to lawyers or other parties?

22  A    There was one other payment made for her benefit, and

23  one other payment to a lawyer that was returned, that would

24  have been to her benefit --

25  Q    And during this period, the family wasn't making --

63

1  A    -- and that one payment was the $250,000 that I spoke

2  about, which was the total amount paid to Brown and Rudnick,

3  no other amounts paid in which to handle the complete -- her

4  complete role in that state court litigation, including

5  appeals.  There is no other payment.  It's been said that

6  there's something else going on.  There is not.  That is it.

7  Q    And during that time period, were there other payments

8  made to other people that she needed to pay for her benefit

9  during that time?

10 A    From my folks?

11 Q    From your folks or from the trust.

12 A    The trust wasn't set up.  After the trust was set up,

13 there was no payment made for her benefit, other than the

14 $250,000 to Brown and Rudnick for complete representation in

15 that state court matter, and a $25,000 payment to James Till

16 for representation in this bankruptcy thing, which was then

17 returned to my mom.

18 Q    Okay.  So how much -- so about 500,000-plus you said

19 went directly to her, and some other monies for her benefit.

20 About how much monies went to each of the other siblings

21 during that same time period?

22 A    Well, you say "went to them."  You know, these were

23 loans, with interest rates and notes, and intended to be

24 paid back.  So do you want to know the loans to the other

25 siblings during that time period?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  247

64

1  Q    Did they get loans?

2        MR. LARSON:  Your Honor, I'm going to object on

3  relevancy grounds at this point, and I know that's not

4  normally a deposition-type objection, but getting into what

5  parents are paying or loaning or financial arrangements they

6  had with their other children, not relevant to this.  I

7  think this is really beyond the scope, or should be beyond

8  the scope.

9        THE COURT:  Mr. Golden, what do you think?

10       MR. GOLDEN:  Your Honor, I think it's relevant to

11 just have a sense of understanding whether she got roughly

12 the same or a disproportionate amount compared to the other

13 siblings during this time period.  I don't know -- I don't

14 think I have 30 questions, I think one question, just

15 basically getting a sense of whether or not other siblings

16 got similar kinds of payments or not.

17       THE COURT:  I have to agree with you.  I'm going

18 to overrule the objection.

19       MR. GOLDEN:  Okay.  Thank you.

20       THE WITNESS:  I'm sorry?

21       THE COURT:  You can answer the question.

22       THE WITNESS:  I can answer the question.  She

23 got -- this was more than some and less than others, and I

24 would say half of the siblings had loans outstanding during

25 that period of time.  Half didn't.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  248

65

1 BY MR. GOLDEN:

2 Q    And during this time period, your role -- going back to

3 your role, I guess, a lot of this time was before the trust

4 was created, but you seem to know what these numbers were to

5 Andrea Downs and the others.  So were you actively involved

6 in these financial transactions?

7 A    Well, no.  I wasn't actively involved in -- you're

8 talking about any loans to Annie?

9 Q    Yes, yes, and/or anyone else.

10 A    No, I wasn't actively involved in making any of those

11 loans.  I did do my parents' tax return, and when they give

12 me permission to that, they give me a list of every -- the

13 different loans they would make to family members and other

14 people.  As I have said, they would say, "Here's how much

15 interest has been paid," and that type of thing, and I would

16 report that on the tax return.  So I was generally aware at

17 that time, you know, at least on a once-a-year basis, what

18 was going on.

19 Q    So now, under the first amendment, Andrea doesn't get

20 any more help from the family anymore.  Is that right?

21 Let's get back to that for --

22 A    I would help her if she needed help.  You know, she's

23 my sister.  So I think that's wrong.

24 Q    Okay.  So what's the effect of the first amendment?

25 A    She's not entitled to anything -- should my parents

66

1  pass away, she's not entitled to anything from the trust.

2  She has no interest in that trust.

3  Q    I understand, but your parents and the family can still

4  help her during the interim, correct?

5  A    Of course.  You would help your sister at any time.

6  So, you know, does that mean that my parents can help her

7  financially, or my parents can help her emotionally, or my

8  parents can help her in other ways?  What are you talking

9  about?

10  Q    I'm talking financially.

11  A    If they want -- if she asks them for some money,

12  they're free to do whatever they want with their money.

13  Q    But have they been helping her financially since the

14  first amendment?

15  A    No.  Everyone is, quite honestly, afraid to, from all

16  this oppression that you guys are wreaking on everyone in

17  our family, undeservedly.

18  Q    So, basically, so the siblings and your parents

19  basically made the decision with the first amendment that

20  she wasn't going to get anything out of the inheritance?

21       MR. LARSON:  Object that it mischaracterizes the

22  testimony.

23       THE COURT:  Can you rephrase it, Mr. Golden?

24       MR. GOLDEN:  Yes.

25  //

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  250

67

1  BY MR. GOLDEN:

2  Q    So who made the decision on the first amendment?

3  A    The trustees in the trust, which would be both of my

4  parents and myself.

5  Q    Were the other family members involved in those

6  discussions?

7  A    Not to my knowledge.

8  Q    And what was the thought process being doing that first

9  amendment?

10         MR. LARSON:  I'll just object to foundation.  As

11  to this witness, certainly he can describe his thought

12  processes.  I think to ask about the thought processes of

13  his parents is beyond the pale.

14         MR. KESSEL:  Unless it's communicated in meetings,

15  unless they express their thought process.

16  BY MR. GOLDEN:

17  Q    You had a meeting with the parents to discuss whether

18  or not you should have the first amendment or not?

19  A    There was a meeting.  We discussed that.

20  Q    About how long was the meeting?

21  A    I can't recall.

22  Q    Okay.  And at the meeting, what was discussed?

23  A    That there was this -- Annie was in some litigation

24  with some people that, you know, were not interested in

25  anything other than, you know, litigating her to death, and

68

1 it's a fact.  You know, it's millions of dollars, over 4.7

2 million dollars, chasing some 500,000 or $700,000

3 investment, and, you know, it would be a good idea to remove

4 her from the trust and remove us from this thing, because

5 it's going to be a burden on everybody.

6 Q    Were the other -- and were there any conversations at

7 all with the other siblings about this?

8 A    What?

9 Q    Were there any conversations with the other siblings

10 about this?

11 A    About removing Annie?

12 Q    Yes.

13 A    Not that I can recall.

14 Q    What was Andrea Downs' reaction to this?

15 A    I don't believe I told Annie this, or discussed it with

16 her, until after she had discussed it with maybe my parents,

17 and I believe, from whatever I understood, she was not --

18 didn't maybe understand it, or the reasons why at first,

19 but, you know, she came to accept it.

20 Q    And did she get financial support after that from the

21 other siblings at all?

22 A    I don't know, but I don't believe so.

23 Q    Did she get any financial support from you?

24 A    You know, nothing of significance.  I can't think of

25 anything, maybe a gift or something of that, but, you know,

69

1 under $2,000 would be the most, I would think, maybe giving

2 her a gift or something at a birthday or Christmas or

3 something like that, but nothing of significance.

4 Q    So, basically, but, in the past, there was -- again,

5 the family was lending Andrea Downs money or giving Andrea

6 Downs money, and that all came to a stop after the first

7 amendment, correct?

8 A    That all came to a stop before the trust was even

9 created, other than what I said, the $250,000 to Brown and

10 Rudnick, in complete payment of everything for their

11 lawsuit.

12 Q    And if the lawsuit were not in the picture, then what

13 would happen with respect to Andrea Downs?

14 A    I don't know that there would be anything much

15 different in the -- you know, what else is going on at that

16 time if this lawsuit is not in the picture?  I don't think

17 that can be answered in a vacuum.

18 Q    But, if there was no litigation against Andrea Downs,

19 would that change what her expectation would be, what her

20 entitlement would be?

21 A    If there was no litigation, and she hadn't borrowed X

22 amount of money, and the payments weren't forthcoming,

23 coming back?  I don't know that that would have been

24 addressed independent of this litigation.  So you can't ask

25 that question in a vacuum and have me give you any

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  253

70

1 reasonable answer, I don't think.

2 Q    Does she have any interest in any of the trust assets

3 right now?

4 A    No, she has no interest in any of the trust assets

5 right now.

6 Q    But she did have an interest in the trust assets

7 previously, correct?

8 A    No, she never had any interest in any of the trust

9 assets.  It's a revocable trust, and they can revoke it at

10 any time.  To me, that is not an interest.

11 Q    And in the assets themselves, she never had any

12 interest, correct?

13 A    Not that I'm aware of.

14 Q    Okay.

15 A    There are brothers and sisters that have maybe

16 part-interest on a property with my folks and this or that,

17 and to my knowledge, Annie never had any of that.

18 Q    And are you or anybody holding any assets for her

19 benefit?

20 A    Absolutely not.  I know nobody is doing that.

21 Q    Does Andrea Downs have an interest in Desmont

22 Properties?

23 A    No, she does not.

24 Q    Has she ever?

25 A    She's never had an interest in Desmont Properties, that

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE 254

71

1 I'm aware of.

2 Q    What does Desmont Properties own?

3 A    Desmont Properties is the successor to Holiday Hill

4 Corporation, which used to run the ski area in Wrightwood,

5 and at sale of the ski area, the name of the company was

6 changed to Desmont Properties.

7        Desmont Properties then became the vehicle that my mom

8 used to build houses, and she's built 50, 60, 70 houses, and

9 she sometimes gets it right, and does all the paperwork in

10 Desmont Properties, and sometimes she does it in her own

11 name, but says it's Desmont Properties, and so I believe

12 that Desmont Properties owns a couple lots for development,

13 and is not currently developing any property.  However, it

14 may own a couple lots for development, and be developing

15 some property.

16 Q    Is Desmont Properties in the trust?

17 A    The interest in Desmont Properties is in the trust.

18 Q    And what's the Morro Bay house?

19 A    Morro Bay house is a house in Morro Bay that we share

20 kind of as a family timeshare.  It's in my name.  Annie has

21 no interest in it.  All the people in the family are not

22 part of it.

23        There was a water list situation that came up 30 years

24 ago, and I needed to build or get put to the back of the

25 water list, and at that time, my mom went in for 10 weeks,

72

1  and my couple brothers and sisters went in for five or six

2  weeks, not Annie, and we built this house, and we use it to

3  this day as a family timeshare-type thing, just among the

4  people who went in and built it originally.

5  Q    Well, so Andrea doesn't have any interest to use that

6  house for a week?

7  A    No, she does not.

8  Q    And she never has?

9  A    She never has.  That's not to say she never used it for

10 a week.  If she asked me for a week, I would give her a

11 week.

12 Q    If she asked you for a week, you would give her a week.

13 Is that what you said?

14 A    I would.

15 Q    All right.

16 A    I have more than I use it myself.

17 Q    But on page 44 of your document, it says, "Morro Bay

18 house, distribute one week per family," but you're saying

19 one week for just some of the family members, but not all of

20 them?

21 A    Page 44 of the document request, I believe, is

22 something that was put together probably by the law firm

23 that was talking to my mom and dad about putting this trust

24 together, and they were giving direction, and this is

25 probably, without talking it through, my mom saying, "This

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  256

73

1  is what I would want to happen should I die."

2      She's still looking at it as a will-type situation,

3  "Should I die, the interest in the Morro Bay house," which

4  she has 10 weeks, should be distributed one week to each of

5  her children.

6  Q    Well, I'm confused.  Go to page 42.  That's a

7  document -- that's a statement of financial condition.  Do

8  you see that?

9  A    Yes.

10  Q    It's redacted.  There's nothing on that page.  So 43

11  and 44 is a separate document, is that right, unrelated?

12  A    Yes.

13  Q    Okay.

14  A    This is not related to the financial statement.

15  Q    Right.

16  A    This came from a file that had the trust documents in

17  it, so I believe this was part of the discussion when they

18  formed the trust, and again says this is the assets that

19  were go in the trust, and some discussion about their

20  intentions about them.

21  Q    All right.  And the intention was to give one week per

22  family?

23  A    That would be when she passed away and my dad passed

24  away, that they would like to see one week per family go to

25  each family member.

74

1  Q    Could you tell me what the redacted pieces of Morro Bay

2  house were about, what they say?

3  A    I can't imagine why there would be a problem in looking

4  at that and telling, but I don't know what they are.

5  Q    Okay.

6  A    There's nothing on here that I would think would -- you

7  know, given that this is a complete invasion of privacy to

8  start with, that this would be any more.

9  Q    And on page 45, there's a reference to a Locarno home.

10 Who owns the --

11 A    There's a reference to what?

12 Q    The Locarno home, L-O-C-A-R-N-O.  Are you familiar with

13 that?

14 A    On page what?

15 Q    Forty-five, the next page.

16 A    Locarno home.  Yes, I think I know which one that is.

17 Q    Which one is that?

18 A    It's a home that my mom built as a spec house, and this

19 is pretty speculative, but I think she built it as a spec

20 house, and then sold it to my brother Jeff, who moved his

21 family into there for a short period of time.

22     Then he moved out, and she bought half of it back, and

23 the two of them use that as a rental, and they had some

24 famous boxer in there that tore it up, and now they got it

25 fixed up again, and they're using it as a rental, as far as

75

1 I know, or they might have just sold it to somebody

2 recently, but this, again, is -- this document is probably

3 2016.  So I think this thing is maybe sold and gone at this

4 point.

5 Q    All right.  Now, what's redacted in that?  It says,

6 "Fifty percent to Jeff," and then it's redacted.  Do you

7 know what's redacted?

8 A    You mean going to the next page?

9 Q    Yes.

10 A    The answer to your question on that is I do know what

11 that is redacted, because you had made that statement prior,

12 and I asked about that at the break, and they showed it to

13 me.  It said, if I'm allowed, that --

14       MR. HAYS:  Objection.  Hold on, your Honor.  If I

15 may, I'd like to interject attorney-client privilege.  It's

16 a handwritten note between Lora Steinmann and the lawyer

17 that was setting up the trust, and we believe that's

18 attorney-client privilege that only Lora Steinmann can

19 waive, but I don't think this witness has the ability to

20 waive it, and I think that question should not be answered.

21       THE COURT:  Are you going to be talking to Lora

22 Steinmann at any time soon?

23       MR. HAYS:  They've started the examination, but

24 they haven't concluded it, so, soon as it's noticed up and

25 she's available.

76

1          THE COURT:  Okay.  Why don't you wait and ask Lora

2  about that.

3          MR. KESSEL:  Well, one thing I just may point to

4  the record, your Honor.  There are other handwritten notes

5  on this that have not been redacted.  They appear on page

6  45, and that actually looks like legal advice.

7          She changed to "Tenants in common," and then

8  there's a deletion on page 47, "Assignment from get Heinz to

9  sign (sic)," and then "Eric," question mark," and then on

10 the next page as well.  So this seems to be selective at

11 best, your Honor.

12 BY MR. GOLDEN:

13 Q    And, actually, with this document, you said it was

14 created by who, again?

15 A    It's speculation on my part, because I didn't create

16 it, but it was in the file with the trust things, and this

17 doesn't look like my mom's typing or organization.  I would

18 assume it would be somebody at the law firm that was setting

19 the trust up, maybe in interviewing them and assembling the

20 information.

21 Q    Do you know if this was ever given to your siblings?

22 A    I don't know if this was ever given to my siblings.  I

23 would be quite surprised if it was.

24          THE COURT:  Mr. Hays, I mean, there are

25 handwritten notes on here that are not redacted.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  260

77

1          MR. HAYS:  That is true, your Honor, but it's our

2  understanding that those are not communications by and

3  between counsel, and so they can ask Ms. Steinmann about who

4  wrote that and who it is directed to, and that can all be

5  handled in Ms. Steinmann's deposition.

6          THE COURT:  I'm going to err on the side of you

7  can talk to Ms. Steinmann about it.

8          MR. GOLDEN:  I'm sorry?

9          THE COURT:  Yes.  Why don't we just move on.  You

10 can ask --

11         MR. GOLDEN:  Understood.

12         THE COURT:  -- Lora about it.

13         MR. GOLDEN:  Understood.

14 BY MR. GOLDEN:

15 Q    Let me ask you about the Nielsen Road (phonetic) house.

16 Are you familiar with that, sir?

17 A    Yes.

18 Q    Have you heard of that before?

19 A    I'm looking at it.  I think I am, yes.

20 Q    Have you ever been there?

21 A    I don't think so, but I might have.

22 Q    Okay.  And so the Nielsen Road house says that -- who

23 owns the Nielsen Road house?

24 A    At this point, it would be the trust and my brother

25 Jeff, I think, 50/50.

78

1  Q    Now, according to this -- well, when was this document

2  create, do you think, that we're looking at today?

3  A    This would be -- as best I can determine, this was

4  created somewhere in the period prior to the origination of

5  the trust, maybe late 2015, when they were putting the trust

6  together.  I don't know the exact time frame.

7  Q    And Annie, Andrea, had owned --

8  A    The "Jeff and Annie Steinmann" there is my brother

9  Jeff's wife, Annie.

10  Q    Okay.  Different "Annie."

11  A    Different "Annie."

12  Q    Okay.

13  A    Her name is Annie Downs.  This is Annie Steinmann.

14  That's my brother Jeff's wife.

15  Q    Understood.  So Andrea Downs never had an ownership

16  interest in this, correct?

17  A    No, no.

18  Q    Now, what about Sheep Water Creek (sic)?  Are you

19  familiar with that?

20  A    What page?

21  Q    I'm not referring to a page.  Are you familiar with

22  Sheep Water Creek?

23  A    No, I'm not.  There is a Sheep Creek Water.

24  Q    Okay.  That's what I meant.

25  A    Okay.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  262

79

1  Q    I apologize.  Are you familiar with Sheep Creek Water?

2  A    I am somewhat familiar with Sheep Creek Water, yes.

3  Q    And has Andrea ever had an interest in that?

4  A    No.

5  Q    And what is that?

6  A    They're shares in a water company that provides water

7  service to certain lots in the community below where my

8  folks live, Phelan, and it's currently, I think, going out

9  of business, so that I'm familiar of the discussion around

10 it from that, but I think, related to this Nielsen Road

11 property, there's a number of shares in Sheep Creek Water

12 that go with it, and, you know, if you sell a property -- if

13 they develop that and sell a property, they would sell a

14 share in the water company, and that would give the people

15 the right to get their water from Sheep Creek Water Company.

16 It's kind of a co-op-type deal.

17 Q    Why did your parents create a trust?

18        MR. LARSON:  Objection, foundation, as to why his

19 parents created a trust.

20 BY MR. GOLDEN:

21 Q    Why was a trust created?

22        MR. LARSON:  It calls for speculation.

23        MR. KESSEL:  He's already testified he didn't know

24 about it until after it was done.

25        MR. GOLDEN:  Well --

80

1          THE COURT:  Well, he signed it.

2          MR. GOLDEN:  He actually changed his testimony and

3 said that now he thinks -- now you think that you did --

4          THE WITNESS:  No, I -- okay.  I'm sorry.

5          MR. LARSON:  Your Honor, the time is not the issue

6 here.  He's asking why the parents did something.  That is

7 pure speculation, and there is no foundation for this

8 witness to explain why somebody else did something.

9          THE COURT:  Can you rephrase it, Mr. Golden?

10          MR. GOLDEN:  Sure.  Absolutely.

11 BY MR. GOLDEN:

12 Q    Did you have an understanding as to why this trust was

13 created?

14 A    You know, I was a CPA for a number of years, and so,

15 from that standpoint, I can understand why people, in

16 general, do revocable trusts, and so, in general, I would

17 say that, in a general way, I understand why people create

18 revocable trusts.

19 Q    Did you ever talk to your parents about why they

20 created the trust?

21 A    Again, I thought I didn't hear about it until

22 afterwards, but it was not something that I woke up and

23 decided that they needed to do, and so the answer would be

24 no.  I wasn't part of the genesis of this trust at that

25 time.  I'm not saying it's a bad idea or a good idea.  I

81

1 just wasn't the one that --

2 Q    Did you ever talk to your parents at any --

3 A    -- launched that boat.  What?

4 Q    Sorry.  Did you ever talk to your parents at any time

5 regarding why they created the trust?

6 A    No, I don't think so.  I think I understood when they

7 did.  You know, it's the right thing to do at some point,

8 and, in my opinion, the last point you can before you die,

9 and, you know, they're pretty old.

10 Q    Did you ever talk to any of your siblings regarding

11 your parents' intent to create a trust?

12 A    I can't recall.

13 Q    Okay.  Did you ever -- do you ever receive a fee for

14 your services as trustee of the trust?

15 A    No.

16 Q    Do you parents ever receive a fee for their services as

17 trustees?

18 A    No.

19 Q    Do you review all of the financial accounting records

20 of the trust?

21 A    Excuse me?

22 Q    Do you review all of the financial accounting records

23 of the trust?

24 A    Not all, no.

25 Q    So how do you know whether or not your parents ever

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  265

82

1  received a fee?

2  A    I guess I don't --

3  Q    And the trust also says --

4  A    -- but I'm willing to bet.

5  Q    So the parents also -- I think you answered that

6  question already, actually.  Let me skip that.

7       The trust also provides, I think, in paragraph three,

8  that you're supposed to assist your father with the

9  management of his assets, and your sister to assist your

10 mother.  What was the purpose of that clause?

11 A    I don't know.  I can only speculate.

12 Q    All right.  Article Three of the trust, in paragraph

13 2B, talks about the distribution of income and principal.

14 Do you see that provision?

15 A    Do you have a page that you're looking at?

16 Q    Yes.

17          UNIDENTIFIED SPEAKER:  Is it 2B or B2?

18          UNIDENTIFIED SPEAKER:  2B.

19 BY MR. GOLDEN:

20 Q    Paragraph 2B.  Sorry.

21 A    Article Three.  Hang on.  Do you have a page?

22 Q    Yes.  Is it page 18?  Yes.  I'm not finding it.  Sorry.

23 I'll come back to that.  I'm not finding it readily.

24      Are you familiar with the last will and testament of

25 Heinz Steinmann dated January 26, 2016?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  266

83

1  A     Now we're onto something else?

2  Q     Yes, yes.

3  A     Okay.  All right.

4  Q     Are you familiar with that?

5  A     I'm familiar -- define "familiar," please.

6  Q     Have you heard of the last will and testament of Heinz

7  Steinmann, dated January 26, 2016?

8  A     I have heard of it, yes.

9  Q     Okay.  And do you have any understanding as to what the

10 purpose of that will was?

11         MR. LARSON:  Objection, vague as to "purpose of

12 the will."

13         THE COURT:  Can you rephrase it, Mr. Golden?

14 BY MR. GOLDEN:

15 Q     Do you have an understanding as to why the will was

16 created?

17 A     No.

18 Q     Do you know what the assets that were in the will were?

19 A     I think the best way to answer that is, as far as I can

20 tell, this was the will that was in place before the trust.

21 So, to the extent I know what assets went into the trust, I

22 would know what assets were in the will at a certain point

23 in time, but certainly not at all points in time.

24 Q     And would all of the assets of the will go into the

25 trust?

84

1  A    I don't know that that's for sure, but that's would I

2  would think.  But there is no assets in a will.  The will

3  just says the assets belong to the person, and the will

4  says, when they die, they you get probate involved, and all

5  the reasons for creating a trust prior to your death.  So

6  this is -- I don't know if you're answering (sic) that

7  correctly, but I think this was what they had to take care

8  of their demise prior to having this trust set up.

9  Q    So did your parents own assets that were not put into

10 the trust?

11         MR. LARSON:  Objection, foundation.

12         THE COURT:  I'm going to overrule, in case he

13 knows.

14         THE WITNESS:  I don't know that there is any

15 assets that were not put into the trust.  So I don't know

16 the answer to that.

17 BY MR. GOLDEN:

18 Q    So are you familiar with the certification of trust

19 dated January 26, 2016?

20 A    I believe I signed it.

21 Q    It's at page three --

22 A    Page three.

23 Q    -- and four, actually three through six.  Is that your

24 signature?

25 A    Yes, yes.  That's my signature.

85

1  Q    Okay.  And what does the certification of trust do?

2  A    I'm going to have to read it for that.  It provides

3  evidence of the existence of the trust.

4  Q    Do you know why it was done about three weeks after the

5  trust was created?

6  A    I have no idea.

7  Q    Do you know whose idea it was to do this?

8  A    What?

9  Q    Do you know whose idea it was to do this?

10  A    No, I don't.

11  Q    So I think we've touched on this before, but, on the

12  schedule of assets to the trust, are there other assets that

13  you're aware of that are not on that schedule?

14  A    What schedule are you talking about?

15  Q    Sure.  Look at page 15.

16  A    Okay.  And your question, again?

17  Q    Are there other assets in the trust that are not on

18  that list?

19  A    This list does not -- this list isn't very -- there's

20  other assets that I believe are in the trust that aren't on

21  this list, and that would be because they've been

22  transferred, to the best of my knowledge, to the trust, but

23  I don't think this is a very comprehensive list of what they

24  had, and I think their intention was to put everything into

25  the trust.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  269

86

1  Q    But there's no other amendment to the trust showing

2  that, correct?

3  A    Not that I'm aware of.

4  Q    And there's no other writing that you're aware of

5  showing that, either?

6  A    No.

7  Q    And, like, the horses you mentioned would not be

8  included here, either, correct?

9  A    The horses are not included there, no.

10  Q    And the horses were in existence prior to the trust?

11  A    Yes.

12  Q    And the horses are still in existence, correct?

13  A    No.

14  Q    What happened to the horses?

15  A    In, I think, 2018 -- could have been -- no, it was

16  2017 -- my brother Heinz, myself -- also included in the

17  group is my brother John, but we have 11 people in the group

18  we put together.  We took over my dad's horses, on his

19  paying us $100,000 to do it, and that is not a good

20  investment.

21  Q    So the horses are -- okay.  And it was not a good

22  investment why?

23  A    Because they're horses.  You know, they're not making

24  any money.  We're trying.  We've had computer programs.

25  We've got all kinds of stuff.  We're not making any money on

87

1  that.

2  Q    So who paid the money?

3  A    My dad paid us 100,000 to take them.

4  Q    Okay.  And who did he pay the 100,000 to?

5  A    To a group of us.  There's 11 of us, where we call

6  ourselves Huntertown Farm (phonetic).

7  Q    Are these your siblings?

8  A    Well, Tessie, John, Heinz, and I are in it.  The others

9  are not.  And then there's six people that are not part of

10 the family that are in it.

11 Q    So Andrea was not included?

12 A    No.

13 Q    But were there other siblings that were not included?

14 A    Yes.

15 Q    Who?

16 A    Katy, Mary, Jeff, Susie, and one more I'm missing.  I

17 can't remember.

18 Q    What other assets did your parents have at the time

19 that were not included in the trust?

20 A    Well, I thought that all their assets went into the

21 trust.  So you're showing me a Schedule A that is not a

22 complete list of their assets at that point in time.  So I

23 don't -- you know, there's some uncertainty regarding this,

24 you know, whether there are assets that aren't in the trust,

25 but, you know, to my knowledge, they put everything in the

88

1 trust, and the idea was to put everything in the trust.

2     I think what happened is somebody started listing this

3 stuff out and didn't do a complete job of listing it out,

4 but that's just what I think.  I don't know any more than

5 what I've told you.  This is the first time I've really

6 looked at this and focused on it.

7 Q   Right.  My question was different.  My question was,

8 what other assets are you aware of that's not on the list?

9 A   That's not on this list?

10 Q   Correct.

11 A   This list right here?

12 Q   Yes.

13 A   Okay.  Real property.  Well, there's that list of real

14 property that was dealt with on that schedule that's been

15 provided to you as part of this document production, that

16 lists out the Locarno Street and the Nielsen Road and all

17 that stuff we just talked about.  Those things are not on

18 this, and my dad's interest in Ally Finance is not on this,

19 and those are two that come to mind, or two categories that

20 come to mind that encompass a fair amount of assets.

21 Q   And are they worth a fair amount of money?

22 A   Money-wise, I think most of it is here, but at what

23 point in time?

24 Q   Right now I'm just talking about the time the trust was

25 created, going through what other assets -- you were listing

89

1  other assets that were not identified, correct?

2  A     Uh-huh.

3  Q     So how much were those assets worth at the time?

4  A     When the trust was created, just the ones that I

5  identified, which would be the assets on that list of real

6  property.  Can you tell me where that is again in this

7  thing?  Here.  Okay.  Has anyone got a calculator?

8             MS. BRADFORD:  It's on page 43.

9             THE WITNESS:  What?

10            MS. BRADFORD:  Page 43.

11            THE WITNESS:  Page 43.  Has anyone got a

12  calculator?  I mean, how much detail do you want on this?

13  Because I can look at those and tell you what I believe

14  they're worth, if that's what you're asking me.

15  BY MR. GOLDEN:

16  Q     Do you think they're worth over a million dollars?

17  A     Collectively?

18  Q     Why don't we go through each one.

19  A     The family home, 500,000 bucks, maybe.

20  Q     Is there a loan against it?

21  A     No.

22  Q     All right.  How about the next one?

23  A     Rico home, 100,000 bucks, if you find somebody to buy

24  it.  It's a town of 300 people.

25  Q     Okay.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  273

90

1  A     Ten weeks in Morro Bay, could be $150,000, maybe, maybe

2  200.

3  Q     This is net of the liens you're giving me, these

4  numbers?

5  A     No lien on that.

6  Q     Yes.  Single, the Wrightwood?

7  A     Single-family dwelling in Wrightwood, rental property

8  we put on the market within a year, probably $220,000,

9  maybe.

10  Q     Okay.  The Chalet Apartments?

11  A     Six hundred thousand, maybe.  It's not very big.

12  Q     Pinon Hills?

13  A     Mono duplex.  I'm not too familiar with that, but, if

14  there was a duplex in Pinon Hills, might be worth 300,000,

15  might be worth 200,000, something like that.

16  Q     What about the St. Francis building?

17  A     Five hundred twenty-five thousand dollars, because it

18  was sold to my sister, her friend, and me, and then they

19  bailed out, and so I own that, or my wife owns that now.

20  Q     And what happened to the money that went -- who was

21  that money paid to for the house?

22  A     It was paid to the trust, I imagine, or my mom to the

23  trust.  I don't remember the escrow, but yes.

24  Q     Do you think the money went --

25  A     And I don't remember the timing, if it was before they

91

1  put it in the trust or not, but it went to my mom or the

2  trust, and if it went to my mom, it probably went to the

3  trust afterwards.

4  Q    But you're not sure?

5  A    I'm not sure who -- if they had transferred that into

6  the trust at the time we did it.  It was a couple years ago.

7  I don't know if they had transferred that in yet.

8  Q    So you think the proceeds went into the trust?

9  A    I think the proceeds, even if they went to my mom,

10 because she hadn't transferred it in yet, would have ended

11 up in one of her accounts, which has subsequently been put

12 into the trust, as far as I know.

13 Q    Does she have individual bank accounts and trust

14 accounts?

15 A    She used to be the queen of individual bank accounts,

16 but, over the years, over many years of trying to get her to

17 narrow them down, at this point, I think she's put

18 everything into the trust account or, knowing here, there's

19 probably still maybe a couple bank accounts out there, but

20 they're not going to have a lot of money.  She had many bank

21 accounts with low balances, and a lot of headaches.

22 Q    What about the Wrightwood home on Locarno?

23 A    As I said, I think that one has now been sold, but,

24 prior to its sale, I think that might have been worth

25 $200,000, but I believe, at that time, it had a tenant in it

92

1  who would not move and was suing.  So maybe there's some

2  discount to that, but something like that.

3  Q    What about the vacant land?

4  A    Cardinal Street lot, I think she built a spec house on

5  that now.  So, at that time, I would say that lot -- my wife

6  bought one over there for about $50,000.  So I'd say

7  probably $50,000 for that lot.

8  Q    What about Phelan?

9  A    Purely speculative on my part, but I would think that

10  might be worth $400,000.

11  Q    Okay.  Nielsen Road?

12  A    Again, they're building duplexes on that now.  They're

13  having a lot of problems, and I think, fully developed, it's

14  like $800,000.  I think the lot might be -- and they have

15  that water problem.  The lot is maybe 150,000 at that time.

16  Q    Is that for both Nielsen Roads?

17  A    Okay.  So that's what they're saying about the six-acre

18  across (sic).  I think they're -- I think that's for both of

19  them.

20  Q    All right.

21  A    They have this water problem.  It would have decreased

22  the value, but I don't know if that water problem was known

23  at the time they did this.

24  Q    How much cash did your parents have at the time the

25  trust was created?

93

1  A     How much what?

2  Q     Cash did your parents have when the trust was created.

3  A     I don't know.

4  Q     Okay.  But you would have the bank statements, correct?

5  A     I wouldn't have the bank statements.

6  Q     You never receive the bank statements as trustee of the

7  trust?

8  A     Well, not at the time it was created, you know, and, as

9  I said, the assets were transferred in over a period of

10 time.  There's no laser wand (sic) when you create a trust

11 and goes and changes all those assets.  If it's a bank

12 account, you've got to go to the bank.

13     You've got to move it to another account, do all the

14 transfers, shut down one account, open another, all that

15 stuff, and if it's property, you've got to go record deeds,

16 and if it's stock, you've got to sign over stock

17 certificates, hand them in.  So I don't think anyone is

18 going to know the answer at the time that trust is created

19 on this stuff.

20 Q     So what other assets do your parents own today, other

21 than what was identified?

22 A     The only thing that just came to mind was a maybe

23 less-than-10-percent interest in the Wrightwood Country

24 Club, which is like the town pond which everyone goes

25 swimming at.

94

1  Q    How much cash do your parents have?

2  A    How much cash do my parents have?

3        MR. LARSON:  Objection, your Honor.  I think this

4  goes well beyond this trust.  I don't think this is -- I

5  have to assert a privacy objection, your Honor.

6        THE COURT:  Yes, I'm going to agree.  So let's

7  back off there.

8  BY MR. GOLDEN:

9  Q    Okay.  And going back to Schedule A on page 15, you see

10 where it says that "Assets of the trust are to be designated

11 by separate documents," correct?

12 A    On Schedule A?

13 Q    Yes.

14 A    It says, "Such other assets of the trust are to be

15 designated by separate documents."  Yes, I see that.

16 Q    And do you know if your parents ever did that?

17 A    I don't know that this is a designation or not, because

18 the answer is no, I don't know if they did that.

19 Q    Okay.  And on page -- we just (indiscernible) page 15.

20 (Indiscernible) for now.

21        MR. GOLDEN:  May I have about -- may I have like a

22 five-minute --

23        THE COURT:  Sure.

24        MR. GOLDEN:  -- five- or 10-minute break, your

25 Honor?

95

1          THE COURT:  Yes.  No problem.

2          MR. GOLDEN:  Okay.  Thank you, your Honor.

3          THE COURT:  Okay.  You can step down, and I'll

4  come back in -- 10 minutes?

5          MR. GOLDEN:  Yes, that's fine, your Honor.  Thank

6  you.

7          THE COURT:  How about a quarter after?

8          UNIDENTIFIED SPEAKER:  Thank you, your Honor.

9          MR. GOLDEN:  Thank you, your Honor.

10     (Proceedings recessed briefly.)

11         THE CLERK:  Please remain seated and come to

12 order.  Court is once again in session.

13         THE COURT:  All right.  We're back on the record.

14         MR. GOLDEN:  Thank you, your Honor.  Your Honor,

15 after consultation with counsel, we actually want an

16 opportunity to ask a few more questions before the day is

17 out, so I was going to turn it over (indiscernible).

18         THE COURT:  Very well.

19         MS. BRADFORD:  Thank you, your Honor.

20 BY MS. BRADFORD:

21 Q   Mr. Steinmann, let's just quickly go back to the

22 document that you were looking at with Mr. Golden, Lora

23 Steinmann's properties, page 43.  Now, you mentioned that,

24 to your knowledge, these properties have been transferred

25 into the trust at some point in time.  Is that correct?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE 279

96

1 A    Or sold, or maybe not yet transferred, but I don't know

2 what the status of them is individually.

3 Q    To the extent they have been transferred, is that

4 something you would have been involved in?

5 A    I've been involved if they have been transferred to the

6 trust and sold, and I know that I have been required to sign

7 escrow papers for selling a couple of these.  So I can only

8 imagine I was required because they had been transferred

9 into the trust.  The trust is now selling them.

10 Q    What is the documentation that would show what

11 properties have been transferred into the trust?

12 A    I think you can do a record search, or just ask a title

13 company to do a record search on what real properties are

14 owned by the trust, would tell you that.

15 Q    Has the trust maintained any records of what properties

16 have been transferred into the trust?

17 A    To the extent we retain records, it's that financial

18 statement that, you know, Joe Sofio does, kind of together

19 with me, and we assume that on that, whether it's right or

20 wrong, that everything has been transferred into the trust.

21     So I don't know if that's accurate or not, but our

22 assumption is that everything has at this time been

23 transferred in, and I know everything was not transferred in

24 for some time, but I think, at this time, it has been.

25 Q    So, to the extent there has been a title change on any

97

1  of these properties, putting it into the name of the trust,

2  is that documentation that the trust would maintain?

3  A    There would a new deed, and there would be a deed on

4  these properties in the name of the trust, I believe, yes.

5  Q    Correct.  Does the trust maintain those documents?

6  A    Well, when you say "the trust," my mom would probably

7  maintain them.  She probably has a fire safe or something

8  with deeds in it.

9  Q    Did you speak with your mother about looking for those

10 documents?

11 A    I'm pretty certain that any of those documents would

12 be, as I said, outside the time period that you requested,

13 but I didn't ask her to go get all the deeds from when she

14 transferred stuff into the trust, no.

15 Q    But it's your assumption that she would have that

16 documentation, were we to request it?

17 A    Yes.

18 Q    You also testified that it's your understanding that

19 all of the bank accounts that used to be individually held

20 by your parents have now been transferred into the trust,

21 correct?

22 A    That's my expectation, that that would have happened by

23 now.

24 Q    And we've talked about the Morgan Stanley investment

25 account.  What would you estimate the value of the bank

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  281

98

1  accounts to be?

2  A    When?

3  Q    Now.

4  A    Isn't that the same question we just had?  When you say

5  "bank accounts," that's just cash, right?

6  Q    It's whatever funds are in the bank accounts, outside

7  of the Morgan Stanley investment accounts.

8  A    Okay.  If there is bank accounts outside the Morgan

9  Stanley account, I would be surprised.  So, if you want me

10 to estimate, I would estimate it would be about $200,000.

11 It could be a million dollars, but I'd really be surprised

12 if it was anything more than that.

13 Q    I would presume that there are bank statements

14 reflecting those values in existence.  Is that right?

15 A    Yes.

16 Q    And would you have access to those bank statements?

17 A    To the extent I could go ask my mom to find them, yes,

18 I imagine so.

19 Q    Or to the extent that these accounts are held by the

20 trust, are you a signatory on those accounts as well?

21 A    I should be, and I don't recall dealing with that in

22 any way.

23 Q    So, to the extent that you are, you would be able to

24 request the documents directly from the bank, correct?

25 A    Yes, but if I knew what accounts we're talking about --

99

1  I mean, I can go ask my mom what accounts still exist, or

2  that she's possibly opened, or anything like that, and then

3  get a statement, I'm sure, I mean, but I think that's what

4  Joe does when he prepares these financial statements,

5  anyway.

6  Q    So you believe we'd have the information we're looking

7  for if we had a copy of a financial statement that was not

8  redacted?

9  A    Yes, you know, unless there's -- yes, because I can't

10 see why she wouldn't give anything, and Joe's not asking for

11 stuff in it out of the trust.  He's just asking for

12 everything they've got.

13 Q    And to your knowledge, has anything been transferred

14 out of the trust since its creation?

15 A    Yes.  I just said that there's a number of these

16 properties -- I wouldn't say a number, but there's two that

17 I can recall, and I don't have the best memory anymore, but

18 it might be that's all there is, that I have had to go sign,

19 get a notary and sign on to transfer, where my mom has built

20 a house and sold it, or she owned a house and sold it, or

21 something to that effect.

22 Q    And there's documentation of those sales, correct?

23 A    Yes.

24 Q    Do you know where the proceeds from those sales went?

25 A    I don't know, exactly, but I think there are two

100

1 houses, and one of them was 220,000.  I know that's one that

2 just happened within the last three weeks or something.

3 Q    Is that on this list?

4 A    I think it probably is.  I'm not sure which one.  It

5 was down in Phelan, or maybe it's just Pinon Hills, or

6 somewhere down the hill.

7 Q    What page are you looking at?

8 A    It might be this property in Pinon Hills or something

9 like that, but there was a sale, and, actually, that one was

10 something that was sold and came back to her.  So it might

11 not even be on this list, but it is a property that somebody

12 had moved into and started hoarding, and my wife went down

13 with her to help clean it up, and she sold it for 220,000,

14 even though it was a pretty nice house, but I think

15 there's -- so I'm aware of that one.

16     The other one I recall wasn't too long ago, and I would

17 doubt if it's more than $300,000 or something, and maybe

18 that was in Wrightwood.

19 Q    Prior to collecting this out of your mother's file, had

20 you seen this document before?

21 A    No.

22 Q    Did you discuss this document with your mother at all?

23 A    No.

24 Q    So, looking at page 47, for example, would you know

25 whose writing that is?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  284

101

1 A    Would I know what?

2 Q    Whose writing that is at the bottom.

3 A    No, and it doesn't look like either of my parents, and

4 I know it's not mine.  So I would assume it would be the

5 attorney that was working on this.

6 Q    Okay.  Going back, you mentioned that you and

7 (indiscernible) folks took over your father's horses.  Is

8 that right?

9 A    Yes.

10 Q    Who currently owns the horses?

11 A    Well, the ones that we got from my dad are owned by

12 our -- I don't know if we're an LLC or just a partnership --

13 Huntertown Farm.  They're officially owned, but there's a

14 requirement when you own a horse that's racing that you've

15 got to go give your fingerprints and register with the

16 state.

17      So, if you look the horses up, they're more than likely

18 owned by my brother Heinz, in his name alone, on the

19 registration papers, and, you know, on the listings that you

20 see on the computer, but they're owned by all of us.  It's

21 just, we've agreed that he just -- he put them in his name

22 so we don't all have to run around and get our fingerprints

23 taken in all these different states and comply with all that

24 horse-racing board stuff.

25 Q    So title was transferred from your father to your

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  285

102

1 group, and for no value?  Well, he paid you $100,000 to give

2 you those assets?

3 A    Yes.

4 Q    Is that your testimony?

5 A    Yes, yes.  We would transfer all that back you in

6 settlement of this, gladly.

7 Q    Are any of those horses still racing?

8 A    Yes -- for my dad, racing, I'm going to say no.  No.

9 Q    None of them are racing still?

10 A    No.

11 Q    Are you receiving stud fees from any of them?

12 A    Well, not exactly, but there is some income coming from

13 one of the horses that originates in the nature of stud

14 fees, but, if we receive anything, it's for a -- what do

15 they call it? -- syndicated interest or something like that.

16 Q    Other than that, are you receiving any income from any

17 of the horses?

18 A    No, I'd say no.  There's some breeding stock, and, you

19 know, we're just paying expenses related to them.

20 Q    Okay.  I'd like to go back to your prior discussions

21 regarding the creation of the trust.  You mentioned that,

22 while you hadn't had any conversations with your parents

23 about the reason they created the trust, it was general

24 understanding from a CPA perspective of why someone would

25 create a trust.  What is that understanding?

1  A     If you don't create -- if your assets are held

2  individually at the time you die, then you have to go

3  through a probate process, which I understand to be

4  expensive and time-consuming, in order to transfer these

5  assets over, or you can -- there are some other things you

6  can do, like holding accounts jointly or, you know, property

7  with the right of survivorship and such, but the traditional

8  ways of handling that are to get a revocable trust and put

9  your assets in the trust so that, at the time of your death,

10 the trust owns the assets, and it has the right to transfer

11 those to where you want to go, without having to get a court

12 to intervene in the probate process to do that.

13 Q     Are there tax benefits to the beneficiaries as a result

14 of the trust?

15 A     I don't know that there's tax benefits to the

16 beneficiaries.  The tax laws regarding estates are changing

17 all the time, but, you know, there's a lot of stuff that

18 comes -- you know, when I was active in this, which was 20

19 years ago or more, there was a whole lot of things that you

20 did with trusts besides just handle the transfer of assets.

21 There was tax reasons for this and that.

22 Q     Okay.  As trustee of the trust, you have access to all

23 of the records related to the trust.  Is that right?

24 A     I think it is.  I don't know if it's as trustee of the

25 trust, but I think I have access to anything if I ask for

104

1  it.  No one is going to say, "You can't get it."

2  Q    Well, would you say the same thing for your siblings?

3  A    No, I don't think that's the case.

4  Q    So the reason you could ask for the documents and get

5  them is because you're the trustee?

6  A    Yes, it might be because I'm trustee, or it might be

7  because I do their taxes, or whatever reason.

8  Q    So do you also have access to your parents' financial

9  information as a result of serving as their accountant?

10  A    Define "financial information."

11  Q    Bank accounts, like whatever information reflecting

12  their financial condition.

13  A    Yes.  I think I have access if I ask for it.  I can get

14  that.

15  Q    I think we're trying to understand what documentation

16  there is out there.  Obviously, we don't have it, but we'd

17  like to understand what documentation exists that -- say,

18  for instance, you wanted to sit down and identify all of the

19  assets that are currently in the trust.  What would you look

20  at?

21  A    I'd look at the 2019 financial statement, to the extent

22  that that's prepared, and then I would ask any questions on

23  anything that's happened since then, which is a month.

24  Q    What about the -- so what documentation are these

25  financial statements based on?  I assume there's --

105

1 A    With the caveat that, given what we're seeing, I don't

2 know that everything that we're showing in there is in the

3 trust, but I think we're trying to show everything that they

4 have any interest in as being in the trust.  So I think that

5 would be probably -- you know, I don't agree that you have

6 access to that.  I think that's their business.  But, if you

7 want an answer to your question, that's probably what would

8 get you the biggest picture of everything.

9 Q    And what about any documents that would show when those

10 assets were transferred to the trust?  What would you look

11 at?

12 A    Well, I would look at some of these 1099s for, you

13 know, the tax effects.  So, when you're talking about the

14 assets that are in the Morgan Stanley account, you're going

15 to have the year-end statements that show when the interest

16 is paid to the trust, instead of being paid to them

17 personally.

18      So you can -- just like we were going through, you can

19 say that that fund was transferred, you know, sometime in

20 March, and this fund was transferred in May, because it

21 started at the end of May, or something like that.

22      On real estate, you know, you could definitely do a

23 title search and find out all the real estate, and when was

24 it transferred, and what else is there?  Horses we've talked

25 about.  What's that Schedule A page thing, 19 or something?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  289

106

1 I'm trying to remember what other asset classes there is,

2 but I don't know what they have.

3      You know, other than that, there's a couple individual

4 investments, these loans.  It's a big category.  He loans a

5 lot of money, and there's copies of those notes, I would

6 say, when they were lent.  As far as when they're

7 transferred to the trust, there's probably a file for each

8 of those loans, and it probably says when it was transferred

9 to the trust in there.  There's probably -- you know, going

10 through this stuff, there's probably something on that.

11     Those are the big asset classes.  If there's anything

12 else, it's, you know, a little bit of private stock here or

13 there, which I'm unaware of any transfers to do with that.

14 Q   So the stock is held in the individual names, as it was

15 prior to creation of the trust?

16 A   I'm betting that most of that never got transferred to

17 the trust formally, and you would probably find stock

18 certificates issued to them currently, but, if the attorney

19 got them going, and they did the right things, then you

20 might see some stock assignments and that type of thing,

21 and, you know, we got a CFO and people like that that would

22 handle it, and they would have a record of it, as far as the

23 stock they have in my company, or the company I'm involved

24 in, but, other than that, I think --

25 Q   And that's Ally Finance?  Is that the company you're

107

1 referring to?

2 A    Yes, the Ally Finance.  Actually, if it's Ally Finance

3 they have their investment in, that would be Lou Tee

4 (phonetic).  He works for me.  You know, I could certainly

5 check on that.  To my knowledge, I never got involved in

6 them transferring how they hold that, so I bet they're still

7 holding that individually.

8 Q    Okay.  I actually was talking to you earlier about

9 Ally Finance, and there's this one document I'd like you to

10 take a look at.  I will provide a copy to (indiscernible).

11         MS. BRADFORD:  Would your Honor like a copy?

12         THE COURT:  Sure.  Thank you.

13 BY MS. BRADFORD:

14 Q    Do you know what this document is?

15     (Witness proffered document.)

16 A    Do I know what it is?

17 Q    Yes.

18 A    Yes, pretty much.

19 Q    Generally, what is it, based on your understanding?

20 A    It's a short-form ownership document that you file

21 before participating in, you know, the radio spectrum that

22 Sprint, Verizon, AT and T operate on.  Cell phone systems,

23 they operate on Spectrum.

24     That used to be allocated by a lottery, but since the

25 Clinton administration, it's been allocated by auction, and

108

1 in order to participate in the auctions, you first file a

2 short form, and this is the short form for Auction 35, which

3 was some block of Spectrum that they sold off, and we

4 apparently participated in that auction.

5 Q    Okay.  If you'd turn to the fourth page of the

6 document.  That's Exhibit A to the application, and looking

7 number two, "Ownership Information," it says:

8            "NTCH, Inc., has the following

9            stockholders:  Glenn Ishihara owns five

10           percent of all ownership interests, 100

11           percent of all the voting stock, and

12           Ally Finance Corporation owns 95 percent

13           of all ownership interests, no voting

14           stock."

15      Is that how NTCH, Inc., is currently held as well?

16 A    I don't think so.  I think that there's an individual

17 doing it, Aguilar (phonetic), who's the CFO of that company,

18 that owns a portion of the voting stock as well at this

19 point.

20 Q    But as far as Ally Finance --

21 A    I don't think Ally Finance has changed.  They might

22 have got diluted when Adelia (phonetic) was issued her

23 shares.  So we might own 93 percent or 92 percent or

24 something.

25 Q    Okay.  And then if you'd turn to the next page, and

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  292

109

1  we're looking at E.  It's for Ally Finance Corporation.

2  Number one says, "54.06 percent is owned by 12 members of

3  the Steinmann family related to Eric Steinmann."  Who are

4  those 12 members?

5  A    I think that would be my six children, my uncle Curt

6  (phonetic), seven, my dad, mom, nine, my brother John, my

7  brother Heinz, and possibly my sister Tessie.

8  Q    So Andrea Downs never had any sort of ownership in Ally

9  at any point in time?

10 A    I saw something about her being bought out in 2008, and

11 I think that's from NTCH.  So, if she was bought out from

12 NTCH, she never had an interest in Ally, and she doesn't, to

13 my knowledge, have any current interest in Ally, and I don't

14 believe so.  Actually, the 12th would be myself personally,

15 myself, my six kids -- or myself, my wife, my six kids,

16 Uncle Curt, Johnny, Heinz, my mom and dad.

17 Q    Okay.  We talked a little bit about money that was

18 given to Andrea Downs in payment of legal fees.  So we had

19 two law firms that payments were made by your mother,

20 correct?

21 A    Uh-huh.

22 Q    And the first one you referenced was a $25,000 payment?

23 A    She made a $25,000 payment on Annie's behalf to an

24 attorney named James Till.

25 Q    And your mother was paid that money back?

110

1   A    She was paid that money back.

2   Q    By whom?

3   A    James Till.

4   Q    Do you know why Mr. Till paid her that money back?

5   A    It was understood that Glenn Ishihara and Mike

6   Feigenbaum (phonetic) made a loan to, I guess, the estate,

7   for the funds that James Till wanted in his account, which

8   was $50,000, but they made a loan for 75,000, which was

9   enough to have that amount returned, and I think that was

10  the -- you know, probably, honestly, didn't feel that it

11  looked good to have her financing it, and so she borrowed

12  more money -- it seemed to be secured at the time -- or they

13  borrowed more money, and paid my mom back.

14  Q    And so you said that Glenn Ishihara -- and who else?

15  I'm sorry.

16  A    Mike Feigenbaum.

17  Q    They made a loan to the estate?

18  A    Well, let me correct that.  A company, I think majority

19  owned by Glenn, made a loan to the -- from what I

20  understand, this would be the normal Debtor-In-Possession

21  financing to go through a bankruptcy or whatever.  Till

22  needed some money to file the bankruptcy, and they needed to

23  get it from somewhere, and he talked to them and said, you

24  know, "Here.  We'll secure it in this manner," and it turned

25  out to be a literal nightmare.

111

1  Q    Well, who talked to whom?  I'm not quite following you.
2  I'm trying to understand.
3  A    Till talked to Glenn and Mike, who obviously talked to
4  Till, because I asked them if they'd consider doing it.  I
5  told them it would be a loan, it paid a decent interest
6  rate, and it would be secured, and it turned out to not be
7  exactly the case.
8  Q    And so it was you that approached Mr. Ishihara.  What
9  were the companies?
10  A    I don't know that I approached them.  You know, Annie
11  knew them, too.  They've worked with me for -- both of them
12  worked with me for 25 years or something.
13  Q    How many occasions do you think Annie had met Mr.
14  Ishihara?
15  A    Forty, 50.  He used to be a speaker at all her shows,
16  that type of thing.  They're, you know, well acquainted.
17  Q    And what about Mr. Feigenbaum?
18  A    Slightly less, same thing.  He was a speaker at her
19  shows and, you know, they did a lot of business together
20  independent of anything I did.
21  Q    And so was it Ms. Andrea Downs who approached them and
22  requested a loan, or did you have conversations with them?
23  A    No, I think I had conversation with them, after the
24  attorney that Andrea found.  I didn't have any involvement
25  with Mr. Till prior to that.  Annie found Till, and Till

112

said that they needed somebody who would lend on a secured

basis, and I knew that both of them had some money and, you

know, were looking for investments.  I said, "I think this

would be reasonable for you guys to do," and I'm sorry that

I did that at this point.

Q     How did you choose them to approach?

A     Because I know them, I work with them a lot, and I knew

they had money.  They've been involved in our business.

They've made money.  They had a lot in their pocket, and

they did stuff like that.  You know, they would talk to me

about the different investments they would make, and it

seemed to be in line with what they did.

     So it didn't -- you know, I wasn't going to go any

further than I had to.  I was trying to help my sister, who

truly needed some protection in bankruptcy from some of

these people that are going after her ruthlessly, to, you

know, get some help.  I was trying to help accomplish that,

and this was the quickest way to do it.

Q     Why didn't you loan her the money?

A     Because I considered that it wouldn't look very good,

and that I would get, possibly, drug into this in that way

or something like that.  I think that's maybe a concern, or

maybe Till said that he didn't think that was the right

thing to do.  I wouldn't be opposed to loaning her money,

and the way it went about, it should have been a fully

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  296

113

1  secured loan.  It should have been a reasonable thing.  But

2  somehow there was a discussion, and it wasn't something that

3  made sense for me to do, but it made sense for Annie to do,

4  and I helped her find somebody to lend her the money.

5  Q    And your mother had already paid 25,000 to Mr. Till,

6  correct?

7  A    Yes.

8  Q    And so part of that 75,000 loan was paying your mother

9  back?

10 A    That's correct.

11 Q    Why was your mother paid back?

12 A    She didn't enter in any agreement yet, to my knowledge

13 or anything.  She just put the money in because Annie went

14 and located Till, and then Till said, "Look.  I need a

15 $25,000 retainer," initially, and then that changed to a

16 $50,000 retainer, and we need people who are willing to put

17 that in, and they can do so on a secured basis.

18      So, when Glenn and Mike came in there, it said 50.  It

19 was 75, pay my mom back, and that seemed to be the prudent

20 thing, and it was done with the advice of James Till, who

21 was the bankruptcy counsel that my sister found that seemed

22 reasonable, and that was his advice.

23 Q    Did your mother ever ask to be repaid back?

24 A    I don't remember the exact circumstances regarding

25 that, if it was -- if she was asking, or someone was saying

114

we should, or what it was, but she didn't come to me and

say, "Hey, I need that money back," if that's what you're

asking, and I don't know what her conversation was with

Annie, and she didn't talk to me before putting the money

in, you know.  So I don't know what her circumstance was on

that.

Q    Did you have any conversations with her about the

repayment?

A    I had conversations with her, I think, about that, and,

you know --

Q    And so what did you tell her about --

A    I told her that, you know, in my opinion, that, you

know, Annie was bankrupt, and she needed to basically show

everybody that she was, and that I didn't agree that, you

know, that -- you know, and it was a hard thing for her.

She's not the type to show people that, you know, she's not

doing very well off.  That's not in her nature.

     In this case, you know, my advice was, you know, "The

more you help her out, the more than you're going to look

like she's not truly what she is," which was a former

successful person who had got driven into bankruptcy by some

guy who's trying to screw his stepkids out of their

inheritance by spending it all on legal fees.

Q    And so it's your testimony that your mother was repaid

back because you wanted -- or it was understood that it

115

1 would be better for Andrea Downs to look bankrupt at the

2 time she's filing bankruptcy?

3 A    I mean, Andrea Downs was bankrupt, and, you know, we've

4 had two and a half years of history after the fact to

5 determine she absolutely is bankrupt, and the only thing

6 that's happened to any assets she had at that time is

7 they've ended up in Mr. Golden's pocket.

8 Q    My question is, the reason that your mother was repaid

9 back was so that it would be -- it would look like Andrea

10 Downs was bankrupt?

11 A    No, she was bankrupt.  That's my answer.

12 Q    You testified earlier that you felt like you needed to

13 show everyone she was bankrupt.  Who is the "everyone" you

14 were referring to, first of all?

15 A    So I testified that I said to my parents that, you

16 know, contrary to what Annie would show, which is that she

17 is -- she tends to show that she's doing good no matter what

18 the circumstance is, and she is a very accomplished woman

19 who started her own business and did very well in it.  She

20 is no "Housewife of Orange County."

21     In this case, she just doesn't have the amount of money

22 that somebody else does that's represented here, and could

23 not keep up with those legal bills.  So the only assets she

24 had left was some real estate that was tied up and was not

25 liquid, and some horses, and really had nothing else than

116

1  that.

2        So, you know, my testimony was that my advice was "Hey.

3  She needs help, because she cannot make these people go

4  away.  They have a blank check from their client to keep

5  incurring legal fees, and it's not going to stop unless

6  somebody stops them, and she's only -- the only way she can

7  get help on that is Bankruptcy Court, which is where she

8  should be able to go and get that help, and if she goes to

9  Bankruptcy Court, you know, you helping her is not going to

10  be good."  And that was my honest discussion at that time.

11  Q    And that was a discussion with your parents, or your

12  mother?

13  A    With my mom.

14  Q    Did you ever --

15  A    And that was before she went and cut another $250,000

16  check.

17  Q    We're going to get to that.  Did you have any

18  conversations with Andrea Downs about filing for bankruptcy?

19  A    Yes.

20  Q    Did you advise her to file for bankruptcy?

21  A    I might have been the one that --

22        MR. LARSON:  Your Honor, I'm going to object to

23  the use of the word "advise."  Counsel has indicated that he

24  is not a lawyer at this point in time.  He's inactive.  I

25  just want to make sure that it's understood that this is not

117

1  legal advice.  I think this has probably been asked in the

2  vernacular, of whether or not there was advice given, but I

3  think this should be clearer, because I think this could

4  lead to problems down the road.  So my objection basically

5  is vague as to "advice."

6          THE COURT:  Can you clarify?

7          MR. KESSEL:  No one is going claim there's an

8  attorney-client privilege between Mr. Steinmann and Ms.

9  Downs.

10 BY MS. BRADFORD:

11 Q    What did you say to Ms. Andrea Downs regarding whether

12 or not she should file for bankruptcy?

13 A    I think I summed it up in what I just said, you know, I

14 mean, "I'm not trying to get too excited here, but, you

15 know, there is no way that you're going to be able to, you

16 know, hold your own in this situation, where people have an

17 unlimited checkbook and they're trying to oppress you in

18 this way.  You know, you need some help, and in my

19 experience, that help should come from the Bankruptcy

20 Court."  It hasn't turned out that way.

21 Q    When did you have that conversation with Ms. Downs?

22 A    Probably prior to her going and seeking out James Till,

23 but probably after she approached my dad for maybe another

24 loan, and my dad maybe said, "Hey.  What's really going on

25 here?" and "Why don't you talk to Annie" or something, and I

118

1 probably went and talked to Annie.

2 Q    When you're saying "maybe" and "probably," do you have

3 an actual recollection of learning that Ms. Downs had

4 approached your father for another loan?

5 A    I do.

6 Q    Okay.  And when was that?

7 A    That would be before, you know -- to put this in a time

8 frame, that would be probably within the year, maybe within

9 the nine months before there was an amendment to the trust.

10 Q    So it was before the creation of the trust?

11 A    I don't know that -- it had nothing to do with the

12 trust.  It had to do with, you know, before, you know, I

13 talked to Annie, and then she talked to my folks, and then I

14 think everybody talked, and the trust was irrespective.  It

15 was just whether my dad was going to loan her some more

16 money or not, and, you know, at that time, it was just like,

17 "This is not helping Annie," you know, "This is just going

18 to go nowhere."

19 Q    But you previously testified that you talked to Annie

20 about bankruptcy after she had approached your father and

21 requested a loan?

22 A    Yes.

23 Q    Is that right?  When did she approach your father to

24 request a loan?

25 A    And I answered that, and I said probably within nine

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  302

119

1 months prior to when that amendment happened, and I would

2 think it was --

3 Q    So that was in --

4 A    -- closer to that.  As far as I can recall, whenever

5 she engaged James Till, it was probably about a month before

6 she filed for bankruptcy, or maybe closer.  Maybe it was two

7 weeks before she filed the bankruptcy, before she retained

8 James Till.  It was maybe two months before that, to the

9 best of my recollection, that I would have talked to my dad,

10 then talked to Annie, then Annie talked to them, and then,

11 finally, came to the conclusion that she needed some help.

12 Q    Okay.  So you've given me a lot of possible dates, but

13 when you say, "Nine months before the amendment" --

14 A    I said within nine months before the amendment, and I

15 gave you some otherwise of pinning it down closer, by

16 looking when the bankruptcy was filed.

17 Q    Okay.  And when your father first approached you and

18 told you that Andrea Downs had asked for a loan, what did he

19 say to you, exactly?  What do you recall him telling you?

20 A    You know, and I testified to this previously.  He would

21 tell me -- on some of these past occasions where a loan had

22 been given, he said, "Look.  I gave Annie something for a

23 new show.  She's going to have a new show."  My dad is a

24 positive person, and he's like, "I think it's going to be

25 really good."

120

1    Then he said, "I gave Annie some more money for a new

2    show," and after a while, I kind of -- you know, "What

3    happened to the last one?"  And then I think there was a

4    time where he said, "Annie is approaching me for some money

5    for a new show, and you seem to be skeptical on this.  Do

6    you want to talk to her?"  I said, "Sure."

7    Q    And so that was the conversation that then led you to

8    talk to Andrea about this?

9    A    Yes.

10   Q    Did you have an understanding of what she was asking

11   for a loan for at that point in time?

12   A    I can't remember the exact amount, but she, you know,

13   seemed to be getting these 100, $200,000 loans, and they

14   weren't really -- it wasn't really adding up, really,

15   because Annie, you know, she actually made things happen

16   when she was running her business, and, you know, I would

17   have expected to see a show, and I'd have heard about it,

18   and that type of thing.

19   Q    Okay.  So we've established that you don't remember the

20   amount.  My question was, did you have an understanding of

21   what the loan was supposed to be for?  What did your dad

22   tell you as far as why she was asking for a loan this time?

23   A    I believe he said she was asking for a loan for her

24   shows, for her business.

25   Q    Do you recall what business it would have been at that

121

1  point in time?

2  A    It was the same business that she had been very

3  successful at.  She called it "Shorecliff," was what most

4  people referred to it as.  I don't know how it was

5  organized, but I know that when she put the big shows on, it

6  would be "The Tower Summit, Presented by Shorecliff

7  Communications," or something like that, you know, 20,000

8  people attending, you know.  She was quite successful, and

9  she did it all on her own.

10  Q    And then what was your conversation with Andrea Downs

11  following your father approaching you?

12  A    In the nature of, you know, "What's really going on?

13  Are things not working right?  You know, what can I do to

14  help you on this?"  And then I think she told me about what

15  was going on with this legal matter.

16  Q    And was that the first time you had heard anything

17  about the legal matter?

18  A    I think it is, yes.

19  Q    And do you recall when that conversation took place?

20  A    No, but that would have been, again, before the actual

21  bankruptcy filing, probably within three months prior to

22  that, or four months or something.  It's not long.

23  Q    And what did she tell you about the litigation?

24  A    I think I even talked to -- she told me who was

25  representing her, and I think I might have talked to that

122

1  person that was representing her, some guy, I think.  If I

2  recall, he was down in South Orange County, maybe even San

3  Diego way or something like that, and he was representing

4  her at the time, and, you know, I think I talked to him to

5  get a feel of it, whether there was a way of this thing

6  getting settled, or just what the big problem was, or what

7  was going on here.

8  Q    And what were you told?

9  A    I was told that -- what was I told by him?  He told me

10 that he -- I think he told me he thought it could get

11 settled for an amount well in excess of what Annie had, and

12 I think he said that, you know, that here's where he saw the

13 strengths of the case, and not strengths of the case, and,

14 you know, I think he told me what he estimated it would cost

15 to continue this on, and that it was going to go to trial,

16 and these costs were going to ratchet up quite a bit.

17      You know, Annie just simply didn't have the money to

18 afford that, and you know, in fact, they asked for and got

19 some judgment for some 4.7 million dollars, I think, at

20 trial or something.  She didn't have any money at that time.

21 So I think I gave her the right advice, and, you know, "You

22 should not fight.  You should seek the protection of the

23 Bankruptcy Court, and try and put this behind you."

24 Q    Let's go back to the conversation that you had with

25 Andrea Downs' attorney.  After you had that conversation --

123

1 or at the time you had that conversation, the case had not

2 yet gone to trial, right?

3 A    The case had not yet gone to trial.

4 Q    Did you come away from that conversation with an

5 understanding that Andrea Downs did not have a good chance

6 of prevailing?

7 A    I didn't know.  I know what she did wasn't wrong.  I

8 know that she got, you know, some guy to stand up on the eve

9 of trial and say, "Hey.  I did this.  I did it

10 intentionally, and Annie was with me," and they've never

11 gone after that guy for one dime, and he's running around,

12 you know, not being involved in this, or his family involved

13 in this at all.

14     I didn't have any confidence that she could -- where

15 was she going to get the representation to go to trial and

16 do that?  She just didn't have the money to do it.  So, as

17 far as you asked me, did I understood she could prevail, it

18 wasn't a matter of her position.  It was a matter of her not

19 being able to lay out that kind of money. She just didn't

20 have it.  She was out of money.

21 Q    And so that's why you told her she should file for

22 bankruptcy?

23 A    Yes, and I understood that if you filed for bankruptcy,

24 there would be a stay on this court action, and, you know,

25 maybe you could put these things behind for it, and it's

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  307

124

1  like rolling over and saying, "I don't have anything," and

2  she didn't.

3  Q    So let's talk a little bit about Brown Rudnick.   That

4  was the firm that actually represented her at trial.   Is

5  that right?

6  A    That's correct.

7  Q    And your mother, I believe, was a party to the

8  engagement letter between Ms. Downs and Brown Rudnick?

9  A    Yes.

10 Q    And your mother agreed to cover all of the defense

11 costs.   Is that right?

12 A    My mother agreed to pay them the amount where they

13 agreed to cover all the defense costs and everything,

14 including through appeal, for that amount of money and no

15 more.

16 Q    And so that amount of money was $250,000?

17 A    That's correct.

18 Q    And your mother paid that amount?

19 A    That's what she paid.

20 Q    Was that money paid from the trust?

21 A    And, again, I believe I answered this already, but that

22 money was paid from accounts that she controls.   I was not

23 asked to sign on to anything.   So I believe that she paid

24 that out of accounts that she had, that was her controlled

25 money, before she transferred those accounts into the trust.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  308

125

1  Q    Okay.  Let's just take a look at the bank statements

2  reflecting the three payments to Brown Rudnick.  So we can

3  look at page 110 in the document production.  Again, we

4  don't have full statements.  We just have single pages.  But

5  this looks like it's a Union Bank account, and then the

6  title -- or the name on the account is the Steinmann Trust.

7  Does that look correct?

8  A    That's correct.

9  Q    And so this was the first payment of $100,000, on

10 September 8th?

11 A    Yes.  And now that I'm looking at these, it looks like

12 she made them out of the trust account.  So I didn't sign

13 off on any of them.

14 Q    When did you find out that your mother had agreed to

15 cover these legal fees for Andrea Downs?

16 A    That discussion happened probably within the month

17 prior to when the agreement with Brown and Rudnick was

18 executed.  You know, I advocated that she not do that, and

19 she went ahead.

20 Q    Did you know that she was going to go ahead?

21 A    I tried to talk her into not doing that, but I did know

22 that, in the end, she was going to go ahead, and she told me

23 that, you know, she was going to, but I didn't know that for

24 sure she would until she did it, but, you know, I told her I

25 didn't think it was a good idea.

126

1  Q    And those monies were a gift to Ms. Downs, correct?

2  A    I wouldn't have wasted my breath if I didn't think I

3  could maybe talk her out of it, so I guess the answer would

4  be no.  I didn't know she was going to do it until up to the

5  time she did it.

6  Q    So my question for you is, the monies that your mother

7  paid to Brown Rudnick, that was a gift to Andrea Downs,

8  correct?

9  A    I don't think anyone expected it back, and I think, in

10 fact, I saw some document saying that -- from Brown and

11 Rudnick -- providing the stuff to you that, you know, they

12 told her that "You're not going to get it back."  So it

13 would be a gift.

14 Q    Right.  So why don't you take a look at page 19, and

15 let me know -- 119, sorry -- and let me know if that's the

16 document you're thinking of.

17 A    Yes, this is what I saw.

18 Q    And so, under this acknowledgment, your mother is

19 representing that:

20         "The payment of such funds to Brown

21         Rudnick will not create an obligation of

22         Ms. Downs to repay the undersigned."

23      Correct?

24 A    That's what it says, yes.

25 Q    Did you review the engagement letter on this

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  310

127

1  acknowledgment before your mom signed it?

2  A    No.

3  Q    This is a little off topic, but is Andrea Downs the

4  only sibling, the only child, that has been disinherited by

5  your parents?

6         MR. LARSON:  Objection as to "disinherited."

7         THE COURT:  Can you rephrase it?  I don't know if

8  there's another word.

9  BY MS. BRADFORD:

10 Q    Why don't we take a look at the first amendment to the

11 trust.  What page?

12        MR. KESSEL:  It's on page 35, and it reads,

13 paragraph 1A, "It is the trustor's intention hereby to

14 disinherit their daughter, Andrea Downs," hence my

15 colleague's use of the word "disinherit."

16        THE COURT:  I don't know that there's another

17 word, so I would like you to answer that.

18        THE WITNESS:  And the question was, has there been

19 a similar amendment for any other child?

20 BY MS. BRADFORD:

21 Q    Has any other child been disinherited?

22 A    No, there has not been.

23 Q    I understand that there might not be a written

24 amendment, but even in practice, has any other child been

25 disinherited?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE 311

128

1 A    In practice, yes, probably.

2 Q    And why do you say that?

3 A    Well, my sister Tess and I both let our folks know that

4 if they wanted to give us anything, we would rather have

5 them give it to charity.  So I think that's been

6 established.  We're not expecting anything.

7 Q    Do you know whether or not your parents plan to make

8 any written amendments to the trust to reflect that?

9 A    No.

10 Q    Have you had those discussions with your parents?

11 A    Whether they're going to do a written amendment?

12 Q    Right.

13 A    No.

14 Q    Have you had any discussions with your parents about

15 any potential future amendments to the trust?

16 A    no.

17          THE COURT:  We're going on 5:15 now.

18          MR. GOLDEN:  Okay.

19          THE COURT:  I know.

20          MS. BRADFORD:  Well, yes.  I mean, I can stop at

21 any time.  Obviously, we're not --

22          THE COURT:  It doesn't sound like we're going to

23 be --

24          MR. GOLDEN:  I think that now is a good stopping

25 point, your Honor.

129

1          MS. BRADFORD:  We're not done.  Yes.

2          THE COURT:  -- done any time soon.

3          MS. BRADFORD:  That's fine.

4          MR. GOLDEN:  Is that all right, now?

5          UNIDENTIFIED SPEAKER:  Yes, we just -- yes.

6    Obviously, we're nowhere near done, but, all right.

7          THE COURT:  So we're going to have to continue

8    this to another date.  I'd like to find something that works

9    for everyone.

10         MR. GOLDEN:  Yes, your Honor.

11         THE COURT:  Mr. Rafatjoo?

12         MR. RAFATJOO:  Your Honor, if I may, Hamid

13   Rafatjoo, Raines Feldman, on behalf of the Moellenhoff

14   creditors.  Your Honor, so that we can avoid frustration on

15   both sides, and to try and make it easier for the witness in

16   terms of how long this is going to take and how many times

17   we need to do this, I know there's additional discovery that

18   needs to be propounded.  I know that people, you know, on

19   the Trustee and the creditors' side have specific items that

20   they are looking for.  Perhaps what we can do is serve that

21   discovery, specify what it is that we are looking for, and

22   then we'll have an opportunity to do a meet-and-confer.

23   We'll either agree on some of them or we won't.  On those

24   that we agree, great.  On what we do not agree, if I may

25   request that we come to the Court, and have this Court rule

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE 313

130

1 on what should or should not be produced, so that, if we're

2 going to come back here, hopefully, the documents will have

3 been produced, what you have determined should now be

4 produced has now been produced, what you have determined

5 should be produced unredacted has been produced unredacted,

6 so that we don't have to keep doing this.  There's four

7 lawyers on this side, three lawyers on this side

8 (indicating), and I don't remember if someone is on the

9 phone or not, and I think that would help streamline this

10 process for everyone, but that's just a recommendation.

11          THE COURT:  Okay.  Thank you.

12          Anybody else?

13          MR. GOLDEN:  That's fine with me.

14          MR. HAYS:  No objection, your Honor.

15          THE COURT:  No objection.  Okay.  So we're talking

16 about a continuance for how many weeks?

17          MR. RAFATJOO:  So, if we get discovery out in --

18 let me open up my calendar.  I apologize, your Honor.  By

19 the 14th, we get our discovery out.

20          MR. KESSEL:  Including with respect to the

21 documents that weren't produced --

22          MR. RAFATJOO:  Right.

23          MR. KESSEL:  -- here.

24          MR. RAFATJOO:  And then, Mr. Hays, you get

25 document discovery on the 14th.  We can have a

131

1  meet-and-confer when?

2          MR. HAYS:  Two weeks later, or less, certainly

3  within two weeks.

4          MR. RAFATJOO:  21st?  When do you want to do it?

5          MR. HAYS:  I'm not entirely sure of my calendar,

6  but I think the 21st is probably fine.  And I left my phone

7  in my car, your Honor, so I apologize.

8          MR. RAFATJOO:  No problem.  I am sure we will be

9  able to come up with a date for a meet-and-confer.

10          THE COURT:  So, as far as --

11          MR. RAFATJOO:  We'll shoot to do it by the 21st.

12          THE COURT:  All right.

13          MR. RAFATJOO:  Okay.  And then, if we cannot agree

14  on that, you will be serving objections to what it is that

15  you are not willing to produce, and you would like to do

16  that by when?

17          MR. HAYS:  I know we get 30 days, but I don't

18  think we will need a full 30 days.  So I would say within

19  two weeks after that.

20          MR. RAFATJOO:  By March 6th, then?

21          MR. HAYS:  By March 6th.

22          MR. RAFATJOO:  Okay.

23          THE COURT:  All right.

24          MR. RAFATJOO:  Objections, if any, the following

25  week.  By the 13th, we will submit our response to their

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  315

132

objections, and then we will come and impose on your

calendar as you have availability following that, your

Honor.

THE COURT:  All right.  Well, as far as the status

conference goes, do you want to just throw it to April

sometime, or what do you want to do?

MR. RAFATJOO:  The status conference in the

adversary?

THE COURT:  What we've got right here.  I don't

want to lose it.

MR. RAFATJOO:  Okay.  Right.  So I think this gets

kicked to -- assume that we can come and see you the week of

March 16th, if you have availability.  This we can kick to

second week of April.

THE COURT:  That will work.

MR. RAFATJOO:  Okay.

THE COURT:  I can do it in the afternoon of the

8th.  I have Chapter 13s on the 9th, with a trial week the

next week.  What looks good for folks?  Are there any bad

days in there --

MR. RAFATJOO:  April --

THE COURT:  -- because I could do --

MR. RAFATJOO:  I have the 8th as Passover.

MR. GOLDEN:  Yes.

THE COURT:  Right.  It is Passover.  The 15th or

133

1 the 16th I could do it.

2           MR. GOLDEN:  I'm sorry, your Honor.  You said

3 which date, the 15th?

4           THE COURT:  The 15th of April, or the 16th.

5           MR. GOLDEN:  The 15th.

6           THE COURT:  And we could start earlier.  We could

7 start at 10:00.

8           MS. BRADFORD:  That would be good.

9           MR. GOLDEN:  I have three 341A meetings on the

10 15th.  I'll be over by probably 11:00-ish, but you said the

11 16th is --

12           THE COURT:  16th is a Thursday.

13           MR. GOLDEN:  16th is wide open for me, your Honor.

14           MR. RAFATJOO:  16th, Mr. Hays?

15           MR. HAYS:  Best I can tell without my phone, I

16 look open.

17           THE COURT:  Okay.  Well, if there's a problem, you

18 know, let me know, but let's pencil it in for April 16th at

19 10:00.  It would be better to start at 10:00, I think.

20           MR. RAFATJOO:  All right.  And then, if -- so that

21 is for Mr. Steinmann to come back and for this to continue.

22 Now, for a hearing date --

23           MR. HAYS:  But we were talking about counsel, and

24 may I inquire of Mr. Steinmann, your Honor, if he's

25 available on that date if he has to come back?

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  317

134

1          THE COURT:  I'm sorry.  We're ignoring you.  I'm

2 sorry.

3          MR. GOLDEN:  Sorry, Mr. Steinmann.

4          MR. KESSEL:  Well, there has to be a ruling

5 before.

6          MR. RAFATJOO:  Right.  We've got to come back to

7 the March hearing date on the ruling for the document

8 production.

9          THE COURT:  Yes, right.

10          MR. RAFATJOO:  Right.

11          MR. HAYS:  So we may or may not need Mr. Steinmann

12 on the 16th of April.  That would be whenever the continued

13 deposition date is.

14          MR. RAFATJOO:  No, the continued deposition date

15 is April 16.

16          MR. HAYS:  Okay.  So, then, the question, your

17 Honor, if I may.

18          Mr. Steinmann, do you know if you're able to be in

19 California on April 16th, which I think is a Friday?

20          MR. LARSON:  It's a Thursday.

21          THE COURT:  No, it's a Thursday.

22          MR. RAFATJOO:  It's a Thursday.

23          MR. GOLDEN:  It's a Thursday.

24          THE COURT:  It's a Thursday.

25          THE WITNESS:  I don't know without looking at my

135

1 calendar.  You know, my schedule is made for me, but, you

2 know, I'll see what I can do.  I'll let you know when I look

3 at it.

4          MR. HAYS:  If it can't be done, I'm sure that we

5 can figure that out in very short order, your Honor, and

6 then do a stipulation to adjust the dates slightly.

7          THE COURT:  That's fine, yes.

8          MR. HAYS:  Okay.

9          MR. RAFATJOO:  Okay.

10          THE COURT:  So at least we have it.  I'm not going

11 to lose the status conference.

12          MR. HAYS:  Yes.

13          MR. RAFATJOO:  We have that on calendar, and that

14 Mr. Steinmann will let us know.  Now we're looking for a

15 hearing date to resolve discovery disputes the week of March

16 16th, if possible.

17          THE COURT:  Well, why don't you pick one.  I think

18 you can still calendar that.

19          MR. RAFATJOO:  So we will be filing our reply on

20 the 13th, to give the Court time.  Would March 19th --

21          THE COURT:  Well, that's my trial week.

22          MR. RAFATJOO:  Okay.  Would you like to do it

23 March 23rd?

24          THE COURT:  Well, you're assuming that you're not

25 going to agree.  If we have to have it, let's see what day.

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE 319

136

1 The 17th at 10:00?  I have relief from stays.  I could do it

2 after that.

3          MR. RAFATJOO:  March 17th at 10:00 a.m. works.

4 Does that work for everyone?

5          MR. GOLDEN:  Yes.

6          MR. HAYS:  That seems to work for me, your Honor.

7          THE COURT:  Okay.  Wear green.  It's St. Paddy's

8 Day.

9          MR. RAFATJOO:  3/17, at 10:00 a.m.

10          MR. GOLDEN:  17th, St. Patrick's Day, yes.

11          MR. RAFATJOO:  Wear green.  All right.

12          THE COURT:  If needed.

13          MR. RAFATJOO:  If needed, yes.  Let's hope.

14          THE COURT:  All right.  Thank you so much, Mr.

15 Steinmann, for being here.  Really appreciate it, and you

16 can step down.

17          THE WITNESS:  Thank you, your Honor.

18      (The witness was excused.)

19          MR. RAFATJOO:  Thank you, your Honor.

20          MR. GOLDEN:  Thank you.

21          THE COURT:  And I think we're done for now.

22          UNIDENTIFIED SPEAKER:  Thank you, your Honor.

23          THE COURT:  Thank you all for hanging in there.

24 Thank you, Audrey, for handing in there.

25          MR. GOLDEN:  Yes.  Thank you.

1        MR. RAFATJOO:  Thank you, Audrey.

2        Your Honor, do you want me to prepare, like, some

3  kind of scheduling order or notice or something regarding

4  this, or are we good, since it's all --

5        THE COURT:  I don't know if parties want to waive

6  it or if we need it.

7        MR. HAYS:  Just to make sure we're on the same

8  page, your Honor, and to make it easy on the Court, I don't

9  think we need a scheduling order, but if Mr. Rafatjoo could

10 do a one-paragraph notice of hearing dates or something, and

11 just file it, and then that way we're all operating from

12 what got filed.

13       THE COURT:  That sounds great.  I appreciate that.

14       MR. RAFATJOO:  Very good.

15       MR. HAYS:  Very good.  Thank you.

16       THE COURT:  All right.  Thank you very much.

17 Thank you all.  Have a good evening.

18       MR. GOLDEN:  Thank you very much, your Honor.

19       MR. RAFATJOO:  Thank you.

20       THE COURT:  Thank you, Audrey.

21       UNIDENTIFIED SPEAKER:  Thank you, your Honor.

22       THE COURT:  Thank you.

23       THE CLERK:  We're off the record.

24    (Proceedings concluded.)

25

138

1          I certify that the foregoing is a correct

2     transcript from the electronic sound recording of the

3     proceedings in the above-entitled matter.

4     /s/ Holly Steinhauer          2-3-20
      Transcriber                   Date

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

EXHIBIT 3  PAGE  322

**Transcript of Recorded Interview**

**Title of Audio:**     L97456_001

**Date/Time:**          July 29, 2016, 10:00 a.m.

**Participants:**       Michael Hauser, Esq., US Trustee

                        Andrea Downs, Witness

                        James Till, Esq.

                        Hamid Rafatjoo, Esq.

                        Alan Kessel, Esq.

EXHIBIT 4  PAGE  323

2        [START RECORDING]

3        MR. MICHAEL HAUSER:  Good morning.  My name

4    is Michael Hauser.  I'm an attorney with the

5    U.S. Trustee's Office.  This is a 341 meeting in

6    the case of Andrea Downs, Chapter 11 case number

7    16-12589-CB.  Today is July 29th, 2016, around

8    10:00 in the morning.  Prior to going on the

9    record, Ms. Downs gave me a copy of her

10   California driver's license.  We will be

11   continuing the meeting, and at that time, she'll

12   be bringing me her social security card.  Ms.

13   Downs, could you please raise your right hand?

14   Do you swear or affirm to tell the truth, the

15   whole truth, and nothing but the truth?

16       MS. ANDREA DOWNS:  Yes, I do.

17       MR. HAUSER:  And could you state your name

18   for the record?

19       MS. DOWNS:  Andrea Downs.

20       MR. HAUSER:  Okay.  And Counsel for the

21   Debtor, could you please make your appearance?

22       MR. JAMES TILL:  Yes, James Till, of Bosley,

23   Till, Neue, & Talerico, LLP.

24       MR. HAUSER:  Okay.  And Counsel for the

25   Creditor?

EXHIBIT 4  PAGE  324

2      MR. ALAN KESSEL:  Alan Kessel [phonetic] of

3  Pepper Hamilton.

4      MR. HAKIM RAFATJOO:  I'm Hakim Rafatjoo, of

5  Venable, LLP.

6      MR. HAUSER:  Okay.  Both of you are probably

7  going to want to speak up because the recording

8  device it to my left.  And I can't pull it

9  anymore, or I'll pull it out of the wall.

10     MR. KESSEL:  Okay.

11     MR. RAFATJOO:  Okay.

12     MR. HAUSER:  Okay.  And Ms. Downs, if you

13 don't mind just speaking a little bit louder

14 than you typically do.

15     MS. DOWNS:  Oh, sure.  Was that not loud

16 enough?

17     MR. HAUSER:  It's fine.

18     MS. DOWNS:  Okay.

19     MR. HAUSER:  It's just sometimes people go

20 to a whisper and—

21     MS. DOWNS:  Okay.

22     MR. HAUSER:  Okay.  First, I want to make

23 sure you have in front of you your bankruptcy

24 schedules and statement of financial affairs.

25 So that would be Docket Item number 42, which

EXHIBIT 4  PAGE 325

2    will be the schedules and Docket Item number 43,

3    which is the statement of financial affairs.

4         MS. DOWNS:  Okay.

5         MR. HAUSER:  Do you see that in front of

6    you, ma'am?

7         MS. DOWNS:  Yes, I do.

8         MR. HAUSER:  Okay.  So those will be the

9    documents we're referring to.

10        MS. DOWNS:  Okay.

11        MR. HAUSER:  Okay.  Now—

12        MR. TILL:  I'll give you clean ones.  There

13   you go.

14        MS. DOWNS:  Okay.

15        MR. HAUSER:  And ma'am, did you sign those

16   documents, under penalty of perjury?

17        MS. DOWNS:  Yes.

18        MR. HAUSER:  Okay.

19        MS. DOWNS:  Yes, I did.

20        MR. HAUSER:  Mr. Till, did she sign them?

21        MR. TILL:  Yes.

22        MR. HAUSER:  You have the whole—

23        MR. TILL:  Well, I asked her to sign them,

24   and she sent them back, yes.

25        MR. HAUSER:  Okay.  And before signing those

EXHIBIT 4  PAGE 326

2   documents, did you review them carefully?

3       MS. DOWNS:  Yes, I did.

4       MR. HAUSER:  Okay.  And to the best of your

5   knowledge the information contained there is

6   true and correct?

7       MS. DOWNS:  To the best of my knowledge.

8       MR. HAUSER:  Okay.  And other than the

9   amendments that were made last night, which were

10  docket items 63 and 64, are there any other

11  amendments that need to be made, that you're

12  aware of at this time?

13      MR. TILL:  Not at this time.

14      MR. HAUSER:  Okay.

15      MR. TILL:  That's statements

16  [unintelligible].

17      MR. HAUSER:  Okay.  And—

18      MS. DOWNS:  [unintelligible] on Monday

19  [unintelligible].

20      MR. TILL:  She's asking about

21  [unintelligible] amend or provide any additional

22  information.

23      MR. HAUSER:  Well if you have to, you have

24  to.

25      MR. TILL:  Yeah, and we will amend again,

EXHIBIT 4  PAGE 327

2    if—as that information—

3        MR. HAUSER:  [Interposing] or supplement.

4        MR. TILL:  —comes forward, and we receive

5    the information—

6        MS. DOWNS:  [Interposing] Oh, okay.

7        MR. TILL:  —we'll supplement, as necessary.

8        MR. HAUSER:  Okay.  And for the record, we

9    discussed among all the parties here that the

10    2015.3 reports will be filed sometime between

11    now and let's say August 15th.  As to Coastal

12    and any other entities, I think Ortega Downs

13    [phonetic] that the debtor has a 20% or more

14    interest in, as a result will be coming back on

15    August 22nd at 10:00, to address those reports,

16    as well as any other unaddressed issues at this

17    meeting.  Does everyone agree to that, coming

18    back on August 22nd, at 10:00?

19        MR. TILL:  Yes.

20        MR. KESSEL:  Yes.

21        MR. HAUSER:  Okay.  Ms. Downs, I'd like you

22    to turn to Docket Item 31.  So when I say Docket

23    Item 31, I'm talking about this—I'm sorry,

24    Docket Item—

25        MS. DOWNS:  I have 22 and 23.

EXHIBIT 4  PAGE 328

2      MR. HAUSER:  Yeah, okay.  As you may recall,

3   these documents were filed—

4      MR. TILL:  [Interposing] Oh yeah, that's

5   right.

6      MR. HAUSER:  —one by one.  So you should

7   have them in the same order [unintelligible].

8      MR. TILL:  That's right.

9      MR. HAUSER:  Turn to where it says,

10   "Schedule A-B."

11      MS. DOWNS:  Okay.

12      MR. HAUSER:  And that actually, probably

13   should be Docket Item 31 at the top.

14      MR. TILL:  Correct.

15      MS. DOWNS:  Yes.

16      MR. HAUSER:  And just so the record is

17   clear, what happened here is each part of the

18   schedule was filed individually, so Docket Item

19   31 will be A-B, and so forth.

20      MR. TILL:  We tried.

21      MR. HAUSER:  I think we all have the same

22   document.

23      MR. TILL:  Yes.

24      MR. HAUSER:  All right.  So we're now

25   looking at Docket Item 31.  And we're looking

EXHIBIT 4  PAGE 329

 2  at—when I say page 1 of 13, there's an internal

 3  Bates stamp.  So you should be able—if you look

 4  at 31, you'll see, "1 of 13."  Okay.  So you're

 5  already there, ma'am?

 6      MS. DOWNS:  Yes, I am.

 7      MR. HAUSER:  Okay, great.  I'd like you to

 8  draw your attention to question number 1, which

 9  says, "Do you own any interest in real

10  property?"  The answer there was no.  Is that

11  correct?

12      MS. DOWNS:  That's correct.

13      MR. HAUSER:  Okay.

14      MR. TILL:  Have you sold any real property

15  recently, in the last four years?

16      MS. DOWNS:  In the last four years?  2012,

17  so I think that was prior.

18      MR. TILL:  Was that the Cota home?

19      MS. DOWNS:  The Coda Home prior to.  It

20  would have been after—I mean, it was—it happened

21  in June of 2012.

22      MR. HAUSER:  It's going to be close.

23      MS. DOWNS:  Or July, beginning of July.

24      MR. HAUSER:  Our notes from the IDI show

25  that you indicated it was in June of 2012.  This

EXHIBIT 4  PAGE  330

2    case was filed in June 19th of 2016, so I'm sure

3    you'll ask for a copy of the closing statements.

4        MR. TILL:  That's what I'm getting to.

5        MR. HAUSER:  Okay.  But we can certainly—I'm

6    going to go through the list of assets from the

7    divorce judgment.  And that's included in there,

8    but you certainly can address that now, if you

9    want to.

10       MR. TILL:  And if you have a compiled list,

11   if you send it over to me—unless it's completely

12   out of bounds, I'd be more than happy to provide

13   that information.

14       MR. HAUSER:  Okay.

15       MR. TILL:  There's nothing to hide there.

16       MR. HAUSER:  All right.  It may be best to

17   address these, as they come up.

18       MR. TILL:  Contain yourself.  You might wet

19   yourself.

20       MR. HAUSER:  Okay.  So on the list of

21   documents, I'll just [unintelligible] the June

22   2012 sale of the residence located at 40

23   Cambridge Court, Cota De Casa.

24       MS. DOWNS:  I think our records show—what

25   you just showed me.  It's July.

EXHIBIT 4  PAGE 331

2      MR. TILL:  July.  We think it's July.

3      MR. HAUSER:  July.  Again, that's—

4      MS. DOWNS:  It was right before July 4th

5  weekend.  It went into escrow sometime in June.

6      MR. HAUSER:  Sure, sure.

7      MR. TILL:  The closing statement will—

8      MR. HAUSER:  Right, the closing statement,

9  and we'll probably address this twice.  But to

10  the best of your recollection, you received

11  $600,000 of net proceeds from that?

12      MS. DOWNS:  To the best of my recollection.

13      MR. HAUSER:  And the document will speak for

14  itself.

15      MS. DOWNS:  Correct.

16      MR. HAUSER:  Okay.  Why don't we save the

17  $600,000 till when we go over the list of all

18  the assets, as opposed to—otherwise we're going

19  to get kind of far afield and—if that's okay?

20      MR. TILL:  That's fine.

21      MR. HAUSER:  Okay.  Document 31, Page 2 of

22  13.  That would be the next page.

23      MS. DOWNS:  Okay.

24      MR. HAUSER:  Okay.  I just want to confirm

25  that other than the Range Rover that you listed

EXHIBIT 4  PAGE 332

2    there, you have no other vehicles.

3         MS. DOWNS:  No.

4         MR. HAUSER:  Okay.  You don't lease any

5    other vehicles?

6         MS. DOWNS:  I do not.

7         MR. TILL:  Do your companies lease any cars?

8         MS. DOWNS:  No.

9         MR. HAUSER:  Now moving over to Document 31,

10   page 4 of 13, so that—you see at the top there,

11   where it says, "Part 3, question 6"?

12        MS. DOWNS:  Yes.

13        MR. HAUSER:  Okay, great.  Question 6 is

14   titled, "Household goods and furnishings."  Do

15   you see that, ma'am?

16        MS. DOWNS:  Yes, I do.

17        MR. HAUSER:  Okay.  And you list the value

18   of your household goods and furnishings in the

19   amount of $3,500.  Is that accurate?

20        MS. DOWNS:  I believe it's accurate, in the

21   context of how I was told to list it, yes.

22        MR. HAUSER:  Why don't you tell us the

23   context, and how you—

24        MS. DOWNS:  If I had to sell it in—right

25   away.

EXHIBIT 4  PAGE  333

2      MR. TILL:  Liquidation, fire sale.

3      MR. HAUSER:  Okay.  That's fair enough.

4   You've explained the methodology, and that's all

5   we ask you to do.

6      MS. DOWNS:  Okay.

7      MR. HAUSER:  Okay.  With respect to question

8   7, which is titled, "Electronics," you listed a

9   valuation of $1,000.  Is that accurate?

10      MS. DOWNS:  Yes.

11      MR. HAUSER:  And again, you used the same

12   methodology, correct?

13      MS. DOWNS:  Correct.

14      MR. HAUSER:  Okay.  Question 8, which is

15   titled "Collectibles of Value," and it includes

16   things such as antiques, paintings, prints,

17   artwork, books, pictures as a whole, description

18   below there.  Do you see that?

19      MS. DOWNS:  Yes, I do.

20      MR. HAUSER:  Okay.  And you've listed the

21   value of your collectibles of value in the

22   amount of $1,500.  Is that accurate?

23      MS. DOWNS:  I believe so, yes.

24      MR. HAUSER:  And again, using the same

25   methodology we discussed.

EXHIBIT 4  PAGE  334

2      MS. DOWNS:  Yes.

3      MR. HAUSER:  Okay.  With respect to question

4   9, equipment for sports and hobbies, you list a

5   valuation of $200.  Is that accurate?

6      MS. DOWNS:  Yes.

7      MR. RAFATJOO:  I would question, with

8   respect to 9, and I know there's some horses

9   involved here.  But isn't there equipment,

10   saddles and that kind of thing for horses?

11   Wouldn't that be included in this mix?

12      MS. DOWNS:  Oh, I probably included it

13   somewhere.  I have a saddle.  It's pretty old.

14   But I believe you're correct, that that needs to

15   be maybe adjusted to include the saddle.

16      MR. RAFATJOO:  Yeah, if there's any horse

17   equipment [unintelligible] anything about the

18   horse, accoutrements.

19      MR. TILL:  [unintelligible] horse

20   accoutrements.  It looks like we're going to be

21   making a further amendment.

22      MR. HAUSER:  That's fine.  We do that all

23   the time.

24      MR. RAFATJOO:  And when you're going through

25   this, on making these amendments, it's very

EXHIBIT 4  PAGE 335

2    important to think through all the stuff that

3    could potentially be there.  I know it's part of

4    your everyday living, so you don't really think

5    of it as an asset.

6         MS. DOWNS:  Uh-huh.

7         MR. RAFATJOO:  But for purposes of these

8    schedules--

9         MS. DOWNS:  Sure.

10         MR. TILL:  Good point.  That's fair.

11         MR. HAUSER:  Okay.  So unless there's

12    nothing more on that, we'll move on to question

13    11, which is clothes.  You listed clothes in the

14    valuation of $5,000.  Is that accurate?

15         MS. DOWNS:  It might be a little high, but

16    yes.

17         MR. HAUSER:  Okay.  With respect to question

18    12, entitled "Jewelry," you list a valuation of

19    $1,500.  Is that accurate?

20         MS. DOWNS:  Yes, it is.

21         MR. HAUSER:  Okay.  With respect to question

22    13, which is non-farm animals, you list a total

23    value of $35,000.  Is that correct?

24         MS. DOWNS:  Non-farm animals.  I guess that

25    would include the horses.

EXHIBIT 4  PAGE 336

2        MR. HAUSER:  Yeah let me help you out.  If

3    you flip to page 11 of 13, you have a rider

4    which breaks that down.  So if you could look at

5    the top there.  Take a deep breath, and go from

6    4 of 13, to 11 of 13.  So keep you hand here.

7    I'm going to flip to 11 of 13.

8        MS. DOWNS:  Okay.

9        MR. HAUSER:  There should be a rider.  Let

10    me make sure you look at that.  Just yeah, yeah,

11    there.  So just hold it like that.  That way it

12    can go back.

13        MS. DOWNS:  Okay, sure.

14        MR. HAUSER:  All right.  So you've broken

15    out the $35,000 valuation of like three animals.

16    One is an equestrian show horse, called Nightcap

17    or Noah.

18        MS. DOWNS:  Mm-hmm.

19        MR. HAUSER:  Okay.  And you've also listed

20    an equestrian show horse named Starla, which is

21    valued at $10,000, a Bernese mountain dog with

22    nominal value, and that's how we got the total

23    of $35,000.  So I'm simply asking you to confirm

24    the valuation.

25        MS. DOWNS:  Yeah, my Bernese actually is

EXHIBIT 4  PAGE 337

2  deceased now.

3      MR. HAUSER:  Sorry to hear that.  How did

4  you arrive at the valuation for the two horses?

5      MS. DOWNS:  Same methodology, liquidation.

6      MR. HAUSER:  Okay.  Let me ask you this

7  question.  How much did you pay for Nightcap or

8  Noah?

9      MS. DOWNS:  Well it was several years ago,

10  but Noah was close to $80,000, and Starla was

11  close to $40,000.

12      MR. HAUSER:  And I know nothing about

13  horses, so unlike artwork, they don't appreciate

14  over time?

15      MS. DOWNS:  Not usually.  My daughter's

16  horse is the exception.  I think with some

17  proper training and some time, Starla could

18  become more valuable.

19      MR. HAUSER:  How old is Starla?

20      MS. DOWNS:  She's 13, I believe.  And I

21  would need to double check on that.

22      MR. HAUSER:  And Noah is how old, or

23  Nightcap?

24      MS. DOWNS:  He would be 15, I believe.

25      MR. HAUSER:  And how long do horses usually

EXHIBIT 4  PAGE 338

2    live?

3        MR. RAFATJOO:  I was thinking the exact same

4    thing.

5        MS. DOWNS:  It's all over the board.  They

6    can live—I mean, it depends on their blood.

7        MR. HAUSER:  Give us a range of what the low

8    end to the high end would be.

9        MR. TILL:  Like most dogs live 10, to 14 or

10   15 years.

11       MS. DOWNS:  Well because of the sport

12   they're in—depending on the sport they're in,

13   they could pass away very early, before 10.

14   Some live to be 25, 30.  I've known horses to

15   live past 30.

16       MR. HAUSER:  Okay.  That's all we're asking

17   for is that you give us a range.  It could be—

18   they can die unfortunately tomorrow or they can

19   live to 25.

20       MS. DOWNS:  Okay.

21       MR. HAUSER:  Anyone have any questions on

22   that?

23       MR. RAFATJOO:  Yeah.  The horse schedule

24   listed multiple horses.

25       MS. DOWNS:  Correct.

EXHIBIT 4  PAGE  339

2    MR. RAFATJOO: What happened to those? One

3   was Coffee Talk, and some other ones.

4    MS. DOWNS: Well yeah, okay. So Cosmo I

5   sold in 2013 for $1,500. Cadbury—

6    MR. RAFATJOO: Who did you sell it to?

7    MS. DOWNS: I sold it to Tracy Bear, B-E-A-

8   R.

9    MR. RAFATJOO: Any relation to you?

10    MS. DOWNS: No. I sold him, not yet.

11   Cadbury, I believe, was always in Whitney's

12   name, my gift to her. And I was able to get

13   almost what I paid for out of it. I believe I

14   purchased Cadbury for $35,000, and was able to

15   sell him for $30,000.

16    MR. HAUSER: I'm confused. I thought at the

17   initial debtor interview that you said Cadbury

18   is—your daughter now has Cadbury.

19    MS. DOWNS: No, that would be Coffee Talk.

20   I'm sorry. They're all C's because they do that

21   in our sport—

22    MR. HAUSER: Okay.

23    MS. DOWNS: —because of their bloodlines.

24    MR. HAUSER: Okay. I need to change this

25   then. So either Marilyn, who doesn't usually

EXHIBIT 4  PAGE 340

2   make mistakes—she wrote Cadbury was in your

3   daughter's name.

4     MS. DOWNS:  I believe that's the case.  But

5   I mean, I purchased the horse for her.

6     MR. HAUSER:  Okay.  Let's start over again.

7   At the time of your divorce, according to your

8   divorce document, which we'll get to in a

9   second, you had—in addition to Noah and Starla,

10  which you've scheduled, you had Cosmo, and

11  Cadbury.

12    MS. DOWNS:  Okay.

13    MR. HAUSER:  So let's just start off with

14  Cosmo first.  What happened to Cosmo?

15    MS. DOWNS:  He was sold to Tracy Bear for

16  $1,500 in 2013.

17    MR. HAUSER:  Right.  And that's consistent

18  with—okay, now what about Cadbury?

19    MS. DOWNS:  Cadbury was sold in I think

20  2011, and—around the same purchase price when I

21  purchased him in 2009, which was some—I bought

22  him somewhere around $30,000, $35,000, sold him

23  for $30,000.

24    MR. HAUSER:  Okay.  But just so we can

25  clarify our internal records here, we show that

EXHIBIT 4  PAGE 341

 2   Cadbury was in your daughter's name.

 3       MS. DOWNS:  I believe that's correct.  I

 4   need to double check that.

 5       MR. HAUSER:  Okay.  But you're saying it was

 6   in your daughter's name, and then in 2011, you

 7   sold it to a third party for $35,000?

 8       MS. DOWNS:  I'm saying it was somewhere

 9   between $30,000 and $35,000.  I would need to

10   double check.

11       MR. HAUSER:  So as we sit here today,

12   Cadbury is not in your daughter's name and has

13   not been in your daughter's name for at least

14   five years.

15       MS. DOWNS:  Correct.

16       MR. HAUSER:  Okay.  Does that make sense to

17   you?

18       MR. RAFATJOO:  Yeah.

19       MR. HAUSER:  Okay.  All right.  So this was—

20   A, you're saying Cadbury was initially in your

21   daughter's name to begin with, but that in 2011,

22   you had sold it to a third party for $35,000.

23       MR. TILL:  Did you sell it on Whitney's

24   behalf or—

25       MS. DOWNS:  Well Whitney—the horse couldn't

EXHIBIT 4  PAGE 342

2    do what—Whitney had advanced in her skill, from

3    the horse.

4        MR. TILL:  But did Whitney sell it, or did

5    you just facilitate the sale?

6        MS. DOWNS:  Well, I facilitated it.  I mean,

7    it was—

8        MR. TILL:  Okay.

9        MS. DOWNS:  I basically got my money back.

10   Is that what you're asking?

11       MR. HAUSER:  We're just trying to understand

12   what happened to the asset—I mean, the horse, I

13   should say.

14       MR. RAFATJOO:  Sure.  Whitney was 11 at that

15   time, right?

16       MS. DOWNS:  What's that?

17       MR. RAFATJOO:  How old is Whitney now?

18       MS. DOWNS:  Whitney is 21.

19       MR. RAFATJOO:  21?

20       MS. DOWNS:  Yeah.

21       MR. RAFATJOO:  So like 14, 15, yeah.  She

22   wouldn't be doing horse transactions.  I'm sure

23   it's through her mom.

24       MS. DOWNS:  Right.

25       MR. HAUSER:  No, we're just trying to figure

EXHIBIT 4  PAGE 343

2    out where the asset is going.  Are there any

3    other questions on—

4         MR. RAFATJOO:  I have other questions

5    regarding horses.  So is there a list

6    [unintelligible] for them?

7         MR. HAUSER:  I have a list of the interest

8    in the other horses, from the—we can do it now

9    or we can do it later.  I'd rather kind of do it

10    all at once, but—

11         MR. RAFATJOO:  Yeah, let's go through the

12    horses, figure it out.

13         MR. HAUSER:  You want to do it right now,

14    the rest of the horses?

15         MR. RAFATJOO:  Yeah.

16         MR. HAUSER:  Okay.

17         MR. KESSEL:  I agree.

18         MR. HAUSER:  Okay.

19         MR. KESSEL:  Let's get through the horses,

20    get the—

21         MR. HAUSER:  Okay.  So if you accept my

22    representation on your divorce judgment, and

23    you're more than happy to take—I can help you

24    find the page, yeah.  So here—yeah, it's right

25    here at the—page 8, question—not a question, but

EXHIBIT 4  PAGE 344

2      page 8, A-5, states that you had a one-half

3      interest in the following horses, Tommy, Abby,

4      Cocoa Puffs, and Aspen.

5          MS. DOWNS:  Correct.

6          MR. HAUSER:  Okay.  So what we want to know

7      is, for the record, what happened to each of

8      those horses, since they're not currently listed

9      on your bankruptcy schedules.

10         MS. DOWNS:  Okay.  Do you want me to finish

11     with the number four above, or do you want me to

12     switch?

13         MR. HAUSER:  To the extent you think we

14     haven't covered Cosmo, Noah—now Noah and Starla

15     are listed, and so that's on the schedule.

16         MS. DOWNS:  Okay, okay.

17         MR. HAUSER:  Cosmo you said was sold for

18     $1,500—

19         MS. DOWNS:  [Interposing] Correct.

20         MR. HAUSER:  —in 2013.  Cadbury you said

21     always was in Whitney's name, but in 2013, I

22     think, or I'm sorry, '11, you sold it to a third

23     party for about the same amount that you

24     purchased it, for $35,000 because she had

25     advanced beyond the horse's level.

EXHIBIT 4  PAGE 345

2          MS. DOWNS:  Right.  Like I said, I believe

3     it was around $30,000 that I bought him for,

4     $30,000, $35,000 that I sold him for.  And I

5     need to double check on whether—it's hard in the

6     equestrian world because the rider rides—has to

7     ride the horses in some class.  They can't ride

8     other people's horses.  So when I say in her

9     name, basically like you would buy a—something

10     for your child, for their sport.  It was a gift—

11     I mean, it was a gift to Whitney and—

12          MR. HAUSER:  I think you've explained it to

13     me fine, so unless you have any further

14     questions about Cadbury, I don't have any

15     further questions about Cadbury.

16          MR. RAFATJOO:  I'm good with Cadbury.

17          MR. HAUSER:  What?

18          MR. RAFATJOO:  I'm good with Cadbury.

19          MR. HAUSER:  Okay.  Now let's move on to the

20     other four horses.

21          MS. DOWNS:  Okay.

22          MR. HAUSER:  That's what I'm saying.  When

23     you said do I have any more questions on—I think

24     we've the horse—

25          [Laughter]

EXHIBIT 4  PAGE  346

2        MR. RAFATJOO:  Wow, that was—

3        MR. HAUSER:  It wasn't even—

4        MR. TILL:  That slipped out, didn't it?

5        MS. DOWNS:  It's not one of my favorite

6    phrases.

7        MR. HAUSER:  yeah, that's a completely

8    Freudian moment there.  Okay.  So now we're on

9    to A-5, on page 8 of the divorce judgment.  Just

10   for the record, we're talking about a document

11   called "Judgment of dissolution, filed in the

12   Superior Court of Orange County, March 24th,

13   2009, in the Matter of the Marriage of

14   Petitioner Annie Downs vs. Respondent Timothy

15   Downs.  Everyone agrees we have a

16   [unintelligible] copy of that document?  Okay,

17   great.  So we're now at page 8 of that document.

18   And there's a list of items, starting at A,

19   which says, "Petitioner," that's Annie Downs,

20   "is awarded"—you don't go Annie, right?

21       MS. DOWNS:  I go by Annie, yes.

22       MR. HAUSER:  Okay, "Is awarded, charged, and

23   credited with the following," and then it lists

24   assets.  And we're now at the five, which is—it

25   says you have a one-half interest—or at the

EXHIBIT 4  PAGE 347

2    time—in Tommy, Abby, Cocoa Puffs, and Aspen.  So

3    just like we did with the other horses, if you

4    could go through and explain what happened to

5    each of the horses.

6        MS. DOWNS:  No problem.  So Tommy is also

7    known as Coffee Talk.  That's the horse that

8    Whitney rides.  It's her horse, actually.  I

9    gifted it to Whitney, my half.  Her dad owns the

10   other half.  I gifted it to her in 2012.  Coffee

11   Talk aka Tommy is currently leased out by

12   Whitney and Tim, who receive the income from the

13   lease.

14       MR. RAFATJOO:  So Coffee Talk is leased out?

15       MS. DOWNS:  As far as I know, yeah.  I don't

16   have any ownership of the horse anymore, so—

17       MR. RAFATJOO:  Do you know how much it's

18   leased out for?

19       MS. DOWNS:  I don't know.  That would be a

20   question for Whitney and her dad.  They own the

21   horse.

22       MR. RAFATJOO:  Okay.

23       MR. HAUSER:  So when you gave your half

24   interest in 2013—'12.

25       MR. RAFATJOO:  Because she was still a minor

EXHIBIT 4  PAGE 348

2  at that point, 2012.

3      MR. HAUSER:  Yeah, you gave that to your ex-

4  husband, or you gave it to your daughter.

5      MS. DOWNS:  No, I gave my half interest to

6  my daughter.

7      MR. HAUSER:  Okay.  And so is there a paper

8  trail, that shows that you gifted—just like

9  there would be for a piece of property, like

10  real estate, is there a piece of paper that

11  evidences that?

12      MS. DOWNS:  Sure.

13      MR. HAUSER:  Okay.  I'm not asking for it.

14  I just want to know if there's a paper.

15      MR. RAFATJOO:  How much do you think Coffee

16  Talk is worth?

17      MS. DOWNS:  Today?

18      MR. RAFATJOO:  Yeah.

19      MS. DOWNS:  Let's see.  We bought him for

20  $175,000.  My ex-husband first started

21  threatening me with divorce around then.  And I

22  guess I should be careful what I say, because we

23  said this is public, right?

24      MR. HAUSER:  It is, ma'am.

25      MS. DOWNS:  And he has been a very

EXHIBIT 4  PAGE 349

2   incredible horse for Whitney.  I don't know what

3   they leased him out, but I know, according to

4   Whitney, he has been able—I mean, through

5   leasing him out, it's covered her tuition at

6   University of San Diego, her living expenses, as

7   well as I believe some of my husband's, a car.

8   So he's getting older now.  I believe he's like

9   20 years old now, maybe 19, maybe 21.  I don't

10  know exactly his age.  But he's a very valuable

11  horse, in terms of he's very well known.

12  Whitney won several national championships on

13  him.  But he's older, so I wouldn't be able to

14  give you an estimate.  I'm not an expert in

15  that.

16      MR. RAFATJOO:  Of how much the horse is

17  worth.

18      MS. DOWNS:  Today, yeah.  I wouldn't be able

19  to tell you.

20      MR. RAFATJOO:  But you gave us values for

21  the other horses, so that's why I was just

22  wondering what ballpark.

23      MS. DOWNS:  Right.  Because those are in my

24  possession, but I haven't seen him or—since I

25  gifted him.

EXHIBIT 4  PAGE 350

2      MR. HAUSER:  Well why don't you just tell us

3   what you think it was worth on the time you

4   transferred it, the half interest, which was

5   2013, correct?

6      MS. DOWNS:  Yeah, I actually had someone who

7   wanted to lease him for $110,000, on top of

8   paying all his expenses.

9      MR. HAUSER:  What does that translate into,

10   though, the valuation of you selling the horse?

11      MS. DOWNS:  I believe he was worth $200,000

12   to $250,000.

13      MR. HAUSER:  In 2013.

14      MS. DOWNS:  Yes.

15      MR. HAUSER:  Okay.  And that's really, from

16   my perspective, as far as we can take that

17   because the testimony is she transferred it.

18   And we'd have to get an independent valuation at

19   this time, correct?

20      MS. DOWNS:  Yeah.  And I don't know that it

21   was 2013.  I think our paperwork says 2012,

22   right?

23      MR. HAUSER:  Okay.

24      MR. TILL:  I have 2012.

25      MR. HAUSER:  Okay.  Then it's 2012.  Okay,

EXHIBIT 4  PAGE 351

2    and 250K.  And do you know even where the horse

3    is boarded at this time?

4        MS. DOWNS:  I don't know for sure.  But I

5    believe he is boarded in the same place that I

6    used to have the master lease, which is called

7    The Oaks in San Juan Capistrano.

8        MR. RAFATJOO:  So when someone leases a

9    horse from another person, they—basically like

10   leasing a car.  "I'm going to take it off your

11   lot.  I'm going to ride it."  So Whitney doesn't

12   ride that horse anymore, correct?

13       MS. DOWNS:  I don't know that it works

14   exactly like that.

15       MR. RAFATJOO:  How does that work?

16       MS. DOWNS:  There's always different—you

17   know, and there's always different nuances to

18   it.  It just depends on—if you really want to

19   get your expenses down and not be paying for the

20   horse.  You might do something, what's called a

21   feed lease, which basically they take care of

22   the expenses but you get nothing.  Because he

23   was valuable, they took care of all expenses and

24   paid something substantial.  But as far as

25   Whitney riding him, I believe she does on

EXHIBIT 4  PAGE  352

2    occasion.  It depends on what the lease

3    agreement says, which I haven't seen.

4         MR. RAFATJOO:  Okay.

5         MR. HAUSER:  Okay.  So now let's move on to

6    Abby.

7         MS. DOWNS:  Okay.

8         MR. HAUSER:  You had a half interest at the

9    time, according to this divorce judgment, in

10   2009.

11        MS. DOWNS:  Yes.

12        MR. HAUSER:  What happened to Abby?

13        MS. DOWNS:  Abby was getting older.  She was

14   getting to be 23, I believe.  And she was lame.

15   And it became a burden on our expenses.  So she

16   went to go live on a ranch in Oregon.  I don't

17   believe that she's-I believe she's probably not

18   still alive.

19        MR. TILL:  And my notes reflected Abby is a

20   pony, not a horse.

21        MS. DOWNS:  Yes, she is a pony, correct.

22        MR. HAUSER:  Okay.  So you gave her to the

23   ranch in Oregon what year?

24        MS. DOWNS:  Oh, gosh.  I'd have to double

25   check, but that was I believe right after this

EXHIBIT 4  PAGE 353

2   divorce decree was signed, so—

3       MR. HAUSER:  This was entered in or filed on

4   March 21st [unintelligible].

5       MS. DOWNS:  Actually, I think even before.

6   I think they were sent to the ranch even before

7   that.  I would say 2008, 2009, and same with

8   Aspen.

9       MR. HAUSER:  Okay.  So Aspen is the same

10  situation?

11      MS. DOWNS:  Same.

12      MR. HAUSER:  So there was no value received

13  for either Abby or Aspen.

14      MS. DOWNS:  No.

15      MR. HAUSER:  Okay.  And then Cocoa Puffs?

16      MS. DOWNS:  Cocoa Puffs is Ryan's horse—was

17  Ryan's horse.  I gave my half interest to Ryan

18  after the divorce, I believe.

19      MR. HAUSER:  Ryan is your—

20      MS. DOWNS:  Ryan is my son.  I believe his

21  dad did the same thing.

22      MR. HAUSER:  Okay.  And how much—at the time

23  of the divorce, which was 2009, how much was

24  Cocoa Puffs worth?

25      MS. DOWNS:  I would estimate probably around

EXHIBIT 4  PAGE  354

2    $5,000.

3    MR. HAUSER:  Okay.  Any other questions on

4    these four horses?

5    MR. RAFATJOO:  Are there any other horses we

6    haven't mentioned or listed?  Do you have any

7    interest in other horses?

8    MS. DOWNS:  In my lifetime or—

9    MR. RAFATJOO:  No, just—

10   MR. HAUSER:  Let's start with 2009, which is

11   the divorce document.  So from 2009, through the

12   present, are there any other horses that you

13   either owned and transferred that aren't listed,

14   either on the divorce document or on your

15   bankruptcy documents?

16   MS. DOWNS:  Not that I can recall.  And I

17   would recall.  But I did lease a horse for my

18   daughter, but—

19   MR. HAUSER:  I'm talking about ownership.

20   MS. DOWNS:  No, not that I can recall.

21   MR. HAUSER:  Okay.  So why don't we put this

22   divorce document to the side for a second.

23   MS. DOWNS:  Okay.

24   MR. HAUSER:  And we're going to go back to

25   the schedules.

EXHIBIT 4  PAGE 355

2        MS. DOWNS:  Sure.

3        MR. HAUSER:  Okay.  So you can just put that

4    over here.  And let's go back to the schedule,

5    so we're back at document 31.  And you should be

6    at page 5 of 13.  I can't read upside down, but

7    that should say 5 of 13.

8        MS. DOWNS:  Oh, okay.

9        MR. HAUSER:  Okay.  So is everyone there?

10       MR. RAFATJOO:  Yep.

11       MR. HAUSER:  Okay.  So now we have a

12   category, question 16, which basically asks how

13   much cash you had on hand at the time of your

14   bankruptcy filing, which was June 19th.  So by

15   the way, all these schedules are a snapshot in

16   time of your financial picture, as of June 19th,

17   2016, which was the date of the filing of your

18   bankruptcy.  Do you understand that?

19       MS. DOWNS:  Correct, yes.

20       MR. HAUSER:  Okay, because some people think

21   it's a moving target, and they say, "Oh, well

22   I've got"—no, that's not the way it works.  So

23   question number 16 shows that on the date you

24   filed your bankruptcy, you had $50 in cash on

25   hand.  Is that accurate?

EXHIBIT 4  PAGE 356

2        MS. DOWNS:  Yes, it is.

3        MR. HAUSER:  Okay.  Let's move on to

4    question 17.  This essentially, as it indicates

5    here, would be checking, savings, financial

6    accounts, monies you have in any kind of

7    brokerage accounts.  And that's on the rest of

8    the questions as well.  And you answered here,

9    on question 17, $22,596.  Is that accurate?

10        MS. DOWNS:  I believe it's accurate.

11        MR. HAUSER:  Okay.

12        MR. RAFATJOO:  Were there any other bank

13    accounts, that you've closed recently?

14        MS. DOWNS:  When you say recently—

15        MR. RAFATJOO:  So two years, three years.

16        MS. DOWNS:  Yes.  There was other bank

17    accounts.  There was an account at Citibank, one

18    personal, one for—for me, personally, you're

19    talking about, or for businesses?

20        MR. HAUSER:  Well let's step back here.

21    Maybe I can help you out.  You filed a document,

22    which is called your statement of financial

23    affairs, which actually asks a specific question

24    about both bank accounts.  So let's go—let's

25    check yours for a second here.  Here is document

EXHIBIT 4  PAGE 357

2    43.

3         MS. DOWNS:   Okay.

4         MR. HAUSER:   Turn to page 9 of 13.   Look at

5    the top.   Okay?   So if you go to page 9 of 13,

6    you should see part 8.   And part 8 has question

7    20.   And 20 asks, I think the question you want

8    to know, that it has a specific time period of

9    one year prior to the filing of this case, and

10   in there—and basically, any financial accounts.

11        MS. DOWNS:   Okay.

12        MR. HAUSER:   And you listed an account at

13   Oppenheimer & Company that you closed in January

14   of 2016.   Is that correct?

15        MS. DOWNS:   That's correct.

16        MR. HAUSER:   Okay.   So we've covered the

17   one-year time period.   You want to go back

18   further, correct?

19        MR. RAFATJOO:   Yeah.

20        MR. HAUSER:   Okay.   So the question is, can

21   you think of any accounts beyond the one-year,

22   let's say maybe going back two years, that you

23   closed?

24        MS. DOWNS:   Okay.   Hold on a second.   Are

25   talking business or are we talking personal?

EXHIBIT 4  PAGE 358

2          MR. HAUSER:  This is your individual bank.

3          MR. TILL:  Individual, not business.

4          MS. DOWNS:  Okay.

5          MR. HAUSER:  And if you want to go—we're

6     coming back on August 22nd, so I don't really

7     want you to guess.

8          MS. DOWNS:  Okay.  Yeah, I would be

9     guessing, but I do remember that there was a

10    personal one at Citibank.  I don't know when it

11    was closed.

12         MR. HAUSER:  Okay.  Well why don't you do

13    this?  Put that on your list, and also you're

14    going to go back and check.  So we're now going

15    back—this is 6/19/2016.  You're going back to

16    6/19/2014.  Okay?

17         MS. DOWNS:  I'm going back to—how far?

18         MR. HAUSER:  Two years.

19         MS. DOWNS:  Two years.

20         MR. HAUSER:  Okay.

21         MR. RAFATJOO:  Shouldn't we go back four

22    years, for transfers?

23         MR. HAUSER:  Well that's something you guys

24    can discuss.  It's not requested on the form,

25    but certainly if you're looking at a 3439 issue,

EXHIBIT 4  PAGE 359

2    and if you want to be transparent and all get

3    along, it probably makes sense.  Certainly you

4    can get it within the context of a 2004

5    application.  I can't force them to give you

6    something that's beyond the scope of this.  But

7    if I was them, I'd—I would do it.

8        MR. RAFATJOO:  Because what we would be

9    looking for is everything, going back four years

10   [unintelligible] that way.

11       MR. TILL:  Yeah, and if you're aware or you

12   think your intelligence tells you there's

13   something there.  We're trying to be

14   transparent.

15       MS. DOWNS:  [unintelligible].  Can I

16   [unintelligible]?

17       MR. HAUSER:  Hold on, guys.  We're going to

18   go off the record for a second.  We're going

19   back on the record.

20       MS. DOWNS:  Okay.

21       MR. HAUSER:  Okay.  We are back on the

22   record, in the Chapter 11 341 exam of Andrea

23   Downs, case number 16-12589CB.  Ms. Downs, I'd

24   like you to look at Docket Item 31, question 19.

25   And that question asks for your interests in

EXHIBIT 4  PAGE  360

2   corporations, LLCs, etcetera.  And there, you've

3   indicated to—directed our attention to the rider

4   at part 4, question 19, correct?

5      MS. DOWNS:  That's correct.

6      MR. HAUSER:  Okay.  So let's all turn to

7   Docket 31, page 12 of 13, which is the rider to

8   question 19.  Ms. Downs, are you there?

9      MS. DOWNS:  Yes, I am.

10      MR. HAUSER:  Okay, great.  So the first

11   entity that's listed there is Coastal

12   Communications.  And you are a hundred percent

13   owner of that, correct?

14      MS. DOWNS:  Correct.

15      MR. HAUSER:  Okay.  And we've all agreed

16   that you're going to file, in the next couple of

17   weeks, what's called a FRBP 2015.3 report,

18   correct?

19      MR. TILL:  Yes.

20      MS. DOWNS:  I'm sorry.  What is it?

21      MR. HAUSER:  There's a report.  That's the

22   report we were talking about.

23      MR. TILL:  B26, form 26, B26

24   [unintelligible] 2015.3 report.

25      MR. HAUSER:  Yeah.  And what that is—and

EXHIBIT 4  PAGE 361

2   this is what we were talking about before.

3       MS. DOWNS:  Right, okay.

4       MR. HAUSER:  What it is, is it's a form that

5   you will basically have a little P&L statement,

6   have a little balance sheet, have a valuation.

7   And that's why you're hiring the person to help

8   you out with it.  Okay?

9       MS. DOWNS:  Okay.

10      MR. HAUSER:  And that's why we're coming

11  back next time.  So we're not going to—I don't

12  personally want to drill down on it until we get

13  that form.  If you want to, go ahead and ask

14  questions about it.

15      MR. RAFATJOO:  I can wait.

16      MR. HAUSER:  Okay.  It's just we're going to

17  get the piece of the iceberg, and then not have

18  any iceberg.  So, okay.  So we'll wait till next

19  time to ask questions about that.  On Ortega

20  Downs, we also discussed, going on the record,

21  that you've indicated that that that entity is—

22  ceased operating in 2012, correct?

23      MS. DOWNS:  Yes.

24      MR. HAUSER:  Okay.  But we've also agreed,

25  for academic regularity, and out of an abundance

EXHIBIT 4  PAGE 362

2    of caution, you'll file a 2015-3 statement, but

3    that will essentially have valuation of zero.

4    It will say something like, "Ceased operating,"

5    and you'll just sign that under penalty of

6    perjury, and file with the court.

7        MS. DOWNS:  Okay.

8        MR. HAUSER:  Okay, great.  Okay.  On Brief

9    Cam, which is the next entity listed, you need

10   to investigate whether—it's pretty clear, from

11   what you describe, that you probably have less

12   than a 20% ownership interest, correct?

13       MS. DOWNS:  Yes.

14       MR. HAUSER:  Okay.  In that case, you would

15   not be filing a 2015.3 report.  If you do have

16   information as to what percentage you own, that

17   would be great, and the valuation.  Did you

18   update the valuation on that or it's still—

19       MR. TILL:  Oh, on Brief Cam?  We could get a

20   value on it.

21       MR. HAUSER:  Okay.  And it's something you

22   think that someone could Google because it was—

23   the way you described it to me, it's a—VC

24   essentially funds 50% of it, and then they

25   essentially sell off the rest, through crowd

EXHIBIT 4  PAGE 363

2      funding and other sources.

3         MR. TILL:  Yes.

4         MR. HAUSER:  Okay.

5         MS. DOWNS:  That's the vehicle that bought—

6      in which I bought the investment, Brief Cam.

7         MR. HAUSER:  And Brief Cam is a technology,

8      you said, that—it's kind of like a drone or

9      something that has a camera overhead and could—

10     that was used like in the Boston bombing, where

11     you could see a grid or a street, and then—

12        MS. DOWNS:  You can drill down by date,

13     location, that kind of thing.

14        MR. HAUSER:  Okay.  Then the next entity you

15     list is called 1020 University, LLC.  Do you see

16     that?

17        MS. DOWNS:  Yes.

18        MR. HAUSER:  Okay.  And you list a 11.5%

19     interest, valued at $25,000, correct?

20        MS. DOWNS:  That is our current

21     understanding.

22        MR. HAUSER:  Sure.  All right.  Let me flesh

23     this out with you.  What does this entity do?

24     Does it own any interest in an apartment

25     complex?

EXHIBIT 4  PAGE 364

2  MS. DOWNS:  That is the LLC that owns that

3 particular apartment building.

4  MR. HAUSER:  Okay, at that address, in

5 Seattle, Washington?

6  MS. DOWNS:  Yes, in Washington, yes.

7  MR. RAFATJOO:  What's the apartment

8 building?

9  MS. DOWNS: 1020 University.

10  MR. RAFATJOO:  I know, but what is it, like

11 two units, three units?  Do you know what it is?

12  MS. DOWNS:  I don't.

13  MR. HAUSER:  So it's an apartment complex,

14 but you're not exactly sure how many units.

15  MR. TILL:  I think it's a larger, like

16 studio homes [unintelligible] or something like

17 that.

18  MS. DOWNS:  I don't know.

19  MR. HAUSER:  Have you ever been up there?

20  MS. DOWNS:  I have not.

21  MR. HAUSER:  Okay.

22  MS. DOWNS:  I've seen pictures, but—a while

23 ago, and the information is not with me.

24  MR. TILL:  I think it's a larger, as opposed

25 to a smaller [unintelligible].

EXHIBIT 4  PAGE  365

2      MR. HAUSER:  So it's some kind of multi-

3   family housing, right?

4      MS. DOWNS:  Right, it's an apartment.

5      MR. HAUSER:  Okay.

6      MS. DOWNS:  They're apartment owners.

7      [Crosstalk]

8      MR. HAUSER:  The address I saw—but—

9      MR. RAFATJOO:  [unintelligible] for

10   $250,000.

11      MR. TILL:  She only has a—she has a limited

12   minority interest in it.

13      MR. RAFATJOO:  I know, but 10% is 25.  So

14   you multiply it by 10.  [unintelligible] this

15   building would be worth $250,000.  That's what

16   I'm trying to figure out, what size this

17   building is.

18      MS. DOWNS:  Oh yeah.  But we don't know if

19   that's a combined—

20      MR. HAUSER:  All right.  Why don't we—let me

21   do my thing, and then you can follow up and—

22   okay.  With respect to the income that you get,

23   on an annual basis, on Docket Item 43—

24      MS. DOWNS:  Yes.

25      MR. HAUSER:  Okay, page 2 of 13, question 5,

EXHIBIT 4  PAGE  366

2   you show that in 2015, calendar year 2015, okay,

3   that 1020 University, you received $7,140,

4   correct?

5        MS. DOWNS:  That's our estimation, yes.

6        MR. HAUSER:  Yeah, estimation, okay.  And as

7   far as you know, do you receive 10% of the net

8   income from that property?  In other words, is

9   your revenue proportionate to your percentage

10  interest?

11       MS. DOWNS:  We don't know if this 11% refers

12  to what I thought was a dissolved company,

13  called Downs Holding, which would mean the 11%

14  is mine and my ex-husband's percent, or if this

15  is my percentage.

16       MR. HAUSER:  Okay.  That's something you're

17  going to have to—

18       MS. DOWNS:  We have to subpoena.

19       MR. TILL:  We're trying.  We're going to

20  have to take discovery of—

21       MS. DOWNS:  We have to get the records.

22       MR. TILL:  —Mr. Downs.

23       MR. HAUSER:  Okay.  So you're not clear on

24  the percentage of ownership, is what you're

25  saying?

EXHIBIT 4  PAGE 367

2        MS. DOWNS:  I thought it was dissolved, that

3    company.  And now it looks like—there's

4    something—

5        MR. HAUSER:  Well let's step back from

6    30,000 feet, because I think there is an easy

7    way to do this.  And LLC doesn't pay taxes, but

8    they file tax returns.  And they issues K-1s to

9    its unit holders.

10       MS. DOWNS:  Right.

11       MR. HAUSER:  Did you receive a K-1 in 2015?

12       MS. DOWNS:  I did.

13       MR. HAUSER:  Okay.  So it's probably fair to

14   say that the LLC has not been dissolved, if

15   someone prepared a tax return.

16       MS. DOWNS:  I received a K-1 for 1020, not a

17   K-1 for Downs Holding.

18       MR. HAUSER:  We're not talking about Downs

19   Holding.

20       MR. TILL:  And there's a resolution—Michael,

21   there's a resolution that Mr. Downs required her

22   to sign in 2012, saying it was being dissolved.

23   It's a court resolution, saying it was going to

24   be dissolved.  Mr. Downs was to dissolve it.

25       MR. HAUSER:  Okay.

EXHIBIT 4  PAGE  368

2      MR. TILL:  And there's email correspondence

3   that follows that.

4      MR. HAUSER:  Yeah, I think we're talking two

5   different languages here, which is fine.  This

6   has happened.  All right.  So here is the way I

7   understand Downs Holdings.  And maybe I'm just

8   misunderstanding the structure here.  This is

9   the head, okay.  And under the head of this,

10   there's five special-purpose entities.  Okay?

11   And each of those special purpose entities

12   holds—is called—has a name like 1020.

13      MS. DOWNS:  Yes.

14      MR. HAUSER:  And then owns a piece of real

15   estate, which is very common, the way you

16   structure.  So what you're talking about is you

17   think maybe Down Holdings was dissolved.  I get

18   that, okay.  We'll get to that.  But that

19   doesn't—when you dissolved this entity, that

20   doesn't dissolve the underlying entities.  Do

21   you see what I'm saying?

22      MS. DOWNS:  Understood.

23      MR. HAUSER:  So they're legally intact

24   entities.

25      MS. DOWNS:  Right, of course.

EXHIBIT 4  PAGE 369

2      MR. HAUSER:  Okay.  So we'll get to that

3   because we still want to know what interest you

4   have in Down Holdings.  So you did receive a K-1

5   for 1020 University LLC, correct?

6      MS. DOWNS:  Yes, I did.

7      MR. HAUSER:  Okay.  All right.  And that

8   would of course—I'm not asking for it, but if

9   they were to ask for it, that would support the—

10   for 2015, the information that you've listed

11   here.

12      MS. DOWNS:  That's where this information

13   came from, as far as I understand.

14      MR. HAUSER:  And that's fine.  And that's as

15   far as I'm going to take it, on that.

16      MS. DOWNS:  Okay.

17      MR. HAUSER:  Now I just want to ask a few

18   more—sorry—a few more questions.

19      MR. TILL:  Oh, my God.

20      MR. HAUSER:  Sorry.  My apologies.

21      MR. TILL:  I was going to wear a dark suit,

22   too, damn it.

23      MR. HAUSER:  How long have you had an

24   interest in this entity?

25      MS. DOWNS:  1020?

EXHIBIT 4  PAGE 370

2          MR. HAUSER:  Yeah.

3          MS. DOWNS:  Oh, I would say 2005—like

4     probably 10—between 9 and 11 years.

5          MR. TILL:  How did you get that interest?

6          MS. DOWNS:  How did I get it?

7          MR. RAFATJOO:  Yeah.

8          MS. DOWNS:  My husband and I invested in it.

9          MR. RAFATJOO:  Who are the other partners on

10    that 1020?

11         MS. DOWNS:  Yes, there are other partners.

12         MR. RAFATJOO:  Who are they?

13         MS. DOWNS:  I don't know them personally.

14    It's a—I guess they can give you the names.

15         MR. HAUSER:  Well let me ask you a question.

16    It's an LLC.  Do you know who the managing

17    member is?

18         [Crosstalk]

19         MS. DOWNS:  I don't know who the—it's

20    managed by Metropolitan management.

21         MR. HAUSER:  Okay, let me—

22         MS. DOWNS:  I don't know who the managing

23    partner of the LLC is.

24         MR. HAUSER:  Okay.  Hold on a second.  We're

25    kind of confusing concepts.

EXHIBIT 4  PAGE 371

2          MS. DOWNS:  Okay.

3          MR. HAUSER:  So an LLC, a limited liability

4     company has what's called a managing member.

5          MS. DOWNS:  Right.

6          MR. HAUSER:  Okay, which is the person

7     through the LLC operating document, is

8     responsible for managing the operations of the

9     LLC.

10          MS. DOWNS:  Correct.

11          MR. HAUSER:  Now they of course can delegate

12     out the actual management of the apartment

13     complex to—you said a company, Metropolitan.

14     But that's two separate things I'm talking

15     about.  So I just want to know, do you happen to

16     know who the managing member is?  That's a

17     formal legal designation of the person who

18     controls the operations of the LLC.

19          MS. DOWNS:  I believe his first name is

20     Rick.  And he is not only the owner of

21     Metropolitan Management, but he is also a

22     shareholder in every LLC.

23          MR. HAUSER:  Okay.  So, yeah.  And

24     oftentimes people make a corporate entity the

25     managing member, so it could be—

EXHIBIT 4  PAGE 372

2      MS. DOWNS:  Yeah.

3      MR. HAUSER:  All right.

4      MS. DOWNS:  I don't know.  I haven't seen

5   those documents, so I wouldn't speculate.

6      MR. HAUSER:  So let's getting back to the

7   family relationship.  Is this a family

8   investment vehicle?

9      MS. DOWNS:  Not even slightly, no.

10     MR. HAUSER:  Okay.  So this is not a family

11  situation.

12     MS. DOWNS:  No.

13     MR. HAUSER:  So as far as you know, the

14  managing member has no familial relationship to

15  either you, or your husband, or your parents.

16     MS. DOWNS:  As far as I know, absolutely

17  none.

18     MR. HAUSER:  Okay.  I don't have any other

19  questions on 1020.  I do of course on VPM.  Do

20  you want to finish up any questions you have on

21  1020 University LLC?

22     MR. RAFATJOO:  I'm fine.

23     MR. HAUSER:  Okay.  So now we're going to

24  move over to—again, on part 4, question 19, you

25  list VPM Westchester LLP, with a 3% interest in

EXHIBIT 4  PAGE  373

2    that.

3        MS. DOWNS:  Share, yeah.

4        MR. HAUSER:  Okay.  And then on your

5    statement of financial affairs, you've listed

6    here that in 2015, you received $6,000 from your

7    3% interest.  Is that correct?

8        MS. DOWNS:  Wait a minute.  Okay.

9        MR. HAUSER:  So this is your ownership

10   interest.

11       MS. DOWNS:  Right.

12       MR. HAUSER:  Okay?  And then on document

13   number 43, you list how much income you received

14   from this entity in 2015.

15       MS. DOWNS:  That's an estimation because we

16   don't have the 2015 K-1 on that one.

17       MR. HAUSER:  Okay, so that's—

18       MS. DOWNS:  We do have it on the 2014, so

19   the 2014, I believe, is more accurate.

20       MR. HAUSER:  Okay.  So in 2014, you show

21   $14,000.

22       MS. DOWNS:  Right.

23       MR. HAUSER:  Do you know why the amount

24   dropped to $6,000?

25       MS. DOWNS:  It's very curious why that

EXHIBIT 4  PAGE 374

2    happens.  It seems to be—it seems random to me,

3    but they—it's run very differently than 1020.

4    1020, as was the other investments that we

5    talked about earlier, through Metropolitan

6    Management, they handle their business very—like

7    very exact.  And so you know exactly what you're

8    buying into.  Now this particular property

9    sounded to my ex-husband and I like exactly what

10   we had invested in, in the Commencement Bay and

11   1020, except for this is an—this started out as

12   an equity investment, whereas this was a loan

13   that was for they—basically they had it as a

14   loan, and then they got refinanced, and then you

15   became an equity partner.  So with VPM

16   Westchester, it took quite a while for them to

17   even start paying us anything.  And they are not

18   related to us in any way, but they have several

19   relatives as shareholders.  So it can be—and we

20   only get one check a year.  It could be $14,000,

21   and it could be $3,000.  It's all over the

22   board, whether they have to do improvements that

23   year, or whatever.

24        MR. HAUSER:  Okay.  And where is the

25   property located that they—

EXHIBIT 4  PAGE 375

2      MS. DOWNS:  It's in Anaheim.

3      MR. HAUSER:  And it's an apartment complex?

4      MS. DOWNS:  Yes.

5      MR. HAUSER:  Do you know how many units it

6   is?

7      MS. DOWNS:  I don't.

8      MR. HAUSER:  Have you ever seen it?

9      MS. DOWNS:  Not physically.

10     MR. HAUSER:  Okay.  Have you seen a picture

11   of it?

12     MS. DOWNS:  Yes.

13     MR. HAUSER:  Okay.  Is it a multi-story—is

14   it one, two, three stories?

15     MS. DOWNS:  It has more than one story.  I

16   don't know how many stories.

17     MR. HAUSER:  Okay.  And how did you arrive

18   at the valuation of $50,000?

19     MR. TILL:  $25,000.

20     MS. DOWNS:  25.

21     MR. HAUSER:  Oh, maybe I was looking at the

22   total here.  Okay, $25,000.

23     MS. DOWNS:  Because just based on how they—

24   we had invested $100,000 for this property.  And

25   I guess the valuation came down to what we had

EXHIBIT 4  PAGE 376

2    been paid back and what we had originally

3    invested.

4        MR. HAUSER:  Okay.  And—

5        MR. TILL:  And we said the valuation came

6    back, came back from [unintelligible].

7        MS. DOWNS:  No, I think—no one officially

8    conducted a valuation for me on this.

9        MR. KESSEL:  Okay.  But [unintelligible] you

10   paid $100,000 for this 3%.

11       MS. DOWNS:  Well, we paid $100,000 for

12   whatever Downs Holding bought, so that could be

13   6% or 3%.

14       MR. KESSEL:  Okay.

15       MR. HAUSER:  Okay.  I don't have any other

16   questions on that, unless you guys do.  We can

17   move one.

18       MR. KESSEL:  Let's move on.

19       MR. HAUSER:  Okay.  All right.  So now we're

20   going to go back to Document 31, this document.

21       MS. DOWNS:  Okay.

22       MR. HAUSER:  And go to page 6 of 13.

23       MS. DOWNS:  Oh, okay.  On here?

24       MR. HAUSER:  Yeah, document 31.

25       MS. DOWNS:  Okay.

EXHIBIT 4  PAGE 377

2        MR. HAUSER:  Go back to page—so flip over to

3    page 6 of 13.

4        MS. DOWNS:  Okay.

5        MR. HAUSER:  And I just need you to verify

6    that—so you have questions 20 through 23 there,

7    and you listed no, with respect to all those

8    questions.  Are those answers accurate?

9        MS. DOWNS: To the best of my knowledge, yes.

10       MR. HAUSER:  Okay.  And then we go over to

11   the next page, which is—

12       MR. RAFATJOO:  So on 21, the divorce decree

13   listed a number of retirement accounts.  What

14   happened to those?

15       MS. DOWNS:  Let me see [unintelligible].

16       MR. RAFATJOO:  [unintelligible].

17       MR. HAUSER:  It's on page 9.

18       MR. TILL:  [unintelligible] names

19   [unintelligible] retirement accounts maintained.

20   This sounded generic, so I don't know

21   [unintelligible].

22       MR. HAUSER:  No, here.  Are you at page 9

23   there?

24       MR. TILL:  No.  Yeah, but it doesn't

25   identify your 401K held at Raymond James or 401K

EXHIBIT 4  PAGE 378

2    at—

3         MR. HAUSER:  Well let me—

4         MR. RAFATJOO:  It's talking about

5    retirement.  I'm just wondering what's going on.

6         MR. TILL:  No, I agree.  No, absolutely.

7    Were there any, and what happened to them if

8    there were?

9         MS. DOWNS:  I don't recall if they needed to

10   be liquidated or—

11        MR. TILL:  Well this says you got them, to

12   the extent they were in existence.

13        MS. DOWNS:  Right.  Okay.

14        MR. TILL:  You got one half of all the

15   individual retirement accounts.  You got one

16   half of all the 401K.

17        MS. DOWNS:  Okay.

18        MR. TILL:  And one half of the cash render

19   value of the insurance policies.

20        MS. DOWNS:  I don't recall getting anything

21   on the 401K, and that could be a mix-up between

22   Tim and I.  But I did have an IRA account that I

23   liquidated.

24        MR. RAFATJOO:  Okay.  When did you liquidate

25   it?

EXHIBIT 4  PAGE 379

2          MS. DOWNS:  When did I liquidate it?  I

3    think like 2008.

4          MR. KESSEL:  Before the divorce?

5          MS. DOWNS:  Oh, no, I'm sorry.  Officially,

6    it would have been after the divorce, 2009.

7          MR. RAFATJOO:  Okay.  And you don't know

8    what's happened to the other accounts that you

9    got?

10          MS. DOWNS:  No, I don't.

11          MR. KESSEL: Did you have any whole life

12    insurance policies?

13          MS. DOWNS:  We did, and those were—those I

14    believe were—we didn't continue them.  They were

15    discontinued.

16          MR. KESSEL:  Right, there was a cash render

17    value, and you split it, 50/50.

18          MS. DOWNS:  Yeah.

19          MR. KESSEL:  [unintelligible], okay.

20          MR. HAUSER:  While we're on this topic, at

21    document 31—flip over to page 10 of 13.

22          MS. DOWNS:  Okay.

23          MR. HAUSER:  And if you see there, there's

24    part 7, question 53, which is sort of a catch-

25    all.

EXHIBIT 4  PAGE  380

2      MR. RAFATJOO:  Yeah, good catch.

3      MR. HAUSER:  Okay.  And there it says, "Do

4  you have any other property that hasn't already

5  been listed?"  And do you see there, part 7,

6  question 53?  Right.  And so it says there—

7      MS. DOWNS:  Oh, yes, yes.

8      MR. HAUSER:  It says, "Potential interest

9  from retirement accounts held by former husband

10  Tim Downs."  What would those potential interest

11  be?

12      MS. DOWNS:  That would be the 401K that I

13  mentioned, that I do not have any of the

14  information on.  But I do know that one exists,

15  and I was never given any of the information on

16  it or the account.

17      MR. TILL:  Correct me if I'm wrong.  My

18  understanding, Michael, is that it is possible

19  that Mr. Downs didn't hand over everything that

20  he was supposed to in 2009, in terms of assets.

21      MS. DOWNS:  Mm-hmm.

22      MR. TILL:  And she just never followed up

23  with it, for a variety of reasons, lifestyle

24  was, that she was—had enough on her plate.  And

25  I think he allegedly may have taken some jewelry

EXHIBIT 4  PAGE 381

2    or something at some point, or china, or

3    something like that.

4        MS. DOWNS:  It was a book.  And he would

5    oftentimes take things.  It was silver that was—

6    solid silver that was given to me by my

7    godfather at every birthday and Christmas while

8    I was growing up, and a book called, "Lonesome

9    Dove," that was a hard copy of Larry McMurtry's

10   that was signed by Larry McMurtry.

11       MR. TILL:  Well we reflect that in

12   [unintelligible].

13       MR. HAUSER:  Well where is this Mr. Downs,

14   that he stays?  Does he live in Orange—

15       MS. DOWNS:  He's in Cota de Casa.

16       MR. TILL:  He reached out to me the other

17   day.  I didn't have a chance to reach back to

18   him, actually yesterday.

19       MR. RAFATJOO:  What does he do?

20       MS. DOWNS:  What is that?

21       MR. RAFATJOO:  What does Tim do?

22       MS. DOWNS:  What does he do?

23       MR. RAFATJOO:  Yeah, what's his job?

24       MS. DOWNS:  I do not know exactly what his

25   job is, at this point in time.

EXHIBIT 4  PAGE  382

2       MR. RAFATJOO:  Well our understanding is Mr.

3  Kessel has been talking to him, so—

4       MS. DOWNS:  He might know.

5       MR. RAFATJOO:  He might be the one—

6       MR. KESSEL:  Your understanding—I don't know

7  where you're getting your understanding from.  I

8  haven't spoken with him.

9       MR. KESSEL:  Okay.  All right.

10      MR. KESSEL:  But I'll be happy to be on your

11  conference call with him.

12      MR. HAUSER:  Okay.  Let's go back to

13  Document 31, page 7 of 13.  It's on Document 31.

14  So you can flip back to 7 of 13.

15      MS. DOWNS:  Sorry.

16      MR. RAFATJOO:  So with respect to number 21,

17  are you guys following up, regarding these

18  retirement accounts, with Tim?

19      MR. TILL:  We've been preoccupied with other

20  things, but one of the things I'm going to speak

21  to Mr. Downs about is either he's going to

22  voluntarily give us the information we need, so

23  that we can fill in these holes, or we're going

24  to be filing a 2004 to get the information.

25      MR. RAFATJOO:  Okay.

EXHIBIT 4  PAGE 383

2          MR. TILL:  That's all I can do.

3          MR. HAUSER:  Okay.  So any other questions

4     on that page, because I'd like to move—

5          MR. TILL:  No.

6          MR. HAUSER:  Okay.  So page 7 of 13,

7     question 24, 25, 26, and 27, if all—you've

8     listed no, as to all those.  Is that correct,

9     ma'am?

10          MS. DOWNS:  Through 29, you're saying?

11          MR. HAUSER:  24, 25, 26, and 27.

12          MS. DOWNS:  Yes, that's correct.

13          MR. HAUSER:  Okay.

14          MS. DOWNS:  I answered no.

15          MR. HAUSER:  Right.

16          MR. RAFATJOO:  So there is no retirement

17     accounts at any of these companies that you

18     have.

19          MS. DOWNS:  At any of my current companies?

20          MR. RAFATJOO:  Yes, companies, any of them.

21     You don't have a retirement account with any of

22     them?

23          MS. DOWNS:  We just discuss that, but not

24     that I'm aware of, no.

25          MR. KESSEL:  Do you receive any statements

EXHIBIT 4  PAGE 384

2    on a monthly, or quarterly, or semiannual, or

3    annual basis—

4        MS. DOWNS:  [Interposing] No.

5        MR. KESSEL:  —from any retirement accounts?

6        MS. DOWNS:  No.

7        MR. KESSEL:  Okay.

8        MR. HAUSER:  Okay.  Moving on to question

9    28, with respect to tax refunds owed to you, we

10   discussed previously, either off the record or

11   on the record, that you don't believe, based

12   upon the tax return you showed me from Coastal,

13   that you have any tax liability for 2015.  Is

14   that correct?

15       MS. DOWNS:  That would be—as far as I know,

16   that's correct, yes.

17       MR. HAUSER:  Okay.  And that to the extent—

18   so there's not going to be tax liability.  Now

19   do you think that you would have a refund from

20   2015, if you carried back the loss to years in

21   which you had income?

22       MR. TILL:  It's possible.

23       MS. DOWNS:  That would be great.

24       MR. TILL:  We would need to retain a CPA to—

25       MR. HAUSER:  Okay.  So just to be clear, and

EXHIBIT 4  PAGE 385

2    the law and the Ninth Circuit is clear, any tax

3    refunds in any calendar year that preceded the

4    day of the filing.  So, for example, this case

5    was filed in June of 2016.  Any tax refunds for

6    2015 or 2014 are property of the state, which

7    means it has to be deposited into the debtor

8    possession account.

9         MS. DOWNS:  Sure.

10        MR. HAUSER:  So when you do prepare your tax

11   returns, A, it would be nice to let us know that

12   that's going to happen.

13        MR. TILL:  Absolutely.

14        MR. HAUSER:  And then B, it sounds like to

15   the extent—again, I don't know whether you

16   actually deposited any funds with federal or

17   state tax authorities.  I don't know if you'd be

18   entitled to refund, but you might, if you carry

19   back the losses.

20        MR. TILL:  Right.

21        MR. HAUSER:  Okay.  So—

22        MS. DOWNS:  Sure.

23        MR. HAUSER:  I'm sorry.  You had a question

24   or—

25        MS. DOWNS:  No.

EXHIBIT 4  PAGE 386

2        MR. HAUSER:  Oh.

3        MS. DOWNS:  I was just waiting.

4        MR. TILL:  You're not beneficiary of any

5    trusts or anything?

6        MS. DOWNS:  No, not that I know of.

7        MR. HAUSER:  Okay.  Question 29, it asks

8    what—you don't receive any family or support at

9    this time?

10        MS. DOWNS:  No.

11        MR. HAUSER:  Okay.  Okay.  Question 30 lists

12    a receivable from Crowd Con.

13        MS. DOWNS:  Sure.

14        MR. HAUSER:  Is that collectible?

15        MS. DOWNS:  Yes, absolutely.

16        MR. HAUSER:  Okay.

17        MR. RAFATJOO:  What is that receivable for?

18        MS. DOWNS:  It's the last client.  It's the

19    last invoice from my client that I worked on, a

20    big Comp—trade show for Coastal Communications.

21        MR. RAFATJOO:  So this is a you receivable

22    or a Coastal Communications receivable?

23        MS. DOWNS:  It's receivable to me, this

24    amount.

25        MR. HAUSER:  Question 32, has anyone passed

EXHIBIT 4  PAGE 387

2    away since the filing of this case, that would

3    entitle you to any inheritance?

4         MS. DOWNS:  No.

5         MR. HAUSER:  We have that, believe it or

6    not, happen more than you would think, so—

7         MS. DOWNS:  Really?

8         MR. HAUSER:  Oh, yeah.  And then there's a

9    specific provision in the Bankruptcy Code that

10   says, "If, in a six-month period from the date

11   you file, that happens, instead of being your

12   money, it's actually the property of your

13   bankruptcy estate.

14        MS. DOWNS:  Well sure.

15        MR. HAUSER:  So it's kind of a—timing is

16   everything in life.  Okay.  Go ahead.  Okay.

17   We're now at page 8 of 13.  So are you there,

18   ma'am?

19        MS. DOWNS:  Yes, I am.

20        MR. HAUSER:  Question 33.

21        MS. DOWNS:  Mm-hmm.

22        MR. HAUSER:  It lists a malicious

23   prosecution settlement, versus Tim Downs.  Was

24   that an in-court settlement or out of court?

25        MS. DOWNS:  Out of court settlement.

EXHIBIT 4  PAGE  388

2        MR. HAUSER:  Okay.  Was it reduced to

3    writing?

4        MS. DOWNS:  I can get that.  There is a

5    settlement in writing.

6        MR. HAUSER:  Okay.  Have you undertaken any

7    efforts to collect on that $50,000 settlement?

8        MS. DOWNS:  Absolutely.

9        MR. HAUSER:  Okay.  And is there a

10   collection firm that's handling that?

11       MS. DOWNS:  No.  I didn't know.  I hoped

12   that I could do some—I could employ something

13   like that.  But he has his own ideas on what he

14   owes, despite the fact that it was—that we both

15   agreed to that amount.

16       MR. HAUSER:  Well maybe I'm—I want to

17   understand something.  Was there a formal

18   lawsuit that was filed against him?

19       MS. DOWNS:  Yes.

20       MR. HAUSER:  Okay, in state court.  And when

21   you settled the matter, was that an order—and

22   Tim, do you know the answer to this?  Was there

23   an order entered by the Superior—I assume the

24   Superior Court of Orange County?

25       MR. TILL:  I don't know the answer to that.

EXHIBIT 4  PAGE  389

2      MR. HAUSER:  Okay.

3      MS. DOWNS:  What happened—

4      MR. KESSEL:  Let's just get that document

5  and see what it is.

6      MS. DOWNS:  Yeah, it's a—we agreed to

7  mediate it.  And the mediator awarded me—I think

8  it was—I don't know the exact amount but it was

9  well over that amount.  And then there was a

10  payment plan.  And Tim has not completed the

11  payment plan.

12      MR. HAUSER:  Okay.  With respect to question

13  number 34—

14      MS. DOWNS:  That would be a rider again,

15  right?

16      MR. HAUSER:  Yeah, so that's—

17      MS. DOWNS:  I don't know.  What do I look

18  at?

19      MR. HAUSER:  Look at page 13 of 13.

20      MS. DOWNS:  13 of 13?

21      MR. HAUSER:  Yeah, so keep your finger on

22  one spot, and then just flip over to 13 of 13.

23      MS. DOWNS:  Oh, okay.

24      MR. HAUSER:  Okay.  Okay, so based on the

25  questions, whether you have any claims.  And the

EXHIBIT 4  PAGE 390

2    rider says that—first it lists a whole set of

3    counterclaims, in connection with the litigation

4    with Reynolds and those folks.  And I don't

5    think we need to go into that, whatsoever.  But

6    below that, it shows that you had made multiple

7    loans to Coastal, in the sum of $250,000.  Is

8    that correct?

9       MS. DOWNS:  It's actually quite a bit higher

10   than that, but this was what was—a promissory

11   note, a formal promissory note, $250.

12      MR. HAUSER:  And when was that note dated?

13      MS. DOWNS:  I want to say January 2011.

14      MR. HAUSER:  Okay.  And—

15      MS. DOWNS:  I'll have to double check on

16   that [unintelligible].

17      MR. HAUSER:  And we'll see it when we get

18   the 2015 report.  But does Coastal have the

19   ability to repay that $250,000 to the bankruptcy

20   estate, because that's now.

21      MS. DOWNS:  Yes, I understand that now it's

22   there.

23      MR. HAUSER:  That note is now property of

24   the bankruptcy estate.

25      MS. DOWNS:  Right.  And I would hope so

EXHIBIT 4  PAGE  391

2    [unintelligible].

3        MR. TILL:  Well my understanding is based on

4    the jobs that she has coming in, there will be a

5    source of able to repay.

6        MR. HAUSER:  Did that promissory note have a

7    timetable, like a term, saying it has to be

8    repaid within—

9        MR. TILL:  I don't recall, Michael.

10       MR. HAUSER:  Okay.

11       MR. RAFATJOO:  But didn't we earlier cover

12   that the income that you've been receiving from

13   Coastal has been coming in as repayment of loans

14   so that [unintelligible] can get it as income?

15   So doesn't that cover this, or what are my terms

16   of connecting the dots here?

17       MR. TILL:  Well I think that she's been

18   putting money in, over and above a formal

19   $250,000 promissory note.  I think from time to

20   time, as many small business owners will do,

21   they just poke money in, and they don't formally

22   classify it as capital contribution, or they

23   actually issue promissory notes.

24       MR. RAFATJOO:  How many employees do you

25   have in Coastal?

EXHIBIT 4  PAGE 392

2      MS. DOWNS:  Zero right now, except—well one,

3  me.

4      MR. RAFATJOO:  Okay.  And how many did you

5  have before?

6      MR. TILL:  Well you're not an employee.

7      MS. DOWNS:  I was not an employee, so zero.

8  So before that, let's see.  I think we had seven

9  at one point, five—three towards the end of

10  2015.

11      MR. HAUSER:  Okay.  Moving on to page 9 of

12  13, on Document 31.

13      MS. DOWNS:  Okay.

14      MR. HAUSER:  So that's question 40, 41, 42,

15  43, 44.  Is the information listed there

16  correct?

17      MS. DOWNS:  41 through 43?

18      MR. HAUSER:  40 through 44.  40 talks about

19  machinery at FF&E.  41 is inventory.

20      MS. DOWNS:  Yes, that's correct.

21      MR. HAUSER:  Okay.

22      MR. RAFATJOO:  So you—there's no desks or

23  anything from your prior employees, when you had

24  five, seven, no computers, nothing like that

25  sitting in storage anywhere?

EXHIBIT 4  PAGE  393

2      MS. DOWNS:  No, everyone uses their own.  We

3  have a printer, but that's about it.  And we

4  used executive—an executive suite.

5      MR. HAUSER:  Okay.  Now flipping over to

6  page 10 of 13, just the next page, ma'am, a

7  question, starting with question 48.  Do you see

8  that?

9      MS. DOWNS:  Wait a minute.  Where were we?

10     MR. HAUSER:  We're at document 31.  And now

11  we're flipping it over to page 10 of—

12     MS. DOWNS:  10, okay.

13     MR. HAUSER:—of 13.  And I just need you to

14  verify the information from questions 48 through

15  51.  Is all that information accurate?  You

16  listed no, as to all those questions.

17     MS. DOWNS:  To the best of my knowledge,

18  yes.

19     MR. HAUSER:  Okay.  And then the next

20  question we talked about is question 53, about

21  potential interests in retirement accounts.  And

22  you've indicated you're going to either

23  informally or formally request that information

24  from Mr. Downs.

25     MR. TILL:  Absolutely.

EXHIBIT 4  PAGE  394

2      MS. DOWNS:  Correct.  Oh, wait.  It goes

3   like that?

4      MR. TILL:  That's how it—

5      MS. DOWNS:  Oh I see, yeah.

6      MR. HAUSER:  What I'd like to do now is just

7   why don't you hold that in place now?  And we're

8   going to go through the divorce judgment.

9      MS. DOWNS:  Okay.

10      MR. HAUSER:  And we're just going to play

11   matchy, matchy, and figure out what you had in

12   2009.

13      MS. DOWNS:  Sure.

14      MR. HAUSER:  So you may want to—well—

15      MS. DOWNS:  I have it right here.

16      MR. HAUSER:  Jim, why don't you help her out

17   with—

18      MR. TILL:  Okay.

19      MR. HAUSER:  —you'll have the schedules.

20      MR. TILL:  Yes, you got it.

21      MR. HAUSER:  And then we'll go through it.

22   So we're now looking at the March 24th, 2009

23   divorce judgment, page 8.  And we've gone over a

24   lot of this, so we should be able to go through

25   pretty quickly.  The first item listed is the

EXHIBIT 4  PAGE 395

2    Cota residence.  You've asked for documentation

3    to deal with that.  Just out of curiosity, what

4    happened to the golf cart?

5        MS. DOWNS: I sold the golf cart for—

6        MR. HAUSER:  Okay.

7        MS. DOWNS:  I think it's in here somewhere.

8    Was it $1,500, in—

9        MR. HAUSER:  That's fine.  I don't really

10    want to spend a lot of time on it.  I don't mean

11    to be short.

12        MS. DOWNS:  Okay.  No, that's okay.  It's

13    fine with me.

14        MR. TILL:  October 2015, for $1,500.

15        MR. HAUSER:  Okay.  We've gone over the four

16    horses on item four.  We've gone over the item

17    five, the half address.  Item six, the Wells

18    Fargo account, was that closed?  We know it was

19    closed more than one year before because it's

20    not on the one-year lookback.

21        MS. DOWNS:  Right.

22        MR. HAUSER:  Correct?

23        MS. DOWNS:  Correct.

24        MR. HAUSER:  Same thing with the 7773?

25        MS. DOWNS:  Correct.

EXHIBIT 4  PAGE  396

2    MR. HAUSER:  Okay.  Let's skip over to nine.

3  I'm not sure eight really is relevant.  You

4  received the entire community interest, which

5  was 15% interest, in what was referred to as the

6  Mammoth Partnership.

7    MS. DOWNS:  Correct.

8    MR. HAUSER:  Okay.  And this was a home in

9  Mammoth Lakes?

10    MS. DOWNS:  Yes, it is.

11    MR. HAUSER:  Okay.  And who owned the other

12  85% at the time of the divorce?

13    MS. DOWNS:  At the time of the divorce,

14  let's see—a couple of my brothers, Eric

15  Steinman, John Steinman, Hines Steinman, and a

16  gentleman by the name of Barry Greames

17  [phonetic], his father George Greames, and Tim

18  Downs, and myself.

19    MR. HAUSER:  Okay.  When did you transfer or

20  sell your 15% interest?

21    MS. DOWNS:  In 2011, I sold my interest to

22  my brother.

23    MR. HAUSER:  Which brother?

24    MS. DOWNS:  John Steinman.  Do you have

25  that?

EXHIBIT 4  PAGE 397

2      MR. TILL:  I do.

3      MR. HAUSER:  Okay.  And how much did you

4   sell the interest for?

5      MS. DOWNS:  Let's see here, $240,000.

6      MR. HAUSER:  Okay.  So do you know when this

7   property was originally purchased, the Mammoth

8   Lakes house?

9      MS. DOWNS:  That's a tough one.  I—

10     MR. HAUSER:  Okay.  If you don't know, you

11  don't know.  We have a continued 341.

12     MS. DOWNS:  Okay.

13     MR. HAUSER:  Okay.  Was there an actual—I

14  know it's a family transaction, but was there an

15  actual documentation, showing—other than—let's

16  step back for a second.  You owned a 50%

17  interest in Mammoth Partnership.  Was that a

18  general partnership or a limited partnership?

19  Jim, do you know the answer to that?

20     MR. TILL:  I think it was more loose than

21  that.

22     MR. HAUSER:  So it wasn't even a formal—

23  okay.

24     MS. DOWNS:  Mm-mm.

25     MR. HAUSER:  But it was the partnership

EXHIBIT 4  PAGE 398

2  which in turn had—do you recall looking at a

3  deed to the property?  Did it have your name

4  personally on it?

5      MS. DOWNS:  No.

6      MR. HAUSER:  So if you were to go through

7  the deed, would it say "Mammoth Partnership" on

8  it?

9      MR. TILL:  No.

10      MS. DOWNS:  No.

11      MR. HAUSER:  So Jim, how did that work?

12      MR. TILL:  It's in a gentleman's name that

13  has escaped me at the moment, because we

14  actually looked at this yesterday because I knew

15  this was going to come up.

16      MS. DOWNS:  Barry Greames.

17      MR. TILL:  Barry Greames.  And I thought I

18  had the wrong address.  And I'm not sure how

19  they all hold it.  But basically, I think it was

20  held in one or—I don't think it was ever held in

21  a Mammoth—I haven't looked at the chain of

22  title.  I just looked at one that was present.

23  I have a friend who is a developer, who just

24  pulled title quickly, but not a whole

25  [unintelligible] of the history of the home.  So

EXHIBIT 4  PAGE  399

2  I think it was loosely held in one person's name

3  or maybe a couple of people [unintelligible].

4      MR. HAUSER:  So you don't even see a

5  Steinmann on there?

6      MR. TILL:  I didn't.

7      MR. HAUSER:  Okay.

8      MR. TILL:  I didn't.

9      MR. HAUSER:  Well I'll leave that to these

10  two gentlemen.

11      MR. TILL:  It's not how I would recommend

12  you do it, as a lawyer, because if there was a

13  dispute—

14      MS. DOWNS:  Yes.

15      MR. TILL:  But, Hamid is smiling

16  [unintelligible].

17      MR. HAUSER:  But your best recollection is

18  that in 2011, your interest went to John

19  Steinman, correct?

20      MS. DOWNS:  Correct.

21      MR. TILL:  And we actually have the backup

22  for all of that.

23      MR. HAUSER:  I'm not asking for the backup,

24  but if they want, you'll deal with them.  Okay.

25  Item number 10 says, "One half of all

EXHIBIT 4  PAGE 400

2    furnishings, furniture, appliances and

3    accessories that were kept in the family

4    residence at 40 Cambridge Court, Cota de Casa."

5    What happened to all of those items?

6         MS. DOWNS:  My half, you mean?

7         MR. HAUSER:  As described here.

8         MS. DOWNS:  Yes.  Most of it is in storage

9    that—in my boyfriend's storage unit, which is

10   here in Orange County.

11        MR. HAUSER:  Right.  So let's get the—so I

12   saw on the statement of financial affairs today—

13        MR. TILL:  Right here.  [unintelligible].

14        MS. DOWNS:  Oh yeah, there we go.  Okay.

15        MR. TILL:  Page 10 of 13, Document 43.

16        MR. HAUSER:  With the boyfriend?

17        MR. TILL:  Yeah.

18        MR. HAUSER:  Okay.

19        MR. TILL:  Question 22.

20        MR. HAUSER:  Okay.  So—

21        MR. TILL:  Irvine West Storage.

22        MR. HAUSER:  So Brian Chase is your—what's

23   his relation to you?

24        MS. DOWNS:  He's my boyfriend.

25        MR. HAUSER:  Okay.  So let's match these

EXHIBIT 4  PAGE 401

2    things up.  So the question was at page 8 of the

3    divorce document, item A-10 listed half of the

4    all the furnishings, furniture, appliances and

5    accessories that where in the Cota de Casa

6    residence.

7          MS. DOWNS:  Right.

8          MR. HAUSER:  And so your testimony is that

9    that is now being stored at Irvine West Storage,

10   which is—actually was—that storage facility or

11   that unit in that storage facility is being

12   rented by Brian Chase, who is your boyfriend.

13   And that information is contained at Document

14   43, item 10 of 13, correct?

15         MS. DOWNS:  Yes.  And just so we understand,

16   that not—I didn't say all of the property was in

17   the storage unit, but a good—most of the amount

18   is.

19         MR. HAUSER:  Okay.  And just to get an idea

20   so you can paint the picture in my head—

21         MS. DOWNS:  [Interposing] Sure.

22         MR. HAUSER:  The 40 Cambridge Court

23   residence, how many square feet was that?

24         MS. DOWNS:  I don't know the exact number,

25   off the top of my head, but I would say in the

EXHIBIT 4  PAGE  402

2  neighborhood of 7,000, maybe 8,000 square feet—

3      MR. HAUSER:  [Interposing] Okay.

4      MS. DOWNS:  —of living space.

5      MR. HAUSER:  So what did it cost to furnish

6  a house of that size?

7      MS. DOWNS:  Quite a bit, because we had a

8  decorator do it.

9      MR. HAUSER:  Okay.  And when did you buy the

10  house?

11      MS. DOWNS:  We bought the property in 1995,

12  when I had first started my business, and we

13  just made a low-ball offer at the time, never

14  thinking they were going to take it.  And then

15  we got the loan for the rest of—we put down

16  money.  It was like we got the 2 acres for

17  $100,000.  We were shocked.  But it was 1995,

18  savings and loans situation.  And then we built

19  a home there, and moved in, in 1999, and then

20  expanded the home, after we sold the business.

21      MR. HAUSER:  Okay.  So then the house was

22  furnished in what year, just so I can get an

23  idea, and was it—you've said you didn't build

24  the house itself until a few years later, right?

25      MS. DOWNS:  Yeah, it took a while.

EXHIBIT 4  PAGE 403

2       MR. HAUSER:  Okay.  When do you think the

3   interior decorator came in and furnished the

4   house?

5       MS. DOWNS:  Well, not until after we sold

6   our business.  And that's when the house was

7   what do you call it?

8       MR. TILL:  2003?

9       MS. DOWNS:  Redone or—

10       MR. HAUSER:  Remodeled?

11       MS. DOWNS:  Remodeled.  Actually, like we

12   had an architect, and we added rooms.  And then

13   it was officially redecorated.

14       MR. HAUSER:  So that would have been what

15   year?

16       MS. DOWNS:  That would have been probably

17   about 2005.

18       MR. HAUSER:  Okay.  So what do you paid the

19   interior decorator to furnish the house?

20       MS. DOWNS:  I would have to go back to my

21   records, to find that.

22       MR. HAUSER:  Sure.  I'm not asking for an

23   exact amount, but—

24       MS. DOWNS:  Are you asking me what I paid

25   her or what I paid for the furniture?

EXHIBIT 4  PAGE 404

2      MR. HAUSER:  Well the furniture, but I

3  thought usually they—whatever fee they get, it's

4  because they've got some kind of—they go to the

5  showrooms and they get a—

6      MS. DOWNS:  Yeah.  Sounds like that's—

7      MR. HAUSER:  But in any event, well what did

8  you pay her?  Do you remember?  Was it more than

9  $50,000?  Was it more than $100,000?  Was it—

10      MS. DOWNS:  I don't think so.  I think it's

11  like you said—it's been over 10 years.  I don't

12  know, but I think it's like they get a

13  percentage of—

14      MR. HAUSER:  Right, so—

15      MS. DOWNS:  They get the furniture at a

16  better cost than you will be able to.

17      MR. HAUSER:  Right, and that's their take.

18      MS. DOWNS:  And they get a percentage, yeah.

19      MR. RAFATJOO:  Allegedly.

20      MS. DOWNS:  Allegedly, yeah.

21      MR. RAFATJOO:  Who was your decorator?

22      MS. DOWNS:  Her name was Barbara—I want to

23  say Barbara Davis.  It could be Barbara Brown.

24      MR. HAUSER:  So do you think the amount—

25      MS. DOWNS:  I don't know.  Her name was

EXHIBIT 4  PAGE 405

2    Barbara.

3       MR. HAUSER:  On order of magnitude, do you

4    think the cost for the furniture that you—

5       MS. DOWNS:  Design by Barbara.  That was it.

6       MR. RAFATJOO:  Designed by Barbara?

7       MS. DOWNS:  Yeah, I remember that logo.

8    Sorry.

9       MR. HAUSER:  No, no.  That's fine.  Do you

10   think that you paid more than $100,000 or less

11   than $100,000?

12      MS. DOWNS:  More.

13      MR. HAUSER:  More than $200,000 or less than

14   $200,000?

15      MS. DOWNS:  More.

16      MR. HAUSER:  More than $300,000 or less than

17   $300,000?

18      MS. DOWNS:  I don't know.

19      MR. HAUSER:  And that's fine.  We got to a

20   point where you're not sure, and that's—we've

21   got a range.  Okay.  Are there any other

22   questions about—so of that $200,000 to $300,000

23   range of furniture, of which you got half of—

24   again, I'm just roughing the numbers here, how

25   much of that do you think is in this storage

EXHIBIT 4  PAGE  406

2   facility, in Irvine West Storage?

3      MS. DOWNS:  We lost a lot—some of our

4   electronic equipment and furniture when I lived

5   in Laguna because of the water and mold, where

6   it was being stored.  I would say—you want a

7   percentage?  Is that what you're asking for?

8      MR. HAUSER:  Yeah, let's just say—first of

9   all, we all agree, you got half of the

10  furnishings, correct?

11     MS. DOWNS:  Right.

12     MR. HAUSER:  So now we're dealing with half

13  of a pie.  Of that pie, half the pie, how much

14  of that do you think is left in the storage

15  facility?

16     MS. DOWNS:  Probably 70% to 75%.

17     MR. HAUSER:  Okay, so almost half a pie.

18  Okay.  So if someone were to want to inspect it—

19  it's not going to be me.  But if you guys were

20  to arrange an inspection, they could look and

21  see—

22     MS. DOWNS:  Absolutely, yeah.

23     MR. HAUSER:  Okay.  Any other questions

24  about the furnishings or item specifically A-10

25  on the divorce judgment?

EXHIBIT 4  PAGE 407

2      MR. RAFATJOO:  Well some of the papers

3  reflected a value of $400,000 for the furniture.

4      MR. HAUSER:  In the divorce judgment that

5  I'm holding?

6      MR. RAFATJOO:  Yeah.

7      MR. HAUSER:  Okay.  I might have missed

8  that.  Where would that be?

9      MR. RAFATJOO:  It's some of the divorce

10  papers.

11      MR. HAUSER:  What page?

12      MR. RAFATJOO:  And the homeowner's policy

13  had a value of $1.5 million for these assets.

14  So—

15      MS. DOWNS:  For just the furniture, or

16  everything in the home?

17      MR. RAFATJOO:  Everything in the home was

18  for the homeowner's policy.  But the furniture

19  was listed at $400,000.

20      MS. DOWNS:  Oh, I see.  Okay.

21      MR. TILL:  So in terms of valuation, when

22  you do the half, you're at $200,000.

23      MR. KESSEL:  $200.

24      MR. TILL:  And then you age it.

25      MR. KESSEL:  And then you age it, and then

EXHIBIT 4  PAGE  408

2    you take liquidation value, versus replacement

3    value.

4         MR. TILL:  And you get to 1,500 bucks.

5         MS. DOWNS:  I had two large dogs.

6         MR. TILL:  You know what?  Whatever you guys

7    think.  If you think it's worth $150,000, we'd

8    be more than happy to credit your claim against

9    it.

10        MS. DOWNS:  [unintelligible] we can, we can

11   give it away, if you want.

12        MR. KESSEL:  I'm not interested in buying

13   furniture.

14        MR. RAFATJOO:  Maybe Alan can take it in

15   fees.

16        MR. HAUSER:  Well this is as far as I can

17   take it.  You guys obviously can figure out how

18   to reconcile.

19        MR. TILL:  [unintelligible] fight over

20   furniture.

21        MR. HAUSER:  Okay.  Moving on to the—

22        MR. TILL:  Unlimited supply of money.

23        MR. HAUSER:  —next question, page 8A-11

24   states that you were the petitioner—that's you,

25   Ms. Downs—you were awarded all women's jewelry,

EXHIBIT 4  PAGE 409

2    sporting goods, or personal property under the

3    possession and control of the petitioner.

4        MS. DOWNS:  Mm-hmm.

5        MR. HAUSER:  At that time, what do you

6    estimate that the value of particularly the

7    jewelry was worth?

8        MS. DOWNS:  I actually saw the jewelry, and

9    I didn't get as much as I had before.

10       MR. HAUSER:  Before this divorce or after?

11       MS. DOWNS:  After the divorce.

12       MR. HAUSER:  Okay.  So what do you think—at

13   the time of the divorce, though.

14       MS. DOWNS:  At the time of the divorce?

15   Well, I sold it shortly afterwards, so I would

16   say it was $20,000.

17       MR. HAUSER:  Okay.

18       MS. DOWNS:  That's what I recall.  And I'm

19   not completely positive.  I have to look, but

20   that's what I recall I got for it.

21       MR. HAUSER:  Were there—

22       MR. KESSEL:  Was the wedding ring included?

23       MS. DOWNS:  Mm-hmm.

24       MR. HAUSER:  Well I was going to ask you

25   sort of was it like just a few items, or was it

EXHIBIT 4  PAGE 410

2   like lots of items, more than 10 or less than

3   10?

4       MS. DOWNS:  I would say less than—around 10.

5       MR. HAUSER:  Okay.

6       MS. DOWNS:  Earrings, a tennis bracelet, two

7   wedding rings—

8       MR. HAUSER:  Why two wedding rings?

9       MS. DOWNS:  Well, I had one, and then when

10  we sold the company—

11      MR. HAUSER:  Oh, so you got—

12      MR. RAFATJOO:  What was the upgraded rank?

13      MS. DOWNS:  What's that?

14      MR. RAFATJOO:  What was the upgraded rank?

15      MS. DOWNS:  What was it?

16      MR. RAFATJOO:  Yeah.

17      MS. DOWNS:  Like it was a diamond.

18      MR. RAFATJOO:  What size stone?

19      MS. DOWNS:  It was like 3 point something,

20  the carats in the diamond, and then it was

21  platinum.

22      MR. RAFATJOO:  Who did you sell it to?

23      MS. DOWNS:  I don't remember his name, but

24  in L.A.  I sold it to—yeah.

25      MR. RAFATJOO:  Just that.  There's no

EXHIBIT 4  PAGE 411

2    documents?

3        MS. DOWNS:  It's a jewelry store.  I had to

4    show my driver's license, and get thumb printed,

5    and all that.  So it was legitimate.  I don't

6    know exactly what the entity is now.  That was

7    almost 10 years ago.

8        MR. HAUSER:  Are there any other questions

9    on that?  Okay.  Moving on to the next item,

10   it's Item A-12, which is Orange County

11   Equestrian Centers Incorporated, and all its

12   assets.  My understanding, from the IDI was that

13   that entity was dissolved in 2008.  Is that

14   correct?  If you look at—

15       MS. DOWNS:  Oh sorry.

16       MR. HAUSER:  A-12, Orange County Equestrian.

17       MS. DOWNS:  I'm getting hypnotized here.

18   Yeah, Orange County Equestrian.

19       MR. HAUSER:  Centers Incorporated.

20       MS. DOWNS:  Dissolved in, yeah, 2008.  I

21   don't know why it still would appear on here,

22   actually, but yeah.

23       MR. HAUSER:  Well we just have to ask, so

24   any questions on that?

25       MS. DOWNS:  Okay.

EXHIBIT 4  PAGE  412

2          MR. HAUSER:  Okay.  Next entity is

3    Equestrian Center of America Clubs Incorporated.

4    My understanding is that entity transmuted into

5    Ortega Downs.  Is that correct?

6          MS. DOWNS:  Correct.

7          MR. HAUSER:  Okay.  So you're going to then—

8    and then your testimony previously was that that

9    ceased doing business in 2012 but you're going

10   to do a 2015 report under penalty of perjury

11   that says that, and says the valuation is zero,

12   correct?

13         MR. TILL:  Yes.  Which entity are we talking

14   about, again?  Just want to make sure.

15         MS. DOWNS:  Ortega Downs.

16         MR. TILL:  Ortega Downs, yes.

17         MR. HAUSER:  Well we came to Ortega Downs by

18   asking about Equestrian Centers of America

19   Clubs.

20         MR. TILL:  Correct.

21         MR. HAUSER:  And we had known from the IDI

22   that the test—or the representation there was

23   that the entity went from an—from that entity to

24   Ortega Downs LLC.  Is that—

25         MR. TILL:  Correct, correct.

EXHIBIT 4  PAGE  413

2      MR. HAUSER:  I want to make sure I'm getting

3   this correct.

4      MS. DOWNS:  Yes, it went from—it was ECA—it

5   was Equestrian Clubs of America.  That became

6   ECA Clubs.  It was sort of an AKA.  And then

7   that become Ortega Downs LLC.

8      MR. HAUSER:  And then we've already talked

9   about Ortega Downs and how we're going to deal

10  with that.

11     MS. DOWNS:  Yes.

12     MR. TILL:  Any questions on that?

13     MR. RAFATJOO:  No.

14     MR. HAUSER:  Okay.  Blue Pony, you indicated

15  the IDI.  That's the next item there.

16     MS. DOWNS:  Mm-hmm.

17     MR. HAUSER:  That entity was dissolved in

18  2009.  Is that correct?

19     MS. DOWNS:  Yes, it was mostly John Braggs'

20  boyfriend at the time.  I was a member of the

21  LLC.  I'm not quite sure how much interest.  I

22  mean, it never made any money.  It cost money.

23     MR. HAUSER:  Okay.

24     MS. DOWNS:  It was around for maybe half a

25  year.

EXHIBIT 4  PAGE 414

2          MR. HAUSER:  Now we're going to get to Down

3     Holdings, okay.  So you got half of Down

4     Holdings.  And this is where my artwork comes

5     into play.  And we're just going to try to go

6     through this really simply.  So ma'am, I'm

7     showing you sort of a chart here.  So Down

8     Holdings Inc., you received half of, right?

9          MS. DOWNS:  Correct.

10         MR. HAUSER:  Okay.  And Down Holdings had

11    100% interest in five separate entities,

12    correct?  Well the reason I say that is if you

13    read your divorce judgment, it says that

14    including the five limited liability companies

15    that operate apartment buildings.  So the way

16    it's described here is that this had a hundred

17    percent interest in five LLCs.  These are LLCs,

18    okay?

19         MS. DOWNS:  I don't know how this got past

20    my divorce attorney but Downs Holding was

21    originally set up to hold the money we received

22    from the sale of Shore Cliff Communications,

23    which would be the biggest asset in Downs

24    Holding.  So I don't know why that's not in

25    there.  I don't have access to those records

EXHIBIT 4  PAGE 415

2    because Tim Downs has them, my ex-husband.  But

3    that's the reason we set up Downs Holding when

4    we did.

5         MR. HAUSER:  Okay.

6         MS. DOWNS:  And then, out of those proceeds,

7    we invested in the other five.  So there should

8    really be six.

9         MR. HAUSER:  Okay, make it six.  So what

10   happened to Shore Cliff Holdings?  You sold it

11   off, right?

12        MS. DOWNS:  We sold it, yes.

13        MR. HAUSER:  Okay.

14        MS. DOWNS:  But we sold—first we sold 60% of

15   it.  And then after I left the company, the

16   entire company was sold.

17        MR. HAUSER:  And what year was that?

18        MS. DOWNS:  Do you have that paperwork from

19   Bob Stimler [phonetic]?

20        MR. TILL:  I do.  I have all the paperwork.

21   It was—

22        MS. DOWNS:  Sale documents, incorporated

23   documents from 2002 information.  2003, Landmark

24   was sold.

25        MR. HAUSER:  Okay.

EXHIBIT 4  PAGE  416

2       MR. TILL:  In 2006.

3       MS. DOWNS:  I'm sorry.  The 60% was sold to

4   Landmark Communications in 2003.  In 2006, the

5   entire company was sold to Ubian [phonetic].

6       MR. HAUSER:  Okay.  So that blacks that out.

7   And then the money was up-streamed to Down

8   Holdings.  And then in turn, Down Holdings set

9   up five LLCs, correct?

10       MS. DOWNS:  Down Holdings started—

11       MR. HAUSER:  I'm just trying to follow the

12   divorce document.

13       MS. DOWNS:  Okay, sure.  Okay.

14       MR. TILL:  You're right.

15       MS. DOWNS:  Okay.

16       MR. TILL:  With the Shore Cliff spin.

17       MR. HAUSER:  So it says here—right, so

18   including the—I get it.  So originally it was

19   just Down Holdings with Shore Cliffs.  Shore

20   Cliffs was sold.  It brings in the money.  You

21   then in turn set up the five LLCs.  But again,

22   Down Holdings owned 100% interest in the five

23   LLCs.

24       MS. DOWNS:  And we never set up five LLCs.

25   We invested in them.

EXHIBIT 4  PAGE 417

2       MR. TILL:  I believe so, Michael.  I've

3   never seen the Downs Holding documents.  That's

4   what we need to get from Downs.

5       MR. HAUSER:  Jim, she just said something

6   about—

7       MR. TILL:  Okay.

8       MR. HAUSER:  She says we never—

9       MS. DOWNS:  We did not set up these LLCs.

10  We were investors in them, except for Shore

11  Cliff.

12      MR. HAUSER:  So Down Holdings did not own

13  100% of each of these?

14      MR. TILL:  Oh yeah, I'm sorry, you're right.

15  She's right.

16      MS. DOWNS:  Yeah, I know.

17      MR. TILL:  Like 1020, that's owned by 1020.

18      MS. DOWNS:  These are investments.

19      MR. TILL:  They just invested money.  So

20  Shore Cliff sale happens.  It goes upstream to

21  Downs Holdings, right?  And then they make

22  investments in these areas.

23      MR. HAUSER:  Well let's go through the five.

24  Are there any apartment buildings left from—you

25  can [unintelligible] that.

EXHIBIT 4  PAGE  418

2        MS. DOWNS:  Oh.  Go ahead.

3        MR. HAUSER:  Let's try and cut through the

4    Gordian knot here.

5        MS. DOWNS:  Okay.

6        MR. HAUSER:  The gist of A-15 is that this

7    Down Holdings had these five entities, which in

8    turn owned apartment buildings.  And it said

9    something like such apartment buildings,

10   commonly known as Commencement Day, 1020,

11   Taquitz [phonetic], Palm Springs Village, and

12   Village Investments.  Okay.  Is that 1020 the

13   same 1020 apartment building that we talked

14   about before, in Seattle Washington?

15       MS. DOWNS:  Yes, but these are investments.

16   They are not companies that we started.

17       MR. HAUSER:  Okay.

18       MS. DOWNS:  Just to be clear.

19       MR. HAUSER:  Okay.  And what about the

20   investment in Commencement Bay?

21       MS. DOWNS:  Same.

22       MR. HAUSER:  Well I didn't see that on your

23   schedule, so what happened to Commencement Bay?

24       MS. DOWNS:  Oh, I'm sorry.  Commencement

25   Bay, it was a great investment, and they ended

EXHIBIT 4  PAGE 419

2   up selling it in 2014.

3       MR. HAUSER:  Okay.  The IDI, you indicated

4   it was sold prior to 2013.

5       MS. DOWNS:  That's what I originally

6   thought, but we changed that, right?

7       MR. TILL:  Well my note—my most recent note

8   said it ceased operations in 2014, but 2013-

9   2014.

10       MS. DOWNS:  I believe we found an amount,

11   the final amount on the 2014 tax returns

12   yesterday, so—

13       MR. HAUSER:  Okay.  What did you get for the

14   sale of Commencement Bay, whatever interest it

15   was?

16       MS. DOWNS:  I want to say—I'm not going to

17   guess.

18       MR. HAUSER:  Don't guess.

19       MS. DOWNS:  But we have it.

20       MR. HAUSER:  Well—

21       MS. DOWNS:  Do you want me to help you look?

22       MR. TILL:  [unintelligible] in this

23   [unintelligible] if we have it.

24       MS. DOWNS:  2013.  Oh, I guess you're right.

25       MR. HAUSER:  No, I was just going off the

EXHIBIT 4  PAGE 420

 2   notes [unintelligible].

 3       MS. DOWNS:  This is really weird.  This says

 4   that it—this says the K-1 for 2013, so we were

 5   right.

 6       MR. HAUSER:  Okay.

 7       MS. DOWNS:  But this is—

 8       MR. HAUSER:  How much was it?  Well was that

 9   making income before it was sold or was it from

10   the—

11       MS. DOWNS:  No, this is our K-1.  This was

12   the final, I believe.  I believe that's what we

13   were talking about yesterday.

14       MR. TILL:  That's all I have on it.

15       MS. DOWNS:  Yeah, that's the latest we have

16   of anything related to Commencement Bay.

17       MR. RAFATJOO:  How much did you invest in

18   Commencement Bay?

19       MS. DOWNS:  It was like $300,000 and

20   something.

21       MR. RAFATJOO:  And it was sold for $100,000.

22       MS. DOWNS:  No, no, no.  That's what our—

23   that was our final payoff.  The way they do it

24   is they take your—yeah.

25       MR. RAFATJOO:  This one?

EXHIBIT 4  PAGE 421

2      MS. DOWNS:  You would put in—let's say

3   $320,000.  They get investors—everyone who is

4   part of the LLC invests money in.  They buy the

5   building.  They promise you your money back

6   within two years, when they refinance—when they

7   get regular financing.  Then when the financing

8   comes in, it pays you back your investment.

9      MR. RAFATJOO:  Okay.

10      MS. DOWNS:  And at that point, you become an

11   equity owner in the LLC.  So prior to that, you

12   get interest payments.  Then you become an

13   equity owner.  And at that point, you get checks

14   every month as—which were lower than the

15   interest payments.  But then when they sold it,

16   it was after we had already made money off of

17   it, so it was nice.

18      MR. RAFATJOO:  Okay.

19      MS. DOWNS:  One of our better investments.

20      MR. HAUSER:  Okay.  So what was the net in

21   2013 that you received after the sale?

22      MS. DOWNS:  Can you help me with this,

23   please?

24      MR. TILL:  Yes.

25      MS. DOWNS:  I don't know.  He's asking—

EXHIBIT 4  PAGE  422

2      MR. TILL:  Michael, what was the question?

3      MR. HAUSER:  What was the net proceeds to

4  Ms. Downs, from the sale in 2013?

5      MS. DOWNS:  It's Downs Holdings, so—

6      MR. TILL:  Yeah, it's Downs Holdings.

7      MS. DOWNS:  I don't know if it's half of

8  that or—

9      MR. TILL:  This is the K-1 for the entity,

10  as opposed to specifically what she would have

11  received when they sold the asset.

12      MR. HAUSER:  I understand.  Do you have a

13  recollection?  I don't want you to guess, as to—

14      MS. DOWNS:  I would estimate, my

15  recollection, that it was like $100,000

16  something.

17      MR. HAUSER:  Okay.

18      MR. RAFATJOO:  And how much of that building

19  did you own?  What percentage of—

20      MS. DOWNS:  Well Downs Holding, again.

21      MR. HAUSER:  I think it said something like

22  6%, but I could have been wrong.  I thought—it

23  may have been—I think one page had 6%.

24      [Crosstalk]

25      MR. HAUSER:  Well I'm guessing, only because

EXHIBIT 4  PAGE  423

2  the allocation of the profit and loss was 6%,

3  but maybe it's—so that's why I thought—

4       MS. DOWNS:  See, it says, "Capital 6.29."

5       MR. TILL:  Yeah, 6.25%, or 6.29333.

6       MR. HAUSER:  Okay.  Does that sound right?

7       MS. DOWNS:  Sure, yeah.

8       MR. HAUSER:  Okay.  All right.  So that's—

9  any other questions on Commencement Bay?

10       MR. RAFATJOO:  No.

11       MS. DOWNS:  Commencement Terrace Associates

12  is the exact—yeah.

13       MR. HAUSER:  Okay.  I'm just reading from

14  the divorce documents.

15       MS. DOWNS:  Yeah, we must have had that

16  wrong.

17       MR. RAFATJOO:  So we've got to ask for K-1s

18  on all that kind of—

19       MS. DOWNS:  Sure.

20       MR. HAUSER:  Okay.  1020, we've covered,

21  right?

22       MR. RAFATJOO:  Yes.

23       MR. HAUSER:  Okay.  On Taquitz [phonetic] my

24  understanding is that property was foreclosed

25  out.  Is that your recollection?

EXHIBIT 4  PAGE  424

2    MS. DOWNS:  Yeah, I believe both of them

3    were or one—

4    MR. HAUSER:  Yeah, both—your—yes, you

5    previously represented that both Taquitz and

6    Palm Springs Village, those properties were

7    foreclosed out.

8    MS. DOWNS:  Exactly.

9    MR. HAUSER:  Okay.  And then Village

10   Investments, what happened with that?

11   MS. DOWNS:  That's VPM.  We still own our

12   shares in that.

13   MR. HAUSER:  Okay.  So that's VPM.  All

14   right.  Any other questions on that?

15   MR. RAFATJOO:  The lender on those two Palm

16   Springs properties, was that just a traditional

17   bank, or was that a personal lender?

18   MS. DOWNS:  I don't know.  You'd have to ask

19   the LLC.

20   MR. HAUSER:  Okay.  Moving on to the next

21   item, Clear Talk Communication.  You had

22   indicated to our office that that was sold in

23   2012.  Is that correct?

24   MS. DOWNS:  Sold in 2012.  It's listed on my

25   2012 tax return.

EXHIBIT 4  PAGE 425

2        MR. HAUSER:  Right.  So do you recall how

3   much it was sold for?

4        MS. DOWNS:  Okay.  She said it's a in a

5   package [unintelligible].

6        MR. HAUSER:  What did Clear Talk

7   Communications [unintelligible]?

8        MS. DOWNS:  Clear Talk Communication is a

9   wireless communications company.  And part of

10   the—the sale that this is referring to is the

11   sale of its tower infrastructure, the towers,

12   the cell towers.

13        MR. HAUSER:  How many cell towers were

14   there?

15        MS. DOWNS:  In this sale?

16        MR. HAUSER:  Yeah.  These were cell towers

17   that were placed on top of like office

18   buildings?

19        MS. DOWNS:  Well an actual built towers, and

20   ones that are off of buildings, yeah.  You do

21   know anything about the how the cell tower—how

22   that works.

23        MR. HAUSER:  I've heard of cell towers, and

24   I know sometimes people put them on top of

25   buildings.

EXHIBIT 4  PAGE  426

2          MS. DOWNS:  Yeah, so we're talking cell

3    towers, and on top of buildings, both.

4          MR. HAUSER:  So you had a company that had a

5    network of these cell towers?

6          MS. DOWNS:  I didn't.  This was an

7    investment.

8          MR. HAUSER:  Okay.  And how many towers did—

9    was it a certain area that they have, of

10   Southern California or—

11         MS. DOWNS:  No, I think they did have some

12   in Southern California, but I think they were

13   closer to like in San Diego or Imperial Valley,

14   but mostly in the Southeastern United States.

15         MR. HAUSER:  Okay, so mostly in the south.

16   So they would cover an area using these towers.

17   And you were an investor in that entity?

18         MS. DOWNS:  Yes, I was.

19         MR. HAUSER:  And what percent did you own?

20         MS. DOWNS:  Do you have any of that

21   information here?

22         MR. TILL:  No, the information I have,

23   Michael, with respect to this is that it was

24   sold in 2012.  And it was listed in the 2012 tax

25   return, which we gave to the U.S. Trustee's

EXHIBIT 4  PAGE 427

2    Office, and sent them a package, which I now

3    have in my hands, and I'm trying to find?

4        MR. RAFATJOO:  Who were the other investors

5    [unintelligible]?

6        MR. HAUSER:  Well rather than trying to

7    rifle through.

8        MS. DOWNS:  I don't know who exactly.

9        MR. HAUSER:  I'll make a suggestion.

10        MS. DOWNS:  I'm sure they have a lot.

11        MR. HAUSER:  Rather than trying to figure

12    out now, you can look between now and the next

13    341, give the relevant information.  Either

14    you're going—because I don't have the—we don't

15    give out tax returns, so I have not given out

16    the [unintelligible].

17        MR. TILL:  Okay.

18        MR. HAUSER:  And that's our policy.  So if

19    you want to give the tax return to Hamid and

20    Alan, that's—

21        MS. DOWNS:  I'm pretty sure I have more

22    complete information on the Clear Talk

23    Communication investment.

24        MR. TILL:  Here's what I—share's of Clear

25    Talk, sales price $580,000, cost or other base

EXHIBIT 4  PAGE 428

2    is $189,500, gain $390,500.  That was 2012.

3         MR. HAUSER:  Okay.

4         MR. RAFATJOO:  So what happened to that

5    money?

6         MS. DOWNS:  What happened to the—from the

7    sale of that?

8         MR. RAFATJOO: [unintelligible].

9         MS. DOWNS:  A lot of it went into my

10   business, Coastal Communications.  I had a high

11   rent of $7,000 a month on that.

12        MR. KESSEL:  [unintelligible] too,

13   presumably, if it was held in Downs Holdings.

14        MR. RAFATJOO:  Yeah, but I thought these

15   [unintelligible].

16        MR. HAUSER:  Clear Talk does not—it could

17   be.  But if you look at the way Down Holdings is

18   defined, it's limited to A-15.

19        MR. KESSEL:  Okay.

20        MR. HAUSER:  So it could, given what I've

21   seen.  I'm not saying it's not.  But it seems

22   to—Down Holdings has this, and then you move on

23   to the '16.  So again, this is stuff you're

24   going to want a paper trail for.  So rather than

25   drill down further—and we've got the answer.  It

EXHIBIT 4  PAGE 429

2 was sold in 2012.  Seems like the net was 390,

3 or something like that.  You're going to want

4 backup documentation anyway, so that's something

5 that I'd rather just move on, and you can get

6 the verification at a later date.

7  MS. DOWNS:  I think I have a file on that,

8 so I can provide any extra information.

9  MR. HAUSER:  I think we've touched on this

10 before, questions 18—not questions—in the

11 divorce judgement on page 9, 19, 19, and 20

12 dealt with your half interest in your ex-

13 husband's IRA, 401K, and the policies.  And we

14 had that discussion, and it's—we didn't come to

15 a conclusion, other than you thought you had an

16 interest.  He hasn't been very forthcoming, and

17 is that where we left it, pretty much?

18  MS. DOWNS:  Yeah, I thought it was dissolved

19 as of 2012.

20  MR. HAUSER:  Okay.  Do you guys—

21  MS. DOWNS:  It doesn't look that way now.

22  MR. HAUSER:  All right.  Someone is going to

23 have to follow up and take the 2004 of Mr.

24 Downs, and figure out if those are still in

25 existence or not.

EXHIBIT 4  PAGE  430

2        MR. TILL:  I'm hoping he'll cooperate—

3        MR. HAUSER:  Well—

4        MR. TILL:  —and not have to go through the

5   formal process, but I'll find out.

6        MR. HAUSER:  All right.  Everyone knows what

7   Charis Portraits [phonetic].  There was a guy in

8   the '50s who came up with those portraits.

9   Those are sentimental value.

10        MS. DOWNS:  Yeah.

11        MR. HAUSER:  Okay.

12        MS. DOWNS:  A lot of people don't know—

13        MR. KESSEL:  I don't know what they are.

14        MR. HAUSER:  Those are pictures—

15        [Crosstalk]

16        MS. DOWNS:  But I'm glad you do.

17        MR. HAUSER:  Well I'm into photography.  But

18   in any event, they're portraits you would take

19   of your kids.  And it's a certain technique.

20   And I think Charis has long passed, and there's

21   people who essentially adopt or subscribe to

22   that technique.  They're of her children.  It

23   would be—

24        MR. KESSEL:  So you take a photo and then

25   you make it a portrait.

EXHIBIT 4  PAGE 431

2          MS. DOWNS:  You make it look like a

3     painting.

4          MR. KESSEL:  A painting, yeah.

5          MR. HAUSER:  Yeah, it's got sort of the

6     shading and lighting that—it's something you

7     hang up on—

8          MS. DOWNS:  It's when they were little.

9          MR. HAUSER:  So all right.  Let's move on.

10    I don't have any questions—further questions

11    about the divorce judgment.  Does anyone else,

12    at this time?  Okay.  We're going into the home

13    stretch.  I think we can wrap this up in 15

14    minutes.

15         MS. DOWNS:  Okay, good.

16         MR. HAUSER:  So now we're going back to

17    Document 33.

18         MS. DOWNS:  Okay.

19         MR. HAUSER:  You can put that away.

20         MS. DOWNS:  Okay.

21         MR. HAUSER:  And Document 33 is going to be

22    one of these two over here.  It's going to be

23    your schedule.  So let's—yeah, keep turning

24    because what happens is 31 becomes 33.

25         MS. DOWNS:  Oh I see.  Okay.

EXHIBIT 4  PAGE  432

2          MR. HAUSER:  Keep going.

3          MS. DOWNS:  Keep going?

4          MR. HAUSER:  Yeah, go all the way to where

5     it says E-F.

6          MS. DOWNS:  Okay.

7          MR. HAUSER:  [unintelligible] jump over.

8          MR. RAFATJOO:  Can we talk about 32, before

9     you go to 33?

10          MS. DOWNS:  Right here?

11          MR. HAUSER:  Yeah, but—yeah, why don't you

12     hold your hand there, and then go—which one did

13     you want to talk about?

14          MR. RAFATJOO:  32.

15          MR. HAUSER:  Okay.  What's that, the

16     exemptions or—

17          MR. RAFATJOO:  Schedule B, creditors,

18     secured [unintelligible].

19          MR. HAUSER:  Oh, all right.  Hold on a

20     second.  No, no, no.

21          MS. DOWNS:  Oh, sorry.

22          MR. HAUSER:  No, it's not C.

23          MS. DOWNS:  It would be D?

24          MR. HAUSER:  Yeah.

25          MS. DOWNS:  Okay, there we go.

EXHIBIT 4  PAGE  433

2      MR. HAUSER:  There, okay.  So go ahead.

3      MR. RAFATJOO:  So on this list of secured

4  creditors—

5      MS. DOWNS:  [Interposing] Sure.

6      MR. RAFATJOO:  —who is this Michael

7  Fagenbaum [phonetic]?  Do you know him?

8      MS. DOWNS:  I don't.  I've never met him.

9  He's the—apparently the person in charge of

10  Excelsior Properties LLC.

11      MR. RAFATJOO:  Who introduced you to

12  Excelsior?

13      MS. DOWNS:  Actually, the person who owns

14  Norio Inc. [phonetic].

15      MR. RAFATJOO:  And who is that?

16      MS. DOWNS:  His name is Glen Ishihara

17  [phonetic].

18      MR. RAFATJOO:  Okay.  And how do you know

19  Glen?

20      MS. DOWNS:  He was a former—he's been to one

21  of our—one or two of our events in the past.

22      MR. RAFATJOO:  And he said that Excelsior

23  Properties would be willing to lend money on the

24  horses?

25      MS. DOWNS:  Mm-hmm, yeah.

EXHIBIT 4  PAGE 434

2      MR. RAFATJOO:  So he arranged this for you,

3   the loan.

4      MS. DOWNS:  I would say that's accurate,

5   yes.

6      MR. RAFATJOO:  Okay.  Because there's been

7   no UCCs filed that we've been able to find.  So

8   you may want to stop making payments on these

9   [unintelligible].

10      MR. TILL:  Okay.  My understanding is that

11   they had [unintelligible] perfected, but—

12      MR. RAFATJOO:  It may not be showing up in

13   the system yet, given the date, but—

14      MR. HAUSER:  Well let's kind of step back.

15   If the transaction was done in June, it's an

16   avoidable—actually it was equivalent value, so

17   then—

18      MR. RAFATJOO:  Correct.

19      MR. HAUSER:  Okay.  This was a

20   contemporaneous exchange of new money.  And then

21   they took a security interest against the

22   horses.  Okay.  So it wasn't the antecedent

23   then.  Okay.  But you're saying the UCC was

24   never recorded.

25      MR. RAFATJOO:  We haven't been able to find

EXHIBIT 4  PAGE 435

2   an UCC on this.

3         MR. HAUSER:  You have no—

4         MR. RAFATJOO:  Do you have loan documents

5   for us?

6         MS. DOWNS:  With me today?

7         MR. HAUSER:  Not today, but—

8         MS. DOWNS:  Oh.

9         MR. TILL:  I can get copies of them.

10        MS. DOWNS:  Sure, yeah.

11        MR. RAFATJOO:  Yeah, and if you have

12   perfected UCCs, that would be great.

13        MR. TILL:  Yeah, I don't have those in my

14   possession but I'll get them.

15        MR. HAUSER:  Are you making monthly payments

16   to—

17        MS. DOWNS:  I was told to by my attorney

18   last month, for the first time, yes.  I made one

19   payment to each of them.

20        MR. HAUSER:  Okay.

21        MR. RAFATJOO:  The monthly operating report

22   shows a payment.  But I couldn't find a UCC.  So

23   they didn't properly perfect for not making

24   payments.

25        MR. TILL:  Correct.

EXHIBIT 4  PAGE 436

2      MR. HAUSER:  Okay.  Any more questions on

3  that Schedule T?

4      MR. RAFATJOO:  Done with that one.

5      MR. HAUSER:  Okay.  Moving on to the E and

6  F.  That would be page 11, Document 33, so flip

7  over.

8      MS. DOWNS:  To the E-F?

9      MR. HAUSER:  Yeah.

10      MS. DOWNS:  Okay.

11      MR. HAUSER:  So just want to confirm that

12  you have no tax—you have not received a notice

13  from any taxing authorities.  And here you have

14  EDD, Franchise Tax Board, the IRS, or State

15  Board, indicating that you have tax liability.

16      MS. DOWNS:  No, not as—not that I know of.

17      MR. HAUSER:  Then that's all I'm asking for.

18  Okay.  Then if you flip over to page 3 of 12,

19  this is your general—what we call your general

20  and secured debt.

21      MS. DOWNS:  Okay.

22      MR. HAUSER:  Okay.  And so I need to confirm

23  that the information on page 3 of 12 is

24  accurate.  Just take a glance at it.

25      MS. DOWNS:  Yes.

EXHIBIT 4  PAGE 437

2        MR. HAUSER:  Okay.  Flipping over to the

3    next page, 4 of 12, does the information there

4    appear to be accurate?

5        MS. DOWNS:  Wait a minute.  Yes.

6        MR. HAUSER:  So it's 4.4, 4.5.  You have

7    three creditors.

8        MS. DOWNS:  Exactly, yes.

9        MR. RAFATJOO:  Okay.  On 4.5, you may want

10   to fix that because it says, "telephone

11   service," bottom right.

12       MS. DOWNS:  Oh, yeah.

13       MR. RAFATJOO:  And then—

14       MS. DOWNS:  That's not correct.  You're

15   right.

16       MR. RAFATJOO:  And then it says, "When was

17   that incurred?"

18       MS. DOWNS:  Why would she put that down?

19       MR. HAUSER:  It was obviously a mistake.

20       MR. RAFATJOO:  Yeah, it just carried over

21   from the prior page.

22       MR. RAFATJOO:  When was that incurred?  It

23   says May of 2016.  Was that entire $56,000

24   incurred in May?

25       MS. DOWNS:  No, it was not.  It was a

EXHIBIT 4  PAGE  438

2    revolving debt.

3         MR. RAFATJOO:  Same question for—

4         MS. DOWNS:  Does it say anywhere, a

5    revolving debt?

6         MR. RAFATJOO:  Where it says, "Telephone

7    service," it would say, "Revolving debt."

8         MS. DOWNS:  Oh, I see.  Yeah, it's revolving

9    debt.

10        MR. RAFATJOO:  In 4.6, same question.  The

11   date that was incurred.  It says, "June 2016."

12        MR. KESSEL:  My [unintelligible] is that

13   [unintelligible] won't use the last statement.

14        MR. RAFATJOO:  I know.  That I'm not worried

15   about.

16        MS. DOWNS:  Yes.

17        MR. RAFATJOO:  I'm just asking.

18        MS. DOWNS:  It's revolving debt as well.

19   It's a credit card.

20        MR. RAFATJOO:  So when was the last time you

21   used these two cards?

22        MS. DOWNS:  The last time I used them?

23        MR. RAFATJOO:  Yeah.

24        MS. DOWNS:  Prior to bankruptcy.  They're

25   unusable now.

EXHIBIT 4  PAGE 439

2      MR. RAFATJOO:  Right.  We're going to want

3    these credit card statements.

4      MR. TILL:  Okay.

5      MR. HAUSER:  Okay.  So moving on to the next

6    page.

7      MR. RAFATJOO:  Start with going back just

8    [unintelligible].  It might be easier.

9      MR. HAUSER:  Okay.  So page 5 of 12.  You've

10   got another set of three creditors.  Is the

11   information there accurate?

12     MS. DOWNS:  I would say that—let's see here,

13   4.7.  Just double checking the work here.  Yes—

14   4.8.  And definitely 4.9 is unknown.

15     MR. HAUSER:  I understand.  Same thing for

16   the next page.  We've got DirecTV, accounting

17   firm, and Happenstance.

18     MS. DOWNS:  The last one unknown, yes.

19     MR. RAFATJOO:  So these, just going—sticking

20   with these, Cox Communication and DirecTV

21   questions.  So you're living with

22   boyfriend/fiancé.  And you pay the—these

23   utilities or these [unintelligible]?

24     MS. DOWNS:  Sometimes I do, yeah.  Yes,

25   oftentimes I do.

EXHIBIT 4  PAGE 440

2       MR. RAFATJOO:  But these aren't in your

3   name?  They're in his name.

4       MS. DOWNS:  Correct.  Some of them.  Well

5   like the Laguna Beach Water District, that was

6   my debt.

7       MR. RAFATJOO:  That was your debt from the

8   prior home?

9       MS. DOWNS:  That was my debt from my prior

10  home.  Is that what you're referring to?

11      MR. RAFATJOO:  I'm just trying to

12  understand.  The utilities aren't in your name.

13      MS. DOWNS:  There's nothing here, creditors,

14  that is not in my name, like that belongs to

15  somebody else.

16      MR. RAFATJOO:  No, I—

17      MR. TILL:  DirecTV, do they invoice you or

18  Brian?

19      MS. DOWNS:  No, DirecTV mistakenly invoices

20  me and Tim.  But—

21      MR. RAFATJOO:  At the [unintelligible]

22  house?

23      MS. DOWNS:  These are debts from Laguna.

24      MR. RAFATJOO:  These are just old debts.

25      MS. DOWNS:  Yeah, they're old debts.

EXHIBIT 4  PAGE 441

2      MR. RAFATJOO:  Okay.

3      MS. DOWNS:  And they were disputed because I

4  already paid them, but they have collections

5  people or whatever.

6      MR. RAFATJOO:  Okay.  So you're not paying—

7  there's no utility bills in your name right now.

8      MS. DOWNS:  There are no utility bills, that

9  I know of, in my name right now, no.

10      MR. RAFATJOO:  Okay.

11      MR. HAUSER:  Were these taken off a credit

12  report that was read?

13      MR. KESSEL:  Yes.

14      MR. HAUSER:  Okay.  I'm just trying to

15  understand what—

16      MR. KESSEL:  Well the combination of

17  [unintelligible].

18      MR. HAUSER:  Right, okay.  All right.  So

19  we're on page 7 of 12 now.

20      MS. DOWNS:  Yeah, I think so, 7 of 12.

21      MR. HAUSER:  Well, if you look at the top.

22      MS. DOWNS:  7 of 12, 8 of 12, oh.

23      MR. HAUSER:  Well, we skipped—okay.  You

24  just confirmed the accuracy of the information

25  on 7?

EXHIBIT 4  PAGE 442

2       MS. DOWNS:  Yeah, so Laguna Beach was from

3   before.  Ms. Blendergam [phonetic] was a former

4   employee.

5       MR. RAFATJOO:  Why do you owe her money

6   directly, rather than your business?

7       MS. DOWNS:  Because my business, for some

8   reason, because of the taxes is—what is it

9   called, suspended?

10      MR. TILL:  FTP suspended.

11      MS. DOWNS:  And so I had to—

12      MR. TILL:  Because the bookkeeper failed to

13  pay the payment, so it had to get rectified.

14      MS. DOWNS:  Had to get paid, because I had

15  to pay attorneys for a lawsuit.  So my—so I

16  basically had to use my regular account.

17      MR. RAFATJOO:  So when was this debt

18  incurred?

19      MS. DOWNS:  So she's a 1099.  She's not an

20  employee anymore.  She's—

21      MR. KESSEL:  How long had you owed her is

22  what he's asking?

23      MS. DOWNS:  Huh?  Oh, this was for a project

24  that started in January and ended at the end of

25  April.  And she just works as a 1099 for me now.

EXHIBIT 4  PAGE 443

2   And Michael Reynolds, we don't know if that's a

3   debt or a credit.  Nordstrom's card service.  Is

4   it all right if I keep moving on?

5       MR. HAUSER:  Yeah [unintelligible].

6       MS. DOWNS:  Para Newswire, yes, Rancho

7   Pasiatempo [phonetic], yes.  That Rancho

8   Pasiatempo I believe is explained elsewhere, but

9   that is the monthly—was the monthly amount for

10  Noah.

11      MR. RAFATJOO:  Was or is?

12      MS. DOWNS:  Was.

13      MR. HAUSER:  Well I'll get to that in a

14  second.  Give me a second.

15      MS. DOWNS:  RMS of Anthem Blue Cross is—yes,

16  that's correct.  Roger Paglia [phonetic],

17  definitely unknown.

18      MR. RAFATJOO:  Who is that?

19      MS. DOWNS:  It says, "Roger Paglia,

20  unknown."

21      MR. TILL:  Reynolds.  It was Reynolds

22  Cohort.

23      MS. DOWNS:  Southern California Edison

24  [unintelligible] credit service.  I guess, yeah,

25  that's correct.  Correct, correct.  And then I

EXHIBIT 4  PAGE 444

2   think we're missing of course Heinz Steinman

3   [phonetic] on this particular one.

4        MR. HAUSER:  Right, but we all know—

5        MR. TILL:  We'll supplement it.

6        MR. HAUSER:  Okay.

7        MR. TILL:  And that was just an error.  It

8   was left out.

9        MR. HAUSER:  What was the—

10        MS. DOWNS:  I think Mr. Houseman is missing

11   as a potential person in here too.  They

12   [unintelligible].

13        MR. TILL:  No, it's there [unintelligible].

14        MS. DOWNS:  I didn't see it, right off the

15   bat.  But I could have missed it.  I know it was

16   originally but—

17        MR. TILL:  It was originally.  I didn't see

18   where—I think it's on page 7, the new 7 insert.

19        MS. DOWNS:  Oh, okay.  The new one?

20        MR. TILL:  Yeah, the amendment.

21        MS. DOWNS:  Okay.  Oh this goes from page 6

22   to page 8.  That's probably why.

23        MR. TILL:  Yeah, that would be set.  That

24   was the missing page.

25        MS. DOWNS:  Okay.

EXHIBIT 4  PAGE 445

2      MR. HAUSER:  So when did [unintelligible].

3   Is Heinz Steinman, is that your father or

4   brother?

5      MS. DOWNS:  Mm-hmm.

6      MR. HAUSER:  And when were those loans made,

7   over just a long period of time or?

8      MS. DOWNS:  Just a long period of time,

9   years and years, yes.

10     MR. HAUSER:  Okay.  All right.  Let's move

11  on to—okay.  Unless there's any other questions,

12  I'm going to move on to Schedule I.

13     MR. TILL:  Michael, how much longer do you

14  think because I'm [unintelligible].

15     MR. HAUSER:  We're at I, and that's it for

16  me.  Just going over income.  It's not—

17     MR. TILL:  Yeah.  No, that's fine.

18     MS. DOWNS:  Okay.  Yeah, well, it's all—

19  almost 1:00.  Okay.  So we're moving on?

20     MR. RAFATJOO:  Hold on.

21     MR. KESSEL:  Well I am, but—

22     MR. HAUSER:  I'm going to use the new one.

23  I'll just [unintelligible] off that.

24     [Crosstalk]

25     MR. KESSEL:  [unintelligible] page 7?

EXHIBIT 4  PAGE  446

2      MR. TILL:  Page 7 is in the amendment.  It

3   was filed yesterday.  That includes Houseman and

4   Heinz.  It was—

5      MR. RAFATJOO:  So new document 63-1, or

6   where?

7      MR. TILL:  63, Doc 63.

8      MR. RAFATJOO:  Got it.

9      MR. TILL:  Got it, okay.

10      MR. RAFATJOO:  I knew I'd seen the page.  I

11   just couldn't figure out where it was.

12      MR. KESSEL:  In the flurry of getting the

13   file.

14      MS. DOWNS:  Okay.

15      MR. HAUSER:  Okay.  I'm just going to ask

16   you these questions.

17      MS. DOWNS:  Okay, sure.

18      MR. HAUSER:  On Document 63-2, this is your

19   amended schedule income.

20      MS. DOWNS:  Uh-huh.

21      MR. HAUSER:  It indicates that you've been

22   working for Coastal Communications for four

23   years.  Is that correct?

24      MS. DOWNS:  Correct, yes.

25      MR. HAUSER:  A gross income of $18,000.

EXHIBIT 4  PAGE  447

2       MS. DOWNS:  Starting this year, yes.

3       MR. HAUSER:  Yeah, okay.  You show

4   deductions, payroll deductions of $700 for

5   insurance.  Is that correct?

6       MS. DOWNS:  Mm-hmm.

7       MR. HAUSER:  For a net income of $17,300 per

8   month.  And then you have additional income of

9   $1,333 from interest and dividends.  That's from

10   VPM and the other investments, right?

11       MS. DOWNS:  Yeah.

12       MR. HAUSER:  So your average gross monthly

13   income is $18,633?

14       MS. DOWNS:  That's correct.  My best—it's

15   not—it's an average.

16       MR. HAUSER:  Okay.  All right.  So that was

17   the amended I, and that's correct, right?

18       MS. DOWNS:  Okay.

19       MR. HAUSER:  Are there any questions about

20   the income stream?  Because then we'll get to

21   the expenses.

22       MR. RAFATJOO:  I was looking at the old one.

23       MR. HAUSER:  The only difference that I

24   could discern was the moving of the $700 from

25   the domestic obligation to the insurance line

EXHIBIT 4  PAGE 448

2    item.  I think there might have been—

3        MS. DOWNS:  I think she just typed it on the

4    wrong line.

5        MR. HAUSER:  Yeah, let me see what else.  So

6    that was moved.

7        MS. DOWNS:  Mm-hmm.

8        MR. HAUSER:  Everything else appears to be

9    the same.  That was the one change on the

10   domestic support.

11       MR. RAFATJOO:  Your LinkedIn says that you

12   work for Crowd Funding, not Coastal, or you work

13   for both of them.  What's that one?  What is

14   that company that you work for?

15       MS. DOWNS:  I work for Coastal

16   Communications.  Crowd Funding?  Are you sure it

17   said that, or did it say funded, the crowd

18   funding event?  It's one of my client's events.

19   And I work for them as well.

20       MR. RAFATJOO:  "Event director at Fund It

21   Crowd Funding [unintelligible]."  So is that a

22   job or is that a job for Coastal Communications?

23       MS. DOWNS:  That's a job for me and Coastal

24   Communications.

25       MR. RAFATJOO:  Okay, so they pay both of

EXHIBIT 4  PAGE 449

2    you?

3        MS. DOWNS:  As I mentioned before, Coastal

4    Communications is currently suspended.

5        MR. RAFATJOO:  Okay.

6        MS. DOWNS:  So they are paying me.

7        MR. RAFATJOO:  They're paying you.

8        MS. DOWNS:  But we intend to clear that up,

9    so they'll be paying Coastal.  I'll be getting

10    paid from Coastal.

11        MR. RAFATJOO:  Okay.  But that's not like a

12    separate job or anything.  It's all still in the

13    Coastal Communications family.

14        MS. DOWNS:  It's just one of my clients,

15    yes.  Mm-hmm.

16        MR. HAUSER:  So on Document 37, which you

17    don't need to have in front of you, you list

18    your expenses.  And there aren't a lot on there.

19    Are those accurate?  So this is your expense

20    side of the equation.

21        MR. RAFATJOO:  Which document are you on?

22        MR. HAUSER:  It's page—Docket Item 37, page

23    2 of 3.

24        MS. DOWNS:  I do need some help on budgeting

25    and figuring out exactly what they're going to

EXHIBIT 4  PAGE  450

2    be, over the long term.  But this was based on

3    what was coming up.

4         MR. HAUSER:  That's fine.

5         MS. DOWNS:  So that's where we came up with

6    those numbers.

7         MR. HAUSER:  Okay.  Now on page 3 of 3,

8    there was some expenses.  So for example, on

9    item number 21, it has house porting and

10   expenses for vet bills, $1,825 a month.

11        MS. DOWNS:  [unintelligible] non—okay.

12        MR. HAUSER:  Okay, so is that accurate?

13        MS. DOWNS:  Training for horse, yes.  Okay.

14   So what happened here, yes, unfortunately, Noah

15   is now leased out completely.  So his expense

16   went away, the one that was at Rancho

17   Pasiamento, that we explained was a monthly

18   expense.

19        MR. HAUSER:  Yeah.

20        MS. DOWNS:  Starla, who was leased out, is

21   not leased out any longer.  So she is going to

22   cost me that much, until I can get her sold or

23   leased out.

24        MR. HAUSER:  Okay.  So let me just—

25        MR. RAFATJOO:  Where is Noah?

EXHIBIT 4  PAGE 451

2        MS. DOWNS:  Noah, where is he?

3        MR. RAFATJOO:  Yeah, which horse is Noah?

4   Because I have [unintelligible] Cadbury, Tommy

5   and [unintelligible].

6        MR. TILL:  Noah is none of those.

7        MR. HAUSER:  No, no.

8        MR. KESSEL:  Noah is an addition.

9        MR. HAUSER:  No, no, no.  Let me take

10  control of the horse situation.  We spent so

11  much time on it.

12       MS. DOWNS:  Oh my God, I know, the horses.

13       MR. TILL:  There's got to be a good joke in

14  this, Michael.  I'm waiting for it.

15       MR. HAUSER:  No, let me just find it and—

16  okay.  So the schedules list two horses.  One is

17  Nightcap, AKA Noah and the other one is Starla.

18  Okay.  So if I understand your testimony is the

19  expense we are looking at is not for Noah

20  because Noah has been leased out.

21       MS. DOWNS:  Starting next month, but—

22       MR. HAUSER:  Yeah, I understand.  Okay.

23       MR. RAFATJOO:  What's the income from

24  leasing out Noah?

25       MS. DOWNS:  Just that they're taking over

EXHIBIT 4  PAGE 452

2    his expenses.  It's a feed lease, what we call a

3    feed lease.

4         MR. HAUSER:  So it's a wash.  It's

5    [unintelligible].

6         MR. TILL:  Basically you can use my horse,

7    and you pay for the monthly upkeep.  So it's a

8    net zero.  There's no cost.

9         MR. RAFATJOO:  Who is it leased out to?  Is

10   there a lease agreement, or how does that work?

11        MS. DOWNS:  It's not signed yet.  It's just

12   starting August 1st.  So I'll have that

13   information for you.

14        MR. HAUSER:  So that leaves the bankruptcy

15   estate [unintelligible] here with one horse to

16   care for.  That's Starla, right?

17        MS. DOWNS:  Yes, correct.

18        MR. HAUSER:  And so what's the boarding

19   expense, going forward on Starla?  Is that the

20   [unintelligible]?

21        MS. DOWNS:  Oh, I wish I had brought this.

22   This is a training and boarding expense, and

23   feeding—care, feeding, boarding.

24        MR. HAUSER:  Okay.  There is a notation that

25   you made at question 24, which I can't read

EXHIBIT 4   PAGE 453

2  back, but I recall it had something to do with

3  there's going to be an increased expense in

4  connection with training.  Is that for Starla?

5      MS. DOWNS:  Starla, yeah.

6      MR. HAUSER:  Okay.  So Jim, what's going to

7  happen with Starla?  How are you going to handle

8  this?

9      MR. RAFATJOO:  Because the horse is worth

10 $10,000, right?

11     MS. DOWNS:  Well, under a liquidation

12 scenario.  But we are going to try to find

13 someone who wants to buy her or lease her.  And

14 in order to do that, she needs to undergo like

15 at least a couple months of training.

16     MR. TILL:  She previously was being leased

17 out for net zero, correct?

18     MS. DOWNS:  Yeah, net zero.

19     MR. TILL:  So they were caring for her

20 costs.  And apparently that horse is a little

21 wild, spooked the child.  The child doesn't want

22 to ride her anymore.

23     MS. DOWNS:  It was a spooky environment, not

24 a good environment for her.

25     MR. TILL:  And so now the horse has come

EXHIBIT 4  PAGE  454

 2    back.  We'd be more than happy to offset your

 3    entire client's [unintelligible] in exchange for

 4    [unintelligible].

 5         MR. RAFATJOO:  [unintelligible].

 6         MS. DOWNS:  Sure.  She's actually—

 7         MR. RAFATJOO:  I knew you'd laugh for me at

 8    least once, Alan.

 9         MS. DOWNS:  We did offer that at one point.

10         MR. RAFATJOO:  [unintelligible] Noah.

11         MS. DOWNS:  Both horses.

12         MR. HAUSER:  All right.  So I am finished

13    with my questions.  And guys, I'm going to open

14    it up, unless you don't—I think it's best we

15    just pick this up next time, unless you've got a

16    burning question that you want to ask.

17         MR. RAFATJOO:  See if I have any burning

18    questions I might ask.

19         MS. DOWNS:  Okay.

20         MR. TILL:  Thanks, Michael.

21         MS. DOWNS:  Thanks, Michael.

22         MR. HAUSER:  Yeah, no problem.

23         MS. DOWNS:  Can I go to the restroom while

24    he's doing that, or are you—

25         MR. HAUSER:  Well hold on.  We're still on

EXHIBIT 4  PAGE 455

2    the record.  It depends.  If he says, "I've got

3    another few questions," obviously I'm going to

4    let you go to the restroom.

5         MS. DOWNS:  Okay.

6         MR. HAUSER:  If he says, "I'm not going to

7    ask anything," I'll continue to the August 22nd—

8         MS. DOWNS:  Okay.

9         MR. HAUSER:  I just—

10        MR. RAFATJOO:  It's all right.  We can

11   continue.

12        MR. HAUSER:  Okay.  So for the record, this

13   meeting will be continued to August 22nd at

14   10:00.  All right.  Thank you very much.

15        MR. RAFATJOO:  Thank you.

16        [END RECORDING]

EXHIBIT 4  PAGE  456

C E R T I F I C A T E

I, Michelle R. Killen certify that the foregoing

transcript of L97456_001 was prepared using standard

electronic transcription equipment and is a true and

accurate record to the best of my ability. I further

certify that I am not connected by blood, marriage

or employment with any of the parties herein nor

interested directly or indirectly in the matter

transcribed.

*Michelle R Killen*

Signature:

Date May 21, 2017

EXHIBIT 4   PAGE  457

**Fill in this information to identify your case:**

Debtor 1  ANDREA STEINMANN DOWNS
First Name          Middle Name          Last Name

Debtor 2
(Spouse, if filing)  First Name          Middle Name          Last Name

United States Bankruptcy Court for the:  Central District of California

Case number  8:16-bk-12589-CB
(if known)

☐ Check if this is an
amended filing

# Official Form 107

## Statement of Financial Affairs for Individuals Filing for Bankruptcy   4/16

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct
information.  If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write your name and case
number (if known). Answer every question.

**Part 1:**   Give Details About Your Marital Status and Where You Lived Before

1. **What is your current marital status?**

   ☐ Married
   ☑ Not married

2. **During the last 3 years, have you lived anywhere other than where you live now?**

   ☐ No
   ☑ Yes. List all of the places you lived in the last 3 years.  Do not include where you live now.

| Debtor 1: | Dates Debtor 1 lived there | Debtor 2: | Dates Debtor 2 lived there |
|---|---|---|---|
| 495 Legion Street | From 7/2012 | ☐ Same as Debtor 1 | ☐ Same as Debtor 1 |
| Number    Street | To 10/2015 | Number    Street | From |
|  |  |  | To |
| Laguna Beach    CA    92651 |  |  |  |
| City    State    ZIP Code |  | City    State    ZIP Code |  |
|  | From | ☐ Same as Debtor 1 | ☐ Same as Debtor 1 |
| Number    Street | To | Number    Street | From |
|  |  |  | To |
| City    State    ZIP Code |  | City    State    ZIP Code |  |

3. **Within the last 8 years, did you ever live with a spouse or legal equivalent in a community property state or territory?** (*Community property
   states and territories* include Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington, and Wisconsin.)

   ☑ No
   ☐ Yes. Make sure you fill out *Schedule H: Your Codebtors* (Official Form 106H).

**Part 2:**  Explain the Sources of Your Income

EXHIBIT 5  PAGE 458

Debtor 1    **ANDREA STEINMANN DOWNS**

First Name    Middle Name    Last Name

Case number *(if known)* 8:16-bk-12589-CB

---

**4.** **Did you have any income from employment or from operating a business during this year or the two previous calendar years?**

Fill in the total amount of income you received from all jobs and all businesses, including part-time activities.

If you are filing a joint case and you have income that you receive together, list it only once under Debtor 1.

☐ No
☑ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income** Check all that apply. | **Gross income** (before deductions and exclusions) | **Sources of income** Check all that apply. | **Gross income** (before deductions and exclusions) |
| **From January 1 of current year until the date you filed for bankruptcy:** | ☐ Wages, commissions, bonuses, tips ☑ Operating a business | $ 100,000 | ☐ Wages, commissions, bonuses, tips ☐ Operating a business | $ |
| **For last calendar year:** (January 1 to December 31, 2015) YYYY | ☑ Wages, commissions, bonuses, tips ☐ Operating a business | $ 15,000 | ☐ Wages, commissions, bonuses, tips ☐ Operating a business | $ |
| **For the calendar year before that:** (January 1 to December 31, 2014) YYYY | ☑ Wages, commissions, bonuses, tips ☐ Operating a business | $ 0 | ☐ Wages, commissions, bonuses, tips ☐ Operating a business | $ |

**5.** **Did you receive any other income during this year or the two previous calendar years?**

Include income regardless of whether that income is taxable. Examples of *other income* are alimony; child support; Social Security, unemployment, and other public benefit payments; pensions; rental income; interest; dividends; money collected from lawsuits; royalties; and gambling and lottery winnings. If you are filing a joint case and you have income that you received together, list it only once under Debtor 1.

List each source and the gross income from each source separately. Do not include income that you listed in line 4.

☐ No
☑ Yes. Fill in the details.

| | Debtor 1 | | Debtor 2 | |
|---|---|---|---|---|
| | **Sources of income** Describe below. | **Gross income from each source** (before deductions and exclusions) | **Sources of income** Describe below. | **Gross income from each source** (before deductions and exclusions) |
| **From January 1 of current year until the date you filed for bankruptcy:** | VPM Westchester Ten Twenty Univ | $ 3,570 $ 6,500 $ | | $ $ $ |
| **For last calendar year:** (January 1 to December 31, 2015) YYYY | VPM Westchester Ten Twenty Univ | $ 6,000 $ 7,140 $ | | $ $ $ |
| **For the calendar year before that:** (January 1 to December 31, 2014) YYYY | VPM Westchester Ten Twenty Univ | $ 14,000 $ 7,140 $ | | $ $ $ |

EXHIBIT 5  PAGE 459

Debtor 1 __ANDREA STEINMANN DOWNS__
     First Name    Middle Name    Last Name

Case number *(if known)* __8:16-bk-12589-CB__

---

**Part 3:**    List Certain Payments You Made Before You Filed for Bankruptcy

---

6. **Are either Debtor 1's or Debtor 2's debts primarily consumer debts?**

    ☑ No. **Neither Debtor 1 nor Debtor 2 has primarily consumer debts.** *Consumer debts* are defined in 11 U.S.C. § 101(8) as "incurred by an individual primarily for a personal, family, or household purpose."

        During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $6,425* or more?

        ☐ No. Go to line 7.

        ☑ Yes. List below each creditor to whom you paid a total of $6,425* or more in one or more payments and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

        * Subject to adjustment on 4/01/19 and every 3 years after that for cases filed on or after the date of adjustment.

    ☐ Yes. **Debtor 1 or Debtor 2 or both have primarily consumer debts.**

        During the 90 days before you filed for bankruptcy, did you pay any creditor a total of $600 or more?

        ☐ No. Go to line 7.

        ☐ Yes. List below each creditor to whom you paid a total of $600 or more and the total amount you paid that creditor. Do not include payments for domestic support obligations, such as child support and alimony. Also, do not include payments to an attorney for this bankruptcy case.

| | Dates of payment | Total amount paid | Amount you still owe | Was this payment for... |
|---|---|---|---|---|
| **Lisa Lundrigan** <br> Creditor's Name | 4/2016 | $ 11,000 | $ 0 | ☐ Mortgage <br> ☐ Car <br> ☐ Credit card |
| **74 Sandcastle** <br> Number   Street | 5/2016 | | | ☐ Loan repayment <br> ☐ Suppliers or vendors |
| **Aliso Viejo**    **CA**    **92656** <br> City    State    ZIP Code | 6/2016 | | | ☑ Other ____ |
| Creditor's Name | ____ | $____ | $____ | ☐ Mortgage <br> ☐ Car <br> ☐ Credit card |
| Number   Street | ____ | | | ☐ Loan repayment <br> ☐ Suppliers or vendors |
| City   State   ZIP Code | ____ | | | ☐ Other ____ |
| Creditor's Name | | $____ | $____ | ☐ Mortgage <br> ☐ Car <br> ☐ Credit card |
| Number   Street | | | | ☐ Loan repayment <br> ☐ Suppliers or vendors |
| City   State   ZIP Code | | | | ☐ Other ____ |

---

EXHIBIT 5  PAGE 460

| Debtor 1 | ANDREA STEINMANN DOWNS | Case number *(if known)* | 8:16-bk-12589-CB |
|---|---|---|---|
| | First Name    Middle Name    Last Name | | |

**7. Within 1 year before you filed for bankruptcy, did you make a payment on a debt you owed anyone who was an insider?**

*Insiders* include your relatives; any general partners; relatives of any general partners; partnerships of which you are a general partner; corporations of which you are an officer, director, person in control, or owner of 20% or more of their voting securities; and any managing agent, including one for a business you operate as a sole proprietor. 11 U.S.C. § 101. Include payments for domestic support obligations, such as child support and alimony.

☐ No
☑ Yes. List all payments to an insider.

| | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment |
|---|---|---|---|---|
| Heinz Steinmann<br>Insider's Name | 10/2015 | $ 45,000 | $ 300,000 | Unsecured loan payments |
| PO Box 327<br>Number    Street | 3/2016 | | | |
| Wrightwood            CA    92397<br>City            State    ZIP Code | | | | |
| _____<br>Insider's Name | | $_____ | $_____ | |
| _____<br>Number    Street | | | | |
| _____<br>City            State    ZIP Code | | | | |

**8. Within 1 year before you filed for bankruptcy, did you make any payments or transfer any property on account of a debt that benefited an insider?**

Include payments on debts guaranteed or cosigned by an insider.

☑ No
☐ Yes. List all payments that benefited an insider.

| | Dates of payment | Total amount paid | Amount you still owe | Reason for this payment<br>Include creditor's name |
|---|---|---|---|---|
| _____<br>Insider's Name | _____ | $_____ | $_____ | |
| _____<br>Number    Street | | | | |
| _____<br>City            State    ZIP Code | | | | |
| _____<br>Insider's Name | | $_____ | $_____ | |
| _____<br>Number    Street | | | | |
| _____<br>City            State    ZIP Code | | | | |

EXHIBIT 5  PAGE 461

Debtor 1    ANDREA STEINMANN DOWNS

First Name    Middle Name    Last Name

Case number (if known) 8:16-bk-12589-CB

---

**Part 4:    Identify Legal Actions, Repossessions, and Foreclosures**

9.  **Within 1 year before you filed for bankruptcy, were you a party in any lawsuit, court action, or administrative proceeding?**
    List all such matters, including personal injury cases, small claims actions, divorces, collection suits, paternity actions, support or custody modifications, and contract disputes.

    ☐ No
    ☑ Yes. Fill in the details.

| | Nature of the case | Court or agency | Status of the case |
|---|---|---|---|
| Case title Hausman Holdings, LLC et al. v. Michael Reynolds et al. | Complaint for Promissory Fraud (False Promise); Fraud & Deceit (Intentional Misrepresentation and Concealment); Breach of Loan Agreements | Superior Ct Orange County, CA<br>Court Name<br>700 Civic Center Drive West<br>Number    Street<br>Santa Ana         CA    92701<br>City                     State    ZIP Code | ☑ Pending<br>☐ On appeal<br>☐ Concluded |
| Case number 30-2013-00627272 | | | |
| Case title _____<br>_____<br>Case number _____ | | Court Name<br>_____<br>Number    Street<br>_____<br>City          State     ZIP Code | ☐ Pending<br>☐ On appeal<br>☐ Concluded |

10. **Within 1 year before you filed for bankruptcy, was any of your property repossessed, foreclosed, garnished, attached, seized, or levied?**
    Check all that apply and fill in the details below.

    ☑ No.  Go to line 11.
    ☐ Yes. Fill in the information below.

| | Describe the property | Date | Value of the property |
|---|---|---|---|
| _____<br>Creditor's Name<br>_____<br>Number    Street<br>_____<br>City          State    ZIP Code | | _____ | $_____ |
| | **Explain what happened**<br>☐ Property was repossessed.<br>☐ Property was foreclosed.<br>☐ Property was garnished.<br>☐ Property was attached, seized, or levied. | | |
| _____<br>Creditor's Name<br>_____<br>Number    Street<br>_____<br>City          State    ZIP Code | | _____ | $_____ |
| | **Explain what happened**<br>☐ Property was repossessed.<br>☐ Property was foreclosed.<br>☐ Property was garnished.<br>☐ Property was attached, seized, or levied. | | |

---

EXHIBIT 5  PAGE 462

Debtor 1    ANDREA STEINMANN DOWNS                                    Case number (if known) 8:16-bk-12589-CB
           First Name    Middle Name    Last Name

11. **Within 90 days before you filed for bankruptcy, did any creditor, including a bank or financial institution, set off any amounts from your accounts or refuse to make a payment because you owed a debt?**

☑ No
☐ Yes. Fill in the details.

| | Describe the action the creditor took | Date action was taken | Amount |
|---|---|---|---|
| _____ Creditor's Name | | | |
| _____ Number   Street | | _____ | $_____ |
| _____ City   State   ZIP Code | | | |

Last 4 digits of account number: XXXX–___ ___ ___ ___

12. **Within 1 year before you filed for bankruptcy, was any of your property in the possession of an assignee for the benefit of creditors, a court-appointed receiver, a custodian, or another official?**

☑ No
☐ Yes

| Part 5: | List Certain Gifts and Contributions |
|---|---|

13. **Within 2 years before you filed for bankruptcy, did you give any gifts with a total value of more than $600 per person?**

☐ No
☑ Yes. Fill in the details for each gift.

| Gifts with a total value of more than $600 per person | Describe the gifts | Dates you gave the gifts | Value |
|---|---|---|---|
| Brian Chase | Christmas gift - briefcase | 12/2015 | $ 1,300 |
| Person to Whom You Gave the Gift | | | |
| 4 Drakes Bay Drive | | _____ | $_____ |
| Number   Street | | | |
| Corona Del Mar  CA   92685 | | | |
| City   State   ZIP Code | | | |
| Person's relationship to you  Boyfriend | | | |

| Gifts with a total value of more than $600 per person | Describe the gifts | Dates you gave the gifts | Value |
|---|---|---|---|
| Whitney Downs | Purse | 1/2016 | $ 1,200 |
| Person to Whom You Gave the Gift | | | |
| 4 Drakes Bay Drive | | _____ | $_____ |
| Number   Street | | | |
| Corona Del Mar  CA   92685 | | | |
| City   State   ZIP Code | | | |
| Person's relationship to you _____ | | | |

EXHIBIT 5  PAGE 463

Debtor 1  ANDREA STEINMANN DOWNS
    First Name     Middle Name     Last Name

Case number (if known) 8:16-bk-12589-CB

**14. Within 2 years before you filed for bankruptcy, did you give any gifts or contributions with a total value of more than $600 to any charity?**

☑ No
☐ Yes. Fill in the details for each gift or contribution.

| Gifts or contributions to charities that total more than $600 | Describe what you contributed | Date you contributed | Value |
|---|---|---|---|
| _____<br>Charity's Name<br><br>_____<br><br>_____<br>Number  Street<br><br>_____<br>City  State  ZIP Code | | _____<br><br>_____ | $_____<br><br>$_____ |

### Part 6:  List Certain Losses

**15. Within 1 year before you filed for bankruptcy or since you filed for bankruptcy, did you lose anything because of theft, fire, other disaster, or gambling?**

☑ No
☐ Yes. Fill in the details.

| Describe the property you lost and how the loss occurred | Describe any insurance coverage for the loss<br><br>Include the amount that insurance has paid. List pending insurance claims on line 33 of *Schedule A/B: Property*. | Date of your loss | Value of property lost |
|---|---|---|---|
| | | _____ | $_____ |

### Part 7:  List Certain Payments or Transfers

**16. Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone you consulted about seeking bankruptcy or preparing a bankruptcy petition?**

Include any attorneys, bankruptcy petition preparers, or credit counseling agencies for services required in your bankruptcy.

☐ No
☑ Yes. Fill in the details.

| | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|
| Bosley Till Neue & Talerico LLP<br>Person Who Was Paid<br>840 Newport Center Drive<br>Number  Street<br>Suite 750<br><br>Newport Beach  CA  92660<br>City  State  ZIP Code<br>www.btntlaw.com<br>Email or website address<br><br>_____<br>Person Who Made the Payment, if Not You | Cash | 6/17/2016<br><br>_____ | $_____ 75,000<br><br>$_____ |

Official Form 107      Statement of Financial Affairs for Individuals Filing for Bankruptcy      page **7**

EXHIBIT 5  PAGE 464

Debtor 1    ANDREA STEINMANN DOWNS
     First Name     Middle Name     Last Name

Case number *(if known)*    8:16-bk-12589-CB

| | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|
| Person Who Was Paid | | | |
| Number    Street | | _____ | $_____ |
| | | _____ | $_____ |
| City    State    ZIP Code | | | |
| Email or website address | | | |
| Person Who Made the Payment, if Not You | | | |

**17.** Within 1 year before you filed for bankruptcy, did you or anyone else acting on your behalf pay or transfer any property to anyone who promised to help you deal with your creditors or to make payments to your creditors?

Do not include any payment or transfer that you listed on line 16.

☑ No
☐ Yes. Fill in the details.

| | Description and value of any property transferred | Date payment or transfer was made | Amount of payment |
|---|---|---|---|
| Person Who Was Paid | | | |
| Number    Street | | _____ | $_____ |
| | | _____ | $_____ |
| City    State    ZIP Code | | | |

**18.** Within 2 years before you filed for bankruptcy, did you sell, trade, or otherwise transfer any property to anyone, other than property transferred in the ordinary course of your business or financial affairs?

Include both outright transfers and transfers made as security (such as the granting of a security interest or mortgage on your property).

Do not include gifts and transfers that you have already listed on this statement.

☐ No
☑ Yes. Fill in the details.

| | Description and value of property transferred | Describe any property or payments received or debts paid in exchange | Date transfer was made |
|---|---|---|---|
| Excelsior Properties LLC<br>Person Who Received Transfer<br>Attn Michael Feigenbaum<br>Number    Street<br>12275 N Hidden Valley Rd<br>Maricopa    AZ    85139<br>City    State    ZIP Code<br>Person's relationship to you    None | Security interest in equestrian show horse "Night Cap" aka "Noah"; value $25,000 | $25,000 | 6/16/2016 |
| Norio Inc<br>Person Who Received Transfer<br>8550 W Desert Inn Rd Ste 107<br>Number    Street<br>Las Vegas    NV    89128<br>City    State    ZIP Code<br>Person's relationship to you    None | Security interest in 11.583% of Ten Twenty University LLC and 3.0216% in VPM Westchester, LP; value $50,000 | $50,000 | 6/16/2016 |

Official Form 107    Statement of Financial Affairs for Individuals Filing for Bankruptcy    page **8**

EXHIBIT 5  PAGE 465

| Debtor 1 | ANDREA STEINMANN DOWNS | | | Case number (if known) | 8:16-bk-12589-CB |
|---|---|---|---|---|---|
| | First Name | Middle Name | Last Name | | |

**19.** **Within 10 years before you filed for bankruptcy, did you transfer any property to a self-settled trust or similar device of which you are a beneficiary?** (These are often called *asset-protection devices*.)

☑ No
☐ Yes. Fill in the details.

| | Description and value of the property transferred | Date transfer was made |
|---|---|---|
| Name of trust _____ | | _____ |
| _____ | | |

---

**Part 8:    List Certain Financial Accounts, Instruments, Safe Deposit Boxes, and Storage Units**

**20.** **Within 1 year before you filed for bankruptcy, were any financial accounts or instruments held in your name, or for your benefit, closed, sold, moved, or transferred?**
Include checking, savings, money market, or other financial accounts; certificates of deposit; shares in banks, credit unions, brokerage houses, pension funds, cooperatives, associations, and other financial institutions.

☐ No
☑ Yes. Fill in the details.

| | Last 4 digits of account number | Type of account or instrument | Date account was closed, sold, moved, or transferred | Last balance before closing or transfer |
|---|---|---|---|---|
| Oppenheimer & Co Inc<br>**Name of Financial Institution**<br>620 Newport Ctr Dr #1000<br>**Number    Street**<br><br>Newport Beach   CA   92660<br>**City            State    ZIP Code** | XXXX–3643 __ __ __ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>● Brokerage<br>☐ Other_____ | 1/15/2016 | $ 25,991 |
| **Name of Financial Institution**<br><br>**Number    Street**<br><br>**City            State    ZIP Code** | XXXX–__ __ __ __ | ☐ Checking<br>☐ Savings<br>☐ Money market<br>☐ Brokerage<br>☐ Other_____ | _____ | $_____ |

**21.** **Do you now have, or did you have within 1 year before you filed for bankruptcy, any safe deposit box or other depository for securities, cash, or other valuables?**

☑ No
☐ Yes. Fill in the details.

| | Who else had access to it? | Describe the contents | Do you still have it? |
|---|---|---|---|
| **Name of Financial Institution**<br><br>**Number    Street**<br><br>**City            State    ZIP Code** | Name<br><br>Number    Street<br><br>City        State    ZIP Code | | ☐ No<br>☐ Yes |

EXHIBIT 5  PAGE 466

Debtor 1  **ANDREA STEINMANN DOWNS**
First Name      Middle Name      Last Name

Case number (*if known*)  8:16-bk-12589-CB

---

**22. Have you stored property in a storage unit or place other than your home within 1 year before you filed for bankruptcy?**

☐ No
☑ Yes. Fill in the details.

| | Who else has or had access to it? | Describe the contents | Do you still have it? |
|---|---|---|---|
| Irvine West Storage | Brian Chase | Personal household furnishings listed on Schedule A/B stored in unit rented by Brian Chase. | ☐ No ☑ Yes |
| **Name of Storage Facility** | **Name** | | |
| 2892 Kelvin Ave | 4 Drakes Bay Dr | | |
| **Number    Street** | **Number    Street** | | |
| | Corona Del Mar  CA  92685 | | |
| Irvine    CA    92614 | **City State   ZIP Code** | | |
| **City    State    ZIP Code** | | | |

---

| Part 9: | Identify Property You Hold or Control for Someone Else |
|---|---|

**23. Do you hold or control any property that someone else owns? Include any property you borrowed from, are storing for, or hold in trust for someone.**

☑ No
☐ Yes. Fill in the details.

| | Where is the property? | Describe the property | Value |
|---|---|---|---|
| _____ | _____ | | $_____ |
| **Owner's Name** | **Number    Street** | | |
| _____ | _____ | | |
| **Number    Street** | | | |
| _____ | _____ | | |
| **City    State    ZIP Code** | **City    State    ZIP Code** | | |

---

| Part 10: | Give Details About Environmental Information |
|---|---|

For the purpose of Part 10, the following definitions apply:

- *Environmental law* means any federal, state, or local statute or regulation concerning pollution, contamination, releases of hazardous or toxic substances, wastes, or material into the air, land, soil, surface water, groundwater, or other medium, including statutes or regulations controlling the cleanup of these substances, wastes, or material.

- *Site* means any location, facility, or property as defined under any environmental law, whether you now own, operate, or utilize it or used to own, operate, or utilize it, including disposal sites.

- *Hazardous material* means anything an environmental law defines as a hazardous waste, hazardous substance, toxic substance, hazardous material, pollutant, contaminant, or similar term.

Report all notices, releases, and proceedings that you know about, regardless of when they occurred.

**24. Has any governmental unit notified you that you may be liable or potentially liable under or in violation of an environmental law?**

☑ No
☐ Yes. Fill in the details.

| | Governmental unit | Environmental law, if you know it | Date of notice |
|---|---|---|---|
| _____ | _____ | | _____ |
| **Name of site** | **Governmental unit** | | |
| _____ | _____ | | |
| **Number    Street** | **Number    Street** | | |
| _____ | _____ | | |
| **City    State    ZIP Code** | **City    State   ZIP Code** | | |

---

EXHIBIT 5  PAGE 467

Debtor 1    ANDREA STEINMANN DOWNS                                    Case number (if known)  8:16-bk-12589-CB
_____
First Name    Middle Name    Last Name

**25. Have you notified any governmental unit of any release of hazardous material?**

☑ No
☐ Yes. Fill in the details.

| | Governmental unit | Environmental law, if you know it | Date of notice |
|---|---|---|---|
| _____ Name of site | _____ Governmental unit | | _____ |
| _____ Number   Street | _____ Number   Street | | |
| _____ City        State    ZIP Code | _____ City        State    ZIP Code | | |

**26. Have you been a party in any judicial or administrative proceeding under any environmental law? Include settlements and orders.**

☑ No
☐ Yes. Fill in the details.

| | Court or agency | Nature of the case | Status of the case |
|---|---|---|---|
| Case title_____ | _____ Court Name | | ☐ Pending |
| _____ | _____ Number   Street | | ☐ On appeal |
| _____ Case number | _____ City        State    ZIP Code | | ☐ Concluded |

---

**Part 11:**     Give Details About Your Business or Connections to Any Business

**27. Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business?**

☐ A sole proprietor or self-employed in a trade, profession, or other activity, either full-time or part-time
☐ A member of a limited liability company (LLC) or limited liability partnership (LLP)
☐ A partner in a partnership
☐ An officer, director, or managing executive of a corporation
☐ An owner of at least 5% of the voting or equity securities of a corporation

☐ No. None of the above applies. Go to Part 12.
☑ Yes. Check all that apply above and fill in the details below for each business.

| See attached SOFA Rider _____ Business Name | Describe the nature of the business | Employer Identification number Do not include Social Security number or ITIN. |
|---|---|---|
| Part 11 - Question 27 _____ Number   Street | | EIN: __ __ – __ __ __ __ __ __ __ |
| _____ City        State    ZIP Code | Name of accountant or bookkeeper | Dates business existed From _____ To Present |
| _____ Business Name | Describe the nature of the business | Employer Identification number Do not include Social Security number or ITIN. |
| _____ Number   Street | | EIN: __ __ – __ __ __ __ __ __ __ |
| _____ City        State    ZIP Code | Name of accountant or bookkeeper | Dates business existed From _____ To _____ |

EXHIBIT 5  PAGE 468

Debtor 1    ANDREA STEINMANN DOWNS      Case number *(if known)*   8:16-bk-12589-CB
     First Name    Middle Name    Last Name

| | |
|---|---|
| **Business Name** | Describe the nature of the business |
| **Number   Street** | Name of accountant or bookkeeper |
| **City**    **State**    **ZIP Code** | |

Employer identification number
Do not include Social Security number or ITIN.

EIN: __ __ - __ __ __ __ __ __ __

Dates business existed

From _____ To _____

28. **Within 2 years before you filed for bankruptcy, did you give a financial statement to anyone about your business? Include all financial institutions, creditors, or other parties.**

☑ No
☐ Yes. Fill in the details below.

Date issued

Name          MM / DD / YYYY

Number   Street

City    State    ZIP Code

---

**Part 12:**    **Sign Below**

I have read the answers on this *Statement of Financial Affairs* and any attachments, and I declare under penalty of perjury that the answers are true and correct. I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

✗ _____      ✗ _____
Signature of Debtor 1                 Signature of Debtor 2

Date   7/5/2016          Date _____

Did you attach additional pages to *Your Statement of Financial Affairs for Individuals Filing for Bankruptcy* (Official Form 107)?

☐ No
☑ Yes

Did you pay or agree to pay someone who is not an attorney to help you fill out bankruptcy forms?

☑ No
☐ Yes. Name of person _____. Attach the *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

---

Official Form 107      Statement of Financial Affairs for Individuals Filing for Bankruptcy      page **12**

EXHIBIT 5  PAGE 469

In re:  ANDREA STEINMANN DOWNS                                    Case No. 8:16-bk-12589-CB

Statement of Financial Affairs

Rider - Part 11 - Question 27:

*Give Details About Your Business or Connections to Any Business.  Within 4 years before you filed for bankruptcy, did you own a business or have any of the following connections to any business.*

| Name/Address of Business | Nature of Business | Connection to Business | EIN | Dates Business Existed | Name of Accountant or Bookkeeper |
|---|---|---|---|---|---|
| Coastal Communications, Inc. c/o CoastalShows 4 Drakes Bay Drive Corona Del Mar, CA 92685 | Media and Event Planning | Owner | 90-0790020 | 2012 to present | Thuy Trifunovic Gish Seiden Accounting |
| Downs Holdings, Inc. Not applicable | Holding company | 50% former interest | 33-0736333 | 1998 to 2013 | Unknown |
| Ortega Downs, LLC (fka ECA Club, LLC) 4 Drakes Bay Drive Corona Del Mar, CA 92685 | Equestrian related activities | Owner | 56-2528977 | 2005 to present | |
| Ten Twenty University, LLC 1020 University St Seattle, WA 98101 | Multi-family assets | 11.583% minority interest | | | |
| VPM Westchester, LP c/o VPM Management Inc 240 Main St Ste 201 Irvine, CA 92614 | Multi-family assets | 3.0216% minority interest | | | |

EXHIBIT 5  PAGE 470

1  James E. Till (State Bar No. 200464)
   David B. Zolkin (State Bar No. 155410)
2  BOSLEY TILL NEUE & TALERICO LLP
3  12121 Wilshire Blvd., Ste 1120
   Los Angeles, CA 90025
4  Telephone: (949) 999-2860
   Facsimile:  (310) 362-8433
5  E-Mail:    jtill@btntlaw.com
              dzolkin@btntlaw.com
6
7  Reorganization Counsel for the
   Debtor and Debtor-in-Possession, Andrea Downs
8

9                  UNITED STATES BANKRUPTCY COURT

10                  CENTRAL DISTRICT OF CALIFORNIA

11                       SANTA ANA DIVISION

12
   In re:                          |  Case No. 8:16-bk-12589-CB
13                                  |
   ANDREA DOWNS,                    |
14                                  |  Chapter 11
                   Debtor.          |
15                                  |  **SECOND AMENDMENT TO SCHEDULE**
16                                  |  **"A/B" AND SUMMARY OF ASSETS AND**
                                    |  **LIABILITIES AND CERTAIN**
17                                  |  **STATISTICAL INFORMATION**
                                    |  **[Dkt. No. 63]**
18                                  |
19                                  |  [No Hearing Required]
20                                  |
21                                  |

22

23        PLEASE TAKE NOTICE that Andrea Downs, Debtor and Debtor-in-Possession herein (the

24  "Debtor"), hereby files this second amendment of her "Schedule A/B: Property" ("1st Amended

25  Schedule A/B") and "Summary of Assets and Liabilities and Certain Statistical Information" ("1st

26  Amended Schedule Summary"), as amended on July 28, 2016 [Docket No. 63][1] with respect to the

27  _____
   [1]  The amendments filed on July 28, 2016 superseded the Debtor's original Schedule A/B and
28  Schedule Summary filed on July 6, 2016 [Docket Nos. 31 and 42, respectively].

SECOND AMENDMENT TO SCHEDULE A/B AND                   1
SUMMARY OF ASSETS AND LIABILITIES

EXHIBIT 5  PAGE 471

assets listed on Exhibit "1" (the "2nd Amended Schedule A/B"), and Exhibit "2" (the "2nd Amended Summary") attached hereto.  The 2nd Amended Schedule A/B, and the 2nd Amended Summary are intended to supersede and replace the 1st Amended Schedule A/B, and 1st Amended Schedule Summary previously filed, in their entirety.

While every effort has been made to prepare complete and accurate amendments, errors may have occurred.  The Debtor reserves fully her right to amend the Schedules with respect to the information listed herein, as additional information becomes available.

DATED:  March 20, 2017

By:  _____
      Andrea Downs,
      Debtor and Debtor-in-Possession

Submitted by:

BOSLEY TILL NEUE & TALERICO LLP

By:  _/s/ James E. Till_____
      James E. Till
Reorganization Counsel for
Andrea Downs, Debtor and Debtor-in-Possession

2

EXHIBIT 5  PAGE 472

EXHIBIT 1 - 2ND AMENDED SCHEDULE A/B: PROPERTY

EXHIBIT 1

EXHIBIT 5  PAGE 473

**Fill in this information to identify your case and this filing:**

Debtor 1    ANDREA STEINMANN DOWNS
_____
First Name        Middle Name        Last Name

Debtor 2
(Spouse, if filing)  First Name        Middle Name        Last Name

United States Bankruptcy Court for the:  Central District of California

Case number    8:16-bk-12589-CB
_____

☑ Check if this is an
amended filing

## Official Form 106A/B

# Schedule A/B: Property                                                    12/15

In each category, separately list and describe items. List an asset only once. If an asset fits in more than one category, list the asset in the
category where you think it fits best. Be as complete and accurate as possible. If two married people are filing together, both are equally
responsible for supplying correct information. If more space is needed, attach a separate sheet to this form. On the top of any additional pages,
write your name and case number (if known). Answer every question.

**Part 1:**    Describe Each Residence, Building, Land, or Other Real Estate You Own or Have an Interest In

1. **Do you own or have any legal or equitable interest in any residence, building, land, or similar property?**

☑ No. Go to Part 2.
☐ Yes. Where is the property?

**What is the property?** Check all that apply.
☐ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

1.1. _____
Street address, if available, or other description

_____

_____
City                State    ZIP Code

_____
County

Do not deduct secured claims or exemptions. Put
the amount of any secured claims on *Schedule D:
Creditors Who Have Claims Secured by Property.*

**Current value of the**       **Current value of the**
**entire property?**            **portion you own?**
$_____              $_____

**Describe the nature of your ownership
interest (such as fee simple, tenancy by
the entireties, or a life estate), if known.**

**Who has an interest in the property?** Check one.
☐ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ **Check if this is community property**
(see instructions)

**Other information you wish to add about this item, such as local
property identification number:** _____

If you own or have more than one, list here:

**What is the property?** Check all that apply.
☐ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

1.2. _____
Street address, if available, or other description

_____

_____
City                State    ZIP Code

_____
County

Do not deduct secured claims or exemptions. Put
the amount of any secured claims on *Schedule D:
Creditors Who Have Claims Secured by Property.*

**Current value of the**       **Current value of the**
**entire property?**            **portion you own?**
$_____              $_____

**Describe the nature of your ownership
interest (such as fee simple, tenancy by
the entireties, or a life estate), if known.**

**Who has an interest in the property?** Check one.
☐ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ **Check if this is community property**
(see instructions)

**Other information you wish to add about this item, such as local
property identification number:** _____

Debtor 1 ___ANDREA STEINMANN DOWNS___ Case number (if known) __8:16-bk-12589-CB__
    First Name    Middle Name    Last Name

---

1.3. _____
    Street address, if available, or other description

_____

_____

City    State    ZIP Code

_____
County

**What is the property?** Check all that apply.

☐ Single-family home
☐ Duplex or multi-unit building
☐ Condominium or cooperative
☐ Manufactured or mobile home
☐ Land
☐ Investment property
☐ Timeshare
☐ Other _____

**Who has an interest in the property?** Check one.

☐ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

**Other information you wish to add about this item, such as local property identification number:** _____

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Secured by Property.*

**Current value of the entire property?**
$ _____

**Current value of the portion you own?**
$ _____

**Describe the nature of your ownership interest (such as fee simple, tenancy by the entireties, or a life estate), if known.**

☐ **Check if this is community property** (see instructions)

2. **Add the dollar value of the portion you own for all of your entries from Part 1, including any entries for pages you have attached for Part 1. Write that number here.** ..................➔  $ _____

---

| Part 2: | Describe Your Vehicles |

**Do you own, lease, or have legal or equitable interest in any vehicles, whether they are registered or not?** Include any vehicles you own that someone else drives. If you lease a vehicle, also report it on *Schedule G: Executory Contracts and Unexpired Leases.*

3. **Cars, vans, trucks, tractors, sport utility vehicles, motorcycles**

☐ No
☑ Yes

3.1. Make:    Landrover
Model:    RgRvrHSE
Year:    2007
Approximate mileage:    143,600
Other information:

**Who has an interest in the property?** Check one.

☑ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ **Check if this is community property** (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

**Current value of the entire property?**
$ _____9,000

**Current value of the portion you own?**
$ _____9,000

If you own or have more than one, describe here:

3.2. Make:    _____
Model:    _____
Year:    _____
Approximate mileage:    _____
Other information:

**Who has an interest in the property?** Check one.

☐ Debtor 1 only
☐ Debtor 2 only
☐ Debtor 1 and Debtor 2 only
☐ At least one of the debtors and another

☐ **Check if this is community property** (see instructions)

Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.*

**Current value of the entire property?**
$ _____

**Current value of the portion you own?**
$ _____

---

Case 8:18-ap-01168-SC    Doc 330    Filed 08/05/21    Entered 08/05/21 19:10:46    Desc
Main Document        Page 480 of 661

Case 8:16-bk-12589-SC    Doc 207-1    Filed 03/20/17    Entered 03/20/17 22:53:07    Desc
Exhibit 1    2nd Amended Schedule A/B    Page 4 of 13

Debtor 1    ANDREA STEINMANN DOWNS                                    Case number (if known) 8:16-bk-12589-CB
           First Name    Middle Name    Last Name

| 3.3. | Make: _____ | **Who has an interest in the property?** Check one. | Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.* |
| | Model: _____ | ☐ Debtor 1 only | |
| | Year: _____ | ☐ Debtor 2 only | |
| | Approximate mileage: _____ | ☐ Debtor 1 and Debtor 2 only | **Current value of the entire property?** / **Current value of the portion you own?** |
| | Other information: | ☐ At least one of the debtors and another | |
| | | ☐ **Check if this is community property** (see instructions) | $_____ / $_____ |

| 3.4. | Make: _____ | **Who has an interest in the property?** Check one. | Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.* |
| | Model: _____ | ☐ Debtor 1 only | |
| | Year: _____ | ☐ Debtor 2 only | |
| | Approximate mileage: _____ | ☐ Debtor 1 and Debtor 2 only | **Current value of the entire property?** / **Current value of the portion you own?** |
| | Other information: | ☐ At least one of the debtors and another | |
| | | ☐ **Check if this is community property** (see instructions) | $_____ / $_____ |

4. **Watercraft, aircraft, motor homes, ATVs and other recreational vehicles, other vehicles, and accessories**

   *Examples:* Boats, trailers, motors, personal watercraft, fishing vessels, snowmobiles, motorcycle accessories

   ● No
   ○ Yes

| 4.1. | Make: _____ | **Who has an interest in the property?** Check one. | Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.* |
| | Model: _____ | ☐ Debtor 1 only | |
| | Year: _____ | ☐ Debtor 2 only | |
| | Other information: | ☐ Debtor 1 and Debtor 2 only | **Current value of the entire property?** / **Current value of the portion you own?** |
| | | ☐ At least one of the debtors and another | |
| | | ☐ **Check if this is community property** (see instructions) | $_____ / $_____ |

If you own or have more than one, list here:

| 4.2. | Make: _____ | **Who has an interest in the property?** Check one. | Do not deduct secured claims or exemptions. Put the amount of any secured claims on *Schedule D: Creditors Who Have Claims Secured by Property.* |
| | Model: _____ | ☐ Debtor 1 only | |
| | Year: _____ | ☐ Debtor 2 only | |
| | Other information: | ☐ Debtor 1 and Debtor 2 only | **Current value of the entire property?** / **Current value of the portion you own?** |
| | | ☐ At least one of the debtors and another | |
| | | ☐ **Check if this is community property** (see instructions) | $_____ / $_____ |

5. **Add the dollar value of the portion you own for all of your entries from Part 2, including any entries for pages you have attached for Part 2. Write that number here** ...................................➔ $ 9,000

Debtor 1    ANDREA STEINMANN DOWNS _____    8:16-bk-12589-CB

First Name    Middle Name    Last Name    Case number (if known)

| **Part 3:** | Describe Your Personal and Household Items |
|---|---|

**Do you own or have any legal or equitable interest in any of the following items?**

Current value of the portion you own?
Do not deduct secured claims or exemptions.

6. **Household goods and furnishings**
   *Examples:* Major appliances, furniture, linens, china, kitchenware
   ☐ No
   ☑ Yes. Describe......... | 2 couches, living room chairs, dining room set, 3 beds, 3 dressers, living room tables, nightstands, home decor artwork, outdoor furniture | $ 3,500

7. **Electronics**
   *Examples:* Televisions and radios; audio, video, stereo, and digital equipment; computers, printers, scanners; music collections; electronic devices including cell phones, cameras, media players, games
   ☐ No
   ☑ Yes. Describe......... | 2 wide-screen TVs, cd changer, VHS equipment and DVD players in storage | $ 1,000

8. **Collectibles of value**
   *Examples:* Antiques and figurines; paintings, prints, or other artwork; books, pictures, or other art objects; stamp, coin, or baseball card collections; other collections, memorabilia, collectibles
   ☐ No
   ☑ Yes. Describe......... | 2 Charis portraits of children; Lonesome Dove signed by author Larry McMurtry (held by former spouse, Tim Downs) | $ 1,500

9. **Equipment for sports and hobbies**
   *Examples:* Sports, photographic, exercise, and other hobby equipment; bicycles, pool tables, golf clubs, skis; canoes and kayaks; carpentry tools; musical instruments
   ☐ No
   ☑ Yes. Describe......... | See attached Rider Part 3, Question 9. | $ 1,220

10. **Firearms**
    *Examples:* Pistols, rifles, shotguns, ammunition, and related equipment
    ☑ No
    ☐ Yes. Describe......... | | $ 0

11. **Clothes**
    *Examples:* Everyday clothes, furs, leather coats, designer wear, shoes, accessories
    ☐ No
    ☑ Yes. Describe......... | See attached Rider Part 3, Question 11. | $ 5,000

12. **Jewelry**
    *Examples:* Everyday jewelry, costume jewelry, engagement rings, wedding rings, heirloom jewelry, watches, gems, gold, silver
    ☐ No
    ☑ Yes. Describe......... | Gold cross necklace and earrings with diamonds | $ 1,500

13. **Non-farm animals**
    *Examples:* Dogs, cats, birds, horses
    ☐ No
    ☑ Yes. Describe......... | See attached Rider Part 3, Question 13 | $ 35,000

14. **Any other personal and household items you did not already list, including any health aids you did not list**
    ☑ No
    ☐ Yes. Give specific information. ............... | | $ 0

15. Add the dollar value of all of your entries from Part 3, including any entries for pages you have attached for Part 3. Write that number here .................................................................➔ | $ 48,720

Debtor 1    ANDREA STEINMANN DOWNS                                              8:16-bk-12589-CB

_First Name_    _Middle Name_    _Last Name_    _Case number (if known)_

---

| **Part 4:** | Describe Your Financial Assets |

| Do you own or have any legal or equitable interest in any of the following? | **Current value of the portion you own?** Do not deduct secured claims or exemptions. |

**16. Cash**

*Examples:* Money you have in your wallet, in your home, in a safe deposit box, and on hand when you file your petition

☐ No
☑ Yes...................................................................................................... Cash: ....................  $_____ 50

**17. Deposits of money**

*Examples:* Checking, savings, or other financial accounts; certificates of deposit; shares in credit unions, brokerage houses, and other similar institutions. If you have multiple accounts with the same institution, list each.

☐ No
☑ Yes .....................

Institution name:

| 17.1. Checking account: | Wells Fargo Bank; xxxxx0016 | $_____ 22,596 |
| 17.2. Checking account: | | $_____ |
| 17.3. Savings account: | | $_____ |
| 17.4. Savings account: | | $_____ |
| 17.5. Certificates of deposit: | | $_____ |
| 17.6. Other financial account: | | $_____ |
| 17.7. Other financial account: | | $_____ |
| 17.8. Other financial account: | | $_____ |
| 17.9. Other financial account: | | $_____ |

**18. Bonds, mutual funds, or publicly traded stocks**

*Examples:* Bond funds, investment accounts with brokerage firms, money market accounts

☑ No
☐ Yes .................

Institution or issuer name:

$_____
$_____
$_____

**19. Non-publicly traded stock and interests in incorporated and unincorporated businesses, including an interest in an LLC, partnership, and joint venture**

☐ No
☑ Yes. Give specific information about them.........

| Name of entity: | % of ownership: | |
| See attached Rider Part 4, Question 19 | _____% | $_____ 50,000 |
| | _____% | $_____ |
| | _____% | $_____ |

---

Official Form 106A/B                    Schedule A/B: Property                    *EXHIBIT 1 - Page 7*                    page 5

EXHIBIT 5  PAGE 478

Debtor 1    ANDREA STEINMANN DOWNS                                               8:16-bk-12589-CB
First Name        Middle Name        Last Name                    Case number (if known)

**20.** **Government and corporate bonds and other negotiable and non-negotiable instruments**

*Negotiable instruments* include personal checks, cashiers' checks, promissory notes, and money orders.
*Non-negotiable instruments* are those you cannot transfer to someone by signing or delivering them.

☑ No
☐ Yes. Give specific         Issuer name:
information about
them......................         _____        $_____
                                  _____        $_____
                                  _____        $_____

**21.** **Retirement or pension accounts**

*Examples:* Interests in IRA, ERISA, Keogh, 401(k), 403(b), thrift savings accounts, or other pension or profit-sharing plans

☑ No
☐ Yes. List each         Type of account:    Institution name:
account separately.

401(k) or similar plan:    _____        $_____

Pension plan:             _____        $_____

IRA:                      _____        $_____

Retirement account:       _____        $_____

Keogh:                    _____        $_____

Additional account:       _____        $_____

Additional account:       _____        $_____

**22.** **Security deposits and prepayments**

Your share of all unused deposits you have made so that you may continue service or use from a company
*Examples:* Agreements with landlords, prepaid rent, public utilities (electric, gas, water), telecommunications
companies, or others

☑ No
☐ Yes.........................    Institution name or individual:

Electric:                 _____        $_____

Gas:                      _____        $_____

Heating oil:              _____        $_____

Security deposit on rental unit:  _____        $_____

Prepaid rent:             _____        $_____

Telephone:                _____        $_____

Water:                    _____        $_____

Rented furniture:         _____        $_____

Other:                    _____        $_____

**23.** **Annuities** (A contract for a periodic payment of money to you, either for life or for a number of years)

☑ No
☐ Yes.........................    Issuer name and description:

                                  _____        $_____
                                  _____        $_____
                                  _____        $_____

EXHIBIT 5  PAGE 479

Debtor 1    ANDREA STEINMANN DOWNS _____    Case number (if known) 8:16-bk-12589-CB
            First Name    Middle Name    Last Name

---

24. **Interests in an education IRA, in an account in a qualified ABLE program, or under a qualified state tuition program.**
26 U.S.C. §§ 530(b)(1), 529A(b), and 529(b)(1).

☑ No
☐ Yes .................................    Institution name and description. Separately file the records of any interests.11 U.S.C. § 521(c):

_____    $_____
_____    $_____
_____    $_____

25. **Trusts, equitable or future interests in property (other than anything listed in line 1), and rights or powers exercisable for your benefit**

☑ No
☐ Yes. Give specific information about them....    $_____

26. **Patents, copyrights, trademarks, trade secrets, and other intellectual property**
*Examples*: Internet domain names, websites, proceeds from royalties and licensing agreements

☑ No
☐ Yes. Give specific information about them....    $_____

27. **Licenses, franchises, and other general intangibles**
*Examples*: Building permits, exclusive licenses, cooperative association holdings, liquor licenses, professional licenses

☑ No
☐ Yes. Give specific information about them....    $_____

**Money or property owed to you?**    **Current value of the portion you own?**
Do not deduct secured claims or exemptions.

28. **Tax refunds owed to you**

☐ No
☑ Yes. Give specific information about them, including whether you already filed the returns and the tax years. ....................    2014 and 2015 Federal and State Refunds; returns are in process; amounts unknown

Federal:    $_____ Unknown
State:    $_____ Unknown
Local:    $_____

29. **Family support**
*Examples*: Past due or lump sum alimony, spousal support, child support, maintenance, divorce settlement, property settlement

☑ No
☐ Yes. Give specific information.............

Alimony:    $_____
Maintenance:    $_____
Support:    $_____
Divorce settlement:    $_____
Property settlement:    $_____

30. **Other amounts someone owes you**
*Examples*: Unpaid wages, disability insurance payments, disability benefits, sick pay, vacation pay,  workers' compensation, Social Security benefits; unpaid loans you made to someone else

☐ No
☑ Yes. Give specific information.............    CrowdCon payment for services rendered

$_____ 18,000

---

Official Form 106A/B    **Schedule A/B: Property**    *EXHIBIT 1 - Page 9*    page 7

EXHIBIT 5  PAGE 480

Debtor 1    ANDREA STEINMANN DOWNS                                    8:16-bk-12589-CB
            First Name    Middle Name    Last Name              Case number (if known)

---

**31. Interests in insurance policies**

*Examples:* Health, disability, or life insurance; health savings account (HSA); credit, homeowner's, or renter's insurance

☒ No

☐ Yes. Name the insurance company of each policy and list its value. ...

| Company name: | Beneficiary: | Surrender or refund value: |
|---|---|---|
| | | $_____ |
| | | $_____ |
| | | $_____ |

**32. Any interest in property that is due you from someone who has died**

If you are the beneficiary of a living trust, expect proceeds from a life insurance policy, or are currently entitled to receive property because someone has died.

☒ No

☐ Yes. Give specific information............. | | $_____

**33. Claims against third parties, whether or not you have filed a lawsuit or made a demand for payment**

*Examples:* Accidents, employment disputes, insurance claims, or rights to sue

☐ No

☒ Yes. Describe each claim. ..................  Malicious Prosecution Settlement vs Tim Downs (unpaid amt)    $  50,000

**34. Other contingent and unliquidated claims of every nature, including counterclaims of the debtor and rights to set off claims**

☐ No

☒ Yes. Describe each claim. ..................  See attached Rider Part 4, Question 34    $  250,000

**35. Any financial assets you did not already list**

☒ No

☐ Yes. Give specific information............ | | $_____

**36. Add the dollar value of all of your entries from Part 4, including any entries for pages you have attached for Part 4. Write that number here** ....................................... ➔    $  390,646

---

| Part 5: | Describe Any Business-Related Property You Own or Have an Interest In. List any real estate in Part 1. |
|---|---|

**37. Do you own or have any legal or equitable interest in any business-related property?**

☐ No. Go to Part 6.

☒ Yes. Go to line 38.

**Current value of the portion you own?**
Do not deduct secured claims or exemptions.

**38. Accounts receivable or commissions you already earned**

☐ No

☒ Yes. Describe.......  Commissions earned from CrowdCon    $  6,500

**39. Office equipment, furnishings, and supplies**

*Examples:* Business-related computers, software, modems, printers, copiers, fax machines, rugs, telephones, desks, chairs, electronic devices

☐ No

☒ Yes. Describe.......  Apple 15" Macbook Pro (2012); Dell Desktop (2011); HP All-in-One Printer (2011)    $  900

---

Official Form 106A/B                    Schedule A/B: Property        *EXHIBIT 1 - Page 10*                    page 8

EXHIBIT 5  PAGE 481

Debtor 1    ANDREA STEINMANN DOWNS                                    8:16-bk-12589-CB
              First Name    Middle Name    Last Name              Case number (if known)

**40. Machinery, fixtures, equipment, supplies you use in business, and tools of your trade**

☑ No

☐ Yes. Describe.......                                                              $_____

**41. Inventory**

☑ No

☐ Yes. Describe.......                                                              $_____

**42. Interests in partnerships or joint ventures**

☑ No

☐ Yes. Describe.......    Name of entity:                              % of ownership:

                          _____    _____%    $_____
                          _____    _____%    $_____
                          _____    _____%    $_____

**43. Customer lists, mailing lists, or other compilations**

☐ No

☑ Yes. **Do your lists include personally identifiable information** (as defined in 11 U.S.C. § 101(41A))?

    ☐ No

    ☑ Yes. Describe.......    CoastalShows Customer List              $    Unknown

**44. Any business-related property you did not already list**

☑ No

☐ Yes. Give specific
    information .........                                                           $_____
                                                                                   $_____
                                                                                   $_____
                                                                                   $_____
                                                                                   $_____
                                                                                   $_____

**45. Add the dollar value of all of your entries from Part 5, including any entries for pages you have attached
    for Part 5. Write that number here** ....................................➔    $    7,400

| Part 6: | Describe Any Farm- and Commercial Fishing-Related Property You Own or Have an Interest In. |
|---|---|
| | **If you own or have an interest in farmland, list it in Part 1.** |

**46. Do you own or have any legal or equitable interest in any farm- or commercial fishing-related property?**

☑ No. Go to Part 7.

☐ Yes. Go to line 47.

                                                                    **Current value of the
                                                                    portion you own?**
                                                                    Do not deduct secured claims
                                                                    or exemptions.

**47. Farm animals**

*Examples:* Livestock, poultry, farm-raised fish

☑ No

☐ Yes ........................                                                      $_____

Official Form 106A/B            **Schedule A/B: Property**    *EXHIBIT 1 - Page 11*        page 9

EXHIBIT 5  PAGE 482

Case 8:18-ap-01168-SC    Doc 330    Filed 08/05/21    Entered 08/05/21 19:10:46    Desc
Main Document    Page 487 of 661

Case 8:16-bk-12589-SC    Doc 207-1    Filed 03/20/17    Entered 03/20/17 22:53:07    Desc
Exhibit 1 - 2nd Amended Schedule A/B    Page 11 of 13

Debtor 1    ANDREA STEINMANN DOWNS                                          8:16-bk-12589-CB
          First Name    Middle Name    Last Name                    Case number (if known)

**48.** **Crops—either growing or harvested**

☑ No
☐ Yes. Give specific
information. ............                                                   $_____

**49.** **Farm and fishing equipment, implements, machinery, fixtures, and tools of trade**

☑ No
☐ Yes ........................                                              $_____

**50.** **Farm and fishing supplies, chemicals, and feed**

☑ No
☐ Yes ........................                                              $_____

**51.** **Any farm- and commercial fishing-related property you did not already list**

☑ No
☐ Yes. Give specific
information. ............                                                   $_____

**52.** **Add the dollar value of all of your entries from Part 6, including any entries for pages you have attached
for Part 6. Write that number here** ..................................................→    $_____0____

| Part 7: | Describe All Property You Own or Have an Interest in That You Did Not List Above |

**53.** **Do you have other property of any kind you did not already list?**

*Examples:* Season tickets, country club membership

☐ No
☑ Yes. Give specific
information. ............

Potential interest in retirement accounts held by former husband, Tim
Downs

$_____Unknown____
$_____
$_____

**54.** **Add the dollar value of all of your entries from Part 7. Write that number here** .........................................→    $_____Unknown____

| Part 8: | List the Totals of Each Part of this Form |

**55.** **Part 1: Total real estate, line 2** ..................................................................................→    $_____0.00____

**56.** **Part 2: Total vehicles, line 5**                                          $_____9,000____

**57.** **Part 3: Total personal and household items, line 15**                     $_____48,720____

**58.** **Part 4: Total financial assets, line 36**                                $_____390,646____

**59.** **Part 5: Total business-related property, line 45**                       $_____7,400____

**60.** **Part 6: Total farm- and fishing-related property, line 52**              $_____0____

**61.** **Part 7: Total other property not listed, line 54**                      +$_____Unknown____

**62.** **Total personal property.** Add lines 56 through 61. ....................    $_____455,766____    Copy personal property total →  +$_____455,766____

**63.** **Total of all property on Schedule A/B.** Add line 55 + line 62.............................................    $_____455,766____

In re:  ANDREA STEINMANN DOWNS                          Case No. 8:16-bk-12589-CB

Second Amended Schedules of Assets & Liabilities
Schedule A/B: Property

Rider - Part 3:  Question 9:

*Equipment for Sports and Hobbies*

| Description | Approximate Value |
|---|---|
| Horse Equipment: | |
| 1 CWD Saddle (12 years old) | $250 |
| 2 Bridles ($20 each) | $40 |
| 2 Horse Blankets ($10 each) | $20 |
| 1 Horse Equipment Trunk with Stable Name Markings | $250 |
| 1 Pair Ladies Custom Riding boots (7 years old, missing zipper/torn) | $150 |
| 3 "Hunt" Coats (7 years old) | $300 |
| 1 Riding Helmet (9 years old, very worn) | $10 |
| | |
| Beach Cruiser Bike, Skis and Canon Powershot camera | $200 |
| | |
| Total | $1,220 |

*EXHIBIT 1 - Page 13*

EXHIBIT 5  PAGE 484

In re:  ANDREA STEINMANN DOWNS                    Case No. 8:16-bk-12589-CB

### Second Amended Schedules of Assets & Liabilities
### Schedule A/B: Property

Rider - Part 3:  Question 11:

*Everyday Clothes, Furs, Leather Coats, Designer Wear, Shoes, Accessories*

| Description | Approximate Value |
|---|---|
| 2 Chanel Purses | |
| 2 Louis Vitton Purses | |
| 1 Stella McCartney Purse (very worn) | |
| 1 Dooney & Burke Purse (12 years old, lightly used) | |
| 1 Dolce Gabbana Purse (10 years old, very worn) | |
| 1 pair Chanel booties (7 years old, grey) | |
| 1 pair Yves St Laurent booties (lightly used) | |
| 1 pair Jimmy Choo heels (9 years old, dog chew damage) | |
| 1 pair Salvatore Ferragamo flats | |
| 1 pair Christian Louboutin sparkly heels (10 years old) | |
| 1 pair Christian Louboutin heels (11 years old, scuffed) | |
| 1 pair Christian Louboutin grey boots (7 years old) | |
| 1 pair Chanel heels (9 years old) | |
| 1 pair tall/thigh high "knock off" boots | |
| 1 Escape sequin dress (12 years old, missing sequins) | |
| 3 Jackets - business style | |
| Blouses - business style | |
| 1 Gucci Dress (old) | |
| And ordinary and necessary everyday clothing, accessories and shoes | |

Total          $5,000

*EXHIBIT 1 - Page 14*

EXHIBIT 5  PAGE 485

EXHIBIT 2 - 2ND AMENDED SUMMARY OF ASSETS
AND LIABILITIES AND CERTAIN STATISTICAL
INFORMATION

EXHIBIT 2

EXHIBIT 5  PAGE 486

**Fill in this information to identify your case:**

| | |
|---|---|
| Debtor 1 | ANDREA STEINMANN DOWNS |
| | First Name    Middle Name    Last Name |
| Debtor 2 | |
| (Spouse, if filing) | First Name    Middle Name    Last Name |
| United States Bankruptcy Court for the: | Central District of California |
| Case number | 8:16-bk-12589-CB |
| | (If known) |

☑ Check if this is an
amended filing

## Official Form 106Sum

### Summary of Your Assets and Liabilities and Certain Statistical Information    **12/15**

Be as complete and accurate as possible. If two married people are filing together, both are equally responsible for supplying correct information. Fill out all of your schedules first; then complete the information on this form. If you are filing amended schedules after you file your original forms, you must fill out a new *Summary* and check the box at the top of this page.

### Part 1:    Summarize Your Assets

**Your assets**
Value of what you own

1. *Schedule A/B: Property* (Official Form 106A/B)
   1a. Copy line 55, Total real estate, from *Schedule A/B* ............................................... $ 0

   1b. Copy line 62, Total personal property, from *Schedule A/B* .................................. $ 455,766

   1c. Copy line 63, Total of all property on *Schedule A/B* .......................................... $ 455,766

### Part 2:    Summarize Your Liabilities

**Your liabilities**
Amount you owe

2. *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 106D)
   2a. Copy the total you listed in Column A, *Amount of claim,* at the bottom of the last page of Part 1 of *Schedule D* ............ $ 75,000

3. *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 106E/F)
   3a. Copy the total claims from Part 1 (priority unsecured claims) from line 6e of *Schedule E/F* ........................................ $ Unknown

   3b. Copy the total claims from Part 2 (nonpriority unsecured claims) from line 6j of *Schedule E/F* ...................................... + $ 441,863

   **Your total liabilities** $ 441,863

### Part 3:    Summarize Your Income and Expenses

4. *Schedule I: Your Income* (Official Form 106I)
   Copy your combined monthly income from line 12 of *Schedule I* ...................................................................... $ 18,333

5. *Schedule J: Your Expenses* (Official Form 106J)
   Copy your monthly expenses from line 22c of *Schedule J* ...................................................................... $ 11,325

Official Form 106Sum          **Summary of Your Assets and Liabilities and Certain Statistical Information**          page 1 of 2
*EXHIBIT 2 - Page 15*

EXHIBIT 5  PAGE 487

Debtor 1    ANDREA STEINMANN DOWNS                                          Case number *(if known)*    8:16-bk-12589-CB
            First Name        Middle Name        Last Name

| **Part 4:** | Answer These Questions for Administrative and Statistical Records |
|---|---|

6. **Are you filing for bankruptcy under Chapters 7, 11, or 13?**

   ☐ No. You have nothing to report on this part of the form. Check this box and submit this form to the court with your other schedules.

   ☑ Yes

7. **What kind of debt do you have?**

   ☐ **Your debts are primarily consumer debts.** *Consumer debts* are those "incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). Fill out lines 8-9g for statistical purposes. 28 U.S.C. § 159.

   ☑ **Your debts are not primarily consumer debts.** You have nothing to report on this part of the form. Check this box and submit this form to the court with your other schedules.

8. **From the *Statement of Your Current Monthly Income*:** Copy your total current monthly income from Official Form 122A-1 Line 11; **OR**, Form 122B Line 11; **OR**, Form 122C-1 Line 14.

   $ _____ 14,516

9. **Copy the following special categories of claims from Part 4, line 6 of *Schedule E/F*:**

|  | Total claim |
|---|---|
| **From Part 4 on *Schedule E/F*, copy the following:** |  |
| 9a. Domestic support obligations (Copy line 6a.) | $_____ 0 |
| 9b. Taxes and certain other debts you owe the government. (Copy line 6b.) | $_____ Unknown |
| 9c. Claims for death or personal injury while you were intoxicated. (Copy line 6c.) | $_____ 0 |
| 9d. Student loans. (Copy line 6f.) | $_____ 0 |
| 9e. Obligations arising out of a separation agreement or divorce that you did not report as priority claims. (Copy line 6g.) | $_____ 0 |
| 9f. Debts to pension or profit-sharing plans, and other similar debts. (Copy line 6h.) | + $_____ 0 |
| 9g. **Total.** Add lines 9a through 9f. | $_____ 0 + Unknown |

**Fill in this information to identify your case:**

Debtor 1    ANDREA STEINMANN DOWNS
First Name    Middle Name    Last Name

Debtor 2
(Spouse, if filing)    First Name    Middle Name    Last Name

United States Bankruptcy Court for the:    Central District of California

Case number    8:16-bk-12589-CB
(If known)

☑ Check if this is an
amended filing

Official Form 106Dec

# Declaration About an Individual Debtor's Schedules    12/15

If two married people are filing together, both are equally responsible for supplying correct information.

You must file this form whenever you file bankruptcy schedules or amended schedules. Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

### Sign Below

**Did you pay or agree to pay someone who is NOT an attorney to help you fill out bankruptcy forms?**

☑ No

☐ Yes.    Name of person_____. Attach *Bankruptcy Petition Preparer's Notice, Declaration, and Signature* (Official Form 119).

**Under penalty of perjury, I declare that I have read the summary and schedules filed with this declaration and that they are true and correct.**

X _____    X _____
Signature of Debtor 1    Signature of Debtor 2

Date    03/20/2017    Date _____
MM / DD / YYYY    MM / DD / YYYY

```
 1                    UNITED STATES BANKRUPTCY COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3                              --oOo--

 4  In Re:                      ) Case No. 8:16-bk-12589-CB
                                )
 5  ANDREA STEINMANN DOWNS,     ) Chapter 7
                                )
 6          Debtor.             ) Santa Ana, California
    _____ ) Tuesday, December 17, 2019
 7                              ) 10:00 a.m.
    CASEY,                      )
 8                              ) Adv. No. 8:18-ap-01168-CB
            Plaintiff,          )
 9                              )
        vs.                     )
10                              )
    STEINMANN, ET AL.,          )
11                              )
            Defendants.         )
12  _____ )

13                              MOTION FOR ENTRY OF ORDER:
                                (1) COMPELLING TESTIMONY OF
14                              LORA RAE STEINMANN AT COURT
                                ORDERED 2004 EXAMINATION;
15                              (2) IMPOSING MONETARY
                                SANCTIONS;
16                              (3) FINDING CIVIL CONTEMPT;
                                AND
17                              (4) AWARDING ATTORNEYS' FEES
                                AND COSTS
18
                                TRUSTEE'S MOTION RE: JOINT
19                              STIPULATION ON DISPUTED ISSUES
                                REGARDING COMPELLING TESTIMONY
20                              OF LORA RAE STEINMANN AT COURT
                                ORDERED 2004 AND COMBINED
21                              DEPOSITION AND EXAMINATION AND
                                PRODUCTION OF DOCUMENTS
22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.
```

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  490

ii

| | |
|---|---|
| 1 | CONT STATUS CONFERENCE RE: COMPLAINT: |
| 2 | (1) TO AVOID AND RECOVER FRAUDULENT TRANSFERS PURSUANT |
| 3 | TO 11 U.S.C. SECTIONS 548(a)(1)(A), 544(b) and 550; |
| 4 | (2) FOR IMPOSITION OF A RESULTING TRUST; |
| 5 | (3) FOR DECLARATORY RELIEF; (4) FOR PRESERVATION OF THE |
| 6 | TRANSFER FOR THE BENEFIT OF THE ESTATE; |
| 7 | (5) FOR ATTORNEYS' FEES AND COSTS |

8

9                TRANSCRIPT OF PROCEEDINGS
10      BEFORE THE HONORABLE CATHERINE BAUER
             UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Hausman and          HAMID R. RAFATJOO, ESQ.
        Moellenhoff Creditors:   Raines Feldman, LLP
13                               1800 Avenue of the Stars
                                 12th Floor
14                               Los Angeles, California 90067
                                 (310) 440-4100
15
                                 ALAN J. KESSEL, ESQ.
16                               Pepper Hamilton, LLP
                                 4 Park Plaza, Suite 1200
17                               Irvine, California 92614
                                 (949) 567-3500
18

19  For Lora Rae Steinmann,      D. EDWARD HAYS, ESQ.
        Heinz H. Steinmann and   Marshack Hays, LLP
20      Eric Steinmann:          870 Roosevelt
                                 Irvine, California 92620
21                               (949) 333-7777

22  For the Chapter 7 Trustee:   JEFFREY I. GOLDEN, ESQ.
                                 Weiland, Golden & Goodrich,
23                                  LLP
                                 650 Town Center Drive
24                               Suite 950
                                 Costa Mesa, California 92626
25                               (714) 966-1000

iii

1  APPEARANCES:  (cont'd.)

2  For Jeffrey D. Steinmann,     E. SCOTT PALMER, ESQ.
      Teresa Steinmann-Stapleton, Law Office of E. Scott Palmer
3     Katy Steinmann-Belknap,     624 South Grand Avenue
      and Heinz J. Steinmann:     Los Angeles, California 90017
4                                 (213) 629-8704

5  For Susanna Steinman-Wilson,  GERALD P. KENNEDY, ESQ.
      Thomas Steinmann, John     Procopio, Cory, Hargreaves &
6     Steinmann and Mary            Savitch, LLP
      Steinmann-Sypkens:         525 B Street, Suite 2200
7                                 San Diego, California 92101
                                  (619) 238-1900
8

9  Court Recorder:               Sally Daniels
                                  United States Bankruptcy Court
10                                411 West Fourth Street
                                  Suite 2030
11                                Santa Ana, California 92701

12 Transcriber:                  Briggs Reporting Company, Inc.
                                  2160 Fletcher Parkway
13                                Suite 209
                                  El Cajon, California 92020
14                                (310) 410-4151

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

EXHIBIT 6  PAGE  492

1

1    SANTA ANA, CALIFORNIA TUESDAY, DECEMBER 17, 2019 10:00 AM

2                    --oOo--

3       (Call to order of the Court.)

4            THE COURT:  And now we'll go the Downs matters.

5  Numbers -- let me get there, 13 -- how many we got here?

6            Number 13 is Downs.  That's the motion for entry

7  of order compelling testimony, et cetera.

8            Number 14 is Downs.  That's the joint stipulation

9  on disputed issues.

10            Fifteen is Downs.  That's Casey vs. Steinmann,

11  status conference.  That's it.

12            Hello.

13            MR. RAFATJOO:  Good morning, your Honor.

14            THE COURT:  Good morning.

15            MR. RAFATJOO:  Hamid Rafatjoo of Raines Feldman,

16  LLP, for the Hausman and Moellenhoff creditors.

17            THE COURT:  Thank you.

18            MR. HAYS:  Good morning, your Honor.  For

19  Defendants, Lora Rae Steinmann, Heinz Steinmann and Eric

20  Steinmann, Ed Hays of Marshack Hays.

21            THE COURT:  Thank you.

22            MR. GOLDEN:  Good morning, your Honor.  Jeffrey

23  Golden of Weiland, Golden, Goodrich, on behalf of the

24  Trustee, Thomas Casey.

25            THE COURT:  Thank you so much.

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  493

2

1          And on the telephone?

2          MR. PALMER:  Yes.  Good morning, your Honor.

3  Scott Palmer appearing for four of the sibling Defendants,

4  Teresa Steinmann-Stapleton, Katy Steinmann-Belknap, Jeffrey

5  D. Steinmann and Heinz J. Steinmann.

6          THE COURT:  Thank you so much.

7          MR. KENNEDY:  Good morning, your Honor.  Gerald

8  Kennedy on behalf of the other sibling Defendants, Susanna

9  Steinmann-Wilson, Thomas Steinmann, John Steinmann and Mary

10  Steinmann-Sypkens.

11          THE COURT:  Great.  Thank you very much.

12          So, anything new?  I say, hopefully?

13          MR. HAYS:  Your Honor, I wouldn't say anything

14  new, per se, but I would like to address the Court in terms

15  of --

16          MR. RAFATJOO:  It's not your motion.  It's our

17  motion.

18          THE COURT:  I was hoping you guys would have

19  worked it out by now.

20          MR. GOLDEN:  That's how I interpreted, that's

21  actually how I interpreted your question, your Honor.

22          THE COURT:  Yeah.  I was hoping --

23          MR. GOLDEN:  I think --

24          THE COURT:  Because I --

25          MR. GOLDEN:  It sounds like they're concerned that

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  494

3

1  you won't let them argue.

2        THE COURT:  No.  I was just hoping that maybe you

3  guys resolved this.

4        MR. GOLDEN:  Right.

5        MR. HAYS:  There's not.

6        THE COURT:  No?

7        MR. HAYS:  Your Honor looked right at me, and I

8  was trying to address the Court.  And so, if counsel would

9  like to go first, I would have no problem, and I do accept

10  his apology for interrupting me.

11        THE COURT:  All right.  I don't know that I like

12  the tone of all of this.  I really don't.

13        MR. GOLDEN:  There's no resolution of anything at

14  this point, your Honor.

15        THE COURT:  Okay.  I've got to say, I'm not happy

16  that Mr. Rafatjoo went all the way up the mountain to find

17  out that he was not going to be able to ask any questions.

18  That just seems to me to lack some courtesy.  Let me start

19  there.

20        MR. RAFATJOO:  Thank you, your Honor.  Hamid --

21        THE COURT:  That was a long trip.

22        MR. RAFATJOO:  -- Hamid Rafatjoo of Raines Feldman

23  for the Hausman and Moellenhoff creditors.

24        Your Honor, last night as I was preparing for

25  this, I was trying to think of how many times I have stood

4

1  here trying to get discovery in this case.  First we started

2  with the Debtor.  The Court granted a 2004, numerous orders

3  on motion to compel, and since the petition date we've been

4  fighting with the Debtor to get discovery documents.  The

5  Court had issued sanction orders that have gone unpaid while

6  the Debtor goes on her merry way.

7          I understand as soon as I mention the Debtor's

8  name people stand up and say, we're not the Debtor.  But I

9  stood here again approximately six months ago when we were

10  talking about discovery, when we had filed -- the Trustee

11  had filed his motion for 2004 orders, they had filed their

12  motion for protective orders.

13          We were talking about discovery cutoff dates, and

14  I raised these very concerns, your Honor.  I raised the

15  history of this case, and the Debtor's lack of cooperation,

16  and just blatant disregard for this Court's orders.  And we

17  were told, we're not the Debtor.

18          So when this Court issued its 2004 orders based on

19  the Trustee's motion and our joinder, you stated that you

20  hoped that the parties will learn to cooperate with one

21  another, or, and I quote, "you'll be a very unhappy camper."

22          A few months ago, before Ms. Steinmann's

23  deposition, I stood here and I held up six or nine pages of

24  documents that were produced in response to the 2004.  And I

25  stated that I expected the discovery cutoff date would need

5

1 to be extended, because we seem to be dealing with people

2 who also considered themselves above the law, and do not

3 need to adhere to this Court's orders.

4          So imagine my surprise, frustration, and, frankly,

5 anger, when I drove 87 miles in morning traffic to

6 accommodate Ms. Steinmann, because she couldn't travel

7 allegedly, to learn for the first time from Mr. Hays, glad

8 you came out.  I'm not going to allow you to ask any

9 questions, and if you do, I am going to instruct my client

10 not to answer.

11          And this was based, apparently, on a decision that

12 was made by Mr. Hays and Mr. Eric Steinmann, that we just

13 filed a joinder.  They thought that we just wanted to come

14 and sit there and listen, because we couldn't read the

15 transcript afterwards.

16          And when you think about what -- how we got there,

17 you think about the hearings before this Court.  It wasn't

18 just one hearing.  There were multiple hearings that led to

19 the Steinmann deposition.  There were multiple conference

20 calls, multiple e-mails.  Not once was the issue raised of,

21 hey, Hamid, we're not going to ask you -- let you ask any

22 questions by the way.

23          When they stood here and argued in opposition to

24 the motion for intervention and they said, your Honor, why

25 would you even consider this?  They've been involved in

6

1  every phase.  They participate, they do everything.  You

2  don't need to bring this motion for intervention.

3          So imagine the decision making that was the

4  calculation that went into the process of saying, hey, I've

5  got a good one.  Let's drag him out to Wrightwood, and when

6  they get there, we will say you can't ask any questions or

7  we will instruct our client not to answer any questions.

8          Never mind that the deposition of Lora Steinmann

9  was pursuant to the 2004 order in the main case, and that we

10  were trying to be accommodating and have it overlap with the

11  adversary as well.

12          Never mind that this Court had authorized our

13  participation in the deposition.  Notwithstanding Eric

14  Steinmann and Mr. Hays made the decision that it would be

15  okay for me to drive out there, and for the first time to

16  learn, I'm not allowed to ask any questions, and if I do,

17  they're going to instruct the client not to answer.

18          So first you look at our joinder that we had filed

19  in the 2004.  That joinder specifically stated that we

20  intended to participate in the deposition.  Second -- and

21  it's in the transcripts, your Honor.  It's in the record

22  before you.  Mr. Hays had told Mr. Golden, by the way, I'm

23  not going to allow Hamid to ask any questions.  And Mr.

24  Golden had informed Mr. Hays, I believe he's coming out to

25  ask questions.  Yet the decision was made, we're not going

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  498

7

1  to let the Hausman-Moellenhoff creditors know.  Let them

2  incur the expense.  Let them spend the money on the

3  attorneys' fees, let them waste their time.

4      Your Honor, the frustrating part is, all the time

5  and energy that went into scheduling it outside of what the

6  Court is aware.  Mr. Steinmann and Mr. Hays must believe

7  that we are all gullible and naive to buy into this twisted

8  interpretation of the facts that, we didn't think you were

9  going to ask questions.  Shucks, we didn't know.

10     And in their opposition they take this position,

11  which is just, I don't even know where it comes from, well,

12  if you notice it up we'll allow you to ask questions.  What

13  have we been going through for the past few months?

14     Your Honor, the reality is that Eric Steinmann and

15  Ed Hays planned for me to drive 87 miles each way.  They

16  planned to cause my clients to incur fees, and all of this

17  was done intentionally, unprofessionally, and with the

18  actual intent of creating a problem and causing the waste of

19  money.

20     Your Honor, this kind of strategy, this kind of

21  planning, far outweighs Andrea Downs' feigned ignorance of

22  court orders or the process.  This was deliberate.  This was

23  calculated and it was in bad faith.

24     For that, your Honor, I think this is the

25  opportunity to send a message that this is not acceptable.

8

1  This case needs to move along once and for all.  And this

2  sort of behavior, lack of professionalism, lack of candor,

3  and frankly, thumbing your nose at this Court's orders, is

4  not going to be tolerated.  If this sort of behavior is not

5  sanctionable, your Honor, I don't know what is.

6          Your Honor, I know you've read the pleadings, and

7  you have certainly stated your opinion regarding what

8  transpired and having me drive out there, but let's get to

9  the next issue here.  Even when we got out there, Mr. Golden

10 was allowed to ask questions.

11         And, again, for the first time, after the Court

12 had issued a 2004 order, after the Court had ruled on a

13 motion for a protective order, Mr. Hays takes the position

14 of, you can come here, you can ask questions, but if you

15 start asking questions that we don't like, I guess as to

16 what assets are in the trust, or if you ask questions that

17 we believe are not relevant, forget about what the court

18 order says, if we believe the questions aren't relevant, we

19 are going to instruct our client not to answer.  Thank you

20 for driving out, but we're going to take that position.

21         Not follow what the rules provide, what the

22 Federal Rule of Bankruptcy Procedures provides in terms of

23 objections, that you note them on the record and then you

24 file a motion for protective order.  Not following case law

25 that says, relevance objections are not a basis for

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  500

9

1  instructing your client to not to answer.

2          I think there is a misunderstanding here on the

3  part of these Defendants as to the role of parties.  We're

4  all the parties to the action.  You are the Judge.  We put

5  issues before you, you rule on those issues, you issue

6  orders.  And until those orders are vacated by you or

7  reversed by an appellate court, those orders stand and must

8  be adhered to.

9          Apparently that unless you are the Defendants,

10  because the Defendants disagree with this Court's ruling on

11  the motion to dismiss.  They are not happy that their motion

12  to dismiss was denied.  They appealed it.  The appellate

13  court denied it.  But they believe, because they have

14  reached the decision that this case is about one narrow

15  issue, and that's whether the trust is revocable or not, and

16  what California law says about it.  Because they believe

17  that that's the issue, that's the only discovery they're

18  going to respond to.  That is the only questions they are

19  going to answer.

20          Forget about what you order, forget about what the

21  appellate court says, forget about what the Trustee wants,

22  Ed Hays and Eric Steinmann have decided that the issue

23  before this Court is a very narrow issue, therefore,

24  regardless of what happens, they're not going to adhere to

25  those orders, and they're not going to provide discovery

*Briggs Reporting Company, Inc.*

EXHIBIT 6  PAGE 501

10

1  responses.

2         When you look at the transcript that is in the

3  record, your Honor, this position becomes evident.  When you

4  start asking questions regarding the assets of the trust,

5  there's a complete shutdown.

6         Now, keep in mind, this is the same trust, that

7  while before the Trustee's appointment, how many times did

8  Andrea Downs testify in 341(a) meetings and in this Court, I

9  don't know if there's a will, I don't know if there's a

10 trust, I don't know anything?  Only to have her mother in a

11 deposition state, yeah, we told Andrea before the bankruptcy

12 that we were taking her name out of the trust, so that you

13 guys wouldn't get to our assets.

14        Your Honor, when it comes to discovery, they lie,

15 they ignore the Court's orders, they act unprofessionally,

16 and they get away with it.  Andrea Downs gotten sanctioned.

17 Hasn't paid a dime towards it, and she's living her life.

18 That is not the process.  That is now how it works.

19        Your Honor, you issued the 2004 order after

20 oppositions were filed to it, and after a motion for

21 protective order was filed in conjunction with it and ruled

22 upon.  When they filed their motion for protective order,

23 they already had our 2004.  They knew what documents we were

24 looking for.  They had our joinder.  But they filed their

25 motion for protective order not based on privacy issues,

*Briggs Reporting Company, Inc.*

EXHIBIT 6  PAGE  502

11

1  because they didn't want to tee that up yet.  This is part

2  of the grand strategy of delay, delay, delay, and cause the

3  burning of fees.

4         They filed their protective order based on the

5  health of Ms. Steinmann and her husband, and we agreed to

6  it.  We said, we'll drive out to Wrightwood.  We get there,

7  no, we're not going to allow you to ask questions, and we're

8  -- even if you ask, we're not going answer them.

9         They make these arguments regarding a prejudgment

10  financial right to privacy.  How that issue is applicable

11  here is beyond me.  We have court orders that say, you shall

12  provide this information.  This information would be

13  available to the Trustee regardless of whether or not there

14  was an adversary action pending.  That's the purpose of a

15  2004.

16         It is the Trustee's job to determine the extent of

17  the interest that this Debtor's estate has, had in this

18  trust, and what the value of that interest is.  So this

19  entire argument regarding, you can't get any information

20  because you don't have a judgment yet, is irrelevant and it

21  is inapplicable and contradicts this Court's orders.

22         And, again, your Honor, instead of allowing Ms.

23  Steinmann to answer, then seeking a protective order, or

24  maybe raising these issues in their first motion for

25  protective order.  I honestly don't know how many protective

12

1  orders can be filed in connection with one single 2004.

2  They had their shot.  They didn't raise it, but now they

3  decided to raise it.  Or maybe they had planned all of this

4  stuff out.  I don't know, and chances are we're not going to

5  get any answer to that question.  But what I do know is that

6  this is not how the process works, your Honor.

7          Your Honor, the Defendants are banking on the fact

8  that you won't sanction them.  They are banking on the fact

9  that you will just admonish them and tell them to cooperate.

10  And that they would consider a win, because they have wasted

11  the Trustee's time, they have wasted our time, they have

12  dragged us out to Wrightwood, wasted our day, and caused our

13  clients to pay us, and it's all good.  They got away with

14  it.

15          And meanwhile, they allowed the discovery clock to

16  tick, so that they can stand here and say, your Honor, this

17  is -- we don't understand why the Trustee hasn't moved us

18  along.  We have offered Eric Steinmann up for deposition 300

19  times.  What am I going to do with a deposition if I do not

20  have documents?  What is the purpose, to just burn the

21  clock, burn fees?

22          Your Honor, I know this case has been pending

23  before you for a very long time, and I know this is not the

24  first time you have heard these sort of issues.  When it

25  comes to this family, their willingness to adhere to this

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  504

13

1  How would you like to proceed?

2          THE COURT:  Well, I have a question.  What's going

3  on with Eric's exam?  I mean, I know you want documents.  I

4  mean, I'm fed up, frankly.  I want to order here, for the

5  exam to take place here in this courtroom, and he is to

6  bring documents.  He seems to be the lynchpin here, and I'm

7  tired of this game.

8          MR. RAFATJOO:  I know, your Honor.  I know that we

9  have been -- since the Court's ruling on intervention,

10 there's a lot of 2004 subpoenas and discovery that have been

11 prepared and is ready to go out.  So, we should be able to

12 get those out before the end of the year, and ready to set

13 his -- you know, as soon as they produce documents, give us

14 time to review the documents --

15         THE COURT:  Well, what if I just say, he has to be

16 here by a date certain, we're going to do it here in the

17 courtroom, and he is to bring documents?  I'm just, I want

18 to short-circuit this.

19         MR. RAFATJOO:  It's fine --

20         THE COURT:  This is just, it's such a game with

21 them.

22         MR. RAFATJOO:  Your Honor, listen, that's fine,

23 too.  My concern with that is going to be the following.

24 For us, they going to, they're either going to show up with

25 two pages, or they going to say, you want documents?

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  505

14

1  They're going to fill up the room, and then we do not have

2  time to get through the documents.

3         So, if you want to order that, I'm perfectly

4  happy, and I would appreciate that.  But let's have the

5  document production be before he shows up here, if possible.

6  I know mister -- well --

7         THE COURT:  I'm trying to think of ways to make

8  sure that it happens --

9         MR. RAFATJOO:  I understand.

10        THE COURT:  -- because I don't believe it will

11 happen.  And then they'll say, delay, delay.

12        MR. RAFATJOO:  Mr. Golden --

13        THE COURT:  Mr. Golden, any ideas?

14        MR. GOLDEN:  If I could offer a suggestion.  I

15 don't want to -- okay.  Just a suggestion on the point that

16 the Court made specifically just now, might be to issue a

17 date for Eric's examination that works for everyone.  And

18 then some period before that, a date for a hearing in this

19 court by which the production of was to occur, so we can

20 just discuss that.

21        In other -- so, rather than have a situation where

22 -- lots of times it happens, too, it's like, you know, a

23 deponent, a deponent says, there's other documents. In this

24 particular case, you note in the transcript Ms. Diamond

25 said, I never checked my e-mails even though I was asked to

*Briggs Reporting Company, Inc.*

EXHIBIT 6  PAGE 506

15

1  look for all the documents.  So, these have only been six or

2  seven or eight pages, but she said, I never went through my

3  e-mails, I never -- you know, so you want people to have

4  acknowledge that they've looked for what they can and they

5  found what they have.  So that would be the ideal situation.

6          And we just, we didn't want to ink Eric's

7  examination without the Court being able to rule on the

8  matters before the Court, because otherwise we felt, I felt

9  we're going to be in the same situation again.

10          THE COURT:  I want there to be some teeth here.  I

11  was just -- I mean, Eric needs to come here.  I'm just so

12  tired of this.  He's in the background actively doing

13  things.  He needs to be here.

14          MR. RAFATJOO:  I agree, your Honor.

15          THE COURT:  And my -- I'm not holding my breath

16  for him to give up any docs, really I'm not.

17          All right.  I'm open to suggestions.  I'm going to

18  let Mr. Hays -- I'm just tried, Mr. Hays, of these people.

19  I'm really tired.  I understand they don't like being sued,

20  but the Trustee has an obligation here, and we need answers

21  to questions.  Is there a side deal here?

22          What -- you know, she was cut out of the trust

23  right before she filed bankruptcy, right after a major

24  judgment.  Yeah, there seems to be some coordination if you

25  just look at the surface.  But since we're getting no

*Briggs Reporting Company, Inc.*

EXHIBIT 6  PAGE  507

16

1  cooperation from them whatsoever --

2          MR. RAFATJOO:  Your Honor --

3          THE COURT:  -- you would think if there wasn't

4  anything, we would be getting cooperation.

5          MR. RAFATJOO:  One of the questions that Mr.

6  Golden asked was, have you given Andrea any money?

7          THE COURT:  Yeah, I'm --

8          MR. RAFATJOO:  We're not answering that.

9          THE COURT:  Yeah, that's ridiculous.  I'm sorry.

10         MR. GOLDEN:  Or what interest did she have -- you

11  know, what was her interest in the trust at one point in

12  time?  What was the interest in -- what was her interest in

13  the trust at the time it was gone?

14         I mean, even from her -- even from a very narrow

15  perspective, without even context or anything else like

16  that, those are -- you know, as the Trustee, Mr. Casey

17  should be in a position to know that.

18         And I'll tell you, too -- and I don't want to

19  interrupt the flow of communication, but, you know, my --

20  there is a lot of communication about -- comments about how,

21  you know, we're not moving fast enough.

22         I will put on the record, Mr. Casey's admonition

23  to me in this case is, get this case resolved as quickly as

24  possible for the creditors, for cost, for the Court, because

25  many courts, especially this Court, doesn't like adversaries

17

1 in general just to linger, and move this thing as quickly as

2 possible.

3        And I'm telling you, that is my instruction, and I

4 want to accomplish that, but I -- exactly like the Court

5 said, I can't, I can't -- without the information, I can't

6 figure it out.  And we have a whole stack of subpoenas for

7 documents from third parties and the like.

8        And I'll tell you, just on the Eric issue, and

9 this is not in our papers because it came up afterwards.

10 But, your Honor, I do think Mr. Steinmann's the lynchpin.  I

11 argued the Bankruptcy Appellate Panel appeal in the

12 Norio matter of this Court, and the parties that were

13 present was a lawyer representing Norio and Eric Steinmann.

14        Those were the only people at the Bankruptcy

15 Appellate Panel courtroom with me, which made me wonder, you

16 know, what is going on?  But we, I think we know what's

17 going on in terms of who has the information and who has the

18 access.

19        Ms. Lora Steinmann initially wouldn't tell me who

20 the lawyer for the -- you know, who the person for the trust

21 who is handling it.  It ultimately came out that it was

22 Eric.  Eric coordinated everything.

23        THE COURT:  Well, Eric's, he's an attorney.  He's

24 a CPA.  Yeah --

25        MR. GOLDEN:  Right,.

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  509

18

1          THE COURT:  -- he's managing, apparently, the

2    family trust, so we need him.  And I'm not happy -- I mean,

3    I'll report him to the Bar if I have to, if he doesn't

4    cooperate.

5          MR. RAFATJOO:  Your Honor, I'll let Mr. Hays

6    address the Court.

7          MR. HAYS:  Your Honor, I appreciate the Court's

8    frustrations, and we're equally frustrated.  I can't tell

9    you the last time I was in front of a court on a discovery

10   dispute.  We do everything we can to try to avoid discovery

11   disputes because that's the last thing any of us want to

12   deal with, especially the Court.

13          With respect to Eric Steinmann coming to

14   California, you can schedule the examination here, you can

15   order it here, that's fine, but since the early part of the

16   summer, I have had dozens and dozens of conversations and

17   written communications with Mr. Golden, when do you want to

18   schedule Eric's examination?  Eric is coming to California

19   on these dates.  Do you want to put it on this date or this

20   date?  We have offered many, many, many times to schedule

21   it.

22          And these comments about, well, we don't know what

23   information we'll get in light of Lora's examination is

24   really sort of disingenuous, because it -- the issues in

25   Lora's examination came up in September, when we've been

19

1    offering to provide Eric as early as June.

2           THE COURT:  Okay.  I want Eric to come.

3           MR. HAYS:  Well, and that's fine.  We've --

4           THE COURT:  I'm so tired, I'm so tired of this.

5           MR. HAYS:  There's no dispute over that.  We have

6    offered that.  That's what the Court ordered, and that's

7    what we have offered.

8           THE COURT:  But I am now ordering him to come to

9    court.  And, you know, I don't know if I even buy -- I mean,

10   his State Bar says he's in Wrightwood, everything seems to

11   say he's in Wrightwood.  But he says he has a license in

12   Florida.  Well, anybody can have a license in Florida.  It

13   doesn't mean that's where they live.

14          Regardless, I'm not buying it.  I want him here in

15   this courtroom, with or without documents.  But if he comes

16   without documents, he will be coming back with documents,

17   even if I have to send the marshals out for him.

18          MR. HAYS:  And, your Honor, we have provided all

19   responsive documents on behalf of Eric and --

20          THE COURT:  I don't buy it.  I don't buy it.  This

21   family's stonewalling.  Eric is the lynchpin.  And like I

22   said, I will report him to the State Bar if this goes any

23   further.  I don't believe him.

24          MR. HAYS:  And, your Honor, there's no reason to

25   do that.  And if we can --

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 511

20

1        THE COURT:  Well, you can tell him that's what I'm

2  thinking of doing.

3        MR. HAYS:  And I absolutely will, your Honor.

4  I'll even pull a copy of the transcript and provide it to

5  him.

6        The -- but the issue here is not a grand scheme of

7  delay tactics or anything else like that.  The issue in this

8  case is fairly clear and it's fairly narrow.  The issue in

9  this case is, the Debtor was once a beneficiary of a

10  revocable trust.  And the Debtor's interest in that trust

11  was terminated prior to bankruptcy, and the Trustee has sued

12  to restore the Debtor's interest in the revocable trust.

13        So, the facts are fairly clear.  If you then look

14  at the law, where the Trustee is trying to avoid an

15  interest, one, you can only avoid a transfer made by the

16  Debtor of an interest in property, when the Debtor didn't

17  even do this.  This was the parents deciding to do this.

18        But, two, it makes no difference whatsoever.

19  California law is clear that you never have rights in

20  property as a revocable beneficiary.  But that's what the

21  Trustee is suing to restore.

22        THE COURT:  But hypothetically, if there are side

23  documents or side deals to restore Andrea to the trust as

24  soon as all of this is over, wouldn't that be something that

25  we should look at?

*Briggs Reporting Company, Inc.*

EXHIBIT 6  PAGE 512

21

1          MR. HAYS:  There are no such documents, but even

2  if --

3          THE COURT:  Do we have that under penalty of

4  perjury from Eric and from the mother and every -- there are

5  no documents of that sort?

6          MR. HAYS:  There are no documents.  There is no

7  evidence there --

8          THE COURT:  Do I have a declaration that says

9  under penalty of perjury there are no documents, no oral

10  agreements?  I don't think I do.  I don't think anybody has

11  seen that.

12          MR. HAYS:  Your Honor, they conducted Lora Rae's

13  examination.  I can't tell you --

14          THE COURT:  And she wouldn't give them anything.

15          MR. HAYS:  That's not true.  We were there for

16  several hours of questions, and most of the questions were

17  answered.  The only issues we're here on are the questions

18  that weren't answered.  And --

19          THE COURT:  Steps she took to collect requested

20  documents she was told not to answer.

21          MR. HAYS:  The issues regarding those documents,

22  your Honor, were, did you have communications with your

23  attorneys regarding documents of Andrea's interest in the

24  trust or what have you.  And I wasn't going to have my

25  client starting to talk about the contents of an attorney-

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  513

22

1  client privileged communication.

2        THE COURT:  All right.

3        MR. HAYS:  But lot's of questions dealing with,

4  what is Andrea's interest in property, if any, all of those

5  were answered.  And the only things that -- you know, the

6  vast, vast majority of all of the questions that were not

7  answered fall into this one category, and the one category

8  is, what were the assets of the trust?  What are the value

9  of those assets?

10        And it's clear, and we cited in our opposition

11  brief to the motion today, that under the California Probate

12  Code a revocable beneficiary --

13        THE COURT:  Okay.  I don't want to get into it

14  today, because that's -- yes, I know what you're arguing.  I

15  get it.

16        But just thinking out loud, could we require that

17  Eric and -- I don't know, maybe every defendant, if they

18  were to say that there is no side deal, there's nothing in

19  writing, there's nothing oral.  They weren't involved in any

20  kind of scheme to take Andrea out and then put her back in.

21        I think I would have -- if I -- you know, knowing

22  what this case is about, if I were one of the siblings, the

23  mom, the brother, I would do a declaration like that.  I've

24  see nothing, nothing of the sort.

25        MR. HAYS:  And, your Honor, the counsel -- well,

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 514

23

1 the proper procedural vehicle I don't think has yet occurred

2 in this case, which I think would be a motion for summary

3 judgment on these issues.  But counsel for the siblings are

4 on the phone, and they can provide that kind of a

5 declaration.

6          And I can represent to the Court, I have never

7 heard of any kind of secret side agreement --

8          THE COURT:  You never heard of it, but as -- they

9 didn't -- there's no declaration under penalty of perjury.

10 I'm sure Eric is going to say, attorney-client privilege.

11          MR. HAYS:  I doubt that.

12          THE COURT:  I just -- that's -- because he was the

13 attorney -- he's the attorney for the trust, right?

14          MR. HAYS:  No, I do not believe he's the attorney

15 for the trust, your Honor.  I think he's an attorney, but I

16 do not believe he was the attorney for the trust.  He's the

17 trustee of the trust, but he is not the attorney for the

18 trust.

19          So, again, if your Honor wants those declarations,

20 I don't think it will be hard to get them, because no such

21 facts, no such evidence exists.  There is no secret side

22 agreement here.

23          And that's not why we're here today, but I do

24 think it's important to note for the Court, that even though

25 the probate code is so clear that a revocable beneficiary,

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  515

24

1 which the bankruptcy is not even yet because they haven't

2 prevailed in the lawsuit.  But even if they prevailed in the

3 lawsuit, a revocable beneficiary has no rights to ask about

4 the assets of the trust.

5          THE COURT:  But we're not there yet.  I appreciate

6 that you think that the Trustee's just wrong in general, but

7 we're trying to get discovery to move along.

8          MR. HAYS:  But that's my point, is even if we

9 assume the Trustee wins this lawsuit, and becomes a

10 revocable beneficiary of the trust again, that does not give

11 the Trustee the right to ask questions about assets of the

12 trust.  Because trust property and a revocable trust

13 continues to be owned by the settlors, and the Probate Code

14 Section 16069 I think it is, is very clear --

15          THE COURT:  And that might be overbroad right now,

16 you're right, but whether or not there are any arrangements

17 -- you know, it's super fishy that she's cut out of this

18 trust right before she files bankruptcy.  And then mom says,

19 yeah, we did it to keep her from having to pay this

20 judgment.  I mean, come on, that right there smells.

21          MR. HAYS:  But, your Honor, there is no question

22 that was asked, and no question that wasn't answered dealing

23 with, is there a secret side agreement?  That's not why

24 we're before you today.

25          THE COURT:  Well, two of the things definitely

*Briggs Reporting Company, Inc.*

EXHIBIT 6  PAGE 516

25

1  should have been answered.  Documents relating to payments

2  or transactions made to or for the benefit of the Debtor.  I

3  think that should have been answered.  Steps taken to

4  collect the documents that were requested, I think that

5  should have been answered.  Okay.  Maybe some of these

6  others are a little overbroad about, you know, what all is

7  in the trust.  But those two questions, those should have

8  been answered.

9        MR. HAYS:  And, your Honor, without violating and

10  privilege, we can answer the question about what steps were

11  taken to gather the documents.  I think the question was

12  formed in a way that raised the issue of privilege.  If --

13  we can easily clear that up.

14        Secondly --

15        THE COURT:  But if the answer is, none, then I got

16  a problem.

17        MR. HAYS:  And I --

18        THE COURT:  Yeah, I didn't look at my e-mails.

19  Yeah, I just looked to see if I had anything laying around,

20  and that's all I had.  I mean, that's not good enough.

21        MR. HAYS:  And, your Honor, Ms. Steinmann, I

22  believe is in her 70's, and I don't know how proficient she

23  is with e-mails, but --

24        THE COURT:  All right.  But we will get Eric in

25  here and he will answer.

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  517

26

1          MR. HAYS:  I understand.  And that will be fine,

2    your Honor.  But I think the bigger point to keep in mind

3    here is that this, while a 2004 may be a fishing expedition

4    vis-a-vis a debtor, it's not a fishing expedition vis-a-vis

5    a third-party's assets.  And that was the thrust of all of

6    this, all of these questions --

7          THE COURT:  Well, if we --

8          MR. HAYS:  -- or the vast majority I should say.

9          THE COURT:  -- if we do it here in the courtroom

10   with Eric, then if there are any issues over the questions

11   we will take care of them right away.

12         MR. HAYS:  And that's fine with me, your Honor.

13         The other thing that I think is important to keep

14   in mind is that Mr. Rafatjoo wants to say people are

15   disregarding the rules and all of these other things.  It's

16   very basic notion of due process that if you're going to

17   examine a witness, you provide notice.  There was no notice

18   provided whatsoever.

19         And you need to keep in mind that at the time the

20   examination was occurring, the motion to intervene had not

21   yet been, you know, I don't even think it had been filed,

22   let alone granted.  And so, the Trustee was combining the

23   dual examination of the 2004 with the deposition.  And so

24   there was going to be crossover of things that would

25   pertain, potentially, to a 2004 and not to a deposition.

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  518

27

1          So, had we had notice of all of this, we could

2     have tried to work it out.  I did have conversations with

3     Mr. Golden, and there is no secret, this wasn't a sandbag

4     job at the time of the deposition that I don't think that

5     this can occur in this manner.  And so there was no sandbag

6     here.  There is no bad faith here.  This is the basic

7     matter, if you want to conduct an examination, you provide

8     notice so that we can try to work out all of the issues and

9     situations in advance.

10          The -- there's other things that I want to

11     mention, included is, the Rule 2004 order that was entered

12     by this Court was entered two weeks after the examination.

13     So, while Mr. Rafatjoo wants to hold my client in contempt

14     of a court order, you can't be in contempt of a court order

15     that hasn't yet even been entered.

16          And so there is a big problem there with the

17     request for an adjudication and finding of contempt, and

18     there is no reason for it.  Your Honor will rule on the

19     scope of questions to be answered, and my client will answer

20     those questions.

21          If Mr. Rafatjoo wants to conduct further, you

22     know, a third day of examination because he's already done

23     two -- his firm, his clients have done two examinations of

24     Mrs. Steinmann before.  If they want to conduct a third,

25     they can notice it up and we can go have a third day of

28

1 examination.

2          The important part of all of this is, this was the

3 first step by the Trustee to move forward with discovery on

4 what's now a 15-month-old adversary case.  And the 2004

5 orders, the hearings were back in February.  And this was

6 seven months later, and it has been us constantly reaching

7 out to the Trustee saying, when do you want to conduct these

8 examinations?  What do you want to do here?  We need to move

9 this forward.  We have mediation cutoff dates.

10          It's been our side that's been trying to move the

11 action along here, and these are real issues that were, you

12 know, valid objections taken in good faith that are fully

13 recognized under California law.  That the revocable

14 beneficiary has no right to ask questions about assets of

15 the trust or their value.

16          So what we would ask the Court to do is, deny this

17 motion.  I don't think it's necessary -- well, you can deny

18 the motion with respect to contempt and sanctions.  There's

19 just no reason for any of that.

20          THE COURT:  Well, Mr. Rafatjoo went up there for

21 nothing.

22          MR. HAYS:  Well, your Honor, if he wanted to ask

23 questions, all he had to do was serve a notice.  Serve a

24 notice.  How hard is that?  If you want to say you're above

25 the law and you can disregard procedure, it's Mr. Rafatjoo

29

1  who doesn't comply with procedure, and then wants to turn

2  around and complain about the result of that.

3       THE COURT:  I'm certain nobody called him to say,

4  you know, don't bother coming because you're not going to be

5  able to ask any questions.  I'm amazed.

6       MR. HAYS:  Your Honor --

7       THE COURT:  I mean, after we went out of our way

8  to, you know, to have this close by.  You know, excuse the

9  dad, just had, you know, mom come.  And it was in

10  Wrightwood, which is a drive and a half.  I'm just appalled

11  that nobody said, don't bother coming if you want to ask

12  questions.  I really am.  And I'm not blaming you, Mr. Hays,

13  really, I'm blaming your clients.

14       MR. HAYS:  Well, your Honor, and I don't want to

15  put the blame on my clients.  I think that this was a

16  situation that developed, and I do not think that the blame

17  is entirely on our side for counsel not following the rules

18  and providing a basic notice that they intend to conduct an

19  examination.

20       That would have led to further discussions where

21  we talk about, well, what questions are you going to ask,

22  because you're not a party to the adversary, and the

23  adversary's pending and anything dealing with avoidance.

24  And the Court has now ruled that they have no right to

25  intervene on the avoidance portion of the adversary, the

30

1  first claim for relief with FDCPA.

2          There were a lot of things that could have and

3  should have, and likely would have been addressed if that

4  had occurred.  But we had no idea that Mr. Rafatjoo was

5  going to show up and conduct an extensive examination.

6          So the bottom line is, it's unnecessary and I

7  think, if anything, it's a reflection of people's lack of

8  communication about what they were intending to do, and what

9  would actually be done in this case.

10          And so, again, nobody likes a discovery dispute.

11  Nobody wants to be here.  I'm embarrassed to be here, and I

12  don't want to waste the Court's time on all of this.  But

13  the bottom line is, I can represent to the Court that when

14  you rule on the scope of questions to be answered, my

15  clients will answer those questions.

16          But these were valid objections that needed to be

17  raised to preserve their rights.  And the Trustee cannot

18  overreach and get to issues and matters of law that are

19  beyond the scope of what they're entitled to.  And there's

20  nothing bad faith about raising a valid objection.

21          So, what I would ask the Court to do is rule on

22  the scope of the questions to be answered.  And if you want

23  to have Eric Steinmann's examination here in the courtroom,

24  that's fine.  He's already been ordered to come to

25  California.  We've been offering to provide him every time

31

1  we know --

2           THE COURT:  I know, and I've heard the same thing

3  over and over again.  I just -- let's -- I want to get this

4  done.

5           MR. HAYS:  Understand.

6           THE COURT:  When is he here next?

7           MR. HAYS:  I do not know the answer to that

8  question --

9           THE COURT:  Can you find out?

10          MR. HAYS:  -- but I can find out within --

11          THE COURT:  Can you find out?  I can take a

12  recess.

13          MR. HAYS:  -- a day or two for sure.

14          THE COURT:  Can you make a phone call now and find

15  out?

16          MR. HAYS:  I can attempt to.  My --

17          THE COURT:  I'd like to pin this down.

18          MR. HAYS:  He works full-time, so I'm not always

19  100-percent successful in reaching him on the first phone

20  call.  But if your Honor wants to take a quick break, I can

21  try to reach him now and see if I am able to reach him, and

22  then we can try to schedule that.

23          THE COURT:  All right.  I would like to do that.

24          Mr. Golden?

25          MR. GOLDEN:  I think two really quick --

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  523

32

 1          THE COURT:  Yes.  Go ahead.

 2          MR. GOLDEN:  Your Honor, I'll be very -- I'll be

 3   brief.

 4          From my perspective, I'm here today, among other

 5   things, just because I just -- hoping for a practical way to

 6   proceed.  And one of the things that concerns me is -- and I

 7   know the Court hasn't ruled yet on these questions.  All of

 8   these categories of questions in my opinion in the discovery

 9   stipulation are all relevant.  And I'm not going to go into

10   a long dissertation about our theory of the case, but it's

11   not what Mr. Hays says.

12          First of all, he has a narrow interpretation of

13   our fraudulent conveyance claim, but he doesn't refer at all

14   to the resulting trust claim, which has nothing to do with

15   the whole revocable trust argument that he's even making

16   remotely at all.

17          The resulting trust claim basically says, hey, if

18   there's some arrangement or some understanding at all, that

19   someone's holding assets for the benefit of another, then

20   that's property of the estate.

21          And the Court's correct.  I mean, you know,

22   affidavits, declarations under penalty of perjury, or if

23   necessary, you can go to trial and, as the Court's aware,

24   sometimes people just deny things under penalty of perjury,

25   and the Court ultimately has to make assessments based upon

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  524

33

1   credibility of the witnesses about whether or not they're

2   telling the truth or not.  Because one can't always expect

3   someone to be truthful about secret deals.  One can't always

4   be -- you know, I committed a fraudulent conveyance, right?

5   People don't always say that, but the Court is ultimately

6   able, if necessary, to draw, if appropriate, evidence from

7   circumstantial.

8           So, to not know what assets are in the trust, to

9   not know what Andrea's interest was in the trust at the

10  time, to not know what assets were dissipated.  Suppose

11  there were assets in the trust in Andrea's name where Andrea

12  was using, that weren't in her name.  Suppose it was some

13  car that was in the name of someone else.  Not being able to

14  test that.  And there's no attorney-client privilege.  The

15  only thing they argue is financial privacy, which doesn't

16  protect you in California at all.

17          Now look, your Honor, I'm practical here.  If

18  they're worried about some financial, you know, whatever,

19  I'll to a protective order.  I'll stipulate that it's not

20  going to be published to the world.  I mean, I'm not --

21  we're not out -- we're out to just get the information, not

22  to, you know, publish things in the newspaper or on the

23  internet.  And -- but this financial privacy claim that

24  they're arguing has no basis in my opinion to cause the

25  prevention of a question and answer.

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  525

34

1        Again, discovery, the standard is -- I forget what

2   the standards under the federal rules, because I know it

3   changed.  It used to be, it's calculated to lead to the

4   discovery of admissible evidence, and they changed it

5   several years ago.  I forget the exact standard, but it --

6   the point is -- but it's still really broad.

7        And the point is, just because -- and if Mr. Hays

8   at trial or at a summary judgment wants to object and say,

9   hey, you can't introduce that evidence it's not relevant to

10  the issue, the Court can sustain that objection.  That's

11  different than us being able to just see what's there so we

12  can test it, so we can understand what's really there or not

13  there, and see whether or not we have an argument that can

14  be made to the Court on that issue or not.

15       So, the biggest thing that concerned in this

16  hearing was the arguments by Mr. Hays about how many of

17  these -- you know, that the Trustee has just a narrow legal

18  theory, and that many of these categories of questions are

19  irrelevant.  I don't think there's a single category that's

20  more relevant.

21       And if your Honor has had the opportunity -- and

22  we have to read the entire transcript, you'll see multiple

23  times where I on the record said to counsel and to Ms.

24  Steinmann, please don't say anything that an attorney told

25  you.  I'm not asking you for that, I'm not looking for that.

35

1  I don't want you go that -- if I ask you a general question,

2  just tell me, did you talk to a lawyer, and then stop right

3  there.  I never wanted to abuse that line, your Honor, in

4  any inappropriate way.  I'm looking just for practical

5  solutions.  And to take Eric's or other people's

6  examinations and be back here arguing over legal theories is

7  just not going to be productive, and it's going to take

8  forever.

9         So that's -- the only other point I want to make

10 is, I'm not really involved in the 2004 thing per se, except

11 as Mr. Rafatjoo pointed out, I guess I did send an e-mail at

12 one point saying that he intended to ask questions, and then

13 -- and the three of us had been involved in conversations

14 regarding scheduling.  But this was a combined 2004 and

15 deposition in the adversary proceeding.  That's all I have,

16 your Honor.

17        THE COURT:  All right.

18        MR. RAFATJOO:  Hamid Rafatjoo of Raines Feldman

19 for the Hausman and Moellenhoff creditors.

20        Your Honor, in our joinder to the Trustee's 2004

21 motion, we wrote:

22             "In order to avoid duplicative

23             examinations and documentary discovery,

24             Movants hereby join the Rule 2004 motion

25             and request court authority to attend

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  527

36

1    and participate in the Rule 2004

2    examinations of Lora Steinmann and Heinz

3    Steinmann at such dates and times as

4    shall be set by the parties and the

5    court.

6        Movants further request that the

7    Steinmanns be ordered to produce all

8    documents to Movants that they will be

9    ordered to produce through the Chapter 7

10   Trustee and the subpoena in accordance

11   with the same production deadlines that

12   will be set forth in the subpoena."

13   In our joinder to the opposition to the motion for

14 protective order, in the prayer there we stated:

15       "Movants respectfully request that

16   the Court enter an order denying the

17   Steinmanns' request for protective

18   order, requiring the Steinmanns to

19   produce the documents, requiring the

20   Steinmanns to appear at the 2004

21   examination."

22   How this is not notice that we intended to

23 participate is beyond me.

24       THE COURT:  Thank you.

25       MR. RAFATJOO:  As to the side agreement issue,

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 528

37

1  your Honor, I want to raise something.

2         THE COURT:  Uh-huh.

3         MR. RAFATJOO:  That Mr. Golden had -- we can get

4  the declarations and people can change their minds.  I want

5  to go back some time in history in this case, your Honor, to

6  when Andrea Downs wanted to hire Brown Rudnick to be her

7  counsel in the state court action.

8         And we had asked, like you need to file an

9  employment application.  She said, we don't -- I don't want

10  to file an employment application because someone else is

11  paying for the fees.  We came to this Court, and the Court

12  ordered Brown Rudnick to file an employment application.

13         And the employment application came in, and it had

14  the declaration of Ron Rus and Lora Steinmann saying that

15  for a flat fee, I think it was 200,000 or 250,000, Brown

16  Rudnick, the international law firm of Brown Rudnick will

17  come up to speed on a case that has been pending for a

18  number of years, and take it through trial, a seven-week

19  jury trial, all for a flat fee of 200,000, 250,000.

20         Your Honor, side agreements are a key part of what

21  happens here and what goes down and what has been

22  orchestrated for quite some time by Eric Steinmann.  The

23  arguments that have been made, that, well, if you want to

24  order us to answer questions now we will.  That's okay.  We

25  appreciate that you will, but that doesn't deal with the

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 529

38

1  fact that you wasted everybody's time.

2         You intentionally knew that people were going to

3  drive and show up and ask questions, and you intentionally

4  decided not to pick up the phone, not to send an e-mail and

5  say, hey, by the way, if you're going to come, I'm not going

6  to let you ask questions, even though you may think so, and

7  even thought Jeff told me you were going to ask questions,

8  but I'm not going to let you ask questions.  That's not how

9  the process works.

10        And the Trustee, as a judgment-lien creditor, has

11  broad scope in terms of the discovery, looking for assets,

12  asking questions regarding finances and getting valuation.

13        We should not have been here today, your Honor.

14  And, again, I request that the Court order sanctions for

15  wasting my time and the Trustee's time.

16        THE COURT:  People on the phone, anything you want

17  to add?  No?  All right.

18        Anything further, Mr. Hays?

19        MR. HAYS:  Your Honor, briefly, and then we can

20  take a break if you want me to see if I can reach Mr.

21  Steinmann.

22        THE COURT:  I do.

23        MR. HAYS:  Documents filed seven, eight, nine

24  months before an examination is not the equivalent of notice

25  of intent to actually appear at an examination and ask

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  530

39

1  questions.  Again, this was a combined 2004 and deposition

2  of the Trustee.  And given that the creditors were not yet

3  parties to the adversary proceeding, we were never going to

4  let the creditors ask questions that were part of a lawsuit

5  to which they were not a party at the time.  And we probably

6  would not have agreed to a joint examination, you know, the

7  2004/deposition, because of these overlapping issues.

8         If we had received notice of their intent to

9  appear and ask questions, we probably would have gotten into

10 a discussion about how to resolve this and how to handle

11 this.  We never got such notice.  And counsel should not be

12 complaining about wasting people's time if they don't comply

13 with the rules by providing notice that we will show up, we

14 will be asking questions.  This will also be our 2004

15 examination, et cetera.

16        So the bottom line is, it's disingenuous at best

17 to complain after the fact that time got wasted, when you

18 didn't follow the rules to begin with.  So the bottom line,

19 your Honor will rule on the scope of questions.  My client

20 will answer the questions, and we will move forward.

21        And I can call Mr. Eric Steinmann now, if your

22 Honor wants, to see if we can resolve the dates that he'll

23 be out here, and we can deal with it at that time.

24        THE COURT:  Okay.  So we'll take a recess.  You

25 give him a call, see when he'll be available.  And then

40

1   we'll go back on the record.

2         Do you want to take a quick lunch break at the

3   same time, or just try and call --

4         MR. HAYS:  The -- I don't need to.  I don't --

5         THE COURT:  Okay.

6         MR. HAYS:  I'll either reach him or I won't.

7         THE COURT:  Okay.

8         MR. HAYS:  But I'll get the information probably

9   with two minutes, so.

10        THE COURT:  Okay.  Let me just take a brief

11  recess, and you can go make that phone call.

12        MR. HAYS:  Very good.  Thank you, your Honor.

13        THE COURT:  Thank you.  I'm just going to sit

14  here.

15        We can go off the record.  Thanks, Sally.

16     (Proceedings recessed briefly.)

17        THE COURT:  Mr. Hays.

18        MR. HAYS:  Yes, your Honor.  Thank you.  I was

19  unable to reach him and get the dates, but I did send a

20  message asking him to call me as soon as possible.

21        THE COURT:  Okay.  What I think I'm going to do is

22  just continue this.  I will probably award something for

23  your client's having to pay for your time to go there,

24  because that is a long trip.  And we really went out of our

25  way to accommodate Ms. Steinmann.

*Briggs Reporting Company, Inc.*

EXHIBIT 6  PAGE 532

41

1   So I'm going to continue this.  I want to figure

2 out what the right amount is to award to Mr. Rafatjoo's

3 clients, but at the same time I want to pin down the date

4 for Mr. Eric Steinmann to be here.  So, I think on all, all

5 these matters, I should just -- I'll continue them.  And I

6 would like to make that continued date the date for Mr.

7 Steinmann to be here, unless I hear otherwise.  How's that?

8   MR. RAFATJOO:  Okay.

9   THE COURT:  And he is to bring whatever documents

10 are responsive to the, yeah, production.

11   MR. RAFATJOO:  Your Honor, can we have those

12 documents produced --

13   THE COURT:  Prior?

14   MR. RAFATJOO:  -- beforehand?

15   THE COURT:  Two weeks?

16   MR. RAFATJOO:  Like two weeks beforehand?

17   THE COURT:  Two weeks before.  Yes, I think so.  I

18 see somebody -- any further comments?

19   MR. KESSEL:  I'm sorry, your Honor.  I'm just

20 wondering if the --

21   THE COURT:  You'd better state an appearance.

22   MR. KESSEL:  Alan Kessel --

23   THE COURT:  Thank you.

24   MR. KESSEL:  -- co-counsel to Mr. Rafatjoo, Pepper

25 Hamilton.

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  533

42

1    I'm just wondering if the Court needs to make

2    determinations on the documents in dispute.  Because,

3    otherwise, what Mr. Hays considers responsive is obviously

4    going to be different than we and the Trustee consider

5    responsive.

6         THE COURT:  Well, I mean the things that I

7    definitely thought should have been answered were the steps

8    taken to collect the requested documents.  That should have

9    been answered.  And then documents related to any payments

10   or transactions made to or for the benefit of Andrea Downs.

11   I think that should have been answered.

12        MR. GOLDEN:  And, your Honor, I would -- may I?

13   Sorry.

14        THE COURT:  Yes.

15        MR. GOLDEN:  And I would ask for (indiscernible)

16   -- documents regarding the trust.  I mean, anything

17   regarding the trust, assets in or out.  I --

18        THE COURT:  Well, I tell you what.  I'm going to

19   give them a chance to produce these documents, and any

20   declaration they think that they can sign under penalty of

21   perjury, saying that there are no side deals oral or written

22   that would restore Andrea to this trust.  Unless -- I'm not

23   sure what the language would be exactly.

24        MR. GOLDEN:  Right.

25        THE COURT:  But I would think if that was the

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  534

43

1 case, since that's really what we're talking about, one of

2 the main issues, that everybody would have signed something

3 like that already and filed it.

4          MR. GOLDEN:  But I -- they still have to produce

5 the underlying documents as well.

6          THE COURT:  Yes.

7          MR. GOLDEN:  Yes.

8          THE COURT:  Yes.

9          MR. RAFATJOO:  The underlying documents as to the

10 assets of the trust?

11          MR. GOLDEN:  And if --

12          THE COURT:  I'm not going to have them do that.  I

13 think there is a -- I'm not sure right now.

14          MR. RAFATJOO:  Okay.

15          THE COURT:  That might be overbroad.

16          MR. KESSEL:  Well, maybe, maybe the way to do this

17 then is, have the Court make a determination at the

18 continued date, in terms of the scope of the documents we

19 produce and the questions we answer.  And then we order

20 those documents and questions answered, then Mr. Steinmann's

21 deposition set here.

22          THE COURT:  I'm so tired of fooling around with

23 this.  I want him here --

24          MR. HAYS:  But if you have those orders --

25          THE COURT:  -- and I want the documents two weeks

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  535

44

1  ahead.  And, you know, like I said, if there's, there are

2  declaration in there that aren't, you know, squishy, maybe

3  they mean something.  But they need to --

4       MR. KESSEL:  Your Honor, may I give you an

5  example?

6       THE COURT:  Okay.

7       MR. KESSEL:  Mr. Golden was talking about the

8  resulting trust theory.  Nobody's going -- it would be

9  absurd if these people were to document, by the way, if

10 we're going to revoke, allegedly revoke Andrea's interest

11 now, and when the dust settles, I, whom the beneficiary is

12 or transfer, I'm going to give it back.  You don't worry.

13      We need to see what assets are in the trust and

14 what's happened to those trusts.  It goes part and parcel,

15 what your Honor's already said, that we need to see what

16 monies Andrea was received.  That's part and parcel of the

17 Trustee's duty to marshal assets on behalf of the estate.

18      With respect to the Ron Rus example, I guarantee

19 you there wasn't a documented agreement that said, I'm going

20 to surreptitiously represent Andrea.  I will represent to

21 the Court because I was a trial lawyer in the state court

22 case --

23      THE COURT:  Uh-huh.

24      MR. KESSEL:  -- that the time that Ms. Rus came

25 in, Brown Rudnick came in, Andrea Downs represented under

45

1  oath she'd already spent 800,000.  Mr. Rus represented that

2  he had spent $1.5 million in fees just after the first phase

3  of the trial, before the punitive damage phase and before

4  the alter ego phase.

5      And for -- you know, it would be naive to think

6  that Brown Rudnick took $250,000 and went more than

7  $2,000,000 in the hole.  What I suspect happened, and this

8  is a good example, the documents would show, is that he

9  probably entered into a separate agreement with one of Eric

10 Steinmann's companies.

11     And what that would be is, hey, we're going to

12 allegedly represent you.  We're going to incur $2,000,000 in

13 fees, but it's really going to go the defense of Andrea in

14 the state court action.

15     And to that end, I'd like to tell the Court, that

16 after we won the case and it appeared -- again, I don't

17 know, because we haven't gotten these documents, but it just

18 shows why the underlying documents are so critical.  Brown

19 Rudnick moved to withdraw, and right before they were

20 called, they went outside and they made a deal, and Brown

21 Rudnick withdrew their motion to withdraw for the non-

22 payment of fees.

23     The non-payment of fees that they said was

24 subsumed within the 250 that Mrs. Steinmann paid up front.

25 And what I suspect happened, your Honor, is, is that Brown

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  537

46

1 Rudnick said, you know what, we're not going to represent

2 you in these prospective post-trial motions.  We're not

3 going to represent you in the appeal unless you pay this AR.

4 And then the Steinmanns, and Mrs. Steinmann was there, paid

5 the AR, and then Brown Rudnick withdrew the motion.

6        And then your Honor entered the contempt order,

7 validating the law that the Trustee stands in miss -- Andrea

8 Downs' shoes, and only he could represent her interest in

9 the state court action.  And Brown Rudnick is still trying

10 to withdraw, now on that basis.

11       So that's why those underlying documents are so

12 critical.  You're going to see the entire nature of the

13 transactions, as to what occurred here.  Andrea Downs is

14 living better than everybody in this room combined, and yet

15 she tells you she doesn't have a dime to her name.

16       And to sit there and think that her parents

17 haven't given her money, and she, then she's been divested

18 of this trust.  And, you know, all the family assets have

19 been gone, and she will never have access to it again is

20 naive.

21       And to sit there and think that she would have --

22 that they would have been, given who they are and their

23 sophistication, for lack of a better word, would have

24 documented it and said, on this date certain, me, the

25 recipients of your interest, are going to give you back the

47

1  monies, that's not the case.

2       THE COURT:  Okay.  I hear you.  Is there a way of

3  limiting -- I mean, I understand the financial privacy

4  issue.  I also understand our need to take a look at what

5  was going in and out as to Andrea.  Is there a way of

6  somehow narrowing the scope?

7       MR. GOLDEN:  Well, one way of doing it, typically

8  in a lot of cases, is start out is, protective order, even

9  for attorneys' eyes only, and to limit it so that no one is

10  viewing things and no one is filing things as a public

11  record, other than perhaps under seal with the Court.

12       THE COURT:  I was thinking under seal.

13       MR. GOLDEN:  But for attorneys' eyes only.  So

14  that means that the lawyers that sign off are limited, and

15  would be held in contempt if they ever shared it or did

16  anything else.  And we do these all the time, and Mr. Hays

17  does, too, I'm sure in cases.  And, you know, they have to

18  be returned at a certain -- you know, it's kept.

19       But at least that way, then if I -- if we can see

20  the documents, see -- you know, I don't care if like my

21  hands are behind my back and I'm just looking, and it's

22  taken away.  I mean, just so I can see what's there and

23  what's not there, and know that's the totality.

24       I know that if we need to give it to the Court,

25  that we don't file it.  That the Court allows us, we can

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  539

48

1 file a motion, whatever, to ask for a procedural process,

2 again, to respect -- I'll do that on any issue, your Honor.

3 Again, I'm not -- any issue that they think may be sensitive

4 about, I don't want to violate it.  I just want to get some

5 information and answers and move on.

6       MR. KESSEL:  And the financial privacy objection,

7 your Honor, such as it is, it's belied by the case law cited

8 in the papers.  But it does not give you a right to instruct

9 and not produce.  It gives you a right to object.  The Court

10 is the trier of fact.  The Court gets to rule on the

11 relevancy.

12       We get the documents.  We get the answer to the

13 question, and the Court determines whether or not those

14 materials and that information is admissible, not Mr. Hays,

15 not anybody else.

16       He has played judge, jury and executioner in this

17 case.  He's told you that because in his estimation and, in

18 fact, he set up a syllogism that he doesn't believe the

19 underlying case is valid, and he's limited it only to the

20 one cause of action with respect to the revocable trust.

21       There really is no discovery here, because he's

22 saying there's a revocable interest, and he thinks because

23 it's revocable interest, and he thinks because it's

24 revocable, you have no rights.

25       You can't see what happened to the assets, you

49

1  can't trace the assets, you can't whether or not the estate

2  was defrauded.  And the Trustee can't go and marshal assets

3  for the benefit of the estate.

4         That's not what your Honor ruled on the motion to

5  dismiss, and it's not what the BAP ruled.  Because if Mr.

6  Hays was correct, those motions to dismiss would have been

7  granted.  They're not.  And then to Mr. Golden's point, you

8  know, there's also a resulting trust and other claims as

9  well, all of which are ignored.

10        This discover should be ordered in full, your

11 Honor, and then we will deal with it.  In terms of the

12 confidentiality they're concerned about, is easily handled

13 with a protective order.  It happens all the time.  Whether

14 it's under seal, attorneys' eyes only or both.  But we're

15 entitled to the information.  They can't obstruct and

16 stonewall.

17        MR. HAYS:  And, your Honor, without going into

18 much detail, I would object to Mr. Kessel's argument that

19 goes way beyond the scope of the papers before the Court

20 today.  And nobody has claimed judge or jury or executioner

21 or anything else.

22        We took valid positions, subject to your Honor's

23 ruling on it, and we're following California law, which is

24 Probate Code Section 16069, which nobody has addressed, that

25 specifically says that a trustee or settlor does not have to

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 541

50

1  respond to information regarding the trust or its assets or

2  value or accountings or anything else.

3          The failed to address it in the reply.  They

4  failed to address it in argument.  And I understand -- I

5  just needed to state my peace for the record.

6          THE COURT:  I am --

7          MR. HAYS:  And I understand your Honor's going to

8  continue the matter, and we can address these issues at a

9  future hearing.

10         THE COURT:  Well, I'm, number one, I'm extending

11 discovery to April, because this is not good.

12         April -- what was the date in April that folks

13 wanted?

14         MR. KESSEL:  The end of April.  April 30th.

15         THE COURT:  The end of April?

16         MR. GOLDEN:  I think --

17         MR. KESSEL:  April 30th is a Thursday.

18         THE COURT:  Okay.  So I'll extend discovery to

19 April 30th, 2020.

20         MR. HAYS:  And with respect to a procedure, your

21 Honor, in terms of the asset issue that you raised, an

22 alternative to disclosing it all subject to protective

23 orders is, let the Trustee here and creditors now, to the

24 extent they're plaintiffs on the resulting trust claim at

25 least, let them ask questions, was Andrea ever on title to a

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 542

51

1 particular asset, to which the answer is yes or no.

2        And it doesn't invade the other assets that are

3 owned by the settlors, and have always been owned by the

4 settlors, either in their own name or in the name of the

5 trust.  But they're not asking those specific questions,

6 instead, the thrust of the --

7        THE COURT:  It seems like dartboard.  You have to

8 ask this one particular -- no.  No.  This -- you know, we

9 need cooperation here.  I'm willing to let things be filed

10 under seal, if need be.  I don't like doing that, but

11 because there are financial privacy issues, I'm willing to

12 do that.  But these documents need to be produced.  This

13 stonewalling needs to stop.  It's just the best way of

14 getting them to understand that at this point.  I -- go

15 ahead, Mr. Golden.

16        MR. GOLDEN:  And on testimony, too, you know --

17 again, I'm -- it hasn't listed it very specifically, but I

18 want to be helpful here.  On testimony, too, if there's

19 pages of testimony where we're asking questions, and they

20 think those are financial privacy issues, your Honor, we can

21 have those pages put in a confidential transcript.  That's

22 done as well, I mean, in order to keep those separate as

23 well.

24        So I, again, I want to get the documents.  I want

25 to get the questions and answers, but I don't mind both in

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 543

52

1  terms of testimony, in terms of documents, finding ways with

2  Mr. Hays in order to, you know, respect any concerns that

3  they have.

4          THE COURT:  Okay.  We also have Mr. Palmer and Mr.

5  Kennedy on the phone, and I know they've heard all of this.

6  I -- there are so many people involved here, I'm afraid that

7  there might be one person who decides to be a holdout, and

8  I'm not going to allow that, so I think what I have to do is

9  a court order on what is required.

10         So, I think I'm going to have to come out with the

11 firm, you know, procedures as to what is going to be

12 happening here, because people don't seem to get it.  And we

13 need documents produced, and we need people to answer

14 questions, or, as I said, it would be very easy for them to

15 let us know that there's no side deals, and I -- whatever

16 they do know, but nobody seems to be coming clean or -- it's

17 just when you don't say the things that would basically end

18 this, it makes me wonder what's going on.

19         MR. KESSEL:  And that's why we need the underlying

20 documents.

21         MR. PALMER:  Well, your Honor, this is -- your

22 Honor, this is Scott Palmer.

23         THE COURT:  Yes.

24         MR. PALMER:  Perhaps if I could be heard.  You

25 mentioned my name.

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 544

53

1          THE COURT:  Of course.  Of course.

2          MR. PALMER:  First of all, just as -- thank you,

3   your Honor.  Thank you for, you know, hearing this matter

4   and allowing this much of your time on, you know, some

5   pretty important matters.

6          So, first of all, just as an administrative issue,

7   because the phone is breaking in and out.  Did I hear

8   correctly the new discovery cutoff is now April 30th?

9          THE COURT:  Correct.

10          MR. PALMER:  Okay.  Thank you.

11          So then, second of all, to address, you know,

12   directly what your court has inquired of -- and I think it's

13   a very good, the common sense kind of thought, is, you know,

14   if there's no secret side deals, which my clients have told

15   me there's no such thing, they don't know anything about it,

16   they're not holding anything for Annie (phonetic).  They

17   didn't have anything to do with, you know, her being taken

18   out of the trust.  They don't know what their parents have,

19   et cetera, et cetera.

20          And you may recall, I had advised the Court, we

21   had offered exactly that to Mr. Golden.  Early on I said,

22   you know, I don't think you need these siblings in the case.

23   It seems to me that a bunch of smart lawyers ought to be

24   able to, you know, get you what you need.  To assure you

25   that, you know, we don't have any interest in this.  It's

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 545

54

1   not our trust.  We didn't amend it.  We can't give you the

2   relief that you're seeking.  We can't put Annie back in the

3   trust.  We don't have anything to do with this.

4            And so, I think we could probably craft something

5   where we could give you the assurance that you would need,

6   and we'd be bound by whatever the result is, you know, in

7   the dispute between the trustees, the trustees of the family

8   trust, the parents and Eric, and the bankruptcy court

9   Trustee.  I said that months ago, your Honor.  So I have

10  been trying to get out front.

11           And then, you know, the last thing I would say is,

12  there are a lot of allegations kind of thrown around about

13  the family, you know, being mischievous or stonewalling or,

14  you know, engaging in fraudulent transactions or whatever.

15           And I guess if any of those other lawyers are

16  directing those at my clients, I'd like to know so I can

17  respond to it.  Because my clients are very frustrated that

18  they've been sucked into this thing.  One of them told me

19  the other day, you know, I've spent on this so far what I

20  could have sent a kid to college for.

21           So, you know, the frustration runs a lot of

22  different ways here, and I think that some lawyers on the

23  other side have tried to craft a narrative that, you know,

24  the family's in this great conspiracy.  I've offered to

25  prove from the outset that my clients are involved in

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 546

55

1 anything like that.

2           And then, lastly, as to discovery, I mean, we

3 served our discovery pretty much as soon we could to the

4 Trustee.  We got initial garbage responses.

5           THE COURT:  Well --

6           MR. PALMER:  We went to a meet and confer.  I

7 think we got two sets of revised responses, and they haven't

8 produced a single document to us.  They just, we don't have

9 anything.  We'll have to get it from the other side.  So, I

10 just would like to try and address this one-sided narrative

11 that, you know, the family is trying to hide the ball here

12 or do something wrong.

13           And I think we've been wrongfully sucked into a

14 case that we shouldn't be in.  And I've asked him to, you

15 know, put up or shut up.  Give us whatever you have to

16 support this, and they've given us nothing.  I mean, I've

17 heard Mr. Rafatjoo say, "six pages, six pages" a bunch of

18 times.  I've gotten zero pages in response to my discovery.

19 So --

20           THE COURT:  I guess I'm really amazed that you're

21 saying that you didn't get discovery from the Trustee.  I'm

22 just, I'm shaking my head over that one.  And I'm not -- I

23 certainly don't think all of this family is bad or in on

24 some scheme, however, the lack of cooperation leads me to

25 believe someone has something they don't want us to know,

56

1 and I think that's Eric.  That's why I'm trying to pinpoint

2 him coming here.

3         MR. KESSEL:  And that underscores the needs, your

4 Honor, for the documents.  And so if I understand your

5 order, when you say that documents need to be produced, are

6 those each of that documents of the subject of the motion to

7 compel?

8         THE COURT:  Well, there are some of these, I

9 think, are overbroad, some of the requests or the questions

10 that came out.  I mean, you -- all assets of the estate, is

11 there a way of -- or, I'm sorry, of the trust.  I always

12 say, "estate."  Is there any way of narrowing some of these?

13 Because, I mean, it could be a dump, and I don't want that.

14 That's a lot for you guys to have to go through.

15         MR. KESSEL:  But --

16         THE COURT:  And I don't -- what, the trust ever or

17 just at the moment or --

18         MR. KESSEL:  No, no.  There was a limited period

19 of time --

20         THE COURT:  Okay.

21         MR. KESSEL:  -- that we're asking for the trust

22 assets.  What was there, what was its valuation, what's the

23 disposition of those assets?  So it's limited to that trust.

24 And as evidenced by these proceedings, and your dartboard

25 analogy, if you don't ask it like that, even though it's

57

1  limited to that trust, well, that's not responsive then,

2  because, you know, you're trying to find a needle in a

3  haystack when you don't have any of the underlying

4  information.

5          THE COURT:  I have a real concern about Eric

6  Steinmann.  He has a lot of corporations, a lot of property,

7  and he seems to be behind all of this.  And I would like to

8  focus on getting him here and putting him under oath.  And,

9  you know, will he give us documents?  He -- or have his --

10  he's the trustee of the trust, right?

11          MR. KESSEL:  Right.

12          THE COURT:  So he's in control of everything.  You

13  know, I really -- I know you want documents, but I want him

14  here in court.  I want him under oath.  He's an officer of

15  the Court.

16          MR. KESSEL:  The problem is, your Honor, without

17  the documents, we're kind of shooting in the blind.  We had

18  over 150 exhibits admitted in the state court because people

19  would get up and say things.  And I had the black-and-white

20  document to show that what they just said was nothing less

21  than an outright lie.

22          I didn't win a unanimous jury verdict and get a

23  unanimous malicious -- a malice finding because people were

24  honest on the other side.

25          THE COURT:  Okay.

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 549

58

1          MR. KESSEL:  I need the documents.  When Eric

2  Steinmann gets up there --

3          THE COURT:  All right.

4          MR. KESSEL:  -- and tells a narrative, and I can

5  say, that's not true, is it?

6          THE COURT:  Okay.  Well, you're assuming he's

7  going to lie?

8          MR. KESSEL:  That's not a bad assumption.  I hope

9  he doesn't, but I mean, God, I haven't seen anyone that I've

10 dealt with in the Steinmann family, and for the record, I'm

11 not -- I haven't dealt with any of the ones that Mr. Palmer

12 is dealing with, the siblings, but I've dealt with Andrea.

13 I've dealt indirectly with Eric.  I've obviously dealt with

14 the parents, Mrs. Steinmann.  I know what -- and I've dealt

15 with their lawyers.  So, you know, I don't think that's an

16 unreasonable conclusion.

17         THE COURT:  Well, I'm going to assume in the first

18 instance, he will be honest.

19         MR. KESSEL:  But we don't even know what questions

20 to ask without the -- when you have a witness at trial, you

21 have the underlying evidence in the documents --

22         THE COURT:  I hear you.

23         MR. KESSEL:  -- and you have the examination.

24         THE COURT:  This is not normal, obviously.  This

25 is not a normal case.

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  550

59

1          MR. KESSEL:  But there's -- but right before you

2 is, do they have to produce these documents?  We would like

3 an order that says which documents, if not all of them, that

4 they have to produce.  And one of the questions that you had

5 raised earlier is, what do we do if Eric Steinmann decides

6 not to produce the documents that we go through.

7          We'll, in addition to money sanctions, your Honor,

8 you have evidence sanctions, issue sanctions available to

9 you.  You can even enter judgment if it gets that far.

10         THE COURT:  I want this to be real to him.  I want

11 him under oath on my stand.  I'm going to be sitting here.

12 And if he wants to lie, he can lie, but I want him here to

13 understand this, you know --

14         MR. KESSEL:  But we're not going to --

15         THE COURT:  And I'll have a member of the State

16 Bar, you know, disciplinary panel here.

17         MR. KESSEL:  And all I'm --

18         THE COURT:  And I'll do whatever it takes, but I

19 want him to understand, this is not a game.

20         MR. KESSEL:  I think it's great that he'd be here,

21 particularly since you can rule on --

22         THE COURT:  And I know you'd like documents.

23         MR. KESSEL:  -- the objections.

24         THE COURT:  He's going to appeal whatever I order.

25         MR. KESSEL:  That's fine, but I'd want to do it at

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  551

60

1  one time.  We're not going to know if he's going to lie

2  until I have the documents.  How are you able to tell what

3  -- whether what he says is true unless you have the

4  documents?  That's why you do trials with both documents and

5  with deposition testimony.

6        I need to see what -- we're shooting in the blind

7  here.  And it's obvious that Mr. Hays and Mr. Steinmann

8  clearly know the whole panoply of what's gone on.  We don't

9  have a clue because they won't give us anything.  So we're

10 shooting in the dark.

11       So Mr. Steinmann getting up there can say whatever

12 he wants, and we have no ability to test his credibility on

13 those issues, or even to, you know, know exactly what to ask

14 him about because we don't have the underlying documents.

15 We're entitled to those underlying documents.

16       THE COURT:  But wouldn't it be interesting if I

17 get him on the stand and he says things that we turn -- we

18 figure out are untruthful somehow.  I mean, penalty of

19 perjury, I think that means you lose your Bar license.  I

20 just, you know, I like to give people, especially lawyers,

21 the benefit of the doubt that they will tell the truth in a

22 federal courthouse under oath.

23       MR. KESSEL:  But to understand the issues, to be

24 able to ask him the questions, to give him that opportunity,

25 I need -- we all need the documents to be able to see

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE 552

61

1  exactly what went on here.

2          Otherwise, you're in a position where Mr.

3  Steinmann gets up there and says, hey, my parents decided to

4  revoke Andrea's interest.  And, yes, it was done right

5  before the bankruptcy, and, yes, it was done for the express

6  purpose of depriving creditors, particularly your clients,

7  to those things.

8          But that's it.  What else is he going to say?  I

9  don't know what assets have transferred.  I don't know what

10  money she's received.  I don't know how she's living.

11          THE COURT:  He's the trustee of the trust, right?

12          MR. KESSEL:  But we don't have -- but we need the

13  documents to go along with his testimony.  So all I'm asking

14  is that before you are --

15          THE COURT:  Well, I mean, if he's going to lie

16  under oath, he's going to lie in documents.  I don't know

17  where to go.

18          MR. KESSEL:  No -- well, if he spoliates evidence,

19  your Honor, that's a whole different ball game.  Now you're

20  talking real, you know, sanctions and potential disbarment

21  and so forth, but we need both.  We need the documents to

22  see --

23          THE COURT:  Okay.

24          MR. KESSEL:  -- what was in there, what's happened

25  to them.  We're not required to take Eric Steinmann's --

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  553

62

1          THE COURT:  All right.  Okay.

2          MR. KESSEL:  -- word for it, we're entitled to get

3    that underlying information.  That's all I'm asking for.

4          THE COURT:  I want to think on this for a little

5    bit --

6          MR. KESSEL:  Okay.

7          THE COURT:  -- because there's a lot going on.  I

8    think everybody gets the gist of where I'm going.  Mr.

9    Steinmann is going to be ordered to come to this Court and

10   be put under oath.  I will look at what documents have to

11   happen prior to that.  And I just hope everybody gets the

12   idea that we're done.  I'm just so tired of this.

13         And, Mr. Rafatjoo, you're entitled to compensation

14   for going up the mountain for nothing.

15         MR. RAFATJOO:  Thank you, your Honor.  Would you

16   like me to submit a declaration regarding the costs and

17   fees?

18         THE COURT:  I thought you -- it was in there.

19         MR. RAFATJOO:  Was it in there already?

20         THE COURT:  I don't know, but you can -- if it's

21   not in there, you can.

22         MR. RAFATJOO:  Okay.

23         THE COURT:  All right.

24         MR. KESSEL:  And as part of your order, your

25   Honor, you're also going to -- in addition to ordering Eric

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  554

63

1 Steinmann to be here, you're also going to rule on Lora

2 Steinmann and her deposition and --

3       THE COURT:  Yes.  Yes.  Although at this point I'm

4 just, you know, I'm just -- we went out of our way to be

5 accommodating to her, and it didn't work.  So, I'm done with

6 -- I'm kind of done with her.  I will rule on it though.  I

7 want Eric here.

8       MR. KESSEL:  Well, I will represent to the Court

9 that Mrs. Steinmann was in court virtually every day of the

10 six-week trial with her daughter.  So, her ability to

11 travel, at least as of 2017, was not an issue.  Now that --

12 I can't make the same representation with respect to Mr.

13 Steinmann, but certainly with respect to Mrs. Steinmann.

14       THE COURT:  All right.  I'm going to continue all

15 these matters to -- well, it's got to be January.  I'm

16 thinking maybe January 29th in the afternoon, because that

17 may be the date I set for Mr. Eric Steinmann to be here.  It

18 could be the 29th in the afternoon or the 30th.  Does

19 anybody have a preference?

20       MR. PALMER:  This is Mr. Palmer.  Both of those

21 dates will work for me, your Honor.

22       MR. KESSEL:  Your Honor, I guess my concern in

23 having Mr. Steinmann here without the -- I guess, unless

24 you're ordering the documents produced beforehand.

25       THE COURT:  I'm going to have the documents --

64

1          MR. KESSEL:  Okay.

2          THE COURT:  What documents have to be produced

3   would be two weeks prior.

4          MR. GOLDEN:  Okay.

5          THE COURT:  Let's do the 29th.

6          MR. GOLDEN:  Yeah, the 29th is better for me, your

7   Honor.

8          THE COURT:  Yeah.  That would be January 29th at

9   1:00 o'clock.  But I'm taking -- let's see.  So that would

10  -- I'm taking under advisement -- I'm trying to figure out

11  what needs to be continued and what is under advisement.

12         Well, the status conference is definitely

13  continued to January 29, 2020 at 1:00.

14         MR. PALMER:  And that's at 1:00 p.m., your Honor?

15         THE COURT:  Yes.  Uh-huh.  So that's the status

16  conference.  The motion -- the joint stipulation on disputed

17  issues, I guess that's under advisement for the moment.  And

18  the compelling testimony, I guess that would be under

19  advisement, also.

20         But the idea being that on the continued date for

21  the status conference, I will probably require Mr. Eric

22  Steinmann to be here, and documents two weeks prior.

23         MR. GOLDEN:  On the 29th, your Honor?

24         THE COURT:  Yes, on the 29th.

25         MR. GOLDEN:  And -- that's fine.  Given where we

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  556

65

1   are in December, does the Court want a status report?

2          THE COURT:  I don't think we need one --

3          MR. GOLDEN:  Okay.  That's fine.  I just want

4   to --

5          THE COURT:  -- unless something happens.

6          MR. GOLDEN:  Right.  Yeah, yeah.  So that's fine.

7          THE COURT:  Okay.

8          MR. GOLDEN:  I just didn't want us not to be --

9          THE COURT:  Yeah.  We don't need one unless

10  something major happens.

11         MR. GOLDEN:  Right.  Yes.  That's fine.

12         THE COURT:  Anything further?

13         MR. RAFATJOO:  Thank you, your Honor.

14         MR. KESSEL:  Thank you for your time, your Honor.

15         THE COURT:  No problem.

16         People on the phone?

17         MR. KENNEDY:  Your Honor, this is Gerald Kennedy

18  on behalf of the other four sibling Defendants.  I just

19  wanted to also thank you for the time and effort here, and

20  also thank you for the comments as far as making the

21  distinction between -- so it appears anyway, the Court's ire

22  is not directed, at least as I understood it from your

23  comments to Mr. Palmer, not as to the siblings here.

24         THE COURT:  Yeah.

25         MR. KENNEDY:  And I also (indiscernible) that your

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  557

66

1  Honor is looking for some kind of a declaration or statement

2  from those siblings, which would really get to the point.

3  And I think Mr. Palmer was accurate as far as what we've

4  actually offered many, many months ago is pretty much what

5  you're suggesting even now, which is we would go with

6  whatever the Court -- our clients would go along with

7  whatever the Court ultimately ordered, because we -- my

8  clients, our clients, the siblings, have no control

9  whatsoever.

10        So it's sort of the flip side of what you are

11  after, which is, we have no control, therefore, we have no

12  knowledge of any side deals.  We certainly didn't have any

13  side deals, because we couldn't have any side deals to

14  control the trust, since we don't control the trust.

15        So, it's sort of a vicious circle of sorts.  But

16  when you start with the premise, it ultimately reaches where

17  you are asking, which is, something to that effect, there's

18  no deal, and nothing certainly that we could do to have that

19  happen.

20        So, again, I thank you for that, and we'll work on

21  that and try to come back perhaps to the Trustee with that,

22  and try to get this resolved.

23        THE COURT:  All right.  But don't ignore the

24  resulting trust issue.  I mean, they may be innocent people.

25  You certainly don't choose your family, but if they ended up

67

1 benefitting from some side deal they don't know about, the

2 Trustee was correct to sue them.  And, you know, that's just

3 the way it is, and, you know, the good and the bad of, I

4 guess, being from a family like this.

5          I -- it does look like I need to continue the

6 mediation date, because that's already -- well, it's going

7 to pass in three days.  So, I'll continue that out to -- I

8 don't -- maybe I should vacate it for the moment.  I don't

9 know.

10          MR. GOLDEN:  Well, you can do either.  I -- you

11 can do either.  I think what was initially contemplated at

12 one point, I think -- and Mr. Hays, correct me if I'm wrong,

13 is that it was going to be done at the -- towards the end of

14 the discovery cutoff or shortly thereafter.  I think we did

15 it for the end.  I think in my mind, maybe do it a little

16 shortly thereafter, just under the theory that, you know,

17 then discovery -- but there's not magic in that.

18          THE COURT:  Yeah.

19          MR. GOLDEN:  I don't know if Mr. Hays agrees with

20 that --

21          THE COURT:  Okay.

22          MR. GOLDEN:  -- now or not.  I don't want to put

23 words in his mouth.

24          THE COURT:  Maybe May, beginning of May, like May

25 8th?

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  559

68

1          MR. GOLDEN:  That works for me, your Honor.

2          MR. HAYS:  That's fine, your Honor.

3          THE COURT:  Okay.  So I'll continue the mediation

4   cutoff date to May 8th, 2020.  And I think that takes care

5   of all the administrative matters, and I'll just get out

6   something about where we go from here.  Okay.

7          MR. GOLDEN:  Thank you very much, your Honor.

8          THE COURT:  Thank you, all.  Thank you.

9          MR. HAYS:  Very good, your Honor.  Thank you.

10         THE COURT:  Thank you folks on the phone.

11         ALL PARTIES:  Thank you, your Honor.

12         THE COURT:  And that ends the calendar and we're

13  off --

14         MR. PALMER:  Thank you, your Honor.

15         THE COURT:  Thank you.  We're off the record.

16      (Proceedings concluded.)

17

18

19         I certify that the foregoing is a correct

20  transcript from the electronic sound recording of the

21  proceedings in the above-entitled matter.

22

23  /s/ Holly Steinhauer_____        1-10-20_____
    Transcriber                        Date

24

25

**Briggs Reporting Company, Inc.**

EXHIBIT 6  PAGE  560

1          UNITED STATES BANKRUPTCY COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3                  --oOo--

4  In Re:                    ) Case No. 8:16-bk-12589-CB
                             )
5  ANDREA STEINMANN DOWNS,   ) Chapter 7
                             )
6          Debtor.           ) Santa Ana, California
   _____) Tuesday, February 26, 2019
7                            ) 1:30 p.m.
   CASEY,                    )
8                            ) Adv. No. 8:18-ap-01168-CB
           Plaintiff,        )
9                            )
        vs.                  )
10                           )
   STEINMANN, ET AL.,        )
11                           )
           Defendants.       )
12 _____)

13                           MOTION FOR STAY PENDING APPEAL

14                           MOTION FOR STAY PENDING APPEAL
                             FROM ORDER DENYING MOTION TO
15                           DISMISS PLAINTIFF THOMAS H.
                             CASEY'S COMPLAINT

16
                             CONT MOTION FOR ORDER
17                           AUTHORIZING THE EXAMINATION OF
                             JAMES TILL AND THE PRODUCTION
18                           OF DOCUMENTS PURSUANT TO
                             FEDERAL RULE OF BANKRUPTCY
19                           PROCEDURE 2004

20                           CONT MOTION FOR ORDER
                             AUTHORIZING THE EXAMINATION OF
21                           ERIC STEINMANN AND THE
                             PRODUCTION OF DOCUMENTS
22                           PURSUANT TO FEDERAL RULE OF
                             BANKRUPTCY PROCEDURE 2004

23

24
   Proceedings recorded by electronic sound recording;
25 transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  561

ii

CONT MOTION FOR ORDER
AUTHORIZING THE EXAMINATION OF
ERIC STEINMANN AS PMK OF:
(1) NTCH, INC.
(2) ALLY FINANCIAL CORPORATION
(3) PTA-FLA AND
(4) DAREDEVIL, INC. AND
PRODUCTION OF DOCUMENTS
PURSUANT TO FEDERAL RULE OF
BANKRUPTCY PROCEDURE 2004

CONT MOTION FOR ORDER
AUTHORIZING THE EXAMINATION OF
LORA R. STEINMANN AND HEINZ Z.
STEINMANN AND PRODUCTION OF
DOCUMENTS PURSUANT TO FEDERAL
RULE OF BANKRUPTCY PROCEDURE
2004

MOTION FOR PROTECTIVE ORDER
RE: EXAMINATIONS OF LORA R.
STEINMANN AND HEINZ H.
STEINMANN AND THE PRODUCTION
OF DOCUMENTS PURSUANT TO FRBP
2004

OMNIBUS MOTION FOR PROTECTIVE
ORDER RE:
(1) MOTION FOR ORDER
AUTHORIZING THE EXAMINATION OF
ERIC STEINMANN AND THE
PRODUCTION OF DOCUMENTS
PURSUANT TO FRBP 2004; AND
(2) MOTION FOR ORDER
AUTHORIZING THE EXAMINATION OF
ERIC STEINMANN AS PMK OF:
(A) NTCH, INC.,
(B) ALLY FINANCE CORPORATION;
(C) PTA-FLA; AND
(D) DAREDEVIL, INC.

CONT CHAPTER 7 TRUSTEE'S
MOTION FOR ORDER DISALLOWING
CLAIM 10-1 FILED BY NORIO,
INC., PURSUANT TO 11 U.S.C.
SECTION 502(b)(9)

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  562

iii

1                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE CATHERINE BAUER
2                  UNITED STATES BANKRUPTCY JUDGE

3   APPEARANCES:

4   For the Debtor:              ANDREA STEINMANN DOWNS, IN PRO
                                 PER
5

6   For the Hausman and         HAMID R. RAFATJOO, ESQ.
      Moellenhoff Creditors:    Raines Feldman, LLP
7                               1800 Avenue of the Stars
                                12th Floor
8                               Los Angeles, California 90067
                                (310) 440-4100
9

10  For Tessie Stapleton, Katy  ARAM ORDUBEGIAN, ESQ.
      Belknap, Jeff Steinmann,  Arent Fox, LLP
11    and Heinz J. Steinman:    555 West 5th Street
                                48th Floor
12                              Los Angeles, California 90013
                                (213) 629-7410
13

14  For Susanna Steinman-Wilson,  GERALD P. KENNEDY, ESQ.
      Thomas Steinmann, John    Procopio, Cory, Hargreaves &
15    Steinmann and Mary          Savitch, LLP
      Steinmann-Sypkens:        525 B Street, Suite 2200
16                              San Diego, California 92101
                                (619) 238-1900
17

18  For Lora Rae Steinmann,     D. EDWARD HAYS, ESQ.
      Heinz H. Steinmann and    Marshack Hays, LLP
19    Eric Steinmann:           870 Roosevelt
                                Irvine, California 92620
20                              (949) 333-7777

21  For the Chapter 7 Trustee:  JEFFREY I. GOLDEN, ESQ.
                                Weiland, Golden & Goodrich,
22                                LLP
                                650 Town Center Drive
23                              Suite 950
                                Costa Mesa, California 92626
24                              (714) 966-1000

25

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 563

iv

1 APPEARANCES:  (cont'd.)

2 For James Till and               MICHAEL B. REYNOLDS, ESQ.
    Bosley Till, LLP:              Snell & Wilmer, LLP
3                                  600 Anton Boulevard
                                   Suite 1400
4                                  Costa Mesa, California 92626
                                   (714) 427-7414
5

6 Court Recorder:                  Sally Daniels
                                   United States Bankruptcy Court
7                                  411 West Fourth Street
                                   Suite 2030
8                                  Santa Ana, California 92701

9 Transcriber:                     Briggs Reporting Company, Inc.
                                   2160 Fletcher Parkway
10                                 Suite P
                                   El Cajon, California 92020
11                                 (310) 410-4151

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  564

1

1    SANTA ANA, CALIFORNIA   TUESDAY, FEBRUARY 26, 2019  1:30 PM

2                              --oOo--

3        (Call to order of the Court.)

4            THE COURT:  Now we have Andrea Downs, number 49,

5    and I have the matters from the 1:30 calendar that were

6    Downs.   Numbers 31 and 32.  So I'll call numbers 31 and 32

7    from the 1:30 calendar.

8            And then on the 2:30 calendar I'll call numbers 50

9    through 54.  They're all the Downs' matters.

10           MR. RAFATJOO:  Good afternoon, your Honor.  Hamid

11   Rafatjoo or Raines Feldman for the Hausman and Moellenoff

12   creditors.

13           THE COURT:  Thank you.

14           MR. ORDUBEGIAN:  Good afternoon, your Honor.  Aram

15   Ordubegian on behalf of Defendants Teresa Stapleton, Katy

16   Belknap, Jeff Steinmann and Heinz J. Steinman --

17           THE COURT:  Okay.  Thank you.

18           MR. ORDUBEGIAN:  -- on all matters.

19           THE COURT:  Thank you.

20           MR. KENNEDY:  Good afternoon, your Honor.  Gerald

21   Kennedy, Procopio, Cory, Hargreaves & Savitch, on behalf of

22   Defendants Susanna Steinman-Wilson, Thomas Steinmann, John

23   Steinmann and Mary Steinmann-Sypkens.

24           THE COURT:  Thank you.

25           MS. DOWNS:  Good afternoon, your Honor.  Debtor,

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 565

2

1  Andrea Downs.

2        THE COURT:  Thank you.

3        MR. HAYS:  Good afternoon, your Honor.  For

4  Defendants Heinz, Lora Rae and Eric Steinmann, Ed Hays of

5  Marshack Hays.

6        THE COURT:  Thank you.

7        MR. REYNOLDS:  Good afternoon, your Honor.

8  Michael Reynolds of Snell and Wilmer, on behalf of James

9  Till and Bosley Till, LLP.

10       THE COURT:  Thank you.  Quite a crew.

11       MR. GOLDEN:  Good afternoon again, your Honor.

12  Jeffrey Golden of Weiland, Golden, Goodrich on behalf of

13  Thomas Casey, the Chapter 7 Trustee.

14       THE COURT:  Thank you very much.

15       All right.  So we have -- let me go back.  I'm not

16  sure.  Where shall we start?  We've got so many motions.

17       MR. HAYS:  Your Honor, I would suggest with the

18  motions for stay pending appeal.

19       THE COURT:  Okay.  Number 31 goes back to the

20  earliest one, so that's a good place to start.

21       MR. GOLDEN:  I think we got the stays and we got

22  the 2004's --

23       THE COURT:  Right.

24       MR. GOLDEN:  -- and I think that's a great

25  approach.

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 566

3

1      THE COURT:  Okay.

2      MR. HAYS:  Good afternoon again, your Honor.

3   There are three factors for determining whether to grant the

4   stay pending appeal.  The first is likelihood of success,

5   the second is balance of hardships, and the third is the

6   public interest.

7      In this case we believe we've solidly demonstrated

8   a likelihood of success on appeal, because this Court's

9   ruling, I think we all can agree, is either a brand new

10  issue of law or a departure from settled law.

11     And just to set the table and make the argument,

12  prior to the bankruptcy case, the Debtor was a beneficiary

13  in her parent's revocable trust.  Her parents terminated

14  that interest prior to bankruptcy.

15     The bankruptcy case gets filed.  The Trustee gets

16  appointed.  The Trustee brings an action to avoid the

17  termination of her interest in the revocable trust as being

18  a quote, "transfer of property by the Debtor."

19     The Trustee does not seek to use Bankruptcy Code

20  Section 548, which is the Bankruptcy Code Section on

21  fraudulent transfer.  Instead the Trustee seeks to use the

22  FDCPA, which is federal law that allows the Federal

23  Government to avoid and recover fraudulent transfers when

24  it's collecting a debt.

25     Putting aside whether the Trustee is even entitled

4

1  to invoke the FDCPA via Section 544, let's just look at what

2  the FDCPA itself says.

3          The Ninth Circuit in a case called <u>The United</u>

4  <u>States Small Business Administration v. Bensal</u>, spelled, B,

5  as in boy, E-N-S-A-L, has said, in looking at whether a

6  transfer of property occurred for purposes of FDCPA, you

7  have to look at what were the debtor's state-delineated

8  rights in that property.  And this is a quote:

9              "Applying the analytical framework

10             set forth in <u>Dry</u>, which is a U.S.

11             Supreme Court case, we look to state law

12             to determine what rights the debtor has

13             in the property the Government seeks to

14             reach, then to federal law to determine

15             whether the debtor's state-delineated

16             rights qualify as property or rights to

17             property within the compass of the

18             FDCPA."

19             And we've cited this in our motion.

20             So, the real issue here, the real crux of this

21 entire fraudulent transfer case is, what were the Debtor's,

22 quote, "state-delineated rights" under the Ninth Circuit

23 authority in <u>Bensal</u>?

24             When you look to California law, until the

25 settlors die, a beneficiary of a revocable trust does not

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 568

5

1 have any property rights at all.  Instead, the interest is,

2 quote, "merely potential," and can, quote, "evaporate in a

3 moment at the whim of the settlor."  That's a 2010 case from

4 the California Court of Appeal.

5        Another quote from another case, and all of these

6 are set forth in the motion.

7            "A settlor with the power to revoke

8            a living trust retains full ownership

9            and control over any property

10            transferred to the trust."

11        Another quote:

12        "The beneficiary's interest in the

13            revocable trust is contingent only, and

14            the settlor can eliminate that interest

15            at any time."  Those are all California

16            cases.

17        Then we get to the Ninth Circuit Bankruptcy

18 Appellate Panel case in <u>Schmitt</u>, and this is a quote:

19            "When a trust expressly reserves

20            the power to change beneficiaries, no

21            one acquires any right under the trust

22            instrument except the settlors to

23            administer the trust in accordance with

24            its terms."

25        So when you look at all of this, what state-

6

1  delineated rights did the Debtor lose when her interest as a

2  revocable beneficiary were terminated?  She didn't lose

3  anything because she never had anything.  And that's very

4  consistent.

5        There's not a single California case that has ever

6  held that the beneficiary of a revocable trust had any

7  property rights at all.  All of the cases, and we've cited

8  at least half dozen of them, are all unanimous that there is

9  no property rights when you are the beneficiary of a

10 revocable trust.

11       So if you have no rights at all, no rights at all

12 cannot possibly serve to constitute property under the

13 definition of property as set forth in the FDCPA.

14       It's also important to keep in mind, if the

15 Debtor's status as a revocable beneficiary had never been

16 terminated, had she remained a revocable beneficiary on the

17 petition date, the Ninth Circuit authorities are clear that

18 that would not have been an asset of this bankruptcy estate.

19       Even if the Debtor's parents died within 180 days

20 post-petition, the rights that would then vest upon the

21 death of the settlors would still not come into the

22 bankruptcy estate.  Because when you acquire property by a

23 trust, it's not a bequest divisor inheritance under Section

24 541(a)(5).

25       Whether her interest was terminated or whether her

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 570

7

1  interest was not terminated, this interest could never have

2  been an asset available to pay creditors in this bankruptcy

3  case.

4          Any ruling to the contrary is a departure from

5  very well settled law, and your Honor may be right, your

6  Honor may be wrong, we've filed an appeal, as you are

7  probably well aware, and this is the stay pending appeal

8  motion.

9          We have filed a motion for leave to pursue what is

10 an interlocutory appeal.  Typically, an order denying a

11 motion to dismiss is interlocutory.  That matter has been

12 filed.  The Trustee has opposed it.  All of the Movants have

13 filed their reply briefs.  The matter is fully briefed.

14         If this Court grants a stay, but the appellate

15 court says, we're denying the motion for relief, your

16 Honor's stay granted today is going to be very short,

17 because we don't yet know if the court's going to grant us

18 leave to finish pursuing the interlocutory appeal.

19         The second factor in deciding whether to grant a

20 stay pending appeal is the balance of hardships.  In this

21 case the Trustee has sued the Debtor's parents, who

22 California law has clearly provided, and its on the face of

23 the statute in Probate Code Section 18200, sued the Debtor's

24 parents for doing something with their property that they

25 were absolutely entitled to do with their property.

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 571

8

1        The Trustee has sued the Debtor's nine siblings,
2   who never had a property right to begin with.  And just
3   because in theory if there's one less beneficiary, 110-
4   percent of zero is still zero.  If you have no property
5   rights you could not have possibly received a transfer of
6   property.  It doesn't work.

7        In defending the Trustee's action, we're talking
8   about nine individuals who are siblings, and the Debtor's
9   parents, who have all now been brought into a federal court
10  lawsuit.  The Debtor's parents are in their 80's.  The
11  Debtor's siblings are all, you know, good citizens, if you
12  will, with jobs and do work, and they're getting sued for
13  something where they never even received anything at all.
14  That's a hardship because that costs money.

15       Your Honor has seen the briefing involved in this
16  matter, where people are out to protect their names and try
17  to get these meritless claims dismissed.  That costs money
18  to retain counsel.  That's a hardship that all of the
19  Defendants are incurring as we sit here today.

20       If the stay is denied, then this lawsuit keeps
21  going forward.  The Trustee will start propounding
22  discovery.  The Trustee will start trying to take
23  depositions.  Other motions may need to be filed for all of
24  the Defendants to protect their rights, including summary
25  judgment on the very issue which is now the subject of our

9

motion for leave to pursue the interlocutory appeal.

On the flip side -- so, if the stay is granted, basically all of these costs and expenses can be avoided until the appeal is resolved. On the flip side of balancing the hardships, is there any hardship to the estate? There's no hardship whatsoever to the estate.

The estate waited until the very last day to even file this complaint. This complaint was filed on the day before the statute of limitations, and that was more than two years post-petition. And typically it's only a two-year statute of limitations, but it was filed within one year of the Trustee's appointment, when the Trustee's appointment occurred in the first two years.

So this action was filed at the very, very last possible date. If there was any hurry to do anything, the Trustee certainly didn't demonstrate it prior to filing this action. So there's no harm here to waiting.

Both of the Debtor's parents are still alive. Nothing has happened to any of the property in the trust. Nobody else has taken anything out of the trust. And even if it did, it's the Debtor's parents' property. And California law is clear on that point, that they can do whatever the want. And if they had creditors, the creditors could go pursue all of the property in the revocable living trust. It doesn't belong to the beneficiaries until the

10

1  settlors die.  Both settlors are still alive.

2          If the estate goes down this path further in

3  pursuing discovery, it's going to run up administrative

4  costs.  And those are administrative costs that if we are

5  successful on appeal can be avoided.  So there's no reason

6  to diminish the return to creditors in this case by pursuing

7  something until the Court of Appeal says that the departure

8  from settled law is actually a claim, and this lawsuit

9  should go forward.

10         The last factor for stay pending appeal is the

11  public interest.  And the public interest certainly favors

12  granting a stay in this case.  No state or federal court has

13  ever held that a revocable beneficiary's rights, if any,

14  constituted property.

15         You have every mom and pop in the world who have

16  gone out and set up their own revocable living trusts.  And

17  if creditors of their beneficiaries can start tying up their

18  property and going after their property, that turns the

19  world of revocable living trusts upside down on its head.

20  The whole idea is probate avoidance and to not grant a

21  present interest in property to any of the revocable

22  beneficiaries.

23         The public interest certainly favors granting a

24  stay until the appellate court has reviewed the issue.  And,

25  again, if the appellate court denies our motion

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 574

11

1 interlocutory appeal, it will be a very short stay.  If we

2 win on appeal, all of the hardship and all of the costs will

3 have been avoided, including the costs to the estate.  And

4 if we lose on appeal, the estate will have been no worse off

5 by having to wait and go demonstrate that they have actually

6 stated a claim.

7      For these reasons we would respectfully request

8 that the Court grant a stay pending appeal, and, again,

9 recognizing that may be a very short stay.

10      THE COURT:  Thank you.

11      MR. ORDUBEGIAN:  Thank you, your Honor.  Aram

12 Ordubegian on behalf of the sibling Defendants, a few of

13 them.  My colleague, Mr. Kennedy, represents the others.

14      Your Honor, I don't want to repeat what Mr. Hays

15 said, but clearly our motion which is separate, we do

16 support everything that was stated.

17      Your Honor, we've -- the balance of hardships is

18 really what impacts us at the end of the day, because the

19 siblings were sort of minding their own business.  They

20 weren't expecting to receive anything.  They didn't receive

21 a transfer.  They didn't do anything to stop a transfer from

22 occurring to anybody else, your Honor.

23      So, in many ways, Mr. Hays took the words out of

24 my mouth, which was, we were receiving zero, and by now the

25 settlors having more to give out somehow, we're getting a

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  575

1  bigger percentage of zero.  We don't have an expectation

2  here, your Honor, and it's very, it's a hardship on our

3  clients to have to defend depositions, potentially Rule 2004

4  exams that are coming, when there is an appeal pending that

5  is going to deal with the legal issues front and center.

6           Your Honor, it could be a very short-term stay.

7  The BAP might rule that they're not taking the interlocutory

8  appeal up, in which case I guess we're back here.  And then

9  we can, we could go down the path at that point.

10          Your Honor, two very quick points.  The Trustee

11 raises in his opposition that we don't know, maybe this is

12 not a revocable trust.  We discussed this before your Honor.

13 The document which was attached to the motion, previously

14 motion to dismiss, the trust document can be reviewed.  It

15 was -- it is and it's stated to be a revocable trust.

16          And, your Honor, the testimony that the Trustee

17 put into his opposition had a citation to a transcript where

18 the settlor, the mother, specifically said, "this is a

19 revocable trust."  So, that issue that was brought up by the

20 Trustee really is a red herring.  And, your Honor, there's

21 no reason to go there and somehow trip up a stay motion

22 here.

23          The second part, your Honor, is the Trustee

24 discusses that this -- even if there is a stay, even if the

25 appeal goes forward, there's still a resulting trust claim

13

1  for relief.

2        Your Honor, the reality is at the end of the day,

3  in order to have a resulting trust, there has to be a

4  transfer of estate property, of the Debtor's property.

5  There isn't a transfer of the Debtor's property, because as

6  Mr. Hays properly stated, the asset, the property is the

7  settlor's.  It's not the Debtor's.  There hasn't been a

8  transfer of anything, so there can't be a resulting trust

9  claim for relief anyways.

10        That, as appears, always has appeared to me at

11 least, as a throwaway claim for relief, and now the

12 Trustee's trying to firm it up here.  So, for all those

13 reasons, your Honor, the temporary stay really should be

14 granted, so that we don't incur any more legal fees until we

15 see what the BAP does.  Thank you, your Honor.

16        THE COURT:  Thank you.

17        Who are we going to take next?

18        MR. KENNEDY:  Your Honor, I'll be brief.  Gerald

19 Kennedy on behalf of the four other siblings.  And I think

20 both of my colleagues have addressed really the key issues

21 that need to be addressed and your Honor has heard dealing

22 with the stay pending appeal.

23        In fact, your Honor, one of the other matters we

24 sat through today mentioned, you know, let's get this

25 figured out, and you were referring to the BAP.  Let's get

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  577

14

1 this figured out.  It was another matter.

2          Well, we're trying to get this figured out.  And

3 we believe and our clients will be in fact irreparably

4 injured.  They are real  people.  They're all over Southern

5 California and Central California.  They had no means, no

6 control whatsoever over this trust.  And they believe that

7 they will continue to be damaged unless they can in fact

8 have this heard and get this done, if you will.

9          So, again, we would ask that a stay be granted,

10 albeit, probably a brief stay be granted pending the appeal.

11 It's a fairly -- been fully briefed as far as the stay -- or

12 of the leave to appeal, as counsel's already indicated, and

13 we're waiting for that ruling.  Thank you.

14          THE COURT:  Thank you.

15          Mr. Golden.

16          MR. GOLDEN:  Thank you, your Honor.  So, I want to

17 go through the factors very briefly, your Honor, very

18 briefly.  But I want to go a little bit out of the order,

19 they way they were in the pleadings.  I'm going to start

20 with -- I think Mr. Hays argued the balancing of the

21 hardships.

22          If you look at our pleadings, that's not the

23 factor, your Honor.  The factor is irreparable harm.  It's

24 actually in their brief and it's in our brief.  That's a

25 correct factor.  There's no irreparable harm here at all to

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 578

15

them.  Irreparable harm is when the house gets foreclosed.

Irreparable harm is when there's some kind of situation

where it is irreparable.

But if we just pretend for a second that it is a

balance of hardships, what they're saying is, objectively,

what they're saying is, it's better for the Trustee to incur

a lot of attorney's fees in defending against motion for

leave to file an interlocutory appeal, for motions for stay,

for all of the things that we're doing, but we don't want to

have to incur any legal fees for allowing the Trustee to

move the litigation forward.

That's what they're saying the balance of

hardships is.  It's okay for them to cause the estate to

incur a lot fees and expenses, the motion to dismiss, all

these other things, but it's not okay for us to do anything

that we want to do to move the litigation along.

The fact of the matter is, there hasn't been a

stay.  Obviously, this Court may or may not decide to

effectuate a stay.  And the Trustee wants to move the

litigation along.  The fact is the appeal, although they've

requested for it to be heard as an interlocutory appeal, the

fact of the matter is, the appeal is in fact interlocutory.

That tells us that it's not even the type of appeal that

typically would even get heard by the appellate court.

Why are appeals interlocutory?  Because we know

16

1 that the case can be resolved one way or the other when it

2 gets to trial.  And that takes us to probability of success.

3 There's certainly no irreparable harm here.  It takes up to

4 probability of success.  This is not -- to me, the arguments

5 that were made on probability of success were really

6 arguments that would be made on a motion for reconsideration

7 in front of this Court.

8        The Court's not here today to analyze a motion for

9 reconsideration when it's looking at probability of success.

10 It's trying to look at -- in the context of a stay motion,

11 the Court needs to examine whether it's likely or not in the

12 big picture, this is going to -- the ultimate result's going

13 to be different, while it ignores all the factual issues

14 that were raised, all of the other arguments that we raised.

15        I'm actually surprised that they didn't go through

16 on their probability of success, going through all of the

17 arguments that we made, and explaining why those had limited

18 chances.  They just sort of go through all of their

19 arguments, which is not how you prove that it is more likely

20 than not that there's a probability of success on the whole

21 situation.  They're just rearguing their case, your Honor.

22 They have not proven probability of success.

23        They also need to show the public interest.  Their

24 argument on public interest is, there's a public interest

25 served in not affecting this family, helping trusts of this

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 580

17

1 type.  Certainly there's no evidence of that, and that

2 didn't really matter.  And, obviously, there's a public

3 interest -- first of all, that's not what the cases say a

4 public interest is.

5        They're talking about public interest in a real

6 societal, broader sense.  But, you know, obviously, if

7 they're wrong and we're right, the public interest is in

8 serving the needs of the creditors of the bankruptcy estate

9 who are owed money.  So, that doesn't work.

10       Please note, and I know the Court's aware, this is

11 not if they win one factor then they get a stay.  They need

12 to win every one of these factors in order to get a stay.

13 If they're not -- if the Court determines in this hearing

14 that they're not successful on any one of these factors,

15 then the Court doesn't -- should not grant a stay.

16       And it's irreparable harm, and then, of course,

17 will the Trustee suffer harm if the stay -- if the Court

18 grants the motion.  And the reality is, the Court will --

19 the Trustee will incur harm.

20       As I indicated before, we're incurring all these

21 fees and expenses and all this time is going by just

22 fighting, taking offensive posture.  We would like to have

23 the matter proceed, your Honor.

24       THE COURT:  Thank you.

25       MR. RAFATJOO:  Hamid Rafatjoo, Raines, Feldman,

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  581

18

1  for the Hausman and Moellenoff creditors.  Your Honor, this

2  issue regarding a stay has played out in this case before.

3  It was when this Court granted relief from stay.  And the

4  Debtor showed up, fired counsel and asked for a stay.  So

5  that documents our 2004 wouldn't proceed, and we wouldn't

6  get access to the documents we had requested.

7       The Court denied that stay, but notwithstanding

8  for two years, two-and-a-half years into this thing, two

9  OSC's, two sanctions orders, and we still don't have the

10 documents.  And this stay is not about anything else, other

11 than a desire not to produce documents.  It is about nothing

12 else other than a desire to avoid transparency, which has

13 been a theme in this case, unfortunately.

14      Your Honor, I understand people were minding their

15 own business and got dragged into a lawsuit, but this is the

16 ripple effect of a strategy that was masterminded two, three

17 years ago, and these are the consequences of the decisions

18 that were made.  They don't want to be here.  We didn't want

19 to be here.  We didn't want to get ripped off.  We didn't

20 want to spend millions of dollars chasing 750 grand either.

21      So, to stand here and argue about irreparable

22 harm, public interest, innocent bystanders, when you look at

23 the procedural history of this case, when you look at what

24 everyone has gone through, what everyone has been put

25 through, there is no basis for granting this motion.  We

19

1 need to get these documents.  There needs to be some degree

2 of accountability, some degree of transparency.  Your Honor,

3 we request that the motion be denied.

4       MS. DOWNS:  Your Honor, can I make some follow-up

5 comments to Hamid's comments?

6       THE COURT:  Of course.

7       MS. DOWNS:  Hamid says that this, there's been a

8 theme of a lack of transparency and stays in this particular

9 case, but he decided not to tell you that the 341(a) has

10 been rescheduled 27 times.  I have sent 38 e-mails to Mr.

11 Golden asking for what documents he needs.

12       Now, he hasn't asked for information from me,

13 other than the -- you know, reams and reams of documents

14 he's got.  But it certainly is not a theme of mine to not be

15 transparent or continue this in any way.  I've been in here

16 for three years, not two and a half.

17       So, I've been asking to give them anything they

18 want, but they decided to go a whole different route.

19 Involve my daughter, involve my family, and no, absolutely

20 no lawful reason to do that when there's other assets that

21 they haven't even looked at.  Thank you.

22       THE COURT:  Mr. Hays.

23       MR. HAYS:  First, your Honor, I'd like to point

24 that we've objected to the joinder filed by Mr. Rafatjoo's

25 client in this matter.  This is an adversary proceeding.

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  583

20

1 His client is not a party to the proceeding as either

2 plaintiff or defendant.  So, he has no standing to appear

3 here today, and we would ask that his comments and arguments

4 not be considered.

5       Going to the issue of harm, there's a quote from a

6 Ninth Circuit case called <u>Alliance for Wild Rockies v.</u>

7 <u>Cottrell</u>, and the quote is as follows:

8             "Serious questions going to the

9             merits and a hardship balance that tips

10            sharply toward the plaintiff can support

11            the issuance of an injunction."

12      That case, obviously, the facts were slightly

13 different over who wanted to seek the injunction.  But

14 serious questions and a hardship balance that tips sharply

15 in favor of one party supports the granting of a stay

16 pending appeal.

17      In this case, we have very serious questions going

18 to the merits.  We think we've actually demonstrated a

19 likelihood of prevailing on the merits.  Trustee's counsel

20 this afternoon did not attempt at all to rebut my arguments

21 regarding the merits.  There was nothing that any of the

22 Defendants had an interest in property on that would form

23 the basis of this lawsuit.

24      With respect to comments about, we need documents,

25 we need to get documents, the existence of this lawsuit

21

1 doesn't open the door or the stay on this lawsuit doesn't

2 close the door towards the Trustee seeking to obtain

3 documents.  The issued framed in this lawsuit is, what was

4 the Debtor's interest in the trust, and did it constitute

5 property?  There's nothing that prevents the Trustee from

6 seeking discovery with regard to other assets of the estate,

7 other than this terminated interest.

8         The Trustee, in fact, has filed motions for Rule

9 2004 examinations, and we'll get to those in a minute.  But

10 the point is that with respect to Mr. Steinmann, Heinz, the

11 86-year-old father of the Debtor, except with respect to his

12 oral testimony for series health reasons, nobody is saying

13 the Trustee cannot conduct Rule 2004 examinations.  Nobody

14 is saying the Trustee cannot obtain documents related to the

15 case.

16         So, whatever has happened between the Trustee and

17 the Debtor is apples and oranges and completely unrelated to

18 the Debtor's parents and siblings who have been drug into

19 this matter because of this lawsuit.  The Trustee is free to

20 go seek and conduct discovery, depending on the scope and

21 whether things are done properly.  The Trustee will get that

22 discovery.  And I'm only referencing the points that we

23 raised in our opposition to the 2004 motions and our motions

24 for protective orders.

25         But the bottom line is, a stay pending appeal in

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 585

22

1 this adversary is not going to stop the Trustee at all from

2 obtaining documents or trying to identify other assets of

3 the estate.  And for those reasons, we'd ask the Court to

4 grant the stay.

5           THE COURT:  Thank you.  So when you say that, how

6 does that relate to some of the other motions I have here,

7 some of the -- I mean, you're -- I'm not clear.

8           MR. HAYS:  And what --

9           THE COURT:  You're saying things still go

10 forward with some discovery.

11          MR. HAYS:  And I don't want to get, I don't want

12 to get too far ahead of myself.  But the other motions are

13 motions for 2004 examinations in the bankruptcy case.

14          THE COURT:  Right.

15          MR. HAYS:  The motions that the Trustee has filed

16 seek to examine the Debtor's two parents and her brother,

17 all of which are my clients.

18          THE COURT:  Uh-huh.

19          MR. HAYS:  And, also, four entities that the

20 Trustee has attempted to designate my client Eric Steinmann

21 as the person most knowledgeable for.

22          THE COURT:  Uh-huh.

23          MR. HAYS:  We have filed oppositions to those, and

24 we have filed motions for protective orders, but those

25 motions do not seek to forever prohibit the Trustee from

23

1 doing anything.  And, again, I don't want to get too far

2 ahead of myself, but, for example, the Trustee seeks to

3 depose the Debtor's father, Heinz Steinmann, in Costa Mesa.

4      Heinz Steinmann is an 86-year-old man who suffers

5 from Parkinson's, who had a protective order issued in the

6 Hausman litigation prior to this bankruptcy three-and-a-half

7 years ago, that three-and-a-half years ago he did not have

8 the medical ability to sit for a deposition.

9      So, we do not want the Trustee to ever force Mr.

10 Steinmann to come to Costa Mesa from his home in Wrightwood,

11 he's mostly homebound, to sit for an examination.  Instead,

12 we have said -- and so for Mr. Steinmann, we just don't

13 think that there's any basis due to his serious health

14 issues.

15      But that doesn't stop the Trustee from sending a

16 request for production of documents, to which Mrs.

17 Steinmann, who's is also my client, can help her husband

18 prepare.  It's probably a common set of documents in their

19 home that would be responsive to anything the Trustee is

20 requesting.

21      And with respect to Mrs. Steinmann, the Debtor's

22 mother, she's 82 years old.  She recently had multiple knee

23 replacement surgeries.  She at serious risk for deep venous

24 blood clots and has been advised by doctors not to sit for

25 more than 30 minutes at a time without getting up and

24

1 walking around for five or 10 minutes.  To drive her from

2 her home in Wrightwood at the age of 82 is probably a two-

3 hour drive.  To then get here and sit for who knows how long

4 of an examination, to then turn around and drive back up the

5 hill.  That's medically not advisable for her to do.

6       But there is nothing that prohibits the Trustee's

7 counsel from driving up the mountain to Wrightwood to

8 examine Mrs. Steinmann in her home or in some other mutually

9 agreeable location in the City of Wrightwood.  So the

10 Trustee can examine Mrs. Steinmann if he wants.  We've asked

11 for certain limitations, like a cap of four hours and half-

12 hour breaks, to accommodate her medical needs, but we

13 haven't said the Trustee cannot ask her questions.

14       Previously during the course of this case, she has

15 had her 2004 examination already taken.  She will do it

16 again if she is required to do it again.

17       So, there are health issues related to the

18 Debtor's two 80-some-year-old parents that we need to

19 protect their health and interest.  There's nothing that

20 prevents production of documents or anything else.

21       With regard to the Debtor's brother, Eric, Eric

22 does not live or work in California.  And all of the

23 evidence in front of the Court is, he doesn't live and work

24 in California.

25       Prior to the Trustee ever filing the motion, I

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 588

25

provided a copy to Trustee's counsel of Eric Steinmann's

driver's license showing his address in Florida.  In

opposition to the Trustee's motion, we have provided

evidence in the form of Eric's declaration that he does not

live or regularly transact business in California, which is

the language of the statutes.  They can't take his

examination here.  It doesn't mean they can't take his

examination, they just have to go to where he is.

Before the Trustee ever filed the motion, I sent

Mr. Golden an e-mail an offered a number of dates where Mr.

Steinmann would make himself available for examination near

his home in Florida.  The Trustee didn't want to go out

there.  But the Trustee can't ignore the rules and compel

Mr. Eric Steinmann to come out here.

And just -- and the evidence, the only evidence in

front of the Court on the Eric Steinmann motion is, he owns

some real property in California, and that he's an inactive

member of the State Bar.  It doesn't prove that he lives or

regularly transacts business here.  So, they can't force him

to come here.  If they want to take his examination, they

can go there.

And with regard to production of documents, they

can send him a request for production of documents.  They

have to specify an address within 100 miles of where he

lives or regularly transacts business in Florida, but I

1 suspect we could work out an agreement where, if the Trustee

2 would accept electronic production, we would just e-mail it

3 to him.

4        We're not trying to keep anybody from getting any

5 documents, we're just seeking to uphold the rules to ensure

6 that proper procedures are put into place, safeguards put

7 into place for the Debtor's elderly parents.  And with

8 respect to putting an undue burden on a non-party to the

9 bankruptcy, Eric Steinmann may be a party to the adversary,

10 but he's not a party to the bankruptcy case.

11        And the case law is clear that you have to avoid

12 undue hardship on non-parties with respect to discovery.

13 And that the burden of persuasion is ultimately on the party

14 seeking the discovery which is the Trustee in this case.

15        And then the last issue on the PMK examination,

16 the Court knows this, you can't designate who the PMK for an

17 examination is.  You can seek an examination of an entity.

18 You can provide the topics to be covered.  In response, the

19 entity designates who the individual is that's most

20 knowledgeable, and produces that person or those persons for

21 examination.  So the Trustee's motion is procedurally

22 defective, but it's not the Trustee's right to designate the

23 PMK of an entity.

24        Additionally, the Trustee's motion was not

25 properly served.  If you're going to examine the entities,

27

1  you have to properly serve the entities.  And Rule

2  7004(b)(3), as this Court knows, says when you serve an

3  entity, you have to serve it to the attention of an officer,

4  director or managing agent, or whatever the exact language

5  is, and in this case that was not done.  A copy of the

6  motion was mailed to the entity at an address without the

7  required language, "to the attention of."

8          We've cited unpublished decisions where courts in

9  this district had denied the motions for improper service.

10 So, again, nobody's seeking to forever prohibit the Trustee

11 from getting discovery, but the Trustee has to comply with

12 the rules and the procedures, and appropriate safeguards

13 need to be put into place for Mr. and Mrs. Steinmann.

14         So, again, no one is trying to say you can never,

15 ever, ever get any discovery here.  That's a complete red

16 herring and a distortion of our positions in this matter.

17         THE COURT:  Thank you.

18         Mr. Golden.

19         MR. GOLDEN:  First of all, just briefly back on

20 the stay motion.  On probability of success, your Honor,

21 they're not going to be successful.  And as our opposition

22 set out, the very fact that this Court granted the motion to

23 dismiss, and all of the arguments that we made, all of the

24 pleadings, all of the declarations, all of the facts are --

25 it's too voluminous to break up here.

28

1          But the Court's well aware of all of those issues.

2   The Court spent a lot of time analyzing it, and there is no

3   indication they're going to be successful at all.

4          On the 2004 matters, your Honor, it's funny

5   because none of this information even starts to come out

6   until there's pleadings.  Now we once had discussions where

7   at one point they had offered that Eric could even attend an

8   examination here in California.  That went away early on.

9          At another point we talked about accommodating

10  them with appropriate medical information, the parents.

11  That never came.  Until we had to file pleadings, your

12  Honor, to actually get a lot of this stuff.

13         Even Eric -- you know, we got some very

14  superficial information from him and -- regarding, you know,

15  not really saying that he's not here per se, but just saying

16  that he lives there and has to travel a lot.  It doesn't say

17  he doesn't come here.  It doesn't say that he doesn't have

18  ties here.

19         We don't mind working with them, but the truth is,

20  I hate to say it, because Mr. Hays and the other lawyers and

21  I, we get along well professionally, but -- and it's not

22  like there's animus among us, but it's almost like we need a

23  discovery referee, in a sense -- which I'm not saying we do,

24  to actually get stuff done.  It's kind of ridiculous from

25  all of our perspectives that we're here arguing over just

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 592

29

trying to work out how to get, how to facilitate some basic

2004 examinations, and getting documents, which we don't

have anything of either.

And with respect to the health issues, you know,

our point is, you know, with respect to Mrs. Steinmann, you

know, we've still ask for additional medical information.  I

don't -- we just don't feel that we have enough to really

understand the parameters.

Mr. Steinmann is still a trustee of the trust, and

the trust that we don't think is revocable, that they think

is revocable, and all this information.  I mean, he's a

person that either has knowledge or doesn't have knowledge.

And, no, your Honor, sending him interrogatories,

if he has both physical and mental incapacity, which I think

is what they're saying now, it doesn't really work, because

that means the lawyers are going to draft the responses.

And I if he does have mental incapacity, then that might be

a whole different, a whole different issue.

But, again, we don't want to be insensitive or

uncooperative in terms of trying to work out reasonable

arrangements, but we still get very limited information,

very limited data about what they're able to do, what

they're not able to do.  And we don't really get it other

than through more and more pleadings and a process that

comes out here.  They -- it's really been a struggle, your

1  Honor, just to get some basic 2004's.

2        I proposed to them that we actually have

3  depositions of some of these people, and combine -- in the

4  adversary, and combine them with the 2004, so that people

5  don't come back twice.  It's just sort of one shot that

6  could be used for all purposes.  They've yet to come back to

7  my proposal for that.

8        Again, I'm interested in efficiency.  We're

9  interested in trying to work out things reasonably.  But

10 there's a lot of parameters, without a lot of information or

11 a lot of evidence that we feel are just trying to put

12 burdens on us.  And, again, not producing documents.

13       The whole argument on service, I'll take a look at

14 that.  But nobody's saying that the company's don't know

15 about it, and nobody's saying that they don't understand

16 that there's -- somebody wants the examination.  And so, we

17 -- if they're just saying they -- they're saying, I guess

18 they're saying, re-serve it, instead of saying, will you

19 just give us a few more weeks or more time.

20       So, what does that mean?  That just means more

21 attorney's fees, more expense for what purpose?  It's not

22 like we're taking a default, we're just trying to get

23 someone in for examination.

24       Cooperation would be helpful, not this constant,

25 deliberate obfuscation of trying to get information and

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 594

31

access to data.  And, your Honor, we'd like to at least get

the documents initially first, number one.  Number two, we'd

like to set exams, and on reasonable terms that the Court

deems is appropriate.

Again, I think there's very little evidence in

support of what they've offered to do.  If they have no

problem supplying declarations of Mrs. Steinmann, they have

no problem supplying -- even in connection with the stay

motion they make reference.  They have no problems providing

declarations of Eric Steinmann in connection with these

matters at all, yet we're not readily allowed to take their

examinations.

Your Honor, if they're going to participate in the

process, they have to really participate in the process.

THE COURT:  Okay.

MR. KENNEDY:  Your Honor.

THE COURT:  Yeah.

MR. KENNEDY:  Just briefly.  Gerald Kennedy on

behalf of the siblings.  And I want to make it clear, the

siblings are here not because of the bankruptcy or the

bankruptcy issues.  I think there's been a conflating, and

rightly so, because we have two separate motions here today.

The motion that my clients are involved in is the

stay pending appeal, not the issues concerning the 2004

examinations, which, again, are before your Honor, but have

1 nothing to do with my clients.  And that I think is really

2 sort of a leaping off point or a going back point.

3          My clients have nothing to do with this

4 bankruptcy.  My clients had nothing to do with and had no

5 control over the trust, which is the basis for the claims in

6 the adversary action.  And that's why they're being damaged.

7          We joined in the objection to Mr. Rafatjoo's

8 objections or getting into really what's been going on in

9 the bankruptcy.  My clients have had no control of what's

10 been going on in the bankruptcy, nor do they have control

11 over the trust before the bankruptcy.  Those are issues that

12 have nothing to do with the eight siblings that are really

13 impacted by this action, which is why we're trying to get it

14 done in front of the Bankruptcy Appellate Panel.

15          THE COURT:  Yeah.  I lot of people get dragged in

16 here that have nothing to do -- I mean, it's --

17          MR. KENNEDY:  Understood.  But the --

18          THE COURT:  -- it's sad.  All the time, people

19 come in and they're like, I don't understand, why am I

20 involved?  So --

21          MR. KENNEDY:  I understand.  I've been doing

22 this --

23          THE COURT:  Yeah.  Yeah.

24          MR. KENNEDY:  -- for 35 years, so I know how that

25 works, your Honor.  But the point is to, if you will, my

33

1  clients are not their sister's keeper.  My clients have

2  nothing to do with what their sister's been doing or didn't

3  do or should have done as alleged in the bankruptcy.  And,

4  in fact, again, to the point, has -- when it comes to this

5  revocable trust, they had nothing to do with and had no real

6  interest in, as we've argued, and the California law makes

7  it very clear.

8         So, again, we'd ask that you give us the limited

9  stay so we can have the ninth -- or the Bankruptcy Appellate

10 Panel review this, and get it done.  Thank you.

11        THE COURT:  Okay.  Say I grant the motion for stay

12 pending appeal.  We've actually got two of them, right?

13        MR. HAYS:  Correct, your Honor.

14        THE COURT:  How does that impact all these other

15 matters?

16        MR. GOLDEN:  You're going to grant those, your

17 Honor?

18        THE COURT:  I said, "say."

19        MR. GOLDEN:  You said, if you grant it?

20        THE COURT:  If I grant it, how does that impact

21 everything else?

22        MR. HAYS:  That would put a freeze on the --

23        THE COURT:  Everything.

24        MR. HAYS:  -- adversary proceeding, and no

25 discovery would go forward in the adversary, nor would

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  597

34

1 people be filing motions in the adversary until we hear from

2 the Bankruptcy Appellate Panel.

3          With respect to the Rule 2004 motions, those would

4 not be affected by the stay.  And we have not asked the

5 Court to try to stay the 2004 motions.  So we can work out

6 the Court's ruling on the 2004 motions.

7          With respect to Eric Steinmann, the examination

8 can go forward in Florida.  We've given the Trustee dates

9 before, we'll give him other dates.  It can go forward in

10 Florida.

11          THE COURT:  So Eric is not going to be here

12 anytime in the near future?

13          MR. HAYS:  I don't know if he's going to be here.

14          THE COURT:  Can we find out?  I mean --

15          MR. HAYS:  I can find out, your Honor.

16          THE COURT:  We're talking about the estate going

17 down -- I mean, if he's going to be here visiting his

18 elderly parents, why not make him available then?

19          MR. HAYS:  We might be able to reach an agreement,

20 but the Trustee can't force this to occur out here absent an

21 agreement.  But, again, I'm trying to find solutions not

22 problems.

23          THE COURT:  I am, too.

24          MR. HAYS:  And we've had a lot of communication

25 with Mr. Golden's office before these motions ever got

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 598

35

1  filed, but everything was always going to be, it has to be

2  at the Trustee's convenience.  Everything's going to take

3  place in Costa Mesa, and without regard to the other issues.

4          You know, we suggested that the examinations

5  proceed in Wrightwood.  Mr. Golden knew what the issues were

6  with the health issues and the previous protective orders

7  issued by the state court, but yet we get a motion that says

8  everything's going to happen out here.

9          THE COURT:  What if we choose Wrightwood?  It

10  sounds like we've got -- Eric has a house in Wrightwood.

11  The parents are in Wrightwood.  They have issues.  What's

12  wrong with going to Wrightwood?  Somebody can go skiing

13  afterwards or something.

14          MR. GOLDEN:  Fine, your Honor.  And I had

15  actually, pre-filing the motion, when I thought Eric was

16  going to out here, subject to medical stuff, I'd actually

17  offered to him that we would go to Wrightwood.

18          THE COURT:  I mean, that seems to make the most

19  sense.

20          MR. HAYS:  And the only concern I have, your

21  Honor, not knowing Eric Steinmann's schedule, is, you know

22  when the examination will actually take place.

23          THE COURT:  Well, I'm confident you can work that

24  out.

25          MR. HAYS:  Which is fine.  And so, as long as the

36

1  -- and with respect to Heinz Steinmann, however, we would

2  ask that no oral examination take place.  That was the

3  ruling of the state court three-and-a-half years ago.  He's

4  got a serious neurological degenerative disease that's

5  getting worse, not better, and he should not sit -- and it's

6  in his doctor's letter we provided in support of the motion,

7  he should not sit for an oral examination.

8       If they want a request for production of documents

9  directed to him, then I'm sure that Mrs. Steinmann can

10 assist in gathering up all responsive documents on behalf of

11 herself and her husband.

12      But there's no reason at this point to have an 86-

13 year-old man with advanced Parkinson's sit for an oral

14 examination on anything having to do with his daughter's

15 property and interest in property.  Because my guess is,

16 they don't know anything.

17      But anyhow, be that as it may, they can get all

18 the documents with no examination of Mr. Steinmann.  That's

19 what his doctor's letter says at this time, and it can be

20 denied without prejudice.  If people want to revisit this

21 issue later in the future, we'll revisit it later in the

22 future.  But no examination of Mr. Steinmann.

23      Mrs. Steinmann can be examined in Wrightwood at a

24 place of mutual, agreeable choosing, whether it's her home

25 or some office building or something that people can rent.

37

1 Capped at four hours, which is what the state court had done

2 three-and-a-half years ago, not counting breaks, with 15 --

3 with breaks at least every half hour of five to 10 minutes

4 for her to get up and walk around.

5       And if additional time is needed, then we can --

6 if we can't agree upon it ourselves, we can revisit the

7 issue with the Court.  But not more than that on a single

8 day, or at least the first day.

9       And so, you know, put those limitations in place

10 without prejudice to reaching mutual agreement or revisiting

11 the issue with the Court, but that allows them four hours of

12 examination time with respect to the Debtor's mother.  And

13 so that, that goes forward.  And production of documents,

14 again, goes forward.

15       And with regard to the entities, we can't just

16 simply say the entities are aware of the motions, therefore,

17 let's just enter an order granting it even though service is

18 defective.  Because the Trustee still has not yet provided

19 the topics by which the entities will be examined on, for

20 the entities to have the ability to designate its person

21 most knowledgeable, and then provide that person to the

22 Trustee for examination.

23       So I think --

24       THE COURT:  Is it likely that's going to be Eric?

25       MR. HAYS:  I don't know, your Honor.  Actually, I

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  601

38

1 have no idea if that's going to be Eric.

2        So what I would suggest for the entity motion is,

3 just refile the motion directed to the entities, with the

4 required topics and properly served, at which point in time

5 my guess is there may not even be an objection to that.  And

6 then in response, the entities will designate their PMK

7 after having had proper service, and then the examination

8 can go forward.

9        MR. GOLDEN:  So, your Honor, with respect to the

10 father, that's fine at this point, although I would like

11 informal, additional medical information.  But that's fine

12 at this point.

13        With respect to Mrs. Steinmann, no problems doing

14 in chunks of four-hour blocks, and doing at Wrightwood, and

15 trying to be, giving it in that connection.  We certainly

16 want documents in advance.

17        With respect to Eric, that'd be great if we could

18 coordinate a time out here to do that.

19        With respect to the PMK argument, I mean, I don't

20 think it could have been -- we could make it clearer, but

21 everyone knows what we're looking for.  What we're looking

22 for are issues relating to Ms. Downs and interests of her

23 and the family in connection with these companies.

24        And there's no requirement that we list different

25 topics the way you do on a notice of deposition.  We all --

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 602

39

1  the parties all briefed all of those issues, whether that's

2  required or not.  And, sure, your Honor, if the Court wants

3  us to, I'm happy to re-submit it in that way.  It's not a

4  problem.  But it sure seems kind of futile -- not futile,

5  but just seems unnecessary.  It just does.

6      And it just seems like we're just pushing the ball

7  down the road, and causing greater fees and expenses.  But I

8  don't mind doing that, it's, you know, it just re-does

9  things and pushes things down another month.  And that takes

10 care of really all of the examinations, your Honor, I think.

11     And on the stay issue, your Honor, you know, they

12 keep making a deal about, hey, if we get a stay, we want it

13 -- we honor the stay pending what the Bankruptcy Appellate

14 Panel does.  All the Bankruptcy Appellate Panel's going to

15 do is decide whether or not they're going to hear the appeal

16 or not.

17     That has nothing -- the appellate process is going

18 to take two to three years as it works its way up, in

19 theory, assuming they decide to take it, through the Ninth

20 Circuit -- through the BAP and then through the Ninth

21 Circuit.

22     Appeals happen all the time with no stays pending

23 appeal.  The idea is that the litigation should be able to

24 go forward unless there's irreparable harm, which there's

25 not.

40

1        MR. ORDUBEGIAN:  Your Honor?

2        THE COURT:  Yes, sir?

3        MR. ORDUBEGIAN:  Your Honor, just to clarify what

4 Mr. Golden just said.  This is a interlocutory appeal that's

5 pending.  If the BAP tomorrow, because it's before them,

6 decides that the appeal is not being taken, they are not

7 going to hear the interlocutory appeal, that's it.  The

8 appeal's dismissed.  We're back here.

9        On the other hand, of course, if the BAP decides

10 to take it and hear an interlocutory appeal, well, that's a

11 whole different story.  But we're -- just because the

12 appeal's been filed doesn't mean it's a two-year process.

13 This really can be a very temporary stay.

14        Also, your Honor, it's -- I heard what your Honor

15 said about innocent parties come into the estate all the

16 time.  I see that all the time as well.  I'm not arguing

17 with that.  However, usually those entities or individuals

18 had something to do with the debtor, okay, or the property

19 of the debtor.

20        They received, they didn't -- innocently they

21 received a fraudulent transfer.  They didn't pay fair value.

22 They were a recipient of a preference, okay.  They were

23 holding some asset in joint tenancy with the debtor, you

24 know, or tenancy in common.

25        It's quite different in this instance where it --

41

1 you know, our clients, Mr. Kennedy's client and my clients,

2 had no property interest.  They had a mere expectancy, and

3 they're now being dragged into this case.  So I think that

4 impacts how harm is also analyzed, your Honor.

5          So, we would urge a temporary stay to see what the

6 Bankruptcy Appellate Panel does.

7          MR. GOLDEN:  Your Honor, I'm sorry.  Just -- and

8 I'll be super brief.

9          THE COURT:  Okay.

10          MR. GOLDEN:  There's one point that was in our --

11          THE COURT:  I think they're going to turn the air

12 and lights off soon.

13          MR. GOLDEN:  I'll be 10 seconds -- or thirty

14 seconds.

15          There was an argument in our -- a point in our

16 brief that I didn't make verbally.  Your Honor, the

17 resulting trust theory is not up on appeal.  That's an

18 independent theory that doesn't correlate to this.  If

19 there's a stay, your Honor, then it basically halts the

20 litigation, because that's not dependent upon any of these

21 trust arguments that they're making.

22          MR. HAYS:  Well, I would absolutely disagree with

23 that.  And I can be heard on it if your Honor wants to.

24 Everything is on appeal.

25          THE COURT:  It is so unusual to have somebody try

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 605

42

1  to appeal my denying a motion to dismiss.

2           MR. HAYS:  Understood.

3           THE COURT:  That is just -- I mean, those are

4  usually nonstarters.

5           MR. HAYS:  And it's probably the first time I've

6  done it in 27 years, your Honor, but this is --

7           THE COURT:  And I've never had one where I had any

8  problems.  It's like, what are you talking about?  No, we

9  don't overturn those.  It's -- if I granted it, sure.

10          MR. HAYS:  Understood, your Honor.

11          THE COURT:  I haven't had that problem.

12          MR. HAYS:  And this is a pretty unique case.  And

13 your Honor even said at oral argument the first time around,

14 there was a lot of interesting things here.

15          THE COURT:  There are a lot of interesting things,

16 a lot of interesting people.  And I'm inclined just to cut

17 to the chase, to grant the motion for stay.  However, I want

18 the 2004's to go forward.  I want cooperation finally in

19 this case.

20          I mean, people who -- I understand a lot of people

21 have been dragged in, but there have been problems with

22 documentation for a long, long time.  And I feel like people

23 are doing it again.  We don't want to be transparent.

24          I'm giving the motion for stay pending appeal

25 reluctantly, but with the understanding documents are going

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  606

43

1 to come out.  People are going to be deposed.  No one of

2 this, I don't live anywhere near.  I can't possibly do this.

3 I want discovery to take place on some level.  And if you're

4 not going to cooperate, maybe I appoint somebody to step in

5 an deal with it, because this has been doing on for way too

6 long.  How's that?

7          MR. RAFATJOO:  Thank you, your Honor.

8          THE COURT:  Yeah.  Okay.

9          MR. HAYS:  Thank you, your Honor.

10         THE COURT:  So, you're getting your motion for

11 stay pending appeal.  I guess that's both 31 and 32?

12         MR. HAYS:  Yes.

13         THE COURT:  And I'm cautioning you, I want

14 discovery, 2004's to go forward in good faith.  And anymore

15 games, I'm going to be a very unhappy camper.  So, that's 31

16 and 32.

17         Then we get to 49, 50, 51, 52, 53, 54 -- 55 is off

18 calendar, so that's good.

19         So when we come to number 49, that's the motion to

20 examine Mr. Till, who apparently is okay with it.

21         MR. HAYS:  Your Honor, if I can interrupt real

22 quick?

23         THE COURT:  Sure.  Sorry.

24         MR. HAYS:  Do we -- I just understood you to have

25 ruled on the 2004's, which are --

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  607

44

1          THE COURT:  I didn't really rule on them yet.

2  Let's go in order --

3          MR. HAYS:  Okay.  Very well.

4          THE COURT:  -- but I shall.  I shall.

5          MR. HAYS:  Okay.  Thank you.

6          THE COURT:  So, 31 and 32 are granted.  I need

7  orders uploaded on those.

8          Forty-nine is the motion -- well, I'm just doing

9  them in order.  Mr. Till's production of document 2004.

10         MR. REYNOLDS:  Good afternoon, your Honor.

11 Michael Reynolds of Snell and Wilmer, again, on behalf of

12 Bosley Till and James Till.  I was going to ask for a

13 temporary stay of numbers 31 and 32 so we could get to 49,

14 but now we're here, so.

15         THE COURT:  Okay.  We're here.

16         MR. REYNOLDS:  Anyway, the primary concern for my

17 client is that he have clear direction from the Court.  He

18 wants to obey the law and he wants to comply with whatever

19 the requirements are.

20         So, the more specific the Court can be in

21 describing for the parties here what exactly is the nature

22 of the privilege, you know, that the privilege -- how far

23 the privilege extends to the Trustee.  It's not Mr. Till's

24 privilege, it's either the Trustee's privilege or the

25 Debtor's privilege.  So --

45

1          THE COURT:  You're going to throw it on me, huh?

2          MR. REYNOLDS:  Well, to the extent that there's

3  specificity there, then we'll avoid a situation where we

4  have to come back later.  Because I'm sure what's going to

5  happen in an examination is that the Debtor's going to show

6  up either with or without counsel, and is going to object to

7  questions.

8          And if we already have specific instructions from

9  the Court on those anticipated objections, then we don't

10 have to come back here and say, your Honor, there's been an

11 objection.  We don't know whether or not we're allowed to

12 answer these questions.

13         So with that in mind, we did discuss with Mr.

14 Rafatjoo and with Mr. Golden earlier this afternoon some

15 specific areas of inquiry that the Trustee would like to

16 present in a proposed order.  And we thought maybe the best

17 way to go forward is, present those in court here.  Let the

18 Debtor state whatever objections she may have to those areas

19 of inquiry.

20         And then lodge the proposed order and give the

21 Debtor seven days to make any additional objections she may

22 have.  And then have the Court issue a yay or nay on that

23 order, or make interlineations as the Court would please.

24         And with that having been done, then we can set up

25 the deposition at the convenience of counsel.  We all play

46

1  very nice together in the sandbox.  I don't think that will

2  be a problem.

3          MS. DOWNS:  I'd like to say something, if I -- go

4  ahead.

5          THE COURT:  Go ahead.

6          MR. REYNOLDS:  That's fine.

7          THE COURT:  Somebody.  I don't care.

8          MS. DOWNS:  You know, I've looked into this, your

9  Honor, and I have to say, it's highly irregular, it's highly

10 distressing, and perhaps even not lawful.  To undermine

11 that, the attorney-client privilege.  I hired Jim Till for

12 me.  The estate does not own it.

13         THE COURT:  And you fired him at one point.  I

14 know he was on the phone.

15         MS. DOWNS:  I know you guys, you guys love to

16 bring that I -- he got fired.  And I rehired him, remember?

17         THE COURT:  Right.  Okay.  But at some point a

18 trustee was appointed.  And at that point, you're not the

19 client anymore.

20         MS. DOWNS:  But you do realize that I was not a

21 voluntary Chapter 7.  And he was my attorney until he was

22 let out of the Chapter 7 case.  So what involvement with the

23 Trustee does he have?

24         THE COURT:  Okay.  So what we're going to do, I

25 like this idea, is put down in writing what it is they're

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 610

47

1  looking at asking about, and then you will have a chance to

2  bring up your objections.  I think that makes a lot of

3  sense.

4        MS. DOWNS:  Uh-huh.

5        THE COURT:  And then we -- everybody can look at

6  what the questioning's going to be.

7        MS. DOWNS:  Because if there's any question that

8  breaks the attorney-client privilege, it will undermine your

9  court --

10        THE COURT:  As to you.  As to you, yes.

11        MS. DOWNS:  For anyone who hires a bankruptcy

12  counsel for anything.

13        THE COURT:  Okay.

14        MS. DOWNS:  Because there are bankruptcy attorneys

15  out there.  There's got to be some privilege.

16        THE COURT:  Okay.  I like that result.  Okay.

17        MR. REYNOLDS:  Your Honor, the areas of inquiry

18  that the Trustee and Mr. Rafatjoo had indicated would --

19  that they would like to have as part of the 2004

20  examination, include the following six areas.  First, the

21  identification, investigation and recovery of assets of the

22  Debtor.

23        THE COURT:  Okay.

24        MR. REYNOLDS:  Second, would be transfers of

25  property of the Debtor.

48

1          MS. DOWNS:  I object to all of these, by the way.

2          THE COURT:  Well, number one, transfers of

3 property of the Debtor, I mean, if you did those

4 prepetition, they'd have to be in the --

5          MS. DOWNS:  They can ask me anything.

6          THE COURT:  -- they have to be in --

7          MS. DOWNS:  They can ask me anything.  To ask my

8 attorney when, you know, attorney/clients, you know, go over

9 things, get ideas, discuss certain things.  I mean, where

10 do --

11          THE COURT:  Okay.  Well --

12          MS. DOWNS:  -- you draw the line?

13          THE COURT:  -- well, we'll get there.

14          MS. DOWNS:  They can ask me anything.

15          THE COURT:  Okay.

16          MS. DOWNS:  I've asked for a 341 so many times,

17 your Honor, it's not even funny.

18          THE COURT:  I appreciate that.

19          Okay.  And what's the third one?

20          MR. REYNOLDS:  The third is property held by non-

21 debtors on behalf of the Debtor.

22          MS. DOWNS:  Object.

23          THE COURT:  You're going to get your chance.  It's

24 not right here though.

25          MS. DOWNS:  Okay.  Well, I'm making a blanket

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 612

49

1  objection --

2          THE COURT:  All right.

3          MS. DOWNS:  -- to all of it.

4          THE COURT:  Okay.  Fair enough.

5          MR. REYNOLDS:  The circumstances surrounding the

6  retainer that was paid to counsel for the Debtor.

7          THE COURT:  Okay.

8          MR. REYNOLDS:  That's number four.

9          Number five is any information that would tend to

10 impeach testimony previously given by the Debtor in this

11 case.

12         THE COURT:  Uh-huh.

13         MR. REYNOLDS:  And six, questions relating to the

14 engagement and termination of counsel.

15         Now, one thing that came up in the Court's

16 discussion with the parties over matters number 31 and 32 in

17 which, in fairness, I have not had a chance to discuss with

18 Mr. Golden or with Mr. Rafatjoo.  But the Court indicated

19 maybe there's some appetite for the appointment of a

20 referee.

21         I don't know what the status of the estate is and

22 whether or not it can afford such an expenditure, but if we

23 do wind up in a situation where we're in a deposition, I

24 have had some success in having retired judges sit in the

25 deposition and rule on objections where we expect it to be

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  613

50

1 very contentious in the deposition.  And a judge, you know,

2 retired judge sits there and says, overruled or sustained.

3          THE COURT:  Well, could we have an acting judge?

4          MR. REYNOLDS:  You could have an active judge,

5 too, if that -- especially, you know, if your Honor, has the

6 time --

7          THE COURT:  Well, I think Judge Clarkson likes

8 doing that stuff.

9          MR. REYNOLDS:  I think you're right.  I think he

10 does like doing that sort of thing.

11          THE COURT:  Well, just an idea.  You wouldn't have

12 to pay him.

13          MR. REYNOLDS:  Yeah.  Well, that -- or the estate

14 wouldn't have to pay him.  I don't think Mr. Till --

15          THE COURT:  Yeah.  Exactly.

16          MR. REYNOLDS:  -- is offering to pay.

17          MR. GOLDEN:  Your Honor, that approach is -- we

18 did discuss it.  That approach is acceptable.  As we

19 indicated in our papers, in our pleadings, you know, that we

20 believe the Trustee holds the privilege under the case law

21 as it relates to the investigation of assets.

22          There's lines of cases that are split, but the

23 middle ground that the cases take, the more nuanced, middle

24 ground is that in an individual debtor case the Trustee

25 holds the privilege where it relates to recovery of assets,

51

1 investigation of assets and the like.

2       And we also argue that even apart from that, we

3 argued that in this case Ms. Downs, based upon testimony she

4 had given, had waived the privilege and had opened the door.

5 That was the second argument we made, which is sort of

6 independent, and that's what created the impetus for filing

7 the motion.

8       So, we are going to be, obviously, asking

9 questions that would otherwise be within that purview as to

10 those areas, but not as to other areas, which would be

11 outside of the purview.

12       And I think with respect to the judge issue, I

13 think that's fine, your Honor.  Maybe we can caucus among

14 ourselves and see if, you know, what judge makes sense,

15 whether Judge Clarkson or anybody else, and timing and

16 availability and things of that nature, and figure it out

17 from there.

18       MS. DOWNS:  Your Honor, would I be included in

19 these discussions?  I obviously wasn't included in the

20 discussions of the subject matter that came up -- ex parte,

21 whatever they were doing, in terms of coming up with the

22 subject matter that want to ask Mr. Till.

23       Since it hasn't been decided by this Court if the

24 privilege is mine, after having paid him for it, or the

25 Trustee who didn't work with him --

52

1          THE COURT:  You're going to get -- absolutely, you

2  will have a chance.

3          MS. DOWNS:  I know.  But they're having meetings

4  without me is what I'm saying.  Now they, if they want to

5  caucus about the judge and who -- what judge to pick, I

6  think I should be included in all that.

7          MR. RAFATJOO:  Your Honor, I just want to -- with

8  respect to who holds the privilege, cases that were cited in

9  the 2004, In Re <u>Williams</u> and In Re <u>Bain</u>.  Both of them are

10 on point as to the fact that this privilege shifts to the

11 Chapter 7 Trustee.

12         Mr. Till was bankruptcy counsel to the estate, not

13 Andrea Downs individually.  The estate is now represented by

14 Mr. Tom Casey.  That's what the case law says.  That's what

15 In Re <u>Williams</u> says, that's what In Re <u>Bain</u> says.

16         MS. DOWNS:  Well, then there needs to be a review

17 of the contract between Till and Andrea Downs.

18         MR. RAFATJOO:  So, bottom line of it is, that the

19 order that will be submitted, we would also request that

20 there be language in there about the privilege having

21 shifted, in addition to the categories that are there,

22 because that's what the case law provides.

23         And I think it is important to have that, so that

24 Mr. Till can testify openly.  Because as pointed out in the

25 2004, when Ms. Downs testified that she had been selling

53

1 property of the estate, granted, nominal sums.  So how did

2 you do that?  Why did you do that?  Mr. Till told me I could

3 do it.

4       So, if Mr. Till has been telling the Debtor that

5 they can sell assets of the estate, or better yet, maybe he

6 told them -- maybe he told the Debtor that she should not be

7 selling assets of the estate, and she went ahead and did it.

8 We need to get that information and figure out who's telling

9 the truth.

10      MS. DOWNS:  Just really quickly, your Honor.  I'm

11 sorry.  But what he's referring to is the furniture that I

12 had to sell because I could not afford the public storage.

13 And we had gone over this in the only 341 that they held.

14 I'm happy to address any concerns they have, any information

15 they need.  They do not need to get 2004's on Till.

16      MR. RAFATJOO:  Thank you, your Honor.

17      THE COURT:  Okay.

18      MR. REYNOLDS:  Your Honor, just one quick point of

19 clarification, and then one suggestion.  The point of

20 clarification is that the engagement by the Debtor was with

21 the firm Bosley Till, LLP.  It was not Jim Till

22 individually, although I know that it's common for the two

23 terms to be used interchangeably.

24      The second, as for the Debtor's suggestion that

25 she be included in discussions among the other players in

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 617

54

1 this dispute, I don't think that's at all necessary so long

2 as her due process rights are preserved by allowing her the

3 opportunity to object.

4          THE COURT:  All right.  So you're going to give me

5 the six, the question -- what are you going -- what are you

6 filing?

7          MR. GOLDEN:  We can make it part of the order,

8 your Honor, and then lodge the order I think as Mr. Reynolds

9 proposed, or as we had discussed.  So what we could do is,

10 we'll memorialize in the order the shifting of the

11 privilege, of the attorney-client privilege, and say that

12 testimony of Mr. Till would be permitted with respect to

13 these areas.  Lodge the order --

14          THE COURT:  And Ms. Downs would have the

15 opportunity to object?

16          MR. GOLDEN:  "Opportunity to object."  And then --

17 at that stage.  And then, if the Court enters the order

18 based thereon, then we would proceed accordingly.  And that

19 would be the scope of the areas where the privilege would be

20 accessible, and questions outside of those areas it would

21 not be.

22          THE COURT:  Okay.

23          MR. REYNOLDS:  And just to follow-up on a point

24 that we just discussed, if the parties are in agreement, we

25 would, we would really prefer to have Judge Clarkson or

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  618

55

1 another one of our judges sit in as a referee during that

2 deposition.

3        MR. RAFATJOO:  Your Honor, and for the -- Hamid

4 Rafatjoo, Raines Feldman, for the Hausman and Moellenoff

5 creditors.  And for the record very briefly, your Honor, Ms.

6 Downs was served with a 2004.  She did not file any

7 responsive paper to the 2004.  We did not know she was going

8 to be here or participate in the process.  So, statements

9 about ex-parte communications, blah, blah, blah, I just want

10 to make that clear for the record.

11       THE COURT:  Yeah.  I thought this was going to be

12 fast.  All right.  I'm going to grant the motion.  And then,

13 Ms. Downs, you have the ability to object to what's in

14 there.

15       MS. DOWNS:  How much time do I have, your Honor?

16       MR. REYNOLDS:  Seven days, I believe, your Honor.

17       MS. DOWNS:  "Seven days"?

18       THE COURT:  I think it's seven days, yeah.

19       MS. DOWNS:  Without an attorney you're --

20       THE COURT:  Okay.

21       MS. DOWNS:  -- you're granting it?

22       THE COURT:  I'm granting it, yes.

23       MS. DOWNS:  Okay.

24       THE COURT:  But the motion -- the order will not

25 be entered until the time passed.  And if you file an

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  619

56

1 objection, I'll take a look at it.

2          MS. DOWNS:  Thank you.

3          THE COURT:  All right.  Okay.  So that's number

4 49.

5          Fifty is the motion to examine Eric Steinmann.

6 And as I've said, I'd like all of these 2004's to go forward

7 on a cooperative basis.  So I'm going to go ahead and grant

8 that.

9          Fifty-one is also the motion for Eric.  That says,

10 "PMK" of all these companies.  Are we going to re-serve

11 that?

12          MR. HAYS:  I think that should be re-served, your

13 Honor.  And it can be done without setting it for hearing.

14 It can be done under the local rule procedure.

15          THE COURT:  Okay.  Just so you know, I'm not going

16 to be real happy if Eric ends up being the PMK of all these

17 companies, and we could have taken care of this.

18          MR. HAYS:  Well, we can coordinate all of it if he

19 is, your Honor --

20          THE COURT:  Okay.

21          MR. HAYS:  -- once we know what the topics are.

22          THE COURT:  Okay.  That would be great.

23          MR. HAYS:  Yeah.

24          THE COURT:  I'd appreciate that.

25          MR. GOLDEN:  I'll re-serve it, and I'll talk to

57

1 counsel.  The rules require, contemplate a meet and confer

2 when you're picking a date.  I never got a date from before.

3 Maybe I'll get a date this time.  If not, I'm going to just

4 set it for a specific date, your Honor.

5         MR. RAFATJOO:  Your Honor, if we're going to be

6 facing more motions for protective orders and objections,

7 let's just deal with those issues.

8         THE COURT:  I'm trying to decide what to do with

9 this one.  If I should continue it at this point, maybe it

10 can be worked out.

11        MR. HAYS:  Your Honor --

12        THE COURT:  I know you want it re-served.

13        MR. HAYS:  Well, I think we can get it -- if this

14 one is denied, they can refile with the topics and properly

15 serve it.  At which point, if we know what the topics are,

16 and Eric is the PMK designated by the entities on one or

17 more topics for one or more entities, we will absolutely

18 coordinate it for the next time Eric's in California, to be

19 able to do all of these examinations at the same time.  I

20 don't see what the problem is, and it's probably going to

21 get done on the no-hearing basis.

22        The only issue I can foresee is if we can't agree

23 upon the date, because Eric may or may not be out here for,

24 you know, two-and-a-half months, and they don't want to wait

25 two-and-a-half months.  But then, you know, the Court's

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  621

58

1 order today was, the next time he's out there.

2          So I can provide proof under a declaration from

3 Mr. Steinmann if he's not going to be out here in the next,

4 you know, four weeks, as to when he will be, and there will

5 be evidentiary basis for that.  But that's the only issue

6 that I can foresee at all.  And if they just simply comply

7 with the proper procedures and service, we'll be done.

8          THE COURT:  Do you want to redo it?

9          MR. GOLDEN:  Your Honor, it doesn't bother me, but

10 I'm going to send an e-mail first to Mr. Hays, as the local

11 rules contemplate, saying, this is the date I'm proposing.

12 Do you want a different date?

13          THE COURT:  Okay.

14          MR. GOLDEN:  I mean, that's what the rules

15 provide.  Otherwise, I'm just going to put in my own date.

16          THE COURT:  All right.  I'm sure everybody will

17 get along well, and Mr. Steinmann will cooperate.  So I'm

18 going to deny this.  You can re-serve it, and I'm sure

19 everybody will play nicely.

20          Number 52.  That's the examination of Lora

21 Steinmann and Heinz.  That I'm going to grant the -- I think

22 that we have it all figured out.  It's going to happen in

23 Brightwood and -- pursuant to the terms.

24          MR. HAYS:  No oral examination of Heinz at this

25 time.  Four hours for Lora, with a five to 10-minute break

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE 622

59

1  every half hour at this time.

2          MR. RAFATJOO:  Your Honor, Hamid Rafatjoo.  The

3  last time we took the examination of Lora Steinmann, I think

4  we spent an hour and a half trying to get ground rules for

5  the examination.  So, if they want to limit it to four

6  hours, that's four hours of asking questions, not trying to

7  waste time.

8          THE COURT:  We need to set the ground rules ahead

9  of time.

10          MR. HAYS:  And I was not present.

11          THE COURT:  I know.

12          MR. HAYS:  I hadn't been hired yet, but I agree

13  that the Court's order today --

14          MR. RAFATJOO:  That's why there's a lot of

15  history.

16          THE COURT:  I know there is.

17          MR. HAYS:  -- will be for actual examination time.

18          THE COURT:  Perfect.

19          Number 53.  This is the motion for protective

20  order.  So that I'm going to -- well, that's -- yeah.

21  That's documents, et cetera.  I'm going to deny that.

22          MR. HAYS:  I guess it's denied as moot in light of

23  the fact that we're going to work in the protections into

24  the order granting the 2004's?

25          THE COURT:  But I have to do something with it.

60

1          MR. HAYS:  No, I understand.

2          MR. GOLDEN:  Yeah, deny --

3          THE COURT:  Either it can withdrawn or it can

4  just --

5          MR. GOLDEN:  I think it should be denied.

6          THE COURT:  I'll deny it.

7          MR. HAYS:  Denied as moot.

8          THE COURT:  Yeah.

9          MR. HAYS:  Correct.

10          THE COURT:  Yeah.  I'll deny it.  So I need an

11  order uploaded denying that.

12          Fifty-four is the omnibus motion for protective

13  order.  And that I'll deny --

14          MR. GOLDEN:  Yes.

15          THE COURT:  -- because I've already ruled on those

16  matters.  So I need an order uploaded on that.

17          And then 55 is off calendar.  Yay.  All right.

18          MR. GOLDEN:  Your Honor, thank you for your time.

19          THE COURT:  Thank you all very much.

20          ALL PARTIES:  Thank you, your Honor.

21          THE COURT:  Thank you for all the good arguments.

22       (Proceedings concluded.)

23

24

25

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  624

61

1          I certify that the foregoing is a correct

2    transcript from the electronic sound recording of the

3    proceedings in the above-entitled matter.

4

5    /s/ Holly Steinhauer          10-7-19
     Transcriber                   Date

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

EXHIBIT 7  PAGE  625

1   Jeffrey I. Golden, State Bar No. 133040
    jgolden@wgllp.com
2   Faye C. Rasch, State Bar No. 253838
    frasch@wgllp.com
3   **WEILAND GOLDEN GOODRICH LLP**
    650 Town Center Drive, Suite 600
4   Costa Mesa, California 92626
    Telephone     714-966-1000
5   Facsimile     714-966-1002

6   Attorneys for Chapter 7 Trustee
    Thomas H. Casey

7

8               **UNITED STATES BANKRUPTCY COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION**

10

11  In re                              Case No. 8:17-bk-12589-CB

12  ANDREA STEINMANN DOWNS,            Chapter 7

13                    Debtor.          Adv. No. 8:18-ap-01168CB

14                                     **PLAINTIFF'S OMNIBUS OPPOSITION TO
                                       MOTIONS TO DISMISS COMPLAINT;**
15                                     **MEMORANDUM OF POINTS AND
                                       AUTHORITIES IN SUPPORT**
16  THOMAS H. CASEY, Chapter 7 Trustee, **THEREOF**

17                    Plaintiff,       **Current Hearing:**
        v.                             **Date:      January 8, 2019**
18                                     **Time:      1:30 p.m.**
    LORA RAE STEINMANN, HEINZ H.       **Ctrm:      5D**
19  STEINMAN, ERIC STEINMANN, MARY
    (SYPKENS) STEINMANN, JOHN
20  STEINMANN, TESSIE (STAPLETON)
    STEINMANN, KATY (BELKNAP)
21  STEINMANN, HEINZ STEINMANN, JEFF
    STEINMANN, TOM STEINMANN, SUSIE
22  (WILSON) STEINMANN.

23

24                    Defendant.

25

26

27

28
    1196356v1                          OMNIBUS OPPOSITION TO MOTIONS TO
                                                              DISMISS

EXHIBIT 8  PAGE 626

## Table of Contents

I.      INTRODUCTION ................................................................................................. 1

II.     SUMMARY OF ARGUMENT ........................................................................... 2

III.    STATEMENT OF FACTS .................................................................................. 5

        A.    Procedural Background ........................................................................... 5

        B.    The Debtor's History of Not Being Forthcoming With the Court, the
              Trustee and Creditors.............................................................................. 6

IV.     ARGUMENT ...................................................................................................... 10

        A.    The Court May Properly Consider The Record In This Case. ............. 10

        B.    Defendants Have Not Met Their Burden to Dismiss Under FRCP
              12(b)(6) ................................................................................................. 10

        C.    The Transfer of the Debtor's Interest in the Trust Is a Recoverable
              Property Transfer Under The FDCPA's Fraudulent Transfer
              Provision ............................................................................................... 12

        D.    The Trustee Properly Employed The FDCPA As The "Applicable
              Law" Under Which He May Avoid Transfers Under Bankruptcy
              Code Section 544(b)(1)......................................................................... 14

        E.    The Removal of the Debtor from the Trust Was a "Transfer" of the
              Debtor's "Property" Under the FDCPA And Is Subject To Being
              Recovered By the Trustee...................................................................... 17

        F.    The Debtor's Interest in the Trust Is Being Held in a Resulting Trust
              By the Siblings....................................................................................... 20

        G.    Declaratory Relief.................................................................................. 23

        H.    Trustee Has Not Failed to Preserve a Claim ........................................ 23

        I.    Trustee Has Properly Stated A Claim For Attorneys Fees and Costs .. 24

        J.    Trustee Has Not Asserted A Claim Under Section 548(c). .................. 24

V.      CONCLUSION ................................................................................................... 24

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000    Fax 714-966-1002

i

EXHIBIT 8  PAGE  627

<div style="text-align:center; color:#4472C4;">Table of Authorities</div>

**<u>Cases</u>**

*Ashcroft v. Iqbal,*
    556 U.S. 662, 129 S. Ct (2009)................................................................11

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007).........................................................................11

*Drye v. United States,*
    528 U.S. 49 (1999)..........................................................................18

*Fid. Nat'l Title Ins. Co. v. Schroeder,*
    179 Cal. App. 4th 834 (2009) ..........................................................5, 21

*In re Cook,*
    No. ADV/SA-07-01143-ES, 2008 WL 8444785 (B.A.P. 9th Cir. Nov. 3,
    2008)......................................................................................20

*In re Costas,*
    555 F.3d 790 (9th Cir. 2009) ......................................................17, 19

*In re CVAH, Inc.,*
    570 B.R. 816 (Bankr. D. Idaho 2017)...........................................passim

*In re Natale,*
    136 B.R. 344 (Bankr. E.D.N.Y. 1992) ..............................................10

*In re Sale Guar. Corp.,*
    220 B.R. 660 (B.A.P. 9th Cir. 1998), aff'd, 199 F.3d 1375 (9th Cir. 2000) ...........21

*In re Schmitt,*
    215 B.R. 417 (B.A.P. 9th Cir. 1997) ................................................19

*In re Spencer,*
    306 B.R. 328 (Bankr. C.D. Cal. 2004) .............................................20

*Jackson v. Birmingham Bd. of Educ.,*
    544 U.S. 167 (2005)........................................................................5

*Johnson v. Johnson,*
    192 Cal. App. 3d 551 (1987) ..........................................................21

*Lee v. City of Los Angeles,*
    250 F.3d 668 (9th Cir. 2001) ................................................3, 20, 22

*MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.),*

<div style="text-align:center;">ii</div>

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

EXHIBIT 8  PAGE  628

675 F.3d 530 (5th Cir. 2012) ...................................................................................16

*O'Campo v. Chico Mall*, LP,
   758 F. Supp. 2d 976 (E.D. Cal. 2010) ..............................................................11

*Rollins v. Neilson (In re Cedar Funding, Inc.),*
   408 B.R. 299 (N.D.Cal. Bankr. 2009) ...............................................................21

*Shroyer v. New Cingular Wireless Services, Inc.,*
   622 F.3d 1035 (9th Cir. 2010) ...........................................................................11

*Sprewell v. Golden State Warriors,*
   266 F.3d 979 (9th Cir. 2001), *amended on other grounds*, 275 F.3d 1187 (9th
   Cir. 2001) ...................................................................................................3, 11, 23

*United States Small Bus. Admin. v. Bensal (Bensal),*
   853 F.3d 992 (9th Cir. 2017) ...............................................................17, 18, 19

*United States v. Harris*,
   854 F.3d 1053 (9th Cir. 2017) ...........................................................................17

*United States v. Summerlin,*
   310 U.S. 414 (1940)...........................................................................................14

**<u>Statutes</u>**

11 U.S.C. § 544(b)(1) ................................................................................................3, 14

28 U.S.C. § 3002(12)...........................................................................................4, 12, 13

28 U.S.C. § 3003(c) ......................................................................................................15

28 U.S.C. § 3301(2)..........................................................................................................4

28 U.S.C. § 3301(6)...........................................................................................4, 12, 13

28 U.S.C. § 3304(a)(1) .....................................................................................4, 13, 19

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

iii

OMNIBUS OPPOSITION TO MOTIONS TO
DISMISS

EXHIBIT 8  PAGE  629

**TO THE HONORABLE CATHERINE E. BAUER, UNITED STATES BANKRUPTCY COURT JUDGE:**

Plaintiff, Thomas H. Casey in his capacity as the duly appointed, qualified, and acting Chapter 7 trustee (the "Trustee") for the bankruptcy estate ("Estate") of Andrea Steinmann Downs ("Debtor"), submits this omnibus opposition (this "Opposition") to the two motions to dismiss [Adv. Dkt. Nos. 25 and 27] (the "Motions"), the Trustee's complaint [Adv. Dkt. No. 1] (the "Complaint"), filed by the defendants in this adversary proceeding ("Defendants").

In support of this Opposition, the Trustee represents as follows:

## I.   INTRODUCTION

The Complaint at issue is about a manipulative scheme to protect family interests and keep assets out of the reach of creditors. The claims for recovery of a fraudulent transfer and resulting trust independently seek to remedy the wrongs committed. These claims are consistent with the facts and applicable law. The pages of disputed facts desperately urged by Defendants are irrelevant to the Complaint and are largely made to confuse the Court. Put simply, the Debtor had an interest in property just before the petition date and now it has been removed. The Bankruptcy Code, applicable law, and the facts here mandate that this interest be returned to the Estate for liquidation and pro rata distribution among creditors.

Both Motions should be denied because the Trustee has properly pled each of his causes of action for, among other things, the avoidance and recovery of transferred property of the Debtor. Specifically, the Debtor, through the First Amendment to the Steinmann Trust, was deleted as a trust beneficiary of the Heinz H. Steinmann and Lora R. Steinman (the "Trust"), and her interest was transferred (the "Transferred Interest") to the Siblings/Defendants (the "Transfer").

The Complaint properly alleges the legal basis for the recovery of the Transferred Interest. First, the allegations in the Complaint are sufficient to establish that a fraudulent transfer of the Debtor's property occurred under Bankruptcy Code section 544(b)(1) because: (i) the Transfer was a "fraudulent" "transfer" of the Debtor's "property" as these terms are defined in the Federal Debt Collection Procedures Act ("FDCPA"), (ii) the Trustee has properly relied on the FDCPA as the

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

2

OMNIBUS OPPOSITION TO MOTIONS TO DISMISS

EXHIBIT 8  PAGE  630

1  "applicable law" contemplated in Bankruptcy Code section 544(b)(1), pursuant to which he may

2  avoid the Transfer; (iii) the Complaint was timely filed within two years of the petition date in this

3  case (*see* 11 U.S.C. § 546(a)(1)(a)); and (iv) by Lora Steinmann's ("Lora") own admission, the

4  Transfer was completed for the sole purpose of preventing the Debtor's creditors from reaching this

5  property.

6         As explained below, the FDCPA is a uniform federal statute that allows federal government

7  creditors broad reach in order to collect debts owed to the government and preempts local state debt

8  collection procedures. Because the Internal Revenue Service ("IRS") was a creditor of the Debtor

9  at the time of the Transfer, the IRS could have brought an avoidance action under the FDCPA to

10  recover the Transfer had this case not been filed. Bankruptcy Code section 544(b)(1) allows the

11  Trustee to now step into the shoes of the IRS to recover the Transfer under the FDCPA.

12         Second, the Trustee has alleged facts sufficient to establish that the Siblings/Defendants are

13  holding the Transferred Interest for the benefit of the Debtor, presumably until these assets are safe

14  from the reach of her creditors. Specifically, Lora has testified that she effectuated the Transfer for

15  the sole purpose of preventing access to this asset by the Debtor's creditors. This testimony

16  supports the Trustee's allegations that the Transfer was a mere ruse and that the Siblings are

17  holding the Transferred Interest in a resulting trust for the benefit of the Debtor. Under California

18  law, property held in a resulting trust for a debtor is reachable by a debtor's creditors. A debtor may

19  not skirt her creditors by divesting herself of title to property while retaining the true beneficial

20  interest in such property.

21         Third, because the Trustee has established that the Transfer was in fact a "fraudulent

22  transfer" under applicable law, it follows that the Transferred Interest should be judicially declared

23  to be property of the Estate. Further, such property must be recovered and preserved for the

24  Debtor's creditors. In light of the foregoing, the Trustee has adequately pled the merits of his

25  request for declaratory relief and his claims under Bankruptcy Section 550.

26

27

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

3                    OMNIBUS OPPOSITION TO MOTIONS TO
                                          DISMISS

EXHIBIT 8  PAGE  631

## II.    SUMMARY OF ARGUMENT

The allegations in the Complaint clearly set forth each element of each cause of action pled, and each such allegation must be taken as true. *Sprewell v. Golden State Warriors,* 266 F.3d 979, 988 (9th Cir. 2001) (amended on other grounds, 275 F.3d 1187 (9th Cir. 2001)(*Sprewell*) (a court addressing a motion to dismiss must accept as true all of the factual allegations set forth in the complaint). Under this analysis, the Defendants' Motions cannot prevail. Indeed, the Defendants do not argue that the Complaint was improperly pled, but rather make numerous factual and legal assertions which would need to be accurate for the Defendants to succeed. Even if the Defendants had submitted evidence to support their claims, which they have not, a motion to dismiss is an improper forum for the Court to analyze the Defendants factual claims. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (in considering a motion to dismiss, the court may not assume the existence of facts that favor defendants based on evidence outside plaintiffs' pleadings or take judicial notice of the truth of disputed factual matters). It is premature and procedurally inappropriate for the Court to be forced to decide between the parties' conflicting assertions of fact and conclusions of law at this time.  Rather, the Court must analyze whether the facts alleged, taken as true, support the plaintiff's claims. In this case, it is clear that the Trustee has met this burden.

The Complaint sufficiently sets forth the elements of a fraudulent transfer under Bankruptcy Code section 544(b)(1). Section 544(b)(1) allows a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor **that is voidable under applicable law**" by a creditor holding an allowed unsecured claim. 11 U.S.C. § 544(b)(1) (emphasis added). Cases in this circuit have deemed "applicable law" to include the FDCPA, which gives significantly broader powers to federal government agencies to collect on debts owed to the United States than are available to creditors under other state and federal transfer avoidance statutes.

Under the FDCPA, a transfer may be recovered as a "fraudulent transfer" if (i) the transfer is made <u>after</u> a debtor incurs a debt to a federal creditor (e.g., the Internal Revenue Service (the "<u>IRS</u>"), (ii) the debtor makes the transfer without receiving a reasonably equivalent value in exchange for the transfer, and (iii) the debtor is insolvent at that time of the transfer, or becomes insolvent as a result of the transfer. 28 U.S.C. § 3304(a)(1). In this case, the IRS filed claims for

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

4                    OMNIBUS OPPOSITION TO MOTIONS TO
                     DISMISS

EXHIBIT 8  PAGE  632

1   unpaid taxes for the years 2014 and 2015 and was therefore already a creditor at the time of the

2   Transfer in May 2016, less than two months before this bankruptcy case. Thus, the IRS could have

3   brought an action to avoid the Transfer under the FDCPA had the Debtor not filed this case.

4       Bankruptcy Code section 544(b)(1) allows the Trustee to step into the shoes of the IRS to

5   bring an avoidance action under the FDCPA to collect the debt owed to the IRS to the extent the

6   IRS could have brought the action outside of bankruptcy. *See In re CVAH, Inc.*, 570 B.R. 816, 827

7   (Bankr. D. Idaho 2017) ("nothing in the language of the FDCPA prohibits a bankruptcy trustee

8   from utilizing the provisions of that law under § 544(b)(1) if the federal creditor could invoke the

9   FDCPA outside of bankruptcy."). Therefore, because the IRS could have brought an action to

10  avoid the transfer under the FDCPA before this bankruptcy, the Trustee may now seek to avoid the

11  Transfer under Bankruptcy Code section 544(b)(1) and the FDCPA.

12      Further, contrary to Defendants' assertions, even if the Transfer was effectuated by

13  Defendants Lora and Heinz Steinmann, the Debtors' parents, rather than the Debtor herself, such

14  fact does not preclude its recovery under the FDCPA. A "transfer" under the FDCPA is defined to

15  include "every mode, direct or **indirect**, absolute or conditional, voluntary or involuntary, of

16  disposing of or parting with an asset or an interest in an asset…" 28 U.S.C. § 3301(6)(emphasis

17  added).

18      The Transferred Interest also fits squarely into the definition of the type of "property"

19  whose transfer may be avoided under the FDCPA. An "asset" that is subject to recovery under the

20  FDCPA is defined as "property of a debtor...." (*Id.* § 3301(2)), which includes "any present or

21  **future interest**, whether legal or equitable, in real, personal … or mixed property, tangible or

22  intangible, vested or **contingent,** wherever located and however held (including … property held in

23  trust...."). 28 U.S.C. § 3002(12)(emphasis added). Finally, the Debtor was insolvent at the time of

24  the Transfer, or became insolvent as a result of the Transfer of her primary asset (i.e., the

25  Transferred Interest).

26      In sum, because the Debtor's Transferred Interest, whether present or future, contingent or

27  vested, was subject to avoidance as a fraudulent transfer under the FDCPA by the IRS **before** this

28

5

OMNIBUS OPPOSITION TO MOTIONS TO
DISMISS

Welland Golden Goodrich LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

EXHIBIT 8  PAGE  633

1  case was filed, the Trustee, rightfully stepping into the shoes of the IRS, has properly brought this

2  avoidance action under the FDCPA.

3         The Trustee has also adequately pled a claim for the imposition of a resulting trust based on

4  evidence he has collected. Indeed, Lora testified that she and her husband, Defendant Heinz

5  Steinmann, removed the Debtor as a beneficiary under the Trust only weeks before this bankruptcy

6  for the sole purpose of keeping creditors away from the Debtor's assets. For now, the Siblings are

7  presumably holding the Transferred Interest in a resulting trust for the Debtor until this bankruptcy

8  case is closed and the assets are out of the reach of her creditors. Assets that are held in a resulting

9  trust for a debtor (e.g., the Transferred Interest) may be reached by a debtor's creditors to satisfy

10  the debtor's debts. *See Fid. Nat'l Title Ins. Co. v. Schroeder,* 179 Cal. App. 4th 834, 848 (2009)

11  (allowing a creditor's judgment lien to attach to the interest held in a resulting trust for the benefit

12  of the defendant-debtor).

13         Under Rule 12(b)(6) of Federal Rules of Civil Procedure ("FRCP"), made applicable herein

14  under Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, "'[t]he issue is not whether a

15  plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the

16  claims.'" *Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 184 (2005) (internal citations

17  omitted). Because the Trustee has met his pleading requirements under FRCP Rule 8(a)(2), the

18  Motions should be denied and the Trustee should be permitted to proceed with his litigation.

19  **III.    STATEMENT OF FACTS**

20         **1.    Procedural Background**

21         On June 19, 2016, the Debtor filed a voluntary petition for relief under chapter 11 of Title

22  11 of the United States Code (the "Petition Date").  On September 7, 2017, the case was converted

23  to one under chapter 7 of Title 11. Thomas H. Casey is the duly appointed Chapter 7 Trustee.

24         On January 8, 2016, Heinz H. Steinmann and Lora R. Steinman (the "Parents"), as trustors,

25  settled the family Trust by executing a "Declaration of Trust." The Debtor and her Siblings were

26  named beneficiaries under the Trust. On May 2, 2016, the Parents executed the "First Amendment

27  to the Steinmann Trust" (the "First Amendment"), pursuant to which they removed the Debtor as a

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

6                                    OMNIBUS OPPOSITION TO MOTIONS TO
                                                           DISMISS

EXHIBIT 8  PAGE  634

1  beneficiary of the Trust. True and correct copies of the Trust and First Amendment are attached to

2  the Parents'/Eric's Motion as Exhibits "1" and "2", respectively.

3      On September 6, 2018, the Trustee filed *Plaintiff Thomas H. Casey's Complaint (1) To*

4  *Avoid And Recover Fraudulent Transfers Pursuant To 11 U.S.C. §§ 548(A)(1)(A), 544(B) And 550;*

5  *(2) For Imposition Of A Resulting Trust; (3) For Declaratory Relief; (4) For Preservation Of The*

6  *Transfer For The Benefit Of The Estate; And (5) For Attorneys' Fees And Costs* [Adv. Dkt. No. 1],

7  against Defendants.

8      On November 9, 2018, eight of the Siblings (not including Eric Steinmann) filed one of the

9  Motions [Adv. Dkt. No. 25] ("Siblings' Motion"). The Parents and Eric Steinmann filed the other

10  motion [Adv. Dkt. No. 27] ("Parents'/Eric's Motion"). Both Motions seek to have the Complaint in

11  its entirety dismissed with prejudice.

12  **B.      The Debtor's History of Not Being Forthcoming With the Court, the Trustee**

13          **and Creditors.**

14      As the Court is already aware, throughout this bankruptcy case, the Debtor has been evasive

15  and deceptive, and has provided misleading testimony. In fact, the Debtor's conduct suggests an

16  **intentional** decision to not adhere to the Federal Rules of Bankruptcy Procedure and this Court's

17  orders. Although the Complaint was properly pled on its face and the Trustee need not allege any

18  more facts in order to defeat either of the Motions, the Debtor's pattern of dishonesty throughout

19  this case is highlighted here only to provide additional context to the Court -- none of these facts

20  are being newly introduced herein. However, such conduct merely further supports denial of the

21  Motions at this early stage of the litigation to allow the Trustee sufficient time to conduct and

22  complete discovery. Again, these facts are to provide context only because the Trustee has, as a

23  matter of law, sufficiently alleged each of the claims set forth in the Complaint.

24      While the Trustee will not repeat **all** of the inconsistencies and misrepresentations that the

25  Debtor made, below are just a few examples:

26          **1.      The Trust.**

27

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

                                    7              OMNIBUS OPPOSITION TO MOTIONS TO
                                                                    DISMISS

EXHIBIT 8  PAGE  635

1    The Debtor has testified both in a prepetition state court litigation (which testimony is part

2   of the record in an adversary proceeding in this bankruptcy case),[1] and in this bankruptcy case, that

3   she lacked knowledge of having had an interest in any family trust. She did so with the presumed

4   intent of not alerting creditors to its existence, despite being aware that she stands to inherit

5   significant assets.[2]

6    Indeed, Defendants Lora and Heinz Steinmann planned to leave their estate to all of their

7   children, without exception. Lora admitted under oath at her 2004 examination taken on July 10,

8   2017, that, it was only **on the eve of the Debtor's bankruptcy filing** that she and her husband

9

10

_____

11

12   [1] This testimony was presented to the Court in a related adversary proceeding [Adv. Case No. 8:17-ap-01235-CB] filed
by plaintiffs Hausman Holdings, LLC, David Moellenhoff, Pamela Moellenhoff David and Pamella Moellenhoff

13   against the Debtor (the "Moellenhoff Adversary"). On June 7, 2018, the Moellenhoff plaintiffs filed a *Motion for
Default Judgment Notice of Motion and Motion for Entry of Non-Dischargeable Default Judgment Against Debtor*

14   *Andrea S. Downs* [Moellenhoff Adv. Dkt. No. 33], which the Court granted on August 30, 2018 [Moellenhoff Adv.
Dkt. No. 51]. In connection with their motion, the Moellenhoff plaintiffs filed a *Notice of Lodgment of Testimonial*

15   *Evidence in Support of Motion for Entry of Non-Dischargeable Default Judgment Against Debtor Andrea S. Downs*
[Moellenhoff Adv. Dkt. No. 42].

16   [2]    **Transcript of hearing held before this Court held on December 19, 2016:**

17   Q:    But, Ms. Downs, the emphasis is more on material
        assets, interests that you have in companies that you are not running, that you're not involved with on

18   a daily basis. If there are family assets that, you know, you have a membership interest in --
     A:    Right

19   Q:    -- those are the things that we are looking for
     A:     I don't have a -- I'm not involved in a trust or will

20   or anything involved in a family asset.

21   Main Case Dkt. No. 171, [Tr. 12/19/16, at pp. 14:25, 15:7-10 (A. Downs).

22   Q:    You testified earlier that you're not part of a will or a trust --
     A:    That's correct.

23   Q:    -- and you're not beneficiary of anything.
     A:    Uh-huh.

24   Main Case Dkt. No. 171, [Tr. 12/19/16, at pp. 75:5-9 (A. Downs).

25   **Transcript of 341(a) Meeting on July 29, 2016:**

26   MR. TILL:    You're not beneficiary of any trusts or anything?
     MS. DOWNS:    No, not that I know of.

27

28   Moellenhoff Adv. Dkt. No. 42, Ex. O [Tr. 7/29/16, at pp. 65:1-4 (A. Downs).

(Continued...)

8    OMNIBUS OPPOSITION TO MOTIONS TO
DISMISS

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

EXHIBIT 8  PAGE  636

1   amended the Trust (and thereby technically "disowned" the Debtor), in order to protect the

2   Debtor's assets from creditors and that she informed the Debtor of this decision:

3           Q: Why was Andrea disowned?

4           A: **In lieu of what was happening**, **we didn't want any of our**
            **assets to be given to anyone else**, so we decided that we have a
5           revocable trust, that we would exclude Andrea from receiving any of
            our assets.
6

7   [Transcript of Lora Steinmann 2004 Exam, July 10, 2017, Page 47, Lines 13-16].[3]

8           Q:      Did you have a conversation with Andrea about disowning her?
            A       Yes.
9

10  [Transcript of Lora Steinmann 2004 Exam, July 10, 2017, Page 48, Lines 2-4].

11          Neither of the Parents has ever testified that taking the Debtor out of the Trust was intended

12  to be a permanent decision.

13              **2.      The Debtor Has Failed to Explain How She Spent $4.5 million of**

14                      **Prepetition Assets.**

15          Before the Petition Date, in the state court litigation proceeding that precipitated this

16  bankruptcy, the Debtor testified that she owned identifiable assets which were sold, including her

17  business, her home in Coto de Caza, her Mercedes Benz, horses, jewelry, her interest in a house in

18  Mammoth, and other assets, which together netted millions of dollars to the Debtor.[4]  The Debtor

19  failed to list these assets on the date she filed her chapter 11 petition, and again on the date the

20  Order of Relief was granted [Main Case Dkt. Nos. 31, 63 and 207]. The Debtor has not provided an

21  adequate explanation for the disposition of the assets in any of her bankruptcy filings or her

22  Schedules of Assets and Liabilities ("Schedules") and Schedule Of Financial Affairs ("SOFA").[5]

23  _____

24      [3] **Moellenhoff Adv. Dkt. No. 42, Ex. R [7/10/17, Tr. at pp. 47:13-16; 48:2-4 (L. Steinmann).**

25      [4] Moellenhoff Adv. Dkt. No. 42, Ex. P [12/19/16, Tr. at pp. 15:21-25, 16:1-13; 38:10-14; 40: 17-25;
    47:18-20; 49:18-24;53:8-19 (A. Downs).

26

27      [5] Through 2014 in connection with the sale of various businesses, business interests, and real estate
    assets, such as her luxury home in On December 19, 2016, when the Debtor testified in Court during her Rule 2004

28                                                                          (Continued...)

EXHIBIT 8  PAGE  637

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

**3.    SOFA and Schedules**:

Piecing together a clear picture of the Debtor's prepetition and postpetition assets has been difficult because she has made false and misleading statements under oath and provided incomplete information/disclosures in her Schedules or SOFA, which were never accurately amended. Similarly, in the Moellenhoff Adversary, the plaintiffs obtained three separate orders compelling her to comply with this Court's orders to produce documents, and one order [Main Case, Dkt. No. 243] awarding $74,772.00 in monetary sanctions to plaintiffs in light of her failure to comply with the court's prior Orders. After the Debtor still failed to comply with the Court's orders to produce documents and failed to properly answer the Moellenhoff's complaint seeking a default judgment and the nondischargeability of their judgment, on August 30, 2018, this Court entered an Order granting a default judgment in favor of plaintiffs and ordering that the judgment is non-dischargeable. [Moellenhoff Adv., Dkt. No. 51.]

**4.    The Debtor Made Unauthorized Postpetition Transfers of Assets.**

At the meeting of creditors held on November 27, 2017, the Debtor disclosed that, after the Petition Date, she transferred furniture that she kept in her boyfriend's storage unit to a consignment store and sold some of the furniture, which was a concealment or unauthorized transfer of any estate property. This alone is part of a pattern of demonstrable misconduct by the Debtor.

**5.    The Debtor's Failure to Provide Documents to the Trustee Necessitated Multiple Continuances of the 341(a) Meeting of Creditors.**

The initial 341(a) Meeting of Creditors in this case was held on July 29, 2016 [Main Case Dkt. No. 10]. The Office of the U.S. Trustee continued the 341(a) Meeting twice [Main Case Dkt.

---

Examination taken in the Moellenhoff Adversary, plaintiffs' counsel inquired, and attempted to gain clarity regarding, how the Debtor allegedly spent approximately $4.5 million of admitted prepetition assets, which assets included money the Debtor had received in her 2009 divorce settlement [Moellenhoff Adv. Dkt. No. 42, Ex. P, 12/19/16, Tr. at p. 57:13-25], and the additional millions of dollars that the Debtor received from 2011 through 2014 in connection with the sale of various businesses, business interests, and real estate assets, such as her luxury home in Coto de Caza (for which she netted approximately $900,000). [Moellenhoff Adv. Dkt. No. 42, Ex. P, 12/19/16, Tr. at pp. 46:17-25, 47:1-7]. The Debtor failed to provide any coherent explanation regarding how she purportedly dissipated her substantial prepetition assets, and she likewise failed to provide evidence to support any of her unsubstantiated and implausible assertions regarding how she spent her money.

10                    OMNIBUS OPPOSITION TO MOTIONS TO
                                              DISMISS

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 • Fax 714-966-1002

EXHIBIT 8  PAGE  638

1  Nos. 93 and 98] because the Debtor failed to provide certain required documents. This marked the

2  beginning of a repeated pattern of the Debtor's failure to comply with her production obligations.

3  After the Debtor's chapter 11 case was converted, the 341(a) Meeting of Creditors, initially set for

4  October 10, 2017 [Dkt. No. 294], has been continued **ten more** times because the Trustee was

5  concerned that additional documents existed but had not yet been provided. The continued exam is

6  currently set for January 22, 2019 [Main Case Dkt. Nos. 491and 492].

7  **IV.**    **ARGUMENT**

8      **A.**    **The Court May Properly Consider The Record In This Case.**

9      When presented with a motion to dismiss, the Court may properly consider the record that

10  has already been established in the case, such as the pleadings that have been filed and evidence

11  that has been presented to the court before the complaint was filed. *See In re Natale*, 136 B.R. 344,

12  349 (Bankr. E.D.N.Y. 1992)(internal citations omitted)(holding that, in deciding a motion under

13  FRCP Rule 12(b)(6), the court may consider "matters of public record such as orders or other items

14  appearing in the record of a case."). In this case, since the Debtor's bankruptcy case has been

15  pending for well over two years, the Trustee may rely on the various documents that have been

16  filed with the Court in relation to the case, such as the SOFA and Schedules, as well as the sworn

17  testimony of Lora and the Debtor entered as part of the record in this case and in the Meollenhoff

18  Adversary. *See Id.* at 348-49 (finding that, when faced with a motion to dismiss, the court may

19  consider the "original bankruptcy petition and accompanying schedules and statement of financial

20  affairs referred to by the Complaint, and the amended bankruptcy schedules and statement of

21  financial affairs, all of which had previously been filed with the court").

22      **B.**    **Defendants Have Not Met Their Burden to Dismiss Under FRCP 12(b)(6)**

23      Defendants have failed to meet their burden under FRCP Rule 12(b)(6) to show why the

24  Complaint should be dismissed.  FRCP Rule 8(a)(2) simply requires a "short and plain statement of

25  a claim; it does not require detailed allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct (2009.

26  A court should not grant a motion under Rule 12(b)(6) unless the complaint does not allege a claim

27  supported by a cognizable legal theory or if the complaint does not allege sufficient facts in support

28  of a cognizable legal theory.  *Shroyer v. New Cingular Wireless Services, Inc.,* 622 F.3d 1035,

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

    OMNIBUS OPPOSITION TO MOTIONS TO DISMISS

EXHIBIT 8  PAGE  639

1    1041 (9th Cir. 2010). Because the Complaint includes both sufficient facts and cognizable legal

2    theories, the Trustee has met this pleading standard.

3        Further, a complaint need only state a facially plausible claim for relief. *Id.* (citing *Iqbal*,

4    556 U.S. at 678). Plausibility means only whether, taking the facts as true, the court can draw the

5    reasonable inference that the defendant is liable for the misconduct alleged. *Id.* (citing *Iqbal*, 556

6    U.S. at 678). This standard is not one of probability, but rather asks for more than a sheer

7    possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550

8    U.S. at 556).

9        Thus, a claim is "plausible" so long as the factual allegations "raise a right to relief above

10    the speculative level." *Twombly*, 550 U.S. at 555. When addressing a motion to dismiss, the court

11    must accept as true all of the factual allegations set forth in the complaint and draw inferences from

12    the allegations in the light most favorable to plaintiff. *Sprewell, supra,* 266 F.3d at 988.

13        Here, the Complaint goes far beyond the "notice pleading" contemplated by Rule 8(a)(2)

14    and makes specific allegations as to the nature and timing of the fraudulent transfer and resulting

15    trust, and includes "cognizable legal theories" for recovery of the Transfer. The Complaint alleges

16    that, just prior to the Petition Date on May 2, 2016, the Debtor's Parents effectuated the Transfer of

17    the Transferred Interest. (Complaint at ¶ 30.) The Complaint further alleges that the Transfer was

18    completed for the "express purpose of preventing the Estate's creditors access to the Trust Assets."

19    (Complaint at ¶ 31.) The Complaint also details Defendants' liability under the FDCPA as a result

20    of the Transfer, and alleges that: (i) the Transferred Interest constitutes "property" of the Debtor

21    under the FDCPA (28 U.S.C. § 3002(12)); (ii) the Transfer meets the definition of a "transfer"

22    under the FDCPA (28 USC §3301(6)); (iii) the Debtor did not receive reasonably equivalent value

23    for the Transfer; (iv) the Debtor was insolvent at the time of the Transfer or became insolvent as a

24    result of the Transfer; and (v) the Trustee is authorized to pursue a claim under the FDCPA (by

25    stepping into the shoes of the IRS). (Complaint at ¶¶ 37-43.)

26        The foregoing facts, taken as true, as required, clearly establish that the Trustee has met his

27    burden and sufficiently pled his claims.

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

OMNIBUS OPPOSITION TO MOTIONS TO
DISMISS

EXHIBIT 8  PAGE  640

**C.**    **The Transfer of the Debtor's Interest in the Trust Is a Recoverable Property Transfer Under The FDCPA's Fraudulent Transfer Provision**

The Trustee may use his avoidance powers under Section 544(b)(1) of the Bankruptcy Code to step into the shoes of the IRS, a creditor in this case, to take advantage of the extraordinarily expansive avoidance and asset recovery powers granted under the FDCPA to federal creditors seeking to collect debts owed to the federal government. The FDCPA preempts state law and permits the federal government to recover a broader spectrum of property from debtors to satisfy its debts than may be allowed under state law or other federal laws. For the reasons discussed below, the Debtor's interest in the Trust, whether present or future, vested or contingent, and regardless of who effected the Transfer, could have been recovered by the IRS under the FDCPA outside of a bankruptcy proceeding. The Trustee is therefore equally empowered with these same broad powers to avoid the Transfer in this case.

The FDCPA, codified in 28 U.S.C. §§ 3001- 3308, is a federal law passed in 1990, affecting money owed to the United States. The FDCPA was enacted to establish a uniform federal statute to govern actions by the federal government to collect debts owed to it, in place of the then-existing practice of using local state debt collection procedures. As discussed below, the Trustee has made a *prima facie* showing that the Debtor's interest that was transferred under the Trust Amendment may be recovered for the benefit of the Estate and creditors under the FDCPA.

28 U.S.C. § 3304(a)(1) provides as follows:

**Debts arising before the transfer**. Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States which arises before the transfer is made or the obligation is incurred if—

(1)(A) the debtor makes the transfer or incurs the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and

(B) the debtor is insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation[.]

Welland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

13    OMNIBUS OPPOSITION TO MOTIONS TO DISMISS

EXHIBIT 8  PAGE  641

1  28 U.S.C. § 3304(a)(1). In this case, the Debtor owed the IRS debts for unpaid taxes in 2014 and

2  2015, so the IRS was already a creditor when the Transfer was made in 2016.

3      The FDCPA defines "transfer" as:

4       [E]very mode, direct or indirect, absolute or conditional, voluntary
        or involuntary, of disposing of or parting with an asset or an interest
5       in an asset, and includes payment of money, release, lease, and
        creation of a lien or other encumbrance.
6

7  28 U.S.C. § 3301(6).

8      For purposes of establishing a "transfer" of an asset under 28 U.S.C. § 3301(6), an

9  "'[a]sset' means property of a debtor...." *Id.* § 3301(2). The FDCPA in turn defines "property"

10 expansively to include:

11      [A]ny present or **future interest**, whether legal or equitable, in real,
        personal (including choses in action), or mixed property, tangible or
12      intangible, vested or **contingent,** wherever located and however held
        (including community property and property held in trust....

13 28 U.S.C. § 3002(12) (emphasis added).[6]

14     This language in the FDCPA is broad and reveals on its face that Congress meant to reach

15 **every interest in property** that a debtor may have **unless** it specifically excepted such interest.

16 Congress could have limited its definition of assets to include only a debtor's interest in property to

17 the extent such interest constitutes property under applicable state law (such as is the case under

18 federal bankruptcy law). It did not. Rather, Congress set forth its own expansive definition of

19 "property" for purposes of the FDCPA, as codified under section 3002(12). Moreover, the

20 FDCPA's list of exemptions to the broad nature of property under section 3002(12) does not

21 include "contingent and revocable inter vivos trust interests".

22     A plain reading of the statue makes at least two things clear. <u>First</u>, the Transferred Interest,

23 whether future or contingent, constitutes an "asset" and "property" under the federal statutory

24 definitions. <u>Second</u>, the broad definition of "transfer" expressly refutes Defendants' contention that

25 it is "the Debtor's actions that trigger any potential action by the Trustee" (Siblings' Motion at p.

26

27 _____

28  [6] In this Circuit, the court in *In re CVAH, Inc.*, 570 B.R. 816, 824 (Bankr. D. Idaho 2017) agreed that, under the
    FDCPA, the Trustee could seek to recover transfers dating back to six and ten years.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

14                OMNIBUS OPPOSITION TO MOTIONS TO
                                        DISMISS

EXHIBIT 8  PAGE  642

16, lns. 10-11.) The fact that the Transfer may have been technically effectuated by the Parents does not preclude the Trustee from being able to recover the property transferred under the FDCPA because it included indirect transfers.

It is also important to note that the FDCPA does not limit the look-back transfer avoidance period and preempts any limits on the recovery of assets that are set forth in other federal statutes or state laws that contain such limitations (e.g., Bankruptcy Code section 548(a)(1), California Uniform Fraudulent Transfer Act). "It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights." *United States v. Summerlin,* 310 U.S. 414, 416 (1940).

### D.    The Trustee Properly Employed The FDCPA As The "Applicable Law" Under Which He May Avoid Transfers Under Bankruptcy Code Section 544(b)(1).

Defendants' assertion that the Trustee may not rely on the FDCPA as "applicable law" in the context of his avoidance powers under Bankruptcy Code section 544(b)(1) has been rejected by the majority of courts that have considered this issue, including in the Ninth Circuit.

Bankruptcy Code section 544(b)(1) allows a trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor **that is voidable under applicable law** by a creditor holding an unsecured claim that is allowable under section 502 of this title…" 11 U.S.C. § 544(b)(1)(emphasis added). In the most recent published decision in the Ninth Circuit on this issue, *In re CVAH, Inc.*, 570 B.R. 816, 826 (Bankr. D. Idaho 2017)(*CVAH*), the Court considered whether a bankruptcy trustee exercising his avoidance powers under Bankruptcy Code Section 544(b)(1) could step into the shoes of the IRS and seek to recover transfers under the fraudulent transfer avoidance provisions of the FDCPA -- the "applicable law."[7] The court held that the trustee was within his rights to do so.

---

[7] The Trustee relied on the avoidance powers under FDCPA because some of the transfers he sought to avoid were made six to ten years before the bankruptcy and were therefore outside of the applicable state law's look-back period, but could be recovered under the FDCPA's longer look-back period. *Id.* at 824.

OMNIBUS OPPOSITION TO MOTIONS TO DISMISS

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

EXHIBIT 8  PAGE  643

1    The court's rationale for its holding was twofold. <u>First</u>, the court found that the term

2    "applicable law" as used in Bankruptcy Code section 544(b)(1) should be applied broadly because

3    the Bankruptcy Code does not contain any language limiting the meaning of "applicable law" (e.g.,

4    to state law). The Bankruptcy Code also does not contain language that limits which of the debtor's

5    creditors the trustee may use as the vehicle to avoid the transfer at issue (e.g., to non-governmental

6    creditors entities). The Court highlighted the axiomatic concept that, in the absence of a contrary

7    definition, the words in a statute are "presumed to have their ordinary meaning." *Id.* at 825.

8    
> [H]ad Congress intended to restrict the reach of applicable law in §
> 544(b) (1), it would have done so expressly. In sum, there is no
9    > reason, based upon the phrase's plain meaning, that Congress
> intended to exclude the FDCPA and the IRC from the "applicable
10   > law" available to trustees under § 544(b)(1).

11   *Id.* at 826. In this case, since the Debtor owed money to the IRS for the years 2014 and 2015,[8] and

12   the Transfer was made in 2016, the IRS could have sought to avoid and recover the Transferred

13   Interest under the FDCPA to satisfy its claims had she not filed for bankruptcy protection. It

14   follows that the Trustee may therefore also do so.

15   
16       <u>Second</u>, the *CVAH* court rejected the debtor's argument that a bankruptcy trustee is

prohibited from utilizing the FDCPA because section 3003(c) of the FDCPA provides that: "[t]his
17
chapter shall not be construed to supersede or modify the operation of—(1) Title 11 ...." 28 U.S.C.
18
§ 3003(c). While the court noted the absence of controlling decisions on this issue from the Ninth
19
Circuit or BAP, it found that the majority of courts that analyzed the issue "agree that
20
**a bankruptcy trustee may utilize the FDCPA under § 544(b)(1)**" despite this language. *Id.* at
21
826 (emphasis added). Agreeing with the majority of courts, the Court expressly **rejected** the Fifth
22
Circuit's minority argument in *MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant*
23
*Corp.),* 675 F.3d 530, 535 (5th Cir. 2012), on which Defendants rely [Siblings' Motion at p. 13,
24
lns. 13-15], that allowing a bankruptcy trustee to rely on the FDCPA as the foundation for a
25
Bankruptcy Code section 544(b)(1) avoidance claim would "impermissibly modify the operation of
26

27   _____

28      [8]  *See* IRS's Proofs of Claim: Claim 1-1 filed on July 7, 2016 and Claim 1-2 filed in this case on July 11, 2018.

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

16                                OMNIBUS OPPOSITION TO MOTIONS TO
                                                              DISMISS

EXHIBIT 8  PAGE  644

Title 11." *CVAH, 570 B.R. at 827, quoting In re Mirant Corp.*, 675 F.3d at 535. The Court was also not persuaded by the comments included in the legislative history of the FDCPA by one of the statute's authors [cited in Siblings' Motion, at p.13, lns. 19-23], in which he commented that the FDCPA would have no effect on the Bankruptcy Code. The *CVAH* court warned that "[a] court must be cautious in relying on a single comment made by an individual congressman in the process of enacting legislation in Congress." *Id.* at 830 (citations omitted.)

Instead, the court held that allowing the bankruptcy trustee to use the FDCPA would not act to modify or supersede the Bankruptcy Code because:

> 544(b)(1) is an enabling statute; its role in the Code is not to identify the specific laws a bankruptcy trustee may use to avoid a transfer. Rather, its purpose is to allow trustees to generally invoke applicable laws, i.e. all statutes that an unsecured creditor with an allowed claim in the case could utilize outside of bankruptcy.

*Id.* at 829. On this basis, the court adopted the majority view that "**nothing in the language of the FDCPA prohibits a bankruptcy trustee from utilizing the provisions of that law under § 544(b)(1) if the federal creditor could invoke the FDCPA outside of bankruptcy.**" *Id.* at 827 (emphasis added).

**None** of the other cases that Defendants cite in the Motion have held that the FDCPA may not be relied upon as the "applicable law" under section 544(b)(1)] because none of them even relied upon or addressed the avoidance powers under the FDCPA. For example, *In re Costas*, 555 F.3d 790 (9th Cir. 2009) involved a bankruptcy trustee who sought to avoid the debtor's disclaimer of his inheritance under section 548(a)(1) of the Bankruptcy Code -- it did not involve a federal government creditor or the FDCPA. *See also*, *United States Small Bus. Admin. v. Bensal (Bensal)*, 853 F.3d 992, 998 (9th Cir. 2017) (not a bankruptcy case and did not discuss the FDCPA); *United States v. Harris*, 854 F.3d 1053 (9th Cir. 2017) (same).

For the reasons set forth in *CVAH* and herein, Defendants' contentions that the FDCPA is not "applicable law" in the context of section 544(b)(1), and cannot be used by the Trustee in this case, are **not supported by the law in this Circuit** and should be rejected.

17                                    OMNIBUS OPPOSITION TO MOTIONS TO
                                      DISMISS

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

EXHIBIT 8  PAGE 645

**E.**    **The Removal of the Debtor from the Trust Was a "Transfer" of the Debtor's "Property" Under the FDCPA And Is Subject To Being Recovered By the Trustee.**

When determining the nature of a debtor's property interest in a "transferred asset, or whether a "transfer" of a debtor's interest in "property" may be recovered under the FDCPA (in cases where the statute applies), the FDCPA's definition of these terms preempt those under applicable state law. 28 U.S.C. section 3003(d) expressly provides that "[t]his chapter shall preempt state law to the extent such law is inconsistent with a provision of this chapter." Since a debtor's interest in "property" is more broadly defined under the FDCPA than under California state law, contrary to Defendants' position on this issue, the FDCPA's definition of "property" applies because the **FDCPA preempts California law**. It is critical to note that **Defendants fail to cite to even one case** in which a court considered whether an asset could be recovered in a bankruptcy case under the FDCPA, and then held that the state law definitions of "property" or "transfer" preempt the FDCPA's definitions of either of these terms.

As explained above, in *In re Costas*, 555 F.3d 790 (9th Cir. 2009), the bankruptcy trustee sought to avoid the debtor's disclaimer of his inheritance under section 548(a)(1) of the Bankruptcy Code- **not the FDCPA**. Defendants correctly note that the court applied state law to determine whether the debtor had a property interest in the trust funds that could be avoided under section 548(a)(1). However, *Costas* did **not** include a federal government creditor, and there was no discussion of which law applies for the purposes of an analysis under the FDCPA's transfer avoidance provisions, so the holding in *Costas* has **no bearing** on this issue.

In an effort to find support for their position, Defendants mischaracterize the Ninth Circuit's holding in *Bensal*, which, contrary to their assertion, **supports the Trustee's position** that the FDCPA preempts state law for purposes of recovering a debtor's fraudulently transferred assets. *See Bensal*, 853 F.3d at 997 ("We … hold that the FDCPA displaces California's disclaimer law."). In *Bensal*, a non-bankruptcy case, the Small Business Administration (the "SBA"), a federal government creditor, sought to apply the FDCPA's avoidance powers to avoid the judgment debtor's disclaimer of his share of his father's estate, which he made after the SBA obtained a

Welland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

18

OMNIBUS OPPOSITION TO MOTIONS TO DISMISS

EXHIBIT 8  PAGE  646

Welland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

1    judgment against him for the unpaid loan. The Ninth Circuit considered whether the broad

2    definition of a "transfer" under the FDCPA preempted the mandate under the California Probate

3    Code that a disclaimer of an inheritance cannot form the basis of a fraudulent transfer.

4        In its analysis, the Ninth Circuit relied primarily on the Supreme Court's decision in *Drye v.*

5    *United States*, 528 U.S. 49 (1999)(*Drye*), and its earlier holding in *Costas*. In *Drye*, the Supreme

6    Court found that the federal tax lien statutes preempted state law where a debtor owing a significant

7    tax debt to the IRS attempted to disclaim his inheritance. In *Costas*, the Ninth Circuit considered

8    and distinguished the holding in *Drye* and held that the chapter 7 trustee (who was **not** a federal

9    government creditor, and was **not** seeking to avoid the transfer under the FDCPA) could not avoid

10   the debtor's prepetition disclaimer of her inheritance as a fraudulent transfer under the section

11   548(a)(1) of the Bankruptcy Code.

12       After an extensive comparison of the cases, the Ninth Circuit held that the facts of *Bensal*

13   were more akin to *Drye* than to *Costas*. Among other things, both *Drye* and *Bensal* involved federal

14   debt recovery statutes (i.e., the federal tax lien statute and the FDCPA, respectively), and federal

15   government creditors, whereas *Costas* did **not** involve a federal government interest, and was

16   analyzed under Bankruptcy Code section 548(a)(1). The Ninth Circuit repeated its reasoning from

17   *Costas*: "… we noted differences in the purpose and structure of the federal tax lien statute and the

18   bankruptcy code. As to purpose, we explained that the federal tax lien statute is primarily

19   concerned with collection of federal debts, which 'justifies the extraordinary priority accorded' to

20   the federal government and 'contrasts sharply with the policy of bankruptcy law, which largely

21   respects substantive state law rights.' (Quoting *Costas*, 555 F.3d at 796–97)." *Bensal*, 853 F.3d at

22   999.

23       For these and other reasons, the Ninth Circuit held that "[i]t seems quite clear that

24   California law is inconsistent with the FDCPA and must give way to the federal statute in light of

25   the express preemption clause." *Bensal*, 853 F.3d at 998. Defendants' assertion that "[i]n *Bensal*

26   the Ninth Circuit affirmed that federal law does not preempt state substantive law in a bankruptcy

27   proceeding" (Siblings' Motion, at p. 14, lns. 12-13) therefore clearly mischaracterizes the holding

28   in *Bensal* - which was **not** a bankruptcy case.

<div align="center">19</div>

OMNIBUS OPPOSITION TO MOTIONS TO
DISMISS

EXHIBIT 8  PAGE  647

1    The Ninth Circuit's analysis in *Bensal* also suggests that it would have reached an opposite

2    result in *Costas* in the face of a federal government debt and reliance on a federal debt recovery

3    statute. Indeed, commentators have already suggested as much:

4        … [T]he reasoning of *Bensal* could apply in bankruptcy where a
         debtor disclaims an inheritance while owing a debt to the federal
5        government (e.g., SBA loan). In that event, the trustee, using the
         trustee's avoidance powers under 11 USC § 544(b)(1) and the
6        FDCPA, could rely on *Bensal* to reverse the disclaimer where the
         federal government holds an allowed unsecured claim (the *Costas*
7        decision did not involve a federal government debt)."

8
9    E. Trustee's Avoidance Power as Successor to Actual Unsecured Creditors (11 USC § 544(b)), Cal.
     Prac. Guide Bankruptcy Ch. 21-E.

10   In the present case, the IRS is a creditor, and the Trustee is seeking to recover transfers

11   under the FDCPA. The holdings in *Drye* and *Bensal* both support the Trustee's position that the

12   **FDCPA preempts California law** to the extent that California state law is inconsistent with the

13   FDCPA. This analysis leads to the conclusion that the FDCPA's definitions of what constitutes a

14   "transfer" of "property" for purposes of the avoidance powers set forth in the FDCPA (28 U.S.C. §

15   3304(a)), is controlling.

16   Defendants have also **failed to cite even one bankruptcy case** involving an avoidance

17   action brought under the FDCPA in which the court held that a revocable or contingent interest in

18   an inter vivos trust is not included in the definition of "property" under the FDCPA. E.g., *In re*

19   *Schmitt*, 215 B.R. 417, 425 (B.A.P. 9th Cir. 1997) (applying California state law to determine

20   whether debtor's interest in a revocable inter vivos trust constituted estate property, in a case **not**

21   **involving the FDCPA**); *In re Spencer*, 306 B.R. 328, 333 (Bankr. C.D. Cal. 2004) (employing

22   definitions of what constitutes a bankruptcy debtor's property under the California Probate Code, in

23   a case **not involving the FDCPA** or any other federal recovery statute).**⁹**

24

25

26

27   ⁹ Moreover, courts in this Circuit have held that state law definitions are not controlling on issues of property if there are greater federal interests at play, e.g., the recovery of money by the federal government. *See*, In re Cook, No. ADV/SA-07-01143-ES, 2008 WL 8444785, at *3 (B.A.P. 9th Cir. Nov. 3, 2008) (explaining that state law definitions

28   should be employed "**unless some federal interest requires a different result**")(Emphasis Added).

20    OMNIBUS OPPOSITION TO MOTIONS TO
                                                                      DISMISS

EXHIBIT 8   PAGE  648

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

1    For all of these reasons, the Transferred Interest, whether future or present, contingent or

2  vested, is "property" of the Debtor under the FDCPA that was "transferred", and, as such, is subject

3  to recovery under the applicable avoidance provisions of the FDCPA, even if such recovery is not

4  permitted under California state law (which contention the Trustee also disputes).

5    Even if the Court finds Defendants' position that California law must be applied to the

6  determination of whether the Debtor has a property interest under the FDCPA, the Motions should

7  still not be granted on the sole basis of Defendants' factual assertions in the Motions. *See Lee v.*

8  *City of Los Angeles*, *supra*, 250 F.3d at 688 (9th Cir. 2001) (reversing the district court's decision to

9  dismiss plaintiffs' claims because in granting defendants' motions, the district court assumed the

10  existence of facts that favored defendants based on evidence outside plaintiffs' pleadings, took

11  judicial notice of the truth of disputed factual matters, and did not construe plaintiffs' allegations in

12  the light most favorable to plaintiffs). Defendants and the Debtor have made every effort to stall

13  and mislead the Trustee's investigation from the start of this case. The Court ought not decide

14  whether the Transferred Interest is recoverable for the benefit of the Estate before allowing the

15  Trustee the opportunity to collect and present further evidence about what interests were transferred

16  and what rights the Debtor has retained in any such interests, including under undisclosed

17  agreements with Defendants.

18    **F.    The Debtor's Interest in the Trust Is Being Held in a Resulting Trust By the**

19    **Siblings.**

20    In order for Defendants to prevail in dismissing the Trustee's claim that the Siblings are

21  holding the Transferred Interest for the benefit of the Debtor in a resulting trust, the Court would

22  have to find that the Trustee is not entitled to any recovery even in the face of the allegations of

23  such undisclosed agreement. Such a finding would be contrary to California law, which provides

24  that assets held in a resulting trust for a debtor are recoverable by the debtor's creditors.

25    A resulting trust will arise where there is a transfer of property "under circumstances

26  showing that the transferee was not intended to take the beneficial interest." *In re Sale Guar. Corp.*,

27  220 B.R. 660, 664 (B.A.P. 9th Cir. 1998), aff'd, 199 F.3d 1375 (9th Cir. 2000). For example, where

28  a transferee of title to property does not remit the purchase price for the property, he will be

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

21    OMNIBUS OPPOSITION TO MOTIONS TO
DISMISS

EXHIBIT 8  PAGE  649

1    deemed to be holding the property in a resulting trust for the party who paid the purchase price.

2    *Johnson v. Johnson*, 192 Cal. App. 3d 551, 554 (1987). A resulting trust has been dubbed the

3    "intention enforcing trust," and will restore the property rights in accordance with the intent of the

4    parties. *Fid. Nat'l Title Ins. Co. v. Schroeder*, 179 Cal. App. 4th 834, 848 (2009)(*Schroeder*); *Cedar*

5    *Funding*, 408 B.R. at 306 ("Under California law, a resulting trust … is enforceable in equity to

6    carry out the inferred intent of the parties to establish a trust.").

7        In *Schroeder*, to avoid the consequences of an imminent judgment lien, the defendant

8    deeded his interest in real property to his co-owner. The creditor commenced an action claiming,

9    *inter alia*, that its judgment lien should attach to the property because the co-owner was simply

10   holding the real property in a resulting trust for the defendant. The appellate court agreed and held

11   that the creditor's judgment lien would attach to the interest the defendant attempted to deed away

12   because the true beneficial interest remained with defendant, the co-owner was merely holding the

13   interest in a resulting trust for the defendant. *Id.* at 850.

14       Similarly, in this case, the Trustee has alleged, and believes, that the Debtor is the true and

15   beneficial holder of the Transferred Interest. The Debtor has attempted to deceive the Court, and

16   her creditors by orchestrating and participating in a sham transaction with her family to conceal

17   property interests that were granted to her under the Trust. Indeed, Lora testified that, once the

18   Debtor was facing this bankruptcy case, she and her husband admittedly moved quickly to remove

19   the Debtor from the Trust, less than two months before the Petition Date, and explained this

20   strategy to the Debtor.[10]

21       This testimony and the facts surrounding the Debtor's removal from the Trust lead to the

22   logical conclusion that the Parents never intended for the Siblings to become the permanent or

23   beneficial owners of the Debtor's share in the Trust assets. There has never been a plan to deprive

24   the Debtor of her inheritance. Instead, the Parents/Defendants amended the Trust to exclude the

25   Debtor in a transparent effort to "wait out" this bankruptcy case and the other pending litigation

26   matters against the Debtor, and then either (i) re-name the Debtor as a beneficiary once the threat of

27   _____

28   [10] Moellenhoff Adv. Dkt. No. 42, Ex. R [7/10/17, Tr. at pp. 47:13-16 (L. Steinmann).

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 850
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

22                    OMNIBUS OPPOSITION TO MOTIONS TO
                                          DISMISS

EXHIBIT 8  PAGE  650

1    those proceedings has passed, or (ii) find another way to funnel money to the Debtor (likely

2    through the Siblings) to ensure that funds are never made available to creditors for as long as they

3    have a legal right to enforce judgments and collect on their claims. In the meantime, the

4    Transferred Interest is being held in a resulting trust for the Debtor's benefit. This is a classic

5    example of the construct of a resulting trust. The Trustee has set forth these allegations in the

6    Complaint. Moreover, he is confident that discovery will further prove this point, as well as show

7    what property they are currently holding for her benefit.

8         Defendants try to muddle this analysis by asserting, as fact, that the Transferred Interest has

9    no value because the Siblings only have contingent interests in the Trust, so the Trustee's cause of

10   action must fail. Yet, there is no evidence in the record of the veracity of Defendants' assertions on

11   which they base their Motions, and there is no evidence to dispute the validity of the Trustee's

12   factual allegations set out in the Complaint. "Indeed, factual challenges to a plaintiff's complaint

13   have no bearing on the legal sufficiency of the allegations under Rule 12(b)(6)." *Lee v. City of Los*

14   *Angeles*, *supra*, 250 F.3d at 688.

15        Defendants have also not disclosed which assets are included in the Trust, the extent and

16   value of the Siblings' interests in these individual assets, or whether the Debtor was vested in any

17   of these assets prepetition. The Trustee has properly pled that the Debtor had a beneficial interest in

18   the Trust, that this interest was transferred out of the Estate by her removal from the Trust, and that

19   the Debtor agreed with Defendants that they would hold this asset for her benefit. (Complaint at ¶¶

20   46, 47). Because such allegations sufficiently plead a cause of action for a resulting trust under

21   California law, and must be accepted as true at this stage of the litigation, Defendants' request to

22   dismiss this cause of action must fail. *See Sprewell, supra*, 266 F.3d at 988 (a court must accept as

23   true all of the factual allegations in a complaint in the light most favorable to the plaintiff).

24        It is important to note that, for now, the Trustee is **not** suggesting that the Estate has a

25   present right to the Trust assets. He is only seeking to restore the prepetition status quo by having

26   the Debtor's Transferred Interest, for whatever it is worth, returned to the Estate in order to ensure

27   that the creditors are not unjustly deprived of **any** value to which the Estate is entitled. The Trustee

28   must be allowed time to conduct further discovery so he can put all of these pieces together. It is

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000 · Fax 714-966-1002

23

OMNIBUS OPPOSITION TO MOTIONS TO
DISMISS

EXHIBIT 8  PAGE  651

1  simply too early to decide these issues based on Defendants' unverified representations and

2  mischaracterization of the applicable law, especially given the Debtor's pattern and practice of

3  concealment and misrepresentation, with assistance from her family.

4      Because all allegations of the Complaint must be taken as true, the foregoing allegations

5  forestall the dismissal of the Trustee's resulting trust claim.

6      **G.    Declaratory Relief**

7      The facts alleged in the Complaint, if taken as true (as a court is required to do when

8  considering a motion to dismiss under FRCP 12(b)(6)), establish that the Debtor's interest in the

9  Trust is an interest in property of the Debtor that was transferred to one or more of the Defendants,

10  as such terms are defined by the FDCPA. The Trustee has therefore established a basis for

11  Defendants' liability as transferees of property belonging to the Estate. Because the Debtor's

12  Transferred Interest is property of the Estate, the Trustee has established a substantive basis for

13  Defendants' liability, and his claim for declaratory relief must be sustained as having been

14  sufficiently pled.

15      **H.    Trustee Has Not Failed to Preserve a Claim**

16      For all of the reasons discussed above, the Trustee has met his burden to establish a claim

17  for fraudulent transfer of the Debtor's property under section 544 of the Bankruptcy Code and the

18  FDCPA, for the benefit of the Estate. The Trustee has established that (1) the FDCPA is applicable

19  in this case, (2) that a "transfer" of the Debtor's "property" in the Trust occurred as a result of the

20  First Amendment, and (3) the Siblings/Defendants have a property interest in the Trust assets as

21  transferees and are holding such interests in a resulting trust for the Debtor, who is the beneficial

22  owner of the Transferred Interest. Accordingly, the Transferred Interest is necessarily preserved for

23  the benefit of the Estate under Bankruptcy Code Section 551, and this claim must be sustained as

24  having been sufficiently pled.

25      **I.    Trustee Has Properly Stated A Claim For Attorneys Fees and Costs**

26      In light of the foregoing, because the Trustee has adequately pled his claims for fraudulent

27  transfer and for the other relief he seeks, and, in the event that he is the prevailing party in this

28

Weiland Golden Goodrich LLP
650 Town Center Drive, Suite 600
Costa Mesa, California 92626
Tel 714-966-1000   Fax 714-966-1002

24                           OMNIBUS OPPOSITION TO MOTIONS TO
                                              DISMISS

EXHIBIT 8  PAGE  652

1    litigation, the Trustee will have a valid claim for attorneys' fees. For all of these reasons, this cause
2    of action should be sustained.

3        **J.    Trustee Has Not Asserted A Claim Under Section 548**

4        The Trustee has not alleged a claim in the Complaint under Bankruptcy Code Section 548,
5    and therefore will not respond herein to the discussion in Defendants' Motions seeking to dismiss
6    any cause of action under that section.

7    **V.    CONCLUSION**
8
9        For the foregoing reasons, the Plaintiff requests that the Court enter an order:
10       1.    Denying Siblings' Motion in its entirety;
11       2.    Denying Parents'/Eric's Motion in its entirety;
12       3.    Ordering Defendants to file an answer to each cause of action alleged in the
13   Complaint within thirty (30) days of the entry of the Court's order denying the Motions; and
14       4.    Granting such other and further relief as the Court deems to be just and proper.
15
16   Dated: December 26, 2018                    WEILAND GOLDEN GOODRICH LLP
17
18                                              By:  /s/ JEFFREY I.
19                                                   JEFFREY I. GOLDEN
                                                     Attorneys for Plaintiff and Chapter 7
                                                     Trustee, Thomas H. Casey
20
21
22
23
24
25
26
27
28

**Weiland Golden Goodrich LLP**
650 Town Center Drive, Suite 950
Costa Mesa, California 92626
Tel 714-966-1000  Fax 714-966-1002

25                          OMNIBUS OPPOSITION TO MOTIONS TO
                                              DISMISS

EXHIBIT 8  PAGE  653

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:

**650 Town Center Drive, Suite 600, Costa Mesa, California 92626**

A true and correct copy of the foregoing document entitled (*specify*): **PLAINTIFF'S OMNIBUS OPPOSITION TO MOTIONS TO DISMISS COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **December 26, 2018**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL:**
On (*date*) **December 26, 2018**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **December 26, 2018**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Catherine Bauer, 411 W, 4th Street, 5th Floor, Santa Ana, CA 92701

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 26, 2018 | Kelly Adele | *Kelly Adele* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
0.0

**F 9013-3.1.PROOF.SERVICE**

EXHIBIT 8  PAGE  654

**Electronic Mail Notice List**

Thomas H Casey (TR)    msilva@tomcaseylaw.com, thc@trustesolutions.net
Jeffrey I Golden    jgolden@wgllp.com, kadele@wgllp.com;vrosales@lwgfllp.com;cbmeeker@gmail.com
D Edward Hays    ehays@marshackhays.com, 8649808420@filings.docketbird.com
Gerald P Kennedy    gerald.kennedy@procopio.com, kristina.terlaga@procopio.com;calendaring@procopio.com;efile-bank@procopio.com
Laila Masud    lmasud@marshackhays.com, 8649808420@filings.docketbird.com
Aram Ordubegian    ordubegian.aram@arentfox.com
Faye C Rasch    frasch@wgllp.com, kadele@wgllp.com;tziemann@wgllp.com
Annie Y Stoops    annie.stoops@arentfox.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

EXHIBIT 8  PAGE  655

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**650 Town Center Drive, Suite 600, Costa Mesa, California 92626**

A true and correct copy of the foregoing document entitled (*specify*):   **CHAPTER 7 TRUSTEE'S OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS UNDER RULE 9011 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE; MEMORANDUM OF POINTS AND AUTHORITIES; AND DECLARATIONS OF THOMAS H. CASEY AND JEFFREY I. GOLDEN IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**1.   TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document.  On (*date*) **August 5, 2021**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.   SERVED BY UNITED STATES MAIL**:
On (*date*) **August 5, 2021**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.   SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served)**:** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **August 5, 2021**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott Clarkson, 411 W. 4th Street, Santa Ana, CA  92701

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| August 5, 2021 | Kelly Adele | *Kelly Adele* |
|:---:|:---:|:---:|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
0.0

**F 9013-3.1.PROOF.SERVICE**

**Electronic Mail Notice List**

Ryan W Beall    rbeall@lwgfllp.com,
vrosales@wgllp.com;kadele@wgllp.com;lbracken@wgllp.com;rbeall@ecf.courtdrive.com
Thomas H Casey (TR)    msilva@tomcaseylaw.com, thc@trustesolutions.net
Justin S Draa    jdraa@dld-law.com
Jeffrey I Golden    jgolden@wgllp.com,
kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com
D Edward Hays    ehays@marshackhays.com,
ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.co
m
Gerald P Kennedy    gerald.kennedy@procopio.com, kristina.terlaga@procopio.com;calendaring@procopio.com;efile-
bank@procopio.com
Laila Masud    lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com
Aram Ordubegian    ordubegian.aram@arentfox.com
Richard M Pachulski    rpachulski@pszjlaw.com
Malhar S Pagay    mpagay@pszjlaw.com, bdassa@pszjlaw.com
Hamid R Rafatjoo    hrafatjoo@raineslaw.com, bclark@raineslaw.com
Faye C Rasch    frasch@wgllp.com, kadele@wgllp.com;lbracken@wgllp.com;gestrada@wgllp.com
Todd C. Ringstad    becky@ringstadlaw.com, arlene@ringstadlaw.com
Annie Y Stoops    annie.stoops@arentfox.com, yvonne.li@arentfox.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov