1  | **PACHULSKI STANG ZIEHL & JONES LLP**
Richard M. Pachulski (State Bar No. 90073)

2  | 10100 Santa Monica Blvd., 13th Floor
Los Angeles, California  90067-4003

3  | Telephone: 310.277.6910
Email: rpachulski@pszjlaw.com

4  |

5  | **RAINES FELDMAN LLP**
Hamid R. Rafatjoo (State Bar No. 181564)

6  | 1800 Avenue of the Stars, 12th Floor
Los Angeles, California  90067

7  | Telephone: 310.440.4100
E-mail: hrafatjoo@raineslaw.com

8  | **TROUTMAN PEPPER HAMILTON SANDERS LLP**
Alan J. Kessel (State Bar No. 130707)

9  | 5 Park Plaza, Suite 1400
Irvine, California  92614-2545

10 | Telephone: 949.622.2700
Email: alan.kessel@troutman.com

11 |

12 | Attorneys for Creditors and Intervenors
HAUSMAN HOLDINGS, LLC and
DAVID and PAMELA MOELLENHOFF

13 |

14 | **UNITED STATES BANKRUPTCY COURT**

    **CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION**

*(left margin, vertical text)* PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| | |
|---|---|
| In re:<br><br>ANDREA STEINMANN DOWNS,<br><br>            Debtor.<br><hr>THOMAS H. CASEY, Chapter 7 Trustee,<br><br>            Plaintiff,<br><br>   v.<br><br>LORA RAE STEINMANN, ET AL.,<br><br>            Defendants. | Case No. 8:16-bk-12589-SC<br><br>Chapter 7<br><br><br><br>Adversary No. 8:18-ap-01168-SC<br><br>**COMPENDIUM OF UNPUBLISHED CASES IN SUPPORT OF HAUSMAN HOLDINGS, LLC'S AND DAVID AND PAMELA MOELLENHOFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS UNDER RULE 9011 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**<br><br>Date:          September 2, 2021<br>Time:          11:00 a.m.<br>Courtroom:   5C |

#118132441v1

1      Creditors and Intervenors Hausman Holdings, LLC and David and Pamela Moellenhoff

2  (collectively, **"Creditors"**), attach copies of the following unreported and/or unpublished decisions

3  cited in their opposition (**"Opposition"**) to the *Motion for Sanctions Under Rule 9011 of the Federal*

4  *Rules of Bankruptcy Procedure* (the "**9011 Motion**") filed by Defendants Lora Rae Steinmann, Heinz

5  H. Steinmann, Eric Steinmann, Susanna Steinmann Wilson, Thomas Steinmann, John Steinmann,

6  Mary Steinmann Sypkens, Teresa Steinmann Stapleton, Kay Steinmann Belknap, Jeff Steinmann, and

7  Heinz J. Steinmann (collectively, the "**Steinmanns**").  (Adv. Dkt. No. 316).

| | |
|---|---|
| Exhibit 1 | *Country Inns & Suites by Carlson, Inc. v. Gokul Mgmt.*, Civil Action No. 07-2044 (DRD), 2007 U.S. Dist. LEXIS 59407, at *12 (D.N.J. Aug. 13, 2007) |
| Exhibit 2 | *Grant v. Bostwick*, No. 15-cv-874 WQH (BLM), 2016 U.S. Dist. LEXIS 96078, at *18 (S.D. Cal. July 20, 2016) |
| Exhibit 3 | *In re Crystal Cathedral Ministries*, No. 2:12-bk-15665-RK, 2020 Bankr. LEXIS 851, at *164 n. 25 (Bankr. C.D. Cal. Mar. 31, 2020) |
| Exhibit 4 | *In re Dane*, No. CC-13-1298-KiLaPa, 2014 Bankr. LEXIS 2378, at *19 (B.A.P. 9th Cir. May 30, 2014) |
| Exhibit 5 | *In re Radakovich*, No. WW-13-1254-KuPaJu, 2014 Bankr. LEXIS 4017, at *11 (B.A.P. 9th Cir. Sep. 19, 2014), at *10 (B.A.P. 9th Cir. Sept. 19, 2014) |
| Exhibit 6 | *In re Theokary*, Nos. 07-110008 ELF, 09-051, 2012 Bankr. LEXIS 4020, at *5 n. 3 (Bankr. E.D. Pa. 2012) |
| Exhibit 7 | *In re Waldrop*, No. 15-14689-JDL, 2017 Bankr. LEXIS 3720, at *17 (Bankr. W.D. Okla. Oct. 25, 2017) |
| Exhibit 8 | *Instant Checkmate, Inc. v. Background Alert, Inc.*, No. 3:14-cv-01182-MMA-DHB, 2014 U.S. Dist. LEXIS 190115, at *20 (S.D. Cal. Dec. 4, 2014) |
| Exhibit 9 | *Loumena v. Kennedy*, No. 15-CV-00951-LHK, 2015 U.S. Dist. LEXIS 139369, at *17 (N.D. Cal. Oct. 13, 2015) |
| Exhibit 10 | *Williams v. Aho*, No. CV 16-2088 PSG (FFMx), 2016 U.S. Dist. LEXIS 195930, at  *9-10 (C.D. Cal. Sep. 2, 2016) |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

#118132441v1                              1

1

2

Dated:  August 5, 2021                    PACHULSKI STANG ZIEHL & JONES LLP

3                                          By:  ___/s/ Richard M. Pachulski_____
                                                Richard M. Pachulski
4                                               Attorneys for Creditors and Intervenors
                                                HAUSMAN HOLDINGS, LLC and
5                                               DAVID and PAMELA MOELLENHOFF

6    Dated:  August 5, 2021                    RAINES FELDMAN LLP

7
                                          By:  ___/s/ Hamid R. Rafatjoo_____
8                                               Hamid R. Rafatjoo
                                                Attorneys for Creditors and Intervenors
9                                               HAUSMAN HOLDINGS, LLC and
                                                DAVID and PAMELA MOELLENHOFF
10
     Dated:  August 5, 2021                    TROUTMAN PEPPER HAMILTON SANDERS LLP
11

12                                         By:  ___/s/ Alan J. Kessel_____
                                                Alan J. Kessel
13                                              Attorneys for Creditors and Intervenors
                                                HAUSMAN HOLDINGS, LLC and
14                                              DAVID and PAMELA MOELLENHOFF

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# EXHIBIT 1

# Country Inns & Suites by Carlson, Inc. v. Gokul Mgmt.

United States District Court for the District of New Jersey

August 13, 2007, Decided; August 14, 2007, Filed

Civil Action No. 07-2044 (DRD)

**Reporter**

2007 U.S. Dist. LEXIS 59407 *; 2007 WL 2362605

Country Inns & Suites By Carlson, Inc., a Minnesota Corporation, Plaintiff, v. Gokul Management, Inc., a New Jersey Corporation; Divyakant Patel, a New Jersey Resident; Rose Hotels, Ltd., a New Jersey Company; and Jitendra Lodhia, a New Jersey Resident, Defendants, v. Gary S. Pasricha, Esq., Third Party Defendant.

**Notice:** NOT FOR PUBLICATION

**Counsel:** [*1] Dennis R. LaFiura, Esq., Day Pitney, LLP, Morristown, NJ, Attorney for Plaintiff, Country Inns & Suites by Carlson.

Lauren R. Staiger, Esq., Paul Robert Rizzo, Esq., DeFrancesco Batemen Coley Yospin Davis & Lehrer PC, Warren, NJ, Attorneys for Defendants, Gokul Management, Inc. and Divyakant Patel.

Clement Chien Ming Chang, Esq., Pasricha & Patel, LLC, Edison, NJ, Attorney for Defendants, Rose Hotels, Ltd., Jitendra Lodhia and Gary S. Pasricha, Esq.

**Judges:** Dickinson R. Debevoise, U.S.S.D.J.

**Opinion by:** Dickinson R. Debevoise

# Opinion

DEBEVOISE, United States Senior District Judge

Gokul Management, Inc. ("GMI") and Divyakant Patel ("Patel"), defendants in an action filed by Country Inns & Suites by Carlson ("Carlson"), filed a Third Party Complaint against Gary S. Pasricha, Esq. ("Pasricha"). Pasricha moves, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Third Party Complaint against him for failure to state a cause of action upon which relief may be granted, asserting that the Third Party Plaintiffs have not pleaded facts sufficient to constitute a cause of action against him for negligence and breach of fiduciary duty. Pasricha also moves, pursuant to Fed. R. Civ. P. 11(b), for sanctions against Paul Robert [*2] Rizzo, Esq. ("Rizzo"), attorney for the Third Party Plaintiffs, for filing a frivolous pleading. Pasricha asserts that the Third Party Complaint is a "bizarre legal malpractice claim," that seeks to hold him liable for damages arising from a negotiation between the Third Party Plaintiffs and Rose Hotels, Inc. ("Rose"), in which he represented Rose.

For the reasons cited below, Pasricha's motion to dismiss will be denied and his motion for sanctions will be denied.

BACKGROUND

The Third Party Plaintiffs sought to construct and license a hotel under the trademark and trade dress of Country Inns & Suites by Carlson, a licensor of guest lodging systems. Patel, as the principal for GMI, entered into a Guaranty of License Agreement ("the Guaranty") with Carlson, which required him to make full and prompt payment to Carlson of all amounts due or payable to Carlson under a license agreement that was yet to be signed. In the event of termination of the Agreement, the Guaranty also required Patel to perform certain post-termination obligations. In June 2004, while the hotel property was still under construction, Carlson, as the franchisor, and GMI, as the franchisee, entered into a fifteen-year [*3] License Agreement ("the Agreement"), which provided, *inter alia,* that GMI could not, and would not,

transfer the hotel or the Agreement to another party without the consent of Carlson. Carlson claims in its Complaint filed with this Court on May 13, 2004 that, in spite of this prohibition, GMI sold its rights, title, and interest in the hotel to Rose, in approximately May of 2006, without notification to, or the permission of, Carlson.

In the sale of the hotel, Pasricha represented Rose and its principal, Jitendra Lodhia ("Lodhia"), the buyers. Bhavini Tara Shah, Esq. ("Shah") represented the Third Party Plaintiffs, the sellers. Following vigorous negotiations, the parties agreed upon the terms of the sale, and Shah drafted the contract of sale (the "Contract"), which was executed on May 28, 2004. The closing was scheduled for December 2004.

According to the Third Party Plaintiffs' June 21, 2007 Crossclaim against Rose and Lodhia, although Pasricha agreed to submit, and assumed the responsibility to submit, to Carlson the documents to terminate the agreement between Carlson and the Third Party Plaintiffs and to substitute Rose and Lodhia as the franchisees in place of the Third Party  [*4] Plaintiffs, Pasricha failed to do so. The Third Party Plaintiffs, in Count One of the two-count complaint, cite Pasricha's failure to file the documents with Carlson as negligence because they relied on him to file the documents and he knew that they were relying on him to do so. Because Pasricha previously represented Patel in other matters, the Third Party Plaintiffs also trusted him to represent their best interests in this matter, too and, in Count Two, assert that they considered Pasricha to be a fiduciary who owed them a duty of loyalty, trust and good faith. When Pasricha failed to effectuate the proper termination of the Agreement, they argued that he breached his fiduciary duty to them, causing them to suffer damages.

Pasricha moves to dismiss the Third Party Complaint claiming that the Third Party Plaintiffs have failed to state a claim upon which relief may be granted by the Court. Pasricha denies the charge of negligence. He asserts that the injury to the Third Party Plaintiffs was caused by their own failure to provide a replacement franchisee prior to terminating their Agreement with Carlson, not his failure to deliver the documents to Carlson. Thus, he argues that, even  [*5] if he were responsible for delivering the documents and failed to do so, his failure was irrelevant because the Third Party Plaintiffs had already caused the damages themselves. Pasricha also denies owing a fiduciary duty to the Third Party Plaintiffs. He argues that in this matter the Third Party Plaintiffs were represented by their own attorney who was responsible for effectuating the proper termination of the Agreement and to protect their interests, and that he represented parties adverse to the interests of the Third Party Plaintiffs, making the Third Party Plaintiffs' reliance on him "necessarily misplaced."

DISCUSSION

The issue before the Court is, not whether the Third Party Plaintiffs will ultimately prevail, but whether the Third Party Plaintiffs' Complaint sufficiently states a cause of action for negligence and breach of fiduciary duty. Here, viewing the Third Party Complaint in the light most favorable to the Third Party Plaintiffs, the Third Party Plaintiffs have pleaded their cause of action sufficiently to withstand dismissal under Fed. R. Civ. P. 12(b)(6).

Pleading Requirements

Federal Rule of Civil Procedure 8(a)(2) provides that pleadings setting forth claims for relief  [*6] must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." To satisfy the pleading requirements set forth in Rule 8, a complaint need only establish a basis for judgment against the defendant. *Thomas v. Independence Twp.,* 463 F.3d 285, 295 (3d Cir. 2006). Generally, this requires the plaintiff to put the defendant on notice of the claims filed against him, thereby making it possible for the defendant to formulate a response. *See Klaitz v. New Jersey,* 2006 U.S. Dist. LEXIS 46650, 2006 WL 1843115,

*5 (D.N.J. June 30, 2006).

Standard of Review Under Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law. *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) (citation omitted). When considering a 12(b)(6) motion, the Court must accept as true all allegations in the Complaint, and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997). "The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded **[*7]** an opportunity to offer evidence in support of their claims." *In re Rockefeller Center Prop., Inc.,* 311 F.3d 198, 215 (3d Cir. 2002). The Supreme Court recently clarified the Rule 12(b)(6) standard in *Bell Atlantic Corporation v. Twombly.,* 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007). Abrogating the standard established in *Conley v. Gibson,* 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80, (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief," the Supreme Court now instructs that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic,* 127 S.Ct at 1965.

Although a court generally looks only to the alleged facts to determine whether dismissal is merited, "[t]o resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410, 426 (3d Cir. 1999). Here, in addition to the facts alleged in the Third Party Complaint and its exhibits, the Court will also consider the May 1, **[*8]** 2007 action filed by Carlson against GMI, Patel, Rose and Lodhia and the June 21, 2007

Crossclaim filed by GMI and Patel against Rose and Lodhia.

The Existence of a Duty

The New Jersey Superior Court Appellate Division has determined that "there is authority for the proposition . . . that an attorney owes a fiduciary duty to persons, though not strictly clients, who the attorney knows or should know would rely on the attorney in his or her professional capacity," although "[t]he traditional rule . . . has been that only a client can assert a cause of action against the attorney for professional negligence or malpractice." *See Petrillo v. Bachenberg* 263 N.J.Super. 472, 483-484, 623 A.2d 272 (App. Div. 1993) (citations omitted). *See also Carino v. Stefan,* 376 F.3d 156 (3d Cir. 2004) (under New Jersey law a lawyer's duty may run to third parties who foreseeably rely on the lawyer's opinion or other legal services).

Federal Rule of Civil Procedure 8 requires only that a "short and plain statement of the claim showing that the pleader is entitled to relief . . . ." "[S]uch a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *See Bell Atlantic,* 127 S.Ct. at 1965.

In **[*9]** this 12(b)(6) motion, the Count accepts as true the Third Party Plaintiffs' allegations that they relied upon Pasricha to submit their Termination Agreement and Rose's licensing agreement to Carlson, and he knew they were relying upon him to do so, but he did not do so, and, as a result of his failure, they are liable to Carlson for liquidated damages in the amount of $ 241,394.08.

The allegations of the complaint are supported by the exhibit dated January 11, 2005 from Andi Putnam of Carlson Hotels Worldwide to Patel at Gokul Management which reads in part, "Enclosed is the Termination Agreement . . . for your review . . . . [I]f it meets with your approval, sign it and return both executed copies to my attention. I will then present the agreement to Carlson together with the License Agreement for the new owner for

Carlson's signature and return to you one full-executed copy." Thus, it appears that the return of the Termination Agreement by the Third Party Plaintiffs to Carlson was a condition precedent for Carlson to accept Rose as the new franchisee. Thus, Pasricha's failure to remit the Termination Agreement to Carlson on behalf of the Third Party Plaintiffs would have prevented **[*10]** conclusion of any other licensing agreement that would have, or could have, been made. For the purposes of the motion to dismiss, the Court need not consider whether the Third Party Plaintiffs can ultimately prevail against Pasricha.

Even though the Third Party Plaintiffs were represented by their own counsel, and not by Pasricha, in this particular action, under New Jersey law, an attorney owes a duty to a non-client where the attorney know or should have known that the non-client was relying on the attorney in his professional capacity. Here, the Third Party Plaintiffs' Complaint states that they relied on Pasricha's representation that he would remit the Termination Agreement to Carlson on their behalf and he failed to do so. Thus, the Third Party Plaintiffs' Complaint against Pasricha has pleaded facts sufficient to withstand dismissal by apprising Pasricha of their claims against him. The New Jersey law provides the ground upon which those claims rest. The Third Party Complaint will not be dismissed at this time.

Pasricha's Motion for Rule 11 Sanctions

In a separate motion, Pasricha alleges that the Third Party Complaint is "frivolous, without legal basis and brought solely to harass", **[*11]** and Pasricha seeks Rule 11 sanctions against the attorney for the Third Party Plaintiffs on the ground that he acted unreasonably in filing the Complaint.

The Federal Rules of Civil Procedure in Rule 11(b), Representations to Court, provide that:

> [b]y presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying

that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances … [that] (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law . . . .

In the Third Circuit, "the legal standard to be applied when evaluating conduct allegedly violative of Rule 11 is reasonableness under the circumstances." *Ford Motor Co. v. Summit Motor Prod., Inc.,* 930 F.2d 277, 289 (3d Cir. 1991) (citations omitted). Reasonableness in the context of a Rule 11 inquiry has been defined as "an objective knowledge or belief at the time of the filing of a challenged paper that the **[*12]** claim was well grounded in law and fact." *Id.* "Generally, sanctions are prescribed only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous." *Id.* At this early stage of the litigation, it does not appear that the Third Party Complaint is "patently unmeritorious." The Third Party Plaintiffs have pleaded sufficient facts and there is a basis in law to defeat the motion to dismiss. Thus, Pasricha's motion for Rule 11 sanctions is denied.

CONCLUSION

The Third Party Plaintiffs have pleaded sufficient facts and law sufficient to withstand Pasricha's 12(b)(6) motion to dismiss and, therefore, his motion will be denied. Because, at this early stage of the litigation, Pasricha has not shown the Third Party Complaint to be patently unmeritorious, Pasricha's motion for sanctions, made pursuant to Fed. R. Civ. P 11, will also be denied. An appropriate order follows.

/s/ Dickinson R. Debevoise, U.S.S.D.J.

Dated: August 13, 2007

**End of Document**

# EXHIBIT 2

# Grant v. Bostwick

United States District Court for the Southern District of California

July 20, 2016, Decided; July 21, 2016, Filed

CASE NO. 15-cv-874 WQH (BLM)

**Reporter**

2016 U.S. Dist. LEXIS 96078 *

JENNIFER GRANT, Plaintiff, v. HON. JEFFREY BOSTWICK, Defendant.

**Prior History:** Grant v. Bostwick, 2015 U.S. Dist. LEXIS 144414 (S.D. Cal., Oct. 22, 2015)

**Counsel:** [*1] Jennifer Grant, Plaintiff, Pro se, Pacific Palisades, CA.

For Hon. Jeffrey Bostwick, Defendant: Susanne C Washington, LEAD ATTORNEY, San Diego Superior Court, San Diego, CA.

**Judges:** WILLIAM Q. HAYES, United States District Judge.

**Opinion by:** WILLIAM Q. HAYES

## Opinion

ORDER

HAYES, Judge:

The matters before the Court are: (1) the Motion for Sanctions and Costs (ECF No. 38) filed by Plaintiff Jennifer Grant, (2) the Motion to Dismiss First Amended Complaint (ECF No. 40) filed by Defendant Honorable Jeffrey Bostwick, and (3) the Ex Parte Application to Shorten Time (ECF No. 48) filed by Plaintiff.

## I. Background

On April 21, 2015, Plaintiff initiated this action by filing the Complaint pursuant to 42 U.S.C. § 1983 alleging violations of her Fourteenth Amendment rights. (ECF No. 1).

On July 15, 2015, Defendant filed a motion to dismiss. (ECF No. 9). On September 15, 2015, Plaintiff filed a motion for a preliminary injunction to stay state probate proceedings pending the resolution of this case. (ECF No. 15). On October 22, 2015, the Court granted the motion to dismiss and denied the motion for a preliminary injunction to stay probate proceedings. (ECF No. 23).

On November 3, 2015, Plaintiff filed a "Motion for Altering the Judgment of Docket #23." (ECF No. 25). [*2] On January 13, 2016, the Court denied Plaintiff's motion. (ECF No. 32).

On February 9, 2016, Plaintiff filed a motion for leave to file a First Amended Complaint. (ECF No. 33). On February 23, 2016, Defendant filed an opposition. (ECF No. 34). On March 18, 2016, the Court issued an Order granting the motion for leave to file a First Amended Complaint. (ECF No, 36). On March 23, 2016, Plaintiff filed a First Amended Complaint, which became the operative pleading in this case. (ECF No. 37).

On April 5, 2016, Plaintiff filed the motion for sanctions and costs based on Defendant's opposition to the motion for leave to file an amended complaint. (ECF No. 38). On April 7, 2016, Defendant filed the motion to dismiss. (ECF No. 40). On April 22, 2016, Defendant filed an opposition to the motion for sanctions. (ECF No. 42). On the same day, Plaintiff filed an opposition to the motion to dismiss. (ECF No. 41). On April 29, 2016, Plaintiff filed a reply to the opposition to the motion for sanctions and costs. (ECF No. 43). On the same day, Defendant filed a reply to the opposition to the motion to dismiss. (ECF No. 44).

On May 27, 2016, with the Court's permission, Plaintiff filed a sur-reply to **[\*3]** the motion to dismiss, (ECF No. 47).

On June 17, 2016, Plaintiff filed an ex parte application to shorten time for decision on the motion for sanctions and costs and the motion to dismiss. (ECF No. 48).

## II. Motion to Dismiss First Amended Complaint

### A. Allegations of the First Amended Complaint

Plaintiff Jennifer Grant is a beneficiary of the Schwichtenberg Revocable Family Trust ("trust"), dated July 28, 1982, and is the trustee of the B subsection of the trust. (ECF No. 23 at ¶ 2). Defendant Jeffrey Bostwick is the judge presiding over the administration of the trust in San Diego Superior Court's Central Probate Provision. *Id.* ¶ 7.

"Defendant inherited Pro-Per Plaintiff's case . . . in September 2012 . . . ." *Id.* ¶ 13. Upon the death of Plaintiff's mother, "Rusty [Grant], no relation to Plaintiff, was to become the trustee of section A of Plaintiff's parents' ABC inter-vivos trust . . . ." *Id.* ¶ 14. "With no legal authority, Rusty took over all three sections of the trust the day Plaintiff's mother died." *Id.* ¶ 15.

"Defendant lacked subject matter jurisdiction. Both Plaintiff's parent's wills specifically state that their intention in creating the trust was NOT to subject their assets to **[\*4]** probate court." *Id.* ¶ 16.

> Rusty/Larsen's petition opened the case purporting to be an internal affairs petition . . . . It was illegally plead due to: 1) lack of capacity . . . as Rusty claimed capacity as trustee of the whole trust 2) limitations of the trust terms regarding the duties accorded the trustee of section A post the last settlor's death, . . 3) failure to meet the standards for proper pleading since its intent was to harass Plaintiff . . .

*Id.* ¶ 18.

Plaintiff tried to bring [to] Defendant's attention . . . that not only was Rusty illegally acting as the administrative B section trustee . . but she and Larsen were 1) purposefully trying to destroy the trust home and denying her access so that she was deprived for years of its enjoyment and use 2) had stolen from the trust home, 3) were acting beyond the duties permitted a trustee of section A 4) were misusing trust funds, 5) were violating the duties of care and loyalty . . . 6) and otherwise disobeying trust terms in a concentrated effort to force the sale of the trust home . . . by bankrupting trust A so the home would end up in foreclosure abatement forcing its sale.

*Id.* ¶ 21.

Between September 2012 and June 2013, Defendant **[\*5]** had not only denied Plaintiff's oral motion for a hearing to show cause on why Rusty should not be removed but continually postponed calendering trial on the Remove Trustee Petition . . . . Defendant also ignored allegations in case management statements and denied numerous ex-partes filed by Plaintiff as 'not urgent' despite clear and convincing exhibits that accompanied the ex-parte documents providing that Plaintiff was being injured by Rusty/Larsen in the manner described.

*Id.* ¶ 24.

"Defendant denied Plaintiff of her liberty to assume the 'job' her parents had given her under the trust instrument" and "suspended Plaintiff . . . for hostility with her brother and Larsen." *Id.* ¶ 28. Plaintiff alleges that Defendant denied her the "choice of appointment of successor trustees" and "appointed a public administrator over all the trust sections." *Id.* ¶ 29. Plaintiff alleges that Defendant denied "Plaintiff her 14th amendment rights through the conduction of a biased courtroom." *Id.* ¶ 32. Plaintiff alleges that after she regained trusteeship over the B and C sections of the trust, "Defendant continued to act with bias and restrict

Plaintiff's liberty to act as trustee by ignoring Plaintiff . . . ." *Id. [\*6]* ¶ 39. Plaintiff alleges that Defendant failed to grant ex parte applications, refused to provide her with a hearing, and "ignored Plaintiff's protests over [a] violation of civil procedure." *Id.* ¶¶ 34, 40, 42.

> Defendant, acting under color of law, has a long history with a well established pattern of abusing the power of his office to deny Plaintiff due process and equal protection of the law with the intent of depriving Plaintiff of the property to which she is legitimately entitled under the trust instrument and her earnings and savings while restricting her liberty to act as trust named administrative trustee.

*Id.* ¶ 19.

Plaintiff seeks declaratory and injunctive relief under 42 U.S.C. § 1983. Plaintiff seeks a declaratory judgment that Defendant has violated and continues to violate her Fourteenth Amendment rights by: (1) conducting proceedings without personal or subject matter jurisdiction, (2) denying Plaintiff a timely hearing on former trustee's alleged breaches of fiduciary duty and state crimes, (3) appointing a temporary trustee, (4) acting without jurisdiction to conduct proceedings on the temporary trustee's accounting/fee petition, (5) acting without jurisdiction should Defendant attempt to hear any fee petitions **[\*7]** by former trustees, and (6) denying Plaintiff due process by refusing to hear her requests for attorney's fees and costs. *Id.* at 36-39. Plaintiff also seeks a declaratory judgment that Defendant "acted as an accessory after the fact to prevent the former trustee, Rusty Grant, from facing punishment for felony crimes. *Id.* at 39.

With regard to injunctive relief, Plaintiff requests the Court to "exercise supplemental jurisdiction" over certain probate petitions and order Defendant to either consolidate the petitions and immediately set them for trial or make a record of the trial and provide it to Plaintiff and this Court, to enable this Court to "conduct a timely judicial review of the

proceedings." *Id.* at 40-41. Alternatively, Plaintiff requests that the trial "be conducted by Defendant before the District Court" or "be conducted by the Honorable William Q. Hayes in District Court." *Id.* at 41. Plaintiff requests similar relief with regard to her request for attorney's fees. *Id.* at 41-42. Plaintiff requests the Court to "arrange with the local district attorney's and federal prosecutor's offices . . . for a hearing before a grand jury." *Id.* at 42.

## B. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." **[\*8]** Fed. R. Civ. P. 12(b)(6). Federal Rule of Civil Procedure 8(a) provides: "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

When considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). However, a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move for dismissal on grounds that the court lacks jurisdiction over the subject matter. Fed. R. Civ. P. 12(b)(1). The burden is on the plaintiff to establish that the court has subject matter jurisdiction over an action. *Assoc. of*

*Medical Colleges v. United States*, 217 F.3d 770, 778-79 (9th Cir. 2000). In resolving an attack on a court's jurisdiction, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion **[*9]** for summary judgment." *Safe Air For Everyone v. Doyle*, 373 F.3d 1035, 1039 (9th Cir. 2004). Issues regarding subject matter jurisdiction may be raised at any time, even on appeal, by motion or sua sponte by the court. Fed. R. Civ. P. 12(h)(3); *Snell v. Cleveland*, 316 F.3d 822, 826-27 (9th Cir. 2002).

## C. Judicial Notice

"As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). However, there are "exceptions to the requirement that consideration of extrinsic evidence converts a 12(b)(6) motion to a summary judgment motion." *Id.* Federal Rule of Evidence 201 provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction; or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed R. Evid. 201(b). "[U]nder Fed.R.Evid. 201, a court may take judicial notice of 'matters of public record.'" *Lee*, 250 F.3d at 689 (quoting *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.1986)). Courts may take judicial notice of "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citation and internal quotations omitted).

Defendant requests judicial notice of certain filings and orders from the probate case in which Plaintiff's allegations against Defendant arose. The documents **[*10]** requested to be noticed are proceedings in another court that have a direct

relation to the matters at issue and are in the public record. *See U.S. ex rel. Robinson Rancheria Citizens Council*, 971 F.2d at 248; *Lee*, 250 F.3d at 689. Defendant's request for judicial notice is granted.

## C. Contentions of the Parties

Defendant moves to dismiss Plaintiff's Complaint with prejudice on the grounds that (1) this Court lacks jurisdiction under the probate exception because the action in state court is properly under the state probate court's jurisdiction, (2) Defendant enjoys absolute judicial immunity against Plaintiff's claim, (3) the *Younger* abstention doctrine bars this action, (4) Eleventh Amendment immunity bars Plaintiff's action against Defendant, and (5) the First Amended Complaint fails to state sufficient facts to state a cognizable claim against Defendant.

Plaintiff contends that she is suing Defendant only in his individual capacity for acts and omissions committed as a judicial officer. Plaintiff contends that Defendant's acts alleged in the First Amended Complaint were non-judicial. Plaintiff contends, that she is not asking the Court to re-litigate Defendant's previous rulings. Plaintiff contends that Defendant acted without jurisdiction and therefore does not have immunity. Plaintiff **[*11]** contends that the probate exception only applies to probate cases, not to civil rights cases in which the Defendant is a probate judge acting in a probate courtroom. Plaintiff contends that the probate exception applies only to wills, not trusts. Plaintiff contends that *Younger* abstention does not apply because the state does not have an interest in the case because Defendant is sued only in his individual capacity.

## D. Discussion

Generally, "judges of courts of superior or general jurisdiction are not liable in civil actions for their judicial acts . . . ." *Stump v. Sparkman*, 435 U.S. 349, 355-56, 98 S. Ct. 1099, 55 L. Ed. 2d 331

(1978). "Judicial immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial actions, i.e. actions not taken in the judge's judicial capacity. . . . Second, a judge is not immune from actions, though judicial in nature, taken in complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991). "[A]bsolute judicial immunity does not apply to non-judicial actions, i.e. the administrative, legislative, and executive functions that judges . . . may on occasion be assigned to perform." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1133 (9th Cir. 2001). The Court of Appeals for the Ninth Circuit has identified four factors relevant to resolving whether a particular act is judicial in nature: **[*12]**

> (1) the precise act is a normal judicial function; (2) the events occurred in the judge's chambers; (3) the controversy centered around a case then pending before the judge; and (4) the events at issue arose directly and immediately out of-a confrontation with the judge in his or her official capacity.

*Id.* (quoting *Meek v. County of Riverside*, 183 F.3d 962, 967 (9th Cir. 1999)). The inquiry focuses on whether the "nature and function of the act" is normally performed by a judge, "not the act itself." *Mireles*, 502 U.S. at 13. [I]f only the particular act in question were to be scrutinized, then any mistake of a judge in excess of his authority would become a 'nonjudicial' act, because an improper or erroneous act cannot be said to be normally performed by a judge." *Id.* at 12.

The First Amended Complaint challenges the decisions of Defendant to proceed as the judge in the pending probate case, to suspend Plaintiff as a trustee, and to appoint a Public Administrator as temporary trustee, just as the original Complaint did. Plaintiff also challenges Defendant's decision to timely hear Plaintiff's petitions and motions and Defendant's failure to rule in her favor. Each of Defendant's decisions occurred within the scope of the ongoing state probate proceedings. Defendant's

actions are normal **[*13]** judicial functions undertaken in state probate proceedings and arose from interactions between the Plaintiff and Defendant in state probate court. Plaintiff has not alleged sufficient factual allegations to show that Defendant acted "in complete absence of all jurisdiction." *See Mireles*, 502 U.S. at 11. The First Amended Complaint challenges actions by the Defendant which are judicial in nature and taken in an ongoing state proceeding within the state probate court's jurisdiction.

In *Pulliam v. Allen*, 466 U.S. 522, 104 S. Ct. 1970, 80 L. Ed. 2d 565 (1984), the Supreme Court held that while judicial immunity bars actions against judges seeking monetary damages, "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Id.* at 541-42. After *Pulliam*, however, Congress narrowed the judicial immunity exception. Section 1983 provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983 (as amended by Pub. L. 104-307, Title III, § 309(c), 110 Stat. 3852 (Oct. 19, 1996)).

Plaintiff challenges actions taken by Defendant Judge Bostwick in his judicial capacity in ongoing state probate proceedings seeking prospective injunctive **[*14]** relief under § 1983. In the Order dismissing the original Complaint, the Court concluded, "The Complaint fails to allege facts to support the conclusion that the exception to judicial immunity from suit in a § 1983 action for injunctive relief—namely, violation of a declaratory decree or the unavailability of declaratory relief—would apply in this case." (ECF No. 23 at 6). In the First Amended Complaint, Plaintiff asserts that "injunctive relief is necessary because no declaratory decree is available that would prevent Defendant continuing his pattern of behavior that violates Plaintiff's 14th amendment rights . . . ." (ECF No. 37 at 40). However, the First

Amended Complaint does not provide sufficient facts to infer that no declaratory relief is available. *See Sprewell*, 266 F.3d at 988 (a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences") (citation omitted); *Moss*, 572 F.3d at 969 ("for a complaint to survive a motion to dismiss, the non-conclusory factual content and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief") (citation and internal quotation marks omitted). To the extent that Plaintiff seeks **[*15]** to challenge the decisions Defendant has made in probate court proceedings, Plaintiff is free to file an appeal with the California Court of Appeal. The Court concludes that the First Amended Complaint fails to allege facts to support the conclusion that an exception to judicial immunity applies in this case. The facts alleged in the First Amended Complaint do not state a plausible claim for relief under § 1983.

In the Order dismissing Plaintiff's original Complaint, the Court concluded that the *Younger* abstention doctrine and the probate exception to federal jurisdiction provided alternate grounds for dismissing Plaintiff's claim. (ECF No. 23 at 7). The Court concludes that *Younger* abstention and the probate exception also provide grounds for dismissing Plaintiff's First Amended Complaint. Plaintiff's claim is closely related to the issues pending in the underlying state probate court proceeding. The relief requested would require the Court to determine issues that fall within the purview of the state probate court. The Court declines to interfere with ongoing judicial proceedings in state probate court. *See New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298 (1989) (holding that under *Younger* abstention, federal courts should not enjoin pending **[*16]** civil proceedings involving "orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions"); *Marshall v. Marshall*, 547 U.S. 293, 126 S. Ct. 1735, 164 L. Ed. 2d 480 (2006) (prohibiting federal

courts from adjudicating rights that would interfere with the state probate court's administration of a decedent's estate).

The motion to dismiss the First Amended Complaint with prejudice is granted. Plaintiff has had an opportunity to amend her pleadings and has only alleged facts regarding Defendant's actions that are covered by judicial immunity. The First Amended Complaint is dismissed with prejudice.

### III. Motion for Sanctions and Costs

Plaintiff contends that Defendant's counsel violated Federal Rule of Civil Procedure 11(b) by making statements in Defendant's opposition to the Plaintiff's motion for leave to file an amended complaint (ECF No. 34) that intentionally attempted to mislead the court and by "presenting background facts regarding previous rulings and Plaintiff's prayers out of context." (ECF No. 38-1). Plaintiff contends that Defendant's counsel tried to commit fraud upon the Court with her arguments and citation to inapplicable caselaw.

Defendant contends that Plaintiff's motion should be denied as procedurally improper because it was filed after **[*17]** the Court ruled on the underlying motion for leave to file an amended complaint. Defendant contends that the motion became moot when the Court issued its Order granting Plaintiff's motion to amend the Complaint. Defendant contends that the motion for sanctions is without merit because all factual citations and legal arguments made in the opposition were accurate and made in good faith.

"Rule 11 is intended to deter baseless filings in district court and imposes a duty of 'reasonable inquiry' so that anything filed with the court is 'well grounded in fact, legally tenable, and not interposed for any improper purpose.'" *Islamic Shura Council of Southern California v. F.B.I.*, 757 F.3d 870, 872 (9th Cir. 2014) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990). "Motions for Rule 11 attorney's

fees cannot be served after the district court has decided the merits of the underlying dispute giving rise to the questionable filing. This is because once the court has decided the underlying dispute, the motion for fees cannot serve Rule 11's purpose of judicial economy." *Id.* at 873 (citing Advisory Committee's Notes to the 1993 Amendments to Rule 11 (noting that a party may not serve a motion for Rule 11 sanctions after "judicial rejection of the offending contention")).

In this case, on February 9, 20016, Plaintiff filed the motion for leave to file an amended complaint. On February 23, 2016, Defendant filed the opposition **[*18]** to the motion, which is the basis for the motion for sanctions. On March 18, 2016, the Court issued an Order granting the motion for leave to amend. On April 5, 2016, Plaintiff filed the motion for sanctions and costs. Because the motion for sanctions was filed after the Court decided the merits of the underlying motion for leave to amend and after "judicial rejection" of the arguments made in Defendant's opposition, the motion for sanctions is denied. *See Islamic Shura Council of Southern California*, 757 F.3d at 873 (reversing an order granting a motion for sanctions where the motion for sanctions was filed after the Court had ruled on the motion underlying the dispute); Advisory Committee's Notes to the 1993 Amendments to Rule 11.

## IV. Conclusion

IT IS HEREBY ORDERED that the motion to dismiss (ECF No. 40) filed by Defendant Honorable Jeffrey Bostwick is granted. The First Amended Complaint is dismissed with prejudice. The Clerk of the Court shall close the case.

IT IS FURTHER ORDERED that the motion for sanctions and costs (ECF No. 38) is denied.

IT IS FURTHER ORDERED that the "Ex Parte Motion to Shorten Time for a Decision on Dkt 38 & 40" (ECF No. 48) is denied as moot.

DATED: 7/20/16

/s/ William Q. Hayes

WILLIAM Q. HAYES

United States District Judge **[*19]**

---

**End of Document**

# EXHIBIT 3

# In re Crystal Cathedral Ministries

United States Bankruptcy Court for the Central District of California, Los Angeles Division

March 31, 2020, Decided; March 31, 2020, Filed and Entered

Case No. 2:12-bk-15665-RK, Chapter 11

**Reporter**

2020 Bankr. LEXIS 851 *; 2020 WL 1649619

In re: CRYSTAL CATHEDRAL MINISTRIES, Debtor.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Affirmed by Mahaffey v. Milner (In re Crystal Cathedral Ministries), 2021 Bankr. LEXIS 1466 (B.A.P. 9th Cir., May 28, 2021)

**Counsel:** **[*1]** For Crystal Cathedral Ministries, a California non-profit corporation, dba MASCOM Advertising, Debtor: Kavita Gupta, Gupta Ferrer, LLP, Newport Beach, CA; Jeannie Kim, Buchalter, A Professional Corporation, San Francisco, Ca; Douglas L Mahaffey, Mahaffey Law Group, PC, Newport Beach, CA; G Emmett Raitt, The Raitt Law FIrm, Irvine, CA; Nanette D Sanders, Ringstad & Sanders, Irvine, CA; Marc J Winthrop, Winthrop Couchot Golubow Hollander, LLP, Newport Beach, CA.

For United States Trustee (SA), U.S. Trustee: Frank Cadigan, Santa Ana, CA.

For Committee of Creditors Holding Unsecured Claims, Creditor Committee: Christopher Minier, Ringstad & Sanders LLP, Newport Beach, CA; Todd C. Ringstad, Irvine, CA; Nanette D Sanders, Ringstad & Sanders, Irvine, CA.

**Judges:** Robert Kwan, United States Bankruptcy Judge.

**Opinion by:** Robert Kwan

# Opinion

**MEMORANDUM DECISION AND ORDER ON MOTION OF RESPONDENT CAROL MILNER FOR SANCTIONS UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 9011 OR THE COURT'S INHERENT AUTHORITY AGAINST DEBTOR, CRYSTAL CATHEDRAL MINISTRIES, AND DEBTOR'S COUNSEL**

Pending before the court is the Motion of Carol Milner for Sanctions against Debtor Crystal Cathedral Ministries and Debtor's Counsel pursuant to Federal Rule of Bankruptcy Procedure 9011 ("Bankruptcy Rule 9011")[1] or the court's inherent authority, filed on July 2, **[*2]** 2019 (the "Sanctions Motion" or "Motion for Sanctions"), Electronic Case Filing ("ECF") 2100. In this memorandum decision, the court refers to Carol Milner as "Milner," her counsel as "Movant's Counsel," Crystal Cathedral Ministries as "CCM," and CCM's counsel as "Debtor's Counsel."

In her Motion for Sanctions, Milner asserts that CCM and Debtor's Counsel filed a frivolous Motion for an Order to Show Cause RE Contempt, ECF 2043 (the "Contempt Motion"), seeking to hold her and her attorney, Harold J. Light ("Light"), in contempt for allegedly violating the discharge injunction in this bankruptcy case, without making a reasonable inquiry or having a legal or factual

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 - 1532. References to the Federal Rules of Bankruptcy Procedure appear as "Bankruptcy Rule __," and references to the Federal Rules of Civil Procedure appear as "Civil Rule __."

basis for the filing of the Contempt Motion. Specifically, Milner contends that her written objection to the issuance of an order to show cause requested in the Contempt Motion, filed on June 12, 2018 (ECF 2050 and 2051) and the July 11, 2018 e-mail from Movant's Counsel to Debtor's Counsel, attaching a warning letter (the "Bankruptcy Rule 9011 Warning Letter"), put CCM and Debtor's Counsel on notice that the facts and law established that a 2006 settlement agreement between Milner and CCM (the "Settlement Agreement") was an enforceable **[*3]** contract, which was no longer executory, and was thus never rejected in CCM's bankruptcy case, which arguments showed that the Contempt Motion lacked merit. *Sanctions Motion*, ECF 2100 at 14 (citing *inter alia, In re Parkwood Realty Corp.*, 157 B.R. 687 (Bankr. W.D. Wash. 1993) and *In re Continental Country Club, Inc.*, 114 B.R. 763 (Bankr. M.D. Fla. 1990)). According to Milner, a reasonable review of the Settlement Agreement indicated that it was not an executory contract which could be rejected by CCM in its bankruptcy case. *Id.* at 13-14 (citing *In re Robert L. Helms Construction & Development Company, Inc.*, 139 F.3d 702, 705 and n. 7 (9th Cir. 1998)). Milner also asserts that Debtor's Counsel, on behalf of CCM, erroneously claimed that the relevant date for rejection or breach under 11 U.S.C. § 1141(b) was the date the final decree was entered in the case, not the "effective date of the plan." *Id.* at 14. Milner further asserts that CCM ignored the Ninth Circuit's decisions in *In re Ybarra*, 424 F.3d 1018 (9th Cir. 2005) and *In re Taggart*, 888 F.3d 438 (9th Cir. 2018)[2] , and wrongfully contended that she violated the discharge injunction by filing an answer in a state court action commenced by CCM against her in November 2017 (the "State Court Action"). *Id.* at 14-15.

Milner contends that Debtor's Counsel and CCM filed a trial brief in support of the Contempt Motion that advanced false factual arguments and misstated

the law, ECF 2071 (the "CCM Trial Brief"). *Sanctions Motion*, ECF 2100 at 15. Milner contends that CCM's position in its Trial Brief filed **[*4]** by Debtor's Counsel, arguing in the alternative that CCM never transferred ownership of the subject property to Milner and that she must present evidence of her ownership of the property at trial, was false and contradictory to its litigating position taken in the State Court Action that she owned the subject property. *Id.* Milner also asserts that CCM through Debtor's Counsel falsely recited California law as requiring a bill of sale to transfer property, misreading *Hull v. Ray*, 80 Cal.App. 284, 251 P. 810 (1926), and wrongfully argued that there was no consideration for the transfer of the subject property to Milner, which CCM contended defeated her claims. *Id.*

Milner further argues that the post-trial brief filed by CCM through Debtor's Counsel presented additional frivolous arguments not warranted by fact or law, ECF 2077 (the "CCM Post-Trial Brief"). *Sanctions Motion*, ECF 2100 at 16. Milner contends that Debtor's Counsel's claim at trial that Ninth Circuit authority supported the proposition that Milner had an implied duty to inspect or "timely" retrieve the subject property, and his subsequent failure to produce such authority in the CCM Post-Trial Brief or retract the claim in the same brief, amounted to a frivolous legal **[*5]** argument. *Id.*

Milner thus argues in the Sanctions Motion that the court may impose sanctions against Debtor's Counsel and CCM pursuant to Bankruptcy Rule 9011 or the court's inherent authority because the Contempt Motion, CCM Trial Brief, and CCM Post-Trial Brief included arguments not warranted by fact or law, and the Contempt Motion was filed by CCM to "harass Ms. Milner in an . . . attempt . . . to persuade her to release CCM from any and all damage claims that she may have against CCM and Crystal Cathedral for their failure to properly store her property." *Id.* at 17.

On August 28, 2019, CCM filed its opposition to

---

[2] The Ninth Circuit's decision in *In re Taggart* was later vacated and remanded, 587 U.S. __, 139 S. Ct. 1795, 204 L.Ed. 2d 129 (2019).

the Sanctions Motion, arguing that the Sanctions Motion was untimely and failed to demonstrate sanctionable conduct by CCM under Bankruptcy Rule 9011. *CCM Opposition to Sanctions Motion*, ECF 2114. CCM argued that Milner failed to trigger the 21-day "safe harbor" under Bankruptcy Rule 9011(c)(1)(A), and, citing *Islamic Shura Council of Southern California v. F.B.I.*, 757 F.3d 870 (9th Cir. 2014), that the Sanctions Motion was untimely because the court already adjudicated the Contempt Motion. *CCM Opposition to Sanctions Motion*, ECF 2114 at 10-12. CCM also argued that because it was represented by legal counsel, Debtor's Counsel, monetary sanctions pursuant to Bankruptcy Rule 9011(b)(2)—those related to claims allegedly not warranted by law—cannot be imposed [*6] against CCM.[3]*Id.* at 15-17. Alternatively, CCM asserted that Milner did not present evidence of specific conduct indicating an "improper purpose" behind the filing of the Contempt Motion. *Id.* at 19. CCM asserted that any of Milner's contentions that might be construed as evidencing its specific conduct were based on claims under Bankruptcy Rule 9011(b)(2), which provision does not apply to represented parties in their individual capacities. *Id.* at 20-23. CCM also argued that sanctions under the court's inherent authority are without merit because Milner failed to demonstrate bad faith on its part because it relied on counsel in filing the Contempt Motion, which was a pleading supported by law. *Id.* at 24.

Debtor's Counsel filed a separate opposition to the Sanctions Motion on August 28, 2019, arguing that the requested relief in the Sanctions Motion should be denied on numerous grounds. *Debtor's Counsel Opposition to Sanctions Motion*, ECF 2120. First, Debtor's Counsel argued that because no motion to reopen the bankruptcy case was filed by Milner, the Sanctions Motion should be denied in its entirety. *Id.* at 6. Debtor's Counsel also made the same arguments as CCM: that the Sanctions Motion was

untimely under *Islamic Shura Council of Southern California v. F.B.I.*, 757 F.3d 870 (9th Cir. 2014), and that Bankruptcy Rule 9011 sanctions are precluded because Milner failed [*7] to satisfy the "safe harbor" requirement of Bankruptcy Rule 9011(c)(1)(A). *Id.* at 7-8. Additionally, Debtor's Counsel asserted that the court could not exercise its inherent authority to sanction because Bankruptcy Rule 9011 expressly covered all of the alleged misconduct and that his conduct did not reach the threshold for a finding of bad faith. *Id.* at 9-10, 12.

CCM and Debtor's Counsel each made a counter-request for sanctions against Milner for filing the Sanctions Motion. *CCM Opposition to Sanctions Motion*, ECF 2114 at 27-28; *Debtor's Counsel Opposition to Sanctions Motion*, ECF 2120 at 14.

On September 11, 2019, Milner filed a reply addressing these oppositions of CCM and Debtor's Counsel. *Milner Reply to CCM and Debtor's Counsel Oppositions*, ECF 2121. Milner argued that the Sanctions Motion was timely pursuant to Bankruptcy Rule 9011 because CCM and Debtor's Counsel had allegedly waived any objections to the 21-day "safe harbor" under Bankruptcy Rule 9011 by signing a stipulation dated July 15, 2019, the Bankruptcy Rule 9011 Warning Letter from Movant's Counsel to Debtor's Counsel satisfied the safe harbor of Bankruptcy Rule 9011, alternatively, the Contempt Motion was essentially the filing of a bad faith petition not requiring compliance with the Bankruptcy Rule 9011 safe harbor, the Sanctions Motion was filed "as soon as practicable," and the court's [*8] inherent authority to sanction is not limited by a procedural safe harbor or similar considerations. *Milner Reply to CCM and Debtor's Counsel Oppositions*, ECF 2121 at 5-6. Milner also made the further arguments that CCM and Debtor's Counsel acted in bad faith, asserting that he failed to independently investigate the facts or law before filing the Contempt Motion and that CCM pursued the Contempt Motion for the improper purpose of intimidating and harassing Milner. *Id.* at 7, 11.

---

[3] Bankruptcy Rule 9011(c)(2)(A) states: "Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2)."

The court conducted a hearing on the Sanctions Motion on September 18, 2019. At the hearing, Milner requested leave of court to file supplemental briefing and evidence in support of the Sanctions Motion.[4] Debtor's Counsel and CCM orally objected to this request, and the court, after hearing argument on the objections, overruled the objections and granted the request of Milner for supplemental briefing and evidence. On September 24, 2019, CCM filed and served a formal written objection to the "order" (i.e., the court's oral ruling of September 18, 2019) allowing Milner to file "amended" or further briefing or evidence. *CCM Objection to Order Allowing Milner to File "Amended" or Further Briefing or Evidence in Support of the [\*9] Motion for Sanctions*, ECF 2124. On September 27, 2019, Milner filed and served a reply to CCM's renewed objection. *Milner Response to Objection of CCM to Supplemental Briefing*, ECF 2125. On October 10, 2019, Debtor's Counsel filed a joinder in CCM's renewed objection. *Joinder to CCM Objection to Order Allowing Supplemental Briefing*, ECF 2126. The court overruled the renewed objections to supplemental briefing filed by CCM and Debtor's Counsel by order entered on November 12, 2019. ECF 2129.

Pursuant to the court's oral ruling of September 18, 2019, which permitted supplemental briefing and evidence, Milner filed a Supplemental Memorandum in support of the Sanctions Motion on October 25, 2019 (the "Supplemental Memorandum"). *Milner Supplemental Memorandum re Bad Faith*, ECF 2127. In her Supplemental Memorandum, Milner argues that the court's inherent sanctioning power is not displaced by Bankruptcy Rule 9011, *id.* at 5-6, and the bad faith conduct of Debtor's Counsel and CCM merits the imposition of sanctions under the court's inherent authority, *id.* at 14 and 19. Milner

contends that Debtor's Counsel should be sanctioned based on his purported

> (i) frivolous [\*10] filing of the OSC Motion for the improper purpose of pressuring her to sign a release of claims before she could inspect her property, (ii) knowing submission of his false declaration in support of a motion for a continuance, (iii) knowing submission of the false and contradictory testimony of Gwen Myers at trial, and (iv) presentation of false and misleading legal arguments at trial, all of which were intended to mislead the Court[.]

*Id.* at 14. As to CCM, Milner argues that the court should impose sanctions under its inherent authority because "CCM supported the introduction of the perjurious declaration of Ms. Myers and the making of frivolous factual and legal arguments to the Court." *Id.* at 19. According to Milner, CCM's choosing to sue both her and her state court attorney, Light, for contempt can only be viewed as a blatant attempt to intimidate and coerce her into signing a release of all claims against CCM before she could inspect her property. *Id.* at 19.

On December 2, 2019, CCM filed its Response to Milner's Supplemental Memorandum, which argued that its conduct did not rise to the level of bad faith—there was no evidence of recklessness and improper purpose or harassment—and that Milner conceded that [\*11] her Bankruptcy Rule 9011 claim was futile. *CCM Response to Supplemental Memorandum*, ECF 2131 at 16-18. Debtor's Counsel filed a separate Brief in Opposition to Milner's Supplemental Memorandum. *Debtor's Counsel Opposition to Supplemental Memorandum*, ECF 2133. In Debtor's Counsel's opposition, he argued, as CCM did, that Bankruptcy Rule 9011 should not be displaced by the court's inherent authority to sanction and asserted that he made legal arguments regarding the executory nature of the Settlement Agreement, claim preclusion, waiver, and the purported nontransfer of the subject property in good faith. *Id.* at 5-16.

---

[4] *Audio Recording, September 18, 2019, Sanctions Motion Hearing* at 12:59-1:01 p.m. ("We thought this was sufficient, but obviously it isn't. . . . Can we have a briefing schedule so we can go ahead . . .") (Movant's Counsel); *see also id.* at 1:04-1:09 p.m.

On December 16, 2019, Milner filed replies to
CCM's supplemental briefing, ECF 2135, and
Debtor's Counsel's supplemental briefing, ECF
2136. In her reply to CCM's opposition, Milner
argued that CCM has engaged in litigation for the
purpose of harassing her into releasing her claims
related to the subject property, and CCM allowed
Debtor's Counsel to file the allegedly fraudulent
declaration of Gwen Myers. *Reply to CCM
Supplemental Opposition*, ECF 2135 at 3-6. In her
reply to Debtor's Counsel's opposition, Milner
argued that the authority in *Chambers v. NASCO,
Inc.*, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27
(1991) allows the federal courts to use their
inherent authority to sanction even when
other **[*12]** federal rules may allow sanctions for
similar conduct. *Reply to Debtor's Counsel
Supplemental Opposition*, ECF 2136 at 5. Milner
also contended that the filing of the Contempt
Motion was in bad faith because, among others,
Debtor's Counsel ignored controlling Ninth Circuit
authority. *Id.* at 7.[5] Additionally, Milner argued that
Debtor's Counsel's significant reliance on the
statements and positions of CCM's prior attorneys
was objectively unreasonable, the exhibits Debtor's
Counsel included with his supplemental brief were
either unauthenticated or already filed, and his
submission of the allegedly fraudulent declaration
of Gwyn Myers all demonstrate bad faith. *Id.* at 7-
13.

Regarding resolution of this Motion for Sanctions,
the court may and does take judicial notice of its
files and records under Federal Rule of Evidence
201. *In re Clark*, 525 B.R. 442, 449 n.8 (Bankr. D.
Idaho 2015), *aff'd*, 2016 Bankr. LEXIS 984, 2016
WL 1377807 (9th Cir. BAP 2016) (taking judicial
notice of papers filed on its docket and noting,
"papers filed in a bankruptcy case by a debtor under
penalty of perjury also have evidentiary
significance under Fed. R. Evid. 801(d)"); *see also*,
Barry Russell, *Bankruptcy Evidence Manual*, §

201.05 (online ed., October 2019 update). In
particular, the court finds that its Memorandum
Decision on Debtor's Motion for Issuance of Order
Directing **[*13]** Carol Milner and Harold J. Light,
Esq. to Show Cause Why They Should Not Be
Held In Contempt (FRBP 9020); And For Damages
and Attorneys' Fees For Intentionally Violating the
Permanent Injunction, filed and entered on
November 2, 2018, ECF 2079 (the "Memorandum
Decision"), along with the papers and evidence
underlying that decision, are integral to
adjudication of the Sanctions Motion. Accordingly,
the court discusses the Memorandum Decision and
the record in that proceeding below.

Having considered all the oral and written
arguments of the parties and the other papers and
pleadings filed relating to this matter, the court
rules as follows.

## I. JURISDICTION

This court has jurisdiction over this contested
matter pursuant to 28 U.S.C. §§ 1334(b) and
157(b)(2)(A).

## II. BACKGROUND

### A. Milner's Play, the 2006 Settlement Agreement, and the CCM's Bankruptcy

The background of the Sanctions Motion originates
in the 1990s when Milner wrote a play entitled
"Glory of Creation" (the "Play"). *Memorandum
Decision*, ECF 2079 at 4. In 2003, CCM and Milner
began negotiations regarding staging the Play on
CCM's church campus beginning in the summer of
2005. *Id.* According to CCM, it incurred almost
$10 million in expenses by purchasing the subject
property **[*14]** for the Play (the "property," the
"subject property," or the "Play Property").[6]*CCM*

[5] Milner again cited to *In re Taggart*, 888 F.3d 438 (9th Cir. 2018), *vacated and remanded*, 587 U.S. __, 139 S. Ct. 1795, 204 L.Ed. 2d 129 (2019) and *In re Ybarra*, 424 F.3d 1018 (9th Cir. 2005).

[6] In making this assertion, CCM relied upon the Declaration of Gwyn Myers, who was a board member of CCM in 2006 and later chief

*Trial Brief*, ECF 2071 at 3. Thereafter, a dispute arose between CCM and Milner after CCM notified Milner that it would not be staging the Play in 2006 or beyond. *Memorandum Decision*, ECF 2079 at 4. CCM and Milner began negotiations of an agreement to resolve their disputes related to the Play, and on or about July 8, 2006, CCM and Milner entered into the Settlement Agreement to resolve their disputes. *Id.* The Settlement Agreement recited that "various disputes and controversies have broken out between [CCM] and [Milner], all of which disputes and controversies the parties intend to and do hereby agree to fully and finally settle and resolve the same in accordance with the terms and conditions set out" in the Settlement Agreement. *Id.* at 4-5. The Settlement Agreement provided for a release of claims by CCM against Milner and Milner against CCM, settlement payments from CCM to Milner, and the storage by CCM of various physical property assets belonging to Milner. *Id.* at 4-5. Much of this property is still being stored by CCM for Milner. *Jacobson Declaration, Contempt Motion*, ECF 2043 at 23-25.

On October 18, 2010, CCM initiated this bankruptcy case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. ECF 1. Milner filed four proofs of claim in CCM's bankruptcy case: (1) Claim No. 243-1, amended by Claim No. 243-2, asserting a claim of $10,615 for "housing allowance and copyright infringement"; (2) Claim No. 336-1 asserting an administrative claim for an unknown amount based on alleged copyright infringement relating to the

Play; (3) Claim No. 337-1 asserting an administrative claim of $83,608.92 for breach of an oral pre-petition employment contract for post-petition services as CCM's "Director of Brand Development and Intellectual Property"; and (4) Claim No. 342-1 asserting an administrative claim for an unknown amount based on other alleged copyright infringement relating to the Play. Milner withdrew Claim Number 243-2 as it related to the copyright infringement claim and Claim Numbers 336-1 and 342-1 in their entirety. *Notice of Withdrawal of Proofs of Claim and Administrative Expense Claims*, ECF 1262. The court allowed in part Milner's Claim Number 243-2 for a housing allowance based on a **[\*16]** concession of the plan agent and disallowed the remainder of the claim and the entirety of her Claim Number 337-1 based on breach of the oral pre-petition employment contract with CCM, which is not related to the Settlement Agreement. *Memorandum Decision on Motion of Plan Agent and Reorganized Debtor for Judgment on Partial Findings re: Objections to Claims*, ECF 1386 at 47-53.

On December 12, 2011, the court entered its order confirming the Second Amended Chapter 11 Plan Filed by the Official Committee of Creditors Holding Unsecured Claims as Modified at Confirmation Hearing (the "Plan"). *Plan Confirmation Order*, ECF 841; *see also Second Amended Chapter 11 Plan*, ECF 812. On April 27, 2012, the court entered an order establishing an Effective Date of the Plan of May 1, 2012 (the "Effective Date"). *Order Establishing Plan Effective Date*, ECF 1105; *see also Notice of Plan Effective Date*, ECF 1108. On May 20, 2016, upon CCM's motion, and having determined that the Plan was fully implemented, the court entered a Final Decree Closing Case, ECF 2028.

## B. CCM's State Court Action and Motion for Contempt

On November 7, 2017, CCM and its affiliate, The Crystal Cathedral, represented by Debtor's **[\*17]**

---

restructuring officer during CCM's bankruptcy case. *Declaration of Gwyn Myers*, ECF 2068 at 2 (¶¶ 3-4). However, at trial the court sustained Milner's objection to testimony as to the asserted $13 million loss that CCM incurred in putting on the Play. *Evidentiary* **[\*15]** *Hearing Transcript, September 20, 2018*, ECF 2095 at 304-305. The statements regarding the financing of the Play provide information as to what the parties contend was involved in the dispute between CCM and Milner, resulting in the Settlement Agreement, and are relevant to the defense of CCM and its attorney, Debtor's Counsel, that they did not act in bad faith. Milner in her trial testimony acknowledged that CCM spent $9 million in expenses in acquiring property for the Play. *Id.* at 304.

Counsel, filed the State Court Action: a *Complaint for: (1) Declaratory Relief; and (2) Injunctive Relief* (the "State Court Complaint") against Milner in the Superior Court of California for the County of Orange, Case Number 30-2017-00954144-CU-MC-CJC. *State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice*, ECF 2044 at 4-115. CCM's State Court Complaint[7] alleged two claims for relief, one for declaratory relief and one for injunctive relief. CCM's declaratory relief claim sought a judicial determination that the relationship of a gratuitous bailment was created between CCM and Milner, that this gratuitous bailment relationship terminated and that CCM has no continuing obligation to store and maintain Milner's personal property items. *State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice*, ECF 2044 at 8-9 (¶¶ 24-29). CCM in its declaratory relief claim alternatively requested that if the state court determined that the Settlement Agreement between CCM and Milner, referred to by CCM as "the subject rejected executory contract," still created "any rights and obligations between the parties," the state court determine that the contract did "not include **[\*18]** any obligation for CCM to store [Milner's property] indefinitely," interpreting the language of the Settlement Agreement that "CCM will keep all goods in the same condition as they were at the end of the '05 Season" to allow it to declare the termination of any storage arrangement. *Id.* at 9 (¶ 30). CCM's injunctive relief claim sought a mandatory injunction compelling Milner to remove her items from its premises, or, alternatively, allowing CCM to dispose of Milner's items with reasonable costs of storage and disposal to be reimbursed by Milner to CCM. *Id.* at 9 (¶¶ 31-34).

In support of its two claims for relief in the State Court Complaint, CCM alleged that it had entered into the Settlement Agreement to resolve the parties' differences regarding the production of the Play, that it stored various physical properties belonging to Milner, that the remaining stored property occupied several large box trailers owned by CCM, that CCM had submitted the Plan in its bankruptcy case on or about November 23, 2011, which plan of reorganization included a provision specifically addressing "Assumption/Rejection of Executory Contracts and Unexpired Leases" that stated: "Any contracts not designated for assumption **[\*19]** or rejection at or before the Confirmation Hearing, shall be deemed rejected as of the Effective Date," that this plan provision applied to the Settlement Agreement of July 8, 2006 between CCM and Milner as the Settlement Agreement "was not Accepted specifically in the Plan," that the bankruptcy court entered its order confirming the Plan, that the bankruptcy court's plan confirmation order resulted in a rejection and discharge of the Settlement Agreement between CCM and Milner, which order terminated CCM's duty to comply with the agreement and relieved it of any and all obligations to any future performance under the Settlement Agreement "to store any of the equipment of" Milner, "if such an obligation ever existed," that after the Settlement Agreement was rejected and discharged in the bankruptcy case, the relationship between CCM and Milner "became one of a gratuitous bailment" as codified by California Code of Civil Procedure §1847(b) in that Milner "deposited her personal property with CCM without CCM ever receiving consideration for storing the property beyond the mere possession of [Milner's] deposit," and that the bailment terminated when CCM gave notice of its termination to Milner **[\*20]** by a letter sent by CCM's out of state counsel in Oklahoma on April 19, 2017. *State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice*, ECF 2044 at 5-8 (¶¶ 7-23).

Thus, in its State Court Complaint, CCM's theory for declaratory and injunctive relief terminating its contractual obligations to store Milner's property under the Settlement Agreement was that such obligations were terminated as a result of the entry

---

[7] Although CCM's affiliate, The Crystal Cathedral, was a plaintiff with CCM in the State Court Action, it was not a party to this contested matter, and the court refers to the State Court Complaint as CCM's.

of the bankruptcy court's order confirming the Plan that included a plan provision which rejected executory contracts not specifically designated for assumption or rejection at or before the plan confirmation hearing, and that the Settlement Agreement was not so designated. CCM in its allegations in the State Court Complaint admitted that it entered into the Settlement Agreement and did not dispute its execution, that it had contractual obligations under the Settlement Agreement to store Milner's property from the Play, and that it did not dispute Milner's ownership of the property.[8] CCM's theory of relief in the State Court Complaint was premised on the assumption that the Settlement Agreement between it and Milner was an executory contract, as the allegations [*21] of paragraphs 14-16 and 30 refer to executory contracts. Paragraphs 14-16 refer to CCM's plan of reorganization, specifically addressing the assumption and rejection of executory contracts and unexpired leases and alleging that the Settlement Agreement was "not Accepted [i.e., assumed]." *State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice*, ECF 2044 at 6 (¶¶ 14-16). Paragraph 30 refers to the Settlement Agreement as "the subject rejected executory contract," but no allegation of the complaint specifically alleges that the Settlement Agreement was an executory contract or how it was executory. *Id.* at 9 (¶ 30).

On February 15, 2018, Debtor's Counsel sent a letter by email to Milner's counsel in the State Court Action, Light, setting forth a settlement proposal on behalf of CCM. By the proposed settlement, CCM would offer Milner "actual ownership of the storage trailers themselves" to resolve the State Court Action with "a mutually acceptable general release and settlement agreement[,]" but that she would have to "accept

the trailers as is, where is, and she would take possession of them in their entirety with all the contents." *Exhibit 3 to Debtor's Counsel Declaration attached [*22] to Contempt Motion*, ECF 2043 at 44. By offering Milner ownership of the storage trailers themselves, the implicit assumption in CCM's settlement offer was that the contents of those trailers, namely, the property stored inside, already belonged to Milner, which was consistent with CCM's allegations in the State Court Complaint that it was storing Milner's property.

On February 28, 2018, Milner, represented by Light, filed an answer to the State Court Complaint (the "Answer"). *Answer, Exhibit B to Debtor's Request for Judicial Notice*, ECF 2044 at 117-125. In the Answer, Milner denied the allegations of the State Court Complaint and asserted twenty-one affirmative defenses. *Id.* The twenty-one Affirmative Defenses included: (1) Failure to State a Claim, (2) Detrimental Reliance, (3) Intentional and/or Negligent Misrepresentation and Concealment, (4) Plaintiff's Acts and Omissions, (5) Intentional or Negligent Misconduct of Third Parties, (6) Contractual Obligations Not Extinguished, (7) Obligation to Maintain Defendant's Property, (8) Failure to Allow Reasonable Access to Property, (9) Acts and Omissions of a Party's Agents, (10) Acts and Omissions of Plaintiffs' Principals, (11) Laches, [*23] (12) Estoppel, (13) Waiver, (14) Unclean Hands, (15) In Pari Delicto, (16) Offset, (17) Failure to Mitigate, (18) Plaintiffs Not Real Parties In Interest, (19) Plaintiffs Lack Capacity to Maintain Action, (20) Breach of Duty to Redeliver Defendant's Property, and (21) Failure to Comply with Statutory/Common Law Duties of Bailee. In Milner's Sixth Affirmative Defense - "Contractual Obligations Not Extinguished," she directly contravened CCM's theory of relief in alleging that "Plaintiffs' contractual obligations were not extinguished in bankruptcy proceedings." *Id.* at 119.

On Monday March 19, 2018, Debtor's Counsel sent

---

[8] Although CCM in the State Court Complaint in paragraphs 25 and 29 referred to the "CCM items," CCM otherwise referred to the property as property belonging to Milner, i.e., "various physical properties belonging to Defendant [Milner]," "her personal property," "her property" and "her items," and none of CCM's allegations in the State Court Complaint made a claim of ownership of this property.

an email message to Milner's counsel, Light, stating that he (Debtor's Counsel) was working on an "ex-parte" to be noticed for "this Thursday" to have the state court rule that "by filing an answer that claims that [Milner] has ownership rights, notwithstanding the bankruptcy plan confirmation order, she is violating the permanent injunction. The law on concept that a plan confirmation order is res judicata [sic] as to any creditor claim, filed or unfiled, is very compelling. [See e.g. *Trulis v. Barton* (9th Cir. 1995) 107 F3d 685, 691; *In re Chattanooga Wholesale Antiques, Inc.* (6th Cir. 1991) 930 F2d 458, 463; *In re Maxwell Communication Corp.* (2nd Cir. 1996) 93 F3d 1036, 1044.]." *Exhibit 5 to Debtor's Counsel Declaration attached to Contempt Motion*, ECF 2043 at 56. **[\*24]** Debtor's Counsel further stated in this email message:

> Once she understands this, or if necessary is educated by the Court, even though my clients could dispose of the property under the protection of the permanent injunction, they are still willing to circulate a release. After your client signs it, she can then come and retrieve the property. The major issue in logic between us, is your use of the phrase 'her property'. The permanent injunction terminated her ownership. Is she ready to sign a release? If not, I will look forward to your opposition.

*Id.*

Apparently, what Debtor's Counsel meant by working on an "ex-parte" was an application for a temporary restraining order to be heard on an ex parte basis relating to CCM's injunctive relief claim in the State Court Complaint, which would be considered and ruled upon by the state court. The case law cited by Debtor's Counsel in the email stands for the general proposition that a plan confirmation order has res judicata effect as to prepetition claims of creditors, whether filed in the bankruptcy case or not, but does not specifically address the situation here of a claim of post-confirmation breach of a prepetition contract that is no **[\*25]** longer executory and could not be

rejected in the bankruptcy case, as discussed herein. The implicit assumption in the statement in Debtor's Counsel's email regarding Milner's property, that "[t]he permanent injunction terminated her ownership," was that Milner previously owned the property which was transferred to her by the Settlement Agreement. *Exhibit 5 to Debtor's Counsel Declaration attached to Contempt Motion*, ECF 2043 at 56. Thus, CCM's position asserted by Debtor's Counsel in this email was not that Milner never owned the property because there was no valid transfer from the Settlement Agreement, but that Milner owned the property, and her ownership was somehow terminated by the plan confirmation order. There is nothing in Debtor's Counsel's email that sets forth the legal authority that terminated the transfer of property to Milner under the Settlement Agreement, and his proposition is simply unfounded as he never provided any valid legal authority for such a proposition in this matter.

On March 30, 2018, Milner's counsel, Light, sent a letter to Debtor's Counsel by email and regular mail in response to Debtor's Counsel's email message of March 19, 2018 and a telephone conversation **[\*26]** that Light and Debtor's Counsel had on March 29, 2018. *Exhibit 6 to Debtor's Counsel Declaration attached to Contempt Motion*, ECF 2043 at 58-59. As recited in this letter, Light stated that Debtor's Counsel said in this telephone conversation that he (Debtor's Counsel) intended to file a motion to strike Milner's answer to the State Court Complaint on grounds that the affirmative defenses purportedly violate the discharge injunction in CCM's bankruptcy case and that he (Debtor's Counsel) had reserved a May 20, 2018 hearing date for this motion, but wanted to seek by way of an ex parte application an earlier hearing date. *Id.* at 58. Light further stated that he was extremely busy dealing with many motions in limine and otherwise preparing for a two week jury trial beginning on April 30, 2018, and had requested Debtor's Counsel to give him an accommodation to set the hearing date in June on account of Light's trial schedule, but that Debtor's

Counsel not only refused such request, but would seek to set the hearing in April. *Id.*

Light wrote:

> Your refusal to extend any courtesy in this regard is disappointing, especially in light of the utter baselessness of the position you are taking in connection [*27] with your proposed motion [for contempt]. As I have pointed out before, the suggestion that because the settlement agreement between our clients was purportedly 'deemed rejected' Ms. Milner lost her ownership interest in her property is specious. In this regard, you have utterly ignored the fact that the settlement agreement was not even an executory contract subject to the provision of the plan of reorganization on which you rely. As you are presumably aware, an executory contract is one which both sides still have duties to perform before it becomes fully executed. My client had completed all of her obligations under the settlement agreement long before the bankruptcy proceeding was filed by your clients, thus making the contract not executory. Moreover, there is nothing in the operative injunction which would purport to preclude my client from defending herself against your clients' complaint and the baseless attempt to convert her personal property apparently included in that pleading.

*Exhibit 6 to Debtor's Counsel Declaration attached to the Contempt Motion*, ECF 2043 at 58-59. Thus, Light's letter put CCM and Debtor's Counsel on notice as of March 30, 2018 of Milner's meritorious [*28] defenses to CCM's claims that she violated the discharge injunction from its bankruptcy case, namely, that the Settlement Agreement could not have been rejected in the bankruptcy case since it was not executory, that Milner owned the property, and that she could defend herself in the State Court Action since CCM was initiating post-confirmation litigation.

Although CCM alleged in its State Court Action that it no longer had a contractual obligation to store Milner's property under the Settlement Agreement because the agreement was terminated by the Plan in CCM's bankruptcy case, which claim for declaratory and injunctive relief was therefore pending and already at issue before the state court, CCM decided to commence new litigation against Milner in another court—this court—by filing the Contempt Motion against Milner and Light for pleading in the pending State Court Action. On June 8, 2018, CCM, by its counsel, filed the Contempt Motion, ECF 2043, requesting that the court issue an order to show cause why it should not hold Milner and Light in civil contempt and issue sanctions for violating the discharge injunction.[9] The gravamen of the Contempt Motion was stated as follows:

---

[9] At the time of filing the Contempt Motion, which instituted new litigation in this bankruptcy case, the bankruptcy case was closed, and CCM did not move to have the bankruptcy case reopened for the court to adjudicate the Contempt Motion. A debtor seeking to enforce the discharge injunction through contempt proceedings is not required to move to reopen a bankruptcy case for such proceeding. *In re Menk*, 241 B.R. 896, 910 (9th Cir. BAP 1999). This is because closing a case generally does not terminate the bankruptcy court's jurisdiction and reopening the case does not affect this jurisdiction. *Id.* at 911. "[T]he reopening of a closed bankruptcy case is a ministerial act that functions primarily to enable the file to be managed by the clerk as an active matter and that, by itself, lacks independent legal significance and determines nothing with respect to the merits of the case." *Id.* at 913. In his opposition to the Sanctions Motion, ECF 2120 at 5-6, Debtor's Counsel argues that the Sanctions Motion should be denied because Milner did not move to have this bankruptcy case reopened. The cases cited by Debtor's Counsel in support of his opposition are inapposite; the holdings of *In re Ozenne*, 841 F.3d 810 (9th Cir. 2016) and *Trohimovich v. C.I.R.*, 776 F.2d 873 (9th Cir. 1985) involved failures to timely appeal. The holding of *Beezley v. California Land Title Co.*, 994 F.2d 1433 (9th Cir. 1993), that a motion to reopen a bankruptcy case should be denied if there is no useful purpose for reopening, such as to amend a schedule of debts in a no asset, no bar date Chapter 7 case, is similarly inapposite. Since reopening a case is administrative and not jurisdictional, and CCM represented by Debtor's Counsel was able to litigate the Contempt Motion without reopening, this court determines that if there was sanctionable behavior arising out of the Contempt Motion proceedings, the court should be able to exercise its inherent authority to consider the motion concerning such behavior without the formality of reopening the case. If the technicality of reopening the case was not a bar to adjudicating the Contempt Motion, it should not be a bar to considering sanctionable behavior arising out of such proceedings. A contrary result would amount to exalting form over substance.

The violation **[*29]** is currently taking place in *Crystal Cathedral Ministries v. Carol Schuller Milner*, Orange County Superior Court Case No. 30-2017-00954144, where, among other things, the Contemnors filed an Answer on February 28, 2019 that include affirmative defenses claiming this Court never extinguished the pre-petition, and post-petition contractual obligations between CCM and Milner that arose out of a rejected 2006 contract. That contract was part of the claims asserted by Milner in the bankruptcy and was the subject matter of litigation during the proceedings. That contract was not accepted and not part of the final approved plan of reorganization, yet the Contemnors continue to insist Milner has continuing rights arising out of it.

*Contempt Motion*, ECF 2043 at 2. CCM specifically contended in the Contempt Motion that "Milner and Light are in contempt in these proceedings by virtue of filing Affirmative Defense Nos. 1-3; 6-8; 11;13-15; 18-21 [in their Answer to the State Court Complaint]." *Id.* at 19. CCM explicitly referenced Milner's Affirmative Defense No. 6, which stated: "Plaintiff's contractual obligations to maintain defendant's property were not extinguished in bankruptcy proceeding [sic]." *Id.* **[*30]**

CCM's legal theory in support of the Contempt Motion was that, citing *inter alia*, 11 U.S.C. §§524 and 1141, the order confirming the Plan discharged it from all preconfirmation claims, including CCM's contractual obligations as to property claims arising from the Settlement Agreement, which CCM referred to as "the Rejected Contract," that Milner could have made, but failed to make, during CCM's Chapter 11 bankruptcy case. *Id.* at 21. As in the State Court Complaint, CCM's theory of relief in the Contempt Motion was premised on the assumption that the Settlement Agreement with Milner was an executory contract. CCM, by Debtor's Counsel, asserted that the Settlement Agreement "was not accepted and part of the final approved plan of reorganization," *id.* at 2, and that "Milner and her attorney Light insist that personal property ownership rights still exist arising out of a rejected prepetition 2006 contract," *id.* at 6. Elaborating on this point, CCM argued:

> The law is clear. A rejection of an unexpired contract removes the contract from the bankruptcy estate, and 'constitutes a breach of such contract or lease' that is effective immediately before the petition for bankruptcy. [11 U.S.C.] § 365(g). '[R]ejection of an executory contract serves two purposes. **[*31]** It relieves the debtor of burdensome future obligations while he is trying to recover financially and it constitutes a breach of a contract which permits the other party to file a creditor's claim. *In re Onecast Media, Inc.* (9th Cir. 2006) 439 F.3d 558, 563; *Sir Speedy Inc. v. Morse*, 256 B.R. 657, 659 (D. Mass. 2000). The estate is relieved from rendering further performance under the contract, and the contract counterparty is given an unsecured claim *for breach* that can be processed in bankruptcy with other creditors' claims. See, e.g., *In re Rega Props., Ltd.*, 894 F.2d 1136, 1140 (9th Cir. 1990).

*Id.* at 11-12 (italics in original).

However, the court observes that as in the State Court Complaint, nowhere in the Contempt Motion does CCM specifically assert that the Settlement Agreement was an executory contract or how it was executory. The court further observes that when CCM states that "the law is clear" and cites 11 U.S.C. § 365(g) that "[a] rejection of an unexpired contract removes the contract from the bankruptcy estate, and 'constitutes a breach of such contract or lease' that is effective immediately before the petition for bankruptcy," CCM substituted the word "unexpired" for "executory," before the word contract. The word "unexpired" precedes "lease," not "contract," in 11 U.S.C. § 365(g). Moreover, "unexpired" is not the equivalent of "executory." Thus, the court finds that CCM's substituted

wording **[*32]** of "unexpired contract" for "executory contract" distorted the meaning of the statutory language in 11 U.S.C. § 365(g). Notably, Milner raised as a defense the argument that the Settlement Agreement was not an executory contract in her Answer to the State Court Complaint and in her counsel's March 30, 2018 letter to Debtor's Counsel. *See Exhibits 4 and 6 to Debtor's Counsel Declaration attached to the Contempt Motion*, ECF 2043 at 48-49, 58-59. Accordingly, before CCM filed the Contempt Motion on June 8, 2018, Debtor's Counsel and CCM had knowledge of the issue of whether the contract was executory, but never addressed the issue in the Contempt Motion, instead arguing based only on the assumption that the Settlement Agreement was executory, ignoring Milner's defense specifically raised in Light's letter to Debtor's Counsel on March 30, 2018. As discussed in the court's Memorandum Decision, ECF 2079, Milner's defense that the Settlement Agreement was not executory was meritorious.

According to CCM in the Contempt Motion:

> The point of rejection was the point of breach which Milner was then responsible to assert her claims. She knew of [the] contract and it was an exhibit in claim litigation she had counsel **[*33]** on. Any claims of bailment, or contract claims to preserve the obligation of CCM to protect and upon demand, return Milner's personal property were waived by her failing to assert a timely claim. *Robertson v. Isomedix, Inc. (In re Intl. Nutronics)* (9th Cir. 1994) 28 F.3d 965, 969. Milner never filed a proof of claim regarding the items for the Play which resulted in a knowing waiver. The Final Decree [in the bankruptcy case] bars any subsequent action by way of the subject Affirmative Defenses in the superior court and represents an ongoing intentional violation.

*Id.* at 21.[10]

CCM thus reasoned that the plan confirmation order discharged it as the bankruptcy debtor from all pre-confirmation claims pursuant to 11 U.S.C. §§ 524(a)(2) and 1141(d)(1)(A), including claims that purportedly could have been brought by Milner. *Id.* at 17 (citing *inter alia, F.C.C. v. NextWave Personal Communications Inc.*, 537 U.S. 293, 303, 123 S. Ct. 832, 154 L. Ed. 2d 863 (2003), *In re Marriage of Williams*, 157 Cal.App.3d 1215, 1224, 203 Cal. Rptr. 909 (1984) and *In re Marriage of Lynn*, 101 Cal.App.4th 120, 125-126, 123 Cal. Rptr. 2d 611 (2002)).

In arguing that Milner waived her rights to enforce the Settlement Agreement by failing to file a claim in the bankruptcy case, CCM did not explicitly refer to the doctrines of claim and issue preclusion (or res judicata and collateral estoppel) in the Contempt Motion,[11] but that was apparently CCM's intention, as indicated by its citation to **[*34]** the Ninth Circuit's decision in *In re Intl Nutronics*, which held that the res judicata effect of a bankruptcy court sale order precluded certain antitrust claims that could have been brought to challenge the sale, 28 F.3d at 969-971, and thus,

---

CCM attached copies of its State Court Complaint and Milner's Answer thereto, signed and filed on behalf of Milner by Light, to its Request for Judicial Notice in support of the Contempt Motion. *Exhibits A and B to Debtor's Request for Judicial Notice*, ECF 2044. CCM also attached a copy of Milner's Answer to the Contempt Motion. *See Exhibit 4 to Debtor's Counsel Declaration attached to the Contempt Motion*, ECF 2043 at 48-49.

[11] In response to Milner's supplemental briefing in support of the Sanctions Motion, Debtor's Counsel argues that his claim preclusion argument was the "center of the [Contempt] motion," *Debtor's Counsel Reply to Milner Supplemental Memorandum re Bad Faith*, ECF 2133 at 7, even though the Contempt Motion and Debtor's Counsel's briefing in support thereof never mentioned the words "claim preclusion," "issue preclusion," "res judicata," or "collateral estoppel," and he never set out the legal standards for application of those doctrines. It is thus understandable that Milner in response asserts that his argument was "ridiculous," commenting: "Nowhere in the Contempt Motion or in the brief filed by [Debtor's Counsel] did he argue that claim preclusion or res judicata barred Ms. Milner from defending herself in the state court litigation." *Reply to Debtor's Counsel Opposition*, ECF 2136 at 8. The court had to read and re-read Debtor's Counsel's argument in the Contempt Motion, ECF 2043 at 21, a number of times to be able to construe it as arguing a claim preclusion theory.

---

[10] As evidence of the alleged contemptuous acts by Milner and Light,

based on this case law, CCM's argument was that the final decree in the bankruptcy case "bars" any subsequent action to enforce any contractual claims under the Settlement Agreement. *Contempt Motion*, ECF 2043 at 21. Thus, according to CCM, the plan confirmation order, which resulted in the rejection of "unexpired" contracts such as the Settlement Agreement between it and Milner, had res judicata effect and precluded Milner from enforcing any contractual claims against CCM based on the Settlement Agreement. This res judicata argument of CCM in support of the purported discharge violation is based on two essential premises: (1) the Settlement Agreement was an executory contract susceptible to rejection upon plan confirmation; and (2) the filing of an answer in post-confirmation litigation initiated by the debtor, CCM, was, therefore, an enforcement action in violation of the discharge injunction in effect upon plan confirmation. As discussed herein, these premises **[*35]** were fundamentally flawed because if the contract was not executory, it would not have been rejected, no breach would have occurred, and thus Milner had no reason to file a claim during the bankruptcy regarding the subject property, and Milner defending herself in post-confirmation litigation initiated by CCM was not a violation of the discharge injunction since the reorganized debtor "returned to the fray" by initiating litigation.

As in the State Court Complaint, CCM in the Contempt Motion affirmatively asserted that it entered into the Settlement Agreement; it did not dispute the execution of the Settlement Agreement, that it had contractual obligations under the Settlement Agreement to store Milner's property from the Play, and that Milner owned the property. *Contempt Motion*, ECF 2043 at 8-9. The Contempt Motion stated:

> On or about July 8, 2006, CCM and Milner entered into a certain written Agreement, (the "Agreement"). The agreement resolved their differences concerning the production of the Play and replaced all prior agreements with the terms and provisions of the Agreement. **[*36]**

Exhibit "1"; Jacobson Dec., ¶ 10. The agreement contained a "Schedule 1 'Distribution of Creation Assets' that stated *inter alia*: 'CCM will keep all goods in same conditions as they were in at the end of '05 season. CCM will not use goods without prior, written approval of CSM [Carol Schuller Milner]". Ex. 1, p. 8. Pursuant to that agreement, CCM stored 'Milner's goods' which were various play related items belonging to Milner which currently include screens, screen frames and truss; props, puppets, scenic elements, and road cases. Jacobson Dec., ¶ 11. Today the various stored items occupy seven (7) large (45' & 48') box trailers owed by CCM. Jacobson Dec., ¶ 12. The storage is offsite of CCM's campus, and it cost them thousands of dollars a year to continue to store the property previously owned by Milner. Jacobson Dec., ¶ 13. Before the Bankruptcy discharge, Milner did retrieve some items, but failed to retrieve 7 trailers full of other items.

*Id.*

Consistently throughout the Contempt Motion, CCM referred to the property that it stored pursuant to the Settlement Agreement as Milner's "goods" or property. In his declaration filed in support of the Contempt Motion, Russell Jacobson ("Jacobson"), **[*37]** CCM's chief operating officer, stated: "This matter concerns CCM's efforts to have Carol Milner, ("Milner"), retrieve the remaining property she previously owned that CCM has been storing for several years at CCM's expense. The storage by CCM at CCM's expense is pursuant to a 2006 contract to which Milner and CCM were parties." *Jacobson Declaration attached to Contempt Motion*, ECF 2043 at 23 (¶¶ 2-3). This testimony of an officer of CCM in a supporting declaration for the Contempt Motion indicates CCM's acknowledgment that it entered into the contract with Milner with the obligation to store her property at its expense and that it was still performing that obligation pursuant to the contract, which was CCM's litigating position for the

Contempt Motion.

In explaining why CCM decided to file the Contempt Motion and institute new litigation in a different court when it already had the pending State Court Action, Debtor's Counsel stated in his opposition to the Sanctions Motion: "The purpose of the motion was to expedite a resolution of the parties' dispute by a single motion, as opposed to a drawn-out State Court action." *Debtor's Counsel Opposition to Sanctions Motion*, ECF 2120 at 10. **[*38]** In elaborating on this rationale, Debtor's Counsel later stated that:

> the state case filed against Milner listed the discharge as a basis of recovery. It was a separate ground in the state litigation that the bankruptcy court may have adjudicated the subject contract by rejecting it as executory or based on the claim preclusion document [sic] as argued herein. However, presenting bankruptcy law and argument to a state judge is not ideal when the actual bankruptcy case itself could be reopened and this issued [sic] decided by the same bankruptcy court. [Debtor's Counsel] believed in good faith that a single hearing with this court could end the dispute if the outcome was favorable to CCM. This was not an improper purpose, it was the intended purpose of streamlining the legal disputes between the parties.

*Debtor's Counsel Opposition to Supplemental Memorandum*, ECF 2133 at 16-17.

On June 12, 2018, Milner filed a written opposition to the Contempt Motion in her Objection to Issuance of an Order to Show Cause RE Contempt (the "Objection to Contempt Motion"), ECF 2050, arguing that the Contempt Motion should be denied because the Settlement Agreement was not an executory contract that could **[*39]** be rejected by operation of the Plan and that the confirmed Plan could not alter her rights in the property being stored by CCM. *Objection to Contempt Motion*, ECF 2050 at 11. In support of her argument that the Settlement Agreement was not an executory

contract that could be rejected, Milner stated that in order for a contract to be rejected under 11 U.S.C. §365(a) the contract had to be executory, and the test to determine whether a contract was executory was the so-called Countryman test formulated by Professor Vern Countryman in the Minnesota Law Review, which test has been adopted by many courts, including the Ninth Circuit. *Objection to Contempt Motion*, ECF 2050 at 6 (citing *In re Robert L. Helms Construction & Development Co., Inc.*, 139 F.3d 702, 705 (9th Cir. 1998) (citing Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973))). As set forth by the Ninth Circuit,

> An executory contract is one "on which performance remains due to some extent on both sides." *National Labor Relations Board v. Bildilsco and Bildilsco*, 465 U.S. 513, 522-23 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (quotation marks and citation omitted). More precisely, a contract is executory if "the obligations of both parties are so unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." *Griffel v. Murphy (In re Wegner)*, 839 F.2d 533, 536 (9th Cir. 1988).

*In re Robert L. Helms Construction & Development Co., Inc.*, 139 F.3d at 705 and n.7 (citing Vern Countryman, Executory Contracts **[*40]** in Bankruptcy: Part I, 57 Minn. L. Rev. at 460). According to Milner, she had no unperformed obligations under the Settlement Agreement other than the duty not to disparage CCM and Crystal Cathedral, she granted CCM a release from its breach of contract, and CCM transferred ownership of the Play Property to her and paid her as required by the Settlement Agreement. Accordingly, the only remaining obligations under the Settlement Agreement inured to CCM—storing and maintaining Milner's Play Property. *Objection to Contempt Motion*, ECF 2050 at 9-10. As Milner argued, based on the Countryman test, for a contract to be executory both contracting parties

must have outstanding material obligations, so that a breach by one excuses the other, and Milner's sole obligation under the Settlement Agreement not to disparage CCM or Crystal Cathedral was not a material obligation that would cause the Settlement Agreement to be executory. *Id.* at 10 (citing *In re Jarvis*, 2005 Bankr. LEXIS 536, 2005 WL 7758805 (Bankr. D. N.H. 2005)).

In addressing CCM's argument that Milner's ownership rights were terminated by the order confirming its reorganization plan, Milner asserted that CCM's confirmed plan did not alter her ownership rights in the Play Property because ownership of the property was transferred to her **[*41]** from CCM under the Settlement Agreement, and there was no need to file a prepetition or administrative claim regarding the property because CCM did not assert ownership to the property. *Id.* at 10-11.

In responding to CCM's argument that her claims relating to the Play Property were not discharged, Milner asserted that her claims arising post-confirmation were not covered by the discharge injunction because these claims arose from CCM's post-confirmation conduct after the entry of the final decree in, and the closing of, the bankruptcy case. *Id.* at 11-13. As the court determined, Milner's claims arose post-confirmation because CCM continued to comply with its contractual obligations to store Milner's property post-petition and post-confirmation. *Memorandum Decision*, ECF 2079 at 19 ("Further, any breach by Debtor occurred post-confirmation, so Milner could not have violated the discharge injunction by asserting her affirmative defenses in the State Court Action. At no time before the Plan was confirmed did Debtor breach the Settlement Agreement . . . .").

Milner finally argued that she and Light could not be held in contempt because under then existing Ninth Circuit law, they had a good faith belief that they **[*42]** did not violate the discharge injunction on grounds that the Settlement Agreement was not an executory contract that could be rejected in

CCM's bankruptcy case, she never lost ownership of the Play Property pursuant to the Settlement Agreement, and she was entitled to defend herself in CCM's post-petition state court action because CCM "returned to the fray" by instituting new litigation against her. *Objection to Contempt Motion*, ECF 2050 at 13-14.

In this responsive pleading to the Contempt Motion, Milner requested that the court "sanction CCM's attorney, on its own initiative," for filing the Contempt Motion, stating: "Because the [Contempt Motion] will be granted or denied within seven days pursuant to Local Rules, Ms. Milner and Mr. Light cannot give CCM the 21 days' notice to withdraw the Motion as otherwise required by Fed.R.Bankr.P. 9011(c)(1)(A)." *Id.* at 5.[12]

On June 14, 2018, CCM by Debtor's Counsel filed its reply to Milner's Objection to Contempt Motion, ECF 2053, and made three arguments in response to Milner's objection. First, CCM argued that Milner was barred from pursuing her personal property claims under the Settlement Agreement because she had filed and litigated other claims under the Settlement Agreement **[*43]** relating to her intellectual property rights in the bankruptcy case, and CCM had never agreed to her ownership of the Play Property, putting her on notice that CCM disputed her ownership and its obligation to store the Play Property, such that she should have filed a proof of claim in the bankruptcy case to avoid the bar from the discharge injunction, asserting: "The duties of storage and protection of the show specific equipment was a liability of the

---

[12] The court notes that contrary to this assertion on behalf of Milner, no local rule mandates that the court decide a Motion for Order to Show Cause re Contempt within seven days. Local Rule 9020-1(b) requires the moving party to serve its motion on the responding party "which shall have 7 [seven] days to object to the issuance of the order [to show cause why party should not be held in contempt]." Milner, by her counsel, complied with Local Rule 9020-1, filing the Objection to Contempt Motion, ECF 2050, only four days after Debtor's Counsel filed the Contempt Motion. Thus, the assertion by Milner's counsel that compliance with the Bankruptcy Rule 9011 "safe harbor" was rendered impracticable or impossible under the Local Rules was incorrect.

Debtor and it was subject to discharge *unless Milner timely objected." CCM Reply to Objection to Contempt Motion*, ECF 2053 at 5 (italics in original). Apparently CCM's reference to Milner having to timely object to discharge meant that Milner needed, but failed, to file a timely proof of claim to preserve her contractual claims under the Settlement Agreement. In any event, CCM did not provide any specific legal authority to support this argument, other than citing *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir. 2002) for the general proposition that disputing the discharge in post-petition litigation was contempt, and 11 U.S.C. § 502(b)(9), which provides that creditors of the estate have to file timely proofs of claim. *Id.* at 4-6. CCM in making this argument did not expressly refer to the doctrines of claim and issue **[*44]** preclusion (i.e., res judicata and collateral estoppel), but couched its argument in terms of the consequence of Milner's alleged failure to file a personal property claim in the bankruptcy case as a "waiver." This argument was simply a reiteration of CCM's waiver argument in the Contempt Motion, ECF 2043 at 21.

Second, in response to Milner's argument that she could not be held in contempt for having a subjective good faith belief that the discharge injunction did not apply to her, CCM argued that Milner was not entitled to this defense because she was actively involved in its bankruptcy case by pursuing her copyright infringement claims based on other parts of the Settlement Agreement, objecting to CCM's reorganization plan, and objecting to the sale of CCM's main assets in the bankruptcy case. CCM also argued that Milner "knowingly waived other claims, including this one." *CCM Reply to Objection to Contempt Motion*, ECF 2053 at 6-7. However, as indicated above, CCM's Contempt Motion and the Jacobson Declaration acknowledged that CCM was still performing the storage obligation under the Settlement Agreement after plan confirmation, and Milner would needed to have had a claim for breach **[*45]** of that obligation at the time of plan confirmation to "knowingly" waive such a claim.

She had no such claim for breach as to the Play Property before the Plan was confirmed. *Memorandum Decision*, ECF 2079 at 19.

Third, in response to Milner's argument that the Settlement Agreement was not an executory contract which could be rejected in the bankruptcy case, CCM argued that Milner had a duty under the contract to act in good faith and perform indemnity obligations, defense obligations, and obligations to protect CCM from infringement claims, thereby rendering the Settlement Agreement executory. *Id.* at 8-10. Citing Sections 1.2, 1.3 and 1.4 of the Settlement Agreement, CCM argued that the Settlement Agreement was executory because Milner had obligations to act in good faith when resolving whether to grant or reject permission for CCM to produce the Play or present any of its creative elements, or for CCM to use show related equipment, or for CCM to duplicate DVD and/or videotape audiovisual versions of the Play. *Id.* at 8-9. CCM cited *Carma Developers (California), Inc. v. Marathon Development California, Inc.* 2 Cal.4th 342, 372, 6 Cal. Rptr. 2d 467, 826 P.2d 710 (1992), and argued that a breach of the implied covenant of good faith and fair dealing is a material breach excusing a counterparty's performance under an agreement. *Id.* at 9. CCM explained: "As affirmed in **[*46]** the *Marathon* case, a breach of this good faith covenant 'would constitute a material breach and thus excuse the performance of the other.'" *Id.* CCM also argued that Milner had future indemnity and defense obligations owing to CCM, which purportedly made the contract executory in that Milner had agreed to indemnify and defend CCM with respect to any claims asserted by or on behalf of Jeff Atmajian, a music composer, for copyright infringement if he made such claims before CCM's reorganization plan was approved. *Id.*

CCM's reply was the first time that it articulated an argument that the Settlement Agreement was still an executory contract at the time that it filed its bankruptcy case and that it identified what Milner's purported unperformed material contractual obligations were. However, as the court determined

in its Memorandum Decision, CCM's executory contract argument was legally unfounded. *Memorandum Decision*, ECF 2079 at 11-18. As explained in the Memorandum Decision, the three distinct provisions of the Settlement Agreement in Sections 1.2, 1.3 and 1.4 requiring CCM to obtain Milner's consent before using, disposing of, or producing certain materials related to the Play, did not impose some ongoing **[\*47]** duty on Milner to act in good faith to perform an affirmative obligation, but rather were independent conditions imposed on CCM before it could take these certain actions. *Id.* at 13-14. Moreover, as further explained in the Memorandum Decision, Milner had substantially performed her material obligations under the Settlement Agreement as soon as it was executed by her releasing her claims against CCM arising out of their dispute regarding the staging of the play. *Id.* The Settlement Agreement gave Milner the sole discretion to withhold her consent and did not impose on her any ongoing contractual duty to perform because these provisions related to CCM's requirements to undertake certain acts, and if Milner had in the future withheld her consent, which had not been alleged, let alone proven, it would not have been a material breach of her affirmative obligation to perform under the contract so that CCM would be excused from its obligation to grant a reversion of rights in the play and to make royalty payments to her. *Id.*

Regarding the indemnity provision identified by CCM, as further explained in the Memorandum Decision, it was not material such that the contract was executory because Milner did not **[\*48]** agree to a general, ongoing duty to indemnify CCM for loss or damage, but rather set limitations on her right to use the music in the play. If Milner used any part of the music, she agreed to indemnify CCM regarding any claim asserted by the music composer, Atmajian, which claim was completely hypothetical based on the record. *Id.* at 15. Moreover, since CCM got Milner's substantial performance by her release of claims against it, any breach of this duty to indemnify it for a

hypothetical breach of the music composer's rights did not have the importance or seriousness to be material to terminate the contract. *Id.* at 15-16. Additionally, the non-disparagement provision in the Settlement Agreement was not a material obligation to show the agreement was executory because a breach would not deprive either party of the benefits reasonably expected under the contract. *Id.* at 16. CCM's arguments in its reply to Milner's objection to the Contempt Motion that the Settlement Agreement was an executory contract at the time of its bankruptcy case were simply unfounded.

On June 19, 2018, the court vacated the July 11, 2018 hearing, which CCM had improperly noticed for hearing on its Contempt Motion contrary to Local Bankruptcy **[\*49]** Rule 9020-1(d), which provides that no hearing be set on a contempt motion unless ordered by the court. *Order Vacating Hearing on Contempt Motion*, ECF 2054.

On June 21, 2018, having determined that the Contempt Motion should be treated as a contested matter, the court set it for a status conference for July 31, 2018, and required that a joint status report be filed on or before July 24, 2018. *Order Treating Contempt Motion as a Contested Matter*, ECF 2055. The court set the status conference because the court was not satisfied that CCM had established a prima facie case requiring Milner to show cause. Accordingly, the court treated the Contempt Motion as a contested matter and asked the parties whether there were disputed issues of fact requiring an evidentiary hearing.

On or about July 11, 2018, Milner, through her counsel, sent the Bankruptcy Rule 9011 Warning Letter: a letter by e-mail, "Re: Notice of Claim to Rule 9011 Sanctions," to Debtor's Counsel, requesting that Debtor's Counsel reconsider and withdraw the Contempt Motion, or otherwise, Milner would continue to defend the "frivolous claims" that he brought on behalf of CCM and file a formal motion for sanctions under Bankruptcy Rule 9011. *Letter from Movant's Counsel to*

*Debtor's Counsel, [\*50] dated July 11, 2018, Exhibit 1 to Movant's Counsel Declaration attached to Sanctions Motion*, ECF 2100 at 19 and 2100-1 at 1-5 (citing *inter alia, In re Ybarra*, 424 F.3d 1018, 1027 (9th Cir. 2005) and *In re Taggart*, 888 F.3d 438 (9th Cir. 2018)). In this warning letter, Movant's Counsel stated that the purpose of the letter was to put Debtor's Counsel on notice that the claims in the Contempt Motion were not supported by the law and had clearly been asserted to harass Milner. Movant's Counsel asserted that Debtor's Counsel was misstating the law regarding the plan confirmation order, misunderstanding the concept of the closing of CCM's bankruptcy case and misidentifying the Settlement Agreement as an executory contract. ECF 2100-1 at 1-5.

In support of Milner's demand for withdrawal of the Contempt Motion, her counsel's Bankruptcy Rule 9011 Warning Letter set forth seven arguments: (1) the Settlement Agreement was not executory for the reasons stated in Milner's objection responding to the Contempt Motion; (2) the Settlement Agreement was never identified as an executory contract in CCM's bankruptcy schedules or amended schedules, and CCM's motion to reject executory contracts did not list the Settlement Agreement as a contract to be rejected; (3) case law demonstrated that where a debtor never [\*51] identifies a contract on its bankruptcy schedules or plan as executory and never seeks to reject it, using boilerplate language in a debtor's reorganization plan is insufficient to put creditors on notice of the executory nature of the contract so as to require a creditor to file a proof of claim, citing *In re Parkwood Realty Corp.*, 157 B.R. 687 (Bankr. W.D. Wash. 1993) and *In re Continental Country Club, Inc.*, 114 B.R. 763 (Bankr. M.D. Fla. 1990); (4) contrary to Debtor's Counsel's claims, the effective date of the plan is the appropriate date for determining whether a breach of contract occurs post-confirmation, and therefore, whether a claim of breach can be asserted against the reorganized debtor without violating the discharge injunction, because 11 U.S.C. § 1141 sets forth the effects of plan confirmation, not the subsequent order closing

the case, and 11 U.S.C. §1141(b) provides that "the confirmation of a plan vests all of the property of the estate in the debtor"; (5) Debtor's Counsel's submission of a June 25, 2012 letter from CCM's prior counsel to Milner's prior counsel as purported evidence of abandonment of her property without including Milner's responsive letter of June 27, 2012 was improper; (6) the discharge injunction does not apply to prevent a creditor from defending itself post-petition where debtor continues or initiates the litigation [\*52] of prepetition claims and "returned to the fray," citing *In re Ybarra*, 424 F.3d 1018, 1027 (9th Cir. 2005); and, (7) the Ninth Circuit held in *In re Taggart*, 888 F.3d 438 (9th Cir. 2018) that based on debtor's "return to the fray" and continuance of litigation post-petition, the creditors acted in good faith and could not be held in contempt for seeking an award of post-petition attorneys' fees, even if the discharge injunction was found to apply. *Letter from Movant's Counsel to Debtor's Counsel, dated July 11, 2018, Exhibit 1 to Movant's Counsel Declaration attached to Sanctions Motion*, ECF 2100-1 at 3-4.

On July 20, 2018, the parties filed a Joint Status Report in compliance with the court's prior order. *Joint Status Report*, ECF 2059. In the joint status report, CCM, represented by Debtor's Counsel, requested authorization to take depositions of Milner and her former counsel regarding her subjective good faith belief that she did not act in violation of the discharge injunction in answering the State Court Complaint based on correspondence between her and CCM's counsel in 2012 relating to CCM's demand that she remove the Play Property from its facilities, which request Milner opposed because such correspondence related to matters occurring after entry of the plan confirmation [\*53] order in 2011. ECF 2059 at 5-7 and 45-46.

On July 31, 2018, the court held a status conference on the Contempt Motion. At the status conference, CCM, by Debtor's Counsel, raised new arguments that the Settlement Agreement may not be an enforceable contract because factual disputes existed as to whether an inventory of the subject

property was ever done, whether the property was actually transferred to Milner, whether there was ever a meeting of the minds sufficient to render the agreement enforceable, and whether a bill of sale evidenced any purported transfer of the property. *Audio Recording, July 31, 2018 Status Conference* at 2:00-2:42 p.m. As a result of CCM's new arguments, the court stated that it was inclined to set an evidentiary hearing. The court first indicated that it would schedule the evidentiary hearing only to resolve the executory contract issue, which determination, the court noted, might be dispositive of the entire dispute. *Id.* at 2:33-2:35 p.m. ("What has to be determined is whether the contract is executory or not.") (statements of the court). CCM by Debtor's Counsel argued that it would be "most efficient" if both questions: (i) whether the subject property was **[\*54]** transferred to Milner, and (ii) whether the Settlement Agreement was executory, be litigated at the evidentiary hearing. *Id.* at 2:35-2:37 p.m. ("I would like to do them both [the transfer of ownership issue and the executory contract issue]. What I would suggest is that we present this in one hearing. It would be most efficient.") (statements of Debtor's Counsel).

On September 7, 2018, Milner filed trial declarations of her three witnesses for the September 20, 2018 evidentiary hearing. *Declarations of Carol Milner, Carl Grumer, and Harold Light in Connection with the Sept. 20, 2018 Evidentiary Hearing*, ECF 2066. CCM by Debtor's Counsel filed one declaration on its behalf, the declaration of Gwyn Myers, ECF 2068, which was refiled with a wet signature on September 19, 2018, ECF 2075. On September 10, 2018, CCM by Debtor's Counsel filed objections to the declarations of Milner's witnesses. ECF 2070. On September 13, 2018, Milner filed objections to the declaration of Gwyn Myers, a reply to Debtor's Counsel's evidentiary objections, along with a trial brief (the "Milner Trial Brief"). *Evidentiary Objections to Myers Declaration*, ECF 2072; *Reply to Objections to Declarations of Carl Grumer [\*55] and Harold Light*, ECF 2073; *Milner Trial Brief*, ECF 2074.

On September 13, 2018, CCM by Debtor's Counsel filed a trial brief entitled Reorganized Debtor's Brief in Support of Finding that the July 8, 2006 Document [sic] Did Not Transfer Ownership of Carol Milner of the Debtor's Property and Is An Executory Contract for Purposes of Bankruptcy Code § 365(g) ("CCM Trial Brief"), ECF 2071. In its trial brief, CCM made three arguments. First, CCM argued that the Settlement Agreement did not legally transfer ownership of the Play Property to Milner; second, the Settlement Agreement was not a valid contract for lack of consideration; and third, if the court did not agree with its argument that the Settlement Agreement did not transfer ownership, the Settlement Agreement was an executory contract. *CCM Trial Brief*, ECF 2071 at 1.

In support of the first argument in its trial brief, CCM asserted that Milner and Light were in contempt of the discharge injunction because Milner could not insist on ownership of the Play Property while demanding that CCM store the Play Property based on the Settlement Agreement where there was no specific list of items that were legally transferred to Milner in Schedule 1 to the Settlement **[\*56]** Agreement, nor was there an accompanying bill of sale for the transferred property, citing, *Hull v. Ray*, 80 Cal.App. 284, 289-290, 251 P. 810 (1926), and there were three different versions of the Settlement Agreement in the record, thereby indicating "uncertainty" that there was sufficient mutual intent to transfer all of the property from CCM to Milner. *CCM Trial Brief*, ECF 2071 at 2-7. According to CCM, the list of transferred property on Schedule 1 to the Settlement Agreement referred to a list of certain categories of "show specific" property, but included that the "list [ ] is not all-inclusive" and also refers to a "binder of information," which CCM asserted was to be created in the future,[13] and thus, the

---

[13] As stated in the CCM Reply to Milner's Objection to the Contempt Motion, ECF 2053 at 2, "The contract states Milner participated in creating this list [see section 1.4] and Milner agreed to the following: 'Distribution of Creation Assets: The following list in [sic] not all inclusive, as that would require a binder of information, rather *it*

language in Schedule 1 to the Settlement Agreement was insufficient to meet the standard of a valid bill of sale contract. *Id.* at 3. CCM did not cite any legal authority for this assertion that the list of transferred property in Schedule 1 to the Settlement Agreement did not meet "the standard of a valid bill of sale contract," *id.*, and it was not clear what that standard was from its brief. Moreover, this argument was inconsistent with CCM's litigation positions taken in the State Court Complaint and the Contempt Motion, which the court **[*57]** determined were judicial admissions, that CCM and Milner executed and had a contractual agreement settling their disputes, the Settlement Agreement, that Milner owned the Play Property transferred to her under the Settlement Agreement, and that CCM was storing Milner's property at its expense under the Settlement Agreement. In any event, the court rejected this argument because a bill of sale is not required under California statutory law to transfer property, and the Settlement Agreement as a contract was specific and definite enough to provide for the transfer of ownership of the "show specific" property, with specifically enumerated categories of property, to Milner. *Memorandum Decision*, ECF 2079 at 21-22 (citing California Civil Code, §§1000 and 1039). CCM's argument that the terms of the Settlement Agreement were too uncertain to be a binding contract transferring the property to Milner because three versions of the Settlement Agreement were in the record before the court lacked merit. The different copies of the Settlement Agreement were not materially different as to the transfer of the property to Milner. Moreover, this new argument of CCM contradicted the judicial admissions made in its affirmative allegations **[*58]** in the State Court Complaint, which factual allegations served as the basis of the Contempt Motion. Those allegations principally were that CCM and Milner executed the Settlement Agreement, and CCM stored the various physical properties belonging to Milner as set forth in the Settlement Agreement.

The plain language of the Settlement Agreement in Section 1.3 and Schedule 1 indicated a clear intent to transfer property as between CCM and Milner. Section 1.3 states:

> In connection with production of the Play on the Ministries campus in 2005 the Ministries [i.e., CCM] commissioned and caused to be created various physical properties more particularly described on Schedule 1 attached hereto and by this reference and made a part hereof. Such exhibit was prepared jointly by CSM [i.e., Carol Schuller Milner] and an authorized representative of the Ministries and provides for the disposition of such physical properties and the respective party's right to use and to possess any of such materials are as set out on Schedule 1, which shall be binding on the parties unless they shall hereafter specifically agree in writing to an alteration set forth on Schedule 1.

*Settlement Agreement, Exhibit 1 to Russell Jacobson [*59] Declaration attached to Contempt Motion*, ECF 2043 at 28. Schedule 1 bore the heading "DISTRIBUTION OF CREATION ASSETS" and stated:

> The following list is not all-inclusive, as that would require a binder of information; rather it serves as examples of what would be show specific (to go to CSM) and non-show specific (to go to CCM) inventoried goods. Some items fall in a gray area and were distributed below based on practicality for both parties. What CCM keeps needs to be transferred from their 'Glory of Creation' books to the CCM's capital expenses or other departmental expenses and needs to be adjusted throughout all CCM documentation regarding Creation. CCM will keep all goods in same condition as they were in at the end of the '05 season. CCM will not use goods without prior, written approval of CCM.

serves as examples of what would be show specific (to go to CSM) and not show specific (to go to CCM) inventoried goods. Some of the items fall in a gray area and were distributed below based on practicality for both parties.'" *Id.* (emphasis added).

*Id.* at 33. Schedule 1 then listed categories of personal property distributed between Milner and CCM. *Id.* CCM in the Contempt Motion represented that Exhibit 1 to the declaration of Russell Jacobson was the duly executed Settlement Agreement, which was signed and initialed by its board members, including Gwyn Myers. ECF 2043 at 5 and 27-33. This plain language of the Settlement Agreement set forth **[\*60]** a clear intent to "distribute" or transfer the personal property described and listed in Schedule 1 as between CCM and Milner.

CCM's second argument in its trial brief was that Milner had no ownership rights in the Play Property because the Settlement Agreement was not a valid contract for lack of consideration. CCM argued that the contract was unconscionable in compensating Milner five years of future salary and royalties, in addition to transferring the Play Property, costing $9 million, for a failed play that was purportedly a $13 million loss for CCM. *CCM Trial Brief*, ECF 2071 at 7. This argument is also inconsistent with CCM's judicial admissions in the State Court Complaint and in the Contempt Motion that CCM and Milner executed and had a contractual agreement settling their disputes, and the agreement was an executory contract that could have been rejected in its bankruptcy case.

CCM's third argument in its trial brief was that the Settlement Agreement was an executory contract that was rejected upon confirmation of the Plan and that Milner waived any claims to the subject property by not filing a claim regarding the property in the bankruptcy case. *Id.* at 8-9. While CCM made this argument **[\*61]** previously in its reply to Milner's objection to the Contempt Motion, its theories explaining what made the Settlement Agreement an executory contract were new; that is, CCM asserted that the Settlement Agreement was executory because: (1) Milner had not performed her part of the agreement to resolve the "gray area" referred to in Schedule 1 to the Settlement Agreement, which states that "[s]ome of the items fall in a gray area and were distributed below based

on practicality for both parties," ECF 2043 at 33; and (2) CCM had an unperformed obligation to comply with paragraph 5.2 of the Settlement Agreement to create and fund a trust instrument in a form satisfactory to Milner and her attorneys to pay the settlement amounts to Milner pursuant to the Settlement Agreement. *CCM Trial Brief*, ECF 2071 at 8-11. CCM's first claim, that the Settlement Agreement was executory based on Milner's failure to resolve the "gray area" referred to in Schedule 1, is baseless because the plain language of Schedule 1 indicates that while arguably there was a "gray area" between show specific and non-show specific property, the distribution of the subject property, whether show specific, non-show specific, **[\*62]** or somewhere in the "gray area," was being made as set forth on the list of property in Schedule 1. Thus, there was no failure of Milner to perform by not separately resolving the "gray area" property because the purpose of Schedule 1 was exactly that. CCM's second claim that the Settlement Agreement was executory based on CCM's unperformed obligation to create and fund a trust instrument to pay Milner under the Settlement Agreement does not make the agreement executory because this obligation does not demonstrate that Milner has unperformed obligations. An executory contract has unperformed material obligations on both sides of the contract. *In re Robert L. Helms Construction & Development Co.*, 139 F.3d at 705 and n. 7. Moreover, this second claim of CCM was based on the declaration of Gwyn Myers and her assertion that CCM did not approve such a trust instrument, ECF 2071 at 10. This claim is meritless because the trust instrument was created and authorized on behalf of CCM by its representatives, Robert Schuller, Arvella Schuller and Myers herself as the non-insider executive committee member. *Settlement Agreement, Trial Exhibit 7*, ECF 2066-1 at 28-44. Further, the funding of the trust was immaterial because CCM made all of the settlement payments **[\*63]** to Milner without funding the trust. *Milner Trial Testimony, Evidentiary Hearing Transcript, September 20, 2018*, ECF 2095 at 98-99, 253-254. CCM's new alternative theories

addressing why the Settlement Agreement was executory were not formulated when CCM filed the Contempt Motion. If they had been, they would have been asserted with the other purported reasons that the contract was executory stated in CCM's reply to Milner's objection to the Contempt Motion, the initial response to Milner's opposing arguments. Thus, the court infers under the circumstances that the new arguments were devised much later in the litigation process, in fact, right before trial.

On September 20, 2018, the court conducted an evidentiary hearing on the Contempt Motion. *Evidentiary Hearing Transcript, September 20, 2018*, ECF 2095. During the evidentiary hearing, Debtor's Counsel on behalf of CCM cross-examined Milner, the only witness who testified live, and both parties set forth more fully the arguments discussed above. During the evidentiary hearing, Debtor's Counsel reiterated his arguments that the Settlement Agreement was not an enforceable contract, and Milner's claims were precluded by collateral estoppel. **[\*64]** *See e.g.*, ECF 2095 at 19 (arguing claim preclusion and no meeting of the minds); *id.* at 85 (arguing no transfer of property); *id.* at 98-100 (cross-examining Milner regarding section 5.2 of the Settlement Agreement and a trust never being funded); *id.* at 205-206 (arguing there was no inventory of the property); *id.* at 283-291 (arguing that a Ninth Circuit authority exists supporting the proposition that Milner had an unperformed material duty to inspect the property, thereby showing that the Settlement Agreement was executory). With leave of court, the parties made their closing arguments on the Contempt Motion in the form of post-trial briefing. *See CCM Post-Trial Brief*, ECF 2077, filed on October 1, 2018, and *Milner Post-Trial Brief*, ECF 2078, filed on October 10, 2018.

On October 1, 2018, CCM by Debtor's Counsel filed its post-trial brief entitled Reorganized Debtor's Closing Brief (the "CCM Post-Trial Brief"), ECF 2077. In its Post-Trial Brief, CCM made two arguments. First, CCM argued that the plan confirmation order barred Milner's claims

against CCM pursuant to the doctrine of claim preclusion, which purportedly barred her breach of contract claims because they were "further claims arising out of the disputed, pre-petition July 8, 2006 **[\*65]** agreement," and Milner had litigated other contract claims arising out of the Settlement Agreement (relating to her intellectual property rights) during the bankruptcy. *CCM Post-Trial Brief*, ECF 2077 at 1. According to CCM, Milner's current contract claims involved the same cause of action that she filed and litigated during the bankruptcy case, that is, as argued by CCM,

> this Court should deem all claims arising from the alleged July 8, 2006 documents consumed by the Court's final order rejecting Milner's contract claims. [Doc. 1411, December 4, 2012 order]. It is well established that a judgment in an action for a breach of contract bars a subsequent action for additional relief based on the same breach. *Holmes v. David H. Bricker, Inc.* (1969) 70 Cal.2d 786, 76 Cal. Rptr. 431, 452 P.2d 647. There were sufficient disputes at the time of the petition to compel Milner to file a separate claim [for breach of CCM's storage obligations]. The claims bar date and final order [in the bankruptcy case] prevent Milner from now pursuing any new claims related to the July 8, 2006 disputed agreement.

*Id.* at 5.

Second, CCM argued that if the court was to assume that the Settlement Agreement was a valid contract, the contract was a "gratuitous bailment contract" for CCM to store goods for no **[\*66]** consideration, which was executory because "[b]ased on the history of uncertainties and disputes over the contract terms, Milner had a duty to take reasonable steps as an owner to make sure that CCM was preserving the property to keep it show ready" and "[h]er duty to inspect, at lease [sic] annually, makes the subject storage provision executory." *CCM Post-Trial Brief*, ECF 2077 at 6-7. However, CCM cited no legal authority to support its argument that Milner had a duty to

inspect her property in storage with CCM.

On October 10, 2018, Milner filed her post-trial brief, ECF 2078 ("Milner Post-Trial Brief"). First, Milner reminded the court and the parties that Debtor's Counsel had requested that he be allowed to file an additional exhibit, which he could not locate at trial, and include a citation to a Ninth Circuit case in his post-trial brief, which he claimed established an implied duty by Milner to inspect or timely retrieve the subject property. *September 20, 2018, Evidentiary Hearing Transcript*, ECF 2095 at 290-291; *see also CCM Post-Trial Brief*, ECF 2077 at 5-7 (arguing that Milner had a duty to inspect, which made the Settlement Agreement an executory contract). Debtor's Counsel **[*67]** argued on behalf of CCM at trial that such a purported duty was impliedly a part of the Settlement Agreement and resulted in the Settlement Agreement being deemed an executory contract that was rejected upon confirmation of the Plan. Milner pointed out that Debtor's Counsel, however, failed to cite any authority—Ninth Circuit or other—supporting the proposition in the CCM Post-Trial Brief that an implied duty to inspect or retrieve one's property exists when such property is being stored by another. *Milner Post-Trial Brief*, ECF 2078 at 5.

Milner argued that: (i) the Settlement Agreement was enforceable and not a rejected executory contract because the evidence showed that Milner had no unperformed obligations, and there was no legal authority to support CCM's argument that she had a duty to inspect her property in storage; (ii) the plan confirmation order was not res judicata because the evidence showed that CCM's breach of the storage obligations occurred post-confirmation and not before or during CCM's bankruptcy case, or before confirmation of the Plan; (iii) Milner was the owner of the subject property as shown by CCM's judicial admissions in its prior pleadings, notably, the State **[*68]** Court Complaint; (iv) claims against CCM concerning the Settlement Agreement could be brought and decided in state court; and, (v) Milner and Light could not be held in contempt of the discharge injunction based on her filings in

the state court proceeding because the Settlement Agreement was not executory and the property belonged to Milner. *Milner Post-Trial Brief*, ECF 2078 at 6-12.

Milner argued that Debtor's Counsel's reliance on allegations asserted by the bankruptcy plan administrator in her objection to Milner's intellectual property claim as support for Debtor's Counsel's claim preclusion argument was evidence of bad faith. *Id.* at 7. Milner also argued that any "suggestion that there was any breach of CCM's storage obligation before and/or during the bankruptcy is not supported by the evidence." *Id.* at 8. Further, Milner argued that Debtor's Counsel's argument that the subject property was never transferred to Milner demonstrated bad faith because CCM's State Court Complaint "repeatedly refer[red] to the [subject property] as Ms. Milner's property." *Id.* at 11 (citing *State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice*, ECF 2044 at ¶¶ 18, 20, 21, 23).

In its Memorandum Decision, filed **[*69]** and entered on November 2, 2018, the court held that CCM failed to prove by clear and convincing evidence that Milner and her counsel knowingly and willfully violated the discharge injunction. *Memorandum Decision*, ECF 2079 at 10. The court held that the Settlement Agreement was not an executory contract, *id.* at 17; the Plan Confirmation Order had no res judicata effect on Milner's right to enforce the Settlement Agreement, *id.* at 21; and additional arguments in CCM's trial brief were without merit, *id.* at 21-22. Specifically, the court rejected "the notion advanced by Debtor that *any* violation of the implied covenant of good faith and fair dealing necessarily constitutes a material breach." *Id.* at 13. The court further commented that it was unable to find the language that CCM quoted as purportedly from the opinion in *Carma Developers (California), Inc. v. Marathon Development California, Inc.*, 2 Cal.4th 342, 372, 6 Cal. Rptr. 2d 467, 826 P.2d 710 (1992), and the proposition attributed to the purported quote was "in direct conflict" with California law. *Id.* at 13-

14. The court also determined that the three provisions of the Settlement Agreement that CCM contended established an ongoing duty of good faith upon Milner, thereby rendering the contract executory, imposed conditions upon CCM—not Milner—and that "Milner substantially performed her obligations under **[\*70]** the Settlement Agreement as soon as it was executed[.]" *Id.* at 14. The court further rejected CCM's arguments that Milner's indemnification or non-disparagement obligations could give rise to material breaches to show that the Settlement Agreement was executory. *Id.* at 15-16.

In the Memorandum Decision, the court also discussed CCM's argument, which Debtor's Counsel raised at the evidentiary hearing on the Contempt Motion and in the *CCM Post-Trial Brief*, ECF 2077 at 5-7, that Milner "had some ongoing duty under state law to periodically inspect" the subject property, and that this duty gave rise to a material obligation that rendered the Settlement Agreement executory. *Memorandum Decision*, ECF 2079 at 16-17; *see also, September 20, 2018, Evidentiary Hearing Transcript*, ECF 2095 at 290-291. After proposing this theory at the evidentiary hearing with no supporting case law, the court directed CCM and Debtor's Counsel to include the argument and authority in CCM's post-trial brief, which they failed to do. Ultimately, CCM and Debtor's Counsel cited no legal authority for the proposition, and the court determined that there is no such legal authority.

The court also rejected CCM's alternative argument that, **[\*71]** even if the Settlement Agreement was not an executory contract that was rejected in its bankruptcy case, Milner was barred by the Plan Confirmation Order from continuing to pursue claims arising from the Settlement Agreement, because either CCM breached the Settlement Agreement preconfirmation—it did not—or Milner waived her claims when she litigated unrelated claims under the Settlement Agreement during the bankruptcy case. *Memorandum Decision*, ECF 2079 at 19-20. Debtor's Counsel, in connection

with the Motion for Sanctions, later argued in his Brief in Opposition to Milner's Supplemental Memorandum, ECF 2133, that his waiver and claim preclusion arguments were not ruled upon, but this is demonstrably false. The court in its Memorandum Decision specifically ruled upon CCM's claim preclusion (or res judicata) argument, stating:

> Here, the proofs of claim filed by Milner in this case had nothing to do with storage of the Play Property. [. . .] At no time before the Plan was confirmed did Debtor breach the Settlement Agreement or notify Milner that it would no longer store the Play Property. [. . .] Debtor presented no evidence that it refused to perform under the Settlement Agreement **[\*72]** or that it engaged in conduct that made it impossible to perform its obligations under the Settlement Agreement before entry of the Plan Confirmation Order, which would give rise to a claim for preconfirmation breach by Milner.

*Memorandum Decision*, ECF 2079 at 19-20. The court also found entirely meritless Debtor's additional arguments that Milner could not have obtained ownership of the subject property because the Settlement Agreement was not accompanied by a bill of sale, or that there was no meeting of the minds as to the Settlement Agreement so it was never enforceable, because, among other reasons, the judicial admissions made by CCM in its State Court Complaint and Contempt Motion that CCM and Milner entered into the contract referred hereto as the Settlement Agreement, and the undisputed evidence showed that the parties had performed under the contract. *Id.* at 21-22.

After the court filed and entered its Memorandum Decision, ECF 2079, and Order Denying Debtor's Motion for Issuance of Order Directing Carol Milner and Harold J. Light, Esq. to Show Cause Why They Should Not Be Held In Contempt, ECF 2080, CCM filed a notice of appeal with the Ninth Circuit Bankruptcy Appellate Panel, ECF 2084, **[\*73]** which it later voluntarily dismissed on

April 15, 2019, ECF 2098.

On July 2, 2019, Milner filed this Sanctions Motion requesting imposition of sanctions against Debtor's Counsel and CCM pursuant to Bankruptcy Rule 9011 and the court's inherent authority.

## III. ANALYSIS

Having considered all the briefing and evidence put forth by the parties, the court grants the motion in part and denies it in part. Specifically, the court grants the motion as to Debtor's Counsel because he acted recklessly, asserted frivolous legal arguments, and brought the Contempt Motion for the improper purpose of coercing Milner into signing a release of any purported claims she might have under the Settlement Agreement, which conduct is tantamount to bad faith and is sanctionable under the court's inherent authority. The court denies the motion as to CCM because the record does not demonstrate either by clear and convincing evidence or by a preponderance of the evidence that it engaged in conduct tantamount to bad faith since it relied on legal counsel to represent its interests in its dispute with Milner from its inception, and there is insufficient evidence in the record showing that it directed the frivolous litigation strategy **[*74]** undertaken by Debtor's Counsel or otherwise committed a fraud upon the court.

## A. <u>Bankruptcy Rule 9011</u>

Under Bankruptcy Rule 9011, bankruptcy courts have the authority to sanction parties, attorneys, and law firms who present papers to the court that are either frivolous or presented for an improper purpose.[14]  "In determining if sanctions are

---

[14] Bankruptcy Rule 9011 provides, in relevant part:

(b) Representations to the Court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the

warranted under [Bankruptcy] Rule 9011, the bankruptcy court must consider both frivolousness and improper purpose 'on a sliding scale, where the more compelling the showing as to one element, the less decisive need be the showing as to the other.'" *Winterton v. Humitech of Northern California, LLC (In re Blue Pine Group, Inc.)*, 457 B.R. 64, 75 (9th Cir. BAP 2011) (vacated in part for other reasons by *In re Blue Pine Group*, 526 Fed. Appx. 768 (9th Cir. 2013)) (internal citation omitted). When evaluating liability under Bankruptcy Rule 9011, courts must examine the matter under an objective standard of reasonableness measured by the actions of "a competent attorney admitted to practice before the involved court." *Id.*

An award of sanctions for a violation of Bankruptcy Rule 9011 is "an exceptionally serious matter, and is reserved for those rare situations in which a claim or defense is asserted without any evidentiary support or legal basis, or for improper purposes, such as to harass or delay an opponent, or cause undue expense." *Board of Trustees v. Quinones (In re Quinones)*, 543 B.R. 638, 646 (Bankr. N.D. Cal. 2015) (citing *inter alia Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)). A party seeking sanctions therefore must strictly comply with all of Bankruptcy Rule 9011's procedural requirements for an award. *Radcliffe v. Rainbow Construction Co.*, 254 F.3d 772, 789 (9th Cir.

---

person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented **[*75]** for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; . . ..

Federal Rule of Bankruptcy Procedure 9011(b).

2001); *Barber v. Miller*, 146 F.3d 707, 710-711 (9th Cir. 1998).

The language of Bankruptcy Rule 9011 mirrors that of Civil Rule 11, so courts analyzing sanctions under Bankruptcy Rule 9011 commonly rely on cases interpreting Civil Rule 11. *Miller v. Cardinale (In re DeVille)*, 361 F.3d 539, 550 and n. 5 (9th Cir. 2004) (citation omitted). Further, when Bankruptcy Rule 9011 was adopted in its present form in 1997, the **[\*76]** drafters of the amended bankruptcy rules referred readers to the notes accompanying the 1993 amendments of Civil Rule 11 for guidance. *Id.* at 552 and n. 8. When interpreting Bankruptcy Rule 9011, the Ninth Circuit continues "to adhere to the practice that precedents interpreting [Civil] Rule 11 may prove a helpful guide" and "look[s] to the Advisory Committee Notes to the 1993 Amendments to Rule 11" to inform judgments about the procedures required in imposing sanctions under Bankruptcy Rule 9011. *Id.* at 552.[15]

In *Barber v. Miller*, 146 F.3d 707 (9th Cir. 1998), the Ninth Circuit discussed sanctions under Civil Rule 11, analyzing the 1993 amendments of Civil Rule 11 and the accompanying Advisory Committee Notes. *Barber v. Miller*, 146 F.3d at 710-711. In *Barber v. Miller*, Imageware, the party seeking sanctions, had warned the offending party, Carlsen, in two separate letters that his claims were baseless, putting him on notice that it would seek Civil Rule 11 sanctions if the purportedly frivolous complaint was not withdrawn. 146 F.3d at 709. Imageware later filed a motion to dismiss, and the court granted the motion with prejudice. *Id.* Around two months after the dismissal, "Imageware

informed Carlsen by letter that it would seek sanctions." *Id.* One month later (and three months after the dismissal), Imageware "both moved for sanctions and served Carlsen with the motion." *Id.* The district court awarded Imageware sanctions against **[\*77]** Carlsen. *Id.* The Ninth Circuit reversed the judgment awarding sanctions, holding that compliance with the "safe harbor" under Civil Rule 11 is binary: (i) the "safe harbor" expressly requires service of a motion in compliance with Civil Rule 11(c)(2),[16] and (ii) the "safe harbor" implicitly requires that service of the motion occur before the court has decided the merits of the underlying dispute. *Id.* at 710-711; *see also Islamic Shura Council of Southern California v. F.B.I.*, 757 F.3d 870, 872-873 (9th Cir. 2014).

As discussed below, the court finds that Milner has not satisfied either procedural requirement of the "safe harbor" under Bankruptcy Rule 9011. Milner did not serve a "motion" in compliance with Bankruptcy Rule 9011, nor did she serve such a motion before the court decided the merits of the underlying dispute, here, CCM's Contempt Motion. The court therefore denies the Sanctions Motion to the extent Milner sought sanctions pursuant to Bankruptcy Rule 9011.

**i. Milner's Failure to Serve the Sanctions Motion on CCM and Debtor's Counsel as Required by the Bankruptcy Rule 9011(c)(1)(A) "Safe Harbor" Warrants Denial of Relief under That Rule**.

Bankruptcy Rule 9011(c)(1)(A)[17] requires that

---

[15] The current wording of Federal Rule of Bankruptcy Procedure 9011(c) dates from 1997, and the essentially identical language in Federal Rule of Civil Procedure 11(c) dates from 1993. The Advisory Committee Notes on the 1997 Amendments to Rule 9011 state: "For an explanation of these amendments, see the advisory committee note to the 1993 amendments to Fed. R. Civ. P. 11." Fed. R. Bankr. P. 9011; Advisory Committee Notes, 1997 Amendment (accessed on March 8, 2020, and available at https://uscode.house.gov/view.xhtml?path=/prelim@title11/title11a/node2&edition=prelim) .

---

[16] The bankruptcy equivalent of Federal Rule of Civil Procedure 11(c)(2) is Federal Rule of Bankruptcy Procedure 9011(c)(1)(A).

[17] Federal Rule of Bankruptcy Procedure 9011(c)(1)(A) provides:

A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as provided in Rule 7004. The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention,

before a motion for sanctions is filed with the court, the motion must have been served on the party whose conduct is alleged to violate the rule, and the alleged violating party must be allowed at least twenty-one days to correct or withdraw [**78**] the offending pleading, allegation, or denial (the "safe harbor"). Fed. R. Bankr. P. 9011(c)(1)(A). To comply with Bankruptcy Rule 9011, a moving party therefore must serve its sanctions motion "on the plaintiffs with a demand for retraction of the allegedly offending allegations," and then allow the plaintiffs at least twenty-one days to retract the pleading before filing the motion with the court. *Radcliffe v. Rainbow Construction Co.*, 254 F.3d at 788-789.

In *Barber v. Miller*, the Ninth Circuit held that the procedural requirements of the safe harbor in Bankruptcy Rule 9011 are mandatory. 146 F.3d at 710-711. The Ninth Circuit has emphasized that the Civil Rule 11 Advisory Committee Notes make "abundantly clear" that the revised Bankruptcy Rule 9011(c)(1)(A), like Civil Rule 11(c)(1)(A), establishes a safe harbor in that "a party will not be subject to sanctions on the basis of another party's motion unless, after receiving the motion, it refused to withdraw that position or to acknowledge candidly that it does not currently have evidence to support a specified allegation." *Barber v. Miller*, 146 F.3d at 710 (citing Advisory Committee Notes, 1993 Amendment). The purpose of the safe harbor "is to give the offending party the opportunity, within 21 days after service of the motion for sanctions, to withdraw the offending pleading *and thereby escape sanctions*." *Barber v. Miller*, 146 F.3d at 710. The safe harbor was adopted to, among other reasons, encourage the withdrawal of papers that violate Bankruptcy Rule 9011 without

involving the court, thereby avoiding sanction proceedings whenever possible and streamlining the litigation process. *See* 5A Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1337.2 (4th ed., online ed., August 2019 update); *see also Truesdell v. Southern California Permanente Medical Group*, 293 F.3d 1146, 1151 (9th Cir. 2002) (safe harbor is meant to give [**80**] an opportunity to remedy any alleged misconduct); *Ellis v. Devig*, No. 3:08-cv-19, 2008 U.S. Dist. LEXIS 29893, 2008 WL 1735389 at *1 (D. N.D. 2008) (purpose of safe harbor is to encourage withdrawal).

In *Radcliffe v. Rainbow Construction Co.*, the Ninth Circuit discussed its holding in *Barber* and the exacting procedures that Bankruptcy Rule 9011 requires:

> In *Barber*, we held that the procedural requirements of Rule 11(c)(1)(A)'s 'safe harbor' are mandatory. [146 F.3d] at 710-11. Thus, in *Barber*, we concluded that, although a defendant had given informal warnings to the plaintiffs threatening to seek Rule 11 sanctions, these warnings did not satisfy the strict requirement that a motion be *served* on the opposing party twenty-one days prior to filing. *Id.* at 710. It is the service of the motion that gives notice to a party and its attorneys that they must retract or risk sanctions. In light of our holding in *Barber*, the fact that the plaintiffs had advance warning that Rainbow objected to their conspiracy allegation did not cure Rainbow's failure to comply with the strict procedural requirement of Rule 11(c)(1)(A). The district court abused its discretion when it concluded otherwise.

*Radcliffe v. Rainbow Construction Co.*, 254 F.3d at 789.[18] Thus, as noted by the Ninth Circuit

---

allegation, or denial is not withdrawn or appropriately corrected, except that this limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b). If warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held jointly responsible for violations [**79**] committed by its partners, associates, and employees.

[18] *See also Ellis v. Devig*, No. 3:08-cv-19, 2008 U.S. Dist. LEXIS 29893, 2008 WL 1735389 at *1 (D.N.D. 2008) ("The language of Rule 11, along with the Advisory Committee Notes, clearly sets forth the procedure which parties must follow when they believe sanctions may be appropriate. First, the other party should be informally

Bankruptcy Appellate Panel, "The Ninth Circuit strictly enforces the safe harbor provision." *Philips v. Gilman (In re Gilman)*, 2019 Bankr. LEXIS 2097, 2019 WL 3096872, at *14 (9th Cir. BAP 2019) (citing **[\*81]** *Islamic Shura Council of Southern California v. F.B.I.*, 757 F.3d 870, 872 (9th Cir. 2014)).

Because Milner did not comply with the "safe harbor" procedures of Bankruptcy Rule 9011(c)(1)(A) the court determines that neither Debtor's Counsel nor CCM may be properly sanctioned under Bankruptcy Rule 9011. The court also finds that CCM and Debtor's Counsel did not and could not have waived any defenses related to the safe harbor under Bankruptcy Rule 9011(c)(1)(A) based on paragraph four of the parties' stipulation to continue the hearing on the Sanctions Motion. *See Stipulation to Continue Hearing on Sanctions Motion*, ECF 2107 at 3 (¶ 4) ("CCM and Debtor's Counsel waive their objections, if any, that Milner failed to comply with Bankruptcy Rule 9011(c)(1)(A) by not serving her Motion for Rule 9011 Sanctions on CCM and Debtor's Counsel at least 21 days before filing it."). Because CCM and Debtor's Counsel had no paper that could be withdrawn at the time Milner filed the Sanctions Motion, as the court had already adjudicated the Contempt Motion, they had no right to relinquish by waiving "their objections" to Milner's failure to comply with the safe harbor. The court does not read paragraph 4 of the stipulation, ECF 2107, as constituting a waiver of any or all defenses under Bankruptcy Rule 9011(c)(1)(A).

Milner was aware of the need to comply with the "safe harbor" provision in Bankruptcy Rule 9011;

she addressed the **[\*82]** "safe harbor" in her Objection to Contempt Motion, her initial pleading in this contested matter. *Milner Objection to Contempt Motion*, filed June 12, 2018, ECF 2050 at 5 ("Because the [Contempt Motion] will be granted or denied within seven days pursuant to Local Rules, Ms. Milner and Mr. Light cannot give CCM the 21 days' notice to withdraw the Motion as otherwise required by Fed.R.Bankr.P. 9011(c)(1)(A)."). As discussed in footnote 11 above, Milner's contention that the local rules somehow precluded strict compliance with Bankruptcy Rule 9011 is incorrect.

The court declines to consider the conversion of the Contempt Motion to a contested matter as the equivalent of the filing of a bad faith bankruptcy petition, which the Bankruptcy Rule 9011(c)(1)(A) safe harbor would not apply to, because the Contempt Motion is not a petition, which is a term of art to commence a case under the Bankruptcy Code under Bankruptcy Rule 1002. *See Milner Reply to CCM and Debtor's Counsel Oppositions*, ECF 2121 at 5-6. The Contempt Motion is a request for an order as defined by Bankruptcy Rule 9013. Milner's contention that she filed the Sanctions Motion as soon as practicable under the circumstances is unavailing because as CCM and Debtor's Counsel argue, she could have served the motion any time after the Contempt Motion **[\*83]** was filed and before the court entered its decision on the merits on the Contempt Motion. Moreover, as discussed herein, controlling Ninth Circuit authority mandates that this court enforce the Bankruptcy Rule 9011(c)(1)(A) "safe harbor" strictly.

In *Barber v. Miller*, the Ninth Circuit held that multiple warning letters to an attorney about the defects of his claim did not satisfy Bankruptcy Rule 9011 because a motion was required to be served. 146 F.3d at 710 ("Those warnings were not motions, however, and the Rule requires service of a motion."). Like the moving party in *Barber v. Miller*, here, Milner only sent a warning letter, and not a motion, to CCM and Debtor's Counsel, to put

---

notified of the potential violation before service of the Rule 11 motion. If the issue is not resolved after informal notification, the party seeking sanctions must serve a separate motion for sanctions upon the other party. After the motion has been served, the other party has the 21-day safe harbor period to withdraw or correct the challenged paper. The district court should not be involved in the matter prior to the expiration of the safe harbor period. If the safe harbor period runs without appropriate action by the other party, only then should the motion for sanctions be filed with the district court.").

them on notice that Bankruptcy Rule 9011 sanctions were likely to be sought if the Contempt Motion was not withdrawn when her counsel e-mailed her Bankruptcy Rule 9011 Warning Letter to Debtor's Counsel. *July 11, 2018 Letter from Movant's Counsel to Debtor's Counsel, Exhibit 1 to Sanctions Motion*, ECF 2100-1 at 4-5. The Bankruptcy Rule 9011 Warning Letter, however, suffers from the same fatal procedural flaw—not being a motion—as the warning letters in *Barber v. Miller*. As discussed above, the evidentiary hearing on the Contempt Motion was conducted on September 20, 2018. Milner's arguments supporting her request for CCM and **[*84]** Debtor's Counsel to withdraw the Contempt Motion, or otherwise face possible sanctions, were put forward in the Bankruptcy Rule 9011 Warning Letter delivered by e-mail to Debtor's Counsel on July 11, 2018. *Id.* Milner could have reconstituted her Bankruptcy Rule 9011 Warning Letter into a motion and served Debtor's Counsel and CCM at least as early as July 11, 2018, but never did so. At the Status Conference on July 31, 2018, the court set the evidentiary hearing for September 20, 2018, and other deadlines related to the evidentiary hearing fell before September 20, 2018, which was approximately seven weeks after the status conference. Milner could have served CCM and Debtor's Counsel with a "safe harbor" sanctions motion at least as late as Tuesday, August 28, 2018 to give 21-day notice before trial started but did not. Moreover, Milner could have served a "safe harbor" motion after trial because the court did not issue its Memorandum Decision adjudicating the Contempt Motion until November 2, 2018. Even though this all may be in hindsight, the court finds that Milner had a sufficient opportunity to satisfy the Bankruptcy Rule 9011(c)(1)(A) "safe harbor" before trial in the time period at least from July 11, 2018 to August 28, 2018 (and she had the **[*85]** opportunity ever since she was served with the Contempt Motion on or about June 8, 2018)..

Accordingly, because Milner did not satisfy the "safe harbor" requirement that she serve a motion pursuant to Bankruptcy Rule 9011(c)(1)(A), this failure alone warrants denial of her Sanctions Motion as to the relief requested under Bankruptcy Rule 9011.

### ii. Milner's Failure to Timely File the Sanctions Motion Before Adjudication of the Contempt Motion as Required by the Ninth Circuit Warrants Denial of Relief Under That Rule.

In *Truesdell v. Southern California Permanente Medical Group*, 293 F.3d 1146 (9th Cir. 2002), the Ninth Circuit reaffirmed its rulings in *Barber v. Miller* and *Radcliffe v. Rainbow Construction Co.*, that require strict procedural compliance under Bankruptcy Rule 9011. 293 F.3d at 1151-1152. The Ninth Circuit explained that in *Barber v. Miller*, it

> held that a party may not wait to serve its motion for sanctions until the court has ruled on the offending filing. [citing *Barber*, 146 F.3d at 710-711.]; *see also* Fed. R. Civ. P. 11 advisory committee's notes to 1993 amends. (stating that, "[g]iven the 'safe harbor' provisions . . ., a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention)"). Once the court has dismissed the action with prejudice, counsel cannot withdraw the pleading. Allowing a party to wait until judgment is entered before **[*86]** serving a Rule 11 motion would effectively eliminate the safe harbor altogether.

*Truesdell v, Southern California Permanente Medical Group*, 293 F.3d at 1152.

Similarly, in *Islamic Shura Council of Southern California v. F.B.I.*, 757 F.3d 870 (9th Cir. 2014), the Ninth Circuit held that:

> Motions for Rule 11 attorney's fees cannot be served after the district court has decided the merits of the underlying dispute giving rise to the questionable filing. This is because once the court has decided the underlying dispute, the motion for fees cannot serve Rule 11's purpose of judicial economy.

757 F.3d at 873; *see also, In re Quinones*, 543 B.R. at 648-649 (same).

Milner filed the Sanctions Motion, ECF 2100, on July 2, 2019, which was eight months after the court issued its Memorandum Decision on the Contempt Motion, ECF 2079, entered on November 2, 2018. By filing the Sanctions Motion long after the court ruled on the Contempt Motion, Milner negated the very purpose of the Bankruptcy Rule 9011 "safe harbor"—allowing the parties an opportunity to avoid litigation about litigation before involving the court. The goal of judicial economy is not served by allowing parties to bypass the "safe harbor" requirement and file motions under Bankruptcy Rule 9011 after the underlying dispute has been adjudicated. Thus, Milner's failure to file the Sanctions Motion until after the underlying dispute had been resolved also warrants denial of the motion as to the relief sought **[\*87]** under Bankruptcy Rule 9011.

## B. The Bankruptcy Court's Inherent Authority to Sanction Bad Faith Conduct

In *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980), the Supreme Court described the bases on which a federal court may impose sanctions under its inherent authority. The Supreme Court stated that there are "ample grounds for recognizing[] . . . that in narrowly defined circumstances federal courts have inherent power to assess attorney's fees against counsel[,]" observing that the general rule that a litigant cannot recover his attorney fees "does not apply when the opposing party has acted in bad faith[,]" and federal courts have the inherent power to levy sanctions, including attorney fees, for "willful disobedience of a court order . . . or when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. . . ." *Id.* at 765-766 (internal quotation marks and citations omitted). The Supreme Court emphatically added that "[i]f a court may tax counsel fees against a party who has litigated in bad faith, it certainly may

assess [attorney fee sanctions] against counsel who willfully abuse judicial processes." *Id.* at 766; *see also Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) (reaffirming the principles set forth in *Roadway*).

A federal court's inherent authority to sanction, however, "ought to **[\*88]** be exercised with great caution[.]" *Chambers v. NASCO, Inc.*, 501 U.S. at 43 (internal quotations omitted) (quoting *Ex parte Burr*, 22 U.S. 529, 9 Wheat. 529, 531, 6 L. Ed. 152 (1824)). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* at 44 (citation omitted).

In a similar vein, the Ninth Circuit has stated with respect to Civil Rule 11 sanctions: "Rule 11 is an extraordinary remedy, one to be exercised with extreme caution." *Operating Engineers Pension Trust v. A-C Co.*, 859 F.2d 1336, 1345 (9th Cir. 1988). In explaining the policy rationale for exercising extreme caution when deciding whether to impose sanctions under Civil Rule 11, the Ninth Circuit stated in *Operating Engineers Pension Trust v. A-C Co.*:

> The [Advisory] Committee [on the Federal Rules]'s note to amended Rule 11 emphasizes that the Rule 'is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories.' Fed.R.Civ.P. 11, Notes of Advisory Committee on Rules, Federal Civil Judicial Procedure and Rules 34 (West 1987). Furthermore, as Justice Stevens has stated: "Freedom of access of the courts is a cherished value in our democratic society. Incremental changes in settled rules of law often result from litigation. The courts provide the mechanism for the peaceful resolution of disputes that might otherwise rise to attempts at self-help. There is, and should be, the strongest presumption **[\*89]** of open access to all levels of the judicial system. Creating a risk that the invocation of the judicial process may give rise to punitive sanctions simply because the litigant's claim is unmeritorious could only

deter the legitimate exercise of the right to seek a peaceful redress of grievances through judicial means . . . . [T]he strong presumption is against the imposition of sanctions for invoking the processes of the law." *Talamini v. All-State Insurance Co.*, 470 U.S. 1067, 105 S.Ct. 1824, 1827-28, 85 L.Ed.2d 125 (1985) (Stevens, J., joined by Brennan, Marshall and Blackmun, concurring). We agree with Justice Stevens that judges must not, by imposing sanctions unnecessarily, discourage the filing of good faith actions. It is essential that free access to the judicial system be maintained; Rule 11 was not intended to impede such access.

859 F.2d at 1344.

The Ninth Circuit in *Operating Engineers Pension Trust v. A-C Co.*, further commented on the potential of Rule 11 sanctions to interfere with a lawyer's ethical duty to zealously represent a client:

Rule 11 must not be construed as to conflict with the primary duty of an attorney to represent his or her client zealously. Forceful representation often requires that an attorney attempt to read a case or an agreement in an innovative though sensible way. Our law is constantly **[*90]** evolving, and effective representation sometimes compels attorneys to take the lead in that evolution. Rule 11 must not be turned into a bar to legal progress. *See, e.g., Hudson v. Moore Business Forms, Inc.*, 827 F.2d 450, 453-55 (9th Cir. 1987) ("attempt to seek tort damages under a *Seaman's*-type action is not frivolous, but rather an attempt to expand a developing area of the law"). Courts must also "avoid using the wisdom of hindsight and should test the signer's conduct by inquiring into what was reasonable to believe at the time the pleading . . . was submitted." *Id.* The simple fact that an attorney's legal theory failed to persuade the district court "does not demonstrate that [counsel] lacked the requisite good faith in attempting to advance the law." *Hurd v. Ralphs Grocery Co.*, 824 F.2d 806, 811

(9th Cir. 1987). Rather, we reserve sanctions for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose.

859 F.2d at 1344.

As the Ninth Circuit further observed in *Conn v. Borjorquez*, 967 F.2d 1418 (9th Cir. 1992), this is so because "[s]uch sanctions can have an unintended detrimental impact on an attorney's career and personal well-being." 967 F.2d at 1421 (citing *Brown v. Federation of State Medical Boards of the U.S.*, 830 F.2d 1429, 1437 (7th Cir. 1987)). Mindful of these policy concerns, the court approaches the task of determining Milner's Motion for Sanctions against CCM and Debtor's Counsel **[*91]** with "great caution," in the words of the Supreme Court in *Chambers v. NASCO, Inc.* regarding sanctions under the court's inherent authority, and with "extreme caution," in the words of the Ninth Circuit in *Operating Engineers Pension Trust v. A-C Co.* regarding sanctions under Civil Rule 11. In the court's mind, the difference between "great caution" and "extreme caution" is probably semantical, and the court has reviewed Milner's sanction motion with great and extreme caution, mindful of the impact on the attorney's career and well-being if sanctions are imposed for bad faith under the court's inherent authority in light of the negative reputational and financial impact of such imposition, considering Milner's current demand of over $150,000 for attorneys' fees she contends that she incurred in defending the Contempt Motion. In determining the sanctions motion, the court has provided this detailed explanation that its ruling is not to punish the attorney's enthusiasm or creativity in pursuing factual or legal theories or his carrying out his primary duty as an attorney to represent his client zealously, but that this case is the rare and exceptional situation where the action is clearly frivolous, **[*92]** legally unreasonable or without legal foundation, or brought for an improper purpose.

Regarding the inherent authority of bankruptcy courts specifically to impose sanctions, the Ninth Circuit has stated: "The inherent sanction authority allows a bankruptcy court to deter and provide compensation for a broad range of improper litigation tactics." *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1196 (9th Cir. 2003)(citing *Fink v. Gomez*, 239 F.3d 989, 992-993 (9th Cir. 2001)). However, before the bankruptcy court imposes sanctions under its inherent authority, it must find either bad faith, conduct tantamount to bad faith, or recklessness with an "additional factor such as frivolousness, harassment, or an improper purpose." *Fink v. Gomez*, 239 F.3d at 994; *see also* Black's Law Dictionary (11th ed. 2019) (defining "bad faith" as "Dishonesty of belief, purpose, or motive"). Regarding the imposition of sanctions for bad faith pursuant to a bankruptcy court's inherent authority, the Bankruptcy Appellate Panel of the Ninth Circuit has stated that bad faith "consists of something more egregious than mere negligence or recklessness." *Cunningham v. Jacobson (In re Jacobson)*, 2009 Bankr. LEXIS 4577, 2009 WL 7751428, at *15 (9th Cir. BAP 2009) (internal citation and quotation marks omitted). The bankruptcy court therefore "must make an explicit finding" of bad faith or similarly egregious conduct to support the imposition of sanctions pursuant to its [*93] inherent authority. *In re Dyer*, 322 F.3d at 1196 (citing *Fink v. Gomez*, 239 F.3d at 992-993); *see also, Primus Automotive Financial Services, Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997); *United States v. Stoneberger*, 805 F.2d 1391, 1393 (9th Cir. 1986). This explicit finding is "especially critical when the court uses its inherent powers to engage in fee-shifting[.]" *Primus Automotive Financial Services, Inc. v. Batarse*, 115 F.3d at 648. As further stated by the Ninth Circuit in *Primus Automotive Financial Services, Inc. v. Batarse*, "[w]e insist on the finding of bad faith because it ensures that 'restraint is properly exercised,' and it preserves a balance between protecting the court's integrity and encouraging meritorious arguments." *Id.* at 649 (citing *Roadway Express, Inc. v. Piper*, 447 U.S. at 764 (noting that because "inherent

powers are shielded from direct democratic controls, they must be exercised with restraint and discretion") and *Zambrano v. City of Tustin*, 885 F.2d 1473, 1478 (9th Cir. 1989)).

The Ninth Circuit's opinion in *Fink v. Gomez* is particularly instructive here, and thus, the court summarizes the opinion in some detail below. In *Fink v. Gomez*, the Ninth Circuit determined that a district court has authority under its inherent power to impose sanctions when an attorney has made reckless misstatements of law and fact and has done so for an improper purpose. 239 F.3d at 990. *Fink v. Gomez* involved an inmate at the California Institute for Men, a man named Fink, who was left permanently and severely disabled after an altercation with several guards whom he later sued for [*94] violations of his civil rights. *Id.* Fink also filed a related petition for a writ of habeas corpus. *Id.* An attorney representing the guard defendants in Fink's civil rights case made "various misrepresentations" of the facts and California law to the district court during an off-the-record telephonic conference related to the habeas corpus case and subsequent hearings before the district court. *Id.* at 990-991. Specifically, the guards' attorney claimed that California law required that the California Department of Corrections hold another disciplinary hearing regarding the altercation involving Fink and the guards, notwithstanding the district court's conditional judgment precluding a new hearing. *Id.* at 990. In reliance on the attorney's representations, the district court did not enjoin the new disciplinary hearing, stating that Fink should suffer no adverse consequences as a result of the new hearing. However, the new disciplinary hearing resulted in substantial adverse consequences to Fink. *Id.* Two months later, the same attorney for the guards appeared before the district court and further misled the court as to the consequences of Fink's new disciplinary hearing. *Id.* at 990-991. The attorney had also falsely claimed [*95] that "the matter of the . . . altercation had been referred to the district attorney for prosecution, [and] that the district court's denial of the petition for writ of habeas

corpus 'wasn't exactly reversed[.]'" *Id.* As a result of the attorney's misbehavior, the district court *sua sponte* issued an order to show cause why the attorney should not be sanctioned for misstating California law, the state of the record and other facts in the case. *Id.* at 991. The district court found that the attorney advanced meritless claims under California law because a new disciplinary hearing was not required, and the attorney had in fact orchestrated the new disciplinary hearing "in bad faith with a view to gaining an advantage in [her] case." *Id.* (internal quotations omitted). However, the district court decided not to impose sanctions due to uncertainty in the case law that some opinions of the Ninth Circuit indicated that only subjective bad faith was sanctionable, while other opinions implied that recklessness or objective bad faith would suffice. Fink appealed on grounds that the district court abused its discretion when it declined to impose sanctions after finding that the attorney had acted in a reckless **[*96]** manner rising to the level of bad faith. *Id.*

On appeal, the Ninth Circuit reversed, stating that the district court abused its discretion in misapprehending the scope of its inherent authority to impose sanctions. *Id.* at 994. In analyzing the imposition of sanctions under a court's inherent power, the Ninth Circuit discussed the Supreme Court's decision in *Chambers v. NASCO, Inc.*, observing that it "left no question that a court may levy fee-based sanctions when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, delaying or disrupting litigation, or has taken actions in the litigation for an improper purpose." *Id.* at 992 (citing *Chambers v. NASCO, Inc.*, 501 U.S. at 45-46 and n.10). The Ninth Circuit's description of the Supreme Court's holding in *Chambers v. NASCO, Inc.*, quoted above, is in the disjunctive; that is, a bad faith finding therefore may be proper where a party acts with improper purpose alone. *Id.* Even before the Supreme Court had decided *Chambers v. NASCO, Inc.*, the Ninth Circuit observed that it had recognized that 'improper purpose' is an independent ground for sanctioning a litigant under a court's inherent

authority. *Fink v. Gomez*, 239 F.3d at 992 ("[*In re Itel Securities Litigation*, 791 F.2d 672 (9th Cir. 1986)] teaches that sanctions are justified when a party acts for an *improper purpose [*97]* — even if the act consists of making a truthful statement or a non-frivolous argument or objection."). Thus, the Ninth Circuit concluded in *Fink v. Gomez* that 'improper purpose' is alone sufficient to support a finding of bad faith. *Id.* at 992. However, the Ninth Circuit held that mere recklessness is not sufficient for a court to sanction under its inherent authority, but, however, "[s]anctions are available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." *Id.* at 993-994.

### i. Frivolousness Standard

In the Sanctions Motion, citing *Fink v. Gomez*, Milner contends that Debtor's Counsel should be sanctioned for bringing the Contempt Motion on behalf of CCM against her and her state court counsel, Light, for an improper purpose and for making frivolous and reckless arguments in support of that motion.

Although it may be said, as the Sixth Circuit has observed, that "[f]rivolity, like obscenity, is often difficult to define[,]" *WSM, Inc. v. Tennessee Sales Co.*, 709 F.2d 1084, 1088 (6th Cir. 1983), there is a consistent body of law in the Ninth Circuit defining frivolousness in the similar context of imposing sanctions under Civil Rule 11. For example, in *Moore v. Keegan Management Company (In re Keegan Management Company Securities Litigation)*, 78 F.3d 431 (9th Cir. 1996), the Ninth Circuit **[*98]** stated: "[t]he word 'frivolous' does not appear anywhere in the text of [] Rule [11]; rather, it is a shorthand that this court has used to denote a filing that is *both* baseless *and* made without a reasonable and competent inquiry." *Id.* at 434. *See also Christian v. Mattel, Inc.*, 286 F.3d 1118, 1127 (9th Cir. 2002); *accord, Thompson v. Massarweh*, 2017 U.S. Dist. LEXIS 203477, 2017

WL 6316816, at *1 (N.D. Cal. 2017) (citing *inter alia, Christian v. Mattel, Inc.*, 286 F.3d at 1127). As to defining frivolous generally, the Ninth Circuit has adopted an ordinary meaning of frivolous, meaning "groundless . . . with little prospect of success; often brought to embarrass or annoy the defendant." *United States v. Braunstein*, 281 F.3d 982, 995 (9th Cir. 2002) (citing *United States v. Gilbert*, 198 F.3d 1293, 1299 (11th Cir. 1999) (adopting the Eleventh Circuit's approach to defining "frivolous" and "bad faith" on a Hyde Amendment motion by looking to Black's Law Dictionary and Civil Rule 11) (citation omitted). As to what constitutes a reasonable inquiry, the Ninth Circuit has also stated that a reasonable inquiry is "that amount of examination into the facts and legal research which is reasonable under the circumstances of the case." *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986).

Since the Ninth Circuit has stated its reliance upon legal authorities interpreting Civil Rule 11 when considering the imposition of sanctions under Bankruptcy Rule 9011, *see, In re DeVille*, 361 F.3d at 552, this court considers that it is appropriate to consider authorities interpreting Civil Rule 11 in determining whether sanctions should be imposed here for bad faith **[\*99]** conduct involving frivolousness.

## ii. Recklessness Standard

"The civil law generally calls a person reckless who acts . . . in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Farmer v. Brennan*, 511 U.S. 825, 836, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (discussing the civil and criminal law standards for recklessness in connection with "deliberate indifference" under the Eighth Amendment) (citation omitted). In the context of sanctions based upon misrepresentations to a court, the Ninth Circuit has defined recklessness as "a departure from ordinary standards of care that disregards a known or obvious risk of material misrepresentation." *Thomas v. Girardi (In re Girardi)*, 611 F.3d 1027, 1038 n. 4 (9th Cir. 2010). Therefore, based on these standards, recklessness essentially involves an unreasonable departure from the ordinary standard of care where the actor had to have been aware of the risks in her behavior. *See id.* (citing *Prescod v. AMR, Inc.*, 383 F.3d 861, 870 (9th Cir. 2004) (per curiam) (applying California tort law identifying recklessness where "the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow"); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-1569 (9th Cir. 1990) (en banc) (defining the "recklessness" that constitutes the **[\*100]** scienter necessary for a securities law violation as behavior "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it") (quotation omitted)). In this case, any alleged recklessness may be identified based on the high risk of harm, namely, litigation costs, that was known by Debtor's Counsel and CCM before filing the Contempt Motion, and the ongoing harm to Milner that would occur if the conduct of Debtor's Counsel and CCM leading up to and during the prosecution of the Contempt Motion unreasonably departed from an ordinary level of care.

## iii. Improper Purpose Standard

Civil Rule 11 indicates that improper purposes that justify sanctions include harassment and causing "unnecessary delay," or "needlessly increase[ing] the cost of litigation," among others. Federal Rule of Civil Procedure 11. In *Bader v. Itel Corporation (In re Itel Securities Litigation)*, 791 F.2d 672 (9th Cir. 1986), the Ninth Circuit found that the improper purpose warranting sanctions was "the attempt to gain tactical advantage in another case."

*Fink v. Gomez*, 239 F.3d at 992 (citing *In re Itel Securities Litigation*, 791 F.2d at 675). This court in a prior case has held that it constitutes bad faith for **[\*101]** a debtor to file a bankruptcy petition to impede, delay, forum shop or obtain a tactical advantage regarding litigation ongoing in a nonbankruptcy forum, such as a state court or a federal district court. *In re Silberkraus*, 253 B.R. 890, 905 (Bankr. C.D. Cal. 2000) (listing cases). Other bankruptcy courts have also determined that bad faith is shown by pursuing litigation for an improper purpose such as a tactical advantage. *Skies Unlimited, Inc. of Colorado v. King*, 72 B.R. 536, 539 (Bankr. D. Colo. 1987) (order to show cause re contempt was filed for the improper purposes of harassment and "placing unwarranted pressure" because debtors were "seeking to browbeat the Defendant with threats of potential contempt orders and thereby dissuade him from pursuing his claims in the state court."); *In re Collins*, 250 B.R. 645, 663 (Bankr. N.D. Ill. 2000) ("[Debtor] did not merely invoke the shield of the automatic stay; he converted it to a sword for the sole purpose of frustrating a single creditor . . . Such a purpose is improper . . ."). Although the subject Contempt Motion does not involve a bankruptcy petition, the non-exhaustive list of improper purposes in *Silberkraus* and the other cases cited above are useful to the court's analysis here.

**iv. Burden of Proof**

The Ninth Circuit has held that the burden of showing bad faith is on the party claiming bad faith, but it has not decided **[\*102]** the standard of proof that applies, i.e., whether a preponderance of the evidence or clear and convincing evidence is sufficient to support a finding of bad faith. *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010); *F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*, 244 F.3d 1128, 1143 and n. 11 (9th Cir. 2001); *see also, Nguyen v. Golden (In re Pham)*, 2017 Bankr. LEXIS 3844, 2017 WL 5148452, at \*8 n. 9

(9th Cir. BAP 2017).

As discussed below, the court determines that whether the standard of proof is clear and convincing evidence or a preponderance of the evidence, Milner has met her burden of proof as to Debtor's Counsel, but not as to CCM.

**C. Discussion**

**i. The Applicability of Bankruptcy Rule 9011 Does Not Preclude the Imposition of Sanctions Under the Court's Inherent Authority**

The court addresses the arguments of CCM and Debtor's Counsel whether Bankruptcy Rule 9011 precludes the court from imposing sanctions under its inherent authority before considering whether the conduct of Debtor's Counsel and CCM was so egregious to constitute bad faith warranting the imposition of sanctions under the court's inherent authority. The "inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers v. NASCO, Inc.*, 501 U.S. at 49. In *Miller v. Cardinale (In re DeVille)*, 361 F.3d 539, 551 (9th Cir. 2004), the Ninth Circuit addressed the arguments now being made by CCM and Debtor's Counsel that if Bankruptcy Rule 9011 applies, imposition of sanctions under the court's inherent authority is precluded, stating that "the Supreme Court has emphatically rejected **[\*103]** the notion that the advent of . . . the sanctioning provisions in the Federal Rules of Civil Procedure displaced the inherent power to impose sanctions for bad faith conduct." *In re DeVille*, 361 F.3d at 551 (citing *Chambers v. NASCO, Inc.*, 501 U.S. at 49-50). The Ninth Circuit further stated in *DeVille* that: "We agree with the BAP's conclusion that, given the inadequacy of rules and statutes to sanction [the Appellants'] misconduct, the bankruptcy court correctly relied upon its inherent power as a sanctioning tool." 361 F.3d at 551. In the BAP's underlying decision, *Miller v. Cardinale (In re DeVille)*, 280 B.R. 483, 486-487 (9th Cir. BAP

2002), the BAP expressly concluded that "[t]his is a situation in which neither a statute nor the rules of procedure are 'up to the task.' [Bankruptcy Rule 9011] does not suffice because the victim did not make the requisite motion following compliance with the mandatory "safe harbor" and because the court may not shift attorneys' fees and costs on its own motion." *In re DeVille*, 280 B.R. at 494. Accordingly, the rule of decision as stated in the Ninth Circuit's opinion in *In re DeVille*, based on the Supreme Court precedent in *Chambers v. NASCO, Inc.*, is that a bankruptcy court may exercise its inherent authority to sanction even when the disputed conduct may also be sanctionable pursuant to Bankruptcy Rule 9011.

Like the party seeking sanctions based on bad faith conduct in *In [*104] re DeVille*, here, Milner did not make a timely "safe harbor" motion as required to impose sanctions pursuant to Bankruptcy Rule 9011. As discussed above, Milner never served Debtor's Counsel and CCM with a copy of her Sanctions Motion and a request to withdraw any allegedly offending pleadings 21 days before filing the Sanctions Motion, nor before the underlying matter of the Contempt Motion was finally adjudicated, but she was aware of the need to comply with the "safe harbor" provision in Bankruptcy Rule 9011 as she addressed the "safe harbor" in her initial Objection to Contempt Motion. *Objection to Contempt Motion*, filed June 12, 2018, ECF 2050 at 5 ("Because the [Contempt Motion] will be granted or denied within seven days pursuant to Local Rules, Ms. Milner and Mr. Light cannot give CCM the 21 days' notice to withdraw the Motion as otherwise required by Fed.R.Bankr.P. 9011(c)(1)(A)."). As indicated by the example of *In re DeVille*, however, Milner's oversight does not necessarily render this court incapable of imposing sanctions against Debtor's Counsel or CCM for bad faith misconduct that might otherwise be sanctionable under the court's inherent authority or Bankruptcy Rule 9011. 361 F.3d at 551. The court thus determines that, as was the case in *In re DeVille*, Bankruptcy Rule 9011 is not "up to [*105] the task" in light of Milner's lack

of compliance with the "safe harbor" and timeliness requirements of Bankruptcy Rule 9011. Accordingly, the court may consider the exercise of its inherent authority to sanction Debtor's Counsel or CCM, even though the court also could have considered the imposition of sanctions against Debtor's Counsel or CCM under Bankruptcy Rule 9011.

### ii. Debtor's Counsel May Be Sanctioned for Conduct Tantamount to Bad Faith

i. Frivolousness and Recklessness: Misstatements of Law and Fact

The argument made by Debtor's Counsel on behalf of CCM in the Contempt Motion was essentially that the effect of the order of this court confirming CCM's plan of reorganization rejected the pre-petition Settlement Agreement between Milner and CCM, and therefore, under the doctrine of claim preclusion, the plan confirmation order had preclusive effect to bar any claim that Milner could raise under that contract. According to CCM and Debtor's Counsel, Milner and her attorney, Light, thus, violated the discharge injunction from the bankruptcy case by filing their answer in CCM's State Court Action asserting affirmative defenses based on contract rights under the purportedly rejected Settlement Agreement. The argument is baseless **[*106]** because there is no authority supporting a discharge injunction violation for a creditor defending herself in post-confirmation litigation initiated by a reorganized debtor who voluntarily "returned to the fray." Moreover, the Settlement Agreement was not executory and thus, not susceptible to rejection through the bankruptcy case pursuant to 11 U.S.C. §365(g), and claim preclusion based on the plan confirmation order was inapplicable because CCM's breach of its contractual storage obligations were post-confirmation.

### *Debtor's Counsel's Argument that Milner Should Be Held in Civil Contempt for Violating the Discharge Injunction in CCM's Bankruptcy Case*

*by Raising Affirmative Defenses in Her Answer in the State Court Action Was Frivolous and Reckless*. CCM's Contempt Motion, drafted and filed by Debtor's Counsel as its counsel, was premised on the theory that Milner and her state court counsel, Light, should be held in civil contempt for violating the discharge injunction in CCM's bankruptcy case for the assertion of affirmative defenses in Milner's answer, prepared and filed by Light, in CCM's state court action against her. As discussed in the Memorandum Decision, CCM in its Contempt Motion, drafted **[*107]** and filed by Debtor's Counsel, failed to cite "any legal authority in support of its proposition that the court has the authority to find a party in civil contempt for filing an answer to a complaint *in a lawsuit initiated by the debtor."* ECF 2079 at 10 (emphasis in original). Neither party to this matter, nor the court, has identified any authority that exists for the proposition that a creditor violates the discharge injunction by filing an answer to a state court complaint—in other words, defending its rights—where that complaint was filed post-confirmation by a reorganized debtor and relates to post-confirmation claims that did not arise, and were not litigated, during the bankruptcy case.

As the Ninth Circuit has recognized in *Siegel v. Federal Home Loan Mortgage Corp.*, 143 F.3d 525 (9th Cir. 1998), confirmation of a plan of reorganization discharges a debtor of its pre-confirmation liabilities. *Id.* at 533 (citing *Sure-Snap Corp. v. Vermont (In re Sure-Snap)*, 983 F.2d 1015, 1019 (11th Cir. 1983)). However, the Ninth Circuit in *Siegel* also observed: "[n]o doubt the future is always contingent, but that does not mean that a bankrupt is discharged regarding everything he might do in the future." *Id.* at 532 (discussing contingent claims). In *Siegel*, the debtor never objected to the creditor's proofs of claim, but rather chose to file a separate action against **[*108]** the creditor even before his bankruptcy case was closed, and the Ninth Circuit held that a debt from an award of attorney fees incurred post-petition, based on a pre-petition cause of action, was not

discharged in bankruptcy. *Id.* at 531-532. In reaching its decision, the Ninth Circuit emphasized the debtor's post-petition initiation of new litigation, commenting that "while his bankruptcy did protect [the debtor] from the results of his past acts, . . . it did not give him carte blanche to go out and commence new litigation about [a] contract without consequences." *Id.* at 534.

Similarly, in *Boeing North America, Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018 (9th Cir. 2005), the Ninth Circuit, following its reasoning in *Siegel*, held that claims for attorneys' fees and costs incurred post-petition are not discharged where, "post-petition, the debtor voluntarily 'pursued a whole new course of litigation,' commenced litigation, or 'returned to the fray' voluntarily." *Id.* at 1024 (citing *Siegel v. Federal Home Loan Mortgage Corp.*, 143 F.3d at 533-534); *see also id.* at 1026 ("Even if a cause of action arose pre-petition, the discharge shield cannot be used as a sword that enables a debtor to undertake risk-free litigation at others' expense." (citation omitted)).

More recently, in another bankruptcy court decision involving a debtor's "return to the fray," in *In re Wiersma*, 2015 Bankr. LEXIS 3391, 2015 WL 5833878 (Bankr. D. Idaho 2015) (Pappas, J.), the **[*109]** debtor received her discharge on January 23, 2013; she initiated a cause of action in state court[19] on October 4, 2013; and, the state court entered a judgment against debtor on September 5, 2014. *In re Wiersma*, 2015 Bankr. LEXIS 3391, 2015 WL 5833878, at *1. The attorney for the prevailing party in the state court litigation later sought additional attorney fees she allegedly incurred in collecting the state court judgment. 2015 Bankr. LEXIS 3391, [WL] at *2. Debtor then sought relief from the bankruptcy court, arguing under Idaho case law and an equitable doctrine of "fairness" that the attorney was in contempt of the discharge order. *Id.* Judge

---

[19] In *Wiersma*, the Chapter 7 trustee had elected not to pursue the cause of action during the bankruptcy. *In re Wiersma*, 2015 Bankr. LEXIS 3391, 2015 WL 5833878, at *1.

Pappas, like the Ninth Circuit in *Siegel v. Federal Home Loan Mortgage Corp.*, emphasized the debtor's initiation of litigation, observing that: "at the time Debtor filed her bankruptcy petition . . . [the creditor] had no knowledge that she would, post-discharge, 'return to the fray' in state court, . . . ." *Id.* at 3. Citing *Siegel v. Federal Home Loan Mortgage Corp.*, the bankruptcy court concluded that there was no discharge violation because "debtor . . . made the decision to 'return to the fray' to prosecute the defamation action herself. [citation]. In doing so, she assumed the risks inherent in that decision[. . .]." *Id.* at 4.

These authorities **[*110]** indicate that where a debtor initiates post-petition a new round of litigation regarding prepetition acts, the debtor has "returned to the fray," and other parties may participate in such litigation and hold debtor liable without running afoul of the discharge injunction. Thus, there was no legal basis for Debtor's Counsel to assert on behalf of CCM in the Contempt Motion that Milner and Light violated the discharge injunction for participating in litigation initiated by CCM post-petition and post-confirmation. Here, CCM "returned to the fray" by suing Milner in state court over a dispute regarding their prepetition contract. Accordingly, Debtor's Counsel's assertion of this claim was frivolous because he has not shown that there was any legal basis for the claim, nor that he made such a claim after a reasonable inquiry into the law or facts. In his opposition to the Sanctions Motion, as Milner points out, Debtor's Counsel does not address Milner's arguments based on *In re Ybarra* that it is permissible to engage in litigation and not violate the discharge injunction where the debtor "returned to the fray." Debtor's Counsel's lack of rebuttal indicates that he had no valid response **[*111]** to support his claim. Under his view, Milner could not legally respond to CCM's state court complaint, even if she had valid grounds to oppose the complaint as she did here, and Milner would be in civil contempt in violation of the discharge injunction under any circumstances, unless she conceded to CCM on the merits of its complaint, which view is inconsistent

with the case law relied upon by Milner and discussed herein.

The record indicates that Debtor's Counsel's assertion of this claim for CCM was not only frivolous, but reckless, as shown by Movant's Counsel's Bankruptcy Rule 9011 Warning Letter, delivered by e-mail on July 11, 2018, on behalf of Milner, which put Debtor's Counsel on notice that *In re Ybarra*, 424 F.3d 1018, 1027 (9th Cir. 2005), *In re Wright*, 509 B.R. 250, 255-256 (Bankr. D. Ariz. 2014), and then-controlling authority in *In re Taggart*, 888 F.3d 438 (9th Cir. 2018), would lead a reasonable attorney to conclude that Milner was entitled to rely on the debtor's "return to the fray" as a basis for defending herself in the state court litigation. *July 11, 2018 Letter from Movant's Counsel to Debtor's Counsel*, Exhibit 1 to *Sanctions Motion*, ECF 2100-1 at 4-5. The Bankruptcy Rule 9011 Warning Letter explained how under the existing Ninth Circuit precedent in *Taggart*, even if a court determined that Milner violated the discharge injunction, her apparent good **[*112]** faith, even if unreasonable, would insulate her from a finding of contempt. *July 11, 2018 Letter from Movant's Counsel to Debtor's Counsel*, Exhibit 1 to *Sanctions Motion*, ECF 2100-1 at 4. In other words, this letter was a clear warning to Debtor's Counsel that even if the Settlement Agreement was executory and therefore rejected, any argument that Milner could be held in contempt by filing her state court answer would very likely fail. Milner reiterated her argument based on *Taggart* in her attachment to the Joint Status Report, filed on July 20, 2018. ECF 2059 at 8. While the court did not have to reach the issue of Milner's good faith in answering CCM's State Court Complaint in its Memorandum Decision, the court notes that Milner's Bankruptcy Rule 9011 Warning Letter, delivered on July 11, 2018, included legal arguments addressing why the Settlement Agreement was not executory, why the Settlement Agreement was not rejected in the bankruptcy case, and why the discharge injunction would not apply to prevent Milner from defending her rights in state court, and thus, effectively undercut any argument

that Milner and Light proceeded subjectively[20] in bad faith in the state court litigation. *July 11, 2018 Letter [\*113] from Movant's Counsel to Debtor's Counsel*, Exhibit 1 to *Sanctions Motion*, ECF 2100-1 at 1-5; *E-mail from Light to Debtor's Counsel, dated March 20, 2018, Exhibit L to the Declaration of Harold J. Light*, ECF 2051 at 48-50.

In proceeding with CCM's Contempt Motion, Debtor's Counsel failed to rebut these substantial legal arguments put forth by Milner, which he did at his peril. Instead of withdrawing the Contempt Motion after a reasonable inquiry in response to the Bankruptcy Rule 9011 Warning Letter, Debtor's Counsel proceeded with his argument "that the Settlement Agreement was an executory contract that was deemed rejected either upon Plan Confirmation or on the Effective Date of the Plan, and that any action by Milner to enforce the Settlement Agreement would violate the discharge injunction," *Memorandum Decision*, ECF 2079 at 10 (citing *Contempt Motion*, ECF 2043 at 6-7), which argument, as discussed below, was also frivolous and reckless. Debtor's Counsel's complete failure to address the Ninth Circuit case authority identified by Milner and discussed above demonstrates that his argument that Milner and Light violated the discharge injunction for merely answering CCM's State Court [\*114] Complaint lacked a reasonable basis in fact and law; he did not perform an objectively reasonable inquiry on this legal issue; and, his assertion of such an argument without addressing this relevant and controlling case law was frivolous and reckless.

### Debtor's Counsel's Argument that Milner Should Be Held in Contempt for Answering CCM's State

---

**Court Complaint Because the Settlement Agreement Was a Rejected Executory Contract Was Frivolous and Reckless**. Milner contends that Debtor's Counsel should be sanctioned for bad faith as the drafter and signer of CCM's Contempt Motion in making a frivolous argument that the Settlement Agreement was executory and thus rejected by the confirmed plan. Debtor's Counsel's claim preclusion argument, also referred to as the waiver argument, was premised on the assumption that the Settlement Agreement was an executory contract.[21] Debtor's Counsel apparently did not consider that this assumption was even at issue, however, even after being put on notice by Milner and her counsel in their correspondence with him (e.g., Light's March 30, 2018 letter to him). Debtor's Counsel's lack of consideration of the issue of whether the Settlement Agreement was executory [\*115] is evident in his initial pleading in this matter, CCM's Contempt Motion. Debtor's Counsel only first addressed the purportedly executory nature of the Settlement Agreement in his reply to Milner's objection to the Contempt Motion.

Debtor's Counsel's reply argument that the contract was executory is baseless as he only argued that nonmaterial obligations unperformed by Milner made the contract executory. The evidence at trial indicated that Milner had no unperformed material obligations under the Settlement Agreement. In ruling on the merits of Debtor's Counsel's argument in the Contempt Motion, the court determined that "the Settlement Agreement is not an executory contract because it did not impose upon Milner any ongoing obligation such that her failure to perform would constitute a material breach and excuse Debtor's performance." *Memorandum Decision*, ECF 2079 at 17. As set forth in its Memorandum Decision, ECF 2079, the court rejected all of

---

[20] At the time that the Contempt Motion was being litigated, the Supreme Court had not yet reversed the Ninth Circuit and determined that "a court may hold a creditor in civil contempt for violating a discharge order if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct." *Taggart v. Lorenzen*, 587 U.S. __, 139 S. Ct. 1795,1799, 204 L. Ed. 2d 129 (2019) (applying an objective standard) (emphasis in original). Even under this standard, Milner and Light would not have been liable for contempt because there was a fair ground of doubt whether the discharge injunction barred her conduct.

[21] Even if Debtor's Counsel's claim preclusion argument could be construed as being premised solely on a pre-confirmation breach of a non-executory contract that did not require rejection, the court previously determined that this construction also had no merit. *Memorandum Decision*, ECF 2079 at 19-20.

Debtor's Counsel's arguments that various provisions in the Settlement Agreement made it somehow executory. *Id.* at 11-18. As discussed herein, the court specifically found that Debtor's Counsel's arguments that the Settlement Agreement **[*116]** was executory based on an alleged "duty of good faith" and an alleged "duty to inspect", both purportedly unperformed by Milner, were unfounded and could not support CCM's position that she violated the discharge injunction. *Memorandum Decision*, ECF 2079 at 13-17. Moreover, as the court previously determined, "Debtor's failure to list the Settlement Agreement in [its Schedule G, Executory Contracts and Unexpired Leases, its Amended Schedule G, or its Executory Contract Rejection Motion during its bankruptcy case] demonstrates either that Debtor did not believe the Settlement Agreement was an executory contract or that it had no intention of rejecting the Settlement Agreement." *Id.* at 18; *see also Milner's Trial Brief*, ECF 2074 at 8.

In making the argument in support of CCM's Contempt Motion that the Settlement Agreement was executory and rejected, Debtor's Counsel was required to make a reasonable legal and factual inquiry before proceeding with the argument. The Contempt Motion threatened Milner and Light with monetary and reputational liability and "foreseeably aroused a vigorous and costly defense." *Unioil, Inc. v. E.F. Hutton & Co.*, 809 F.2d 548, 557 (9th Cir. 1986).

In *Unioil, Inc. v. E.F. Hutton & Co.*, the Ninth Circuit considered the reasonableness of **[*117]** an attorney's legal and factual inquiry under Civil Rule 11, stating: "Just as the gravity of foreseeable injury is relevant to determining a party's standard of care in a negligence case, so should the cost of a foreseeable response by opposing parties be relevant to determining an attorney's standard of reasonable inquiry." *Id.* at 557. The Ninth Circuit analyzed an attorney's argument that he did not violate Civil Rule 11 because he relied on "forwarding co-counsel" and therefore conducted a reasonable inquiry. 809 F.3d at 558. The Ninth

Circuit found the attorney's defense to be unavailing, stating that

> reliance on forwarding co-counsel may in certain circumstances satisfy an attorney's duty of reasonable inquiry. In relying on another lawyer, however, counsel must acquire knowledge of facts sufficient to enable him to certify that the paper is well-grounded in fact. An attorney who signs the pleading cannot simply delegate to forwarding co-counsel his duty of reasonable inquiry.

*Id.* (internal quotations, alterations, and citations omitted); *see also, Phillips v. Burt (In re Burt)*, 179 B.R. 297, 303 (Bankr. M.D. Fla. 1995) ("Even when relying on the information furnished by the forwarding counsel, he or she must obtain knowledge or facts independently that are adequate to allow him or her **[*118]** to certify that the signed pleading is well grounded in fact. An attorney who signs a pleading may not rely on previous counsel to satisfy his obligation to perform a reasonable inquiry." (citing *Unioil, Inc. v. E.F. Hutton & Co.*, 809 F.2d at 558)).

In defending the executory contract argument that he made for CCM in the Contempt Motion, Debtor's Counsel emphasized his reliance on certain legal opinions indicated in letters written by other attorneys representing CCM in 2012[22], 2013,[23] and 2017[24] rather than his independent

---

[22] *See Exhibit 28 to Declaration of Carl Grumer*, ECF 2066-2 at 11-14 (letter of Dennis W. Ghan, CCM's counsel, to Carl Grumer, Milner's counsel, dated June 25, 2012, asserting that the Settlement Agreement is not a valid agreement and even if the Settlement Agreement was valid, CCM has no obligation to store and maintain the subject property indefinitely).

[23] *See Exhibit 6 to CCM's Attachment to the July 20, 2018 Joint Status Report*, ECF 2059 at 60 (CCM's counsel, Salus, in an email to Milner's counsel, Grumer, dated March 18, 2013, stated: "Keep in mind that Carol [Milner]'s contract you refer to was rejected as part of the bankruptcy proceedings and therefore CCM has no obligation to continue to store the items for free — CCM has given sufficient statutory notice, on several occasions, to have the materials retrieved or they will be disposed of as allowable under the law."). The subject property was never disposed of, and apparently continues to be stored by CCM, as previously discussed.

factual and legal inquiry in support of the executory contract argument. It is apparent that Debtor's Counsel did not perform any factual or legal inquiry to support the argument on his own, instead relying on the work of others, and this does not satisfy his duty of reasonable inquiry. As set forth in the court's Memorandum Decision on the Contempt Motion, the arguments that Debtor's Counsel made on behalf of CCM, based on the representations of CCM's prior counsel, utterly lacked merit. Debtor's Counsel cannot use his reliance on the opinions of other attorneys to demonstrate the reasonableness of his factual and legal inquiry in support of the arguments that he made on behalf of CCM because, among other reasons, none **[*119]** of those attorneys offered to raise those arguments in a signed pleading before this court. Debtor's Counsel was the attorney making the arguments for CCM; he had to do the reasonable inquiry of the law regarding executory contracts; and, he did not. Thus, Debtor's Counsel cannot demonstrate that he undertook and met his duty to perform a reasonable inquiry in making the executory contract arguments for CCM in the Contempt Motion.

There was no reason for Debtor's Counsel not to conduct a reasonable factual and legal inquiry as it appears that he had ample time for investigation, and the record does not indicate severe constraints of time or money that would impede his inquiry in support of the arguments he advanced in CCM's Contempt Motion. As discussed previously, Debtor's Counsel was put on notice at least by March 30, 2018, when Light responded by letter on behalf of Milner in response to CCM's threat to move for a temporary restraining order or to strike Milner's answer in the State **[*120]** Court Action on grounds that her answer violated the discharge

injunction in this case, stating Milner's positions that the Settlement Agreement could not have been rejected in the bankruptcy case because it was not an executory contract, that there was nothing in the discharge injunction that precludes her from defending herself in the State Court Action or deprived her of ownership of the Play Property. Yet Debtor's Counsel persisted in filing the Contempt Motion without addressing Milner's arguments made by Light in his letter of March 30, 2018, as these arguments were not addressed, let alone rebutted, in the Contempt Motion at all.

***Debtor's Counsel's Argument that Milner Should Be Held in Contempt for Answering CCM's State Court Complaint Because the Settlement Agreement Was a Rejected Executory Contract Based on Her Purported Duty to Inspect the Subject Property Was Frivolous and Reckless***. At the evidentiary hearing, Debtor's Counsel affirmatively asserted that Ninth Circuit authority held that a party has an affirmative obligation to inspect property that is being stored by another, and that responsibility makes such an agreement executory. *September 20, 2018 Evidentiary Hearing [\*121] Transcript*, ECF 2095 at 290-291; *see also CCM's Post-Trial Brief*, ECF 2077 at 5-7 (arguing that Milner had a duty to inspect, which made the Settlement Agreement an executory contract). As discussed in the Memorandum Decision, Debtor's Counsel specifically represented to the court at the evidentiary hearing that there was such authority for the "duty to inspect" proposition, it was cited in one of his prior pleadings, but that he could not find the citation. Debtor's Counsel claimed that he did not remember the case at the time, and that he would provide the citation to the authority for this proposition in his post-trial brief. *Evidentiary Hearing Transcript*, ECF 2095 at 291 ("I'll provide that."). However, he failed to do so; the court noted that Debtor cited no legal authority for his "duty to inspect" argument, and found the position lacking merit absent any supporting legal authority. *Memorandum Decision*, ECF 2079 at 16-17. This showed that Debtor's Counsel made a baseless representation of purported controlling law

---

[24] *See Exhibit 1 to Declaration of Debtor's Counsel, attached to the Contempt Motion*, ECF 2043 at 37-38 (letter of Wesley R. Carter, of the law firm of Winters & King, Inc., to Milner sent by email dated April 17, 2017, asserting that the Settlement Agreement was rejected as of the Effective Date of the Plan, and therefore "CCM is not obligated to any future performance on the agreement referenced in paragraph two, if such obligation existed in the first instance.").

to the court, which was frivolous as there is no showing that there was any such authority when he made the representation in open court. This behavior was also reckless **[*122]** because when Debtor's Counsel made the representation, he departed from the ordinary standard of care and should have known that the risk of harm to Milner would be high in having to expend litigation resources to rebut this unfounded "duty to inspect" argument to show that the Settlement Agreement was not executory.

***Debtor's Counsel's Argument that Milner Should Be Held in Contempt for Answering CCM's State Court Complaint Because the Settlement Agreement Requiring CCM to Store the Subject Property Was Unenforceable For Lack of a Bill of Sale Transferring the Property to Milner Was Frivolous and Reckless***. Debtor's Counsel also erroneously argued that California law requires a bill of sale to transfer property, misreading *Hull v. Ray*, 80 Cal.App. 284, 251 P. 810 (1926). *See Memorandum Decision*, ECF 2079 at 21. At the July 31, 2018 Status Conference, Debtor's Counsel, for the first time, contended that the Settlement Agreement may not be an enforceable contract because no bill of sale evidenced any transfer of the subject property to Milner. *Audio Recording, July 31, 2018 Status Conference* at 2:17-2:18 p.m. ("Never a conveyance, never a bill of sale . . .")(statement of Debtor's Counsel); 2:20-2:22 p.m. ("Where after [the Settlement **[*123]** Agreement] was entered into [was] there [sic] a bill of sale or a transfer of any of these items that she now claims she owns? . . . We're simply asking them to confirm that they don't have ownership rights transferred by a bill of sale or through some kind of a conveyance on [the subject property]") (statement of Debtor's Counsel); 2:24 p.m. ("Correct. Unless the creditor can prove . . . that there was actually a completion of a bill of sale that identified transfer of ownership . . .")(statements of Debtor's Counsel). At trial, Debtor's Counsel reiterated the position that the Settlement Agreement was not enforceable because there was no bill of sale evidencing a transfer of ownership of the subject property from CCM to

Milner. *Transcript, September 20, 2018 Evidentiary Hearing*, ECF 2095 at 7-10. The court rejected Debtor's Counsel's position because it contradicted California statutory law. *Memorandum Decision*, ECF 2079 at 21 ("As explained by the court on the record at trial, Debtor misreads *Hull v. Ray*, 80 Cal.App. 284, 251 P. 810 (1926), which describes the form requirements of a bill of sale, but does not require that *all* transfers of ownership in personal property must be evidenced by a bill of sale. Such a reading contradicts **[*124]** California law. [citing California Civil Code §§ 1000, 1039 and 1052 indicating that property can be transferred without a writing]."). Moreover, as the court noted in its Memorandum Decision, such assertion contradicted CCM's judicial admissions in the Contempt Motion, the supporting declarations and the State Court Complaint that Milner owned the Play Property. *Memorandum Decision*, ECF 2079 at 22. The court finds that Debtor's Counsel's argument based on the purported bill of sale requirement was baseless under California law based on a misreading of the cited case and a failure to consider applicable California statutory law, reflecting a failure to conduct a reasonable legal inquiry for the proposition that he advanced, and this argument was frivolous and reckless.

Debtor's Counsel's Misrepresentation of ***Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.***, 2 Cal.4th 342, 6 Cal. Rptr. 2d 467, 826 P.2d 710 (Cal. 1992) *Was Reckless*. As discussed in the Memorandum Decision, ECF 2079 at 11-14, Debtor's Counsel misquoted the case of *Carma Developers* in support of a proposition "in direct conflict" with California law. *Id.* at 14. That is, Debtor's Counsel purportedly quoted the decision and argued that this case "affirmed" that a breach of a covenant of good faith and fair dealing, "would constitute a material **[*125]** breach and thus excuse the performance of the other," but as the court stated in the Memorandum Decision, this purported quote was nowhere to be found in the cited decision and contradicted other California case law stating the concept that the materiality of a breach must be determined on a case-by-case basis.

*Id.* ( citing *Brown v. Grimes*, 192 Cal. App. 4th 265, 267, 120 Cal. Rptr. 3d 893 (2011)). Although a similar misrepresentation could be construed under various circumstances as an honest mistake, mere negligence, reckless incompetence, or even willful misconduct, under the totality of the circumstances of this case, the court finds that Debtor's Counsel's erroneous quotation of case authority in support of a frivolous argument further indicates, at a minimum, a recklessness that is material to the court's bad faith analysis. *See* Rules of Professional Conduct of the State Bar of California, Rule 3.3(a)(2) ("A lawyer shall not: . . . knowingly misquote to a tribunal the language of a book, statute, decision or other authority") (available at http://www.calbar.ca.gov/Portals/0/documents/rules/Rules-of-Professional-Conduct.pdf) (last visited January 30, 2020).

***Debtor's Counsel's Arguments that Milner Should Be Held in Contempt for Answering CCM's State Court Complaint [\*126] Because the Settlement Agreement was Purportedly Not an Enforceable Agreement, or, a Transfer of Property from CCM to Milner Never Occurred, Were Frivolous and Reckless***. Apparently feeling insecure about the efficacy of his argument in the State Court Complaint and Contempt Motion that the Settlement Agreement was a rejected contract from the bankruptcy case, Debtor's Counsel advanced an alternative argument that Milner and Light should be held in contempt on grounds that the Settlement Agreement did not legally transfer ownership to her and that therefore, she could not assert contractual rights under the Settlement Agreement for CCM to store the subject property because she did not own the property.

Debtor's Counsel's new argument was baseless because it was flatly inconsistent with the judicial admissions that he made on behalf of CCM in the State Court Complaint and the Contempt Motion that the property belonged to her. CCM's State Court Complaint, signed and filed by Debtor's Counsel, described the property as belonging to

Milner. *See Memorandum Decision*, ECF 2079 at 7-8 (citing *State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice*, ECF 2044 at 5-7 (¶¶ 12, 14-17, [\*127] 20-21)). As noted in the Memorandum Decision, citing the Jacobson Declaration in support of the Contempt Motion signed and filed by Debtor's Counsel, CCM has performed under the Settlement Agreement for years, and "according to Russell Jacobson, Debtor's Chief Operating Officer, 'Pursuant to [the Settlement] Agreement, [Debtor] stored various physical properties *belonging to Milner*. Much of that property remains in storage at [Debtor]'s expense including screens, screen frames and truss props, puppets, scenic elements and road cases' [ ]." *Memorandum Decision*, ECF 2079 at 5 (citing *Russell Jacobson Declaration attached to Contempt Motion*, ECF 2043 at 24 (¶ 11)); *see also, Schedule 1 to Settlement Agreement, Respondents' Trial Exhibits 5 and 7*, ECF 2066-1 at 25, 35; *Exhibit 1 to Jacobson Declaration attached to Contempt Motion*, ECF 2043 at 33.

Debtor's Counsel's "lack of ownership" argument was also baseless because the arguments he made in support of this position lacked legal and evidentiary support. As noted previously, Debtor's Counsel argued that the property could not transfer to Milner without a bill of sale, which is not supported by California statutory law. He argued that the [\*128] contract did not transfer the property to Milner for lack of a proper description of the transferred property, which is not supported by a plain reading of the contract, which included specific descriptions of categories of property transferred to Milner. He argued that the contract did not transfer the property to Milner for lack of consideration, which is not supported by the evidence since the contract showed that she gave consideration for the contract by releasing her claims against CCM pursuant to the Settlement Agreement. *See Memorandum Decision*, ECF 2079 at 17.

Beginning at the July 31, 2018 Status Conference, Debtor's Counsel took this frivolous position that

the subject property was never transferred to Milner and therefore was not her personal property. *Audio Recording, July 31, 2018 Status Conference*, at 2:35 - 2:36 p,m. ("[The Debtor] bought it. We owned it. We didn't convey it. [. . .] If you're looking at a contract that was never formed, i.e. there was never any ownership conveyance of personal property under it. We're done in terms of the Debtor's position . . . . Never ownership conveyed, therefore there cannot be a claim that we have to do something for 'her' property.")(statements **[*129]** of Debtor's Counsel). This assertion was not supported by the record in the bankruptcy case, the communications between the parties, or CCM's ongoing performance under the Settlement Agreement, and the court determines that this argument was frivolous because it was made without a reasonable factual basis. *See Memorandum Decision*, ECF 2079 at 21 (". . . all other emails, letters, or other evidence of communications from Debtor to Milner fell well short of conduct tantamount to an express repudiation constituting anticipatory breach. Moreover, the evidence shows that Debtor continued to store the Play Property and continues to do so to this day."). The court finds that it was reckless for Debtor's Counsel to characterize the subject property as Milner's property before the state court in the State Court Action, make similar representations before this court in the Contempt Motion, and then alternatively claim that CCM owned the property in later pleadings in support of the Contempt Motion. Moreover, Debtor's Counsel's alternative argument was without merit and recklessly made because it would seem that if CCM had any confidence at all in its position that it owned the property, it would **[*130]** have disposed of the subject property a long time ago, or sought declaratory relief on that ground, at least since the effective date of the plan in 2012, instead of filing the Contempt Motion asserting its rejected executory contract argument based on the position that Milner owned the property.

The court also declines to absolve Debtor's Counsel of his obligation to make reasonable inquiries as to

the facts and law based on his reliance on the views and opinions of CCM's prior counsel regarding the purported lack of enforceability of the Settlement Agreement and its nature as executory or not. Under the totality of the circumstances and in light of the apparent lack of due diligence undertaken by Debtor's Counsel in his legal and factual research, as discussed above, the court finds that a reasonable attorney appearing before this court may not and would not rely, to the court and opposing party's detriment, on other counsel's representations in the place of a reasonable legal and factual inquiry of his own.

***Debtor's Counsel's Failure to Address and Rebut Certain Cases Cited by Milner in Opposition to CCM's Contempt Motion Was Not Frivolous and Reckless***. Milner contends that Debtor's **[*131]** Counsel's contract rejection argument was also frivolous because he failed to rebut or otherwise address the case law cited by Movant's Counsel in her Bankruptcy Rule 9011 Warning Letter of July 11, 2018, specifically, *In re Parkwood Realty Corp.*, 157 B.R. 687 (Bankr. W.D. Wash. 1993) and *In re Continental Country Club, Inc.*, 114 B.R. 763 (Bankr. M.D. Fla. 1990). Because, among other reasons, *Parkwood* and *Continental* are not binding authority, the court finds Debtor's Counsel's lack of rebuttal of these case authorities, while some evidence to put him on notice that the position he was taking was not supported in the case law, to be not significant. Similarly, although Debtor's Counsel erroneously claimed that the relevant date for purposes of rejection or breach of the Settlement Agreement under 11 U.S.C. § 1141(b) was the date the final decree was entered in the bankruptcy case, rather than the Effective Date of the Plan, the court finds that Debtor's Counsel's misunderstanding was more negligent than egregious conduct tantamount to bad faith as the difference in these circumstances was not material.

***Debtor's Counsel's Prefiling Inquiry as to the Law and Facts Was Not Reasonable and was Reckless***. Debtor's Counsel stated in his declaration in opposition to the Sanctions Motion that he made a

reasonable legal inquiry for his arguments in support of the Contempt [*132] Motion: "I had a conviction the law supported each [argument] based on extensive research[,]" and "I had a conviction that the facts that I argued supported the arguments, and that my client was entitled to the relief sought." *Declaration of Debtor's Counsel attached to Opposition to Motion for Sanctions*, ECF 2120 at 16 (¶ 6-7). In describing specifically what Debtor's Counsel relied upon, he stated that he "received the case from [Winters & King, Inc., which] evaluated and communicated to Ms. Milner the exact same contentions on the subject contract being executory[,]" referring to that law firm's letter to Milner dated April 21, 2017, attached as Exhibit 1 to the Contempt Motion. *Declaration of Debtor's Counsel attached to Opposition to Motion for Sanctions*, ECF 2120 at 16-17 (¶ 8). Debtor's Counsel noted in his declaration that the Winters & King, Inc. letter asserted that the Settlement Agreement was not "Accepted or Rejected" specifically in CCM's reorganization plan, and thus the contract was subject to Section VIII.A.ii of the plan providing for the deemed rejection of any contract not designated for assumption or rejection as of the effective date of the plan. The Winters & [*133] King, Inc. letter concluded that, therefore, CCM was not obligated to any future performance on the agreement as of the effective date of the plan. However, this Winters & King, Inc. letter relied upon by Debtor's Counsel did not cite any legal authority for its contentions in the letter, and specifically did not address the issue whether the Settlement Agreement was executory, which would be necessary in order for the Settlement Agreement to be deemed rejected pursuant to this plan provision. *Id.*

Elaborating on his defense of adequate reasonable inquiry, Debtor's Counsel stated that "I had in my possession from multiple other attorneys representing the Debtor emails and letters to Ms. Milner's counsel making the same claim. I relied in part on those attorneys' position in concluding the argument had substantial merit as it was recognized by several different attorneys over a span of years,

looking at the same facts." *Id.* at 17 (¶ 9). However, Debtor's Counsel did not specifically identify these emails and letters of other counsel, so the legal authority for their contentions could not be ascertained and evaluated. *Id.*

According to Debtor's Counsel, "[t]he gravamen of my Motion re Contempt and [*134] arguments was not just the executory contract claim, but was based on claim preclusion." *Id.* at 17 (¶ 10). In explaining his research underlying CCM's preclusion claim, he reviewed the bankruptcy case docket, noting that Milner had "listed the subject contract as the basis of a bankruptcy claim she then lost with a judgment against her for attorney fees[, [Doc. 2013, pps. 16-17.]" and Debtor's Counsel "identified carefully in my briefs the parts of the bankruptcy docket, the briefs, and the rulings that supported this argument." *Declaration of Debtor's Counsel attached to Opposition to Motion for Sanctions*, ECF 2120 at 17 (¶ 11). Debtor's Counsel further stated that he "cited to *Robertson vs Isomedix, Inc.* (9th Cir) 28 F.3d 965, 969 in my opening motion re contempt, and I relied upon established law of claim preclusion as a basis for my opening motion," adding that *"Robertson* held, 'the claim could have been asserted at the time of the proceeding confirming sale, and this opportunity is sufficient to satisfy that requirement of the doctrine of res judicata." *Id.* at 17 (¶ 13). Furthermore, according to Debtor's Counsel,

> I presented evidence that before the bankruptcy petition was filed, Milner was claiming the Debtor was in breach, and yet despite litigating [*135] another clause *in the same* contract, she failed to argue that CCM had breached the storage obligation, even though she had contended that before the Petition, and was seeking damages. This was a waiver of ripe integrated claim, justifying claim preclusion. [See e.g., Milner Exhibit 10, attached to Doc. 2066].

*Id.* at 17-18 (¶ 14) (emphasis in original). Debtor's Counsel then asserted in his declaration that:

"These arguments and this evidence were not addressed in the Court's final decision, so I in good faith filed an appeal[,]" but that "I dismissed the appeal in good faith[ ]" because "The appeal was then dismissed based on changed circumstances involving the civil case, and the Court of Appeal denied Milner's request [to] recover fees and costs against CCM [Case No. 18-1310, Doc 15]." *Id.* at 18 (¶ 15-17).

Contrary to the assertions made in this declaration of Debtor's Counsel, the court in its Memorandum Decision had addressed and ruled upon CCM's claim preclusion (or res judicata) argument, rejecting it on grounds that Milner had no prepetition claim for breach of the contract regarding the storage obligations, which claim would have been subject to discharge as a prepetition claim, since there was no **[\*136]** breach of those obligations before confirmation. *Memorandum Decision*, ECF 2079 at 19-20. The evidence indicated that CCM had complied and was complying with its contractual obligations to store the property. *Id.* Debtor's Counsel referred to Milner's Exhibit 10 to ECF 2066, which was a prepetition letter from her counsel to CCM, stating that she had not been fully paid the settlement amount through the trust agreement, which may have been a prepetition claim if it had not been paid as of the petition date, however, the evidence in the record demonstrated that based on Milner's uncontroverted testimony at trial, CCM made all of the settlement payments to Milner without funding the trust. *Milner Trial Testimony, Evidentiary Hearing Transcript, September 20, 2018*, ECF 2095 at 98-99, 253-254. Nevertheless, it is legally baseless for Debtor's Counsel to argue that the discharge of prepetition claims absolved a debtor of liability for post-discharge conduct. *Memorandum Decision*, ECF 2079 at 19-20 (citing *O'Loghlin v. County of Orange*, 229 F.3d 871, 874-875 (9th Cir. 2000)). As discussed previously, since the Settlement Agreement was not an executory contract subject to rejection from the confirmed reorganization plan, its obligations continued to be enforceable, **[\*137]** including post-confirmation.

The declaration of Debtor's Counsel in opposition to the Sanctions Motion contains mostly conclusory assertions regarding his prefiling legal inquiry and does not otherwise specify what efforts he made in undertaking a reasonable legal inquiry in connection with filing and litigating the Contempt Motion, which has left the court to analyze the arguments that he made during the proceedings of the Contempt Motion as discussed herein.

As set forth in the declaration of Debtor's Counsel in response to Milner's supplemental points and authorities in support of the Sanctions Motion, ECF 2133, Debtor's Counsel stated: "I always believed in good faith that the two primary arguments I made to this Court had substantial factual and legal merit[,]" and "[m]y arguments were, (1) that because Ms. Milner had litigated intellectual property claims arising out of the exact same 2005 contract in the bankruptcy court, and (2) because all of her disputes regarding storage and ownership existed pre-petition, that she waived her rights to further litigate these matters after the discharge period." *Debtor's Counsel Post-Trial Declaration attached to Debtor's Counsel Opposition [\*138] to Supplemental Memorandum*, ECF 2133 at 18 (¶ 4-5).

In support of such arguments, Debtor's Counsel stated:

> I cited strong Ninth Circuit authority that outlined the Doctrine of Claim Preclusion and *res judicata* and believed the facts and circumstances qualified under the Doctrine. I further believed that the subject contract was executory, and I made that argument in good faith. The same conclusion had been placed in writing to me by several other attorneys including Winters and King who had referred the case to me and other attorneys that I had studies [sic] correspondence from that had represented the debtor during the bankruptcy. Exhibit 9 (attached hereto) is an example of a legal opinion provided by Richard Salus to Carl Grumer on March 18, 2013, that specifically

stated Mr. Salus' opinion that the contract was executory and had been rejected as part of the bankruptcy proceeding, stating 'and therefore CCM has no obligation to continue to store the items for free.' I independently researched this doctrine and believe that there were dual responsibilities under the subject contract, including Ms. Milner having an obligation to retrieve her alleged items in a timely manner. There was **[\*139]** never any agreement that CCM would indefinitely store these items. The contract did not state that, and Ms. Milner could not in good faith expected CCM to do so. I advocated in good faith that the entire premise of this contract was a temporary storage to allow Ms. Milner to independently return to producing a play without the budget of CCM funding it, and to then use the items for another play that she would be funding. There was an inherent 'reasonable' timeframe on this storage duty and after the items had been in storage for over ten years, I believed in good faith that the contract was executory, and that Ms. Milner had breached her part of the contract by not retrieving the items. Although the court disagreed with my implied covenant of good faith argument, i.e., I asserted the argument in good faith and believed in its accuracy."

*Debtor's Counsel Post-Trial Declaration attached to Debtor's Counsel Opposition to Supplemental Memorandum*, ECF 2133 at 18-19 (¶ 6-14).

Specifically, in support of his claim preclusion argument, Debtor's Counsel further stated that, "I argued that the Claim Preclusion Doctrine applied based on numerous exhibits that I had in my file, that were relied **[\*140]** upon and/or offered at trial[,]" and Debtor's Counsel attached copies of these exhibits to his declaration. *Id.* at 19 (¶ 15-26, 28) and Exhibits 1-11 attached thereto.

In this further declaration of Debtor's Counsel in opposition to Milner's supplemental briefing, he elaborated on his description of his legal inquiry in support of the Contempt Motion, but in substance,

he did not add very much because this further description of his inquiry was conclusory and lacked specific detail. That is, Debtor's Counsel did not describe with any detail what legal research he did before filing the Contempt Motion, and he instead reiterated what he described in his prior declaration in response to Milner's Motion for Sanctions. He said that he cited "strong Ninth Circuit authority that outlined the Doctrine of Claim Preclusion and *res judicata*" without identifying such authority, apparently referring to the case of *Robertson v. Isomedix, Inc. (In re Intl Nutronics, Inc.)*, 28 F.3d 965 (9th Cir. 1994) previously identified in his original declaration in response to the Motion for Sanctions. *Compare Debtor's Counsel Declaration attached to Opposition to Motion for Sanctions*, ECF 2120 at 17 (¶ 13), *with Debtor's Counsel Post-Trial Declaration attached to Debtor's Counsel Opposition to Supplemental* **[\*141]** *Memorandum*, ECF 2133 at 18 (¶ 6). He reiterated that "I further believed that the subject contract was executory, and I made that argument in good faith[,]" without providing further details regarding his legal inquiry for such belief and argument. *Debtor's Counsel Post-Trial Declaration attached to Debtor's Counsel Opposition to Supplemental Memorandum*, ECF 2133 at 18 (¶ 7). He also referred to his reliance on the conclusions of other lawyers without providing any further detail, except describing and attaching an email from Richard Salas, CCM's counsel, to Carl Grumer, Milner's counsel, on March 18, 2013, as an example of a legal opinion that he had considered. *Id.* at 18 (¶ 9), and Exhibit 9 attached thereto. However, this email of Salus to Grumer, containing Salus's opinion that the contract was executory and had been rejected as part of the bankruptcy proceeding, "and therefore CCM has no obligation to continue to store the items for free," contained no legal analysis with citation to any legal authority for that opinion. *Id.* This was the only identified example of a legal opinion of other counsel that Debtor's Counsel considered and relied upon as his legal inquiry for his executory contract **[\*142]** argument, which

inquiry by Debtor's Counsel is entirely unreasonable.

Debtor's Counsel asserts in the same post-trial declaration that he independently researched the executory contract doctrine, but he did not describe specifically what his research was, and the court could only ascertain what legal inquiry he did based on the legal authorities he cited in support of his argument, which argument, as discussed herein, was baseless. Regarding the reliance of Debtor's Counsel on numerous exhibits in support of his claim preclusion argument, Milner has objected to some of the exhibits as not being part of the record because the exhibits were not offered at trial or produced to Milner, ECF 2136 at 1-2, but nonetheless, the exhibits do not support Debtor's Counsel's argument that Milner had material unperformed duties which made the contract executory. While the exhibits attached to the post-trial declaration may have contained legal conclusions of some of the attorney-authors, there were no legal authorities cited in support of such conclusions. The exhibits were mainly communications between Milner and CCM's representatives, such as Gwyn Myers and Jim Penner, which expressed certain opinions **[*143]** about the Settlement Agreement, but did not support the assertions of Debtor's Counsel that the contract was executory at the time of CCM's bankruptcy case. Debtor's Counsel asserted that "I was not alone in my analysis from other bankruptcy attorneys and I relied in good faith on both their opinions and my own independent research." *Debtor's Counsel Post-Trial Declaration attached to Debtor's Counsel Opposition to Supplemental Memorandum*, ECF 2133 at 21 (¶ 25). Aside from failing to lay any foundation that any of the attorneys that he identified, and whose opinions he relied upon, were bankruptcy attorneys, the fact that Debtor's Counsel relied on the opinions of other attorneys does not show that he made a reasonable inquiry before filing the Contempt Motion because there was a complete and utter absence of legal authorities or other bases for their opinions, which, as discussed in the Memorandum

Decision, did not support the arguments raised in the Contempt Motion. Debtor's Counsel's assertion that he did independent research is not supported in the record; Debtor's Counsel's pleadings and oral arguments, the products of his research, were legally baseless, as discussed herein. **[*144]** In his declarations in response to the Motion for Sanctions and Milner's supplemental briefing, Debtor's Counsel had the opportunity to show that he made efforts to make a reasonable legal inquiry for his arguments, but he failed to make such a showing.

The importance of a reasonable legal inquiry before commencing litigation cannot be overstated. In this vein, the policy behind Civil Rule 11 also applies to the court's inherent authority and may indicate conduct tantamount to bad faith. While Debtor's Counsel may have been sincere in his beliefs that his arguments were made in good faith, as the Seventh Circuit stated about the importance of the policy of requiring a reasonable prefiling legal inquiry under Civil Rule 11, "[a]n empty head but a pure heart is no defense" and "[t]he Rule requires counsel to read and consider before litigating." *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 932 (7th Cir. 1989) (citation omitted). That is, "[c]ounsel may not drop papers into the hopper and insist that the court or opposing counsel undertake bothersome factual and legal investigation." *Id.* As the Seventh Circuit further observed, the focus of Civil Rule 11

is ex ante (what should have been done before filing) rather than ex post (how things turned out). How much investigation **[*145]** is justified (i.e., 'reasonable') in light of the costs depends on the circumstances of the case, and Rule 11 does not allow an award of sanctions just because things went poorly after an investigation that was adequate in light of what was known (and how much time was available) before the paper was filed. Sanctuary as a result of reasonable investigation ensures that counsel may take novel, innovative positions—Rule 11 does not jeopardize aggressive advocacy or

legal evolution.

*Id.* (citations omitted). These observations about Civil Rule 11 equally apply to situations where the court's inherent authority is involved with a pleading filed or an argument made in court that is baseless or frivolous without prior reasonable legal inquiry.

As the Seventh Circuit further stated about the duty of an advocate under Civil Rule 11,

> Rule 11 creates duties to one's adversary and to the legal system, just as tort law creates duties to one's client. The duty to one's adversary is to avoid needless legal costs and delay. The duty to the legal system (that is, to litigants in other cases) is to avoid clogging the courts with papers that wastes judicial time and thus defers the disposition of other cases or, by leaving judges less time **[\*146]** to resolve each case, increases the rate of error. Rule 11 allows judges to husband their scarce energy for the claims of litigants with serious disputes needing resolution.

*Id.* These concerns also apply to the court's consideration of its inherent authority to sanction behavior in making arguments without first making a reasonable legal inquiry, which may also be subject to Civil Rule 11.

Regarding what constitutes reasonable legal inquiry, the Seventh Circuit further stated:

> An objectively frivolous legal position supports an inference that the signer did not do a reasonable amount of research, but an inference, no matter how impressive, is still no more than an inference. In most cases the amount of research into legal questions that is 'reasonable' depends on whether the issue is central, the stakes of the case, and related matters that influence whether further investigation is worth the costs. The focus of Rule 11 on conduct rather than result, its close affiliation to tort law, and the fact that

objectively frivolous filings support but do not compel an inference of unreasonable investigation, mean that each Rule 11 case in the district court is unique, just as every tort suit is unique. How much investigation **[\*147]** should have been done in a given case becomes a question of line-drawing, as much as a matter of 'fact' as is the purpose behind the paper.

*Id.* at 932-933. These observations are instructive to the court in determining under its inherent authority the reasonableness of the legal inquiry by Debtor's Counsel in litigating the Contempt Motion.

The record before the court shows that the arguments that Debtor's Counsel made in support of the Contempt Motion were legally baseless and frivolous and that when he filed the Contempt Motion, he had not conducted a reasonable legal inquiry to support his arguments that Milner and Light violated the discharge injunction in filing their answer in the State Court Action. The applicable legal authorities and the facts of this case show that the contract between CCM and Milner was not executory at the time of its bankruptcy case because Milner had no material unperformed contractual obligations at the time of the bankruptcy case. The contract could not have been rejected as a result of the bankruptcy case if it was not executory, and Milner could defend herself if the bankruptcy debtor, CCM, had initiated litigation regarding prepetition acts against that other party, **[\*148]** Milner, post-discharge. The record shows that Debtor's Counsel did not research the applicable law to support these arguments before he filed the Contempt Motion as indicated by the statements made in his declarations in response to the Sanctions Motion and in his pleadings and arguments in this contested matter. Despite being put on notice that his arguments had no legal support by Milner's counsel in Light's letter of March 30, 2018 and Movant's Counsel's Rule 9011 Warning Letter, stating that the arguments were problematic and giving him an opportunity to do adequate legal research, he did not do so and continued to defend the baseless arguments made in

the Contempt Motion and raised new and additional baseless arguments in support of the Contempt Motion in opposition to Milner's meritorious arguments.

In considering the Sanctions Motion, the court is also mindful of its obligation to exercise restraint and great or extreme caution, especially because such sanctions can have "an unintended detrimental impact on an attorney's career and personal well-being." *Conn v. Borjorquez*, 967 F.2d 1418, 1421 (9th Cir. 1992) (citation omitted). As Debtor's Counsel stated in his declaration in response to Milner's supplemental briefing, "[t]he amount of sanctions **[*149]** requested is a substantial amount of money that would be crippling to [his law office]. There is no ability to pay that level of sanctions and it appears punitive." *Debtor's Counsel Post-Trial Declaration attached to Debtor's Counsel Opposition to Supplemental Memorandum*, ECF 2133 at 22 (¶ 29).

The court believes it has exercised great and extreme caution in adjudicating the Sanctions Motion by examining and discussing at great length the pleadings and other papers and arguments in this contested matter and in this bankruptcy case, and the court has analyzed at length whether the arguments of Debtor's Counsel were frivolously and recklessly made, or with an improper purpose, and whether Debtor's Counsel made a reasonable legal inquiry before he made such arguments. . The court understands that the sanctions rules must not be construed to conflict with the primary duty to represent a client zealously, and that forceful representation often requires that an attorney attempt to read a case or an agreement in an innovative though sensible way, and that when an attorney's legal theories fail to persuade the court it does not demonstrate by itself that the attorney lacked good faith in attempting **[*150]** to advance the law. *See Operating Engineers Pension Trust v. A-C Co.*, 859 F.2d at 1344. However, what the record shows here is the failure of Debtor's Counsel did not involve the making of innovative but sensible arguments or the simple failure to persuade

the court, but the failure to do basic legal research on the essential issue before the court of whether the Settlement Agreement was an executory contract which could have been rejected through CCM's bankruptcy case under 11 U.S.C. §365. The record shows that Debtor's Counsel never understood this, nor looked at the issue, when he filed the Contempt Motion, and did not understand it until he had to respond in his reply to Milner's objection to the motion by raising baseless arguments that she had material unperformed obligations under the contract. In asserting the primary argument that Debtor's Counsel made in the Contempt Motion that the court's order confirming CCM's reorganization plan worked a rejection of the contract under 11 U.S.C. §365(g), the threshold issue was of bankruptcy law: whether the contract was still executory where "the obligations of both parties are so underperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the **[*151]** other" as stated in controlling law by the Ninth Circuit in *In re Robert L. Helms Construction & Development Co.*, 139 F.3d at 705 and n. 7. The other argument that Debtor's Counsel made in support of the Contempt Motion based on claim preclusion was dependent on the contract being executory because if it were not executory, it could not have been rejected and rendered unenforceable by the bankruptcy case. There is no indication in the record that Debtor's Counsel has expertise in bankruptcy law or any of the other lawyers whose opinions he says he relied upon had any bankruptcy expertise, or that Debtor's Counsel consulted a standard bankruptcy law specific treatise, such as Collier on Bankruptcy, for example, which has a fulsome discussion defining executory contracts which could be rejected under 11 U.S.C. § 365(a). *See* Levin and Sommer, *Collier on Bankruptcy*, ¶365.02 at 365-16 - 365-25 (16th ed. 2019). Thus, Debtor's Counsel proceeded with filing and pressing the Contempt Motion without a proper legal basis based on his failure to make a reasonable legal inquiry by performing basic legal

research.

In determining the Sanctions Motion, the court must necessarily engage in line-drawing, and the court observes that there is a line between zealous advocacy and frivolous, [*152] reckless advocacy, and on this record, Debtor's Counsel crossed the line because making the arguments that he did without doing the basic legal research was baseless and reckless. For the reasons discussed herein, the court determines that Debtor's Counsel made objectively frivolous arguments in support of the Contempt Motion, in particular, the arguments that: Settlement Agreement was an executory contract subject to rejection in CCM's bankruptcy case, the plan confirmation order had preclusive effect under the doctrine of claim preclusion to bar Milner from asserting claims of ownership or for breach of contract based on post-confirmation conduct, and Milner and Light violated the discharge injunction by filing an answer in the State Court Action. The court also determines that Debtor's Counsel failed to conduct a reasonable legal inquiry before he made these arguments in this contested matter forcing the court and opposing counsel to undertake bothersome factual and legal investigation in violation of his duty to his adversaries to avoid needless legal costs and delay and to the legal system to avoid clogging the court with arguments that wasted judicial time. *See Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d at 932.

*ii*. Recklessness [*153] and Improper Purpose: Increasing Litigation and Expanding the Issues

On July 20, 2018 the parties filed a Joint Status Report. *Joint Status Report*, ECF 2059. Milner took the position that an evidentiary hearing or trial was unnecessary and improper, and the matter should be heard and argued as a motion. *Id.* at 2-3. Milner also contended that no discovery was needed. *Id.* at 2. Debtor's Counsel, however, requested a multi-day trial, written discovery, the depositions of Milner, Light and former bankruptcy counsel to Milner, a pre-trial conference, and he indicated that

he intended to call six witnesses at trial. *Id.* at 2-3. In Milner's attachment to the Joint Status Report, she argued, "Plaintiff is obviously trying to use discovery in this proceeding in a bad faith effort to bludgeon Respondent Milner into signing a release of claims in relation to her property without being given an opportunity first even to view that property." *Id.* at 5 (Attachment of Defendants/Respondents). The court ultimately stayed discovery in the matter before conducting the evidentiary hearing. *Audio Recording, July 31, 2018 Status Conference* at 2:37-2:38 p.m.

At the July 31, 2018 Status Conference, Debtor's Counsel raised for the first time arguments [*154] discussed above that lacked a sound basis in the factual record and the law, namely, that the executory contract issue need not be addressed because there was never a transfer of the subject property because there was no bill of sale, and that there was no meeting of the minds so the Settlement Agreement was not an enforceable contract at all. *Audio Recording, July 31, 2018 Status Conference* at 2:35 - 2:39 p.m. (explaining Debtor's position that (i) there was never a conveyance of property or enforceable contract and (ii) the contract, if it was enforceable, is executory. Debtor's Counsel had not raised in his initial pleading in this contested matter, the Contempt Motion, these arguments that no transfer of property ever occurred, or that there was no meeting of the minds establishing an enforceable contract, which arguments were inconsistent with his assertions in the Contempt Motion and State Court Complaint that there was a contract, but it was rejected through the bankruptcy case. At the evidentiary hearing, Debtor's Counsel pursued the argument that CCM disputed that the Settlement Agreement "ever reached the point of a binding agreement to transfer ownership." *Evidentiary Hearing [*155] Transcript*, ECF 2095 at 57; *see also id.* at 8-9. Yet Debtor's Counsel at the same time continued to assert the argument that the Settlement Agreement was an executory contract which had been rejected based on a new theory that Milner had some duty to inspect the property,

which made the agreement executory. *Id.* at 279-280.

In this case, Debtor's Counsel made new and inconsistent arguments because Milner, by her arguments in her pleadings and her counsel's Bankruptcy Rule 9011 Warning Letter, had raised serious doubts about his initial arguments in the Contempt Motion. Debtor's Counsel needlessly expanded the litigation between CCM and Milner because his arguments were frivolous and reckless, lacking a reasonable basis in fact and law and were made without a reasonable legal inquiry. Debtor's Counsel's conduct and pleadings indicate that instead of pursuing CCM's claims in the existing State Court Action that he brought against Milner, he multiplied litigation proceedings against her by instituting new litigation in another forum by filing the Contempt Motion in this case in an effort to coerce Milner into releasing her claims against CCM, the same objective that he sought in the state court litigation, which conduct is forum [*156] shopping. Debtor's Counsel admits as much in his opposition to Milner's supplemental brief in support of the Sanctions Motion, where he states that "the state case filed against Milner listed the discharge as a basis of recovery. [. . .] However, presenting bankruptcy law and arguments to a state judge is not ideal when the actual bankruptcy case could be reopened and this issued [sic] decided by the same bankruptcy court." *Debtor's Counsel Opposition to Supplemental Memorandum*, ECF 2133 at 16-17. In his original opposition to the Sanctions Motion, Debtor's Counsel stated, regarding the Contempt Motion he filed for CCM: "The purpose of the motion was to expedite a resolution of the parties' dispute by a single motion, as opposed to a drawn-out State Court action." ECF 2120 at 10. This statement is another admission of forum shopping. According to Debtor's Counsel in his response to Milner's supplemental brief in support of the Sanctions Motion, this multiplying of litigation and forum shopping was justified because he "believed in good faith that a single hearing with this court could end the dispute if the outcome was favorable to CCM[,]" which he says "was not an improper

purpose, [*157] [sic] it was the intended purpose of streamlining the legal disputes between the parties." ECF 2133 at 17.

The court determines that contrary to Debtor's Counsel's assertions that the initiation of the additional litigation proceeding in this court was "streamlining" or "expediting" a resolution of the parties' dispute, it increased the litigation between them by multiplying litigation proceedings. On this record, when Debtor's Counsel says that he was concerned about a drawn-out State Court Action or that a state judge would not be ideal to resolve the dispute, he indicates that he was evidently dissatisfied with the progress of the State Court Action that he initiated for CCM against Milner, and he wanted to forum shop instead of proceeding in that action. Debtor's Counsel chose the state court as the forum to commence the initial litigation against Milner to vindicate his client's rights, and even though his theory of relief was based on bankruptcy law, i.e., the effect of the plan confirmation order on the Settlement Agreement, Debtor's Counsel chose to litigate in the state court by filing the State Court Complaint.

As indicated in the correspondence between Debtor's Counsel and [*158] Milner's counsel, Light, before the Contempt Motion was filed, Debtor's Counsel notified Light that he was considering bringing an "ex-parte" application for a temporary restraining order against Milner or moving to strike her answer in the State Court Action and to schedule the hearings at the time when Light was busily preparing for trial in another case, while at the same time, offering to settle if Milner released her claims against CCM, *Exhibit 3-6 to Declaration of Debtor's Counsel attached to Contempt Motion*, ECF 2043 at 44-59. Instead, Debtor's Counsel initiated new litigation in this court by filing the Contempt Motion to hold Milner and her counsel, Light, in contempt for defending herself in the State Court Action by filing an answer asserting affirmative defenses. These circumstances indicate that Debtor's Counsel intended to put more pressure on Milner by

increasing litigation costs and starting new litigation proceedings to hold her and her attorney in contempt. If it were more expeditious or in the interests of streamlining litigation to have this court adjudicate a matter involving bankruptcy law rather than the state court, Debtor's Counsel should have come to this [*159] court first instead of initiating the State Court Action and then bypassing that court by filing the Contempt Motion. It is evident on this record that before he filed the Contempt Motion, Debtor's Counsel did not make a reasonable inquiry of the applicable law to support the claims made in the Contempt Motion, even though Milner through her counsel, Light, put him on notice that the theories on which the claims were based were legally dubious. Under these circumstances, the forum shopping and filing of new litigation to put pressure on Milner in the hopes of dissuading her from defending herself in the existing State Court Action, and to cause Milner to capitulate, settle and release her claims, along with the baseless nature of CCM's claims and the lack of reasonable inquiry attributable to Debtor's Counsel, all indicate an improper purpose for this litigation.

In *Skies Unlimited, Inc. of Colorado v. King*, 72 B.R. 536, 539 (Bankr. D. Colo. 1987), a dispute arose between a creditor and two debtors after plan confirmation. After the creditor initiated state court litigation and filed a notice of lis pendens against the debtors' property, the debtors filed a complaint in the bankruptcy court and filed a motion for an order to show cause why the creditor should not [*160] be held in contempt for violation of the automatic stay. *Id.* at 537-538. The court granted the creditor's motion to dismiss the complaint because the automatic stay had no application to a dispute arising post-confirmation over property of the reorganized debtors since there was no longer a bankruptcy estate for which a stay would apply. *Id.* at 537. The court granted the creditor's motion for sanctions against debtors' counsel under Bankruptcy Rule 9011 because the arguments that the debtors made concerning the applicability of the stay under 11 U.S.C. §362 were "totally unfounded

and without merit," and the complaint and motion for an order to show cause were brought for an improper purpose as these pleadings were "replete with claims that [creditor] violated the clearly inapplicable section 362, and the repeated assertions that [creditor] is therefore in contempt of the orders of this court, it is . . . clear to this court that the complaint and the order to show cause were filed for the purposes of placing unwarranted pressure on [creditor] and to harass him." *Id.* at 539. The court further concluded that there was "no question that these Debtors, through their attorneys, were seeking to browbeat the Defendant with threats of potential contempt orders and thereby [*161] dissuade him from pursuing his claims in the state court." *Id.* The court imposed sanctions against the debtors' attorneys under Bankruptcy Rule 9011 on grounds that their actions were frivolous and were taken with the improper purpose of harassing the creditor. *Id.*

The court determines that similar to the sanctioned litigation by debtors' counsel in *Skies Unlimited*, the Contempt Motion filed by Debtor's Counsel was a baseless attempt to gain an advantage over Milner in litigation and coerce a release of claims by instituting new litigation as additional pressure on her. CCM's claims that it was no longer obligated to comply with the Settlement Agreement could have been litigated in the existing State Court Action where it originally chose to litigate, and Debtor's Counsel abused the judicial process by bringing new litigation in the form of a contempt motion based on baseless legal positions. Debtor's Counsel then compounded the problem by expanding the issues further with additional baseless legal positions after Milner presented him with compelling arguments rebutting his positions in the original motion, thereby imposing needless litigation costs on Milner. In his Opposition to the Sanctions Motion, [*162] Debtor's Counsel asserted:

> The purpose of the motion was to expedite a resolution of the parties' dispute by a single motion, as opposed to a drawn-out State Court action. There was not intent to harass Ms.

Milner by Debtor's Counsel or his client in filing the motion. It was based on the available remedies unique to a discharged Chapter 11 Debtor where the same creditor that had demanded damages for the alleged breach of contract before and during the bankruptcy case, was continuing to seek those same damages post discharge.

*Debtor's Counsel's Opposition to the Sanctions Motion*, ECF 2120 at 10-11 and 16. Based on the record as described herein, the court determines that the Contempt Motion was brought by Debtor's Counsel for the purpose of browbeating Milner into releasing her claims by forum shopping and bringing additional litigation in another court because he was not making the progress that he wanted in the pending state court litigation. Debtor's Counsel hoped to exert additional pressure on Milner by suing her and her counsel for asserting defenses in the pending state court litigation, thereby compelling her to release her state court claims and obtaining a more favorable forum **[\*163]** for his client. This purpose of filing the Contempt Motion was improper and, taken together with the frivolous arguments discussed above, the court finds under its inherent authority that Debtor's Counsel acted in bad faith in filing and litigating the Contempt Motion and that Milner's motion for sanctions should be granted in part as to him.

### iii. Milner Has Not Met Her Burden of Proving that CCM Should Be Sanctioned for Conduct Tantamount to Bad Faith

As discussed above, a court may not sanction a litigant or counsel by invocation of its inherent powers absent a specific finding of bad faith. In an analysis of sanctions under the court's inherent power the court therefore may not impute the bad faith of one litigant or counsel to another. *Primus Automotive Financial Services, Inc. v. Batarse*, 115 F.3d at 648 (requiring an "explicit" finding of bad faith) (citation omitted); *see also In re Keegan*

*Management Company Securities Litigation*, 78 F.3d at 436 (requiring a "specific" finding of bad faith) (citation omitted). Although neither *Primus Automotive Financial Services, Inc. v. Batarse* nor *In re Keegan Management Company Securities Litigation* expressly held that bad faith may not be imputed, the court reaches this conclusion based on authorities cited herein interpreting the court's inherent authority to sanction, *see [\*164]* e.g. *Fink v. Gomez*, 239 F.3d at 993 (requiring a "specific finding") (citation omitted), Bankruptcy Rule 9011,[25] and other authorities addressing a client's accountability for her counsel's conduct.

In a different context, such as non-jurisdictional dismissals, a client is normally chargeable with her counsel's conduct. *Link v. Wabash Railroad Co.*, 370 U.S. 626, 633-634, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962) (dismissal by the district court for counsel's unexcused failure to prosecute was not an "unjust penalty on the client").[26] In *Link v. Wabash Railroad Co.*, the Supreme Court in dicta noted that a party voluntarily chooses her attorney as her representative in an action, and she "cannot [ ] avoid the consequences of the acts or omissions of this freely selected agent." *Id.* "Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Id.* at 634 (citation omitted); *see also, In re Hill*, 775 F.2d

---

[25] Pursuant to Bankruptcy Rule 9011(c)(2)(A), "Monetary sanctions may not be awarded against a represented party for a violation of subdivision (b)(2)." Subdivision (b)(2) is the frivolousness prong of Rule 9011: "the claims, defenses, and other legal contentions . . . are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law[.]" In other words, a represented party relies on her counsel's expertise and may not be held accountable for legal arguments that are baseless and made without a reasonable inquiry. *See Hamel v. Lalliss (In re Hamel)*, 2009 Bankr. LEXIS 4521, 2009 WL 7751431, at \*11 (9th Cir. BAP 2009).

[26] In *Link v. Wabash Railroad Co.*, the Supreme Court held that "the failure to appear at a pretrial conference may, in the context of other evidence of delay, be considered by a District Court as justifying a dismissal with prejudice." 370 U.S. at 635.

Exhibit 3, Page 67

1385, 1387 (9th Cir. 1985)("We have no intent to disavow the established principle that the faults and defaults of the attorney may be imputed to, and their consequences visited upon, his client.").

In *Community Dental Services v. Tani*, 282 F.3d 1164 (9th Cir. 2002), the Ninth Circuit, applying Federal Rule of Civil Procedure 60(b)(6),[27] reversed the district court's [*165] denial of a motion for relief from default judgment after the district court had concluded that no "extraordinary circumstances" beyond the party's control existed, because the party was chargeable with his counsel's conduct. 282 F.3d at 1169. In reversing the district court, the Ninth Circuit distinguished between the general imputation rule that a client is accountable for her counsel's "neglectful or negligent acts," and a client's purported responsibility for "the more unusual circumstances of his attorney's extreme negligence or egregious conduct." *Id.* at 1168. The Ninth Circuit held that "where the client has demonstrated gross negligence on the part of his counsel, a default judgment against the client may be set aside pursuant to Rule 60(b)(6)." *Id.* at 1169. Although the "extraordinary circumstances" analysis under FRCP 60(b)(6) is not at issue in this case, the court finds *Community Dental Services v. Tani* persuasive as to when it may be proper to impute attorney conduct to a client. Because the court may only invoke its inherent authority to sanction a party upon an explicit finding of bad faith or egregious conduct tantamount to bad faith, it follows that such a finding may not be imputed to an attorney or client but must be specifically [*166] supported by the party or counsel's conduct.

i. Recklessness and Frivolousness: Misstatements of Law and Fact

The court cannot make a finding of misconduct on the part of CCM demonstrating bad faith on its part either under a clear and convincing or a preponderance of the evidence standard. The record does not demonstrate that CCM did anything more than rely on Debtor's Counsel to develop the legal theories for the claims it made to pursue the Contempt Motion against Milner and Light. As set forth in the Declaration of Russell Jacobson, CCM's Chief Operating Officer: "At the time the underlying Motion for an Order to Show Cause ('Motion for OSC') was filed, CCM was represented solely by [Debtor's Counsel] in this bankruptcy proceeding. Furthermore, at that time, CCM believed that [Debtor's Counsel] understood the relevant law and that the Motion for OSC was proper." *Jacobson Declaration in Support of CCM Opposition to Sanctions Motion*, ECF 2116 at 2 (¶ 4). The record before the court does not show that CCM had knowledge that the legal arguments made by Debtor's Counsel on its behalf, discussed above, were baseless. Based on the Jacobson Declaration, CCM believed that Debtor's Counsel [*167] understood the relevant law, and thus, undertook a reasonable inquiry into all factual and legal matters asserted in the State Court Action and the Contempt Motion. The court attributes the arguments frivolously and recklessly made in support of the Contempt Motion, related misstatements of law, and overall lack of reasonable inquiry to Debtor's Counsel, not CCM.

ii. Recklessness and Improper Purpose

The record does demonstrate, however, that CCM was not entirely blameless in transmitting mixed messages and acting inconsistently leading up to the filing of the Contempt Motion, including not giving sufficient notice of its attempt to reject the contract with Milner in its bankruptcy case. The court finds, however, that CCM's conduct is not so beyond the pale that the imposition of sanctions under the court's inherent authority is appropriate. "It is, of course, beyond cavil that the attorney-client relationship is an agent-principal relationship." *McCarthy v. Recordex Services, Inc.*, 80 F.3d 842, 853 (3d Cir. 1996). This relationship "serves as ratification of any actions taken by the attorney." *Campbell v. Conway*, 611 B.R. 38, 48

---

[27] Federal Rule of Civil Procedure 60(b)(6) provides that "the court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . any other reason that justifies relief."

(M.D. Pa. 2020). "Where sanctions are concerned . . . 'if the fault lies with the attorneys, that is where the impact of the sanction should be lodged.'" *M.E.N. Co. v. Control Fluidics, Inc.*, 834 F.2d 869, 873 (10th Cir. 1987) (citation omitted). **[*168]** "A debtor cannot, [however,] merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath." *In re Tully*, 818 F.2d 106, 111 (1st Cir. 1987) (affirming bankruptcy court's denial of discharge where debtor knowingly failed to disclose material facts in his schedules).

In Milner's Reply to the Supplemental Opposition filed by CCM, ECF 2135, filed on December 16, 2019, she argued that CCM was "intimately involved" in the filing of the Contempt Motion for the "improper purpose" of harassing and coercing her to sign a release of claims. ECF 2135 at 3. In support, Milner contends that CCM first discussed rejection or breach of the continuing obligation to store the subject property in 2011, when the CCM Board of Directors passed a resolution to reject the Settlement Agreement. *Id.* Notwithstanding the resolution, CCM never took formal action to reject the contract with notice to Milner in the bankruptcy case and never breached the contract during the bankruptcy to give her notice that it was repudiating or rejecting the contract. Milner asserts that the board minutes indicate that CCM must have known at that point that it could not follow through on the **[*169]** resolution because the agreement was not executory. *Id.*; *see also Trial Exhibit 39, Supplemental Appendix*, ECF 2128 at 366-370. Perhaps such an inference could be drawn, but the court cannot speculate as to what advice former bankruptcy counsel may have given to CCM regarding the Settlement Agreement being an executory contract.

As discussed further below, however, the court finds in some respects that CCM's efforts to extricate itself from the obligations of the Settlement Agreement, specifically, storing the subject property in like condition, concerning. In November 2010, approximately one month after CCM filed its bankruptcy petition, Milner was in communication with CCM regarding certain light fixtures, "Martin Macs," some of which CCM retained and others CCM transferred to her pursuant to the Settlement Agreement. *Exhibit 13 to Milner Declaration*, ECF 2066-1 at 61-63. Jim Penner of CCM ("Penner") responded to Milner's concern that her property might be errantly recorded on the schedules, stating that "whatever is yours on the settlement record is yours, not a problem." *Id.* at 62-63. When Milner responded and asked Penner what would be listed as assets of CCM, Penner responded, "[j]ust what **[*170]** the cathedral owns. The Ministry can't list your Mac's as our assets as that would go against the agreement. They were handed over to you, . . . ." *Id.* Here, CCM's representative indicates to Milner that the contract between CCM and Milner is valid and the property is hers.

At the March 24, 2011 meeting of CCM's Board of Directors, Gwyn Myers raised the issue of the status of the 2006 Settlement Agreement between CCM and Milner in light of CCM's pending bankruptcy case. *Trial Exhibit 39, Supplemental Appendix*, ECF 2128 at 366-368. Richard Salus ("Salus") and Marc Winthrop ("Winthrop"), bankruptcy counsel to CCM, and Carl Grumer ("Grumer"), counsel to Robert and Arvella Schuller (and Milner), attended the meeting. *Id.* at 366.[28] The minutes of the board meeting recited:

> The settlement contract with Carol Milner was discussed. It was noted that all cash and property items in the settlement contract have all be [sic] fulfilled, but that there is a clause in the contract that requires CCM to store set items from Creation owned by Carol Milner and maintain and preserve these items in "like condition". The agreement between CCM and Carol Milner is silent on the term for CCM's

---

[28] The other attendees at the CCM board meeting on March 24, 2011 included Robert Schuller, Arvella Schuller, Gwyn Myers, Rick Mysse, Jim Penner and Sheila Schuller Coleman, the then-CEO of CCM. *Id.*

obligation to store said items. **[\*171]** Noting that it was an extremely difficult task to store physical items in an unchanged state, and with no end date given, Gwyn Myers recommended that the contract be rejected, and that Carol Milner should be given reasonable notice to retrieve her physical items from ministry storage. After discussion the Board passed the following resolution, with Gwyn Myers making the motion. Rick Mysse seconding and all voting in favor, with Dr. Robert Schuller abstaining, and Arvella Schuller voting in opposition. **RESOLVED, the contract between CCM and Carol Milner dated July 8, 2006 be rejected. RESOLVED FURTHER, that Carol Milner shall be given thirty (30) days to remove her items from CCM's custody and control, at her expense**.

*Trial Exhibit 39, Supplemental Appendix*, ECF 2128 at 368. Thus, a year after Penner tells Milner that the property is hers, CCM's board of directors passes a corporate resolution to reject the contract with Milner, though the resolution acknowledges that the property is hers.

On or about May 4, 2012, more than a year after this resolution of the CCM board of directors to "reject" the Settlement Agreement and less than a week after the Effective Date of the Plan, May 1, **[\*172]** 2012, John Charles, CCM's then-President and CEO, wrote a letter to Milner requesting that she retrieve all of the subject property in CCM's warehouse and trailers by around the end of June 2012, or CCM would consider the property abandoned and dispose of it. *Exhibit 15 to Milner Declaration*, ECF 2066-1 at 68-69. It is undisputed that as reflected on the case docket of this bankruptcy case, CCM did not file a formal motion to reject the Settlement Agreement as an executory contract before the effective date of the plan. That is, a year after the CCM board passed its resolution to reject its contract with Milner, it had not taken any action in the bankruptcy case to obtain an order to reject the Settlement Agreement with sufficient notice to Milner, but its president

requested her to remove her property, or otherwise CCM would consider the property abandoned by her, which still indicated that CCM considered the property hers.

On June 25, 2012, Dennis W. Ghan ("Ghan"), also CCM's counsel, in a letter to Grumer, Milner's counsel, reiterated CCM's position that Milner needed to retrieve the items by approximately June 30, 2012. *Exhibit 28 to Grumer Declaration*, ECF 2066-2 at 11-14. Ghan **[\*173]** referenced the May 4, 2012 letter from John Charles, the then-President of CCM, to Milner and stated, "I am giving you written notice of CCM's intent to remove and dispose of the Creation Items in accordance with California law and the procedures outlined below if Ms. Milner fails to remove the Creation Items from the warehouse and trailers by June 30, 2012." *Exhibit 28 to Grumer Declaration*, ECF 2066-2 at 12; *Exhibit 1 to Ghan Declaration attached to CCM Reply to Milner's Objection to Contempt Motion*, ECF 2053 at 14 (same). Ghan went on to assert that pursuant to the California Commercial Code, CCM as "warehouse-bailee" would be forced to sell the subject property and deduct storage, moving and preservation costs incurred by CCM if Milner did not retrieve the subject property. *Exhibit 28 to Grumer Declaration*, ECF 2066-2 at 13. Ghan further stated in this letter: "[h]owever, if Ms. Milner timely removes the goods from the warehouse and the trailers, *CCM is willing to abandon the Creation Items to Ms. Milner* and waive its claims for storage, moving and preservation costs." *Id.* (emphasis added). Ghan made the following assertion in his letter:

. . . Ms. Milner's alleged ownership interest **[\*174]** in the Creation Items stems from the agreement dated July 8, 2006 between Ms. Milner and CCM (the "Settlement Agreement"). CCM does not believe that the Settlement Agreement is a valid agreement because it was a "self-dealing transaction" that was not reviewed or ratified by CCM's board of directors. . . . based on its determination that the Creation Items have limited to no value and

the cost of storing the Creation Items is cost prohibitive, CCM is willing to abandon the Creation Items to Ms. Milner if she timely removes them from the warehouse and trailers by June 30, 2012. . . . [E]ven assuming that the Settlement Agreement is valid, it does not require CCM to store and maintain the Creation Items, which it has been forced to do for the past six years during a time of extreme financial difficulty. Ms. Milner could have and should have removed the Creation Items during the last six years. Therefore, CCM is not responsible for any alleged loss or damage to the Creation Items.

*Id.* However, Ghan in this letter did not cite any legal authority to support the proposition that the Settlement Agreement was not a valid agreement because it was a "self-dealing transaction" that was not reviewed **[\*175]** or ratified by CCM's board of directors. Salus, Winthrop, and a third attorney for CCM, Kavita Gupta, all received email copies of Ghan's June 25, 2012 letter to Grumer. *Id.* at 14. Here, a month after CCM's president, Charles, requested that Milner remove her property, a lawyer for CCM wrote Milner, telling her that CCM considered the contract to be an invalid "self-dealing" transaction and that CCM was willing to "abandon" the property to her if she promptly removed it, which indicates that CCM's position about ownership of the Play Property had changed and that the property was purportedly not hers.

Between June 2012 and March 2013, the parties attempted to coordinate Milner's inspection and retrieval of the subject property to no avail. In March 2013, Salus, CCM's counsel, had numerous communications with Grumer, Milner's counsel, regarding the subject property. On March 5, 2013, Salus, requesting that Milner retrieve the subject property, wrote to Grumer, "the items are allegedly her property - she should come and get her "stuff"; . . . the Ministry cannot [sic] longer front the cost of storing Carol's items and with the pending move this matter must be resolved." *Exhibit B to Milner Attachment **[\*176]** to the July 20, 2018 Joint Status*

*Report*, ECF 2059 at 23 (internal pagination, Exhibit B at 21). Grumer responded, noting the logistical challenges for retrieving the subject property in CCM's trailers. *Id.* at 22-23 (internal pagination, Exhibit B at 20-21). On March 18, 2013, Salus replied in a letter to Grumer with a copy to John Charles, CCM's then-President and CEO, writing,

> Keep in mind that [Milner]'s contract you refer to was rejected as part of the bankruptcy proceedings and therefore CCM has no obligation to continue to store the items for free—CCM has given sufficient statutory notice, on several occasions, to have the materials retrieved or they will be disposed of as allowable under the law. . . . If [Milner] actually wants to [sic] items, which I highly doubt since there is no resale value to the items and absolutely no use for them, she should get a moving company and arrange to haul away the stuff.

*Id.* at 22 (internal pagination, Exhibit B at 20). In these communications, CCM's counsel wrote Milner's counsel requesting that Milner remove the property referring to it as her "stuff" or "allegedly her property."

From 2013 to 2017, the parties continued to exchange communications without resolving **[\*177]** their differences. On April 21, 2017, Wesley R. Carter ("Carter") of Winters & King, Inc., counsel to CCM, wrote a letter to Milner, stating: "CCM can no longer store your property at its own expense. CCM does not believe it has any contractual obligation to do so and does not intend to keep the property if you do not take possession of it." *Exhibit 1 to Debtor's Counsel Declaration attached to Contempt Motion*, ECF 2043 at 38; *see also Exhibit 22 to Milner Declaration*, ECF 2066-1 at 86-88 (arguing that the Settlement Agreement was rejected by operation of the Plan and therefore "CCM is not obligated to any future performance . . . if such obligation existed in the first instance."). Milner responded in a letter, disagreeing with Carter's "assertion that the

agreement was rejected under the bankruptcy matter" and stating that CCM "certainly has no right to discard the property and I will seek damages if the property has not been or does not continue to be preserved per the agreement and for any other breach of agreement." *Exhibit 23 to Milner Declaration*, ECF 2066-1 at 90.

Carter replied to Milner by letter of May 12, 2017, wherein he reiterated CCM's position that it "will not store **[*178]** the subject property forever as you continue to allege it is obligated to do." *Exhibit 2 to Debtor's Counsel Declaration attached to Contempt Motion*, ECF 2043 at 41. Carter asserted CCM's position that:

> It has been over a decade since the [Settlement Agreement] with CCM [was entered into,] and CCM continues to store your property at a substantial cost to CCM. . . . CCM denies any assumption of the agreement post-bankruptcy. . . . Attempts by the ministry to avoid additional conflict with you should not be construed as an assumption of any official contract. I must also make clear that CCM does not agree with your interpretation of the underlying agreement in the first instance. Your interpretation relies on a single sentence in Schedule 1 which reads: 'CCM will keep all goods in same condition as they were in at the end of the '05 season.' However, that schedule is simply a list of how the assets were to be distributed to the respective parties. This sentence does not create an ongoing obligation for CCM to store your property forever. It is a common contractual term that requires a party to keep property in a similar condition until it can be transferred. A reasonable time to take **[*179]** possession of the property would be inferred in the contract and I believe any reasonable person would see a decade as a reasonable amount of time. CCM does not believe it has any contractual obligation to do so and does not intend to keep the property if you do not take possession of it.

*Id.* at 41-42. In these later communications between counsel for the parties, CCM's counsel once more refers to the property as Milner's property.

As previously discussed, Debtor's Counsel also relied upon some of these communications, specifically, the opinion of CCM's counsel, Salus, as set forth in the March 18, 2013 letter to Grumer, Milner's counsel. *Debtor's Counsel Post-Trial Declaration attached to Debtor's Counsel Opposition to Supplemental Memorandum*, ECF 2133 at 21 (¶ 25). However, Debtor's Counsel's reliance on these opinions was not reasonable because the opinions were just assertions by CCM's prior counsel not supported by any analysis citing applicable legal authority. Debtor's Counsel was required to make his own independent legal inquiry. At issue here and discussed below, however, is *CCM's* knowledge and conduct from when it filed its bankruptcy petition on October 18, 2010 through the date of the **[*180]** filing of the Contempt Motion on June 8, 2018. What distinguishes CCM from Debtor's Counsel, however, is that CCM was and is a represented party, as opposed to counsel with the independent duty of reasonable legal inquiry.

***The Jacobson Declaration and Role***. In asserting that CCM should be sanctioned for conduct tantamount to bad faith, Milner focuses on the role of Russell Jacobson, CCM's chief operating officer. *Reply to CCM Supplemental Opposition*, ECF 2135 at 2, 5 and 9. Milner argues:

> CCM claims that the Myers Declaration was truthful and suggests conflicting evidence, including undisputed testimony of Ms. Milner, should be disregarded. As described in the Supplemental Brief and below, the Myers Declaration was untrue and intended to mislead the court. Moreover, Mr. Jacobson, CCM's chief operating officer, participated in the filing and pursuit of Ms. Milner through trial, and knew or should have known that the information and testimony presented was not true. Additionally, since [Debtor's Counsel]

was relatively new to the case and facts, the information that [Debtor's Counsel] used to prepare for trial, including for preparation of the Myers Declaration must have come from CCM. [*181]

*Id.* at 5-6.

In his declaration filed in support of the Contempt Motion, Jacobson stated that the matter concerned "CCM's efforts to have [Milner] retrieve the remaining property she previously owned that CCM has been storing for several years at CCM's expense." *Jacobson Declaration attached to Contempt Motion*, ECF 2043 at 23 (¶ 2). Jacobson stated his view that Milner lost ownership of the property as a result of CCM exiting bankruptcy. *Id.* (¶ 5). However, Jacobson also characterized the Settlement Agreement as a "2006 contract to which Milner and CCM were parties," *id.* at (¶ 3), whereby "CCM stored various physical properties *belonging to Milner* . . . . at CCM's expense . . . and it costs CCM thousands of dollars a year to continue to store the subject box trailers full of *Milner's Play related equipment*. It will cost CCM thousands of dollars to empty and haul to a waste site all of the belongings in the seven trailers[,]" *id.* at 24 (¶¶ 11, 13) (emphasis added). Jacobson's characterization of the subject property, the Play Property, as Milner's property, notwithstanding his view that she lost ownership through CCM's bankruptcy case, is consistent with CCM's representations in the State Court Complaint [*182] that the Play Property was transferred by CCM to Milner pursuant to the Settlement Agreement. *See State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice*, ECF 2044 at 4-10. In the State Court Complaint, CCM referenced Milner's ownership interest in the Play Property no less than thirteen times.[29] The

court finds that Jacobson's declaration was not misleading or fraudulent because while it is argumentative, it accurately stated CCM's position and views about the characterization of the Play Property. There is no evidence in the record that CCM or Jacobson directed Debtor's Counsel to assert that the property was never transferred to Milner or that her ownership interest in the property was somehow terminated.

Milner does not cite any evidence to show that Jacobson "participated in the filing and pursuit of Ms. Milner through trial" for an improper purpose, and it is unclear what she meant by "filing and pursuit of Ms. Milner through trial." *Reply to CCM Supplemental Opposition*, ECF 2135 at 5-7. The evidence, based on Jacobson's declaration in opposition to the Sanctions Motion, [*183] is that he is the representative of CCM, the client. There is no evidence showing that Jacobson was actively involved in directing the conduct and course of the litigation. Furthermore, Milner does not cite any evidence to show that Jacobson knew that the information and testimony presented at trial was not true or that the alleged false information must have come from CCM. There is a good faith dispute between the parties about the veracity of the Myers Declaration, and, as discussed below, the court determines that the testimony in the Myers Declaration was not false or perjurious, but mistaken. On this record, the evidence is insufficient to show by a preponderance of the evidence that Jacobson's role in the litigation was more than being a passive representative of a client who relied upon an attorney to handle a legal dispute that resulted in litigation.

**The Myers Declaration**. Milner also argued that the Declaration of Gwyn Myers, ECF 2075, filed September 19, 2018, was false testimony, and reflected on CCM because the declaration was in support of the Contempt Motion, and Myers was a representative of CCM. *Milner Supplemental Memorandum re Bad Faith*, ECF 2127 at 12-13.

---

[29] *State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice*, ECF 2044 at 6 (¶ 12)("physical properties belonging to [Milner]"); *id.* at 7 (¶ 17)("equipment of [Milner]"); *id.* (¶ 18)("her personal property"); *id.* (¶ 20)("[Milner]'s items"); *id.* (¶ 21)(same); *id.* (¶ 21)(same); *id.* (¶ 21)(same); *id.* at 8 (¶ 23)("[Milner]'s property"); *id.* (¶ 26)("her personal property"); *id.* (¶ 27)("her

property"); *id.* at 9 (¶ 32)("her items"); *id.* (¶ 34)("[Milner]'s property"); *id.* at 10 (¶ 1)(same).

Case 8:18-ap-01168-SC    Doc 332    Filed 08/05/21    Entered 08/05/21 20:15:00    Desc
Main Document      Page 78 of 164

Page 61 of 76

Specifically, **[\*184]** Milner took issue with paragraph 8 of the Myers declaration, ECF 2075 at 2, where Myers, a former board member and Chief Restructuring Officer of CCM, testified that CCM's board of directors agreed with the advice of CCM's attorney, Robert Gipson, that the Settlement Agreement was not valid until a disinterested majority of the CCM board of directors approved it and that CCM would need to quit claim the Play Property to Milner. *Milner Supplemental Memorandum re Bad Faith*, ECF 2127 at 13. Milner also asserted that paragraph 8 of the Myers declaration was fraudulent because Myers declared that based on July 2006 e-mails from CCM's counsel, Myers understood that the subject property would need to be quitclaimed to Milner apart from the Settlement Agreement, and that an inventory of the subject property would also need to be done. *Id.* Milner contends that later e-mails between Myers and Milner demonstrate that these statements were false because they were contradicted by these later emails wherein Myers's understanding changed, and Myers stated that no quitclaim deed or further board approval would be necessary to effectuate the transfer of property to Milner despite counsel's advice. **[\*185]** *Id.* (citing *Trial Exhibit 8 and 9, Supplemental Appendix*, ECF 2128 at 353-355 and 356-359). The court does not find it perjurious or fraudulent that Myers's understanding of CCM's corporate governance procedures required to render the Settlement Agreement enforceable may have changed between 2006 and 2007, or some years after.

Myers declared under penalty of perjury her understanding of the facts related to this dispute. She did not have a duty to describe in her declaration every e-mail she sent to Milner, and the court does not find her declaration fraudulent. For instance, in paragraph fourteen of her declaration, Myers describes sending an August 21, 2006 email to Milner in which Myers stated that the Settlement Agreement would require CCM board approval. *Myers Declaration*, ECF 2075 at 4 (¶ 14). In paragraph fifteen, Myers states that to her knowledge no final majority vote of the CCM

board approved the Settlement Agreement. *Id.* (¶ 15). These statements of Myers are not patently false because they reflect her understanding of the circumstances surrounding the execution of the Settlement Agreement, but it appears that these statements were factually incomplete as other emails in **[\*186]** evidence show, as Milner points out, that Myers' understanding changed in that no quitclaim deed or further board approval was needed to effectuate the property transfer as discussed above.

The court did not find credible Myers' statements that the Settlement Agreement was not valid until a disinterested majority of the CCM board of directors approved it, or that a quitclaim deed was needed to effectuate a transfer of the Play Property to Milner, because such statements were Myers' statements of legal opinion, which are not authoritative or dispositive here. It is undisputed that Myers, as a member of CCM's executive committee and board of directors, signed and initialed the Settlement Agreement to execute the agreement on behalf of CCM. If further board approval was required, then she should not have executed the agreement on behalf of CCM, which she did, and she should have done so only *after* such board approval. Thus, the court did not find Myers' declaration on this point to be credible. Myers' statements of her understanding of the circumstances of the execution of the Settlement Agreement may have been true, and in the court's view, they were selective and incomplete as shown **[\*187]** by other evidence identified by Milner, and thus, not credible, but also, not perjurious. Moreover, while it appears that Debtor's Counsel solicited Myers' declaration as part of his representation of CCM, there is no credible evidence that CCM directed the drafting of Myers' declaration.

The totality of the circumstances of CCM's conduct, specifically its years long strategy to extricate itself from the obligations of the Settlement Agreement by giving ultimatums to Milner based on dubious legal arguments through

its attorneys, is very concerning. The record, however, does not demonstrate conduct tantamount to bad faith because CCM relied on its legal counsel, including Debtor's Counsel, to represent its interests in this dispute from the commencement of its bankruptcy case to the present time. There is no credible evidence in the record that a CCM representative such as Jacobson or Myers committed a fraud upon the court or directed the assertion by Debtor's Counsel of baseless litigation positions advocated in support of the Contempt Motion.

Myers in her declaration, like other representatives and counsel for CCM, described the financial burden on CCM under the Settlement Agreement, [*188] ECF 2075 at 1-2 (¶¶ 3-5),[30] and other factual issues that purportedly rendered the Settlement Agreement unenforceable. *Id.* at 2-4 (¶¶ 7-15)(asserting that the board never approved the agreement and/or there was no transfer of ownership to Milner); *id.* at 4-5 (¶¶ 16-20)(arguing that disagreements as to enforceability of the Settlement Agreement or a prepetition breach existed); *see also, Trial Exhibit 39, Supplemental Appendix*, ECF 2128 at 368 (noting the difficulty in storing physical property in like condition indefinitely at March 24, 2011 board meeting); *June 25, 2012 Letter from Ghan to Grumer, Exhibit 28 to Grumer Declaration*, ECF 2066-2 at 13 (describing storage of the subject property as "cost prohibitive" and noting the then-six years of storage during a time of "extreme financial difficulty"); *March 5, 2013 E-mail from Salus to Grumer, Exhibit B to Milner Attachment to the July 20, 2018 Joint Status Report*, ECF 2059 at 23 (internal pagination, Exhibit B at 21) (stating that "the Ministry cannot [sic] longer front the cost of storing Carol's items"); *April 21, 2017 Letter from Carter to Milner, Exhibit 1 to Debtor's Counsel Declaration attached to Contempt Motion*, ECF

_____

[30] As noted previously, Myers's declaration testimony relating to the alleged loss in staging the play was not admitted at trial, though it is considered here since it was relied upon and offered by CCM through Debtor's Counsel, which reliance is relevant to the issue of bad faith.

2043 at 37-38 (stating that [*189] "CCM continues to store your property at a substantial cost to CCM. [. . .] CCM can no longer store your property at its own expense."). CCM's counsel, not its representatives, however, asserted the baseless legal claims and internally inconsistent arguments in these proceedings, as discussed herein.

The record here indicates that CCM, although unwilling to stop performing its obligation to store Milner's property under the Settlement Agreement, has and does rely upon its counsel to characterize CCM's storage obligation and the ownership of the Play Property as its counsel saw fit to argue in this matter: at times as a rejected or unenforceable agreement, and at other times property that was never transferred from CCM to Milner at all. The fault in making arguments that lacked good faith, however, lies with CCM's counsel. *Cf. American Rena International Corporation v. Sis-Joyce International Company*, 2015 U.S. Dist. LEXIS 189271, 2015 WL 12732433, at *46 (Olguin, J.) (C.D. Cal. 2015)("Defendants' pattern of bad faith litigation misconduct shows that defendants do 'not take their oath to tell the truth seriously and . . . will say anything at any time in order to prevail in this litigation.' [citation]. Defendants provide shifting explanations depending on the day or attorneys that happen to represent them."). In *American Rena [*190] International Corporation v. Sis-Joyce International Company*, the court found that the party defendant drafted false declarations and devised a scheme to keep plaintiffs from deposing a witness, demonstrating that the party defendant was "sophisticated, disingenuous, and in control of the direction of defendants' litigation." 2015 U.S. Dist. LEXIS 189271, [WL] at *25. Here, the evidence does not indicate that CCM or any of its representatives directed to CCM's counsel a strategy in this litigation to present legally unfounded arguments to the court. To the contrary, the record indicates that CCM has for years performed its storage obligation under the Settlement Agreement while relying on its counsel to assert various legal positions on its behalf to extricate itself from its burdensome obligation

under the agreement. While CCM's reliance on counsel was misplaced in light of the baseless and reckless legal arguments that were made on its behalf, this reliance of a client on counsel by itself is not tantamount to bad faith, although perhaps such reliance may have been negligent, particularly in knowing that litigation positions were being asserted that were inconsistent with its prior positions.

Perhaps CCM should have known **[\*191]** that the litigation positions advanced by its counsel were not in good faith. For example, in his May 4, 2012 letter to Milner, then President and CEO of CCM John Charles notified Milner that if she did not take possession of the subject property at her own expense CCM would consider the property "abandoned" and would dispose of it. *May 4, 2012 Letter from Charles to Milner, Exhibit 15 to Milner Declaration*, ECF 2066-1 at 69. CCM and Charles could not have considered the property subject to abandonment *by* Milner if it did not assume that the property had been transferred from CCM *to* Milner and that she owned it. Additionally, less than two months later, Ghan, CCM's counsel at the time, stated in a letter to Milner's counsel at the time, Grumer, that CCM would be willing to "abandon" the subject property "*to* Milner," and characterized Milner's ownership as "alleged" in the letter because, among others, the agreement was purportedly a self-dealing transaction and was not properly ratified by CCM's board of directors. *June 25, 2012 Letter from Ghan to Grumer, Exhibit 28 to Grumer Declaration*, ECF 2066-2 at 12-13 (emphasis added). Salus, counsel to CCM, in a March 5, 2013 e-mail to Milner's **[\*192]** counsel, Grumer, characterized the subject property as both "allegedly" belonging to Milner and "Carol's items[.]" *March 5, 2013 E-mail from Salus to Grumer, Exhibit B to Milner Attachment to the July 20, 2018 Joint Status Report*, ECF 2059 at 23 (internal pagination, Exhibit B at 21). In a March 18, 2013 response to Grumer, Salus then described the property as Milner's "belongings" and "her items[.]" *March 18, 2013 E-mail from Salus to Grumer, Exhibit B to Milner Attachment to the July*

20, 2018 Joint Status Report*, ECF 2059 at 22 (internal pagination, Exhibit B at 20). In the April 21, 2017 letter to Milner, Carter, CCM's counsel, characterized the subject property as Milner's property *and* property she only claimed ownership to, while arguing that CCM "is not obligated to any future performance on the [Settlement Agreement], if such obligation existed in the first instance." *April 21, 2017 Letter from Carter to Milner, Exhibit 1 to Debtor's Counsel Declaration attached to Contempt Motion*, ECF 2043 at 37-38. These assertions made on behalf of CCM were erroneous, but were apparently made based on the advice of counsel, or by counsel. However, Debtor's Counsel's conduct is distinguishable **[\*193]** because he was the only counsel to assert internally inconsistent and baseless positions in pleadings filed in, and arguments made in, court. Thus, here, the fault lies with Debtor's Counsel, and his conduct warrants sanctions.

The representations of CCM and its counsel as to the enforceability of the Settlement Agreement, the ownership or purported transfer of the subject property, and CCM's obligations, if any, under the Settlement Agreement, indicate that CCM had for years desired to rid itself of the burdensome storage obligation. CCM may have taken conflicting positions, but it relied upon counsel to take these positions. The court's finding that Debtor's Counsel's inquiry was unreasonable and certain legal arguments he presented were baseless may not be imputed to CCM based on the evidence here. In this case, CCM as principal may avoid sanctions because the conflicting positions as to the subject property and Settlement Agreement were presented by counsel as agent in this litigation, rather than representatives of CCM, the client, in its effort to end the storage obligation. The court finds that CCM did not act in bad faith when it authorized Debtor's Counsel to file the Contempt **[\*194]** Motion, even though it may have had knowledge that its representatives and counsel had taken somewhat conflicting positions during this dispute and in the years before. While CCM *may* have authorized Debtor's Counsel to bring the Contempt

Motion for the purpose of coercing Milner into releasing claims for damages she may or may not be owed under the Settlement Agreement, which purpose the court determines was improper, the evidence indicates that CCM only could have done so in reliance on the advice of counsel that there was a proper legal basis for filing the Contempt Motion, and Milner has not shown by a preponderance of the evidence that CCM authorized the filing of the Contempt Motion for this improper purpose. Accordingly, Milner has not shown that CCM acted in bad faith either by clear and convincing evidence or a preponderance of the evidence in authorizing the filing of the Contempt Motion.

"The concept of 'efficient breach' is built into our system of contracts, with the understanding that people will sometimes intentionally break their contracts for no other reason than that it benefits them financially." *Lockerby v. Sierra*, 535 F.3d 1038, 1042 (9th Cir. 2008) (citation omitted). It is worth noting that at paragraph 20 of the Declaration **[*195]** of Carol Schuller Milner, ECF 2066, filed on September 7, 2018, Milner stated that before the 2006 Settlement Agreement was ever contemplated, she tried to explain to CCM that failing to restage her play would be financially reckless. *Milner Declaration*, ECF 2066 at 8 (¶ 20). Milner "summarized the various agreements in place [between Milner and CCM] and explained [to the CCM Leadership Team] that CCM would be in breach of the various agreements and that such breach would be more costly than staging the show. My warnings went unheeded." *Id.*[31] Strictly in

hindsight, perhaps CCM would have been better off if any of its numerous attorneys over the past fourteen years, after reviewing the 2006 Settlement Agreement, might have provided a similar warning regarding the consequences of a breach of the Settlement Agreement versus the cost of years of future performance, i.e. storage in "like condition."

As stated in the Memorandum Decision, "any breach by Debtor occurred post-confirmation, so Milner could not have violated the discharge injunction by asserting her affirmative defenses in the State Court Action. At no time before the Plan was confirmed did Debtor breach the Settlement Agreement" **[*196]** with regard to the Play Property. *Memorandum Decision*, ECF 2079 at 19. The record indicates that pursuant to the Settlement Agreement, CCM has stored the subject property for Milner for nearly 14 years and apparently stores the property today. In the Contempt Motion, CCM described its conundrum:

> "[Milner] refuses to sign a mutual release of her claims . . . . This has forced the discharged Debtor into a no win circumstances as disposing of the property will result in a suit by Milner, and releasing the property to Milner without a release will result in a suit by Milner."

*Contempt Motion*, ECF 2043 at 7. CCM by Debtor's Counsel originally sought to resolve this conundrum by filing the State Court Action for declaratory and injunctive relief, but apparently, Debtor's Counsel was not satisfied with the progress of the State Court Action, so he filed new litigation in this court, which was an exercise in forum shopping. The filing of the Contempt Motion, however, did not resolve CCM's conundrum because the Contempt Motion was based on frivolous and reckless claims asserted on CCM's behalf by Debtor's Counsel. This litigation did not expedite or streamline the dispute between the parties; **[*197]** it made things worse. CCM relied upon Debtor's Counsel, whom it thought

---

[31] Milner's testimony indicates that there was a factual basis for CCM to enter into the Settlement Agreement in 2006 in order to obtain releases of her claims, which was consideration for the contract. If Milner's releases were not consideration, there is no rational reason why Gwyn Myers, in light of her fiduciary duty as a non-insider member of CCM's executive committee, signed off on the agreement for CCM, or why CCM consistently, though later grudgingly, performed under the agreement to store Milner's property at its expense for almost 14 years. In hindsight, the financial viability of re-staging Milner's play was and is somewhat doubtful, especially considering that Milner has not retrieved her property, nor has she re-staged the play herself in the nearly 14 years since the execution

of the agreement.

understood the relevant law. Because of this reliance, CCM is not liable for sanctions under the court's inherent authority, and Milner has not demonstrated by a preponderance of the evidence, nor, necessarily, clear and convincing evidence, conduct tantamount to bad faith by CCM.

## D. Reasonableness of Attorney Fees

Milner seeks an award of $151,391 for the fees and expenses incurred during the pendency of the contempt proceeding, including the filing of the Sanctions Motion. *Milner Supplemental Memorandum re Bad Faith*, ECF 2127 at 19-20 (including Light's fees of $38,822.50 and Movant's Counsel's fees and expenses of $112,569.26). Milner provided the billing entries showing the fees and expenses billed by her attorneys, Movant's Counsel and Light, which the court has reviewed in detail. The court determines that a reasonable compensatory sanction of $69,400.00 in attorneys' fees and $729.26 in expenses is appropriate in this case in consideration of the complexity of this contested matter and the legal standards discussed below.

In *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186, 197 L. Ed. 2d 585 (2017), the Supreme Court recognized that a bankruptcy court's inherent authority to sanction **[\*198]** includes an "order . . . instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." (citation omitted). Such an order must be compensatory, however, not punitive; the court must "establish a causal link—between the litigant's misbehavior and legal fees paid by the opposing party." *Id.* Any award of attorneys' fees pursuant to the court's inherent authority therefore may only include the fees that the complaining party would not have paid but for the misconduct. *Id.* at 1187. In sum, "the award is . . . the sum total of the fees that, except for the misbehavior, would not have accrued." *Id.* (citation omitted).

Additionally, although the court's consideration of attorneys' fees in this case is not governed by 11

U.S.C. § 330, the fees awarded must only be compensatory and must be reasonable. "The customary method for assessing the amount of reasonable attorney's fees to be awarded in a bankruptcy case is the 'lodestar.' Under this approach, 'the number of hours reasonably expended' is multiplied by 'a reasonable hourly rate' for the person providing the services.'" *Wechsler v. Macke International Trade, Inc. (In re Macke International Trade, Inc.)*, 370 B.R. 236, 254 (9th Cir. BAP 2007) (citation omitted). A bankruptcy court has broad discretion to determine the number of hours reasonably **[\*199]** expended. *Id.* "Even where evidence supports that a particular number of hours were worked, the court may give credit for fewer hours if the time claimed is 'excessive, redundant, or otherwise unnecessary.'" *Id.* (quoting *Dawson v. Washington Mutual Bank, F.A. (In re Dawson)*, 390 F.3d 1139, 1152 (9th Cir. 2004)) (alterations omitted). Courts undertaking a fee analysis may also consider "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, . . . (8) the amount involved and the results obtained, . . . and (12) awards in similar cases." *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).

As discussed above in Section C.ii., the court finds that Debtor's Counsel's conduct, specifically, filing the Contempt Motion, failing to withdraw the Contempt Motion, and expanding the issues in his briefing and by argument at the evidentiary hearing, was tantamount to bad faith and caused Milner to incur costs by having to respond to frivolous arguments, prepare for the expanded evidentiary hearing, and file a reply to the post-trial briefing that Debtor's Counsel requested. Because Debtor's Counsel acted recklessly and made arguments in the Contempt Motion and subsequent filings that were baseless and without reasonable inquiry, and acted **[\*200]** with an improper purpose tantamount to bad faith in an effort to exert pressure in the state court litigation, the majority of the attorneys' fees incurred by Milner were caused by Debtor's Counsel's filing of the Contempt Motion. Milner

would not have incurred attorney fees related to the Contempt Motion and its appeal from July 11, 2018 to June 2019 but for Debtor's Counsel's bad faith conduct in filing the Contempt Motion, refusing to withdraw the Contempt Motion, and pursuing frivolous litigation positions. Milner also would not have incurred attorney fees related to the Sanctions Motion from June 2019 to September 20, 2019, but for Debtor's Counsel's bad faith conduct.

As to the attorneys' fees incurred by Milner from September 20, 2019 onward, which fees were related to the supplemental briefing on evidence of bad faith, the court finds that those fees are not compensable because no causal link exists between Debtor's Counsel's bad faith conduct and the supplemental briefing on bad faith. During the September 18, 2019 hearing on the Sanctions Motion, Milner requested a briefing schedule and the court allowed Milner the opportunity to amend or supplement her Sanctions Motion to **[*201]** identify express evidence of bad faith in lieu of the court denying the Sanctions Motion without prejudice. *Audio Recording, September 18, 2019, Sanctions Motion Hearing* at 12:59-1:01 p.m. ("We thought this was sufficient, but obviously it isn't. . . . Can we have a briefing schedule so we can go ahead . . .") (statement of Movant's Counsel); *see also id.* at 1:04-1:09 p.m. No conduct by Debtor's Counsel or CCM caused Milner to incur fees related to the supplemental briefing. Milner explained in her Reply to Debtor's Counsel's Supplemental Opposition, ECF 2136, that she offered no additional evidence in her Supplemental Brief or the Reply, and all of the exhibits included in Milner's appendix were trial exhibits previously filed with the Court. *Reply to Debtor's Counsel Supplemental Opposition*, ECF 2136 at 4. Other than the Trial Transcript and Trial Exhibit 39 (offered by Debtor's Counsel), Milner presented no new evidence in her Supplemental Brief. This is consistent with the court's comments at the September 18, 2019 hearing—in the court's view, Milner did not sufficiently identify citations to the record that supported a finding of bad faith as to Debtor's Counsel or CCM in her **[*202]** previous

filings since her primary reliance was on Bankruptcy Rule 9011. Upon Movant's Counsel's request, the court allowed Milner to amend or supplement in order to do so. Accordingly, no fees incurred by Milner after September 20, 2019 are compensable under the court's inherent authority because no causal link exists between the supplemental briefing on bad faith, related legal fees incurred by Milner, and Debtor's Counsel's bad faith conduct.

As to the fees requested by Light in connection with the Contempt Motion, the court determines that Light's fees were redundant and unnecessary because only one attorney was needed to represent Milner in this contested matter, which was primarily a bankruptcy law matter for which Movant's Counsel had sufficient expertise to handle by herself, i.e., whether Milner violated the discharge injunction by defending herself in the state court action by filing an answer that asserted as an affirmative defense that the Settlement Agreement was not rejected and terminated from the plan confirmation order. The primary issue in this contested matter was whether the Settlement Agreement was or was not an executory contract when CCM's bankruptcy case was filed, which was mainly **[*203]** an issue of contract interpretation and a factual issue of whether both sides had material unperformed obligations. Although Debtor's Counsel needlessly complicated the matter by expanding the issues and raising baseless arguments, the resolution of the matter was a matter of determining whether the contract was still executory when CCM filed for bankruptcy, which issue also addresses Debtor's Counsel's alternative argument based on claim preclusion or waiver, as he called it. Movant's Counsel's Bankruptcy Rule 9011 Warning Letter demonstrated her knowledge of the bankruptcy law and related contract law issues that arose in this matter, and the court finds that Movant's Counsel was entirely able to manage this case on her own. While Light is Milner's counsel in the State Court Action, it was not necessary for him to be involved in the bankruptcy law issues, and his continued involvement resulted

in unnecessary costs, which is unreasonable.

Even if the court found that Light's fees were necessary, the amount of the fees would still be unreasonable and should be reduced by at least 50% because Milner asks the court to assume that Light billed zero time to his own defense as a respondent in the Contempt Motion. **[\*204]** Light's interests as a respondent were entirely aligned with Milner's on the Contempt Motion, and no factual or legal issues were distinguishable as to the two respondents; there is no indication in Light's fees on his billing entries that his services did not benefit him as a respondent, nor did Light distinguish between services provided in defense of Milner alone and those provided in his own defense. *Dipaolo v. Moran*, 277 F. Supp. 2d 528, 536-537 (E.D. Pa. 2003) ("In short, while [the attorney-defendant] may not receive fees for defending himself, the language of the [sanctioning] statutes leads to the conclusion that he may be entitled to fees incurred for defending his law firm to the extent that they are not included in the time spent representing himself."). In the Ninth Circuit, "pro se litigants, attorneys or not, cannot recover statutory attorneys' fees." *Elwood v. Drescher*, 456 F.3d 943, 947 (9th Cir. 2006) (noting that courts have viewed *Kay v. Ehrler*, 499 U.S. 432, 111 S. Ct. 1435, 113 L. Ed. 2d 486 (1991), as precluding the award of fees to pro se attorney-defendants under 42 U.S.C. § 1988 and other fee shifting statutes, including those for sanctions under Rule 11 and 28 U.S.C. § 1927 (citing *Dipaolo v. Moran*, 277 F. Supp. 2d 528, 536 (E.D. Pa. 2003)); *S.E.C. v. Chapman*, 602 Fed. Appx. 407, 407 (9th Cir. 2015)("Applying *Kay*, we . . . determined that all pro se litigants (including attorneys) are not entitled to attorneys' fees under fee-shifting statutes, such as the EAJA." (citing *Elwood v. Drescher*, 456 F.3d at 946-947)); *Massengale v. Ray*, 267 F.3d 1298, 1302-1303 (11th Cir. 2001)("the word 'attorney' **[\*205]** generally assumes some kind of agency (that is, attorney/client) relationship. The fees a lawyer might charge himself are not, strictly speaking, 'attorney's fees.'")(citation and alteration omitted);

*Pickholtz v. Rainbow Technologies, Inc.*, 284 F.3d 1365, 1375 (Fed. Cir. 2002) ("one cannot 'incur' fees payable to oneself, fees that one is not obliged to pay.") (citation omitted); *Upson v. Wallace*, 3 A.3d 1148, 1169 (D.C. 2010) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. at 46, and finding that the rationale in *Kay v. Ehrler*, 499 U.S. at 432, "applies just as forcefully in [the inherent authority sanctions] context" as in the statutory sanctions context).

### i. Contempt Motion Fees

Below, the court includes a table setting forth Movant's Counsel's professional fees in connection with the contempt proceeding alone. After a review of all billing entries, the court has categorized the fees into seven groups, as set forth below:

Go to table1

The court determines for the purposes of the lodestar method that Movant's Counsel's professional billing rate of $400 **[\*206]** an hour is reasonable.[32] The court next addresses the fees in each of the seven categories included in the above table. The court determines that certain requested fees are excessive, redundant, or otherwise unnecessary and disallows those fees.

The court has authority to reduce hours when the hours are block-billed or when the services are "lumped" together in a single entry. *Welch v. Metropolitan Life Insurance Co.*, 480 F.3d 942, 948 (9th Cir. 2007) ("We do not quarrel with the district court's authority to reduce hours that are billed in

---

[32] For some unknown reason, Movant's Counsel did not state her professional qualifications in her declaration in support of the motion, but based on her information listed on the website of the State Bar of California, she was admitted to the State Bar of California on December 10, 1985 and her law school was USC (University of Southern California) Law School, which information the court can take judicial notice of. Federal Rule of Evidence 201. The court determines that based on its observation of the legal practice community, in light of her experience as a lawyer for over 34 years, Movant's Counsel's hourly rate of $400 is within the range of reasonableness in the Los Angeles legal community.

block format."). "The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked." *Id.* (citation omitted). "[B]lock billing makes it more difficult to determine how much time was spent on particular activities." *Id.* "Given that lumping may prevent a Court from being able to ascertain the reasonableness of the fees requested, lumping may be cause for reduction or elimination of fees in bankruptcy." *Roger v. Burns (In re Roger)*, 2017 Bankr. LEXIS 2977, 2017 WL 4097810 at *5 (Bankr. C.D. Cal. 2017) (citations omitted). The court has observed lumping of services in many billing entries submitted by Movant's Counsel.[33] Accordingly, because the lumping described above prevents the court from determining the reasonableness of the fees [*207] billed for each service, the court may reduce the allowed amount of the entries for lumped services.

**The Objection to Contempt Motion**. On June 12, 2018, Milner through Movant's Counsel, filed the Objection to Contempt Motion, ECF 2050, which included approximately six pages of factual history and six pages of legal analysis, citing to two statutes and six cases. Movant's Counsel prepared and filed the objection promptly in accordance with the local rules and included exhibits, along with declarations from Milner and Light. *See* ECF 2051. Because the State Court Action had been filed by Debtor's Counsel and CCM more than six months

before the Contempt Motion, and Debtor's Counsel forewarned Light that he would be filing an "ex parte" action of some sort, the court finds it reasonable to presume that Milner and Light were quite familiar with the facts underlying this dispute. Milner's declaration (five pages) and Light's declaration (eight pages) were not extensive. Further, the language of the Settlement Agreement was straightforward and consisted of only seven pages. *Settlement Agreement, Exhibit A to Carol Schuller Milner Declaration*, ECF 2051 at 15-22. Accordingly, the court finds [*208] that the total hours of 23.6 hours spent on the objection by Movant's Counsel is excessive. While the objection's legal arguments were concise and well-pleaded, they are not so complex as to require nearly three full business days of work done by an experienced litigator, as the fundamental issue was whether the Settlement Agreement was executory, which issue was already known to Milner and Light from the state court litigation. The court determines that Movant's Counsel could have prepared the objection with minimal assistance from Light, who was familiar with the dispute as Milner's state court counsel, particularly, the executory contract issue. Light's minimal assistance could have efficiently gotten Movant's Counsel up to speed on the State Court Action and underlying facts. In the court's view, Movant's Counsel thereafter could have prepared the 12-page objection in approximately 18 hours. Accordingly, the court reduces Movant's Counsel's allowed fee from 23.6 hours to 18 hours, because the four legal arguments in the objection were fairly straightforward, the legal research could not have been voluminous, the factual background should have been provided efficiently from the [*209] State Court Action pleadings and the clients, Milner and Light, and some of the billing entries for this work were block-billed.

**The Joint Status Report, Discovery, and Status Conference**. On July 20, 2018, the parties filed a Joint Status Report with attachments, and subsequently attended the Status Conference on July 31, 2018. In the Joint Status Report, Milner argued that "in light of the fact that the issues

---

[33] The billing entries submitted by Movant's Counsel are replete with block-billed time entries. Representative examples are for $1,480.00 for 3.70 hours on 8/29/18 for "Review and revise Milner declarations and sent it to Carol and Hal; telephone conference with Carol re highlighted paragraphs in her declaration; revise request to take judicial notice and sent it to Hal; draft face page for the declaration with proposed title and send it to Hal; review Hal's prior declaration and send him an email re suggestion that we do not include his declaration," and for $1,680.00 for 4.20 hours on 8/30/18 for "Telephone calls with Carol Milner and Hal Light regarding Declarations and the titles of documents so as to frame the issues for the court; revise the Milner declaration; revise the Request to Take Judicial Notice; begin drafting the supporting brief." Movant's Counsel billed over $3,000, a substantial sum, on two consecutive days as reflected on these block-billed time entries, making it difficult for the court to review the entries for reasonableness.

presented are so limited (with the relevant evidence being bankruptcy court filings and correspondence between the parties)," an evidentiary hearing was unnecessary, and no discovery was needed. *Joint Status Report*, ECF 2059 at 2-4. Milner by counsel also attached a four-page addendum and two exhibits addressing discovery issues, prior correspondence between the parties that bore on the underlying dispute, and one paragraph restating arguments from the objection that "the suggestion that Respondents should be held in contempt for responding to Plaintiff's declaratory relief complaint is baseless." *Id.* at 8. While meeting and conferring with opposing counsel necessarily takes time and preparation, the court finds that the Joint Status Report, accompanying addendum, and exhibits included **[*210]** in the report by Milner could have been prepared in less than the 26.4 hours billed in Movant's Counsel's fee request because the status report is simply a report on the state of the litigation, and not a forum for extensive briefing and argument of the parties with voluminous exhibits attached, which was "overkill." See Local Bankruptcy Rule 7016-1.

First, Movant's Counsel could have prepared for the Status Conference, including preparing arguments and an outline as set forth in her billing entries, without the assistance of Light because she is an experienced lawyer and the issues to be raised at the Status Conference were not overly complex or novel. The primary issue was whether the contract between CCM and Milner was still executory at the time of the bankruptcy case. Secondly, lengthy telephone conferences with Light regarding revisions to the Joint Status Report and preparations for the Status Conference are excessive and unreasonable because Movant's Counsel did not require constant input, supervision, and consultation from or with Light, who was also her client, related to a "meet and confer" conference with opposing counsel and preparation of the joint status report. Accordingly, the **[*211]** court reduces Movant's Counsel's allowed fee from 26.4 hours to 20 hours because the extensive status report submitted was "overkill" resulting in part

from unnecessary consultation with Light, and some of the billing entries for this work were block-billed.

***Trial Declarations, Exhibits, and Evidentiary Objections***. On September 7, 2018, Milner by Movant's Counsel filed declarations of Milner, Grumer and Light in connection with the evidentiary hearing in this matter, along with 48 exhibits and a request for judicial notice. *See* ECF 2066, 2066-1, 2066-2 and 2067. On September 13, 2018, Milner by Movant's Counsel also filed evidentiary objections to the declaration of Gwen Myers. ECF 2072. In anticipation of her testifying at the evidentiary hearing, Milner's declaration was more than 20 pages and established much of the factual record the court relied upon in reaching its decision on the Contempt Motion. The court allows the requested total hours of 30.8 hours for this category of fees.

***The Trial Brief***. The Milner Trial Brief, filed on September 13, 2018, addressed whether Milner was the owner of the subject property identified in the Settlement Agreement and whether the Settlement Agreement **[*212]** was an executory contract at the time of CCM's bankruptcy case. ECF 2074. Because the Milner Trial Brief restated multiple arguments that Milner already presented to the court, the court reduces the total hours requested by Movant's Counsel from 37.2 to 24 hours as reasonable. For example, Milner's argument that the Settlement Agreement was not an executory contract at the time of the CCM bankruptcy was copied nearly verbatim from her Objection to the Contempt Motion. *Compare Milner Trial Brief*, ECF 2074 at 15-17, *with Objection to Contempt Motion*, ECF 2050 at 6-7. Similarly, Milner by Movant's Counsel restated in the Trial Brief her previous argument from the Bankruptcy Rule 9011 Warning Letter that boilerplate plan language does not amount to a rejection of a contract such as the Settlement Agreement, citing *In re Parkwood Realty Corp.*, 157 B.R. 687 (Bankr. W.D. Wash. 1993) and *In re Continental Country Club, Inc.*, 114 B.R. 763 (Bankr. M.D. Fla. 1990), which

should not have been time-consuming to include. *Compare Milner Trial Brief*, ECF 2074 at 17-19, *with E-mail from Movant's Counsel to Debtor's Counsel, dated July 11, 2018, Exhibit 1 to Sanctions Motion*, ECF 2100-1 at 3. The court therefore reduces the total hours requested in this category as set forth above.

***Trial Preparations and Trial***. The court determines that the fees for Movant's **[\*213]** Counsel's time of 18.4 hours spent preparing for the evidentiary hearing and representing Milner and Light at the hearing are reasonable and should be allowed.

***The Post-Trial Brief***. The Milner Post-Trial Brief, ECF 2078, filed October 10, 2018, responded to the CCM Post-Trial Brief, ECF 2077, citing two cases and otherwise rebutting factual arguments that CCM asserted by Debtor's Counsel in its post-trial brief. Because Milner's Post-Trial Brief was essentially a factual rebuttal to the CCM Post-Trial Brief, based almost entirely on citations to the record and requiring almost no legal analysis, the court determines that Movant's Counsel may only be compensated for 10 allowed hours in respect of preparing Milner's response to the CCM Post-Trial Brief. The Milner Post-Trial Brief required minimal additional legal research and while effective, the filing was more akin to a closing argument outline, which should not have required 17 hours of attorney time, rather than a supplemental brief addressing novel legal questions.

***The Dismissed Appeal***. The court determines that the fees for Movant's Counsel's time of 11.5 hours spent defending CCM's appeal, which was ultimately abandoned and dismissed, **[\*214]** are reasonable and should be allowed.

Pursuant to *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186, 197 L. Ed. 2d 585 (2017) and the reasons set forth above, the court determines that total aggregate hours of 132.7 hours at a rate of $400 an hour for Movant's Counsel's services in defending the Contempt Motion is a reasonable attorneys' fee as a sanction under the court's inherent authority compensating Milner for

having to defend this action as a result of Debtor's Counsel's bad faith conduct. The allowed fee amount in connection with the Contempt Motion is therefore $53,080.00.

**ii. Sanctions Motion Fees**

Below, the court includes a table setting forth Movant's Counsel's professional fees requested by Milner in connection with the Sanctions Motion. As noted above the court has determined that the fees requested in connection with the Sanctions Motion supplemental briefing on bad faith are not compensable. After a review of all requested billing entries, the court has categorized the fees into three groups, as set forth below:

⊞ Go to table2

As discussed above **[\*215]** for the Contempt Motion Fees, the court determines for the purposes of the lodestar method that Movant's Counsel's billing rate of $400 an hour is reasonable. The court next addresses the fees in each of the three categories included in the above table. The court determines that certain fees in each category are excessive, redundant, unnecessary, or otherwise not compensable.

***Motion for Sanctions***. Milner through Movant's Counsel filed the Sanctions Motion, ECF 2100 on July 2, 2019. As discussed above, the Sanctions Motion principally relied upon case law and argument set forth by Milner in the briefing filed in connection with the Contempt Motion, and in particular, the Bankruptcy Rule 9011 Warning Letter Movant's Counsel sent to Debtor's Counsel by e-mail on July 11, 2018. *Compare E-mail from Movant's Counsel to Debtor's Counsel, dated July 11, 2018, Exhibit 1 to Sanctions Motion*, ECF 2100-1 at 1-5 (citing *In re Parkwood Realty Corp.*, 157 B.R. 687 (Bankr. W.D. Wash. 1993), *In re Continental Country Club, Inc.*, 114 B.R. 763 (Bankr. M.D. Fla. 1990), *In re Ybarra*, 424 F.3d 1018 (9th Cir. 2005), and *In re Taggart*, 888 F.3d 438 (9th Cir. 2018)), *and Objection to Contempt*

*Motion*, ECF 2050 (citing *In re Robert L. Helms Construction & Development Company, Inc.*, 139 F.3d 702 (9th Cir. 1998)), *with Sanctions Motion*, ECF 2100 (citing same). Moreover, as to the "the amount involved and the results obtained," *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d at 70, Milner's principal argument in the Sanctions Motion was a request for sanctions under Bankruptcy Rule 9011. *Sanctions Motion*, ECF 2100 at **[*216]** 12-17. Absent one paragraph on the penultimate page of the Sanctions Motion addressing the court's inherent authority, citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991), Milner's motion was premised on Bankruptcy Rule 9011. *Id.* at 17. Accordingly, the result sought in the Sanctions Motion—at least on Milner's primary argument based on Bankruptcy Rule 9011—was not achieved.

As discussed above and at the September 18, 2019 hearing, the court determined that Milner's arguments failed to satisfy the Ninth Circuit's stringent procedural requirements for compliance with Bankruptcy Rule 9011.[34] Although it might not be an abuse of discretion for a court to broadly grant all fees that arose subsequent to a party filing a contempt motion in bad faith, here, the court finds the exercise of "restraint and discretion[ ]" acknowledged by the Supreme Court in *Chambers v. NASCO, Inc.*, 501 U.S. at 44, appropriate in light of the "result obtained" and the legal complexity of the Sanctions Motion. The court therefore reduces Movant's Counsel's allowed fee as to the Sanctions Motion from 21.6 hours to 14 hours based on Movant's Counsel having already researched and briefed the arguments included therein and the failure to obtain a result under Bankruptcy Rule 9011 as requested in the motion.

**Preparing Milner's [*217] Reply to CCM and**

*Debtor's Counsel Oppositions*. On September 11, 2019, Milner by Movant's Counsel filed her reply to the CCM and Debtor's Counsel oppositions to the Sanctions Motion, ECF 2121. Like the Sanctions Motion discussed above, Milner's arguments in the reply were focused on addressing Bankruptcy Rule 9011, her primary claim. *See Reply to CCM and Debtor's Counsel Oppositions*, ECF 2121 at 4-14. The reply, however, required Milner to respond to legal and factual assertions newly and separately raised by CCM and Debtor's Counsel. Milner also identified persuasive authorities in the reply that had not been presented in prior briefing or the adjudication of the Contempt Motion. Accordingly, the court reduces Movant's Counsel's allowed fee as to the Reply to CCM and Debtor's Counsel Oppositions from 32.8 hours to 17 hours because Milner failed to prevail on her primary claim under Bankruptcy Rule 9011, which was the focus of her Reply to CCM and Debtor's Counsel Oppositions.

*Hearing Preparations and Attendance*. The court determines that Movant's Counsel's time of 9.8 hours spent preparing for and attending the hearing on the Sanctions Motion[35] is reasonable.

Pursuant to *Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct. at 1186, and the reasons set forth above, the court determines **[*218]** that total aggregate hours of 40.8 hours at a rate of $400 an hour for Movant's Counsel's professional services in prosecuting the Sanctions Motion are reasonable attorneys' fees as a sanction under the court's inherent authority compensating Milner for prevailing on the Sanctions Motion as to Debtor's Counsel, as a result of Debtor's Counsel's bad faith conduct. The allowed fee amount in connection with the Sanctions Motion is therefore $16,320.00.

Having determined the reasonable fees in

---

[34] *Audio Recording, September 18, 2019, Sanctions Motion Hearing* at 01:03-01:04 p.m. ("Is [allowing supplemental briefing] better than letting them file another amended motion?") (statements of the court); *id.* at 01:08-01:09 p.m. ("Should I give them an opportunity to amend and we do this again, or should we just have supplemental [briefing]?") (statements of the court).

[35] Movant's Counsel's billing entries included a total of 12.3 hours that the court categorized into group three, billing entries from September 17, 2019, to September 20, 2019, however Movant's Counsel categorized 2.5 hours as "No Charge" for certain services related to reviewing and editing time entries.

connection with the Contempt Motion and Sanctions Motion, below the court includes a table setting forth the reasonable fee award owing by Debtor's Counsel to Milner as a compensatory sanction in light of Debtor's Counsel's conduct:

⊞Go to table3

⊞Go to table4

Additionally, having reviewed the amount of $729.26 in expenses requested by Milner in connection with Movant's Counsel's professional services, the court determines that such expenses are reasonable and are allowed.

As discussed herein, CCM and Debtor's Counsel each made requests for sanctions against Milner for her filing the Sanctions Motion through Movant's Counsel. *CCM's Opposition to Sanctions Motion*, ECF 2114 at 27-28; *Debtor's Counsel's Opposition to Sanctions Motion*, ECF 2120 at 14. Because Debtor's Counsel is not a prevailing party **[*220]** on the Sanctions Motion, the court declines to award any fees to Debtor's Counsel pursuant to Bankruptcy Rule 9011(c)(1)(A), even though he prevailed on Milner's claims under Bankruptcy Rule 9011 against him. Such fees are not warranted under Bankruptcy Rule 9011(c)(1)(A) because he engaged in conduct that would be sanctionable under Bankruptcy Rule 9011, but for Milner's failure to comply with the requirements of the Bankruptcy Rule 9011 safe harbor. Although CCM is a prevailing party on the Sanctions Motion because the court does not grant the motion as to CCM under either Bankruptcy Rule 9011 or the court's inherent authority, such "reverse" sanctions are not warranted under Bankruptcy Rule 9011(c)(1)(A). Even though the ruling on Milner's Bankruptcy Rule 9011 claims were in CCM's favor and against Milner, and her request for Bankruptcy Rule 9011 sanctions did not satisfy the Ninth Circuit's stringent requirements, her arguments, among others, that she filed the Sanctions Motion as soon as practicable and the Bankruptcy Rule 9011 Warning Letter satisfied the safe harbor, were

not so baseless as to warrant sanctions. It was not unreasonable for Milner to request an extension of the law as to Bankruptcy Rule 9011 based on actual notice of her intent to seek Bankruptcy Rule 9011 sanctions in the emailed letter, though not formally a motion as required by the rule. Milner's assertion that there was some factual support for seeking **[*221]** sanctions against CCM, though ultimately unpersuasive, was not baseless. Moreover, as discussed above, CCM is not entirely blameless in this situation on account of the mixed messages in its communications with Milner and its inconsistent positions regarding the Settlement Agreement and the Play Property. Therefore, the court determines that Milner's unsuccessful claims as to CCM under Bankruptcy Rule 9011 or its inherent authority were not frivolous and do not warrant "reverse" Bankruptcy Rule 9011 sanctions.

## IV. CONCLUSION

For the foregoing reasons, the court determines the following:

1. The Sanctions Motion should be denied to the extent that Milner seeks relief under Bankruptcy Rule 9011 for failure to meet the safe harbor requirements of the rule.

2. The Sanctions Motion should be denied in part to the extent that Milner seeks relief under the court's inherent authority as to CCM because she has not met her burden of proving her claim that CCM acted in bad faith either by clear and convincing evidence or the preponderance of the evidence.

3. The Sanctions Motion should be granted in part to the extent that Milner seeks relief under the court's inherent authority as to Debtor's Counsel because she has met her burden of proving her claim that **[*222]** he engaged in conduct tantamount to bad faith by clear and convincing evidence, and therefore also by the preponderance of the evidence.

4. The court determines under its inherent authority that an award of reasonable attorneys'

fees of $69,400.00 and reasonable expenses of
$729.26 should be awarded as a compensatory
sanction in favor of Milner and against Debtor's
Counsel, Douglas L. Mahaffey, Esquire.

Milner as the prevailing party on the Sanctions
Motion is ordered to lodge a proposed final order
granting the motion consistent with this
memorandum decision within 30 days of the date of
entry of this decision pursuant to Local Bankruptcy
Rule 9021-1.

IT IS SO ORDERED.

Date: March 31, 2020

/s/ Robert Kwan

Robert Kwan

United      States      Bankruptcy      Judge

**Table1** ([Return to related document text](#))

| Fee Category | Total Fees Billed | Movant's Counsel Hours at $400/hr |
|---|---|---|
| *Objection to the OSC* | 9,440.00 | 23.6 |
| *Joint Status Report, Discovery, and Status Conference* | 10,560.00 | 26.4 |
| *Trial Declarations, Exhibits, and Evidentiary Objections* | 30.8 | 30.8 |
| *Trial Brief* | 14,880.00 | 37.2 |
| *Trial Preparations and Trial* | 7,360.00 | 18.4 |
| *Post-Trial Brief* | 6,840.00 | 17.1 |
| *Appeal* | 4,600.00 | 11.5 |
| **Totals** | 66,000.00 | 165 |

**Table1** ([Return to related document text](#))

---

**Table2** ([Return to related document text](#))

| Fee Category | Total Fees Billed | Total Hours Billed (Movant's Counsel at $400/hr) |
|---|---|---|
| *Motion for Sanctions* | 8,640.00 | 21.6 |
| *Reply to CCM and Debtor's Counsel Oppositions* | 13,120.00 | 32.8 |
| *Hearing Preparations and Hearing* | 3,920.00 | 9.8 |
| **Totals** | 25,680.00 | 64.2 |

**Table2** ([Return to related document text](#))

---

**Table3** ([Return to related document text](#))

| Fee Category | Total Fees Billed | Movant's Counsel |
|---|---|---|

| | **Hours at $400/hr** | |
|---|---|---|
| *Objection to the OSC* | 9,440.00 | 23.6 |
| *Joint Status Report, Discovery, and Status Conference* | 10,560.00 | 26.4 |
| *Trial Declarations, Exhibits, and Evidentiary Objections* | 12,320.00 | 30.8 |
| *Pre-Trial Brief* | 14,880.00 | 37.2 |
| *Trial Preparations and Trial* | 7,360.00 | 18.4 |
| *Post-Trial Brief* | 6,840.00 | 17.1 |
| *Appeal* | 4,600.00 | 11.5 |
| **Totals** | **66,000.00** | **165** |

| **Fee Category** | **Total Fees Billed** | **Total Hours Billed (Movant's Counsel at $400/hr)** |
|---|---|---|
| *Motion for Sanctions* | 8,640.00 | 21.6 |
| *Reply to CCM and [*219] Debtor's Counsel Oppositions* | 13,120.00 | 32.8 |
| *Hearing Preparations and Hearing* | 3,920.00 | 9.8 |
| **Totals** | **25,680.00** | **64.2** |

**Table3** ([Return to related document text](#))

---

**Table4** ([Return to related document text](#))

| **Fee Category** | **Allowed Hours** | **Adjusted Fees** |
|---|---|---|
| *Objection to the OSC* | 18 | $7,200.00 |
| *Joint Status Report, Discovery, and Status Conference* | 20 | $8,000.00 |
| *Trial Declarations, Exhibits, and Evidentiary Objections* | 30.8 | $12,320.00 |
| *Pre-Trial Brief* | 24 | $9,600.00 |
| *Trial Preparations* | 18.4 | $7,360.00 |

| Fee Category | Allowed Hours | Adjusted Fees |
|---|---|---|
| *and Trial* | | |
| *Post-Trial Brief* | 10 | $4,000.00 |
| *Appeal* | 11.5 | $4,600.00 |
| **Totals** | **132.7** | **$53,080.00** |

| Fee Category | Allowed Hours Billed | Allowed Fees Billed |
|---|---|---|
| *Motion for Sanctions* | 14 | $5,600.00 |
| *Reply to CCM and Debtor's Counsel Oppositions* | 17 | $6,800.00 |
| *Hearing Preparations and Hearing* | 9.8 | $3,920.00 |
| **Totals** | **40.8** | **$16,320.00** |
| | **TOTAL Allowed Fee Award** | **$69,400.00** |

**Table4** ([Return to related document text](#))

---

End of Document

# EXHIBIT 4

# BMD Mgmt., LLC v. Dane (In re Dane)

United States Bankruptcy Appellate Panel for the Ninth Circuit

May 15, 2014, Argued and Submitted at Pasadena, California; May 30, 2014, Filed

BAP No. CC-13-1298-KiLaPa

## Reporter

2014 Bankr. LEXIS 2378 *

In re: MARIA ELENA DANE, Debtor. BMD MANAGEMENT, LLC, Appellant, v. MARIA ELENA DANE, Appellee.

**Notice:** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION. ALTHOUGH IT MAY BE CITED FOR WHATEVER PERSUASIVE VALUE IT MAY HAVE (SEE FED. R. APP. P. 32.1), IT HAS NO PRECEDENTIAL VALUE. SEE 9TH CIR. BAP RULE 8013-1.

**Prior History:** **[*1]** Appeal from the United States Bankruptcy Court for the Central District of California. Bk. No. 2:12-45992-ER. Adv. No. 2:13-01073-ER. Honorable Ernest M. Robles, Bankruptcy Judge, Presiding.

**Counsel:** S. Michael Kernan, Esq. argued for appellant, BMD Management, LLC.

Stella A. Havkin, Esq. of Havkin & Shrago argued for appellee, Maria Elena Dane.

**Judges:** Before: KIRSCHER, LATHAM [2] and PAPPAS, Bankruptcy Judges.

## Opinion

### MEMORANDUM

Appellant BMD Management, LLC ("BMD")

appeals an order granting the motion of chapter 7 [3] debtor, Maria Elena Dane a/k/a Mylene Dane ("Maria") to dismiss with prejudice BMD's complaint under Civil Rule 12(b)(6). We AFFIRM.[4]

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Prepetition events

BMD is a California limited liability company that was owned 50/50 by Maria and her former husband, Barry Dane ("Barry"). Maria was BMD's Vice President. BMD was formed in 2003 to own a gym facility known as Train West Hollywood ("Train"). The Danes paid $425,000 for Train.

---

[2] Hon. Christopher Latham, Bankruptcy Judge for the Southern District of California, sitting by designation.

[3] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

[4] Maria has moved to strike certain portions of BMD's excerpts of the record, namely documents involving the bankruptcy case of Maria's corporate entity. ER Tabs 23-33. Conversely, BMD has asked us to take judicial notice **[*2]** of these same documents. We generally cannot consider items that were not presented to the bankruptcy court when making its decision. See Kirshner v. Uniden Corp. of Am., 842 F.2d 1074, 1077 (9th Cir. 1988). In any event, these documents are not relevant to our decision here. Therefore, we GRANT Maria's motion to strike.

In addition, BMD asks that we take judicial notice of a document from the California Secretary of State showing that Maria's LLC has been cancelled and a summary judgment from the state court in BMD's action against Maria's LLC. Because both of these documents post-date the order on appeal and have no bearing on our decision, we will not consider them. Id. As such, BMD's request for judicial notice is DENIED.

Train was not the usual type of gym with customers paying on a monthly basis; rather, it rented time to personal trainers who **[*3]** brought in their clients to work out. Train's assets included the name of the gym, the goodwill and customers of Train, the gym equipment, the lease of the premises, a checking account and receivables (the "Assets").

The Danes divorced in 2006. Rather than sell Train, the Danes amended BMD's Operating Agreement and continued operating Train through BMD. Maria was to be Train's primary manager, while Barry was in charge of negotiations and daily transactions with the landlord of Train's leased premises.

After discussions for Maria to buy out Barry's share of BMD broke down in the spring/summer of 2008, in December 2008, Maria transferred the Assets of BMD to her newly-formed entity, Maria Elena Dane, LLC ("Dane LLC"), without prior notice to Barry and without paying Barry reasonably equivalent value for his 50% interest. On December 31, 2008, Maria's attorney informed Barry that Maria had created Dane LLC and that her business relationship with Barry "was closed." Specifically, her attorney sent Barry an email stating that Maria had "established a new entity that has exclusive right to possession and has no connection to [Barry] whatsoever." An arbitrator later found that Maria's acts **[*4]** violated BMD's amended Operating Agreement as an improper attempt to dissolve BMD. Around this same time, the landlord terminated Train's lease and served BMD with a thirty-day notice to quit. The landlord later testified that he was not willing to renew Train's lease to BMD or Barry. However, he did negotiate a new lease with Maria who continued to operate Train without interruption, using the Assets and the same customer list.

On January 1, 2009, Maria sent an email to Train customers informing them that she had "dissolved" her "previous business relationship" with Barry and that she was now the "solo owner and manager of the gym." Thereafter, the customers began making

payments to Dane LLC.

Several lawsuits between the parties ensued. Barry first commenced a binding arbitration action against Maria, individually, in January 2009 ("Arbitration Action"). Barry alleged claims for Breach of Contract, Fraud, Negligent Misrepresentation, Common Counts, Conversion and Accounting. Barry alleged that "in or around the summer of 2008," Maria froze him out of BMD and converted BMD's profits and Assets to Dane LLC for her own use, in violation of the amended Operating Agreement. Barry alleged **[*5]** that Maria's act of obtaining a new lease for Train without his knowledge was also a violation. Barry requested damages of $236,000 plus attorney's fees and costs. At some point prior to the arbitration hearing, and for reasons not clear on the record, Barry dismissed his tort and negligence claims against Maria and proceeded only on the Breach of Contract claim. The arbitrator found in favor of Barry. However, since the gym was losing money and Barry was entitled only to profits as an LLC member, he could not establish any damages and was awarded nothing. Maria was ordered to distribute any remaining assets of BMD, including the gym equipment, which the arbitrator found had "little if any real value."

The second lawsuit, filed in May 2009, involved BMD's claims against Dane LLC over the BMD business (the "LLC Action")(BMD, LLC v. Maria Elena Dane, LLC, Case No. BC414409 (Cal. Super. Ct., Cnty of L.A.)). According to the Third Amended Complaint ("TAC") filed in the LLC Action on June 16, 2011, BMD alleged claims against Dane LLC for Violations of the CAL. BUS. & PROF. CODE § 17200 et seq., Conversion, Trespass to Chattels, Misappropriation of Trade Secrets, Trademark Infringement and **[*6]** Declaratory Relief. Maria was not named as a defendant to that action. However, paragraph three of the TAC states:

> Plaintiff is informed and believes, and based thereon alleges, that Maria Elena Dane who is

an Officer of Plaintiff BMD Management, LLC, created the company Maria Elena Dane, LLC to hold assets that she illegally and/or improperly transferred to Maria Elena Dane, LLC, <u>which may be the alter ego of Maria Elena Dane</u>(emphasis added).

A third lawsuit was filed by BMD against Maria on September 12, 2012, alleging a single claim for declaratory relief ("Declaratory Relief Action")(<u>BMD Mgmt. LLC v. Dane</u>, Case No. BC492311 (Cal. Super. Ct., Cnty of L.A.)). In that action, BMD sought to have Maria removed as an officer of BMD.

## B. Postpetition events

Maria filed an individual chapter 7 bankruptcy case on October 26, 2012. Her case was reassigned to Judge Robles on January 18, 2013, because Dane LLC had filed a bankruptcy case which was pending before him.

On February 15, 2013, the bankruptcy court granted BMD's motion for relief from stay to continue the Declaratory Relief Action against Maria in state court. It also granted BMD relief to continue the LLC Action.

## 1. BMD's first amended  [*7] complaint

On March 18, 2013, BMD filed its first amended complaint against Maria ("FAC"), seeking to except its debt from discharge under § 523(a)(2),[5] (a)(4) and (a)(6). BMD also alleged claims for fraudulent conveyance under § 548, for turnover under § 542, declaratory relief, conversion and

fraud.[6] The claims were based on the same factual allegation that Maria misappropriated the Assets of BMD and transferred them to Dane LLC. BMD requested damages of no less than $1 million. Attached to the FAC were copies of the December 31 email from Maria's attorney to Barry and the arbitrator's findings in the Arbitration Action.

## 2. Maria's motion to dismiss and BMD's opposition

Maria moved to dismiss the FAC under Civil Rule 12(b)(6). She argued that at no time prior to January 23, 2013 (when BMD had filed its original complaint) had BMD ever sued her for the claims alleged in the FAC, namely fraud, breach of fiduciary duty and conversion, and these claims were now either barred by the statute of limitations or belonged to the chapter 7 trustee. Maria argued that the First, Second, Third and Eighth claims for relief (the § 523(a)(2), (a)(4) and (a)(6) claims, and the stand-alone "fraud" claim) had to be filed by either the summer of 2011 or 2012, based on Barry's undisputed assertion that he discovered the facts constituting the fraud, breach of fiduciary duty and/or conversion in the summer of 2008. The Fourth and Fifth claims for relief (fraudulent conveyance under § 548 and turnover under § 542) arguably belonged solely to the chapter 7 trustee, so Barry lacked standing to assert them. As for the Sixth claim (declaratory relief), Maria argued that BMD had already sued her for this  [*9] in the Declaratory Relief Action, and the bankruptcy court had terminated the stay so BMD could pursue that claim in state court.

BMD opposed the Motion to Dismiss, contending that Maria's statute of limitations arguments failed for four reasons. First, the LLC Action was filed within months of discovering Maria's conduct, and BMD had alleged that Maria was the alter ego of

---

[5] Although not specifically referenced in the FAC, BMD claims that, in addition to a claim under § 523(a)(2)(A), it pled a claim under § 523(a)(2)(B) because Maria's fraud was "committed both orally and in writing." The bankruptcy court did not address this. We conclude that the FAC failed to plead sufficient facts for a plausible claim under § 523(a)(2)(B). Even if it had, however, this claim would still be subject to the same statute of limitations, which has already expired, as explained below.

---

[6] BMD later voluntarily dismissed its Seventh claim for conversion on April  [*8] 23, 2013, so it could pursue it in state court. Therefore, it was not subject to the dismissal order at issue in this appeal.

Dane LLC and faced potential liability. Thus, argued BMD, without citing to any authority, the alter ego allegation rendered the § 523(a) claims against her timely. Alternatively, BMD argued that it could get leave to amend the TAC in the LLC Action to add Maria as a defendant, which would relate back to the original filing date and defeat any statute of limitations attack. Second, claims against fiduciaries for their inequitable conduct could be equitably tolled and not subject to a statute of limitations defense. Third, even if BMD was aware of a fraud-based claim, the statute of limitations did not accrue until Maria had completed the "last overt act," which BMD claimed occurred within the limitations period. Lastly, many of Maria's "individual actions" took place in 2012, some of which had occurred after she **[*10]** filed for bankruptcy.[7]

In addition, BMD argued that it had stated a plausible claim under § 523(a)(2)(A) because Maria obtained BMD's property through her alter ego, Dane LLC, by using false pretenses, which she was able to do solely through her fiduciary role as the officer and manager for BMD running its gym. The FAC had also pled facts for fraudulent concealment, alleging that Maria had concealed from Barry that she **[*11]** was secretly taking the Assets, and a claim for fraudulent business practices, alleging that Maria's practices resulted in injury to BMD. BMD believed it had also alleged a claim under § 523(a)(2)(B), contending that Maria had obtained property through a written statement that was false — i.e., the email to the Train

customers. As for BMD's claims under § 523(a)(4) or (a)(6), Maria's argument that BMD and Barry are one and the same had already been rejected by the bankruptcy court in its ruling on the motion for relief from stay and by the state court. Further, BMD and Barry had completely different rights and remedies. Even though Barry could not prove damages in the Arbitration Action, this had no impact on BMD's claims, which could be made for the Assets themselves. Finally, BMD disagreed that only the chapter 7 trustee had standing to bring the Fourth and Fifth claims for fraudulent conveyance and turnover. Attached to BMD's opposition was a request for judicial notice that included copies of the TAC filed in the LLC Action and Maria's answer.

In reply, Maria countered that equitable tolling of the statute of limitations does not apply when the plaintiff has actual notice of the **[*12]** defendant's conduct giving rise to the claim. Here, it was undisputed that Maria gave notice to Barry, BMD's only other member, of her intent to freeze him out of the business on December 31, 2008. Further, argued Maria, Barry had already sued her for this conduct, alleging claims for fraud, breach of fiduciary duty and conversion, yet he dismissed them prior to the binding arbitration. Maria also disputed BMD's "last overt act" argument to toll the applicable deadlines, contending that in the cases cited by BMD, the court only applied the doctrine where the defendant concealed the wrongdoing. Here, Maria concealed nothing. Finally, Maria argued that BMD's allegation in the LLC Action that it <u>may</u> have an alter ego claim against her was insufficient to overcome the statute of limitations problem.

### 3. The bankruptcy court's ruling on the Motion to Dismiss

A hearing on Maria's Motion to Dismiss was held on May 7, 2013. After announcing its tentative ruling and hearing argument from BMD, the bankruptcy court decided to take the matter under

---

[7] We are not certain what BMD was arguing here, and the bankruptcy court never addressed it in its tentative or final ruling. BMD appears to be claiming that it was also seeking to except from discharge damages caused by Maria's bad acts that occurred in 2012, some of which perhaps occurred after she filed bankruptcy. If so, this is problematic for two reasons. First, the FAC is based entirely on Maria's bad acts in 2008 and January 2009, when she misappropriated and transferred the Assets to Dane LLC and obtained a new lease for Train; it is not based on anything that purportedly happened in 2012. Second, any bad acts Maria committed after filing bankruptcy would not be subject to discharge or barred by the automatic stay, so BMD may pursue those claims in state court.

advisement so that it could review and consider two unbriefed cases BMD's counsel raised regarding alter ego claims in California.

In the bankruptcy court's **[*13]** tentative ruling, which it ultimately incorporated into its final ruling, it dismissed the First through Fifth claims and the Eighth claim, but denied dismissal of the Sixth claim for declaratory relief.[8] The court dismissed with prejudice the First, Second, Third and Eighth claims for relief as barred by the statute of limitations. It reasoned that the debt underlying these § 523 claims was based on the same factual allegation that Maria had misappropriated BMD's Assets and transferred them to Dane LLC. Because Barry, BMD's only other member, admitted that he was aware of Maria's acts to freeze him out of the business in the summer of 2008, his fraud or conversion claims should have been filed within three years, by 2011; his breach of fiduciary duty claim should have been filed within four years, by 2012. The court further determined that the TAC in the LLC Action had not asserted a proper alter ego claim against Maria, and thus did not defeat her statute of limitations defense. Moreover, the statutes of limitations were not equitably tolled, as that doctrine applied only where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory **[*14]** period, or where the claimant was tricked by the defendant into allowing the filing deadline to pass. Here, while BMD had pursued its claims against Dane LLC, it had not initiated any proceeding against Maria prior to the expiration of the statutes of limitations. Further, nothing in the record indicated that this failure was due to any misconduct by Maria. Finally, the bankruptcy court rejected BMD's contention that its breach of fiduciary duty claim did not accrue during the time the fiduciary duty continued to exist, noting that California courts have recognized a postponement of the accrual only "until the beneficiary has knowledge or notice of the act constituting a breach

of fidelity," citing U.S. Liab. Ins. Co. v. Haidinger-Hayes, Inc., 1 Cal.3d 586, 595, 83 Cal. Rptr. 418, 463 P.2d 770 (1970). Here, Barry had knowledge of Maria's acts in 2008, but BMD did not file an action against her until 2013. The bankruptcy court also dismissed with prejudice BMD's Fourth and Fifth claims for fraudulent conveyance and turnover, as such claims belonged exclusively to the chapter 7 trustee.[9]

On May 20, 2013, BMD voluntarily dismissed its Sixth claim for declaratory relief so that it could pursue that claim in state court.

On June 3, 2013, the bankruptcy court entered its Amended Memorandum Decision and Order granting the Motion to Dismiss in part and denying it in part ("Dismissal Order").[10] Finding the authority raised by BMD regarding statute of limitations issues in cases presenting alter ego claims "inapposite," the bankruptcy court determined that BMD's fraud, breach of fiduciary duty and/or conversion claims were not "saved" by the alleged alter ego claim in the LLC Action. The court again found that no alter ego claim was pending against Maria in that action. Alternatively, even if Dane LLC and Maria were viewed as one and the same under an alter ego theory, the court reasoned that the filing of the LLC Action did not stop the statute of limitations from running against Maria with respect to any fraud, breach **[*16]** of fiduciary duty and/or conversion claims — claims which were not pled in the LLC Action.

The bankruptcy court entered an order dismissing BMD's adversary proceeding with prejudice on June 7, 2013. The order stated that only the Fourth and Fifth claims for relief were dismissed with

---

[8] BMD had already dismissed the Seventh claim for conversion by the time of the hearing on May 7, 2013.

[9] Both parties filed post-hearing **[*15]** briefing. In its later-issued memorandum decision, the bankruptcy court stated that it had rejected the parties' briefs because no post-hearing briefing was ordered or authorized. Although BMD has included these documents in the record, we did not consider them.

[10] When the court denied the Motion to Dismiss in part, it apparently was not aware of BMD's voluntary dismissal of the Sixth claim for declaratory relief filed a few weeks earlier.

prejudice, despite the bankruptcy court's prior Dismissal Order (in the tentative ruling portion attached) which stated that the First, Second, Third and Eighth claims for relief were also dismissed with prejudice. The adversary proceeding was closed on June 25, 2013.

## 4. Post-ruling events

Apparently confused by the court's multiple orders and docket entry closing the adversary proceeding, BMD filed an untimely appeal of the Dismissal Order on June 26, 2013. On June 27, 2013, BMD moved to extend the appeal time or, in the alternative, to amend the FAC based on excusable neglect. On September 5, 2013, the bankruptcy court entered a memorandum decision and order denying BMD's request for leave to amend the FAC, but granting its motion **[*17]** to extend retroactively the time to file a notice of appeal pursuant to Rule 8002(c) and to reopen the adversary proceeding due to the pending appeal.

## II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

## III. ISSUES

1. Did the bankruptcy court err in dismissing the FAC under Civil Rule 12(b)(6)?

2. Did the bankruptcy court abuse its discretion in dismissing the FAC without leave to amend?

## IV. STANDARDS OF REVIEW

The bankruptcy court's dismissal of an adversary proceeding for failure to state a claim under Civil Rule 12(b)(6) is reviewed de novo. Barnes v. Belice (In re Belice), 461 B.R. 564, 572 (9th Cir. BAP 2011). A dismissal without leave to amend is

reviewed for abuse of discretion. Ditto v. McCurdy, 510 F.3d 1070, 1079 (9th Cir. 2007). A bankruptcy court abuses its discretion if it applies an incorrect legal standard or its factual findings are illogical, implausible or without support from evidence in the record. TrafficSchool.com v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011). "Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not **[*18]** be saved by any amendment." Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc., 368 F.3d 1053, 1061 (9th Cir. 2004)(citation omitted). However, it is not error for the trial court to deny leave to amend where the amendment would be futile. Id. (citing Saul v. United States, 928 F.2d 829, 843 (9th Cir. 1991)).

## V. DISCUSSION

### A. Civil Rule 12(b)(6) standards

Under Civil Rule 12(b)(6), made applicable in adversary proceedings through Rule 7012, a bankruptcy court may dismiss a complaint if it fails to "state a claim upon which relief can be granted." In reviewing a Civil Rule 12(b)(6) motion, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). However, the trial court need not accept as true conclusory allegations or legal characterizations cast in the form of factual allegations. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); Hartman v. Gilead Scis., Inc. (In re Gilead Scis. Sec. Litig.), 536 F.3d 1049, 1055 (9th Cir. 2008)(court is not required to accept as true "allegations that are merely conclusory, unwarranted **[*19]** deductions of fact, or unreasonable inferences."). Moreover, we do not ignore affirmative defenses to a claim; if the allegations show that relief is barred as a matter of law, the complaint is subject to dismissal. Jones v.

Bock, 549 U.S. 199, 215, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)(dismissal is appropriate under Civil Rule 12(b)(6) if the allegations show that relief is barred by the applicable statute of limitations).

To avoid dismissal under Civil Rule 12(b)(6), a plaintiff must aver in the complaint "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)(quoting Twombly, 550 U.S. at 570). It is axiomatic that a claim cannot be plausible when it has no legal basis. A dismissal under Civil Rule 12(b)(6) may be based on either the lack of a cognizable legal theory, or on the absence of sufficient facts alleged under a cognizable legal theory. Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1121 (9th Cir. 2008).

**B. The bankruptcy court did not err in dismissing the FAC.**

BMD raises a variety of arguments to demonstrate why the Dismissal Order should be reversed. For the most part, BMD simply reasserts the same **[*20]** arguments it raised before the bankruptcy court as opposed to articulating how the court erred. Notably, BMD does not dispute the bankruptcy court's ruling that the Fourth and Fifth claims for relief were dismissed due to BMD's lack of standing. Therefore, we AFFIRM the Dismissal Order with respect to those claims. See Wake v. Sedona Inst. (In re Sedona Inst.), 220 B.R. 74, 76 (9th Cir. 1998)(an issue not briefed is deemed waived). As for the remaining First, Second, Third and Eighth claims for relief, we address each of BMD's arguments in turn.

Two distinct issues exist concerning the statute of limitations in a nondischargeability proceeding. First, the establishment of the debt is governed by the applicable state statute of limitations law, which, in this case, is California. Banks v. Gill Distrib. Ctrs., Inc., 263 F.3d 862, 868 (9th Cir.

2001)(citation omitted). If the suit is not brought within the time period allotted under state law, the debt cannot be established. Second, the question of dischargeability of the debt is a distinct issue governed solely by the limitations periods established by bankruptcy law, in particular, Rule 4007. Id. **[*21]** Only the first prong is at issue here.

BMD's First and Eighth claims for relief assert nondischargeability of a debt due to Maria's alleged fraud. Under CAL. CODE CIV. PROC. § 338(d), fraud actions must be brought within three years and "[t]he cause of action in that case is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." Thus, the "discovery" rule applies to fraud actions. BMD's Second claim for relief asserts a claim for Maria's alleged breach of fiduciary duty under § 523(a)(4). Breach of fiduciary duty claims are governed by CAL. CODE CIV. PROC. § 343 and are subject to a four-year statute of limitations. See David Welch Co. v. Erskine & Tulley, 203 Cal.App.3d 884, 893, 250 Cal. Rptr. 339 (1988). Finally, BMD's Third claim for relief asserts a claim under § 523(a)(6) for "fraudulent conveyance - actual intent." However, the facts alleged suggest a conversion claim. A claim for conversion is governed by CAL. CODE CIV. PROC. § 338 and is subject to a three-year statute of limitations. See Minsky v. City of L.A., 11 Cal. 3d 113, 120 n.6, 113 Cal. Rptr. 102, 520 P.2d 726 (1974). Notably, BMD dismissed its conversion claim — its Seventh claim for relief — prior **[*22]** to the bankruptcy court's ruling on the Motion to Dismiss. However, even if the Third claim were a claim for actual fraudulent transfer, in this case the statute of limitations is four years.[11]

BMD first contends the bankruptcy court

---

[11] CAL. CIV. CODE § 3439.09 provides that no action may be brought for fraudulent transfer more than seven (7) years after the transfer was made notwithstanding any other provision of law. Where actual intent to defraud can be shown under § 3439.04(a)(1), an action must be brought within four years after the transfer was made, or, if later, within one year of when the transfer was or could reasonably have been discovered by the claimant.

Exhibit 4, Page 96

Case 8:18-ap-01168-SC    Doc 332    Filed 08/05/21    Entered 08/05/21 20:15:00    Desc
Main Document    Page 102 of 164

Page 8 of 11

misapplied the rule that all factual allegations in the complaint are to be accepted as true for purposes of reviewing a motion to dismiss under Civil Rule 12(b)(6). Specifically, BMD contends that it had alleged in the TAC in the LLC Action that Dane LLC is the alter ego of Maria. Therefore, the bankruptcy court had to accept this fact as true. The only reference within the TAC as to any alter ego claim against Maria is in paragraph three, which states that "Maria Elena Dane, LLC may be the alter ego of Maria Elena Dane." **[\*23]** This statement is not a "fact" but rather a legal characterization cast in the form of a factual allegation. <u>Twombly</u>, 550 U.S. at 555-56. As such, the bankruptcy court did not have to accept it as true.

BMD next contends the bankruptcy court erred in determining that its alter ego allegation in the LLC Action was insufficient to save its claims from Maria's statute of limitations defense. In short, BMD argues that because it filed the LLC Action within months after Maria transferred BMD's Assets to Dane LLC, and because BMD alleged an alter ego claim in that action, the claims in the nondischargeability action were not barred by the statute of limitations.

Under California law, "there is no such thing as a substantive alter ego claim . . . ." <u>Ahcom, Ltd. v. Smeding</u>, 623 F.3d 1248, 1251 (9th Cir. 2010). A claim against a defendant, based on the alter ego theory, is not itself a claim for substantive relief, e.g., breach of contract or to set aside a fraudulent conveyance. <u>Hennessey's Tavern, Inc. v. Am. Air Filter Co.</u>, 204 Cal.App.3d 1351, 1359, 251 Cal. Rptr. 859 (1988). Rather, it is a procedural device by which courts will disregard the corporate entity in order to hold the alter ego individual liable **[\*24]** on the obligations of the corporation. <u>Id.</u> Before the doctrine may be invoked, two elements must be alleged: (1) there is such unity of interest and ownership that the separate personalities of the individual and the corporation no longer exist; and (2) that, if the acts in question are treated as those of the corporation alone, an inequitable result will

follow. <u>Neilson v. Union Bank of Cal., N.A.</u>, 290 F.Supp.2d 1101, 1115 (C.D. Cal. 2003); <u>Sonora Diamond Corp. v. Super. Ct.</u>, 83 Cal.App.4th 523, 538, 99 Cal. Rptr. 2d 824 (2000). "Conclusory allegations of 'alter ego' status are insufficient to state a claim. Rather, a plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each." <u>Neilson</u>, 290 F.Supp.2d at 1116 (citations omitted); <u>Hokama v. E.F. Hutton & Co., Inc.</u>, 566 F.Supp. 636, 647 (C.D. Cal. 1983) ("Defendants further argue that plaintiffs cannot circumvent the requirements for secondary liability by blandly alleging that Madgett, Consolidated, and Frane are 'alter egos' of other defendants accused of committing primary violations. This point is well taken . . . . If plaintiffs wish to pursue such a theory of liability, they must allege the elements **[\*25]** of the doctrine. Conclusory allegations of alter ego status such as those made in the present complaint are not sufficient."). <u>See also Leek v. Cooper</u>, 194 Cal.App.4th 399, 414-15, 125 Cal. Rptr. 3d 56 (2011)(recognizing split in California authority as to whether alter ego doctrine must be pleaded in the complaint, but holding that when the court is asked to take some action upon an alter ego theory at the pleadings stage, plaintiff must allege facts to show a unity of interest and ownership and an unjust result if the corporation is treated as the sole actor)(citations omitted).

The TAC filed in the LLC Action contains only one conclusory allegation that Maria may be the alter ego of Dane LLC. It fails to allege any facts establishing either one of the two elements necessary to invoke the doctrine. While the TAC asserts facts that establish Maria as the sole owner of Dane LLC and of her participation in transferring BMD's Assets to Dane LLC, it does not assert any allegation as to how, when or why the separateness between Maria and Dane LLC ceased to exist, or why the corporate entity should be disregarded. More importantly, the TAC does not allege that fraud or injustice will result if Maria is not a **[\*26]** party to the LLC Action. "The allegation that a corporation is the alter ego of the

individual stockholders is insufficient to justify the court in disregarding the corporate entity in the absence of allegations of facts from which it appears that justice cannot otherwise be accomplished." Meadows v. Emett & Chandler, 99 Cal.App.2d 496, 498-99, 222 P.2d 145 (1950)(quoting Norins Realty Co. v. Consol. Abstract & Title Guar. Co., 80 Cal.App.2d 879, 883, 182 P.2d 593 (1947)). In order to rely on the theory of alter ego "it must be alleged and proved that the stockholders and the corporate entity are the business conduits and alter ego of one another, and that to recognize their separate entities would aid the consummation of a wrong." Id. at 499 ("The rule is firmly settled that no reliance can be had on this [alter ego] theory in the absence of pleading that recognition of the corporate entity would sanction a fraud or promote injustice.")(emphasis in original). We conclude that the elements of alter ego were not sufficiently pled in the TAC, and so we agree with the bankruptcy court that no alter ego claim is pending against Maria in the LLC Action.

Because the TAC did not establish an alter ego claim against Maria, **[\*27]** it would have to be amended a fourth time to add her as a new defendant. "When a defendant is first named in an amended complaint, and is alleged to be the alter ego of a defendant named in the original complaint, he is brought into the action as a new defendant and the action is commenced as to him at the time the amended complaint naming him is filed." Hennessey's Tavern, Inc., 204 Cal.App.3d at 1359. As a general rule, "an amended complaint that adds a new defendant does not relate back to the date of filing the original complaint and the statute of limitations is applied as of the date the amended complaint is filed, not the date the original complaint is filed." Woo v. Super. Ct., 75 Cal.App.4th 169, 176, 89 Cal. Rptr. 2d 20 (1999)(string citations omitted). Further, an "amendment after the statute of limitations has run will not be permitted when the result is the addition of a party who, up to the time of the proposed amendment, was neither a named nor a fictitiously

designated party to the proceeding." Ingram v. Super. Ct., 98 Cal.App.3d 483, 492, 159 Cal. Rptr. 557 (1979)(citing Stephens v. Berry, 249 Cal.App.2d 474, 478, 57 Cal. Rptr. 505 (1967)). Presuming BMD could even amend the TAC at this point to add Maria, the result is the **[\*28]** same — the statutes of limitations for claims of fraud, breach of fiduciary duty, conversion or actual fraudulent transfer have run.

While California law allows a plaintiff to bring an action against an alter ego defendant after the statute of limitations has expired in certain circumstances, such as after a judgment has been entered, that situation is not applicable here. See CAL. CODE CIV. PROC. § 187 (judgment creditor may be able to amend the judgment to add non-party alter ego defendant as a judgment debtor and enforce the judgment against that debtor); Most Worshipful Sons of Light Grand Lodge Ancient Free and Accepted Masons v. Sons of Light Lodge No. 9, 160 Cal. App. 2d 560, 566-67, 569, 325 P.2d 606 (1958). First, no judgment has been entered in the LLC Action. Second, BMD could never add Maria as an alter ego defendant after judgment because it was aware of Maria's existence before trial. Jines v. Abarbanel, 77 Cal.App.3d 702, 717, 143 Cal. Rptr. 818 (1978)(holding that trial court erred by amending judgment against a doctor to add his corporation as a judgment debtor because plaintiff was aware of corporation's existence before trial). Thus, BMD did not preserve any post-judgment right under CAL. CODE CIV. PROC. § 187 **[\*29]** to add her as an alter ego defendant.

We disagree with BMD that it could amend the TAC in the LLC Action to add Maria as a "Doe" defendant to overcome the statute of limitations problem. Under CAL. CODE CIV. PROC. § 474, "an amended complaint substituting a new defendant for a fictitious Doe defendant filed after the statute of limitations has expired is deemed filed as of the date the original complaint was filed." Woo, 75 Cal.App.4th at 176 (citing Austin v. Mass. Bonding & Ins. Co., 56 Cal.2d 596, 599, 15 Cal. Rptr. 817, 364 P.2d 681 (1961)). However, this exception to

the general rule has a caveat — the plaintiff must have been genuinely ignorant of the Doe defendant's identity at the time it filed its original complaint. Id. at 177 (citations omitted). BMD was well aware of its potential claims against Maria when it filed its original complaint in the LLC Action in 2009, yet it chose not to pursue them. As such, CAL. CODE CIV. PROC. § 474 would not apply.

BMD alternatively argues that the statutes of limitations should be equitably tolled because of Maria's alleged self-dealing as a corporate fiduciary. It further argues that Maria's "continuous wrongs" or "last overt act," some of which BMD contends occurred within **[*30]** the statute of limitations, prevents her from raising any statute of limitations defense. In actions where the federal court borrows the state statute of limitation, the court also borrows all applicable provisions for tolling the limitations period found under state law. Cervantes v. City of San Diego, 5 F.3d 1273, 1275 (9th Cir. 1993).

Without question, Maria owed a fiduciary duty to Barry as a co-member of BMD. BMD cites to U.S. Liab. Ins. Co. v. Haidinger-Hayes, Inc., 1 Cal.3d 586, 83 Cal. Rptr. 418, 463 P.2d 770 (1970), for the proposition that no claim accrues during the time the fiduciary relationship continues to exist. BMD contends that Maria breached and continues to breach her fiduciary duty to BMD because she has usurped corporate opportunities and taken corporate assets as her own. BMD has several problems here. First, as recognized by the bankruptcy court, the California Supreme Court in Haidinger-Hayes, Inc. noted that accrual of a cause of action involving a fiduciary is only postponed "until the beneficiary has knowledge or notice of the act constituting a breach of fidelity." Id. at 596 (string citing cases). Here, Barry was on actual notice of Maria's subject actions in 2008 and January 2009. In **[*31]** addition, the facts alleged in the FAC speak only of Maria's acts of misappropriating BMD's Assets and transferring them to Dane LLC in December 2008, her

obtaining a lease from the landlord around that same time, and her email to the trainers on January 1, 2009. Although BMD alleged in its opposition to the Motion to Dismiss that Maria had engaged in "multiple diversions of money," no facts about these alleged diversions were specifically pled in the FAC. A plaintiff's memorandum in opposition to a Civil Rule 12(b)(6) motion cannot serve to supplement or amend the complaint. See Gomez v. Ill. State Bd. of Educ., 811 F.2d 1030, 1039 (7th Cir. 1987). Finally, equitable tolling would not apply here because BMD did not actively pursue the claims at issue against Maria within the statutory period, and nothing in the record shows that BMD's delay in suing her was due to her misconduct. See O'Donnell v. Vencor Inc., 465 F.3d 1063, 1068 (9th Cir. 2006).

Accordingly, because the FAC failed to establish plausible claims for relief under § 523(a), the bankruptcy court did not err in granting the Motion to Dismiss.

## C. The bankruptcy court did not abuse its discretion in dismissing the FAC without **[*32]** leave to amend.

Under Civil Rule 15(a)(2), applicable here by Rule 7015, BMD could amend its FAC only with Maria's consent, or with the bankruptcy court's leave. BMD contends that leave should have been given in this case, particularly since BMD voluntarily dismissed two causes of action, which the bankruptcy court intimated would have "saved" the FAC. We assume BMD means its Sixth and Seventh claims for declaratory relief and conversion, but BMD does not show where the bankruptcy court "intimated" that these claims would have saved the FAC. Actually, the Seventh claim was dismissed before the bankruptcy court could even rule on it and, for whatever reason, BMD chose to dismiss the Sixth claim after the bankruptcy court issued its tentative ruling. BMD contends that it should have, at minimum, been permitted to reinstate its Sixth claim, which it argues the bankruptcy court found

had merit.

BMD did not ask for an opportunity to amend the FAC until after the adversary proceeding had been dismissed with prejudice and the appeal of the Dismissal Order had been filed. The bankruptcy court denied that request for two reasons, as explained in its August 20 tentative ruling, which it incorporated **[\*33]** into its final memorandum and order entered on September 5, 2013. First, BMD had already amended its complaint once, and it failed to demonstrate entitlement for leave to file a second amendment. Although the court did not articulate why BMD had failed to show that leave was warranted under Civil Rule 15, we infer from the record that its decision was based on BMD's inability to remedy the statute of limitations problem. The trial court does not err in denying leave to amend where the amendment would be futile. Thinket Ink Info. Res., Inc., 368 F.3d at 1061. Second, the court found that it made little sense to consider a request to amend when BMD had already filed its notice of appeal (albeit, untimely, but not yet dismissed) of the Dismissal Order. We discern no abuse of discretion in that ruling. In addition, we find BMD's argument that the bankruptcy court abused its discretion by not allowing BMD to reinstate its Sixth claim without merit, when BMD consciously chose to dismiss that claim to pursue it in state court.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM.

---

End of Document

# EXHIBIT 5

# Radakovich v. Wilson (In re Radakovich)

United States Bankruptcy Appellate Panel for the Ninth Circuit

June 26, 2014, Argued and Submitted at Pasadena, California; September 19, 2014, Filed

BAP No. WW-13-1254-KuPaJu

**Reporter**

2014 Bankr. LEXIS 4017 *

In re: ROBERT RADAKOVICH, Debtor.
ROBERT PETER RADAKOVICH, Appellant, v.
STEPHEN J. WILSON; TRICIA WILSON,
Appellees.

**Notice:** THIS DISPOSITION IS NOT
APPROPRIATE FOR PUBLICATION.
ALTHOUGH IT MAY BE CITED FOR
WHATEVER PERSUASIVE VALUE IT MAY
HAVE (SEE FED. R. APP. P. 32.1), IT HAS NO
PRECEDENTIAL VALUE. SEE 9TH CIR. BAP
RULE 8013-1.

**Subsequent History:** Related proceeding at
Wilson v. Mt. Solo Landfill, Inc., 2014 Wash. App.
LEXIS 2660 (Wash. Ct. App., Nov. 13, 2014)

**Prior History:** **[*1]** Appeal from the United States
Bankruptcy Court for the Western District of
Washington. Bk. No. 11-49810. Adv. No. 12-
04117. Honorable Brian D. Lynch, Bankruptcy
Judge, Presiding.

**Counsel:** For Robert Radakvoich, Appellant:
Randall L. Stewart, Esq.

Kevin R. Vibbert, Esq. argued Pro se.

For Stephen J. and Tricia Wilson, Appellees: Kevin
R. Vibbert, Esq.

**Judges:** Before: KURTZ, PAPPAS and JURY,
Bankruptcy Judges. Memorandum by Judge Kurtz.
Concurrence by Judge Jury.

**Opinion by:** Kurtz

# Opinion

# MEMORANDUM[*]

## INTRODUCTION

Chapter 7[1] debtor Robert Peter Radakovich appeals
from the bankruptcy court's order denying his
motion for Rule 9011 sanctions against appellees
Stephen and Trisha Wilson and their attorney
Kevin Vibbert.

In denying Radakovich's sanctions motion, the
bankruptcy court determined that the complaint and
other adversary proceeding papers Vibbert
filed **[*2]** on behalf of the Wilsons were not
frivolous. Under the applicable standard of review,
abuse of discretion, Radakovich has not persuaded
us that the bankruptcy court committed reversible
error in making this determination.

Accordingly, we AFFIRM.

## FACTS

The relevant facts are mostly procedural and
undisputed. Radakovich filed a chapter 7 petition
on December 21, 2011. The Wilsons received
notice that the last day for filing a complaint

_____

[*] This disposition is not appropriate for publication. Although it may
be cited for whatever persuasive value it may have (see Fed. R. App.
P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[1] Unless otherwise indicated, all chapter and section references are to
the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are
to the Federal Rules of Bankruptcy Procedure and "Civil Rule"
references are to the Federal Rules of Civil Procedure.

objecting to Radakovich's discharge was March 26, 2012.

Vibbert prepared an adversary complaint on the Wilsons' behalf objecting to Radakovich's discharge under § 727(a)(2)(A) and attempted to file it with the bankruptcy court through the court's electronic case filing system ("ECF") a few hours before the bar date expired at midnight.[2] Vibbert's delay in filing was partially caused by his miscalendaring the bar date as March 27 rather than March 26, 2012. Vibbert also discovered that he did not remember his password for ECF access, and he was locked out of the system after several failed attempts. He eventually obtained the correct password from his assistant at approximately 11:40 p.m., but after so many attempts to gain ECF access, he was locked out and could not gain [*3] access until after midnight. Also, unknown to him, his assistant was attempting to log into the account to verify that she had given Vibbert the correct password at the same time he was attempting to log into the account. Vibbert finally filed the complaint at 12:19 a.m. on March 27, 2012.

Radakovich then served the Wilsons and Vibbert with a safe harbor motion for sanctions under Rule 9011 on the ground that the complaint was time-barred as a matter of law. The sanctions motion stated that, if the Wilsons did not voluntarily dismiss their complaint within twenty-one days, Radakovich would seek to hold the Wilsons and Vibbert jointly and severally liable for monetary sanctions and attorney's fees.

Believing that they had a valid basis for arguing that the complaint was not time-barred, the Wilsons did not dismiss their complaint. Thereafter, Radakovich filed an answer to the complaint followed by a motion for summary judgment. The Wilsons responded by explaining the circumstances surrounding their late-filed complaint and by arguing that the bankruptcy court should [*4] grant

equitable relief from the bar date under these circumstances. In support of their argument, the Wilsons relied upon a Seventh Circuit decision, In re Kontrick, 295 F.3d 724 (7th Cir. 2002), aff'd, Kontrick v. Ryan, 540 U.S. 443, 124 S. Ct. 906, 157 L. Ed. 2d 867 (2004). The Wilsons also relied upon two prior decisions of this panel, Schunk v. Santos (In re Santos), 112 B.R. 1001 (9th Cir. BAP 1990), and DeLesk v. Rhodes (In re Rhodes), 61 B.R. 626 (9th Cir. BAP 1986).

In Santos, the Panel held that the doctrines of equitable tolling, equitable estoppel and excusable neglect were at odds with the strict construction of the complaint filing deadlines set forth in Rules 4004(a) and 4007(c). In re Santos, 112 B.R. at 1006-08. At the same time, however, the Santos Panel acknowledged the continuing validity of the exceptional or unique circumstances doctrine: "Notwithstanding this strict construction, we recognize and reaffirm those Panel cases indicating that relief from the bar date may be available in extraordinary circumstances." Id. at 1007 n.6 (citing In re Rhodes, 61 B.R. at 630). This was the aspect of Santos and Rhodes that the Wilsons and Vibbert were relying upon.

At the September 5, 2012 hearing on the summary judgment motion, Vibbert explained that there was a change in his password for the ECF system: "[Q]uite simply, I screwed up when I was trying to log into the system. I got locked out. . . ." Vibbert argued that the case law supported equitable relief from the bar date in "exceptional" circumstances.

Without [*5] explicitly deciding whether the underlying facts constituted exceptional or unique circumstances, the bankruptcy court determined that the Wilsons had received notice of the bar date and that there were no equitable grounds pursuant to which the court could grant the Wilsons relief from the bar date. Consequently, the bankruptcy court granted Radakovich's summary judgment motion and dismissed the Wilsons' adversary complaint with prejudice by order entered on September 10, 2012.

---

[2] Under Rule 9006(a)(4)(A), the deadline for all electronic filings is midnight local time on the day set by the relevant order of the bankruptcy court.

In September 2012, Radakovich filed the previously served motion for sanctions in the bankruptcy court. Radakovich sought monetary sanctions under Rule 9011(c)(1)(A) and (2) and attorney's fees in the amount of $4,664.

The Wilsons opposed the sanctions motion by essentially reiterating their arguments previously made in response to the summary judgment motion. On the Wilsons' behalf, Vibbert admitted that the case law he cited did not identify what specific circumstances would justify equitable relief from the bar date. He nonetheless asserted that, after reviewing the case law, he believed that he had a reasonable basis for arguing that relief from the bar date should be allowed. He further contended that the decision to proceed [*6] with the complaint was based on a diligent review of existing case law and an argument to extend that case law to allow the Wilsons' objection to discharge claim to proceed.

At the hearing on the sanctions motion, Vibbert argued that the legal position he had taken on behalf of the Wilsons was not frivolous and that the case law he cited "very clearly states" that bankruptcy courts have discretion to allow matters to proceed after the bar date under certain circumstances, even though that case law did not identify what those circumstances were. He further asserted that he did not find any case law that addressed his particular problem with ECF. Vibbert maintained that because the ECF system lockout prevented him from filing the complaint on time, this constituted an "extraordinary circumstance" which should have allowed the case to continue. Finally, Vibbert again asserted that his arguments were based on an extension of the law.

The bankruptcy court agreed that Vibbert's arguments, while ultimately unsuccessful, were not legally baseless or frivolous because no existing case law addressed the inability of counsel to access ECF due to the system's security features. In fact, Radakovich's [*7] counsel conceded at the sanctions hearing that there was no case law on point at the time the Wilsons filed their papers. As a result, the court held that the Wilsons' papers were not sanctionable under Rule 9011(b)(2).

Radakovich moved for relief from the order denying sanctions under Rule 9024. In the motion, Radakovich requested the court to more specifically articulate its analysis, findings and conclusions with respect to the dispositive order. On May 16, 2013, the court entered its order denying Radakovich's Rule 9024 motion. That order essentially reiterated the bankruptcy court's previous findings and conclusions. Specifically, the court decided that "[The Wilsons'] argument to extend the law to cover the factual situation at issue here, involving technical difficulties accessing the Court's ECF system, was warranted, made in good faith and nonfrivolous, although eventually unsuccessful." Radakovich timely filed this appeal.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(J). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court abused its discretion in denying Radakovich's motion for sanctions under Rule 9011.

## STANDARD OF REVIEW

We review the bankruptcy court's denial of a motion for sanctions [*8] under Rule 9011 for an abuse of discretion. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990) ("an appellate court should apply an abuse of discretion standard in reviewing all aspects of a district court's [Civil] Rule 11 determination."); Valley Nat'l Bank v. Needler (In re Grantham Bros.), 922 F.2d 1438, 1441 (9th Cir. 1991).

Under Ninth Circuit law, a bankruptcy court abuses its discretion when it applies the incorrect legal rule or its application of the correct legal rule is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." United States v. Loew, 593 F.3d 1136, 1139 (9th Cir. 2010).

## DISCUSSION

Rule 9011(b)(1) provides for an award of sanctions against an attorney or a party who files pleadings or papers that are "interposed for any improper purpose." Id. Rule 9011(b)(2) provides for an award of sanctions against an attorney or a party who files pleadings or papers that are not "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Id.; see also Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1362 (9th Cir. 1990) (en banc) ("Our cases have established that sanctions must be imposed on the signer of a paper [under Civil Rule 11] if either a) the paper is filed for an improper purpose, or b) the paper is 'frivolous.'").

The language of Rule 9011 parallels that of Civil Rule 11. Therefore, in analyzing sanctions under Rule 9011 we generally may rely on **[\*9]** cases interpreting Civil Rule 11. In re Grantham Bros., 922 F.2d at 1441; but cf. Marsch v. Marsch (In re Marsch), 36 F.3d 825, 829-30 (9th Cir. 1994) (declining to apply in the Rule 9011 context particular Ninth Circuit precedent applicable to Civil Rule 11 cases because of perceived policy differences between bankruptcy cases and general federal civil litigation).

In this appeal, Radakovich challenges only one aspect of the bankruptcy court's ruling. Radakovich contends that the Wilsons' complaint and summary judgment opposition were frivolous and that the bankruptcy court erred when it held otherwise. We will limit our appellate review to this single issue. See Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu, 626 F.3d 483, 487-88 (9th Cir. 2010);

Brownfield v. City of Yakima, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010) (citing Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994)).[3]

For Civil Rule 11 sanctions purposes, the Ninth Circuit uses the term "frivolous" to describe "a filing that is both baseless and made without a reasonable and competent inquiry." Townsend, 929 F.2d at 1362 (emphasis added). Accord, Holgate v. Baldwin, 425 F.3d 671, 676 (9th Cir. 2005).

Frivolousness in this context is measured objectively. See G.C. & K.B. Invs., Inc. v. Wilson, 326 F.3d 1096, 1109 (9th Cir. 2003). This means that the litigant's filings are measured against a reasonableness standard set by what a competent attorney admitted to practice before the same court would have filed. See id.; In re Grantham Bros., 922 F.2d at 1441. This also means that, when the court assesses the reasonableness of the litigant's inquiry, the actual inquiry undertaken is measured against what the hypothetical competent attorney would have learned at the time from reasonable inquiry. See id. at 1442; see also Townsend, 929 F.2d at 1364 ("whether a pleading is sanctionable must be based on an assessment of the knowledge that reasonably could have been acquired at the time the pleading was filed.")

 **[\*11]** Under the objective standard, "counsel can

---

[3] While In re Marsch, 36 F.3d at 829-30, holds that a bankruptcy court in making a Rule 9011 Sanctions determination must concurrently consider both frivolousness and improper purpose, we decline to address at length the improper purpose issue here because Radakovich made no argument in his opening appeal brief regarding improper purpose. See Wu, 626 F.3d at 487-88; Brownfield, 612 F.3d at 1149 n.4. In any event, even though the bankruptcy court did not make an explicit finding regarding improper purpose, the entirety of the record and the explicit findings of the bankruptcy court convince us that the court implicitly found no improper purpose and that this finding was not clearly erroneous. See Townsend, 929 F.2d at 1366 (holding that remand was not necessary **[\*10]** for further findings on improper purpose issue because the district court's limited findings when combined with the record were adequate for purposes of appellate review); see also Simeonoff v. Hiner, 249 F.3d 883, 891 (9th Cir. 2001)("Conclusory and unhelpful findings of fact do not necessarily require reversal if the record supports the district court's ultimate conclusion.").

no longer avoid the sting of [Civil] Rule 11 sanctions by operating under the guise of a pure heart and empty head." Smith v. Ricks, 31 F.3d 1478, 1488 (9th Cir. 1994). On the other hand, Civil Rule 11 frivolousness is a minimal standard. As stated in Strom v. United States, 641 F.3d 1051, 1059 (9th Cir. 2011), "[Civil] Rule 11 sets a low bar: It deters 'baseless filings' by requiring a 'reasonable inquiry' that there is some plausible basis for the theories alleged." When there is a plausible basis, even a very weak one, supporting the litigant's position, imposition of Civil Rule 11 sanctions is inappropriate. Id. As stated in Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc., 186 F.3d 157, 167 (2d Cir. 1999): "[T]o constitute a frivolous legal position for purposes of [Civil] Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." Id. (quoting Mareno v. Rowe, 910 F.2d 1043 (2d Cir. 1990)), quoted with approval in Strom, 641 F.3d at 1059.

This minimalist approach to assessing frivolousness is no accident. Rather, it is necessitated by the risk that losing arguments easily can be conflated with frivolous arguments. See Operating Eng'rs Pension Trust v. A-C Co., 859 F.2d 1336, 1344-45 (9th Cir. 1988). To mitigate this risk, Civil Rule 11 is treated as an "extraordinary remedy" that must be imposed "with extreme caution." Id. at 1345. Indeed, imposing a broader frivolousness standard could chill effective representation and zealous advocacy. As the Ninth Circuit has explained:

> [Civil] Rule 11 must not be construed so as to conflict with the primary duty of an attorney to represent his or her client zealously. Forceful representation often requires that an attorney attempt to read a case or an agreement in an innovative though sensible way. Our law is constantly evolving, and effective representation sometimes compels attorneys to take the lead in that evolution. [Civil] Rule 11 must not be turned into a bar to legal progress. The simple fact that an attorney's legal theory failed to persuade the district court does not

demonstrate that counsel lacked the requisite good faith in attempting to advance the law.

Id. at 1344. Accord, Townsend, 929 F.2d at 1363-64.

Here, [*12] the bankruptcy court held that the Wilsons' exceptional or unique circumstances argument was a losing argument but not a frivolous one. In essence, the bankruptcy court determined that the Wilsons' invocation of the unique circumstances doctrine was not frivolous because of the status of Ninth Circuit law at the time the argument was made. At that time, there was no case directly on point — no Ninth Circuit precedent determining whether an eleventh-hour denial of access to the bankruptcy court's ECF system resulting from the routine operation of the system's password security features constituted exceptional or unique circumstances for purposes of seeking relief from an expired deadline under Rule 4004(a).

Radakovich contends that the bankruptcy court's determination was erroneous and that the Wilsons' position was nothing more than a variation of the oft-rejected attempts by litigants to assert excusable neglect as a basis for relief from the Rule 4004(a) and Rule 4007(c) filing deadlines. See, e.g., Jones v. Hill (In re Hill), 811 F.2d 484, 486 (9th Cir. 1987); In re Santos, 112 B.R. at 1008 (9th Cir. BAP 1990); Osborn v. Ricketts (In re Ricketts), 80 B.R. 495, 496-97 (9th Cir. BAP 1987); Buckeye Gas Prods. Co. v. Rhodes (In re Rhodes), 71 B.R. 206, 208 (9th Cir. BAP 1987).

The record does not support Radakovich's characterization of the Wilsons' position. In their summary judgment motion opposition, in their sanctions motion opposition, and at the hearings on these two motions, the [*13] Wilsons' acknowledged that "equitable defenses" like equitable estoppel and equitable tolling were not generally available for the purpose of seeking equitable relief from the Rule 4004(a) and Rule 4007(c) filing deadlines. Rather, they argued that the particular circumstances that occurred on the eve of the filing deadline involving their counsel

Vibbert constituted exceptional circumstances under which the court could exercise its equitable discretion to relieve them from the complaint filing deadline. The Wilsons further admitted that their counsel, after conducting research, could not articulate with any certainty the parameters of the exceptional or unique circumstances doctrine. Consequently, we reject Radakovich's assertion that the Wilsons' argument was nothing more than an excusable neglect argument.

We acknowledge that the Wilsons' account of the status of the unique circumstances doctrine in the Ninth Circuit was partisan and incomplete. They failed to mention that the Ninth Circuit has questioned the continued existence of the doctrine and that it "appears" limited to situations where it is necessary to remedy an explicitly misleading statement made by the court. See Allred v. Kennerley (In re Kennerley), 995 F.2d 145, 147 (9th Cir. 1993); see also Shull v. Wells (In re Wells), 2010 Bankr. LEXIS 5071, 2010 WL 6259961, at **3-4 (9th Cir. BAP 2010)(more-recent, albeit **[*14]** unpublished, Ninth Circuit decision stating the same points). Nonetheless, an adversarial and incomplete statement of the law does not, by itself, permit a court to conclude that such a statement is sanctionable under Civil Rule 11. See United States v. Stringfellow, 911 F.2d 225, 226 (9th Cir 1990) ("The failure to cite relevant authority, whether it be case law or statutory provisions, does not alone justify the imposition of [Civil Rule 11] sanctions.").

As we already have indicated above, the critical question is not whether the legal position taken is partisan or incomplete but whether that position is frivolous. As we already have explained, a legal position is not frivolous for purposes of Rule 9011 if it was supported by reasonable inquiry - "knowledge that reasonably could have been acquired at the time the pleading was filed" by a hypothetical competent attorney admitted to practice before the same court. Townsend, 929 F.2d at 1364; see also In re Grantham Bros., 922 F.2d at 1442.

Here, both Vibbert and the bankruptcy court stated that their respective inquiries turned up no cases directly on point. Nor have we found any cases on all fours that were in existence at the time the Wilsons invoked the unique circumstances doctrine.

More importantly, our research indicates that, in the context of Rules 4004(a) and 4007(c), the continued existence **[*15]** and parameters of the unique circumstances doctrine were uncertain at the time the Wilsons filed their papers. See, e.g., In re Kennerley, 995 F.2d at 147; In re Wells, 2010 Bankr. LEXIS 5071, 2010 WL 6259961, at **3-4. The unsettled state of the law supports the bankruptcy court's conclusion that sanctions were inappropriate. See Bank of Maui v. Estate Analysis, Inc., 904 F.2d 470, 472 (9th Cir. 1990).

Furthermore, two recent Ninth Circuit cases indicate that the application of the doctrine in this context remains in a state of flux. See Willms v. Sanderson, 723 F.3d 1094, 1103 (9th Cir. 2013); Anwar v. Johnson, 720 F.3d 1183, 1188 n.6 (9th Cir. 2013). Anwar is particularly instructive on this point. Anwar states:

> We acknowledge that the U.S. Supreme Court has not expressly addressed whether FRBP 4007(c)'s filing deadline admits of any equitable exceptions and that lower courts are divided on the issue. We need not, and do not, reach the question of whether external forces that prevented any filings — such as emergency situations, the loss of the court's own electronic filing capacity, or the court's affirmative misleading of a party — would warrant such an exception.

Id. (citations omitted).

We acknowledge that neither the Willms decision nor the Anwar decision was available at the time the Wilsons asserted their position regarding the unique circumstances doctrine. Nonetheless, these two decisions support the proposition that a reasonably competent attorney admitted to **[*16]** practice before the bankruptcy court, upon

reviewing the cases cited in Willms and Anwar, would have reached the same conclusion — that the existence and parameters of the unique circumstances doctrine were and are unsettled.

At bottom, on this record and in light of the unsettled state of the law regarding the unique circumstances doctrine, we hold that the bankruptcy court did not err when it concluded that the Wilsons' papers were not frivolous. Because Radakovich has not posited any other grounds for holding that the bankruptcy court abused its discretion, we will uphold the bankruptcy court's ruling on Radakovich's sanctions motion.[4]

Finally, it is worth noting that, if the bankruptcy court had determined that the Wilsons' papers were frivolous, we might have been equally hard pressed to find reversible error given the fact-sensitive nature of the inquiry and the inherently close calls associated with determinations of this type. See Townsend, 929 F.2d at 1362 ("[Civil Rule 11] calls for an intensely fact-bound inquiry, and for this kind of inquiry, 'bright lines' are not appropriate"); see also Cooter & Gell, 496 U.S. at 401-05 (explaining at length why all aspects of Civil Rule 11 sanctions rulings are entitled to a deferential standard of review). The highly deferential effect of appellate review under the abuse of discretion standard when applied in fact-intensive settings is not unusual. Cf. Pincay v. Andrews, 389 F.3d 853,

---

[4] According to the concurrence, our majority decision suggests that the absence of case authority directly on point "precludes" a determination that the Wilsons' papers were frivolous. This is not what we mean to say. Our majority decision is meant to establish a more modest proposition: that, based on the entire record and the unsettled state of the law regarding the parameters of the unique circumstances doctrine, we decline to overturn the bankruptcy court's assessment that the Wilsons' papers were not frivolous.

In reality, there is little difference [*17] between our viewpoint and that of the concurrence. The concurrence perceives as frivolous not the Wilsons' legal argument, but rather the Wilsons' attempt to characterize the facts and circumstances of this case as anything other than mere negligence on the part of their counsel. Unlike the concurrence, we believe the bankruptcy court was acting within its discretion when it concluded that the Wilsons' attempted characterization was not frivolous.

858-59 (9th Cir. 2004) (en banc) (noting that, whichever way the district [*18] court had decided the issue under review, the court of appeals would have been hard pressed to identify any grounds for reversal given the fact-intensive nature of the inquiry and the abuse of discretion standard of review).

## CONCLUSION

For the reasons set forth above, we AFFIRM the bankruptcy court's denial of Radakovich's sanctions motion.

**Concur by:** JURY

## Concur

JURY, Bankruptcy Judge, concurring:

I concur in the result achieved by the majority, but I arrive at that conclusion from a different path. Although I would determine that a Rule 9011 violation did occur here as a matter of law, because the bankruptcy court has broad discretion in awarding sanctions if such violation occurred, I would not disturb the exercise of that discretion on the facts of this case.

The majority, as did the bankruptcy court, suggests that the lack of authority on whether an ECF security lock out may constitute the sort of unique and exceptional circumstance which justifies denial of sanctions under Rule 9011. It suggests that an absence of an existing case on all fours with this one makes the argument that the circumstances were unique or exceptional non-frivolous so as to avoid Rule 9011 sanctions. In my mind, the lack of case law on point did not automatically [*19] preclude a finding of a Rule 9011 violation, especially when ample case law existed to determine that mere negligence would not excuse the time-barred filing. See, for example, Schunk v Santos (In re Santos), 112 B.R. 1001, 1008 (9th Cir. BAP 1990), where our panel held that the

bankruptcy court has no discretion to enlarge the time periods under Rules 4004(a) and 4007(c) on the basis of excusable neglect when the request is made after the time period has expired.

Indeed, I do not see unique or exceptional circumstances in this case. I disagree with the majority's statement that Radakovich's characterization of the Wilsons' position as nothing more than negligence is not supported by the record. Objectively, the record shows just that. Although the Wilsons _argued_ something different than negligence, Vibbert's difficulty with timely filing the Wilsons' complaint using the ECF system was nothing more. Vibbert mis-calendared the bar date and as a result attempted to file the complaint after business hours and, more or less, at the last minute. The ECF security lock out was triggered because Vibbert forgot his password — he "screwed up," he attempted to sign in with the wrong password multiple times, and his legal assistant was trying to access the system presumably with the correct password **[*20]** at the same time that he was. When Vibbert's conduct is properly recognized for what it was, the supposedly unsettled state of the law with respect to the parameters of the unique circumstances doctrine holds little significance in my mind. On these facts, no reasonable, objective argument for an exception to the bar date could be made. See Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc., 186 F.3d 157, 167 (2nd Cir. 1999).

That said, even if Vibbert's conduct constituted negligence, which I think it did, and even if the time-barred complaint had no chance of success, which I think it did not, in light of the bankruptcy court's substantial discretion in these matters, I feel compelled to concur in the result. The bankruptcy court has substantial discretion when deciding whether to award or not award sanctions even when a violation of Rule 9011(b) has been found. The text of Rule 9011(c) states that a court may impose sanctions for a violation, but it is not required to do so. See Rule 9011(c) ("If, after notice and a reasonable opportunity to respond, the court

determines that subdivision (b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party. . . .") (emphasis added); see also Civil Rule 11 advisory committee's note, 1993 Amendment ("[W]hat sanctions, if any, to impose for a violation **[*21]** are matters committed to the discretion of the trial court."); Thompson v. RelationServe Media, Inc., 610 F.3d 628, 666 (11th Cir. 2010) (noting that under Civil Rule 11 sanctions are discretionary and a court can "excuse an attorney's negligence, mistake, or plain-old incompetence" if it chooses). In short, the bankruptcy court's discretion under Rule 9011(c) makes it very difficult to demonstrate reversible error when the court decides not to award sanctions.

As a consequence, on these facts, I defer to the bankruptcy court's substantial discretion in deciding no sanctions were warranted.

---

**End of Document**

# EXHIBIT 6

# Theokary v. Shay (In re Theokary)

United States Bankruptcy Court for the Eastern District of Pennsylvania

August 22, 2012, Decided

Chapter 7, Bky. No. 07-11008 ELF, Adv. No. 09-051

**Reporter**

2012 Bankr. LEXIS 4020 *; 2012 WL 3717967

In re: RAFAIL THEOKARY, Debtor.RAFAIL THEOKARY, Plaintiff, v. TOM SHAY, et al., Defendants.

**Prior History:** Theokary v. Abbatiello (In re Theokary), 468 B.R. 729, 2012 Bankr. LEXIS 1541 (Bankr. E.D. Pa., 2012)

**Counsel:** **[*1]** For Rafail Theokary, Debtor (07-11008-elf): KEITH D. SKLAR, Law Offices of Sklar Smith-Sklar, Ewing, NJ; MICHAEL J. RUTENBERG, Attorney at Law, Philadelphia, PA.

Trustee (07-11008-elf): GARY F SEITZ, Rawle & Henderson LLP, Philadelphia, PA.

For Rafail Theokary, Plaintiff (09-00051-elf): ANTHONY J. SCIOLLA, JR., Anthony J. Sciolla, Jr. Esquire, Jenkintown, PA; KENNETH A. SANDLER, LEAD ATTORNEY, Attorney at Law, Marlton, NJ; MICHAEL J. RUTENBERG, Attorney at Law, Philadelphia, PA.

For Tom Shay, Eric Abbatiello, Showplace Farms, Gaitway Farm, Inc., Defendants (09-00051-elf): JEFFREY R. POCARO, Attorney at Law, Fanwood, NJ.

**Judges:** ERIC L. FRANK, U.S. BANKRUPTCY JUDGE.

**Opinion by:** ERIC L. FRANK

## Opinion

### ORDER

**AND NOW WHEREAS**:

A. Plaintiff Rafail Theokary commenced this adversary proceeding on **February 20, 2009**.

B. During the pre-trial phase of this proceeding the Defendants filed three (3) motions to dismiss the adversary proceeding and for sanctions, all of which were denied by the court.[1]

C. On **September 10, 2009**, this court entered an order bifurcating trial of the liability and damages issues in this adversary proceeding. (See Doc. # 89).

D. The liability trial was conducted on **November 9 & 30, 2009** and **February 22, 2010**.

E. After post-trial briefing, by order entered **February 15, 2011**, the court:
> (1) entered judgment in favor of Defendant Gaitway Farm, Inc. ("Gaitway") and Defendant Showplace Farms ("Showplace"); and
> (2) entered judgment in favor of the Plaintiff and against Defendant Eric Abbatiello ("Abbatiello") and Defendant Tom Shay ("Shay") as to liability.

(Doc. #'s 175, 176). See In re Theokary, 444 B.R. 306 (Bankr. E.D. Pa. 2011).

F. On **May 24, 2011**, in connection with the damages phase of the adversary proceeding, the Defendants filed a Motion to Bar the Use of Amended Expert Report, Bar the Testimony of

---

[1] See Order dated April 2, 2009 (Doc. # 34) (denying motion filed February 25, 2009); Order dated July 24, 2009 (Doc. # 78) (denying motion filed June 2, 2009); Order dated October 12, 2009 (Doc. # 106) (denying motion filed September 15, **[*2]** 2009).

Exhibit 6, Page 109

Samuel Paparo and Dismiss the Complaint with Prejudice ("the Motion to Dismiss") (Doc. # 210).

G. For hearing purposes, the court consolidated the Motion to Dismiss with the damages trial. ("the Consolidated Hearing"). (See Order dated May 25, 2011, Doc. # 213).

H. The Consolidated Hearing was conducted on **June 13 & 14 and July 12, 19 & 25, 2011**.

I. On **April [*3] 10, 2012**, due to the Plaintiff's litigation misconduct and pursuant to its inherent power, the court granted the Motion to Dismiss as to the remaining Defendants. (Doc. #'s 286, 287). See In re Theokary, 468 B.R. 729 (Bankr. E.D. Pa. 2012).

J. The Plaintiff has appealed both the **February 15, 2011** and the **April 10, 2012** orders of this court to the district court.

* * * *

K. On **July 16, 2012**, Gaitway and Showplace (hereafter, "the Movants") filed a Motion for Sanctions Under Fed. R. Bankr. P. 9011 Against Plaintiff Rafail Theokary, and His Attorneys ("the Motion for Sanctions"). (Doc. # 308).

L. The attorney-respondents are Keith D. Sklar, Anthony Sciolla, Kenneth A. Sandler, and Michael J. Rutenberg ("the Respondents").

M. In response to the Motion for Sanctions, Sandler and Rutenberg filed a Memorandum in Opposition, (Doc. #310), and Sklar filed an Answer with Affirmative Defenses and a Motion to Dismiss Defendants' Motion for Sanctions Pursuant to Fed. R. Civ. Proc. 12(b), (Doc. #'s 315, 316).

N. On **August 15, 2012**, the court held and concluded a hearing on the Motion for Sanctions.[2]

* * * *

O. In the Motion for Sanctions, the Movants assert that the Plaintiff's attorneys violated Fed. R. Bankr. P. 9011 and should be sanctioned for pressing a claim for violation of the automatic stay against Gaitway and Showplace for either an improper purpose or without adequate factual and legal support. See Fed. R. Bankr. P. 9011(b)(1)-(4).

P. All of the conduct giving rise to the Movants' request that sanctions be imposed occurred prior to the completion of the liability trial on **February 22, 2010**.[3]

Q. The Motion for Sanctions, filed twenty-nine (29)

---

submission from the record. (See Doc. # 328).

[2] On August 16, 2012, the Movants' counsel filed an unsolicited letter, docketed as a "Post Argument Supplemental [*4] Letter." (Doc. # 325). The Letter referenced and appended certain evidentiary matter that was not introduced into evidence at the August 15, 2012 hearing. On August 17, 2012, the court entered an order striking this

---

[3] As the Respondents have pointed out, the conduct giving rise to the alleged Rule 9011 violation was the subject of the three (3) prior motions that the court denied. See footnote 1, supra. Ordinarily, a party's continued prosecution of a claim after the court's denial of a motion to dismiss will not give rise to a Rule 9011 violation. See, e.g., DeStefano v. Twentieth Century Fox Film Corp., 111 F.3d 123, at *2 [published in full-text format at 1997 U.S. App. LEXIS 6247] (2d Cir. 1997) (nonprecedential) ("counsels' reliance on a prior order . . . denying summary judgment, despite the successor judge's statement as to her expectation that she would overturn that ruling, was not so misguided as to warrant imposition of sanctions under either Rule 11 or the court's inherent power").

Undeterred, the Movants assert that, notwithstanding the prior orders, the Plaintiff's counsel should be sanctioned for continuing to press (what the Movants consider to be) frivolous claims after the denial of the sanctions motions through trial. Of course, such a theory cannot be applied against Sklar and Sciolla, who did not participate in the adversary proceeding as counsel and withdrew their appearances in favor of Sandler and Rutenberg on June 16, 2009.

I also understand the Movants to be arguing that, in light of subsequent events — primarily, the absence or paucity of evidence later presented at trial supporting the Plaintiff's claims against Gaitway and Showplace — the court should revisit the merits of the prior orders denying sanctions. See, e.g., Bausch & Lomb, Inc. v. Moria S.A., 222 F. Supp. 2d 616, 669 (E.D. Pa. 2002) (court has inherent power to reconsider interlocutory orders); [*6] Young v. School Dist. of Philadelphia, 2010 U.S. Dist. LEXIS 24733, 2010 WL 1006724, at *1 (E.D. Pa. Mar. 16, 2010) (same); see also Fed. R. Bankr. P. 7054 (incorporating Fed. R. Civ. P. 54(b)).

Because I deny the Motion for Sanctions on other grounds, I do not decide the extent to which, if any, the prior orders denying sanctions preclude consideration of the merits of this fourth Motion for Sanctions.

months after the completion of the liability trial on **February 22, 2010**, seventeen (17) months after the court's **February 15, 2011** order dismissing the claims against Gaitway and Showplace and four (4) months after the entry of a final judgment in this adversary proceeding on **April 10, 2012**, is untimely.[4]

_____

[4] The Respondents initially contend that the court lacks jurisdiction to rule on a motion for sanctions during the pendency of the appeal taken from the court's final order in this adversary proceeding (i.e., the April 10, 2012 Order). They are incorrect. The Court of Appeals has held unequivocally that a trial court has jurisdiction to rule on a motion for sanctions notwithstanding the pendency of an appeal from its final order. Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 98 (3d Cir. 1988) **[*7]** ("Pensiero"); accord In re Schaefer Salt Recovery, Inc., 542 F.3d 90, 98 (3d Cir. 2008) ("It is well established . . . that a district court, after the entry of final judgment and the filing of a notice of appeal, retains the power to adjudicate collateral matters such as sanctions under Rule 11").

The Respondents are correct, however, in their contention that the Motion for Sanctions is untimely and should be denied on that basis.

More than twenty (20) years ago, in Pensiero, the Court of Appeals announced a supervisory rule requiring that all motions for sanctions under Fed. R. Civ. P. 11 be filed before the entry of final judgment. The purpose of the supervisory rule is to conserve judicial resources by maximizing the likelihood that an appeal of a Rule 11 decision may be resolved at the same time as any appeal on the merits. The supervisory rule is intended to "eliminat[e] piecemeal appeals and avoid[ ] scenarios in which two separate appellate panels are forced to acquaint themselves with the pertinent facts and the parties' respective positions." In re Tobacco Road Associates, LP, 2007 U.S. Dist. LEXIS 22990, 2007 WL 966507, at *22 (E.D. Pa. Mar. 30, 2007).

Although the Court of Appeals has not stated so expressly **[*8]** in a precedential decision, courts in this circuit have held that the Rule 11 supervisory rule applies when Rule 9011 sanctions are sought in bankruptcy proceedings. See, e.g., In re Nicola, 65 F. App'x 759, 762 (3d Cir. 2003) (nonprecedential); see also Schaefer Salt, 542 F.3d at 98 (collecting cases). I will follow the existing precedent in this regard.

Since its adoption, the supervisory rule has been both expanded and restricted. The Court of Appeals has applied the supervisory rule to a district court's sua sponte imposition of Rule 11 sanctions, see Simmerman v. Corino, 27 F.3d 58 (3d Cir. 1994), and the imposition of sanctions under the court's inherent power, see Prosser v. Prosser, 186 F.3d 403 (3d Cir. 1999). More recently, however, the Court declined to extend the supervisory rule to sanctions imposed under 28 U.S.C. §1927. See Schaefer Salt, 542 F.3d at 102. Whether Schaefer Salt is a precursor to further contraction of the Pensiero supervisory rule is not for this court to say. Unless and until the

Court of Appeals directs otherwise, this court is bound to apply the supervisory rule.

A mechanical application of the supervisory rule would mandate denial of the Motion for **[*9]** Sanctions because it was filed: (a) seventeen (17) months after the court's February 15, 2011 order entering judgment in favor of the remaining Defendants (if that was a final order, but see Theokary, 444 B.R. at 310 n.6) and (b) three (3) months after the April 10, 2012 order entering judgment against the remaining Defendants.

The supervisory rule, however, may not be so rigid. For example, in In re Brown, 1998 U.S. Dist. LEXIS 19188, 1998 WL 848102, at *4-5 (E.D. Pa. Dec. 3, 1998), the district court affirmed the bankruptcy court's grant of a Rule 11 motion filed three (3) weeks after the entry of the final judgment. The court reasoned that, in the particular circumstances of that case, the movant's discovery of the Rule 11 violation was so close in time to the entry of judgment that the filing of the motion was sufficiently prompt as to warrant the relaxation of the supervisory rule. Accord Project 74 Allentown, Inc. v. Frost, 143 F.R.D. 77, 85-87 (E.D. Pa. 1992).

As the court stated in Tobacco Road, the supervisory rule is

> a guide for litigants filing Rule 11 motions for sanctions, generally requiring them to do so as early as practicable, but not necessarily establish[ing] a per se test for promptness that requires **[*10]** dismissal for noncompliance under all circumstances. While the rule provides the courts in the Third Circuit with the discretion to avoid consideration of Rule 11 motions filed after final judgment is entered in order to promote judicial economy, it also appears to leave the courts with some discretion in deciding when it is practicable to file a sanctions motion.

2007 U.S. Dist. LEXIS 22990, 2007 WL 966507, at *22 (footnotes and quotation marks omitted).

Even under the "relaxed" standard articulated by Tobacco Road, the Motion for Sanctions is untimely.

As early as February 22, 2010, the last day of the liability trial, the Movants knew what evidence had been presented at trial and were in the position to evaluate whether they wished to seek sanctions under Rule 9011. The Motion for Sanctions could have been filed any time thereafter, and certainly in advance of the court's February 15, 2011 liability decision. Even if I use February 15, 2011 as the date on which the existence of the alleged Rule 11 violation became apparent, the Motion for Sanctions is still untimely. The Movants waited seventeen (17) months from that date before filing the Motion for Sanctions. Had the Motion been filed reasonably promptly after **[*11]** the February 2011 liability decision, it could have been resolved in conjunction with April 2012 final judgment, thus permitting all of the disputed matters to be heard in a single appeal. Even after the April 2012 final judgment, the Movants did not act promptly, waiting another three (3) months before filing the Motion.

The Movants have come forward with no justification for their

It is therefore **ORDERED** that:

1. The Motion for Sanctions is **DENIED**.

2. Sklar's Motion to Dismiss the Motion for Sanctions is **DENIED** as moot.

**Date: August 22, 2012**

/s/ Eric L. Frank

**ERIC L. FRANK**

**U.S. BANKRUPTCY JUDGE**

---

**End of Document**

---

failure to press their request for sanctions within the deadline set forth by the supervisory rule. To the extent that I have discretion to relax the deadline, there is no basis in the record for doing so.

# EXHIBIT 8

# Waldrop v. Discover Bank (In re Waldrop)

United States Bankruptcy Court for the Western District of Oklahoma

October 25, 2017, Decided

Case No. 15-14689-JDL, Ch. 7, ADV. 16-1015-JDL

**Reporter**

2017 Bankr. LEXIS 3720 *

In re: Nikki Marie Waldrop, Debtor.Nikki Marie Waldrop, Plaintiff, v. Discover Bank, and Stephen L. Bruce, Esq., Defendants.

**Prior History:** Waldrop v. Discover Bank (In re Waldrop), 2016 Bankr. LEXIS 2150 (Bankr. W.D. Okla., May 27, 2016)

**Counsel:** **[\*1]** For Nikki Marie Waldrop, Debtor (5:15bk14689): John W. Cloar, Park on Main Executive Suites, Norman OK.

Trustee (5:15bk14689): Joel C. Hall, Oklahoma City OK.

For Nikki Marie Waldrop, Plaintiff (16-01015): Andrew R Chilson, Oklahoma City, OK; Ryan M Eitzmann, National Litigation Law Group, Oklahoma City, OK; Robert J. Haupt, Haupt Law PC, Oklahoma City, OK.

For Discover Bank, Defendant (16-01015): Everette C Altdoerffer, Stephen Bruce & Assoc, Edmond, OK; April D Kelso, Needham & Associates, PLLC, Oklahoma City, OK; Clayton D Ketter, Timothy Kline, Phillips Murrah PC, Oklahoma City, OK.

For Stephen L. Bruce, Esq, Defendant (16-01015): Everette C Altdoerffer, Stephen Bruce & Assoc, Edmond, OK; April D Kelso, Needham & Associates, PLLC, Oklahoma City, OK.

**Judges:** Janice D. Loyd, United States Bankruptcy Judge.

**Opinion by:** Janice D. Loyd

# Opinion

## OPINION AND ORDER DENYING MOTION FOR SANCTIONS

## 1. Introduction

This matter comes on for consideration upon *Defendant Stephen L Bruce Esq.'s Motion for Sanctions with Brief in Support* (the "Motion") [Doc. 90], the *Response in Opposition to the Motion for Sanctions* filed by National Litigation Law Group ("the Law Firm") (the "Response") [Doc. 94] and *Plaintiff's Response to Defendant* **[\*2]** *Bruce's Motion for Sanctions* ("Plaintiff's Response") [Doc. 92][1] and the oral argument and exhibits offered at the hearing conducted October 24, 2017. The following constitutes Findings of Fact and Conclusions of Law required by Fed. R. Bankr. R. 7052 and 9014.

## 2. Jurisdiction

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1334(b) and the General Order of Reference entered in this District pursuant to LcvR 81.4. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). The Court retains jurisdiction although the case was dismissed on September 26, 2017. *In re Johnson*, 575 F.3d 1079

---

[1] Attorney Robert J. Haupt ("Haupt") was at all times pertinent to this litigation a member of the Law Firm representing the Plaintiff. He left the Law Firm in July 2017. Haupt, on behalf of both himself and as counsel for the Plaintiff, has filed a *Response* to Bruce's Motion separate and apart from that of the Law Firm.

(10th Cir. 2009); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395-98, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990) (voluntary dismissal of a lawsuit does not deprive the district court of jurisdiction over a motion for sanctions under Rule 11); *Steinert v. Winn Group, Inc.*, 440 F.3d 1214, 1220-21, 1223-24 (10th Cir. 2006) (affirming a sanctions award under 28 U.S.C. §1927 that was ordered well after the case was dismissed with prejudice at the plaintiff's request); *Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1552-57 (10th Cir. 1996).

### 3. Background

This adversary proceeding was commenced by Plaintiff's Complaint alleging that Defendants Discover Bank ("Discover") and its attorney, Stephen L. Bruce ("Bruce"), violated the automatic stay by instructing Waldrop's garnishee-bank to retain possession of funds garnished pre-petition pending further order of the court. Discover and Bruce first challenged the Complaint by filing a Motion to Dismiss **[*3]** asserting that as a matter of law Plaintiff had not stated a cause of action where Discover held a valid garnishment lien on the funds, that it was under no obligation to release the funds to the Plaintiff and merely instructed the garnishee-bank to hold the funds "subject to further order of the court." The Court denied the Motion to Dismiss. [*Memorandum Opinion and Order Denying Defendant's Motions to Dismiss*, Doc. 26]. In its Order the Court specifically found that Discover did not have a duty to immediately dismiss the garnishment, release of the funds or that the filing of the bankruptcy impaired any garnishment lien rights which it may have had in the funds. [Doc. 26, pgs. 13-14]. The Court did find, however, that Discover did have the obligation to take some affirmative action to seek appropriate relief from the bankruptcy court, either by lifting the stay, if it thought appropriate, or by seeking enforcement, adequate protection or determination of its lien rights. This obligation on the part of Discover/Bruce precluded the Court from dismissing the case at the initial pleading

stage of the case. *Id.*

After the Motion to Dismiss was overruled, Bruce and Discover answered the **[*4]** Complaint, conducted discovery and then moved for summary judgment. In their Motion for Summary Judgment, Bruce and Discover argued (1) there was no duty on their part to take any action with regard to the garnishment funds as they had earlier argued in their Motion to Dismiss and (2) for the first time argued that there was an agreement between Plaintiff's prior bankruptcy counsel, John Cloar, and Bruce that the garnishee-bank could retain possession of the funds.[2]

As to Bruce's first argument, the Court found that since its decision on the Motion to Dismiss the Tenth Circuit had ruled that a creditor simply retaining possession of property of the debtor did not constitute committing an "act", taking "action" or "exercising control" over such property so as to violate § 362(a)(3), and, correlatively, there was no duty on the part of the creditor to take any affirmative action with regard to the property in its possession. *WD Equipment, LLC v. Cowen (In re Cowen)*, 849 F.3d 943 (10th Cir. 2017). As to the second issue, the Court found, based on the undisputed facts, that within days of the bankruptcy filing there was an agreement between Plaintiff's former counsel, Cloar, and Bruce that the garnished funds would remain in the Bank's possession 'pending an ultimate **[*5]** determination as to the rights of the parties'. The Court thereupon entered summary judgment in part for Discover and Bruce dismissing the Plaintiff's claims for violation of the automatic stay.

### 4. Rule 9011 Standard

---

[2] There had been no mention in either the Complaint or in the Motion to Dismiss of any purported agreement between counsel that the garnishee-bank would retain possession of the funds. Had the Court been made aware of evidence of such an agreement, it would likely have made "short-shrift" of Plaintiff's claims by converting the Motion to Dismiss to one for summary judgment as is permitted by Fed. R Civ. P. 12(d) made applicable to adversary proceedings pursuant to Fed. R. Bankr. P. 7012(b).

Federal Rule of Bankruptcy Procedure (Fed. R. Bankr. P) 9011[3] warns attorneys that by "presenting to the court a petition, pleading, written motion, or other paper," they certify to the best of their "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that the paper meets the following conditions:

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions are therein warranted by existing law or by a nonfrivolous argument for extension, modification, or reversal of existing law or for establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence **[*6]** or, if specifically so identified, are reasonably based on a lack of information or belief.

In short, Rule 9011 requires that a "pleading be, to the best of the signer's knowledge, well grounded in fact, warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and...not interposed for any improper purpose." *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1182 (10th Cir. 2015); *Coffey v. Healthtrust, Inc.*, 1 F.3d 1101, 1104 (10th Cir. 1993).

This Court is guided by certain core principles when deciding to impose sanctions against an attorney under Rule 9011. "This court is also mindful that Rule 11 sanctions are an extraordinary remedy. Rule 11 is intended to discourage frivolous litigation, not to punish litigants." *Greeley Publishing Co. v. Hergert*, 233 F.R.D. 607, 611 (D. Colo.2006); *Ludwikoski & Associates, Inc. v. Yeti Coolers, LLC*, 2014 U.S. Dist. LEXIS 104523, 2014 WL 3767684 *3 (D. Kan. 2014) ("Rule 11 sanctions are reserved for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation."). In determining a motion for sanctions, the Court must resolve all doubts and draw all inferences in favor of the signer. *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F.Supp. 579, 586 (S.D. N.Y.1989); *Eavenson Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 544 (3rd Cir. 1985) (In deciding a Rule 11 motion, "[a]ny doubt . . . should be resolved in favor of the party charged with the violation.").

Rule 9011 sanctions may be imposed on the filing of the complaint when the frivolous nature of the claims-at-issue is unequivocal. *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357,1372 (Fed Cir. 2013). The fact that a legal theory has a "long-shot" does not necessarily **[*7]** mean it is sanctionable under Rule 9011; rather, the operative question is whether the argument is frivolous, i.e., the legal position has no chance of success, and there is no reasonable argument to extend, modify or reverse the law as it stands. *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2nd Cir. 2011). In determining whether a given argument for change in the law is reasonable or frivolous, the courts may look to the extent to which counsel has researched the area, whether there is some support in the dissents, etc., for the position he or she take, and whether legitimate law review articles of other reputable legal journals raise the same or similar argument. If some other court of jurisdiction has actually accepted the argument, the argument seems extremely unlikely to be the proper subject of sanctions. *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820 (2nd Cir. 1992). "Because our adversary system expects lawyers to zealously represent their clients, this standard is a

---

[3] Bankruptcy Rule 9011 is based on Fed. R. Civ. P. 11, "and rulings under Rule 11 are authoritative in cases following Bankruptcy Rule 9011." *Masunaga v. Stoltenberg (In re Rex Montis Silver Co.)*, 87 F.3d 435, 437 (10th Cir. 1996); *In re Harmes*, 423 B.R. 678, 680 (Bankr. D. N. M. 2010); *In re Renewable Energy Development Corp.*, 2014 Bankr. LEXIS 590, 2014 WL 527229 (Bankr. D. Utah 2014) (slip opinion). Accordingly, much of this Court's analysis is based on cases under Rule 11.

tough one to satisfy; an attorney can be rather aggressive and still be reasonable." *Predator*, 793 F.3d at 1182.

On the merits of Bruce's Rule 9011 claim, the question before the Court is whether the Plaintiff's *Complaint* was unwarranted under the facts or law. To answer that question, the Court must evaluate the Law Firm's conduct under a standard of "objective reasonableness **[*8]** -- whether a reasonable attorney admitted to practice before the [Bankruptcy Court] would file such a document." *Adamson v. Bowen*, 855 F.2d 668, 673 (10th Cir. 1988); See *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 554, 111 S.Ct. 922, 934-35, 112 L. Ed. 2d 1140 (1991) (reversing the District Court because of its use of a subjective standard). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 9011 has been violated, the court may impose an appropriate sanction," meaning one "limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Bankr. P. 9011(c)(2). Before considering whether the actions of the Plaintiff and/or the Law Firm violated Rule 9011, the Court must address the procedural issue as to whether Bruce has timely presented his Sanctions Motion.

### 5. The Timeliness of the Rule 9011 Motion

This adversary was commenced by the filing of the *Complaint* on January 27, 2016. [Adv. Doc. 1]. On February 26, 2016, Bruce sent Plaintiff's Law Firm the requisite "safe harbor" letter with a copy of a proposed Motion for Sanctions giving the Law Firm twenty-one (21) days to withdraw or correct the allegedly offending pleading as required by Rule 9011(c)(1)(A). [Law Firm Trial Ex.4]. The safe harbor letter argued, among other things, that as a matter of law Discover's retention of the garnished funds in the **[*9]** hands of the garnishee-bank constituted merely maintaining the status quo and did not violate the automatic stay. The letter

asserted that the Complaint was "not warranted by existing law and is brought for an improper or frivolous purpose". *Id.* There was no mention in either the safe harbor letter or the draft of the Motion for Sanctions attached to it of any purported agreement between Cloar and Bruce that the garnishee-bank could maintain possession of the funds.

Bruce filed his Rule 12(b)(6) Motion to Dismiss on March 23, 2016. [Doc. 21]. The Motion to Dismiss was premised on the basis that as a matter of law there was no obligation on the part of Discover/Bruce to release possession of the funds or otherwise take any action which might impair its garnishment lien rights. There was no mention in the Motion to Dismiss of the purported agreement between Cloar and Bruce. The Motion to Dismiss was overruled by the Court's Opinion and Order of May 27, 2016 [Doc. 26]. In its Order the Court held that while there was no obligation on the part of Discover/Bruce to release the garnished funds or take any action which would impair its lien rights (which the Court noted would pass through the bankruptcy **[*10]** unaffected), there was an issue of fact remaining as to Discover's obligation as a creditor "to take some affirmative action to begin the process by which the issues of the automatic stay and its lien rights might be timely adjudicated." [Doc. 26, pg. 11].

After the Motion to Dismiss was overruled, on November 8, 2016, Bruce sent the Law Firm a second safe harbor letter demanding that the Complaint be dismissed or Rule 9011 sanctions would be sought. [Law Firm Trial Ex. 11]. The letter primarily relied upon *In re C. W. Mining Co.*, 477 B.R. 176, *aff'd, In re C. W. Mining Co.* 749 F.3d 895 (10th Cir. 2014), in which the 10th Circuit held that a creditor who has taken possession pre-petition of debtor's property should not have to turn over such property absent assurance that its pre-petition position would be protected. In this letter, for the first time Bruce mentioned a purported agreement between Bruce and Cloar, stating that Bruce's asking the garnishee-bank to maintain the

status quo by holding onto the funds until the further order of the court "was taken with approval of John Cloar, Ms. Waldrop's bankruptcy attorney, whose name also appears on the signature block of your adversary pleadings." [Id. at pg 1]. The draft of a proposed Motion for Sanctions attached to the safe harbor [*11] letter alleged a "December 17, 2015 conversation wherein Cloar agreed to Bruce's suggested course of action, namely, to send a letter to the garnishee-bank, asking it to hold the garnished funds . . .." *Id.*

On June 13, 2016, both Discover and Bruce filed their Answers to the Complaint. [Docs. 28 and 29]. Neither Answer raised the issue of an agreement between Cloar and Bruce. On October 27, 2016, four-and-a half (4 1/2) months after having filed their Answers, Discover and Bruce filed their Motions for Summary Judgment. [Doc. 55]. In the Motions, Discover/Bruce for the first time in any pleading raised the issue of the agreement with Cloar. On March 29, 2017, the Court entered its *Opinion and Order Granting in Part Defendants' Motions for Summary Judgment* and, by separate document, the *Judgment* dismissing Waldrop's claims of violation of the automatic stay. [Docs. 83 and 84]. Based upon the intervening decision of the Tenth Circuit in *Cowen*, the Court found there was no duty on the part of Discover to take any affirmative action with regard to the funds, and that its "inaction" in maintaining the status quo was not violative of the automatic stay. The Court further found that the agreement [*12] between Cloar and Bruce for the garnishee-bank to hold the funds also precluded assertion of a violation of the automatic stay.

Bankruptcy Rule 9011 (or Rule 11) does not contain explicit time limits for bringing a motion for sanctions; however, the Advisory Committee Notes to the 1993 amendments to Rule 11 gives some direction:

* * * Ordinarily the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as

untimely. In other circumstances, it should not be served until the other parties had a reasonable opportunity for discovery. Given the "safe harbor" provision discussed below, a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention)."

Acting consistent with the Advisory Note, courts have thus held that "where appropriate, such motion should be filed at an earlier time, as soon as practicable after discovery of a Rule 11 violation." *Kaplan v. Zenner*, 956 F.2d 149, 151 (7th Cir. 1992) (court rule requiring Rule 11 motions to be filed not later than ninety days after entry of judgment merely represents "the outer parameters of the timeliness for sanction claims"). At a minimum, a party must bring his motion in "a reasonable amount of time," with reasonableness [*13] dependent on "the specific facts and circumstances in a given case." *Id.*

In *Thompson v. United Transp. Union*, 167 F.Supp.2d 1254 (D. Kan. 2001), the defendant did not file its Rule 11 motion for sanctions until after the court had granted summary judgment and dismissed the plaintiff's complaint. In holding the filing of the motion untimely, the court stated as follows:

While the Tenth Circuit, then, (in *Hutchinson v. Pfeil,*, 208 F.3d 1180 (10th Cir. 2000)) did not directly address the issue before the Court today, the Circuit's decision in *Hutchinson* strongly suggests that if faced with the issue, the Circuit would follow the *Ridder* decision and hold that a Rule 11 motion filed after summary judgment (regardless of whether service of the motion occurred prior to judgment and within the 21-day safe harbor period) is untimely.

The Court is inclined to deny defendant's motion as untimely as it was filed after the entry of summary judgment and because defendant's counsel offers no explanation whatsoever for waiting until that late date to

file the motion. If defendant's counsel truly believed that plaintiff's conduct was so abusive and vexatious as to warrant service of the Rule 11 motion in July 2000, then defendant's counsel should have pursued that motion by filing it with the court shortly after the expiration of the 21-day **[\*14]** safe harbor period. Instead defendant's counsel elected to wait six months, all the while spending additional time and money in the discovery process and the summary judgment process. The Court cannot comprehend why defendant would not attempt to avoid these fees and costs by filing his motion earlier.[4]

*Thompson*, 167 F.Supp.2d at 1259-60. Likewise, as stated in *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 99 (3rd Cir. 1988), in holding that all motions requesting Rule 11 sanctions be filed before entry of final judgment and, where appropriate, at an earlier time, and as soon as practicable after discovery of the Rule 11 violation the court stated:

> Promptness in filing valid motions will serve not only to foster efficiency, but in many instances will deter further violations of Rule 11 which might otherwise occur during the remainder of litigation. (citations omitted). If a party's action is "abusive" as contemplated by Rule 11, the adversary should be able to realize immediately that an offense has occurred. Seldom should it be necessary to wait for the district court or the court of appeals to rule on the merits of the underlying question of law. If there is doubt how the district court will rule on the challenged pleading or motion, the filing of the paper is unlikely to have violated Rule 11.

See also, **[\*15]** *Hutchinson v. Pfeil*, 208 F.3d 1180, 1183-84 (10th Cir. 2000) (in dicta stating that, "[a]s

---

[4] The Court recognizes that the court's statement in *Thomson* is dicta in that the court went on to state that it "need not decide whether Defendant's motion was timely filed because the Court denies the motion on its merits." 167 F.Supp.2d at 1260. This Court does not cite *Thomson* for precedential authority, but finds its rationale on untimeliness persuasive, if not compelling.

the motion was filed subsequent to summary judgment, long after disposition of the interlocutory disputes cited as sanctionable conduct, reliance on Rule 11 would have been untimely and in violation of the rule's twenty-one day 'safe harbor' provision . . .."); *Morgan v. Covington Township*, 2013 U.S. Dist. LEXIS 121596, 2013 WL 4538637 at \*3 (M.D. Pa. 2013) (defendant's motion for sanctions denied where filed after judgment was entered in favor of defendants following their Rule 50 motion at trial); *Fassl v. Our Lady of Perpetual Help Roman Catholic Church*, 2006 U.S. Dist. LEXIS 11054, 2006 WL 709799 at \*6 (E.D. Pa. 2006) (Rule 11 motion filed after order granting defendant's motion to dismiss was not timely); *Robert S. v. City of Philadelphia*, 2001 U.S. Dist. LEXIS 13485, 2001 WL 1021190 at \*5 (E.D. Pa. 2001) (Rule 11 motion filed by defendants following a jury verdict in their favor was untimely).

The policy behind Rule 9011 is to prevent baseless filings and promote judicial economy. See *Cooter & Gell*, 496 U.S. at 393, 110 S.Ct. 2447. Given that "the primary purpose of sanctions, is to deter subsequent abuses", that purpose is not served "by tolerating abuses during the course of an action and then punishing the offender after the trial is at an end." *Matter of Yagman*, 796 F.2d 1165, 1183 (9th Cir. 1986); *Islamic Shura Council of Southern California v. F.B.I.*, 757 F.3d 870, 873 (9th Cir. 2014) (Rule 11 motion for sanctions made after "judicial rejection of the offending contention" is untimely).

In *In re Quinones*, 543 B.R. 638, 648 (Bankr. N.D. Cal. 2015) the debtors filed Rule 11 sanction motions in two adversary proceedings which they contended had groundlessly been brought against them seeking the non-dischargeability of debts. Approximately a year and **[\*16]** a half after the debtors had first asserted Rule 11 violations, the bankruptcy court ruled in favor of the debtors in both adversaries. After the court had ruled in the debtors' favor in both cases, the debtors filed their sanction motions. In denying the Rule 11 motions

the court, in language applicable to the present case, stated as follows:

[C]ourts look with disfavor on Rule 11 motions brought at the conclusion of a matter. Since the "cure" of alleged Rule 11 violation is the withdrawal or correction of an improper pleading, it follows that the purpose of Rule 11 may not be achieved at the conclusion of a matter, when issues have been disposed of, and the prospective withdrawal or correction of a pleading is no longer a relevant concept.***

Further, delaying the bringing of a Rule 11 motion until the matter is actually or essentially concluded, and depending therefore on the favorable disposition of the matter, turns Rule 11 from a powerful tool for the deterrence of abusive litigation practices to a mere fee shifting statute, a transformation that the language of the statute disclaims and the cases interpreting Rule 11 condemn (citations omitted). In these cases, the Quinoneses' delay in bringing the *Sanctions Motions* until the favorable [*17] conclusion of these APs is exactly the sort of behavior that should result in the Court denying the motions." **** There is no excuse for such delay; and, more fundamentally, there is no longer any conduct to be corrected. The Quinoneses' *Sanctions Motions* must also be denied for this reason.

The Sanction Motion was filed by Bruce on August 11, 2017, eighteen-and-a-half (18 1/2) months after the filing of the Complaint, seventeen (17) months after the first safe harbor letter, sixteen (16) months after filing the Motion to Dismiss, nine (9) months after the second safe Harbor letter and the filing of the Motion for Summary Judgment and four-and-a-half (4 1/2) months after the entry of the judgment in Bruce's favor. If Bruce truly believed that the Law Firm's conduct was so abusive and vexatious to warrant service of the safe harbor letters, and this Court has no reason to believe that Bruce wasn't sincere in that belief, he should have pursued that motion by filing it shortly after the expiration of the twenty-one (21) day safe harbor in either February

and/or November 2016. Instead, Bruce elected to wait and spend additional time and money in the discovery process and summary judgment [*18] process. The Court doesn't know the reason for the delay, and the pleadings and oral argument did not enlighten the Court. It may have been because Bruce felt confident of the outcome and wanted to establish a precedent rather than cutting the litigation off at an early stage. "Suffice it to say that [Discover and Bruce] would be better served by reexamining their own litigation tactics rather than condemning plaintiff's counsel for her litigation tactics." *Thompson v. United Transportation Union*, 167 F.Supp.2d at 1260. The Court finds that Bruce's Motion was not timely filed and can be denied on that basis alone, so is not necessary for the Court to decide the sanction motion on its merits. Accordingly,

**IT IS ORDERED** that Defendant Stephen L. Bruce Esq.'s Motion for Sanctions [Doc 90] is hereby **DENIED**.

**Dated: October 25, 2017**

**The following is ORDERED**:

/s/ Janice D. Loyd

Janice D. Loyd

U.S. Bankruptcy Judge

---

*End of Document*

# EXHIBIT 9

# Instant Checkmate, Inc. v. Background Alert, Inc.

United States District Court for the Southern District of California

December 4, 2014, Decided; December 5, 2014, Filed

CASE NO. 3:14-cv-01182-MMA-DHB

**Reporter**
2014 U.S. Dist. LEXIS 190115 *

INSTANT CHECKMATE, INC., Plaintiff, vs. BACKGROUND ALERT, INC., ANDREW WILDER, INC., KUROSH ZAHABIAN, Defendants.

**Counsel:  [*1]** For Instant Checkmate, Inc., a Delaware Corporation, Plaintiff: Damon Wright, LEAD ATTORNEY, PRO HAC VICE, Venable LLP, Washington, DC; Joshua Kaufman, LEAD ATTORNEY, PRO HAC VICE, Washington, DC; Tamany Vinson Bentz, LEAD ATTORNEY, Venable LLP, Los Angeles, CA.

For Instant Checkmate, Inc., a Delaware Corporation, Counter Defendant, Damon Wright, LEAD ATTORNEY, PRO HAC VICE, Venable LLP, Washington, DC; Tamany Vinson Bentz, LEAD ATTORNEY, Venable LLP, Los Angeles, CA.

For Backgroundalert, Inc., a California Entity, Kurosh Zahabian, an individual, Defendant: Oren Bitan, LEAD ATTORNEY, Buchalter Nemer, Los Angeles, CA.

For Andrew Wilder, Inc., a Nevada Corporation, Defendant, Counter Claimant: Oren Bitan, LEAD ATTORNEY, Buchalter Nemer, Los Angeles, CA.

**Judges:** Hon. Michael M. Anello, United States District Judge.

**Opinion by:** Michael M. Anello

# Opinion

## DENYING INSTANT CHECKMATE'S MOTION TO DISMISS COUNTERCLAIM AND MOTION FOR SANCTIONS

[Doc. Nos. 12, 17]

## DENYING WILDER, INC.'S MOTION FOR SANCTIONS

[Doc. No. 21]

Plaintiff and Counter-Defendant Instant Checkmate, Inc. ("Instant Checkmate") filed a complaint alleging copyright infringement, false advertising, a violation of the California Business and Professions Code, and **[*2]** unjust enrichment against Defendants BackgroundAlert, Inc., Andrew Wilder, Inc., and Kurosh Zahabian. Doc. No. 1. Defendants Andrew Wilder, Inc. and Kurosh Zahabian filed an answer, largely denying the allegations of the complaint and asserting fifteen affirmative defenses. Doc. No. 9. Simultaneously with its answer, Defendant Andrew Wilder, Inc. ("Wilder") filed a counterclaim, alleging false advertising. Doc. No. 8. Instant Checkmate now moves to dismiss Wilder's counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) and for sanctions pursuant to Federal Rule of Civil Procedure 11. Doc. Nos. 12, 17. The Court finds the matters suitable for decision on the papers, without oral argument, pursuant to Local Civil Rule 7.1. For the reasons stated below, the Court DENIES Instant Checkmate's motions.

**ORDER:**

BACKGROUND[1]

Instant Checkmate is a company incorporated in Delaware with its principal place of business in San Diego County, California. It provides people finder, public records search, and criminal records search services ("background check services") to consumers through its website, Instant Checkmate ("ICM website").

Defendant BackgroundAlert, Inc. is a California business entity headquartered [*3] in Huntington Beach, California, registered in California, and conducting business across the United States.[2] Defendant Andrew Wilder, Inc. is a Nevada corporation, headquartered in Huntington Beach, California, and conducting business across the United States. Defendant Kurosh Zahabian is an individual residing in Huntington Beach, California, and the president of Defendant Andrew Wilder, Inc. Defendants operate a competing website, BackgroundAlert ("BA website"), which also provides background check services.

On May 12, 2014, Instant Checkmate initiated this lawsuit. In its Complaint, Instant Checkmate alleges that the contents of the ICM website are copyrighted materials protected under various copyright registrations. Instant Checkmate alleges that the BA website infringes on Instant Checkmate's copyrighted materials because the BA website includes imagery, text, and an overall concept and feel that are identical or substantially similar to the ICM website. Instant Checkmate further alleges that the BA website falsely advertises that it is protected by Norton software and "TRUSTe" Website Privacy Services by [*4] including the Norton Secured Seal and Wilder, Inc. was erroneously sued as BackgroundAlert, Inc. Doc. No. 9 at 1. the "TRUSTe" logo when the BA website is not protected by either service. Instant

Checkmate brings claims for (1) copyright infringement under 17 U.S.C. § 106, (2) false advertising under 15 U.S.C. § 1125(a), (3) unfair competition under Cal. Bus. & Prof. § 17200 *et seq.*, and (4) unjust enrichment.

On August 15, 2014, Defendants filed their Answer. Doc. No. 9. In their answer, Defendants substantially denied the allegations of the complaint. *Id.* Defendants also raised fifteen affirmative defenses. *Id.* ¶¶ 1-15.[3]

Simultaneously with Defendants' Answer, Wilder[4] filed a counterclaim for false advertising under the [*5] Lanham Act, 15 U.S.C. § 1125(a), based on three allegedly misleading representations: (1) Instant Checkmate's "advertorial" blog, Crime Wire, touts Instant Checkmate's product without providing sufficient notice that Crime Wire is a paid advertisement and not an independent news source; (2) the inclusion on the ICM website of trademarked logos of media organizations such as AOL, Yahoo, Fox News, ABC, and the Huffington Post gives consumers the false impression that these entities endorse the ICM website; and (3) the ICM website misleads consumers by representing that it can search driving records when it does not, in fact, search such records. Doc. No. 8 ¶¶ 14-18.

Instant Checkmate now moves the Court to dismiss Wilder's counterclaim on the following grounds: (1) the allegedly false and misleading representations are not, in fact, false; and (2) because the representations are not false, Wilder's

---

[1] Unless otherwise noted, all allegations are taken from the Complaint. *See* Doc. No. 1.

[2] Defendants Andrew Wilder, Inc. and Zahabian assert that Defendant Andrew

[3] Instant Checkmate moved the Court to strike Defendants' affirmative defenses on the ground that they do not meet the heightened plausibility standard under Federal Rule of Civil Procedure 8, as articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). Doc. No. 13-1. Defendants filed an opposition, in which they articulated the bases for many of their affirmative defenses and agreed to withdraw their first, sixth, eighth, and fifteenth defenses. Doc. No. 23 at 13. Based on Defendants' explanations and withdrawals, Instant Checkmate withdrew its motion to strike. Doc. No. 28.

[4] The Court refers to Defendant Andrew Wilder, Inc. as "Wilder."

allegations are insufficient to support the remaining elements of a false advertising claim and fail to meet Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. Doc. No. 12.

## MOTION TO DISMISS COUNTERCLAIM

### A. Legal Standard

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency **[\*6]** of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed. R. Civ. P. 8(a)(2). Plaintiffs must also plead, however, "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plausibility standard thus demands more than a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Instead, the complaint "must contain allegations of underlying facts sufficient to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court need not take legal conclusions as true "merely because they are cast in the form of factual allegations." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)) (internal quotation marks omitted). Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. Fed. Deposit Ins. Corp.*, 139 F.3d 696, 699 (9th Cir. 1998).

In determining the propriety of a Rule 12(b)(6) dismissal, courts generally may not look beyond the complaint for additional facts. *See United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003). "'However, material which is **[\*7]** properly submitted as part of the complaint may be considered' on a motion to dismiss." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1993) (quoting *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990)), *overruled in part as stated in Gilbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125 (9th Cir. 2002). Thus, a court may properly consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading" when ruling on a Rule 12(b)(6) motion to dismiss without converting the motion to one for summary judgment. *Branch*, 14 F.3d at 454.

### B. Discussion

Instant Checkmate moves to dismiss the counterclaim on the ground that the three allegedly false statements are not actually false. Doc. No. 12; Doc. No. 27. Instant Checkmate goes on to argue that because the statements are not false, Wilder can neither plead plausible facts to support the remaining elements of a false advertising claim under the Lanham Act, nor meet Rule 9(b)'s heightened pleading standard. Doc. No. 12 at 11.

In response, Wilder argues that the statements, while literally true, are nonetheless misleading. Doc. No. 22. With respect to Crime Wire, Wilder further argues that Instant Checkmate's disclosures are inadequate under the Federal Trade Commission's (FTC) standards dealing with clear and conspicuous disclosures. *Id.* at 11. Wilder also argues that Rule 9(b)'s heightened **[\*8]** pleading standard does not apply to its false advertising claim because the claim is not "grounded in fraud," but rather alleges that the statements are misleading. *Id.* at 16. Wilder finally argues that the Court cannot consider Instant Checkmate's exhibits

without converting the motion to dismiss into a motion for summary judgment. *Id.* at 17.

### 1. Whether the Court may Properly Consider the Parties' Exhibits.

As an initial matter, Wilder argues that Instant Checkmate improperly attempts to introduce evidence beyond the pleadings. Doc No. 22 at 17. Wilder argues that this converts Instant Checkmate's motion to dismiss into a motion for summary judgement. *Id.* The Court disagrees.

Wilder's counterclaim puts into question both Crime Wire's contents and whether certain news and media organizations have "featured" the ICM website. *See id.* at 3-4. Wilder does not contest the authenticity of Instant Checkmate's exhibits, only that they constitute "selective evidence [that] provide[] a defense to the Lanham Act claim...." *Id.*; *see also Branch*, 14 F.3d at 453 (noting that the rule of incorporation is limited to documents "whose authenticity no party questions"). Ninth Circuit law, however, is clear that "when [the] plaintiff fails to introduce **[*9]** a pertinent document as part of his pleading, [the] defendant may introduce the exhibit as part of his motion attacking the pleading." *Branch*, 14 F.3d at 453 (alterations in original). Accordingly, the Court finds that it may properly consider each party's exhibits without converting the motion to dismiss into a motion for summary judgment. *See id.* at 454.

### 2. Whether the Allegedly False Statements are, in Fact, False.

Instant Checkmate's arguments center on contesting the alleged falsity of the statements. It makes several arguments in response to the three allegedly false statements identified in the counterclaim, but comes to the same conclusion as to all three: the statements are not false. Doc. Nos. 12, 27.

The Lanham Act prohibits "false statement[s] of fact" found in "commercial advertising." 15 U.S.C. § 1125(a)(1)(B); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). The elements of a Lanham false advertising claim are:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; **[*10]** and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms*, 108 F.3d at 1139 (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990)). To demonstrate falsity, "a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Id.* (internal citation omitted).

Instant Checkmate argues that it provides sufficient disclaimers on Crime Wire to alert consumers to the fact that the website is associated with the ICM website: Crime Wire's address is instantcheckmate.com; it lists "Like Us on Facebook" and "Follow Us on Twitter" and identifies Instant Checkmate as the page to like or follow; each page of Crime Wire provides a disclaimer to inform consumers that Instant Checkmate cannot be used for any purpose covered by the Fair Credit Reporting Act; and the bottom of the website states, "Copyright © 2014 Instant Checkmate. All Rights Reserved." Doc. No. 12 at 5-8. Wilder counters that these disclosures fail to meet the FTC's standards, which provide guidance on ensuring that **[*11]** disclosures are sufficiently clear and conspicuous. Doc. No. 22 at 3, 11-13.

Instant Checkmate further argues that its use of

various media organizations' logos does not constitute false advertising because those media outlets have, in fact, "featured" the ICM website. Doc. No. 12-1 at 8-10. Instant Checkmate argues that the term "featured" is not confined to positive stories, but rather to any story that "give[s] special attention to" its product. Doc. No. 27 at 6 (quoting The Am. Heritage Dictionary of the English Lang. (5th ed. 2014)). Wilder acknowledges that it is literally true that the media outlets have "featured" the ICM website, but asserts that Instant Checkmate's use of the logos and representation that those organizations have "featured" the ICM website is nevertheless misleading. *See* Doc. No. 8 ¶ 17; Doc. No. 22 at 13-14. The term "featured," Wilder argues, denotes approval or endorsement, but several of the organizations whose logos appear on the ICM website have run negative stories about it. Doc. No. 22 at 13-14; *see also, e.g.*, Doc. No. 22-4 at 1-6, 12.

Finally, Instant Checkmate argues that its assertion that it can search driving records is, in fact, true because its background **[*12]** check services include searches of publicly available criminal, traffic, and arrest records and judicial records that reflect prosecution for traffic offenses. Doc. No. 12-1 at 10; Doc. No. 27 at 8-9. Wilder argues that Instant Checkmate "only searches court records, which may or may not include some driving citations," and cannot search "records of the Department of Motor Vehicles." Doc. No. 22 at 15.

The Court need not parse out each of the parties' arguments because, as the Ninth Circuit has unequivocally held, the question of whether a particular statement is false and misleading is a question of fact that is inappropriate for adjudication on a motion to dismiss. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008). In *Newcal Industries, Inc. v. Ikon Office Solution*, the Ninth Circuit reversed in part a district court's Rule 12(b)(6) dismissal of a false advertising claim brought under the Lanham Act. *Id.* at 1044, 1053-54. Of the five statements at issue, the district court concluded that two of the

statements "were not 'false or misleading representations of fact' at the time they were made....'" *Id.* at 1053. The Ninth Circuit found this improper. While the defendant "correctly point[ed] out that [parts of the complaint] support the inference that [the false statements were] true **[*13]** when made..., *that inference could be proved false, or the statement could be proved true but misleading*." *Id.* at 1053-54 (citing *Cook, Perkiss, & Liehe, Inc.*, 911 F.2d at 245) (emphasis added). Because "there remain[ed] a factual question of whether the statement was intentionally *misleading* at the time it was made," the district court improperly dismissed the claim on the defendant's Rule 12(b)(6) motion. *Id.* at 1054 (emphasis in original).

Like the statements at issue in *Newcal Industries, Inc.*, the statements at issue in this case, as Wilder concedes, may be literally true. *See* Doc. No. 22 at 13. For example, it may be literally true that the ICM website has been given "special attention" by various media organizations. However, Instant Checkmate's assertion that it has been "featured by" those organizations may nonetheless mislead consumers because they may find, as Wilder argues, that the phrase "featured by" is synonymous with approval or endorsement. And it may be literally true that Instant Checkmate can search "driving records" vicariously through court records. However, the assertion that it can search "driving records" may nevertheless mislead consumers because they may believe, as Wilder argues, that the phrase "driving records" includes records of the Department **[*14]** of Motor Vehicles. Or these statements may not mislead consumers at all. Similarly, while it may be true that Crime Wire contains various indicia of its relationship to Instant Checkmate, the Court cannot say as a matter of law that these indicia are sufficient under the FTC's standards for clear and conspicuous disclaimers and thus do not mislead consumers into believing Crime Wire is an independent news source.

As illustrated, whether or not these statements mislead consumers is a factual question that this

Court should not, under Ninth Circuit precedent, dismiss on a Rule 12(b)(6) motion. Rather, these factual questions are properly left to adjudication on the merits. Accordingly, the Court DENIES Instant Checkmate's motion to dismiss the counterclaim to the extent it argues that the allegedly misleading representations are not, in fact, false.

### 3. Whether Rule 9(b)'s Heightened Pleading Standard Applies.

Instant Checkmate next argues that Wilder's false advertising claim under the Lanham Act fails because it does not meet the strictures of Rule 9(b)'s pleading standard. *See* Doc. No. 12-1 at 4, 11-12. Wilder counters that Rule 9(b) does not apply to its claim because it predicates Instant Checkmate's liability on having made **[*15]** misleading statements as opposed to intentionally false statements. Doc. No. 22 at 16. Wilder further argues that even if Rule 9(b) applies, Wilder has satisfied its standard. *Id.*

Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Under the Federal Rules, a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985) (citing *Bosse v. Crowell Collier & Macmillan*, 565 F.2d 602, 611 (9th Cir. 1977)). Thus, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). However, where fraud

is not an essential element of a claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirement of Rule 9(b). *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003); *Hansen Bev. Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG (POR), 2009 U.S. Dist. LEXIS 127605, at *53 (S.D. Cal. Dec. 23, 2009).

The Ninth Circuit has not yet ruled on whether Rule 9(b) applies to false advertising claims under the Lanham Act. **[*16]** *See Skedco, Inc. v. Arc Prods., LLC*, No. 3:13-cv-00696-HA, 2014 U.S. Dist. LEXIS 18215, at *3 (D. Or. Feb. 13, 2014). As a result, district courts have split on the issue. *Compare id.* at *6-7 (collecting cases that apply Rule 9(b) to false advertising claims) *with Hansen Bev. Co. v. Innovation Ventures, LLC*, 2009 U.S. Dist. LEXIS 127605, at *52-56 (finding the counterclaim does not "sound in fraud," and therefore need not meet Rule 9(b), because counterclaimant "does not specifically allege fraud, fraud is not an essential element of the counterclaim, and [counterclaimant] does not allege 'a unified course of fraudulent conduct' and rely entirely on that course of conduct as the basis of the claim").

The Court need not expressly decide whether Rule 9(b)'s heightened pleading standard applies because even if Rule 9(b) does apply, the counterclaim is sufficiently pled to meet Rule 9(b)'s heightened pleading standard. In its counterclaim, Wilder identifies three representations it alleges to be misleading: the lack of sufficient disclaimers in the "advertorial" blog, Crime Wire, to alert consumers to the fact that Crime Wire is paid advertisement; the unauthorized use of various media organizations' logos; and that Instant Checkmate can search "driving records." Doc. No. 8 ¶¶ 16-17. The counterclaim further specifies why each statement is allegedly misleading: Crime Wire "leaves consumers **[*17]** with the overall impression that 'Crime Wire' is an independent news site or blog that is promoting [Instant Checkmate's] services, rather than a paid

advertisement"; the media organizations whose logos appear on Instant Checkmate's website neither "approve[ n]or endorse[]" the ICM website; and Instant Checkmate "does not in fact search driving records." *Id.*

The purpose of Rule 9(b)'s heightened pleading requirement is to ensure that allegations of fraud are "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen*, 780 F.2d at 731. The counterclaim has sufficiently filled that purpose here, as evidenced by Instant Checkmate's detailed arguments that the three representations at issue are not, in fact, false. The Court therefore DENIES Instant Checkmate's motion to dismiss the counterclaim.

## MOTIONS FOR RULE 11 SANCTIONS

### A. Legal Standard

Federal Rule of Civil Procedure 11 states, in pertinent part, that when an attorney presents a signed paper to a court, that attorney is certifying that to the best of his or her

> knowledge, information, and belief, formed after an inquiry reasonable under the **[\*18]** circumstances... (2) the claims, defenses, and other legal contentions therein are warranted by existing law or for establishing new law; [and] (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.... Fed. R. Civ. P. 11(b). Sanctions under Rule 11 are warranted when a party files a lawsuit or motion that is frivolous, legally unreasonable, without factual foundation, or is otherwise brought for an improper purpose. *Warren v. Guelker*, 29 F.3d 1386, 1388 (9th Cir. 1994) (citing *Conn v. Borjorquez*, 967 F.2d

1418, 1420 (9th Cir. 1992); *Operating Engineers Trust v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988)). A filing is "frivolous" when it is "both baseless and made without a reasonable and competent inquiry." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990). Either improper purpose or frivolousness is sufficient to sustain a sanction. *Id.*

When one party seeks sanctions against another, the Court must first determine whether any provision of Rule 11(b) has been violated. *Warren*, 29 F.3d at 1389. A finding of subjective bad faith is not required under Rule 11. *See Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir. 1994) (quoting *Zuniga v. United Can Co.*, 812 F.2d 443, 452 (9th Cir. 1987)) ("Counsel can no longer avoid the sting of Rule 11 sanctions by operating under the guise of a pure heart and empty head."). Instead, the question is whether, at the time the paper was presented to the Court (or later defended), it lacked evidentiary support or contained "frivolous **[\*19]** legal arguments. *Odish v. CACH, LLC*, No. 12cv1710 AJB (DHB), 2012 U.S. Dist. LEXIS 157114, at \*9 (S.D. Cal. Nov. 1, 2012). Where such a violation is found, Rule 11 authorizes sanctions against persons—attorneys, law firms, or parties—responsible. Fed. R. Civ. P. 11(c)(1).

### B. Discussion

Instant Checkmate argues for sanctions under Rule 11, asking that the Court dismiss Wilder's counterclaim with prejudice and award Instant Checkmate attorneys' fees and costs because the counterclaim "is legally and factually baseless and reflects no minimum factual investigation by Wilder and/or its attorneys." Doc. No. 17-1 at 2. In its opposition, Wilder also seeks sanctions, arguing that Instant Checkmate's aggressive litigation strategy stems from its desire "'to make an example of Wilder' and send a message to other competitors...." Doc. No. 21 at 16.

### 1. Instant Checkmate's Motion for Rule 11 Sanctions

Instant Checkmate seeks sanctions because Wilder's counterclaim "grossly misrepresents the facts about Instant Checkmate's advertising in violation of Rule 11." Doc. No. 17-1 at 3. Instant Checkmate makes factual arguments identical to the arguments asserted in its motion to dismiss, all of which come to the conclusion that the alleged misrepresentations are not, in fact, false. *See id.* at 3-8; Doc. No. 29 at 2-10. As evidence of **[*20]** Wilder's lack of pre-filing investigation, Instant Checkmate points to the dates on which Wilder's exhibits were printed, which occurred after Instant Checkmate filed its motion for sanctions. *See* Doc. No. 29 at 8.

As discussed *supra*, the Court does not agree with Instant Checkmate's position that the statements' literal truth precludes a false advertising claim. Wilder correctly points out that the Lanham Act may be violated by a statement that was "literally true but likely to mislead or confuse consumers." Doc. No. 21 at 9 (quoting *Southland Sod Farms*, 108 F.3d at 1139). As noted previously, a question of fact exists as to whether the statements alleged in the counterclaim are misleading. Given this question of fact, and in light of the Court's denial of Instant Checkmate's motion to dismiss, the Court finds that the counterclaim is not frivolous for purposes of Rule 11 sanctions. Accordingly, the Court DENIES Instant Checkmate's motion for sanctions.

### 2. Wilder's Cross-Motion for Rule 11 Sanctions

Wilder also seeks sanctions under Rule 11, arguing that Instant Checkmate's sanctions motion was filed with the improper purpose of "intimidat[ing] Wilder from pursuing its Counterclaim." Doc. No. 21 at 17. While the filing of a Rule 11 motion for sanctions simultaneously **[*21]** with an initial motion to dismiss may be an aggressive strategy, the Court cannot say that Instant Checkmate's purpose is clearly improper to justify Rule 11

sanctions at this early stage of litigation. *See Operating Engineers Pension Trust*, 859 F.2d at 1344 (noting that sanctions are reserved "for the rare and exceptional case where the action is *clearly* frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose") (emphasis added). Accordingly, in its discretion, the Court DENIES Wilder's motion for sanctions. *See Patelco Credit Union v. Sahni*, 262 F.3d 897, 913 (9th Cir. 2001) (quoting Fed. R. Civ. P. advisory committee's notes (1993)) ("[T]he court *may* award to the person who prevails on a motion under Rule 11—whether the movant or the target of the motion—reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion.") (emphasis added).

### CONCLUSION

Based on the foregoing, the Court DENIES Instant Checkmate's motion to dismiss the counterclaim for failure to state a claim under Rule 12(b)(6) [Doc. No. 12]; DENIES Instant Checkmate's motion for sanctions under Rule 11 [Doc. No. 17]; and DENIES Wilder's cross-motion for sanction under Rule 11 [Doc. No. 21].

**IT IS SO ORDERED.**

DATED: December 4, 2014

/s/ Michael M. Anello

Hon. Michael M. Anello

United States District Judge

---

*End of Document*

# EXHIBIT 9

# Loumena v. Kennedy

United States District Court for the Northern District of California, San Jose Division

October 13, 2015, Decided; October 13, 2015, Filed

Case No. 15-CV-00951-LHK

## Reporter

2015 U.S. Dist. LEXIS 139369 *; 2015 WL 5963988

JACK LOUMENA, Plaintiff, v. PAMELA KENNEDY, et al., Defendants.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part Loumena v. Kennedy, 2015 U.S. Dist. LEXIS 145125 (N.D. Cal., Oct. 23, 2015)

Affirmed by Loumena v. Kennedy, 671 Fed. Appx. 446, 2016 U.S. App. LEXIS 21126 (9th Cir. Cal., Nov. 23, 2016)

**Prior History:** Hettinga (Wylmina) & Loumena (Timothy P.), Marriage of, 2010 Cal. LEXIS 3467 (Cal., Apr. 14, 2010)

**Counsel:** **[\*1]** Jack Loumena, Plaintiff, Pro se, Los Osos, CA.

For Walter P Hammon, Travis I Krepelka, Defendants: Bruce Douglas MacLeod, Willoughby Stuart & Bening, Inc., San Jose, CA.

For Jeanie O'Connor, Chicago Title Company, Defendants: Dave M. McGraw, LEAD ATTORNEY, The Law Division of Fidelity National Title Group Inc., Walnut Creek, CA.

**Judges:** LUCY H. KOH, United States District Judge.

**Opinion by:** LUCY H. KOH

## Opinion

### ORDER GRANTING MOTIONS TO DISMISS, GRANTING TITLE CO.'S MOTION FOR SANCTIONS, DENYING PLAINTIFF'S

MOTION FOR SANCTIONS, AND DECLARING PLAINTIFF A VEXATIOUS LITIGANT

Re: Dkt. Nos. 21, 29, 30, 33

Before the Court is: (1) a Motion to Dismiss filed by Defendants Walter P. Hammon ("Hammon") and Travis I. Krepelka ("Krepelka"), ECF No. 21; (2) a Motion to Dismiss and to Declare Plaintiff Jack Loumena ("Plaintiff") a Vexatious Litigant filed by Defendants Chicago Title Co. and Jeanie O'Connor (collectively, "Title Co.") (with Hammon and Krepelka, "Defendants"), ECF No. 30; (3) Title Co.'s Motion for Sanctions against Plaintiff, ECF No. 29; (4) Plaintiff's Motion for Sanctions against Title Co., ECF No. 33; and (5) requests for judicial notice filed by all parties, ECF Nos. 23, 26, 30-2, 34.

Having considered the submissions **[\*2]** of the parties, the relevant law, and the record in this case, the Court hereby GRANTS Defendants' Motions to Dismiss, GRANTS Title Co.'s Motion for Sanctions, DENIES Plaintiff's Motion for Sanctions, and DECLARES Plaintiff a vexatious litigant.

## I. BACKGROUND

### A. Factual Background

This case arises out of the state court divorce proceedings between Plaintiff's mother, Wylmina E. Hettinga ("Hettinga"), and father, Timothy Loumena ("Loumena"). The state divorce case has

been ongoing since 2005. ECF No. 23 (Hammon's and Krepelka's Request for Judicial Notice, "HK RJN") Ex. E ("Aug. 25, 2014 Order"); ECF No. 30 (Title Co.'s Request for Judicial Notice, "Title RJN") Ex. H (same).

The instant complaint alleges facts and a cause of action nearly identical to a previous case brought by Plaintiff against the same defendants. *See* HK RJN Ex. I (Complaint in *Loumena v. Kennedy, et al. ("Kennedy I")*, No. 14-CV-04165-LHK, or "*Kennedy I* Compl."); Title RJN Ex. M (same). As in *Kennedy I*, Plaintiff's complaint here alleges one cause of action: a violation of Plaintiff's civil rights under 42 U.S.C. § 1983. ECF No. 1 ("Compl."); *see also Kennedy I* Compl. Also as in *Kennedy I*, Plaintiff's complaint alleges that Defendants **[*3]** acted under the color of law to deprive Plaintiff of his property in violation of his Fourth, Fifth, and Fourteenth Amendment rights.[1] Compl. ¶¶ 32-36; *see also Kennedy I* Compl. ¶¶ 25-30. The instant complaint additionally alleges that Defendants deprived Plaintiff of his property in violation of federal tax laws. Compl. ¶ 36 (citing 26 U.S.C. §§ 7206(1),(5)(A)).

The factual allegations in the instant complaint mirror the allegations in *Kennedy I*. Plaintiff's complaint arises out of the state-court-ordered sale of the Hettinga-Loumena **[*4]** family home ("the Property"). Compl. ¶ 11; HK RJN Ex. A ("The

family residence located at 21251 Almaden Road, San Jose, CA is treated as community property."); Title RJN Ex. A (same). Plaintiff, who is *pro se*, alleges that Defendants acted under the color of law and in an "agency relationship" to transfer the Property to Loumena, who then sold the Property to third parties. Compl. ¶¶ 14, 21, 25; *see also Kennedy I* Compl. ¶¶ 17-18, 21. According to the complaint, the Property was sold to third party bidders even though Pacific Almaden Investments, LLC ("PAI") was the highest bidder. *Id.* ¶ 26.

PAI "is a limited liability corporation which was originally owned, at least on paper, by . . . Timothy Tibbott. Mr. Tibbott was the former live in boyfriend of [Hettinga]." Aug. 25, 2014 Order at 5. PAI also appears to involve Hettinga's brother, Joel Hettinga. *Id.* at 4. From 2010 to 2012, Hettinga attempted to transfer her interest in the Property to PAI by executing quitclaim deeds signed only by herself or her brother and not by Loumena. *Id.* at 4. The state court found that "the transfers executed by [Hettinga] in her attempts to transfer title to the former family residence violated the Automatic Temporary **[*5]** Restraining Orders" under Family Code § 2040. *Id.* at 6. The transfers were also in violation of Hettinga's fiduciary duty to Loumena. *Id.* at 7. Accordingly, the state court found "that the series of deeds . . . were void and of no force and effect." *Id.* at 12.

Documents from the state court divorce case—the same documents before this Court in *Kennedy I*—reveal that the state court repeatedly ordered the Property to be sold, with the proceeds to be placed in a trust account. In an order filed January 23, 2013, the state court wrote:

> This Court previously ordered this property sold on 1 September 2011 (order filed 28 March 2012). Under that Order, Respondent Timothy Loumena was to select the realtor, both parties were to sign any and all necessary paperwork, and the net proceeds were to be placed into an interest-bearing trust account. The Court reiterates and modifies that Order as follows:

---

[1] The complaint fails to claim a violation of Plaintiff's Fourteenth Amendment rights, although Plaintiff cites the Fourteenth Amendment in Plaintiff's briefs. *See* Compl. ¶¶ 32-34; ECF No. 25 ("Opp."). However, Plaintiff clearly intends to state a claim against a state official. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 764, 130 S. Ct. 3020, 177 L. Ed. 2d 894 & n.12 (2010) (noting that the Fourteenth Amendment applies the Fifth Amendment's just compensation clause and the Fourth Amendment's prohibition against unreasonable searches and seizures to the states). The Court will construe the complaint as claiming a violation of Plaintiff's Fourth and Fifth Amendment rights, as applied to state actors by the Fourteenth Amendment. *See Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (internal citations omitted)).

(a) The property shall be listed and sold forthwith. The listing agent shall be the individual named on the record by Mr. Loumena—Scott Raley of Customer Service Realty. Mr. Loumena shall be the sole lister of the property.

(b) Mr. Loumena shall work with the realtor to prepare the property for sale and make decisions concerning the **[*6]** appropriate list price, what to do with offers received, and any other necessary elements of the sales process. . . . As to any documents requiring any signatures from Ms. Hettinga, . . . Mr. Loumena shall provide them, and those parties shall promptly sign and return the documents to Mr. Loumena. If three (3) days after presenting the documents, Mr. Loumena has not received the necessary signatures, he may bring the documents to Department 83 for the Court Clerk to sign as elisor on behalf of Ms. Hettinga, . . . .

. . . .

(c) All net sales proceeds shall be immediately placed in a blocked, interest-bearing trust account, and shall not be released in any fashion absent further Court Order.

(d) The Court expressly reserves jurisdiction over all parties' respective interests, if any, in the proceeds, which shall be determined after the sale and deposit of proceeds into a trust account.

Title RJN Ex. C at 2 ("Jan. 23, 2013 Order"); *see also* HK RJN Ex. B ("Mar. 28, 2012 Order") ("The house at 21251 Almaden Road, San Jose, CA shall be sold with Respondent charged with selecting the Real Estate Agent to facilitate the sale. . . . Net proceeds shall be placed into an interest bearing trust account. **[*7]** A court order will be required to disburse the funds from the account.").

Pursuant to the January 23, 2013 state court order, Loumena was required to have the Superior Court Clerk, Defendant Pamela Kennedy ("Kennedy"), sign as elisor on behalf of Hettinga and PAI. *See* Compl. Ex. M (recorded Grant Deed showing transfer from PAI to Loumena, signed by Kennedy); HK RJN Ex. F (recorded Grant Deed showing transfer from Hettinga to Loumena, signed by Kennedy). The Property was then sold by Loumena to a third party. Compl. ¶ 25. The state court later found that "the sale to the third party buyers was proper, final, and in full compliance with all prior orders to sell the subject property." Aug. 25, 2014 Order at 3. The state court also divided the proceeds of the sale between Loumena and Hettinga. *Id.* at 3, 5.

These same allegations and state court orders were before this Court in *Kennedy I. See generally* HK RJN Ex. J (Order Granting Motion to Dismiss in *Kennedy I*, or "*Kennedy I* Dismissal"); Title RJN Ex. N (same). The only new allegations in the instant complaint relate to Plaintiff's claims to ownership of the Property. Plaintiff now alleges that Hettinga gifted the Property to Plaintiff in 2006. Compl. **[*8]** ¶ 14. Plaintiff also alleges that, at some later point, Hettinga transferred the Property to PAI, and, at some point, PAI's ownership transferred to Plaintiff. *Id.* ¶ 12 (alleging that Plaintiff is "the sole member of PAI"). Additionally, Plaintiff now alleges that PAI purchased the Property in a foreclosure sale. *Id.* ¶¶ 16, 19. In the August 25, 2014 Order, the state court found that "[t]he foreclosure sale did not occur . . . . PAI never acquired title by purchasing the property in a foreclosure sale." Aug. 25, 2014 Order at 12. The state court further noted, "There are no deeds transferring title by virtue of a foreclosure," leaving PAI without any interest in the Property. *Id.* at 13.

## B. Prior Litigation Involving the Hettinga-Loumena Divorce

### 1. Overview of Hettinga-Loumena Divorce Litigation

This is now the twelfth case in the U.S. District Court for the Northern District of California filed by Plaintiff, Plaintiff's company PAI, Hettinga, or Plaintiff's brother regarding the divorce proceedings of Hettinga and Loumena. *See Loumena v. Hammon, et al. ("Hammon II")*, No. 15-CV-03613-NC; *M.L. v. Nichols, et al. ("Nichols II")*, 15-CV-02303-BLF; *Hettinga v. Paliwal*, No. 15-CV-02246-BLF; *Loumena v. Nichols, [*9] et al. ("Nichols I")*, No. 15-CV-01372-BLF; *M.L. v. Barth*, No. 14-CV-05423-LHK; *Kennedy I*, No. 14-CV-04165-LHK; *Pacific Almaden Invs., LLC v. Hettinga, et al. ("PAI")*, 14-CV-01631-RMW; *Hettinga v. Loumena ("Loumena II")*, No. 13-CV-02217-RMW; *Hettinga, et al. v. Loumena, et al. ("Loumena I")*, No. 10-CV-02975-JSW; *Hettinga v. Orlando, et al.*, No. 09-CV-00253-JW; *Hettinga v. Hammon, et al.* ("*Hammon I*"), No. 09-CV-06040-JW.

Six different judges of the Northern District have heard these twelve cases. Seven of these cases have been the subject of a motion to dismiss, and all seven were dismissed for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine, including *Kennedy I. See Nichols I*, No. 15-CV-01372-BLF (dismissing case under the *Rooker-Feldman* doctrine and collecting previous cases). Two of the dismissed cases have been summarily affirmed by the U.S. Court of Appeals for the Ninth Circuit. *See PAI*, 14-CV-01631-RMW; *Orlando*, No. 09-CV-00253-JW.

The California Superior Court and the California Court of Appeal have each declared Hettinga a vexatious litigant. Aug. 25, 2014 Order at 8. The U.S. District Court for the Northern District of California has also declared Hettinga **[*10]** a vexatious litigant. *Loumena II*, No. 13-CV-02217-RMW, 2014 U.S. Dist. LEXIS 140470, 2014 WL 4955187, at *4-5 (N.D. Cal. Sept. 30, 2014). As a result, Hettinga is subject to a pre-filing review of all her future filings in the U.S. District Court for the Northern District of California. *Id.* Specifically, "[t]he Clerk of this court may not file or accept any further complaints filed by or on behalf of Wylmina

Hettinga as a named plaintiff that arise out of facts related to plaintiff's divorce case." 2014 U.S. Dist. LEXIS 140470, [WL] at *5.

## 2. Plaintiff's First Case: *Kennedy I*

Including the instant case, Plaintiff has filed four of the twelve cases in this district involving the Hettinga-Loumena divorce proceedings. Plaintiff filed his first suit, *Kennedy I*, on September 16, 2014. *Kennedy I* Dismissal at 4. As discussed above, *Kennedy I* and this case present virtually identical allegations against the same defendants. *See generally* Compl.; *Kennedy I* Compl. The instant case adds only some new allegations about Plaintiff's and PAI's ownership of the Property. *See generally* Compl.; *Kennedy I* Compl. In *Kennedy I*, as in the instant case, Plaintiff argued that the sale of the Property to a third party, the execution of the grant deed by Kennedy, and the distribution of the proceeds from the sale violate Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights. *Kennedy I* Dismissal at 8. On February **[*11]** 27, 2015, this Court dismissed *Kennedy I* for lack of subject matter jurisdiction pursuant to the *Rooker-Feldman* doctrine. *Id.* at 9.

*Kennedy I*, and the instant case, overlap substantially with two earlier suits by Hettinga. First, on May 15, 2013, Hettinga sued Loumena and Kennedy and alleged that she or PAI owned the Property and Kennedy granted the Property to Loumena in violation of Hettinga's Fourth, Fifth, and Fourteenth Amendment rights. *Loumena II*, No. 13-CV-02217-RMW. On September 30, 2014, Hettinga's suit was dismissed for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine and Hettinga was declared a vexatious litigant. *Id.* Hettinga's suit is on appeal with the Ninth Circuit. ECF No. 27 (Plaintiff's Request for Judicial Notice, or "PRJN 1") (Order of the Ninth Circuit in Case No. 14-17135 denying summary affirmance); ECF No. 34 (Plaintiff's Request for Judicial Notice, or "PRJN 2") Ex. B (same).

Second, on April 9, 2014, PAI sued Hettinga,

Loumena, Kennedy, Scott Raley ("Raley"), and O'Connor. HK RJN Ex. H (Order Granting Motion to Dismiss in *PAI*, No. 14-CV-01631-RMW, or "*PAI* Dismissal"); Title RJN Ex. L (same). Hettinga filed a cross complaint, naming PAI, Loumena, Kennedy, Raley, O'Connor, and **[*12]** Chicago Title Co as defendants. *Id.* The Court noted, "The complaint and cross-complaint allege similar facts and claims, all of which are nearly identical to the claim brought by Hettinga in an earlier case in this district against the same defendants," referring to *Loumena II. Id.* at 2. PAI and Hettinga alleged that the sale of the Property to a third party, the execution of the grant deed by Kennedy, and the distribution of the proceeds from the Property's sale were in violation of Hettinga's and PAI's Fourth, Fifth, and Fourteenth Amendment rights. *Id.* at 2-3. On October 1, 2014, the Court dismissed the complaint and cross-complaint for lack of subject matter jurisdiction under the *Rooker-Feldman. Id.* at 5. Hettinga appealed to the Ninth Circuit, which denied Hettinga in forma pauperis status because "the appeal is frivolous." *PAI*, 14-CV-01631-RMW. The Ninth Circuit summarily affirmed the district court on April 16, 2015, noting that "the questions raised in this appeal are so insubstantial as to not require further argument." *Id.*

### 3. Plaintiff's Second Case: *Nichols I*

On March 25, 2015, Plaintiff filed his second suit arising out of the Hettinga-Loumena divorce proceedings, this time against Hammon and a retired Santa Clara County Superior Court Judge. *Nichols I*, **[*13]** No. 15-CV-01372-BLF. Plaintiff challenged the Superior Court Judge's January 6, 2015 refusal to hear any more requests for declaratory relief from a state court order that required Plaintiff to be in the care of Loumena and have limited contact with Hettinga. *Id.* On August 3, 2015, the Court dismissed the complaint for lack of subject matter jurisdiction pursuant to the *Rooker-Feldman* doctrine. *Id.*

Plaintiff's younger brother filed a virtually identical

suit on May 21, 2015 against Hammon and the same Superior Court Judge. *Nichols II*, 15-CV-02303-BLF. Plaintiff's younger brother challenged the Superior Court Judge's January 6, 2015 refusal to hear more requests for declaratory relief from an order that barred Plaintiff's younger brother from Hettinga's custody. *Id.* This suit remains pending.

*Nichols I* and *Nichols II* follow a December 28, 2009 suit by Hettinga on behalf of herself, Plaintiff, Plaintiff's younger brother, and Hettinga's other minor children, in which Hettinga challenged the state court's limitation of her visitation rights. *Hammon I*, No. 09-CV-06040-JW. On April 1, 2010, Hettinga's case was dismissed for lack of subject matter jurisdiction pursuant to the *Rooker-Feldman* **[*14]** doctrine. *Id.*

### 4. Plaintiff's Third Case: *Hammon II*

Plaintiff filed his third case arising out of the Hettinga-Loumena divorce proceedings on August 6, 2015. *Hammon II*, No. 15-CV-03613-NC. Plaintiff sued Hammon and Krepelka for distributing Plaintiff's money from the proceeds of the sale of the Property, held in an interest-bearing trust account, to themselves and their clients and colleagues. *Id.;* ECF No. 45 (Plaintiff's Motion to Relate). Plaintiff's third case remains pending.

### C. Procedural Background

On February 27, 2015, this Court dismissed *Kennedy I* for lack of subject matter jurisdiction pursuant to the *Rooker-Feldman* doctrine. *Kennedy I* Dismissal at 9. Three days later, on March 2, 2015, Plaintiff filed the instant complaint. ECF No. 1. The complaint names the same six defendants from *Kennedy I*: Kennedy, Clerk of the Santa Clara County Superior Court; Hammon, an attorney appointed by the state court to represent Hettinga and Loumena's four minor children; Krepelka, Loumena's attorney; Raley, the court-appointed real estate listing agent; Chicago Title Co., which was involved in the sale of the Property; and Jeanie

O'Connor, who has some relationship with Chicago Title Co.[2]

Defendants Hammon and Krepelka filed a Motion to Dismiss and Request for Judicial Notice on May 22, 2015. ECF Nos. 21, 23. Plaintiff opposed the Motion to Dismiss and filed a Request for Judicial Notice on June 4, 2015. Opp.; PRJN 1. Defendants Hammon and Krepelka replied on June 11, 2015. ECF No. 31. Title Co. filed a Motion for Sanctions on June 10, 2015. ECF No. 29. That same day, Title Co. moved to dismiss the complaint and to declare Plaintiff a vexatious litigant. ECF No. 30. Additionally, Title Co. filed a Request for Judicial Notice. ECF No. 30-2. On June 18, 2015, Plaintiff opposed all of Title Co.'s motions. ECF No. 33 ("Opp.2"). Plaintiff also filed a second Request for Judicial Notice. PRJN 2. Title Co. did not reply.

## II. LEGAL STANDARDS

### A. Rule 12(b)(1) Subject Matter Jurisdiction

A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. "The party asserting federal subject matter jurisdiction bears the burden of proving its existence." *Chandler v. State Farm Mut. Auto Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). The party carries that burden by putting forth "the manner and degree of evidence **[\*16]** required" by whatever stage of the litigation the case has reached. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

### B. Rule 12(b)(6) Motion to Dismiss

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short

---

[2] Summons were issued for each defendant **[\*15]** on April 13, 2015. ECF Nos. 4-9. No proofs of service have been filed. Defendants Raley and Kennedy have not yet appeared in the case.

and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth **[\*17]** of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### C. Rule 11 Sanctions

"Rule 11 requires the imposition of sanctions when a motion is frivolous, legally unreasonable, or without factual foundation, or is brought for an improper purpose." *Conn v. Borjorquez*, 967 F.2d

1418, 1420 (9th Cir. 1992). "The central purpose of Rule 11 is to deter baseless filings . . . ." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 254 (9th Cir. 1992) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)). An "improper purpose" is a purpose to "harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed. R. Civ. P. 11(b)(1). The test for improper purpose is an objective one. *G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1109 (9th Cir. 2003).

Courts also use an objective standard to address the other conditions for Rule 11 sanctions by looking to whether a reasonable basis for the challenged position existed in law and fact at the time the position was adopted. *Conn*, 967 F.2d at 1421; *see also Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 554, 111 S. Ct. 922, 112 L. Ed. 2d 1140 (1991) (establishing the "objective standard of reasonable inquiry" imposed by Rule 11). In determining whether an objectively reasonable basis exists, whether the pleader is correct in his perception of the law is not critical. *Conn*, 967 F.2d at 1421. Thus, if a court finds that a party made a reasonably arguable claim at the time of filing the complaint, the court **[*18]** should not apply Rule 11 sanctions.

## III. DISCUSSION

### A. Requests for Judicial Notice

The Court first addresses the parties' requests for judicial notice. Although a district court generally may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion, the Court may take judicial notice of documents referenced in the complaint, as well as matters in the public record, without converting a motion to dismiss into one for summary judgment. *See Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir.

2002). In addition, the Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Public records, including judgments and other court documents, are proper subjects of judicial notice. *See, e.g., United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007). Records filed with a county recorder are also judicially noticeable as undisputed public records. *See Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004).

### 1. Defendants' Requests for Judicial Notice

First, in support of Hammon's and Krepelka's Motion to Dismiss, Hammon and Krepelka request judicial notice of various orders and filings by the parties, including complaints, in related state and federal court **[*19]** proceedings. *See* HK RJN. Plaintiff does not oppose Hammon's and Krepelka's request. The Court GRANTS Hammon's and Krepelka's Request for Judicial Notice, as these are filings in related state and federal court proceedings. *See Black*, 482 F.3d at 1041.

Second, Title Co. requests judicial notice in support of Title Co.'s Motion to Dismiss and to Declare Plaintiff a Vexatious Litigant. Title Co.'s Request for Judicial Notice is largely duplicative of Hammon's and Krepelka's request. *See* Title RJN Exs. A-B, G, H-J, L-N (orders and party filings in related state and federal cases). However, Title Co. requests judicial notice of additional state court orders, *id.* Exs. C-E, and Hettinga's cross-complaint in *PAI*, No. 14-CV-01631-RMW, *id.* Ex. K. Finally, Title Co. requests judicial notice of the "Vexatious Litigant List" maintained by the California Judicial Council. *Id.* Ex. F.

In response to Title Co.'s request, Plaintiff opposes only judicial notice of Exhibit A, a Superior Court order filed on January 10, 2008 that found the Property was community property. The Court notes that it granted judicial notice of this document in

response to Hammon's and Krepelka's Request for Judicial Notice, which Plaintiff did not [*20] oppose. Plaintiff argues that Title Co. should have notified this Court of a state Court of Appeal remand order altering part of the Superior Court's order in Exhibit A. Opp.2 at 4. However, Title Co.'s Exhibit H included a description of the remand order. Title RJN Ex. H. Moreover, Plaintiff relies on Title Co.'s Exhibit H as evidence of the remand order. Opp.2 at 4. Further, Plaintiff does not argue that Exhibit A is an inaccurate copy of the Superior Court's ruling as issued. Additionally, the remand order appears to have almost entirely affirmed the state court order in Exhibit A. *See* Compl. Ex. L (noting the remand order affirmed that the house was community property, except for a small portion that Hettinga had separately contributed); Aug. 25, 2014 Order at 1. The Court GRANTS Title Co.'s Request for Judicial Notice, as these are filings in related state and federal court proceedings or other public records. *See Black*, 482 F.3d at 1041; *Rupert v. Bond*, No. 12-CV-05292-LHK, 2013 U.S. Dist. LEXIS 134318, 2013 WL 5289617, at *5 (N.D. Cal. Sept. 18, 2013) (granting request for judicial notice of the California Vexatious Litigant List).

## 2. Plaintiff's Requests for Judicial Notice

First, in opposition to Hammon's and Krepelka's Motion to Dismiss, Plaintiff requests judicial notice of an [*21] order filed in Ninth Circuit Case No. 14-17135, two exhibits submitted in the same Ninth Circuit case, and an excerpt from a Memorandum of Points and Authorities in an unnamed case. PRJN 1. Plaintiff also requests notice of an affidavit filed by Hettinga. *Id.* Defendants Hammon and Krepelka oppose Plaintiff's Request for Judicial Notice. ECF No. 31.

The Court GRANTS judicial notice of the order filed by the Ninth Circuit in Case No. 14-17135, as it is a filing in a related court proceeding. *See Black*, 482 F.3d at 1041. However, the Court DENIES judicial notice of the two exhibits submitted in the Ninth Circuit case and the

memorandum. For each of these three documents, Plaintiff submitted only a single page from an apparently longer document. Each page fails to identify the document of which it is part and the document's authorship. Moreover, Plaintiff fails to explain the relevance of these out-of-context pages. The Court finds these documents are not sources whose accuracy cannot reasonably be questioned and that they are not relevant to an issue presented. *See* Fed. R. Evid. 201(b); *Flick v. Liberty Mut. Fire Inc. Co.*, 205 F.3d 386, 392 n.7 (9th Cir. 2000). Further, the Court DENIES Plaintiff's request for judicial notice of Hettinga's affidavit. This document includes hearsay and statements about [*22] documents that are not attached. Moreover, Hettinga has an interest in the outcome of this action. As a result, the Court finds Hettinga's affidavit is not a source whose accuracy cannot be reasonably be questioned. *See* Fed. R. Evid. 201(b).

Second, Plaintiff filed a Request for Judicial Notice in opposition to Title Co.'s Motion to Dismiss and to Declare Plaintiff a Vexatious Litigant. Plaintiff again requests notice of the Ninth Circuit's order in Ninth Circuit Case No. 14-17135, *see* PRJN 2 Ex. B, which the Court GRANTS for the reason stated above. Plaintiff also requests notice of excerpts from a reply brief and a memorandum filed in other cases, a declaration by PAI lawyer Michael Stone ("Stone") filed in a state court case, a letter sent to PAI by Loumena, and a grant deed executed by Chicago Title Co. PRJN 2 Exs. A, C-F. Title Co. does not oppose Plaintiff's Request for Judicial Notice.

The Court GRANTS judicial notice of the grant deed, as it is a public record. *See Black*, 482 F.3d at 1041. The Court DENIES the remainder of Plaintiff's request, as the documents are not sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b). The brief and memoranda are out-of-context one-page excerpts from longer documents, without [*23] any identifying information. The Stone Declaration includes hearsay and statements about documents that are not attached. Further, PAI has an interest in the

outcome of this action and thus is not a source whose accuracy cannot reasonably be questioned. Finally, the Loumena letter is not notarized or authenticated in any way.

## B. Motions to Dismiss

All defendants move to dismiss on two grounds: (1) no defendant is a state actor; and (2) the Court lacks subject matter jurisdiction over the case pursuant to the *Rooker-Feldman* doctrine. Additionally, Title Co. asserts that Plaintiff lacks standing. Because the Court finds that it lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine, the Court need not address Defendants' other arguments.

Under the *Rooker-Feldman* doctrine, a federal district court has no authority to review the final determinations of a state court in judicial proceedings. *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16, 44 S. Ct. 149, 68 L. Ed. 362 (1923). "The purpose of the doctrine is to protect state judgments from collateral federal attack. Because district courts lack power to hear direct appeals from state court decisions, they must decline jurisdiction whenever they are 'in essence called upon to review the state court decision.'" **[*24]** *Doe & Assocs. Law Offices v. Napolitano*, 252 F.3d 1026, 1030 (9th Cir. 2001) (quoting *Feldman*, 460 U.S. at 482 n.16). The *Rooker-Feldman* doctrine precludes not only review of decisions of the state's highest court, but also those of its lower courts. *See Dubinka v. Judges of Superior Court*, 23 F.3d 218, 221 (9th Cir. 1994). A challenge under the *Rooker-Feldman* doctrine is a challenge for lack of subject matter jurisdiction. *Olson Farms, Inc. v. Barbosa*, 134 F.3d 933, 937 (9th Cir. 1998).

The *Rooker-Feldman* doctrine applies when a plaintiff in federal court alleges a "de facto appeal" by (1) asserting errors by the state court as an injury, and (2) seeking relief from the state court

judgment as a remedy. *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1139-40 (9th Cir. 2004). "A federal action constitutes such a de facto appeal where 'claims raised in the federal court action are 'inextricably intertwined' with the state court's decision such that the adjudication of the federal claims would undercut the state ruling or require the district court to interpret the application of state laws or procedural rules.'" *Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 859 (9th Cir. 2008) (quoting *Bianchi v. Rylaarsdam*, 334 F.3d 895, 898 (9th Cir. 2003)).

In this case, Plaintiff brings a § 1983 claim based on the state court's alleged violation of federal tax laws and Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights in ordering and executing the sale of the family property. Compl. ¶¶ 32-36. Plaintiff seeks relief in the form of monetary damages and an injunction barring Defendant Kennedy from being a Court Clerk of any court in the United States. **[*25]** *Id.* ¶¶ 37-38.

As in *Kennedy I*, Plaintiff appears to challenge (1) the state court's order to sell the Property, (2) the execution of the sale of the Property to third-party buyers, and (3) the distribution of the proceeds from the sale. As before, the Court finds all three challenges barred by the *Rooker-Feldman* doctrine. Plaintiff also challenges the "seizure" of PAI's interest in the Property. This challenge is also barred by the *Rooker-Feldman* doctrine.

First, to the extent that Plaintiff is challenging the sale of the Property, that would constitute a collateral attack on the state court's order directing the property to be sold. The state court ordered, "The house at 21251 Almaden Road, San Jose, CA shall be sold with [Loumena] charged with selecting the Real Estate Agent to facilitate the sale." Mar. 28, 2012 Order. The state court also ordered, "The property shall be listed and sold forthwith. The listing agent shall be the individual named on the record by Mr. Loumena—Scott Raley of Customer Service Realty." Jan. 23, 2013 Order. In order to review the propriety of the sale of the

Property, this Court would have to review the state court's March 28, 2012 and January 23, 2013 Orders. **[*26]** However, "when a losing plaintiff in state court brings a suit in federal district court asserting as legal wrongs the allegedly erroneous legal rulings of the state court and seeks to vacate or set aside the judgment of that court, the federal suit is a forbidden de facto appeal." *Noel v. Hall*, 341 F.3d 1148, 1156 (9th Cir. 2003). This is exactly the case here, where Plaintiff, arguably "losing" in state court, asserts that the orders to sell the Property violated his Constitutional rights. Compl. ¶ 36. The case is "a forbidden de facto appeal." *Noel*, 341 F.3d at 1156.

Second, Plaintiff challenges the execution of the sale on the grounds that the Property was sold to third party buyers instead of PAI and the sale documents were improperly signed by Kennedy. The state court expressly ruled that "the sale to the third party buyers was proper, final, and in full compliance with all prior orders to sell the subject property." Aug. 25, 2014 Order at 3. Additionally, the state court noted that "the Court ordered that the Clerk of the Court would be authorized to sign documents required to complete the sale in the event that [Hettinga] refused to sign the required documents." *Id.; see also* Jan. 23, 2013 Order (setting out procedure for the Court Clerk to sign **[*27]** sale documents). Given the state court's express ruling approving the sale to third party buyers, this Court cannot review whether PAI was a higher bidder or whether the Court Clerk should have signed the documents. Such a review is forbidden by the *Rooker-Feldman* doctrine. "A federal action constitutes such a *de facto* appeal where claims raised in the federal court action are inextricably intertwined with the state court's decision such that the adjudication of the federal claims would undercut the state ruling or require the district court to interpret the application of state laws or procedural rules." *Reusser*, 525 F.3d at 859 (citation omitted). "Where the district court must hold that the state court was wrong in order to find in favor of the plaintiff, the issues presented to both courts are inextricably intertwined" and the action

is properly dismissed under the *Rooker-Feldman* doctrine. *Doe & Assocs.*, 252 F.3d at 1030.

Third, to the extent that Plaintiff challenges the distribution of the proceeds from the sale, that is a challenge to the state court's order requiring that the funds be placed in a trust and distributed at the court's direction. "The *Rooker-Feldman* doctrine, generally speaking, bars a plaintiff from bringing a § 1983 suit **[*28]** to remedy an injury inflicted by the state court's decision." *Jensen v. Foley*, 295 F.3d 745, 747 (7th Cir. 2002); *see also Rhodes v. Gordon*, No. CV 12-2863-JGB(DTB), 2013 U.S. Dist. LEXIS 100813, 2013 WL 3780378, at *10 (C.D. Cal. July 16, 2013) ("A plaintiff may not avoid the *Rooker-Feldman* bar by styling his attack on the state court's ruling as a civil rights action." (citing *Branson v. Nott*, 62 F.3d 287, 291 (9th Cir. 1995))). The state court divided the proceeds of the sale between Loumena and Hettinga, and directed that Loumena's attorney distribute the funds only in accordance with the state court's order. Aug. 25, 2014 Order at 3, 22. Thus, this Court cannot review the state court's distribution of funds. *See Reusser*, 525 F.3d at 859.

Finally, Plaintiff challenges the seizure of PAI's interest in the Property. Plaintiff claims that, at some point prior to the sale to third party buyers, PAI purchased the Property in a non-judicial foreclosure. Compl. ¶ 16. However, the state court ruled that, "The foreclosure sale did not occur . . . PAI never acquired title by purchasing the property in a foreclosure sale." Aug. 25, 2014 Order at 12. The state court further noted, "There are no deeds transferring title by virtue of a foreclosure." *Id.* at 13. This Court cannot review PAI's alleged ownership without reviewing the state court's August 25, 2014 Order. District courts "must decline jurisdiction whenever **[*29]** they are 'in essence called upon to review the state court decision.'" *Doe & Assocs.*, 252 F.3d at 1030. Thus, this Court cannot review PAI's ownership through the foreclosure sale.

Plaintiff argues that the *Rooker-Feldman* doctrine

does not apply for three reasons. First, Plaintiff contends that he was not a party in the state court proceedings and that PAI was not notified of any state court proceedings. Opp. at 7; Opp.2 at 3. Plaintiff relies on *Lance v. Dennis*, 546 U.S. 459, 461, 126 S. Ct. 1198, 163 L. Ed. 2d 1059 (2006) (per curiam), in which several citizens challenged a Colorado Supreme Court decision requiring Colorado to use a court-ordered congressional redistricting plan. The district court found that the *Rooker-Feldman* doctrine barred the citizens' federal challenge because the citizens were in privity with the Colorado General Assembly, who was the plaintiff before the Colorado Supreme Court. *Id.* at 462. The U.S. Supreme Court reversed, holding that the federal plaintiffs' claims were not barred because the federal plaintiffs had not been "in a position to ask this Court to review the state court's judgment." *Id.* at 465.

*Lance* bears little relation to this case. Here, Plaintiff was represented in the state court proceedings by a court-appointed attorney. *See, e.g.*, HK RJN Ex. C (listing Defendant Hammon [*30] as Plaintiff's attorney). Plaintiff does not argue—and there is no indication in the record—that his attorney was unable to participate in the state court proceedings or to challenge the state court orders. *See* Mar. 28, 2012 Order (noting Hammon was present at hearing); *see also Lance*, 546 U.S. at 465. Additionally, Plaintiff claims ownership of the Property through his ownership of PAI, and seeks to restore *PAI's* interest in the Property. PAI was joined to the state court divorce action in August 2012. Aug. 25, 2014 Order at 6. Although Plaintiff asserts that PAI was not notified, the state court found that "PAI was properly joined" in the state court proceeding and that PAI failed to appear for a hearing "even though they were noticed for it." *Id.* at 17-18. In fact, PAI appealed the January 23, 2013 Order directing that the Property be sold and the proceeds placed into a trust account. *See id.* at 22. To the extent that Plaintiff disputes PAI's joinder in the state court action, that is a challenge to the state court's August 25, 2014 Order and is barred by the *Rooker-*

*Feldman* doctrine. *See Noel*, 341 F.3d at 1156.

Second, Plaintiff argues that the *Rooker-Feldman* doctrine applies only to federal cases brought "after the state proceedings ended," while [*31] Plaintiff originally filed a federal lawsuit on September 16, 2014. Opp. at 7. Although Plaintiff's argument is not clear, the Court believes Plaintiff is pointing out that the *Rooker-Feldman* doctrine does not bar parallel state and federal proceedings. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005) (noting that in *Rooker* and *Feldman*, "the losing party in state court filed suit in federal court after the state proceedings ended"). However, Plaintiff points to no parallel state and federal proceedings. The state court orders essentially challenged by Plaintiff here are final court orders issued before Plaintiff filed this proceeding on March 2, 2015. ECF No. 1.

Third, Plaintiff contends that this Court has jurisdiction over any lawsuit between Plaintiff and the IRS over a tax form that the IRS may issue for the sale of the Property. Opp. at 6. Plaintiff fails to explain why an IRS action would affect the application of the *Rooker-Feldman* doctrine to this case. Moreover, Plaintiff does not allege the IRS has actually issued any tax forms or taken any action regarding the Property.

Accordingly, Plaintiff's § 1983 claim is a challenge to the final order of a state court. Such a claim is barred by the *Rooker-Feldman* doctrine, and the Court thus GRANTS Defendants' [*32] motions to dismiss without prejudice for lack of subject matter jurisdiction. *See Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999) (noting that dismissal for lack of subject matter jurisdiction should be without prejudice).

## C. Motion for Sanctions

Title Co. asks for Rule 11 sanctions against Plaintiff in the amount of $10,000. ECF No. 29. Title Co. contends that Plaintiff's complaint is

meritless and duplicative of previous suits, and was filed to harass Title Co. ECF No. 29-1. In response, Plaintiff requests sanctions against Title Co.'s attorney in the amount of $102,000, based on alleged inconsistency in Title Co.'s representations to the Court about PAI's ownership. Opp.2 at 2-3. The Court addresses the two motions in turn.

## 1. Title Co.'s Request for Sanctions

"The key question in assessing frivolousness is whether a complaint states an arguable claim . . . ." *Conn*, 967 F.2d at 1421; *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990) (en banc) (noting a pleading is frivolous if it is "both baseless and made without a reasonable and competent inquiry"). For the reasons stated below, the Court concludes the instant complaint is frivolous.

This is essentially the fourth time a district court in the Northern District of California has heard this claim, and the fourth time that this claim is being dismissed for [*33] lack of subject matter jurisdiction. The sale of the Property was first addressed in *Loumena II*, filed on May 15, 2013. No. 13-CV-02217-RMW. Hettinga sued Loumena and Kennedy for transferring the Property to Loumena and accused Kennedy of improperly signing the grant deed. *Id.* U.S. District Judge Ronald Whyte dismissed *Loumena II* for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine on September 30, 2014. *Id.* Appeal is pending before the Ninth Circuit.

Judge Whyte next addressed the disposition of the Property when PAI sued Hettinga, Loumena, Kennedy, Raley, and O'Connor on April 9, 2014. *See PAI* Dismissal. Hettinga filed a cross complaint, naming PAI, Loumena, Kennedy, Raley, O'Connor, and Chicago Title Co as defendants. *Id.* Judge Whyte noted, "The complaint and cross-complaint allege similar facts and claims, all of which are nearly identical to the claim brought by Hettinga in an earlier case in this district against the same defendants," referring to *Loumena II*. *Id.* at 2.

PAI and Hettinga alleged that the sale of the Property to a third party, the execution of the grant deed by Kennedy, and the distribution of the proceeds from the sale violated Hettinga's and PAI's Fourth, Fifth, and Fourteenth Amendment rights. **[*34]** *Id.* at 2-3. Judge Whyte found that the complaint and cross-complaint were barred by the *Rooker-Feldman* doctrine and dismissed the case on October 1, 2014. *Id.* at 5. Hettinga appealed to the Ninth Circuit, which denied Hettinga in forma pauperis status because "the appeal is frivolous." *PAI*, 14-CV-01631-RMW. The Ninth Circuit summarily affirmed the district court on April 16, 2015, noting that "the questions raised in this appeal are so insubstantial as to not require further argument." *Id.*

On September 16, 2014, Plaintiff filed *Kennedy I*. *Kennedy I* Dismissal at 4. Plaintiff also claimed that the sale of the Property to a third party, the execution of the grant deed by Kennedy, and the distribution of the proceeds from the sale were in violation of Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights. *Id.* at 8. On February 27, 2015, like Judge Whyte in *Loumena II* and *PAI*, this Court dismissed *Kennedy I* for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine. *Id.* at 9.

Despite the rulings in *Loumena II, PAI*, and *Kennedy I*, Plaintiff filed the instant complaint just three days after the dismissal of *Kennedy I*. ECF No. 1. As explained above, this suit mirrors *Kennedy I*. There are very few new allegations in the instant complaint, none of which substantively alter **[*35]** Plaintiff's *Kennedy I* allegations about Defendants' conduct in selling the Property. The instant case raises the same challenges to the sale of the Property, the execution of the grant deed, and the distribution of the proceeds that this Court considered in *Kennedy I*. Moreover, the new allegations Plaintiff did make about Plaintiff's and PAI's ownership of the Property were squarely contradicted by the state court. Plaintiff alleged that PAI purchased the Property in a foreclosure sale, *see* Compl. ¶¶ 16, 19, but the state court's August

25, 2014 Order expressly ruled that "[t]he foreclosure sale did not occur . . . PAI never acquired title by purchasing the property in a foreclosure sale." Aug. 25, 2014 Order at 12. Plaintiff was well aware of the state court's August 25, 2014 Order, as the Court discussed this same state court order when applying the *Rooker-Feldman* doctrine in *Kennedy I. See Kennedy I* Dismissal at 9. When filing the instant complaint, Plaintiff had no "arguable claim" that the *Rooker-Feldman* doctrine would not also apply to bar the Court's consideration of the instant complaint. *See Conn*, 967 F.2d at 1421.

The Court recognizes that "[w]hat is objectively reasonable for a *pro* se litigant and for an attorney may not be the **[*36]** same." *Rupert*, 2013 U.S. Dist. LEXIS 134318, 2013 WL 5289617, at *4. However, it is inescapable that a reasonably competent litigant would not, in good faith, file a complaint based on the same facts and claims that the U.S. District Court for the Northern District of California has already rejected three times. *See Conn*, 967 F.2d at 1421. Plaintiff knew that this Court dismissed *Kennedy I*, a virtually identical complaint, just three days before the instant case was filed. As discussed above, Plaintiff made no changes to the complaint that would lead an objectively reasonable person to believe the instant complaint warranted a different result than *Kennedy I*.

Further, the Court recently dismissed substantially similar suits by Plaintiff's mother and Plaintiff's company PAI. Although the record does not reflect when PAI's ownership transferred to Plaintiff, Plaintiff is now the "sole member" of PAI, *see* Compl. ¶ 12, and likely was aware of PAI's lawsuit and the lawsuit's dismissal under the *Rooker-Feldman* doctrine. Moreover, Plaintiff shares Hettinga's phone and fax numbers, and *Kennedy I* listed Plaintiff's email as wylmina@live.com. *See* ECF No. 29-2 (Declaration of Dave M. McGraw). It strains credulity that Plaintiff was not aware of Hettinga's lawsuit or the lawsuit's **[*37]** dismissal, also under the *Rooker-Feldman* doctrine. Plaintiff

certainly would have been aware of the lawsuits—and the lack of legal foundation for the instant case—with a reasonably competent investigation. *See Conn*, 967 F.2d at 1421. Plaintiff's complaint warrants sanctions because it is "clearly frivolous," "legally unreasonable or without legal foundation," and was brought without a reasonably competent inquiry into the claim's merits. *See Operating Eng'rs Pension Trust v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988).

Additionally, it appears that this complaint was brought for the improper purpose of harassing Defendants. *See G.C. & K.B. Invs., Inc.*, 326 F.3d at 1110 ("[W]ithout question, successive complaints based upon propositions of law previously rejected may constitute harassment under Rule 11."). As discussed, Plaintiff brought successive complaints "based on propositions of law clearly rejected by the Court." *See id.* Plaintiff filed the instant case just three days after the dismissal of *Kennedy I* and "failed to allege anything other than the same argument repeatedly rejected by this Court." *See id.* Defendants have been forced to respond to virtually the same frivolous complaint four different times in five years. *See id.* (affirming grant of sanctions based on improper purpose when party filed four motions based on the same rejected **[*38]** argument). Moreover, the similarities of the complaints filed by Plaintiff and Hettinga, as well as Plaintiff's and Hettinga's shared contact information, suggest to the Court that Hettinga may be attempting to circumvent the three orders declaring her a vexatious litigant by filing suits through Plaintiff. *See Loumena II*, 2014 U.S. Dist. LEXIS 140470, 2014 WL 4955187, at *4-5 (declaring Hettinga a vexatious litigant); Aug. 25, 2014 Order (noting Hettinga was declared a vexatious litigant in the California Superior Court and the California Court of Appeal). The Court concludes that Plaintiff's successive baseless filings constitute harassment. *See id.* (affirming that successive motions were both frivolous and harassing when the motions relied upon law rejected by the court).

The Court desires to deter Plaintiff from repeated "baseless filings" and harassment of Defendants. *Townsend*, 929 F.2d at 1362. However, the Court recognizes that Plaintiff is *pro se*. Accordingly, the Court GRANTS Title Co.'s Motion for Sanctions in the amount of $300. Plaintiff must pay the penalty to Title Co. within thirty (30) days of the filing of this order. The Court cautions Plaintiff that filing another complaint based on these same facts and claims may result in greater sanctions.

## 2. Plaintiff's [*39] Request for Sanctions

Plaintiff requests $102,000 in sanctions against Title Co.'s attorney because "Defendants previously fraudulently claimed that prior lawsuits brought by [PAI] were in fact lawsuits brought by Wylmina E Hettinga" and Defendants "fraudulently" switched ownership of PAI between Hettinga and Plaintiff. Opp.2 at 2-3. However, the local rules of this Court require that all motions for sanctions be separately filed. Civ. L.R. 7-8(a). Plaintiff's request for sanctions, included within Plaintiff's opposition to Title Co.'s Motion to Dismiss, does not comply with this requirement. *See Haar v. City of Mountain View*, No. 10-CV-02995, 2010 U.S. Dist. LEXIS 120508, 2010 WL 4919478, at *4 (N.D. Cal. Nov. 12, 2010) (denying motion for sanctions because it was not separately filed).

Moreover, Plaintiff makes no substantive argument as to why the actions of Title Co.'s attorney warrant sanctions. To support Plaintiff's motion for sanctions, Plaintiff cites a memorandum of which the Court declined to take judicial notice. The memorandum is an unlabeled one-page excerpt of a longer document without any identifying information. However, even if the Court took notice of this memorandum, which includes one instance in which Title Co. referred to PAI as Hettinga's company, the memorandum does not demonstrate that Title **[*40]** Co. fraudulently misrepresented PAI's ownership to the Court. Nor does the memorandum demonstrate that Title Co. has in any way made a frivolous filing or filed a

motion for an improper purpose. *See* Fed. R. Civ. P. 11(b). There is simply no evidence in the record supporting a sanctions award against Title Co. Plaintiff's motion is frivolous. Accordingly, the Court DENIES Plaintiff's request for sanctions.

## D. Motion to Declare Plaintiff a Vexatious Litigant

District courts have the inherent power under the All Writs Act to declare a party a vexatious litigant and impose upon him appropriate pre-filing restrictions. *See Ringgold-Lockhart v. Cnty. of L.A.*, 761 F.3d 1057, 1061 (9th Cir. 2014) (citing 28 U.S.C. § 1651(a)). "Out of regard for the constitutional underpinnings of the right to court access, 'pre-filing orders should rarely be filed.'" *Id.* at 1062 (quoting *De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990)). "Nevertheless, 'flagrant abuse of the judicial process cannot be tolerated because it enables one person to preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.'" *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007) (brackets omitted) (quoting *De Long*, 912 F.2d at 1148) .

"When district courts seek to impose pre-filing restrictions, they must: (1) give litigants notice and 'an opportunity to oppose the order before it [is] entered'; (2) compile an adequate **[*41]** record for appellate review, including 'a listing of all the cases and motions that led the district court to conclude that a vexatious litigant order was needed'; (3) make substantive findings of frivolousness or harassment; and (4) tailor the order narrowly so as 'to closely fit the specific vice encountered.'" *Ringgold-Lockhart*, 761 F.3d at 1062 (alteration in original) (quoting *De Long*, 912 F.2d at 1147-48). "The first and second of these requirements are procedural, while the latter two factors are substantive considerations that help the district court define who is, in fact, a vexatious litigant and construct a remedy that will stop the litigant's abusive behavior while not unduly infringing the

litigant's right to access the courts." *Id.* (alterations omitted). The Court addresses each requirement in turn.

## 1. Adequate Notice

As to the first factor, "[t]he requirement that the plaintiff receive an opportunity to be heard does not require an oral hearing; 'the opportunity to brief the issue fully satisfies due process requirements.'" *See Reddy v. MedQuist, Inc.*, No. CV 12-01324 PSG, 2012 U.S. Dist. LEXIS 171421, 2012 WL 6020010, at *3 (N.D. Cal. Dec. 3, 2012) (quoting *Molski*, 500 F.3d at 1059). Here, Plaintiff filed written opposition to the motion to declare him a vexatious litigant. Opp.2. Accordingly, Plaintiff had adequate notice and opportunity to oppose **[*42]** this order. *See Molski*, 500 F.3d at 1058 (finding adequate notice when the court's order was prompted by defendants' motion and served on plaintiff's counsel).

## 2. Record for Review

Under the second factor, the Court must compile an adequate record for review, including "a listing of all the cases and motions that led the district court to conclude that a vexatious order was needed." *De Long*, 912 F.2d at 1147. The Court has already detailed Plaintiff's prior lawsuits, as well as the lawsuits filed by Plaintiff's company PAI, Hettinga, and Plaintiff's brother. To complete the record, however, the Court will briefly summarize Plaintiff's litigation history.

Plaintiff has filed four lawsuits arising out of the Hettinga-Loumena divorce proceedings, including the instant case. *Hammon II*, No. 15-CV-03613-NC; *Nichols I*, No. 15-CV-01372-BLF; *Kennedy I*, No. 14-CV-04165-LHK. Plaintiff's first suit, *Kennedy I*, presented virtually identical allegations against the same defendants as the instant case. *See generally* Compl.; *Kennedy I* Compl. The instant case adds only some new allegations about Plaintiff's and PAI's ownership of the Property. *See*

*generally* Compl.; *Kennedy I* Compl. *Kennedy I* and the instant case raise the same claim that the sale of **[*43]** the Property to a third party, the execution of the grant deed by Kennedy, and the distribution of the proceeds from the sale violate Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights. *Kennedy I* Dismissal at 8. *Kennedy I*, like the instant case, was dismissed for lack of subject matter jurisdiction. *Id.* at 9. Moreover, Plaintiff filed the instant case three days after this Court dismissed *Kennedy I*.

*Kennedy I*, and the instant case, followed similar suits filed by Plaintiff's company PAI and Hettinga. In *Loumena II*, Hettinga sued Loumena and Kennedy and alleged that she or PAI owned the Property and that Kennedy granted the Property to Loumena in violation of Hettinga's Fourth, Fifth, and Fourteenth Amendment rights. *Loumena II*, No. 13-CV-02217-RMW. In *PAI*, PAI sued Hettinga, Loumena, Kennedy, Raley, and O'Connor while Hettinga filed a cross-complaint against PAI, Loumena, Kennedy, Raley, O'Connor, and Chicago Title Co. *PAI Dismissal*. The Court in *PAI* found that the "complaint and cross-complaint allege similar facts and claims, all of which are nearly identical to the claim brought by Hettinga in an earlier case in this district against the same defendants," referring to *Loumena II. Id.* at 2. Both *Loumena II* and *PAI* were dismissed for lack of subject matter jurisdiction under the *Rooker-Feldman* **[*44]** doctrine in 2014. As discussed in detail above, this Court examined this litigation history and concluded that the instant complaint was frivolous, harassing, and warrants sanctions. *See supra* Part III.C.1.

Plaintiff's second suit in this district challenged a Superior Court Judge's January 6, 2015 refusal to hear any more requests for declaratory relief from a state court order requiring Plaintiff to be in the care of Loumena and have limited contact with Hettinga. *Nichols I*, No. 15-CV-01372-BLF. Like *Kennedy I*, Plaintiff's second suit was dismissed for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine. Further, like *Kennedy I*,

Plaintiff's second suit overlaps substantially with other lawsuits filed by Plaintiff's family members. Plaintiff's younger brother filed a virtually identical suit challenging the same Superior Court Judge's January 6, 2015 refusal to hear more requests for declaratory relief from an order barring Plaintiff's younger brother from Hettinga's custody. *Nichols II*, 15-CV-02303-BLF. Additionally, Hettinga filed a lawsuit on behalf of herself, Plaintiff, Plaintiff's younger brother, and Hettinga's other minor children challenging the state court's **[*45]** limitation of Hettinga's visitation rights. *Hammon I*, No. 09-CV-06040-JW. Although Plaintiff's brother's suit remains pending, Hettinga's suit was dismissed for lack of subject matter jurisdiction on December 28, 2009.

Plaintiff filed his third case arising out of the Hettinga-Loumena divorce proceedings on August 6, 2015. *Hammon II*, No. 15-CV-03613-NC. Plaintiff sued Hammon and Krepelka—both defendants in the instant case—over the distribution of Plaintiff's money from the proceeds of the sale of the Property. *Id.;* ECF No. 45 (Plaintiff's Motion to Relate). Plaintiff's third case remains pending.

Thus, Plaintiff, Plaintiff's company PAI, Hettinga, and Plaintiff's brother have filed eight substantially overlapping lawsuits in this district. Plaintiff's mother and brother have filed an additional four lawsuits arising out of the Hettinga-Loumena divorce proceedings. *See Paliwal*, No. 15-CV-02246-BLF; *Barth*, No. 14-CV-05423-LHK; *Loumena I*, No. 10-CV-02975-JSW; *Orlando*, No. 09-CV-00253-JW. Of the twelve total cases in this district arising from the Hettinga-Loumena divorce proceedings, eight cases, now including this one, have faced a motion to dismiss. All eight have been dismissed for **[*46]** lack of subject matter jurisdiction. *See Nichols I*, No. 15-CV-01372-BLF (collecting cases). Two of the dismissed cases have been summarily affirmed by the Ninth Circuit. *PAI*, 14-CV-01631-RMW; *Orlando*, No. 09-CV-00253-JW; *see also Loumena II*, No. 13-CV-02217-RMW (appeal pending).

Additionally, Hettinga has been declared a vexatious litigant in this district and in the state Superior Court and the state Court of Appeal. *See Loumena I*, 2014 U.S. Dist. LEXIS 140470, 2014 WL 4955187, at *4-5 (declaring Hettinga a vexatious litigant); Aug. 25, 2014 Order at 8. This record, the Court concludes, is adequate for review. *See Sepehry-Fard v. Select Portfolio Servicing, Inc., et al.*, No. 14-CV-05142-LHK, 2015 U.S. Dist. LEXIS 29989, 2015 WL 1063070, at *8 (N.D. Cal. Mar. 10, 2015) (finding the second factor met where the court discussed the relevant federal court suits and motions).

**3. Substantive Finding**

Under the third factor, a district court must make a substantive finding that the party's litigation has been either frivolous or harassing. *Ringgold-Lockhart*, 761 F.3d at 1064. "To determine whether the litigation is frivolous, district courts must look at both the number and content of the filings as indicia of the frivolousness of the litigant's claims." *Id.* There is no numerical baseline for frivolousness, but a district court must find that the litigant has filed an "inordinate" **[*47]** number of actions. *Id.* "Litigiousness alone," the Ninth Circuit has said, "is not enough." *Id.* As to the content of the filings, the party's claims must "be patently without merit." *Id.* Litigation is harassing, moreover, where "the litigant's filings show a pattern of harassment." *Id.* Courts should "be careful not to conclude that particular types of actions filed repetitiously are harassing, and must instead discern whether the filing of several similar types of actions constitutes an intent to harass the defendant or the court." *Id.* (alterations omitted).

In addition, the Ninth Circuit has identified five factors courts should consider in determining whether a party's litigation qualifies as frivolous or harassing:

(1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the

litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions **[\*48]** would be adequate to protect the courts and other parties.

*Id.* at 1062.

Having considered these five factors, as well as the standards detailed above, the Court concludes Plaintiff is a vexatious litigant. The first and second factors weigh heavily in favor of declaring Plaintiff vexatious. Again, Plaintiff has filed at least four lawsuits aimed at undermining state court orders on issues arising out of the Hettinga-Loumena divorce proceedings. Plaintiff has not prevailed in any. Further, Plaintiff's lawsuits are "duplicative." *Id.* Plaintiff filed the instant lawsuit three days after the dismissal of *Kennedy I*, which was virtually identical. Both *Kennedy I* and the instant lawsuit are duplicative of previous lawsuits filed by Plaintiff's company PAI and Hettinga. Plaintiff lacked "an objective good faith expectation of prevailing" in the instant case. *See id.*

Additionally, Plaintiff's second lawsuit challenging the state court visitation order is virtually identical to a lawsuit filed by Plaintiff's younger brother, and both of those lawsuits overlap with a lawsuit filed by Hettinga. *See id.* at 1064 (noting litigant may be declared vexatious when the filings "show a pattern of harassment").

None of the **[\*49]** lawsuits filed by Plaintiff, Plaintiff's company PAI, Hettinga, or Plaintiff's brother have been successful on the merits. Rather, eight of the twelve lawsuits filed by these litigants, including the instant lawsuit, have been dismissed for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine. *See Nichols I*, No. 15-CV-01372-BLF (collecting cases). These cases have been "patently without merit." *See Ringgold-Lockhart*, 761 F.3d at 1064. Thus, that Plaintiff has

filed only four lawsuits as a named plaintiff does not undermine the Court's conclusion that Plaintiff is a vexatious litigant. *See Sepehry-Fard*, 2015 U.S. Dist. LEXIS 29989, 2015 WL 1063070, at \*9 (declaring plaintiff vexatious based on eleven lawsuits).

Further, the similarities of the complaints filed by Plaintiff and Hettinga suggest to the Court that Hettinga may be attempting to circumvent the order of the U.S. District Court, the California Superior Court, and the California Court of Appeal declaring Hettinga a vexatious litigant by filing suits through Plaintiff. Plaintiff shares Hettinga's phone and fax numbers, and in a previous case listed Plaintiff's email as "wylmina@live.com." *See* ECF No. 29-2 (Declaration of Dave M. McGraw). This further bolsters the Court's conclusion that Plaintiff's litigation **[\*50]** is filed to harass Defendants.

The fourth factor also weighs in favor of declaring Plaintiff a vexatious litigant. As discussed, Plaintiff's four suits have been duplicative of other lawsuits filed by Plaintiff's company PAI, Hettinga, and Plaintiff's brother. The twelve cases of Plaintiff, Plaintiff's company PAI, Hettinga, and Plaintiff's brother have raised similar claims against similar groups of defendants. For example, Hammon has been a defendant in nine cases, including all four of Plaintiff's cases. These lawsuits have required Defendants, and the Court, to duplicate effort to address similar claims before six different judges in the Northern District of California. Plaintiff "without question" has "caused unnecessary expense to [his] opposing parties and ha[s] posed an unnecessary burden on the courts." *See Sepehry-Fard*, 2015 U.S. Dist. LEXIS 29989, 2015 WL 1063070, at \*10.

Plaintiff does not address these factors or defend his litigation history. Instead, Plaintiff claims that "Defendants previously fraudulently claimed that prior lawsuits brought by [PAI] were in fact lawsuits brought by Wylmina E Hettinga" and Defendants "fraudulently" switched ownership of PAI between Hettinga and Plaintiff. Opp.2 at 2-3.

As discussed above, Plaintiff does **[\*51]** not demonstrate that Defendants fraudulently misrepresented PAI's ownership to the Court. Further, Plaintiff does not explain why the alleged improper behavior by Title Co. affects *Plaintiff's* declaration as a vexatious litigant. Lastly, Plaintiff does not dispute that Hettinga and PAI—and Plaintiff himself—have filed substantially similar lawsuits about the sale of the Property.

The third and fifth factors do not counsel a different result. "[P]ro se litigants are not immune from a vexatious litigation finding." *Sepehry-Fard*, 2015 U.S. Dist. LEXIS 29989, 2015 WL 1063070, at \*11. Notwithstanding Plaintiff's status as a pro se litigant, the record amply shows that his litigation has been frivolous and harassing. Plaintiff's suits are "preempt[ing] the use of judicial time that properly could be used to consider the meritorious claims of other litigants." *Molski*, 500 F.3d at 1057. Furthermore, the Court does not believe that other sanctions would adequately protect the courts and prospective defendants. It appears to the Court that Hettinga may be attempting to avoid the orders of the U.S. District Court, the California Superior Court, and the California Court of Appeal declaring Hettinga a vexatious litigant by filing suits through her children. Given this potential disregard of the orders **[\*52]** declaring Hettinga a vexatious litigant and the repeated duplicative filings by Plaintiff, the Court finds that other remedies would not be "adequate to protect the courts and other parties." *See Ringgold-Lockhart*, 761 F.3d at 1062. The Court concludes that a narrowly tailored pre-filing order is the most appropriate remedy in this instance.

#### 4. Narrowly Tailored Remedy

"Finally, pre-filing orders must be narrowly tailored to the vexatious litigant's wrongful behavior." *Ringgold-Lockhart*, 761 F.3d at 1066. A narrowly tailored order, thus, should restrain the "plaintiff from filing only the type of claims [he] had been filing vexatiously." *Id.; see also Molski*, 500 F.3d at

1061.

Here, Plaintiff's abusive behavior is the filing of duplicative lawsuits arising out of the sale of the Property at 21251 Almaden Road, San Jose, CA and the distribution of the proceeds. The Court therefore enjoins Plaintiff from filing any documents in this case or from filing any new action in the U.S. District Court for the Northern District of California arising out of facts related to sale of the Property at 21251 Almaden Road, San Jose, CA or to the distribution of the proceeds from the sale, without passing a pre-filing review. By requiring pre-filing review of Plaintiff's future actions related to the sale of the Property and the **[\*53]** distribution of the proceeds, the Court seeks to preclude Plaintiff from further harassing the individuals involved in the sale and to ensure respect of the Court's order declaring Hettinga a vexatious litigant.

### IV. CONCLUSION

For the foregoing reasons, the Court rules as follows:
  • The Court GRANTS Defendants' motions to dismiss without prejudice;
  • The Court GRANTS Title Co.'s Motion for Sanctions against Plaintiff in the amount of $300, which Plaintiff must pay to Title Co. within thirty days of the filing of this order;
  • The Court DENIES Plaintiff's Motion for Sanctions against Title Co.; and
  • The Court DECLARES Plaintiff to be a vexatious litigant.

This order is not a bar to Plaintiff bringing lawsuits; it merely requires pre-filing review. Plaintiff does not currently file electronically. Plaintiff must file at the office of the Clerk of this Court. The Clerk may not file or accept any further documents in this case or any new complaints filed by or on behalf of Plaintiff as a named plaintiff that arise out of facts related to the sale of the Property at 21251 Almaden Road, San Jose, CA or to the distribution of the proceeds from the sale. If Plaintiff wishes to

file a document in this case or a complaint **[\*54]** arising out of facts related to the sale of the Property or to the distribution of the proceeds, Plaintiff shall provide a copy of any such document or complaint and a copy of this order to the Clerk of this Court. The Clerk shall then forward the document or complaint and a copy of this order to the Duty Judge for a determination whether the document or complaint should be accepted for filing. If the Duty Judge determines that the document or complaint is duplicative or frivolous, it will not be filed and will be returned to Plaintiff. If the document or complaint is neither duplicative nor frivolous, it will be given to the Clerk with instructions to file it. Any violation of this order will expose Plaintiff to a contempt hearing and appropriate sanctions, and any action filed in violation of this order will be subject to dismissal with prejudice.

The Clerk shall close the case file.

**IT IS SO ORDERED**.

Dated: October 13, 2015

/s/ Lucy H. Koh

LUCY H. KOH

United States District Judge

---

**End of Document**

# EXHIBIT 10

# Williams v. Aho

United States District Court for the Central District of California

September 2, 2016, Decided; September 2, 2016, Filed

CV 16-2088 PSG (FFMx)

## Reporter

2016 U.S. Dist. LEXIS 195930 *

Nigel Eric Williams v. Bruce Edwin Aho, d.b.a. TheHollywoodSentinel.com

**Subsequent History:** Later proceeding at Williams v. Aho, 2017 U.S. Dist. LEXIS 22575 (C.D. Cal., Feb. 16, 2017)

**Counsel:** [*1] Attorneys for Plaintiff(s): Not Present.

Attorneys for Defendant(s): Not Present.

**Judges:** Philip S. Gutierrez, United States District Judge.

**Opinion by:** Philip S. Gutierrez

# Opinion

## CIVIL MINUTES - GENERAL

**Proceedings (In Chambers): Order DENYING Defendant's Motion to Dismiss and DENYING Defendant's Motion for Sanctions**

Before the Court is Defendant Bruce Edwin Aho's motion to dismiss Plaintiff Nigel Eric Williams's Complaint, and Defendant's motion for Rule 11 sanctions. Dkt. #20. The Court finds the matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. After considering the moving and opposing papers, the Court DENIES Defendant's motions.

## I. Background

Plaintiff Nigel Williams, a/k/a Willy Camden, is a professional photographer who specializes in celebrity photographs. *Complaint* ("*Compl.*") ¶¶ 2, 7, 8. In 2003, Plaintiff photographed socialite Paris Hilton as part of a photo shoot for Maxim magazine. *Id.* ¶¶ 8-9, Ex. B. Plaintiff registered the Hilton photographs with the U.S. Copyright Office in 2012. *Id.* ¶ 9, Ex. B. In November 2014, Plaintiff discovered copies of one of his Hilton photographs on Defendant's website, www.thehollywoodsentinel.com, and on another website, www.newsblaze.com. *Id.* ¶¶ 11-12. Plaintiff alleges [*2] that he did not give Defendant permission to copy or display the photograph on his own website, or to distribute the photograph to newsblaze.com. *Id.* ¶ 13.

The Complaint alleges violations of the Copyright Act, 17 U.S.C. § 501 *et seq.*, and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202. *See generally Compl.* Defendant now brings a Rule 12(b)(6) motion to dismiss for failure to state a claim and a Rule 11 motion for sanctions. Dkt. #20.

## II. Legal Standard

### A. Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). When deciding a Rule 12(b)(6) motion, the court must accept the facts pleaded in the complaint as true, and construe them in the light most favorable to the plaintiff. *Faulkner v. ADT Sec.*

*Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013); *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009). The Court, however, is not required to accept "legal conclusions . . . cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981); *see Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

After accepting all non-conclusory allegations as true and drawing all reasonable inferences in favor of the plaintiff, the court must determine whether the complaint alleges a plausible claim to relief. *See Iqbal*, 556 U.S. at 679-80. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the **[*3]** reasonable inference that the defendant is liable for the misconduct alleged. . . . The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.

## B. Rule 11

Rule 11 gives federal courts the authority to impose sanctions on litigants. *See* Fed. R. Civ. P. 11. It is "designed to deter attorneys and unrepresented parties from violating their certification that any pleading, motion or other paper presented to the court is supported by an objectively reasonable legal and factual basis." *Truesdell v. S. Cal. Permanente Med. Group*, 209 F.R.D. 169, 173-73 (C.D. Cal. 2002). A court considering Rule 11 sanctions should consider whether the parties' submissions were "frivolous," "legally unreasonable," or "without factual foundation, even if not filed in subjective bad faith." *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986); *see also Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362-65 (9th Cir. 1990) (en banc). "The issue in determining whether to impose sanctions under Rule 11 is whether a reasonable attorney, having conducted an objectively reasonable inquiry into the facts and law, would have concluded that the offending paper was well-founded." *Schutts v. Bently Nevada Corp.*, 966 F. Supp. 1549, 1562 (D. Nev.1997) (citation omitted).

## III. Discussion

Title Nigel Eric Williams v. Bruce Edwin Aho, d.b.a. TheHollywoodSentinel.com The Court first addresses Defendant's Rule 12(b)(6) motion and then turns to the Rule 11 motion for sanctions. **[*4]**

## A. Rule 12(b)(6)

To state a claim for copyright infringement, Plaintiff must show that he owned a valid copyright and that the Defendant violated it. 17 U.S.C. § 501; *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01 (Matthew Bender Rev. Ed.) ("Reduced to the most fundamental terms, there are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant."). Defendant contends that the Complaint failed to state a claim for relief under the Copyright Act because (1) Plaintiff delayed in notifying Defendant of the alleged copyright infringement and did not notify Defendant before filing suit, (2) Plaintiff failed to state a plausible claim for damages, given that Plaintiff failed to investigate whether Defendant's conduct was willful and that damages are too speculative, (3) Plaintiff failed to allege the date of copyright registration, date of first publication, and date of the alleged infringement, (4) Plaintiff did not assert that Defendant owns the domain name "Newsblaze," and (5) Plaintiff has not adequately established a relationship between the Hilton photograph and Plaintiff's copyright. *Motion to Dismiss* ("*Mot.*") 3:1-8, 3:15-18, **[*5]** 4:12-17, 5:6-10, 5:15-19, 6:9-10, 7:1-3. Because these arguments do not address whether Plaintiff stated a plausible claim for relief under the Copyright Act, the Court DENIES Defendant's 12(b)(6) motion.[1]

---

[1] At times, Defendant appears to argue that the Court should dismiss the Complaint because Plaintiff's counsel violated Rule 11. *See* 1:23-25, 4:11-20. Although federal courts are vested with inherent power, including the power to dismiss a case, for severe violations of Rule 11, *Adams v. Cal. Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007), Defendant has not given the Court any reason to impose sanctions, let alone the severe sanction of dismissing the case.

### i. Delay and Failure to Notify

Defendant faults Plaintiff for failing to provide a "take down notice" and for delaying more than a year before bringing a copyright claim. *Mot.* 3:10-13. Plaintiff correctly points out that the Copyright Act does not require Plaintiff to provide pre-suit notice to an alleged infringer in Defendant's position. *See ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 623 (4th Cir. 2001); *Opposition* ("*Opp.*") 2:26-27. Although the Copyright Act provides a "safe harbor" and requires plaintiffs to issue a takedown notice to internet service providers that passively store infringing content on their networks, Defendant does not claim to be an internet service provider. *See Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1201 (N.D. Cal. 2004). Further, the Copyright Act allows for a three-year statute of limitations from the time that the copyright owner reasonably could have discovered the infringement. *See* 17 U.S.C. § 507(b); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004). Even if Plaintiff delayed for "a year and a half" as Defendant asserts, the law does not fault Plaintiff for it. Accordingly, the Court denies Defendant's motion to dismiss for delay and **[\*6]** failure to notify.

### ii. Damages and Willfulness

Defendant argues that the Complaint should be dismissed because Plaintiff failed to state a plausible claim for damages, and Plaintiff failed to investigate whether Defendant's conduct was willful. *Mot.* 3:1-2, 3:15-18, 5:1-14. The Copyright Act permits the owner of a copyright to collect actual or statutory damages. 17 U.S.C. § 504(b), (c). If Plaintiff can show that Defendant's conduct was "willful," Plaintiff can collect up to $150,000 in statutory damages. § 504(c)(2). Precedent clearly establishes that damages are not an element of a copyright infringement claim and a level of uncertainty exists in establishing copyright

damages. *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014) (citing *On David v. The Gap, Inc.*, 246 F.3d 152, 158, 166-67 (2d Cir. 2001)). Precedent also establishes that willfulness if not an element of a copyright infringement claim and "the innocent intent of a defendant constitutes no defense to liability." *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2004). Willfulness is an issue that goes only to the amount of statutory damages, not liability. *See* 17 U.S.C. § 504(c). Because Defendant failed to point to a legal deficiency in Plaintiff's complaint, the Court denies Defendant's motion to dismiss for failure to state a claim for damages and failure to investigate whether Defendant's conduct was willful.

### iii. Failure to Allege Dates **[\*7]** of Copyright Registration, Publication, and Alleged Infringement

Defendant next faults Plaintiff for failing to assert the date of copyright registration, the date of first publication, and the date of the alleged infringement. *Mot.* 5:15-19. Defendant cites *Zito v. Steeplechase Films*, 267 F. Supp. 2d 1022, 1024-26 (N.D. Cal. 2003), in support of his argument. Unfortunately for Defendant, *Zito* is readily distinguishable. In that case, the complaint made clear that plaintiff did not register its copyright before the alleged infringement. *Id.* at 1025-26. Here, Plaintiff alleges that he obtained a copyright for the photograph in 2012,[2] and discovered

---

[2] "Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *accord Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss."). Courts may also, however, consider "attached exhibits, documents incorporated by reference, and matters properly subject to judicial notice." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014), *cert. denied sub nom. Cohen v. Nvidia Corp.*, 135 S. Ct. 2349, 192 L. Ed. 2d 143 (2015). The incorporation by reference doctrine permits the court "to take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading.'" *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (alteration omitted) (quoting *Silicon Graphics*, 183 F.3d at 986). The Complaint alleges that Plaintiff

Defendant's infringement in November 2014. *Compl.* ¶¶ 9, 12, Ex. B. Indeed, it is factually incorrect to state that Plaintiff did not allege the date of copyright registration, date of first publication, and date of the alleged infringement. This information is readily available in the Complaint or the attached exhibits. *Compl.* ¶¶ 9, 12, Ex. B. The Court thus denies Defendant's motion to dismiss for failure to allege sufficient dates.

### iv. Defendant's Ownership of the Domain Name

Defendant's fourth ground for dismissing the Complaint is Plaintiff's failure to assert that Defendant owned the domain **[*8]** name "newsblaze.com." *Mot.* 6:9-10. Although it is true that Plaintiff never asserts that Defendant owns newsblaze.com, it is an omission that makes no difference to Plaintiff's claims. The Complaint asserts that Defendant unlawfully "distribut[ed]" or "caus[ed] to be displayed" the photograph on several newsblaze.com websites. *Compl.* ¶ 12. As Plaintiff points out, Defendant does not need to own newsblaze.com to violate Plaintiff's copyright. Copyright law grants the copyright owner the exclusive right to "distribute copies . . . of the copyrighted work," as well as display the works on their own forums. *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1177 (9th Cir. 2011). Because Plaintiff did not need to allege that Defendant owned newsblaze.com to state a claim for copyright infringement, the Court denies Defendant's motion to dismiss for failure to allege that Defendant owned the domain name newsblaze.com.

---

registered the photograph with the U.S. Copyright Office, *Compl.* ¶ 9, and refers the Court to the registration, attached at Exhibit B. Although the date of registration is not alleged in the Complaint, the date is apparent from the face of the registration. Because Defendant has provided the Court with no reason to question the validity of the registration attached at Exhibit B, the Court incorporates the registration by reference and takes note of the date of the copyright, which is June 26, 2012.

### v. Relationship Between Photograph and Copyright

Fifth and finally, Defendant asserts that the Court should dismiss the Complaint because Plaintiff has not established that Plaintiff's copyright includes the Hilton photograph. *Mot.* 7:1-3. At the motion to dismiss phase, however, the Court must accept the facts plead in the Complaint as true and **[*9]** must construe the facts in the light most favorable to Plaintiff. *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013); *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009). Plaintiff alleges that he is the original author of the Hilton photograph, that he obtained a copyright for the photograph, and that Defendant reproduced, distributed, and publicly displayed the photograph on his own website and websites owned by others. *Compl.* ¶¶ 8-10, 12. Plaintiff does not need to allege anything further to state a plausible claim for relief under the Copyright Act. The Court thus denies Defendant's motion to dismiss on the ground that Plaintiff failed to prove that the copyright covered the photograph.

### B. Rule 11 Sanctions

Defendant alleges that Plaintiff's counsel violated Rule 11(b) by failing to perform a reasonable inquiry before filing the Complaint, bringing a frivolous lawsuit for harassment purposes, and making allegations of willful infringement without evidentiary support. *Mot.* 4:11-20. The Court finds Plaintiff's claims unfounded. Rule 11(b) requires an attorney to certify that "to best of the person's knowledge, information, and belief," the pleading is not presented "for any improper purpose" and that the claims in the pleading are supported by existing law and have sufficient evidentiary foundation. Fed. R. Civ. P. 11(b). Given **[*10]** that the Court has already concluded that the Complaint stated a plausible claim for relief under the Copyright Act and the DMCA, Defendant has provided the Court with no reason to believe that this litigation was filed purely to harass or that Plaintiff's claims are wholly lacking evidentiary support. The Court thus denies Defendant's motion for sanctions.

V. <u>Conclusion</u>

Having found that the Complaint states a plausible claim for relief under the Copyright Act and the DMCA and that Defendant has not provided the Court with any reason to believe that Plaintiff filed the lawsuit for an improper purpose, the Court DENIES both Defendant's motion to dismiss and Defendant's motion for Rule 11 sanctions.

**IT IS SO ORDERED**.

---

End of Document

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1800 Avenue of the Stars, 12th Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*):
**COMPENDIUM OF UNPUBLISHED CASES IN SUPPORT OF HAUSMAN HOLDINGS, LLC'S AND DAVID AND PAMELA MOELLENHOFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS UNDER RULE 9011 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) August 5, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ryan W Beall**    rbeall@lwgfllp.com, vrosales@wgllp.com;kadele@wgllp.com;lbracken@wgllp.com;rbeall@ecf.courtdrive.com
- **Thomas H Casey (TR)**    msilva@tomcaseylaw.com, thc@trustesolutions.net
- **Justin S Draa**    jdraa@dld-law.com
- **Jeffrey I Golden**    jgolden@wgllp.com, kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com
- **D Edward Hays**    ehays@marshackhays.com, ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com
- **Gerald P Kennedy**    gerald.kennedy@procopio.com, kristina.terlaga@procopio.com;calendaring@procopio.com;efile-bank@procopio.com
- **Laila Masud**    lmasud@marshackhays.com, lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com
- **Aram Ordubegian**    ordubegian.aram@arentfox.com
- **Richard M Pachulski**    rpachulski@pszjlaw.com
- **Malhar S Pagay**    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- **Hamid R Rafatjoo**    hrafatjoo@raineslaw.com, bclark@raineslaw.com
- **Faye C Rasch**    frasch@wgllp.com, kadele@wgllp.com;lbracken@wgllp.com;gestrada@wgllp.com
- **Todd C. Ringstad**    becky@ringstadlaw.com, arlene@ringstadlaw.com
- **Annie Y Stoops**    annie.stoops@arentfox.com, yvonne.li@arentfox.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
-

☐ Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
1991916.1

**F 9013-3.1.PROOF.SERVICE**

**2.  SERVED BY UNITED STATES MAIL**:

On (*date*) _____ I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 5, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

The Honorable Scott C. Clarkson
United States Bankruptcy Judge
411 West Fourth Street
Suite 5130
Santa Ana, CA 92701-4393

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 8/5/2021 | Bambi Clark | /s/ Bambi Clark |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*
1991916.1

**F 9013-3.1.PROOF.SERVICE**