**PACHULSKI STANG ZIEHL & JONES LLP**
Richard M. Pachulski (State Bar No. 90073)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067-4003
Telephone: 310.277.6910
Email: rpachulski@pszjlaw.com

**RAINES FELDMAN LLP**
Hamid R. Rafatjoo (State Bar No. 181564)
1800 Avenue of the Stars, 12th Floor
Los Angeles, CA 90067
Telephone: 310.440.4100
Email: hrafatjoo@raineslaw.com

**TROUTMAN PEPPER HAMILTON SANDERS LLP**
Alan J. Kessel (State Bar No. 130707)
5 Park Plaza, Suite 1400
Irvine, CA 92614-2545
Direct Dial: 949.567.3528
Email: alan.kessel@troutman.com

Attorneys for Creditors and Intervenors
HAUSMAN HOLDINGS, LLC and
DAVID and PAMELA MOELLENHOFF

**LONDON FISCHER LLP**
Julie Van Wert (State Bar No. 166712)
David Berke (State Bar No. 228827)
800 Wilshire Blvd., Suite 1550
Los Angeles, California  90017
Telephone: 213.404.0240
E-mail: jvanwert@londonfischer.com
          dberke@londonfisher.com

Attorneys for RAINES FELDMAN LLP and
HAMID R. RAFATJOO

**KENDALL BRILL & KELLY LLP**
Alan J. Weil (State Bar No. 63153)
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Direct Dial: 310.272-7911
Email: ajweil@kbkfirm.com

Attorneys for TROUTMAN PEPPER
HAMILTON SANDERS LLP and
ALAN J. KESSEL

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, SANTA ANA DIVISION

| | |
|---|---|
| In re: | Case No. 8:16-bk-12589-SC |
| ANDREA STEINMANN DOWNS,<br><br>Debtor. | Chapter 7 |
| THOMAS H. CASEY, Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>LORA RAE STEINMANN, *et al.,*<br><br>Defendants. | Adversary No. 8:18-ap-01168-SC<br><br>**COMPENDIUM OF UNPUBLISHED CASES IN SUPPORT OF HAUSMAN HOLDINGS, LLC'S AND DAVID AND PAMELA MOELLENHOFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO THE COURT'S INHERENT AUTHORITY**<br><br>Date:          September 2, 2021<br>Time:         11:00 a.m.<br>Courtroom:  5C |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Creditors and Intervenors Hausman Holdings, LLC and David and Pamela Moellenhoff (collectively, **"Creditors"**) and their counsel (together with Creditors, the **"Opposing Parties"**), attach copies of the following unreported and/or unpublished decisions cited in their opposition (**"Opposition"**) to the *Motion for Sanctions Pursuant to the Court's Inherent Authority* (the "**Inherent Authority Motion**") filed by Defendants Lora Rae Steinmann, Heinz H. Steinmann, Eric Steinmann, Susanna Steinmann Wilson, Thomas Steinmann, John Steinmann, Mary Steinmann Sypkens, Teresa Steinmann Stapleton, Kay Steinmann Belknap, Jeff Steinmann, and Heinz J. Steinmann (collectively, the "**Steinmanns**").  (Adv. Dkt. No. 324).

| | |
|---|---|
| Exhibit 1 | *Bradford v. Usher*,  No. 1:17-cv-01128-SAB (PC), 2020 U.S. Dist. LEXIS 61235 (E.D. Cal. Apr. 7, 2020) |
| Exhibit 2 | *Cityview at Riverwalk, LLC v. Knoxville Cmty. Dev. Corp.*,  No. 3:11-CV-050, 2011 U.S. Dist. LEXIS 127883 (E.D. Tenn. Nov. 4, 2011) |
| Exhibit 3 | *Country Inns & Suites by Carlson, Inc. v. Gokul Mgmt.*,  Civil Action No. 07-2044 (DRD), 2007 U.S. Dist. LEXIS 59407 (D.N.J. Aug. 13, 2007) |
| Exhibit 4 | *Gomes v. Am. Century Cos.*, No. 2:09-cv-02153-FCD/KJM, 2010 U.S. Dist. LEXIS 57400 (E.D. Cal. May 14, 2010) |
| Exhibit 5 | *Grant v. Bostwick*, No. 15-cv-874 WQH (BLM), 2016 U.S. Dist. LEXIS 96078 (S.D. Cal. July 20, 2016) |
| Exhibit 6 | *Great Dynasty Int'l Fin. Holdings Ltd. v. Haiting Li*, No. C-13-1734 EMC, 2014 U.S. Dist. LEXIS 94658 (N.D. Cal. July 10, 2014) |
| Exhibit 7 | *In re Dane*, No. CC-13-1298-KiLaPa, 2014 Bankr. LEXIS 2378 (B.A.P. 9th Cir. May 30, 2014) |
| Exhibit 8 | *In re Gonzalez*, No. 8:12-bk-19213-RCT, 2019 Bankr. LEXIS 675 (Bankr. M.D. Fla. Mar. 5, 2019) |
| Exhibit 9 | *In re Jacobson*, No. CC-08-1273-DMkPa, 2009 Bankr. LEXIS 4577 (B.A.P. 9th Cir. June 23, 2009) |
| Exhibit 10 | *In re Radakovich*, No. WW-13-1254-KuPaJu, 2014 Bankr. LEXIS 4017 (B.A.P. 9th Cir. Sep. 19, 2014) |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

2928738.1

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Exhibit 11     *In re Theokary*, Nos. 07-110008 ELF, 09-051, 2012 Bankr. LEXIS 4020 (Bankr. E.D. Pa. 2012)

Exhibit 12     *In re Waldrop*, No. 15-14689-JDL, 2017 Bankr. LEXIS 3720 (Bankr. W.D. Okla. Oct. 25, 2017)

Exhibit 13     *In re Yates*, No. BKR. 04-05619-H7, 2007 WL 7147271 (Bankr. S.D. Cal. Jan. 26, 2007)

Exhibit 14     *Instant Checkmate, Inc. v. Background Alert, Inc.*, No. 3:14-cv-01182-MMA-DHB, 2014 U.S. Dist. LEXIS 190115 (S.D. Cal. Dec. 4, 2014)

Exhibit 15     *Leverty & Assocs. Law Chtd. v. Exley*, No. 3:17-cv-00175-MMD-WGC, 2018 U.S. Dist. LEXIS 221766 (D. Nev. Nov. 5, 2018)

Exhibit 16     *Loumena v. Kennedy*, No. 15-CV-00951-LHK, 2015 U.S. Dist. LEXIS 139369 (N.D. Cal. Oct. 13, 2015)

Exhibit 17     *Marchant v. Jamieson*, No. 2:06-cv-02631 PHX JWS, 2007 U.S. Dist. LEXIS 27835 (D. Ariz. Apr. 13, 2007)

Exhibit 18     *Patriot Rail Corp. v. Sierra R.R. Co.*, No. 2:09-cv-0009-TLN-AC, 2015 U.S. Dist. LEXIS 103434 (E.D. Cal. Aug. 5, 2015)

Exhibit 19     *Rodriguez v. Serv. Emples. Int'l*, No. C-10-01377 JCS, 2011 U.S. Dist. LEXIS 117793 (N.D. Cal. Oct. 12, 2011)

Exhibit 20     *Rojas v. Theobald*, No. 02-CV-3623 (DRH) (MLO), 2007 U.S. Dist. LEXIS 62321 (E.D.N.Y. Aug. 23, 2007)

Exhibit 21     *Salessi v. Commonwealth Land Title Ins. Co.*, No. SACV 08-1274-DOC (JPRx), 2014 U.S. Dist. LEXIS 199653 (C.D. Cal. Mar. 4, 2014)

Exhibit 22     *Silaev v. Swiss-America Trading Corp.*, No. CV-14-02551-PHX-JAT, 2017 U.S. Dist. LEXIS 12364 (D. Ariz. Jan. 30, 2017)

Exhibit 23     *Vestin Fund II, LLC v. Srinivasan*, No. CIV. H-03-5071, 2007 WL 1091002 (S.D. Tex. Apr. 10, 2007)

Exhibit 24     *Warshawer v. Tarnutzer*, No. C14-1042 RSM, 2016 U.S. Dist. LEXIS 51075 (W.D. Wash. Apr. 15, 2016)

2928738.1

Exhibit 25     *Williams v. Aho*, No. CV 16-2088 PSG (FFMx), 2016 U.S. Dist. LEXIS 195930 (C.D. Cal. Sep. 2, 2016)

Exhibit 26     *Youngevity Int'l v. Smith*, No. 16-CV-704-BTM-JLB, 2018 U.S. Dist. LEXIS 20373 (S.D. Cal. Feb. 6, 2018)


Dated: August 19, 2021          PACHULSKI STANG ZIEHL & JONES

                                By: _____
                                    Richard M. Pachulski
                                    Attorneys for Creditors and Intervenors
                                    HAUSMAN HOLDINGS, LLC and
                                    DAVID and PAMELA MOELLENHOFF

Dated: August 19, 2021          RAINES FELDMAN LLP

                                By: /s/ Hamid R. Rafatjoo
                                    Hamid R. Rafatjoo
                                    Attorneys for Creditors and Intervenors
                                    HAUSMAN HOLDINGS, LLC and
                                    DAVID and PAMELA MOELLENHOFF

Dated: August 19, 2021          TROUTMAN PEPPER HAMILTON SANDERS LLP

                                By: _____
                                    Alan J. Kessel
                                    Attorneys for Creditors and Intervenors
                                    HAUSMAN HOLDINGS, LLC and
                                    DAVID and PAMELA MOELLENHOFF

Dated: August 19, 2021          LONDON FISCHER LLP

                                By: _____
                                    Julie Van Wert
                                    David Berke
                                    Attorneys for RAINES FELDMAN LLP and
                                    HAMID R. RAFATJOO

Dated: August 19, 2021          KENDALL BRILL & KELLY LLP

                                By: _____
                                    Alan Jay Weil
                                    Attorneys for TROUTMAN PEPPER HAMILTON
                                    SANDERS LLP and ALAN J. KESSEL

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

Exhibit 25    *Williams v. Aho*, No. CV 16-2088 PSG (FFMx), 2016 U.S. Dist. LEXIS 195930
(C.D. Cal. Sep. 2, 2016)

Exhibit 26    *Youngevity Int'l v. Smith*, No. 16-CV-704-BTM-JLB, 2018 U.S. Dist. LEXIS
20373 (S.D. Cal. Feb. 6, 2018)

Dated: August 19, 2021                    PACHULSKI STANG ZIEHL & JONES

By:_____
　　Richard M. Pachulski
　　Attorneys for Creditors and Intervenors
　　HAUSMAN HOLDINGS, LLC and
　　DAVID and PAMELA MOELLENHOFF

Dated: August 19, 2021                    RAINES FELDMAN LLP

By: /s/ Hamid R. Rafatjoo
　　Hamid R. Rafatjoo
　　Attorneys for Creditors and Intervenors
　　HAUSMAN HOLDINGS, LLC and
　　DAVID and PAMELA MOELLENHOFF

Dated: August 19, 2021                    TROUTMAN PEPPER HAMILTON SANDERS LLP

By: _____
　　Alan J. Kessel
　　Attorneys for Creditors and Intervenors
　　HAUSMAN HOLDINGS, LLC and
　　DAVID and PAMELA MOELLENHOFF

Dated: August 19, 2021                    LONDON FISCHER LLP

By: _____
　　Julie Van Wert
　　David Berke
　　Attorneys for RAINES FELDMAN LLP and
　　HAMID R. RAFATJOO

Dated: August 19, 2021                    KENDALL BRILL & KELLY LLP

By: _____
　　Alan Jay Weil
　　Attorneys for TROUTMAN PEPPER HAMILTON
　　SANDERS LLP and ALAN J. KESSEL

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

3

2928738.1

# EXHIBIT 1

# Bradford v. Usher

United States District Court for the Eastern District of California

April 7, 2020, Decided; April 7, 2020, Filed

Case No. 1:17-cv-01128-SAB (PC)

**Reporter**

2020 U.S. Dist. LEXIS 61235 *; 2020 WL 1689711

RAYMOND ALFORD BRADFORD, Plaintiff, v. USHER, et al., Defendants.

**Subsequent History:** Objection overruled by Bradford v. Ogbuehi, 2020 U.S. Dist. LEXIS 72763, 2020 WL 1970063 (E.D. Cal., Apr. 23, 2020)

**Prior History:** Bradford v. Ogbuehi, 2018 U.S. Dist. LEXIS 8317, 2018 WL 466269 (E.D. Cal., Jan. 18, 2018)

**Counsel:** [*1] Raymond Alford Bradford, Plaintiff, Pro se, CORCORAN, CA.

**Judges:** Stanley A. Boone, UNITED STATES MAGISTRATE JUDGE.

**Opinion by:** Stanley A. Boone

## Opinion

ORDER DENYING PLAINTIFF'S MOTION FOR TERMINATING AND EVIDENTARY SANCTIONS AND MOTION FOR A PROTECTIVE ORDER AND PRELIMINARY INJUNCTION AND RESTRAINING ORDER

(ECF Nos. 37, 42, 47, 48)

Raymond Alford Bradford ("Plaintiff"), a state prisoner, is appearing *pro se* and *in forma pauperis* in this civil rights action pursuant to 42 U.S.C. § 1983. Currently before the Court is a motion for terminating and evidentiary sanctions against Defendants German, Rimbach, Sao, Spaeth, Ulit and Usher for destruction of Plaintiff's legal property and a motion for a protective order and

preliminary injunction and restraining order.[1]

## I.

## BACKGROUND

Plaintiff filed the complaint in this action on August 22, 2017. (ECF No. 1.) On October 16, 2017, Plaintiff consented to the jurisdiction of the magistrate judge. (ECF No. 8.) On January 18, 2018, Plaintiff's complaint was screened and found not to state any cognizable claims. (ECF No. 9.) Plaintiff was granted leave to file an amended complaint within thirty days. (Id.)

After receiving an extension of time, Plaintiff filed a first amended complaint on April 9, 2018. (ECF No. 13.) On August 29, 2018, Plaintiff's complaint was screened and [*2] found to state a cognizable claim. (ECF No. 17.) Plaintiff was ordered to either file an amended complaint or notify the court that he was willing to proceed on the claims found to be cognizable in the screening order. (Id.) Plaintiff filed objections to the screening order on September 19, 2018. (ECF No. 18.) On September 21, 2018, findings and recommendations issued recommending that certain claims and defendants be dismissed from the action. (ECF No. 19.) Plaintiff filed objections to the findings and

---

[1] Also pending before the Court is Defendants' motion to dismiss and Plaintiff's motion to strike the motion to dismiss. (ECF Nos. 36, 46.) On February 20, 2020, Plaintiff was granted thirty days to file a renewed motion for leave to file a second amended complaint. (ECF No. 59.) The Court shall address the motion to dismiss and motion to strike once the deadline for Plaintiff to file his renewed motion has passed.

recommendations on October 18, 2018. (ECF No. 20.) On December 4, 2018, District Judge Dale Drozd adopted the findings and recommendations and this matter is proceeding on the first amended complaint against Defendants Usher, Rimbach, German, Ulit, Spaeth, and Sao for violation of the Eighth Amendment based on Plaintiff's allegations related to Valley Fever. (ECF No. 21.)

Based on the first amended complaint, on December 5, 2018, findings and recommendations issued recommending revoking Plaintiff's in forma pauperis status in this matter. (ECF No. 22.) On December 26, 2018, Plaintiff filed objections to the findings and recommendations and a motion for injunctive relief alleging he was under imminent [*3] danger of serious physical injury. (ECF Nos. 23, 24.) On February 5, 2019, findings and recommendations issued recommending that Plaintiff's motion for injunctive relief be denied. (ECF No. 25.) On September 12, 2019, District Judge Drozd declined to adopt the findings and recommendations to revoke Plaintiff's in forma pauperis status and adopted the findings and recommendations denying the motion for a preliminary injunction and temporary restraining order. (ECF No. 29.) On December 4, 2019, Defendants consented to the jurisdiction of the magistrate judge and this case was reassigned to the undersigned for all purposes. (ECF Nos. 34, 35.)

On December 23, 2019, Defendants filed a motion to dismiss Plaintiff's first amended complaint and Plaintiff filed a motion for terminating and evidentiary sanctions. (ECF Nos. 36, 37.) On January 2, 2020, Plaintiff filed a motion for leave to file a second amended complaint and an opposition to the motion to dismiss. (ECF Nos. 38, 39.) On January 9, 2020, Defendants filed a reply to Plaintiff's opposition and an opposition to Plaintiff's motion for sanctions. (ECF Nos. 42, 43.)

On January 21, 2020, Plaintiff filed two motions for summary judgment, [*4] a motion to strike Defendants' motion to dismiss, a request for judicial notice, and a motion for a protective order and preliminary injunction. (ECF Nos. 44-48.) On January 27, 2020, Plaintiff filed six motions for summary judgment, a request for judicial notice, and a motion for leave to file a second amended complaint. (ECF Nos. 49-56.) On January 28, 2020, Defendants filed an opposition to Plaintiff's motions for summary judgment. (ECF No. 57.) On February 20, 2020, Plaintiffs' eight motions for summary judgment were denied as premature and his motion for leave to file a second amended complaint was denied without prejudice for his failure to include the proposed complaint with the motion. (ECF Nos. 58, 59.) Plaintiff was ordered to file a renewed motion for leave to file his amended complaint within thirty days. (ECF No. 59.)

**II**.

**DISCUSSION**

Plaintiff seeks an order excusing him from having to exhaust his administrative remedies and for a settlement conference to be set because prison officials poured feces over three of his boxes of legal and personal property. Plaintiff also seeks a protective order and temporary restraining order to be transferred to the county jail to serve out [*5] the remainder of his sentence.

Plaintiff contends that this legal property was destroyed to keep him from litigating a nonfrivolous claim and that sanctions are justified pursuant to the local rules and the inherent power of the court. Plaintiff alleges that he has been subjected to an ongoing campaign of bad faith and abusive litigation tactics by defendants and prison officials from August 29, 2017 though the date the motion was filed which appears to be an active conspiracy to commit murder and obstruction of justice.

On May 17, 2018, Plaintiff was attacked by prison guards and received a head injury and was charged with two bogus counts of attempted murder. On August 8, 2018; October 6, 2018; and June 5, 2019,

Plaintiff was attacked in retaliation for his filing civil litigation and his legal papers were destroyed by prison officials pouring feces over three boxes of his legal property. Plaintiff seeks sanctions under Rules 37 and 41 of the Federal Rules of Civil Procedure.

Defendants counter that Plaintiff's request for terminating sanctions should be denied because the conduct he complains of cannot be attributed to the defendants in this action, but is the alleged conduct of third parties. Defendants also contend that Plaintiff [*6] has not established that the third parties actually engaged in the conduct that he complains of, and he has failed to demonstrate how the alleged conduct of the third parties frustrated or impeded his ability to bring or maintain this action. Defendants assert that it is clear from the documents attached to Plaintiff's motion that the conduct alleged at occurred at California State Prison-Los Angeles County between May 18, 2018 and January 23, 2019, and that Plaintiff has not been housed at Kern Valley State Prison ("KVSP") since August 29, 2017.

Defendants argue that the claims proceeding in this action are brought against (1) Usher, a Correctional Counselor at KVSP; (2) Rimbach, the Acting Warden at KVSP; (3) Spaeth, a physician at KVSP; (4) Sao, a physician at KVSP; (5) German, a RN at KVSP; and (6) Ulit, a physician at KVSP and none of these defendants are alleged to have been employed as a prison guard, or in any other capacity at California State Prison-Los Angeles County. Defendants contend that since there are no allegations that the defendants in this action engaged in the misconduct alleged but by some employee at another prison who is not a party to this action sanctions [*7] would be inappropriate in this action.

Further, Defendants contend there is no authority that would permit the court to impose sanctions based on the acts of third parties.

## A. Plaintiff's Motion for Sanctions

"Three primary sources of authority enable courts to sanction parties or their lawyers for improper conduct: (1) Federal Rule of Civil Procedure 11, which applies to signed writings filed with the court, (2) 28 U.S.C. § 1927, which is aimed at penalizing conduct that unreasonably and vexatiously multiplies the proceedings, and (3) the court's inherent power." Fink v. Gomez, 239 F.3d 989, 991 (9th Cir. 2001). Plaintiff seeks terminating or evidentiary sanctions pursuant to Rules 37 and 41 of the Federal Rules of Civil Procedure, Rule 110 of the Local Rules of the Eastern District of California, and the inherent power of the court.

Rule 37 of the Federal Rules of Civil Procedures provides for sanctions for the failure to make discovery disclosures or to cooperate in discovery. Upon finding a violation of the discovery rules, a court may "bar the disobedient party from introducing certain evidence, or it may direct that certain facts shall be 'taken to be established for the purposes of the action. . . .' Roadway Exp., Inc. v. Piper, 447 U.S. 752, 763, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980). Rule 37 also permits the court to issue sanctions such as striking claims from the pleadings or to dismiss the action or issue a judgment by default against the disobedient party. [*8] Roadway Exp., Inc., 447 U.S. at 763. Plaintiff has not alleged the defendants nor any other person has failed to cooperate in discovery or failed to make discovery disclosures in this action. The Court finds no basis for sanctions to issue under Rule 37.

A court may dismiss an action under Rule 41 where "the plaintiff fails to prosecute or to comply with these rules or a court order." Fed. R. Civ. P 41(b). Similarly, Local Rule 110 provides that "[f]ailure of counsel or of a party to comply with these Rules or with any order of the Court may be grounds for imposition by the Court of any and all sanctions . . . within the inherent power of the Court." However, Plaintiff has not set forth any Rule or order of the Court that has been violated by the conduct alleged. Plaintiff has not demonstrated that sanctions would be appropriate under Rule 41 or Local Rule 110.

Additionally, the court possesses inherent authority to impose sanctions to manage its own affairs so as to achieve the orderly and expeditious disposition of cases. Chambers v. NASCO, Inc., 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). The court's inherent power is that which is necessary to the exercise of all others, including to protect the due and orderly administration of justice and maintain the authority and dignity of the court. Roadway Exp., Inc., 447 U.S. at 764. This inherent power is to "be exercised with restraint and **[*9]** discretion." Id.; F.J. Hanshaw Enterprises, Inc. v. Emerald River Dev., Inc., 244 F.3d 1128, 1137 (9th Cir. 2001). Sanctions may be issued under the court's inherent power where the court finds that a party acted in "willful disobedience of a court order ... or when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons....". Fink, 239 F.3d at 994 (quoting Roadway Exp., 447 U.S. at 766). The district court's inherent authority to impose sanctions for bad faith includes a broad range of willful improper conduct. Fink, 239 F.3d at 992; B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1108 (9th Cir. 2002), as amended (Feb. 20, 2002).

This inherent power provides courts with the ability to punish conduct not only within their confines but beyond, regardless of whether that conduct interfered with trial. F.J. Hanshaw Enterprises, Inc., 244 F.3d at 1136. In exercising its inherent power, the court can dismiss a case in its entirety, bar witnesses, award attorney's fees and assess fines. Id. The Ninth Circuit has not decided the burden of proof required for an award of sanctions, but has held that clear and convincing evidence of bad faith will suffice. Lahiri v. Universal Music & Video Distribution Corp., 606 F.3d 1216, 1219 (9th Cir. 2010); In re Lehtinen, 564 F.3d 1052, 1061 n.4 (9th Cir. 2009).

Here, it is clear from Plaintiff's motions that the misconduct he alleges occurred did not take place at KVSP and cannot be attributed to any action by any defendant named in this action. Plaintiff submits his appeal regarding his paperwork being

covered in feces. (ECF No. 37 at 13-14.) **[*10]** The appeal response and the attached medical records demonstrate that the incident occurred at California State Prison-Los Angeles. (Id. at 13, 14, 15.) The appeal states that Plaintiff's property was inventoried on October 6, 2018, by Officer R. Monteon after Plaintiff was admitted to a mental crisis bed in the Correctional Treatment Center. (Id. at 13.) The property was soiled with feces all over it and it was placed in three boxes that were taken to Receiving and Release. (Id.) On this date, Plaintiff's cell was recorded to have contained fecal matter in various areas. The team assigned to clean the cell had to wear protective gear due to the amount of fecal matter that had been smeared in the cell. (Third Level Appeal Decision, ECF No. 37 at 12.) Correctional Officer Miranda reported that Plaintiff had smeared feces all over his cell, including his mattress and his property. (Id.)

Plaintiff also attaches a medical record from May 17, 2018 from R.J. Donovan Correctional Center which states that Plaintiff said, "I stabbed an inmate." (ECF 37 at 16.) Further, the documents in support of his protective order all concern events that occurred at the R.J. Donovan Correctional Center or California State Prison-Los **[*11]** Angeles. (See ECF No. 47.)

Plaintiff has not presented any evidence that the defendants named in this action were involved in or instigated the incidents alleged in Plaintiff's motions. The Court notes that the defendants in this action are a correctional counselor, an acting warden, a nurse, and physicians at KVSP. Plaintiff's motion merely contains conclusory allegations that Defendants engaged in an active conspiracy to commit murder and obstruct justice. However, there are no allegations by which the Court could reasonably infer that there is an ongoing conspiracy and Plaintiff has presented no evidence of such a conspiracy.

Here, the evidence attached to Plaintiff's complaint suggests that Plaintiff smeared feces over his cell and his property was also contaminated as a result.

Plaintiff has presented no evidence that any prison official "poured feces" over his three boxes of property or that any defendant in this action was involved in the incident. Further, Plaintiff contends that prison officials continually lie about beating him up, but again there is no evidence that any defendant in this action engaged in such conduct or that the conduct alleged in the motion can be attributed [**12**] to any defendant. Plaintiff has failed to show by clear and convincing evidence that the defendants have engaged in bad faith conduct or conduct tantamount to bad faith.

The Ninth Circuit has held that there are some situations in which the district court does have the authority to sanction a nonparty under its inherent authority to curb abusive litigation practices. Corder v. Howard Johnson & Co., 53 F.3d 225, 232 (9th Cir. 1994); see In re Rainbow Magazine, Inc., 77 F.3d 278, 282 (9th Cir. 1996) (sanction imposed against a nonparty for filing false statement); David v. Hooker, Ltd., 560 F.2d 412, 421 (9th Cir. 1977) (sanctions against sole officer of corporation for failing to respond to discovery requests); see also Manez v. Bridgestone Firestone N. Am. Tire, LLC, 533 F.3d 578, 585 (7th Cir. 2008) ("No matter who allegedly commits a fraud on the court—a party, an attorney, or a nonparty witness—the court has the inherent power to conduct proceedings to investigate that allegation and, if it is proven, to punish that conduct."). However, Plaintiff is not seeking sanctions against the non-parties nor has he presented evidence that the action of any non-party constituted an abusive litigation practice in the current action.

Plaintiff's motion for terminating or evidentiary sanctions is denied.

## B. Motion for a Protective Order and Preliminary Injunction

Plaintiff contends that he has filed several motions of a protective order that [**13**] contain evidentiary support that prison officials have conspired to commit murder and obstruct justice, but his motions for a preliminary injunction have been denied by both this court and the Central District of California. He alleges that prison officials continue to destroy his legal property and beat him up and he seeks an order transferring him to the custody of the county jail to complete his prison term.

The purpose of a temporary restraining order or a preliminary injunction is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the court to intervene to secure the positions until the merits of the action are ultimately determined. University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S. Ct. 1830, 68 L. Ed. 2d 175 (1981). "A plaintiff seeking a preliminary injunction [or temporary restraining order] must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." [**14**] Mazurek v. Armstrong, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (quotations and citations omitted) (emphasis in original).

Federal courts are courts of limited jurisdiction and in considering a request for preliminary injunctive relief, the Court is bound by the requirement that as a preliminary matter, it have before it an actual case or controversy. City of Los Angeles v. Lyons, 461 U.S. 95, 102, 103 S. Ct. 1660, 75 L. Ed. 2d 675 (1983); Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 471, 102 S. Ct. 752, 70 L. Ed. 2d 700 (1982). Requests for prospective relief are further limited by 18 U.S.C. § 3626(a)(1)(A) of the Prison Litigation Reform Act, which requires that the Court find the "relief [sought] is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least

intrusive means necessary to correct the violation of the Federal right."

In his present motion, Plaintiff contends that since August 29, 2017, he has continually been attacked by prison guards at each and every prison in which he has been housed because he has filed a nonfrivolous lawsuit against the defendants in this action. Plaintiff states that his legal property was soiled with feces when he was housed at California State Prison-Los Angeles County. Plaintiff was framed for two attempted murders and prison guards ordered a hit on Plaintiff. When inmate Cornett tried to ambush Plaintiff, he was stabbed in self-defense and after Plaintiff **[*15]** surrendered his weapon, the guard stabbed himself with Plaintiff's weapon to justify Plaintiff's injuries. Further, as previously discussed, all the exhibits attached to Plaintiff's motion reference incidents that occurred at the R.J. Donovan Correctional Facility or at California State Prison-Los Angeles County. Plaintiff attaches a third level appeal decision regarding his appeal in which Plaintiff grieved that on November 21, 2017, he was threatened with being written up because one of the guards believed that he was using his pill pass to roam the yard in his wheelchair. Plaintiff sought to be able to pick up his pills without being assaulted. (Third Level Appeal Decision, ECF No. 47 at 5.)

Plaintiff also includes a declaration from P. Bracamonte, facility captain at the R.J. Donovan Correctional Facility, stating that on May 17, 2018, Plaintiff was discovered to have an inmate manufactured weapon in his hand, and that Plaintiff charged toward a correctional officer and lunged forward striking the officer with the weapon. (Decl. of P. Bracamonte, ECF No. 47 at 9-10.) Also included is the rules violation report from the officer regarding the alleged attack by Plaintiff and a rules **[*16]** violation report stating that during the investigation into the attack Plaintiff admitted to stabbing inmate Cornett on this same date. (Rules Violation Report, ECF No. 47 at 11-13.)

There are also medical reports attached: two

October 6, 2018 report from California State Prison-Los Angeles County in which Plaintiff states that he was beat up by the guards and describes his injuries; and a May 5, 2018 report from R.J Donovan Correctional Facility in which Plaintiff states that he stabbed an inmate. (ECF No. 47 at 14-16.)

This action is proceeding on Plaintiff's claim against defendants Usher, Rimbach, German, Ulit, Spaeth, and Sao for violation of the Eighth Amendment, based on Plaintiff's allegations related to Valley Fever while housed at Kern Valley State Prison. (ECF No. 21.) As Plaintiff has previously been advised in the February 5, 2019 findings and recommendations issued by this Court, the pendency of this case does not provide Plaintiff with standing to seek relief directed at remedying his current conditions of confinement, which are occurring at a different prison and which involve different prison employees. Summers v. Earth Island Institute, 555 U.S. 488, 493, 129 S. Ct. 1142, 173 L. Ed. 2d 1 (2009) (citation omitted); Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992); Mayfield v. United States, 599 F.3d 964, 969 (9th Cir. 2010). Plaintiff is not entitled to any relief that is not narrowly **[*17]** drawn to correct the violation of his rights at issue in this action.

The equitable relief requested herein, transfer to the county jail, is not sufficiently related to Plaintiff's underlying legal claims to satisfy the jurisdictional requirements that apply to federal courts. Moreover, Plaintiff may not seek injunctive relief against an individual who is not a party to the instant action. "A federal court may issue an injunction if it has personal jurisdiction over the parties and subject matter jurisdiction over the claim; it may not attempt to determine the rights of persons not before the court." Zepeda v. United States Immigration Service, 753 F.2d 719, 727 (9th Cir. 1985) (emphasis added).

Here, the Court does not have jurisdiction over any parties at the California State Prison, Sacramento

where Plaintiff is currently housed. Moreover, even if the Court did have jurisdiction over those individuals, Plaintiff has failed to establish the imminent irreparable harm required to support a preliminary injunction. Plaintiff alleges only violations of the law in the past, and he has failed to establish that there is a threat of future or repeated injury that is both "real and immediate," not just "conjectural" or "hypothetical." <u>Lyons</u>, , 461 U.S. at 102.

For these reasons, Plaintiff's request **[*18]** for injunctive relief is denied.

**III**.

**CONCLUSION AND ORDER**

For the reasons discussed, Plaintiff has failed to establish that evidentiary or terminating sanctions would be appropriate in this matter. Further, the Court does not have jurisdiction to order the injunctive relief sought by Plaintiff in this action, the remedy he seeks is not narrowly tailored to address the claims at issue in this action, and he has not established that there is a threat of harm that is more than just conjectural or hypothetical.

Accordingly, IT IS HEREBY ORDERED that:
    1. Plaintiff's motion for terminating and evidentiary sanctions, filed December 23, 2019, is DENIED; and
    2. Plaintiff's motion for a protective order and preliminary injunction is DENIED.

IT IS SO ORDERED.

Dated: **April 7, 2020**

/s/ Stanley A. Boone

UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 2

# Cityview at Riverwalk, LLC v. Knoxville Cmty. Dev. Corp.

United States District Court for the Eastern District of Tennessee

November 4, 2011, Filed

No. 3:11-CV-050

**Reporter**
2011 U.S. Dist. LEXIS 127883 *; 2011 WL 5358716

CITYVIEW AT RIVERWALK, LLC and FOCUS DEVELOPMENT, INC., Plaintiffs, v. KNOXVILLE COMMUNITY DEVELOPMENT CORPORATION and THE CITY OF KNOXVILLE, TENNESSEE, Defendants.

**Counsel:** **[*1]** For Cityview at Riverwalk, LLC, Focus Development, Inc, Plaintiffs: Mark S Kaufman, PRO HAC VICE, McKenna Long & Aldridge, Atlanta, GA; Suneel C Gupta, McKenna Long & Aldridge LLP, Atlanta, GA.

For Knoxville Community Development Corporation, The City of Knoxville, Tennessee, Defendants: Andrew L Colocotronis, LEAD ATTORNEY, Wesley Edward Shipe, Wagner, Myers & Sanger, PC, Knoxville, TN.

**Judges:** Leon Jordan, United States District Judge.

**Opinion by:** Leon Jordan

# Opinion

## MEMORANDUM OPINION

Four motions are currently before the court: defendants' partial motion for dismissal and for attorney fees [doc. 14]; plaintiffs' motion for attorney fees [doc. 18]; plaintiffs' motion for a hearing [doc. 19]; and defendants' motion for extension of time to file a response [doc. 22]. The motions have been fully briefed [docs. 15, 17, 20, 23-27] and are ripe for the court's consideration.

Because the court finds that oral argument is unnecessary, plaintiffs' motion for a hearing will be denied. Defendants' motion for extension of time will be granted for the reasons provided therein. For the grounds stated in this memorandum opinion, plaintiffs' motion for attorney fees will be denied, and defendants' partial motion for dismissal and **[*2]** attorney fees will be granted in part and denied in part.

I.

### Applicable Legal Standards

The Federal Rules of Civil Procedure authorize dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Fed. R. Civ. P. 8(a)). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' . . . A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing and quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).

II.

### Background

Defendant Knoxville [sic] Community Development Corporation ("KCDC") is a housing

and redevelopment authority of defendant City of Knoxville, Tennessee.[1] Plaintiffs Cityview at Riverwalk, LLC and Focus Development, Inc. are identified in the complaint as affiliated entities sharing some common **[*3]** ownership. Although every party in this case was not a signatory to every document now at issue, for ease of reference the court will herein simply employ the terms "plaintiffs," "defendants," and "the parties."

Under a Development and Financing Agreement ("TIF Agreement"), plaintiffs contracted to be the developer of defendants' Old Knoxville Glove Factory Redevelopment and Urban Renewal Plan ("the Plan"). The TIF Agreement required plaintiffs to obtain one or more performance bonds. However, by further agreement of the parties, plaintiffs instead provided an irrevocable letter of credit.

The parties also executed a Performance and Indemnity Agreement ("P&I Agreement"). That contract in material part set forth specific conditions of default, notice, and cure.

The defendants eventually terminated plaintiffs as developer of the Plan. According to the complaint, that termination resulted from defendants' breach of the P&I Agreement's default, notice, and cure provisions. The complaint further alleges that defendants wrongfully drew upon, and then misapplied, the full face amount of the letter of credit.

III.

*Analysis*

The **[*4]** complaint contains seven counts, two of which are labeled "Count VI." By their partial motion to dismiss, defendants argue that only Count V states a claim upon which relief can be granted. Among the theories raised by the defense are standing and statute of limitations issues under

Chapter 5 of the Uniform Commercial Code ("UCC"). *See* Tenn. Code Ann. §§ 47-5-101-118. If successful on UCC grounds, defendants further argue that they will be due attorney fees as a "prevailing party." *See* Tenn. Code Ann. § 47-5-111(e). Conversely, plaintiffs contend that *they* are entitled to attorney fees for having to respond to a "patently frivolous motion to dismiss."

A. Count III

Before turning to the issues discussed immediately above, the court will address Count III of the complaint. That count is captioned "Conversion" but additionally seeks damages for defendants' purported violation of a state criminal statute. *See* Tenn. Code. Ann. § 39-14-103(a) ("A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent."). Plaintiffs offer no explanation how the defendants can **[*5]** be found civilly liable to them for violating a state theft statute. The claim is frivolous and warrants no further attention from the court.

As for the conversion claim, plaintiffs' complaint does not state that this count is brought under Tennessee's Governmental Tort Liability Act ("GTLA"), "but such Act is the only authority for this action . . ., hence it must be considered the basis of this action." *Gentry v. Cookeville Gen. Hosp.*, 734 S.W.2d 337, 339 (Tenn. Ct. App. 1987). The GTLA provides that, with limited exceptions set forth at sections 29-20-202 through 205, "all governmental entities shall be immune from suit for any injury which may result from the activities of such governmental entities . . . engaged in the exercise and discharge of any of their functions, governmental or proprietary." Tenn. Code Ann. § 29-20-201(a).[2] Section 29-20-205 of the GTLA lists a number of torts, both negligent and intentional, for which immunity is not waived. Conversion is not on that list.

---

[1] KCDC's actual name is "Knoxville's Community Development Corporation."

[2] The defendants are "governmental entities" for purposes of the GTLA. *See* Tenn. Code Ann. § 29-20-102(3)(A).

The defendants are therefore potentially subject to suit for conversion, but that is not the end **[*6]** of the story. A claim against a governmental entity under § 29-20-205

> must overtly allege that the tort was committed by an employee or employees of the governmental entity within the scope of his or their employment. A complaint which does not so state does not state a claim for which relief can be granted because the action is not alleged to be within the class of cases excepted by the statute from governmental immunity.

*Gentry*, 734 S.W.2d at 339. The court has reviewed plaintiffs' complaint and is satisfied that Count III should be dismissed due to plaintiffs' failure to state a claim upon which relief can be granted. The complaint does not "overtly allege that the tort was committed by an employee or employees of the governmental entity within the scope of his or their employment." *Id.* Accordingly, the complaint "does not state a claim for which relief can be granted because the action is not alleged to be within the class of cases excepted by the statute from governmental immunity." *Id.*

## B. UCC Chapter 5

The defendants argue that all counts other than Count V are merely a suit on the letter of credit, for which the plaintiffs lack standing under the UCC and for which the UCC's one-year **[*7]** statute of limitations has run. The defendants are incorrect.

Each of the disputed counts mentions the letter of credit. It is, however, apparent from a reading of those counts and the complaint as a whole that the plaintiffs are ultimately suing for breach of the underlying P&I Agreement. While Chapter 5 of the UCC could arguably bar suit by the plaintiffs on the letter of credit, Chapter 5 "does not address claims respecting the underlying contract." *Demczyk v. Mut. Life Ins. Co. of N.Y. (In re Graham Square, Inc.)*, 126 F.3d 823, 827-28 (6th Cir. 1997). "It is one thing to attempt to prevent the distribution of the proceeds of a letter of credit, an attempt the doctrine of independence is designed to prevent;

but it is quite another to bring an action on the underlying contract that created the letter of credit." *Id.* at 829. "Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it . . . ." Tenn. Code Ann. § 47-5-103(d).

This is not a suit on the letter of credit. This is a suit on the **[*8]** P&I Agreement. Therefore, with the exception of the dismissal of Count III as addressed above, defendants' partial motion to dismiss will be denied. Further, because the defendants are not entitled to dismissal under Chapter 5 of the UCC, their claim for attorney fees similarly fails.

## C. Plaintiffs' Motion for Attorney Fees

Plaintiffs' attorney fee motion does not explain the purported basis for that request. Instead, the filing directs the court to plaintiff's dispositive motion response "for their arguments that form the basis of the instant Motion." Turning then to plaintiffs' dispositive motion briefing, one finds the argument that this court can bypass Rule 11 of the Federal Rules of Civil Procedure and instead sanction the defense under the court's inherent powers. Plaintiffs accuse the defendants of acting "vexatiously" and "for oppressive reasons" by filing the motion for partial dismissal in an attempt to "obfuscate a straightforward breach of contract dispute . . . ."

The court will first note the obvious - the defendants have been partially successful with their motion to dismiss. The instant complaint in part seeks damages from a governmental entity for that entity's alleged **[*9]** violation *of a criminal statute.* The instant complaint seeks damages in tort but did not satisfy the GTLA's pleading requirements. It should therefore come as no surprise to the plaintiffs that their complaint was responded to in the form of a motion to dismiss.

It is next noted that the court's inherent powers "must be exercised with restraint and discretion."

*See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). When there is alleged bad-faith conduct that can adequately be addressed by Rule 11, the court and the parties should ordinarily rely on that rule instead of the court's inherent powers. *See id.* at 50. Plaintiffs' theory - that the instant motion to dismiss is frivolous and has been filed for an improper purpose - is well-covered by Rule 11. The facts of the present case do not *approach* the persistent and egregious conduct found in *Chambers* and the other case relied on by plaintiffs, *Stalley v. Mountain States Health Alliance*, Nos. 2:06-CV-216, 2:06-CV217, 2008 U.S. Dist. LEXIS 109136, 2008 WL 5459750 (E.D. Tenn. Sept. 23, 2008). Plaintiffs' request for attorney fees under the court's inherent powers will be denied.

Next, even if the court were to construe plaintiffs' request as a Rule 11 motion, plaintiffs **[*10]** did not comply with the safe harbor provision of Rule 11(c)(2). For that additional reason, the motion would be denied. *See, e.g., First Bank of Marietta v. Hartford Underwriters Ins.*, 307 F.3d 501, 510-11 (6th Cir. 2002)

Lastly, the court notes plaintiffs' alternative theory that they are entitled to attorney fees as a "prevailing party" under paragraph 35 of the TIF Agreement. That paragraph states, "The prevailing party in any action commenced due to a breach of this Agreement shall be entitled to receive from the other party reasonable attorneys' fees and court cost incurred in such action." Plaintiffs's argument is without merit. This litigation has not concluded, and neither the plaintiffs nor the defendants have attained "prevailing party" status at this time.

An order consistent with this opinion will be entered.

ENTER:

/s/ Leon Jordan

United States District Judge

---

**End of Document**

# EXHIBIT 3

# Country Inns & Suites by Carlson, Inc. v. Gokul Mgmt.

United States District Court for the District of New Jersey

August 13, 2007, Decided; August 14, 2007, Filed

Civil Action No. 07-2044 (DRD)

**Reporter**
2007 U.S. Dist. LEXIS 59407 *; 2007 WL 2362605

Country Inns & Suites By Carlson, Inc., a Minnesota Corporation, Plaintiff, v. Gokul Management, Inc., a New Jersey Corporation; Divyakant Patel, a New Jersey Resident; Rose Hotels, Ltd., a New Jersey Company; and Jitendra Lodhia, a New Jersey Resident, Defendants, v. Gary S. Pasricha, Esq., Third Party Defendant.

**Notice:** NOT FOR PUBLICATION

**Counsel:** [*1] Dennis R. LaFiura, Esq., Day Pitney, LLP, Morristown, NJ, Attorney for Plaintiff, Country Inns & Suites by Carlson.

Lauren R. Staiger, Esq., Paul Robert Rizzo, Esq., DeFrancesco Batemen Coley Yospin Davis & Lehrer PC, Warren, NJ, Attorneys for Defendants, Gokul Management, Inc. and Divyakant Patel.

Clement Chien Ming Chang, Esq., Pasricha & Patel, LLC, Edison, NJ, Attorney for Defendants, Rose Hotels, Ltd., Jitendra Lodhia and Gary S. Pasricha, Esq.

**Judges:** Dickinson R. Debevoise, U.S.S.D.J.

**Opinion by:** Dickinson R. Debevoise

# Opinion

DEBEVOISE, United States Senior District Judge

Gokul Management, Inc. ("GMI") and Divyakant Patel ("Patel"), defendants in an action filed by Country Inns & Suites by Carlson ("Carlson"), filed a Third Party Complaint against Gary S. Pasricha, Esq. ("Pasricha"). Pasricha moves, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Third Party

Complaint against him for failure to state a cause of action upon which relief may be granted, asserting that the Third Party Plaintiffs have not pleaded facts sufficient to constitute a cause of action against him for negligence and breach of fiduciary duty. Pasricha also moves, pursuant to Fed. R. Civ. P. 11(b), for sanctions against Paul Robert [*2] Rizzo, Esq. ("Rizzo"), attorney for the Third Party Plaintiffs, for filing a frivolous pleading. Pasricha asserts that the Third Party Complaint is a "bizarre legal malpractice claim," that seeks to hold him liable for damages arising from a negotiation between the Third Party Plaintiffs and Rose Hotels, Inc. ("Rose"), in which he represented Rose.

For the reasons cited below, Pasricha's motion to dismiss will be denied and his motion for sanctions will be denied.

## BACKGROUND

The Third Party Plaintiffs sought to construct and license a hotel under the trademark and trade dress of Country Inns & Suites by Carlson, a licensor of guest lodging systems. Patel, as the principal for GMI, entered into a Guaranty of License Agreement ("the Guaranty") with Carlson, which required him to make full and prompt payment to Carlson of all amounts due or payable to Carlson under a license agreement that was yet to be signed. In the event of termination of the Agreement, the Guaranty also required Patel to perform certain post-termination obligations. In June 2004, while the hotel property was still under construction, Carlson, as the franchisor, and GMI, as the franchisee, entered into a fifteen-year [*3] License Agreement ("the Agreement"), which provided, *inter alia,* that GMI could not, and would not,

Exhibit 3, Page 15

transfer the hotel or the Agreement to another party without the consent of Carlson. Carlson claims in its Complaint filed with this Court on May 13, 2004 that, in spite of this prohibition, GMI sold its rights, title, and interest in the hotel to Rose, in approximately May of 2006, without notification to, or the permission of, Carlson.

In the sale of the hotel, Pasricha represented Rose and its principal, Jitendra Lodhia ("Lodhia"), the buyers. Bhavini Tara Shah, Esq. ("Shah") represented the Third Party Plaintiffs, the sellers. Following vigorous negotiations, the parties agreed upon the terms of the sale, and Shah drafted the contract of sale (the "Contract"), which was executed on May 28, 2004. The closing was scheduled for December 2004.

According to the Third Party Plaintiffs' June 21, 2007 Crossclaim against Rose and Lodhia, although Pasricha agreed to submit, and assumed the responsibility to submit, to Carlson the documents to terminate the agreement between Carlson and the Third Party Plaintiffs and to substitute Rose and Lodhia as the franchisees in place of the Third Party **[*4]** Plaintiffs, Pasricha failed to do so. The Third Party Plaintiffs, in Count One of the two-count complaint, cite Pasricha's failure to file the documents with Carlson as negligence because they relied on him to file the documents and he knew that they were relying on him to do so. Because Pasricha previously represented Patel in other matters, the Third Party Plaintiffs also trusted him to represent their best interests in this matter, too and, in Count Two, assert that they considered Pasricha to be a fiduciary who owed them a duty of loyalty, trust and good faith. When Pasricha failed to effectuate the proper termination of the Agreement, they argued that he breached his fiduciary duty to them, causing them to suffer damages.

Pasricha moves to dismiss the Third Party Complaint claiming that the Third Party Plaintiffs have failed to state a claim upon which relief may be granted by the Court. Pasricha denies the charge

of negligence. He asserts that the injury to the Third Party Plaintiffs was caused by their own failure to provide a replacement franchisee prior to terminating their Agreement with Carlson, not his failure to deliver the documents to Carlson. Thus, he argues that, even **[*5]** if he were responsible for delivering the documents and failed to do so, his failure was irrelevant because the Third Party Plaintiffs had already caused the damages themselves. Pasricha also denies owing a fiduciary duty to the Third Party Plaintiffs. He argues that in this matter the Third Party Plaintiffs were represented by their own attorney who was responsible for effectuating the proper termination of the Agreement and to protect their interests, and that he represented parties adverse to the interests of the Third Party Plaintiffs, making the Third Party Plaintiffs' reliance on him "necessarily misplaced."

DISCUSSION

The issue before the Court is, not whether the Third Party Plaintiffs will ultimately prevail, but whether the Third Party Plaintiffs' Complaint sufficiently states a cause of action for negligence and breach of fiduciary duty. Here, viewing the Third Party Complaint in the light most favorable to the Third Party Plaintiffs, the Third Party Plaintiffs have pleaded their cause of action sufficiently to withstand dismissal under Fed. R. Civ. P. 12(b)(6).

Pleading Requirements

Federal Rule of Civil Procedure 8(a)(2) provides that pleadings setting forth claims for relief **[*6]** must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." To satisfy the pleading requirements set forth in Rule 8, a complaint need only establish a basis for judgment against the defendant. *Thomas v. Independence Twp.,* 463 F.3d 285, 295 (3d Cir. 2006). Generally, this requires the plaintiff to put the defendant on notice of the claims filed against him, thereby making it possible for the defendant to formulate a response. *See Klaitz v. New Jersey,* 2006 U.S. Dist. LEXIS 46650, 2006 WL 1843115,

*5 (D.N.J. June 30, 2006).

Standard of Review Under Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law. *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) (citation omitted). When considering a 12(b)(6) motion, the Court must accept as true all allegations in the Complaint, and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff. *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997). "The inquiry is not whether plaintiffs will ultimately prevail in a trial on the merits, but whether they should be afforded **[*7]** an opportunity to offer evidence in support of their claims." *In re Rockefeller Center Prop., Inc.,* 311 F.3d 198, 215 (3d Cir. 2002). The Supreme Court recently clarified the Rule 12(b)(6) standard in *Bell Atlantic Corporation v. Twombly.,* 127 S.Ct. 1955, 167 L. Ed. 2d 929 (2007). Abrogating the standard established in *Conley v. Gibson,* 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80, (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim, which would entitle him to relief," the Supreme Court now instructs that "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic,* 127 S.Ct at 1965.

Although a court generally looks only to the alleged facts to determine whether dismissal is merited, "[t]o resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.,* 181 F.3d 410, 426 (3d Cir. 1999). Here, in addition to the facts alleged in the Third Party Complaint and its exhibits, the Court will also consider the May 1, **[*8]** 2007 action filed by Carlson against GMI, Patel, Rose and Lodhia and the June 21, 2007

Crossclaim filed by GMI and Patel against Rose and Lodhia.

The Existence of a Duty

The New Jersey Superior Court Appellate Division has determined that "there is authority for the proposition . . . that an attorney owes a fiduciary duty to persons, though not strictly clients, who the attorney knows or should know would rely on the attorney in his or her professional capacity," although "[t]he traditional rule . . . has been that only a client can assert a cause of action against the attorney for professional negligence or malpractice." *See Petrillo v. Bachenberg* 263 N.J.Super. 472, 483-484, 623 A.2d 272 (App. Div. 1993) (citations omitted). *See also Carino v. Stefan,* 376 F.3d 156 (3d Cir. 2004) (under New Jersey law a lawyer's duty may run to third parties who foreseeably rely on the lawyer's opinion or other legal services).

Federal Rule of Civil Procedure 8 requires only that a "short and plain statement of the claim showing that the pleader is entitled to relief . . . ." "[S]uch a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *See Bell Atlantic,* 127 S.Ct. at 1965.

In **[*9]** this 12(b)(6) motion, the Count accepts as true the Third Party Plaintiffs' allegations that they relied upon Pasricha to submit their Termination Agreement and Rose's licensing agreement to Carlson, and he knew they were relying upon him to do so, but he did not do so, and, as a result of his failure, they are liable to Carlson for liquidated damages in the amount of $ 241,394.08.

The allegations of the complaint are supported by the exhibit dated January 11, 2005 from Andi Putnam of Carlson Hotels Worldwide to Patel at Gokul Management which reads in part, "Enclosed is the Termination Agreement . . . for your review . . . . [I]f it meets with your approval, sign it and return both executed copies to my attention. I will then present the agreement to Carlson together with the License Agreement for the new owner for

Carlson's signature and return to you one full-executed copy." Thus, it appears that the return of the Termination Agreement by the Third Party Plaintiffs to Carlson was a condition precedent for Carlson to accept Rose as the new franchisee. Thus, Pasricha's failure to remit the Termination Agreement to Carlson on behalf of the Third Party Plaintiffs would have prevented **[\*10]** conclusion of any other licensing agreement that would have, or could have, been made. For the purposes of the motion to dismiss, the Court need not consider whether the Third Party Plaintiffs can ultimately prevail against Pasricha.

Even though the Third Party Plaintiffs were represented by their own counsel, and not by Pasricha, in this particular action, under New Jersey law, an attorney owes a duty to a non-client where the attorney know or should have known that the non-client was relying on the attorney in his professional capacity. Here, the Third Party Plaintiffs' Complaint states that they relied on Pasricha's representation that he would remit the Termination Agreement to Carlson on their behalf and he failed to do so. Thus, the Third Party Plaintiffs' Complaint against Pasricha has pleaded facts sufficient to withstand dismissal by apprising Pasricha of their claims against him. The New Jersey law provides the ground upon which those claims rest. The Third Party Complaint will not be dismissed at this time.

Pasricha's Motion for Rule 11 Sanctions

In a separate motion, Pasricha alleges that the Third Party Complaint is "frivolous, without legal basis and brought solely to harass", **[\*11]** and Pasricha seeks Rule 11 sanctions against the attorney for the Third Party Plaintiffs on the ground that he acted unreasonably in filing the Complaint.

The Federal Rules of Civil Procedure in Rule 11(b), Representations to Court, provide that:

> [b]y presenting to the court (whether by signing, filing, submitting, or later advocating) a pleading, written motion, or other paper, an attorney or unrepresented party is certifying

that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances … [that] (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law . . . .

In the Third Circuit, "the legal standard to be applied when evaluating conduct allegedly violative of Rule 11 is reasonableness under the circumstances." *Ford Motor Co. v. Summit Motor Prod., Inc.,* 930 F.2d 277, 289 (3d Cir. 1991) (citations omitted). Reasonableness in the context of a Rule 11 inquiry has been defined as "an objective knowledge or belief at the time of the filing of a challenged paper that the **[\*12]** claim was well grounded in law and fact." *Id.* "Generally, sanctions are prescribed only in the exceptional circumstance where a claim or motion is patently unmeritorious or frivolous." *Id.* At this early stage of the litigation, it does not appear that the Third Party Complaint is "patently unmeritorious." The Third Party Plaintiffs have pleaded sufficient facts and there is a basis in law to defeat the motion to dismiss. Thus, Pasricha's motion for Rule 11 sanctions is denied.

CONCLUSION

The Third Party Plaintiffs have pleaded sufficient facts and law sufficient to withstand Pasricha's 12(b)(6) motion to dismiss and, therefore, his motion will be denied. Because, at this early stage of the litigation, Pasricha has not shown the Third Party Complaint to be patently unmeritorious, Pasricha's motion for sanctions, made pursuant to Fed. R. Civ. P 11, will also be denied. An appropriate order follows.

/s/ Dickinson R. Debevoise, U.S.S.D.J.

Dated: August 13, 2007

---

**End of Document**

# EXHIBIT 4

# Gomes v. Am. Century Cos.

United States District Court for the Eastern District of California

May 14, 2010, Decided

NO. 2:09-cv-02153-FCD/KJM

**Reporter**

2010 U.S. Dist. LEXIS 57400 *; 2010 WL 1980201

NELSON GOMES, individually, derivatively and on behalf of all others similarly situated, Plaintiff, v. AMERICAN CENTURY COMPANIES, INC.; AMERICAN CENTURY GLOBAL INVESTMENT MANAGEMENT, INC.; JAMES E. STOWERS, JR.; JAMES E. STOWERS, III; JONATHAN S. THOMAS; THOMAS A. BROWN; ANDREA C. HALL; DONALD H. PRATT; GALE E. SAYERS; M. JEANNINE STRANDJORD; TIMOTHY S. WEBSTER; WILLIAM M. LYONS; ENRIQUE CHAN; MARK KOPINSKI; and BRIAN BRADY, Defendants, AMERICAN CENTURY WORLD MUTUAL FUNDS, INC., doing business as AMERICAN CENTURY INTERNATIONAL DISCOVERY FUND, Nominal Defendant.

**Counsel:** **[\*1]** For Nelson Gomes, Plaintiff: Crystal Gayle Howard, LEAD ATTORNEY, Simmons Cooper LLC, El Segundo, CA; Thomas I. Sheridan, III, PHV, LEAD ATTORNEY, PRO HAC VICE, Hanly Conroy Bierstein Sheridan Fisher & Hayes, LLP, New York, NY.

For American Century Companies, Inc., American Century World Mutual Funds, Inc., Doing business as American Century International Discovery Fund, Brian Brady, Mark Kopinski, Enrique Chan, William M. Lyons, Timothy S. Webster, M. Jeannine Strandjord, Gale E. Sayers, Donald H. Pratt, Andrea C. Hall, Thomas A. Brown, Jonathan S. Thomas, James E. Stowers, III, James E. Stowers, Jr., American Century Global Investment Management, Inc., Defendants: Gordon C. Atkinson, LEAD ATTORNEY, Benjamin Hansel Kleine, Cooley Godward Kronish, LLP, San Francisco, CA.

**Judges:** FRANK C. DAMRELL, JR., UNITED STATES DISTRICT JUDGE.

**Opinion by:** FRANK C. DAMRELL, JR.

# Opinion

MEMORANDUM AND ORDER

This matter is before the court on defendants' motion for sanctions against plaintiff's counsel under Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the courts inherent authority. For the reasons set forth below, [1] defendants' motion is DENIED. [2]

**BACKGROUND**

On August 4, 2009, Nelson Gomes ("plaintiff") initiated this action by filing a complaint that based venue on 28 U.S.C. § 1391 and 18 U.S.C. § 1965, the Racketeer Influenced and Corrupt Organizations Act's ("RICO") venue provision. ("Pl.'s Compl. ["Compl."], filed Aug. 4, 2009 [Docket # 2], P 29.) Plaintiff asserted claims for violation of RICO, breach of fiduciary duty, negligence, and waste. (Id. P 5.) Plaintiff alleges that defendants, American Century World Mutual

---

[1] Because oral argument will not be of material assistance, the court orders **[\*2]** this matter submitted on the briefs. E.D. Cal. L.R. 230(g).

[2] In defendants' reply brief they move to strike plaintiff's opposition as being beyond the 20 page limit on opposition papers. Defendants' motion is DENIED.

Funds, Inc., its parent companies, directors, and officers, engaged in a pattern of racketeering activity by allowing a mutual fund, which plaintiff had invested in, to invest money in an illegal gambling business. (Id. P 3.) When law enforcement officials began enforcement proceedings against the illegal gambling business, the market value of plaintiff's mutual fund investment declined. (Id.)

On November 10, 2009, defendants filed a motion to transfer venue. (Defs.' Mtn. to Transfer Venue, filed Nov. **[*3]** 10, 2009 [Docket # 11].) Defendants sought transfer to the Southern District of New York, where similar recent disputes between some of the same defendants and plaintiff's counsel had been litigated and decided in defendants' favor. (Defs.' Mem. in Support of Mtn. to Transfer Venue ["Defs.' Venue Motion"], filed Nov. 10, 2009 [Docket # 12], 1:2-4, 2-4); see McBrearty v. Vanguard Group, Inc., 2009 U.S. Dist. LEXIS 29775, 2009 WL 875220 (S.D.N.Y. April 2, 2009) (Cote, J.), aff'd 353 Fed. Appx. 640 (2d Cir. 2009), petition for cert. filed, 78 U.S.L.W. 3590 (Mar. 30, 2010) (No. 09-1187) [cert. denied, 130 S. Ct. 3411, 177 L. Ed. 2d 349, 2010 U.S. LEXIS 4743 (2010)] (dismissing a similar claim on motion to dismiss for failure to state a claim for lack of proximate causation). In their motion, defendants contended that the case had no connection with the Eastern District of California other than the fact that the plaintiff resides within the District; defendants also contented that the court lacked personal jurisdiction over several of the defendants. On January 22, 2010, plaintiff filed a notice of voluntary dismissal pursuant to Federal Rule of Civil Procedure ("FRCP") 41(a)(1)(A)(i), closing the case. Defendants' motion was never ruled on by this court.

On February 4, 2010, defendants filed a **[*4]** request to reopen the case for the limited purpose of filing a motion for sanctions. (Docket # 16.) The court noted that the request was procedurally improper but allowed defendants to file a properly noticed motion for sanctions, which

they did on March 18, 2010. (Docket # 18.) Defendants assert that they should be entitled to sanctions for attorneys' fees pursuant to FRCP 11, 28 U.S.C. § 1927, and the court's inherent authority because plaintiff's assertion that venue was proper in the Eastern District of California was frivolous and done in a bad faith attempt at forum shopping.

## ANALYSIS

## I. Rule 11 Sanctions

An attorney is subject to Rule 11 sanctions when, *inter alia,* he presents to the court "claims, defenses, and other legal contentions . . . [not] warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed. R. Civ. P. 11(b)(2). When sanctions are sought by opposing counsel, opposing counsel must comply with Rule 11's "safe harbor" provision. See Barber v. Miller, 146 F.3d 707, 710-11 (9th Cir. 1998); Radcliffe v. Rainbow Constr. Co., 254 F.3d 772, 789 (2001) ("[T]he procedural requirements **[*5]** of Rule 11[(c)(2)]'s 'safe harbor' are mandatory.") Rule 11's safe harbor provision provides that a party may not file a motion for sanctions under Rule 11 unless the party against whom sanctions are sought is served with the motion and given 21 days to either withdraw or correct the paper that is the subject of the motion. Fed. R. Civ. Pro. 11(c)(2). Within the Ninth Circuit, the safe harbor provision is strictly enforced. Holgate v. Baldwin, 425 F.3d 671, 678 (2005) ("We enforce this safe harbor provision strictly."). Failure to follow the procedure set forth in Rule 11(c)(2) precludes the moving party from obtaining an award of sanctions. Radcliffe, 254 F.3d at 789.

Defendants do not, and cannot, claim that they have met the requirements of Rule 11's safe harbor provision. Rather, defendants argue that this court retains jurisdiction to award sanctions under Rule 11 under the circumstances of this case, where the plaintiff has voluntarily withdrawn the action

pursuant to Rule 41(a)(1). However, the retention of jurisdiction is irrelevant to the court's analysis of whether defendants complied with the safe harbor provision.

Neither of the cases cited by defendants excuse compliance **[*6]** with Rule 11's safe harbor provision. In Madamba, the defendant moved for sanctions after summary judgment was entered in their favor *during* the safe harbor period; the defendant had served the sanction motion on the plaintiff after already filing a motion for summary judgment but before that motion had been ruled on by the court. Madamba v. Certified Grocers California, LTD, 1998 U.S. App. LEXIS 9762, 1998 WL 339685, at *1 (9th Cir. May 12, 1998). [3] In denying the defendant's motion for sanctions after judgment had been entered the court noted that "sanctions may be imposed after a case has been resolved." 1998 U.S. App. LEXIS 9762, [WL] at *2 (citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 393-98, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)). However, the court neither addressed whether sanctions may be entered after a voluntary dismissal nor whether the court may totally disregard Rule 11's safe harbor provision. Indeed, the defendant in Madamba had complied with the safe harbor provision of Rule 11(c)(2) prior to filing the motion.

Similarly unpersuasive is defendants' reliance on Commercial Space Mgmt. Co. v. Boeing Co. 193 F.3d 1074 (1999). In Boeing, the court addressed whether a district court, after a notice of voluntary dismissal pursuant to Rule 41(a)(1), may determine whether the dismissal is one with or without prejudice. 193 F.3d at 1075-76. The court held that a notice of voluntary dismissal divests the court of jurisdiction, and therefore a district court cannot thereafter determine whether the dismissal was with or without prejudice. Id. at 1080. However, in a

footnote, the court cited Cooter & Gell [4] for the proposition that a voluntary dismissal does not divest the district court of jurisdiction to impose sanctions. Boeing, 193 F.3d at 1079 n. 8. To the extent Boeing and Cooter & Gell hold that a case can remain open after it has been voluntarily dismissed for purposes of imposing sanctions, neither case concludes that the moving party is relieved of his burden to comply with Rule 11's safe harbor provision.

Furthermore, the Ninth Circuit has explicitly provided that the safe harbor provision is to be strictly enforced. See Radcliffe, 254 F.3d at 789. Under Rule 11, if a plaintiff voluntarily dismisses the action during the safe harbor period they will not be subject to monetary sanctions. Fed. R. Civ. Pro. 11(c)(2). To allow sanctions here, where plaintiff filed a voluntary dismissal *prior* to the sanctions motion being served, would be contrary to the spirit of Rule 11. As such, defendants motion for sanctions pursuant to Rule 11 is DENIED.

## II. Sanctions Pursuant to § 1927 and the Court's Inherent Authority

Section 1927 allows the court **[*9]** to award fees against "any attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously." 28 U.S.C. § 1927. This section is not specific to any statute, but applies to any civil suit in federal court. Hyde v. Midland Credit Mgmt., Inc., 567 F.3d 1137, 1141 (9th Cir. 2009). Further, the statute "explicitly provides for remedies against

---

[3] In defendants' motion for sanctions they directly rely on Madamba, an unpublished Ninth Circuit opinion. In their reply brief, defendants' counsel acknowledges that their reliance on an unpublished opinion, under the circumstances, was **[*7]** not warranted.

---

[4] Cooter & Gell did "conclude that petitioner's voluntary dismissal did not divest the District Court of jurisdiction to consider respondents' Rule 11 motion." 496 U.S. at 398. However, **[*8]** Cooter & Gell was decided before the 1993 amendments to Rule 11 which inserted the safe harbor provision. While the Supreme Court has not directly overturned its holding, several district courts have concluded that the 1993 amendments supersede the Court's holding in Cooter & Gell, as it relates to voluntary dismissals. See e.g., Hockley by Hockley v. Shan Enter. Ltd. P'ship, 19 F. Supp. 2d 235, 240 (N.J. 1998); Photocircuits Corp. v. Marathon Agents, Inc., 162 F.R.D. 449, 452 (E.D. N.Y. 1995); Morroni v. Gunderson, 169 F.R.D. 168, 171 (M.D. Fla. 1996).

offending attorneys." Id.; F.T.C. v. Alaska Land Leasing, Inc., 799 F.2d 507, 510 (9th Cir. 1986) (noting that § 1927 does not authorize recovery from a party, but "only from an attorney or otherwise admitted representative of a party") (emphasis in original) (internal quotations and citations omitted). "The filing of a complaint may be sanctioned pursuant to Rule 11 or a court's inherent power, but it may not be sanctioned pursuant to § 1927." In re Keegan Mgmt. Co., Sec. Lit., 78 F.3d 431, 436 (9th Cir. 1996).

Attorneys fees under § 1927 are appropriate if an attorney's conduct is in bad faith; recklessness satisfies this standard. B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1107 (9th Cir. 2002); Barber, 146 F.3d at 711 ("An award of sanctions under 28 U.S.C. § 1927 or the district court's inherent authority requires a finding **[\*10]** of recklessness or bad faith."). The Ninth Circuit has also required a finding of subjective bad faith, "which is present when an attorney knowingly or recklessly raises a _frivolous_ argument, or argues a meritorious claim for the purpose of harassing an opponent." B.K.B., 276 F.3d at 1107 (emphasis in original) (quoting In re Keegan, 78 F.3d at 436). Moreover, the Ninth Circuit has cautioned that "[s]anctions should be reserved for the 'rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose.'" Primus Auto. Fin. Servs., Inc. v. Batarse, 115 F.3d 644, 649 (9th Cir. 1997) (quoting Operating Eng'rs Pension Trust v. A-C Co., 859 F.2d 1336, 1344 (9th Cir. 1988)).

The court also has the inherent power to issue sanctions in order "to protect the due and orderly administration of justice and maintain the authority and dignity of the court." Id. at 648 (internal quotations and citation omitted). These sanctions may be issued when the party has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons" and may take the form of attorneys' fees. Id. Before awarding such sanctions, however, "the **[\*11]** court must make an explicit finding that counsel's conduct 'constituted or was tantamount to

bad faith.'" Id. (quoting Roadway Express, Inc. v. Piper, 447 U.S. 752, 767, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980)). A finding of bad faith is supported by the same standard required under § 1927. See id.

As an initial matter, defendants are precluded from seeking sanctions under § 1927 because the conduct that is the subject of defendants' sanctions motion is plaintiff's filing of the complaint in the Eastern District of California. The Ninth Circuit has made it clear that "[t]he filing of a complaint . . . may not be sanctioned pursuant to § 1927" because § 1927 only addresses the multiplication of proceedings. In re Keegan Mgmt. Co., Sec. Lit., 78 F.3d 431, 436 (9th Cir. 1996) ("Because the section authorizes sanctions only for the 'multipli[cation of] proceedings,' it applies only to unnecessary filings and tactics once a lawsuit has begun." (alteration in original)); Matter of Yagman, 796 F.2d 1165, 1187 (9th Cir.) ("Section 1927 does not apply to initial pleadings, since it addresses only the multiplication of proceedings. It is only possible to multiply or prolong proceedings after the complaint is filed."), _amended_ **[\*12]** _by,_ 803 F.2d 1085 (9th Cir. 1986). While defendants allege a pattern of forum shopping by plaintiff's counsel, the complaint in this action was the first lawsuit filed between this particular plaintiff and these particular defendants. As such, plaintiff's complaint cannot be the basis of § 1927 sanctions because it has not "multiplie[d] the proceedings." 28 U.S.C. § 1927.

Additionally, defendants' motion for sanctions pursuant to both § 1927 and the court's inherent power must be denied because defendant have not demonstrated the requisite bad faith by showing that plaintiff's counsel knowingly or recklessly raised a frivolous argument. See B.K.B., 276 F.3d at 1107; Piper, 447 U.S. at 767. In arguing that plaintiff's counsel knowingly or recklessly filed a frivolous complaint the defendants rely heavily on what they term a "warning" from Judge Armstrong of California's Northern District in Seidl v. Am. Century Cos., Inc., No. 08-cv-04117 (N.D. Cal. Aug 28, 2008). Seidl was an action very similar to

the present case and involved the same plaintiff's counsel (acting on behalf of a different plaintiff), many of the same defendants, and the same claims. The venue allegation filed in the **[\*13]** Seidl action is an exact replica of the venue allegation in the complaint in this action. (Compare Compl. P 29, with Decl. of Benjamin H. Kleine ["Kleine Decl."], filed March 18, 2010 [Docket # 20], Ex. A ["Seidl Compl."], P 23.) Judge Armstrong, acting *sua sponte,* raised the issue of venue and ordered that the parties file briefs as to whether or not the court should transfer the case to a different venue. (Kleine Decl., Ex. B.) In the alternative, Judge Armstrong stated that "plaintiff may withdraw this matter and re-file it in a district more closely related to the events giving rise to this matter." (Id.) The question of venue was not litigated further as the plaintiff voluntarily dismissed the action and then re-filed it in the Southern District of New York.

Defendants argue that the fact that Judge Armstrong *sua sponte* issued an order questioning whether venue was proper in Seidl shows that plaintiff's counsel in this case either knowingly or recklessly filed the complaint in a district they knew was improper. This argument is not persuasive. As the plaintiff voluntarily dismissed the Seidl action in the Northern District before the venue issue could be litigated and determined **[\*14]** by the court, plaintiff's counsel was not on notice that their choice of venue was frivolous but, at most, that it *may* not have been valid. (Defs.' Mem. in Support of Motion for Sanctions, filed March 28, 2010 [Docket # 19], 12:5-7) ("Plaintiff's counsel, by virtue of Judge Armstrong's October, 2008 *sua sponte* order, knew venue was highly questionable and, more likely, improper in California."). While plaintiff's counsel may have been aware that their argument as to venue was unlikely to succeed, "[s]anctions should be reserved for the 'rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation." Batarse, 115 F.3d at 649; cf. Fed. R. Civ. P. 11(b)(2). This is not such a rare and exceptional case. [5] As such, defendants motion for sanctions pursuant to 28 U.S.C. § 1927 and the court's inherent power is DENIED. [6]

## CONCLUSION

For the foregoing reasons, defendants motion for sanctions pursuant to FRCP 11, 28 U.S.C. § 1927, and the court's inherent power is DENIED.

IT **[\*16]** IS SO ORDERED.

DATED: May 14, 2010

/s/ Frank C. Damrell

FRANK C. DAMRELL, JR.

UNITED STATES DISTRICT JUDGE

---

---

[5] While not directly mentioned in defendants' motion for sanctions, in defendants' motion to transfer venue they relied heavily on a Ninth Circuit opinion which limits the use of RICO's venue provision to situations in which the plaintiff shows that there is "no other district in which a court will have personal jurisdiction **[\*15]** over all of the alleged co-conspirators." Butcher's Union Local No. 498 v. SDC Inv., Inc., 788 F.2d 535, 539 (9th Cir. 1986). While the Ninth Circuit's interpretation of RICO's jurisdictional and venue statute is binding on this court, other circuit courts have reached somewhat different conclusions. See Republic of Panama v. BCCI Holdings (Luxembourg) S.A., 119 F.3d 935, 942 (11th Cir. 1997). Sanctions should not be granted where a party is arguing for modification or reversal of existing law. As such, an argument that sanctions should be granted because plaintiff's choice of venue was improper under Ninth Circuit precedent must be denied.

[6] In plaintiff's opposition they seek to recover expenses and attorney fees incurred in defending against defendants' motion for sanctions. "If warranted, the court may award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion." Fed. R. Civ. P. 11(c)(2). The court finds that under the circumstances of this case such an award is not warranted.

# EXHIBIT 5

# Grant v. Bostwick

United States District Court for the Southern District of California

July 20, 2016, Decided; July 21, 2016, Filed

CASE NO. 15-cv-874 WQH (BLM)

**Reporter**
2016 U.S. Dist. LEXIS 96078 *

JENNIFER GRANT, Plaintiff, v. HON. JEFFREY BOSTWICK, Defendant.

**Prior History:** Grant v. Bostwick, 2015 U.S. Dist. LEXIS 144414 (S.D. Cal., Oct. 22, 2015)

**Counsel:** [*1] Jennifer Grant, Plaintiff, Pro se, Pacific Palisades, CA.

For Hon. Jeffrey Bostwick, Defendant: Susanne C Washington, LEAD ATTORNEY, San Diego Superior Court, San Diego, CA.

**Judges:** WILLIAM Q. HAYES, United States District Judge.

**Opinion by:** WILLIAM Q. HAYES

## Opinion

ORDER

HAYES, Judge:

The matters before the Court are: (1) the Motion for Sanctions and Costs (ECF No. 38) filed by Plaintiff Jennifer Grant, (2) the Motion to Dismiss First Amended Complaint (ECF No. 40) filed by Defendant Honorable Jeffrey Bostwick, and (3) the Ex Parte Application to Shorten Time (ECF No. 48) filed by Plaintiff.

## I. Background

On April 21, 2015, Plaintiff initiated this action by filing the Complaint pursuant to 42 U.S.C. § 1983 alleging violations of her Fourteenth Amendment rights. (ECF No. 1).

On July 15, 2015, Defendant filed a motion to dismiss. (ECF No. 9). On September 15, 2015, Plaintiff filed a motion for a preliminary injunction to stay state probate proceedings pending the resolution of this case. (ECF No. 15). On October 22, 2015, the Court granted the motion to dismiss and denied the motion for a preliminary injunction to stay probate proceedings. (ECF No. 23).

On November 3, 2015, Plaintiff filed a "Motion for Altering the Judgment of Docket #23." (ECF No. 25). [*2] On January 13, 2016, the Court denied Plaintiff's motion. (ECF No. 32).

On February 9, 2016, Plaintiff filed a motion for leave to file a First Amended Complaint. (ECF No. 33). On February 23, 2016, Defendant filed an opposition. (ECF No. 34). On March 18, 2016, the Court issued an Order granting the motion for leave to file a First Amended Complaint. (ECF No, 36). On March 23, 2016, Plaintiff filed a First Amended Complaint, which became the operative pleading in this case. (ECF No. 37).

On April 5, 2016, Plaintiff filed the motion for sanctions and costs based on Defendant's opposition to the motion for leave to file an amended complaint. (ECF No. 38). On April 7, 2016, Defendant filed the motion to dismiss. (ECF No. 40). On April 22, 2016, Defendant filed an opposition to the motion for sanctions. (ECF No. 42). On the same day, Plaintiff filed an opposition to the motion to dismiss. (ECF No. 41). On April 29, 2016, Plaintiff filed a reply to the opposition to the motion for sanctions and costs. (ECF No. 43). On the same day, Defendant filed a reply to the opposition to the motion to dismiss. (ECF No. 44).

On May 27, 2016, with the Court's permission, Plaintiff filed a sur-reply to [*3] the motion to dismiss, (ECF No. 47).

On June 17, 2016, Plaintiff filed an ex parte application to shorten time for decision on the motion for sanctions and costs and the motion to dismiss. (ECF No. 48).

## II. Motion to Dismiss First Amended Complaint

### A. Allegations of the First Amended Complaint

Plaintiff Jennifer Grant is a beneficiary of the Schwichtenberg Revocable Family Trust ("trust"), dated July 28, 1982, and is the trustee of the B subsection of the trust. (ECF No. 23 at ¶ 2). Defendant Jeffrey Bostwick is the judge presiding over the administration of the trust in San Diego Superior Court's Central Probate Provision. *Id.* ¶ 7.

"Defendant inherited Pro-Per Plaintiff's case . . . in September 2012 . . . ." *Id.* ¶ 13. Upon the death of Plaintiff's mother, "Rusty [Grant], no relation to Plaintiff, was to become the trustee of section A of Plaintiff's parents' ABC inter-vivos trust . . . ." *Id.* ¶ 14. "With no legal authority, Rusty took over all three sections of the trust the day Plaintiff's mother died." *Id.* ¶ 15.

"Defendant lacked subject matter jurisdiction. Both Plaintiff's parent's wills specifically state that their intention in creating the trust was NOT to subject their assets to [*4] probate court." *Id.* ¶ 16.

Rusty/Larsen's petition opened the case purporting to be an internal affairs petition . . . . It was illegally plead due to: 1) lack of capacity . . . as Rusty claimed capacity as trustee of the whole trust 2) limitations of the trust terms regarding the duties accorded the trustee of section A post the last settlor's death, . . 3) failure to meet the standards for proper pleading since its intent was to harass Plaintiff . . .

*Id.* ¶ 18.

Plaintiff tried to bring [to] Defendant's attention . . . that not only was Rusty illegally acting as the administrative B section trustee . . but she and Larsen were 1) purposefully trying to destroy the trust home and denying her access so that she was deprived for years of its enjoyment and use 2) had stolen from the trust home, 3) were acting beyond the duties permitted a trustee of section A 4) were misusing trust funds, 5) were violating the duties of care and loyalty . . . 6) and otherwise disobeying trust terms in a concentrated effort to force the sale of the trust home . . . by bankrupting trust A so the home would end up in foreclosure abatement forcing its sale.

*Id.* ¶ 21.

Between September 2012 and June 2013, Defendant [*5] had not only denied Plaintiff's oral motion for a hearing to show cause on why Rusty should not be removed but continually postponed calendering trial on the Remove Trustee Petition . . . . Defendant also ignored allegations in case management statements and denied numerous ex-partes filed by Plaintiff as 'not urgent' despite clear and convincing exhibits that accompanied the ex-parte documents providing that Plaintiff was being injured by Rusty/Larsen in the manner described.

*Id.* ¶ 24.

"Defendant denied Plaintiff of her liberty to assume the 'job' her parents had given her under the trust instrument" and "suspended Plaintiff . . . for hostility with her brother and Larsen." *Id.* ¶ 28. Plaintiff alleges that Defendant denied her the "choice of appointment of successor trustees" and "appointed a public administrator over all the trust sections." *Id.* ¶ 29. Plaintiff alleges that Defendant denied "Plaintiff her 14th amendment rights through the conduction of a biased courtroom." *Id.* ¶ 32. Plaintiff alleges that after she regained trusteeship over the B and C sections of the trust, "Defendant continued to act with bias and restrict

Plaintiff's liberty to act as trustee by ignoring Plaintiff . . . ." *Id. [*6]* ¶ 39. Plaintiff alleges that Defendant failed to grant ex parte applications, refused to provide her with a hearing, and "ignored Plaintiff's protests over [a] violation of civil procedure." *Id.* ¶¶ 34, 40, 42.

> Defendant, acting under color of law, has a long history with a well established pattern of abusing the power of his office to deny Plaintiff due process and equal protection of the law with the intent of depriving Plaintiff of the property to which she is legitimately entitled under the trust instrument and her earnings and savings while restricting her liberty to act as trust named administrative trustee.

*Id.* ¶ 19.

Plaintiff seeks declaratory and injunctive reliefunder 42 U.S.C. § 1983. Plaintiff seeks a declaratory judgment that Defendant has violated and continues to violate her Fourteenth Amendment rights by: (1) conducting proceedings without personal or subject matter jurisdiction, (2) denying Plaintiff a timely hearing on former trustee's alleged breaches of fiduciary duty and state crimes, (3) appointing a temporary trustee, (4) acting without jurisdiction to conduct proceedings on the temporary trustee's accounting/fee petition, (5) acting without jurisdiction should Defendant attempt to hear any fee petitions **[*7]** by former trustees, and (6) denying Plaintiff due process by refusing to hear her requests for attorney's fees and costs. *Id.* at 36-39. Plaintiff also seeks a declaratory judgment that Defendant "acted as an accessory after the fact to prevent the former trustee, Rusty Grant, from facing punishment for felony crimes. *Id.* at 39.

With regard to injunctive relief, Plaintiff requests the Court to "exercise supplemental jurisdiction" over certain probate petitions and order Defendant to either consolidate the petitions and immediately set them for trial or make a record of the trial and provide it to Plaintiff and this Court, to enable this Court to "conduct a timely judicial review of the

proceedings." *Id.* at 40-41. Alternatively, Plaintiff requests that the trial "be conducted by Defendant before the District Court" or "be conducted by the Honorable William Q. Hayes in District Court." *Id.* at 41. Plaintiff requests similar relief with regard to her request for attorney's fees. *Id.* at 41-42. Plaintiff requests the Court to "arrange with the local district attorney's and federal prosecutor's offices . . . for a hearing before a grand jury." *Id.* at 42.

## B. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) permits dismissal for "failure to state a claim upon which relief can be granted." **[*8]** Fed. R. Civ. P. 12(b)(6). Federal Rule of Civil Procedure 8(a) provides: "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory. *See Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

When considering a motion to dismiss, a court must accept as true all "well-pleaded factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). However, a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001). "In sum, for a complaint to survive a motion to dismiss, the non-conclusory factual content, and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quotations omitted).

Rule 12(b)(1) of the Federal Rules of Civil Procedure allows a defendant to move for dismissal on grounds that the court lacks jurisdiction over the subject matter. Fed. R. Civ. P. 12(b)(1). The burden is on the plaintiff to establish that the court has subject matter jurisdiction over an action. *Assoc. of*

*Medical Colleges v. United States*, 217 F.3d 770, 778-79 (9th Cir. 2000). In resolving an attack on a court's jurisdiction, "the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion **[*9]** for summary judgment." *Safe Air For Everyone v. Doyle*, 373 F.3d 1035, 1039 (9th Cir. 2004). Issues regarding subject matter jurisdiction may be raised at any time, even on appeal, by motion or sua sponte by the court. Fed. R. Civ. P. 12(h)(3); *Snell v. Cleveland*, 316 F.3d 822, 826-27 (9th Cir. 2002).

## C. Judicial Notice

"As a general rule, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). However, there are "exceptions to the requirement that consideration of extrinsic evidence converts a 12(b)(6) motion to a summary judgment motion." *Id.* Federal Rule of Evidence 201 provides that "[t]he court may judicially notice a fact that is not subject to reasonable dispute because it . . . is generally known within the trial court's territorial jurisdiction; or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed R. Evid. 201(b). "[U]nder Fed.R.Evid. 201, a court may take judicial notice of 'matters of public record.'" *Lee*, 250 F.3d at 689 (quoting *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.1986)). Courts may take judicial notice of "proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citation and internal quotations omitted).

Defendant requests judicial notice of certain filings and orders from the probate case in which Plaintiff's allegations against Defendant arose. The documents **[*10]** requested to be noticed are proceedings in another court that have a direct relation to the matters at issue and are in the public record. *See U.S. ex rel. Robinson Rancheria Citizens Council*, 971 F.2d at 248; *Lee*, 250 F.3d at 689. Defendant's request for judicial notice is granted.

## C. Contentions of the Parties

Defendant moves to dismiss Plaintiff's Complaint with prejudice on the grounds that (1) this Court lacks jurisdiction under the probate exception because the action in state court is properly under the state probate court's jurisdiction, (2) Defendant enjoys absolute judicial immunity against Plaintiff's claim, (3) the *Younger* abstention doctrine bars this action, (4) Eleventh Amendment immunity bars Plaintiff's action against Defendant, and (5) the First Amended Complaint fails to state sufficient facts to state a cognizable claim against Defendant.

Plaintiff contends that she is suing Defendant only in his individual capacity for acts and omissions committed as a judicial officer. Plaintiff contends that Defendant's acts alleged in the First Amended Complaint were non-judicial. Plaintiff contends, that she is not asking the Court to re-litigate Defendant's previous rulings. Plaintiff contends that Defendant acted without jurisdiction and therefore does not have immunity. Plaintiff **[*11]** contends that the probate exception only applies to probate cases, not to civil rights cases in which the Defendant is a probate judge acting in a probate courtroom. Plaintiff contends that the probate exception applies only to wills, not trusts. Plaintiff contends that *Younger* abstention does not apply because the state does not have an interest in the case because Defendant is sued only in his individual capacity.

## D. Discussion

Generally, "judges of courts of superior or general jurisdiction are not liable in civil actions for their judicial acts . . . ." *Stump v. Sparkman*, 435 U.S. 349, 355-56, 98 S. Ct. 1099, 55 L. Ed. 2d 331

(1978). "Judicial immunity is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial actions, i.e. actions not taken in the judge's judicial capacity. . . . Second, a judge is not immune from actions, though judicial in nature, taken in complete absence of all jurisdiction." *Mireles v. Waco*, 502 U.S. 9, 11, 112 S. Ct. 286, 116 L. Ed. 2d 9 (1991). "[A]bsolute judicial immunity does not apply to non-judicial actions, i.e. the administrative, legislative, and executive functions that judges . . . may on occasion be assigned to perform." *Duvall v. County of Kitsap*, 260 F.3d 1124, 1133 (9th Cir. 2001). The Court of Appeals for the Ninth Circuit has identified four factors relevant to resolving whether a particular act is judicial in nature: **[*12]**

> (1) the precise act is a normal judicial function; (2) the events occurred in the judge's chambers; (3) the controversy centered around a case then pending before the judge; and (4) the events at issue arose directly and immediately out of-a confrontation with the judge in his or her official capacity.

*Id.* (quoting *Meek v. County of Riverside*, 183 F.3d 962, 967 (9th Cir. 1999)). The inquiry focuses on whether the "nature and function of the act" is normally performed by a judge, "not the act itself." *Mireles*, 502 U.S. at 13. [I]f only the particular act in question were to be scrutinized, then any mistake of a judge in excess of his authority would become a 'nonjudicial' act, because an improper or erroneous act cannot be said to be normally performed by a judge." *Id.* at 12.

The First Amended Complaint challenges the decisions of Defendant to proceed as the judge in the pending probate case, to suspend Plaintiff as a trustee, and to appoint a Public Administrator as temporary trustee, just as the original Complaint did. Plaintiff also challenges Defendant's decision to timely hear Plaintiff's petitions and motions and Defendant's failure to rule in her favor. Each of Defendant's decisions occurred within the scope of the ongoing state probate proceedings. Defendant's

actions are normal **[*13]** judicial functions undertaken in state probate proceedings and arose from interactions between the Plaintiff and Defendant in state probate court. Plaintiff has not alleged sufficient factual allegations to show that Defendant acted "in complete absence of all jurisdiction." *See Mireles*, 502 U.S. at 11. The First Amended Complaint challenges actions by the Defendant which are judicial in nature and taken in an ongoing state proceeding within the state probate court's jurisdiction.

In *Pulliam v. Allen*, 466 U.S. 522, 104 S. Ct. 1970, 80 L. Ed. 2d 565 (1984), the Supreme Court held that while judicial immunity bars actions against judges seeking monetary damages, "judicial immunity is not a bar to prospective injunctive relief against a judicial officer acting in her judicial capacity." *Id.* at 541-42. After *Pulliam*, however, Congress narrowed the judicial immunity exception. Section 1983 provides that "in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983 (as amended by Pub. L. 104-307, Title III, § 309(c), 110 Stat. 3852 (Oct. 19, 1996)).

Plaintiff challenges actions taken by Defendant Judge Bostwick in his judicial capacity in ongoing state probate proceedings seeking prospective injunctive **[*14]** relief under § 1983. In the Order dismissing the original Complaint, the Court concluded, "The Complaint fails to allege facts to support the conclusion that the exception to judicial immunity from suit in a § 1983 action for injunctive relief—namely, violation of a declaratory decree or the unavailability of declaratory relief—would apply in this case." (ECF No. 23 at 6). In the First Amended Complaint, Plaintiff asserts that "injunctive relief is necessary because no declaratory decree is available that would prevent Defendant continuing his pattern of behavior that violates Plaintiff's 14th amendment rights . . . ." (ECF No. 37 at 40). However, the First

Amended Complaint does not provide sufficient facts to infer that no declaratory relief is available. *See Sprewell*, 266 F.3d at 988 (a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences") (citation omitted); *Moss*, 572 F.3d at 969 ("for a complaint to survive a motion to dismiss, the non-conclusory factual content and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief") (citation and internal quotation marks omitted). To the extent that Plaintiff seeks **[\*15]** to challenge the decisions Defendant has made in probate court proceedings, Plaintiff is free to file an appeal with the California Court of Appeal. The Court concludes that the First Amended Complaint fails to allege facts to support the conclusion that an exception to judicial immunity applies in this case. The facts alleged in the First Amended Complaint do not state a plausible claim for relief under § 1983.

In the Order dismissing Plaintiff's original Complaint, the Court concluded that the *Younger* abstention doctrine and the probate exception to federal jurisdiction provided alternate grounds for dismissing Plaintiff's claim. (ECF No. 23 at 7). The Court concludes that *Younger* abstention and the probate exception also provide grounds for dismissing Plaintiff's First Amended Complaint. Plaintiff's claim is closely related to the issues pending in the underlying state probate court proceeding. The relief requested would require the Court to determine issues that fall within the purview of the state probate court. The Court declines to interfere with ongoing judicial proceedings in state probate court. *See New Orleans Public Service, Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368, 109 S. Ct. 2506, 105 L. Ed. 2d 298 (1989) (holding that under *Younger* abstention, federal courts should not enjoin pending **[\*16]** civil proceedings involving "orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions"); *Marshall v. Marshall*, 547 U.S. 293, 126 S. Ct. 1735, 164 L. Ed. 2d 480 (2006) (prohibiting federal courts from adjudicating rights that would interfere with the state probate court's administration of a decedent's estate).

The motion to dismiss the First Amended Complaint with prejudice is granted. Plaintiff has had an opportunity to amend her pleadings and has only alleged facts regarding Defendant's actions that are covered by judicial immunity. The First Amended Complaint is dismissed with prejudice.

### III. Motion for Sanctions and Costs

Plaintiff contends that Defendant's counsel violated Federal Rule of Civil Procedure 11(b) by making statements in Defendant's opposition to the Plaintiff's motion for leave to file an amended complaint (ECF No. 34) that intentionally attempted to mislead the court and by "presenting background facts regarding previous rulings and Plaintiff's prayers out of context." (ECF No. 38-1). Plaintiff contends that Defendant's counsel tried to commit fraud upon the Court with her arguments and citation to inapplicable caselaw.

Defendant contends that Plaintiff's motion should be denied as procedurally improper because it was filed after **[\*17]** the Court ruled on the underlying motion for leave to file an amended complaint. Defendant contends that the motion became moot when the Court issued its Order granting Plaintiff's motion to amend the Complaint. Defendant contends that the motion for sanctions is without merit because all factual citations and legal arguments made in the opposition were accurate and made in good faith.

"Rule 11 is intended to deter baseless filings in district court and imposes a duty of 'reasonable inquiry' so that anything filed with the court is 'well grounded in fact, legally tenable, and not interposed for any improper purpose.'" *Islamic Shura Council of Southern California v. F.B.I.*, 757 F.3d 870, 872 (9th Cir. 2014) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990). "Motions for Rule 11 attorney's

fees cannot be served after the district court has decided the merits of the underlying dispute giving rise to the questionable filing. This is because once the court has decided the underlying dispute, the motion for fees cannot serve Rule 11's purpose of judicial economy." *Id.* at 873 (citing Advisory Committee's Notes to the 1993 Amendments to Rule 11 (noting that a party may not serve a motion for Rule 11 sanctions after "judicial rejection of the offending contention")).

In this case, on February 9, 20016, Plaintiff filed the motion for leave to file an amended complaint. On February 23, 2016, Defendant filed the opposition **[*18]** to the motion, which is the basis for the motion for sanctions. On March 18, 2016, the Court issued an Order granting the motion for leave to amend. On April 5, 2016, Plaintiff filed the motion for sanctions and costs. Because the motion for sanctions was filed after the Court decided the merits of the underlying motion for leave to amend and after "judicial rejection" of the arguments made in Defendant's opposition, the motion for sanctions is denied. *See Islamic Shura Council of Southern California*, 757 F.3d at 873 (reversing an order granting a motion for sanctions where the motion for sanctions was filed after the Court had ruled on the motion underlying the dispute); Advisory Committee's Notes to the 1993 Amendments to Rule 11.

## IV. Conclusion

IT IS HEREBY ORDERED that the motion to dismiss (ECF No. 40) filed by Defendant Honorable Jeffrey Bostwick is granted. The First Amended Complaint is dismissed with prejudice. The Clerk of the Court shall close the case.

IT IS FURTHER ORDERED that the motion for sanctions and costs (ECF No. 38) is denied.

IT IS FURTHER ORDERED that the "Ex Parte Motion to Shorten Time for a Decision on Dkt 38 & 40" (ECF No. 48) is denied as moot.

DATED: 7/20/16

/s/ William Q. Hayes

WILLIAM Q. HAYES

United States District Judge **[*19]**

---

**End of Document**

# EXHIBIT 6

# Great Dynasty Int'l Fin. Holdings Ltd. v. Haiting Li

United States District Court for the Northern District of California

July 10, 2014, Decided; July 10, 2014, Filed

No. C-13-1734 EMC

**Reporter**

2014 U.S. Dist. LEXIS 94658 *; Fed. Sec. L. Rep. (CCH) P98,021; 2014 WL 3381416

GREAT DYNASTY INTERNATIONAL FINANCIAL HOLDINGS LIMITED, Plaintiff, v. HAITING LI, et al., Defendants.

**Prior History:** Great Dynasty Int'l Fin. Holdings Ltd. v. Haiting Li, 2013 U.S. Dist. LEXIS 200751 (N.D. Cal., Dec. 16, 2013)

**Counsel:** [*1] For Great Dynasty International Financial Holdings Limited, Plaintiff: Sally Weiss Mimms, LEAD ATTORNEY, Locke Lord LLP, San Francisco, CA; John F. Kloecker , PRO HAC VICE, Locke Lord LLP, Chicago, IL.

For Haiting Li, Pacific Bepure Industry, Inc., Defendants: Kent Jeffrey Schmidt, LEAD ATTORNEY, Bryan Martin McGarry, Dorsey & Whitney LLP, Costa Mesa, CA.

**Judges:** EDWARD M. CHEN, United States District Judge.

**Opinion by:** EDWARD M. CHEN

# Opinion

## ORDER DENYING DEFENDANTS' MOTION FOR RULE 11 INQUIRY AND GRANTING SANCTIONS UNDER THE COURT'S INHERENT AUTHORITY

**(Docket No. 51)**

Plaintiff Great Dynasty International Financial Holdings, Ltd. ("GDI") brought this private action alleging violations of federal securities laws as well as state law claims, against Defendant Haiting Li,

Defendant Zhiyan Li,[1] and derivatively on behalf of nominal Defendant Pacific Bepure Industry, Inc. ("PBEP") (collectively "Defendants"). In addition to being a shareholder in its own right, GDI was an assignee of the claims belonging to eight PBEP shareholders.[2] In a prior order the Court dismissed the action with leave to amend. *See* Docket No. 37. GDI then filed a first amended complaint ("FAC"), which GDI subsequently dismissed voluntarily. *See* Docket [*2] Nos. 39, 48. Currently before the Court is Defendants' motion for Federal Rule of Civil Procedure ("Rule") 11 inquiry under the Private Securities Litigation Reform Act ("PSLRA"), or in the alternative, for sanctions pursuant to the Court's inherent authority. *See* Docket No. 51. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **DENIES** the motion for Rule 11 inquiry under the PSLRA and **GRANTS** the motion for sanctions under the Court's inherent authority.

## I. FACTUAL & PROCEDURAL BACKGROUND

### A. Background Facts

---

[1] Defendant Zhiyan Li, Defendant Haiting Li's son and former employee of PBEP, was named only in the original complaint. Zhiyan Li was terminated as a defendant upon the filing of the first amended complaint ("FAC"). *See* FAC Docket No. 39.

[2] The named assignor shareholders included China Overseas Financial Group Limited, Asia Alpha Limited, Best Olympic Limited, Infinity Wealth Management Limited, Chinada International Limited, Liu Hansong, Hu Yicheng, and Liu Dongping (together "Assignor Shareholders"). *See* Complaint ¶ 5 Docket No. 1; FAC ¶ 4.

The following allegations were contained in the FAC and PBEP's U.S. **[\*3]** Securities and Exchange Commission ("SEC") Form 10-K for Fiscal Year End December 31, 2009 ("Form 10-K"). *See* Defendants' Request for Judicial Notice ("Def. RJN") Exhibit A, Form 10-K (Docket No. 43-1).

GDI was organized under the laws of the British Virgin Islands with its principal office in Beijing China. *See* FAC ¶ 3. GDI purchased shares in Wollemi Mining Corporation ("Wollemi") in October 2009. *See* FAC ¶¶ 3, 15. Wollemi was a publically traded company on the U.S. OTC Bulletin Board ("OTCBB") but no trading of its securities had occurred from its October 9, 2009 inception through November 5, 2009. *See* FAC ¶ 12; Form 10-K at 24. On November 5, 2009, Wollemi entered into a Share Exchange Agreement with Peakway Worldwide Ltd. ("Peakway") and its shareholder Cabo Development Ltd., pursuant to which Wollemi acquired 100% of the outstanding capital stock of Peakway in exchange for 10,500,000 shares of Wollemi's newly issued common stock. *See* FAC ¶ 12; Form 10-K at 7, 24. As a result of the share exchange, Defendant Haiting Li became the beneficial owner of approximately 70% of Wollemi's outstanding capital stock and became its Chief Executive Officer and Chairman (hereinafter the exchange **[\*4]** between Wollemi and Peakway will be referred to as a "reverse merger"). *See* FAC ¶ 17; Form 10-K at 32-33. According to GDI, GDI and the Assignor Shareholders controlled approximately 18.31% of the total outstanding shares of Wollemi but GDI did not make clear who owned the remaining 11.69%. *See* FAC ¶ 18. Yet, according to Defendants, GDI originally owned 100% of Wollemi and, following the reverse merger whereby 70% ownership was transferred back to Defendant Li, GDI retained a 30% interest in Wollemi. *See* Def. Motion for Rule 11 Inquiry at 1-2.

Peakway was a holding company that owned two Chinese subsidiaries, Fujian Jinjing Pacific Shoes Co. and Fujian Baopiao Light Industry Company Ltd. *See* FAC ¶ 11. On December 17, 2009, Wollemi received approval from the Financial Industry Regulatory Authority to change its name from Wollemi Mining Corp. to Pacific Bepure Industry, Inc. and to begin trading under the symbol "PBEP." *See* FAC ¶ 12; Form 10-K at 22. Accordingly, the name of the stock that GDI and the Assignor Shareholders owned changed from Wollemi to PBEP. *See* FAC ¶ 12. PBEP was a Delaware corporation with principal offices in China, specializing in manufacturing and marketing of footwear. **[\*5]** *See* FAC ¶¶ 5, 13. PBEP sold its products in at least twenty-two provinces in China as well as internationally through a distributor in South America and over the Internet. *See* FAC ¶ 14.

GDI alleges that at least one Assignor Shareholder, Mr. Liu Hansong, purchased additional PBEP shares through the U.S. OTCBB. However, GDI does not specify when those purchases occurred or if they occurred subsequent to the reverse merger. *See* FAC ¶ 15.

GDI alleges Defendants artificially inflated PBEP's net revenue and profit through public announcements and SEC filings. *See* FAC ¶¶ 19-40. In the alternative, GDI alleges Defendants artificially deflated PBEP's revenues and profit to the authorities in China. *See* FAC ¶¶ 26, 41. The first alleged misrepresentation occurred on January 27, 2010 where PBEP announced it anticipated that the full year sales for 2009 increased by at least 25% from 2008, prior to PBEP filing the 2009 fiscal year-end audited financials on March 31, 2010. *See* FAC ¶ 28. GDI alleges that various other misrepresentations were made throughout 2010 and 2011. It was not until November 11, 2011 that PBEP disclosed in its SEC Form 10-Q for fiscal quarter ending on September 30, 2011 that **[\*6]** revenues had actually decreased approximately 30% and net profit decreased approximately 77% as compared with the same period in 2010. *See* FAC ¶ 46. On March 30, 2012, PBEP filed SEC Form 15 to voluntary deregister its

common stock. *See* FAC ¶ 54.

## B. The Instant Case

On December 16, 2013, this Court granted Defendants' motion to dismiss the original complaint with leave to amend as to all claims, finding GDI failed to sufficiently allege falsity, scienter, causation, control person liability, demand futility, and a breach of the fiduciary duty. *See* Order Granting Def. MTD (Docket No. 37).[3] On January 23, 2014, GDI filed the FAC asserting three counts: (1) violation of Section 10(b) of Securities and Exchange Act and Rule 10b-5; (2) violation of Section 20(a) of Securities and Exchange Act; and (3) breach of fiduciary duty. *See* Docket No. 39. Defendants filed a motion to dismiss the FAC arguing, *inter alia*, it was neither a purchaser nor seller of securities, GDI lacked standing to state a claim, and that GDI failed to sufficiently plead all elements of the claims. *See* Motion to Dismiss the FAC (Docket No. 43). Specifically, Defendants argued that because GDI acquired its stock in PBEP **[*7]** *prior to* the alleged misrepresentations, GDI could not demonstrate that it purchased or sold securities that were purported to have had an artificially inflated stock price. *See* Motion to Dismiss the FAC at 17-20. As argued in the motion, this timing sequence — *i.e.*, the alleged misrepresentations occurred after GDI acquired its stock — precluded GDI from asserting a federal securities fraud claim in light of clear legal precedent which limits standing to purchasers and sellers of securities (*see e.g. Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 725-736, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975)) and also prevented GDI from demonstrating causation because no causal connection could have existed between the alleged misrepresentations and the alleged harm.

After the Court  **[*8]** heard the motion on April 10, 2014 and took the matter under submission, GDI filed a notice of voluntary dismissal pursuant to Rule 41(a)(I)(A)(i) prior to the Court issuing an order. *See* Docket No. 48. On April 17, 2014, the Court terminated the case and the pending motion to dismiss, which it had anticipated granting with prejudice as to all claims, allowing leave to amend only as to the one Assignee Shareholder, Mr. Liu Hansong, who may have purchased shares *after* Defendants allegedly made misrepresentations. Defendants now move the Court to perform a mandatory Rule 11 inquiry under the PSLRA or in the alternative, for sanctions under the Court's inherent authority.

## C. New Facts Provided by Defendants With This Motion

As part of this motion, Defendants provide the Court with new information regarding the relationship between the parties. First, Defendants attach a complaint filed by PBEP against GDI in the Superior Court of Fulton County State of Georgia ("Georgia Complaint") alleging breach of contract claims. *See* Declaration of Schmidt ("Schmidt Decl.") in support of Motion Exhibit A, Georgia Complaint (Docket No. 51-2). Attached to the Georgia Complaint is an unsigned copy of the  **[*9]** contract at issue in that action, entitled Cooperation Agreement for Listing Services ("Cooperation Agreement"). *See id.* Georgia Complaint Exhibit A, Cooperation Agreement. GDI does not contest the authenticity of the Cooperation Agreement. The Cooperation Agreement identifies Fujian Jinjiang Taipingyang Shoes, Co., Ltd. and Beijing Greater Dynasty Investment Co., Ltd. as the contracting parties but PBEP alleges in the Georgia Complaint that, through a variety of name changes and the reverse merger, the parties to the Cooperation Agreement became PBEP and GDI. *See id.* Georgia Complaint ¶ 23. The Cooperation Agreement states Fujian Jinjiang Taipingyang Shoes, Co., Ltd. will contribute 100% of its equity interest to the publically traded shell company

---

[3] GDI's original complaint asserted six claims: (1) violation of Section 10(b) of Securities and Exchange Act and Rule 10b-5; (2) violation of Section 20(a) of the Securities and Exchange Act; (3) breach of fiduciary duty against Defendant Haiting Li; (4) waste of corporate assets against Defendant Haiting Li; (5) unjust enrichment against Defendant Haiting Li; and (6) imposition of a constructive trust against Defendant Zhiyan Li. *See* Docket No. 1.

owned by Beijing Greater Dynasty Investment Co., Ltd., and will subsequently obtain a 70% controlling stake in that publicly traded shell company, leaving Beijing Greater Dynasty Investment Co., Ltd. with a 30% interest — *i.e.,* the reverse merger. *See id.* Cooperation Agreement Art. 1 ¶ 2.

Under the Cooperation Agreement Defendants were required to make preparations for publically listing Fujian Jinjiang Taipingyang Shoes, Co., Ltd.'s company **[*10]** in the U.S., including preparing financial reports in accordance with U.S. generally accepted accounting principals ("GAAP") for three years prior, obtain a financial audit from an SEC recognized firm, and register a holding company in Hong Kong. *See id.* at Art. 1 ¶ 1. GDI was to ensure that the U.S. listed shell company was legally registered in full compliance with all U.S. legal formalities and without debt or legal dispute. *See id.* at Art. 2 ¶ 2. Furthermore, after listing on the OTCBB, GDI shall "complete the financial plan for [Wollemi] and formulate a detailed operable action plan" to raise funds in accordance with PBEP's financial plan. *See id.* at Art. 2 ¶ 4. The Cooperation Agreement contains a liquidated damages provision under which Fujian Jinjiang Taipingyang Shoes, Co., Ltd. would pay Beijing Greater Dynasty Investment Co., Ltd. $800,000 plus up front costs if within two years commencing with the execution date, Fujian Jinjiang Taipingyang Shoes, Co., Ltd. abandoned implementation due to its own reasons. *See id.* at Art. 1 ¶ 3.

Second, Defendants provide six emails, from August 4th through 7th, 2011, between Mr. Xavier Waugh, GDI's founder, Chairman, and President, and Defendant **[*11]** Haiting Li. GDI does not contest the authenticity of the emails. The emails demonstrate Mr. Waugh solicited Defendant Li to sign a new contract entitled Amended Cooperation Agreement as well as "a private operation agreement," entitled Special Fund Agreement, that "should not be known to the lawyers or auditors" and would "enabl[e] you [Defendant Haiting Li] to

handle accounts and sales flexibly and simplify operations." Declaration of Haiting Li ("Haiting Decl.") Ex. A at 7 Docket No. 51-1. In the emails, Mr. Waugh also stated that should a class action lawsuit be filed against PBEP, "I will be incapable to prevent the occurrence and snowballing of this event that is too terrible to think about, though I myself do not want them to happen." *Id.* at 4.

## II. DISCUSSION

### A. PSLRA's Mandatory Rule 11 Inquiry

#### 1. Legal Standard

Rule 11(b) requires an attorney who is presenting to the court a pleading or motion, to certify to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, that

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) **[*12]** the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). The purposes of Rule 11 are to "to deter baseless filings in district court," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990) and to deter "dilatory or abusive pretrial tactics and streamlin[e] of litigation." *Golden Eagle Distrib. Corp. v. Burroughs Corp.*, 801 F.2d 1531, 1536

(9th Cir. 1986) ("Rule 11 is intended to reduce the burden on district courts by sanctioning, and hence deterring, attorneys who submit motions or pleadings which cannot reasonably be supported in law or in fact.").

In any private action arising under the PSLRA, courts are required to make Rule 11 findings "upon **[\*13]** final adjudication of the action." 15 U.S.C. § 78u—4(c)(1).[4] After termination of the action and upon motion by a party, the PSLRA requires the court to "include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion." 15 U.S.C. § 78u-4(c)(1). Section 78u—4(c)(2) requires the court to impose mandatory sanctions for any violation of Rule 11(b).[5] The presumptive sanction is for attorneys' fees and other expenses incurred in the action. *See* 15 U.S.C.A. § 78u-4(c)(3). The Second Circuit explains the purpose of the PSLRA's mandatory Rule 11 inquiry,

[r]ecognizing what it termed "the need to reduce significantly the filing of meritless

securities lawsuits without hindering the ability of victims of fraud to pursue legitimate claims," and commenting that the "[e]xisting Rule 11 has not deterred abusive securities litigation," the 104th Congress included in the Private Securities Litigation Reform Act of 1995 ("PSLRA") a measure intended to put "teeth" in Rule 11. H.R. Conf. Rep. No. 104-369 (1995), *reprinted* **[\*14]** *in* 1995 U.S.C.C.A.N. 730 . . . The PSLRA thus does not in any way purport to alter the substantive standards for finding a violation of Rule 11, but functions merely to reduce courts' discretion in choosing whether to conduct the Rule 11 inquiry at all and whether and how to sanction a party once a violation is found.

*Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 166-67 (2d Cir. 1999).

## 2. The PSLRA Requires a Final Adjudication

GDI argues that the PSLRA's mandatory inquiry does not apply here because GDI voluntarily dismissed the case without prejudice under Rule 41(a)(1)(A)(i), which is not a "final adjudication" under the PSLRA. In *Blaser v. Bessemer Trust Co.,* the district court for the Southern District of New York considered whether PSLRA's section 78u—4(c)(1) applied to a Rule 41(a)(1)(A)(i) voluntary dismissal, finding that

[t]o the extent that plaintiff voluntarily dismissed her complaint without prejudice pursuant to Rule 41(a)(1)(i), this dispute has not been 'resolv[ed]' and the Court has not 'decid[ed]'the case. Nor has it 'hear[d] and settle[d]' the case. By the plain meaning of the term, there has been no 'adjudication' in this case, let alone adjudication that is 'final.'

01-CV-11599-DLC, 2002 U.S. Dist. LEXIS 19856, 2002 WL 31359015 *3 (S.D.N.Y. Oct. 21, 2002). The court reasoned "[i]f Congress actually intended to saddle district courts with this task, it would **[\*16]** have stated so explicitly instead of using the phrase 'final adjudication' as the trigger for the Rule

---

[4] Section 78u—4(c)(1) provides,

In any private action arising under this chapter, *upon final adjudication* of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

15 U.S.C § 78u—4(c)(1) (emphasis added).

[5] Section 78u—4(c)(2) provides,

If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure. **[\*15]** Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

15 U.S.C. § 78u—4(c)(1).

11 review." *Id.* Later, the court followed its same reasoning to conclude in another decision that "a court is not required to conduct the review of each party and attorney's compliance with Rule 11 as required by Section 78u-4(c)(1) after a plaintiff voluntary dismisses its case without prejudice." *Unite Here v. Cintas Corp.,* 500 F. Supp. 2d 332, 337 (S.D.N.Y. 2007); *see also In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 269 (S.D.N.Y. 2004) ("Because this case is dismissed without prejudice and with leave to re-file, the Court may not have made a 'final adjudication' and it may be unnecessary for the Court to rule on the applicability of Rule 11 sanctions at this time.").

Similarly, although not considering a voluntary dismissal directly, the district court for the Southern District of California concluded "that § 78u—4(c)(1)'s plain meaning clearly reveals that 'final adjudication' occurs upon a terminating decision, such as a verdict, summary judgment or dismissal *with prejudice* without leave to amend." *DeMarco v. Depotech Corp.,* 131 F. Supp. 2d 1185, 1187 (S.D. Cal. 2001)  **[*17]** *aff'd* 32 F. App'x 260 (9th Cir. 2002) (emphasis added).

The Court agrees with these decisions that a voluntary dismissal without prejudice is not a final adjudication within the meaning of PSLRA. This conclusion comports with a plain reading of the statute: "In the absence of [a statutory] definition, [a court should] construe a statutory term in accordance with its ordinary or natural meaning." *F.D.I.C. v. Meyer*, 510 U.S. 471, 476, 114 S. Ct. 996, 127 L. Ed. 2d 308 (1994). Black's Law Dictionary defines "adjudication" as "[t]he legal process of resolving a dispute; the process of judicially deciding a case." Black's Law Dictionary (9th ed. 2009). Rule 41(a)(1)(A)(i) allows a plaintiff to voluntarily dismiss an action without a court order, by filing a notice of dismissal before the opposing party serves an answer. Because such a dismissal is without a court order, no judicial process is utilized in deciding the case, and the dispute is not resolved through adjudication. Accordingly, because there has been no final

adjudication, the PSLRA does not require the Court to perform a Rule 11 inquiry pursuant to section § 78u-4(c)(1) and include on the record specific findings regarding compliance with Rule 11(b).

Defendants'  **[*18]** reliance on *Smith v. Smith*, 184 F.R.D. 420, 422 (S.D. Fla. 1998), to the contrary is misplaced. There, the court granted defendants' motion for Rule 11 inquiry under the PSLRA even though the plaintiff had voluntarily dismissed the complaint upon notice of the Rule 11 motion. *Id.* at 421. *Smith* relied on the Supreme Court's 1990 decision in *Cooter & Gell* to hold "a voluntary dismissal does not bar the Court from imposing sanctions," while also finding the Rule 11(c) safe harbor provision, which allows a litigant to withdraw the offending pleading within twenty-one days of notice of the Rule 11 motion and escape sanctions, did not apply to federal securities actions brought under the PSLRA. *Smith*, 184 F.R.D. at 422 (relying on *Cooter & Gell*, 496 U.S. 384, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)). The Supreme Court made clear in *Cooter & Gell*, which was decided prior to the passage of the PSLRA, that "nothing in the language of Rule 41(a)(1)(i), Rule 11, or other statute or Federal Rule terminates a district court's authority to impose sanctions after such a dismissal." 496 U.S. at 395. But, Congress' subsequent passage of the PSLRA plainly requires a mandatory Rule 11 inquiry only "upon final adjudication of the action."  **[*19]** 15 U.S.C. § 78u-4(c)(1); *see Blaser,* 2002 U.S. Dist. LEXIS 19856, 2002 WL 31359015 *4 ("Even if Section 78u—4(c) has the effect of eliminating any requirement that a Rule 11 motion be served or if one is served that the 21—day safe harbor has expired, Section 78u—4(c)(1) still requires that the Rule 11(b) review be conducted 'upon final adjudication of the action.' It is important in construing statutory language to give effect to each word Congress has chosen to use in drafting the statute. . ."); *see gen. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81-82, 126 S. Ct. 1503, 164 L. Ed. 2d 179 (2006) (discussion of the PSLRA's purpose).

Exhibit 6, Page 36

Accordingly, *Smith v. Smith* is inapposite.[6]

B. Rule 11

The **[*20]** Court need not consider whether Rule 11 provides a basis of sanctions irrespective of the PSLRA because Defendants only raise the issue in Reply. However, even if it was raised in the motion, Defendants fail to satisfy Rule 11's safe harbor provision. Rule 11(c) requires that motions "must not be filed or be presented to the court if the challenged paper . . . is withdrawn or appropriately corrected within 21 days after service or within another time the court sets." Fed. R. Civ. P. 11(c)(2). The Ninth Circuit found the safe harbor's purpose was "abundantly clear," citing the Advisory Committee note that states,

> [t]hese provisions are intended to provide a type of 'safe harbor' against motions under Rule 11 in that a party will not be subject to sanctions on the basis of another party's motion unless, after receiving the motion, it refused to withdraw that position or to acknowledge candidly that it does not currently have evidence to support a specified allegation.

*Barber v. Miller*, 146 F.3d 707, 710 (9th Cir. 1998) (quoting Rule 11 Adv. Comm. Notes, 1993 Amend.). Because the purpose of the safe harbor is "to withdraw the offending pleading and *thereby escape sanctions,"* the Ninth Circuit **[*21]** held that a Rule 11 motion cannot be served after a complaint has been dismissed because it would not give the offending party the opportunity to escape the sanctions. *Id.* (emphasis in original) ("[W]e agree with the Sixth Circuit that 'a party cannot wait until after summary judgment to move for sanctions under Rule 11.'") (citing *Ridder v. City of*

*Springfield*, 109 F.3d 288 (6th Cir.1997), *cert. denied*, 522 U.S. 1046, 118 S. Ct. 687, 139 L. Ed. 2d 634 (1998)).

Here, the notice of motion and motion for sanctions were filed together on May 6, 2014, (*see* Docket No. 51), which was well after the offending pleading was withdrawn by GDI on April 17, 2014. *See* Docket No. 48. The twenty-one day notice was not satisfied because the notice of motion was not filed prior to the withdrawal of the offending pleading. Moreover, regardless of whether Defendants had provided the proper twenty-one day notice, the underlying purpose of the safe harbor precludes Defendants ability to move for sanctions given the offending pleading had already been withdrawn. *See e.g. Hockley by Hockley v. Shan Enterprises Ltd. P'ship*, 19 F. Supp. 2d 235, 241 (D.N.J. Aug. 5. 1998) ("Since [defendant] withdrew its position when it voluntarily dismissed its **[*22]** claims [against a third-party defendant], it is not subject to Rule 11 sanctions.").

Accordingly, the Court denies Defendants' motion for Rule 11 sanctions alone and pursuant to the PSLRA.

C. Court's Inherent Authority

A court has the inherent authority to issue sanctions separate from the authority provided by the PSLRA or under Rule 11. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 41-42, 50, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991); *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001) ("Three primary sources of authority enable courts to sanction parties or their lawyers for improper conduct (1) Federal Rule of Civil Procedure 11 . . . (2) 28 U.S.C. § 1927 . . . and (3) the court's inherent power."). To award sanctions, the court must make an explicit finding that there was conduct that constituted or was tantamount to bad faith. *See Fink*, 239 F.3d at 994 ("the cases discussed above make clear that sanctions are available if the court specifically finds bad faith or conduct tantamount to bad faith.").

In *Fink v. Gomez*, the Ninth Circuit held

---

[6] Defendants' reliance on *ITI Internet Services v. Solana Capital Partners* is inapposite because it does not address the question before the Court. There, the court held that a court's dismissal without prejudice for lack of prosecution, because defendants failed to file a joint status report, was a final adjudication under the PSLRA. *See* C055-2010Z, 2007 U.S. Dist. LEXIS 14099, 2007 WL 666593 (W.D. Wash. Feb. 27, 2007). Here, GDI voluntarily dismissed its complaint *prior* to the Court issuing an order; unlike *ITI Internet Services*, there was no dismissal by the Court.

"[s]anctions are **[\*23]** available for a variety of types of willful actions, including recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." 239 F.3d at 994; *see also Primus*, 115 F.3d at 649 (citing *In re Keegan Mgmt. Co., Sec. Litig.*, 78 F.3d 431, 436 (9th Cir. 1996)) ("A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.") Frivolous filings are "those that are both baseless and made without a reasonable and competent inquiry." *Estate of Blue v. Cnty. of Los Angeles*, 120 F.3d 982, 985 (9th Cir. 1997). "When a losing party has acted 'in bad faith, vexatiously, wantonly, or for oppressive reasons,' sanctions under the court's inherent powers may take the form of attorney's fees." *Primus*, 115 F.3d at 648 (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258-59, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975)). Courts have "broad fact-finding powers to grant or decline sanctions" warranting "great deference." *Smith v. Lenches*, 263 F.3d 972, 978 (9th Cir. 2001) (citing *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir.1997)).

Regarding **[\*24]** the burden of proof, the Ninth Circuit has not concluded whether a court's bad faith finding must be supported by clear and convincing evidence. *See Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010) ("This court has not addressed the burden of proof required for a sanctions award. . . . The burden of proof issue need not be resolved here because the district court's bad faith finding is supported by clear and convincing evidence."); *In re Lehtinen*, 564 F.3d 1052, 1061 n. 4 (9th Cir.2009) (declining to address burden of proof because clear and convincing evidence of misconduct supported bad faith finding and imposition of sanctions under the court's inherent authority). However, other circuits have held that clear and convincing evidence is required. *Shepherd v. Am. Broad. Companies, Inc.*, 62 F.3d 1469, 1476-78, 314 U.S. App. D.C. 137 (D.C. Cir.

1995) ("for those inherent power sanctions that are fundamentally penal . . . [including] awards of attorneys' fees . . . the district court must find clear and convincing evidence of the predicate misconduct," also noting that the First, Third, Fifth, Eighth, and Eleventh Circuits have applied a clear and convincing burden of **[\*25]** proof to a court's imposition of inherent authority sanctions); *see also Kelly v. U.S. Bank*, CIV. 08-1421-AC, 2010 U.S. Dist. LEXIS 72066, 2010 WL 2817292 (D. Or. June 25, 2010) (same).

### 1. GDI's Counsel's Conduct Was Tantamount to Bad Faith

The Court finds there is clear and convincing evidence that GDI's counsel, Ms. Sally W. Mimms and Mr. John F. Kloecker of Locke Lord, LLP (collectively "Counsel"), assertion of federal securities law claims, including violation of section 10(b) and Rule 10b-5 and section 20(a), on behalf of GDI as well as most Assignor Shareholders, was both reckless and frivolous, and amounted to conduct tantamount to bad faith. As the Ninth Circuit held in *Fink*, 239 F.3d at 993, a showing of subjective bad faith is not required where there is "recklessness when combined with an additional factor such as frivolousness, harassment, or an improper purpose." Counsel's conduct was reckless and frivolous because a reasonable and competent inquiry into the law would have revealed that GDI and most Assignor Shareholders could not demonstrate (1) standing to assert federal securities fraud claims or (2) a causal connection between the purchase or sale the PBEP securities in reliance on the alleged misrepresentations, **[\*26]** and an economic loss. *Cf. See Holgate v. Baldwin*, 425 F.3d 671, 677 (9th Cir. 2005) (Pursuant to Rule 11(b), "the reasonable inquiry test is meant to assist courts in discovering whether an attorney, after conducting an objectively reasonable inquiry into the facts and law, would have found the complaint to be well-founded.").

Federal securities fraud jurisprudence is clear that standing to bring a private action under section 10(b) and Rule 10b-5 is limited to "purchasers" or

"sellers" of securities. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 725-736, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975); *see Binder v. Gillespie*, 184 F.3d 1059, 1066-67 (9th Cir. 1999) ("As a matter of law, "conduct actionable under Rule 10b-5 must occur before investors purchase the securities."); *Levine v. Diamanthuset, Inc.,* 950 F.2d 1478, 1487 (9th Cir.1991) ("In addition to the requirement of an actual purchase or sale . . . we have also said that conduct actionable under Rule 10b—5 must occur before investors purchase the securities, if — as here — they allege the fraud induced them to make the purchase."); *Roberts v. Peat, Marwick, Mitchell & Co.,* 857 F.2d 646, 651 (9th Cir.1988) ("The actionable conduct must occur before the **[\*27]** investors become purchasers of securities as required by *Blue Chip Stamps.*" (citation omitted)).

Furthermore, to state a claim under section 10(b) and Rule 10b-5 a plaintiff must allege: "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss." *In re Daou Sys., Inc. Sec. Litig.,* 411 F.3d 1006, 1014 (9th Cir.2005) (citing *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341-42, 125 S. Ct. 1627, 161 L. Ed. 2d 577, (2005)). To allege a claim pursuant to section 20(a), the plaintiffs must allege: "(1) a primary violation of federal securities law, and (2) that the defendant exercised actual power or control over the primary violator." *Howard v. Everex Sys.,* 228 F.3d 1057, 1065 (9th Cir.2000).

Here, GDI's acquisition of stock in Wollemi/PBEP *preceded* the alleged misrepresentations concerning PBEP's finances. Specifically, GDI and several Assignor Shareholders acquired their PBEP shares in connection to the reverse merger occurring on November 12, 2009. *See* Compl. ¶¶ 14, 17-19; FAC ¶¶ 3, 12, 15, 16. Yet, the first alleged misrepresentation did not occur until over two months later on January 27, 2010. Hence, **[\*28]** the alleged misrepresentation could not have influenced their decision to acquire the stock, nor

did it affect value of PBEP shares at the time of their acquisition.[7] *See* Compl. ¶ 20; FAC ¶ 28. Counsel had all necessary facts in their possession of which to evaluate whether the claims could be asserted; although GDI clearly lacked standing and could not demonstrate a causal connection, Counsel asserted the claims. Such conduct by Counsel was at the very least reckless and frivolous, because the claims had no basis in fact and Counsel failed to make a reasonable and competent inquiry into the law. *Cf. Holgate*, 425 F.3d 671, 677 (Court found claims were frivolous, warranting Rule 11 sanctions under Rule 11 where "[e]ven the most cursory legal inquiry would have revealed the required elements of the federal claims asserted, elements that the [plaintiff's] complaint did not allege."); *Estate of Blue*, 120 F.3d 982, 985 (9th Cir. 1997) (Frivolous filings are "those that are both baseless and made without a reasonable and competent inquiry.").

To be sure, GDI specifically identified one individual, Mr. Hansong, who may have purchased shares during the relevant time period, and yet, failed to identify when the additional shares were purchased or the amount. *See* FAC ¶ 15. To the extent Mr. Hansong purchased shares after the alleged misrepresentation, the Court finds that the securities fraud claims asserted as to those additional shares, were not frivolous.[8] However, the

---

[7] Counsel argued in opposition to Defendants' motion to dismiss the FAC that the alleged misrepresentations generally occurred throughout 2009 and 2011, **[\*29]** and that PBEP's financial reporting of revenue and net profit was inflated for the fiscal year 2009 "the time frame in which Plaintiff purchased its shares" citing FAC ¶¶ 19, 22. *See* Opposition to Motion to Dismiss FAC (Docket No. 44). However, misrepresentations contained in the 2009 financial reports were not disclosed until the SEC report was filed on *March 31, 2010. See* FAC ¶ 28; Def. RJN Ex. A.

[8] GDI's Counsel also argues in its opposition to this motion that it had a good faith basis for all of its claims because it "was prepared to add other shareholder Assignors **[\*30]** who also purchased shares on the U.S. market." Opp. to Motion for Rule 11 Inquiry under the PSLRA at 9 (Docket No. 52). In an attempt to support its contention, Counsel attaches an exhibit to the opposition, which purports to be records of stock purchase in 2010 for 2011 for two individuals not named in either complaint, Hua Jiuin and Yue Shen. *See* Exhibit A,

Case 8:18-ap-01168-SC    Doc 347    Filed 08/19/21    Entered 08/19/21 21:07:48    Desc
Main Document    Page 48 of 242
2014 U.S. Dist. LEXIS 94658, *30

Page 10 of 13

fact that Mr. Hansong may have purchased shares after the alleged misrepresentation does not negate the fact that the majority of claims on behalf of GDI and the Assignor Shareholders were frivolous.

Accordingly, as to GDI and the Assignor Shareholders (other than Mr. Hansong's shares purchased on the OTCBB), Ms. Simms and Mr. Kloecker acted recklessly in filing frivolous federal securities fraud claims without a basis in fact or in law. Ms. Mimms and Mr. Kloecker, who was admitted *pro hac vice*, certified and / or signed the complaint [9] and the FAC, thus engaging in conduct tantamount to bad faith. That conduct is sanctionable under the inherent authority of this Court.

As for the remaining claims, including breach of fiduciary duty alleged in the complaint and the FAC (*see* Compl. Count III; FAC Count III) as well as waste of corporate assets alleged only in the complaint (*see* Compl. Count IV), the Court finds while the claims were meritless, they were not frivolous and do not support a finding of bad faith.[10] *Cf. Holgate*, 425 F.3d at 677 ("'the mere existence of one non-frivolous claim'" in a complaint does not immunize it from Rule 11 sanctions") (citing *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1364 (9th Cir.1990)).

2. GDI's Conduct (as a Party) Was Not Tantamount To Bad Faith

_____

Docket No. 52-1. The exhibit is not in English and is an unintelligible listing of numbers and headers. No foundation is laid for this document, and the Court declines to consider as evidence. The Court cannot conclude that the securities fraud claims were asserted in good faith as to these two individuals.

[9] Mr. Kloecker did not sign the original complaint because [*31] he was awaiting his status to appear *pro hac vice*. Because his name was provided both in the caption page and on the signatory line, the Court finds that Mr. Kloecker certified the pleading. *See* Docket No. 1.

[10] Regarding the remaining claims in the original complaint, including unjust enrichment (Count V) and imposition of a constructive trust (Count VI), as the Court concluded in its order granting the first motion to dismiss, these counts are remedies and not separate claims. *See* Docket No. 37.

Having found Counsel liable for sanctions, the Court now turns to whether **[*32]** GDI itself is culpable because it too engaged in conduct tantamount to bad faith. Unlike Counsel, the Court does not expect GDI to be informed of the law in order to determine whether the claims were legally frivolous. Defendants argue that in addition to recklessness, GDI brought this lawsuit for the improper purpose of harassment. According to Defendants, PBEP originally contracted with GDI to assist PBEP in becoming listed on the U.S. stock exchange. *See* Schmidt Decl. Ex. A, Georgia Complaint. After GDI failed to get PBEP listed on the U.S. exchange and PBEP observed and reported a decline in profits, PBEP's Board of Directors decided it was in the company's best interest to terminate its reporting obligations under the Securities Exchange Act. *See* Def. Motion at 3. In an attempt to salvage GDI's interest in PBEP, GDI purportedly tried to coerce Defendants to sign a new contract so that GDI would remain as PBEP's financial consultant, handling its U.S. de-registration and return to China. *See id.* at 8-10. Defendants' refusal to sign the new contract allegedly prompted GDI to assert this lawsuit in retaliation and for the improper purpose of harassment.

In support of this contention, **[*33]** Defendants provide the email exchange between Defendant Haiting Li and GDI's founder, President, and Chairman, Mr. Xavier Waugh. Defendants' argue the emails demonstrate that Mr. Waugh threatened Defendant Haiting Li with this lawsuit if PBEP refused to sign the new contract. In the email, Mr. Waugh states that should a class action lawsuit ensue, Mr. Waugh "will be incapable to prevent the occurrence and snowballing of this event that is too terrible to think about, though I myself [*e.g.* Mr. Waugh] do not want them to happen." Haiting Decl. Ex. A at 4. While this statement could be viewed as a thinly-veiled threat of litigation against Defendants, it is ambiguous. The Court finds the emails are not sufficiently compelling to conclude that GDI itself asserted the lawsuit with an improper purpose.

Next, Defendants argue the assertion of a $5 million damage claim with "no conceivable theory" as to why GDI would be entitled to those damages, supports an inference of an improper purpose. According to Defendants, the assertion of a $5 million claim is particularly egregious given: (1) GDI paid nothing for its stock in PBEP, acquiring it instead through the reverse merger, (2) GDI failed [**34**] to perform its obligations under the Cooperation Agreement (*e.g.* getting PBEP listed on the exchange), and (3) the liquidated damages provision in the Cooperation Agreement was for much less in damages, *i.e.,* $800,000. *See* Cooperation Agreement, Art. 1 ¶ 2. Further, Defendants argue that asserting this claim against Defendant Zhiyan Li, who was only a college student at that time, was "based solely on the identity of his father [Defendant Haiting Li]" constituted harassment.

Defendants' reliance on *Hudson v. Moore Business Forms* to support its argument that the $5 million claim gives rise to an inference of improper purpose is unavailing. There, the *Hudson* court found a $4.2 million damages claim against an unemployed woman over 50 whose husband is living on retirement was "wholly unsubstantiated and unconscionable," raising a strong inference that the claim was brought for the improper purpose of harassment and subject to sanctions under Rule 11. 836 F.2d 1156, 1162 (9th Cir. 1987) (Counsel's "failure to justify the basis for the compensatory damage calculation and its inability to defend the lack of proportionality between the compensatory and punitive damages only serve to support [**35**] the district court's conclusion that the damage claims were frivolous and brought to harass [the opposing party]."). Yet, the Ninth Circuit has since made clear that Rule 11's objective analysis allows for an *inference* of an improper purpose where a claim for damages is completely unsubstantiated. *See Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1365 (9th Cir. 1990) ("A district court confronted with solid evidence of a pleading's frivolousness may in circumstances that warrant it infer that it was filed

for an improper purpose. That is precisely what the district court did in *Hudson*, 836 F.2d at 1162. This is permissible because the test for improper purpose is objective."). However, sanctions under the Court's inherent authority requires a specific showing of conduct tantamount to bad faith. While an unsubstantiated $5 million damage claim could be evidence of bad faith, it is not obvious that such a claim is totally out of proportion as in *Hudson*.

Lastly, Defendants argue that the contract between PBEP and GDI demonstrates that GDI's allegations were factually untenable, because GDI could not possibly have relied on any alleged misrepresentations given that "GDI was contractually [**36**] responsible for overseeing and ensuring the accuracy of the very PBEP financials and other regulatory filings alleged to have been materially false." Motion at 11. In support, Defendants attach their complaint filed in Georgia Superior Court for breach of contract against GDI, which includes as an attachment an unsigned version of the Cooperation Agreement that is purportedly between PBEP and GDI.[11] *See* Schmidt Decl., Ex. A Cooperation Agreement. Defendants argue Article 2 ¶ 2 of the Cooperation Agreement demonstrates that GDI had full access to, and was responsible for the preparation of, PBEP financial reports. Article 2 ¶ 2 states that GDI "must ensure that the Listed Shell Company [*i.e.* Wollemi and later PBEP] is accessible and that the Listed Shell Company available to Party A [*i.e.* PBEP] is a legally registered company in full compliance with United States legal formalities and requirements and with no debt or legal dispute." *Id.* at Art. 2 ¶ 2. While this provision, as well as the Georgia Complaint generally, suggest that GDI was likely involved in maintaining PBEP's compliance with U.S. law that may have included the ability to access PBEP's financial information, the Court [**37**] cannot conclude that GDI in fact obtained

---

[11] In the Georgia Complaint, PBEP alleges that through a variety of name changes and the reverse merger, the parties to the Cooperation Agreement became PBEP and GDI. *See id.* Ex. A at 5, Georgia Complaint ¶ 23.

full access to PBEP's financial documents so as to belie any claim of reliance on an alleged misrepresentation.

The Court cannot conclude GDI's conduct was tantamount to bad faith. The Court denies sanctions under its inherent authority against GDI.

### D. Type of Sanctions

"Because of their very potency, inherent powers must be exercised with restraint and discretion" and a "primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. 32, 44-45, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). "[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 46 (citations omitted). The Court's decision to impose attorneys' fees "transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself." *Id.* Imposing attorney's fees as a sanction, "serv[es] the dual purpose **[\*38]** of 'vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy.'" *Id.* (citing *Hutto v. Finney*, 437 U.S. 678, 689, n. 14, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978); *see also Lahiri*, 606 F.3d at 1222 (affirming award of attorneys' fees and costs as the appropriate sanction under both 28 U.S.C. § 1927 and the court's inherent authority where the "bad faith finding was based on the cumulative effect of [plaintiff's counsel's] litigation conduct for more than five years."); *cf.* PSLRA, 15 U.S.C. § 78u-4(c)(3)(A)(ii) (where a "substantial failure of any complaint to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure [there is a presumption for] an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.").

After finding a basis of sanctions exists and prior to holding counsel liable for those sanctions, the court must first provide the offending party sufficient notice and an adequate hearing to contest the type and amount of sanctions proposed. *W. Sys., Inc. v. Ulloa*, 958 F.2d 864, 873 (9th Cir. 1992) (The court **[\*39]** found the offending party was on notice for the basis of the sanctions but vacated the sanction amount, remanding "for a hearing on the appropriateness and the amount of the sanctions.").

Here, the Court finds Ms. Mimms, Mr. Kloecker, and Locke Lord LLP jointly and severally liable for Defendants' attorneys' fees and costs in connection with litigating the frivolous federal securities fraud claims in both the complaint and the FAC. Such an award would both vindicate the Court's judicial authority while also make Defendants whole for expenses incurred to defend the frivolous claims.

Defendants contend in this motion that they incurred $96,207.28 in fees and costs related to defending the action from commencement through the dismissal of the original complaint, and an additional to $66,378.53 in fees and costs related to defending the action from the Court's dismissal of the original complaint through hearing on Defendants' motion to dismiss the FAC, for a total of $162,585.81. *See* Schmidt Decl. ¶¶ 5, 6. Defendants have not yet accounted for the fees and costs incurred with bringing this motion for sanctions.

However, the parties have not had a chance to address the proper allocation of **[\*40]** fees that should be attributable to frivolous (versus non-frivolous) claims. *See Lahiri*, 606 F.3d at 1222 (affirming district court's method in calculating sanctions finding that "[a]n apportioned percentage is not an abuse of discretion because it would be impossible to determine with mathematical precision the fees and costs generated only Kornarens [counsel who acted in bad faith]").

### III. CONCLUSION

For the foregoing reasons, the Court **DENIES** the motion for Rule 11 inquiry pursuant to the PSLRA

and **GRANTS** the motion for sanctions pursuant to the Court's inherent authority. The Court hereby orders Defendants to submit a full accounting of their costs and expenses to date, and brief how the attorneys' fees should be allocated to its litigation of the frivolous claims. The Court also sets the following briefing schedule to allow GDI's Counsel the opportunity respond.

Defendants' supplemental brief and supporting material shall be filed by July 31, 2014. GDI's response shall be filed by August 14, 2014. The Court sets a hearing for 1:30 p.m., August 28, 2014.

This order disposes of Docket No. 51.

IT IS SO ORDERED.

Dated: July 10, 2014

/s/ Edward M. Chen

EDWARD M. CHEN

United States District **[*41]** Judge

---

**End of Document**

# EXHIBIT 7

# BMD Mgmt., LLC v. Dane (In re Dane)

United States Bankruptcy Appellate Panel for the Ninth Circuit

May 15, 2014, Argued and Submitted at Pasadena, California; May 30, 2014, Filed

BAP No. CC-13-1298-KiLaPa

**Reporter**

2014 Bankr. LEXIS 2378 *

In re: MARIA ELENA DANE, Debtor. BMD MANAGEMENT, LLC, Appellant, v. MARIA ELENA DANE, Appellee.

**Notice:** THIS DISPOSITION IS NOT APPROPRIATE FOR PUBLICATION. ALTHOUGH IT MAY BE CITED FOR WHATEVER PERSUASIVE VALUE IT MAY HAVE (SEE FED. R. APP. P. 32.1), IT HAS NO PRECEDENTIAL VALUE. SEE 9TH CIR. BAP RULE 8013-1.

**Prior History:** [*1] Appeal from the United States Bankruptcy Court for the Central District of California. Bk. No. 2:12-45992-ER. Adv. No. 2:13-01073-ER. Honorable Ernest M. Robles, Bankruptcy Judge, Presiding.

**Counsel:** S. Michael Kernan, Esq. argued for appellant, BMD Management, LLC.

Stella A. Havkin, Esq. of Havkin & Shrago argued for appellee, Maria Elena Dane.

**Judges:** Before: KIRSCHER, LATHAM [2] and PAPPAS, Bankruptcy Judges.

# Opinion

## MEMORANDUM

Appellant BMD Management, LLC ("BMD")

appeals an order granting the motion of chapter 7 [3] debtor, Maria Elena Dane a/k/a Mylene Dane ("Maria") to dismiss with prejudice BMD's complaint under Civil Rule 12(b)(6). We AFFIRM.[4]

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Prepetition events

BMD is a California limited liability company that was owned 50/50 by Maria and her former husband, Barry Dane ("Barry"). Maria was BMD's Vice President. BMD was formed in 2003 to own a gym facility known as Train West Hollywood ("Train"). The Danes paid $425,000 for Train.

---

[3] Unless specified otherwise, all chapter, code and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and the Federal Rules of Bankruptcy Procedure, Rules 1001-9037. The Federal Rules of Civil Procedure are referred to as "Civil Rules."

[4] Maria has moved to strike certain portions of BMD's excerpts of the record, namely documents involving the bankruptcy case of Maria's corporate entity. ER Tabs 23-33. Conversely, BMD has asked us to take judicial notice [*2] of these same documents. We generally cannot consider items that were not presented to the bankruptcy court when making its decision. See Kirshner v. Uniden Corp. of Am., 842 F.2d 1074, 1077 (9th Cir. 1988). In any event, these documents are not relevant to our decision here. Therefore, we GRANT Maria's motion to strike.

In addition, BMD asks that we take judicial notice of a document from the California Secretary of State showing that Maria's LLC has been cancelled and a summary judgment from the state court in BMD's action against Maria's LLC. Because both of these documents post-date the order on appeal and have no bearing on our decision, we will not consider them. Id. As such, BMD's request for judicial notice is DENIED.

---

[2] Hon. Christopher Latham, Bankruptcy Judge for the Southern District of California, sitting by designation.

Train was not the usual type of gym with customers paying on a monthly basis; rather, it rented time to personal trainers who **[\*3]** brought in their clients to work out. Train's assets included the name of the gym, the goodwill and customers of Train, the gym equipment, the lease of the premises, a checking account and receivables (the "Assets").

The Danes divorced in 2006. Rather than sell Train, the Danes amended BMD's Operating Agreement and continued operating Train through BMD. Maria was to be Train's primary manager, while Barry was in charge of negotiations and daily transactions with the landlord of Train's leased premises.

After discussions for Maria to buy out Barry's share of BMD broke down in the spring/summer of 2008, in December 2008, Maria transferred the Assets of BMD to her newly-formed entity, Maria Elena Dane, LLC ("Dane LLC"), without prior notice to Barry and without paying Barry reasonably equivalent value for his 50% interest. On December 31, 2008, Maria's attorney informed Barry that Maria had created Dane LLC and that her business relationship with Barry "was closed." Specifically, her attorney sent Barry an email stating that Maria had "established a new entity that has exclusive right to possession and has no connection to [Barry] whatsoever." An arbitrator later found that Maria's acts **[\*4]** violated BMD's amended Operating Agreement as an improper attempt to dissolve BMD. Around this same time, the landlord terminated Train's lease and served BMD with a thirty-day notice to quit. The landlord later testified that he was not willing to renew Train's lease to BMD or Barry. However, he did negotiate a new lease with Maria who continued to operate Train without interruption, using the Assets and the same customer list.

On January 1, 2009, Maria sent an email to Train customers informing them that she had "dissolved" her "previous business relationship" with Barry and that she was now the "solo owner and manager of the gym." Thereafter, the customers began making payments to Dane LLC.

Several lawsuits between the parties ensued. Barry first commenced a binding arbitration action against Maria, individually, in January 2009 ("Arbitration Action"). Barry alleged claims for Breach of Contract, Fraud, Negligent Misrepresentation, Common Counts, Conversion and Accounting. Barry alleged that "in or around the summer of 2008," Maria froze him out of BMD and converted BMD's profits and Assets to Dane LLC for her own use, in violation of the amended Operating Agreement. Barry alleged **[\*5]** that Maria's act of obtaining a new lease for Train without his knowledge was also a violation. Barry requested damages of $236,000 plus attorney's fees and costs. At some point prior to the arbitration hearing, and for reasons not clear on the record, Barry dismissed his tort and negligence claims against Maria and proceeded only on the Breach of Contract claim. The arbitrator found in favor of Barry. However, since the gym was losing money and Barry was entitled only to profits as an LLC member, he could not establish any damages and was awarded nothing. Maria was ordered to distribute any remaining assets of BMD, including the gym equipment, which the arbitrator found had "little if any real value."

The second lawsuit, filed in May 2009, involved BMD's claims against Dane LLC over the BMD business (the "LLC Action")(<u>BMD, LLC v. Maria Elena Dane, LLC</u>, Case No. BC414409 (Cal. Super. Ct., Cnty of L.A.)). According to the Third Amended Complaint ("TAC") filed in the LLC Action on June 16, 2011, BMD alleged claims against Dane LLC for Violations of the CAL. BUS. & PROF. CODE § 17200 <u>et seq.</u>, Conversion, Trespass to Chattels, Misappropriation of Trade Secrets, Trademark Infringement and **[\*6]** Declaratory Relief. Maria was not named as a defendant to that action. However, paragraph three of the TAC states:

> Plaintiff is informed and believes, and based thereon alleges, that Maria Elena Dane who is

an Officer of Plaintiff BMD Management, LLC, created the company Maria Elena Dane, LLC to hold assets that she illegally and/or improperly transferred to Maria Elena Dane, LLC, <u>which may be the alter ego of Maria Elena Dane</u>(emphasis added).

A third lawsuit was filed by BMD against Maria on September 12, 2012, alleging a single claim for declaratory relief ("Declaratory Relief Action")(BMD Mgmt. LLC v. Dane, Case No. BC492311 (Cal. Super. Ct., Cnty of L.A.)). In that action, BMD sought to have Maria removed as an officer of BMD.

### B. Postpetition events

Maria filed an individual chapter 7 bankruptcy case on October 26, 2012. Her case was reassigned to Judge Robles on January 18, 2013, because Dane LLC had filed a bankruptcy case which was pending before him.

On February 15, 2013, the bankruptcy court granted BMD's motion for relief from stay to continue the Declaratory Relief Action against Maria in state court. It also granted BMD relief to continue the LLC Action.

### 1. BMD's first amended  [*7] complaint

On March 18, 2013, BMD filed its first amended complaint against Maria ("FAC"), seeking to except its debt from discharge under § 523(a)(2),[5] (a)(4) and (a)(6). BMD also alleged claims for fraudulent conveyance under § 548, for turnover under § 542, declaratory relief, conversion and

fraud.[6] The claims were based on the same factual allegation that Maria misappropriated the Assets of BMD and transferred them to Dane LLC. BMD requested damages of no less than $1 million. Attached to the FAC were copies of the December 31 email from Maria's attorney to Barry and the arbitrator's findings in the Arbitration Action.

### 2. Maria's motion to dismiss and BMD's opposition

Maria moved to dismiss the FAC under Civil Rule 12(b)(6). She argued that at no time prior to January 23, 2013 (when BMD had filed its original complaint) had BMD ever sued her for the claims alleged in the FAC, namely fraud, breach of fiduciary duty and conversion, and these claims were now either barred by the statute of limitations or belonged to the chapter 7 trustee. Maria argued that the First, Second, Third and Eighth claims for relief (the § 523(a)(2), (a)(4) and (a)(6) claims, and the stand-alone "fraud" claim) had to be filed by either the summer of 2011 or 2012, based on Barry's undisputed assertion that he discovered the facts constituting the fraud, breach of fiduciary duty and/or conversion in the summer of 2008. The Fourth and Fifth claims for relief (fraudulent conveyance under § 548 and turnover under § 542) arguably belonged solely to the chapter 7 trustee, so Barry lacked standing to assert them. As for the Sixth claim (declaratory relief), Maria argued that BMD had already sued her for this  [*9] in the Declaratory Relief Action, and the bankruptcy court had terminated the stay so BMD could pursue that claim in state court.

BMD opposed the Motion to Dismiss, contending that Maria's statute of limitations arguments failed for four reasons. First, the LLC Action was filed within months of discovering Maria's conduct, and BMD had alleged that Maria was the alter ego of

---

[5] Although not specifically referenced in the FAC, BMD claims that, in addition to a claim under § 523(a)(2)(A), it pled a claim under § 523(a)(2)(B) because Maria's fraud was "committed both orally and in writing." The bankruptcy court did not address this. We conclude that the FAC failed to plead sufficient facts for a plausible claim under § 523(a)(2)(B). Even if it had, however, this claim would still be subject to the same statute of limitations, which has already expired, as explained below.

[6] BMD later voluntarily dismissed its Seventh claim for conversion on April  [*8] 23, 2013, so it could pursue it in state court. Therefore, it was not subject to the dismissal order at issue in this appeal.

Dane LLC and faced potential liability. Thus, argued BMD, without citing to any authority, the alter ego allegation rendered the § 523(a) claims against her timely. Alternatively, BMD argued that it could get leave to amend the TAC in the LLC Action to add Maria as a defendant, which would relate back to the original filing date and defeat any statute of limitations attack. Second, claims against fiduciaries for their inequitable conduct could be equitably tolled and not subject to a statute of limitations defense. Third, even if BMD was aware of a fraud-based claim, the statute of limitations did not accrue until Maria had completed the "last overt act," which BMD claimed occurred within the limitations period. Lastly, many of Maria's "individual actions" took place in 2012, some of which had occurred after she **[*10]** filed for bankruptcy.[7]

In addition, BMD argued that it had stated a plausible claim under § 523(a)(2)(A) because Maria obtained BMD's property through her alter ego, Dane LLC, by using false pretenses, which she was able to do solely through her fiduciary role as the officer and manager for BMD running its gym. The FAC had also pled facts for fraudulent concealment, alleging that Maria had concealed from Barry that she **[*11]** was secretly taking the Assets, and a claim for fraudulent business practices, alleging that Maria's practices resulted in injury to BMD. BMD believed it had also alleged a claim under § 523(a)(2)(B), contending that Maria had obtained property through a written statement that was false — i.e., the email to the Train

customers. As for BMD's claims under § 523(a)(4) or (a)(6), Maria's argument that BMD and Barry are one and the same had already been rejected by the bankruptcy court in its ruling on the motion for relief from stay and by the state court. Further, BMD and Barry had completely different rights and remedies. Even though Barry could not prove damages in the Arbitration Action, this had no impact on BMD's claims, which could be made for the Assets themselves. Finally, BMD disagreed that only the chapter 7 trustee had standing to bring the Fourth and Fifth claims for fraudulent conveyance and turnover. Attached to BMD's opposition was a request for judicial notice that included copies of the TAC filed in the LLC Action and Maria's answer.

In reply, Maria countered that equitable tolling of the statute of limitations does not apply when the plaintiff has actual notice of the **[*12]** defendant's conduct giving rise to the claim. Here, it was undisputed that Maria gave notice to Barry, BMD's only other member, of her intent to freeze him out of the business on December 31, 2008. Further, argued Maria, Barry had already sued her for this conduct, alleging claims for fraud, breach of fiduciary duty and conversion, yet he dismissed them prior to the binding arbitration. Maria also disputed BMD's "last overt act" argument to toll the applicable deadlines, contending that in the cases cited by BMD, the court only applied the doctrine where the defendant concealed the wrongdoing. Here, Maria concealed nothing. Finally, Maria argued that BMD's allegation in the LLC Action that it <u>may</u> have an alter ego claim against her was insufficient to overcome the statute of limitations problem.

### 3. The bankruptcy court's ruling on the Motion to Dismiss

A hearing on Maria's Motion to Dismiss was held on May 7, 2013. After announcing its tentative ruling and hearing argument from BMD, the bankruptcy court decided to take the matter under

---

[7] We are not certain what BMD was arguing here, and the bankruptcy court never addressed it in its tentative or final ruling. BMD appears to be claiming that it was also seeking to except from discharge damages caused by Maria's bad acts that occurred in 2012, some of which perhaps occurred after she filed bankruptcy. If so, this is problematic for two reasons. First, the FAC is based entirely on Maria's bad acts in 2008 and January 2009, when she misappropriated and transferred the Assets to Dane LLC and obtained a new lease for Train; it is not based on anything that purportedly happened in 2012. Second, any bad acts Maria committed after filing bankruptcy would not be subject to discharge or barred by the automatic stay, so BMD may pursue those claims in state court.

advisement so that it could review and consider two unbriefed cases BMD's counsel raised regarding alter ego claims in California.

In the bankruptcy court's **[*13]** tentative ruling, which it ultimately incorporated into its final ruling, it dismissed the First through Fifth claims and the Eighth claim, but denied dismissal of the Sixth claim for declaratory relief.[8] The court dismissed with prejudice the First, Second, Third and Eighth claims for relief as barred by the statute of limitations. It reasoned that the debt underlying these § 523 claims was based on the same factual allegation that Maria had misappropriated BMD's Assets and transferred them to Dane LLC. Because Barry, BMD's only other member, admitted that he was aware of Maria's acts to freeze him out of the business in the summer of 2008, his fraud or conversion claims should have been filed within three years, by 2011; his breach of fiduciary duty claim should have been filed within four years, by 2012. The court further determined that the TAC in the LLC Action had not asserted a proper alter ego claim against Maria, and thus did not defeat her statute of limitations defense. Moreover, the statutes of limitations were not equitably tolled, as that doctrine applied only where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory **[*14]** period, or where the claimant was tricked by the defendant into allowing the filing deadline to pass. Here, while BMD had pursued its claims against Dane LLC, it had not initiated any proceeding against Maria prior to the expiration of the statutes of limitations. Further, nothing in the record indicated that this failure was due to any misconduct by Maria. Finally, the bankruptcy court rejected BMD's contention that its breach of fiduciary duty claim did not accrue during the time the fiduciary duty continued to exist, noting that California courts have recognized a postponement of the accrual only "until the beneficiary has knowledge or notice of the act constituting a breach

of fidelity," citing U.S. Liab. Ins. Co. v. Haidinger-Hayes, Inc., 1 Cal.3d 586, 595, 83 Cal. Rptr. 418, 463 P.2d 770 (1970). Here, Barry had knowledge of Maria's acts in 2008, but BMD did not file an action against her until 2013. The bankruptcy court also dismissed with prejudice BMD's Fourth and Fifth claims for fraudulent conveyance and turnover, as such claims belonged exclusively to the chapter 7 trustee.[9]

On May 20, 2013, BMD voluntarily dismissed its Sixth claim for declaratory relief so that it could pursue that claim in state court.

On June 3, 2013, the bankruptcy court entered its Amended Memorandum Decision and Order granting the Motion to Dismiss in part and denying it in part ("Dismissal Order").[10] Finding the authority raised by BMD regarding statute of limitations issues in cases presenting alter ego claims "inapposite," the bankruptcy court determined that BMD's fraud, breach of fiduciary duty and/or conversion claims were not "saved" by the alleged alter ego claim in the LLC Action. The court again found that no alter ego claim was pending against Maria in that action. Alternatively, even if Dane LLC and Maria were viewed as one and the same under an alter ego theory, the court reasoned that the filing of the LLC Action did not stop the statute of limitations from running against Maria with respect to any fraud, breach **[*16]** of fiduciary duty and/or conversion claims — claims which were not pled in the LLC Action.

The bankruptcy court entered an order dismissing BMD's adversary proceeding with prejudice on June 7, 2013. The order stated that only the Fourth and Fifth claims for relief were dismissed with

---

[8] BMD had already dismissed the Seventh claim for conversion by the time of the hearing on May 7, 2013.

[9] Both parties filed post-hearing **[*15]** briefing. In its later-issued memorandum decision, the bankruptcy court stated that it had rejected the parties' briefs because no post-hearing briefing was ordered or authorized. Although BMD has included these documents in the record, we did not consider them.

[10] When the court denied the Motion to Dismiss in part, it apparently was not aware of BMD's voluntary dismissal of the Sixth claim for declaratory relief filed a few weeks earlier.

prejudice, despite the bankruptcy court's prior Dismissal Order (in the tentative ruling portion attached) which stated that the First, Second, Third and Eighth claims for relief were also dismissed with prejudice. The adversary proceeding was closed on June 25, 2013.

### 4. Post-ruling events

Apparently confused by the court's multiple orders and docket entry closing the adversary proceeding, BMD filed an untimely appeal of the Dismissal Order on June 26, 2013. On June 27, 2013, BMD moved to extend the appeal time or, in the alternative, to amend the FAC based on excusable neglect. On September 5, 2013, the bankruptcy court entered a memorandum decision and order denying BMD's request for leave to amend the FAC, but granting its motion **[*17]** to extend retroactively the time to file a notice of appeal pursuant to Rule 8002(c) and to reopen the adversary proceeding due to the pending appeal.

### II. JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(I). We have jurisdiction under 28 U.S.C. § 158.

### III. ISSUES

1. Did the bankruptcy court err in dismissing the FAC under Civil Rule 12(b)(6)?

2. Did the bankruptcy court abuse its discretion in dismissing the FAC without leave to amend?

### IV. STANDARDS OF REVIEW

The bankruptcy court's dismissal of an adversary proceeding for failure to state a claim under Civil Rule 12(b)(6) is reviewed de novo. Barnes v. Belice (In re Belice), 461 B.R. 564, 572 (9th Cir. BAP 2011). A dismissal without leave to amend is

reviewed for abuse of discretion. Ditto v. McCurdy, 510 F.3d 1070, 1079 (9th Cir. 2007). A bankruptcy court abuses its discretion if it applies an incorrect legal standard or its factual findings are illogical, implausible or without support from evidence in the record. TrafficSchool.com v. Edriver Inc., 653 F.3d 820, 832 (9th Cir. 2011). "Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not **[*18]** be saved by any amendment." Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc., 368 F.3d 1053, 1061 (9th Cir. 2004)(citation omitted). However, it is not error for the trial court to deny leave to amend where the amendment would be futile. Id. (citing Saul v. United States, 928 F.2d 829, 843 (9th Cir. 1991)).

### V. DISCUSSION

#### A. Civil Rule 12(b)(6) standards

Under Civil Rule 12(b)(6), made applicable in adversary proceedings through Rule 7012, a bankruptcy court may dismiss a complaint if it fails to "state a claim upon which relief can be granted." In reviewing a Civil Rule 12(b)(6) motion, the trial court must accept as true all facts alleged in the complaint and draw all reasonable inferences in favor of the plaintiff. Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). However, the trial court need not accept as true conclusory allegations or legal characterizations cast in the form of factual allegations. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007); Hartman v. Gilead Scis., Inc. (In re Gilead Scis. Sec. Litig.), 536 F.3d 1049, 1055 (9th Cir. 2008)(court is not required to accept as true "allegations that are merely conclusory, unwarranted **[*19]** deductions of fact, or unreasonable inferences."). Moreover, we do not ignore affirmative defenses to a claim; if the allegations show that relief is barred as a matter of law, the complaint is subject to dismissal. Jones v.

Bock, 549 U.S. 199, 215, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007)(dismissal is appropriate under Civil Rule 12(b)(6) if the allegations show that relief is barred by the applicable statute of limitations).

To avoid dismissal under Civil Rule 12(b)(6), a plaintiff must aver in the complaint "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)(quoting Twombly, 550 U.S. at 570). It is axiomatic that a claim cannot be plausible when it has no legal basis. A dismissal under Civil Rule 12(b)(6) may be based on either the lack of a cognizable legal theory, or on the absence of sufficient facts alleged under a cognizable legal theory. Johnson v. Riverside Healthcare Sys., LP, 534 F.3d 1116, 1121 (9th Cir. 2008).

**B. The bankruptcy court did not err in dismissing the FAC.**

BMD raises a variety of arguments to demonstrate why the Dismissal Order should be reversed. For the most part, BMD simply reasserts the same **[*20]** arguments it raised before the bankruptcy court as opposed to articulating how the court erred. Notably, BMD does not dispute the bankruptcy court's ruling that the Fourth and Fifth claims for relief were dismissed due to BMD's lack of standing. Therefore, we AFFIRM the Dismissal Order with respect to those claims. See Wake v. Sedona Inst. (In re Sedona Inst.), 220 B.R. 74, 76 (9th Cir. 1998)(an issue not briefed is deemed waived). As for the remaining First, Second, Third and Eighth claims for relief, we address each of BMD's arguments in turn.

Two distinct issues exist concerning the statute of limitations in a nondischargeability proceeding. First, the establishment of the debt is governed by the applicable state statute of limitations law, which, in this case, is California. Banks v. Gill Distrib. Ctrs., Inc., 263 F.3d 862, 868 (9th Cir.

2001)(citation omitted). If the suit is not brought within the time period allotted under state law, the debt cannot be established. Second, the question of dischargeability of the debt is a distinct issue governed solely by the limitations periods established by bankruptcy law, in particular, Rule 4007. Id. **[*21]** Only the first prong is at issue here.

BMD's First and Eighth claims for relief assert nondischargeability of a debt due to Maria's alleged fraud. Under CAL. CODE CIV. PROC. § 338(d), fraud actions must be brought within three years and "[t]he cause of action in that case is not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." Thus, the "discovery" rule applies to fraud actions. BMD's Second claim for relief asserts a claim for Maria's alleged breach of fiduciary duty under § 523(a)(4). Breach of fiduciary duty claims are governed by CAL. CODE CIV. PROC. § 343 and are subject to a four-year statute of limitations. See David Welch Co. v. Erskine & Tulley, 203 Cal.App.3d 884, 893, 250 Cal. Rptr. 339 (1988). Finally, BMD's Third claim for relief asserts a claim under § 523(a)(6) for "fraudulent conveyance - actual intent." However, the facts alleged suggest a conversion claim. A claim for conversion is governed by CAL. CODE CIV. PROC. § 338 and is subject to a three-year statute of limitations. See Minsky v. City of L.A., 11 Cal. 3d 113, 120 n.6, 113 Cal. Rptr. 102, 520 P.2d 726 (1974). Notably, BMD dismissed its conversion claim — its Seventh claim for relief — prior **[*22]** to the bankruptcy court's ruling on the Motion to Dismiss. However, even if the Third claim were a claim for actual fraudulent transfer, in this case the statute of limitations is four years.[11]

BMD first contends the bankruptcy court

---

[11] CAL. CIV. CODE § 3439.09 provides that no action may be brought for fraudulent transfer more than seven (7) years after the transfer was made notwithstanding any other provision of law. Where actual intent to defraud can be shown under § 3439.04(a)(1), an action must be brought within four years after the transfer was made, or, if later, within one year of when the transfer was or could reasonably have been discovered by the claimant.

misapplied the rule that all factual allegations in the complaint are to be accepted as true for purposes of reviewing a motion to dismiss under Civil Rule 12(b)(6). Specifically, BMD contends that it had alleged in the TAC in the LLC Action that Dane LLC is the alter ego of Maria. Therefore, the bankruptcy court had to accept this fact as true. The only reference within the TAC as to any alter ego claim against Maria is in paragraph three, which states that "Maria Elena Dane, LLC *may* be the alter ego of Maria Elena Dane." **[*23]** This statement is not a "fact" but rather a legal characterization cast in the form of a factual allegation. Twombly, 550 U.S. at 555-56. As such, the bankruptcy court did not have to accept it as true.

BMD next contends the bankruptcy court erred in determining that its alter ego allegation in the LLC Action was insufficient to save its claims from Maria's statute of limitations defense. In short, BMD argues that because it filed the LLC Action within months after Maria transferred BMD's Assets to Dane LLC, and because BMD alleged an alter ego claim in that action, the claims in the nondischargeability action were not barred by the statute of limitations.

Under California law, "there is no such thing as a substantive alter ego claim . . . ." Ahcom, Ltd. v. Smeding, 623 F.3d 1248, 1251 (9th Cir. 2010). A claim against a defendant, based on the alter ego theory, is not itself a claim for substantive relief, e.g., breach of contract or to set aside a fraudulent conveyance. Hennessey's Tavern, Inc. v. Am. Air Filter Co., 204 Cal.App.3d 1351, 1359, 251 Cal. Rptr. 859 (1988). Rather, it is a procedural device by which courts will disregard the corporate entity in order to hold the alter ego individual liable **[*24]** on the obligations of the corporation. Id. Before the doctrine may be invoked, two elements must be alleged: (1) there is such unity of interest and ownership that the separate personalities of the individual and the corporation no longer exist; and (2) that, if the acts in question are treated as those of the corporation alone, an inequitable result will follow. Neilson v. Union Bank of Cal., N.A., 290 F.Supp.2d 1101, 1115 (C.D. Cal. 2003); Sonora Diamond Corp. v. Super. Ct., 83 Cal.App.4th 523, 538, 99 Cal. Rptr. 2d 824 (2000). "Conclusory allegations of 'alter ego' status are insufficient to state a claim. Rather, a plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each." Neilson, 290 F.Supp.2d at 1116 (citations omitted); Hokama v. E.F. Hutton & Co., Inc., 566 F.Supp. 636, 647 (C.D. Cal. 1983) ("Defendants further argue that plaintiffs cannot circumvent the requirements for secondary liability by blandly alleging that Madgett, Consolidated, and Frane are 'alter egos' of other defendants accused of committing primary violations. This point is well taken . . . . If plaintiffs wish to pursue such a theory of liability, they must allege the elements **[*25]** of the doctrine. Conclusory allegations of alter ego status such as those made in the present complaint are not sufficient."). See also Leek v. Cooper, 194 Cal.App.4th 399, 414-15, 125 Cal. Rptr. 3d 56 (2011)(recognizing split in California authority as to whether alter ego doctrine must be pleaded in the complaint, but holding that when the court is asked to take some action upon an alter ego theory at the pleadings stage, plaintiff must allege facts to show a unity of interest and ownership and an unjust result if the corporation is treated as the sole actor)(citations omitted).

The TAC filed in the LLC Action contains only one conclusory allegation that Maria may be the alter ego of Dane LLC. It fails to allege any facts establishing either one of the two elements necessary to invoke the doctrine. While the TAC asserts facts that establish Maria as the sole owner of Dane LLC and of her participation in transferring BMD's Assets to Dane LLC, it does not assert any allegation as to how, when or why the separateness between Maria and Dane LLC ceased to exist, or why the corporate entity should be disregarded. More importantly, the TAC does not allege that fraud or injustice will result if Maria is not a **[*26]** party to the LLC Action. "The allegation that a corporation is the alter ego of the

individual stockholders is insufficient to justify the court in disregarding the corporate entity in the absence of allegations of facts from which it appears that justice cannot otherwise be accomplished." Meadows v. Emett & Chandler, 99 Cal.App.2d 496, 498-99, 222 P.2d 145 (1950)(quoting Norins Realty Co. v. Consol. Abstract & Title Guar. Co., 80 Cal.App.2d 879, 883, 182 P.2d 593 (1947)). In order to rely on the theory of alter ego "it must be alleged and proved that the stockholders and the corporate entity are the business conduits and alter ego of one another, and that to recognize their separate entities would aid the consummation of a wrong." Id. at 499 ("The rule is firmly settled that no reliance can be had on this [alter ego] theory in the absence of pleading that recognition of the corporate entity would sanction a fraud or promote injustice.")(emphasis in original). We conclude that the elements of alter ego were not sufficiently pled in the TAC, and so we agree with the bankruptcy court that no alter ego claim is pending against Maria in the LLC Action.

Because the TAC did not establish an alter ego claim against Maria, **[*27]** it would have to be amended a fourth time to add her as a new defendant. "When a defendant is first named in an amended complaint, and is alleged to be the alter ego of a defendant named in the original complaint, he is brought into the action as a new defendant and the action is commenced as to him at the time the amended complaint naming him is filed." Hennessey's Tavern, Inc., 204 Cal.App.3d at 1359. As a general rule, "an amended complaint that adds a new defendant does not relate back to the date of filing the original complaint and the statute of limitations is applied as of the date the amended complaint is filed, not the date the original complaint is filed." Woo v. Super. Ct., 75 Cal.App.4th 169, 176, 89 Cal. Rptr. 2d 20 (1999)(string citations omitted). Further, an "amendment after the statute of limitations has run will not be permitted when the result is the addition of a party who, up to the time of the proposed amendment, was neither a named nor a fictitiously

designated party to the proceeding." Ingram v. Super. Ct., 98 Cal.App.3d 483, 492, 159 Cal. Rptr. 557 (1979)(citing Stephens v. Berry, 249 Cal.App.2d 474, 478, 57 Cal. Rptr. 505 (1967)). Presuming BMD could even amend the TAC at this point to add Maria, the result is the **[*28]** same — the statutes of limitations for claims of fraud, breach of fiduciary duty, conversion or actual fraudulent transfer have run.

While California law allows a plaintiff to bring an action against an alter ego defendant after the statute of limitations has expired in certain circumstances, such as after a judgment has been entered, that situation is not applicable here. See CAL. CODE CIV. PROC. § 187 (judgment creditor may be able to amend the judgment to add non-party alter ego defendant as a judgment debtor and enforce the judgment against that debtor); Most Worshipful Sons of Light Grand Lodge Ancient Free and Accepted Masons v. Sons of Light Lodge No. 9, 160 Cal. App. 2d 560, 566-67, 569, 325 P.2d 606 (1958). First, no judgment has been entered in the LLC Action. Second, BMD could never add Maria as an alter ego defendant after judgment because it was aware of Maria's existence before trial. Jines v. Abarbanel, 77 Cal.App.3d 702, 717, 143 Cal. Rptr. 818 (1978)(holding that trial court erred by amending judgment against a doctor to add his corporation as a judgment debtor because plaintiff was aware of corporation's existence before trial). Thus, BMD did not preserve any post-judgment right under CAL. CODE CIV. PROC. § 187 **[*29]** to add her as an alter ego defendant.

We disagree with BMD that it could amend the TAC in the LLC Action to add Maria as a "Doe" defendant to overcome the statute of limitations problem. Under CAL. CODE CIV. PROC. § 474, "an amended complaint substituting a new defendant for a fictitious Doe defendant filed after the statute of limitations has expired is deemed filed as of the date the original complaint was filed." Woo, 75 Cal.App.4th at 176 (citing Austin v. Mass. Bonding & Ins. Co., 56 Cal.2d 596, 599, 15 Cal. Rptr. 817, 364 P.2d 681 (1961)). However, this exception to

the general rule has a caveat — the plaintiff must have been genuinely ignorant of the Doe defendant's identity at the time it filed its original complaint. Id. at 177 (citations omitted). BMD was well aware of its potential claims against Maria when it filed its original complaint in the LLC Action in 2009, yet it chose not to pursue them. As such, CAL. CODE CIV. PROC. § 474 would not apply.

BMD alternatively argues that the statutes of limitations should be equitably tolled because of Maria's alleged self-dealing as a corporate fiduciary. It further argues that Maria's "continuous wrongs" or "last overt act," some of which BMD contends occurred within [*30] the statute of limitations, prevents her from raising any statute of limitations defense. In actions where the federal court borrows the state statute of limitation, the court also borrows all applicable provisions for tolling the limitations period found under state law. Cervantes v. City of San Diego, 5 F.3d 1273, 1275 (9th Cir. 1993).

Without question, Maria owed a fiduciary duty to Barry as a co-member of BMD. BMD cites to U.S. Liab. Ins. Co. v. Haidinger-Hayes, Inc., 1 Cal.3d 586, 83 Cal. Rptr. 418, 463 P.2d 770 (1970), for the proposition that no claim accrues during the time the fiduciary relationship continues to exist. BMD contends that Maria breached and continues to breach her fiduciary duty to BMD because she has usurped corporate opportunities and taken corporate assets as her own. BMD has several problems here. First, as recognized by the bankruptcy court, the California Supreme Court in Haidinger-Hayes, Inc. noted that accrual of a cause of action involving a fiduciary is only postponed "until the beneficiary has knowledge or notice of the act constituting a breach of fidelity." Id. at 596 (string citing cases). Here, Barry was on actual notice of Maria's subject actions in 2008 and January 2009. In [*31] addition, the facts alleged in the FAC speak only of Maria's acts of misappropriating BMD's Assets and transferring them to Dane LLC in December 2008, her

obtaining a lease from the landlord around that same time, and her email to the trainers on January 1, 2009. Although BMD alleged in its opposition to the Motion to Dismiss that Maria had engaged in "multiple diversions of money," no facts about these alleged diversions were specifically pled in the FAC. A plaintiff's memorandum in opposition to a Civil Rule 12(b)(6) motion cannot serve to supplement or amend the complaint. See Gomez v. Ill. State Bd. of Educ., 811 F.2d 1030, 1039 (7th Cir. 1987). Finally, equitable tolling would not apply here because BMD did not actively pursue the claims at issue against Maria within the statutory period, and nothing in the record shows that BMD's delay in suing her was due to her misconduct. See O'Donnell v. Vencor Inc., 465 F.3d 1063, 1068 (9th Cir. 2006).

Accordingly, because the FAC failed to establish plausible claims for relief under § 523(a), the bankruptcy court did not err in granting the Motion to Dismiss.

## C. The bankruptcy court did not abuse its discretion in dismissing the FAC without [*32] leave to amend.

Under Civil Rule 15(a)(2), applicable here by Rule 7015, BMD could amend its FAC only with Maria's consent, or with the bankruptcy court's leave. BMD contends that leave should have been given in this case, particularly since BMD voluntarily dismissed two causes of action, which the bankruptcy court intimated would have "saved" the FAC. We assume BMD means its Sixth and Seventh claims for declaratory relief and conversion, but BMD does not show where the bankruptcy court "intimated" that these claims would have saved the FAC. Actually, the Seventh claim was dismissed before the bankruptcy court could even rule on it and, for whatever reason, BMD chose to dismiss the Sixth claim after the bankruptcy court issued its tentative ruling. BMD contends that it should have, at minimum, been permitted to reinstate its Sixth claim, which it argues the bankruptcy court found

had merit.

BMD did not ask for an opportunity to amend the FAC until after the adversary proceeding had been dismissed with prejudice and the appeal of the Dismissal Order had been filed. The bankruptcy court denied that request for two reasons, as explained in its August 20 tentative ruling, which it incorporated [**33**] into its final memorandum and order entered on September 5, 2013. First, BMD had already amended its complaint once, and it failed to demonstrate entitlement for leave to file a second amendment. Although the court did not articulate why BMD had failed to show that leave was warranted under Civil Rule 15, we infer from the record that its decision was based on BMD's inability to remedy the statute of limitations problem. The trial court does not err in denying leave to amend where the amendment would be futile. <u>Thinket Ink Info. Res., Inc.</u>, 368 F.3d at 1061. Second, the court found that it made little sense to consider a request to amend when BMD had already filed its notice of appeal (albeit, untimely, but not yet dismissed) of the Dismissal Order. We discern no abuse of discretion in that ruling. In addition, we find BMD's argument that the bankruptcy court abused its discretion by not allowing BMD to reinstate its Sixth claim without merit, when BMD consciously chose to dismiss that claim to pursue it in state court.

## VI. CONCLUSION

For the foregoing reasons, we AFFIRM.

---

End of Document

# EXHIBIT 8

# In re Gonzalez

United States Bankruptcy Court for the Middle District of Florida, Tampa Division

March 5, 2019, Decided

Case No. 8:12-bk-19213-RCT, Chapter 7

**Reporter**

2019 Bankr. LEXIS 675 *; 67 Bankr. Ct. Dec. 10

In re OILEDKIN GONZALEZ, Debtor.

**Counsel:** **[*1]** For Oiledkin Gonzalez, Debtor: Raul Cabrera, Cabrera Law, PL, Tampa, FL.

For Christine L Herendeen, Trustee: Thomas A Lash, Attorney for Trustee, Lash, Wilcox & Grace PL, Tampa, FL; W Todd Boyd, James K Parker, Bennett C Lofaro, Boyd Richards Parker & Colonnelli PL, Miami, FL.

**Judges:** Roberta A. Colton, United States Bankruptcy Judge.

**Opinion by:** Roberta A. Colton

# Opinion

## MEMORANDUM OPINION ON REMAND

Lash Wilcox & Grace PL (formerly known as Lash & Wilcox PL) ("LW&G") is a law firm with a niche practice specializing in the prosecution of consumer protection cases on behalf of chapter 7 trustees. Christine Herendeen ("Ms. Herendeen") is one of six chapter 7 trustees in the Tampa Division of the Middle District of Florida who retain LW&G to handle consumer protection lawsuits in her chapter 7 cases.

CadleRock Joint Venture, LP ("CadleRock") was a creditor of Oiledkin Gonzalez.[1] Mr. Gonzalez filed a chapter 7 bankruptcy in late 2012.[2] He testified at his first meeting of creditors on February 8, 2013 (the "341 Meeting") that CadleRock called his cell phone several times demanding repayment after he told them to stop calling because he could not repay the debt.[3] Ms. Herendeen referred the matter to LW&G.

LW&G, in turn, filed **[*2]** a lawsuit against CadleRock.[4] Count I of the complaint alleged multiple violations of the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. § 559.55 *et seq.* Count II alleged multiple violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.*[5]

On December 10, 2013, CadleRock sent LW&G a letter stating that the complaint was meritless,[6] and enclosed a proposed Motion for Sanctions pursuant to Fed. R. Bankr. P. 9011(c).[7] On December 17, 2013, LW&G dismissed the complaint against

---

[1] CadleRock was not Mr. Gonzalez's original lender. The debt is based on a 2006 loan from Star Funding, LLC and was first assigned to GMAC Mortgage, LLC. It was then purchased by and assigned to CadleRock in 2009 as part of a bulk purchase of distressed loans.

Doc. 220, Ex. H (Shaulis Dep. 18-20, 41-42).

[2] Doc. 1.

[3] Doc. 35, Ex. B, p. 5.

[4] Adv. No. 8:13-ap-01004-KRM (hereinafter "AP").

[5] AP Doc. 1.

[6] Doc. 35, Ex. E.

[7] A party that intends to file a sanctions motion under Fed. R. Bankr. P. 9011(c) must comply with the safe harbor provision of Fed. R. Bankr. P. 9011(c)(1)(A), which requires that the party seeking sanctions first serve the motion upon the offending party and give the offending party twenty-one (21) days to withdraw or correct the challenged pleading. "This process provides a 'safe harbor' in which the offending party can avoid sanctions by withdrawing or correcting the challenged document or position after receiving notice of the alleged violation." *Gwynn v. Walker(In re Walker)*, 532 F.3d 1304, 1308 (11th Cir. 2008).

CadleRock, with prejudice, within the Fed. R. Bankr. P. 9011(c)(1)(A) 21-day safe harbor.[8] The adversary proceeding was closed on December 27, 2013.

CadleRock then began what has become a five-year quest to punish LW&G and Ms. Herendeen for filing that lawsuit. Because LW&G complied with Fed. R. Bankr. P. 9011 ("Rule 9011")[9] by dismissing the action within the safe harbor period, CadleRock could not pursue sanctions under Rule 9011. So, CadleRock got creative. First, CadleRock tried to sue LW&G and Ms. Herendeen for racketeering.[10] When that failed,[11] CadleRock settled on a Motion for Sanctions based on this court's inherent authority and 28 U.S.C. § 1927 (the "Motion for Sanctions").[12]

# I. PROCEDURAL BACKGROUND

CadleRock filed its Motion for Sanctions in August 2015.[13] In June 2016, LW&G and Ms. Herendeen filed an Amended Motion for Summary **[*3]** Judgment.[14] The Honorable K. Rodney May, then the presiding judge,[15] granted summary judgment in favor of LW&G and Ms. Herendeen and denied

CadleRock's Motion for Sanctions.[16]

CadleRock appealed to the District Court.[17] During the appeal process, the District Court requested statistics regarding the number of Consumer Protection Cases[18] filed and dismissed by LW&G during the period January 1, 2011 through December 31, 2014 (the "Designated Period").[19] The parties complied and filed summaries and unsworn statistical information in the District Court.[20] Based on these statistics, the District Court reversed and remanded the Motion for Sanctions for further consideration by this court in light of the statistical information.[21]

Judge May retired in December 2017.

To prepare the record for reconsideration of the Motion for Sanctions, this court entered two case management orders. The first directed the parties to package the statistics in proper form for consideration on summary judgment.[22] The second addressed discovery and related matters and set a schedule for oral argument.[23]

LW&G filed a declaration verifying the unsworn information previously provided to the District Court.[24] CadleRock filed its own affidavits **[*4]** in response.[25]

---

[8] AP Doc. 10.

[9] Rule 9011's counterpart in an action in the federal district courts is Federal Rule of Civil Procedure 11, often referred to, including herein, as "Rule 11."

[10] See Docs. 32, 34, and 35.

[11] See Doc. 51 ("Order On Motion of CadleRock Joint Venture, L.P. to Reopen Bankruptcy Case and Motion for Leave to Sue Trustee and Special Counsel"). CadleRock appealed this Order along with two others (Docs. 48 and 49) to the U.S. District Court for the Middle District of Florida (the "District Court"). The District Court consolidated the three appeals under Case No. 8:14-cv-3212-JSM ("DC1") and subsequently affirmed all three Orders. DC1 Docs. 22 and 84.

[12] Doc. 95.

[13] Id.

[14] Doc. 220.

[15] In July 2015, CadleRock unsuccessfully attempted to recuse Judge May. Docs. 86 and 98.

[16] Doc. 232.

[17] CadleRock also appealed three additional orders. The District Court consolidated the four appeals under Case. No. 8:16-cv-02046-JSM ("DC2").

[18] As used herein, the phrase "Consumer Protection Cases" refers to cases filed under the Florida Consumer Collection Practices Act ("FCCPA"), Fla. Stat. § 559.55 et seq., the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 et seq., and similar state and federal statutes.

[19] DC2 Docs. 26, 28, and 33.

[20] DC2 Docs. 25, 27, 31, and 34.

[21] DC2 Doc. 37; Doc. 297.

[22] Doc. 334.

[23] Doc. 350.

[24] Doc. 336.

[25] Docs. 338 and 352.

## II. SUPPLEMENTAL FINDINGS

As instructed, this court acknowledges the previous findings made by Judge May, considers the statistics, takes judicial notice of the court's own records and experience with cases of this type, and makes the following supplemental findings:

1. <u>Number of Cases</u>. Many Consumer Protection Cases have been filed in individual chapter 7 bankruptcy cases in the Tampa Division of this court. LW&G is not the only firm bringing these cases but is the most active. The actual number of cases LW&G filed during the Designated Period is unclear. LW&G calculates 2,865 complaints, although this number includes unfiled complaints resolved pre-suit.[26] CadleRock, on the other hand, calculates 3,324 adversary proceedings filed during the Designated Period.[27]

Suffice it to say, the actual number of cases brought by LW&G on behalf of trustees during the Designated Period lies somewhere between 2,865 and 3,324. Of these, based on the court's own PACER research, only 135 adversary proceedings filed during the Designated Period are attributable to Ms. Herendeen.

2. <u>Dismissals</u>. Most Consumer Protection Cases are dismissed with prejudice, either by settlement or by stipulation of [*5] the parties. Both LW&G and CadleRock include a column in their respective spreadsheets that purports to show the ultimate disposition of the cases cited. LW&G labels its column "Reason Closed" whereas CadleRock labels its column "Status of Case." There the similarities end. Each uses various terms, none of which are defined, to explain the "Reason Closed" or "Status of Case."

According to LW&G, of the 2,865 complaints it counted during the Designated Period: (a) 2,016 were settled with a distribution to the estate; (b) 810 were dismissed (*i.e.* "agreed to drop") with no distribution to the estate; (c) 22 resulted in court abstention; (d) 9 resulted in a court decision, some of which resulted in distributions to the estate; (e) 7 resulted in a default; and (f) 1 was sent to arbitration.[28]

For its part, CadleRock states that for each adversary proceeding, it reviewed the docket to determine the case status and any recovery. CadleRock uses the following terms to describe the disposition of a case: dismissed with prejudice, dismissed without prejudice, dismissed, abstained, terminated, and left blank (indicating no adversary).[29] But, CadleRock does not summarize the data in its "Status of Case" [*6] column in any meaningful way.

Accordingly, it is difficult for the court to objectively draw conclusions from either party's case disposition statistics. However, according to the court's own tally of the 135 cases filed by Ms. Herendeen within the Designated Period, nearly two-thirds were settled with a distribution to the estate.

3. <u>Trials</u>. Consumer Protection Cases generally do not go to trial. Some result in the entry of a default judgment, dismissal, or are sent to arbitration. Most cases have at least one pretrial conference, go through initial discovery, and settle after the exchange of information.[30] Many are set for trial.[31] One of Ms. Herendeen's cases apparently went to trial.[32] But, for the most part, these cases settle or are dismissed by agreement of the parties.

---

[26] Doc. 336 ¶ 5.

[27] Doc. 352 ¶ 22. CadleRock frequently counts a single adversary proceeding multiple times if there are multiple defendants. This occurs so often that the court has little confidence in CadleRock's number.

[28] Doc. 336-1 ¶ 5.

[29] Doc. 352 ¶ 17; Docs. 352-1 and 352-2.

[30] *See* Fed. R. Civ. P. 26(a)(1) (made applicable to adversary proceedings by Fed. R. Bankr. P. 7026).

[31] This court currently has a bi-monthly trial docket for Consumer Protection Cases.

[32] Doc. 220, Ex. E (Herendeen Dep. 14:17-25).

4. <u>Settlements</u>. Consumer Protection Cases generally settle for statutory damages, plus costs and attorneys' fees.[33] Typically, the total settlement amount is under $5,000. Although there are exceptions, the net recovery to the estate is typically between $1,300 and $2,000 per case, after attorneys' fees are paid to LW&G. This is true for most of the cases settled by Ms. Herendeen, though in one case she netted $23,100 [*7] for the estate.[34] Every settlement is noticed to creditors and approved by the bankruptcy court overseeing the case.[35]

5. <u>Investigations</u>. For every Consumer Protection Case arising from a bankruptcy, the debtor has testified, under oath, at a creditor's meeting as required by 11 U.S.C. § 341. The debtor's testimony is digitally recorded, and a transcript of the recording can be requested for a fee.[36] LW&G relies upon this sworn testimony to file its Consumer Protection Cases.[37]

6. <u>Chapter 7 Trustees</u>. At least seven members of the chapter 7 trustee panel in the Tampa Division of this court (Ms. Herendeen, V. John Brook, Larry Hyman, Dawn Carapella, Stephen Meininger, Angela Welch, and Beth Ann Scharrer) referred Consumer Protection Cases to LW&G during the Designated Period. Ms. Herendeen (the target here) was a relatively new trustee and, as indicated above, had far fewer cases with LW&G than any of the other chapter 7 trustees during the Designated Period.

7. <u>Oversight and Guidance for Trustees</u>. The Office of the United States Trustee selects and supervises the chapter 7 panel trustees. Section 704 of the

Bankruptcy Code sets forth the duties of a chapter 7 trustee which include the duty to "investigate [*8] the financial affairs of the debtor" and to "collect and reduce to money the property of the estate."[38] The chapter 7 trustees also use a handbook for guidance.[39] For an asset case, the handbook provides that there should be a "meaningful distribution" to creditors.[40] The handbook does not define the phrase "meaningful distribution." However, for purposes of guidance, the minimum recovery of an avoidable preference in a consumer case under the Bankruptcy Code is $600.[41] Statutory damages under the Fair Debt Collection Practices Act are limited to $1,000 per action.[42] Statutory damages under the TCPA are $500 per violation.[43]

8. <u>Chapter 7 Distributions</u>. The claims, recoveries, and distributions in consumer chapter 7 cases are generally small. Indeed, most chapter 7 cases result in no recovery for creditors. Sometimes, if the assets or the lawsuits do not pan out as expected, professionals are left holding the bag. On occasion, there is a partial distribution to administrative (*e.g.*, trustee and professionals) and priority claimants (*e.g.*, domestic relations debts and tax claims), leaving little or nothing to general unsecured creditors.

9. <u>Judicial Oversight of Attorneys' Fees and Costs</u>. The bankruptcy [*9] court approves the applications of LW&G to represent a chapter 7 trustee as special counsel in every case in which LW&G is paid.[44] Every subsequent application for

---

[33] *See infra* Section III.A and B for a discussion of the statutory recoveries available under federal and state consumer protection statutes.

[34] *See In re Richardson*, Case No. 8:13-bk-14606-CPM (Doc. 33).

[35] Fed. R. Bankr. P. 9019.

[36] *See, e.g.*, Doc. 35, Ex. B.

[37] Doc. 220, Ex. F (Lash Dep. 110:1-16).

[38] 11 U.S.C. § 704(a)(1), (4).

[39] *See* U.S. Dept. of Justice, Exec. Office for U.S. Trustees, Handbook for Chapter 7 Trustees (2012), https://www.justice.gov/ust/file/handbook_for_chapter_7_trustees.pdf/download.

[40] *Id.* at p. 4-1 (citing 28 U.S.C. § 586).

[41] 11 U.S.C. § 547(c)(8).

[42] 15 U.S.C. § 1692k(a)(1)-(3).

[43] 47 U.S.C. § 227(b)(3).

[44] *See* Fed. R. Bankr. P. 2014.

attorneys' fees filed by LW&G—and the other law firms that handle Consumer Protection Cases—are noticed to creditors in the chapter 7 case and approved by the bankruptcy court.[45] No fees are paid without court approval. This is true whether the Consumer Protection Case is filed in bankruptcy court, state court, or goes to arbitration. Generally, LW&G is employed on a modified contingency fee plus costs basis.[46] The estate recovers 100% of statutory damages awarded and 70% of actual damages awarded.[47] LW&G receives the attorneys' fees paid by the defendant as part of a recovery or settlement, plus 30% of the actual damages recovered by the estate.[48] No recovery, no fees.[49] For settled cases, LW&G typically takes a small discount and receives less than $2,000.

10. Chapter 7 Trustee's Fees. Under § 330 of the Bankruptcy Code, a chapter 7 trustee is entitled to "reasonable compensation."[50] Compensation is limited by the sliding scale percentages set forth in § 326 of the Bankruptcy Code. Chapter 7 trustees typically receive no compensation until the end of a chapter 7 case. Fees [*10] are calculated based on all recoveries by the trustee—not just Consumer Protection Cases—and are disclosed in a final report filed with the court. Creditors, the United States Trustee, or the bankruptcy court may object to a chapter 7 trustee's compensation and request a hearing on the matter.[51] Typically, the commissions set forth in § 326(a) are allowed, but the court has the discretion to reduce fees when appropriate.[52] In "no asset" cases, which most chapter 7 cases are, the chapter 7 trustee receives only a statutory fee of $60.[53] If the debtor is indigent, which is not uncommon in chapter 7, the chapter 7 trustee is paid nothing.

## III. APPLICABLE LAW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[54] In this context, "[a] genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict [in its favor].'"[55] "Although all justifiable inferences are to be drawn in favor of the [*11] [non-movant], inferences based upon speculation are not reasonable."[56]

CadleRock's Motion for Sanctions must also be considered in light of the statutory framework constructed by consumer protection laws and the limitations imposed on this court in sanctioning parties where, as here, there has been no Rule 9011 violation.

### A. Federal Consumer Protection Laws

Congress found that "[c]ollection abuse takes many forms, including obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining

---

[45] See Fed. R. Bankr. P. 2016.

[46] Doc. 20 ¶ 6.

[47] Id.

[48] Id.

[49] Id.

[50] 11 U.S.C. § 330(a)(1)(A).

[51] 11 U.S.C. § 330(a)(2).

[52] Id.

[53] 11 U.S.C. § 330(b).

[54] Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); see generally Fed. R. Civ. P. 56(a) (made applicable by Fed. R. Bankr. P. 7056, 9014).

[55] Kernel Records Oy v. Mosley, 694 F.3d 1294, 1300 (11th Cir. 2012) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

[56] Id. at 1301 (internal quotations omitted).

information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process."[57] Congress also found that "[a]busive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy."[58] Because existing laws and procedures for remedying these wrongs were deemed inadequate to protect consumers,[59] the Fair Debt Collection Practices Act and the Telephone Consumer Protection Act were enacted.

## 1. Fair Debt Collection [*12]  Practices Act

The Fair Debt Collection Practices Act ("FDCPA")[60] is the federal law regulating interactions between consumer debtors and "debt collector[s]," defined to include "any person who regularly collects . . . debts owed or due or asserted to be owed or due another."[61] In effect since March 1978, the law is designed to end serious and widespread abuse by third-party debt collectors.[62] Specifically, Congress enacted the FDCPA to: (1) protect consumers by eliminating abusive debt collection practices, (2) insure that debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and (3) promote consistent state action to protect consumers against debt collection abuses.[63] Among other things, the FDCPA prohibits debt collectors from making false representations as to a debt's character, amount, or legal status,[64] communicating with consumers at an "unusual time or place" likely

to be inconvenient to the consumer,[65] or using obscene or profane language or violence or the threat thereof.[66]

The FDCPA was crafted to be self-enforcing, primarily leaving consumer victims to enforce compliance. The FDCPA provides that "any debt collector who fails to comply [*13] with any provision of th[e] [Act] with respect to any person is liable to such person . . ."[67] In addition to actual damages, plus costs and "a reasonable attorney's fee," a court may also award "additional damages," subject to a statutory cap of $1,000 for individual actions or, for class actions, "the lesser of $500,000 or 1[%] of the net worth of the debt collector."[68]

## 2. Telephone Consumer Protection Act

The Telephone Consumer Protection Act ("TCPA")[69] was enacted in 1991 "to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and . . . certain uses of facsimile ([f]ax) machines and automatic dialers."[70] The legislation was a response to complaints stemming from the increased use of automated equipment by telemarketers.[71] Because telemarketers called numbers randomly and sequentially, having an unlisted phone number did not stop the calls.[72] Such calls were a nuisance and an invasion of privacy.[73] When the TCPA was enacted, approximately 40 states had passed

---

[57] S. Rep. No. 95-382, at 2 (1977).

[58] 15 U.S.C. § 1692(a).

[59] 15 U.S.C. § 1692(b).

[60] 15 U.S.C. § 1692 *et seq.*

[61] 15 U.S.C. § 1692a(6).

[62] S. Rep. 95-382 at *1-2 (1977).

[63] 15 U.S.C. § 1692(e).

[64] 15 U.S.C. § 1692e(2)(A).

[65] 15 U.S.C. § 1692c(a)(1).

[66] 15 U.S.C. § 1692d(1), (2).

[67] 15 U.S.C. § 1692k(a).

[68] 15 U.S.C. § 1692k(a)(1)-(3).

[69] 47 U.S.C. § 227 *et seq.*

[70] S. Rep. 102-178 at *1 (1991).

[71] *Id.*

[72] *Id.* at *2.

[73] *Id.*

legislation to regulate unsolicited calls.[74] However, state legislation proved ineffective to combat unwanted interstate calls.[75] Telemarketers avoided [*14] state laws by locating their phone centers out of state.[76] The TCPA lists a number of prohibited debt collection practices designed to protect the privacy of consumers.[77]

Significantly, the TCPA also provides for a private right of action and statutory damages. Unlike the FDCPA, the TCPA does not include an express provision for costs and attorneys' fees if a consumer obtains a judgment against a defendant. But, the TCPA does provide for treble damages when there is a finding that the defendant's conduct was willful or knowing.[78]

## B. State Consumer Protections Laws

Florida's consumer protection laws are consistent with federal law.[79] Like Congress, the Florida legislature deemed it important "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce" and declared such acts to be unlawful.[80]

## 1. Florida Consumer Collections Practices Act

Collection agencies operating in Florida are subject to the Florida Consumer Collection Practices Act ("FCCPA").[81] The FCCPA, Florida's counterpart to the FDCPA, similarly lists prohibited debt collection [*15] practices to increase the level of protection available to consumers.[82] These laws are intended to work in tandem with the FDCPA. Fla. Stat. § 559.552 states that "[n]othing in [the FCCPA] shall be construed to limit or restrict the continued applicability of the federal [FDCPA] to consumer collection practices in this state." Furthermore, "[i]n the event of an inconsistency between [the FCCPA] and any provision of [the FDCPA], the provision which is more protective of the consumer or debtor shall prevail."[83]

The FCCPA grants consumers a private right of action to sue for violations of the law and to recover actual damages sustained, statutory damages, and punitive damages.[84] The FCCPA also expressly authorizes the recovery of attorneys' fees and costs to a successful plaintiff as a means to encourage consumers to bring these suits.[85] "A clear public policy underlies the fee-shifting provisions of the FCCPA: to 'ensure that lawyers will represent individuals with valid claims, despite a limited amount of potential damages.'"[86]

## 2. Florida Deceptive and Unfair Trade Practices Act

The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") is another consumer [*16] protection law which prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct

---

[74] Id. at *3.

[75] Id.

[76] H.R. Rep. 102-317 at 9 (1991).

[77] 47 U.S.C. § 227(b)(1).

[78] 47 U.S.C. § 227(b)(3).

[79] Fla. Stat. § 501.202(3).

[80] Fla. Stat. § 501.202(2).

[81] Fla. Stat. § 559.55 et seq.

[82] See Fla. Stat. § 559.72.

[83] Fla. Stat. § 559.552.

[84] See Fla. Stat. § 559.72.

[85] See Brook v. JP Morgan Chase Bank, N.A. (In re Burdett), No. 8:09-bk-00816-KRM, Adv. No. 8:09-ap-00390-KRM, 2015 Bankr. LEXIS 104, 2015 WL 150848, at *2 (Bankr. M.D. Fla. Jan. 12, 2015).

[86] 2015 Bankr. LEXIS 104, [WL] at *2 n.12 (quoting In re Jones, 494 B.R. 569, 574 (Bankr. M.D. Fla. 2013)).

of any trade or commerce."[87] The statute also provides that a violation of "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices" is a violation of FDUTPA.[88] In enacting FDUTPA, the Florida legislature explicitly provided that the Act must be "construed liberally [t]o. . . simplify, clarify, and modernize the law governing consumer protection . . . and [t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition . . . and [t]o make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection."[89]

To further those policies, FDUTPA authorizes both government enforcement and a private right of action.[90] For private enforcement actions, FDUTPA provides that "[i]n any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees [*17] and court costs."[91]

## C. Bases for Imposing Sanctions

### 1. Inherent Authority

A federal court has an inherent authority to sanction parties appearing before it.[92] This authority extends to bankruptcy courts, primarily through 11 U.S.C. § 105.[93] But, because inherent powers are so broad,

courts are admonished to exercise caution when invoking them to sanction litigants.[94]

To impose sanctions under its inherent authority, a court must find that the challenged conduct "constituted or was tantamount to bad faith."[95] A finding of bad faith is appropriate when "an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent."[96] Delaying or disrupting the litigation or disrupting enforcement of a court order also supports a finding of bad faith.[97]

Because of the constraint of bad faith, inherent power "is both broader and narrower than other means of imposing sanctions."[98] The court's "inherent power extends to a full range of litigation abuses' and can be invoked even if other rules sanction the same conduct, "for these rules are not substitutes for the inherent power."[99] The threshold of bad faith conduct required under the court's inherent power [*18] "is at least as high as the threshold of bad faith conduct for sanctions under [28 U.S.C.] § 1927."[100]

Usually, if a court cannot impose sanctions under Rule 11, the court should not exercise its inherent powers to sanction.[101] Otherwise, the safe harbor of Rule 11 would be meaningless.[102] "But if in the

---

[87] Fla. Stat. §§ 501.201-501.213.

[88] Fla. Stat. § 501.203(3)(c).

[89] Fla. Stat. § 501.202.

[90] Fla. Stat. §§ 501.207 & 501.211(2).

[91] Fla. Stat. § 501.211(2).

[92] *Chambers v. NASCO*, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991).

[93] *In re Haque*, 395 B.R. 799, 803 (Bankr. S.D. Fla. 2008) ("The Court's power to sanction resides both in 11 U.S.C. § 105(a) and in the inherent power of the federal courts to sanction improper conduct." (citations omitted)).

[94] *Chambers*, 501 U.S. at 50.

[95] *Durrett v. Jenkins Brickyard, Inc.*, 678 F.2d 911, 918 (11th Cir. 1982); *see also Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) ("The key to unlocking a court's inherent power is a finding of bad faith.").

[96] *Barnes*, 158 F.3d at 1214.

[97] *Id.*

[98] *Chambers*, 501 U.S. at 46.

[99] *Peer*, 606 F.3d at 1314 (quotation and citation omitted).

[100] *Id.* at 1316 (citation omitted).

[101] *In re Engle Cases*, 283 F. Supp. 3d 1174, 1241 (M.D. Fla. 2017).

[102] *See Lincoln-Gaston Farmers Mut. Ins. Co. v. GE*, No. 5:08cv50,

informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power" to sanction bad faith litigation conduct.[103] Section 105(a) of the Bankruptcy Code specifically authorizes the power "to prevent an abuse of process."[104] Nevertheless, like all inherent powers, it "must be exercised with restraint and discretion."[105]

## 2. 28 U.S.C. § 1927

Sanctions under 28 U.S.C. § 1927 are intended to discourage the unreasonable and vexatious multiplication of proceedings.[106] A court may impose sanctions under § 1927 if three requirements are satisfied: (i) an attorney has engaged in unreasonable and vexatious conduct; (ii) the unreasonable and vexatious conduct must have multiplied the proceedings; and (iii) the financial value of the sanction must bear a nexus to the excessive proceedings.[107] An attorney is deemed to have multiplied the proceedings unreasonably and vexatiously "only when the **[\*19]** attorney's conduct is so egregious that it is 'tantamount to bad faith.'"[108] Bad faith is an objective standard that is satisfied by a showing that an attorney knowingly

---

2009 U.S. Dist. LEXIS 49982, 2009 WL 1677245, at *3 (W.D. N.C. June 15, 2009) ("This principle finds support in the purpose of Rule 11's twenty-one safe harbor period, namely to allow the offending party twenty-one days to withdraw the offending claims and escape sanctions." (quoting *Giganti v. Gen-X Strategies, Inc.*, 222 F.R.D. 299, 308-09 (E.D. Va. 2004)); *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment (noting the safe harbor is intended so that timely withdrawal of a challenged pleading or paper will serve to protect a party from a motion for sanctions).

[103] *Chambers*, 501 U.S. at 50.

[104] 11 U.S.C. § 105(a).

[105] *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980).

[106] *Peer*, 606 F.3d at 1314.

[107] *Peterson v. BMI Refractories*, 124 F.3d 1386, 1396 (11th Cir. 1997).

[108] *Peer*, 606 F.3d at 1314 (quoting *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007)).

---

or recklessly pursues a frivolous claim.[109] Finally, § 1927 "'require[s] clear and convincing evidence that sanctions are justified.'"[110]

As a court established under Article 1 of the United States Constitution, it is not clear that a bankruptcy court can issue sanctions under § 1927.[111] If not, sanctions imposed by a bankruptcy court should be treated as a recommendation to the district court.[112]

## IV. CONCLUSIONS

### A. So, What Do The "Statistics" Show or Not Show?

"There are three kinds of lies: lies, damned lies and statistics."[113] This quote is sometimes attributed to Mark Twain—who some say attributed the statement to Benjamin Disraeli—who may not have been the first to say it after all. No matter the source, the quote has colored statistical analysis for some time. But the quote is only partially true. Certainly, statistics can be fabricated or manipulated, but they can also be a useful tool if the underlying data is accurate and neutral in selection and interpretation, and adequate controls are made for outside variables. An understanding of the difference **[\*20]** between causation and correlation is also necessary to put statistics into

---

[109] *Id.*

[110] *In re Engle Cases*, 283 F. Supp. 3d at 1225 (quoting *Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848, 872 (5th Cir. 2014)).

[111] *See generally In re Evergreen Sec., Ltd.*, 381 B.R. 407, 411-12 (Bankr. M.D. Fla. 2007) (citing 28 U.S.C. § 157(c)(1); *IRS v. Brickell Inv. Corp. (In re Brickell Inv. Corp.)*, 922 F.2d 696, 701 (11th Cir. 1991)).

[112] *See generally Wellness Int'l Network, Ltd. v. Sharif*, 135 S.Ct. 1932, 191 L. Ed. 2d 911 (2015).

[113] Mark Twain, *Chapters from My Autobiography: XX*, 185 The North American Review 618, 465-74 (1907).

proper perspective.[114]

Here, the statistics presented by both sides should be viewed with skepticism. Neither party has opted to use an independent expert to gather or interpret the case data at issue. Lacking anything impartial, the court conducted its own review of court documents on PACER and randomly spot checked much of the data that has been presented by the parties.

CadleRock's statistics are clouded by misapplications of bankruptcy and consumer protection laws which skew its numbers. For example, in cases where the trustee had recoveries in addition to those derived from Consumer Protection Cases, CadleRock attributes the entire trustee fee to the Consumer Protection Cases. This is just wrong and significantly overstates the trustee fees attributable to Consumer Protection Cases. An example of this is found in the Affidavit of Michelle Harris and her examination of Case No. 8:09-bk-26264-KRM.[115] Ms. Harris states that $2,370.57 was paid to the trustee from the settlement of the Consumer Protection Case.[116] The settlement amount paid to the estate was $3,350.00. [*21] [117] However, a review of the trustee's Final Account and Distribution shows that the trustee's fee was actually based on a percentage of gross receipts of $22,305.72.[118] Consequently, Ms. Harris' follow up claim that only $729.43 went to general unsecured creditors is wrong. What

makes this error even more baffling is the fact that Ms. Harris states in her affidavit that "[t]he trustee's final report and accounting were reviewed to see how the settlement/recovered funds were disbursed . . . [t]his information was placed in the Spreadsheet."[119]

The analysis presented by LW&G is also not without flaws. Although LW&G properly states the applicable law, some of its calculations are off and the data selection is not always neutral, *i.e.* the data does not give the complete picture. Specifically, the aggregate recoveries touted by LW&G do not tell the whole story.

Ultimately, the court finds that the statistics add little to the issues presented in CadleRock's Motion for Sanctions. Instead, what emerges from the morass of data is a wealth of obviousness but no disputed issues of material fact.

First, it should surprise no one that lots of Consumer [*22] Protection Cases arise from individual chapter 7 cases. This is the natural by-product of the creditor harassment that often drives consumers to seek personal bankruptcy in the first place. Indeed, as discussed above, Congress made this express finding when it enacted the FDCPA.

Second, Consumer Protection Cases rarely go to trial. Again, undisputed and no surprise. Small dollars are usually at issue and a reasoned cost benefit analysis should drive all litigation decisions. As discussed above, the FCCPA expressly authorizes the recovery of attorneys' fees and costs to a successful plaintiff (but not a defendant) to encourage consumers to bring these suits.[120] Instead of unnecessarily prolonging cases and milking them for fees, LW&G and the trustees arguably minimize fees by settling cases well before trial and discounting fees in settlements.[121]

---

[114] "Correlation (or association) of two variables is just a matter of their moving together. Correlation does not prove causation[.] . . . Just because two things move together, doesn't mean the one is pushing the other; the sun doesn't rise every day because the rooster crowed." M. Elizabeth Karns, *Statistical Misperceptions*, 47-JUN Fed. Law. 19 *20 (2000).

[115] Doc. 338 ¶ 17.

[116] *Id.* The Consumer Protection Case in question began as adversary proceeding 8:11-ap-00263-KRM. The bankruptcy court granted the defendant's motion to abstain, and the trustee then filed the case in state court. *See In re Squiciarino*, 8:09-bk-26264-KRM (Doc. 49).

[117] *In re Squiciarino*, 8:09-bk-26264-KRM (Doc. 49).

[118] *In re Squiciarino*, 8:09-bk-26264-KRM (Doc. 63 pp. 3-4).

---

[119] Doc. 338 ¶ 12.

[120] *Brook*, 2015 Bankr. LEXIS 104, 2015 WL 150848, at *2.

[121] CadleRock's arguments also suggest that debt collectors are willing to pay small settlements to avoid litigation without regard to

Third, in most cases, the award of attorneys' fees exceeds the estate's recovery. Again, undisputed and no surprise. Surely this is the expected result when a statutory private right of action authorizes attorneys' fees for nominal statutory awards. Non-reciprocal, fee-shifting provisions in consumer protection statutes are designed to encourage counsel [*23] to take on small consumer cases. The statutes not only protect consumers from predatory debt collectors, but they also protect law abiding debt collectors from commercial disadvantage.

Finally, many Consumer Protection Cases are dismissed with prejudice by agreement of the parties very early in the litigation. This process of weeding out the good claims from the bad claims is anticipated by the operation of Federal Rule of Bankruptcy Procedure 7026 (early disclosure and exchange of information) and Rule 9011 (*e.g.* the debtor was mistaken or less than truthful or the claim was sold or sent to a third-party debt collector). The court might be more concerned if cases dragged along on the docket in the face of bad evidence.

In short, the court finds nothing seriously disputed or remarkable from the statistics themselves. So, we turn to the specific claims for sanctions in view of these statistics and consider some of the more difficult questions.

## B. The Claim for Sanctions Against the Chapter 7 Trustee

Should a chapter 7 trustee send a case to a contingency fee lawyer if the expected statutory recovery is less than $2,000? There could be some disagreement here. But from the trustee's perspective, when she makes a referral, she has

determined [*24] only that a potential claim exists based upon the debtor's sworn testimony. She does not know what discovery might uncover. And, as with any contingent case, there is no risk if there is no recovery.

From the creditors' perspective, why not? Aggregating small distributions in consumer bankruptcies can add up to a reasonable distribution to creditors.[122] The alternative is that the debtor gets a discharge, the case is closed, the good creditors get nothing, and the bad debt collector is free to move on to the next consumer victim without consequence.

Should the bankruptcy system fear having multiple contingency fee lawyers attend a first meeting of creditors at the trustee's behest? This potential practice obviously troubled the District Court who viewed these hypothetical lawyers as "birds of prey."[123] This court is not similarly troubled. If there is a potential personal injury claim, the trustee would be wise to invite a personal injury lawyer to assess the claim and the debtor as a potential witness because that claim now belongs to the creditors and the bankruptcy estate. If the debtor has a patent that has been infringed, the trustee would be smart to invite a patent [*25] lawyer to assess the claim that now belongs to the creditors and the bankruptcy estate. If the debtor may have fraudulently transferred money to a relative, the trustee would be smart to invite a lawyer specializing in avoidance actions to evaluate the claim and the debtor. And, if a chapter 7 trustee can persuade these lawyers to attend the meeting of creditors to evaluate her potential claims for free, or to take those cases on a contingency fee basis, she is doing a service to the bankruptcy estate and its

---

the merits of the case. To the extent that debt collectors are making calculated business decisions, it is not something with which this court can or should be concerned. But that is plainly at odds with what happened here. And it flies in the face of CadleRock's statistical argument that far too many cases are dismissed with no recovery to the estate.

---

[122] For example, one of the cases the court spot checked is *In re Rudisill*, Case No. 8:12-bk-10518-CPM. There, Ms. Herendeen was the chapter 7 trustee. She retained LW&G to pursue three Consumer Protection Cases. All three were settled, netting approximately $5,500 to the estate. The Trustee's fee, based on gross receipts, was $1,300. The dividend to unsecured creditors was 31.3%. *See id.*, Doc. 47 ("Trustee's Final Report").

[123] Doc. 297.

Case 8:18-ap-01168-SC    Doc 347    Filed 08/19/21    Entered 08/19/21 21:07:48    Desc
Main Document    Page 76 of 242
2019 Bankr. LEXIS 675, *25

Page 12 of 17

creditors. Indeed, because most chapter 7 cases are no-asset cases, these potential contingent claims may be the only hope creditors have of any recovery.

Consumer Protection Cases are different from other potential claims only because the statutory damages are small, and they are often overlooked. There are no specific questions on the official bankruptcy schedules and forms to identify a consumer protection claim. There is a general question that asks the debtor to identify any potential claims, but many debtors, especially *pro se* debtors, cannot be expected to know their rights under consumer protection laws or many other laws for that matter. The trustee, therefore, should **[*26]** not be faulted for asking probing questions at the meeting of creditors. To uncover potential personal injury actions, the trustee asks about car accidents or falls. To ferret out any potential consumer protection claims, the trustee must ask the debtor if they have been called or otherwise harassed by creditors in the lead-up to bankruptcy. In this regard, a consumer protection claim really is no different than any other undisclosed asset which may have been intentionally or (more likely) unintentionally omitted from the debtor's schedules.

Here, Ms. Herendeen's examination of the Debtor at the 341 Meeting was thorough and complete. She uncovered the nature of the CadleRock debt, that CadleRock had called the debtor four times every two or three weeks, that the calls were made to Debtor's cell phone, and the identity of his cell phone provider. At the end of the 341 Meeting, she asked permission to have her attorneys (LW&G) contact the debtor to investigate any potential claim. No one else asked any questions at 341 Meeting.[124]

The trustee was doing her job and the statistics demonstrate only that she referred relatively few cases to LW&G during the Designated Period and received modest **[*27]** compensation for her

efforts. The attempt to sanction Ms. Herendeen, or remove her as a panel trustee, is without merit or cause. Nothing in the record suggests that she was in cahoots with LW&G (or any of the other law firms handling such cases) or received anything beyond her Congressionally authorized statutory fees, as reviewed and approved by the United States Trustee and the bankruptcy court.

Accordingly, summary judgment will, again, be entered in favor of Ms. Herendeen.

## C. The Claim for Sanctions Against LW&G

LW&G made clever a business decision—that it is more likely than not that a consumer debtor who seeks bankruptcy relief may have been pushed into that choice by oppressive debt collection tactics. This business decision is unquestionably sound. The issue is whether the tactics and procedures employed by LW&G are abusive to the bankruptcy system and rise to the level of sanctionable bad faith abuse of process. Those tactics are now reviewed in the context of the large number of Consumer Protection Cases filed in this court.

Initially, the court finds nothing improper with LW&G's practice of educating the trustees to look for potential consumer protection claims by developing **[*28]** and distributing a questionnaire designed to evaluate such claims. This is no different than trustees learning the right questions to ask to discover any undisclosed or previously overlooked asset. The questions should be asked because it is an opportunity—not a guarantee—to enhance the bankruptcy estate.

Next, is LW&G's practice of sending a paralegal to the first meeting of creditors improper? This procedure initially causes some pause because it suggests that the paralegal may be practicing law without a license or engaging in the improper solicitation of legal business.

But neither concern is warranted here. In truth, the paralegal is not even necessary. The trustees ask the

---

[124] Doc. 35, Ex. B.

questions and decide which cases to refer to LW&G for further evaluation. Perhaps, the better practice may be for LW&G to send a lawyer to hear the debtor and make a credibility evaluation, but it is not uncommon for paralegals, or private investigators, to evaluate potential witnesses or to take initial witness statements in civil or criminal proceedings. Ultimately, the attorney is responsible for supervising these non-lawyers and making the final case evaluation. Nothing here suggests that LW&G's paralegal [*29] is practicing law without a license. The meeting of creditors is not a court proceeding. It is a public meeting and non-attorney creditors, even unrepresented corporate creditors, are invited to ask questions. But LW&G's paralegal does not ask questions. She simply takes notes and reports the chapter 7 trustee's referrals back to the law firm.

Is the paralegal improperly soliciting business? Certainly not. LW&G has a continuing and prior relationship with the chapter 7 trustees.[125] Marissa Samperisi-Gomez, a contract paralegal with LW&G, was assigned to assist Ms. Herendeen during the Designated Period. She distributed the questionnaires for the trustee. She collected up the completed questionnaires, watched the proceedings, and took notes. Ms. Herendeen, who is an attorney, then questioned the debtors and decided which cases to refer to LW&G.

LW&G works for the trustee and the trustee only.[126] A consumer protection claim based on pre-bankruptcy conduct is an asset the bankruptcy estate. And the appointed chapter 7 trustee is statutorily charged with investigating and, if appropriate, monetizing all non-exempt assets. She has the authority to hire a law firm to investigate any [*30] claim. But, for the firm to be paid, the bankruptcy court must approve the firm's retention and the amount of its compensation. In Consumer Protection Cases, the debtor is never the client of LW&G.

The concern here really is not improper solicitation of legal business, there is none. Rather, it is the perception that the paralegal is drumming up business for the law firm by her mere presence. Ms. Samperisi-Gomez simply hands out questionnaires and takes notes.[127] But is business being drummed up by this process? Absolutely. Previously overlooked consumer protection claims are being investigated and pursued. And along with the good claims uncovered, there are no doubt some bad claims too.

Does LW&G sufficiently investigate claims before filing them? The firm concedes that mistakes were made in preparing the complaint against CadleRock but notes it promptly dismissed the claim. As for all the other cases filed in this court, LW&G relies on the debtor's testimony taken under oath at the meeting of creditors.[128] That testimony can be in the form of a recording, a transcript, or a report from the trustee. Judge May has already found that, for this case, reliance [*31] on the sworn testimony of the debtor is not negligence, malpractice, or bad faith.[129] There is no reason that his finding should not extend to the other cases where LW&G relied on the debtor's sworn testimony.

Could LW&G do more? Of course, they can and frankly they should. The firm could send an

---

[125] A "prior professional relationship" is an express exception to the anti-solicitation rules governing the Florida Bar. *See generally* Rules Regulating the Florida Bar, Rule 4-7.18(a)(1) (Dec. 2018).

[126] 11 U.S.C. § 327(a) provides that "[e]xcept as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys . . . *to represent or assist the trustee* in carrying out the trustee's duties under this title." (emphasis added); *see Smith v. Geltzer*, 507 F.3d 64, 71 (2d Cir. 2007) ("Courts give the [chapter 7] trustee [] deference in choosing special counsel because of the 'highly confidential' relationship between the special counsel-attorney and the trustee-client. Importantly, the special counsel represents the trustee, not the debtor." (citations omitted)).

[127] Doc. 220, Ex. G (Samperisi-Gomez Dep. 26:13-24).

[128] In drafting complaints, information is sometimes drawn from the questionnaire before attorney review. Doc. 228-1 (Friedman Dep. 46:3-25). An attorney then reviews the transcript of the meeting of creditors before the complaint is finalized and filed. Doc. 220, Ex. F (Lash Dep. 110:1-16).

[129] Doc. 232 ¶ 16.

attorney to the meeting of creditors or interview the debtor before filing suit. They could ask for phone records and could investigate whether the calls were made by the original creditor, the purchaser of the debt, or a third-party debt collector.

But pre-suit investigation of these types of cases is not easy. Mr. Gonzalez testified that he probably would not have answered the phone if LW&G had called him because he would not have recognized the number.[130] And Mr. Lash testified that debtors' phone records are difficult and expensive to obtain because they are likely subject to privacy objections by the carriers. Also, they may not yield much useful information without knowing the phone numbers used by the debt collectors.[131] From the court's observation, the key evidence in most of these cases seems to be the debt collector's phone records and call logs. Sometimes those records are produced voluntarily. [*32] Sometimes a protective order is required to secure the documents. Sometimes a motion to compel is required.

Here, one questionable assumption got LW&G in trouble. LW&G assumes that all debt collectors use automatic calling devices. They base this assumption on two factors (i) their experience that automatic calling is an "industry standard" and (ii) the fact that the technology is very inexpensive.[132] LW&G's assumption apparently was incorrect with respect to CadleRock, and the case was promptly dismissed. LW&G could be more cautious when making this assumption in its initial pleading. Still, in this case, Mr. Gonzalez testified, albeit after the fact, that a "machine" called him from CadleRock.[133]

But, although LW&G could do more, and as discussed below the court will require more in the future, reliance on the sworn testimony of the debtor does not rise to the level of a bad faith abuse of process warranting sanctions.

Perhaps a comparison to the lawyers recently sanctioned in *In re Engle Cases*[134] is appropriate to put things in perspective. There, the lawyers filed thousands of tobacco cases that were removed to federal court. A special master's report found that the attorneys were never [*33] authorized to bring most of the cases, many of the plaintiffs did even not smoke, and 588 "personal injury" cases were filed on behalf of dead people.[135] The *Engle Cases* lawyers also used a questionnaire, but they sent their questionnaire out a year and a half after filing suit![136] Multiple judges on the district court joined in sanctioning the lawyers who, without doubt, wreaked havoc in the Jacksonville Division of the Middle District of Florida and unnecessarily clogged the court's dockets for years.

LW&G's conduct in filing Consumer Protection Cases does not rise to this level. In reviewing LW&G's voluntary dismissals and dismissals by agreement, the court is reminded of the Eleventh Circuit's admonition that hindsight is not the appropriate standard to assess the viability of a claim.[137] It is incumbent upon the court to consider what the attorney knew when he filed the case. Fortunately, there is no dispute about what LW&G knows when Consumer Protection Cases are filed on behalf of chapter 7 trustees. LW&G knows what the debtor testified to under oath at the meeting of creditors and the fact of the chapter 7 trustee's referral. The court cannot conclude that relying on the sworn testimony [*34] of the aggrieved party (i.e. the chapter 7 debtor) and the trustee's referral after questioning the debtor is sanctionable bad faith, even in the face of the statistics.

---

[130] Doc. 220, Ex. D (Gonzales Dep. 47).

[131] Doc. 220, Ex. F (Lash Dep. 107:15-25, 108:1-25).

[132] *Id.* at 63:21-25; 64:1-24.

[133] Doc. 220, Ex. D (Gonzales Dep. 40).

---

[134] *In re Engle Cases*, 283 F. Supp. 3d 1174.

[135] A personal injury case obviously cannot be brought on behalf of a dead person. *See id.* at 1214-23.

[136] *Id.* at 1194-95.

[137] *See Merricks v. Adkisson*, 785 F.3d 553, 562 (11th Cir. 2015).

So, what protects debt collectors who do nothing improper and still get sued? Obviously, in federal district court, the answer is Rule 11, and in bankruptcy court, it is Rule 9011. Like all contingency fee lawyers, LW&G has no interest in pursuing bad cases. They get nothing. But not all debtors tell the truth or have a clear recollection of stressful contacts with creditors. Debtors, and sometimes lawyers, make mistakes. That is why Rule 9011 exists, in the hope that it will curtail complex ancillary sanctions litigation.

Here, Rule 9011 kicked in and worked as its drafters anticipated. CadleRock presented its concerns and LW&G promptly dismissed the adversary proceeding. CadleRock did not even have to answer the complaint.

Still, CadleRock wants LW&G out of the Consumer Protection Case business.

CadleRock first complains that LW&G did not send them a pre-litigation demand letter. This may be a good practice, but it is not a statutory prerequisite. It is hardly sanctionable conduct. In any event, CadleRock's own spreadsheet of statistics rebuts this **[*35]** argument and reflects that many matters are resolved "presuit" or with "No adversary."[138]

Next, CadleRock argues that LW&G's practices and procedures are an affront to the bankruptcy system. Underlying this position is an assumption that the courts are unable or unwilling to properly oversee Consumer Protection Cases. At oral argument, counsel for CadleRock conceded that every Consumer Protection Case settlement and every fee awarded to LW&G, and to a chapter 7 trustee, is approved by the bankruptcy court after notice and hearing. But CadleRock complains that creditors will not object to these settlements or fees because their claims against consumer debtors are too small to warrant participation in the chapter 7 case.

CadleRock misses the point. Even if creditors do not object, the court reviews all settlements and fees for reasonableness. Small settlements may be approved because statutory recoveries under the applicable consumer protection laws are small. LW&G's fees have been approved, in part, because the firm consistently takes a voluntary reduction of fees in settled matters and, in part, because the firm is efficient in handling Consumer Protection Cases.

The bottom line is that **[*36]** the decision to enforce consumer protection laws by private attorney generals is the policy decision of Congress and the Florida Legislature. These claims were not created by LW&G, the other law firms engaged in this practice, or the chapter 7 trustees. Admittedly, for the court, Consumer Protection Cases require attention and administration. Nevertheless, it is incumbent upon any federal court to administer and adjudicate all claims properly before it.

This court has handled a great many Consumer Protection Cases filed by LW&G and by other law firms. The cases are handled efficiently and professionally. The lawyers on both sides of the courtroom are prepared, have engaged in a Federal Rule of Bankruptcy Procedure 7026 discovery conference in advance of pretrial hearings, and do not delay the proceedings. LW&G's practice is no doubt a volume litigation practice based on forms and repeated filings.[139] The firm's work is not always perfect, but for a volume litigation practice the work product is above average and, with direction from the court, continues to improve. The Consumer Protection Cases and the process employed by LW&G are not an affront to the bankruptcy system or an abuse of process.

Accordingly, summary judgment will, **[*37]** again, be entered in favor of LW&G.

Nevertheless, the court's in-depth review of Consumer Protection Cases and experience has led

---

[138] *See* Docs. 352-1 and 352-2.

[139] A complete and thorough description of the software, forms, and procedures used by LW&G and its contractors is found in the deposition of David Freedman (Doc. 228-1).

to the conclusion that greater due diligence can only enhance the prosecution and administration of Consumer Protection Cases. Although the court does not find that LW&G's reliance on the sworn testimony of the debtor at the meeting of creditors rises to the level of bad faith warranting sanctions, going forward, the court does find it appropriate to require that LW&G, and any other law firm taking on Consumer Protection Cases, conduct additional due diligence before an application to employ is filed.

Therefore, starting April 15, 2019, this court[140] will require prospective special counsel for Consumer Protection Cases to declare that he or she has listened to or read the debtor's testimony at the meeting of creditors and has (i) spoken directly with the debtor or (ii) the trustee has sent a request to the debt collector for call records that went unanswered for 14 days or (iii) has engaged in some other form of pre-suit investigation. This declaration should be included in the affidavit of disinterestedness filed with the attorney's application for employment, [*38] and failure to include the declaration will result in denial of the application.

An order consistent with this Opinion will be entered separately.

ORDERED.

**Dated: March 05, 2019**

/s/ Roberta A. Colton

Roberta A. Colton

United States Bankruptcy Judge

**ORDER GRANTING SUMMARY JUDGMENT AFTER REMAND, AND DENYING CREDITOR'S MOTION FOR**

---

[140] By this court, I mean only me. I do not purport to speak on behalf of my colleagues on the bench. A notice of this procedure will be posted on the court's website.

## SANCTIONS

THIS CASE is considered, following remand, upon the *Amended Motion for Summary Judgment Regarding CadleRock Joint Venture's Motion for Sanctions* (Doc. 220), filed by Special Counsel to the Chapter 7 Trustee, Lash & Wilcox PL (now Lash Wilcox & Grace PL) and Thomas A. Lash, Esq. ("Special Counsel"), and the joinder in the motion (Doc. 221), filed by Chapter 7 Trustee, Christine L Herendeen ("Ms. Herendeen"). This court had granted summary judgment in favor of Special Counsel and Ms. Herendeen and had denied the underlying Motion for Sanctions (Doc. 95), filed by CadleRock Joint Venture, L.P. ("CadleRock"). On appeal, the district court reversed and remanded, in part, for further consideration of CadleRock's motion in light of certain statistical information (Doc. 297). Concurrently with entry of this Order, the court has entered its Memorandum Opinion on Remand, [*39] in which, as directed, it has reconsidered CadleRock's motion for sanctions bearing in mind the proffered statistics. As indicated in the court's opinion, and for the reasons stated therein, the court finds it appropriate to grant summary judgment in favor of Special Counsel and Ms. Herendeen and, again, deny CadleRock's motion for sanctions.

It is therefore **ORDERED AND ADJUGED**:

1. Special Counsel's Amended Motion for Summary Judgment (Doc. 220) is **GRANTED**.

2. CadleRock's Motion for Sanctions (Doc. 95) is **DENIED** as to both Special Counsel and Ms. Herendeen.

ORDERED.

**Dated: March 05, 2019**

/s/ Roberta A. Colton

Roberta A. Colton

United States Bankruptcy Judge

**End of Document**

# EXHIBIT 9

# Cunningham v. Jacobson (In re Jacobson)

United States Bankruptcy Appellate Panel for the Ninth Circuit

May 14, 2009, Argued and Submitted at Pasadena, California; June 23, 2009, Filed

BAP No. CC-08-1273-DMkPa

**Reporter**

2009 Bankr. LEXIS 4577 *; 2009 WL 7751428

In re: MYRNA JACOBSON, Debtor. LARRY CUNNINGHAM, Appellant, v. GREGORY MORSE; MYRNA JACOBSON, Appellees.

**Notice:** This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have (see Fed. R. App. P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

**Prior History: [*1]** Appeal from the United States Bankruptcy Court for the Central District of California. Honorable Robert N. Kwan, Bankruptcy Judge, Presiding. Bk. No. SA 06-10093-RK.

**Disposition:** AFFIRM.

**Judges:** Before: DUNN, MARKELL and PAPPAS, Bankruptcy Judges.

## Opinion

### MEMORANDUM

Larry Cunningham ("Cunningham") appeals the bankruptcy court's order denying his motion for sanctions under Rule 9011 and § 105(a)[2] and the bankruptcy court's inherent authority ("sanctions motion") against the debtor, Myrna Jacobson, and her former attorney, Gregory Morse ("Morse").[3]

Having reviewed the record, we conclude that it supports the bankruptcy court's decision not to impose sanctions against the debtor and Morse. We AFFIRM.

### FACTS[4]

There has been bad blood between Cunningham and the debtor for years. It began more than twenty years ago, when Cunningham bought a home in Seal Beach, California, with the debtor acting as real estate broker for Cunningham.[5]

Two years after he bought the home, Cunningham filed a complaint in state court against the debtor,[6] alleging that the debtor forged and recorded a note and second deed of trust in her favor against the residence.[7] Among the numerous causes of action set forth against the debtor in the state court complaint, Cunningham asserted fraud, breach of fiduciary duty, negligent and intentional broker malpractice, intentional interference with

---

[2] Unless otherwise indicated, all chapter, section and rule references are to the federal Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

[3] Jeffrey Vanderveen, who represents the debtor in the present appeal, later substituted in as counsel for the debtor.

[4] Neither the debtor nor Cunningham provided certain documents relevant to our review. We obtained them from the bankruptcy court's docket. See Atwood v. Chase Manhattan Mortgage Co. (In re Atwood), 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003)(obtaining **[*2]** relevant documents not included in the record on appeal from the bankruptcy court clerk and taking judicial notice of them).

[5] At the time of the purchase, the debtor and her husband, Donald Jacobson, were part of a general partnership that purchased, developed, and sold real property. Cunningham purchased the home from the partnership.

[6] Cunningham **[*3]** named all members of the partnership as defendants in the state court complaint.

[7] Cunningham actually alleged that one or more members of the partnership had forged and recorded the note and second deed of trust.

prospective economic opportunity, and breach of warranty.[8] Brent Ayscough ("Ayscough") and Sidney Lanier ("Lanier") of Ayscough & Marar ("A&M") represented Cunningham in the state court action.

The state court action proceeded to trial. The jury returned a special verdict against the debtor on the cause of action for breach of fiduciary duty only, awarding Cunningham $15,000 in damages. With respect to the remaining causes of action, the jury found in favor of the debtor. On or about November 8, 1989, the trial court entered judgment in favor of Cunningham in the amount of $15,000 ("November 1989 judgment"). The debtor did not appeal the November 1989 judgment. However, Cunningham appealed the state court judgment as to the causes of action decided in the debtor's favor. The appellate **[*4]** court reversed and remanded to the trial court as to those causes of action.

While the state court action was pending before the trial court on remand, the debtor and her husband filed a chapter 7 petition on October 6, 1995 (bankruptcy case no. 95-20255).

Three months later, the debtor and her husband converted their bankruptcy case from chapter 7 to chapter 13. Two months following the conversion of the bankruptcy case, Cunningham filed a proof of claim, asserting an unsecured claim of $500,000, based on the state court action. The debtor and her husband filed an objection to Cunningham's claim; though hearings were scheduled on the objection, no order was entered as to its disposition.

The bankruptcy court entered an order reconverting the bankruptcy case to chapter 7 on February 25, 1997.[9] Six months after the reconversion,

Cunningham, still represented by A&M, filed a complaint against the debtor and her husband for denial of their discharge under § 727 (adv. proc. no. 97-1934).[10]

On September 29, 1999, after a trial in the adversary proceeding, the bankruptcy court entered judgment against the debtor denying her discharge under § 727(a)(2)(A) and (a)(4)(A) ("September 1999 discharge denial judgment").[11] The bankruptcy court entered judgment in favor of her husband. On the same day, the bankruptcy court entered an order in the main bankruptcy case denying the debtor's discharge ("discharge denial order"). The main bankruptcy case docket twice noted the bankruptcy court's denial of the debtor's discharge; in the docket entry regarding the discharge denial order (docket no. 149) and in the docket entry regarding the order closing the case on April 9, 2001 (docket no. 154).

Before the chapter 7 case closed, the debtor and her husband filed a chapter 13 petition on August 6, 1998 (bankruptcy case no. 98-21038). Their second bankruptcy case was dismissed on October 15, 1998, and closed on February 19, 1999.

Retrial of the state court action took place on June 19, 2000. The jury found in favor of Cunningham as to his causes of action for fraud, intentional

---

the case from chapter 13 to chapter 7. At the February 12, 1997 hearing on the chapter 13 trustee's motion to reconvert, the bankruptcy court **[*5]** determined that the debtors converted their case from chapter 7 to chapter 13 in bad faith and granted the chapter 13 trustee's motion.

[10] Cunningham earlier filed two complaints against the debtor and her husband, one to determine nondischargeability of a debt under § 523 (adv. proc. no. 95-2330) and the other for denial of discharge under § 727 (adv. proc. no. 96-1906). Both adversary proceedings were dismissed.

[11] The bankruptcy court found that the debtor concealed assets, knowingly and with **[*6]** fraudulent intent, by transferring her monthly income to her daughter's bank account to prevent attachments by Cunningham to enforce the November 1989 judgment. It also found that the debtor made false oaths or accounts, knowingly and with fraudulent intent, on her schedules and statement of financial affairs by failing to disclose various assets and transfers of assets.

---

[8] Cunningham asserted the following causes of action solely against the debtor individually: negligent and intentional broker malpractice. He asserted the following causes of action against all members of the partnership: fraud, slander of title, intentional interference with prospective economic opportunity, breach of warranty, breach of fiduciary duty, constructive fraud, and conspiracy.

[9] On November 25, 1996, the chapter 13 trustee moved to reconvert

interference with prospective economic opportunity, breach of warranty, and negligent broker malpractice. The trial court then, on August 11, 2000, awarded judgment in favor of Cunningham against the debtor in the amount of $98,700, plus $143,052 in interest. The trial court further awarded Cunningham attorney's fees in the amount of $596,615.75 under a subsequent order (collectively, "August 2000 judgment").

On October 14, 2005, a writ of [*7] execution was issued to enforce the August 2000 judgment; when it was issued, the unpaid August 2000 judgment totaled $1,302,918.03, including interest and fees. Sometime in January 2006, Cunningham initiated judgment levy proceedings to sell the debtor's residence to satisfy the August 2000 judgment.

On January 25, 2006, the debtor met with Morse and retained him as her bankruptcy attorney. Morse had not represented the debtor in either of her two prior bankruptcy cases. At the time she met with Morse, the debtor was 77 years old.[12]

In preparing the petition, Morse interviewed the debtor, questioning her about prior lawsuits and other legal proceedings. The debtor did not disclose the existence of the September 1999 discharge denial judgment or the discharge denial order to Morse during the interview.

Morse also "pulled up a check on Pacer" ("PACER query"), which listed the debtor's prior bankruptcy cases and related adversary proceedings. The PACER query did not provide any information as to the history [*8] or disposition of the prior bankruptcy cases and related adversary proceedings; it did not mention the September 1999 discharge denial judgment or the discharge denial order. Morse attached a copy of the PACER query to the petition filed in the debtor's current bankruptcy case.[13] The debtor's prior bankruptcy

cases also were listed on the petition and on the Statement of Related Cases.[14]

Cunningham was listed on the original Schedule F as a general unsecured creditor with a claim of $1,324,256;[15] the claim was not characterized as contingent, unliquidated or disputed. Cunningham also was listed on the List of Creditors Holding 20 Largest Unsecured Claims as having a judgment lien of $1,324,256, secured against the debtor's residence. The amended List of Creditors and Schedule F (docket no. 108), [*9] filed later, indicated that several general unsecured debts, including Cunningham's judgment lien of $1,324,256, were "ordered nondischargeable."

On February 2, 2006, the debtor filed her chapter 7 petition. On the same day, she filed a motion to avoid Cunningham's judgment lien under § 522(f) to preserve her homestead exemption ("lien avoidance motion"). Cunningham filed an opposition to the debtor's lien avoidance motion, attaching a copy of the September 1999 discharge denial judgment and discharge denial order in support. No hearing was scheduled on the debtor's lien avoidance motion.

Shortly after filing the bankruptcy petition, Morse contacted the debtor's former attorneys who had represented her in the prior bankruptcy cases. According to Morse, they provided him with little information.

On February 21, 2006, Cunningham filed a motion for relief from stay ("stay motion"), contending that his interest in the debtor's residence was not adequately [*10] protected and that the debtor filed

_____

[12] At the time Cunningham filed the sanctions motion in October 2007, the debtor was 78 years old. Declaration of Myrna Jacobson in Opposition to Cunningham's Motion for Sanctions, 8:7.

[13] Morse apparently accessed the U.S. Party/Case Index, a system

that serves as a case locator index for PACER. The U.S. Party/Case Index website is at http://pacer.uspci.uscourts.gov.

[14] The Statement of Related Cases is a form, known as Local Form 1015-2.1, that is required under Rule 1015-2(b) of the Local Bankruptcy Rules for the United States Bankruptcy Court, Central District of California.

[15] Cunningham also was listed as having an additional general unsecured claim. The second claim was in the amount of $8,362, based on a judgment entered in October 1992. According to Lanier, the claim arose from a judgment for costs on appeal.

the bankruptcy case to delay or hinder him from executing on the August 2000 judgment. In support of the stay motion, he again attached a copy of the September 1999 discharge denial judgment and the discharge denial order. The debtor did not oppose Cunningham's stay motion. The bankruptcy court entered an order granting Cunningham relief from stay on May 4, 2006.

The debtor and Cunningham meanwhile began negotiating to settle Cunningham's claim.

On March 29, 2006, the debtor filed a motion to dismiss the bankruptcy case on the ground that a discharge would not benefit her, as most of the debts scheduled in her current bankruptcy case also were scheduled in her prior chapter 7 case, in which the debtor was denied her discharge under the September 1999 discharge denial judgment and discharge denial order. Because no hearing was set on the debtor's motion to dismiss, no action was taken on it.

Two months later, Cunningham filed a complaint against the debtor to determine that the August 2000 judgment was nondischargeable under § 523(a) (adv. proc. no. 06-1356). The debtor filed an answer, denying all but one of the allegations based on lack of knowledge  [*11] or information.

In the meantime, Cunningham and the debtor continued to negotiate. By January 23, 2007, they had reached a tentative settlement.[16]

Under the proposed settlement agreement, the debtor agreed to pay Cunningham $500,000 in full satisfaction of the August 2000 judgment. The debtor proposed to pay Cunningham in two installments through a refinance of her residence and another property owned by her husband. She proposed to pay Cunningham $300,000 from the refinance of her residence within twenty-five days following execution of the settlement agreement

("first installment payment") and $200,000 from the refinance of her husband's property ("second installment payment").

As security for the second installment payment, the debtor and her husband agreed to give Cunningham a promissory note and trust deed against the debtor's husband's property in the amount of $200,000. The debtor and her husband were required to execute the promissory note and trust deed concurrently with signing  [*12] the settlement agreement. The debtor also agreed to release any interest she had in her husband's property. She further agreed to repair her residence and sell it, applying the remaining sale proceeds, if any, to Cunningham's claim.

The debtor agreed to pay the remainder of any sums due Cunningham on his claim no later than 120 days after the close of escrow on her residence and upon termination of her bankruptcy case. At the close of escrow, the debtor was to receive a discharge in the main bankruptcy case.

The debtor also stipulated to a determination that the August 2000 judgment was nondischargeable as set forth in Cunningham's complaint. The stipulation would remain in effect, whether or not the terms of the settlement agreement were performed.

For his part, Cunningham agreed to "execute  [*13] any documents reasonably required by the lenders, title companies or escrows in order to remove encumbrances and liens from title as conditions to financing, including but not limited to documents resulting in termination of the court ordered sale of [the debtor's residence], abstracts of judgment, or any other instruments resulting in conditions which may limit [the debtor's] ability to obtain financing." Cunningham was to deliver the documents to Godfrey Escrow, which would not release them until the debtor made the first installment payment.

After receiving the first installment payment and subsequent additional payments, Cunningham

---

[16] At a status conference on January 23, 2007, Cunningham and the debtor reported to the bankruptcy court that they had negotiated a settlement but needed additional time to finalize the settlement agreement.

would deliver a partial release and satisfaction of his claim in the amount of those payments. If the debtor failed to make any of the payments due under the settlement agreement, Cunningham would be entitled to the full amount of the August 2000 judgment, less any payments the debtor had made.

Cunningham and the debtor signed off on the settlement agreement. Although the settlement agreement was subject to the bankruptcy court's approval, neither the debtor nor Cunningham asked the court to approve it.

The settlement fell apart, however, when the debtor  [*14] failed to make the first installment payment. The debtor subsequently filed three separate motions in the adversary proceeding in an attempt to modify and enforce the settlement agreement.

The debtor filed her first motion on April 23, 2007, requesting that the bankruptcy court review the settlement agreement for fairness ("motion for fairness"). The debtor contended that the terms of the settlement agreement, as drafted, unfairly limited the time in which she could sell her residence to fund the first installment payment. Such a restrictive time limit, she argued, would cause her to default; as a result, Cunningham would "take all her assets," and the debtor still would remain liable for the entire amount of the August 2000 judgment.

The debtor further asserted that the terms of the settlement agreement unfairly required the debtor's husband, who was not a party to the adversary proceeding, to provide his separate property as security for the payments due. Moreover, the debtor claimed, Cunningham failed to comply with the terms of the settlement agreement by refusing to release his liens against the debtor's residence, which was necessary in order for the debtor to refinance it, and  [*15] by instructing the chapter 7 trustee not to dismiss or discharge the bankruptcy case.

Cunningham opposed the debtor's motion for fairness. He argued that "the deal was off" because the debtor, not Cunningham, failed to comply with the conditions of the settlement agreement.[17] He contended that the debtor failed to make the first installment payment and to provide a promissory note and trust deed against her husband's property as security, as required under the settlement agreement.

At the hearing on May 23, 2007, the bankruptcy court denied the debtor's motion for fairness. The bankruptcy court reasoned that it was not its role to rewrite or interpret the settlement agreement, but it was "a matter between the parties as to what they agreed to." Tr. of July 12, 2007 Hr'g, 2:21-24, 3:2-3. The bankruptcy court could only approve or disapprove the settlement agreement. Tr. of July 12, 2007 Hr'g, 3:5-6.

Following the bankruptcy court's cue,  [*16] on May 29, 2007, the debtor filed a motion to enforce the settlement agreement ("motion to enforce settlement"). A month later, she filed a motion to approve the settlement agreement ("motion to approve settlement"). In both the motion to enforce settlement and the motion to approve settlement (collectively, "settlement motions"),[18] the debtor advanced essentially the same arguments she had made in the motion for fairness.

Cunningham opposed the debtor's motion to enforce settlement.[19] He argued that it simply was a

---

[17] Cunningham rescinded the settlement agreement in a letter dated April 27, 2007. Cunningham, through Lanier, informed the debtor that, because she failed to comply with the terms of the settlement agreement, "the [settlement] agreement [was] repudiated."

[18] According to the debtor, she managed to obtain approval for a $300,000 loan, but because Cunningham failed to release his liens against her residence, the debtor was unable to complete the loan transaction and make the first installment payment. The debtor managed to find a buyer for her residence and proposed to pay Cunningham his claim in full with the sale proceeds, but he again failed to release his liens against her residence, preventing escrow from closing.

[19] Reviewing the adversary proceeding docket and the record before us, it appears that Cunningham did not file an opposition to the Motion to Approve Settlement. The bankruptcy court's subsequent order addressed both the settlement motions, however.

motion for reconsideration of the bankruptcy court's denial of her earlier motion for fairness. He further alleged that the debtor was acting in bad faith by failing to keep him informed of the progress of the **[*17]** escrow and by refusing to disclose details of the sale of her residence.

He further alleged that, even though Cunningham had selected a specific escrow company, Godfrey Escrow, to process the payment of his claim through the refinance, the debtor used another escrow company.[20] Because the debtor did not comply with the terms of the settlement agreement, Cunningham "called off" the settlement.

At a hearing on July 12, 2007, the bankruptcy court denied the settlement motions. The bankruptcy court found that the settlement agreement was not binding against Cunningham because it had not been approved by the bankruptcy court. Tr. of July 12, 2007 Hr'g, 3:25, 4:1-3, 13:23-25, 15:22-25. Because the settlement agreement was not binding, the bankruptcy court continued, Cunningham could and did rescind the settlement agreement. Tr. of July 12, 2007 Hr'g, 8:22-24, **[*18]** 15:22-25. The bankruptcy court declined to approve or enforce it. On July 24, 2007, the bankruptcy court entered an order denying the settlement motions.

After the bankruptcy court entered its order denying the settlement motions, Cunningham proceeded to execute on the August 2000 judgment, selling the debtor's residence at a sheriff's sale on August 2, 2007.[21]

On August 31, 2007, Cunningham filed a motion for summary judgment as to the nondischargeability of the August 2000 judgment under § 523(a) ("summary judgment motion"). Before filing the summary judgment motion on Cunningham's behalf, however, in a letter dated July 20, 2007, Lanier informed Morse of his intent

to file the summary judgment motion. He warned Morse against opposing the summary judgment motion, as such an "unwarranted opposition" would be disfavored by the court under Rule 9011. Lanier then proposed that the debtor stipulate to a judgment of nondischargeability to avoid incurring further legal fees and costs.

After receiving no response from the debtor to his proposal,[22] in a letter **[*19]** dated August 23, 2007, Lanier advised Morse that he intended to file a motion for sanctions against Morse and the debtor under § 105 and Rule 9011, based on their conduct in the main bankruptcy case and the adversary proceeding, which included their refusal to withdraw the answer in the adversary proceeding. Lanier suggested that the debtor and Morse "mitigate [their] financial exposure" by withdrawing the answer in the adversary proceeding and stipulating to a judgment of nondischargeablity of the August 2000 judgment.

Despite this warning, on October 5, 2007, the debtor filed an opposition to the summary judgment motion, admitting that Cunningham had a judgment against her, but disputing the amount that remained owing on the judgment. After holding a hearing, the bankruptcy court granted Cunningham's summary judgment motion. It later entered judgment against the debtor on March 21, 2008, finding the August 2000 judgment nondischargeable under § 523(a)(6) and (a)(10) **[*20]** ("March 2008 nondischargeability judgment").[23]

On October 3, 2007, in the main bankruptcy case, Cunningham filed the sanctions motion. Cunningham filed the sanctions motion against the debtor and Morse under Rule 9011 and the bankruptcy court's inherent authority and § 105(a) for filing the bankruptcy petition in bad faith. He requested that sanctions in the amount of

---

[20] The debtor claimed that the buyer had selected the escrow and the title insurance company.

[21] In his declaration in support of the sanctions motion, according to Lanier, Cunningham purchased the debtor's residence for $765,000.

[22] Morse sent to Lanier an e-mail correspondence, dated July 27, 2007, informing Lanier that he was discussing the proposed stipulated judgment with the debtor. Morse would contact Lanier once the debtor made a decision.

[23] The adversary proceeding closed on July 28, 2008.

$153,560.31, representing his attorney's fees and costs, be imposed against the debtor and Morse. Cunningham also requested that Morse disgorge to the chapter 7 trustee any attorney's fees paid to him by the debtor.

Specifically, Cunningham called for imposing sanctions against the debtor and Morse under Rule 9011 on the ground that they filed the bankruptcy petition for the improper purpose of frustrating his attempt to execute judgment against the debtor.[24] Cunningham further argued that filing the bankruptcy petition was frivolous, as the debtor had no dischargeable debts as a result of the September 1999 discharge denial judgment.

Cunningham alternatively asserted that sanctions should be imposed against the debtor and Morse under § 105(a) and the bankruptcy court's inherent authority because they engaged in bad faith conduct prior to and during the present bankruptcy case. Specifically, he contended that, in filing the prior and present bankruptcy cases, the debtor and her attorneys, including Morse, sought to hinder Cunningham's attempts to obtain and execute judgment against her - conduct that demonstrated an abuse of the bankruptcy system.

The debtor opposed the sanctions motion. The debtor claimed that she did not file the bankruptcy petition to frustrate her creditors, but to obtain "some breathing room" from them; she had debts, other than those owed to Cunningham, that she was unable to pay and had defaulted on payments on the second mortgage against her residence.

The debtor also contended that she did not engage in any bad faith conduct during the bankruptcy case, but cooperated with the chapter 7 trustee and Cunningham and performed all **[*22]** of her duties as debtor. Although she faced foreclosure of her

residence by Cunningham, the debtor did not attempt to prevent him from proceeding with the foreclosure.

Morse, for his part, contended that he made every effort to prepare the debtor's petition and schedules properly before filing them. He asserted that, given the time constraints, he conducted as reasonable an investigation as he could into the circumstances giving rise to the bankruptcy petition. When he at last became aware of the September 1999 discharge denial judgment, Morse took steps to mitigate any negative effects of the filing of the bankruptcy petition on Cunningham.

The bankruptcy court held a hearing on the sanctions motion on November 28, 2007 ("initial hearing"). At the close of the initial hearing, the bankruptcy court asked the debtor and Cunningham to file supplemental briefs. After reviewing supplemental briefing from Cunningham and the debtor, as well as the papers they earlier submitted, the bankruptcy court issued an order ("evidentiary hearing order") setting an evidentiary hearing on the sanctions motion ("evidentiary hearing") to hear testimony from the debtor, Morse, Ayscough and Lanier in order **[*23]** to address several material factual issues raised in the papers.

In the evidentiary hearing order, the bankruptcy court set forth the following factual issues it wished to address at the evidentiary hearing:

(1) What was the basis for the debtor's statements in her declarations in opposition to the [sanctions] motion that she had other debts owed to creditors other than Cunningham to rebut the contentions that the petition was filed in bad faith;
(2) Did Morse know of the debtor's prior bankruptcy cases and the court's judgment denying debtor's discharge in the prior bankruptcy case, and if not, why not;
(3) What was the urgent need for the debtor to file this bankruptcy case when she did;
(4) How long did Morse have to prepare the bankruptcy petition for filing before the case

---

[24] At the November 28, 2008 hearing, Cunningham, through Ayscough, also contended that the debtor violated Rule 9011 by filing her answer to **[*21]** his § 523(a) nondischargeability complaint. Tr. of November 28, 2007 Hr'g, 32:21-23, 33:4-8; 33:19-25, 34:3-5. It appears that Cunningham did not pursue this argument.

Case 8:18-ap-01168-SC    Doc 347    Filed 08/19/21    Entered 08/19/21 21:07:48    Desc
Main Document    Page 90 of 242

Page 8 of 16
2009 Bankr. LEXIS 4577, *23

was filed;

(5) Did Ayscough refuse to discuss a possible resolution of the debt owed by the debtor to Cunningham with Morse and hang up on Morse when Morse contacted A&M, Cunningham's attorneys, before the petition was filed, and did Ayscough use inappropriate language in his conversation with Morse;

(6) Should the attorney's fees and costs claimed by A&M be reduced as excessive, or allowed as reasonable.

At the May  [*24] 9, 2008 evidentiary hearing, the debtor testified that she filed for bankruptcy because she had fallen behind on payments on the second mortgage against her residence.[25] Tr. of May 9, 2008 Hr'g, 11:3-10.

She filed for bankruptcy also because her stepson, in whose name she had taken out the first mortgage against the residence, threatened her with legal action unless she "[got] the loan out of his name." Tr. of May 9, 2008 Hr'g, 7:12-17, 10:18-22.

Morse also appeared as a witness at the evidentiary hearing. Morse testified that he had represented the debtor for only a week before he filed the bankruptcy petition. Tr. of May 9, 2008 Hr'g, 19:1-4, 22:4-9. He believed that there was an urgent need for the debtor to file the bankruptcy petition because her residence "was in eminent [sic] threat of sale." Tr. of May 9, 2008 Hr'g, 19:5-11, 21:23-25, 22:1-3. Moreover, Morse continued, the debtor had "valid debts and limited income [with which] to pay them," as "her work was diminishing due to [her] health." Tr. of May 9, 2008 Hr'g, 21:5-7. He believed that the debtor  [*25] needed the automatic stay that resulted from filing the bankruptcy petition "to understand what was going on with the sale and give her a chance to reorganize." Tr. of May 9, 2008 Hr'g, 21:12-14.

Morse testified that it took a few days for him to obtain from the debtor the information necessary to

complete the bankruptcy petition. Tr. of May 9, 2008 Hr'g, 22:9-12. He asserted that, because of his PACER query, he knew of the debtor's prior bankruptcy cases before he filed the petition. Tr. of May 9, 2008 Hr'g, 19:12-16. He had "pulled up a check on PACER and [he] saw the cases listed there from an earlier and previous decade." Tr. of May 9, 2008 Hr'g, 19:14-16. He also was aware of the August 2000 judgment as it was the basis for the sheriff's sale of the debtor's residence and for the writ of execution. Tr. of May 9, 2008 Hr'g, 19:19-21.

Morse testified he was not aware of the September 1999 discharge denial judgment when he filed the debtor's bankruptcy petition, however, because certain cases, such as the debtor's prior bankruptcy cases, had limited records available on PACER. Tr. of May 9, 2008 Hr'g, 20:5-8. He even "took the liberty to communicate with PACER" to confirm this. Tr.  [*26] of May 9, 2008 Hr'g, 20:1-4. He further testified that, although he questioned the debtor about prior lawsuits before filing the bankruptcy petition, the September 1999 discharge denial judgment did not "come up." Tr. of May 9, 2008 Hr'g, 22:13-22. Morse did not discover the September 1999 discharge denial judgment until Cunningham filed the stay motion. Tr. of May 9, 2008 Hr'g, 20:9-15.

Morse testified that he contacted Ayscough before filing the bankruptcy petition in order to determine the nature of Cunningham's claim and to determine whether the debtor "could work out something where she could retain her home and yet satisfy [the] debt" without needing to file for bankruptcy. Tr. of May 9, 2008 Hr'g, 23:3-12, 23:21-25, 24:1-7. Ayscough refused to discuss the matter with Morse, however; "the only thing [Ayscough] said to [Morse] was an obscenity and then hung up the phone immediately." Tr. of May 9, 2008 Hr'g, 24:23-24.

At the evidentiary hearing, Ayscough questioned the debtor and Morse and appeared as a witness. Ayscough testified that the sheriff's sale was "just

---

[25] According to the debtor's Schedule D, Alvin and Barbara Fink had a second position lien of $32,500 against the debtor's residence.

around the corner from the date of the filing of the bankruptcy . . . it was a matter of days." Tr. of May 9, 2008 Hr'g,  [*27] 37:22-24.

After the evidentiary hearing, the bankruptcy court took the matter under submission. On October 16, 2008, the bankruptcy court entered its order denying Cunningham's sanctions motion. It issued the Memorandum Decision re: Creditor Larry Cunningham's Motion for Sanctions ("Memorandum Decision") on the same day.

The bankruptcy court held that the debtor and Morse did not violate Rule 9011 in filing the bankruptcy petition. Memorandum Decision, 8:21-23. The bankruptcy court found that the debtor filed the bankruptcy petition because she owed debts to creditors, other than Cunningham, that she could not pay. Memorandum Decision,  11:10-12. Although the debtor incorrectly characterized Cunningham's claim as a general unsecured claim, for the most part, she accurately disclosed her assets and liabilities and financial circumstances and disclosed her prior bankruptcy cases. Memorandum Decision, 11:14-17. The bankruptcy court thus concluded that the bankruptcy petition was not frivolous. Memorandum Decision, 11:10.

With respect to Morse, the bankruptcy court determined that Morse made a reasonable inquiry into the facts and law under the circumstances before he filed the bankruptcy  [*28] petition on the debtor's behalf. Memorandum Decision, 12:6-10. Because the debtor was facing immediate foreclosure of her residence, Morse had little time to conduct a prefiling investigation. Memorandum Decision, 12:25-26. Morse had to rely on the debtor, "a layperson," for much of the information regarding the state court action and her prior bankruptcy cases. Memorandum Decision, 12:27-28, 13:1. The bankruptcy court also found that Morse was unable to retrieve information regarding the September 1999 discharge denial judgment because it was not readily available from PACER, and could be obtained only from the federal archives, "a process which could take weeks, if not

months." Memorandum Decision, 13:1-5. The bankruptcy court further found that Morse tried, unsuccessfully, to obtain information from Ayscough, who refused to cooperate. Memorandum Decision 13:7-11. The bankruptcy court ultimately determined that Morse had not known of the September 1999 discharge denial judgment, despite his efforts to obtain the information. Memorandum Decision, 13:19-20, 14:1.

The bankruptcy court also determined that the debtor did not file the bankruptcy petition for an improper purpose. Memorandum  [*29] Decision, 11:9-10. It found that the debtor filed the bankruptcy petition because she owed debts to creditors, other than those she owed to Cunningham. 11:10-12. The bankruptcy court further found that the debtor filed the bankruptcy petition in an attempt to settle Cunningham's claim and to avoid foreclosure of her residence. Memorandum Decision, 11:12-13, 13:11-15. The bankruptcy court believed that the debtor "was attempting to deal with her liability to Cunningham through negotiation rather than mere avoidance or evasion." Memorandum Decision, 11:19-20. The bankruptcy court further found that the debtor did not unreasonably oppose Cunningham's summary judgment motion. Memorandum Decision, 11:22-23, 12:1.

The bankruptcy court also held, under its inherent authority and § 105(a), that the debtor and Morse did not engage in bad faith conduct to warrant the imposition of sanctions against them. Memorandum Decision, 8:23-24.

The bankruptcy court determined that the debtor had been forthcoming with it and the creditors. Memorandum Decision, 15:4. It noted that the debtor filed her bankruptcy petition before Cunningham executed the judgment levy. Memorandum Decision, 14:27-28. Although  [*30] it acknowledged that the debtor had moved to avoid Cunningham's judgment lien, the bankruptcy court noted that Morse, on the debtor's behalf, filed the lien avoidance motion at the

beginning of the case when he had limited information about the debtor's prior bankruptcy cases. Memorandum Decision, 15:6-8. The bankruptcy court found that the debtor thereafter did not try to prevent Cunningham from executing on his judgment lien; she did not oppose the stay motion and opposed the summary judgment motion only to question the balance of the debt owed to him. Tr. of May 9, 2008 Hr'g, 15:10-15. Considering the totality of the circumstances, the bankruptcy court did not find any attempts by the debtor to mislead it or to manipulate the bankruptcy process. Memorandum Decision, 15:4-6, 15:19. Rather, it concluded, the debtor "was making an honest attempt to deal with her debts," filing the bankruptcy petition to try to settle Cunningham's claim to avoid foreclosure of her residence and to deal with her other creditors. Memorandum Decision, 15:20-23.

The bankruptcy court found that Morse did not act in bad faith in aiding the debtor in filing for bankruptcy. Memorandum Decision, 15:25-26. Morse **[*31]** had limited information in preparing and filing the bankruptcy case, despite his efforts to obtain information. Memorandum Decision, 15:27-28, 16:1. When Morse learned of the September 1999 discharge denial judgment, he tried "to mak[e] the best of a bad situation by attempting to negotiate a settlement with Cunningham" and by not opposing the stay motion. Memorandum Decision, 16:3-5. The bankruptcy court thus concluded that Morse "was sincere and diligent in trying to resolve [the] case for . . . [the debtor] through legitimate, nonfrivolous means . . . ." Memorandum Decision, 16:7-9.

Cunningham appeals.

## JURISDICTION

The bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(O). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

(1) Whether the bankruptcy court abused its discretion in declining to impose sanctions against the debtor and Morse under Rule 9011.

(2) Whether the bankruptcy court abused its discretion in declining to impose sanctions against the debtor and Morse under § 105(a) and its inherent authority.

## STANDARDS OF REVIEW

We review the bankruptcy court's refusal to impose sanctions for abuse of discretion. See Classic Auto Refinishing v. Marino (In re Marino), 37 F.3d 1354, 1358 (9th Cir. 1994)(reviewing **[*32]** denial of sanctions under Rule 9011). The bankruptcy court abuses its discretion if it bases its decision on "'an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" Valley Nat'l Bank v. Needler (In re Grantham Bros.), 922 F.2d 1438, 1441 (9th Cir. 1991)(quoting Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)). Under the abuse of discretion standard, we will not reverse the bankruptcy court unless we have a definite and firm conviction that it made a clear error in judgment. Valley Eng'rs, Inc. v. Elec. Eng'g Co., 158 F.3d 1051, 1057 (9th Cir. 1998)(reviewing imposition of discovery sanction). The bankruptcy court has "broad factfinding powers with respect to sanctions, and its findings warrant great deference . . . ." Primus Auto. Fin. Servs., Inc. v. Batarse, 115 F.3d 644, 649 (9th Cir. 1997)(quoting Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1366 (9th Cir. 1990)(en banc))(internal quotation marks omitted).

We review the bankruptcy court's findings of fact for clear error. Rifino v. United States (In re Rifino), 245 F.3d 1083, 1086 (9th Cir. 2001). A finding of fact is clearly erroneous, even though there is evidence to support it, if **[*33]** we have the definite and firm conviction that a mistake has been committed. Banks v. Gill Distribution Ctrs., Inc. (In

re Banks), 263 F.3d 862, 869 (9th Cir. 2001)(quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985)). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." Anderson, 470 U.S. at 574.

## DISCUSSION

A. The bankruptcy court did not abuse its discretion in declining to impose sanctions against the debtor and Morse under Rule 9011

Under Rule 9011, the bankruptcy court may sanction litigants and attorneys who file a frivolous petition, written motion or other paper or file a petition, written motion or paper for an improper purpose.[26] Dressler v. The Seeley Co. (In re Silberkraus), 336 F.3d 864, 870 (9th Cir. 2003). A frivolous paper is one "that is both baseless and made without a reasonable and competent inquiry." Townsend, 929 F.2d at 1362. That is, it is neither "well-grounded in fact and warranted by existing law [nor] a good faith argument for the extension, modification or reversal of existing law." Marsch v. Marsch (In re Marsch), 36 F.3d 825, 829 (9th Cir. 1994)(internal quotations [*34] omitted).

Attorneys or litigating parties file a petition, written motion or paper for an improper purpose if they file

_____

[26] Rule 9011(b) provides, in relevant part:

(b) By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, -

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

. . . .

it "to harass or to cause unnecessary delay or needless increase in the cost of litigation." Id. at 829 (internal quotations omitted). While frivolousness and improper purpose are not completely separate considerations, as they often overlap, "bankruptcy courts must consider both frivolousness and improper purpose on a sliding scale, where [*35] the more compelling the showing as to one element, the less decisive need be the showing as to the other." Id. at 830.

Cunningham claims that the bankruptcy court abused its discretion in declining to impose sanctions against the debtor and Morse under Rule 9011 because it based its decision on an erroneous view of the law and evidence. After reviewing the record before us, we do not have a definite and firm conviction that the bankruptcy court erred.

1. The bankruptcy court did not err in its view of Rule 9011

Cunningham argues that the bankruptcy court erred in declining to consider all of the papers filed by the debtor and Morse in the bankruptcy case in determining whether to impose sanctions against them under Rule 9011. The bankruptcy court refused to take these papers into account because Cunningham failed to provide the debtor and Morse an opportunity to withdraw or correct the challenged papers as required under Rule 9011(c)(1)(A). Cunningham asserts that the bankruptcy court nonetheless should have considered these papers because "all [of] the proceedings were the fruit of the warrantless petition." Appellant's Opening Brief at 24. In other words, as Cunningham asserted at the [*36] initial hearing, "because the bankruptcy itself was filed in bad faith with no creditors means that all [of] the motions [the d]ebtor [had filed were] filed in bad faith." Tr. of November 28, 2007 Hr'g, 18:5-9.

Rule 9011 "requires that precise procedures be followed . . . ." Polo Bldg. Group, Inc. v. Rakita (In re Shubov), 253 B.R. 540, 545 (9th Cir. BAP 2000). Among these procedures, Rule 9011(c)(1)(A) requires the moving party to allow

the offending party to withdraw or correct the offending matter before submitting the motion for sanctions to the bankruptcy court.[27] This requirement does not apply to filing a bankruptcy petition. Silberkraus, 336 F.3d at 868.

"No party can file a Bankruptcy Rule 9011 motion until after the targeted party has been served with the motion and given 21 days (or a court-prescribed interval) in which to withdraw or correct the offending matter." Shubov, 253 B.R. at 545. The party requesting sanctions must give the offending party the chance to escape sanctions by withdrawing or correcting the offending matter. See Barber v. Miller, 146 F.3d 707, 710 (9th Cir. 1998)("The purpose of the safe harbor, however, is to give the offending party the opportunity . . . to withdraw the offending pleading and thereby escape sanctions.")(emphasis in original). Accord Shubov, 253 B.R. at 546.

Cunningham did not comply with Rule 9011(c)(1)(A); he failed to provide the debtor **[*38]** and Morse an opportunity to withdraw or correct the allegedly offending papers before filing the sanctions motion.[28] Cunningham does not cite

---

[27] Rule 9011(c) provides, in relevant part: "If, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated, the court may, subject to the conditions stated below, impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation.

(1) How Initiated.

(A) By Motion. A motion for sanctions under this rule shall be made separately from other motions or requests and shall describe the specific conduct **[*37]** alleged to violate subdivision (b) . . . . The motion for sanctions may not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected, except that this limitation shall not apply if the conduct alleged is the filing of a petition in violation of subdivision (b)."

[28] Although he does not refer to them in his opening brief, Cunningham's letters, dated July 20, 2007 and August 23, 2007, do not comply with the safe harbor requirements of Rule 9011(c)(1)(A). The letters failed to provide the debtor and Morse the 21-day time

---

any authority excusing him from the safe harbor requirement under Rule 9011(c)(1)(A). Simply alleging that all of the papers in the bankruptcy case were filed in bad faith because the bankruptcy petition was filed in bad faith does not release Cunningham from his duty under Rule 9011(c)(1)(A). The bankruptcy court therefore did not err in refusing to consider all of the papers filed by the debtor and Morse in the bankruptcy case in its analysis under Rule 9011.

Cunningham also contends that the bankruptcy court erred in applying a subjective standard, rather than an objective standard, in determining whether Morse conducted a reasonable inquiry into the facts and the law before filing **[*39]** the bankruptcy petition.

Under Rule 9011(b), an attorney has "an affirmative duty to conduct a reasonable inquiry into the facts and the law before filing . . . ." Business Guides, Inc. v. Chromatic Commc'ns Enter., Inc., 498 U.S. 533, 551, 111 S. Ct. 922, 112 L. Ed. 2d 1140 (1991). An appropriate inquiry is one that is reasonable under the circumstances. See id. Accord Townsend, 929 F.2d at 1364. That is, the bankruptcy court should "assess the attorney's conduct in light of 'the situation which existed when the paper was filed.'" Hamer v. Career College Ass'n, 979 F.2d 758, 759 (9th Cir. 1992)(quoting Golden Eagle Distrib. Corp. v. Burroughs Corp., 801 F.2d 1531, 1536 (9th Cir. 1986)). Accord Shmavonian v. Lewis (In re Lewis), 79 B.R. 893, 896 (9th Cir. BAP 1987)("[A]n attorney's conduct is measured by an objective standard - the attorney's conduct must have been reasonable under the circumstances. The reasonable man against which conduct is tested is a competent attorney admitted to practice before the district court.")(internal quotations and citations omitted). A determination of reasonableness under Rule 9011 is "an intensely fact-bound inquiry." See Townsend, 929 F.2d at 1364-65.

---

period to withdraw or correct the allegedly offending papers before Cunningham filed the sanctions motion.

Based on our review of the record, [*40] we conclude that the bankruptcy court used an objective standard to measure the reasonableness of Morse's inquiry into the facts and the law. The bankruptcy court had Morse testify as to the circumstances extant when he prepared and filed the bankruptcy petition on the debtor's behalf. In determining that Morse made a reasonable inquiry, the bankruptcy court expressly considered the conditions under which Morse operated at the time. It highlighted the facts that the foreclosure sale was imminent, which gave Morse little time to conduct his inquiry, that Morse could not obtain detailed information about the debtor's prior bankruptcy cases on PACER because certain older bankruptcy cases, such as the debtor's prior bankruptcy cases, had limited records available on PACER, and that Morse interviewed the debtor about prior lawsuits and contacted Ayscough to obtain further information, both of whom did not mention the September 1999 discharge denial judgment. The bankruptcy court evaluated the reasonableness of Morse's inquiry, not by considering what Morse himself believed was reasonable, but by examining the circumstances at the time that Morse conducted his inquiry. The bankruptcy court [*41] did not err in its interpretation of Rule 9011 legal standards.

2. The bankruptcy court did not clearly err in its assessment of the evidence

Cunningham claims that the bankruptcy court erred in its assessment of the evidence in determining that the debtor's bankruptcy petition was not frivolous. He points out that Morse had attached a copy of the PACER query to the bankruptcy petition, which revealed the debtor's prior bankruptcy cases. Having become aware of these prior bankruptcy cases, Cunningham continues, any reasonable attorney would have inquired further into the disposition of the prior bankruptcy cases - that is, whether a discharge had been entered. Appellant's Opening Brief at 26. Having knowledge of these prior bankruptcy cases, Morse could and should have inquired into the disposition of those cases and accessed the September 1999 discharge

denial judgment through PACER. Appellant's Opening Brief at 3. Had Morse inquired further, Cunningham argues, he would have "had all the information he needed to counsel [the debtor] against filing another Chapter 7 petition regarding the same claims previously held to be nondischargeable in bankruptcy." Id.

Cunningham does not provide [*42] any evidence, however, demonstrating that Morse could have obtained information regarding the September 1999 discharge denial judgment through PACER. Morse testified that the debtor's prior bankruptcy cases had limited records available on PACER when he prepared and filed the bankruptcy petition. Although Cunningham contends that Morse could have "downloaded" the September 1999 discharge denial judgment from PACER, he has not submitted evidence showing how Morse could have done so at the time he conducted his PACER query. Morse further testified that he tried other means of obtaining more information about the debtor's prior bankruptcy cases - namely, by interviewing the debtor and collecting documentation from her and by contacting Ayscough - that proved unsuccessful.[29] The record before the Panel contains sufficient evidence to support the bankruptcy court's determination that Morse did not file a frivolous bankruptcy petition, as he conducted a reasonable inquiry into the facts and law under the circumstances at the time.

Cunningham also contends that the bankruptcy court erred in its assessment of the evidence in determining whether the debtor filed the bankruptcy petition for an improper purpose. The bankruptcy court found that the debtor filed the bankruptcy petition because she owed debts to creditors other than Cunningham and she wanted to try to negotiate a settlement with him. Cunningham

---

[29] Cunningham does not challenge the bankruptcy court's determination as to the credibility of the testimony given by Morse and the debtor. We give particular deference [*43] to findings of fact based on credibility. Price v. Lehtinen (In re Lehtinen), 332 B.R. 404, 416 (9th Cir. BAP 2005)(citing Anderson, 470 U.S. at 575), aff'd 564 F.3d 1052 (9th Cir. 2009).

complains, however, that filing the bankruptcy petition in an attempt to settle is not a proper purpose. He alleges that the debtor filed the bankruptcy petition to invoke the automatic stay "as leverage for settlement negotiations." Appellant's Opening Brief at 26. He cites the debtor's schedules and long history of concealing assets in her prior bankruptcy cases as evidence of her intent to hinder and delay his execution of the August 2000 judgment.

Under certain circumstances, filing a bankruptcy petition in an attempt to force settlement may qualify as an improper purpose under Rule 9011. Cf. Leeds Bldg. Prods., Inc. v. Moore-Handley, Inc. (In re Leeds Bldg. Prods., Inc.), 181 B.R. 1006, 1012 (Bankr. N.D. Ga. 1995)("[U]nder [*44] the right circumstances, filing a complaint to force a settlement may qualify as improper conduct prohibited by Rule 9011."); In re Grossinger, 268 B.R. 386 (Bankr. S.D.N.Y. 2001)(filing an involuntary petition as a tactic to extract settlement of a disputed claim is an improper purpose under Rule 9011). But the bankruptcy court here found that the debtor had other grounds, in addition to her desire to negotiate a settlement with Cunningham, that warranted filing her bankruptcy petition. As evidenced by her schedules and disclosed in her testimony, the debtor filed for bankruptcy protection because she owed debts, other than those to Cunningham, that she could not pay. The debtor testified that she also filed for bankruptcy because her stepson threatened her with legal action.

Moreover, the debtor did not try to prevent Cunningham from executing on the August 2000 judgment; she did not oppose his stay motion and even filed a motion to dismiss her bankruptcy case. Although she filed an opposition to Cunningham's summary judgment motion, she did not contest it on the merits, but challenged the balance of the judgment owed, which the bankruptcy court determined to be a legitimate argument, [*45] though ultimately unsuccessful.

Based on her testimony and her conduct in the bankruptcy case, the bankruptcy court found that the debtor "was making an honest attempt to deal with her debts." We conclude that the bankruptcy court did not clearly err in its assessment of the evidence in deciding not to impose sanctions against the debtor under Rule 9011.

B. The bankruptcy court did not abuse its discretion in declining to impose sanctions against the debtor and Morse under § 105(a) and its inherent authority

Cunningham argues that the bankruptcy court abused its discretion in refusing to impose sanctions under § 105(a) and its inherent authority against the debtor and Morse for engaging in bad faith conduct. Cunningham asserts that the debtor filed her prior bankruptcy cases to hinder the state court action and to defraud her creditors and filed her present bankruptcy case to delay Cunningham from executing on the August 2000 judgment. He claims that the bankruptcy court abused its discretion in refusing to consider the debtor's prior bankruptcy cases in its decision to deny the sanctions motion, as her present bankruptcy case "was of a piece with her prior conduct [in the prior bankruptcy [*46] cases]." Appellant's Opening Brief at 29.

Bankruptcy courts have the inherent authority to sanction bad faith conduct. Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.), 77 F.3d 278, 284 (9th Cir. 1996). This inherent authority is recognized by implication in § 105(a).[30] Id.

"The inherent sanction authority allows a bankruptcy court to deter and provide compensation for a broad range of improper litigation tactics." Knupfer v. Lindblade (In re Dyer), 322 F.3d 1178, 1196 (9th Cir. 2003)(citing

---

[30] Section 105(a) provides: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process."

Exhibit 9, Page 85

Fink v. Gomez, 239 F.3d 989, 992-93 (9th Cir. 2001)). Before the bankruptcy court can impose sanctions under its inherent authority, however, it must make an explicit finding of bad faith or conduct tantamount to bad faith. Dyer, 322 F.3d at 1196 **[*47]** (citing Fink, 239 F.3d at 992-93).

Bad faith in this context "consists of something more egregious than mere negligence or recklessness." Id. (citing Fink, 239 F.3d at 993-94). Where a litigant or an attorney "is substantially motivated by vindictiveness, obduracy, or mala fides, the assertion of a colorable claim will not bar the assessment of attorney's fees [as sanctions]." Fink, 239 F.3d at 992 (quoting In re Itel Sec. Litig., 791 F.2d 672, 675 (9th Cir. 1986))(internal quotation marks omitted). Bad faith also is found when a litigant or an attorney acts recklessly, combined with an additional factor such as frivolousness, harassment or an improper purpose. Fink, 239 F.3d at 994. In short, bad faith includes a broad range of willful improper conduct. Id. at 992.

The bankruptcy court declined to consider the debtor's conduct in the prior bankruptcy cases, stating that it did not "seem to have the power [under § 105(a)] to award attorneys [sic] fees for conduct that's outside this case." Tr. of November 28, 2007 Hr'g, 38:15-17. The bankruptcy court explicitly did find that the debtor and Morse did <u>not</u> engage in bad faith conduct in the present bankruptcy case.

The bankruptcy court determined **[*48]** that the debtor filed the bankruptcy petition to work out a deal with Cunningham and her other creditors. The bankruptcy court found that the debtor had been forthcoming with it and her creditors. She did not attempt to prevent Cunningham from executing on his judgment lien. With respect to Morse, the bankruptcy court found that he was "sincere and diligent in trying to resolve [the bankruptcy] case for [the debtor], through legitimate, nonfrivolous means . . . ." When he learned of the September 1999 discharge denial judgment, Morse tried to help the debtor "in making the best of a bad

situation" by attempting to negotiate a settlement with Cunningham and by declining to oppose Cunningham's stay motion. Cunningham has not presented any evidence demonstrating that the bankruptcy court clearly erred in its fact findings.

Citing Chambers v. NASCO, Inc., 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991), Cunningham asserts that the bankruptcy court should have considered the debtor's conduct in her prior bankruptcy cases as indicative of bad faith in determining whether to impose sanctions.[31] Appellant's Opening Brief at 28. According to Cunningham, under Chambers, a bankruptcy court may consider all of a debtor's prior **[*49]** conduct outside of and before the bankruptcy court as evidence of bad faith. He further asserts that Chambers permits the bankruptcy court to award all of the attorney's fees and costs incurred over the course of the bankruptcy case as sanctions upon a finding of bad faith.[32]

In Chambers, the district court did not assess sanctions against the appellant until after the litigation had concluded. 501 U.S. at 40-42. After holding a hearing, the district court imposed sanctions of $996,644.65, representing the entire amount of the appellee's litigation costs over the course of the litigation. Id. at 40.

_____

[31] Citing Mortgage Mart, Inc. v. Rechnitzer (In re Chisum), 847 F.2d 597 (9th Cir. 1988), Cunningham further contends that successive filings of bankruptcy petitions in bad faith require the imposition of sanctions under § 105(a). The debtor filed her first two bankruptcy cases in 1995 and 1998 - almost ten years before she filed the present bankruptcy case. The debtor's bankruptcy cases do not qualify as "successive," at least in the sense set forth in Chisum, where the debtor filed four bankruptcy cases, each approximately two or six months apart. Chisum, 847 F.2d at 598 (where the debtor filed his first bankruptcy case in February 1983, his second bankruptcy case in July 1983, his third bankruptcy case in December 1983, and his fourth bankruptcy case in February 1984).

[32] The bankruptcy court referred to Chambers, saying that "[u]nder Chambers, the Court can determine from looking at cases not before it whether **[*50]** a course of conduct is in bad faith and then it can impose the appropriate sanction that that conduct merits." Tr. of November 28, 2008 Hr'g, 39:6-9. It is unclear whether the bankruptcy court interpreted Chambers in this way or merely was paraphrasing Cunningham's interpretation of Chambers.

Case 8:18-ap-01168-SC   Doc 347   Filed 08/19/21   Entered 08/19/21 21:07:48   Desc
Main Document   Page 98 of 242

Page 16 of 16
2009 Bankr. LEXIS 4577, *50

The appellant in <u>Chambers</u> argued that the district court should have imposed sanctions when the sanctionable conduct occurred, not after entry of the judgment concluding the litigation. <u>Id.</u> at 56. Moreover, the appellant contended, the district court tried to make an end run around the notice requirements of Rule 11 by relying on its inherent authority to impose sanctions for the entire amount of the appellee's attorney's fees. <u>Id.</u> at 55-56. The Supreme Court determined that the district court could impose sanctions years after a judgment on the merits. <u>Id.</u> at 56. More importantly, **[*51]** the Supreme Court continued, the bankruptcy court repeatedly had warned the appellant throughout the litigation that his conduct was sanctionable. <u>Id.</u>

In this appeal, unlike the appellant in <u>Chambers,</u> the debtor received no notice in the current case that her conduct in the prior bankruptcy cases was or would be sanctionable. Further, unlike the litigation in <u>Chambers,</u> the debtor filed three separate bankruptcy cases, each under varying circumstances. When the debtor filed her first two bankruptcy cases, the state court action had not concluded; Cunningham had not obtained the August 2000 judgment, and even filed an unsecured claim. Years later, at the time the debtor filed the present bankruptcy case, Cunningham had obtained the August 2000 judgment and was trying to execute it on the debtor's residence.

While in its totality of the circumstances review, the bankruptcy court could have considered the debtor's conduct in prior cases, we conclude that the bankruptcy court did not clearly err in refusing to consider the debtor's conduct prior to the current case in determining whether to impose sanctions against the debtor and Morse under § 105(a) and its inherent authority.

## CONCLUSION

The **[*52]** bankruptcy court did not clearly err in its findings that the debtor and Morse did not file a bankruptcy petition that was frivolous and for an improper purpose, and that they did not act in bad faith. Reviewing the record before the Panel, we do not have a definite and firm conviction that the bankruptcy court erred in its view of the law and clearly erred in its assessment of the evidence, and we defer to its findings. <u>See Primus Auto Fin. Servs., Inc.,</u> 115 F.3d at 649. We conclude that the bankruptcy court did not abuse its discretion in declining to impose sanctions against the debtor and Morse under Rule 9011 and § 105(a) and its inherent authority. We AFFIRM.

---

**End of Document**

# EXHIBIT 10

# Radakovich v. Wilson (In re Radakovich)

United States Bankruptcy Appellate Panel for the Ninth Circuit

June 26, 2014, Argued and Submitted at Pasadena, California; September 19, 2014, Filed

BAP No. WW-13-1254-KuPaJu

**Reporter**

2014 Bankr. LEXIS 4017 *

In re: ROBERT RADAKOVICH, Debtor.
ROBERT PETER RADAKOVICH, Appellant, v.
STEPHEN J. WILSON; TRICIA WILSON,
Appellees.

**Notice:** THIS DISPOSITION IS NOT
APPROPRIATE FOR PUBLICATION.
ALTHOUGH IT MAY BE CITED FOR
WHATEVER PERSUASIVE VALUE IT MAY
HAVE (SEE FED. R. APP. P. 32.1), IT HAS NO
PRECEDENTIAL VALUE. SEE 9TH CIR. BAP
RULE 8013-1.

**Subsequent History:** Related proceeding at
Wilson v. Mt. Solo Landfill, Inc., 2014 Wash. App.
LEXIS 2660 (Wash. Ct. App., Nov. 13, 2014)

**Prior History:** [*1] Appeal from the United States
Bankruptcy Court for the Western District of
Washington. Bk. No. 11-49810. Adv. No. 12-
04117. Honorable Brian D. Lynch, Bankruptcy
Judge, Presiding.

**Counsel:** For Robert Radakvoich, Appellant:
Randall L. Stewart, Esq.

Kevin R. Vibbert, Esq. argued Pro se.

For Stephen J. and Tricia Wilson, Appellees: Kevin
R. Vibbert, Esq.

**Judges:** Before: KURTZ, PAPPAS and JURY,
Bankruptcy Judges. Memorandum by Judge Kurtz.
Concurrence by Judge Jury.

**Opinion by:** Kurtz

# Opinion

# MEMORANDUM[*]

## INTRODUCTION

Chapter 7[1] debtor Robert Peter Radakovich appeals
from the bankruptcy court's order denying his
motion for Rule 9011 sanctions against appellees
Stephen and Trisha Wilson and their attorney
Kevin Vibbert.

In denying Radakovich's sanctions motion, the
bankruptcy court determined that the complaint and
other adversary proceeding papers Vibbert
filed [*2] on behalf of the Wilsons were not
frivolous. Under the applicable standard of review,
abuse of discretion, Radakovich has not persuaded
us that the bankruptcy court committed reversible
error in making this determination.

Accordingly, we AFFIRM.

## FACTS

The relevant facts are mostly procedural and
undisputed. Radakovich filed a chapter 7 petition
on December 21, 2011. The Wilsons received
notice that the last day for filing a complaint

---

[*] This disposition is not appropriate for publication. Although it may
be cited for whatever persuasive value it may have (see Fed. R. App.
P. 32.1), it has no precedential value. See 9th Cir. BAP Rule 8013-1.

[1] Unless otherwise indicated, all chapter and section references are to
the Bankruptcy Code, 11 U.S.C. §§ 101-1532. "Rule" references are
to the Federal Rules of Bankruptcy Procedure and "Civil Rule"
references are to the Federal Rules of Civil Procedure.

Exhibit 10, Page 88

objecting to Radakovich's discharge was March 26, 2012.

Vibbert prepared an adversary complaint on the Wilsons' behalf objecting to Radakovich's discharge under § 727(a)(2)(A) and attempted to file it with the bankruptcy court through the court's electronic case filing system ("ECF") a few hours before the bar date expired at midnight.[2] Vibbert's delay in filing was partially caused by his miscalendaring the bar date as March 27 rather than March 26, 2012. Vibbert also discovered that he did not remember his password for ECF access, and he was locked out of the system after several failed attempts. He eventually obtained the correct password from his assistant at approximately 11:40 p.m., but after so many attempts to gain ECF access, he was locked out and could not gain [*3] access until after midnight. Also, unknown to him, his assistant was attempting to log into the account to verify that she had given Vibbert the correct password at the same time he was attempting to log into the account. Vibbert finally filed the complaint at 12:19 a.m. on March 27, 2012.

Radakovich then served the Wilsons and Vibbert with a safe harbor motion for sanctions under Rule 9011 on the ground that the complaint was time-barred as a matter of law. The sanctions motion stated that, if the Wilsons did not voluntarily dismiss their complaint within twenty-one days, Radakovich would seek to hold the Wilsons and Vibbert jointly and severally liable for monetary sanctions and attorney's fees.

Believing that they had a valid basis for arguing that the complaint was not time-barred, the Wilsons did not dismiss their complaint. Thereafter, Radakovich filed an answer to the complaint followed by a motion for summary judgment. The Wilsons responded by explaining the circumstances surrounding their late-filed complaint and by arguing that the bankruptcy court should [*4] grant

equitable relief from the bar date under these circumstances. In support of their argument, the Wilsons relied upon a Seventh Circuit decision, In re Kontrick, 295 F.3d 724 (7th Cir. 2002), aff'd, Kontrick v. Ryan, 540 U.S. 443, 124 S. Ct. 906, 157 L. Ed. 2d 867 (2004). The Wilsons also relied upon two prior decisions of this panel, Schunk v. Santos (In re Santos), 112 B.R. 1001 (9th Cir. BAP 1990), and DeLesk v. Rhodes (In re Rhodes), 61 B.R. 626 (9th Cir. BAP 1986).

In Santos, the Panel held that the doctrines of equitable tolling, equitable estoppel and excusable neglect were at odds with the strict construction of the complaint filing deadlines set forth in Rules 4004(a) and 4007(c). In re Santos, 112 B.R. at 1006-08. At the same time, however, the Santos Panel acknowledged the continuing validity of the exceptional or unique circumstances doctrine: "Notwithstanding this strict construction, we recognize and reaffirm those Panel cases indicating that relief from the bar date may be available in extraordinary circumstances." Id. at 1007 n.6 (citing In re Rhodes, 61 B.R. at 630). This was the aspect of Santos and Rhodes that the Wilsons and Vibbert were relying upon.

At the September 5, 2012 hearing on the summary judgment motion, Vibbert explained that there was a change in his password for the ECF system: "[Q]uite simply, I screwed up when I was trying to log into the system. I got locked out. . . ." Vibbert argued that the case law supported equitable relief from the bar date in "exceptional" circumstances.

Without [*5] explicitly deciding whether the underlying facts constituted exceptional or unique circumstances, the bankruptcy court determined that the Wilsons had received notice of the bar date and that there were no equitable grounds pursuant to which the court could grant the Wilsons relief from the bar date. Consequently, the bankruptcy court granted Radakovich's summary judgment motion and dismissed the Wilsons' adversary complaint with prejudice by order entered on September 10, 2012.

---

[2] Under Rule 9006(a)(4)(A), the deadline for all electronic filings is midnight local time on the day set by the relevant order of the bankruptcy court.

In September 2012, Radakovich filed the previously served motion for sanctions in the bankruptcy court. Radakovich sought monetary sanctions under Rule 9011(c)(1)(A) and (2) and attorney's fees in the amount of $4,664.

The Wilsons opposed the sanctions motion by essentially reiterating their arguments previously made in response to the summary judgment motion. On the Wilsons' behalf, Vibbert admitted that the case law he cited did not identify what specific circumstances would justify equitable relief from the bar date. He nonetheless asserted that, after reviewing the case law, he believed that he had a reasonable basis for arguing that relief from the bar date should be allowed. He further contended that the decision to proceed [*6] with the complaint was based on a diligent review of existing case law and an argument to extend that case law to allow the Wilsons' objection to discharge claim to proceed.

At the hearing on the sanctions motion, Vibbert argued that the legal position he had taken on behalf of the Wilsons was not frivolous and that the case law he cited "very clearly states" that bankruptcy courts have discretion to allow matters to proceed after the bar date under certain circumstances, even though that case law did not identify what those circumstances were. He further asserted that he did not find any case law that addressed his particular problem with ECF. Vibbert maintained that because the ECF system lockout prevented him from filing the complaint on time, this constituted an "extraordinary circumstance" which should have allowed the case to continue. Finally, Vibbert again asserted that his arguments were based on an extension of the law.

The bankruptcy court agreed that Vibbert's arguments, while ultimately unsuccessful, were not legally baseless or frivolous because no existing case law addressed the inability of counsel to access ECF due to the system's security features. In fact, Radakovich's [*7] counsel conceded at the sanctions hearing that there was no case law on point at the time the Wilsons filed their papers. As a result, the court held that the Wilsons' papers were not sanctionable under Rule 9011(b)(2).

Radakovich moved for relief from the order denying sanctions under Rule 9024. In the motion, Radakovich requested the court to more specifically articulate its analysis, findings and conclusions with respect to the dispositive order. On May 16, 2013, the court entered its order denying Radakovich's Rule 9024 motion. That order essentially reiterated the bankruptcy court's previous findings and conclusions. Specifically, the court decided that "[The Wilsons'] argument to extend the law to cover the factual situation at issue here, involving technical difficulties accessing the Court's ECF system, was warranted, made in good faith and nonfrivolous, although eventually unsuccessful." Radakovich timely filed this appeal.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(J). We have jurisdiction under 28 U.S.C. § 158.

## ISSUE

Whether the bankruptcy court abused its discretion in denying Radakovich's motion for sanctions under Rule 9011.

## STANDARD OF REVIEW

We review the bankruptcy court's denial of a motion for sanctions [*8] under Rule 9011 for an abuse of discretion. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990) ("an appellate court should apply an abuse of discretion standard in reviewing all aspects of a district court's [Civil] Rule 11 determination."); Valley Nat'l Bank v. Needler (In re Grantham Bros.), 922 F.2d 1438, 1441 (9th Cir. 1991).

Under Ninth Circuit law, a bankruptcy court abuses its discretion when it applies the incorrect legal rule or its application of the correct legal rule is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." United States v. Loew, 593 F.3d 1136, 1139 (9th Cir. 2010).

## DISCUSSION

Rule 9011(b)(1) provides for an award of sanctions against an attorney or a party who files pleadings or papers that are "interposed for any improper purpose." Id. Rule 9011(b)(2) provides for an award of sanctions against an attorney or a party who files pleadings or papers that are not "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Id.; see also Townsend v. Holman Consulting Corp., 929 F.2d 1358, 1362 (9th Cir. 1990) (en banc) ("Our cases have established that sanctions must be imposed on the signer of a paper [under Civil Rule 11] if either a) the paper is filed for an improper purpose, or b) the paper is 'frivolous.'").

The language of Rule 9011 parallels that of Civil Rule 11. Therefore, in analyzing sanctions under Rule 9011 we generally may rely on **[*9]** cases interpreting Civil Rule 11. In re Grantham Bros., 922 F.2d at 1441; but cf. Marsch v. Marsch (In re Marsch), 36 F.3d 825, 829-30 (9th Cir. 1994) (declining to apply in the Rule 9011 context particular Ninth Circuit precedent applicable to Civil Rule 11 cases because of perceived policy differences between bankruptcy cases and general federal civil litigation).

In this appeal, Radakovich challenges only one aspect of the bankruptcy court's ruling. Radakovich contends that the Wilsons' complaint and summary judgment opposition were frivolous and that the bankruptcy court erred when it held otherwise. We will limit our appellate review to this single issue. See Christian Legal Soc'y Chapter of Univ. of Cal. v. Wu, 626 F.3d 483, 487-88 (9th Cir. 2010);

Brownfield v. City of Yakima, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010) (citing Greenwood v. Fed. Aviation Admin., 28 F.3d 971, 977 (9th Cir. 1994)).[3]

For Civil Rule 11 sanctions purposes, the Ninth Circuit uses the term "frivolous" to describe "a filing that is both baseless and made without a reasonable and competent inquiry." Townsend, 929 F.2d at 1362 (emphasis added). Accord, Holgate v. Baldwin, 425 F.3d 671, 676 (9th Cir. 2005).

Frivolousness in this context is measured objectively. See G.C. & K.B. Invs., Inc. v. Wilson, 326 F.3d 1096, 1109 (9th Cir. 2003). This means that the litigant's filings are measured against a reasonableness standard set by what a competent attorney admitted to practice before the same court would have filed. See id.; In re Grantham Bros., 922 F.2d at 1441. This also means that, when the court assesses the reasonableness of the litigant's inquiry, the actual inquiry undertaken is measured against what the hypothetical competent attorney would have learned at the time from reasonable inquiry. See id. at 1442; see also Townsend, 929 F.2d at 1364 ("whether a pleading is sanctionable must be based on an assessment of the knowledge that reasonably could have been acquired at the time the pleading was filed.")

  **[*11]** Under the objective standard, "counsel can

_____

[3] While In re Marsch, 36 F.3d at 829-30, holds that a bankruptcy court in making a Rule 9011 Sanctions determination must concurrently consider both frivolousness and improper purpose, we decline to address at length the improper purpose issue here because Radakovich made no argument in his opening appeal brief regarding improper purpose. See Wu, 626 F.3d at 487-88; Brownfield, 612 F.3d at 1149 n.4. In any event, even though the bankruptcy court did not make an explicit finding regarding improper purpose, the entirety of the record and the explicit findings of the bankruptcy court convince us that the court implicitly found no improper purpose and that this finding was not clearly erroneous. See Townsend, 929 F.2d at 1366 (holding that remand not necessary **[*10]** for further findings on improper purpose issue because the district court's limited findings when combined with the record were adequate for purposes of appellate review); see also Simeonoff v. Hiner, 249 F.3d 883, 891 (9th Cir. 2001)("Conclusory and unhelpful findings of fact do not necessarily require reversal if the record supports the district court's ultimate conclusion.").

no longer avoid the sting of [Civil] Rule 11 sanctions by operating under the guise of a pure heart and empty head." Smith v. Ricks, 31 F.3d 1478, 1488 (9th Cir. 1994). On the other hand, Civil Rule 11 frivolousness is a minimal standard. As stated in Strom v. United States, 641 F.3d 1051, 1059 (9th Cir. 2011), "[Civil] Rule 11 sets a low bar: It deters 'baseless filings' by requiring a 'reasonable inquiry' that there is some plausible basis for the theories alleged." When there is a plausible basis, even a very weak one, supporting the litigant's position, imposition of Civil Rule 11 sanctions is inappropriate. Id. As stated in Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc., 186 F.3d 157, 167 (2d Cir. 1999): "[T]o constitute a frivolous legal position for purposes of [Civil] Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." Id. (quoting Mareno v. Rowe, 910 F.2d 1043 (2d Cir. 1990)), quoted with approval in Strom, 641 F.3d at 1059.

This minimalist approach to assessing frivolousness is no accident. Rather, it is necessitated by the risk that losing arguments easily can be conflated with frivolous arguments. See Operating Eng'rs Pension Trust v. A-C Co., 859 F.2d 1336, 1344-45 (9th Cir. 1988). To mitigate this risk, Civil Rule 11 is treated as an "extraordinary remedy" that must be imposed "with extreme caution." Id. at 1345. Indeed, imposing a broader frivolousness standard could chill effective representation and zealous advocacy. As the Ninth Circuit has explained:

[Civil] Rule 11 must not be construed so as to conflict with the primary duty of an attorney to represent his or her client zealously. Forceful representation often requires that an attorney attempt to read a case or an agreement in an innovative though sensible way. Our law is constantly evolving, and effective representation sometimes compels attorneys to take the lead in that evolution. [Civil] Rule 11 must not be turned into a bar to legal progress. The simple fact that an attorney's legal theory failed to persuade the district court does not

demonstrate that counsel lacked the requisite good faith in attempting to advance the law.

Id. at 1344. Accord, Townsend, 929 F.2d at 1363-64.

Here, [*12] the bankruptcy court held that the Wilsons' exceptional or unique circumstances argument was a losing argument but not a frivolous one. In essence, the bankruptcy court determined that the Wilsons' invocation of the unique circumstances doctrine was not frivolous because of the status of Ninth Circuit law at the time the argument was made. At that time, there was no case directly on point — no Ninth Circuit precedent determining whether an eleventh-hour denial of access to the bankruptcy court's ECF system resulting from the routine operation of the system's password security features constituted exceptional or unique circumstances for purposes of seeking relief from an expired deadline under Rule 4004(a).

Radakovich contends that the bankruptcy court's determination was erroneous and that the Wilsons' position was nothing more than a variation of the oft-rejected attempts by litigants to assert excusable neglect as a basis for relief from the Rule 4004(a) and Rule 4007(c) filing deadlines. See, e.g., Jones v. Hill (In re Hill), 811 F.2d 484, 486 (9th Cir. 1987); In re Santos, 112 B.R. at 1008 (9th Cir. BAP 1990); Osborn v. Ricketts (In re Ricketts), 80 B.R. 495, 496-97 (9th Cir. BAP 1987); Buckeye Gas Prods. Co. v. Rhodes (In re Rhodes), 71 B.R. 206, 208 (9th Cir. BAP 1987).

The record does not support Radakovich's characterization of the Wilsons' position. In their summary judgment motion opposition, in their sanctions motion opposition, and at the hearings on these two motions, the [*13] Wilsons' acknowledged that "equitable defenses" like equitable estoppel and equitable tolling were not generally available for the purpose of seeking equitable relief from the Rule 4004(a) and Rule 4007(c) filing deadlines. Rather, they argued that the particular circumstances that occurred on the eve of the filing deadline involving their counsel

Vibbert constituted exceptional circumstances under which the court could exercise its equitable discretion to relieve them from the complaint filing deadline. The Wilsons further admitted that their counsel, after conducting research, could not articulate with any certainty the parameters of the exceptional or unique circumstances doctrine. Consequently, we reject Radakovich's assertion that the Wilsons' argument was nothing more than an excusable neglect argument.

We acknowledge that the Wilsons' account of the status of the unique circumstances doctrine in the Ninth Circuit was partisan and incomplete. They failed to mention that the Ninth Circuit has questioned the continued existence of the doctrine and that it "appears" limited to situations where it is necessary to remedy an explicitly misleading statement made by the court. See Allred v. Kennerley (In re Kennerley), 995 F.2d 145, 147 (9th Cir. 1993); see also Shull v. Wells (In re Wells), 2010 Bankr. LEXIS 5071, 2010 WL 6259961, at **3-4 (9th Cir. BAP 2010)(more-recent, albeit **[*14]** unpublished, Ninth Circuit decision stating the same points). Nonetheless, an adversarial and incomplete statement of the law does not, by itself, permit a court to conclude that such a statement is sanctionable under Civil Rule 11. See United States v. Stringfellow, 911 F.2d 225, 226 (9th Cir 1990) ("The failure to cite relevant authority, whether it be case law or statutory provisions, does not alone justify the imposition of [Civil Rule 11] sanctions.").

As we already have indicated above, the critical question is not whether the legal position taken is partisan or incomplete but whether that position is frivolous. As we already have explained, a legal position is not frivolous for purposes of Rule 9011 if it was supported by reasonable inquiry - "knowledge that reasonably could have been acquired at the time the pleading was filed" by a hypothetical competent attorney admitted to practice before the same court. Townsend, 929 F.2d at 1364; see also In re Grantham Bros., 922 F.2d at 1442.

Here, both Vibbert and the bankruptcy court stated that their respective inquiries turned up no cases directly on point. Nor have we found any cases on all fours that were in existence at the time the Wilsons invoked the unique circumstances doctrine.

More importantly, our research indicates that, in the context of Rules 4004(a) and 4007(c), the continued existence **[*15]** and parameters of the unique circumstances doctrine were uncertain at the time the Wilsons filed their papers. See, e.g., In re Kennerley, 995 F.2d at 147; In re Wells, 2010 Bankr. LEXIS 5071, 2010 WL 6259961, at **3-4. The unsettled state of the law supports the bankruptcy court's conclusion that sanctions were inappropriate. See Bank of Maui v. Estate Analysis, Inc., 904 F.2d 470, 472 (9th Cir. 1990).

Furthermore, two recent Ninth Circuit cases indicate that the application of the doctrine in this context remains in a state of flux. See Willms v. Sanderson, 723 F.3d 1094, 1103 (9th Cir. 2013); Anwar v. Johnson, 720 F.3d 1183, 1188 n.6 (9th Cir. 2013). Anwar is particularly instructive on this point. Anwar states:

> We acknowledge that the U.S. Supreme Court has not expressly addressed whether FRBP 4007(c)'s filing deadline admits of any equitable exceptions and that lower courts are divided on the issue. We need not, and do not, reach the question of whether external forces that prevented any filings — such as emergency situations, the loss of the court's own electronic filing capacity, or the court's affirmative misleading of a party — would warrant such an exception.

Id. (citations omitted).

We acknowledge that neither the Willms decision nor the Anwar decision was available at the time the Wilsons asserted their position regarding the unique circumstances doctrine. Nonetheless, these two decisions support the proposition that a reasonably competent attorney admitted to **[*16]** practice before the bankruptcy court, upon

Exhibit 10, Page 93

reviewing the cases cited in Willms and Anwar, would have reached the same conclusion — that the existence and parameters of the unique circumstances doctrine were and are unsettled.

At bottom, on this record and in light of the unsettled state of the law regarding the unique circumstances doctrine, we hold that the bankruptcy court did not err when it concluded that the Wilsons' papers were not frivolous. Because Radakovich has not posited any other grounds for holding that the bankruptcy court abused its discretion, we will uphold the bankruptcy court's ruling on Radakovich's sanctions motion.[4]

Finally, it is worth noting that, if the bankruptcy court had determined that the Wilsons' papers were frivolous, we might have been equally hard pressed to find reversible error given the fact-sensitive nature of the inquiry and the inherently close calls associated with determinations of this type. See Townsend, 929 F.2d at 1362 ("[Civil Rule 11] calls for an intensely fact-bound inquiry, and for this kind of inquiry, 'bright lines' are not appropriate"); see also Cooter & Gell, 496 U.S. at 401-05 (explaining at length why all aspects of Civil Rule 11 sanctions rulings are entitled to a deferential standard of review). The highly deferential effect of appellate review under the abuse of discretion standard when applied in fact-intensive settings is not unusual. Cf. Pincay v. Andrews, 389 F.3d 853,

---

[4] According to the concurrence, our majority decision suggests that the absence of case authority directly on point "precludes" a determination that the Wilsons' papers were frivolous. This is not what we mean to say. Our majority decision is meant to establish a more modest proposition: that, based on the entire record and the unsettled state of the law regarding the parameters of the unique circumstances doctrine, we decline to overturn the bankruptcy court's assessment that the Wilsons' papers were not frivolous.

In reality, there is little difference [*17] between our viewpoint and that of the concurrence. The concurrence perceives as frivolous not the Wilsons' legal argument, but rather the Wilsons' attempt to characterize the facts and circumstances of this case as anything other than mere negligence on the part of their counsel. Unlike the concurrence, we believe the bankruptcy court was acting within its discretion when it concluded that the Wilsons' attempted characterization was not frivolous.

858-59 (9th Cir. 2004) (en banc) (noting that, whichever way the district [*18] court had decided the issue under review, the court of appeals would have been hard pressed to identify any grounds for reversal given the fact-intensive nature of the inquiry and the abuse of discretion standard of review).

## CONCLUSION

For the reasons set forth above, we AFFIRM the bankruptcy court's denial of Radakovich's sanctions motion.

**Concur by:** JURY

## Concur

JURY, Bankruptcy Judge, concurring:

I concur in the result achieved by the majority, but I arrive at that conclusion from a different path. Although I would determine that a Rule 9011 violation did occur here as a matter of law, because the bankruptcy court has broad discretion in awarding sanctions if such violation occurred, I would not disturb the exercise of that discretion on the facts of this case.

The majority, as did the bankruptcy court, suggests that the lack of authority on whether an ECF security lock out may constitute the sort of unique and exceptional circumstance which justifies denial of sanctions under Rule 9011. It suggests that an absence of an existing case on all fours with this one makes the argument that the circumstances were unique or exceptional non-frivolous so as to avoid Rule 9011 sanctions. In my mind, the lack of case law on point did not automatically [*19] preclude a finding of a Rule 9011 violation, especially when ample case law existed to determine that mere negligence would not excuse the time-barred filing. See, for example, Schunk v Santos (In re Santos), 112 B.R. 1001, 1008 (9th Cir. BAP 1990), where our panel held that the

bankruptcy court has no discretion to enlarge the time periods under Rules 4004(a) and 4007(c) on the basis of excusable neglect when the request is made after the time period has expired.

Indeed, I do not see unique or exceptional circumstances in this case. I disagree with the majority's statement that Radakovich's characterization of the Wilsons' position as nothing more than negligence is not supported by the record. Objectively, the record shows just that. Although the Wilsons _argued_ something different than negligence, Vibbert's difficulty with timely filing the Wilsons' complaint using the ECF system was nothing more. Vibbert mis-calendared the bar date and as a result attempted to file the complaint after business hours and, more or less, at the last minute. The ECF security lock out was triggered because Vibbert forgot his password — he "screwed up," he attempted to sign in with the wrong password multiple times, and his legal assistant was trying to access the system presumably with the correct password **[*20]** at the same time that he was. When Vibbert's conduct is properly recognized for what it was, the supposedly unsettled state of the law with respect to the parameters of the unique circumstances doctrine holds little significance in my mind. On these facts, no reasonable, objective argument for an exception to the bar date could be made. See Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc., 186 F.3d 157, 167 (2nd Cir. 1999).

That said, even if Vibbert's conduct constituted negligence, which I think it did, and even if the time-barred complaint had no chance of success, which I think it did not, in light of the bankruptcy court's substantial discretion in these matters, I feel compelled to concur in the result. The bankruptcy court has substantial discretion when deciding whether to award or not award sanctions even when a violation of Rule 9011(b) has been found. The text of Rule 9011(c) states that a court may impose sanctions for a violation, but it is not required to do so. See Rule 9011(c) ("If, after notice and a reasonable opportunity to respond, the court

determines that subdivision (b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party. . . .") (emphasis added); see also Civil Rule 11 advisory committee's note, 1993 Amendment ("[W]hat sanctions, if any, to impose for a violation **[*21]** are matters committed to the discretion of the trial court."); Thompson v. RelationServe Media, Inc., 610 F.3d 628, 666 (11th Cir. 2010) (noting that under Civil Rule 11 sanctions are discretionary and a court can "excuse an attorney's negligence, mistake, or plain-old incompetence" if it chooses). In short, the bankruptcy court's discretion under Rule 9011(c) makes it very difficult to demonstrate reversible error when the court decides not to award sanctions.

As a consequence, on these facts, I defer to the bankruptcy court's substantial discretion in deciding no sanctions were warranted.

---

**End of Document**

# EXHIBIT 11

# Theokary v. Shay (In re Theokary)

United States Bankruptcy Court for the Eastern District of Pennsylvania

August 22, 2012, Decided

Chapter 7, Bky. No. 07-11008 ELF, Adv. No. 09-051

**Reporter**

2012 Bankr. LEXIS 4020 *; 2012 WL 3717967

In re: RAFAIL THEOKARY, Debtor.RAFAIL
THEOKARY, Plaintiff, v. TOM SHAY, et al.,
Defendants.

**Prior History:** Theokary v. Abbatiello (In re
Theokary), 468 B.R. 729, 2012 Bankr. LEXIS 1541
(Bankr. E.D. Pa., 2012)

**Counsel:** **[*1]** For Rafail Theokary, Debtor (07-
11008-elf): KEITH D. SKLAR, Law Offices of
Sklar Smith-Sklar, Ewing, NJ; MICHAEL J.
RUTENBERG, Attorney at Law, Philadelphia, PA.

Trustee (07-11008-elf): GARY F SEITZ, Rawle &
Henderson LLP, Philadelphia, PA.

For Rafail Theokary, Plaintiff (09-00051-elf):
ANTHONY J. SCIOLLA, JR., Anthony J. Sciolla,
Jr. Esquire, Jenkintown, PA; KENNETH A.
SANDLER, LEAD ATTORNEY, Attorney at Law,
Marlton, NJ; MICHAEL J. RUTENBERG,
Attorney at Law, Philadelphia, PA.

For Tom Shay, Eric Abbatiello, Showplace Farms,
Gaitway Farm, Inc., Defendants (09-00051-elf):
JEFFREY R. POCARO, Attorney at Law,
Fanwood, NJ.

**Judges:** ERIC L. FRANK, U.S. BANKRUPTCY
JUDGE.

**Opinion by:** ERIC L. FRANK

## Opinion

**ORDER**

**AND NOW WHEREAS:**

A. Plaintiff Rafail Theokary commenced this
adversary proceeding on **February 20, 2009**.

B. During the pre-trial phase of this proceeding the
Defendants filed three (3) motions to dismiss the
adversary proceeding and for sanctions, all of
which were denied by the court.[1]

C. On **September 10, 2009**, this court entered an
order bifurcating trial of the liability and damages
issues in this adversary proceeding. (See Doc. #
89).

D. The liability trial was conducted on **November
9 & 30, 2009** and **February 22, 2010**.

E. After post-trial briefing, by order entered
**February 15, 2011**, the court:
> (1) entered judgment in favor of Defendant
> Gaitway Farm, Inc. ("Gaitway") and Defendant
> Showplace Farms ("Showplace"); and
> (2) entered judgment in favor of the Plaintiff
> and against Defendant Eric Abbatiello
> ("Abbatiello") and Defendant Tom Shay
> ("Shay") as to liability.

(Doc. #'s 175, 176). See In re Theokary, 444 B.R.
306 (Bankr. E.D. Pa. 2011).

F. On **May 24, 2011**, in connection with the
damages phase of the adversary proceeding, the
Defendants filed a Motion to Bar the Use of
Amended Expert Report, Bar the Testimony of

---

[1] See Order dated April 2, 2009 (Doc. # 34) (denying motion filed
February 25, 2009); Order dated July 24, 2009 (Doc. # 78) (denying
motion filed June 2, 2009); Order dated October 12, 2009 (Doc. #
106) (denying motion filed September 15, **[*2]** 2009).

Exhibit 11, Page 96

Samuel Paparo and Dismiss the Complaint with Prejudice ("the Motion to Dismiss") (Doc. # 210).

G. For hearing purposes, the court consolidated the Motion to Dismiss with the damages trial. ("the Consolidated Hearing"). (See Order dated May 25, 2011, Doc. # 213).

H. The Consolidated Hearing was conducted on **June 13 & 14 and July 12, 19 & 25, 2011**.

I. On **April [*3] 10, 2012**, due to the Plaintiff's litigation misconduct and pursuant to its inherent power, the court granted the Motion to Dismiss as to the remaining Defendants. (Doc. #'s 286, 287). See In re Theokary, 468 B.R. 729 (Bankr. E.D. Pa. 2012).

J. The Plaintiff has appealed both the **February 15, 2011** and the **April 10, 2012** orders of this court to the district court.

* * * *

K. On **July 16, 2012**, Gaitway and Showplace (hereafter, "the Movants") filed a Motion for Sanctions Under Fed. R. Bankr. P. 9011 Against Plaintiff Rafail Theokary, and His Attorneys ("the Motion for Sanctions"). (Doc. # 308).

L. The attorney-respondents are Keith D. Sklar, Anthony Sciolla, Kenneth A. Sandler, and Michael J. Rutenberg ("the Respondents").

M. In response to the Motion for Sanctions, Sandler and Rutenberg filed a Memorandum in Opposition, (Doc. #310), and Sklar filed an Answer with Affirmative Defenses and a Motion to Dismiss Defendants' Motion for Sanctions Pursuant to Fed. R. Civ. Proc. 12(b), (Doc. #'s 315, 316).

N. On **August 15, 2012**, the court held and concluded a hearing on the Motion for Sanctions.[2]

* * * *

O. In the Motion for Sanctions, the Movants assert that the Plaintiff's attorneys violated Fed. R. Bankr. P. 9011 and should be sanctioned for pressing a claim for violation of the automatic stay against Gaitway and Showplace for either an improper purpose or without adequate factual and legal support. See Fed. R. Bankr. P. 9011(b)(1)-(4).

P. All of the conduct giving rise to the Movants' request that sanctions be imposed occurred prior to the completion of the liability trial on **February 22, 2010**.[3]

Q. The Motion for Sanctions, filed twenty-nine (29)

_____

submission from the record. (See Doc. # 328).

[3] As the Respondents have pointed out, the conduct giving rise to the alleged Rule 9011 violation was the subject of the three (3) prior motions that the court denied. See footnote 1, supra. Ordinarily, a party's continued prosecution of a claim after the court's denial of a motion to dismiss will not give rise to a Rule 9011 violation. See, e.g., DeStefano v. Twentieth Century Fox Film Corp., 111 F.3d 123, at *2 [published in full-text format at 1997 U.S. App. LEXIS 6247] (2d Cir. 1997) (nonprecedential) ("counsels' reliance on a prior order . . . denying summary judgment, despite the successor judge's statement as to her expectation that she would overturn that ruling, was not so misguided as to warrant imposition of sanctions under either Rule 11 or the court's inherent power").

Undeterred, the Movants assert that, notwithstanding the prior orders, the Plaintiff's counsel should be sanctioned for continuing to press (what the Movants consider to be) frivolous claims after the denial of the sanctions motions through trial. Of course, such a theory cannot be applied against Sklar and Sciolla, who did not participate in the adversary proceeding as counsel and withdrew their appearances in favor of Sandler and Rutenberg on June 16, 2009.

I also understand the Movants to be arguing that, in light of subsequent events — primarily, the absence or paucity of evidence later presented at trial supporting the Plaintiff's claims against Gaitway and Showplace — the court should revisit the merits of the prior orders denying sanctions. See, e.g., Bausch & Lomb, Inc. v. Moria S.A., 222 F. Supp. 2d 616, 669 (E.D. Pa. 2002) (court has inherent power to reconsider interlocutory orders); [*6] Young v. School Dist. of Philadelphia, 2010 U.S. Dist. LEXIS 24733, 2010 WL 1006724, at *1 (E.D. Pa. Mar. 16, 2010) (same); see also Fed. R. Bankr. P. 7054 (incorporating Fed. R. Civ. P. 54(b)).

Because I deny the Motion for Sanctions on other grounds, I do not decide the extent to which, if any, the prior orders denying sanctions preclude consideration of the merits of this fourth Motion for Sanctions.

_____

[2] On August 16, 2012, the Movants' counsel filed an unsolicited letter, docketed as a "Post Argument Supplemental [*4] Letter." (Doc. # 325). The Letter referenced and appended certain evidentiary matter that was not introduced into evidence at the August 15, 2012 hearing. On August 17, 2012, the court entered an order striking this

months after the completion of the liability trial on **February 22, 2010**, seventeen (17) months after the court's **February 15, 2011** order dismissing the claims against Gaitway and Showplace and four (4) months after the entry of a final judgment in this adversary proceeding on **April 10, 2012**, is untimely.[4]

---

[4] The Respondents initially contend that the court lacks jurisdiction to rule on a motion for sanctions during the pendency of the appeal taken from the court's final order in this adversary proceeding (i.e., the April 10, 2012 Order). They are incorrect. The Court of Appeals has held unequivocally that a trial court has jurisdiction to rule on a motion for sanctions notwithstanding the pendency of an appeal from its final order. Mary Ann Pensiero, Inc. v. Lingle, 847 F.2d 90, 98 (3d Cir. 1988) **[*7]** ("Pensiero"); accord In re Schaefer Salt Recovery, Inc., 542 F.3d 90, 98 (3d Cir. 2008) ("It is well established . . . that a district court, after the entry of final judgment and the filing of a notice of appeal, retains the power to adjudicate collateral matters such as sanctions under Rule 11").

The Respondents are correct, however, in their contention that the Motion for Sanctions is untimely and should be denied on that basis.

More than twenty (20) years ago, in Pensiero, the Court of Appeals announced a supervisory rule requiring that all motions for sanctions under Fed. R. Civ. P. 11 be filed before the entry of final judgment. The purpose of the supervisory rule is to conserve judicial resources by maximizing the likelihood that an appeal of a Rule 11 decision may be resolved at the same time as any appeal on the merits. The supervisory rule is intended to "eliminat[e] piecemeal appeals and avoid[ ] scenarios in which two separate appellate panels are forced to acquaint themselves with the pertinent facts and the parties' respective positions." In re Tobacco Road Associates, LP, 2007 U.S. Dist. LEXIS 22990, 2007 WL 966507, at *22 (E.D. Pa. Mar. 30, 2007).

Although the Court of Appeals has not stated so expressly **[*8]** in a precedential decision, courts in this circuit have held that the Rule 11 supervisory rule applies when Rule 9011 sanctions are sought in bankruptcy proceedings. See, e.g., In re Nicola, 65 F. App'x 759, 762 (3d Cir. 2003) (nonprecedential); see also Schaefer Salt, 542 F.3d at 98 (collecting cases). I will follow the existing precedent in this regard.

Since its adoption, the supervisory rule has been both expanded and restricted. The Court of Appeals has applied the supervisory rule to a district court's sua sponte imposition of Rule 11 sanctions, see Simmerman v. Corino, 27 F.3d 58 (3d Cir. 1994), and the imposition of sanctions under the court's inherent power, see Prosser v. Prosser, 186 F.3d 403 (3d Cir. 1999). More recently, however, the Court declined to extend the supervisory rule to sanctions imposed under 28 U.S.C. §1927. See Schaefer Salt, 542 F.3d at 102. Whether Schaefer Salt is a precursor to further contraction of the Pensiero supervisory rule is not for this court to say. Unless and until the

Court of Appeals directs otherwise, this court is bound to apply the supervisory rule.

A mechanical application of the supervisory rule would mandate denial of the Motion for **[*9]** Sanctions because it was filed: (a) seventeen (17) months after the court's February 15, 2011 order entering judgment in favor of the remaining Defendants (if that was a final order, but see Theokary, 444 B.R. at 310 n.6) and (b) three (3) months after the April 10, 2012 order entering judgment against the remaining Defendants.

The supervisory rule, however, may not be so rigid. For example, in In re Brown, 1998 U.S. Dist. LEXIS 19188, 1998 WL 848102, at *4-5 (E.D. Pa. Dec. 3, 1998), the district court affirmed the bankruptcy court's grant of a Rule 11 motion filed three (3) weeks after the entry of the final judgment. The court reasoned that, in the particular circumstances of that case, the movant's discovery of the Rule 11 violation was so close in time to the entry of judgment that the filing of the motion was sufficiently prompt as to warrant the relaxation of the supervisory rule. Accord Project 74 Allentown, Inc. v. Frost, 143 F.R.D. 77, 85-87 (E.D. Pa. 1992).

As the court stated in Tobacco Road, the supervisory rule is

> a guide for litigants filing Rule 11 motions for sanctions, generally requiring them to do so as early as practicable, but not necessarily establish[ing] a per se test for promptness that requires **[*10]** dismissal for noncompliance under all circumstances. While the rule provides the courts in the Third Circuit with the discretion to avoid consideration of Rule 11 motions filed after final judgment is entered in order to promote judicial economy, it also appears to leave the courts with some discretion in deciding when it is practicable to file a sanctions motion.

2007 U.S. Dist. LEXIS 22990, 2007 WL 966507, at *22 (footnotes and quotation marks omitted).

Even under the "relaxed" standard articulated by Tobacco Road, the Motion for Sanctions is untimely.

As early as February 22, 2010, the last day of the liability trial, the Movants knew what evidence had been presented at trial and were in the position to evaluate whether they wished to seek sanctions under Rule 9011. The Motion for Sanctions could have been filed any time thereafter, and certainly in advance of the court's February 15, 2011 liability decision. Even if I use February 15, 2011 as the date on which the existence of the alleged Rule 11 violation became apparent, the Motion for Sanctions still is untimely. The Movants waited seventeen (17) months from that date before filing the Motion for Sanctions. Had the Motion been filed reasonably promptly after **[*11]** the February 2011 liability decision, it could have been resolved in conjunction with April 2012 final judgment, thus permitting all of the disputed matters to be heard in a single appeal. Even after the April 2012 final judgment, the Movants did not act promptly, waiting another three (3) months before filing the Motion.

The Movants have come forward with no justification for their

It is therefore **ORDERED** that:

1. The Motion for Sanctions is **DENIED**.

2. Sklar's Motion to Dismiss the Motion for Sanctions is **DENIED** as moot.

**Date: August 22, 2012**

/s/ Eric L. Frank

**ERIC L. FRANK**

**U.S. BANKRUPTCY JUDGE**

---

**End of Document**

---

failure to press their request for sanctions within the deadline set forth by the supervisory rule. To the extent that I have discretion to relax the deadline, there is no basis in the record for doing so.

# EXHIBIT 12

# Waldrop v. Discover Bank (In re Waldrop)

United States Bankruptcy Court for the Western District of Oklahoma

October 25, 2017, Decided

Case No. 15-14689-JDL, Ch. 7, ADV. 16-1015-JDL

**Reporter**

2017 Bankr. LEXIS 3720 *

In re: Nikki Marie Waldrop, Debtor.Nikki Marie Waldrop, Plaintiff, v. Discover Bank, and Stephen L. Bruce, Esq., Defendants.

**Prior History:** Waldrop v. Discover Bank (In re Waldrop), 2016 Bankr. LEXIS 2150 (Bankr. W.D. Okla., May 27, 2016)

**Counsel: [*1]** For Nikki Marie Waldrop, Debtor (5:15bk14689): John W. Cloar, Park on Main Executive Suites, Norman OK.

Trustee (5:15bk14689): Joel C. Hall, Oklahoma City OK.

For Nikki Marie Waldrop, Plaintiff (16-01015): Andrew R Chilson, Oklahoma City, OK; Ryan M Eitzmann, National Litigation Law Group, Oklahoma City, OK; Robert J. Haupt, Haupt Law PC, Oklahoma City, OK.

For Discover Bank, Defendant (16-01015): Everette C Altdoerffer, Stephen Bruce & Assoc, Edmond, OK; April D Kelso, Needham & Associates, PLLC, Oklahoma City, OK; Clayton D Ketter, Timothy Kline, Phillips Murrah PC, Oklahoma City, OK.

For Stephen L. Bruce, Esq, Defendant (16-01015): Everette C Altdoerffer, Stephen Bruce & Assoc, Edmond, OK; April D Kelso, Needham & Associates, PLLC, Oklahoma City, OK.

**Judges:** Janice D. Loyd, United States Bankruptcy Judge.

**Opinion by:** Janice D. Loyd

# Opinion

## OPINION AND ORDER DENYING MOTION FOR SANCTIONS

### 1. Introduction

This matter comes on for consideration upon *Defendant Stephen L Bruce Esq.'s Motion for Sanctions with Brief in Support* (the "Motion") [Doc. 90], the *Response in Opposition to the Motion for Sanctions* filed by National Litigation Law Group ("the Law Firm") (the "Response") [Doc. 94] and *Plaintiff's Response to Defendant [*2] Bruce's Motion for Sanctions* ("Plaintiff's Response") [Doc. 92][1] and the oral argument and exhibits offered at the hearing conducted October 24, 2017. The following constitutes Findings of Fact and Conclusions of Law required by Fed. R. Bankr. R. 7052 and 9014.

### 2. Jurisdiction

The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. §1334(b) and the General Order of Reference entered in this District pursuant to LcvR 81.4. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A). The Court retains jurisdiction although the case was dismissed on September 26, 2017. *In re Johnson*, 575 F.3d 1079

---

[1] Attorney Robert J. Haupt ("Haupt") was at all times pertinent to this litigation a member of the Law Firm representing the Plaintiff. He left the Law Firm in July 2017. Haupt, on behalf of both himself and as counsel for the Plaintiff, has filed a *Response* to Bruce's Motion separate and apart from that of the Law Firm.

Exhibit 12, Page 100

(10th Cir. 2009); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395-98, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990) (voluntary dismissal of a lawsuit does not deprive the district court of jurisdiction over a motion for sanctions under Rule 11); *Steinert v. Winn Group, Inc.*, 440 F.3d 1214, 1220-21, 1223-24 (10th Cir. 2006) (affirming a sanctions award under 28 U.S.C. §1927 that was ordered well after the case was dismissed with prejudice at the plaintiff's request); *Olcott v. Delaware Flood Co.*, 76 F.3d 1538, 1552-57 (10th Cir. 1996).

### 3. Background

This adversary proceeding was commenced by Plaintiff's Complaint alleging that Defendants Discover Bank ("Discover") and its attorney, Stephen L. Bruce ("Bruce"), violated the automatic stay by instructing Waldrop's garnishee-bank to retain possession of funds garnished pre-petition pending further order of the court. Discover and Bruce first challenged the Complaint by filing a Motion to Dismiss **[*3]** asserting that as a matter of law Plaintiff had not stated a cause of action where Discover held a valid garnishment lien on the funds, that it was under no obligation to release the funds to the Plaintiff and merely instructed the garnishee-bank to hold the funds "subject to further order of the court." The Court denied the Motion to Dismiss. [*Memorandum Opinion and Order Denying Defendant's Motions to Dismiss*, Doc. 26]. In its Order the Court specifically found that Discover did not have a duty to immediately dismiss the garnishment, release of the funds or that the filing of the bankruptcy impaired any garnishment lien rights which it may have had in the funds. [Doc. 26, pgs. 13-14]. The Court did find, however, that Discover did have the obligation to take some affirmative action to seek appropriate relief from the bankruptcy court, either by lifting the stay, if it thought appropriate, or by seeking enforcement, adequate protection or determination of its lien rights. This obligation on the part of Discover/Bruce precluded the Court from dismissing the case at the initial pleading

stage of the case. *Id.*

After the Motion to Dismiss was overruled, Bruce and Discover answered the **[*4]** Complaint, conducted discovery and then moved for summary judgment. In their Motion for Summary Judgment, Bruce and Discover argued (1) there was no duty on their part to take any action with regard to the garnishment funds as they had earlier argued in their Motion to Dismiss and (2) for the first time argued that there was an agreement between Plaintiff's prior bankruptcy counsel, John Cloar, and Bruce that the garnishee-bank could retain possession of the funds.[2]

As to Bruce's first argument, the Court found that since its decision on the Motion to Dismiss the Tenth Circuit had ruled that a creditor simply retaining possession of property of the debtor did not constitute committing an "act", taking "action" or "exercising control" over such property so as to violate § 362(a)(3), and, correlatively, there was no duty on the part of the creditor to take any affirmative action with regard to the property in its possession. *WD Equipment, LLC v. Cowen (In re Cowen)*, 849 F.3d 943 (10th Cir. 2017). As to the second issue, the Court found, based on the undisputed facts, that within days of the bankruptcy filing there was an agreement between Plaintiff's former counsel, Cloar, and Bruce that the garnished funds would remain in the Bank's possession 'pending an ultimate **[*5]** determination as to the rights of the parties'. The Court thereupon entered summary judgment in part for Discover and Bruce dismissing the Plaintiff's claims for violation of the automatic stay.

### 4. Rule 9011 Standard

[2] There had been no mention in either the Complaint or in the Motion to Dismiss of any purported agreement between counsel that the garnishee-bank would retain possession of the funds. Had the Court been made aware of evidence of such an agreement, it would likely have made "short-shrift" of Plaintiff's claims by converting the Motion to Dismiss to one for summary judgment as is permitted by Fed. R Civ. P. 12(d) made applicable to adversary proceedings pursuant to Fed. R. Bankr. P. 7012(b).

Federal Rule of Bankruptcy Procedure (Fed. R. Bankr. P) 9011[3] warns attorneys that by "presenting to the court a petition, pleading, written motion, or other paper," they certify to the best of their "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that the paper meets the following conditions:

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions are therein warranted by existing law or by a nonfrivolous argument for extension, modification, or reversal of existing law or for establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence **[*6]** or, if specifically so identified, are reasonably based on a lack of information or belief.

In short, Rule 9011 requires that a "pleading be, to the best of the signer's knowledge, well grounded in fact, warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and...not interposed for any improper purpose." *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 793 F.3d 1177, 1182 (10th Cir. 2015); *Coffey v. Healthtrust, Inc.*, 1 F.3d 1101, 1104 (10th Cir. 1993).

This Court is guided by certain core principles when deciding to impose sanctions against an attorney under Rule 9011. "This court is also mindful that Rule 11 sanctions are an extraordinary remedy. Rule 11 is intended to discourage frivolous litigation, not to punish litigants." *Greeley Publishing Co. v. Hergert*, 233 F.R.D. 607, 611 (D. Colo.2006); *Ludwikoski & Associates, Inc. v. Yeti Coolers, LLC*, 2014 U.S. Dist. LEXIS 104523, 2014 WL 3767684 *3 (D. Kan. 2014) ("Rule 11 sanctions are reserved for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation."). In determining a motion for sanctions, the Court must resolve all doubts and draw all inferences in favor of the signer. *Airlines Reporting Corp. v. Aero Voyagers, Inc.*, 721 F.Supp. 579, 586 (S.D. N.Y.1989); *Eavenson Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 544 (3rd Cir. 1985) (In deciding a Rule 11 motion, "[a]ny doubt . . . should be resolved in favor of the party charged with the violation.").

Rule 9011 sanctions may be imposed on the filing of the complaint when the frivolous nature of the claims-at-issue is unequivocal. *Hall v. Bed Bath & Beyond, Inc.*, 705 F.3d 1357,1372 (Fed Cir. 2013). The fact that a legal theory has a "long-shot" does not necessarily **[*7]** mean it is sanctionable under Rule 9011; rather, the operative question is whether the argument is frivolous, i.e., the legal position has no chance of success, and there is no reasonable argument to extend, modify or reverse the law as it stands. *Fishoff v. Coty Inc.*, 634 F.3d 647, 654 (2nd Cir. 2011). In determining whether a given argument for change in the law is reasonable or frivolous, the courts may look to the extent to which counsel has researched the area, whether there is some support in the dissents, etc., for the position he or she take, and whether legitimate law review articles of other reputable legal journals raise the same or similar argument. If some other court of jurisdiction has actually accepted the argument, the argument seems extremely unlikely to be the proper subject of sanctions. *Pierce v. F.R. Tripler & Co.*, 955 F.2d 820 (2nd Cir. 1992). "Because our adversary system expects lawyers to zealously represent their clients, this standard is a

---

[3] Bankruptcy Rule 9011 is based on Fed. R. Civ. P. 11, "and rulings under Rule 11 are authoritative in cases following Bankruptcy Rule 9011." *Masunaga v. Stoltenberg (In re Rex Montis Silver Co.)*, 87 F.3d 435, 437 (10th Cir. 1996); *In re Harmes*, 423 B.R. 678, 680 (Bankr. D. N. M. 2010); *In re Renewable Energy Development Corp.*, 2014 Bankr. LEXIS 590, 2014 WL 527229 (Bankr. D. Utah 2014) (slip opinion). Accordingly, much of this Court's analysis is based on cases under Rule 11.

tough one to satisfy; an attorney can be rather aggressive and still be reasonable." *Predator*, 793 F.3d at 1182.

On the merits of Bruce's Rule 9011 claim, the question before the Court is whether the Plaintiff's *Complaint* was unwarranted under the facts or law. To answer that question, the Court must evaluate the Law Firm's conduct under a standard of "objective reasonableness **[*8]** -- whether a reasonable attorney admitted to practice before the [Bankruptcy Court] would file such a document." *Adamson v. Bowen*, 855 F.2d 668, 673 (10th Cir. 1988); See *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 554, 111 S.Ct. 922, 934-35, 112 L. Ed. 2d 1140 (1991) (reversing the District Court because of its use of a subjective standard). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 9011 has been violated, the court may impose an appropriate sanction," meaning one "limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Bankr. P. 9011(c)(2). Before considering whether the actions of the Plaintiff and/or the Law Firm violated Rule 9011, the Court must address the procedural issue as to whether Bruce has timely presented his Sanctions Motion.

### 5. The Timeliness of the Rule 9011 Motion

This adversary was commenced by the filing of the *Complaint* on January 27, 2016. [Adv. Doc. 1]. On February 26, 2016, Bruce sent Plaintiff's Law Firm the requisite "safe harbor" letter with a copy of a proposed Motion for Sanctions giving the Law Firm twenty-one (21) days to withdraw or correct the allegedly offending pleading as required by Rule 9011(c)(1)(A). [Law Firm Trial Ex.4]. The safe harbor letter argued, among other things, that as a matter of law Discover's retention of the garnished funds in the **[*9]** hands of the garnishee-bank constituted merely maintaining the status quo and did not violate the automatic stay. The letter

asserted that the Complaint was "not warranted by existing law and is brought for an improper or frivolous purpose". *Id.* There was no mention in either the safe harbor letter or the draft of the Motion for Sanctions attached to it of any purported agreement between Cloar and Bruce that the garnishee-bank could maintain possession of the funds.

Bruce filed his Rule 12(b)(6) Motion to Dismiss on March 23, 2016. [Doc. 21]. The Motion to Dismiss was premised on the basis that as a matter of law there was no obligation on the part of Discover/Bruce to release possession of the funds or otherwise take any action which might impair its garnishment lien rights. There was no mention in the Motion to Dismiss of the purported agreement between Cloar and Bruce. The Motion to Dismiss was overruled by the Court's Opinion and Order of May 27, 2016 [Doc. 26]. In its Order the Court held that while there was no obligation on the part of Discover/Bruce to release the garnished funds or take any action which would impair its lien rights (which the Court noted would pass through the bankruptcy **[*10]** unaffected), there was an issue of fact remaining as to Discover's obligation as a creditor "to take some affirmative action to begin the process by which the issues of the automatic stay and its lien rights might be timely adjudicated." [Doc. 26, pg. 11].

After the Motion to Dismiss was overruled, on November 8, 2016, Bruce sent the Law Firm a second safe harbor letter demanding that the Complaint be dismissed or Rule 9011 sanctions would be sought. [Law Firm Trial Ex. 11]. The letter primarily relied upon *In re C. W. Mining Co.*, 477 B.R. 176, *aff'd, In re C. W. Mining Co.* 749 F.3d 895 (10th Cir. 2014), in which the 10th Circuit held that a creditor who has taken possession pre-petition of debtor's property should not have to turn over such property absent assurance that its pre-petition position would be protected. In this letter, for the first time Bruce mentioned a purported agreement between Bruce and Cloar, stating that Bruce's asking the garnishee-bank to maintain the

status quo by holding onto the funds until the further order of the court "was taken with approval of John Cloar, Ms. Waldrop's bankruptcy attorney, whose name also appears on the signature block of your adversary pleadings." [Id. at pg 1]. The draft of a proposed Motion for Sanctions attached to the safe harbor **[*11]** letter alleged a "December 17, 2015 conversation wherein Cloar agreed to Bruce's suggested course of action, namely, to send a letter to the garnishee-bank, asking it to hold the garnished funds . . . ." Id.

On June 13, 2016, both Discover and Bruce filed their Answers to the Complaint. [Docs. 28 and 29]. Neither Answer raised the issue of an agreement between Cloar and Bruce. On October 27, 2016, four-and-a half (4 1/2) months after having filed their Answers, Discover and Bruce filed their Motions for Summary Judgment. [Doc. 55]. In the Motions, Discover/Bruce for the first time in any pleading raised the issue of the agreement with Cloar. On March 29, 2017, the Court entered its *Opinion and Order Granting in Part Defendants' Motions for Summary Judgment* and, by separate document, the *Judgment* dismissing Waldrop's claims of violation of the automatic stay. [Docs. 83 and 84]. Based upon the intervening decision of the Tenth Circuit in *Cowen*, the Court found there was no duty on the part of Discover to take any affirmative action with regard to the funds, and that its "inaction" in maintaining the status quo was not violative of the automatic stay. The Court further found that the agreement **[*12]** between Cloar and Bruce for the garnishee-bank to hold the funds also precluded assertion of a violation of the automatic stay.

Bankruptcy Rule 9011 (or Rule 11) does not contain explicit time limits for bringing a motion for sanctions; however, the Advisory Committee Notes to the 1993 amendments to Rule 11 gives some direction:

> * * * Ordinarily the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as

untimely. In other circumstances, it should not be served until the other parties had a reasonable opportunity for discovery. Given the "safe harbor" provision discussed below, a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention)."

Acting consistent with the Advisory Note, courts have thus held that "where appropriate, such motion should be filed at an earlier time, as soon as practicable after discovery of a Rule 11 violation." *Kaplan v. Zenner*, 956 F.2d 149, 151 (7th Cir. 1992) (court rule requiring Rule 11 motions to be filed not later than ninety days after entry of judgment merely represents "the outer parameters of the timeliness for sanction claims"). At a minimum, a party must bring his motion in "a reasonable     amount     of     time," with reasonableness **[*13]** dependent on "the specific facts and circumstances in a given case." *Id.*

In *Thompson v. United Transp. Union*, 167 F.Supp.2d 1254 (D. Kan. 2001), the defendant did not file its Rule 11 motion for sanctions until after the court had granted summary judgment and dismissed the plaintiff's complaint. In holding the filing of the motion untimely, the court stated as follows:

> While the Tenth Circuit, then, (in *Hutchinson v. Pfeil*,, 208 F.3d 1180 (10th Cir. 2000)) did not directly address the issue before the Court today, the Circuit's decision in *Hutchinson* strongly suggests that if faced with the issue, the Circuit would follow the *Ridder* decision and hold that a Rule 11 motion filed after summary judgment (regardless of whether service of the motion occurred prior to judgment and within the 21-day safe harbor period) is untimely.

> The Court is inclined to deny defendant's motion as untimely as it was filed after the entry of summary judgment and because defendant's counsel offers no explanation whatsoever for waiting until that late date to

file the motion. If defendant's counsel truly believed that plaintiff's conduct was so abusive and vexatious as to warrant service of the Rule 11 motion in July 2000, then defendant's counsel should have pursued that motion by filing it with the court shortly after the expiration of the 21-day **[\*14]** safe harbor period. Instead defendant's counsel elected to wait six months, all the while spending additional time and money in the discovery process and the summary judgment process. The Court cannot comprehend why defendant would not attempt to avoid these fees and costs by filing his motion earlier.[4]

*Thompson*, 167 F.Supp.2d at 1259-60. Likewise, as stated in *Mary Ann Pensiero, Inc. v. Lingle*, 847 F.2d 90, 99 (3rd Cir. 1988), in holding that all motions requesting Rule 11 sanctions be filed before entry of final judgment and, where appropriate, at an earlier time, and as soon as practicable after discovery of the Rule 11 violation the court stated:

> Promptness in filing valid motions will serve not only to foster efficiency, but in many instances will deter further violations of Rule 11 which might otherwise occur during the remainder of litigation. (citations omitted). If a party's action is "abusive" as contemplated by Rule 11, the adversary should be able to realize immediately that an offense has occurred. Seldom should it be necessary to wait for the district court or the court of appeals to rule on the merits of the underlying question of law. If there is doubt how the district court will rule on the challenged pleading or motion, the filing of the paper is unlikely to have violated Rule 11.

See also, **[\*15]** *Hutchinson v. Pfeil*, 208 F.3d 1180, 1183-84 (10th Cir. 2000) (in dicta stating that, "[a]s

_____

[4] The Court recognizes that the court's statement in *Thomson* is dicta in that the court went on to state that it "need not decide whether Defendant's motion was timely filed because the Court denies the motion on its merits." 167 F.Supp.2d at 1260. This Court does not cite *Thomson* for precedential authority, but finds its rationale on untimeliness persuasive, if not compelling.

the motion was filed subsequent to summary judgment, long after disposition of the interlocutory disputes cited as sanctionable conduct, reliance on Rule 11 would have been untimely and in violation of the rule's twenty-one day 'safe harbor' provision . . .."); *Morgan v. Covington Township*, 2013 U.S. Dist. LEXIS 121596, 2013 WL 4538637 at \*3 (M.D. Pa. 2013) (defendant's motion for sanctions denied where filed after judgment was entered in favor of defendants following their Rule 50 motion at trial); *Fassl v. Our Lady of Perpetual Help Roman Catholic Church*, 2006 U.S. Dist. LEXIS 11054, 2006 WL 709799 at \*6 (E.D. Pa. 2006) (Rule 11 motion filed after order granting defendant's motion to dismiss was not timely); *Robert S. v. City of Philadelphia*, 2001 U.S. Dist. LEXIS 13485, 2001 WL 1021190 at \*5 (E.D. Pa. 2001) (Rule 11 motion filed by defendants following a jury verdict in their favor was untimely).

The policy behind Rule 9011 is to prevent baseless filings and promote judicial economy. See *Cooter & Gell*, 496 U.S. at 393, 110 S.Ct. 2447. Given that "the primary purpose of sanctions, is to deter subsequent abuses", that purpose is not served "by tolerating abuses during the course of an action and then punishing the offender after the trial is at an end." *Matter of Yagman*, 796 F.2d 1165, 1183 (9th Cir. 1986); *Islamic Shura Council of Southern California v. F.B.I.*, 757 F.3d 870, 873 (9th Cir. 2014) (Rule 11 motion for sanctions made after "judicial rejection of the offending contention" is untimely).

In *In re Quinones*, 543 B.R. 638, 648 (Bankr. N.D. Cal. 2015) the debtors filed Rule 11 sanction motions in two adversary proceedings which they contended had groundlessly been brought against them seeking the non-dischargeability of debts. Approximately a year and **[\*16]** a half after the debtors had first asserted Rule 11 violations, the bankruptcy court ruled in favor of the debtors in both adversaries. After the court had ruled in the debtors' favor in both cases, the debtors filed their sanction motions. In denying the Rule 11 motions

the court, in language applicable to the present case, stated as follows:

> [C]ourts look with disfavor on Rule 11 motions brought at the conclusion of a matter. Since the "cure" of alleged Rule 11 violation is the withdrawal or correction of an improper pleading, it follows that the purpose of Rule 11 may not be achieved at the conclusion of a matter, when issues have been disposed of, and the prospective withdrawal or correction of a pleading is no longer a relevant concept.***
>
> Further, delaying the bringing of a Rule 11 motion until the matter is actually or essentially concluded, and depending therefore on the favorable disposition of the matter, turns Rule 11 from a powerful tool for the deterrence of abusive litigation practices to a mere fee shifting statute, a transformation that the language of the statute disclaims and the cases interpreting Rule 11 condemn (citations omitted). In these cases, the Quinoneses' delay in bringing the *Sanctions Motions* until the favorable **[*17]** conclusion of these APs is exactly the sort of behavior that should result in the Court denying the motions." **** There is no excuse for such delay; and, more fundamentally, there is no longer any conduct to be corrected. The Quinoneses' *Sanctions Motions* must also be denied for this reason.

The Sanction Motion was filed by Bruce on August 11, 2017, eighteen-and-a-half (18 1/2) months after the filing of the Complaint, seventeen (17) months after the first safe harbor letter, sixteen (16) months after filing the Motion to Dismiss, nine (9) months after the second safe Harbor letter and the filing of the Motion for Summary Judgment and four-and-a-half (4 1/2) months after the entry of the judgment in Bruce's favor. If Bruce truly believed that the Law Firm's conduct was so abusive and vexatious to warrant service of the safe harbor letters, and this Court has no reason to believe that Bruce wasn't sincere in that belief, he should have pursued that motion by filing it shortly after the expiration of the twenty-one (21) day safe harbor in either February and/or November 2016. Instead, Bruce elected to wait and spend additional time and money in the discovery process and summary judgment **[*18]** process. The Court doesn't know the reason for the delay, and the pleadings and oral argument did not enlighten the Court. It may have been because Bruce felt confident of the outcome and wanted to establish a precedent rather than cutting the litigation off at an early stage. "Suffice it to say that [Discover and Bruce] would be better served by reexamining their own litigation tactics rather than condemning plaintiff's counsel for her litigation tactics." *Thompson v. United Transportation Union*, 167 F.Supp.2d at 1260. The Court finds that Bruce's Motion was not timely filed and can be denied on that basis alone, so is not necessary for the Court to decide the sanction motion on its merits. Accordingly,

**IT IS ORDERED** that Defendant Stephen L. Bruce Esq.'s Motion for Sanctions [Doc 90] is hereby **DENIED**.

**Dated: October 25, 2017**

**The following is ORDERED**:

/s/ Janice D. Loyd

Janice D. Loyd

U.S. Bankruptcy Judge

---

**End of Document**

# EXHIBIT 13

2007 WL 7147271
Only the Westlaw citation is currently available.
WRITTEN DECISION—NOT FOR PUBLICATION
United States Bankruptcy Court,
S.D. California.

In re Donald YATES, Debtor.

No. 04–05619–H7.
|
Jan. 26, 2007.

**Attorneys and Law Firms**

Craig E. Dwyer, San Diego, CA, for Debtor.

MEMORANDUM DECISION

JOHN J. HARGROVE, United States Bankruptcy Judge.

**\*1** Chapter 7 trustee, Gregory A. Akers, (the "Chapter 7 Trustee"), moved for sanctions against Donald A. Yates ("debtor") to compensate the estate for expenses caused by debtor's alleged "bad faith" conversion of his chapter 7 to chapter 13 and reconversion to chapter 7.

After a two-day evidentiary hearing, the Court took the matter under submission. Subsequently, the Chapter 7 Trustee submitted offers of proof and debtor filed a response and opposition. The Chapter 7 Trustee moved ex parte to file a reply, which this Court granted on January 10, 2007. The matter has been fully briefed and is now ripe for decision.

This Court has jurisdiction to determine this matter pursuant to 28 U.S.C. §§ 1334 and 157(b)(1) and General Order No. 312–D of the United States District Court for the Southern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

I.

*FACTS*

Debtor filed his voluntary chapter 7 petition on June 24, 2004.

A. *THE DEBTOR'S REAL PROPERTY*

On December 14, 2004, the Chapter 7 Trustee filed an adversary complaint against debtor and others to avoid fraudulent transfers with respect to his real property. The debtor had arranged to sell his real property while it was still property of this estate and without court authority.

The Chapter 7 Trustee moved for partial summary judgment and for an order to surrender possession and control of the property to the Chapter 7 Trustee. On August 16, 2005, the Court granted the Chapter 7 Trustee's motion and ordered debtor's real property sold. In addition, the order provided that the United States Marshals Service or the San Diego County Sheriff were authorized and directed to evict debtor.

B. *DEBTOR'S MOTION TO CONVERT TO CHAPTER 13*
Shortly thereafter, on August 31, 2005, debtor moved to convert his case from chapter 7 to chapter 13. Debtor also filed an emergency motion for an order allowing him to remain in possession of his residence due to medical reasons.

The Chapter 7 Trustee opposed both motions, contending that debtor's motion to convert his chapter 7 to chapter 13 was in bad faith. On September 19, 2005, the Chapter 7 Trustee filed a request and notice for hearing opposing debtor's motion to convert and moved to reconvert his case to chapter 7. On September 22, 2005, the Court granted debtor's motion to convert his case to a chapter 13 and authorized him to regain possession of his real property. The Chapter 7 Trustee's motion to reconvert was vacated without prejudice to be reset on the Chapter 13 Law and Motion calendar.

C. *THE SHORT–LIVED CHAPTER 13*
On October 20, 2005, debtor filed his chapter 13 plan which provided for a $1500 monthly payment, resulting in a 40% payment to unsecured creditors. Debtor began making his plan payments.

On November 1, 2005, the Chapter 7 Trustee renewed his motion to reconvert debtor's case to chapter 7 on various grounds including, *inter alia,* debtor's bad faith. The Chapter 7 Trustee alleged that the "bad faith of this debtor is extreme." The debtor's alleged bad faith included, *inter alia,* concealment of estate assets from this Court and the Chapter 7 Trustee, lying under oath, misrepresentations, inaccuracies and omissions in the debtor's schedules, filing of the original chapter 7 petition to avoid a state court judgment against him, pre-bankruptcy transfer of his property interests, unauthorized transfer of his real property post-petition,

noncooperation with the Chapter 7 Trustee, lying under oath in his pleadings, illegal conduct involving wholesale automobile purchasing and selling of vehicles without a license, apparent tax evasion, and a history of dishonest and contentious litigation conduct.

**\*2** The chapter 13 trustee, Thomas Billingslea (the "Chapter 13 Trustee") objected to confirmation of debtor's plan on various grounds and also moved to reconvert debtor's chapter 13 case to chapter 7.

Debtor opposed the Chapter 7 Trustee's motion for reconversion, but debtor's attorney evidently continued to meet and confer with the Chapter 13 Trustee in an effort to resolve the objections to debtor's plan. The hearing on the Chapter 7 Trustee's motion to reconvert and the Chapter 13 Trustee's objection to debtor's plan and motion to reconvert was initially scheduled for November 29, 2005, and continued to December 14, 2005, so this Court could hear the matters.

Shortly before the hearing, or at the hearing, debtor withdrew his opposition to the reconversion of his case. Accordingly, the Court sustained the Chapter 13 Trustee's objections to debtor's plan and granted the motions to reconvert the case to one under chapter 7.

### D. *THE CHAPTER 7 TRUSTEE'S MOTION FOR SANCTIONS*
On January 26, 2006, the Chapter 7 Trustee filed his motion for sanctions in the amount of $46,708 to compensate the estate for the expense and injury resulting from debtor's alleged bad faith conversion of his case from chapter 7 to chapter 13, his related bad faith emergency applications, and his frivolous opposition to the Chapter 7 Trustee's motion to reconvert the proceedings to chapter 7, which debtor withdrew at the last minute.

### II.

### *DISCUSSION*

### A. *SUMMARY OF THE ARGUMENTS*
The Chapter 7 Trustee argues that sanctions are warranted under Federal Rule Bankruptcy Procedure ("FRBP") 9011(a) and 11 U.S.C. § 105(a). The Chapter 7 Trustee contends that the "facts and evidence" show debtor converted his case in bad faith. Specifically, debtor allegedly had no real ability

or intention to perform under chapter 13; the debtor brought various, related emergency applications for the purposes of regaining possession and use of the estate's real property based on lies and misrepresentations to the Court; the debtor opposed the Chapter 7 Trustee's motion to reconvert to chapter 7 in bad faith and without any good faith basis in fact or law; and, finally, the debtor concealed estate assets, lied under oath regarding his schedules, failed to cooperate with the Chapter 7 trustee (in numerous respects), and allegedly has engaged in tax evasion and other illegal conduct. [Chapter 7 Trustee's Motion, 5:17–28; 6; 7:1–3, docket # 97].

In opposition, debtor refutes the Chapter 7 Trustee's allegations one by one, with back-up declarations by various witnesses. Debtor also notes that the Chapter 7 Trustee failed to comply with the safe harbor provisions of FRBP 9011(c)(1)(A). Debtor argues that the actions taken by the Chapter 7 Trustee's counsel, for which he seeks reimbursement of close to $47,000 from debtor, were totally unnecessary as a "simple challenge to the confirmation of debtor's chapter 13 plan ... would have been all that was required to bring the issue of the viability of the conversion before the court."

**\*3** In reply, the Chapter 7 Trustee argues that the safe harbor provision under FRBP 9011(c)(1)(A) is inapplicable if the conduct alleged is the filing of a petition. The Chapter 7 Trustee also cites *In re Porras,* 188 B.R. 375, 379 (Bankr.W.D.Tex.1995) [1] in support of his position that sanctions under FRBP 9011(a) are appropriate to recover damage caused by conversion and he reiterates examples of debtor's bad faith.

[1]     In *Porras,* the debtor sought to convert his chapter 7 case to chapter 11 after the trustee moved to take his 2004 exam. The United States objected to the debtor's motion to convert. The court overruled the objection, finding that the plain language of 11 U.S.C. § 706(a) confers on the debtor the absolute right to convert his or her case to chapter 11 or chapter 13. The court found that the United States had ample remedies regarding any abuse caused by the debtor's conversion. The United States could move to reconvert the case or could seek sanctions under FRBP 9011. Notably, FRBP 9011 was amended after the *Porras* decision to include the safe harbor provision. The *Porras* court did not therefore discuss the safe harbor provision in its decision.

Exhibit 13, Page 108

B. *SANCTIONS PURSUANT TO FRBP 9011*

1. *THE SAFE–HARBOR PROVISION*

Federal Rule Bankruptcy Procedure was amended in 1997 to conform to the 1993 changes in Federal Rule Civil Procedure 11. Rule 9011 requires that precise procedures be followed before sanctions may be imposed. The "safe harbor" provision contained in subdivision (c)(1)(A) prohibits the filing of a motion for sanctions unless the challenged paper is not withdrawn or corrected within a prescribed time after service of the motion, and is inapplicable if the challenged paper is a petition. The Advisory Committee Notes states:

> The filing of a petition has immediate serious consequences, including the imposition of the automatic stay under § 362 of the Code, which may not be avoided by the subsequent withdrawal of the petition. In addition, a petition for relief under chapter 7 or chapter 11 may not be withdrawn unless the court orders dismissal of the case for cause after notice and a hearing. See Advisory Committee Notes (1997) to FRBP 9011.

The safe harbor provision is therefore inapplicable if the challenged paper is a petition. However, debtor's motion to convert his case from chapter 7 to chapter 13 under 11 U.S.C. § 706(a) is done by way of motion and not by the filing of a new petition. *See* FRBP 1017(f)(2) (stating that the procedure for conversion under § 706(a) shall be by motion). Moreover, the safe harbor provision would also apply to the other pleadings the Chapter 7 Trustee complains about, *i.e.,* debtor's emergency application and opposition to the Chapter 7 Trustee's motion for reconversion of his case. The Chapter 7 Trustee failed to comply with the requirements of FRBP 9011(c).

The Chapter 7 Trustee's motion for sanctions was filed well after debtor had any opportunity to withdraw the allegedly offending pleadings. Therefore, the Chapter 7 Trustee's motion for sanctions to the extent it is based on FRBP 9011 must be denied. *See Polo Bldg. Grp., Inc. v. Rakita (In re Shubov),* 253 B.R. 450, 545 (B.A.P. 9th Cir.2000) ("Parties who ask for sanctions under this rule are not permitted to circumvent the safe harbor by waiting until it is too late to withdraw or correct the offending matter.") (citations omitted).

2. *THE COURT'S INHERENT POWERS*

To the extent the Chapter 7 Trustee implies the Court may act on its own initiative to impose sanctions under FRBP 9011, there is a mandatory procedure that was not followed in this case. *See* FRBP 9011(c)(1)(B). This Court did not issue an order to show cause why debtor may have violated the rule with respect to any of the pleadings that the Chapter 7 Trustee refers to in his motion.

3. *APPLICABILITY TO DEBTOR'S MOTION TO CONVERT*

 **\*4** It is unlikely that FRBP 9011(b) is applicable to debtor's motion to convert his case from chapter 7 to chapter 13 since the Ninth Circuit holds that debtor has an absolute right to convert when certain statutory requirements are met. *Croston v. Davis (In re Croston),* 313 B.R. 447, 451 (B.A.P. 9th Cir.2004) (neither conduct nor motive vitiates the absolute nature of the § 706(a) right to convert).

The Bankruptcy Appellate Panel explained that if the debtor was engaged in bad faith, there were multiple remedies available:

> One remedy for addressing bad faith manipulation lies in the fact that there is no absolute right to remain in the chapter to which the case is converted. Thus, a case that is converted to chapter 11, 12, or 13 under § 706(a) is nonetheless vulnerable to conversion back to chapter 7 for 'cause.' Facts that are sufficiently egregious to support an argument that the § 706(a) conversion right should be overridden ought to make it easy to demonstrate 'cause' for reconverting the case to chapter 7. Nor does the reconversion process necessarily introduce inordinate delay. Parties in interest can make a reconversion motion as soon as they learn of conversion. Likewise, the court is even entitled to raise the § 1307(c) conversion issue on its own

motion and has substantial control over matters of timing.

Given the precedent in this Circuit, it is unclear to the Court why the Chapter 7 Trustee would bother filing an opposition to debtor's motion for an order converting his case when he was eligible to file a chapter 13. *See* docket # 30. Clearly, the Chapter 7 Trustee's opposition to debtor's motion was contrary to the law.

In sum, the Court denies the Chapter 7 Trustee's motion for sanctions to the extent it is based on FRBP 9011.

C. *SANCTIONS UNDER 11 U.S.C. SECTION 105(a)*
The Chapter 7 Trustee also relies on this Court's inherent power under § 105(a) as a basis to sanction debtor for moving to convert his case and presumably for his emergency application and opposition to the Chapter 7 Trustee's motion for reconversion of his case.

Section 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

The United States Supreme Court has cautioned that this Court must exercise restraint and discretion in using its powers under § 105(a). *Chambers v. NASCO,* 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). *Chambers* held that a federal court is not

> forbidden to sanction bad-faith conduct by means of the inherent

power simply because that conduct could also be sanctioned under the statute or the Rules. A court must, of course, exercise caution invoking its inherent power, and it must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees. Furthermore, when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.

**\*5** 501 U.S. at 50 (citation omitted).

1. *APPLICABILITY TO DEBTOR'S MOTION TO CONVERT*
As previously mentioned, the debtor's alleged bad faith does not provide grounds to grant sanctions in connection with debtor's motion to convert his case to Chapter 13 when the debtor has the absolute right to convert under *Croston.*

2. *FRBP 9011 PROVIDES ADEQUATE REMEDY FOR OTHER PLEADINGS*
The United States Supreme Court noted in *Chambers* that this Court's inherent power must be exercised with caution especially when there is bad-faith conduct that could be adequately sanctioned under the Rules. To the extent the Chapter 7 Trustee seeks sanctions with respect to debtor's emergency application or his opposition to the Chapter 7 Trustee's motion to reconvert, the Court finds that FRBP 9011 is "up to the task" and the Court declines to use its general authority under § 105(a). The Chapter 7 Trustee cannot use this Court's inherent powers to circumvent the requirements of FRBP 9011.

Even if this Court were to use its inherent powers under § 105(a), as further explained below, an award of sanctions would be inappropriate in this case.

D. *THE COURT CANNOT FIND ANY BAD FAITH BASED ON THE EVIDENCE AND THE CHAPTER 7 TRUSTEE'S OFFERS OF PROOF*

This Court held a two-day evidentiary hearing on May 31 and June 1, 2006, and made numerous rulings with respect to the admissibility of the Chapter 7 Trustee's evidence. The Chapter 7 Trustee later filed offers of proof on November 3, 2006, which this Court has examined. [2]

[2]     Debtor complains that he has never seen any of the new exhibits attached to the Chapter 7 Trustee's offers of proof. Moreover, the debtor alleges that the Chapter 7 Trustee's counsel fabricates some statements regarding her "evidence." The Court gave the Chapter 7 Trustee the opportunity to respond to debtor's arguments and has considered the Chapter 7 Trustee's response.

Based on the admissible evidence, the Court cannot find debtor acted in bad faith in converting his case under the totality of circumstances. *See In re Ho,* 274 B.R. 867, 876 (B.A.P. 9th Cir.2002) (citation omitted) (in determining whether a chapter 13 petition has been filed in bad faith, a bankruptcy court must review the totality of circumstances). The debtor testified at length and was throughly questioned by the Chapter 7 Trustee's counsel and this Court.

The Court finds that debtor adequately explained the discrepancies on his tax returns. He also adequately explained why he filed his Chapter 7 petition, which was not to avoid a state court judgment. Rather, debtor explained that he had been unable to work for almost two years, he had lost his law practice and was ill. As a consequence, he had mounting bills and was "borrowing significant amounts of money from friends." [Transcript dated June 1, 2006, at 14:12–25; 15:1]. Thus, it appears to the Court that events other than the state court judgment prompted debtor to file his initial chapter 7 petition. The Court further finds that the judgment had little relevance to debtor's desire to convert his chapter 7 case to one under chapter 13. *See Ho,* 274 B.R. at 876 (one factor for the court to consider in determining whether debtor filed his chapter 13 petition in bad faith is whether the debtor's only purpose in filing is to defeat state court litigation).

**\*6** Debtor adequately explained why he mistakenly thought he had the right to sell to his real property after his discharge. Further, he had even contacted his bankruptcy attorney and advised him of what he intended to do with his real property. [*Id.* at 19:1–25; 20:1–19]. Lastly, debtor testified that his

motive for the conversion of his case was not to hinder or delay. He testified that he had a good faith belief his Chapter 13 plan would be confirmable and he hired competent counsel to assist him with his plan. [*Id.* at 26:21–25; 27:1–7].

Moreover, the record demonstrates that debtor immediately filed his chapter 13 plan and began making his plan payments. The plan proposed a 40% payout to unsecured creditors. It was only after the Chapter 13 Trustee objected to his plan, that debtor and his counsel learned that the Chapter 13 Trustee would not be recommending his plan. [*Id.* at 28:24–25]. Therefore, the debtor did not oppose the Chapter 7 Trustee's reconversion motion. *See Croston,* 313 B.R. at 453 (inability to propose a confirmable plan is a reconversion issue).

The Court finds debtor's testimony credible. The Court cannot find any evidence that the debtor intended to hinder or delay creditors from receiving some sort of payment on their claim. [Transcript dated June 1, 2006, at 51:22–24; 52:1–5]. Nor can the Court find prejudice to the Chapter 7 estate. "A 'court must make its good-faith determination in light of *all* militating factors.' " *Ho,* 274 B.R. at 877. Under these circumstances, the Court cannot find debtor converted his chapter 7 to chapter 13 in bad faith.

E. *THE AMOUNT OF THE SANCTIONS REQUEST*

Although the Court denies the Chapter 7 Trustee's request for sanctions, the Court is troubled by the amount of sanctions sought. Not only was the Chapter 7 Trustee's opposition to debtor's motion to convert unwarranted, but the Chapter 7 Trustee's request for reconversion of the case was both premature and unnecessary. The debtor had commenced making his plan payments, attended the 341a hearings, and was producing documents to Mr. Billingslea, an experienced chapter 13 trustee. In addition, debtor was represented by an experienced consumer attorney, Harold Thompson. This Court expressed its views at the evidentiary hearing:

In this Court's experience, when you get these conversions, usually what the chapter 7 trustee does is he or she sits back and they coordinate with the Chapter 13 trustee. And the Chapter 13 trustee takes the lead, which he has to because the plan is coining under their supervision and administration....Rarely do they file a

motion to reconvert and charge full bore into the Chapter 13 arena when there's an experienced trustee such as Mr. Billingslea handling the case, dialoguing with experienced Chapter 13 counsel, as Mr. Thompson was —I'll take judicial notice of that—and attempt to negotiate a plan. *See* Transcript dated June 1, 2006, at 43:7–24.

**\*7** This Court further noted that it was Mr. Billingslea's duty as the chapter 13 trustee to address plan confirmation issues and it wasn't necessary for the Chapter 7 trustee to get aggressively involved. *Id.* at 45:3–10. The Court further pointed out that if the Chapter 7 Trustee felt his interests were not being represented adequately by the Chapter 13 Trustee, since he is a creditor, he could have simply filed an objection to the plan. *Id.* 61:21–25.

The Court is concerned with the amount of the requested sanctions, since Mr. Akers is an experienced chapter 7 trustee, and the services rendered by his attorney appear to have been unnecessary in light of the Chapter 13 Trustee's active participation in the Chapter 13 case.

Ironically, the Chapter 7 Trustee's counsel's over-aggressive and unnecessary services may reduce any distribution to unsecured creditors in this case. This issue, however, will be addressed at a later date, when the Chapter 7 Trustee and his attorney submit their fee applications.

III.

*CONCLUSION*

The Court denies the Chapter 7 Trustee's motion for sanctions.

This Memorandum Decision constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. The debtor is directed to file with this Court an order in conformance with this Memorandum Decision within ten (10) days from the date of entry thereof.

**All Citations**

Not Reported in B.R., 2007 WL 7147271

---

**End of Document**                    © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 14

# Instant Checkmate, Inc. v. Background Alert, Inc.

United States District Court for the Southern District of California

December 4, 2014, Decided; December 5, 2014, Filed

CASE NO. 3:14-cv-01182-MMA-DHB

**Reporter**
2014 U.S. Dist. LEXIS 190115 *

INSTANT CHECKMATE, INC., Plaintiff, vs. BACKGROUND ALERT, INC., ANDREW WILDER, INC., KUROSH ZAHABIAN, Defendants.

**Counsel:** **[*1]** For Instant Checkmate, Inc., a Delaware Corporation, Plaintiff: Damon Wright, LEAD ATTORNEY, PRO HAC VICE, Venable LLP, Washington, DC; Joshua Kaufman, LEAD ATTORNEY, PRO HAC VICE, Washington, DC; Tamany Vinson Bentz, LEAD ATTORNEY, Venable LLP, Los Angeles, CA.

For Instant Checkmate, Inc., a Delaware Corporation, Counter Defendant, Damon Wright, LEAD ATTORNEY, PRO HAC VICE, Venable LLP, Washington, DC; Tamany Vinson Bentz, LEAD ATTORNEY, Venable LLP, Los Angeles, CA.

For Backgroundalert, Inc., a California Entity, Kurosh Zahabian, an individual, Defendant: Oren Bitan, LEAD ATTORNEY, Buchalter Nemer, Los Angeles, CA.

For Andrew Wilder, Inc., a Nevada Corporation, Defendant, Counter Claimant: Oren Bitan, LEAD ATTORNEY, Buchalter Nemer, Los Angeles, CA.

**Judges:** Hon. Michael M. Anello, United States District Judge.

**Opinion by:** Michael M. Anello

# Opinion

**DENYING INSTANT CHECKMATE'S MOTION TO DISMISS COUNTERCLAIM AND MOTION FOR SANCTIONS**

[Doc. Nos. 12, 17]

**DENYING WILDER, INC.'S MOTION FOR SANCTIONS**

[Doc. No. 21]

Plaintiff and Counter-Defendant Instant Checkmate, Inc. ("Instant Checkmate") filed a complaint alleging copyright infringement, false advertising, a violation of the California Business and Professions Code, and **[*2]** unjust enrichment against Defendants BackgroundAlert, Inc., Andrew Wilder, Inc., and Kurosh Zahabian. Doc. No. 1. Defendants Andrew Wilder, Inc. and Kurosh Zahabian filed an answer, largely denying the allegations of the complaint and asserting fifteen affirmative defenses. Doc. No. 9. Simultaneously with its answer, Defendant Andrew Wilder, Inc. ("Wilder") filed a counterclaim, alleging false advertising. Doc. No. 8. Instant Checkmate now moves to dismiss Wilder's counterclaim pursuant to Federal Rule of Civil Procedure 12(b)(6) and for sanctions pursuant to Federal Rule of Civil Procedure 11. Doc. Nos. 12, 17. The Court finds the matters suitable for decision on the papers, without oral argument, pursuant to Local Civil Rule 7.1. For the reasons stated below, the Court DENIES Instant Checkmate's motions.

**ORDER:**

## BACKGROUND[1]

Instant Checkmate is a company incorporated in Delaware with its principal place of business in San Diego County, California. It provides people finder, public records search, and criminal records search services ("background check services") to consumers through its website, Instant Checkmate ("ICM website").

Defendant BackgroundAlert, Inc. is a California business entity headquartered [*3] in Huntington Beach, California, registered in California, and conducting business across the United States.[2] Defendant Andrew Wilder, Inc. is a Nevada corporation, headquartered in Huntington Beach, California, and conducting business across the United States. Defendant Kurosh Zahabian is an individual residing in Huntington Beach, California, and the president of Defendant Andrew Wilder, Inc. Defendants operate a competing website, BackgroundAlert ("BA website"), which also provides background check services.

On May 12, 2014, Instant Checkmate initiated this lawsuit. In its Complaint, Instant Checkmate alleges that the contents of the ICM website are copyrighted materials protected under various copyright registrations. Instant Checkmate alleges that the BA website infringes on Instant Checkmate's copyrighted materials because the BA website includes imagery, text, and an overall concept and feel that are identical or substantially similar to the ICM website. Instant Checkmate further alleges that the BA website falsely advertises that it is protected by Norton software and "TRUSTe" Website Privacy Services by [*4] including the Norton Secured Seal and Wilder, Inc. was erroneously sued as BackgroundAlert, Inc. Doc. No. 9 at 1. the "TRUSTe" logo when the BA website is not protected by either service. Instant

Checkmate brings claims for (1) copyright infringement under 17 U.S.C. § 106, (2) false advertising under 15 U.S.C. § 1125(a), (3) unfair competition under Cal. Bus. & Prof. § 17200 *et seq.*, and (4) unjust enrichment.

On August 15, 2014, Defendants filed their Answer. Doc. No. 9. In their answer, Defendants substantially denied the allegations of the complaint. *Id.* Defendants also raised fifteen affirmative defenses. *Id.* ¶¶ 1-15.[3]

Simultaneously with Defendants' Answer, Wilder[4] filed a counterclaim for false advertising under the [*5] Lanham Act, 15 U.S.C. § 1125(a), based on three allegedly misleading representations: (1) Instant Checkmate's "advertorial" blog, Crime Wire, touts Instant Checkmate's product without providing sufficient notice that Crime Wire is a paid advertisement and not an independent news source; (2) the inclusion on the ICM website of trademarked logos of media organizations such as AOL, Yahoo, Fox News, ABC, and the Huffington Post gives consumers the false impression that these entities endorse the ICM website; and (3) the ICM website misleads consumers by representing that it can search driving records when it does not, in fact, search such records. Doc. No. 8 ¶¶ 14-18.

Instant Checkmate now moves the Court to dismiss Wilder's counterclaim on the following grounds: (1) the allegedly false and misleading representations are not, in fact, false; and (2) because the representations are not false, Wilder's

---

[1] Unless otherwise noted, all allegations are taken from the Complaint. *See* Doc. No. 1.

[2] Defendants Andrew Wilder, Inc. and Zahabian assert that Defendant Andrew

[3] Instant Checkmate moved the Court to strike Defendants' affirmative defenses on the ground that they do not meet the heightened plausibility standard under Federal Rule of Civil Procedure 8, as articulated by the Supreme Court in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). Doc. No. 13-1. Defendants filed an opposition, in which they articulated the bases for many of their affirmative defenses and agreed to withdraw their first, sixth, eighth, and fifteenth defenses. Doc. No. 23 at 13. Based on Defendants' explanations and withdrawals, Instant Checkmate withdrew its motion to strike. Doc. No. 28.

[4] The Court refers to Defendant Andrew Wilder, Inc. as "Wilder."

allegations are insufficient to support the remaining elements of a false advertising claim and fail to meet Federal Rule of Civil Procedure 9(b)'s heightened pleading requirements. Doc. No. 12.

## MOTION TO DISMISS COUNTERCLAIM

### A. Legal Standard

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency [*6] of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed. R. Civ. P. 8(a)(2). Plaintiffs must also plead, however, "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). The plausibility standard thus demands more than a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Instead, the complaint "must contain allegations of underlying facts sufficient to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).

In reviewing a motion to dismiss under Rule 12(b)(6), courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court need not take legal conclusions as true "merely because they are cast in the form of factual allegations." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (quoting *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)) (internal quotation marks omitted). Similarly, "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. Fed. Deposit Ins. Corp.*, 139 F.3d 696, 699 (9th Cir. 1998).

In determining the propriety of a Rule 12(b)(6) dismissal, courts generally may not look beyond the complaint for additional facts. *See United States v. Ritchie*, 342 F.3d 903, 907-08 (9th Cir. 2003). "'However, material which is [*7] properly submitted as part of the complaint may be considered' on a motion to dismiss." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1993) (quoting *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990)), *overruled in part as stated in Gilbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125 (9th Cir. 2002). Thus, a court may properly consider "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading" when ruling on a Rule 12(b)(6) motion to dismiss without converting the motion to one for summary judgment. *Branch*, 14 F.3d at 454.

### B. Discussion

Instant Checkmate moves to dismiss the counterclaim on the ground that the three allegedly false statements are not actually false. Doc. No. 12; Doc. No. 27. Instant Checkmate goes on to argue that because the statements are not false, Wilder can neither plead plausible facts to support the remaining elements of a false advertising claim under the Lanham Act, nor meet Rule 9(b)'s heightened pleading standard. Doc. No. 12 at 11.

In response, Wilder argues that the statements, while literally true, are nonetheless misleading. Doc. No. 22. With respect to Crime Wire, Wilder further argues that Instant Checkmate's disclosures are inadequate under the Federal Trade Commission's (FTC) standards dealing with clear and conspicuous disclosures. *Id.* at 11. Wilder also argues that Rule 9(b)'s heightened [*8] pleading standard does not apply to its false advertising claim because the claim is not "grounded in fraud," but rather alleges that the statements are misleading. *Id.* at 16. Wilder finally argues that the Court cannot consider Instant Checkmate's exhibits

Case 8:18-ap-01168-SC    Doc 347    Filed 08/19/21    Entered 08/19/21 21:07:48    Desc
Main Document      Page 132 of 242

Page 4 of 8
2014 U.S. Dist. LEXIS 190115, *8

without converting the motion to dismiss into a motion for summary judgment. *Id.* at 17.

## 1. Whether the Court may Properly Consider the Parties' Exhibits.

As an initial matter, Wilder argues that Instant Checkmate improperly attempts to introduce evidence beyond the pleadings. Doc No. 22 at 17. Wilder argues that this converts Instant Checkmate's motion to dismiss into a motion for summary judgement. *Id.* The Court disagrees.

Wilder's counterclaim puts into question both Crime Wire's contents and whether certain news and media organizations have "featured" the ICM website. *See id.* at 3-4. Wilder does not contest the authenticity of Instant Checkmate's exhibits, only that they constitute "selective evidence [that] provide[] a defense to the Lanham Act claim...." *Id.*; *see also Branch*, 14 F.3d at 453 (noting that the rule of incorporation is limited to documents "whose authenticity no party questions"). Ninth Circuit law, however, is clear that "when [the] plaintiff fails to introduce **[*9]** a pertinent document as part of his pleading, [the] defendant may introduce the exhibit as part of his motion attacking the pleading." *Branch*, 14 F.3d at 453 (alterations in original). Accordingly, the Court finds that it may properly consider each party's exhibits without converting the motion to dismiss into a motion for summary judgment. *See id.* at 454.

## 2. Whether the Allegedly False Statements are, in Fact, False.

Instant Checkmate's arguments center on contesting the alleged falsity of the statements. It makes several arguments in response to the three allegedly false statements identified in the counterclaim, but comes to the same conclusion as to all three: the statements are not false. Doc. Nos. 12, 27.

The Lanham Act prohibits "false statement[s] of

fact" found in "commercial advertising." 15 U.S.C. § 1125(a)(1)(B); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997). The elements of a Lanham false advertising claim are:

> (1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; **[*10]** and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms*, 108 F.3d at 1139 (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 244 (9th Cir. 1990)). To demonstrate falsity, "a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Id.* (internal citation omitted).

Instant Checkmate argues that it provides sufficient disclaimers on Crime Wire to alert consumers to the fact that the website is associated with the ICM website: Crime Wire's address is instantcheckmate.com; it lists "Like Us on Facebook" and "Follow Us on Twitter" and identifies Instant Checkmate as the page to like or follow; each page of Crime Wire provides a disclaimer to inform consumers that Instant Checkmate cannot be used for any purpose covered by the Fair Credit Reporting Act; and the bottom of the website states, "Copyright © 2014 Instant Checkmate. All Rights Reserved." Doc. No. 12 at 5-8. Wilder counters that these disclosures fail to meet the FTC's standards, which provide guidance on ensuring that **[*11]** disclosures are sufficiently clear and conspicuous. Doc. No. 22 at 3, 11-13.

Instant Checkmate further argues that its use of

various media organizations' logos does not constitute false advertising because those media outlets have, in fact, "featured" the ICM website. Doc. No. 12-1 at 8-10. Instant Checkmate argues that the term "featured" is not confined to positive stories, but rather to any story that "give[s] special attention to" its product. Doc. No. 27 at 6 (quoting The Am. Heritage Dictionary of the English Lang. (5th ed. 2014)). Wilder acknowledges that it is literally true that the media outlets have "featured" the ICM website, but asserts that Instant Checkmate's use of the logos and representation that those organizations have "featured" the ICM website is nevertheless misleading. *See* Doc. No. 8 ¶ 17; Doc. No. 22 at 13-14. The term "featured," Wilder argues, denotes approval or endorsement, but several of the organizations whose logos appear on the ICM website have run negative stories about it. Doc. No. 22 at 13-14; *see also, e.g.*, Doc. No. 22-4 at 1-6, 12.

Finally, Instant Checkmate argues that its assertion that it can search driving records is, in fact, true because its background **[*12]** check services include searches of publicly available criminal, traffic, and arrest records and judicial records that reflect prosecution for traffic offenses. Doc. No. 12-1 at 10; Doc. No. 27 at 8-9. Wilder argues that Instant Checkmate "only searches court records, which may or may not include some driving citations," and cannot search "records of the Department of Motor Vehicles." Doc. No. 22 at 15.

The Court need not parse out each of the parties' arguments because, as the Ninth Circuit has unequivocally held, the question of whether a particular statement is false and misleading is a question of fact that is inappropriate for adjudication on a motion to dismiss. *Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1053 (9th Cir. 2008). In *Newcal Industries, Inc. v. Ikon Office Solution*, the Ninth Circuit reversed in part a district court's Rule 12(b)(6) dismissal of a false advertising claim brought under the Lanham Act. *Id.* at 1044, 1053-54. Of the five statements at issue, the district court concluded that two of the

statements "were not 'false or misleading representations of fact' at the time they were made....'" *Id.* at 1053. The Ninth Circuit found this improper. While the defendant "correctly point[ed] out that [parts of the complaint] support the inference that [the false statements were] true **[*13]** when made..., *that inference could be proved false, or the statement could be proved true but misleading*." *Id.* at 1053-54 (citing *Cook, Perkiss, & Liehe, Inc.*, 911 F.2d at 245) (emphasis added). Because "there remain[ed] a factual question of whether the statement was intentionally *misleading* at the time it was made," the district court improperly dismissed the claim on the defendant's Rule 12(b)(6) motion. *Id.* at 1054 (emphasis in original).

Like the statements at issue in *Newcal Industries, Inc.*, the statements at issue in this case, as Wilder concedes, may be literally true. *See* Doc. No. 22 at 13. For example, it may be literally true that the ICM website has been given "special attention" by various media organizations. However, Instant Checkmate's assertion that it has been "featured by" those organizations may nonetheless mislead consumers because they may find, as Wilder argues, that the phrase "featured by" is synonymous with approval or endorsement. And it may be literally true that Instant Checkmate can search "driving records" vicariously through court records. However, the assertion that it can search "driving records" may nevertheless mislead consumers because they may believe, as Wilder argues, that the phrase "driving records" includes records of the Department **[*14]** of Motor Vehicles. Or these statements may not mislead consumers at all. Similarly, while it may be true that Crime Wire contains various indicia of its relationship to Instant Checkmate, the Court cannot say as a matter of law that these indicia are sufficient under the FTC's standards for clear and conspicuous disclaimers and thus do not mislead consumers into believing Crime Wire is an independent news source.

As illustrated, whether or not these statements mislead consumers is a factual question that this

Court should not, under Ninth Circuit precedent, dismiss on a Rule 12(b)(6) motion. Rather, these factual questions are properly left to adjudication on the merits. Accordingly, the Court DENIES Instant Checkmate's motion to dismiss the counterclaim to the extent it argues that the allegedly misleading representations are not, in fact, false.

### 3. Whether Rule 9(b)'s Heightened Pleading Standard Applies.

Instant Checkmate next argues that Wilder's false advertising claim under the Lanham Act fails because it does not meet the strictures of Rule 9(b)'s pleading standard. *See* Doc. No. 12-1 at 4, 11-12. Wilder counters that Rule 9(b) does not apply to its claim because it predicates Instant Checkmate's liability on having made **[*15]** misleading statements as opposed to intentionally false statements. Doc. No. 22 at 16. Wilder further argues that even if Rule 9(b) applies, Wilder has satisfied its standard. *Id.*

Claims sounding in fraud are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Under the Federal Rules, a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, the allegations must be "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen v. Weidner*, 780 F.2d 727, 731 (9th Cir. 1985) (citing *Bosse v. Crowell Collier & Macmillan*, 565 F.2d 602, 611 (9th Cir. 1977)). Thus, claims sounding in fraud must allege "an account of the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)). However, where fraud

is not an essential element of a claim, only allegations of fraudulent conduct must satisfy the heightened pleading requirement of Rule 9(b). *See Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003); *Hansen Bev. Co. v. Innovation Ventures, LLC*, No. 08-CV-1166-IEG (POR), 2009 U.S. Dist. LEXIS 127605, at *53 (S.D. Cal. Dec. 23, 2009).

The Ninth Circuit has not yet ruled on whether Rule 9(b) applies to false advertising claims under the Lanham Act. **[*16]** *See Skedco, Inc. v. Arc Prods., LLC*, No. 3:13-cv-00696-HA, 2014 U.S. Dist. LEXIS 18215, at *3 (D. Or. Feb. 13, 2014). As a result, district courts have split on the issue. *Compare id.* at *6-7 (collecting cases that apply Rule 9(b) to false advertising claims) *with Hansen Bev. Co. v. Innovation Ventures, LLC*, 2009 U.S. Dist. LEXIS 127605, at *52-56 (finding the counterclaim does not "sound in fraud," and therefore need not meet Rule 9(b), because counterclaimant "does not specifically allege fraud, fraud is not an essential element of the counterclaim, and [counterclaimant] does not allege 'a unified course of fraudulent conduct' and rely entirely on that course of conduct as the basis of the claim").

The Court need not expressly decide whether Rule 9(b)'s heightened pleading standard applies because even if Rule 9(b) does apply, the counterclaim is sufficiently pled to meet Rule 9(b)'s heightened pleading standard. In its counterclaim, Wilder identifies three representations it alleges to be misleading: the lack of sufficient disclaimers in the "advertorial" blog, Crime Wire, to alert consumers to the fact that Crime Wire is paid advertisement; the unauthorized use of various media organizations' logos; and that Instant Checkmate can search "driving records." Doc. No. 8 ¶¶ 16-17. The counterclaim further specifies why each statement is allegedly misleading: Crime Wire "leaves consumers **[*17]** with the overall impression that 'Crime Wire' is an independent news site or blog that is promoting [Instant Checkmate's] services, rather than a paid

advertisement"; the media organizations whose logos appear on Instant Checkmate's website neither "approve[ n]or endorse[]" the ICM website; and Instant Checkmate "does not in fact search driving records." *Id.*

The purpose of Rule 9(b)'s heightened pleading requirement is to ensure that allegations of fraud are "specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Semegen*, 780 F.2d at 731. The counterclaim has sufficiently filled that purpose here, as evidenced by Instant Checkmate's detailed arguments that the three representations at issue are not, in fact, false. The Court therefore DENIES Instant Checkmate's motion to dismiss the counterclaim.

## MOTIONS FOR RULE 11 SANCTIONS

### A. Legal Standard

Federal Rule of Civil Procedure 11 states, in pertinent part, that when an attorney presents a signed paper to a court, that attorney is certifying that to the best of his or her

> knowledge, information, and belief, formed after an inquiry reasonable under the **[*18]** circumstances... (2) the claims, defenses, and other legal contentions therein are warranted by existing law or for establishing new law; [and] (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.... Fed. R. Civ. P. 11(b). Sanctions under Rule 11 are warranted when a party files a lawsuit or motion that is frivolous, legally unreasonable, without factual foundation, or is otherwise brought for an improper purpose. *Warren v. Guelker*, 29 F.3d 1386, 1388 (9th Cir. 1994) (citing *Conn v. Borjorquez*, 967 F.2d

1418, 1420 (9th Cir. 1992); *Operating Engineers Trust v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988)). A filing is "frivolous" when it is "both baseless and made without a reasonable and competent inquiry." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990). Either improper purpose or frivolousness is sufficient to sustain a sanction. *Id.*

When one party seeks sanctions against another, the Court must first determine whether any provision of Rule 11(b) has been violated. *Warren*, 29 F.3d at 1389. A finding of subjective bad faith is not required under Rule 11. *See Smith v. Ricks*, 31 F.3d 1478, 1488 (9th Cir. 1994) (quoting *Zuniga v. United Can Co.*, 812 F.2d 443, 452 (9th Cir. 1987)) ("Counsel can no longer avoid the sting of Rule 11 sanctions by operating under the guise of a pure heart and empty head."). Instead, the question is whether, at the time the paper was presented to the Court (or later defended), it lacked evidentiary support or contained "frivolous **[*19]** legal arguments. *Odish v. CACH, LLC*, No. 12cv1710 AJB (DHB), 2012 U.S. Dist. LEXIS 157114, at *9 (S.D. Cal. Nov. 1, 2012). Where such a violation is found, Rule 11 authorizes sanctions against persons—attorneys, law firms, or parties—responsible. Fed. R. Civ. P. 11(c)(1).

### B. Discussion

Instant Checkmate argues for sanctions under Rule 11, asking that the Court dismiss Wilder's counterclaim with prejudice and award Instant Checkmate attorneys' fees and costs because the counterclaim "is legally and factually baseless and reflects no minimum factual investigation by Wilder and/or its attorneys." Doc. No. 17-1 at 2. In its opposition, Wilder also seeks sanctions, arguing that Instant Checkmate's aggressive litigation strategy stems from its desire "'to make an example of Wilder' and send a message to other competitors...." Doc. No. 21 at 16.

Exhibit 14, Page 119

### 1. Instant Checkmate's Motion for Rule 11 Sanctions

Instant Checkmate seeks sanctions because Wilder's counterclaim "grossly misrepresents the facts about Instant Checkmate's advertising in violation of Rule 11." Doc. No. 17-1 at 3. Instant Checkmate makes factual arguments identical to the arguments asserted in its motion to dismiss, all of which come to the conclusion that the alleged misrepresentations are not, in fact, false. *See id.* at 3-8; Doc. No. 29 at 2-10. As evidence of **[\*20]** Wilder's lack of pre-filing investigation, Instant Checkmate points to the dates on which Wilder's exhibits were printed, which occurred after Instant Checkmate filed its motion for sanctions. *See* Doc. No. 29 at 8.

As discussed *supra*, the Court does not agree with Instant Checkmate's position that the statements' literal truth precludes a false advertising claim. Wilder correctly points out that the Lanham Act may be violated by a statement that was "literally true but likely to mislead or confuse consumers." Doc. No. 21 at 9 (quoting *Southland Sod Farms*, 108 F.3d at 1139). As noted previously, a question of fact exists as to whether the statements alleged in the counterclaim are misleading. Given this question of fact, and in light of the Court's denial of Instant Checkmate's motion to dismiss, the Court finds that the counterclaim is not frivolous for purposes of Rule 11 sanctions. Accordingly, the Court DENIES Instant Checkmate's motion for sanctions.

### 2. Wilder's Cross-Motion for Rule 11 Sanctions

Wilder also seeks sanctions under Rule 11, arguing that Instant Checkmate's sanctions motion was filed with the improper purpose of "intimidat[ing] Wilder from pursuing its Counterclaim." Doc. No. 21 at 17. While the filing of a Rule 11 motion for sanctions simultaneously **[\*21]** with an initial motion to dismiss may be an aggressive strategy, the Court cannot say that Instant Checkmate's purpose is clearly improper to justify Rule 11

sanctions at this early stage of litigation. *See Operating Engineers Pension Trust*, 859 F.2d at 1344 (noting that sanctions are reserved "for the rare and exceptional case where the action is *clearly* frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose") (emphasis added). Accordingly, in its discretion, the Court DENIES Wilder's motion for sanctions. *See Patelco Credit Union v. Sahni*, 262 F.3d 897, 913 (9th Cir. 2001) (quoting Fed. R. Civ. P. advisory committee's notes (1993)) ("[T]he court *may* award to the person who prevails on a motion under Rule 11—whether the movant or the target of the motion—reasonable expenses, including attorney's fees, incurred in presenting or opposing the motion.") (emphasis added).

### CONCLUSION

Based on the foregoing, the Court DENIES Instant Checkmate's motion to dismiss the counterclaim for failure to state a claim under Rule 12(b)(6) [Doc. No. 12]; DENIES Instant Checkmate's motion for sanctions under Rule 11 [Doc. No. 17]; and DENIES Wilder's cross-motion for sanction under Rule 11 [Doc. No. 21].

**IT IS SO ORDERED.**

DATED: December 4, 2014

/s/ Michael M. Anello

Hon. Michael M. Anello

United States District Judge

---

# EXHIBIT 15

# Leverty & Assocs. Law Chtd. v. Exley

United States District Court for the District of Nevada

November 5, 2018, Decided; November 5, 2018, Filed

Case No.: 3:17-cv-00175-MMD-WGC

**Reporter**

2018 U.S. Dist. LEXIS 221766 *; 2018 WL 6728415

LEVERTY & ASSOCIATES LAW CHTD, a Nevada Corporation, Plaintiff, v. RAY WARREN EXLEY, an individual, Defendant.RAY WARREN EXLEY, an individual, Counter-Plaintiff, v. LEVERTY & ASSOCIATES LAW CHTD, a Nevada Corporation, Counter-Defendants.

**Subsequent History:** Adopted by, Objection overruled by, Sanctions allowed by, in part, Sanctions disallowed by, in part, Motion granted by Leverty & Assocs. Law Chtd. v. Exley, 2019 U.S. Dist. LEXIS 29152 (D. Nev., Feb. 22, 2019)

**Prior History:** Leverty & Assocs. Law CHTD v. Exley, 2018 U.S. Dist. LEXIS 44309 (D. Nev., Mar. 19, 2018)

**Counsel:** [*1] For Leverty & Associates Law Chtd., a Nevada Professional Corporation, Plaintiff: Vernon E. Leverty, William Ginn, LEAD ATTORNEYS, Jess P. Rinehart, Patrick R. Leverty, Leverty & Associates Chtd, Reno, NV.

For Ray Warren Exley, an individual, Defendant: Richard J. McGuffin, LEAD ATTORNEY, Alling & Jillson, Ltd, Lake Tahoe, NV.

For Ray Warren Exley, Counter Claimant: Richard J. McGuffin, LEAD ATTORNEY, Alling & Jillson, Ltd, Lake Tahoe, NV.

For Leverty & Associates Law Chtd., Counter Defendant: Vernon E. Leverty, William Ginn, LEAD ATTORNEYS, Jess P. Rinehart, Patrick R. Leverty, Leverty & Associates Chtd, Reno, NV.

**Judges:** William G. Cobb, United States Magistrate Judge.

**Opinion by:** William G. Cobb

# Opinion

## Report & Recommendation of United States Magistrate Judge

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR IB1-4.

Before the court is the Motion for Sanctions filed by Plaintiff/Counter-Defendant Leverty & Associates Law, Chtd. (Leverty). (ECF Nos. 97, 97-1 to 97-6, 98.) Defendant/Counter-Plaintiff Ray Warren Exley (Exley) failed to file a timely response. Leverty [*2] filed a reply brief. (ECF Nos. 101, 101-1 to 101-4.) Exley belatedly filed a request for extension of time to respond to the motion, which was denied. (ECF Nos. 105, 107.) On May 25, 2018, Magistrate Judge Valerie P. Cooke ordered Leverty to file a supplement with itemizations in support of the motion for sanctions. (ECF No. 113.) Leverty filed the supplement on June 11, 2018. (ECF Nos. 117, 117-1 to 117-5.)

This action was reassigned to the undersigned as magistrate judge after Judge Cooke recused herself from the action on June 19, 2018, because her nephew, Jeremy Clarke, Esq., entered an appearance on behalf of Exley. (ECF Nos. 123, 124.) On August 1, 2018, District Judge Miranda

M. Du referred the motion for sanctions to the undersigned. (ECF No. 132.) Leverty moves for sanctions because of: Exley's refusal to sign the written settlement agreement after agreeing to its essential terms on the record in court; his vexatious multiplication of this litigation; and, his repeated violation of court orders. Leverty's request for sanctions is based on the court's inherent power as well as Federal Rule of Civil Procedure 11. Leverty also seeks to recover reasonable attorney's fees and costs incurred under Nevada's offer **[*3]** of judgment protocol. Finally, Leverty contends that it is entitled to recover costs and expenses incurred in enforcing the settlement agreement under section 15 of the settlement agreement itself.

The court finds that Leverty's request for sanctions and fees and costs should be granted in part and denied in part. Sanctions against Exley are clearly warranted under the court's inherent power due to Exley's bad faith conduct, including his refusal to execute the settlement agreement and needless multiplication of this litigation. Leverty can only recover, however, the fees and costs that have a causal connection to the bad faith conduct. Sanctions should not be imposed under Rule 11. Finally, Nevada law precludes the recovery of attorney's fees by Leverty in connection with the offer of judgment and settlement agreement. While Leverty could recover post-offer of judgment costs, the request for costs is not adequately supported.

## I. BACKGROUND

### A. The Underlying Litigation and Filing of this Action

Given the broad scope of the request for sanctions and the requirements that sanctions under the court's inherent power be causally linked to the offending conduct, it is necessary for the court to provide a detailed **[*4]** summary of this litigation.

This action stems from Leverty's previous representation of Exley regarding a dispute Exley had with his ex-wife concerning real property located in Stateline, Nevada. (*See* ECF No. 1 at 8.) In April of 2014, Exley and Leverty entered into an agreement for legal services, and Leverty provided legal services to Exley concerning this dispute from April 2014 through February of 2017. (*Id.*) Specifically, Leverty filed a complaint on behalf of Exley and against Exley's ex-wife, Lois M. O'Brien, in Douglas County, Nevada. (*Id.* at 9.) Leverty filed a motion for summary judgment on behalf of Exley in that action, which was granted by the State court, and declared Exley to have 100 percent ownership of the property. (*Id.*) This was followed by a one-day trial concerning whether O'Brien was entitled to any offset. (*Id.*) Leverty represented Exley at the trial, and on January 26, 2017, the State court granted Exley's motion for judgment as a matter of law, ruling in favor of Exley as to the offset issue. (*Id.*)

Following this success, on January 31, 2017, Leverty provided Exley with updated itemized statements (statements had been sent from April 2014 through January 2017). (*Id.* at 9-10.) **[*5]** Exley failed to remit payment for the amount due. (*Id.* at 10.) As a result, Leverty filed an action for the failure to pay the amount due under the legal services agreement in State court. (*Id.*)

Exley answered the complaint and filed counter-claims against Leverty. (ECF No. 1 at 15-57.) In those pleadings, Exley states that he is a medical doctor, a certified anesthesiologist, an emergency room specialist, and a scientist. (ECF No. 1 at 16:21-22.) He indicates that he suffered from several medical setbacks, which resulted in "severely limited energy and limited hours of activity during any 24-hour period. Therefore, much of the 'legal activities' are directed and overseen by his wife, Juliana Loza-Exley whose credentials are listed below." (*Id.* at 17:3-8.) He described Ms. Loza's credentials (which become relevant below) as follows:

> Ms. Loza is officially retired as an international attorney and was licensed to practice in Mexico

as an 'Abogada' and "Associate Solicitor' in England. She is also a Certified Company Director in the U.K. and was a Pension Trustee and Administrator/Fiduciary of various Pension Plans in Switzerland, England, Mexico and the United States. She formally retired from **[\*6]** most of the above professional occupations in December 2008.

(*Id.* at 17:16-23.)

On March 17, 2017, Leverty made an offer of judgment under State law, and Exley did not accept the offer. (*See* ECF No. 97 at 2; Ginn Decl. ECF No. 97 at 24 ¶ 7.) Exley removed the action to federal court on March 22, 2017. (ECF No. 1.)

## B. Motion to Dismiss/Motion to Strike

Shortly after the action was removed to federal court, Leverty filed a motion to dismiss the counter-claims and a motion to strike portions of Exley's answer. (ECF Nos. 4, 7.) Leverty argued that the counter-claims failed to state a claim upon which relief could be granted; that claims for fraud, misrepresentation and breach of fiduciary duty must be pled with particularity; that there is no private right of action for the alleged violations of Nevada statutes invoked; and, that many sections of the answer were immaterial and scandalous.

Exley failed to timely file a response to the motions. He contacted Leverty on April 19, 2017, to ask for a two-week extension, and Leverty provided a one-week extension. (*See* ECF Nos. 8, 8-1 to 8-5, 9, 9-1 to 9-5.) Again, Exley failed to file his responsive briefs, so Leverty went ahead and filed reply briefs. **[\*7]** (ECF Nos. 8, 9.) Exley belatedly filed an ex parte application for an extension of time to respond to the motions. (ECF No. 11.) District Judge Du gave until May 15, 2017, to file a response. (ECF No. 13.)

Then, on May 2, 2017, Exley filed another ex parte application for an extension of time of thirty days to respond to the motions, which was accompanied

by a declaration as well as a motion for leave to amend the answer and counter-complaint (labeled an "errata"). (ECF No. 15.) Leverty filed a response to these filings asserting, among other things, that Exley's request for an extension of time contained various false statements. (ECF No. 17.)

On May 15, 2017, Exley filed a stipulation and order giving Exley additional time to file a response to the motion to dismiss and motion to strike. (ECF No. 18.) Judge Du approved the stipulation, making the responsive briefing due May 22, 2017. (ECF No. 19.)

After all this, Exley still failed to file a response, and Leverty filed additional reply briefing. (ECF Nos. 25, 26.)

At the June 20, 2017, case management conference, Magistrate Judge Cooke gave Exley yet another extension, until July 10, 2017, to file a response to the motion to dismiss **[\*8]** Exley's counter-complaint, noting that no further extensions would be granted. (ECF No. 33 at 2.)

Exley, through his newly retained counsel Marie Kerr, Esq. (who entered an appearance on June 19, 2017, ECF No. 32), ultimately filed a non-opposition to the motion to dismiss and motion to strike. (ECF No. 36.) Leverty filed additional reply briefing asking the court to dismiss Exley's counter-complaint with prejudice, and to strike the requested portions of Exley's answer. (ECF Nos. 37, 38.)

## C. Exley's Motion for Leave to Amend the Answer and Counterclaim

Exley filed a motion for leave to amend his answer and counter-claim. (ECF No. 12.) He sought to add a violation of the American Bar Association's Rule of Professional Conduct 8.4, asserting that Leverty had interfered with his efforts to engage local counsel. Leverty opposed the motion on the basis that Exley failed to follow LR 15-1 and because the claims would be legally futile. (ECF No. 14.)

At a June 20, 2017 case management conference, Ms. Kerr advised the court that Exley was voluntarily withdrawing the motion for leave to amend the answer and counter-claim. (ECF No. 33 at 2.)

## D. Exley's Motion to Change Venue

After Exley missed the extended **[\*9]** deadline to respond to the motion to dismiss and motion to strike, but before he retained Ms. Kerr, he filed a motion for change of venue to the Central District of California. (ECF No. 21.) Leverty filed a response, arguing Exley was engaging in impermissible forum shopping and that there was no good cause to change venue. (ECF No. 27.) This motion was filed even though the underlying case was litigated in Douglas County, Nevada; the real property was in Nevada; Leverty is in Nevada; and, Exley himself removed the case to the District of Nevada. Ms. Kerr subsequently advised the court that Exley was also voluntarily withdrawing the motion for change of venue. (ECF No. 33 at 2.)

## E. June 1, 2017 Case Management Conference

At a June 1, 2017, case management conference, Judge Cooke inquired about Ms. Loza's role in this case. Exley admitted that Ms. Loza was not licensed to practice law in any state in the United States. (ECF No. 91 at 6:23-25.) Judge Cooke advised Exley that since Ms. Loza was not a licensed lawyer, she was prohibited from assisting and/or writing papers on his behalf, as that would constitute the unauthorized practice of law. (ECF No. 28 at 1.) Judge Cooke voiced her **[\*10]** concern regarding whether Exley was being candid with the court about the nature of his wife's assistance in this action, and set a further case management conference for June 20, 2017, requiring the personal appearance of Leverty and Exley. (Id.) Exley was required to bring all his legal filings and was to be prepared to testify under oath about his filings and to explain his wife's involvement in the preparation of legal papers on

his behalf.

## F. June 20, 2017 Case Management Conference

Exley did not personally appear for the case management conference as ordered. Ms. Kerr did appear, and advised the court that Exley was unable to attend due to an illness. (ECF No. 33 at 1.) Judge Cooke issued an order to show cause as to why Exley should not be sanctioned for his failure to appear for the court-ordered pre-trial conference. (Id.; ECF No. 34.)

The court also conferred with counsel and set a settlement conference for July 27, 2017. (ECF No. 33 at 2.) Dr. Exley was ordered to personally appear for the settlement conference. (Id.)

## G. Discovery

On May 16, 2017, Leverty propounded written discovery to Exley, with responses due by June 19, 2017. No responses were provided. This was discussed **[\*11]** at the June 20, 2017, case management conference, and Judge Cooke ordered that discovery was stayed pending the settlement conference, except that Exley was required to provide responses to the outstanding discovery by July 10, 2017. (ECF No. 33 at 2.) Exley served responses that date, but he only responded to 31 out of 83 requests for admission, 8 of 13 interrogatories, and did not provide any documents in response to 206 requests for production. (ECF Nos. 55-1, 55-2, 55-3, 55-4, 55-5.)

Leverty sent a meet and confer letter concerning the responses to Ms. Kerr on July 11, 2017. (ECF No. 55-7; Ginn Decl., ECF No. 97 at 26 ¶ 15.) The letter was then sent to Exley's next attorney, Richard J. McGuffin, Esq. (Id.) This was followed by a telephone call and several emails. (Ginn Decl., ECF No. 97 at 26 ¶ 15.) Updated answers to the requests for admission were sent, but not to the interrogatories or requests for production. (Ginn Decl., ECF No. 97 at 26 ¶ 16.) According to

Leverty, a motion to compel would have been filed but for the settlement conference and stay of discovery. (Ginn Decl., ECF No. 97 at 26 ¶ 16 (there are two paragraphs identified as 16, this citation is to the second paragraph **[*12]** 16)).

## H. Motion for Leave to Appear Telephonically for the OSC & Settlement Conference

On July 21, 2017, Exley, through Mr. McGuffin, moved for an order permitting him to appear telephonically for the OSC and Settlement Conference scheduled for July 27, 2017, indicating that Exley lived in Beverly Hills, California, and had various medical ailments and had been advised not to travel. (ECF Nos. 40, 40-1 to 40-6.)

Leverty opposed the motion, arguing that Exley's conduct suggested he should not be believed. (ECF Nos. 42, 42-1 to 42-8.)

Judge Cooke granted the motion, albeit reluctantly (*see* ECF No. 45 at 1), but ordered that Exley be present telephonically, without fail, for the duration of all proceedings. (ECF No. 44.) He was cautioned that a failure to comply would result in the court considering sanctions. (*Id.*)

## I. July 27, 2017 OSC

In the minutes of the OSC proceeding, Judge Cooke noted there was no objection to the OSC by Exley, and she construed his silence to the OSC order as agreeing that he should be sanctioned. (ECF No. 45.) As such, Judge Cooke sanctioned Exley for his failure to appear at the June 20, 2017, case management conference, and ordered Leverty to prepare a statement **[*13]** of attorney's fees and costs incurred for preparation and attendance at the conference. (*Id.*) In addition, the court found that Exley should be personally sanctioned in the amount of $2,500, payable to the attorney admission fund by August 28, 2017. (*Id.* at 2.)

## J. Settlement Conference

The parties participated in the court-ordered settlement conference following the hearing on the OSC on July 27, 2017. The parties negotiated for most of the day and ultimately reached, a settlement and placed the terms on the record. (ECF No. 46.) Exley and Ms. Loza specifically agreed that the settlement was binding as to Exley, Ms. Loza, as well as Athena, Nevada, an entity with which Exley and Loza were involved. (ECF No. 55-9 at 16-17.) As a result of settlement, Judge Cooke agreed to vacate her earlier order sanctioning Exley $2,500. (ECF No. 46.) The parties were ordered to file a stipulation for dismissal with prejudice by December 1, 2017. (*Id.*) The court retained jurisdiction over the subject matter during finalization of settlement documents, and until the stipulation for dismissal was entered. (*Id.*)

## K. Finalizing the Agreement

Leverty circulated its first draft of the settlement agreement approximately **[*14]** one week after the settlement conference. (Ginn Decl., ECF No. 55 at 16 ¶ 4.) Several weeks later, McGuffin circulated a different draft. (Ginn Decl., ECF No. 55 at 16 ¶ 5.) At that time, McGuffin advised Ginn: "I would like to schedule a call with you to discuss an issue that has apparently arisen with Athena and get your thoughts." (*Id.*)

On August 23, 2017, McGuffin advised Mr. Ginn that Exley and Ms. Loza could no longer make any representations or take any actions on behalf of Athena, as they had been removed from the Athena positions. (Ginn Decl., ECF No. 55 at 16 ¶ 6.) This was to the astonishment of Mr. Ginn, as Exley and Ms. Loza had represented that they could do so at the settlement conference and this had been an important part of the deal. Ginn told McGuffin that this would require other assurances, and McGuffin stated he would work with his client to provide those assurances. (Ginn Decl., ECF No. 55 at 16 ¶ 8.)

Several additional drafts were circulated, conversations occurred between counsel, and a finalized agreement was within reach, or so they thought. (Ginn Decl., ECF No. 55 at 17 ¶ 14.)

## L. Withdrawal of McGuffin

Ginn sent multiple emails to McGuffin in the first few weeks **[\*15]** of October to ascertain the status of the settlement agreement, believing that they were very close to having a final agreement. (Ginn Decl., ECF No. 55 at 17 ¶¶ 14-15.) Other than one email that essentially said McGuffin was working on it, Ginn got no response. (Ginn Decl., ECF No. 55 at 17 ¶ 15.) Then, in an email dated October 24, 2017, McGuffin stated that he no longer represented Exley. (Ginn Decl., ECF No. 55 at 17 ¶ 16, ECF No. 55-19.)

On October 31, 2017, McGuffin filed a motion for leave to withdraw as counsel of record, citing irreconcilable differences in that Exley failed to effectively communicate and cooperate with counsel, and failed to follow counsel's legal advice. (ECF No. 50.)

Leverty filed a non-opposition, noting that numerous drafts of the settlement agreement had been circulated, but Exley had refused to execute the agreement. (ECF No. 51.) Leverty simultaneously filed a request for a status conference because no final settlement agreement had been signed or agreed to by Exley, and it did not appear that would occur before the December 1, 2017, deadline considering the withdrawal of counsel. (ECF No. 52.)

Judge Cooke granted McGufffin's motion to withdraw. (ECF **[\*16]** No. 53.) She denied the request for a status conference, indicating that instead she would consider a motion to enforce the settlement agreement on shortened time. (*Id.*)

After McGuffin ceased to represent Exley, Leverty sent the latest draft of the settlement agreement directly to Exley, asking him to sign it. (Ginn Decl.,

ECF No. 55 at 17 ¶ 17, ECF No. 55-21.) Exley responded that nothing that had been exchanged between Leverty and McGuffin was approved. (ECF No. 55-23.)

## M. Motion to Enforce the Settlement and Related Matters

On November 9, 2017, Leverty filed a motion to enforce the settlement agreement. (ECF Nos. 55, 55-1 to 55-22.) Leverty argued that the court had authority to enforce the agreement because the terms were agreed to on the record in court, enforcement was appropriate under basic contract law, and the parties had a valid and enforceable agreement. Leverty's motion also requested that sanctions be imposed in connection with Exley's failure to execute the settlement documents.

This was accompanied by a motion for leave to file the motion to enforce the settlement agreement under seal because it contained confidential settlement communications. (ECF No. 55.) Exley opposed **[\*17]** the motion to seal and used that occasion to include a diatribe about his version of events leading to this litigation and to air his complaints about Leverty, and even requested that Rule 11 sanctions issue against Leverty. (ECF No. 56.) Exley then filed his own motion to seal, where he stated that he wanted to seal certain documents accompanying his response to the motion to enforce the settlement agreement, but then he copied and pasted Leverty's points and authorities and even Leverty's request that the entirety of the motion to enforce the settlement agreement and exhibits be sealed. (ECF No. 59.) Judge Cooke granted Leverty's motion to seal, and denied Exley's motion to seal, noting the contradiction in Exley's filings. (ECF No. 61.)

Exley also opposed the motion to enforce the settlement agreement. (ECF Nos. 62, 62-1 to 62-8.) Judge Cooke set the motion to enforce the settlement agreement for a hearing on February 21, 2018. Exley filed three motions to continue the hearing, which Judge Cooke denied. (*See* ECF Nos.

84, 86, 87, 88 at 2.)

At the hearing, Judge Cooke had Exley and Ms. Loza, sworn and they were canvassed by the court. (ECF No. 88 at 1, transcript at ECF No. 95.) Judge Cooke **[*18]** admonished Exley and Ms. Loza again about the unauthorized practice of law, as Exley admitted she had drafted the brief in opposition to the motion to enforce the settlement agreement. (*See* ECF No. 95 at 24-25, 27-28.) Exley and Ms. Loza maintained they did not have the transcript from the settlement agreement, which required Judge Cooke to read the transcript into the record, only to have Exley and Ms. Loza later acknowledged they had received the transcript. (*See* ECF No. 95 at 29-51.)

Judge Cooke advised the parties that she would issue a report and recommendation that the motion to enforce the settlement agreement be granted and would allow Leverty to file a motion for attorney's fees for having to undertake litigation caused by the conduct of Exley and Ms. Loza. (*Id.*) In addition, Judge Cooke indicated that she would issue a separate order to show cause why Exley and Ms. Loza should not be sanctioned under 28 U.S.C. § 1927, the court's inherent powers, and the Local Rules, for the improper practice of law and disobeying court orders, requiring Ms. Loza to appear in person, and Exley to provide an affidavit from a treating physician verifying his inability to travel to the hearing. (*Id.*) She subsequently **[*19]** vacated the order to show cause and allowed Leverty to re-file its request for sanctions. (ECF No. 94.)

Judge Cooke issued her report and recommendation that the motion to enforce the settlement agreement be granted on March 19, 2018. (ECF Nos. 92, 92-1.)

District Judge Du accepted and adopted Judge Cooke's report and recommendation on the motion to enforce the settlement agreement; found that the parties entered into an enforceable settlement agreement; and, that Exhibit 22 to ECF No. 55 (as amended in the report and recommendation) reflected the agreement upon which judgment would be entered. (ECF No. 102.) As such, District Judge Du ordered the case dismissed with prejudice pursuant to the terms of the operative settlement agreement. (*Id.*)

## N. Exley's Request for Accommodations

Exley filed a motion requesting accommodations under the Americans with Disabilities Act (ADA), setting forth in detail his various medical conditions and asking that court proceedings take place in the morning and that he be able to participate by telephone.(ECF No. 69.) Leverty opposed the motion. (ECF No. 71.) Judge Cooke denied the motion as moot because the court had not issued any order requiring Exley's **[*20]** appearance in person in the court. (ECF No. 75.)

## O. Exley's Objection to Judge Cooke's Denial of the Motion to Vacate the Mediation Agreement and her Subsequent Orders

Like many of his other filings, Exley's objection recited his version of events and perceived wrongdoings by Leverty and argued that the State court decision ordering payment on the attorney's lien was res judicata in this case. Exley also criticized Judge Cooke's reprimand of Exley and Ms. Loza in connection with the unauthorized practice of the law. Finally, Exley attacked the settlement agreement as one-sided. (ECF No. 70.)

Leverty filed a response to the objection, asserting that it was untimely and, in any event, did not show that Judge Cooke's decisions were clearly erroneous or contrary to the law. (ECF No. 72.) District Judge Du overruled the objection. (ECF No. 103.)

## P. Request for Sanctions, Attorney's Fees and Costs

Leverty filed the motion for sanctions on April 18,

2018. (ECF Nos. 97, 97-1 to 97-6.) Leverty argues that Exley should be sanctioned for: (1) his refusal to sign the settlement agreement; (2) his vexatious multiplication of this litigation; and (3) his repeated violation of court orders. Leverty argues **[*21]** that Exley should be sanctioned under the court's inherent power and for violating Rule 11. In addition, Leverty seeks to recover fees and costs under Nevada's offer of judgment protocol. Finally, Leverty argues that an award of fees for litigating the enforcement of the agreement is proper under section 15 of the settlement agreement itself.

Exley did not timely file a response. On May 10, 2018, Leverty filed a reply brief. (ECF No. 101.)

On May 16, 2018, Exley filed a belated request for an extension of time to respond to the motion for sanctions. (ECF No. 105.) Leverty opposed the request. (ECF No. 106.) Judge Cooke denied the request because Exley had not demonstrated good cause or excusable neglect under Local Rule 26-4. (ECF No. 107.)

On May 25, 2018, Judge Cooke issued an order that in conformity with Local Rule 54-14, Leverty must file an itemization of the fees and costs sought and description of the work performed, as well as a discussion of the factors set forth in Local Rule 54-14(b)(3). (ECF No. 113.) Leverty filed a supplement to the sanctions motion on June 11, 2018. (ECF Nos. 117, 117-1 to 117-5.)

## II. DISCUSSION

### A. Sanctions are Not Appropriate Under Rule 11

Leverty argues that Exley should be sanctioned under Rule 11 for his vexatious multiplication of **[*22]** this litigation. (ECF No. 97 at 20-21.)

Federal Rule of Civil Procedure 11 provides that when an attorney or unrepresented party signs a pleading, motion or other paper, and presents it to the court, he or she certifies that it: (a) "is not being presented for any improper purpose"; (b) "the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous legal argument for extending, modifying, or reversing existing law or for establishing new law"; (c) "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery"; and, (d) "denials of factual contentions are warranted on the evidence or ... reasonably based on belief or a lack of information." Fed. R. Civ. P. 11(a), (b)(1)-(4). The court may impose appropriate sanctions for a violation of the rule. Fed. R. Civ. P. 11(c)(1).

A motion for sanctions under Rule 11 must be separate from any other motion, and Leverty included the request for Rule 11 sanctions in a broader motion for sanctions. Fed. R. Civ. P. 11(c)(2). In addition, a Rule 11 motion must be served under Rule 5 and cannot be filed until after the party against whom sanctions are sought is given twenty-one days from service to withdraw or correct the **[*23]** challenged conduct. *Id.* Leverty made no indication that it complied with Rule 11's safe harbor provision.

While the court may initiate the sanction process under Rule 11 sua sponte, this would have required the court to issue an order to show cause to have Exley demonstrate why specifically described conduct did not violate Rule 11. Fed. R. Civ. P. 11(c)(3). This step was not taken under Rule 11 prior to the case being reassigned; therefore, the court is not able to sua sponte order sanctions under Rule 11 at this juncture. In any event, the court has discretion to rely on its inherent powers rather than a federal rule or statute. *See Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001). For these reasons, the request for sanctions under Rule 11 should be denied.

### B. The Court's Inherent Power to Impose Sanctions

A federal district court has inherent authority to

sanction conduct abusive of the judicial process. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 43-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). The inherent power is "not conferred by rule or statute," but exists for courts "to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct. 1178, 1186, 197 L. Ed. 2d 585 (2017) (quotation marks and citation omitted). This power, however, is to be exercised with restraint and discretion. *Chambers*, 501 U.S. at 44. To impose sanctions under the inherent power, a court is required to make an explicit finding of bad **[*24]** faith or willful misconduct. *See In re Dyer*, 322 F.3d 1178, 1196 (9th Cir. 2003); *Fink v. Gomez*, 239 F.3d 989, 993-94 (9th Cir. 2001). Recklessness, when combined with an additional factor such as frivolousness, harassment, or an improper purpose, may support sanctions. *See In re Girardi*, 611 F.3d 1027, 1061 (9th Cir. 2010); *Gomez v. Vernon*, 255 F.3d 1118, 1134 (9th Cir. 2001); *Fink*, 239 F.3d at 994. Mere negligence or recklessness alone will not suffice. *In re Lehtinen*, 564 F.3d 1052, 1058 (9th Cir. 2009). Thus, "sanctions are available if the court specifically finds bad faith or conduct tantamount to bad faith." *Fink*, 239 F.3d at 994.

Under the court's inherent power, sanctions may include: fines, awards of attorney's fees and expenses, contempt citations, issue and evidence preclusion, default judgment and even dismissal. *See e.g. Goodyear*, 137 S.Ct. at 1186 (citation omitted) (one permissible sanction under court's inherent power is an assessment of attorney's fees and costs incurred by the other side); *Shepherd v. Am. Broad. Cos.*, 62 F.3d 1469, 1472-73, 314 U.S. App. D.C. 137 (D.C. Cir. 1995) (fines); *Roadway Express Inc. v. Piper*, 447 U.S. 752, 765, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980) (attorney's fees and contempt); *Fink*, 239 F.3d at 992 (citation omitted) ("the Court left no question that a court may levy fee-based sanctions when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons"); *Link v. Wabash R.R.*, 370 U.S. 626, 633, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962) (upholding

dismissal with prejudice for failure to prosecute).

## C. Fee Shifting & Attorney's Fees as a Sanction Under the Court's Inherent Power

The only specific sanction requested in Leverty's motion requests is award of attorney's fees and costs.

The assessment of attorney's **[*25]** fees is within the court's power, "even though the so-called 'American Rule' prohibits fee shifting in most cases." *Chambers*, 501 U.S. at 45, 46 (citation omitted). This serves "the dual purpose of vindicat[ing] judicial authority without resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy. *"Chambers*, 501 U.S. at 46 (citation and quotation marks omitted).

In a case where the court's jurisdiction is based on diversity of citizenship of the parties, such as this one, "[o]nly when there is a conflict between state and federal substantive law are the concerns of *Erie R. Co. v. Tompkins* ... at issue." *Chambers*, 501 U.S. at 52. In *Chambers*, the court examined whether sanctions in the form of attorney's fees could be awarded under the court's inherent power in a diversity action where the forum state had a statute providing that attorney's fees were not allowed to a successful litigant unless authorized by statute or contract. *Id.* at 54. The Supreme Court explained that "the imposition of sanctions under the bad-faith exception [to the American Rule] depends not on which party wins the lawsuit, but on how the parties conduct themselves during litigation." *Id.* at 53. As such, "the **[*26]** party, by controlling his or her conduct in litigation, has the power to determine whether sanctions will be assessed." *Id.* The Supreme Court concluded that there was no conflict between the state court rule where sanctions were being imposed under the court's inherent power for conduct during litigation. *Id.* at 54.

Consistent with *Chambers*, Nevada's statutory scheme providing for an award of attorney's fees only by statute or agreement does not prevent the court from awarding fees under its inherent power for bad faith conduct in federal litigation; however, the court must now address the separate issue of whether fees may be awarded to a law firm plaintiff represented in litigation by attorneys within the firm.

### D. The Court May Impose a Sanction of Attorney's Fees Under its Inherent Power in a Diversity Action Where the Law Firm Plaintiff is Represented by Attorneys within the Firm

In this case, there is a law firm plaintiff suing to recover fees incurred in its successful representation of a client, and the law firm is being represented by attorneys within the firm.

The Nevada Supreme Court has held that attorneys representing themselves or their law firms in litigation may not recover attorney's **[*27]** fees under the Nevada statute allowing fees when authorized by statute or agreement, under Rule 11, under the State's offer of judgment protocol, or under the State's prevailing party statute. *See Dezzani v. Kern*, 412 P.3d 56, 134 Nev. Adv. Rep. 9 (2018) (precluded attorney representing herself and her law firm from recovering fees under both the statute allowing fees by statute or agreement and Rule 11, but allowing the recovery of costs); *Frank Settelmeyer & Sons, Inc. v. Smith & Harmer, Ltd.*, 197 P.3d 1051, 124 Nev. 1206 (2008) (prohibiting award of attorney's fees where law firm filed notice of attorney's lien and then action for recovery of fees owed where firm sought fees based on unaccepted offer of judgment); *Sellers v. Dist. Ct.*, 71 P.3d 495, 119 Nev. 256 (2003) (precluding pro se litigant who was an attorney from recovering of attorney's fees under prevailing party statute).

Neither the United States Supreme Court, the Ninth Circuit, nor the Nevada Supreme Court has specifically addressed whether an attorney representing himself or herself or his or her law firm may recover attorney's fees when awarded as a sanction under the court's *inherent power* because of another party's bad faith conduct during litigation.

In considering an appeal in a patent case from the Northern District of California, the Federal Circuit held that an attorney pro se litigant could not **[*28]** recover attorney's fees incurred as a sanction for a discovery violation under Rule 37, but the district court erred in failing to consider whether a sanction of attorney's fees was appropriate under the court's inherent power. *Pickholtz v. Rainbow Technologies, Inc.*, 284 F.3d 1365, 1376 (Fed. Cir. 2002). The Federal Circuit recognized "there is no federal statutory or appellate precedent for imposing attorney fees sanctions in favor of a *pro se* attorney under a court's inherent power." *Id.* at 1377.

The Federal Circuit concluded that there was "no reason why in proper circumstances [attorney fees sanctions] may not be applied in favor of a *pro se* attorney under inherent power." *Id.* The court reasoned that the "failure to do so ... would place a *pro se* litigant at the mercy of an opponent who might engage in otherwise sanctionable conduct, but not be liable for attorney fees to a *pro se* party." *Id.* The court recognized that there are options other than imposing attorney's fees as a sanction, such as evidence preclusion or default judgment, but stressed that "attorney fees are such a valuable and frequently used tool in the armamentarium of trial judges that we see no reason for categorically ruling them out of consideration." *Id.*

At least two district judges within the Ninth Circuit **[*29]** have followed *Pickholtz* in allowing an attorney representing himself to recover attorney's fees as a sanction under the court's inherent power. *See Brown v. Stroud*, No. C-08-02348 JSW (DMR), 2012 U.S. Dist. LEXIS 93840, 2012 WL 2709058, at *8 (N.D. Cal. 2012); *Surowiec v. Capital Title Agency, Inc.*, 790 F.Supp.2d 997, 1011 (D. AZ. 2011).

The court finds the reasoning of *Pickholtz*

Exhibit 15, Page 130

persuasive and recommends adopting this approach. The court's inherent powers are those "necessary to the exercise of all others." *Chambers*, 501 U.S. 32, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). They derive from the "control necessarily vested in courts to manage their own affairs" and are not "governed ... by rule or statute." *Link v. Wabash R.R.*, 370 U.S. 626, 630-31, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962). The court is not constrained by application of the term "incurred" which has caused courts to disallow sanctions to attorneys representing themselves or their law firms in the case of sanctions under other fee shifting statutes and Rule 37. Instead, the court imposes sanctions under its inherent power only when confronted with bad faith conduct.

While another case might present the opportunity to impose other sanctions to adequately address bad faith conduct, in this case the other available sanctioning tools are simply not practical. The court could impose a fine, but that would be arbitrary. A sanction of attorney's fees accurately reflects the time that Leverty spent addressing Exley's bad faith conduct. Issue **[*30]** or evidence preclusion, default judgment, and dismissal are not appropriate here as a settlement has already been enforced.

The court is not precluded from awarding attorney's fees in this case because it sits in diversity because the Nevada Supreme Court has itself not addressed an award of attorney's fees as a sanction under the court's inherent power to an attorney or law firm representing itself. As the Fifth Circuit aptly noted in the decision that was ultimately affirmed in *Chambers*:

> *Erie* guarantees a litigant that if he takes his state law cause of action to federal court, and abides by the rules of that court, the result in his case will be the same as if he had brought it in state court. It does not allow him to waste the court's time and resources with cantankerous conduct, even in the unlikely event a state court would allow him to do so.

*NASCO, Inc. v. Calcasieu Television and Radio,*

*Inc.*, 894 F.2d 696, 706 (5th Cir. 1990).

In conclusion, the court finds it is appropriate to award attorney's fees as a sanction under the inherent power in this action involving a law firm represented by partners and associates within the law firm.

## E. The Causal Connection Requirement

In *Goodyear*, the Supreme Court reiterated that when attorney's fees are imposed as a sanction, it **[*31]** must be "compensatory rather than punitive in nature." *Goodyear*, 137 S.Ct. at 1186 (citation omitted). This means that "the fee award may go no further than to redress the wronged party 'for losses sustained'; it may not impose an additional amount as punishment for the sanctioned party's misbehavior." *Id.* (citation omitted). Consequently, "the court can shift only those attorney's fees incurred because of the misconduct at issue." *Id.* In other words, there must be a causal connection between the sanction imposed and the bad faith conduct on which the sanction is based. *Id.* at 1186-87. Otherwise, the sanction is akin to punishment, which requires criminal-style procedural guarantees. *Id.* at 1186. Generally, the court cannot shift fees for work the victim of the bad faith conduct would have incurred anyway. *Id.* at 1187. The court's inquiry is focused on whether the specific litigation expenses "would or would not have been incurred in the absence of the sanctioned conduct." *Id.*

The court is still allowed to use its judgment and exercise discretion in determining the amount of the sanction. *Id.* "But ... trial courts undertaking that task 'need not, and indeed should not, become green-eyeshade accountants' (or whatever the contemporary equivalent **[*32]** is)." *Id.* "The essential goal' in shifting fees is 'to do rough justice, not to achieve auditing perfection." *Id.* This means that the court is permitted to consider the "overall sense of a suit" and may use estimates for computing the fees.

In an "exceptional case," a district court may shift *all* the party's fees, as was done in *Chambers. Id.* In *Chambers*, this was appropriate because "literally everything the defendant did—'his entire course of conduct' throughout, and indeed preceding, the litigation—was 'part of a sordid scheme' to defeat a valid claim.'" *Id.* at 1188 (quoting *Chambers*, 501 U.S. at 51, 57).

### F. Exley's Conduct that Warrants the Imposition of Sanctions

A reading of the history of the case set out above makes it easy to conclude that Exley acted not only in bad faith, but vexatiously and wantonly to cause delay and disruption to the court, and for an improper purpose. At times he was deliberately deceptive, and on various occasions he acted in defiance of court orders. The sanctionable conduct includes the following:

### 1. Filings that Were Reckless, Frivolous, Intended to Harass or for an Improper Purpose

First, Exley filed documents and motions that were not only reckless, but frivolous, intended to harass or for **[*33]** another improper purpose, and in many cases were ultimately voluntarily withdrawn when Exley was represented by counsel.

Initially, the answer and counter-claim filed by Exley contained many extraneous and salacious statements, and positions that were simply untenable. Had Exley voluntarily withdrawn the offending portions of the answer and counter-claim within a reasonable amount of time of receiving the motion to dismiss and motion to strike, the court would not be assessing sanctions for this conduct. Instead, Exley dragged the process out for months, refusing to acknowledge the merits of the motions. In addition, he consistently disregarded courtesies from Leverty and orders of the court giving him extensions of time to explain his positions in a response. Ultimately, when he retained counsel, non-oppositions were filed to the motions,

conceding their validity.

Instead of responding to the motion to dismiss and motion to strike, as he implied he would in requesting various extensions, he filed a motion to amend the counter-claim to add a violation of the ABA rules of professional conduct containing more insults against Leverty, disjointed and distorted factual allegations, and spurious **[*34]** claims. This motion too was ultimately withdrawn by Exley's counsel.

Then, Exley filed a motion for a change of venue even though the underlying case had been litigated in Douglas County, the real property was in Nevada, Leverty was in Nevada, and Exley himself had removed the action to the federal district court for the District of Nevada. Once again, the motion was withdrawn.

Yet another example is when Exley took pains to oppose a motion by Leverty to file a document under seal, only to then file his own motion to seal where he copied Leverty's request to seal documents.

### 2. The Continued Involvement of Ms. Loza in Legal Research and Drafting in the Case

Second, Exley engaged in bad faith conduct with respect to the continued involvement of Ms. Loza in the research and drafting of documents submitted to the court despite Judge Cooke's admonitions that she was engaging in the unauthorized practice of law. When Judge Cooke became aware that Exley was utilizing his wife to litigate his case, it necessitated another status conference on June 20, 2017, that Leverty was required to prepare for and attend. It was apparent throughout the litigation that despite Judge Cooke's warnings that Ms. **[*35]** Loza could not assist in litigating this matter for Mr. Exley, she continued to do so.

### 3. Failure to Follow Court Orders

Third, Exley frequently deliberately failed to follow

court orders.

Exley failed to file briefing after requesting and being granted various extensions of time in connection with Leverty's motion to dismiss and motion to strike to which Exley ended up filing non-oppositions.

Then, Exley failed to personally appear at June 20, 2017, case management conference, despite a court order, which resulted in the issuance of an OSC, on July 27, 2017, which Leverty was also required to prepare for and attend.

Exley even failed to file a timely response to the motion for sanctions, despite being given another opportunity when he failed to address the topic when it was raised in the motion to enforce the settlement agreement.

**4. Refusal to Sign the Settlement Agreement**

Finally, the conduct that perhaps most exhibits bad faith and a deliberate intention to thwart the judicial process is Mr. Exley's refusal to sign the written settlement agreement after countless hours were spent by the court, court staff, parties and attorneys to prepare for and reach a resolution of this case. This, **[*36]** in turn, required Leverty to file a motion to enforce the agreement, and consequently the expenditure of a significant amount of time and effort by the court and Leverty.

In *Doi v. Halekulani*, the Ninth Circuit held that the district court was within its discretion to impose sanctions under its inherent power where it had enforced a settlement against a party who refused to sign the written agreement after agreeing to the terms in open court. 276 F.3d 1131, 1140-41 (9th Cir. 2002). The Ninth Circuit emphasized that federal judiciary resources are "strained to the breaking point"; therefore, it could not "countenance a plaintiff's agreeing to settle a case in open court, then subsequently disavowing the settlement when it suits her." *Id.* at 1141. "The courts spend enough time on the merits of

litigation; we need not (and therefore ought not) open the flood gates to this kind of needless satellite litigation." *Id.*

"Needless satellite litigation" is exactly what occurred here when Exley refused to sign the settlement agreement after agreeing to its essential terms in open court. The court could not agree more with the Ninth Circuit that this type of behavior cannot be condoned. Judge Cooke and her staff, the parties and attorneys (on **[*37]** both sides) all took time to prepare for the settlement conference in this case, and then spent most of a day pursuing a resolution of this action. The record is crystal clear that Exley and Ms. Loza agreed to the essential terms, and specifically represented they could bind Athena. Judge Cooke made sure to clarify each one of the terms with precision and confirmed that each of the parties and attorneys understood and agreed to the terms.

This was followed up with attorneys on both sides taking great effort to create a written document that reflected that agreement. All this was done, only to be disavowed by Exley. This, of course, necessitated the expenditure of a great deal more time on briefing for the motion to enforce the settlement, and attendance at the hearing on the motion. The settlement was ultimately enforced by District Judge Du on the recommendation of Judge Cooke.

For refusing to sign the settlement agreement, Leverty should recover the fees for time spent: negotiating with Exley's counsel after Leverty was informed, contrary to the representations made in court, that Exley and Ms. Loza could not bind Athena; on the motion to enforce the settlement agreement; on the reply **[*38]** brief filed in response to Exley's opposition, which was disjointed and contained a dearth of extraneous arguments and information; opposing Exley's various motions to continue the hearing which Judge Cooke denied; preparing for and attending the hearing that turned out to be quite lengthy; and, on the opposition to Exley's objection to the court's

denial of his motion to vacate the settlement agreement (which was overruled by Judge Du).

## G. Fees Should Not be Awarded Where there is no Causal Connection to the Misconduct

### 1. Informal Efforts to Settle the Case

Leverty seeks to recover 11.9 hours-worth of fees for informal negotiations to reach a settlement that were unsuccessful in May and June of 2017, asserting that Exley made things more difficult and was constantly changing the terms and backing out of things he previously agreed to.

The court cannot say that the 11.9 hours would not have been spent but for Exley's bad faith conduct. Informal settlement discussions are a typical aspect of most cases, and just as typical are negotiations that are made more difficult because a party is representing himself or herself. The court does not countenance Exley's behavior in connection with these [*39] negotiations, but it cannot conclude based on the limited information about these negotiations in the record that this conduct was in bad faith or was tantamount to bad faith.

### 2. Fees for Opposing Exley's Motion to Appear at the OSC and Settlement Conference by Telephone

While Leverty says that this motion was filed in bad faith, that argument is not supported by the record. Judge Cooke ultimately granted the motion. While she was reluctant to do so, that was the outcome, and the court cannot discern bad faith under these circumstances.

### 3. Discovery

Leverty seeks to recover fees for preparing discovery requests to Exley (15.08 hours). Leverty would have had to prepare discovery to Exley in any event. Therefore, Leverty should not be allowed to recover these fees.

Counsel for Exley, Ms. Kerr, eventually served inadequate responses which necessitated meet and confer correspondence and communications. Updated responses to the requests for admission were sent, but not the interrogatories or requests for production. Leverty did not file a motion to compel because discovery had been stayed pending the outcome of the settlement conference, which was just weeks away.

Leverty seeks to recover for [*40] 13.5 hours spent in the meet and confer process. (ECF No. 117 at 6.) The question is whether Leverty can recover fees for the meet and confer process when no motion to compel was ever filed, and sanctions were not sought under Rule 37.

In *Chambers*, the Supreme Court held that a federal court is not "forbidden to sanction bad-faith conduct by means of the inherent power simply because that conduct could also be sanctioned under the statute or the Rules." *Chambers*, 501 U.S. at 50. The Court cautioned, however, that district courts must "exercise caution in invoking [their] inherent power, and ... must comply with the mandates of due process, both in determining that the requisite bad faith exists and in assessing fees[.]" *Id.* (citation omitted). "Furthermore, when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Id.* If, "in the informed discretion of the court, neither the statute nor the Rules are up to task, the court may safely rely on its inherent power." *Id.*

Here, the court finds sanctions under the inherent power are inappropriate for two reasons. First, Leverty could have availed [*41] itself of the tools under the Rules for addressing perceived misconduct in the discovery arena—namely, a motion to compel and a request for sanctions under Rule 37. Leverty made a tactical decision to defer that action because a settlement conference was on the horizon, but those avenues were still available.

Second, the meet and confer process was conducted through Leverty's communications with Exley's then counsel and not Exley himself. The court cannot determine that the meet and confer process was due to Exley's own bad faith. Therefore, inherent power sanctions for time spent on the meet and confer process should not be awarded.

## 4. The June 1, 2017, Case Management Conference

Leverty seeks to recover fees in connection with attending the June 1, 2017, case management conference, as well as for post-conference discussions. This was the initial case management conference held by Judge Cooke in the case, which Leverty would have been required to attend in any case. While Exley's behavior at subsequent conferences justify the recovery of fees, there is no causal connection between any misconduct and Leverty having to attend this particular case management conference.

## 5. Opposing Exley's Motion [*42] to Avoid Appearing in Person

Exley, through Mr. McGuffin, filed a motion to appear at the OSC hearing by telephone. (ECF No. 40.) Leverty seeks to recover for 9.3 hours spent opposing this motion. Exley's motion, in comparison to most of Exley's other filings, was concise and straightforward, and was ultimately granted by Judge Cooke, albeit reluctantly. Therefore, the court cannot conclude that this work was tied to Exley's bad faith conduct.

## 6. Fees for Drafting the Settlement Conference Statement and Appearing for the Settlement Conference, Including Fees for Time Mr. Ginn Spent Traveling to Reno

Leverty indicates that 35.65 hours were spent preparing for and drafting its settlement conference statement, and 18.25 hours were spent attending the

show cause hearing and settlement conference. While Leverty should recover fees for having to attend the show cause hearing because of Exley's misconduct, fees should not be allowed for drafting the settlement conference statement or attending the settlement conference, which Leverty was required to do regardless of Exley's conduct.

Mr. Ginn also seeks fees for the 3.25 hours he spent traveling to Reno for the OSC and settlement conference. The [*43] attorneys representing Leverty were required to attend the settlement conference regardless of Exley's conduct preceding or after the settlement conference. Moreover, the docket reflects that both the Leverty firm and Mr. Ginn are in Reno. Therefore, the fees for travel should not be awarded.

## 7. Finalizing the Settlement Agreement

Leverty requests fees for finalizing the settlement agreement—19.2 hours from the conclusion of the settlement conference through the date Exley terminated Mr. McGuffin. The court cannot conclude that Leverty would not have spent the time finalizing the agreement in any event. The only exception to this is the communications that Mr. Ginn was required to have with Mr. McGuffin when Exley apparently changed the position he and Ms. Loza had taken at the settlement conference that they could bind Athena. Leverty should be able to recover fees for reviewing Mr. McGuffin's August 23, 2017 letter on this issue; Mr. McGuffin's response of September 25, 2017; and, the September 26, 2017 telephone conference between the two hashing out the terms in light of this issue.

## 8. Exley's Motion for ADA Accommodations

Leverty seeks fees for 5.7 hours spent opposing Exley's request [*44] for ADA accommodations. On November 28, 2017, Exley filed a request for ADA accommodations and supporting declaration. (ECF No. 69.) The motion cites his health issues

and asked that court sessions be held in the morning, and that he be allowed to appear telephonically. Judge Cooke denied the motion as moot because she had not issued any order requiring Exley's future appearance in court. Judge Cooke did not conclude the motion was brought in bad faith or for an improper purpose, and she had previously allowed him to appear telephonically because of his various medical ailments. Therefore, the court cannot conclude that the request for accommodations was brought in bad faith or an improper purpose.

### 9. Fees for Time Mr. Ginn Spent Traveling to Reno for the Hearing on the Motion for Enforcement of the Settlement Agreement

Mr. Ginn seeks to recover fees and costs for travel to the hearing on the motion to enforce the settlement agreement before Judge Cooke on February 21, 2018. While Exley certainly necessitated the filing of the motion, Mr. Ginn and the Leverty firm are in Reno, Nevada, and his was a hearing on Leverty's own motion. If the hearing date conflicted with travel plans abutting [*45] the hearing date, Mr. Ginn could have requested another date. The court cannot conclude that Mr. Ginn's travel from outside of Reno was necessitated by Mr. Exley's conduct.

### 10. Other Unspecified Fees

Leverty references another 34.69 hours not specifically identified in their initial filing, which include preparing initial disclosures, attending the early case conference, preparing the joint case conference report, telephone calls with counsel, and other routine items, as well as fees for work on motions that were ultimately unfiled. For this type of routine litigation work, there is no causal connection to Exley's bad faith conduct; therefore, these fees should not be awarded. Nor can the court discern a causal connection between Exley's bad faith conduct and the documents that Leverty never even filed. Therefore, these fees should also be disallowed.

### H. Computation of Fees

### 1. Standard

In cases where attorney's fees are awarded as a sanction under the court's inherent power, courts have applied traditional methods for calculating the fee award, including reference to local rules and the lodestar analysis. *See e.g. Lahiri v. Universal Music and Video Distrib. Corp.*, 606 F.3d 1216, 1222-23 (9th Cir. 2010); *Sanchez v. Bank of America*, No. 09-5574 SC, 2010 U.S. Dist. LEXIS 81787, 2010 WL 2889033, at * 4-5 (N.D. Cal. July 22, 2010); *Mr. Rooter Corp. v. Mr. Plumber, Rooter and Plumbing Servs., LLC*, No. 3:07-cv-00156-LRH-RAM, 2008 U.S. Dist. LEXIS 85836, 2008 WL 4533978 (D. Nev. Oct. 6, 2008) [*46] .

### 2. Local Rule 54-14

Local Rule 54-14(b) requires a request for attorney's fees to include: (1) a reasonable itemization and description of the work performed; (2) an itemization of all costs sought to be charged as part of the fee award; (3) a brief summary of: (A) the results obtained and amount involved; (B) the time and labor required; (C) the novelty and difficulty of the questions involved; (D) the skill requisite to perform the legal service properly; (E) the preclusion of other employment by the attorney due to acceptance of the case; (F) the customary fee; (G) whether the fee is fixed or contingent; (H) the time limitations imposed by the client or circumstances; (I) the experience, reputation and ability of the attorney(s); (J) the undesirability of the case; (K) the nature and length of the professional relationship with the client; (L) awards in similar cases; and (M) any other requested information. The request must also be accompanied by an affidavit from the attorney responsible for the billings in the case authenticating the information, and confirming the fees and costs charged are

reasonable. LR 54-14(c). When no response **[\*47]** is filed, as is the case here, the court may grant the motion after conducting an independent review of the record. LR 54-14(e).

The court will address the 54-14(b)(3) factors, except that the customary fee factor will be addressed, *infra*, and some of the factors do not apply given that this case involves a law firm being represented by attorneys within the firm.

There is no question that Leverty obtained a successful result in this case, and that the time and labor required were significant, especially given the limited nature of the substantive issues of the complaint. While the claims were not novel or difficult, Exley's conduct made difficulty the norm throughout this litigation. The claims asserted did not require any special skill; however, navigating and responding to Exley's filings surely did. This case undoubtedly burdened the other work these attorneys were performing. The attorneys involved all have a good reputation before this court. Finally, it is fair to say that anytime an attorney must sue a client for fees, it is an undesirable case.

### 3. The Lodestar Analysis

When a party establishes it is entitled to an award of attorney's fees, "[i]t remains for the district court to determine **[\*48]** what fee is 'reasonable.'" *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). A determination of whether a fee is reasonable is generally based upon the traditional "lodestar" calculation set forth in *Hensley*. First, the court must determine a reasonable fee by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Id.* Second, the court must decide to adjust the lodestar amount based on an evaluation of factors articulated in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), that have not been subsumed in the lodestar calculation. *See Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000) (citation omitted). The factors include those set forth in Local Rule 54-14.

The court has discretion to adjust the amount awarded to address excessive and unnecessary effort, and as such may exclude hours that are excessive, redundant or otherwise unnecessary. *Id.*

### a. Reasonable Hourly Rate

Reasonable hourly rates are determined by the "prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984); *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008). The burden is on the moving party to demonstrate the requested rates are in line with those in the community for similar services by lawyers of reasonably comparable skill, experience and reputation. *Sorenson v. Mink*, 239 F.3d 1140, 1145 (9th Cir. 2001) (internal quotation marks and citation omitted). Affidavits or declarations of the moving attorney and other attorneys regarding prevailing **[\*49]** rates in the community are sufficient evidence. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990) (citations omitted). The court may also rely on its own familiarity with the rates in the community to assess those sought in the pending case. *Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).

The determination is not made by "reference to the rates actually charged by the prevailing party." *Schwarz v. Sec. of Health & Human Servs.*, 73 F.3d 895, 908 (9th Cir. 1995) (citation omitted).

Three attorneys were involved in working on this case: Vernon E. Leverty (VEL), William R. Ginn (WRG), and Jess P. Rinehart (JPR). They were granted fees in the underlying State court litigation at the rates of $350, $300, and $200, respectively. (Ginn Decl., ECF No. 97 at 24 ¶¶4-5.) In the reply brief, Leverty seeks increased hourly rates of $450 for Mr. Leverty, $400 for Mr. Ginn, and $350 for Mr. Rinehart. (ECF No. 101 at 9.) Leverty cites a recent District of Nevada (in the unofficial southern division in Las Vegas) case awarding fees at hourly rates of $450 per hour for an attorney with 30 years

of experience, and $375 for an attorney with 12 years of experience (in that case, the court also approved the hourly rate of $250 for an associate with seven years of experience). (ECF No. 101 at 9, citing *SVI, Inc. v. Supreme Corp.*, No. 2:16-cv-01098-JAD-NJK, 2018 U.S. Dist. Lexis 69727, at *7 (2018 WL 1718560) (D. Nev. Apr. 9, 2018)). In the supplement to the [**50**] motion for sanctions, Leverty indicates that Mr. Leverty's normal hourly rate for litigation is $450 hour, Mr. Ginn's is $350-$400, and Mr. Rinehart's is $250-$275. (ECF No. 117 at 13; Ginn Decl., ECF No. 117-3 ¶ 7.) The supplement cites another case from the unofficial southern division of the District of Nevada, *Cohen v. Gold*, No. 2:17-cv-00804-JAD-NJK, 2018 U.S. Dist. LEXIS 40661, 2018 WL 1308945, at *7 (D. Nev. Mar. 12, 2018), where the court found that a rate of $250 was reasonable for an attorney with five years of experience.

In 2011 and 2015, rates of $400 and $450 for lawyers with thirty-plus years of experience were approved in cases in the unofficial northern division of the District of Nevada. *See Doud v. Yellow Cab*, 3:13-cv-00664-WGC (Terry Keyser-Cooper, Esq. requested and received an hourly rate of $400); *Van Asdale v. Int'l Game Tech.*, Case No. 3:04-cv-00703-RAM (Margo Piscevich, Esq. requested and received an hourly rate of $450). In the *Doud* case, the court also approved the hourly rate of $350 for an attorney who had been practicing for 20-plus years.

Mr. Leverty has 47 years of experience; Mr. Ginn indicates that he has been practicing for 19 years; and, Mr. Rinehart has nine years of experience. (ECF No. 97 at 27 ¶ 17; ECF No. 101 at 9; Ginn Decl., [**51**] ECF No. 117-3; Leverty Decl., ECF No. 117-4; Rinehart Decl., ECF No. 117-5.)

Based on Mr. Leverty's experience, and the fact that the court has awarded this rate to practitioners with 30-plus years of experience, the requested rate of $450 per hour is reasonable. The court will approve the high-end of Mr. Ginn's customary hourly rate of $375, based on the approval of a rate

of $350 for an attorney with similar experience in 2015. Finally, the court will approve an hourly rate of $275 for Mr. Rinehart based on his nine years of experience, his customary rate, and the court's own familiarity with rates in this legal community.

### b. Reasonableness of the Time Spent

### i. Motion to Dismiss, Motion to Strike, and Related Work

Leverty spent 16.25 hours on work associated with the motion to dismiss and motion to strike, which is broken down as follows: 9.95 hours drafting the motions (and communications regarding an extension for a response) (2.2 by VEL and 7.75 by WRG); 3.25 hours drafting the first set of replies (WRG); 2.75 hours drafting the second set of replies (WRG); and, .3 hours on the third and final reply (WRG). In addition, 6.6 (WRG) hours were spent opposing Exley's motion for an extension [**52**] of time and on the response to Exley's errata.

The court finds the time spent drafting the motions and first set of replies to be reasonable.

The court finds that the 2.75 hours spent on the second set of replies to be unreasonable. The second set of replies contain a page and a half of substantive information, much of which is copied from the initial replies, and is followed by Mr. Ginn's declaration and exhibits that were also provided with the initial replies. The court recommends limiting the recovery for the second set of replies to .75 hours.

The final .3 hours spent (WRG) on the third reply brief is reasonable.

The court likewise finds reasonable the time spent opposing Exley's motion for extension of time and errata. These two filings were difficult to comprehend, requiring the court and the parties to wade through a vast amount of information that was ultimately immaterial to the request for

extension of time. The filings also contained many salacious accusations and other arguments about the merits of the case that Leverty was required to address.

In sum, Leverty should be able to recover the following: 2.2 hours for Mr. Leverty and 18.65 hours by Mr. Ginn in connection with work [*53] related to the motion to dismiss and motion to strike.

### ii. Motion for Leave to Amend

Mr. Ginn spent 5.45 hours opposing Exley's motion for leave to amend that was ultimately withdrawn when Exley retained counsel, which the court finds reasonable.

### iii. Exley's Change of Venue

17.85 hours were spent by Mr. Ginn in opposing Exley's motion for change of venue. A review of the response to the motion reveals a lengthy retort, which is supported by extensive research, declarations, as well as exhibits. The court finds this to be reasonable.

### iv. June 20, 2017 Case Management Conference

This is the case management conference ordered by Judge Cooke that Exley failed to personally attend. Mr. Ginn spent 4.5 hours preparing for the hearing. Then, Mr. Ginn and Mr. Leverty each spent .75 hours attending the hearing. The court finds this to be reasonable.

### v. Attending the OSC Hearing on July 27, 2017

Mr. Leverty and Mr. Ginn each spent 7.2 hours attending the OSC and settlement conference that date. The attorneys would have been required to attend the settlement conference regardless of Mr. Exley's conduct necessitating the OSC. Therefore, it is reasonable to allow recovery of fees for

attending the OSC [*54] hearing before the settlement conference, but not for attending the settlement conference. The OSC commenced at 9:06 a.m. and adjourned at 9:20 a.m. (ECF No. 45); therefore, .3 hours for Mr. Leverty and .3 hours Mr. Ginn to attend the OSC is reasonable.

### vi. Negotiating and Finalizing the Written Settlement Agreement

Again, Leverty would have had to engage in work to negotiate and finalize the written agreement following the settlement conference regardless of Exley's subsequent failure to execute the agreement. Therefore, fees for engaging in this work should not be allowed, except that: Leverty should be able to recover fees for Mr. Ginn's review Mr. McGuffin's August 23, 2017 letter on this issue; his September 25, 2017 response; and the September 26, 2017 telephone conference between the two hashing out the terms.

Leverty's filings do not contain a separate itemized entry for the review of the August 23, 2017 letter, but the court finds .3 hours is a reasonable amount to award for this task by Mr. Ginn. The records reflect that Mr. Ginn spent .3 in drafting the September 25, 2017 email to McGuffin, and .9 hours on the telephone call with McGuffin on September 26, 2017. The total for [*55] these three tasks is 1.5 hours.

### vii. Motion to Enforce the Settlement and Related Filings

46.35 hours were spent drafting the motion to enforce the settlement agreement and the motion to seal, opposing Exley's motions, and drafting reply briefs. Of that, 44.1 hours were spent by Mr. Ginn and 2.25 hours by Mr. Leverty. The court has reviewed the billing attributed to these filings (ECF No. 117 at 9) and finds the time spent to be reasonable under the circumstances.

### viii. Opposition to Exley's Objection to Denial of his Motion to Vacate the Settlement Agreement

Exley filed a document which was styled as an objection to Judge Cooke's denial of his motion to vacate the settlement agreement. (ECF No. 70.) It contained a lengthy history of Exley's version of events leading up to the settlement agreement; an unsuccessful res judicata argument; criticism of Judge Cooke's decisions; as well as unsubstantiated claims that the settlement was one-sided.

Mr. Ginn spent 5.2 hours preparing a response to the objection, which the court finds to be reasonable. (ECF No. 72.)

### ix. Hearing on Motion to Enforce the Settlement

Leverty seeks to recover a total of 24.9 hours in connection with the hearing on the [*56] motion to enforce the settlement agreement, including reviewing communications from the court and Exley's motions to continue the hearing, preparation for and attending the hearing, as well as Mr. Ginn's travel to and from Burbank for the hearing.

Leverty should be allowed to recover fees for reviewing communications from the court regarding the hearing and Exley's motions to continue the hearing, and for preparation and appearing at the hearing. As was discussed above, Leverty should not recover fees for Mr. Ginn's travel to and from Reno.

In sum, Leverty may recover the following fees in connection with the hearing on the motion to enforce the settlement agreement: 3.15 hours for Mr. Leverty; 3.6 hours for Mr. Rinehart; and, 7.9 hours for Mr. Ginn.

### c. Total Fees

The total amount of fees is **$45,045**. This is calculated as follows: 8.65 total hours for Mr. Leverty at a rate of $450 is $3,892.50; 107.1 total

hours for Mr. Ginn at a rate of $375 is $40,162.50; and, 3.6 hours for Mr. Rinehart at a rate of $275 is $990.

### d. Costs

Leverty also seeks to recover costs in the amount of $2,640, which includes: $884.90 in copying costs, $1,024.92 in legal research costs, $263.50 in filing fees, $20.10 [*57] in postage, $361.34 in travel/lodging costs, and $59 for service of process. (ECF No. 117 at 14, ECF No. 97-6.)

Here, costs are sought as a sanction under the court's inherent power, and not as a prevailing party under Rule 54. Therefore, there must be a causal connection between the bad faith conduct and the sanction imposed, which Leverty has failed to demonstrate.

Leverty may, however, recover costs under Nevada's offer of judgment protocol, which is discussed below.

### I. NRCP 68

Here, Exley rejected Leverty's offer of judgment, and Leverty ended up obtaining a settlement for payment of attorney's fees in the underlying litigation which District Judge Du ordered as a judgment. The Nevada Supreme Court has specifically held that an attorney or law firm representing itself in an action to recover fees is not entitled to recover attorney's fees under Nevada's offer of judgment protocol. *Frank Settelmeyer & Sons, Inc. v. Smith & Harmer, Ltd.*, 197 P.3d 1051, 1060-61, 124 Nev. 1206, 1220 (2008). Therefore, Leverty is not entitled to recover post-offer attorneys' fees under NRCP 68; however, it may recover its post-offer costs under Rule 68.

In Nevada, a court has discretion in determining what expenses to allow as costs. *See Bergmann v. Boyce*, 856 P.2d 560, 565-66, 109 Nev. 670, 679 (1993) (citations omitted). "[C]osts must be reasonable, necessary, and actually

incurred." [*58] *Cadle Co. v. Woods & Erickson, LLP*, 345 P.3d 1049, 1054, 131 Nev. ___(2015). A request for an award of costs must contain justifying documentation that demonstrates how the costs were necessary to and incurred in the action. *Bobby Berosini, Ltd. v. PETA*, 971 P.2d 383, 386, 114 Nev. 1348, 1352-53 (1998). This means "something more than a memorandum of costs." *Cadle*, 345 P.3d at 1054. For example, in *Cadie*, the Nevada Supreme Court said that a request for photocopying costs must be supported by documentation substantiating the reason for the copy. *Id.* (citation omitted).

Preliminarily, Leverty may not recover its legal research costs because the Nevada Supreme Court has held that computer-aided research is not a recoverable cost. *Bergmann*, 856 P.2d at 566-67.

As to the remaining costs, Leverty's initial motion only contains a ledger listing costs with no explanation as to how the costs were necessary to the action. (*See* ECF No. 97-6 at 2-3.) The supplement identifies the actual costs sought (ECF No. 117 at 14), but again, it does not contain any explanation about the costs sought. For these reasons, costs should not be allowed under NRCP 68.

## J. Request for Costs and Fees Incurred in Enforcing the Settlement Agreement Under the Agreement Itself

Leverty included an argument that it can recover fees and costs related to enforcement of the settlement agreement itself. The Nevada Supreme Court's [*59] decisions in *Dezzani, Settlemeyer* and *Sellers* preclude Leverty's recovery of attorneys' fees under the settlement agreement itself, but the court has recommended that these fees be awarded under the court's inherent power.

Leverty did not provide any explanation specifically connecting any of the requested costs to the litigation to enforce the settlement agreement, and more broadly, did not explain how

the costs sought were reasonable and necessary. Therefore, Leverty should not recover costs under the terms of the settlement agreement itself.

## III. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING IN PART AND DENYING IN PART** Leverty's motion for sanctions. Sanctions should be imposed against Exley under the court's inherent power, but not to the extent requested. Sanctions should not be imposed under Rule 11. Sanctions should not be imposed under State law under either NRCP 68 or the language of the settlement agreement itself. Leverty's request for costs should be denied. Leverty should be awarded and Exley sanctioned in the amount of: **$45,045.** Exley should be required to pay this amount within 30 days of any order adopting and accepting this Report and [*60] Recommendation.

The parties should be aware of the following:
1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.
2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: November 5, 2018.

/s/ William G. Cobb

William G. Cobb

United States Magistrate Judge

2018 U.S. Dist. LEXIS 221766, *60

**End of Document**

# EXHIBIT 16

# Loumena v. Kennedy

United States District Court for the Northern District of California, San Jose Division

October 13, 2015, Decided; October 13, 2015, Filed

Case No. 15-CV-00951-LHK

**Reporter**

2015 U.S. Dist. LEXIS 139369 *; 2015 WL 5963988

JACK LOUMENA, Plaintiff, v. PAMELA KENNEDY, et al., Defendants.

**Subsequent History:** Motion granted by, in part, Motion denied by, in part Loumena v. Kennedy, 2015 U.S. Dist. LEXIS 145125 (N.D. Cal., Oct. 23, 2015)

Affirmed by Loumena v. Kennedy, 671 Fed. Appx. 446, 2016 U.S. App. LEXIS 21126 (9th Cir. Cal., Nov. 23, 2016)

**Prior History:** Hettinga (Wylmina) & Loumena (Timothy P.), Marriage of, 2010 Cal. LEXIS 3467 (Cal., Apr. 14, 2010)

**Counsel:** **[*1]** Jack Loumena, Plaintiff, Pro se, Los Osos, CA.

For Walter P Hammon, Travis I Krepelka, Defendants: Bruce Douglas MacLeod, Willoughby Stuart & Bening, Inc., San Jose, CA.

For Jeanie O'Connor, Chicago Title Company, Defendants: Dave M. McGraw, LEAD ATTORNEY, The Law Division of Fidelity National Title Group Inc., Walnut Creek, CA.

**Judges:** LUCY H. KOH, United States District Judge.

**Opinion by:** LUCY H. KOH

# Opinion

## ORDER GRANTING MOTIONS TO DISMISS, GRANTING TITLE CO.'S MOTION FOR SANCTIONS, DENYING PLAINTIFF'S

## MOTION FOR SANCTIONS, AND DECLARING PLAINTIFF A VEXATIOUS LITIGANT

Re: Dkt. Nos. 21, 29, 30, 33

Before the Court is: (1) a Motion to Dismiss filed by Defendants Walter P. Hammon ("Hammon") and Travis I. Krepelka ("Krepelka"), ECF No. 21; (2) a Motion to Dismiss and to Declare Plaintiff Jack Loumena ("Plaintiff") a Vexatious Litigant filed by Defendants Chicago Title Co. and Jeanie O'Connor (collectively, "Title Co.") (with Hammon and Krepelka, "Defendants"), ECF No. 30; (3) Title Co.'s Motion for Sanctions against Plaintiff, ECF No. 29; (4) Plaintiff's Motion for Sanctions against Title Co., ECF No. 33; and (5) requests for judicial notice filed by all parties, ECF Nos. 23, 26, 30-2, 34.

Having considered the submissions **[*2]** of the parties, the relevant law, and the record in this case, the Court hereby GRANTS Defendants' Motions to Dismiss, GRANTS Title Co.'s Motion for Sanctions, DENIES Plaintiff's Motion for Sanctions, and DECLARES Plaintiff a vexatious litigant.

## I. BACKGROUND

### A. Factual Background

This case arises out of the state court divorce proceedings between Plaintiff's mother, Wylmina E. Hettinga ("Hettinga"), and father, Timothy Loumena ("Loumena"). The state divorce case has

been ongoing since 2005. ECF No. 23 (Hammon's and Krepelka's Request for Judicial Notice, "HK RJN") Ex. E ("Aug. 25, 2014 Order"); ECF No. 30 (Title Co.'s Request for Judicial Notice, "Title RJN") Ex. H (same).

The instant complaint alleges facts and a cause of action nearly identical to a previous case brought by Plaintiff against the same defendants. *See* HK RJN Ex. I (Complaint in *Loumena v. Kennedy, et al. ("Kennedy I")*, No. 14-CV-04165-LHK, or "*Kennedy I* Compl."); Title RJN Ex. M (same). As in *Kennedy I*, Plaintiff's complaint here alleges one cause of action: a violation of Plaintiff's civil rights under 42 U.S.C. § 1983. ECF No. 1 ("Compl."); *see also Kennedy I* Compl. Also as in *Kennedy I*, Plaintiff's complaint alleges that Defendants **[*3]** acted under the color of law to deprive Plaintiff of his property in violation of his Fourth, Fifth, and Fourteenth Amendment rights.[1] Compl. ¶¶ 32-36; *see also Kennedy I* Compl. ¶¶ 25-30. The instant complaint additionally alleges that Defendants deprived Plaintiff of his property in violation of federal tax laws. Compl. ¶ 36 (citing 26 U.S. C. §§ 7206(1),(5)(A)).

The factual allegations in the instant complaint mirror the allegations in *Kennedy I*. Plaintiff's complaint arises out of the state-court-ordered sale of the Hettinga-Loumena **[*4]** family home ("the Property"). Compl. ¶ 11; HK RJN Ex. A ("The

family residence located at 21251 Almaden Road, San Jose, CA is treated as community property."); Title RJN Ex. A (same). Plaintiff, who is *pro se*, alleges that Defendants acted under the color of law and in an "agency relationship" to transfer the Property to Loumena, who then sold the Property to third parties. Compl. ¶¶ 14, 21, 25; *see also Kennedy I* Compl. ¶¶ 17-18, 21. According to the complaint, the Property was sold to third party bidders even though Pacific Almaden Investments, LLC ("PAI") was the highest bidder. *Id.* ¶ 26.

PAI "is a limited liability corporation which was originally owned, at least on paper, by . . . Timothy Tibbott. Mr. Tibbott was the former live in boyfriend of [Hettinga]." Aug. 25, 2014 Order at 5. PAI also appears to involve Hettinga's brother, Joel Hettinga. *Id.* at 4. From 2010 to 2012, Hettinga attempted to transfer her interest in the Property to PAI by executing quitclaim deeds signed only by herself or her brother and not by Loumena. *Id.* at 4. The state court found that "the transfers executed by [Hettinga] in her attempts to transfer title to the former family residence violated the Automatic Temporary **[*5]** Restraining Orders" under Family Code § 2040. *Id.* at 6. The transfers were also in violation of Hettinga's fiduciary duty to Loumena. *Id.* at 7. Accordingly, the state court found "that the series of deeds . . . were void and of no force and effect." *Id.* at 12.

Documents from the state court divorce case—the same documents before this Court in *Kennedy I*—reveal that the state court repeatedly ordered the Property to be sold, with the proceeds to be placed in a trust account. In an order filed January 23, 2013, the state court wrote:

> This Court previously ordered this property sold on 1 September 2011 (order filed 28 March 2012). Under that Order, Respondent Timothy Loumena was to select the realtor, both parties were to sign any and all necessary paperwork, and the net proceeds were to be placed into an interest-bearing trust account. The Court reiterates and modifies that Order as follows:

---

[1] The complaint fails to claim a violation of Plaintiff's Fourteenth Amendment rights, although Plaintiff cites the Fourteenth Amendment in Plaintiff's briefs. *See* Compl. ¶¶ 32-34; ECF No. 25 ("Opp."). However, Plaintiff clearly intends to state a claim against a state official. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 764, 130 S. Ct. 3020, 177 L. Ed. 2d 894 & n.12 (2010) (noting that the Fourteenth Amendment applies the Fifth Amendment's just compensation clause and the Fourth Amendment's prohibition against unreasonable searches and seizures to the states). The Court will construe the complaint as claiming a violation of Plaintiff's Fourth and Fifth Amendment rights, as applied to state actors by the Fourteenth Amendment. *See Erickson v. Pardus*, 551 U.S. 89, 94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007) (per curiam) ("A document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (internal citations omitted)).

(a) The property shall be listed and sold forthwith. The listing agent shall be the individual named on the record by Mr. Loumena—Scott Raley of Customer Service Realty. Mr. Loumena shall be the sole lister of the property.

(b) Mr. Loumena shall work with the realtor to prepare the property for sale and make decisions concerning the **[*6]** appropriate list price, what to do with offers received, and any other necessary elements of the sales process. . . . As to any documents requiring any signatures from Ms. Hettinga, . . . Mr. Loumena shall provide them, and those parties shall promptly sign and return the documents to Mr. Loumena. If three (3) days after presenting the documents, Mr. Loumena has not received the necessary signatures, he may bring the documents to Department 83 for the Court Clerk to sign as elisor on behalf of Ms. Hettinga, . . . .

. . . .

(c) All net sales proceeds shall be immediately placed in a blocked, interest-bearing trust account, and shall not be released in any fashion absent further Court Order.

(d) The Court expressly reserves jurisdiction over all parties' respective interests, if any, in the proceeds, which shall be determined after the sale and deposit of proceeds into a trust account.

Title RJN Ex. C at 2 ("Jan. 23, 2013 Order"); *see also* HK RJN Ex. B ("Mar. 28, 2012 Order") ("The house at 21251 Almaden Road, San Jose, CA shall be sold with Respondent charged with selecting the Real Estate Agent to facilitate the sale. . . . Net proceeds shall be placed into an interest bearing trust account. **[*7]** A court order will be required to disburse the funds from the account.").

Pursuant to the January 23, 2013 state court order, Loumena was required to have the Superior Court

Clerk, Defendant Pamela Kennedy ("Kennedy"), sign as elisor on behalf of Hettinga and PAI. *See* Compl. Ex. M (recorded Grant Deed showing transfer from PAI to Loumena, signed by Kennedy); HK RJN Ex. F (recorded Grant Deed showing transfer from Hettinga to Loumena, signed by Kennedy). The Property was then sold by Loumena to a third party. Compl. ¶ 25. The state court later found that "the sale to the third party buyers was proper, final, and in full compliance with all prior orders to sell the subject property." Aug. 25, 2014 Order at 3. The state court also divided the proceeds of the sale between Loumena and Hettinga. *Id.* at 3, 5.

These same allegations and state court orders were before this Court in *Kennedy I. See generally* HK RJN Ex. J (Order Granting Motion to Dismiss in *Kennedy I*, or "*Kennedy I* Dismissal"); Title RJN Ex. N (same). The only new allegations in the instant complaint relate to Plaintiff's claims to ownership of the Property. Plaintiff now alleges that Hettinga gifted the Property to Plaintiff in 2006. Compl. **[*8]** ¶ 14. Plaintiff also alleges that, at some later point, Hettinga transferred the Property to PAI, and, at some point, PAI's ownership transferred to Plaintiff. *Id.* ¶ 12 (alleging that Plaintiff is "the sole member of PAI"). Additionally, Plaintiff now alleges that PAI purchased the Property in a foreclosure sale. *Id.* ¶¶ 16, 19. In the August 25, 2014 Order, the state court found that "[t]he foreclosure sale did not occur . . . . PAI never acquired title by purchasing the property in a foreclosure sale." Aug. 25, 2014 Order at 12. The state court further noted, "There are no deeds transferring title by virtue of a foreclosure," leaving PAI without any interest in the Property. *Id.* at 13.

## B. Prior Litigation Involving the Hettinga-Loumena Divorce

## 1. Overview of Hettinga-Loumena Divorce Litigation

This is now the twelfth case in the U.S. District Court for the Northern District of California filed by Plaintiff, Plaintiff's company PAI, Hettinga, or Plaintiff's brother regarding the divorce proceedings of Hettinga and Loumena. *See Loumena v. Hammon, et al. ("Hammon II")*, No. 15-CV-03613-NC; *M.L. v. Nichols, et al. ("Nichols II")*, 15-CV-02303-BLF; *Hettinga v. Paliwal*, No. 15-CV-02246-BLF; *Loumena v. Nichols, [*9] et al. ("Nichols I")*, No. 15-CV-01372-BLF; *M.L. v. Barth*, No. 14-CV-05423-LHK; *Kennedy I*, No. 14-CV-04165-LHK; *Pacific Almaden Invs., LLC v. Hettinga, et al. ("PAI")*, 14-CV-01631-RMW; *Hettinga v. Loumena ("Loumena II")*, No. 13-CV-02217-RMW; *Hettinga, et al. v. Loumena, et al. ("Loumena I")*, No. 10-CV-02975-JSW; *Hettinga v. Orlando, et al.*, No. 09-CV-00253-JW; *Hettinga v. Hammon, et al.* ("*Hammon I*"), No. 09-CV-06040-JW.

Six different judges of the Northern District have heard these twelve cases. Seven of these cases have been the subject of a motion to dismiss, and all seven were dismissed for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine, including *Kennedy I. See Nichols I*, No. 15-CV-01372-BLF (dismissing case under the *Rooker-Feldman* doctrine and collecting previous cases). Two of the dismissed cases have been summarily affirmed by the U.S. Court of Appeals for the Ninth Circuit. *See PAI*, 14-CV-01631-RMW; *Orlando*, No. 09-CV-00253-JW.

The California Superior Court and the California Court of Appeal have each declared Hettinga a vexatious litigant. Aug. 25, 2014 Order at 8. The U.S. District Court for the Northern District of California has also declared Hettinga **[*10]** a vexatious litigant. *Loumena II*, No. 13-CV-02217-RMW, 2014 U.S. Dist. LEXIS 140470, 2014 WL 4955187, at *4-5 (N.D. Cal. Sept. 30, 2014). As a result, Hettinga is subject to a pre-filing review of all her future filings in the U.S. District Court for the Northern District of California. *Id.* Specifically, "[t]he Clerk of this court may not file or accept any further complaints filed by or on behalf of Wylmina

Hettinga as a named plaintiff that arise out of facts related to plaintiff's divorce case." 2014 U.S. Dist. LEXIS 140470, [WL] at *5.

## 2. Plaintiff's First Case: *Kennedy I*

Including the instant case, Plaintiff has filed four of the twelve cases in this district involving the Hettinga-Loumena divorce proceedings. Plaintiff filed his first suit, *Kennedy I*, on September 16, 2014. *Kennedy I* Dismissal at 4. As discussed above, *Kennedy I* and this case present virtually identical allegations against the same defendants. *See generally* Compl.; *Kennedy I* Compl. The instant case adds only some new allegations about Plaintiff's and PAI's ownership of the Property. *See generally* Compl.; *Kennedy I* Compl. In *Kennedy I*, as in the instant case, Plaintiff argued that the sale of the Property to a third party, the execution of the grant deed by Kennedy, and the distribution of the proceeds from the sale violate Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights. *Kennedy I* Dismissal at 8. On February **[*11]** 27, 2015, this Court dismissed *Kennedy I* for lack of subject matter jurisdiction pursuant to the *Rooker-Feldman* doctrine. *Id.* at 9.

*Kennedy I*, and the instant case, overlap substantially with two earlier suits by Hettinga. First, on May 15, 2013, Hettinga sued Loumena and Kennedy and alleged that she or PAI owned the Property and Kennedy granted the Property to Loumena in violation of Hettinga's Fourth, Fifth, and Fourteenth Amendment rights. *Loumena II*, No. 13-CV-02217-RMW. On September 30, 2014, Hettinga's suit was dismissed for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine and Hettinga was declared a vexatious litigant. *Id.* Hettinga's suit is on appeal with the Ninth Circuit. ECF No. 27 (Plaintiff's Request for Judicial Notice, or "PRJN 1") (Order of the Ninth Circuit in Case No. 14-17135 denying summary affirmance); ECF No. 34 (Plaintiff's Request for Judicial Notice, or "PRJN 2") Ex. B (same).

Second, on April 9, 2014, PAI sued Hettinga,

Loumena, Kennedy, Scott Raley ("Raley"), and O'Connor. HK RJN Ex. H (Order Granting Motion to Dismiss in *PAI*, No. 14-CV-01631-RMW, or "*PAI* Dismissal"); Title RJN Ex. L (same). Hettinga filed a cross complaint, naming PAI, Loumena, Kennedy, Raley, O'Connor, and **[*12]** Chicago Title Co as defendants. *Id.* The Court noted, "The complaint and cross-complaint allege similar facts and claims, all of which are nearly identical to the claim brought by Hettinga in an earlier case in this district against the same defendants," referring to *Loumena II. Id.* at 2. PAI and Hettinga alleged that the sale of the Property to a third party, the execution of the grant deed by Kennedy, and the distribution of the proceeds from the Property's sale were in violation of Hettinga's and PAI's Fourth, Fifth, and Fourteenth Amendment rights. *Id.* at 2-3. On October 1, 2014, the Court dismissed the complaint and cross-complaint for lack of subject matter jurisdiction under the *Rooker-Feldman. Id.* at 5. Hettinga appealed to the Ninth Circuit, which denied Hettinga in forma pauperis because "the appeal is frivolous." *PAI*, 14-CV-01631-RMW. The Ninth Circuit summarily affirmed the district court on April 16, 2015, noting that "the questions raised in this appeal are so insubstantial as to not require further argument." *Id.*

### 3. Plaintiff's Second Case: *Nichols I*

On March 25, 2015, Plaintiff filed his second suit arising out of the Hettinga-Loumena divorce proceedings, this time against Hammon and a retired Santa Clara County Superior Court Judge. *Nichols I*, **[*13]** No. 15-CV-01372-BLF. Plaintiff challenged the Superior Court Judge's January 6, 2015 refusal to hear any more requests for declaratory relief from a state court order that required Plaintiff to be in the care of Loumena and have limited contact with Hettinga. *Id.* On August 3, 2015, the Court dismissed the complaint for lack of subject matter jurisdiction pursuant to the *Rooker-Feldman* doctrine. *Id.*

Plaintiff's younger brother filed a virtually identical suit on May 21, 2015 against Hammon and the same Superior Court Judge. *Nichols II*, 15-CV-02303-BLF. Plaintiff's younger brother challenged the Superior Court Judge's January 6, 2015 refusal to hear more requests for declaratory relief from an order that barred Plaintiff's younger brother from Hettinga's custody. *Id.* This suit remains pending.

*Nichols I* and *Nichols II* follow a December 28, 2009 suit by Hettinga on behalf of herself, Plaintiff, Plaintiff's younger brother, and Hettinga's other minor children, in which Hettinga challenged the state court's limitation of her visitation rights. *Hammon I*, No. 09-CV-06040-JW. On April 1, 2010, Hettinga's case was dismissed for lack of subject matter jurisdiction pursuant to the *Rooker-Feldman* **[*14]** doctrine. *Id.*

### 4. Plaintiff's Third Case: *Hammon II*

Plaintiff filed his third case arising out of the Hettinga-Loumena divorce proceedings on August 6, 2015. *Hammon II*, No. 15-CV-03613-NC. Plaintiff sued Hammon and Krepelka for distributing Plaintiff's money from the proceeds of the sale of the Property, held in an interest-bearing trust account, to themselves and their clients and colleagues. *Id.;* ECF No. 45 (Plaintiff's Motion to Relate). Plaintiff's third case remains pending.

### C. Procedural Background

On February 27, 2015, this Court dismissed *Kennedy I* for lack of subject matter jurisdiction pursuant to the *Rooker-Feldman* doctrine. *Kennedy I* Dismissal at 9. Three days later, on March 2, 2015, Plaintiff filed the instant complaint. ECF No. 1. The complaint names the same six defendants from *Kennedy I*: Kennedy, Clerk of the Santa Clara County Superior Court; Hammon, an attorney appointed by the state court to represent Hettinga and Loumena's four minor children; Krepelka, Loumena's attorney; Raley, the court-appointed real estate listing agent; Chicago Title Co., which was involved in the sale of the Property; and Jeanie

O'Connor, who has some relationship with Chicago Title Co.[2]

Defendants Hammon and Krepelka filed a Motion to Dismiss and Request for Judicial Notice on May 22, 2015. ECF Nos. 21, 23. Plaintiff opposed the Motion to Dismiss and filed a Request for Judicial Notice on June 4, 2015. Opp.; PRJN 1. Defendants Hammon and Krepelka replied on June 11, 2015. ECF No. 31. Title Co. filed a Motion for Sanctions on June 10, 2015. ECF No. 29. That same day, Title Co. moved to dismiss the complaint and to declare Plaintiff a vexatious litigant. ECF No. 30. Additionally, Title Co. filed a Request for Judicial Notice. ECF No. 30-2. On June 18, 2015, Plaintiff opposed all of Title Co.'s motions. ECF No. 33 ("Opp.2"). Plaintiff also filed a second Request for Judicial Notice. PRJN 2. Title Co. did not reply.

## II. LEGAL STANDARDS

### A. Rule 12(b)(1) Subject Matter Jurisdiction

A defendant may move to dismiss an action for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. "The party asserting federal subject matter jurisdiction bears the burden of proving its existence." *Chandler v. State Farm Mut. Auto Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010). The party carries that burden by putting forth "the manner and degree of evidence [*16] required" by whatever stage of the litigation the case has reached. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).

### B. Rule 12(b)(6) Motion to Dismiss

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short

and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6). Rule 8(a) requires a plaintiff to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

For purposes of ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The Court, however, need not accept as true allegations contradicted by judicially noticeable facts, *see Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000), and it "may look beyond the plaintiff's complaint to matters of public record" without converting the Rule 12(b)(6) motion into a motion for summary judgment, *Shaw v. Hahn*, 56 F.3d 1128, 1129 n.1 (9th Cir. 1995). Nor must the Court "assume the truth [*17] of legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam). Mere "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

### C. Rule 11 Sanctions

"Rule 11 requires the imposition of sanctions when a motion is frivolous, legally unreasonable, or without factual foundation, or is brought for an improper purpose." *Conn v. Borjorquez*, 967 F.2d

---

[2] Summons were issued for each defendant [*15] on April 13, 2015. ECF Nos. 4-9. No proofs of service have been filed. Defendants Raley and Kennedy have not yet appeared in the case.

1418, 1420 (9th Cir. 1992). "The central purpose of Rule 11 is to deter baseless filings . . . ." *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 254 (9th Cir. 1992) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990)). An "improper purpose" is a purpose to "harass or to cause unnecessary delay or needless increase in the cost of litigation." Fed. R. Civ. P. 11(b)(1). The test for improper purpose is an objective one. *G.C. & K.B. Invs., Inc. v. Wilson*, 326 F.3d 1096, 1109 (9th Cir. 2003).

Courts also use an objective standard to address the other conditions for Rule 11 sanctions by looking to whether a reasonable basis for the challenged position existed in law and fact at the time the position was adopted. *Conn*, 967 F.2d at 1421; *see also Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 554, 111 S. Ct. 922, 112 L. Ed. 2d 1140 (1991) (establishing the "objective standard of reasonable inquiry" imposed by Rule 11). In determining whether an objectively reasonable basis exists, whether the pleader is correct in his perception of the law is not critical. *Conn*, 967 F.2d at 1421. Thus, if a court finds that a party made a reasonably arguable claim at the time of filing the complaint, the court **[*18]** should not apply Rule 11 sanctions.

## III. DISCUSSION

### A. Requests for Judicial Notice

The Court first addresses the parties' requests for judicial notice. Although a district court generally may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion, the Court may take judicial notice of documents referenced in the complaint, as well as matters in the public record, without converting a motion to dismiss into one for summary judgment. *See Lee v. City of L.A.*, 250 F.3d 668, 688-89 (9th Cir. 2001), *overruled on other grounds by Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119, 1125-26 (9th Cir.

2002). In addition, the Court may take judicial notice of matters that are either "generally known within the trial court's territorial jurisdiction" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Public records, including judgments and other court documents, are proper subjects of judicial notice. *See, e.g., United States v. Black*, 482 F.3d 1035, 1041 (9th Cir. 2007). Records filed with a county recorder are also judicially noticeable as undisputed public records. *See Disabled Rights Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861, 866 n.1 (9th Cir. 2004).

### 1. Defendants' Requests for Judicial Notice

First, in support of Hammon's and Krepelka's Motion to Dismiss, Hammon and Krepelka request judicial notice of various orders and filings by the parties, including complaints, in related state and federal court **[*19]** proceedings. *See* HK RJN. Plaintiff does not oppose Hammon's and Krepelka's request. The Court GRANTS Hammon's and Krepelka's Request for Judicial Notice, as these are filings in related state and federal court proceedings. *See Black*, 482 F.3d at 1041.

Second, Title Co. requests judicial notice in support of Title Co.'s Motion to Dismiss and to Declare Plaintiff a Vexatious Litigant. Title Co.'s Request for Judicial Notice is largely duplicative of Hammon's and Krepelka's request. *See* Title RJN Exs. A-B, G, H-J, L-N (orders and party filings in related state and federal cases). However, Title Co. requests judicial notice of additional state court orders, *id.* Exs. C-E, and Hettinga's cross-complaint in *PAI*, No. 14-CV-01631-RMW, *id.* Ex. K. Finally, Title Co. requests judicial notice of the "Vexatious Litigant List" maintained by the California Judicial Council. *Id.* Ex. F.

In response to Title Co.'s request, Plaintiff opposes only judicial notice of Exhibit A, a Superior Court order filed on January 10, 2008 that found the Property was community property. The Court notes that it granted judicial notice of this document in

response to Hammon's and Krepelka's Request for Judicial Notice, which Plaintiff did not **[\*20]** oppose. Plaintiff argues that Title Co. should have notified this Court of a state Court of Appeal remand order altering part of the Superior Court's order in Exhibit A. Opp.2 at 4. However, Title Co.'s Exhibit H included a description of the remand order. Title RJN Ex. H. Moreover, Plaintiff relies on Title Co.'s Exhibit H as evidence of the remand order. Opp.2 at 4. Further, Plaintiff does not argue that Exhibit A is an inaccurate copy of the Superior Court's ruling as issued. Additionally, the remand order appears to have almost entirely affirmed the state court order in Exhibit A. *See* Compl. Ex. L (noting the remand order affirmed that the house was community property, except for a small portion that Hettinga had separately contributed); Aug. 25, 2014 Order at 1. The Court GRANTS Title Co.'s Request for Judicial Notice, as these are filings in related state and federal court proceedings or other public records. *See Black*, 482 F.3d at 1041; *Rupert v. Bond*, No. 12-CV-05292-LHK, 2013 U.S. Dist. LEXIS 134318, 2013 WL 5289617, at *5 (N.D. Cal. Sept. 18, 2013) (granting request for judicial notice of the California Vexatious Litigant List).

## 2. Plaintiff's Requests for Judicial Notice

First, in opposition to Hammon's and Krepelka's Motion to Dismiss, Plaintiff requests judicial notice of an **[\*21]** order filed in Ninth Circuit Case No. 14-17135, two exhibits submitted in the same Ninth Circuit case, and an excerpt from a Memorandum of Points and Authorities in an unnamed case. PRJN 1. Plaintiff also requests notice of an affidavit filed by Hettinga. *Id.* Defendants Hammon and Krepelka oppose Plaintiff's Request for Judicial Notice. ECF No. 31.

The Court GRANTS judicial notice of the order filed by the Ninth Circuit in Case No. 14-17135, as it is a filing in a related court proceeding. *See Black*, 482 F.3d at 1041. However, the Court DENIES judicial notice of the two exhibits submitted in the Ninth Circuit case and the

memorandum. For each of these three documents, Plaintiff submitted only a single page from an apparently longer document. Each page fails to identify the document of which it is part and the document's authorship. Moreover, Plaintiff fails to explain the relevance of these out-of-context pages. The Court finds these documents are not sources whose accuracy cannot reasonably be questioned and that they are not relevant to an issue presented. *See* Fed. R. Evid. 201(b); *Flick v. Liberty Mut. Fire Inc. Co.*, 205 F.3d 386, 392 n.7 (9th Cir. 2000). Further, the Court DENIES Plaintiff's request for judicial notice of Hettinga's affidavit. This document includes hearsay and statements about **[\*22]** documents that are not attached. Moreover, Hettinga has an interest in the outcome of this action. As a result, the Court finds Hettinga's affidavit is not a source whose accuracy cannot be reasonably be questioned. *See* Fed. R. Evid. 201(b).

Second, Plaintiff filed a Request for Judicial Notice in opposition to Title Co.'s Motion to Dismiss and to Declare Plaintiff a Vexatious Litigant. Plaintiff again requests notice of the Ninth Circuit's order in Ninth Circuit Case No. 14-17135, *see* PRJN 2 Ex. B, which the Court GRANTS for the reason stated above. Plaintiff also requests notice of excerpts from a reply brief and a memorandum filed in other cases, a declaration by PAI lawyer Michael Stone ("Stone") filed in a state court case, a letter sent to PAI by Loumena, and a grant deed executed by Chicago Title Co. PRJN 2 Exs. A, C-F. Title Co. does not oppose Plaintiff's Request for Judicial Notice.

The Court GRANTS judicial notice of the grant deed, as it is a public record. *See Black*, 482 F.3d at 1041. The Court DENIES the remainder of Plaintiff's request, as the documents are not sources whose accuracy cannot reasonably be questioned. *See* Fed. R. Evid. 201(b). The brief and memoranda are out-of-context one-page excerpts from longer documents, without **[\*23]** any identifying information. The Stone Declaration includes hearsay and statements about documents that are not attached. Further, PAI has an interest in the

outcome of this action and thus is not a source whose accuracy cannot reasonably be questioned. Finally, the Loumena letter is not notarized or authenticated in any way.

## B. Motions to Dismiss

All defendants move to dismiss on two grounds: (1) no defendant is a state actor; and (2) the Court lacks subject matter jurisdiction over the case pursuant to the *Rooker-Feldman* doctrine. Additionally, Title Co. asserts that Plaintiff lacks standing. Because the Court finds that it lacks subject matter jurisdiction under the *Rooker-Feldman* doctrine, the Court need not address Defendants' other arguments.

Under the *Rooker-Feldman* doctrine, a federal district court has no authority to review the final determinations of a state court in judicial proceedings. *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476, 103 S. Ct. 1303, 75 L. Ed. 2d 206 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16, 44 S. Ct. 149, 68 L. Ed. 362 (1923). "The purpose of the doctrine is to protect state judgments from collateral federal attack. Because district courts lack power to hear direct appeals from state court decisions, they must decline jurisdiction whenever they are 'in essence called upon to review the state court decision.'" **[*24]** *Doe & Assocs. Law Offices v. Napolitano*, 252 F.3d 1026, 1030 (9th Cir. 2001) (quoting *Feldman*, 460 U.S. at 482 n.16). The *Rooker-Feldman* doctrine precludes not only review of decisions of the state's highest court, but also those of its lower courts. *See Dubinka v. Judges of Superior Court*, 23 F.3d 218, 221 (9th Cir. 1994). A challenge under the *Rooker-Feldman* doctrine is a challenge for lack of subject matter jurisdiction. *Olson Farms, Inc. v. Barbosa*, 134 F.3d 933, 937 (9th Cir. 1998).

The *Rooker-Feldman* doctrine applies when a plaintiff in federal court alleges a "de facto appeal" by (1) asserting errors by the state court as an injury, and (2) seeking relief from the state court

judgment as a remedy. *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1139-40 (9th Cir. 2004). "A federal action constitutes such a de facto appeal where 'claims raised in the federal court action are 'inextricably intertwined' with the state court's decision such that the adjudication of the federal claims would undercut the state ruling or require the district court to interpret the application of state laws or procedural rules.'" *Reusser v. Wachovia Bank, N.A.*, 525 F.3d 855, 859 (9th Cir. 2008) (quoting *Bianchi v. Rylaarsdam*, 334 F.3d 895, 898 (9th Cir. 2003)).

In this case, Plaintiff brings a § 1983 claim based on the state court's alleged violation of federal tax laws and Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights in ordering and executing the sale of the family property. Compl. ¶¶ 32-36. Plaintiff seeks relief in the form of monetary damages and an injunction barring Defendant Kennedy from being a Court Clerk of any court in the United States. **[*25]** *Id.* ¶¶ 37-38.

As in *Kennedy I*, Plaintiff appears to challenge (1) the state court's order to sell the Property, (2) the execution of the sale of the Property to third-party buyers, and (3) the distribution of the proceeds from the sale. As before, the Court finds all three challenges barred by the *Rooker-Feldman* doctrine. Plaintiff also challenges the "seizure" of PAI's interest in the Property. This challenge is also barred by the *Rooker-Feldman* doctrine.

First, to the extent that Plaintiff is challenging the sale of the Property, that would constitute a collateral attack on the state court's order directing the property to be sold. The state court ordered, "The house at 21251 Almaden Road, San Jose, CA shall be sold with [Loumena] charged with selecting the Real Estate Agent to facilitate the sale." Mar. 28, 2012 Order. The state court also ordered, "The property shall be listed and sold forthwith. The listing agent shall be the individual named on the record by Mr. Loumena—Scott Raley of Customer Service Realty." Jan. 23, 2013 Order. In order to review the propriety of the sale of the

Property, this Court would have to review the state court's March 28, 2012 and January 23, 2013 Orders. **[*26]** However, "when a losing plaintiff in state court brings a suit in federal district court asserting as legal wrongs the allegedly erroneous legal rulings of the state court and seeks to vacate or set aside the judgment of that court, the federal suit is a forbidden de facto appeal." *Noel v. Hall*, 341 F.3d 1148, 1156 (9th Cir. 2003). This is exactly the case here, where Plaintiff, arguably "losing" in state court, asserts that the orders to sell the Property violated his Constitutional rights. Compl. ¶ 36. The case is "a forbidden de facto appeal." *Noel*, 341 F.3d at 1156.

Second, Plaintiff challenges the execution of the sale on the grounds that the Property was sold to third party buyers instead of PAI and the sale documents were improperly signed by Kennedy. The state court expressly ruled that "the sale to the third party buyers was proper, final, and in full compliance with all prior orders to sell the subject property." Aug. 25, 2014 Order at 3. Additionally, the state court noted that "the Court ordered that the Clerk of the Court would be authorized to sign documents required to complete the sale in the event that [Hettinga] refused to sign the required documents." *Id.; see also* Jan. 23, 2013 Order (setting out procedure for the Court Clerk to sign **[*27]** sale documents). Given the state court's express ruling approving the sale to third party buyers, this Court cannot review whether PAI was a higher bidder or whether the Court Clerk should have signed the documents. Such a review is forbidden by the *Rooker-Feldman* doctrine. "A federal action constitutes such a *de facto* appeal where claims raised in the federal court action are inextricably intertwined with the state court's decision such that the adjudication of the federal claims would undercut the state ruling or require the district court to interpret the application of state laws or procedural rules." *Reusser*, 525 F.3d at 859 (citation omitted). "Where the district court must hold that the state court was wrong in order to find in favor of the plaintiff, the issues presented to both courts are inextricably intertwined" and the action

is properly dismissed under the *Rooker-Feldman* doctrine. *Doe & Assocs.*, 252 F.3d at 1030.

Third, to the extent that Plaintiff challenges the distribution of the proceeds from the sale, that is a challenge to the state court's order requiring that the funds be placed in a trust and distributed at the court's direction. "The *Rooker-Feldman* doctrine, generally speaking, bars a plaintiff from bringing a § 1983 suit **[*28]** to remedy an injury inflicted by the state court's decision." *Jensen v. Foley*, 295 F.3d 745, 747 (7th Cir. 2002); *see also Rhodes v. Gordon*, No. CV 12-2863-JGB(DTB), 2013 U.S. Dist. LEXIS 100813, 2013 WL 3780378, at *10 (C.D. Cal. July 16, 2013) ("A plaintiff may not avoid the *Rooker-Feldman* bar by styling his attack on the state court's ruling as a civil rights action." (citing *Branson v. Nott*, 62 F.3d 287, 291 (9th Cir. 1995))). The state court divided the proceeds of the sale between Loumena and Hettinga, and directed that Loumena's attorney distribute the funds only in accordance with the state court's order. Aug. 25, 2014 Order at 3, 22. Thus, this Court cannot review the state court's distribution of funds. *See Reusser*, 525 F.3d at 859.

Finally, Plaintiff challenges the seizure of PAI's interest in the Property. Plaintiff claims that, at some point prior to the sale to third party buyers, PAI purchased the Property in a non-judicial foreclosure. Compl. ¶ 16. However, the state court ruled that, "The foreclosure sale did not occur . . . PAI never acquired title by purchasing the property in a foreclosure sale." Aug. 25, 2014 Order at 12. The state court further noted, "There are no deeds transferring title by virtue of a foreclosure." *Id.* at 13. This Court cannot review PAI's alleged ownership without reviewing the state court's August 25, 2014 Order. District courts "must decline jurisdiction whenever **[*29]** they are 'in essence called upon to review the state court decision.'" *Doe & Assocs.*, 252 F.3d at 1030. Thus, this Court cannot review PAI's ownership through the foreclosure sale.

Plaintiff argues that the *Rooker-Feldman* doctrine

does not apply for three reasons. First, Plaintiff contends that he was not a party in the state court proceedings and that PAI was not notified of any state court proceedings. Opp. at 7; Opp.2 at 3. Plaintiff relies on *Lance v. Dennis*, 546 U.S. 459, 461, 126 S. Ct. 1198, 163 L. Ed. 2d 1059 (2006) (per curiam), in which several citizens challenged a Colorado Supreme Court decision requiring Colorado to use a court-ordered congressional redistricting plan. The district court found that the *Rooker-Feldman* doctrine barred the citizens' federal challenge because the citizens were in privity with the Colorado General Assembly, who was the plaintiff before the Colorado Supreme Court. *Id.* at 462. The U.S. Supreme Court reversed, holding that the federal plaintiffs' claims were not barred because the federal plaintiffs had not been "in a position to ask this Court to review the state court's judgment." *Id.* at 465.

*Lance* bears little relation to this case. Here, Plaintiff was represented in the state court proceedings by a court-appointed attorney. *See, e.g.*, HK RJN Ex. C (listing Defendant Hammon [*30] as Plaintiff's attorney). Plaintiff does not argue—and there is no indication in the record—that his attorney was unable to participate in the state court proceedings or to challenge the state court orders. *See* Mar. 28, 2012 Order (noting Hammon was present at hearing); *see also Lance*, 546 U.S. at 465. Additionally, Plaintiff claims ownership of the Property through his ownership of PAI, and seeks to restore *PAI's* interest in the Property. PAI was joined to the state court divorce action in August 2012. Aug. 25, 2014 Order at 6. Although Plaintiff asserts that PAI was not notified, the state court found that "PAI was properly joined" in the state court proceeding and that PAI failed to appear for a hearing "even though they were noticed for it." *Id.* at 17-18. In fact, PAI appealed the January 23, 2013 Order directing that the Property be sold and the proceeds placed into a trust account. *See id.* at 22. To the extent that Plaintiff disputes PAI's joinder in the state court action, that is a challenge to the state court's August 25, 2014 Order and is barred by the *Rooker-*

*Feldman* doctrine. *See Noel*, 341 F.3d at 1156.

Second, Plaintiff argues that the *Rooker-Feldman* doctrine applies only to federal cases brought "after the state proceedings ended," while [*31] Plaintiff originally filed a federal lawsuit on September 16, 2014. Opp. at 7. Although Plaintiff's argument is not clear, the Court believes Plaintiff is pointing out that the *Rooker-Feldman* doctrine does not bar parallel state and federal proceedings. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 291, 125 S. Ct. 1517, 161 L. Ed. 2d 454 (2005) (noting that in *Rooker* and *Feldman*, "the losing party in state court filed suit in federal court after the state proceedings ended"). However, Plaintiff points to no parallel state and federal proceedings. The state court orders essentially challenged by Plaintiff here are final court orders issued before Plaintiff filed this proceeding on March 2, 2015. ECF No. 1.

Third, Plaintiff contends that this Court has jurisdiction over any lawsuit between Plaintiff and the IRS over a tax form that the IRS may issue for the sale of the Property. Opp. at 6. Plaintiff fails to explain why an IRS action would affect the application of the *Rooker-Feldman* doctrine to this case. Moreover, Plaintiff does not allege the IRS has actually issued any tax forms or taken any action regarding the Property.

Accordingly, Plaintiff's § 1983 claim is a challenge to the final order of a state court. Such a claim is barred by the *Rooker-Feldman* doctrine, and the Court thus GRANTS Defendants' [*32] motions to dismiss without prejudice for lack of subject matter jurisdiction. *See Freeman v. Oakland Unified Sch. Dist.*, 179 F.3d 846, 847 (9th Cir. 1999) (noting that dismissal for lack of subject matter jurisdiction should be without prejudice).

## C. Motion for Sanctions

Title Co. asks for Rule 11 sanctions against Plaintiff in the amount of $10,000. ECF No. 29. Title Co. contends that Plaintiff's complaint is

meritless and duplicative of previous suits, and was filed to harass Title Co. ECF No. 29-1. In response, Plaintiff requests sanctions against Title Co.'s attorney in the amount of $102,000, based on alleged inconsistency in Title Co.'s representations to the Court about PAI's ownership. Opp.2 at 2-3. The Court addresses the two motions in turn.

## 1. Title Co.'s Request for Sanctions

"The key question in assessing frivolousness is whether a complaint states an arguable claim . . . ." *Conn*, 967 F.2d at 1421; *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990) (en banc) (noting a pleading is frivolous if it is "both baseless and made without a reasonable and competent inquiry"). For the reasons stated below, the Court concludes the instant complaint is frivolous.

This is essentially the fourth time a district court in the Northern District of California has heard this claim, and the fourth time that this claim is being dismissed for **[*33]** lack of subject matter jurisdiction. The sale of the Property was first addressed in *Loumena II*, filed on May 15, 2013. No. 13-CV-02217-RMW. Hettinga sued Loumena and Kennedy for transferring the Property to Loumena and accused Kennedy of improperly signing the grant deed. *Id.* U.S. District Judge Ronald Whyte dismissed *Loumena II* for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine on September 30, 2014. *Id.* Appeal is pending before the Ninth Circuit.

Judge Whyte next addressed the disposition of the Property when PAI sued Hettinga, Loumena, Kennedy, Raley, and O'Connor on April 9, 2014. *See PAI* Dismissal. Hettinga filed a cross complaint, naming PAI, Loumena, Kennedy, Raley, O'Connor, and Chicago Title Co as defendants. *Id.* Judge Whyte noted, "The complaint and cross-complaint allege similar facts and claims, all of which are nearly identical to the claim brought by Hettinga in an earlier case in this district against the same defendants," referring to *Loumena II. Id.* at 2.

PAI and Hettinga alleged that the sale of the Property to a third party, the execution of the grant deed by Kennedy, and the distribution of the proceeds from the sale violated Hettinga's and PAI's Fourth, Fifth, and Fourteenth Amendment rights. **[*34]** *Id.* at 2-3. Judge Whyte found that the complaint and cross-complaint were barred by the *Rooker-Feldman* doctrine and dismissed the case on October 1, 2014. *Id.* at 5. Hettinga appealed to the Ninth Circuit, which denied Hettinga in forma pauperis status because "the appeal is frivolous." *PAI*, 14-CV-01631-RMW. The Ninth Circuit summarily affirmed the district court on April 16, 2015, noting that "the questions raised in this appeal are so insubstantial as to not require further argument." *Id.*

On September 16, 2014, Plaintiff filed *Kennedy I. Kennedy I* Dismissal at 4. Plaintiff also claimed that the sale of the Property to a third party, the execution of the grant deed by Kennedy, and the distribution of the proceeds from the sale were in violation of Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights. *Id.* at 8. On February 27, 2015, like Judge Whyte in *Loumena II* and *PAI*, this Court dismissed *Kennedy I* for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine. *Id.* at 9.

Despite the rulings in *Loumena II, PAI*, and *Kennedy I*, Plaintiff filed the instant complaint just three days after the dismissal of *Kennedy I*. ECF No. 1. As explained above, this suit mirrors *Kennedy I*. There are very few new allegations in the instant complaint, none of which substantively alter **[*35]** Plaintiff's *Kennedy I* allegations about Defendants' conduct in selling the Property. The instant case raises the same challenges to the sale of the Property, the execution of the grant deed, and the distribution of the proceeds that this Court considered in *Kennedy I*. Moreover, the new allegations Plaintiff did make about Plaintiff's and PAI's ownership of the Property were squarely contradicted by the state court. Plaintiff alleged that PAI purchased the Property in a foreclosure sale, *see* Compl. ¶¶ 16, 19, but the state court's August

25, 2014 Order expressly ruled that "[t]he foreclosure sale did not occur . . . PAI never acquired title by purchasing the property in a foreclosure sale." Aug. 25, 2014 Order at 12. Plaintiff was well aware of the state court's August 25, 2014 Order, as the Court discussed this same state court order when applying the *Rooker-Feldman* doctrine in *Kennedy I. See Kennedy I* Dismissal at 9. When filing the instant complaint, Plaintiff had no "arguable claim" that the *Rooker-Feldman* doctrine would not also apply to bar the Court's consideration of the instant complaint. *See Conn*, 967 F.2d at 1421.

The Court recognizes that "[w]hat is objectively reasonable for a *pro* se litigant and for an attorney may not be the **[*36]** same." *Rupert*, 2013 U.S. Dist. LEXIS 134318, 2013 WL 5289617, at *4. However, it is inescapable that a reasonably competent litigant would not, in good faith, file a complaint based on the same facts and claims that the U.S. District Court for the Northern District of California has already rejected three times. *See Conn*, 967 F.2d at 1421. Plaintiff knew that this Court dismissed *Kennedy I*, a virtually identical complaint, just three days before the instant case was filed. As discussed above, Plaintiff made no changes to the complaint that would lead an objectively reasonable person to believe the instant complaint warranted a different result than *Kennedy I*.

Further, the Court recently dismissed substantially similar suits by Plaintiff's mother and Plaintiff's company PAI. Although the record does not reflect when PAI's ownership transferred to Plaintiff, Plaintiff is now the "sole member" of PAI, *see* Compl. ¶ 12, and likely was aware of PAI's lawsuit and the lawsuit's dismissal under the *Rooker-Feldman* doctrine. Moreover, Plaintiff shares Hettinga's phone and fax numbers, and *Kennedy I* listed Plaintiff's email as wylmina@live.com. *See* ECF No. 29-2 (Declaration of Dave M. McGraw). It strains credulity that Plaintiff was not aware of Hettinga's lawsuit or the lawsuit's **[*37]** dismissal, also under the *Rooker-Feldman* doctrine. Plaintiff

certainly would have been aware of the lawsuits—and the lack of legal foundation for the instant case—with a reasonably competent investigation. *See Conn*, 967 F.2d at 1421. Plaintiff's complaint warrants sanctions because it is "clearly frivolous," "legally unreasonable or without legal foundation," and was brought without a reasonably competent inquiry into the claim's merits. *See Operating Eng'rs Pension Trust v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988).

Additionally, it appears that this complaint was brought for the improper purpose of harassing Defendants. *See G.C. & K.B. Invs., Inc.*, 326 F.3d at 1110 ("[W]ithout question, successive complaints based upon propositions of law previously rejected may constitute harassment under Rule 11."). As discussed, Plaintiff brought successive complaints "based on propositions of law clearly rejected by the Court." *See id.* Plaintiff filed the instant case just three days after the dismissal of *Kennedy I* and "failed to allege anything other than the same argument repeatedly rejected by this Court." *See id.* Defendants have been forced to respond to virtually the same frivolous complaint four different times in five years. *See id.* (affirming grant of sanctions based on improper purpose when party filed four motions based on the same rejected **[*38]** argument). Moreover, the similarities of the complaints filed by Plaintiff and Hettinga, as well as Plaintiff's and Hettinga's shared contact information, suggest to the Court that Hettinga may be attempting to circumvent the three orders declaring her a vexatious litigant by filing suits through Plaintiff. *See Loumena II*, 2014 U.S. Dist. LEXIS 140470, 2014 WL 4955187, at *4-5 (declaring Hettinga a vexatious litigant); Aug. 25, 2014 Order (noting Hettinga was declared a vexatious litigant in the California Superior Court and the California Court of Appeal). The Court concludes that Plaintiff's successive baseless filings constitute harassment. *See id.* (affirming that successive motions were both frivolous and harassing when the motions relied upon law rejected by the court).

The Court desires to deter Plaintiff from repeated "baseless filings" and harassment of Defendants. *Townsend*, 929 F.2d at 1362. However, the Court recognizes that Plaintiff is *pro se*. Accordingly, the Court GRANTS Title Co.'s Motion for Sanctions in the amount of $300. Plaintiff must pay the penalty to Title Co. within thirty (30) days of the filing of this order. The Court cautions Plaintiff that filing another complaint based on these same facts and claims may result in greater sanctions.

## 2. Plaintiff's [*39] Request for Sanctions

Plaintiff requests $102,000 in sanctions against Title Co.'s attorney because "Defendants previously fraudulently claimed that prior lawsuits brought by [PAI] were in fact lawsuits brought by Wylmina E Hettinga" and Defendants "fraudulently" switched ownership of PAI between Hettinga and Plaintiff. Opp.2 at 2-3. However, the local rules of this Court require that all motions for sanctions be separately filed. Civ. L.R. 7-8(a). Plaintiff's request for sanctions, included within Plaintiff's opposition to Title Co.'s Motion to Dismiss, does not comply with this requirement. *See Haar v. City of Mountain View*, No. 10-CV-02995, 2010 U.S. Dist. LEXIS 120508, 2010 WL 4919478, at *4 (N.D. Cal. Nov. 12, 2010) (denying motion for sanctions because it was not separately filed).

Moreover, Plaintiff makes no substantive argument as to why the actions of Title Co.'s attorney warrant sanctions. To support Plaintiff's motion for sanctions, Plaintiff cites a memorandum of which the Court declined to take judicial notice. The memorandum is an unlabeled one-page excerpt of a longer document without any identifying information. However, even if the Court took notice of this memorandum, which includes one instance in which Title Co. referred to PAI as Hettinga's company, the memorandum does not demonstrate that Title **[*40]** Co. fraudulently misrepresented PAI's ownership to the Court. Nor does the memorandum demonstrate that Title Co. has in any way made a frivolous filing or filed a

motion for an improper purpose. *See* Fed. R. Civ. P. 11(b). There is simply no evidence in the record supporting a sanctions award against Title Co. Plaintiff's motion is frivolous. Accordingly, the Court DENIES Plaintiff's request for sanctions.

## D. Motion to Declare Plaintiff a Vexatious Litigant

District courts have the inherent power under the All Writs Act to declare a party a vexatious litigant and impose upon him appropriate pre-filing restrictions. *See Ringgold-Lockhart v. Cnty. of L.A.*, 761 F.3d 1057, 1061 (9th Cir. 2014) (citing 28 U.S.C. § 1651(a)). "Out of regard for the constitutional underpinnings of the right to court access, 'pre-filing orders should rarely be filed.'" *Id.* at 1062 (quoting *De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990)). "Nevertheless, 'flagrant abuse of the judicial process cannot be tolerated because it enables one person to preempt the use of judicial time that properly could be used to consider the meritorious claims of other litigants.'" *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1057 (9th Cir. 2007) (brackets omitted) (quoting *De Long*, 912 F.2d at 1148) .

"When district courts seek to impose pre-filing restrictions, they must: (1) give litigants notice and 'an opportunity to oppose the order before it [is] entered'; (2) compile an adequate **[*41]** record for appellate review, including 'a listing of all the cases and motions that led the district court to conclude that a vexatious litigant order was needed'; (3) make substantive findings of frivolousness or harassment; and (4) tailor the order narrowly so as 'to closely fit the specific vice encountered.'" *Ringgold-Lockhart*, 761 F.3d at 1062 (alteration in original) (quoting *De Long*, 912 F.2d at 1147-48). "The first and second of these requirements are procedural, while the latter two factors are substantive considerations that help the district court define who is, in fact, a vexatious litigant and construct a remedy that will stop the litigant's abusive behavior while not unduly infringing the

litigant's right to access the courts." *Id.* (alterations omitted). The Court addresses each requirement in turn.

## 1. Adequate Notice

As to the first factor, "[t]he requirement that the plaintiff receive an opportunity to be heard does not require an oral hearing; 'the opportunity to brief the issue fully satisfies due process requirements.'" *See Reddy v. MedQuist, Inc.*, No. CV 12-01324 PSG, 2012 U.S. Dist. LEXIS 171421, 2012 WL 6020010, at *3 (N.D. Cal. Dec. 3, 2012) (quoting *Molski*, 500 F.3d at 1059). Here, Plaintiff filed written opposition to the motion to declare him a vexatious litigant. Opp.2. Accordingly, Plaintiff had adequate notice and opportunity to oppose **[*42]** this order. *See Molski*, 500 F.3d at 1058 (finding adequate notice when the court's order was prompted by defendants' motion and served on plaintiff's counsel).

## 2. Record for Review

Under the second factor, the Court must compile an adequate record for review, including "a listing of all the cases and motions that led the district court to conclude that a vexatious order was needed." *De Long*, 912 F.2d at 1147. The Court has already detailed Plaintiff's prior lawsuits, as well as the lawsuits filed by Plaintiff's company PAI, Hettinga, and Plaintiff's brother. To complete the record, however, the Court will briefly summarize Plaintiff's litigation history.

Plaintiff has filed four lawsuits arising out of the Hettinga-Loumena divorce proceedings, including the instant case. *Hammon II*, No. 15-CV-03613-NC; *Nichols I*, No. 15-CV-01372-BLF; *Kennedy I*, No. 14-CV-04165-LHK. Plaintiff's first suit, *Kennedy I*, presented virtually identical allegations against the same defendants as the instant case. *See generally* Compl.; *Kennedy I* Compl. The instant case adds only some new allegations about Plaintiff's and PAI's ownership of the Property. *See*

*generally* Compl.; *Kennedy I* Compl. *Kennedy I* and the instant case raise the same claim that the sale of **[*43]** the Property to a third party, the execution of the grant deed by Kennedy, and the distribution of the proceeds from the sale violate Plaintiff's Fourth, Fifth, and Fourteenth Amendment rights. *Kennedy I* Dismissal at 8. *Kennedy I*, like the instant case, was dismissed for lack of subject matter jurisdiction. *Id.* at 9. Moreover, Plaintiff filed the instant case three days after this Court dismissed *Kennedy I*.

*Kennedy I*, and the instant case, followed similar suits filed by Plaintiff's company PAI and Hettinga. In *Loumena II*, Hettinga sued Loumena and Kennedy and alleged that she or PAI owned the Property and that Kennedy granted the Property to Loumena in violation of Hettinga's Fourth, Fifth, and Fourteenth Amendment rights. *Loumena II*, No. 13-CV-02217-RMW. In *PAI*, PAI sued Hettinga, Loumena, Kennedy, Raley, and O'Connor while Hettinga filed a cross-complaint against PAI, Loumena, Kennedy, Raley, O'Connor, and Chicago Title Co. *PAI Dismissal*. The Court in *PAI* found that the "complaint and cross-complaint allege similar facts and claims, all of which are nearly identical to the claim brought by Hettinga in an earlier case in this district against the same defendants," referring to *Loumena II. Id.* at 2. Both *Loumena II* and *PAI* were dismissed for lack of subject matter jurisdiction under the *Rooker-Feldman* **[*44]** doctrine in 2014. As discussed in detail above, this Court examined this litigation history and concluded that the instant complaint was frivolous, harassing, and warrants sanctions. *See supra* Part III.C.1.

Plaintiff's second suit in this district challenged a Superior Court Judge's January 6, 2015 refusal to hear any more requests for declaratory relief from a state court order requiring Plaintiff to be in the care of Loumena and have limited contact with Hettinga. *Nichols I*, No. 15-CV-01372-BLF. Like *Kennedy I*, Plaintiff's second suit was dismissed for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine. Further, like *Kennedy I*,

Case 8:18-ap-01168-SC    Doc 347    Filed 08/19/21    Entered 08/19/21 21:07:48    Desc
Main Document        Page 176 of 242
2015 U.S. Dist. LEXIS 139369, *44

Page 16 of 19

Plaintiff's second suit overlaps substantially with other lawsuits filed by Plaintiff's family members. Plaintiff's younger brother filed a virtually identical suit challenging the same Superior Court Judge's January 6, 2015 refusal to hear more requests for declaratory relief from an order barring Plaintiff's younger brother from Hettinga's custody. *Nichols II*, 15-CV-02303-BLF. Additionally, Hettinga filed a lawsuit on behalf of herself, Plaintiff, Plaintiff's younger brother, and Hettinga's other minor children challenging the state court's **[*45]** limitation of Hettinga's visitation rights. *Hammon I*, No. 09-CV-06040-JW. Although Plaintiff's brother's suit remains pending, Hettinga's suit was dismissed for lack of subject matter jurisdiction on December 28, 2009.

Plaintiff filed his third case arising out of the Hettinga-Loumena divorce proceedings on August 6, 2015. *Hammon II*, No. 15-CV-03613-NC. Plaintiff sued Hammon and Krepelka—both defendants in the instant case—over the distribution of Plaintiff's money from the proceeds of the sale of the Property. *Id.*; ECF No. 45 (Plaintiff's Motion to Relate). Plaintiff's third case remains pending.

Thus, Plaintiff, Plaintiff's company PAI, Hettinga, and Plaintiff's brother have filed eight substantially overlapping lawsuits in this district. Plaintiff's mother and brother have filed an additional four lawsuits arising out of the Hettinga-Loumena divorce proceedings. *See Paliwal*, No. 15-CV-02246-BLF; *Barth*, No. 14-CV-05423-LHK; *Loumena I*, No. 10-CV-02975-JSW; *Orlando*, No. 09-CV-00253-JW. Of the twelve total cases in this district arising from the Hettinga-Loumena divorce proceedings, eight cases, now including this one, have faced a motion to dismiss. All eight have been dismissed for **[*46]** lack of subject matter jurisdiction. *See Nichols I*, No. 15-CV-01372-BLF (collecting cases). Two of the dismissed cases have been summarily affirmed by the Ninth Circuit. *PAI*, 14-CV-01631-RMW; *Orlando*, No. 09-CV-00253-JW; *see also Loumena II*, No. 13-CV-02217-RMW (appeal pending).

Additionally, Hettinga has been declared a vexatious litigant in this district and in the state Superior Court and the state Court of Appeal. *See Loumena II*, 2014 U.S. Dist. LEXIS 140470, 2014 WL 4955187, at *4-5 (declaring Hettinga a vexatious litigant); Aug. 25, 2014 Order at 8. This record, the Court concludes, is adequate for review. *See Sepehry-Fard v. Select Portfolio Servicing, Inc., et al.*, No. 14-CV-05142-LHK, 2015 U.S. Dist. LEXIS 29989, 2015 WL 1063070, at *8 (N.D. Cal. Mar. 10, 2015) (finding the second factor met where the court discussed the relevant federal court suits and motions).

**3. Substantive Finding**

Under the third factor, a district court must make a substantive finding that the party's litigation has been either frivolous or harassing. *Ringgold-Lockhart*, 761 F.3d at 1064. "To determine whether the litigation is frivolous, district courts must look at both the number and content of the filings as indicia of the frivolousness of the litigant's claims." *Id.* There is no numerical baseline for frivolousness, but a district court must find that the litigant has filed an "inordinate" **[*47]** number of actions. *Id.* "Litigiousness alone," the Ninth Circuit has said, "is not enough." *Id.* As to the content of the filings, the party's claims must "be patently without merit." *Id.* Litigation is harassing, moreover, where "the litigant's filings show a pattern of harassment." *Id.* Courts should "be careful not to conclude that particular types of actions filed repetitiously are harassing, and must instead discern whether the filing of several similar types of actions constitutes an intent to harass the defendant or the court." *Id.* (alterations omitted).

In addition, the Ninth Circuit has identified five factors courts should consider in determining whether a party's litigation qualifies as frivolous or harassing:

> (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the

litigant's motive in pursuing the litigation, e.g., does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions **[*48]** would be adequate to protect the courts and other parties.

*Id.* at 1062.

Having considered these five factors, as well as the standards detailed above, the Court concludes Plaintiff is a vexatious litigant. The first and second factors weigh heavily in favor of declaring Plaintiff vexatious. Again, Plaintiff has filed at least four lawsuits aimed at undermining state court orders on issues arising out of the Hettinga-Loumena divorce proceedings. Plaintiff has not prevailed in any. Further, Plaintiff's lawsuits are "duplicative." *Id.* Plaintiff filed the instant lawsuit three days after the dismissal of *Kennedy I*, which was virtually identical. Both *Kennedy I* and the instant lawsuit are duplicative of previous lawsuits filed by Plaintiff's company PAI and Hettinga. Plaintiff lacked "an objective good faith expectation of prevailing" in the instant case. *See id.*

Additionally, Plaintiff's second lawsuit challenging the state court visitation order is virtually identical to a lawsuit filed by Plaintiff's younger brother, and both of those lawsuits overlap with a lawsuit filed by Hettinga. *See id.* at 1064 (noting litigant may be declared vexatious when the filings "show a pattern of harassment").

None of the **[*49]** lawsuits filed by Plaintiff, Plaintiff's company PAI, Hettinga, or Plaintiff's brother have been successful on the merits. Rather, eight of the twelve lawsuits filed by these litigants, including the instant lawsuit, have been dismissed for lack of subject matter jurisdiction under the *Rooker-Feldman* doctrine. *See Nichols I*, No. 15-CV-01372-BLF (collecting cases). These cases have been "patently without merit." *See Ringgold-Lockhart*, 761 F.3d at 1064. Thus, that Plaintiff has

filed only four lawsuits as a named plaintiff does not undermine the Court's conclusion that Plaintiff is a vexatious litigant. *See Sepehry-Fard*, 2015 U.S. Dist. LEXIS 29989, 2015 WL 1063070, at *9 (declaring plaintiff vexatious based on eleven lawsuits).

Further, the similarities of the complaints filed by Plaintiff and Hettinga suggest to the Court that Hettinga may be attempting to circumvent the order of the U.S. District Court, the California Superior Court, and the California Court of Appeal declaring Hettinga a vexatious litigant by filing suits through Plaintiff. Plaintiff shares Hettinga's phone and fax numbers, and in a previous case listed Plaintiff's email as "wylmina@live.com." *See* ECF No. 29-2 (Declaration of Dave M. McGraw). This further bolsters the Court's conclusion that Plaintiff's litigation **[*50]** is filed to harass Defendants.

The fourth factor also weighs in favor of declaring Plaintiff a vexatious litigant. As discussed, Plaintiff's four suits have been duplicative of other lawsuits filed by Plaintiff's company PAI, Hettinga, and Plaintiff's brother. The twelve cases of Plaintiff, Plaintiff's company PAI, Hettinga, and Plaintiff's brother have raised similar claims against similar groups of defendants. For example, Hammon has been a defendant in nine cases, including all four of Plaintiff's cases. These lawsuits have required Defendants, and the Court, to duplicate effort to address similar claims before six different judges in the Northern District of California. Plaintiff "without question" has "caused unnecessary expense to [his] opposing parties and ha[s] posed an unnecessary burden on the courts." *See Sepehry-Fard*, 2015 U.S. Dist. LEXIS 29989, 2015 WL 1063070, at *10.

Plaintiff does not address these factors or defend his litigation history. Instead, Plaintiff claims that "Defendants previously fraudulently claimed that prior lawsuits brought by [PAI] were in fact lawsuits brought by Wylmina E Hettinga" and Defendants "fraudulently" switched ownership of PAI between Hettinga and Plaintiff. Opp.2 at 2-3.

As discussed above, Plaintiff does **[*51]** not demonstrate that Defendants fraudulently misrepresented PAI's ownership to the Court. Further, Plaintiff does not explain why the alleged improper behavior by Title Co. affects *Plaintiff's* declaration as a vexatious litigant. Lastly, Plaintiff does not dispute that Hettinga and PAI—and Plaintiff himself—have filed substantially similar lawsuits about the sale of the Property.

The third and fifth factors do not counsel a different result. "[P]ro se litigants are not immune from a vexatious litigation finding." *Sepehry-Fard*, 2015 U.S. Dist. LEXIS 29989, 2015 WL 1063070, at *11. Notwithstanding Plaintiff's status as a pro se litigant, the record amply shows that his litigation has been frivolous and harassing. Plaintiff's suits are "preempt[ing] the use of judicial time that properly could be used to consider the meritorious claims of other litigants." *Molski*, 500 F.3d at 1057. Furthermore, the Court does not believe that other sanctions would adequately protect the courts and prospective defendants. It appears to the Court that Hettinga may be attempting to avoid the orders of the U.S. District Court, the California Superior Court, and the California Court of Appeal declaring Hettinga a vexatious litigant by filing suits through her children. Given this potential disregard of the orders **[*52]** declaring Hettinga a vexatious litigant and the repeated duplicative filings by Plaintiff, the Court finds that other remedies would not be "adequate to protect the courts and other parties." *See Ringgold-Lockhart*, 761 F.3d at 1062. The Court concludes that a narrowly tailored pre-filing order is the most appropriate remedy in this instance.

### 4. Narrowly Tailored Remedy

"Finally, pre-filing orders must be narrowly tailored to the vexatious litigant's wrongful behavior." *Ringgold-Lockhart*, 761 F.3d at 1066. A narrowly tailored order, thus, should restrain the "plaintiff from filing only the type of claims [he] had been filing vexatiously." *Id.; see also Molski*, 500 F.3d at

1061.

Here, Plaintiff's abusive behavior is the filing of duplicative lawsuits arising out of the sale of the Property at 21251 Almaden Road, San Jose, CA and the distribution of the proceeds. The Court therefore enjoins Plaintiff from filing any documents in this case or from filing any new action in the U.S. District Court for the Northern District of California arising out of facts related to sale of the Property at 21251 Almaden Road, San Jose, CA or to the distribution of the proceeds from the sale, without passing a pre-filing review. By requiring pre-filing review of Plaintiff's future actions related to the sale of the Property and the **[*53]** distribution of the proceeds, the Court seeks to preclude Plaintiff from further harassing the individuals involved in the sale and to ensure respect of the Court's order declaring Hettinga a vexatious litigant.

### IV. CONCLUSION

For the foregoing reasons, the Court rules as follows:
- The Court GRANTS Defendants' motions to dismiss without prejudice;
- The Court GRANTS Title Co.'s Motion for Sanctions against Plaintiff in the amount of $300, which Plaintiff must pay to Title Co. within thirty days of the filing of this order;
- The Court DENIES Plaintiff's Motion for Sanctions against Title Co.; and
- The Court DECLARES Plaintiff to be a vexatious litigant.

This order is not a bar to Plaintiff bringing lawsuits; it merely requires pre-filing review. Plaintiff does not currently file electronically. Plaintiff must file at the office of the Clerk of this Court. The Clerk may not file or accept any further documents in this case or any new complaints filed by or on behalf of Plaintiff as a named plaintiff that arise out of facts related to the sale of the Property at 21251 Almaden Road, San Jose, CA or to the distribution of the proceeds from the sale. If Plaintiff wishes to

file a document in this case or a complaint **[*54]** arising out of facts related to the sale of the Property or to the distribution of the proceeds, Plaintiff shall provide a copy of any such document or complaint and a copy of this order to the Clerk of this Court. The Clerk shall then forward the document or complaint and a copy of this order to the Duty Judge for a determination whether the document or complaint should be accepted for filing. If the Duty Judge determines that the document or complaint is duplicative or frivolous, it will not be filed and will be returned to Plaintiff. If the document or complaint is neither duplicative nor frivolous, it will be given to the Clerk with instructions to file it. Any violation of this order will expose Plaintiff to a contempt hearing and appropriate sanctions, and any action filed in violation of this order will be subject to dismissal with prejudice.

The Clerk shall close the case file.

**IT IS SO ORDERED**.

Dated: October 13, 2015

/s/ Lucy H. Koh

LUCY H. KOH

United States District Judge

---

**End of Document**

# EXHIBIT 17

# Marchant v. Jamieson

United States District Court for the District of Arizona

April 13, 2007, Decided ; April 13, 2007, Filed

2:06-cv-02631 PHX JWS

**Reporter**

2007 U.S. Dist. LEXIS 27835 *; 2007 WL 1108898

JAMES BRETT MARCHANT, Plaintiff, vs. KATHY L. JAMIESON, JAMES JAMIESON, and KASSIE KIENTZ, Defendants.

**Prior History:** Jamieson v. Slater, 2007 U.S. Dist. LEXIS 27478 (D. Ariz., Apr. 12, 2007)

**Counsel:** **[*1]** For James Brett Marchant, Plaintiff: Lawrence Bruce Slater, LEAD ATTORNEY, Slater & Associates PC, Gilbert, AZ.

For Kathy L. Jamieson, James Jamieson, Kassie Kientz, Defendants: Lori A Curtis, Richard R Thomas, LEAD ATTORNEYS, Davis Miles PLLC, Mesa, AZ. For James Brett Marchant, Counter Defendant: Lawrence Bruce Slater, Slater & Associates PC, Gilbert, AZ.

**Judges:** JOHN W. SEDWICK, UNITED STATES DISTRICT JUDGE.

**Opinion by:** John W. Sedwick

# Opinion

## ORDER AND OPINION

**[Re: Motion at Docket 13]**

## I. MOTION PRESENTED

At docket 13, defendant James Jamieson moves for an award of attorney's fees and costs in the amount of $ 4,653.00 pursuant to Federal Rule of Civil Procedure 54. At docket 14, plaintiff James Marchant opposes the motion. Defendant replies at

docket 15. Oral argument was not requested, and it would not assist the court.

## II. BACKGROUND

On September 22, 2006, plaintiff James Marchant ("plaintiff") filed a complaint in Arizona Superior Court against defendants Kathy Jamieson, James Jamieson, and Kassie Kientz. Plaintiff's complaint makes the following allegations against defendant Kathy Jamieson: In 1996 plaintiff separated from his former wife and began **[*2]** living with Kathy Jamieson. Plaintiff's divorce from his former wife was final in May 1998. Between 1996 and 1998, plaintiff learned of several real estate investment opportunities and was advised by his divorce attorney not to take title to new investments in his own name. Kathy Jamieson, who was already managing payments on plaintiff's prior real estate investments, agreed to hold title in her name to two properties, referred to as the Sangria and Ellsworth properties, and to transfer title to plaintiff once his divorce was final. In exchange, Ms. Jamieson was to receive a ten percent interest in these properties. Ms. Jamieson did not transfer title of the properties after plaintiff's divorce was final. Ms. Jamieson also agreed to close the sale of a third property, referred to as the Ellsworth property, in plaintiff's name, but closed the sale in her own name without plaintiff's knowledge or consent. Ms. Jamieson made these false representations in order to steal the properties from plaintiff. In addition, Ms. Jamieson forged plaintiff's signature on checks made out to plaintiff and deposited them in her own account, and she wrongfully withdrew money from plaintiff's business account. **[*3]** On an

Exhibit 17, Page 162

undisclosed date, plaintiff and Kathy Jamieson were married. Ms. Jamieson filed for legal separation from plaintiff in May 2003, and the couple subsequently divorced.

Plaintiff's complaint makes the following allegations against defendant James Jamieson:

> The Defendant, Jim Jamieson is believed and therefore alleged to hold an unrecorded interest in the Sangria, Ellsworth, and George properties. To further this scheme he deposited money into the bank accounts of Defendant Kassie Kientz to be used by Kathy [Jamieson] to support herself while she pursue[d] unjustified claims and litigation in Maricopa County cause number FN2003-092151. He also funded the legal and expert fees for the divorce case, and helped pay off the final balloon payment on the Ellsworth property. He is liable for the damages sought against Kathy as her co-conspirator. [1]

Plaintiff's complaint alleges claims of fraud, consumer fraud, unjust enrichment, interference with privacy, and conversion [*4] against all defendants. The complaint seeks actual and consequential damages for the above claims, as well as punitive damages for defendants' "willful and malicious acts." [2] Defendants removed plaintiff's complaint to federal court on the basis of diversity under 28 U.S.C. § 1441. [3]

On November 13, 2006, defendant James Jamieson (hereinafter "defendant") moved to dismiss all of plaintiff's claims against him pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action upon which relief can be granted. [4] Defendant also moved for sanctions pursuant to Federal Rule of Civil Procedure 11. Plaintiff did not file an opposition to the motion. By order dated February 9, 2007, the court granted defendant's

motion to dismiss all claims against defendant James Jamieson and denied defendant's motion for sanctions on procedural grounds. [5] Defendant now moves for an award of the reasonable costs and attorney's fees incurred [*5] in defending this action.

## III. DISCUSSION

Defendant requests an award of attorney's fees under A.R.S. § 12-341.01(A). Pursuant to A.R.S. § 12-341.01(A), "[i]n any contested action arising out of a contract, express or implied, the court may award the successful party reasonable attorney fees." The purpose of an award under A.R.S. § 12-341.01(A) is to "mitigate the burden of the expense of litigation to establish a just claim or a just defense." [6] Fees awarded under the statute "need not equal or relate to the attorney fees actually paid or contracted, but…may not exceed the amount paid or agreed to be paid." [7]

The parties do not [*6] dispute that this was a contested action and that defendant was the "successful party" as a result of the court's order dismissing plaintiff's claims against defendant. At issue is whether this action "aris[es] out of a contract, express or implied." Plaintiff argues that "[t]here was never an allegation that this matter arose out of contract regarding James Jamieson." [8] Defendant argues that because plaintiff's complaint alleges an oral agreement between plaintiff and defendant Kathy Jamieson, the underlying action in this matter is grounded in contract, and defendant James Jamieson is entitled to an award of reasonable attorney's fees and costs pursuant to A.R.S. § 12-341.01(A).

---

[1] Complaint at 13, doc. 1.

[2] Complaint at 10-11, doc. 1.

[3] Doc. 1.

[4] Doc. 7.

[5] Doc. 12.

[6] A.R.S. § 12-341.01(B); *Building Innovation Industries, L.L.C. v. Onken*, 473 F. Supp. 2d 978, 2007 U.S. Dist. LEXIS 3833, 2007 WL 158737, *7 (D. Ariz. 2007).

[7] A.R.S. § 12-341.01(B).

[8] Doc. 14 at 1.

In determining whether the claim is one arising out of a contract, the court looks to the "nature of the action and the surrounding circumstances," regardless of the form of the pleadings. [9] In the past, Arizona courts have broadly interpreted what types of transactions are included within the clause "arising [*7] out of a contract." [10]

In *Sparks v. Republic,* the Arizona Supreme Court decided the question of whether an insurer's torts of bad faith and misrepresentation are actions "arising out of a contract." [11] Citing *Wenk,* the court ruled that "attorney's fees may be awarded pursuant to § 12-341.01(A) based upon facts which show a breach of contract, the breach of which may also constitute a tort." [12] "The fact that the two legal theories are intertwined does not preclude recovery of attorney's fees under § 12-341.01(A) as long as the cause of action in tort could not exist but for the breach of the contract." [13] Applying the above principles, the court ruled that the tort of bad faith is one "arising out of a contract" within the meaning of § 12-341.01(A) because "the tort of bad faith cannot be committed absent [*8] the existence of an insurance contract and a breach thereof." On the other hand, the court ruled that an action for misrepresentation under the Insurance Code is not one arising out of contract because "[s]uch an action sounds mainly in tort and its existence does not depend upon a breach of the contract of insurance." [14]

In *Marcus v. Fox,* a party to a contract sued another party to a contract, alleging fraudulent inducement.

[*9]    The Arizona Supreme Court held that where the validity of a contract was challenged on grounds of fraudulent inducement, the claim was one "arising out of contract" within the meaning of A.R.S. § 12-341.01(A). [16] The court cautioned, however, that "attorneys' fees are not appropriate based on the mere existence of a contract somewhere in the litigation." [17]

In *Morris v. Achen Construction Company,* a homeowner filed suit against a contractor and certain named employees for breach of contract, negligence and fraud. [18] The court held that an employee who successfully defended the homeowner's fraud claim against him was not eligible for an award of attorney's fees under A.R.S. § 12-341.01(A) because the tort of fraudulently "inducing one to enter into a contract with a third party is not the type of tort falling within the ambit of A.R.S. § 12-341.01(A)." [19] The court reasoned that the duty not to commit fraud is not created by a contractual relationship and exists, as here, even when there is no contractual relationship between the parties. [20]

Here, plaintiff's [*10] complaint alleges that 1) defendant Kathy Jamieson agreed to hold title to two properties in her name and then transfer title to plaintiff, but did not transfer title; 2) Ms. Jamieson agreed to close the sale of a third property in plaintiff's name, but closed the sale in her own name; 3) Ms. Jamieson made these false representations in order to steal the properties from plaintiff; 4) "[p]laintiff was damaged by Kathy's frauds, as he did not have the benefit of title to the properties, and has lost their value"; and, 4) defendant James Jamieson "is liable for the

---

[9] *Marcus v. Fox,* 150 Ariz. 333, 723 P.2d 682, 684 (Ariz. 1986) (en banc) (citing *Wenk v. Horizon Moving & Storage Co.,* 131 Ariz. 131, 639 P.2d 321, 322 (1982)).

[10] *Id.* at 683.

[11] 647 P.2d 1127 (Ariz. 1982).

[12] *Sparks,* 647 P.2d at 1141.

[13] *Id.*

[14] *Id.* at 1142.

---

[15] 150 Ariz. 333, 723 P.2d 682 (Ariz. 1986) (en banc).

[16] *Marcus,* 723 P.2d at 684-85.

[17] *Id.* at 684.

[18] 155 Ariz. 512, 747 P.2d 1211 (Ariz. 1988) (en banc).

[19] *Morris,* 747 P.2d at 1213.

[20] *Id.*

damages sought against Kathy as her co-conspirator." [21] Plaintiff's complaint alleges claims for fraud, violation of Arizona's Consumer Fraud Statute, A.R.S. § 44-1522, punitive damages, unjust enrichment, interference with privacy, and conversion.

Considering the "nature of the action and the surrounding circumstances," the instant case is much more like *Morris,* than *Marcus* or *Sparks.* The alleged oral agreements **[*11]** in this action regarding the transfer of properties formed "a factual predicate to the action" but not "the essential basis of it." [22] Plaintiff's complaint does not contest the validity of any alleged contract, allege a breach of contract claim, or seek damages arising out of a breach of contract. Rather, plaintiff's action for general fraud and consumer fraud sounds mainly in tort, and its existence does not depend upon a breach of the alleged oral agreement. [23] Furthermore, plaintiff's claims for damages and punitive damages are all based on allegations of fraud, not allegations of breach of contract. [24]

Moreover, defendant James Jamieson was not a party to any alleged oral agreement between Kathy Jamieson and plaintiff. Here, as in *Morris,* plaintiff's action against defendant James Jamieson is "wholly an **[*12]** action for damages for fraud where the alleged fraud is claimed to have resulted in one party entering into a contract with a third party. Nothing in A.R.S. § 12-341.01(A), *Sparks, Marcus,* or *Barmat,* justifies an award of attorneys' fees as between these parties." [25] For the reasons stated above, the court finds that plaintiff's action against defendant James Jamieson is not an action "arising out of a contract" and defendant is not

entitled to an award of attorney's fees under A.R.S. § 12-341.01(A).

Defendant alternatively requests an award of attorney's fees "pursuant to this Court's inherent powers to sanction objectionable conduct and frivolous pleadings." [26] Assuming without deciding that this court does in fact have "inherent powers to sanction objectionable conduct or frivolous pleadings" through an award of attorney's fees, the court denies defendant's request for sanctions. In its order dated February 9, 2007, the court denied defendant's motion for sanctions **[*13]** under Federal Rule of Civil Procedure 11 on the grounds that defendant failed to comply with the procedural requirements set forth in Rule 11. [27] "Federal Rule of Civil Procedure 11 contains prerequisites and protections for parties, who are accused of violating its strictures, and parties should be able to rely upon those in federal court proceedings." [28] An award of sanctions under the court's "inherent powers to sanction" would in effect allow defendant to circumvent the prerequisites and protections of Rule 11.

## IV. CONCLUSION

For the reasons set out above, defendant's motion for an award of attorney's fees and costs at docket 13 **DENIED.**

DATED at Anchorage, Alaska, this 13th day of April 2007.

/s/ JOHN W. SEDWICK

UNITED STATES DISTRICT JUDGE

---

End of Document

---

[21] Complaint at 13, doc. 1.

[22] *In re Larry's Apartment, L.L.C.,* 249 F.3d 832, 837 (9th Cir. 2001).

[23] *Marcus,* 723 P.2d at 685 n.1.

[24] *Morris,* 747 P.2d at 1212.

[25] *Id.* at 1213.

[26] Doc. 15 at 4.

[27] Doc. 12.

[28] *Larry's Apartment,* 249 F.3d at 839.

# EXHIBIT 18

# Patriot Rail Corp. v. Sierra R.R. Co.

United States District Court for the Eastern District of California

August 5, 2015, Decided; August 5, 2015, Filed

No. 2:09-cv-0009-TLN-AC

**Reporter**

2015 U.S. Dist. LEXIS 103434 *; 2015 WL 4662707

PATRIOT RAIL CORP., Plaintiff, v. SIERRA RAILROAD CO., Defendant. AND RELATED COUNTERCLAIMS

**Subsequent History:** Motion granted by, in part, Motion denied by, in part, Objection overruled by Patriot Rail Corp. v. Sierra R.R. Co., 2016 U.S. Dist. LEXIS 15862 (E.D. Cal., Feb. 8, 2016)

**Prior History:** Patriot Rail Corp. v. Sierra R.R. Co., 2015 U.S. Dist. LEXIS 102935 (E.D. Cal., Aug. 5, 2015)

**Counsel:** [*1] For Patriot Rail Corp., a Delaware Corporation, Plaintiff: Aimee M. Housinger, PHV, Elliot H. Scherker, PHV, Pamela Anne Ferguson, PHV, Paul Jonathan Brown, PHV, LEAD ATTORNEYS, PRO HAC VICE, Greenberg Traurig, LLP, Houston, TX; Jennifer L Tomsen, Laura Gleen, PHV, LEAD ATTORNEYS, Greenberg Traurig, Llp, Houston, TX; Stephen Paffrath, LEAD ATTORNEY, Greenberg Traurig, Sacramento, CA; Jacob Eugene Godard, Greenberg Traurig, Houston, TX; Karin L. Bohmholdt, Scott D. Bertzyk, Greenberg Traurig, LLP, Los Angeles, CA; Mary-Olga Lovett, PHV, PRO HAC VICE, Greenberg Traurig, LLP, Houston, TX.

For Sierra Railroad Company, a California Corporation, Defendant: Jonathan G. Riddell, LEAD ATTORNEY, Emmanuel Fua, Orrick, Herrington & Sutcliffe, Sacramento, CA; McGregor Scott, LEAD ATTORNEY, Michael C. Weed, Norman C. Hile, Orrick, Herrington & Sutcliffe LLP, Sacramento, CA.

For Greenberg Traurig LLP, Greenberg Traurig LLP, Unknown: Elliot Remsen Peters, LEAD ATTORNEY, Elizabeth Katharine McCloskey, Steven P. Ragland, Keker & Van Nest, LLP, San Francisco, CA.

For Gary O Marino, Unknown: John P Kern, Matthew Paul Vafidis, LEAD ATTORNEYS, Jessica Elaine Lanier, Holland & Knight Llp, San Francisco, CA.

[*2] For Sierra Railroad Company, Counter Claimant: McGregor Scott, LEAD ATTORNEY, Michael C. Weed, Norman C. Hile, Orrick, Herrington & Sutcliffe LLP, Sacramento, CA; Emmanuel Fua, Orrick, Herrington & Sutcliffe, Sacramento, CA.

For Patriot Rail Corp., Counter Defendant: Aimee M. Housinger, PHV, Pamela Anne Ferguson, PHV, Paul Jonathan Brown, PHV, LEAD ATTORNEYS, PRO HAC VICE, Greenberg Traurig, LLP, Houston, TX; Jennifer L Tomsen, Laura Gleen, PHV, LEAD ATTORNEYS, Greenberg Traurig, Llp, Houston, TX; Stephen Paffrath, LEAD ATTORNEY, Jacob Eugene Godard, Greenberg Traurig, Sacramento, CA; Karin L. Bohmholdt, Scott D. Bertzyk, Greenberg Traurig, LLP, Los Angeles, CA; Mary-Olga Lovett, PHV, PRO HAC VICE, Greenberg Traurig, LLP, Houston, TX.

For Patriot Rail LLC, Cross Defendant: Aimee M. Housinger, PHV, Elliot H. Scherker, PHV, Pamela Anne Ferguson, PHV, Paul Jonathan Brown, PHV, LEAD ATTORNEYS, PRO HAC VICE, Greenberg Traurig, LLP, Houston, TX; Jennifer L Tomsen, Laura Gleen, PHV, LEAD ATTORNEYS, Greenberg Traurig, Llp, Houston, TX; Stephen Paffrath, LEAD ATTORNEY, Jacob Eugene Godard, Greenberg Traurig, Sacramento, CA;

Karin L. Bohmholdt, Scott D. Bertzyk, Greenberg Traurig, LLP, Los Angeles, [*3] CA; Mary-Olga Lovett, PHV, PRO HAC VICE, Greenberg Traurig, LLP, Houston, TX.

For Patriot Rail Holdings, LLC, Patriot Equity LLC, Cross Defendants: John P Kern, Matthew Paul Vafidis, LEAD ATTORNEYS, Jessica Elaine Lanier, Holland & Knight Llp, San Francisco, CA.

For Larry Coe, Cross Defendant: Aimee M. Housinger, PHV, Pamela Anne Ferguson, PHV, Paul Jonathan Brown, PHV, LEAD ATTORNEYS, PRO HAC VICE, Greenberg Traurig, LLP, Houston, TX; Jennifer L Tomsen, Laura Gleen, PHV, LEAD ATTORNEYS, Greenberg Traurig, Llp, Houston, TX; Stephen Paffrath, LEAD ATTORNEY, Jacob Eugene Godard, Greenberg Traurig, Sacramento, CA; Karin L. Bohmholdt, Greenberg Traurig, LLP, Los Angeles, CA; Mary-Olga Lovett, PHV, PRO HAC VICE, Greenberg Traurig, LLP, Houston, TX.

For Surface Transportation Board, Intervenor: Craig Mitchell Keats, GOVT, LEAD ATTORNEY, U.S. Surface Transportation Board, Washington, DC.

For Sierra Railroad Company, Sierra Railroad Company, a California Corporation, Sierra Railroad Company, Sierra Railroad Company, a California Corporation, Counter Claimants: McGregor Scott, LEAD ATTORNEY, Michael C. Weed, Norman C. Hile, Orrick, Herrington & Sutcliffe LLP, Sacramento, CA; Emmanuel Fua, Orrick, [*4] Herrington & Sutcliffe, Sacramento, CA.

**Judges:** Troy L. Nunley, United States District Judge.

**Opinion by:** Troy L. Nunley

# Opinion

### ORDER DENYING SIERRA'S MOTION FOR SANCTIONS (ECF NO. 528)

This matter is before the Court pursuant to Counter-Plaintiff Sierra Railroad Company's ("Sierra") motion for sanctions (ECF No. 528). For the reasons stated below, Sierra's motion is hereby DENIED.

The Court has broad discretion to impose sanctions under two different, non-exclusive legal bases: (1) 28 U.S.C. § 1927, which penalizes unreasonable and vexatious litigation tactics; and (2) the Court's "inherent authority to impose sanctions for a broad range of willful improper conduct." *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001).

The Court is authorized under 28 U.S.C. § 1927 ("Section 1927") to require an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously . . . to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Section 1927 gives the Court authority to impose sanctions on the responsible attorneys. *Id.*.

The Court may also exercise its inherent authority to order sanctions to penalize conduct that abuses the judicial process. The Court may exercise its inherent power independent of, or in addition to, any available statutory scheme. [*5] *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) ("These other mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions."). The Court may impose sanctions under its inherent authority if a party or counsel has demonstrated by clear and convincing evidence to have "acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45 (internal quotations omitted).

Sierra is asking the Court to impose sanctions against Patriot and its counsel. Sierra asserts that during the punitive damages phase, Patriot and its counsel disregarded the truth and the law, and directly violated their prior assurances to the Court and Sierra, by trying to improperly keep key financial evidence from the jury, shielding Patriot's

assets and unjustifiably evading punitive damages. (ECF No. 528 at 1.) Sierra further contends that Patriot brought frivolous motions to stop Sierra from presenting evidence of Patriot Rail Company LLC's net worth because, they said, "Patriot Rail Company LLC was a separate legal entity from Patriot Rail Corp., was not a party to this litigation, and subjecting it to punitive damages would violate due process." (ECF No. [*6] 528 at 1.)

The Court agrees that Patriot's legal stances throughout litigating this matter have been attenuated at times and that some of the conduct has walked the fine line between vigorously litigating this case and being vexatious. However, the Court declines to make a finding of bad faith and thus DENIES Sierra's motion for sanctions (ECF No. 528).

IT IS SO ORDERED.

Dated: August 5, 2015

/s/ Troy L. Nunley

Troy L. Nunley

United States District Judge

_____

End of Document

# EXHIBIT 19

# Rodriguez v. Serv. Emples. Int'l

United States District Court for the Northern District of California

October 12, 2011, Decided; October 12, 2011, Filed

No. C-10-01377 JCS

**Reporter**

2011 U.S. Dist. LEXIS 117793 *; 2011 WL 4831201

MAXIMA C. RODRIGUEZ, ET AL., Plaintiffs, v. SERVICE EMPLOYEES INTERNATIONAL, ET AL., Defendants.

**Prior History:** Rodriguez v. Serv. Emples. Int'l, 755 F. Supp. 2d 1033, 2010 U.S. Dist. LEXIS 124291 (N.D. Cal., 2010)

**Counsel:** **[*1]** For Maxima Carolina Rodriguez, Elsa Acevedo, Olga Loaiza, Raquel Martinez, Mario Suarez, Francisco Garcia, Plaintiffs: Arlo Garcia Uriarte, Liberation Law Group, P.C., San Francisco, CA.

For Service Employees International Union Local 87, Olga Miranda, Hung Chi Szeto, Defendants: Daniel Mark Siegel, LEAD ATTORNEY, Peter Alex Haberfeld, Siegel & Yee, Oakland, CA.

For Ahmed Abozayd, Defendant: Daniel Mark Siegel, LEAD ATTORNEY, Siegel & Yee, Oakland, CA.

**Judges:** JOSEPH C. SPERO, United States Magistrate Judge.

**Opinion by:** JOSEPH C. SPERO

# Opinion

**ORDER GRANTING MOTION BY PLAINTIFFS FOR VOLUNTARY DISMISSAL AND DENYING DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO FED. R. CIV. P. 11(c), 28 U.S.C. §1927, COURT'S INHERENT POWER [Docket No. 78, 80]**

## I. INTRODUCTION

Plaintiffs in this action are union members who asserted claims under the Labor Management Relations Disclosure Act ("LMRDA") based on alleged impropriety by Defendant Service Employees International Union Local 87 ("Local 87") and several individual officers of the Local 87 in connection with ratification of a collective bargaining agreement. The parties consented to the jurisdiction of a magistrate judge, pursuant to 28 U.S.C. § 636(c). After some of Plaintiffs' **[*2]** claims survived a motion to dismiss and some discovery had occurred, Plaintiffs decided that they did not want to go forward with the lawsuit. According to their counsel, Arlo Uriarte, Plaintiffs could no longer afford to prosecute the action and were not willing to risk the possibility that they might be held liable for Defendants' attorneys' fees and/or costs if they did not prevail at trial. Accordingly, Plaintiffs bring a motion seeking dismissal of the action pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure ("the Motion for Voluntary Dismiss"). Defendants do not oppose the dismissal of the action but argue that the dismissal should be with prejudice and that they are entitled to an award of costs. In addition, Defendants bring a sanctions motion seeking an award of attorneys' fees under Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927 and the Court's inherent power ("Motion for Sanctions").

The Court finds that the Motions are suitable for determination without oral argument and therefore **vacates** the hearing scheduled for **October 21,**

Exhibit 19, Page 169

**2011** at 9:30 a.m. For the reasons stated below, the Court GRANTS Plaintiff's Motion to for Voluntary Dismissal. **[\*3]** The Court DENIES Defendants' Motion for Sanctions.

## II. BACKGROUND

### A. Motion for Dismissal[1]

In the Motion for Dismissal, Plaintiffs seek a voluntary dismissal of their claims pursuant to Rule 41(a)(2). According to Plaintiffs' counsel, Arlo Uriarte, the main reason Plaintiffs wish to dismiss the action is their concern that if they do not prevail they will be held responsible for Defendants' attorneys' fees and/or costs. Declaration of Arlo Uriarte in Support of Plaintiffs' Motion for Voluntary Dismissal ("Uriarte Motion Decl."); *see also* Amended Declaration of Mario Suarez ("Suarez Amended Decl.") (stating that he is on disability leave from his job as a janitor, where he earns an hourly wage of $18.25, and that has no real estate assets or savings); Declaration of Carolina Rodriguez ("Rodriguez Decl.") (stating that she is on disability leave from her job as a janitor, where she earns an hourly wage of $18.25, and that she has no assets or savings); Declaration of Elsa Acevedo ("Acevedo Decl.") (stating **[\*4]** that she works as a janitor and earns an hourly wage of $18.75 and has no disposable income); Declaration of Olga Loaiza ("Loaiza Decl.") (stating that she was cleared to return from disability leave to her position as a janitor in May 2011 but that her supervisor and Olga Miranda have not allowed her to return to her former position and therefore she currently has no income).

Defendants do not oppose dismissal of the case but assert that the dismissal should be with prejudice and further, that they should be awarded their costs. According to Defendants, dismissal with prejudice

is appropriate in this case because: 1) the case was "flimsy" from the outset; 2) Plaintiffs' request for dismissal came only after Defendants elicited testimony from the Plaintiffs that would have allowed Defendants to prevail on summary judgment; 3) Plaintiffs' conduct resulted in excessive delay and subjected Defendants to great expense. With respect to their request for costs, Defendants assert that Rule 54(d) mandates an award of costs where, as here, plaintiffs dismiss an action at a point when the defendant likely would have prevailed. To the extent that courts may decline to award costs under exceptional **[\*5]** circumstances, Defendants assert, there are no such circumstances here.

In their Reply brief, Plaintiffs stipulate to dismissal of the action with prejudice but assert that where a dismissal under Rule 41(a)(2) is with prejudice an award of costs is not appropriate. Plaintiffs reject Defendants' assertion that their claims were baseless or that they necessarily would have lost on summary judgment. Rather, they argue that they litigated in good faith to protect their rights as union members.

### B. Motion for Sanctions

Defendants assert that sanctions, in the form of their attorneys' fees and costs, should be awarded against Plaintiffs and their attorney under Rule 11 of the Federal Rules of Civil Procedure, 28 U.S.C. § 1927 and the Court's inherent powers. Defendants assert that sanctions are warranted because: 1) Plaintiffs did not have a factual or legal basis for their claims and did not withdraw or amend them after Defendants sent Plaintiffs a 21-day safe-harbor letter in May 2010 or after Defendants filed a motion for sanctions and a motion to dismiss; 2) Plaintiffs did not comply with discovery deadlines, including responses to interrogatories and requests for admissions, and delayed **[\*6]** the litigation by failing to agree to scheduled deposition dates and cancelling some depositions at the last minute, causing Defendants to incur penalty charges from

---

[1] A summary of Plaintiffs' claims and allegations can be found in the Court's November 23, 2010 Order granting in part and denying in part Defendants' motion to dismiss. *See* Docket No. 66.

translators and court reporters in the amount of $1800; and 3) Plaintiffs' request for voluntary dismissal is motivated by an awareness that Plaintiffs are unlikely to prevail on their claims. *See* Declaration of Peter Haberfeld in Support of Motion for Sanctions Pursuant to Fed. R. Civ. P. 11(c), 28 U.S.C. § 1927, Court's Inherent Power ("Haberfeld Motion Decl."), ¶¶ 4-8.

Plaintiffs respond that sanctions should not be awarded because Plaintiffs' claims were not frivolous and were asserted in good faith, as is shown by declarations and testimony from union members during the union internal hearings that preceded this action as well as the fact that some of Plaintiffs' claims survived Defendants' motion to dismiss. Plaintiffs further assert that Defendants' Motion for Sanctions was brought for an improper purpose, namely, to pressure the plaintiffs in another action (one of whom is also a plaintiff in this case) to dismiss that action. *See* Declaration of Arlo Uriarte in Support of Plaintiffs' Reply Memorandum re Plaintiffs' **[\*7]** Motion for Voluntary Dismissal ("Uriarte Reply Decl."), ¶ 6 (stating that on July 11, 2011, he received a letter from Defendants' counsel offering to waive all costs and fees in this action if the plaintiffs in *Gomez v. SEIU*, Case No. 10-1888 RS, U.S. District Court for the Northern District of California, dismissed that action). Plaintiffs do not address Defendants' contention that Plaintiffs failed to comply with discovery deadlines; Mr. Uriarte does state in his declaration, however, that "[a]ny penalties incurred by Mr. Haberfeld regarding the translator is of his own making and choosing. If such is the condition of his translator then it is suggested he find more reasonable translators." Uriarte Reply Decl., ¶ 4.

## III. ANALYSIS

## A. Whether Costs Should Be Awarded as a Condition of Dismissal

### 1. Legal Standard

Federal Rule of Civil Procedure 41(a)(2) allows the court, at the plaintiff's request, to dismiss an action "on terms the court considers proper." Fed. R. Civ. P. 41(a)(2). The decision to grant or deny a motion pursuant to Rule 41(a)(2) is within the sound discretion of the trial court and may be reviewed only for abuse of that discretion. *Sams v. Beech Aircraft Corp.*, 625 F.2d 273, 277 (9th Cir.1980). **[\*8]** "A district court should grant a motion for voluntary dismissal under Rule 41(a)(2) unless a defendant can show that it will suffer some plain legal prejudice as a result." *Smith v. Lenches*, 263 F.3d 972, 975 (9th Cir.2001) . Although the Ninth Circuit has held that Rule 41(a)(2) does not provide an independent source of authority for imposing sanctions, *see Heckethorn v. Sunan Corp.,* 992 F.2d 240, 242 (9th Cir.1993), where there is an independent source of authority for such an award, courts have discretion to award fees and/or costs as a condition of dismissal under Rule 41(a)(2) where the dismissal is *without prejudice. See Westlands Water Dist. v. United States*, 100 F.3d 94, 96 (9th Cir.1996).

It is less clear whether an award of fees or costs is appropriate where a dismissal under Rule 41(a)(2) is *with prejudice.* In *Chavez v. Northland Group*, the court explained that this question has not been resolved in the Ninth Circuit:

> In *Heckethorn*, because the court held that Fed.R.Civ.P. 41(a) (2) does not provide an independent basis for sanctioning attorneys, it left open the issues of "whether a district court can impose conditions under Fed.R.Civ.P. 41(a)(2) when the dismissal is with **[\*9]** prejudice. *Id.* at 242-43. Although it does not appear that the Ninth Circuit has resolved the issue, other federal courts have concluded that the payment of fees and costs ordinarily should not be imposed as a condition for voluntary dismissal with prejudice. *Burnette v. Godshall*, 828 F.Supp. 1439, 1443

Exhibit 19, Page 171

(N.D.Cal.1993) ( "Since the ... cause of action has been dismissed with prejudice, costs and attorney fees cannot be awarded to Defendants because there is no future risk of litigation," but noting that sanctions could still be imposed under Fed.R.Civ.P. 11); see also *Gonzalez v. Proctor and Gamble Co.*, 2008 U.S. Dist. LEXIS 16872, 2008 WL 612746 at * 3 (S.D.Cal.2008) ("A plaintiff faced with the imposition of attorneys' fees and costs as a condition of voluntary dismissal may request that the action be dismissed with prejudice to avoid payment."); *Steinert v. Winn Group, Inc.*, 440 F.3d 1214, 1222 (10th Cir.2006) ("if the dismissal is with prejudice, attorney fees may be imposed under Rule 41(a)(2) only in 'exceptional circumstances.' "). However, these courts have held that, in the case of a voluntary dismissal with prejudice, costs and fees may be imposed under "exceptional circumstances" or pursuant to Fed.R.Civ.P. 11.

2011 U.S. Dist. LEXIS 10113, 2011 WL 317482, at * 4 (D.Ariz., Feb. 1, 2011).

## 2. [*10] Application of the Law to the Facts

The Court finds that the approach described in *Chavez* is sound and therefore denies Defendants' request for costs as a condition of dismissal pursuant to Rule 41(a)(2) on the basis that Plaintiffs have stipulated to dismissal with prejudice and this case is not exceptional. Further, as discussed below, the Court concludes that Defendants are not entitled to sanctions under Rule 11.

## B. Whether the Court Should Award Sanctions

## 1. Legal Standard

## a. Rule 11

Rule 11 of the Federal Rules of Civil Procedure states, in relevant part, as follows:

(b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, **[*11]** or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). Rule 11 further provides that the court may impose sanctions upon attorneys or parties "[i]f, after notice and a reasonable opportunity to respond, the court determines that subdivision (b) has been violated...." When evaluating whether sanctions should be imposed under Rule 11, courts conduct "a two-prong inquiry to determine (1) whether the complaint is legally or factually baseless from an objective perspective, and (2) if the attorney has conducted a reasonable and competent inquiry before signing and filing it." *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005) (internal citation omitted). When imposing sanctions under Rule 11, the court is also obligated to describe the conduct determined to constitute a violation of the rule and explain the basis **[*12]** for the sanction imposed. Fed. R. Civ.P. 11(c)(6).

**b. 28 U.S.C. § 1927**

A court may impose sanctions against an attorney under 28 U.S.C. § 1927, which provides as follows:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. "[T]he term 'vexatious' has been defined as 'lacking justification and intended to harass.'" *Terrebonne, Ltd. of California v. Murray*, 1 F.Supp.2d 1050, 1055 (E.D. Cal.,1998) (quoting *Overnite Transp. Co. v. Chicago Ind. Tire Co.*, 697 F.2d 789, 795 (7th Cir.1983)). Sanctions may be imposed under § 1927 where there is a finding of bad faith or recklessness. *See Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216, 1219 (9th Cir. 2010).

**c. Inherent Powers**

A district court has the inherent power to impose sanctions on counsel who "willfully abuse[s] judicial processes." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766, 100 S. Ct. 2455, 65 L. Ed. 2d 488. The imposition of sanctions under the court's **[\*13]** inherent power requires a finding that counsel's conduct "constituted or was tantamount to bad faith." *Id.* at 767. A court's inherent powers "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). Chambers, 501 U.S. at 43, 111 S.Ct. at 2132.

**2. Application of the Law to the Facts**

Having carefully reviewed the submissions of the parties, the Court declines to award sanctions against Plaintiffs. First, Plaintiff's claims were not obviously baseless at the outset of the action. To the contrary, the action survived Defendants' motion to dismiss as to at least some of Plaintiff's claims. Further, the testimony and evidence from the internal Union proceeding provided Plaintiffs' counsel with a sufficient factual basis for filing the action under Rule 11. Second, the Court does not find that Plaintiffs' counsel acted recklessly or in bad faith so as to warrant the imposition of sanctions under § 1927. Although the evidence in the record suggests that Plaintiffs' case may have been weak, it is not so obvious that Defendants' **[\*14]** would have prevailed that the Court can conclude that Plaintiffs' counsel multiplied the proceedings in continuing to litigate the action beyond the motion to dismiss stage of the case. Nor does the Court find that counsel's failure to comply with discovery deadlines - or even counsel's failure to provide advance notice before canceling depositions - rose to the level of conduct that was intended to harass and thus vexatious. Similarly, the Court declines to impose sanctions under its inherent power because Defendants have not established that Plaintiffs or their counsel acted in bad faith.

**IV. CONCLUSION**

For the reasons stated above, Plaintiffs' Motion for Dismissal is GRANTED. Defendants' Motion for Sanctions is DENIED. The action is dismissed with prejudice, pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure, with the parties to bear their own fees and costs.

IT IS SO ORDERED.

Dated: October 12, 2011

/s/ Joseph C. Spero

JOSEPH C. SPERO

United States Magistrate Judge

2011 U.S. Dist. LEXIS 117793, *14

**End of Document**

Exhibit 19, Page 174

# EXHIBIT 20

# Rojas v. Theobald

United States District Court for the Eastern District of New York

August 23, 2007, Decided; August 23, 2007, Filed

02-CV-3623 (DRH) (MLO)

**Reporter**

2007 U.S. Dist. LEXIS 62321 *; 2007 WL 2455133

REYNA ROJAS and EDUARDO ROJAS, on behalf of themselves, and on behalf of their minor children CARLOS ROJAS and DULCE ROJAS and LONG ISLAND HOUSING SERVICES, INC., [1] Plaintiffs, - against - VICTORIA THEOBALD, JASON THEOBALD, and GREGORY SCHKODA, Defendants.

**Subsequent History:** Affirmed by Rojas v. Schkoda, 2009 U.S. App. LEXIS 7078 (2d Cir., Apr. 3, 2009)

**Counsel:** [*1] For the Plaintiffs: Law Offices of Frederick Brewington, Hempstead, New York, Wendy Pelle-Beer, Esq.

For Defendant Victoria Theobald: Vincent F. Siccardi, Esq., Kew Gardens, New York.

For Defendant Gregory Schkoda: Law Offices of Thomas F. Liotti, Garden City, New York, Thomas F. Liotti, Esq.

**Judges:** Denis R. Hurley,, United States District Judge.

**Opinion by:** Denis R. Hurley

# Opinion

## MEMORANDUM AND ORDER

## HURLEY, Senior District Judge:

Presently before the Court are the motions by: (1) defendant Victoria Theobald for judgment as a matter of law dismissing the verdict entered against her pursuant to Federal Rule of Civil Procedure ("Rule") 50(b); (2) plaintiffs Reyna Rojas and Eduardo Rojas, on behalf of themselves and their minor children Carlos and Dulce (collectively, "Plaintiffs"), for judgment as a matter of law against defendants Victoria Theobald and Schkoda pursuant to Rule 50(b); and (3) defendant Gregory Schkoda ("Schkoda") for sanctions pursuant to Rule 11 and counsel fees pursuant to 42 U.S.C. §§ 1988(b) and 3613(c)(2). For the reasons stated below, all three motions are denied.

### BACKGROUND

Plaintiff brought this action against defendants Victoria Theobald, Jason Theobald, and Gregory Schkoda (collectively, "Defendants") [*2] asserting claims under 42 U.S.C. §§ 1982, 1985 and 1986, the fourteenth amendment, the Fair Housing Act, 42 U.S.C. § 3617 (the "FHA"), and state law. The trial commenced with jury selection on September 25, 2006. Following Plaintiffs' direct case, each of the Defendants moved for judgment as a matter of law pursuant to Rule 50(a) on all counts. (Tr. [2] at 1053-55, 1059, 1075.) The majority of Plaintiffs' claims were either voluntarily discontinued by Plaintiffs or dismissed by the Court. At the conclusion of the trial, only three claims were presented to the jury, viz. alleged violations under the FHA, § 1985, and a claim for

---

[1] Long Island Housing Services, Inc. was dismissed from the case for lack of standing pursuant to Rule 50(a).

[2] References to "Tr." refer to the trial transcript filed in this case.

private nuisance. On October 23, 2006, the jury returned a verdict finding defendant Victoria Theobald liable on the claim of private nuisance only and awarded compensatory damages as follows: $ 1,000.00 to Reyna Rojas; $ 500.00 to Eduardo Rojas; $ 250.00 to Carlos Rojas; and $ 250.00 to Dulce Rojas. The jury also awarded $ 100.00 in punitive damages to Reyna Rojas. Defendants Jason Theobald and Schkoda were found not liable on all counts.

On October 31, 2006, Victoria Theobald filed a motion **[*3]** to set aside the private nuisance verdict pursuant to Rule 50(b). On November 16, 2006, Schkoda filed a motion for attorneys' fees pursuant to Rule 11 and counsel fees and costs pursuant to 42 U.S.C. §§ 1988(b) and 3613(c)(2). Thereafter, on December 16, 2006, Plaintiffs cross-moved under Rule 50(b) for judgment notwithstanding the verdict on all counts as against Schkoda and on their FHA claim as against Victoria Theobald. For the reasons that follow, the Court denies the parties' motions.

## DISCUSSION

### I. *The Court's Jurisdiction Over Plaintiffs' and Victoria Theobald's Rule 50(b) Motions*

Before determining whether the parties are entitled to judgment as a matter of law, the Court must first consider whether the parties' respective motions are procedurally barred. At the time Victoria Theobald filed her motion, i.e., October 31, 2006, Rule 50 provided, in pertinent part, as follows: [3]

(a) *Judgment as a Matter of Law.*

(1) If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party

and may grant a motion for judgment as **[*4]** a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

(2) Motions for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.

(b) *Renewing Motion for Judgment After Trial; Alternative Motion for New Trial.* If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment-and may alternatively request a new trial or join a motion for a new trial under Rule 59. [4]

Fed. R. Civ. P. 50(a) and (b).

Rule 50(a) governs a party's initial motion for judgment as a matter of law. It provides that such motions may be made "at any time before submission of the case to the jury." *Id.* 50(a). Post-verdict renewal of such motions is governed by Rule 50(b). Pursuant to Rule 50(b) as it existed prior to the amendment, "when a Rule 50(a) motion made during trial is not granted, the moving party must renew the motion both at the close of the evidence and within ten days after entry of judgment." *Pahuta v. Massey-Ferguson, Inc.,* 170 F.3d 125, 129 (2d Cir. 1999). Accordingly, "[t]here is no provision for a [motion for judgment as a matter of law] to be made for the first time after trial." *McCardle v. Haddad,* 131 F.3d 43, 50-51 (2d Cir. 1997).

---

[3] Rule 50 was amended effective December 1, 2006, *see* discussion *infra.*

[4] The parties' respective motions seek judgment as a matter of law; no alternate requests for a new trial have been **[*5]** made.

Effective December 1, 2006, Rule 50(b) was "amended to permit renewal of *any* Rule 50(a) motion for judgment as a matter of law, deleting the requirement that a motion be made at the close of all the evidence." Fed. R. Civ. P. 50 advisory committee's note 2006 Amendment (emphasis added). As further explained:

> This change responds to many decisions that have begun to move away from requiring a motion for judgment as a matter of law at the literal close **[\*6]** of all the evidence. Although the requirement has been clearly established for several decades, lawyers continue to overlook it. The courts are slowly working away from the formal requirement. The amendment establishes the functional approach that courts have been unable to reach under the present rule and makes practice more consistent and predictable.

*Id.* Under the amendment, a motion under Rule 50(b) continues as a "renewal of the preverdict motion." *Id.* That is to say, a district court remains powerless to entertain a Rule 50(b) motion unless the movant has first requested judgment as a matter of law "at any time before the case is submitted to the jury." *Id.* 50(a). However, under the new subsection (b), a movant is no longer required to renew its Rule 50(a) motion at the close of all the evidence.

## A. *Defendant Victoria Theobald's Motion is Procedurally Proper*

It is undisputed that each defendant made a motion for judgment as a matter of law pursuant to Rule 50(a) at the close of Plaintiffs' case. (Tr. at 1053-55, 1059, 1075.) The parties do not address, however, whether any of the Defendants expressly renewed their motions at the close of all the evidence. After a review of the transcript, **[\*7]** it would appear that Defendants did not. (*See id.* at 1399.) Under the current version of Rule 50(b), Victoria Theobald's failure to expressly renew her Rule 50(a) motion at the close of all the evidence would have no bearing on her ability to bring the

present motion under subsection (b). Her Rule 50(b) motion, however, was filed prior to December 1, 2006, the effective date of the amendment, and, therefore, presumably the former version of Rule 50 is applicable. Nonetheless, for the reasons that follow, the Court finds that Victoria Theobald's Rule 50(b) motion is procedurally proper.

"The purpose of requiring the moving party to articulate the ground on which [judgment as a matter of law] is sought is to give the other party an opportunity to cure the defects in proof that might otherwise preclude him from taking the case to the jury. The articulation is necessary . . . so that the responding party may seek to correct any overlooked deficiencies in the proof." *Galdieri-Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 286 (2d Cir. 1998) (internal quotation marks and citation deleted). That purpose was more than adequately served in this case although defense counsel did not **[\*8]** expressly move for judgment as a matter of law at the conclusion of all the evidence. To begin with, defense counsel explained its position following the presentation of Plaintiffs' case-in-chief. (Tr. at 1053-75.) At that time, the Court indicated its intent to proceed with Defendants' witnesses and address Defendants' arguments at the end of the day. (*Id.* at 1058, 1075-76.) Thereafter, Defendants called two witnesses. Following their testimony, the Court briefly addressed some of the arguments raised in Defendants' Rule 50(a) motion and the matter was adjourned to the following week. (*See id.* at 1038-1322.) The next week, Defendants called their third and final witness. (*See id.* at 1348.) At the conclusion of his testimony, the defense rested. (*See id.* at 1399.) The pre-summation charge conference was then conducted, during which defense counsel mentioned again the arguments embodied within their Rule 50(a) motions made at the conclusion of Plaintiffs' evidence. (*See id.* at 1406-1517.) Thus, defense counsel provided specific notice of what they perceived to be the deficiencies in Plaintiffs' proof. And, as explained *infra,* the deficiencies cited were not truly factual in

nature, **[*9]** but rather concerned the legal conclusions to be drawn based on a given set of undisputed material facts. After the conference, the Court specifically reserved decision on Defendants' motion to dismiss Plaintiffs' private nuisance claim, noting that it would submit the claim to the jury and that if there was verdict in favor of Plaintiffs, it would entertain the appropriate Rule 50 motion. (*See id.* at 1497.) Accordingly, the Court will treat that charge colloquy as a motion for judgment as a matter of law made at the conclusion of all of the evidence. *See Campbell v. Liberty Transfer Co.,* No. CV-02-3084, 2005 U.S. Dist. LEXIS 45567, 2005 WL 2002453, at *2 (E.D.N.Y. Aug. 19, 2005) and cases cited therein, *vacated in part upon reconsideration on other grounds,* 2006 U.S. Dist. LEXIS 91568, 2006 WL 3751529 (E.D.N.Y. Dec. 19, 2006). Victoria Theobald's Rule 50(b) motion is therefore procedurally proper.

## B. *Plaintiffs' Rule 50(b) Motion is Procedurally Barred*

Plaintiffs move for judgment as a matter of law on all counts as against defendant Schkoda and on their FHA claim as against Victoria Theobald. Defendants argue that Plaintiffs' motion is barred because Plaintiffs failed to move for judgment as a matter of law "before the case [wa]s **[*10]** submitted to the jury." Fed. R. Civ. P. 50(a). The Court agrees. [5]

Plaintiffs advance several arguments as to why their Rule 50(b) motion is not procedurally defective. First, they claim that "at the close of Plaintiff[s'] case, the Court entertained all motions from all Defense Counsel, including motions pursuant to Rule 50, all of which Plaintiffs opposed." (Pls.' Reply Mem. of Law in Further Supp. of Their Mot. Pursuant to Rule 50 at 1.) The

Court fails to see the significance of this statement. Clearly, the fact that Defendants moved under Rule 50(a), or that Plaintiffs voiced opposition thereto, does not evidence Plaintiffs' intent to move for judgment as a matter of law under Rule 50(a). [6]

Next, Plaintiffs contend that:

> After the Jury returned a verdict, the Court stated that it would entertain post trial motions on papers. Accordingly, the parties along with the Court essentially reserved Plaintiffs' right to bring the instant motion. See Rule 6(b)[.] This grant by the Court was well understood by all the parties, thus the filing of a Rule 50(b) motion **[*12]** on papers by the Plaintiffs was reserved. "A mov[]ant may renew its request for judgment as a matter of law by filing a motion after entry of judgment." FRCP 50. Here, in the instant matter, there is no judgment and therefore the motion is timely.

(*Id.* at 2.) Plaintiffs' argument completely misconstrues the meaning of Rule 50. As noted above, it is firmly established law that a Rule 50(b) motion will not lie unless it was preceded by a motion for judgment as a matter of law under Rule 50(a) "before the case [wa]s submitted to the jury." Fed. R. Civ. P. 50(a); *see also* Fed. R. Civ. P. 50 advisory committee note (2006); *McCardle,* 131 F.3d at 51 (noting that party may not move for judgment as a matter of law for the first time after trial). Here, Plaintiffs made no such application.

---

[5] Plaintiffs' Rule 50(b) motion was filed on December 16, 2006, after the effective date of the amendment to Rule 50. The amendment has no bearing on Plaintiffs' motion, however, because Plaintiffs wholly failed to comply with subsection (a) by not moving thereunder "before the case [wa]s submitted to the jury." Fed. R. Civ. P. 50(a). In any event, the Court will hereinafter cite to Rule 50 in its current form.

[6] In support of this argument, Plaintiff cites page 1074 of the transcript, where Plaintiffs **[*11]** noted their opposition to Defendants' motions, and page 1402, where Plaintiffs indicated that they "would like to make [their] Rule 50 motion with regard to defendants' counterclaim" when the parties reconvened for the charge conference. (Tr. at 1402.) Again, the Court fails to see the relevance of this latter page citation as any attempt by Plaintiffs to make a Rule 50(a) motion with regard to defendants' counterclaim would have no bearing on the relief Plaintiffs presently seek, which is based on entirely different grounds. *See Lambert v. Genesee Hosp.,* 10 F.3d 46, 53-54 (2d Cir. 1993) (noting that because a Rule 50(b) motion "is in reality a renewal of a motion for a directed verdict, it cannot assert new grounds for relief"). Parenthetically, the Court notes that defendants' counterclaim was not presented to the jury.

Exhibit 20, Page 178

The Court's statement that it would entertain post-trial motions was clearly limited to those motions filed in compliance with the Federal Rules of Civil Procedure. Plaintiffs' citation to Rule 6(b), which permits the Court under certain circumstances to permit a party to perform an act after the time period to do so has expired, is misguided, to say the least. The plain language of Rule 6(b) excludes motions **[*13]** made under Rule 50(b) from the scope of its coverage. Fed. R. Civ. Proc. 6(b).

Moreover, the fact that a judgment has not yet been entered in this case is of no moment. Although Rule 50(b) provides that a "[m]ovant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after the entry of judgment," that statement presupposes that a motion pursuant to Rule 50(a) has already been made. Accordingly, because Plaintiffs failed to move for judgment as a matter of law "at any time before the case [wa]s submitted to the jury" Fed. R. Civ. P. 50(a), Plaintiff's motion pursuant to Rule 50(b) is barred.

## II. *Defendant Victoria Theobald's Rule 50(b) Motion is Denied*

### A. *Standard of Review*

As explained by the Second Circuit:

> The standard governing motions for judgment as a matter of law ("JMOL") pursuant to Rule 50, formerly denominated motions for directed verdict or motions for judgment notwithstanding the verdict is well established. Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor. In deciding such **[*14]** a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. Thus, judgment as a matter of law

> should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it].

*Galdieri-Ambrosini,* 136 F.3d at 289 (citations omitted).

### B. *Defendant's Arguments*

In support of her Rule 50(b) motion seeking judgment as a matter of law dismissing the jury's verdict awarding Plaintiffs $ 2,000.00 in compensatory damages and $ 100.00 in punitive damages on their private nuisance claim, Victoria Theobald presents several arguments. The Court addresses these arguments below.

### 1. *There was Sufficient Evidence that Victoria Theobald's Interference With Plaintiffs' Right to Enjoy Their Land was Substantial in Nature*

The elements of a claim for private nuisance are as follows: "(1) an interference **[*15]** substantial in nature, (2) intentional in origin, (3) unreasonable in character, (4) with a person's property right to use and enjoy land, (5) caused by another's conduct in acting or failure to act." *Copart Indus. v. Consolidated Edison Co. of N.Y.,* 41 N.Y.2d 564, 570, 362 N.E.2d 968, 394 N.Y.S.2d 169 (1977). Victoria Theobald argues that she is entitled to judgment as a matter of law because the interference she committed, if any, was not substantial in nature. She contends that the jury's award of $ 2,000.00 in compensatory damages and $ 100.00 in punitive damages -- low when compared to the $ 5 million originally requested -- necessarily indicates that the jury found her actions "annoying" rather than substantial. In this regard, defendant argues that "if the jury felt that the actions of Victoria Theobald forced them to sell their home, the damages would have been significantly greater." (Affirmation of Vincent F.

Siccardi, dated Oct. 27, 2006, P 24.)

Whether or not an interference is substantial enough to rise to the level of private nuisance is a question of fact for the jury. *Weinberg v. Lombardi,* 217 A.D.2d 579, 629 N.Y.S.2d 280, 281 (2d Dep't 1995). To be substantial, the interference must "not be fanciful, slight, or theoretical, [*16] but certain and substantial, and must interfere with the physical comfort of the ordinarily reasonable person." *Bove v. Donner-Hanna Coke Corp.,* 236 A.D. 37, 258 N.Y.S. 229, 233 (4th Dep't 1932).

Here, the record is replete with sufficient evidence to permit a rational trier of fact to find that Mrs. Theobald's conduct rose to the level of a substantial interference with Plaintiffs' use and enjoyment of their land. The Rojases purchased their home in Selden in August 1999. (Tr. at 100.) There was an easement which provided that the Rojases share their driveway with the Theobalds. (Tr. at 444.) Reyna Rojas testified that on the first day she moved in to her new home, Victoria Theobald screamed at her, telling her that she was not allowed to park her car in the driveway and that she would have to put her car someplace else. (*Id.* at 106-08.) As a result, Mr. Rojas created a separate walkway so as to avoid using the driveway. (*Id.* at 447-48.)

Mrs. Rojas also testified that after placing some branches on her own property, Mrs. Theobald screamed at her that she should not put the branches there and "that [she] should learn how to speak English and that [she] should go back to [her] country." (*Id.* at 111; [*17] *see also id.* at 112.) Mrs. Rojas thereafter removed the branches and took them to the dump. (*Id.* at 112-13.)

Mrs. Rojas testified that the Theobalds had four large dogs on their property during the time Plaintiffs lived at their Selden house. (*Id.* at 121.) She also testified that one of the dogs approached her while on her own property and placed its paw on her leg, which frightened her so that she ran inside her home. (*Id.* at 129-31.) According to Mrs. Rojas, the dogs approached her children "[a]lmost

every day" (*id.* at 132), and she and her husband erected a fence to prevent the dogs from entering her property, although one dog still managed to get on her property. (*Id.* at 136-37.) Mrs. Rojas testified that she complained to Victoria Theobald about her dogs (*id.* at 149-50), that Mrs. Theobald responded by getting angry (*id.* at 152), and that Mrs. Rojas called the police and told them that her children couldn't go outside because they were afraid of the dogs, (*id.* at 155.)

Mrs. Rojas also testified that she complained to Mrs. Theobald about her placing her garbage in front of Mrs. Rojas' mailbox but that Mrs. Theobald continued to do so. (*Id.* at 157-168.)

Mr. Rojas testified that after [*18] getting into a dispute with the Theobalds about the latter's placement of a sign on Plaintiffs' property, Mrs. Theobald responded by saying "fuckin' Mexicans, when are you going to learn English, when are you going to go back to your country. Why are you here? Why don't you move." (*Id.* at 476.) Dulce Rojas testified that she overheard Victoria Theobald cursing at her Mother and telling her to "go back to [her] country" and that she was "scared because [she] didn't know what was going to happen to [her] [M]om." (*Id.* at 1010.) She also testified that she was scared of the Theobald's dogs. (*Id.* at 1009.)

After reviewing the trial testimony, as well as the relevant case law, the Court finds that Victoria Theobald has failed to demonstrate either the complete absence of evidence, or the existence of an overwhelming amount of evidence in her favor, entitling her to judgment as a matter of law. Instead, the Court finds that the evidence presented at trial was sufficient to permit the jury to find that Victoria Theobald's interference was substantial in nature. *Compare Domen Holding Co. v. Aranovich,* 1 N.Y.3d 117, 124, 802 N.E.2d 135, 769 N.Y.S.2d 785 (2003) (finding that issue of fact existed as to whether conduct of tenant's [*19] guest constituted a nuisance where landlord alleged "fact-specific examples of [guest's] outrageous conduct and

detail[ed] his use of profanity, racial epithets and threats of violence against [a doorman], his threats to physically harm [another tenant] and his actual use of violence against the superintendent"); *Schwegel v. Chiaramonte,* 4 A.D.3d 519, 772 N.Y.S.2d 379, 381 (2d Dep't 2004) ("The plaintiffs' alleged videotaping of the defendants . . . and their children, raised triable issues of fact as to whether the plaintiffs were liable in nuisance."); *Zimmerman v. Carmack,* 292 A.D.2d 601, 739 N.Y.S.2d 430, 432 (2d Dep't 2002) (finding that plaintiffs adequately pled cause of action for nuisance where they alleged that defendants "repeatedly left their home for long periods of time with an outside stereo playing so loudly that the police were required to come and disconnect the wires, and that the defendants continuously and intentionally allowed the improper and unlawful accumulation of dog waste and garbage, including soiled diapers and rotting food, immediately adjacent to the plaintiffs' property"). Although defendant makes much of the fact that the jury awarded Plaintiffs "only" $ 2,000.00 in compensatory **[*20]** damages and $ 100.00 in punitive damages, defendant proffers no authority whatsoever to support her claim that in order for a jury to find substantial interference, the amount of damages awarded must be significant as well. Accordingly, Victoria Theobald's Rule 50(b) motion is denied on this ground.

### 2. The Cause of Action for Private Nuisance was not Duplicitous With the Section 1985 Claim

Without citation to a single authority, defendant argues as follows:

> The defendants Jason Theobald and Gregory Schkoda were eventually found not liable on the conspiracy claim. Therefore Victoria Theobald should also have been found not liable.
>
> . . . .
>
> The cause of action commenced by the plaintiffs for private nuisance was duplicitous with 42 U.S.C. § 1985 - the conspiracy claim. The jury found Victoria Theobald not liable on

the §1985 claim. In fact, the jurors found all 3 defendants not liable on that claim.

(Def.'s Mem. of Law, dated Oct. 27, 2006, at 4-6.) Plaintiffs do not address this argument other than to generally state that "Defendant Theobald misapprehends the Court's statement with regard to the charge of conspiracy and the separate charge of nuisance that were presented to the jury for consideration. **[*21]** Nevertheless, this argument is not one upon which a Rule 50 motion may be granted." (Pls.' Mem. of Law in Opp'n to Def.'s Mot. Pursuant to Rule 50 at 12.)

Defendant's argument appears to be twofold. Proceeding in reverse order, she argues that: (1) it was inconsistent for the jury to find her not liable on the § 1985 conspiracy claim yet liable for private nuisance; and (2) it was inconsistent for the jury to find Jason Theobald and Schkoda not liable for conspiracy yet her liable for private nuisance. Neither of defendant's arguments have merit.

In order to state a claim for conspiracy under § 1985(3), the plaintiff must allege that the conspiracy was motivated by some "class-based animus." *Iqbal v. Hasty,* 490 F.3d 143, 176 (2d Cir. 2007). Thus, the Court's charge provided that in order for Plaintiffs to establish a claim under § 1985(3), they needed to demonstrate by a preponderance of the evidence that Defendants deprived Plaintiffs of their right to the enjoyment of their home and property and were motivated "in whole or in part by a dislike or hateful discriminatory attitude toward a specific class of people, here Hispanics." (Tr. at 1663.) When charging on private nuisance, the **[*22]** Court pointed out that there was "no discrimination aspect to" this claim and that "a private nuisance can exist with or without any discriminatory animus." (*Id.* at 1667.) Thus, contrary to defendant's contentions, given that a claim for private nuisance does not require discriminatory animus, these two claims are not duplicitous.

Next, the fact that the jury found Jason Theobald and Gregory Schkoda not liable on the § 1985

Case 8:18-ap-01168-SC    Doc 347    Filed 08/19/21    Entered 08/19/21 21:07:48    Desc
Main Document      Page 204 of 242
2007 U.S. Dist. LEXIS 62321, *22

Page 8 of 11

conspiracy claim, or even on the private nuisance claim, has no bearing on Victoria Theobald's liability for private nuisance. As just discussed, they are separate claims comprised of different elements. Moreover, there is no conspiracy element to a claim for private nuisance. Accordingly, the Court declines to grant defendant's Rule 50(b) motion on this basis.

### 3. A Claim for Private Nuisance May Be Predicated on a Defendant's Conduct as Opposed to a Defendant's Use of Land

Defendant briefly asserts that "the Court expressed reservations about submitting the private nuisance claim to the jury." (Def.'s Mem of Law, dated Oct. 27, 2006, at 4 (citing Tr. at 1424-24, 1430-31).) In fact, during the charge conference, the Court noted that there was some language in the New **[*23]** York Pattern Jury Instructions which suggested that a claim for private nuisance must emanate from a defendant's use of his or her land, as opposed to arising out of a defendant's conduct. (Tr. at 1423-25.) The language the Court was referring to reads as follows: "While landowners in an organized community must tolerate some damage, annoyance and inconvenience from each other, no one may make an *unreasonable use of his or her land* to the material injury of a neighbor's right to use and enjoy his or her land." N.Y. Pattern Jury Instructions Civil 3:16 (emphasis added).

Plaintiffs' counsel disputed the implication that a private nuisance claim required the unreasonable use of a defendant's land and argued that it was the defendant's conduct, and not the use of his or her property, which controlled. Plaintiff cited *Schwegel,* 4 A.D.3d 519, 772 N.Y.S.2d 379, where the Second Department held that "[t]he plaintiffs' alleged videotaping of the defendants . . . and their children, raised triable issues of fact as to whether the plaintiffs were liable in nuisance." Based on the *Schwegel* case, the Court presented the private nuisance claim to the jury (Tr. at 1497), charging that "a plaintiff seeking to recover **[*24]** damages for private nuisance must show . . . that the conduct

of the defendant you are considering interfered with plaintiff's right to use and enjoy his land." (*Id.* at 1667.) Other than defendant's reference to the Court having "reservations" with regard to the private nuisance claim, neither party analyzes this issue in their Rule 50(b) briefs.

Given defendant's complete failure to address this issue in any meaningful way, the Court declines to grant defendant's request for relief under Rule 50(b) on this ground and instead adheres to its previous ruling. Parenthetically, the Court notes that in *Copart,* the leading New York Court of Appeals case on private nuisance, the Court noted in dictum that "[d]espite early private nuisance cases, which apparently assumed that the defendant was strictly liable, today it is recognized that one is subject to liability for a private nuisance if *his conduct* is a legal cause of the invasion of the interest in the private use and enjoyment of land and such invasion is (1) intentional and unreasonable, (2) negligent or reckless, or (3) actionable under the rules governing liability for abnormally dangerous conditions or activities." 41 N.Y.2d at 569 **[*25]** (emphasis added). Such disjunctive language would seem to indicate that a defendant may be liable for a private nuisance based wholly on his or her conduct.

In a later case involving nuisance under New York's Rent Stabilization Code, the Court of Appeals noted that "[t]o constitute a nuisance the *use of property* must interfere with a person's interest in the use and enjoyment of land." *Domen Holding Co.,* 1 N.Y.3d at 123 (citing Restatement Second of Torts § 821D and *Copart,* 41 N.Y.2d 564, 362 N.E.2d 968, 394 N.Y.S.2d 169) (emphasis added). Nonetheless, the Court went on to hold that genuine issues of material fact existed as to whether the *conduct* of the defendant-tenant's guest constituted a nuisance based on allegations that the guest used profanities, made racial epithets, and threatened and actually used violence against others in the building. *Id.* at 124. The Court found that "[t]hese allegations of [the guest's] conduct are of the type that may render the enjoyment of the

building especially uncomfortable--indeed, they may even be threatening and frightening--for other tenants and building staff." *Id.*

After a review of the *Copart* and *Domen Holding Co.* cases, as well as the Second Department's decision in *Schwegel,* **[*26]** the Court adheres to its ruling at trial and finds that the private nuisance claim was properly submitted to the jury.

## III. *Schkoda's Motion for Sanctions and Attorneys' Fees is Denied*

Over three weeks after the jury reached its verdict in this case, Schkoda filed a motion for Rule 11 sanctions and counsel fees, arguing in part that "[a]ll thirteen causes of action by Long Island Housing Services, Inc. were dismissed before the jury charge [and] [t]en (10) out of thirteen (13) causes of action brought by the remaining plaintiffs were dismissed." (Aff. of Thomas F. Liotti, dated Nov. 15, 2006, P 12.) For the reasons that follow, both motions are denied.

### A. *Schkoda's Motion for Rule 11 Sanctions is Denied*

In arguing for sanctions, defense counsel contends that the instant action "was brought by experienced counsel who knew that these claims lacked merit, were legally baseless and could not be brought in the absence of bad faith." (*Id.* P 20.) Despite defense counsel's assertions regarding the frivolity of Plaintiffs' claims, counsel did not move for Rule 11 sanctions until *after* the trial was conducted in this case, more than four years after Plaintiffs initiated this action. In addition, **[*27]** at no time during the litigation, did any of the Defendants move to dismiss the Complaint pursuant to Rule 12 or move for summary judgment pursuant to Rule 56. In fact, by the time Schkoda filed the instant Rule 11 motion, all claims against him had already been dismissed or withdrawn.

### 1. *Rule 11(c)(1)(A)*

Rule 11(c)(1)(A) provides that a motion for sanctions "shall be served as provided in Rule 5,

but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." Fed. R. Civ. P. 11(c)(1)(A). This "safe harbor" provision affords protection to a party that voluntarily withdraws its challenged statement after receiving notice of the specific grounds for a potential sanction. Here, it is undisputed that Schkoda did not comply with Rule 11(c)(1)(A) because he did not serve his Rule 11 motion on Plaintiffs prior to presenting it to the Court. Ordinarily, failure to comply with Rule 11's "safe harbor" provision requires dismissal of the motion. *See, e.g., Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1328 (2d Cir. 1995). **[*28]** There is, however, an added wrinkle in this case.

Schkoda's motion was filed after all of Plaintiffs' claims against him had been dismissed or withdrawn. Therefore, it was too late for the "safe harbor" provision to have any effect as Plaintiffs could no longer withdraw their challenged claims. Although not raised by the parties, one could argue that under the circumstances, compliance with Rule 11(c)(1)(A) was unnecessary given the futility of the "safe harbor" provision. The Court's independent research, however, has revealed that this is not the case. In *In re Pennie & Edmonds LLP,* 323 F.3d 86 (2d Cir. 2003), the Second Circuit noted as follows:

> Although Rule 11 contains no explicit time limit for serving the motion, the "safe harbor" provision functions as a practical time limit, and motions have been disallowed as untimely when filed after a point in the litigation when the lawyer sought to be sanctioned lacked an opportunity to correct or withdraw the challenged submission. The Advisory Committee on Civil Rules contemplated that Rule 11 motions would be deemed untimely if filed too late to permit correction or withdrawal, and the Moore treatise endorses

this approach. [7]

*Id.* at 89  **[\*29]** (citations omitted).

By delaying his motion until after the trial had concluded, Schkoda deprived Plaintiffs' counsel of the right to avoid sanction by withdrawing Plaintiffs' claims. *See Ridder v. City of Springfield,* 109 F.3d 288, 297 (6th Cir. 1997) (holding that defendant gave "up the opportunity to receive an award of Rule 11 sanctions . . . by waiting to file the motion until after the entry of summary judgment"). Accordingly, Schkoda's motion for sanctions pursuant to Rule 11(c)(1)(A) is denied as untimely.  **[\*30]** [8]

### 2. *Rule 11(c)(1)B)*

Schkoda attempts to circumvent his failure to comply with Rule 11's "safe harbor" provision by arguing that the Court should sanction Plaintiffs pursuant to its inherent power under Rule 11. *See* Fed. R. Civ. P. 11(c)(1)(B). Given defendant's failure to avail himself of the remedies provided for in Rule 11, the Court declines to do so.

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). "Furthermore, when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the

---

[7] "The 21-day, safe-harbor service requirement controls not only the earliest date on which a motion may be filed . . . , it also indirectly controls the last date on which a Rule 11 sanctions motion may be filed. At the very least, a party must serve its Rule 11 motion before the court has ruled on the pleading, and thus before the conclusion of the case. Otherwise, the purpose of the 'safe harbor' provision would be nullified. This has been interpreted to mean that Rule 11 motions must be served at least a full 21 days before the court concludes the case or resolves the offending contention . . . ." 2 Moore's Federal Practice § 11.22[1](c) (3rd ed. 2001) (footnotes omitted).

[8] To the extent Schkoda has moved for "supplemental sanctions" (docket entry 101) barring Plaintiffs' Rule 50 motion, this motion is denied for failure to comply with the "safe harbor" provision of Rule 11 as defendant did not serve it on Plaintiffs 21 days prior to presenting it to the Court.

Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power." *Id.* at 50.

This is plainly not a case where the conduct  **[\*31]** at issue was not covered by one of the other sanctioning provisions. Defendant could have utilized Rule 11 earlier in the litigation. His failure to do so, together with his failure to make *any* dispositive motions in this case, call into question the merits of the argument he now advances. Accordingly, Schkoda's motion for sanctions pursuant to Rule 11(c)(1)(B) is denied.

### IV. *Schkoda's Motion for Attorneys' Fees and Costs are Denied*

Schkoda moves for an award of attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988(b) and 3613(c)(2). In actions under Sections 1981, 1981a, 1982, 1983, 1985, and 1986, a district court, "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. §§ 1988(b). Similarly, under the FHA, a district court, "in its discretion, may allow the prevailing party . . . a reasonable attorney's fee and costs." *Id.* § 3613(c)(2). The same substantive standards apply under both statutes. *LeBlanc-Sternberg v. Fletcher,* 143 F.3d 748, 757 (2d Cir. 1998). As explained by the Second Circuit:

> Fees are regularly awarded to prevailing plaintiffs who obtain some significant measure of relief but not to prevailing defendants.  **[\*32]** Instead, a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so. A prevailing defendant need not show bad faith by a plaintiff to be entitled to attorneys' fees, though such a showing provides an even stronger basis for the award.

*Panetta v. Crowley,* 460 F.3d 388, 399 (2d Cir. 2006); *see also LeBlanc-Sternberg v. Fletcher,* 143

Case 8:18-ap-01168-SC    Doc 347    Filed 08/19/21    Entered 08/19/21 21:07:48    Desc
Main Document      Page 207 of 242

Page 11 of 11
2007 U.S. Dist. LEXIS 62321, *32

F.3d 765, 770 (2d Cir. 1998) ("The fact that a plaintiff may ultimately lose his case is not in itself a sufficient justification for the assessment of fees in favor of the defendant.") (citation and internal quotation marks omitted). In making this distinction, the Supreme Court identified "two strong equitable considerations" for awarding attorneys' fees to a prevailing plaintiff which are "wholly absent" where the defendant prevails. *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 418, 98 S. Ct. 694, 54 L. Ed. 2d 648 (1978). First, the plaintiff is the chosen instrument to vindicate 'a policy that Congress considered of the highest priority.'" *Id.* (quoting *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402, 88 S. Ct. 964, 19 L. Ed. 2d 1263 (1968)). Second, when [*33] a prevailing plaintiff is awarded attorneys' fees, these fees are assessed "against a violator of federal law." *Id.* at 419.

Here, in moving for attorneys' fees and costs, defense counsel merely cites the two statutes, viz. 42 U.S.C. §§ 1988(b) and 3613(c)(2), and presents argument as to why the *amount* of the fee requested is appropriate. At no point does he address the case law outlined above or indicate why he would be entitled to such relief. Although he makes vague references throughout his motion papers that Plaintiffs' claims were all frivolous, nowhere does he provide any specificity as to why that is the case. There is no explanation as to what Plaintiffs' claims were, the elements thereof, how they were disposed of, or citation to any authority whatsoever. Although Plaintiffs withdrew a number of claims from the Court's consideration and several others were dismissed during the trial, it must be recognized that defendant never moved to either dismiss Plaintiffs' claims as a matter of law or for summary judgment -- actions which might have obviated the need for any trial preparation on these issues. Moreover, a trial was clearly necessary on at least three of Plaintiffs' claims [*34] as those claims were presented to the jury. *See LeBlanc-Sternberg*, 143 F.3d at 770 ("[A] court cannot properly consider a claim to be frivolous on its face if it finds that the plaintiff must be allowed to litigate the claim."). Under these circumstances, and based on the papers provided, the Court finds that defendant has failed to establish that Plaintiffs' claims were "frivolous, unreasonable, or groundless" and therefore declines to grant defendant Schkoda's motion for attorneys' fees and costs under 42 U.S.C. §§ 1988(b) and 3613(c)(2).

## CONCLUSION

For all of the above reasons, both Plaintiffs' and defendant Victoria Theobald's motions for judgment as a matter of law pursuant to Rule 50 are DENIED; Schkoda's motion for sanctions and counsel fees is DENIED. Upon entry of judgment, the Clerk is directed to close this case.

## SO ORDERED.

Dated: August 23, 2007

Central Islip, New York

Denis R. Hurley,

United States District Judge

End of Document

# EXHIBIT 21

# Salessi v. Commonwealth Land Title Ins. Co.

United States District Court for the Central District of California

March 4, 2014, Decided; March 4, 2014, Filed

SACV 08-1274-DOC (JPRx)

**Reporter**
2014 U.S. Dist. LEXIS 199653 *

KAREEM SALESSI v. COMMONWEALTH LAND TITLE INSURANCE COMPANY, ET AL.

**Prior History:** Salessi v. Commonwealth Land Title Ins. Co., 2013 U.S. Dist. LEXIS 200319 (C.D. Cal., June 7, 2013)

**Counsel:** [*1] Kareem Salessi, Plaintiff, Pro se, Laguna Niguel, CA USA.

For Commonwealth Land Title Insurance Company, a Pennsylvania Corporation, Fidelity National Financial, a California Corporation, Defendants: Nami R Kang, Epport Richman & Robbins, Los Angeles, CA USA.

For Ann E Skinner, an individual, Defendant: Darin L Wessel, LEAD ATTORNEY, Manning & Kass Ellrod Ramirez Trester LLP, San Diego, CA USA.

For Debra A Ortiz, Patrick F Ortiz, Defendants: Lisa Joyce McMains, LEAD ATTORNEY, Watten Discoe Bassett & McMains, Santa Ana, CA USA.

For County of, a municipal corporation, Defendant: Albert P Ballog, Jr, LEAD ATTORNEY, Sullivan Ballog & Williams LLP, Santa Ana, CA USA; Michael S Vasin, Sullivan & Ballog LLP, Santa Ana, CA USA.

For Wachovia Mortgage Fsb, Defendant: Frederick J Hickman, LEAD ATTORNEY, Anglin Flewelling Rasmussen Campbell & Trytten, Pasadena, CA USA.

For Wachovia Corporation, a North Carolina Corporation, Defendant: Frederick J Hickman, LEAD ATTORNEY, Anglin Flewelling Rasmussen Campbell & Trytten, Pasadena, CA USA.

**Judges:** HONORABLE DAVID O. CARTER, JUDGE.

**Opinion by:** DAVID O. CARTER

## Opinion

**CIVIL MINUTES — GENERAL**

**PROCEEDINGS (IN CHAMBERS): ORDER DENYING MOTION FOR SANCTIONS [208]**

Before the Court is the Motion [*2] for Sanctions (Dkt. 208) filed by Defendants Wachovia Corporation, Michael Goldberg, Golden West Savings Association Service Company, and World Savings Bank, FSB, renamed to Wachovia Mortgage, FSB's ("Defendants").[1] The Court finds this matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. Having considered the motion, opposition, reply and supporting documents, the Court DENIES Defendants' Motion for Sanctions.

## I. BACKGROUND

The Court summarized the relevant facts of this case in its Order filed October 16, 2014. *See* Order, October 16, 2014, (Dkt. 178), at 2. The Court therefore reiterates only those facts particularly

---

[1] All Defendants in this motion are all inter-related parties. All corporate entities are affiliates within Wells Fargo & Company and Michael Goldberg is an in-house counsel for Wachovia.

relevant here.[2]

This case arises from Plaintiff's purchase of a house in Laguna Niguel in 2002 ("the Property"). Plaintiff received a loan to purchase the Property. The Plaintiff claims that his agent, the seller's brokers, the seller's agents, the sellers, his loan broker, an appraisal company hired by a prospective lender, the eventual lender, and the county tax assessor all conspired to sell Plaintiff an uninhabitable home. Plaintiff claims that the loan documents were forged, hidden, and recorded. Plaintiff brought a series of claims related to that home purchase [*3] and the alleged conduct.

On November 4, 2004, Plaintiff filed a case in the Superior Court of Orange County, case number 04CC11080. Order at 3. The case was dismissed against World Savings Bank, now known as Wachovia Mortgage, FSB. On appeal, Defendants' motion to dismiss the appeal was granted. RJN (Dkt. 209) at Ex. L. In June 2008, Plaintiff filed a second state court action in Orange County, 30-2008-0010753, against various parties including Defendants. RJN at Ex. C. The court dismissed the claims against Defendants with prejudice, most on the basis of res judicata. *Id.* at Ex. E.

Plaintiff then brought similar claims against the same parties and some new parties related to purchase or foreclosure of the Property in this Court. All claims against Defendants were dismissed with prejudice on the basis of res judicata. Order at 13. Defendants then filed the current motion for sanctions. Defendants argue that the claims alleged in the complaint were frivolous because they were procedurally barred.

## II. LEGAL STANDARD

"Rule 11 provides for the imposition of sanctions when a [claim] is frivolous, legally unreasonable, or without factual foundation, or is brought for an improper purpose." *Warren v. Guelker*, 29 F.3d

1386, 1388 (9th Cir. 1994) (citing [*4] *Conn v. Borjorquez*, 967 F.2d 1418, 1420 (9th Cir. 1992); *Operating Pension Trust v. A-C Co.*, 859 F.2d. 1336, 1344 (9th Cir. 1988)). However, Rule 11 must not operate to be "a bar to [the] legal process." *Operating Pension Trust*, 859 F.2d at 1344. Thus, "[c]ourts must also 'avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading . . . was submitted.'" *Id.* (quoting Fed. R. Civ. Pro. 11 Advisory Committee notes).

The Ninth Circuit has held that an "objective-objective" test governs whether a party has violated Rule 11. *In re Keegan Mgmt. Co., Secs. Litig.*, 78 F.3d 431, 434 (9th Cir. 1996). Under this test, a court should consider both whether the paper at issue is objectively frivolous and also whether a reasonable attorney, rather than the actual person submitting the paper, would have believed it to be frivolous at the time it was filed. *Id.*

However, the analysis is different if a plaintiff proceeds pro se because "arguments that a lawyer should or would recognize as clearly groundless may not seem so to the pro se [litigant]." *Coleman v. Teamsters Local 853*, No. 12-05981 SC, 2013 U.S. Dist. LEXIS 100768, 2013 WL 3790900, at *2 (N.D. Cal. July 18, 2013) (quoting *Pryzina v. Ley*, 813 F.2d 821, 823-24 (7th Cir. 1987)) (internal quotation marks omitted). "[W]hat is objectively reasonable for a pro se litigant and for an attorney may not be the same." *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 892 F.2d 802, 811 (9th Cir. 1989), *aff'd*, 498 U.S. 533, 111 S. Ct. 922, 112 L. Ed. 2d 1140 (1991). Additionally, "the pro se status of a violator may be relevant to the court's discretionary choice of the appropriate sanction in a given case." *Id.* Additionally, [*5] the Court may consider a party's ability to pay monetary sanctions as one factor when assessing sanctions. *Warren v. Guelker*, 29 F.3d 1386, 1390 (9th Cir. 1994).

## III. ANALYSIS

---

[2] Defendants' request for judicial notice (Dkt. 209) is GRANTED.

Defendants ask the Court to sanction Plaintiff for pursuing the litigation in bad faith. Mot. at 7. Defendants argue that monetary sanctions against Plaintiff are necessary to deter any future abuse of process. *Id.* at 10. Defendants also move the Court to declare Plaintiff a vexatious litigant and request that the Court require that Plaintiff seek the Court's approval for any future filing. *Id.*

## A. Rule 11 Sanctions

Defendants argue Plaintiffs claims are frivolous because all of the claims were already decided against Plaintiff in the previous state court proceedings. Mot. at 5. Sanctions may be imposed for bringing claims that are barred on procedural grounds, such as res judicata. *See Mir. v. Little Co. of Mary Hosp.*, 844 F. 2d 646, 653 (9th Cir. 1988) (upholding a sanction against party for filing claims barred by statutes of limitation and res judicata because claims are both frivolous and for harassment).

However, when "sanctions are initiated by motion, Rule 11 provides for a *mandatory* 21 day safe-harbor period before a motion for sanctions is filed with the court." *Truesdell v. S. Cal. Permanente Med. Grp.*, 293 F.3d 1146, 1152 (9th Cir. 2002) (emphasis added). Courts must strictly enforce this safe harbor provision. *Holgate v. Baldwin*, 425 F.3d 671, 678 (9th Cir. 2005) (citing **[*6]** *Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 788-89 (9th Cir. 2001)). Therefore, even if the underlying filing were frivolous, there can be no award of sanctions when the moving party fails to comply with the safe harbor provisions. *Id.* (citing *Barber v. Miller*, 146 F.3d 707, 711 (9th Cir. 1998)).

Additionally, "[t]he purpose of the safe harbor . . . is to give the offending party the opportunity, within 21 days after service of the motion for sanctions, to withdraw the offending pleading *and thereby escape sanctions.*" *Barber*, 146 F.3d at 710 (emphasis in original). A motion served after the complaint is dismissed does not give the party that opportunity. *Id.* Therefore, Defendant must not

only give Plaintiff sufficient notice, but cannot give that notice or file the motion after the complaint is dismissed.

Defendants failed to follow the safe harbor provisions in two ways. First, Defendants did not give Plaintiff twenty-one days' notice prior to filing their motion. Defendants electronically served the motion on Plaintiff on December 4, 2013, the same day they filed the motion with the Court. *See* Mot. Certificate of Service. Second, Defendants filed the motion after the Court had dismissed the case with prejudice on October 16, 2013. Accordingly, Defendants' motion for sanctions under Rule 11 must be DENIED.

## B. Sanctions Under the [*7] Court's Inherent Power

Defendants also argue that sanctions are appropriate under the Court's inherent power. The Court may impose sanctions under its inherent power for "willful disobedience of a court order, . . . when a losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, . . . [or] against counsel who willfully abuse judicial processes." *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001).

Defendants argue that sanctions are appropriate here because Plaintiff pursued the litigation in bad faith. Mot. at 6-7. Bad faith includes a "broad range of willful improper conduct." *Id.* at 992. "The bad faith requirement sets a high threshold" that is not met in this case. *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 649 (9th Cir. 1997) (holding that bad faith had not been established even when the arguments made were "totally frivolous"). Although Plaintiff brought procedurally barred claims despite their prior dismissal, the Court finds no bad faith because there is no apparent willful improper purpose. Plaintiff's claims were largely frivolous, but frivolousness alone is insufficient to establish bad faith absent recklessness. *See Primus Auto. Fin. Servs.*, 115 F.3d at 649. The Court finds Plaintiff's conduct suggests negligence, not

recklessness. Accordingly, the Court DENIES Defendants' Motion for Sanctions under the **[*8]** Court's inherent powers.


## C. Vexatious Litigant Status

Defendants also seek nonmonetary sanctions against Plaintiff, namely pre-filing orders requiring Plaintiff to seek approval of the Court prior to any new filings pertaining to the Property. Mot. at 10. "The All Writs Act, 28 U.S.C. § 1651(a), provides district courts with the inherent power to enter pre-filing orders against vexatious litigants." *Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1056 (9th Cir. 2007) (citing *Weissman v. Quail Lodge Inc.*, 179 F.3d 1194, 1197 (9th Cir. 1999)). "[P]re-filing orders are an extreme remedy that should rarely be used." *Id.* (citing *De Long v. Hennessey*, 912 F.2d 1144, 1147 (9th Cir. 1990)). Courts should tread lightly as such sanctions can interfere with a "litigant's due process right of access to the courts." *Id.* (citing *Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 817 (4th Cir. 2004); *Moy v. United States*, 906 F.2d 467, 470 (9th Cir. 1990)).

The Ninth Circuit sets out four guidelines that must be satisfied before pre-filing orders may issue. *See De Long*, 912 F.2d at 1147-48. The four requirements are: (1) the litigant must be given adequate notice and chance to be heard; (2) the Court must compile an adequate record for review; (3) the Court must make "substantive findings of frivolousness or harassing nature of litigant's actions"; and (4) the order must be narrowly tailored to prevent the specific vice encountered. *Id.*

In making substantive findings of frivolousness, the Court "needs to look 'both the number and content of the filings as indicia' **[*9]** of frivolousness." *Id.* at 1148 (quoting *In re Powell*, 851 F.2d 427, 431, 271 U.S. App. D.C. 172 (D.C. Cir. 1988)). By looking at both number and content, the Court can "discern if the litigant is filing numerous, similar complaints, and whether the litigant is attempting to harass a particular adversary." *In re Powell*, 851 F.2d at 431. Pre-filing orders cannot be based solely on the fact the litigant is litigious. *Moy v. U.S.*, 906 F.2d 467, 470 (9th Cir. 1990).

As the Court stated earlier, this is the second time Plaintiff brings claims barred by the doctrine of res judicata against Defendants. Although this is duplicative, the Court is wary to impose such an extreme sanctions without any clear evidence of bad faith. Similarly, in a prior order, the Court declined to impose any pre-filing orders. *See* Order at 15-16. The Court therefore declines to enact pre-filing orders or declare Plaintiff a vexatious litigant at this time.

However, the Court warns Plaintiff that pre-filing orders may be warranted if Plaintiff brings further claims associated with the Laguna Niguel property.


## IV. DISPOSITION

For the foregoing reasons, the Court DENIES Defendants' Motion for Sanctions. Additionally, the Court declines to declare Plaintiff a vexatious litigant and impose any pre-filing orders as sanctions.

---

**End of Document**

# EXHIBIT 22

# Silaev v. Swiss-America Trading Corp.

United States District Court for the District of Arizona

January 30, 2017, Decided; January 30, 2017, Filed

No. CV-14-02551-PHX-JAT

**Reporter**
2017 U.S. Dist. LEXIS 12364 *; 2017 WL 394342

Serguei Silaev, Plaintiff, v. Swiss-America Trading Corporation, Defendant.

**Subsequent History:** Appeal dismissed by Silaev v. Swiss-America Trading Corp., 2017 U.S. App. LEXIS 17503 (9th Cir., Aug. 25, 2017)

Affirmed by Silaev v. Swiss-America Trading Corp., 2018 U.S. App. LEXIS 11384 (9th Cir. Ariz., May 2, 2018)

**Prior History:** Silaev v. Swiss-America Trading Corp., 2016 U.S. Dist. LEXIS 121481 (D. Ariz., Sept. 8, 2016)

**Counsel:** [*1] For Serguei Silaev, Plaintiff: Michael Shane Thompson, LEAD ATTORNEY, Scott G Hunziker, Voss Law Center, The Woodlands, TX.

For Swiss-America Trading Corporation, Defendant: Kraig J Marton, LEAD ATTORNEY, Jaburg & Wilk PC - Phoenix, AZ, Phoenix, AZ; Mark D Bogard, LEAD ATTORNEY, Jaburg & Wilk PC, Phoenix, AZ.

**Judges:** James A. Teilborg, Senior United States District Judge.

**Opinion by:** James A. Teilborg

# Opinion

WO

**ORDER**

Pending before the Court are Defendant Swiss-America Trading Corporation's ("Defendant") motion for attorney fees and nontaxable costs (Doc. 54) and motion for sanctions (Doc. 55). Also pending before the Court is Plaintiff Serguei Silaev's ("Plaintiff") motion to alter or amend the judgment (Doc. 58). The Court now rules on the motions.

## I. Background

The facts of this case are explained in detail in this Court's order granting summary judgment (Doc. 50 at 2-3), and it will not recite them here. It is sufficient to note that Plaintiff filed suit against Defendant, a dealer of numismatic and precious metal coins, after Plaintiff's investment in coins proved unsuccessful. Plaintiff alleged that Defendant committed fraud, breach of contract, negligent misrepresentation, and breach of warranty involving several [*2] sales of coin-based investments. (Doc. 23 at 2).

Defendant moved for summary judgment, which this Court granted in Defendant's favor. (Doc. 50 at 18). In its order, this Court explained that Plaintiff's response to Defendant's summary judgment motion was insufficient and failed to comply with the local rules governing summary judgment filings. (Doc. 50 at 5). Plaintiff filed no controverting statement of facts as required by Local Rule of Civil Procedure 56.1(b), and his opposition to Defendant's motion was unsupported by legal authority. (Doc. 50 at 5-6). This Court nevertheless expanded its analysis on summary judgment to consider the affidavit and deposition testimony

provided by Plaintiff. Even in so doing, Plaintiff was unable to provide enough factual support for his claims to survive summary judgment. (Doc. 50 at 13-16). The Court found that Plaintiff had not proven the existence of a genuine issue of material fact, and granted judgment in favor of Defendant. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Defendant then filed a motion for attorney fees (Doc. 54) and a motion for sanctions against Plaintiff (Doc. 55), and Plaintiff filed a motion requesting this Court alter or amend the its summary judgment order under **[*3]** Rule 59 (Doc. 58).[1]

## II. Motion to Alter or Amend the Judgment

First, the Court considers Plaintiff's motion under Federal Rule of Civil Procedure ("Rule") 59, asking the Court to vacate the summary judgment ruling on Plaintiff's claims for fraud and negligent misrepresentation.[2] (Doc. 58). This Court may grant a Rule 59 motion if (1) it is "presented with newly discovered evidence," (2) it "committed clear error or the initial decision was manifestly unjust," or (3) there has been "an intervening change in controlling law." *School Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1263 (9th Cir. 1993). Rule 59 relief is an "extraordinary remedy," and should be granted only when the Court is left with a firm conviction that a mistake was made. *Kona Enters. v. Estate of Bishop*, 229 F.3d 877, 890 (9th Cir. 2000); *Smith v. Clark Cnty. Sch. Dist.*, 727 F.3d 950, 955 (9th Cir. 2013).

Plaintiff asserts that newly discovered evidence

should compel this Court to conclude it was error to grant judgment in Defendant's favor. (Doc. 58 at 3). The "evidence" on which Plaintiff's motion relies includes a formal declaration of counsel and Plaintiff's May 24, 2016 affidavit. (Doc. 58 at 4). Neither of these documents, however, contains newly discovered evidence. First, the declaration of counsel is not evidence at all; it is merely an explanation as to why Plaintiff's counsel failed to comply with Local Rule 56.1 and a list of reasons why this Court should now accept **[*4]** his untimely attempt at filing a controverting statement of facts. *See* L.R. Civ. P. 56.1(b). (Doc. 58-2; *see also* Doc. 50 at 5-7). Second, Plaintiff's affidavit is not newly discovered. Despite counsel's prior failure to properly file a controverting statement of facts, this Court independently expanded its summary judgment analysis to include evidence contained in the May 24, 2016 affidavit.[3] (*See* Doc. 50 at 6-7, 9, 10, 12, 14). Plaintiff's motion is therefore unsupported by any newly discovered (or previously unconsidered) evidence.

Moreover, Plaintiff's motion advances no cognizable legal argument as to why the Court's summary judgment ruling was error. Each of Plaintiff's objections to Defendant's statements is based on a contrary statement Plaintiff made in either his affidavit or his deposition. But as noted above, this Court already considered Plaintiff's statements in its ruling on summary judgment. Rule 59 motions may not be used to raise arguments already made, or to present arguments that could have been made at an earlier stage in the litigation. *Kona Enters.*, 229 F.3d at 890. Accordingly, Plaintiff's motion fails because it advances no new legal argument, but merely repeats the arguments made in Plaintiff's response in opposition **[*5]** to summary judgment — arguments this Court has already considered and rejected. (*See* Doc. 50).

## III. Motions for Sanctions and Attorneys' Fees

---

[1] Plaintiff's motion also purports to act as a "notice of appeal" in the event that the Court denies its motion to amend the judgment. (Doc. 58 at 42). After filing the motion, however, Plaintiff also filed a separate notice of appeal. (Doc. 59). The appeal is currently pending under Ninth Circuit case number 16-16812.

[2] Plaintiff did not include this Court's rulings on his breach of contract and breach of warranty claims in his motion to alter the judgment. (Doc. 58 at 2 n.2).

[3] This Court's summary judgment ruling also took into consideration Plaintiff's deposition testimony. (Doc. 50 at 8, 9 n.7, 12, 16).

This Court's order granting summary judgment directed Defendant to file a motion to recover fees and costs under whatever theory Defendant deemed appropriate. (*See* Doc. 50 at 18). In compliance with that directive, Defendant filed a timely motion for attorney's fees and non-taxable expenses (Doc. 54) and a motion for sanctions (Doc. 55).

## A. Rule 11 Sanctions

First, the Court turns to Defendant's motion for attorneys' fees sanctions against Plaintiff's counsel ("Counsel") for violating Rule 11 of the Federal Rules of Civil Procedure. Sanctions are justified under Rule 11 "when a filing is frivolous, legally unreasonable, or without factual foundation, or brought for an improper purpose." *Estate of Blue v. Cnty. of L.A.*, 120 F.3d 982, 985 (9th Cir. 1997). A filing is frivolous if it is "both baseless and made without a reasonable and competent inquiry." *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990). The purpose of Rule 11 is to promote judicial economy by deterring baseless filings, thereby "streamlin[ing] the administration and procedure of the federal courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990).

Defendant asserts that Counsel filed a frivolous complaint asserting "baseless claims that were shown to have been made without any reasonable inquiry into the facts." (Doc. 55 **[\*6]** at 7).[4] Defendant also argues that, had Counsel conducted a reasonable and competent factual investigation of Plaintiff's claims, he would have known that they

had no legal or factual basis. But even if this Court were to agree with Defendant, a motion requesting attorneys' fees under Rule 11 "cannot be served after the district court has decided the merits of the underlying dispute giving rise to the questionable filing." *Islamic Shura Council of So. Cal. v. FBI*, 757 F.3d 870, 873 (9th Cir. 2014); *see also* Advisory Committee's Notes to the 1993 Amendments to Rule 11 (explaining that a party may not serve a motion for Rule 11 sanctions after "judicial rejection of the offending contention"). This is because Rule 11's purpose of judicial efficiency is not served by the imposition of sanctions on questionable filings when those filings have already been disposed of on their merits. *See id.* This Court already determined that Plaintiff's complaint does not entitle him to relief, and has granted summary judgment in Defendant's favor. (*See* Doc. 50 at 18). Sanctions under Rule 11 are therefore inappropriate at this point in the litigation.[5] *See Barber v. Miller*, 146 F.3d 707, 710 (9th Cir. 1998) (declining to award sanctions because, at the time the Rule 11 motion was filed, "the offending complaint had long since been dismissed").

## B. Section 28 U.S.C. § 1927 Sanctions

Defendant also argues attorneys' **[\*7]** fees sanctions are warranted under 28 U.S.C. § 1927. (Doc. 55 at 4-5). In pertinent part, 28 U.S.C § 1927 provides:

---

[4] Defendant also highlights Counsel's actions at other points in these proceedings, including failing to inform Plaintiff of a compromise offer, failing to respond to Defendant's motion to dismiss, and failing to comply with the discovery deadlines set forth by the Scheduling Order. (Doc. 55 at 6-7, 9). Because Rule 11 applies only to filings and not to conduct or oral representations, the Court will consider only Counsel's filings for the purpose of determining whether sanctions are warranted under Rule 11. *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1129 (9th Cir. 2002) (explaining that Rule 11 "does not authorize sanctions for, among other things, discovery abuses or misstatements made to the Court during an oral presentation").

[5] This holding is consistent with the "safe harbor" provision of Rule 11(c)(2). This Rule protects a party against whom sanctions are sought by giving it the opportunity to withdraw its position or claim within 21 days of service. Fed. R. Civ. P. 11(c)(2). Defendant acknowledges that it could not comply with the 21-day safe harbor provisions, but argues this Court has the authority to issue sanctions under Rule 11 *sua sponte*. (*See* Doc. 55). The Court disagrees and declines to award Rule 11 sanctions in this case; such an award would defeat the very purpose of the Rule. *See Barber v. Miller*, 146 F.3d 707, 710 (9th Cir. 1998) (explaining that because the responding party was "not given the opportunity to respond to the [Rule 11] motion by withdrawing his claim . . . the purpose of the amendment was entirely defeated.").

Exhibit 22, Page 192

Any attorney ... who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

In order to impose sanctions under § 1927, the Court must make a finding that the sanctioned party "knowingly or recklessly raise[d] a frivolous argument, or argue[d] a meritorious claim for the purpose of harassing an opponent." *In re Keegan Mgmt. Co.*, 78 F.3d 431, 436 (9th Cir. 1996). The Ninth Circuit has also explained that sanctions under § 1927 may be used only to sanction the multiplication of proceedings, not the initiation of proceedings. *Matter of Yagman*, 796 F.2d 1165, 1187 (9th Cir. 1986). The section "applies only to unnecessary filings and tactics once a lawsuit has begun." *Keegan*, 78 F.3d at 436 (internal quotations omitted).

Defendant highlights several actions or inactions on the part of Counsel that it alleges are sanctionable under § 1927. First, Defendant points to three letters in which Defendant's attorney made "compromise offers" to Plaintiff. In September and October of 2012, Defendant offered to buy back Plaintiff's coins. (*See* Doc. 55 at 6). According to Defendant, Counsel never informed Plaintiff of any such **[*8]** offer. (*Id.*) But, even assuming this is true, the compromise offers were made in 2012, and the complaint was filed in 2014. (*See* Doc. 55 at 6-7). Accordingly, failing to inform Plaintiff of the potential for settlement is not conduct sanctionable under § 1927 because it occurred before the initiation of the suit. *See Keegan*, 78 F.3d at 436.

Defendant also cites a number of discovery abuses allegedly committed by Plaintiff, including failure to comply with this Court's Scheduling Order "except when under Defendant's threats of motion to compel." (Doc. 55 at 9). But sanctions for discovery abuses are not governed by § 1927; they are governed by the Federal Rules of Civil

Procedure. *Matter of Yagman*, 796 F.2d 1165, 1187 (9th Cir. 1986) ("Sanctions for discovery abuses are governed primarily by . . . Rule 37" and "section 1927 is not appropriate for use in these circumstances"); *see also* Fed. R. Civ. P. 37(b) (outlining sanctions for failing to comply with a court order regarding discovery). This Court therefore declines to impose sanctions for any alleged discovery abuses.

Finally, Defendant argues sanctions are appropriate with respect to Plaintiff's failure to properly respond to Defendant's Motion for Summary Judgment. In its order granting summary judgment, this Court explained how Plaintiff's counsel failed **[*9]** entirely to comply with the requirements of Local Rule 56.1(b). (Doc. 50 at 5-7). As this Court noted in its summary judgment order, Counsel not only failed to comply with the local rules by filing a controverting statement of facts, but did so even after having been admonished for an identical rule violation in a parallel case. *See Philip Mann, et al. v. Swiss-America Trading Corp.*, No. CV-14-002552-PHX-ROS. (Doc. 50 at 7). The Court agrees with Defendant that Counsel's actions indicate a staggering lack of attention to and compliance with this Court's directives. Nevertheless, they do not represent the type of conduct § 1927 was intended to prevent. The statute imposes sanctions for multiplying or prolonging the litigation. *See* 28 U.S.C. § 1927. In this case, Counsel's deficient filings had the opposite effect: his failure to comply with the Rules of Practice for the District substantially curtailed the action by compelling the entry of summary judgment against Counsel's client. (*See* Doc. 50 at 7). Accordingly, sanctions are not warranted under § 1927.

## C. Inherent Authority to Sanction

Finally, Defendant asks this Court to exercise its broad "inherent power" to impose sanctions on counsel who "willfully abuses judicial processes." **[*10]** *United States v. Blodgett*, 709

F.2d 608, 610 (9th Cir. 1983) (citing *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980). Such a sanction must be supported by "something more" than a finding of recklessness; inherent power sanctions also require an attorney to act with an improper purpose or in bad faith. *Fink v. Gomez*, 239 F.3d 989, 993 (9th Cir. 2001).

In addition to the allegedly frivolous complaint and discovery failures, deficient responses, and failure to inform Plaintiff of compromise offers, Defendant's motion for sanctions emphasizes the fact that of five customer suits filed against Swiss-America in the last 20 years, four of them came from Counsel's firm. (Doc. 55 at 5). Defendant also emphasizes that Counsel's firm advertised specifically to clients who may have been dissatisfied with Swiss-America's investment products, and that Counsel has been sanctioned for similar conduct in recent cases. (Doc. 55 at 5, 10).

Despite Defendant's laundry list of complaints, the Court is not convinced that sanctions are warranted here. The fact that a complaint may be frivolous does not in and of itself establish that it was filed in bad faith. *See Blodgett*, 709 F.2d at 610. The Court must also be convinced that Counsel acted in "subjective bad faith." *Fink*, 239 F.3d at 993. Although Defendant has clearly shown Counsel's representation tactics fell below the quality of representation expected **[*11]** of an officer of this Court, Defendant has not shown that Counsel's actions were undertaken for the purpose of harassment. *See Estate of Blas v. Winkler*, 792 F.2d 858, 860 (9th Cir. 1986) ("Bad faith is present when an attorney . . . argues a meritorious claim for the purpose of harassing an opponent."). And, the fact that other courts have determined Counsel acted in bad faith while litigating unrelated cases does not necessitate a conclusion that he did so here.

Attorneys' fees sanctions "should not be assessed lightly." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980).

Although this Court does not condone Counsel's conduct, it is not convinced that it is appropriate here to exercise its inherent power to impose sanctions as a result of that conduct. Accordingly, Defendant's motion (Doc. 55) is denied.[6]

## D. Attorneys' Fees under Arizona Revised Statutes

Finally, Defendant requests an award of attorney fees and related nontaxable expenses under Arizona Revised Statutes ("A.R.S.") sections 12-341, 12-341.01(A) and Rule 54(d)(2). (Doc. 54). Under A.R.S. § 12-341.01(A), the Court may award "reasonable attorney fees" to the "successful party" in "any contested action arising out of a contract, express or implied." If the Court finds the party requesting fees is the "successful party," it has broad discretion in awarding reasonable attorneys' fees. *See* **[*12]** *Assoc. Indem. Corp. v. Warner*, 143 Ariz. 567, 694 P.2d 1181, 1184 (Ariz. 1985).

The Court finds, and Plaintiff does not dispute, that Defendant is the successful party in this action. (*See* Doc. 62 at 2). Defendant is therefore entitled to an award of reasonable attorneys' fees under § 12-341.01(A). *See Rigoli v. 44 Monroe Marketing, L.L.C.*, 236 Ariz. 112, 336 P.3d 745, 753 (Ariz. Ct. App. 2014) ("Because the parties agree that § 12-341.01(A) is applicable, we will apply the statute in favor of . . . the successful part[y].").

In accordance with Local Rule of Civil Procedure 54.2(c), Defendant filed a motion requesting attorneys' fees, as well as a task-based itemized statement of fees and expenses. Plaintiff responded, arguing that Defendant's requested fees were duplicative, excessive, and unreasonable. (Doc. 62 at 2-4). Plaintiff's response, however, offers no specific explanation as to why Plaintiff's charges are unreasonable, nor does it "separately identify each and every disputed time entry or expense

---

[6] Because the Court rules in Plaintiff's favor on Defendant's motion for sanctions, it denies Plaintiff's motion for leave to file a sur-reply to Defendant's motion. (*See* Doc. 68).

item" such that the Court can meaningfully consider the objections. *See* L.R.Civ.P. 54.2(f) (setting forth the requirements for responding to requests for attorneys' fees). Because Plaintiff's response fails to comply with the local rules, the Court deems Plaintiff's noncompliance as consent to the granting of Plaintiff's motion for attorney fees and nontaxable expenses. *See* L.R.Civ. 7.2(i) (explaining that if "counsel **[*13]** does not serve and file the required answering memoranda . . . such non-compliance may be deemed a consent to the denial or granting of the motion and the Court may dispose of the motion summarily.").

Defendant's motion for fees and costs requested $99,956.00 in attorneys' fees and $497.18 in nontaxable costs. In Plaintiff's reply in support of its motion, Defendant increased its fee request to include the attorney fees it incurred in filing and responding to its motion for sanctions against Plaintiff's counsel. Because Defendant's motion for sanctions was unsuccessful, the Court declines to award attorney fees incurred in arguing it. *See, e.g., Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 407, 110 S. Ct. 2447, 110 L. Ed. 2d 359 (1990) (explaining that the fees and expenses incurred by filing an action for Rule 11 sanctions are distinct from and not caused by the initial filing). The Court therefore awards Defendant the amount of fees and nontaxable costs originally requested in Defendant's motion.

## IV. Conclusion

For the foregoing reasons,

**IT IS ORDERED** that Plaintiff's motion to alter or amend the judgment (Doc. 58) is DENIED.

**IT IS FURTHER ORDERED** that Defendant's motion for sanctions (Doc. 55) is DENIED. Accordingly, Plaintiff's motion for leave to file a sur-reply to the motion **[*14]** for sanctions (Doc. 68) is also DENIED.

**IT IS FURTHER ORDERED** that Defendant's

motion for attorney fees and nontaxable expenses (Doc. 54) is GRANTED. Defendant is awarded $99,956.00 in fees and $497.18 in nontaxable costs for a total award of $100,453.18.

Dated this 30th day of January, 2017.

/s/ James A. Teilborg

**James A. Teilborg**

**Senior United States District Judge**

---

*End of Document*

# EXHIBIT 23

2007 WL 1091002
Only the Westlaw citation is currently available.
United States District Court,
S.D. Texas,
Houston Division.

VESTIN FUND II, LLC, Plaintiff,
v.
Lucky SRINIVASAN, et al., Defendants,
v.
Vestin Mortgage, et al., Third-Party Defendants.

Civil No. H-03-5071.
|
April 10, 2007.

**Attorneys and Law Firms**

David Philip Whittlesey, Akin Gump, Michael Simons, Akin Gump Strauss Hauer & Feld LLP, Austin, TX, Keith Miles Aurzada, Powell Goldstein, Dallas, TX, for Plaintiff.

Sterling Reit Inc., R.F. Bearden, President, Houston, TX, pro se.

David H. Donaldson, Jr., Graves Dougherty et al., Preston Randall, Graves Dougherty Hearon & Moody, Austin, TX, Amy Elizabeth Hawk, Sanford L. Dow, Dow Golub Berg & Beverly, LLP, Houston, TX, for Defendants.

### ORDER DENYING ATTORNEYS FEES

NANCY K. JOHNSON, United States Magistrate Judge.

**\*1** Presently pending before the court is Third-Party Defendant Ronald F. Bearden's Motion for Recovery of Attorney's Fees from Third-Party Plaintiff Charles Glace (Docket Entry No. 316) and the response filed thereto.

The facts in this suit have been exhaustively discussed in other memoranda. The bone of contention in the present motion is whether Glace had a factual basis for his claims of fraud, breach of fiduciary duty and conspiracy against Bearden as asserted in his Third-Party Complaint. The court found that Glace's claims lacked both a factual and legal basis and granted summary judgment. *See* Docket Entry Nos. 279 and 285. Bearden contends that these claims were brought in

bad faith and seeks recovery of the attorney's fees expended defending the claims.

Texas law does not permit recovery of attorney's fees for the successful defense of tort claims. Although the Federal Rules of Civil Procedure allow attorney's fees to be imposed for certain violations of the Rules, [1] Bearden bypasses those options and seeks sanctions under the court's inherent power to punish the bad faith conduct of litigants, citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 53, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991).

[1]     See, e.g., Federal Rules of Civil Procedure 11, 16(f), 26(g), 37(b), and 56(g).

In *Chambers,* the sole shareholder and director of a company that operated a television station agreed to sell the company's assets and broadcast license to NASCO, Inc. Chambers changed his mind about the sale and engaged in a number of actions both in and out of court that were designed to obstruct the sale's consummation. The trial court found that Chambers had attempted to deprive the court of jurisdiction by acts of fraud, filed false and frivolous pleadings, and engaged in activities designed to oppress and harass NASCO into dropping the suit.

Determining that Federal Rule of Civil Procedure 11 did not reach Chambers' out-of-court conduct, and acknowledging that the falsity of certain pleadings was not apparent until after a trial on the merits, the court relied on its inherent power to assess attorney's fees as a sanction for Chambers' bad-faith conduct during the litigation. In affirming the sanctions, the Supreme Court found that the lower court's ability to sanction was not limited by statutes or rules and the court could rely on its inherent power to sanction a party when a party institutes or continues a proceeding without reasonable ground. *Chambers,* 501 U.S. at 46. The Court stated that a lower court should only resort to its inherent powers when "in the informed discretion of the court, neither the statute [28 U.S.C. § 1927] nor the Rules are up to the task ..." *Chambers,* 501 U.S. at 50. The Court warned that while a court has the inherent power to sanction, such power should be used only when it finds that "fraud has been practiced upon it, or that the very temple of justice has been defiled." *Chambers,* 501 U.S. at 46.

Such is not the case here. Although the court agrees that Glace has played fast and loose with many of his initial factual allegations and his claims have evaporated in the face of

Vestin Fund II, LLC v. Srinivasan, Not Reported in F.Supp.2d (2007)
2007 WL 1091002

his own deposition testimony, there has been no adequate explanation of why the Rules do not provide an adequate remedy. Bearden argues that he did not file a motion pursuant to Rule 11 because he assumed that Glace would manufacture evidence to contest the motion for summary judgment and by the time it became apparent that Glace was unwilling to manufacture evidence to support his claims, it was too late to file a motion pursuant to Rule 11. Bearden also claims that pursuing a Rule 11 motion would have cost him additional attorney's fees.

**\*2** Glace's conduct is not comparable to the conduct involved in *Chambers*. Glace did not obstruct any court proceeding by out-of-court conduct and any sanctions warranted by baseless assertions could have been addressed pursuant to Rule 11. The court finds that Bearden's excuses for sidestepping Rule 11 are nothing more than litigation strategy and do not warrant the invocation of the inherent powers of the court to sanction for conduct that Rule 11 was intended to address.

Accordingly, Bearden's motion for recovery of attorney's fees is **DENIED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 1091002

---

Exhibit 23, Page 197

2

# EXHIBIT 24

# Warshawer v. Tarnutzer

United States District Court for the Western District of Washington

April 15, 2016, Decided; April 15, 2016, Filed

CASE NO. C14-1042 RSM

**Reporter**

2016 U.S. Dist. LEXIS 51075 *; 2016 WL 1531915

ROBERT WARSHAWER and KIM WARSHAWER, a married couple; GLENN BUTLER, Shareholder's Agent or the former shareholders of Black Rock Cable, Inc., Plaintiffs, v. RICK TARNUTZER, an individual; NANCY TARNUTZER, and individual, Defendants.

**Prior History:** Warshawer v. Tarnutzer, 2015 U.S. Dist. LEXIS 74637 (W.D. Wash., June 9, 2015)

**Counsel:** [*1] For Robert Warshawer, Kim Warshawer, a married couple, Plaintiffs: Spencer Hall, Jr., LEAD ATTORNEY, SPENCER HALL & ASSOCIATES PLLC, SEATTLE, WA; Colin M George, HALL ZANZIG ZULAUF CLAFLIN MCEACHERN, SEATTLE, WA.

For Rick Tarnutzer, an individual., Nancy Tarnutzer, an individual., Defendants: H. James Keathley, LEAD ATTORNEY, PRO HAC VICE, KEATHLEY & KEATHLEY LLP, IRVINE, CA; Kevin P. Sullivan, LEAD ATTORNEY, THE SULLIVAN LAW FIRM, SEATTLE, WA.

For Rick Tarnutzer, an individual., Nancy Tarnutzer, an individual., ThirdParty Plaintiffs: H. James Keathley, LEAD ATTORNEY, KEATHLEY & KEATHLEY LLP, IRVINE, CA; Kevin P. Sullivan, LEAD ATTORNEY, THE SULLIVAN LAW FIRM, SEATTLE, WA.

**Judges:** RICARDO S. MARTINEZ, CHIEF UNITED STATES DISTRICT JUDGE.

**Opinion by:** RICARDO S. MARTINEZ

# Opinion

ORDER VACATING SANCTIONS IN PART AND PROVIDING NOTICE TO COUNSEL

# I. INTRODUCTION

THIS MATTER comes before the Court upon Defendant's Motion to Strike Order and for Evidentiary Hearing. Dkt. #110. Defendants' counsel bring this motion arguing that the Court should have provided them with notice and opportunity to be heard prior to *sua sponte* directing sanctions directly against them. *Id.* Because the Court agrees that such notice should have been [*2] provided, the Court will now VACATE IN PART its prior Order for sanctions and allows Defendants' counsel to respond to the proposed sanctions as discussed below.

# II. BACKGROUND

In November of 2015, Plaintiffs moved for an order compelling Defendants to produce certain financial documents in discovery. Dkt. #80. Defendants opposed the motion, arguing in part that the documents were protected by the privacy provision of California's state constitution. Dkt. #82. Defendants also moved to strike a settlement letter between the parties that Plaintiffs had offered as an Exhibit in support of their motion to compel. *Id.* On December 2, 2015, the Court granted Plaintiffs' motion, and directed Defendants to produce the financial documents at issue. Dkt. #86. The Court rejected Defendants' privacy argument, explaining:

> The law cited by Defendants is inapposite. Since the decision in *Erie R.R. v. Tompkins*,

304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), federal courts in diversity cases apply state substantive law and federal procedural law. *Feldman v. Allstate Ins. Co.*, 322 F.3d 660, 666 (9th Cir. 2003). Generally, evidentiary rulings are procedural in nature, unless the state evidence rules at issue are "intimately bound up" with the state's substantive law at issue. *Id.* The discovery questions here are not intimately bound [**3**] to the substantive law. Therefore, the state law Defendants cite to support their argument does not apply.

Dkt. #86 at 11.

Likewise, the Court denied Defendants' motion to strike:

> As an initial matter, the Court DENIES Defendants' motion to strike Exhibit 3 to the Declaration of Spencer Hall, which is a settlement communication from Defendants' counsel. Dkt. #82 at 8-9. Federal Rule of Evidence does not preclude all use of settlement communications. Rather, it precludes the admission of evidence of settlement negotiations to prove liability. Fed. R. Evid. 408(a). The exhibit offered by Plaintiffs on this motion is not being used to prove liability on any of their claims, and therefore FRE 408 does not preclude it.

Dkt. #86 at 5.

Defendants then moved for reconsideration, arguing that the Court committed manifest error in rejecting their privacy argument and in denying their motion to strike. Dkt. #88. The Court denied the motion, noting that by Local Rule such motions are disfavored and Defendants neither demonstrated manifest legal error nor directed the Court to new facts or legal authority that they could not have presented in their prior response. Dkt. #92 at 2. With respect to the privacy argument, the Court [**4**] stated that Defendants had not demonstrated manifest error. With respect to the motion to strike, the Court again found no demonstration of a manifest error, but also explained that even if the settlement letter had been stricken from the record, the Court's conclusion would have remained the same because a review of the Court's entire Order revealed that the letter was not material to the Court's conclusion that certain records should be compelled. *Id.*

Defendants then filed a Petition for Writ of Mandamus raising the same issues before the Ninth Circuit Court of Appeals. Dkt. #96. At the same time, Defendants sought an Order from this Court staying the enforcement of the Order compelling the production of financial records until the Court of Appeals has decided the Petition. Dkt. #95. This Court denied Defendants' motion for a stay, finding that it was not likely Defendants would succeed on the merits of their Petition and finding their alleged irreparable harm argument unpersuasive. Dkt. #101.

On March 8, 2016, the Ninth Circuit Court of Appeals dismissed the Petition for Writ of Mandamus, finding that "Petitioners have not demonstrated [] this case warrants the intervention of this [**5**] court by means of the extraordinary remedy of mandamus." Dkt. #104. The Court also dismissed a pending motion to stay this Court's discovery Order as moot. *Id.*

Plaintiffs' then filed a Motion for Modification of Case Schedule and Sanctions. Dkt. #102. Plaintiffs sought *inter alia* "coercive" monetary sanctions against Defendants. On March 23, 2016, the Court granted the motion, but declined to impose coercive sanctions. Dkt. #109. Instead, the Court dismissed Defendants' Counterclaims with prejudice and, although Plaintiffs did not request such a sanction, the Court directed Defendants' attorneys to pay Plaintiff's attorney's fees and costs for their role in violating the Court's prior discovery Order. *Id.* The instant motion followed.

## III. DISCUSSION

Defendants' counsel now moves this Court for an Order vacating the sanctions imposed directly against them and asks the Court to schedule an

evidentiary hearing if it still proposes sanctions. Dkt. #110. Plaintiffs do not oppose the scheduling of an evidentiary hearing, but assert that either Defendants or their counsel should continue to be sanctioned in the form of attorney's fees for their refusal to follow this Court's prior discovery **[\*6]** Order. Dkt. #114.

For the reasons below, the Court agrees that Notice should have been provided to Defendants' counsel before making any sanctions final. Accordingly, the Court hereby issues this Order vacating that portion of its prior Order imposing sanctions on defense counsel and providing notice of the legal rule on which sanctions would be based, the form of the potential sanctions, and to notify counsel that they stand accused of willful disobedience of a court order.

The Court has proposed sanctions in the form of Plaintiffs' attorneys' fees associated with the filing of their Motion for Modification of Case Schedule. Dkt. #109. Those sanctions, if imposed, would rest on the Court's inherent authority to impose such sanctions, Federal Rule of Civil Procedure 37, and the Western District of Washington's Local Civil Rule 11(c). As the Court noted in its prior Order, federal courts have inherent power to impose sanctions against attorneys and parties who willfully abuse the judicial process. *See* Dkt. #109 at 5-9; *see also Or. RSA No. 6, Inc. v. Castle Rock Cellular of Or. Ltd*, 76 F.3d 1003, 1007 (9th Cir. 1996); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991).

Under its inherent power and the Rules noted above, this Court may sanction an attorney who willfully disobeys a court order. LCR 11(c); *Chambers*, 501 U.S. at 45-46. However, the Court also recognizes that its inherent powers are limited. **[\*7]** Indeed, these powers must be exercised with "restraint and discretion." *Chambers*, 501 U.S. at 42; *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980). This is particularly true in cases where the Court is "accuser, fact finder, and

sentencing judge all in one." *In re Peters*, 642 F.3d 381, 384 (2d Cir. 2011).

Further, the Court acknowledges certain due process restraints on its ability to impose sanctions. The Court must notify the party being sanctioned of the legal rule on which sanctions are to be based, the reasons for the sanctions, and the form of potential sanctions. *Lasar*, 399 F.3d at 1109-10; *Mickle*, 297 F.3d at 126; *Rogal*, 74 F.3d at 44. The Court must conduct a hearing or permit briefing to determine whether sanctions are appropriate. *Lasar*, 399 F.3d at 1109-10; *Or. RSA*, 76 F.3d at 1007-08 (reversing sanctions order because no hearing held); *Pac. Harbor Capital, Inc. v. Carnival Air Lines, Inc.*, 210 F.3d 1112, 1118 (9th Cir. 2000) (finding that the opportunity to submit briefing can satisfy due process requirements). The Court must also make a specific finding that the attorney or party being sanctioned acted in bad faith or willfully disobeyed a court order. *Chambers*, 501 U.S. at 44; *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 650 (9th Cir. 1997). Sanctions imposed under the Court's inherent power are punitive in nature and so must be proven by clear and convincing evidence. *Shepherd v. Am. Broad. Co., Inc.*, 62 F.3d 1469, 1476-78, 314 U.S. App. D.C. 137 (D.C. Cir. 1995).

In this case the Court is proposing that defense counsel pay Plaintiff's attorney's fees and costs associated with Plaintiff's Motion for Modification of Case Schedule. When making a final **[\*8]** determination, the Court will consider: (1) the nature and quality of the conduct at issue; (2) who is responsible for the culpable conduct as between attorney and client; (3) whether there was a pattern of wrongdoing requiring a stiffer sanction; (4) the sanctioned party's ability to pay; (5) whether the opposing party was hindered or prejudiced by the wrongdoer's conduct; and (6) any other mitigating or aggravating factors. *Republic of the Philippines v. Westinghouse Elec. Corp.*, 43 F.3d 65, 74 (3d Cir. 1994).

## IV. CONCLUSION

Having reviewed Defendants' motion, the partial opposition thereto and reply in support thereof, along with any supporting Declarations and the remainder of the record, the Court hereby finds and ORDERS:

1. Defendants' Motion to Strike Order (Dkt. #110) is GRANTED as discussed above. That portion of the Court's prior Order (Dkt. #109) directing sanctions directly against defense counsel is VACATED and the Court will reconsider directing such sanctions after response from defense counsel.

2. **No later than ten (10) days from the date of this Order**, Defendants shall file a response to the Court's proposed sanctions on defense counsel. That response shall be filed on the docket as "Objections" to the Court's proposed sanctions. No reply from Plaintiffs **[*9]** shall be filed.

3. The Court further STRIKES Plaintiff's pending Motion for Attorney's Fees (Dkt. #112), but will REOPEN the motion should the Court decide to impose sanctions after response from defense counsel.

DATED this 15th day of April 2016.

/s/ Ricardo S. Martinez

RICARDO S. MARTINEZ

CHIEF UNITED STATES DISTRICT JUDGE

---

**End of Document**

# EXHIBIT 25

# Williams v. Aho

United States District Court for the Central District of California

September 2, 2016, Decided; September 2, 2016, Filed

CV 16-2088 PSG (FFMx)

**Reporter**

2016 U.S. Dist. LEXIS 195930 *

Nigel Eric Williams v. Bruce Edwin Aho, d.b.a. TheHollywoodSentinel.com

**Subsequent History:** Later proceeding at Williams v. Aho, 2017 U.S. Dist. LEXIS 22575 (C.D. Cal., Feb. 16, 2017)

**Counsel:** **[*1]** Attorneys for Plaintiff(s): Not Present.

Attorneys for Defendant(s): Not Present.

**Judges:** Philip S. Gutierrez, United States District Judge.

**Opinion by:** Philip S. Gutierrez

# Opinion

### CIVIL MINUTES - GENERAL

**Proceedings (In Chambers): Order DENYING Defendant's Motion to Dismiss and DENYING Defendant's Motion for Sanctions**

Before the Court is Defendant Bruce Edwin Aho's motion to dismiss Plaintiff Nigel Eric Williams's Complaint, and Defendant's motion for Rule 11 sanctions. Dkt. #20. The Court finds the matter appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78; L.R. 7-15. After considering the moving and opposing papers, the Court DENIES Defendant's motions.

### I. Background

Plaintiff Nigel Williams, a/k/a Willy Camden, is a professional photographer who specializes in celebrity photographs. *Complaint* ("*Compl.*") ¶¶ 2, 7, 8. In 2003, Plaintiff photographed socialite Paris Hilton as part of a photo shoot for Maxim magazine. *Id.* ¶¶ 8-9, Ex. B. Plaintiff registered the Hilton photographs with the U.S. Copyright Office in 2012. *Id.* ¶ 9, Ex. B. In November 2014, Plaintiff discovered copies of one of his Hilton photographs on Defendant's website, www.thehollywoodsentinel.com, and on another website, www.newsblaze.com. *Id.* ¶¶ 11-12. Plaintiff alleges **[*2]** that he did not give Defendant permission to copy or display the photograph on his own website, or to distribute the photograph to newsblaze.com. *Id.* ¶ 13.

The Complaint alleges violations of the Copyright Act, 17 U.S.C. § 501 *et seq.*, and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1202. *See generally Compl.* Defendant now brings a Rule 12(b)(6) motion to dismiss for failure to state a claim and a Rule 11 motion for sanctions. Dkt. #20.

### II. Legal Standard

#### A. Rule 12(b)(6)

A motion to dismiss under Rule 12(b)(6) tests whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). When deciding a Rule 12(b)(6) motion, the court must accept the facts pleaded in the complaint as true, and construe them in the light most favorable to the plaintiff. *Faulkner v. ADT Sec.*

Case 8:18-ap-01168-SC   Doc 347   Filed 08/19/21   Entered 08/19/21 21:07:48   Desc
Main Document    Page 230 of 242
2016 U.S. Dist. LEXIS 195930, *2

Page 2 of 5

*Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013); *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009). The Court, however, is not required to accept "legal conclusions . . . cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981); *see Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

After accepting all non-conclusory allegations as true and drawing all reasonable inferences in favor of the plaintiff, the court must determine whether the complaint alleges a plausible claim to relief. *See Iqbal*, 556 U.S. at 679-80. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the **[*3]** reasonable inference that the defendant is liable for the misconduct alleged. . . . The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678.

## B. Rule 11

Rule 11 gives federal courts the authority to impose sanctions on litigants. *See* Fed. R. Civ. P. 11. It is "designed to deter attorneys and unrepresented parties from violating their certification that any pleading, motion or other paper presented to the court is supported by an objectively reasonable legal and factual basis." *Truesdell v. S. Cal. Permanente Med. Group*, 209 F.R.D. 169, 173-73 (C.D. Cal. 2002). A court considering Rule 11 sanctions should consider whether the parties' submissions were "frivolous," "legally unreasonable," or "without factual foundation, even if not filed in subjective bad faith." *Zaldivar v. City of Los Angeles*, 780 F.2d 823, 831 (9th Cir. 1986); *see also Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362-65 (9th Cir. 1990) (en banc). "The issue in determining whether to impose sanctions under Rule 11 is whether a reasonable attorney, having conducted an objectively reasonable inquiry into the facts and law, would have concluded that the offending paper was well-founded." *Schutts v. Bently Nevada Corp.*, 966 F. Supp. 1549, 1562 (D. Nev.1997) (citation omitted).

## III. Discussion

Title Nigel Eric Williams v. Bruce Edwin Aho, d.b.a. TheHollywoodSentinel.com The Court first addresses Defendant's Rule 12(b)(6) motion and then turns to the Rule 11 motion for sanctions. **[*4]**

### A. Rule 12(b)(6)

To state a claim for copyright infringement, Plaintiff must show that he owned a valid copyright and that the Defendant violated it. 17 U.S.C. § 501; *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004); 4 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 13.01 (Matthew Bender Rev. Ed.) ("Reduced to the most fundamental terms, there are only two elements necessary to the plaintiff's case in an infringement action: ownership of the copyright by the plaintiff and copying by the defendant."). Defendant contends that the Complaint failed to state a claim for relief under the Copyright Act because (1) Plaintiff delayed in notifying Defendant of the alleged copyright infringement and did not notify Defendant before filing suit, (2) Plaintiff failed to state a plausible claim for damages, given that Plaintiff failed to investigate whether Defendant's conduct was willful and that damages are too speculative, (3) Plaintiff failed to allege the date of copyright registration, date of first publication, and date of the alleged infringement, (4) Plaintiff did not assert that Defendant owns the domain name "Newsblaze," and (5) Plaintiff has not adequately established a relationship between the Hilton photograph and Plaintiff's copyright. *Motion to Dismiss* ("*Mot.*") 3:1-8, 3:15-18, **[*5]** 4:12-17, 5:6-10, 5:15-19, 6:9-10, 7:1-3. Because these arguments do not address whether Plaintiff stated a plausible claim for relief under the Copyright Act, the Court DENIES Defendant's 12(b)(6) motion.[1]

---

[1] At times, Defendant appears to argue that the Court should dismiss the Complaint because Plaintiff's counsel violated Rule 11. *See* 1:23-25, 4:11-20. Although federal courts are vested with inherent power, including the power to dismiss a case, for severe violations of Rule 11, *Adams v. Cal. Dep't of Health Servs.*, 487 F.3d 684, 688 (9th Cir. 2007), Defendant has not given the Court any reason to impose sanctions, let alone the severe sanction of dismissing the case.

Exhibit 25, Page 203

### i. Delay and Failure to Notify

Defendant faults Plaintiff for failing to provide a "take down notice" and for delaying more than a year before bringing a copyright claim. *Mot.* 3:10-13. Plaintiff correctly points out that the Copyright Act does not require Plaintiff to provide pre-suit notice to an alleged infringer in Defendant's position. *See ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 623 (4th Cir. 2001); *Opposition* ("*Opp.*") 2:26-27. Although the Copyright Act provides a "safe harbor" and requires plaintiffs to issue a takedown notice to internet service providers that passively store infringing content on their networks, Defendant does not claim to be an internet service provider. *See Online Policy Grp. v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1201 (N.D. Cal. 2004). Further, the Copyright Act allows for a three-year statute of limitations from the time that the copyright owner reasonably could have discovered the infringement. *See* 17 U.S.C. § 507(b); *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 706 (9th Cir. 2004). Even if Plaintiff delayed for "a year and a half" as Defendant asserts, the law does not fault Plaintiff for it. Accordingly, the Court denies Defendant's motion to dismiss for delay and **[*6]** failure to notify.

### ii. Damages and Willfulness

Defendant argues that the Complaint should be dismissed because Plaintiff failed to state a plausible claim for damages, and Plaintiff failed to investigate whether Defendant's conduct was willful. *Mot.* 3:1-2, 3:15-18, 5:1-14. The Copyright Act permits the owner of a copyright to collect actual or statutory damages. 17 U.S.C. § 504(b), (c). If Plaintiff can show that Defendant's conduct was "willful," Plaintiff can collect up to $150,000 in statutory damages. § 504(c)(2). Precedent clearly establishes that damages are not an element of a copyright infringement claim and a level of uncertainty exists in establishing copyright

damages. *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014) (citing *On David v. The Gap, Inc.*, 246 F.3d 152, 158, 166-67 (2d Cir. 2001)). Precedent also establishes that willfulness if not an element of a copyright infringement claim and "the innocent intent of a defendant constitutes no defense to liability." *Monge v. Maya Magazines, Inc.*, 688 F.3d 1164, 1170 (9th Cir. 2004). Willfulness is an issue that goes only to the amount of statutory damages, not liability. *See* 17 U.S.C. § 504(c). Because Defendant failed to point to a legal deficiency in Plaintiff's complaint, the Court denies Defendant's motion to dismiss for failure to state a claim for damages and failure to investigate whether Defendant's conduct was willful.

### iii. Failure to Allege Dates **[*7]** of Copyright Registration, Publication, and Alleged Infringement

Defendant next faults Plaintiff for failing to assert the date of copyright registration, the date of first publication, and the date of the alleged infringement. *Mot.* 5:15-19. Defendant cites *Zito v. Steeplechase Films*, 267 F. Supp. 2d 1022, 1024-26 (N.D. Cal. 2003), in support of his argument. Unfortunately for Defendant, *Zito* is readily distinguishable. In that case, the complaint made clear that plaintiff did not register its copyright before the alleged infringement. *Id.* at 1025-26. Here, Plaintiff alleges that he obtained a copyright for the photograph in 2012,[2] and discovered

---

[2] "Generally, the scope of review on a motion to dismiss for failure to state a claim is limited to the contents of the complaint." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); *accord Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002) ("Ordinarily, a court may look only at the face of the complaint to decide a motion to dismiss."). Courts may also, however, consider "attached exhibits, documents incorporated by reference, and matters properly subject to judicial notice." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1051 (9th Cir. 2014), *cert. denied sub nom. Cohen v. Nvidia Corp.*, 135 S. Ct. 2349, 192 L. Ed. 2d 143 (2015). The incorporation by reference doctrine permits the court "to take into account documents 'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading.'" *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (alteration omitted) (quoting *Silicon Graphics*, 183 F.3d at 986). The Complaint alleges that Plaintiff

Defendant's infringement in November 2014. *Compl.* ¶¶ 9, 12, Ex. B. Indeed, it is factually incorrect to state that Plaintiff did not allege the date of copyright registration, date of first publication, and date of the alleged infringement. This information is readily available in the Complaint or the attached exhibits. *Compl.* ¶¶ 9, 12, Ex. B. The Court thus denies Defendant's motion to dismiss for failure to allege sufficient dates.

### iv. Defendant's Ownership of the Domain Name

Defendant's fourth ground for dismissing the Complaint is Plaintiff's failure to assert that Defendant owned the domain **[*8]** name "newsblaze.com." *Mot.* 6:9-10. Although it is true that Plaintiff never asserts that Defendant owns newsblaze.com, it is an omission that makes no difference to Plaintiff's claims. The Complaint asserts that Defendant unlawfully "distribut[ed]" or "caus[ed] to be displayed" the photograph on several newsblaze.com websites. *Compl.* ¶ 12. As Plaintiff points out, Defendant does not need to own newsblaze.com to violate Plaintiff's copyright. Copyright law grants the copyright owner the exclusive right to "distribute copies . . . of the copyrighted work," as well as display the works on their own forums. *UMG Recordings, Inc. v. Augusto*, 628 F.3d 1175, 1177 (9th Cir. 2011). Because Plaintiff did not need to allege that Defendant owned newsblaze.com to state a claim for copyright infringement, the Court denies Defendant's motion to dismiss for failure to allege that Defendant owned the domain name newsblaze.com.

---

registered the photograph with the U.S. Copyright Office, *Compl.* ¶ 9, and refers the Court to the registration, attached at Exhibit B. Although the date of registration is not alleged in the Complaint, the date is apparent from the face of the registration. Because Defendant has provided the Court with no reason to question the validity of the registration attached at Exhibit B, the Court incorporates the registration by reference and takes note of the date of the copyright, which is June 26, 2012.

### v. Relationship Between Photograph and Copyright

Fifth and finally, Defendant asserts that the Court should dismiss the Complaint because Plaintiff has not established that Plaintiff's copyright includes the Hilton photograph. *Mot.* 7:1-3. At the motion to dismiss phase, however, the Court must accept the facts plead in the Complaint as true and **[*9]** must construe the facts in the light most favorable to Plaintiff. *Faulkner v. ADT Sec. Servs., Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013); *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir. 2009). Plaintiff alleges that he is the original author of the Hilton photograph, that he obtained a copyright for the photograph, and that Defendant reproduced, distributed, and publicly displayed the photograph on his own website and websites owned by others. *Compl.* ¶¶ 8-10, 12. Plaintiff does not need to allege anything further to state a plausible claim for relief under the Copyright Act. The Court thus denies Defendant's motion to dismiss on the ground that Plaintiff failed to prove that the copyright covered the photograph.

### B. Rule 11 Sanctions

Defendant alleges that Plaintiff's counsel violated Rule 11(b) by failing to perform a reasonable inquiry before filing the Complaint, bringing a frivolous lawsuit for harassment purposes, and making allegations of willful infringement without evidentiary support. *Mot.* 4:11-20. The Court finds Plaintiff's claims unfounded. Rule 11(b) requires an attorney to certify that "to best of the person's knowledge, information, and belief," the pleading is not presented "for any improper purpose" and that the claims in the pleading are supported by existing law and have sufficient evidentiary foundation. Fed. R. Civ. P. 11(b). Given **[*10]** that the Court has already concluded that the Complaint stated a plausible claim for relief under the Copyright Act and the DMCA, Defendant has provided the Court with no reason to believe that this litigation was filed purely to harass or that Plaintiff's claims are wholly lacking evidentiary support. The Court thus denies Defendant's motion for sanctions.

2016 U.S. Dist. LEXIS 195930, *10

V. <u>Conclusion</u>

Having found that the Complaint states a plausible claim for relief under the Copyright Act and the DMCA and that Defendant has not provided the Court with any reason to believe that Plaintiff filed the lawsuit for an improper purpose, the Court DENIES both Defendant's motion to dismiss and Defendant's motion for Rule 11 sanctions.

**IT IS SO ORDERED**.

_____

**End of Document**

# EXHIBIT 26

# Youngevity Int'l v. Smith

United States District Court for the Southern District of California

February 6, 2018, Decided; February 6, 2018, Filed

Case No.: 16-CV-704-BTM-JLB

**Reporter**

2018 U.S. Dist. LEXIS 20373 *; 2018 WL 747658

Youngevity International, et al., Plaintiffs, v. Todd Smith, et al., Defendants.

**Prior History:** Youngevity Int'l Corp. v. Smith, 2016 U.S. Dist. LEXIS 189236 (S.D. Cal., June 29, 2016)

**Counsel:** [*1] For Youngevity International, Corp., a Delaware corporation, Plaintiff: Bethany R Kennedy, Eric Jordan Awerbuch, James Stephen McAuliffe, III, Joshua Scott Furman, Peter A. Arhangelsky, LEAD ATTORNEYS, PRO HAC VICE, Emord & Associates PC, Gilbert, AZ; Jonathan W Emord, LEAD ATTORNEY, PRO HAC VICE, Emord and Associates, Clifton, VA; Laura Golden Liff, LEAD ATTORNEY, PRO HAC VICE, Miles & Stockbridge P.C., Tysons Corner, VA; Martin R. Denney, LEAD ATTORNEY, PRO HAC VICE, The Denney Law Firm, Salt Lake City, UT.

For Joel D. Wallach, DVM, ND, a California resident, Plaintiff: Bethany R Kennedy, James Stephen McAuliffe, III, Eric Jordan Awerbuch, LEAD ATTORNEYS, PRO HAC VICE, Emord & Associates PC, Gilbert, AZ; Martin R. Denney, LEAD ATTORNEY, PRO HAC VICE, The Denney Law Firm, Salt Lake City, UT; Peter A. Arhangelsky, LEAD ATTORNEY, Emord & Associates PC, Gilbert, AZ.

For Todd Smith, an individual and Utah resident, William Andreoli, an individual and New Hampshire resident, Wakaya Perfection, a Utah corporation, Total Nutrition Team, doing business as TNT, Blake Graham, an individual and Utah resident, Andre Vaughn, an individual and Pennsylvania resident, Dave Pitcock, an individual

and [*2] Kansas resident, Patti Gardner, an individual and Utah resident, Brytt Cloward, an individual and Utah resident, Defendants: Cynthia Love, Michael S Anderson, LEAD ATTORNEYS, PRO HAC VICE, Parr Brown Gee & Loveless, Salt Lake City, UT; Darwin Poyfair, LEAD ATTORNEY, PRO HAC VICE, Reese Poyfair Richards, PLLC, Cottonwood Heights, UT; Jonathan O. Hafen, Jonathan R. Schofield, LEAD ATTORNEYS, Parr Brown Gee & Loveless, Salt Lake City, UT; Kyle M Van Dyke, LEAD ATTORNEY, Hurst & Hurst, San Diego, CA.

For DOES 1-10, inclusive, Barb Pitcock, an individual and Kansas resident, Mike Randolph, an individual and New Hampshire resident, Mike Casperson, an individual and Utah resident, Defendants: Jonathan R. Schofield, LEAD ATTORNEY, Parr Brown Gee & Loveless, Salt Lake City, UT; Kyle M Van Dyke, LEAD ATTORNEY, Hurst & Hurst, San Diego, CA.

For Maxandra Desrosiers, Kurt Venekamp, Counter Claimants: Darwin Poyfair, LEAD ATTORNEY, PRO HAC VICE, Reese Poyfair Richards, PLLC, Cottonwood Heights, UT; Jonathan O. Hafen, Jonathan R. Schofield, LEAD ATTORNEYS, Parr Brown Gee & Loveless, Salt Lake City, UT; Kyle M Van Dyke, LEAD ATTORNEY, Hurst & Hurst, San Diego, CA.

For Teresa Venekamp, Five Point Consulting, [*3] Inc., Total Nutrition, Inc., doing business as TNT, Counter Claimants: Cynthia Love, Michael S Anderson, LEAD ATTORNEYS, PRO HAC VICE, Parr Brown Gee & Loveless, Salt Lake City, UT; Darwin Poyfair, LEAD ATTORNEY, PRO HAC VICE, Reese Poyfair Richards, PLLC, Cottonwood Heights, UT; Jonathan O. Hafen,

Jonathan R. Schofield, LEAD ATTORNEYS, Parr Brown Gee & Loveless, Salt Lake City, UT; Kyle M Van Dyke, LEAD ATTORNEY, Hurst & Hurst, San Diego, CA.

For Steve Wallach, Michelle Wallach, Dave Briskie, Joel D. Wallach, Andre Vaughn, an individual and Maryland resident, Todd Smith, an individual and Utah resident, Wakaya Perfection, a Utah corporation, Dave Pitcock, an individual and Kansas resident, Brytt Cloward, an individual and Utah resident, Total Nutrition Team, William Andreoli, an individual and New Hampshire resident, Patti Gardner, an individual and Utah resident, Blake Graham, an individual and Utah resident, Counter Defendants: Bethany R Kennedy, Eric Jordan Awerbuch, James Stephen McAuliffe, III, Joshua Scott Furman, Peter A. Arhangelsky, LEAD ATTORNEYS, PRO HAC VICE, Emord & Associates PC, Gilbert, AZ; Jonathan W Emord, LEAD ATTORNEY, PRO HAC VICE, Emord and Associates, Clifton, [*4] VA; Laura Golden Liff, LEAD ATTORNEY, PRO HAC VICE, Miles & Stockbridge P.C., Tysons Corner, VA; Martin R. Denney, LEAD ATTORNEY, PRO HAC VICE, The Denney Law Firm, Salt Lake City, UT.

For Youngevity International, Corp., a Delaware corporation, Counter Defendant: Bethany R Kennedy, James Stephen McAuliffe, III, Eric Jordan Awerbuch, LEAD ATTORNEYS, PRO HAC VICE, Emord & Associates PC, Gilbert, AZ; Martin R. Denney, LEAD ATTORNEY, PRO HAC VICE, The Denney Law Firm, Salt Lake City, UT; Peter A. Arhangelsky, LEAD ATTORNEY, Emord & Associates PC, Gilbert, AZ.

For Wakaya Perfection, a Utah corporation, Total Nutrition Team, Dave Pitcock, an individual and Kansas resident, Blake Graham, an individual and Utah resident, Todd Smith, an individual and Utah resident, Andre Vaughn, an individual and Maryland resident, Counter Claimants: Cynthia Love, Michael S Anderson, LEAD ATTORNEYS, PRO HAC VICE, Parr Brown Gee & Loveless, Salt Lake City, UT; Darwin Poyfair, LEAD

ATTORNEY, PRO HAC VICE, Reese Poyfair Richards, PLLC, Cottonwood Heights, UT; Jonathan O. Hafen, Jonathan R. Schofield, LEAD ATTORNEYS, Parr Brown Gee & Loveless, Salt Lake City, UT; Kyle M Van Dyke, LEAD ATTORNEY, Hurst & Hurst, San [*5] Diego, CA.

For Dave Briskie, Joel D. Wallach, Steve Wallach, Counter Defendants: Bethany R Kennedy, LEAD ATTORNEY, PRO HAC VICE, Emord & Associates PC, Gilbert, AZ; Corrie J. Klekowski, LEAD ATTORNEY, Paul Plevin Sullivan & Connaughton LLP, San Diego, CA; James Stephen McAuliffe, III, LEAD ATTORNEY, PRO HAC VICE, Miles & Stockbridge P.C., Rockville, MD; Martin R. Denney, LEAD ATTORNEY, PRO HAC VICE, The Denney Law Firm, Salt Lake City, UT; Peter A. Arhangelsky, LEAD ATTORNEY, Eric Jordan Awerbuch, Emord & Associates PC, Gilbert, AZ.

For Michelle Wallach, Counter Defendant: Bethany R Kennedy, LEAD ATTORNEY, PRO HAC VICE, Emord & Associates PC, Gilbert, AZ; James Stephen McAuliffe, III, LEAD ATTORNEY, PRO HAC VICE, Miles & Stockbridge P.C., Rockville, MD; Martin R. Denney, LEAD ATTORNEY, PRO HAC VICE, The Denney Law Firm, Salt Lake City, UT; Peter A. Arhangelsky, LEAD ATTORNEY, Eric Jordan Awerbuch, Emord & Associates PC, Gilbert, AZ.

For Youngevity International, Corp., a Delaware corporation, Counter Defendant: Bethany R Kennedy, LEAD ATTORNEY, PRO HAC VICE, Emord & Associates PC, Gilbert, AZ; Corrie J. Klekowski, LEAD ATTORNEY, Paul Plevin Sullivan & Connaughton LLP, San Diego, CA; Eric [*6] Jordan Awerbuch, Peter A. Arhangelsky, LEAD ATTORNEYS, Emord & Associates PC, Gilbert, AZ; James Stephen McAuliffe, III, LEAD ATTORNEY, PRO HAC VICE, Miles & Stockbridge P.C., Rockville, MD; Jonathan W Emord, LEAD ATTORNEY, Emord and Associates, Clifton, VA; Joshua Scott Furman, LEAD ATTORNEY, PRO HAC VICE, Emord and Associates PC, Chandler, AZ; Laura Golden Liff,

LEAD ATTORNEY, PRO HAC VICE, Miles & Stockbridge P.C., Tysons Corner, VA; Martin R. Denney, LEAD ATTORNEY, PRO HAC VICE, The Denney Law Firm, Salt Lake City, UT.

For Dave Briskie, Counter Claimant: Bethany R Kennedy, LEAD ATTORNEY, Emord & Associates PC, Gilbert, AZ; Corrie J. Klekowski, LEAD ATTORNEY, Paul Plevin Sullivan & Connaughton LLP, San Diego, CA; James Stephen McAuliffe, III, LEAD ATTORNEY, Miles & Stockbridge P.C., Rockville, MD; Martin R. Denney, LEAD ATTORNEY, The Denney Law Firm, Salt Lake City, UT; Peter A. Arhangelsky, LEAD ATTORNEY, Eric Jordan Awerbuch, Emord & Associates PC, Gilbert, AZ.

For Steve Wallach, Michelle Wallach, Joel D. Wallach, Counter Claimants: Bethany R Kennedy, LEAD ATTORNEY, Emord & Associates PC, Gilbert, AZ; James Stephen McAuliffe, III, LEAD ATTORNEY, Miles & Stockbridge P.C., Rockville, [*7] MD; Martin R. Denney, LEAD ATTORNEY, The Denney Law Firm, Salt Lake City, UT; Peter A. Arhangelsky, LEAD ATTORNEY, Eric Jordan Awerbuch, Emord & Associates PC, Gilbert, AZ.

For Youngevity International, Corp., a Delaware corporation, Counter Claimant: Bethany R Kennedy, LEAD ATTORNEY, Emord & Associates PC, Gilbert, AZ; Corrie J. Klekowski, LEAD ATTORNEY, Paul Plevin Sullivan & Connaughton LLP, San Diego, CA; Eric Jordan Awerbuch, Peter A. Arhangelsky, LEAD ATTORNEYS, Emord & Associates PC, Gilbert, AZ; James Stephen McAuliffe, III, LEAD ATTORNEY, Miles & Stockbridge P.C., Rockville, MD; Jonathan W Emord, LEAD ATTORNEY, Emord and Associates, Clifton, VA; Joshua Scott Furman, LEAD ATTORNEY, Emord and Associates PC, Chandler, AZ; Laura Golden Liff, LEAD ATTORNEY, Miles & Stockbridge P.C., Tysons Corner, VA; Martin R. Denney, LEAD ATTORNEY, The Denney Law Firm, Salt Lake City, UT.

For Maxandra Desrosiers, Kurt Venekamp, Counter

Defendants: Cynthia Love, Michael S Anderson, LEAD ATTORNEYS, Parr Brown Gee & Loveless, Salt Lake City, UT; Darwin Poyfair, LEAD ATTORNEY, Reese Poyfair Richards, PLLC, Cottonwood Heights, UT; Jonathan O. Hafen, Jonathan R. Schofield, LEAD ATTORNEYS, Parr Brown [*8] Gee & Loveless, Salt Lake City, UT; Kyle M Van Dyke, LEAD ATTORNEY, Hurst & Hurst, San Diego, CA.

**Judges:** Barry Ted Moskowitz, Chief United States District Judge.

**Opinion by:** Barry Ted Moskowitz

# Opinion

## ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR SANCTIONS FOR WITNESS TAMPERING [ECF No. 180]

Before the Court is Plaintiffs' motion for sanctions for witness tampering (ECF No. 180). For the reasons discussed below, the Court grants in part and denies in part Plaintiffs' motion.

## I. FACTUAL BACKGROUND

Plaintiffs and Counterclaim Defendants (collectively "Youngevity") move the Court to impose sanctions against Defendants Todd Smith ("Smith") and Wakaya Perfection, LLC ("Wakaya") for witness tampering. Youngevity claims that Smith sent text messages to Rick Anson ("Anson") and David Smith with the intent of influencing their deposition testimony.

Rick Anson is the CEO and founder of LiveWell, LLC. In November 2015, Anson began working for Wakaya as the Vice President of Product Development and LiveWell began producing and supplying its products for Wakaya. Anson and Wakaya entered into a Royalty Agreement and LiveWell entered into a licensing agreement with Wakaya. In 2016, LiveWell's relationship with

Wakaya came to an **[*9]** end with Anson serving Wakaya a Notice of Default in December 2016. The Notice of Default alleges that Wakaya violated and breached numerous responsibilities and duties under the agreement between Wakaya and LiveWell. Several of these alleged breaches are issues on which Youngevity grounds its own causes of action. Anson's and LiveWell's relationship with Wakaya terminated on or about January 16, 2017. Shortly thereafter, Anson was hired as Youngevity's Vice President. Both parties designated Anson as a witness and agreed to take his deposition on July 7, 2017 in Tempe, Arizona.

Youngevity alleges that Smith attempted to suppress the Notice of Default. On the same day that Smith received Anson's Notice, he sent Anson the following text message:

> Got your letter. Let's talk and work things out Soon! Also, by way of advice. You had better ensure that this letter remains confidential. You have made some very serious allegations which if publicized would make you liable for defamation and libel. Your claims are false. You do not at this stage have judicial immunity. You leak anything like this letter to anyone and I can't protect you. Be careful.

Anson testified in his deposition that the **[*10]** text message made him feel uncomfortable.

Youngevity also claims that Smith intended to intimidate Anson the night before his deposition when he sent Anson the following text message:

> Hello Rick— I hope you arrived in AZ safely. As you prepare your thoughts for tomorrow, please realize that I know what the magic ingredient is to the LuvCap you supplied to us. Not on the label though. I wonder if Clay and others are aware. Not a good thing legally for someone of Clay's reputation. See you in the morning. ;)
> Shhhhhhhhh!

It is important to note that Clay Carley is a director and prominent investor in LiveWell. On the day of the deposition, Smith was asked to leave the deposition by his counsel when Youngevity's counsel shared the content of the text message. Anson testified at the deposition that he felt intimidated by the text. He also stated that he interpreted the first text referencing the Notice of Default as a threat. However, despite feeling threatened and intimidated, Anson stated that Smith's actions did not affect his testimony. Smith subsequently apologized for sending Anson the text message.

Youngevity also argues that Smith intended to interfere with the testimony of David Smith, **[*11]** co-founder and co-owner of Great American Clay Company ("GAC"), a Wakaya supplier. On June 15, 2017, David Smith sent Todd Smith, Defendant Blake Graham, counsel for Youngevity and Wakaya, Lynn Jenkins, GAC's other co-founder and co-owner, and Jamie Kidd, a Wakaya employee, an email that stated the following:

> Todd, Both Lynn [Jenkins] and I received yet another urgent text message from you today saying we need to talk because Youngevity was pushing things in regards to a deposition and that we needed to talk today. You have our attorneys name and contact information. You know Lynn and I both have legal representation. Please do not continue in your attempts to circumvent by contacting us directly. I thank you in advance for your cooperation in this regard.

On June 28, 2017 at his deposition, David Smith testified that Smith sent him repeated text messages even after he asked Smith to stop contacting him. Though he was told by Lynn that Smith had an interest in discussing his deposition, David Smith never spoke to Smith personally about it. Youngevity contends that Smith's repeated text messages demonstrates Smith's attempts to change David Smith's deposition testimony.

## II. DISCUSSION [*12]

### A. Bad Faith

Courts are vested with the inherent authority to sanction conduct which abuses the judicial process. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991). While a court's inherent power "extends to a full range of litigation abuses," it must make a finding that the litigant "engaged in bad faith or wilful disobedience of a court's order." *Fink v. Gomez*, 239 F.3d 989, 992 (quoting *Chambers*, 501 U.S. at 46-47). The Court here finds by clear and convincing evidence that Smith acted in bad faith in texting Anson, but not David Smith.

While regretful now that he sent Anson the text messages at issue, Smith intended to influence Anson's testimony. First, Smith threatened Anson with libel and defamation if he discussed the Notice of Default or its content with anyone. Second, he texted Anson the night before his deposition and threatened to disclose the ingredients of one of LiveWell's products. While he was unsuccessful in influencing Anson's testimony, Smith nevertheless intended to do so. As to David Smith, however, it is not clear what Smith's intentions were. David Smith testified that he could only speculate as to why Smith was attempting to contact him. The Court has not seen the messages that Smith sent David Smith and based on the evidence before it, it does not find that he acted **[*13]** in bad faith.

## B. Remedy

Having found that Smith engaged acted in bad faith as to Anson, the Court must fashion the appropriate remedy. Youngevity specifically moves for monetary sanctions against Smith for the cost of two depositions and the bringing of this motion, for a referral of the matter to the United States Attorney for investigation and potential prosecution under 18 U.S.C. § 1512(b)(1), and for the Court to make a finding that the content of Anson's Notice of Default is true and admissible against Smith and Wakaya.

First, the Court hereby awards Youngevity the cost of bringing this motion. Under its inherent powers,

"a court may assess attorney's fees when a party acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers*, 501 U.S. at 45-46. Here, Smith intended to influence Anson's testimony. Accordingly, Youngevity is entitled to reasonable attorney's fees for the work performed in bringing this motion. However, the Court declines to award Youngevity the cost of Anson's deposition because as he testified, Smith did not succeed in influencing his testimony.

As to Youngevity's request for a referral to the United States Attorney's Office, the Court also declines to exercise its authority in such manner. **[*14]** Courts have referred instances of perjury in civil cases before it to the U.S. Attorney for investigation and prosecution. *Neal v. LaRIVA*, 765 F.3d 788, 791 (7th Cir. 2014); *SEC v. Payton*, 176 F. Supp. 3d 346, 354 (S.D.N.Y. 2016); *In re Actos (Pioglitazone) Prods. Liability Litigation*, No. 6:12-CV-00064-RFD, 2014 U.S. Dist. LEXIS 81305, 2014 WL 2624943, at *7 (W.D. La. June 11, 2014). The Court chooses not to make such a referral in this case. First, the case did not involve perjury. Second, Smith did not hide his actions and seems to understand that they were improper. Third, the actions did not take place before the Court and Plaintiffs can bring them to the attention of the U.S. Attorney. Instead, the Court hereby enjoins Smith and Wakaya from harassing or intimidating any of Plaintiffs' and Counterclaim Defendants' witnesses in this case as set forth below.

Lastly, while the Court declines to enter a finding that the content of the Notice of Default is true, the Court finds that a properly tailored adverse inference instruction is appropriate and will not cause unfairness to Smith or Wakaya. The Court will give the following instruction:

> Youngevity has offered evidence that Todd Smith tried to suppress the Notice of Default written by LiveWell, L.L.C. and tried to influence Rick Anson's testimony. After considering all of the pertinent facts and

2018 U.S. Dist. LEXIS 20373, *14

circumstances, **[*15]** you may, but are not obligated to, infer that any evidence you find that Mr. Smith attempted to suppress or influence was favorable to Youngevity and unfavorable to him and Wakaya.

### III. CONCLUSION AND ORDER

For the reasons discussed above, Youngevity's motion for sanctions for witness tampering is **GRANTED IN PART** and **DENIED IN PART**. The Court grants Youngevity's request for fees and costs it incurred in bringing this motion. A motion for fees and costs shall be calendared for April 13, 2018 at 11:00 a.m. The injunction provided for herein shall take effect immediately and the Court will give an adverse inference instruction as set forth above.

Todd Smith and Wakaya, and his and its agents, and employees, are enjoined and restrained from, directly or through others, harassing, threatening, intimidating or influencing, or attempting to do so, any of Plaintiffs' and Counterclaim Defendants' witnesses. Todd Smith and Wakaya shall not communicate with any of Plaintiffs' and Counterclaim Defendants' witnesses other than Wakaya employees, agents or representatives, except when counsel for Smith or Wakaya are participating in the communication.

**IT IS SO ORDERED**. Dated: February 6, 2018

/s/ Barry **[*16]** Ted Moskowitz

Barry Ted Moskowitz

Chief United States District Judge

---

**End of Document**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1800 Avenue of the Stars, 12th Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*):
**COMPENDIUM OF UNPUBLISHED CASES IN SUPPORT OF HAUSMAN HOLDINGS, LLC'S
AND DAVID AND PAMELA MOELLENHOFF'S OPPOSITION TO DEFENDANTS' MOTION
FOR SANCTIONS PURSUANT TO THE COURT'S INHERENT AUTHORITY**
will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in
the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General
Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*)
August 19, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the
following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ryan W Beall**    rbeall@lwgfllp.com,
  vrosales@wgllp.com;kadele@wgllp.com;lbracken@wgllp.com;rbeall@ecf.courtdrive.com
- **William C Beall**    will@beallandburkhardt.com, carissa@beallandburkhardt.com
- **David M Berke**    dberke@londonfischer.com
- **Thomas H Casey (TR)**    msilva@tomcaseylaw.com, thc@trustesolutions.net
- **Justin S Draa**    jdraa@dld-law.com
- **Jeffrey I Golden**    jgolden@wgllp.com,
  kadele@ecf.courtdrive.com;cbmeeker@gmail.com;lbracken@wgllp.com;gestrada@wgllp.com
- **D Edward Hays**    ehays@marshackhays.com,
  ehays@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com;cmendoza@marshackhays.com;cmendoza@ecf.courtdrive.com
- **Gerald P Kennedy**    gerald.kennedy@procopio.com,
  kristina.terlaga@procopio.com;calendaring@procopio.com;efile-bank@procopio.com
- **Laila Masud**    lmasud@marshackhays.com,
  lmasud@ecf.courtdrive.com;kfrederick@ecf.courtdrive.com
- **Aram Ordubegian**    ordubegian.aram@arentfox.com
- **Richard M Pachulski**    rpachulski@pszjlaw.com
- **Malhar S Pagay**    mpagay@pszjlaw.com, bdassa@pszjlaw.com
- **Hamid R Rafatjoo**    hrafatjoo@raineslaw.com, bclark@raineslaw.com
- **Faye C Rasch**    frasch@wgllp.com,
  kadele@wgllp.com;lbracken@wgllp.com;gestrada@wgllp.com
- **Todd C. Ringstad**    becky@ringstadlaw.com, arlene@ringstadlaw.com
- **Annie Y Stoops**    annie.stoops@arentfox.com, yvonne.li@arentfox.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov
-

☐  Service information continued on attached page

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**2.  SERVED BY UNITED STATES MAIL**:

On (*date*) _____   I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) August 19, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Honorable Scott C. Clarkson
United States Bankruptcy Judge
411 West Fourth Street
Suite 5130
Santa Ana, CA 92701-4393

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 8/19/2021 | Bambi Clark | /s/ Bambi Clark |
|-----------|-------------|-----------------|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.